# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **CROWN PACKAGING TECHNOLOGY, INC. AND CROWN CORK & SEAL USA, INC.,** | ) ) ) ) | |
| **PLAINTIFFS,** | ) | **CIVIL ACTION NO. 05-608 (MPT)** |
| | ) | |
| **V.** | ) ) | |
| **REXAM BEVERAGE CAN CO.,** | ) ) | |
| **DEFENDANT.** | ) ) ) | |

## CROWN'S OPENING CLAIM CONSTRUCTION BRIEF RELATING TO CROWN'S PATENTS

Barry M. Klayman, Esquire (#3676)
WOLF, BLOCK, SCHORR and
SOLIS-COHEN LLP
Wilmington Trust Center
1100 N. Market Street
Wilmington, DE 19801
(302) 777-0313

Dale M. Heist
Lynn Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

*Attorneys for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

**Table of Contents**

I.  INTRODUCTION ............................................................................................... 1

II.  THE NATURE OF THE PRESENT DISPUTE ..................................................... 1

III.  BACKGROUND OF THE INVENTIONS ............................................................. 2

    A.  The Origins of Can Ends ............................................................................ 2

    B.  Conventional Can End Geometry ............................................................... 3

    C.  Conventional Seaming ................................................................................ 3

IV.  THE 826 AND 875 PATENT SPECIFICATIONS ............................................... 5

V.  CROWN'S PROPOSED CLAIM CONSTRUCTION ........................................... 6

    A.  Law of Claim Construction ......................................................................... 7

        1.  Claims Define the Invention ............................................................ 7

        2.  Role of the Patent Specification ...................................................... 8

        3.  Role of the Prosecution History ...................................................... 10

        4.  Role of Unasserted and Dependent Claims ..................................... 10

        5.  Role of the Accused Device ............................................................. 11

    B.  Construction of the Asserted Claims of the 826 Patent ............................. 11

        1.  Claims 13 and 14 ............................................................................ 12

        2.  Construction of Disputed Terms of Claims 13 and 14 ..................... 13

            a)  *first and second chuck walls forming a juncture therebetween* ...................................................................13

            b)  *peripheral cover hook* ........................................................16

            c)  *seaming panel adapted to be formed into a portion of said double seam during said seaming operation* .................18

            d)  *wall extending inwardly and downwardly from said cover hook* ...............................................................................19

            e)  *first portion of said wall extending from said cover hook* .............20

f)    *first point on said wall* .................................................................21

g)    *adapted to be deformed during said seaming operation* ..............21

h)    *bent upwardly around said juncture of said chuck walls at said first point* .................................................................22

i)    *a second point forming a lowermost end of said wall* .................24

j)    *annular reinforcing bead* .................................................25

C.    Construction of the Asserted Claims of the 875 Patent ......................... 29

1.    Claims 32-34 ................................................................. 30

2.    Construction of Disputed Terms of Claims 32-34 ................................... 31

a)    *circumferentially extending peripheral cover hook* ......................31

b)    *seaming panel* .................................................31

c)    *circumferentially extending wall comprising first and second portion* .................................................31

d)    *first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel* ..............................32

e)    *second location on said wall . . . being the lowermost point of said wall* .................................................34

f)    *between about 20° and about 60°* .................................35

g)    *a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°* ..........................35

h)    *transition from said double seam to said second wall portion* .................................................36

i)    *between about 30° and 50°* .........................................37

j)    *upward by an angle of at least about 26°* .............................37

3.    Claims 50, 51, 52 and 53 .......................................................... 37

4.    Construction of Disputed Terms of Claims 50-53 ................................... 39

a)    *peripheral cover hook* .................................................39

b) *seaming panel* ............................................................39

c) *annular reinforcing bead* ...................................39

d) *circumferentially extending wall extending from said seaming panel* ...............................................39

e) *forming a transition therebetween* .................40

f) *first and second circumferentially extending walls* .....................40

g) *depending from said first chuck wall so as to form a juncture therebetween* ...............................41

h) *deform* .................................................................41

i) *bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall* .................................41

j) *portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°* .................................41

VI.    CONCLUSION ..........................................................42

.

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agfa Corp. v. Creo Prods. Inc.*,
  51 F.3d 1366 (Fed. Cir. 2006)............................................................................ *passim*

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005).......................................................................9

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001).......................................................................7

*Intervet Am., Inc. v. Kee-Yet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989).......................................................................8

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999).........................................................................7

*Jurgens v. McKasy*,
  927 F.2d 1552 (Fed. Cir. 1991).....................................................................11

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)................................21, 32, 34

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005)........................................................... *passim*

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002).....................................................................11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................... *passim*

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985).....................................................................11

*Sandisk Corp. v. Memorex Prods.*,
  415 F.3d 1278 (Fed. Cir. 2005)..............................................................18, 19, 34

*Specialty Composites v. Cabot Corp.*,
  845 F.2d 981 (Fed. Cir. 1988).......................................................................10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)..............................................................8

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000)..............................................................28

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004)..............................................11, 27, 29

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.*,
    842 F.2d 1275 (Fed. Cir. 1988)..............................36, 37, 38, 39

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006)............................................... *passim*

## FEDERAL STATUTES

35 U.S.C. § 112, ¶ 2...........................................................................7

## I.    INTRODUCTION

Plaintiffs Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (together "Crown") submit this opening brief in support of their proposed construction of disputed terms of the asserted claims of Crown's U.S. Patent Nos. 6,935,826 ("the 826 patent") and 6,848,875 ("the 875 patent").[1]

## II.    THE NATURE OF THE PRESENT DISPUTE

Crown Packaging Technology is the owner of the 826 and 875 patents. Its sister company, Crown Cork & Seal USA, makes and sells aluminum cans used for beer and carbonated beverages. Crown Cork & Seal USA also makes and sells "can ends" used to seal the cans after they have been filled with beverages by its customers.

Crown's 826 patent is directed to a novel can-end geometry that provides improved strength compared to prior can ends. The increased strength allows the patented can ends to be made using less aluminum (Ex. 23, 826 patent at 8:40-43). Because billions of can ends are made each year, the metal savings are very significant. The 875 patent is directed to an improved method of joining the can ends to the cans themselves. Crown makes and sells the patented can ends under the brand "Superend®."

Rexam Beverage Can Co. ("Rexam") is a direct competitor of Crown Cork & Seal USA. Rexam makes and sells can ends called "Rexam" ends.

Crown contends that Rexam's manufacture and sale of Rexam can ends in the United States infringes claims 13 and 14 of the 826 patent. Crown also contends that methods used by

---

[1] A copy of the 826 patent forms Ex. 23 and a copy of the 875 patent forms Ex. 24 hereto. Copies of the file histories of the 826 and 875 patents are attached hereto as Exs. 25 and 26, respectively. Both patents derive from a common patent application and have substantially identical patent specifications (Ex. 23; Ex. 24).

Rexam's customers to join the can ends to metal cans infringe claims 32-34 and 50-53 of the 875 patent and that Rexam contributes to and induces that infringement.

## III.    BACKGROUND OF THE INVENTIONS

### A.    The Origins of Can Ends

Ermal Fraze is credited with having invented the first "flip-top" or "easy-opening" can end. All of the major can companies entered into license agreements to make Mr. Fraze's patented can ends. Later, others improved upon Mr. Fraze's idea by developing can ends with a "stay-on tab" in which the easy-opening tab did not detach from the can end when the can was opened (Ex. 25, 826 file history at P93). Can ends embodying Mr. Fraze's flip-top concept and the later-developed "stay-on tab" proliferated and were sold by the hundreds of billions.

Over the last thirty years, the industry has searched for ways to reduce the amount of aluminum consumed in each can end. Historically, efforts were made to reduce metal consumption by minimizing the overall diameter of the can ends (*id.*). But each reduction in can end diameter required a corresponding reduction of the can "neck" diameter (*id.* at P94). Reducing can diameter, however, is very capital intensive (*id.*). Other efforts were made to reduce the thickness of the aluminum used in can ends. But aluminum cans and can ends must withstand the internal pressures developed from the beer and carbonated beverages contained in the finished package; and as metal thickness is reduced, the likelihood of metal failure increases.

Despite these major efforts to reduce aluminum consumption, the overall geometry of conventional can ends remained virtually unchanged for decades as billions and billions of can ends were sold (*see id.* at P95). The geometry of Crown's patented can ends, however, allows for a significant reduction in aluminum consumption without a change in can diameter and corresponding capital investment. And even though the patented can ends can be made from

thinner aluminum, they still have adequate strength to withstand the internal pressure caused by beer and carbonated beverages (Ex. 23, 826 patent at 8:41-43).

### B.    Conventional Can End Geometry

The geometry of conventional can ends, before they were joined to a can body, is shown in cross-section in Figure 2 of Crown's patents (*Id.* at Fig. 2).



As shown, conventional can ends included a "center panel" (16) (*id.* at 3:27). Mr. Fraze's flip-top opening device and the later-developed stay-on tab opening device are located there. Conventional can ends also included a "reinforcing bead" (15); a "chuck wall" (14); and a peripheral curl" (13) (*id.* at 3:24-27). The wall (14) of conventional can ends was typically inclined from the vertical at an angle of about 12-15° (*id.* at 3:27-29).

### C.    Conventional Seaming

After a can is filled with a beer or carbonated beverage, a can end must be joined to the can to secure the contents. The process of joining can ends (whether conventional can ends or the patented can ends) to a filled can is called "seaming." The process used to seam conventional can ends to a can is shown in Figure 1 of Crown's patents:



FIG. 1
PRIOR ART

During the seaming process with conventional can ends, an unseamed can end (11) was placed over the open can such that a flange or rim of the can contacted the peripheral curl of the can end (Ex. 23, 826 patent at Fig. 1). A rotating chuck (5) then engaged the can end causing the end to rotate relative to two seaming rolls (6 and 8) (*id.*). The seaming rolls successively contacted the rotating can end at the peripheral curl, causing the curl and can flange to roll into a "double seam" (*id.* at Fig. 3).

With conventional can ends, the can end chuck wall (14), after seaming, was vertically oriented from the top of the seam along its entire length toward the bottom of the reinforcing bead.

## IV.    THE 826 AND 875 PATENT SPECIFICATIONS

The concept of the inventions described in the specifications of Crown's patents was to combine a new can end geometry with a modified seaming process to provide significant metal savings without the enormous capital investment typically required by a reduction in can end diameter and corresponding reduction in can diameter.

The new geometry of the can end described in Crown's patents is based upon an increase in the wall angle of the unseamed can end — from about 12-15° to between 30° and 60° (as recited in the asserted 826 patent claims) and 20° and 60° (as recited in the 875 patent claims). Although the invention is defined by the patent claims, one illustrative embodiment of the patented unseamed can end is set forth in the Figure 4 of the patent drawings:



The specification discloses that the new can geometry, including the increased chuck wall angle (denoted as angle "C" in Figure 4), results in significant metal savings (Ex. 23, 826 patent at 1:33-35; 2:1-12; 8:40-43).

In the new seaming method described in the patent specification, the upper portion of the chuck wall of the can end is deformed against the wall of the rotatable chuck while the remainder of the lower portion of the can end wall remains inclined at its original angle between 20° and 60° (*Id.* at 5:21-28; Ex. 26, 875 file history at P644). An illustration of the resulting seamed can end and can configuration, including the deformed portion of the can end chuck wall and the

remaining inclined portion of the can end chuck wall, are shown on the right side of Figure 7 of

the patent drawing:



The new can end geometry exhibits greatly enhanced strength (Ex. 23, 826 patent at 1:33-

35; 2:1-12; 8:40-43; *see also* Ex. 26, 875 file history at P635). Because the patented can ends are

stronger, they can be made with thinner metal and still satisfy pressure performance requirements

(Ex. 23, 826 patent at Table 6). Because the cost savings of the invention are derived from the

new geometry and modified seaming process, rather than a can diameter change, the invention

may be employed without significant capital investment. Crown has thus far sold more than 70

billion of the new ends worldwide.

## V.    CROWN'S PROPOSED CLAIM CONSTRUCTION

The 826 patent includes 14 claims. Each is specifically directed to an unseamed can end,

*i.e.*, to a can end before it is joined to a can by a seaming process.

Crown alleges that the Rexam end infringes claims 13 and 14 of the 826 patent. Claim

13 is an independent claim. Claim 14 depends from claim 13 and incorporates by reference each

of the elements of claim 13.

The 875 patent includes 61 claims. Each is specifically directed to a method of seaming

a can end to a can during a seaming operation.

Crown alleges that Rexam's customers directly infringe not only independent claims 32 and 50 but also dependent claims 33-34 and 51-53 by seaming the Rexam can ends to cans. Crown also contends that Rexam indirectly infringes by inducing and contributing to their customers' infringement.

### A.     Law of Claim Construction

#### 1.     Claims Define the Invention

It is a "bedrock principle" of claim construction that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Thus, it is the words of the claims themselves that define the scope of the patented invention. *Id.* at 1312, (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). For that reason, "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (quoting *Vitronics*, 90 F.3d at 1582). "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation." *Id.* at 1322.

"General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

In some cases, the ordinary meaning of claim language is apparent and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Therefore, if the meaning of a claim term is clear on its face, there is no need for additional construction. In these cases, general purpose dictionaries can be helpful. *Id.*

### 2.     Role of the Patent Specification

Claim terms, however, must be understood in the context of the written description of the patent specification. *See id.* at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification").

In claim construction, "interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee-Yet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir. 1989) (quoting *E. I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)). Consequently, "although the specification often describes very specific embodiments of the invention, [district courts have been] repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. Accordingly, the Federal Circuit has expressly rejected the contention that "if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,* 383 F.3d 1352, 1366 (Fed. Cir. 2004)). The disclosure of preferred embodiments or implementing examples should not be used to limit the scope of the claims absent a clear disavowal by the inventor. *See id.*; *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the

-8-

preferred embodiment or other structures or steps disclosed in the specification or prosecution history") (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  It is "not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323.

Therefore, "the rule that 'a court will give a claim term the full range of its ordinary meaning,' does not mean that the term will presumptively receive its broadest dictionary definition." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001)).  "[I]n those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the [specification and prosecution history] in order to determine the most appropriate definition." *Id.* at 1349.

"To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of ordinary skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips*, 415 F.3d at 1323.  "One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case." *Id.*  "[U]pon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*  For that reason, "[w]here a specification does not require a limitation, that

limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

Thus, where "[n]othing in the specification, including the claims, indicates explicitly or implicitly, that the inventor intended to impart a novel meaning to [a claim term] 'annular' [and] [t]he record also contains no evidence that 'annular' has a peculiar meaning in the field of art encompassed by the [] patent[,] [the Federal Circuit has concluded] that the ordinary and customary meaning attributed to this term by those of ordinary skill in this art at the time of the invention involves little more the application of its widely accepted meaning." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006); *see Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376-77 (Fed. Cir. 2006) (holding that "stack" had no particular meaning in the art).

### 3.    Role of the Prosecution History

Counsel's arguments in the prosecution history are far less important than the claim language allowed by the Examiner "because the prosecution history represents an on going negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Phillips,* 415 F.3d at 1317.

Arguments in the prosecution history, as opposed to claim amendments may only limit claims if they contain "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1308-09 (Fed. Cir. 2005) (citing *Gemstar-TV Guide*, 383 F.3d at 1364).

### 4.    Role of Unasserted and Dependent Claims

"Other claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term." *Phillips,* 415 F.3d at 1314.

"Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

Further, dependent claims are presumed to be narrower in scope than the independent claim from which they depend. Thus, a limitation added in a dependent claim is presumptively not to be read into the terms of the independent claim. *See id.* at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"). In general, there is a "presumption that each claim in a patent has a different scope." *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

### 5.    Role of the Accused Device

It is improper to use the accused device as a form of extrinsic evidence in order to add limitations to patent claims. *Wilson Sporting Goods*, 442 F.3d at 1331. Thus, claims should not be construed with reference to the accused device. *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc). A claim construction should never be tailored "to fit the dimensions of the accused product or process and to reach a preconceived judgment of infringement or noninfringement." *Wilson Sporting Goods*, 442 F.3d at 1331; *see also Jurgens v. McKasy*, 927 F.2d 1552, 1560 (Fed. Cir. 1991) (noting that a claim should be construed "without regard to the accused product"). By doing so, a court would improperly impart a bias into the task of claim construction, instead of focusing on the plain meaning of the claims themselves.

### B.    Construction of the Asserted Claims of the 826 Patent

Crown alleges that the Rexam can end infringes claims 13 and 14 of the 826 patent.

### 1.    Claims 13 and 14

Claim 13 is set forth below with the disputed terms shown in bold italics:

13.    A metal can end for use in packaging beverages under pressure and adapted to be joined to a can body by a seaming process so as to form a double seam therewith using a rotatable chuck comprising

first and second circumferentially extending walls, *said first and second chuck walls forming a juncture therebetween,* said can end comprising:

a *peripheral cover hook*, said peripheral cover hook comprising

a *seaming panel adapted to be formed into a portion of said double seam during said seaming operation*;

a central panel;

*a wall extending inwardly and downwardly from said cover hook,*

a *first portion of said wall extending from said cover hook* to a *first point on said wall,* said first wall portion *adapted to be deformed during said seaming operation* so as to be *bent upwardly around said juncture of said chuck walls at said first point on said wall;*

a second portion of said wall extending from said first point *to a second point forming a lowermost end of said wall,* a line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle of between 30° and 60° (Ex. 23, 826 patent at 10:37-60) (emphasis added).

Claim 14 depends from claim 13 and incorporates by reference each of the limitations set forth in claim 13. Claim 14 is also set forth below with the single disputed term set forth in bold italics:

14.    The can end according to claim 13, further comprising an annular reinforcing bead connected to said wall at said second point, said *annular reinforcing bead* connecting said wall to said central panel (*Id.* at 10:61-64) (emphasis added).

2.      **Construction of Disputed Terms of Claims 13 and 14**

a)      *first and second chuck walls forming a juncture therebetween*

The Court should construe the phrase "*first and second chuck walls forming a juncture therebetween*" to refer to "first and second walls encircling the chuck forming a place between them at which they meet."

The phrase "*first and second chuck walls forming a juncture therebetween*" should be given its ordinary meaning. *See Phillips,* 415 F.3d at 1312. The phrase in question refers to the "circumferentially" extending walls of the chuck previously recited in the claim. The specification does not define the term "circumferentially." Nor does it indicate that the term has a specialized meaning to those skilled in the art. Thus, the plain meaning of the term "circumferentially" is appropriate. *Agfa Corp.,* 451 F.3d at 1376-77; *Wilson Sporting Goods Co.,* 442 F.3d at 1328. The term "circumferentially" means "encircling" (Ex. 12, Webster's Third New International Dictionary (2002) ("Webster's") at 409). In the context of claim 13, which recites that the "chuck" comprises "first and second *circumferentially* extending walls," the phrase refers to "first and second walls encircling the chuck."

The phrase "*juncture therebetween*" means "a place between two things at which they meet." The specification does not define the term "juncture." Nor does it indicate that the term has a specialized meaning to one of ordinary skill. Thus, as with "circumferentially," the plain meaning of the term "juncture" is also appropriate. *Id.*. The plain meaning of the term "*juncture*" is "junction," which in turn refers to "a place *or* point of . . . meeting" (Ex. 12, Webster's at 1226). Consequently, the phrase "*juncture therebetween*" simply means "a place between two things at which they meet." In the context of claim 13, the "two things" are the first and second walls of the chuck.

Crown's proposed plain-meaning construction of the phrase is consistent with, but not limited to, the preferred embodiment set forth in the patent specification (Ex. 23, 826 patent at Figure 5):



Figure 5 illustrates an embodiment of a "juncture" as recited in the claims that is entirely consistent with the plain meaning of the phrase *"juncture therebetween."* Figure 5 shows the first and second walls (32, 33) of the chuck in the cross-sectional view. In Figure 5, for example, the cross-sectional view of the chuck (30) shows a juncture at which the first wall of the chuck (33) and the second wall of the chuck (32) meet.

Rexam contends that the term *"juncture"* is limited to a "point" rather than a "place or point" and that the entire phrase *"first and second chuck walls forming a juncture therebetween"* is limited to an "upper wall and a lower wall of a seaming chuck meet[ing] at a ***point*** (juncture) to form a distinct angle." But nothing in the claim language indicates that the *"juncture"* must be "a point" or that the *"first and second chuck walls"* must "meet at a point (juncture) to form a distinct angle," as Rexam proposes. Further, the specification nowhere describes a *"juncture"* as "a point" or specifies that the *"chuck walls"* must form a "distinct angle." Rexam's proposed definition appears to be based, instead, on a word depiction of the chuck profile shown in the

Figures 6 and 7 of the patent drawing. But this approach to claim construction was specifically rejected by the Federal Circuit in the recent *Agfa* decision. *Agfa Corp.*, 451 F.3d at 1376.

In *Agfa*, the Federal Circuit affirmed the judgment of the district court, which had relied upon the plain meaning of a disputed term — "*stack*" — as set forth in a general dictionary and which had rejected arguments made by the accused infringer that the term was limited to a "horizontal arrangement" of the "stack" as illustrated in the figures. *Id*. According to the Court, because "[t]he customary meaning within this field of art does not limit the term 'stack'" and because "nothing in the disclosures of the asserted patents suggests that 'stack' has any meaning in the art that would limit its scope" the case "falls squarely" within the principal recited in *Phillips* that "the ordinary meaning of some claim terms 'may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words.'" *Id*. (quoting *Phillips*, 415 F.3d at 1314).

The Federal Circuit also approved the district court's rejection of the accused infringer's argument that the term "stack" "covers only a horizontal arrangement, like [the arrangement] shown in figure 1 of the [patent]." *Id*. at 1376. According to the Court, "this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claim to that depicted scope." *Id*. The Court went on: "any depiction of any stack will necessarily show that stack arranged in a particular manner. *Id*. Nothing beyond that depiction, however, limits the claim language . . . to some particular orientation. *Id*. at 1376-77.

Here, as in the *Agfa* case, the claims are not limited to what is shown in the drawings. Rather, the patent expressly indicates that the figures are merely "embodiments" or "example[s]" of the invention (Ex. 23, 826 patent at 2:50-52, 4:11, 4:35-37). There is no indication that the claims are limited to the chuck profile illustrated in these figures. *Id*. at 1377 ("Without any

indication beyond some necessary depiction [in the figures] to suggest limiting the invention to this single embodiment, the broader language of the claims cannot carry that unexpressed and unintended . . . limitation"). Because the specification lacks a limiting disclosure, Rexam's construction is erroneous.

b)    *peripheral cover hook*

The Court should construe the phrase "*peripheral cover hook*" to mean a "curved portion of the can end that is to be formed into a portion of a double seam."

The term "*cover hook*" is used synonymously in the specification with the term "curl;" and both terms indicate curvature (Ex. 23, 826 patent at 3:23-27). Thus, the peripheral cover hook is a curved portion of the recited can end. The specification also describes the "cover hook" as a "flange" (*Id.* at 4:39-42), and describes the "cover hook" as resting on the "flange" of the can before formation of the double seam (*Id.*). This suggests that the "cover hook" is to be formed into a portion of a double seam.[2]

Claim 13 itself confirms that at least a part of the *peripheral cover hook* is formed into a portion of the double seam by reciting a "peripheral cover hook [which includes a seaming panel is] adapted to be formed into a portion of said double seam during said seaming operation." Taken together, the phrase "*peripheral cover hook*" simply refers to a curved portion of the can end that is to be formed into a portion of a double seam.

---

[2] The specification does not define the term "*peripheral*." Nor does it indicate that the term has a specialized meaning. Thus, as with "circumferentially," the plain meaning of the term "*peripheral*" is appropriate. *Wilson Sporting Goods Co.*, 442 F.3d at 1328. The plain meaning of "*peripheral*" is "of, relating to, involving, or forming a periphery or surface part;" the term periphery, in turn, refers to "the perimeter of a circle or other closed curve" (Ex. 12, Webster's at 1681). Thus, the "peripheral cover hook" forms the perimeter or outer portion of the can end. This further confirms that this portion is to be formed into a portion of the double seam during seaming.

Rexam claims that the phrase "*peripheral cover hook*" is limited to "the outermost portion of the can end that is curved or conforms to one or more radii, which engages a can body flange to form at least a part of a double seam, and ends where the curved or radiused portion(s) stops." Nothing in the claim language, however, requires that the "*peripheral cover hook*" must "end[] where the curved or radiused portion(s) stops," as Rexam proposes. Nor does the specification require that the disputed phrase be so limited. On the contrary, the specification expressly discloses that the "*peripheral cover hook*" may end *along* a "curved or radiused portion(s)." In fact, the embodiment shown in Figure 4 of the patent drawing references a radius $r_1$ between a seaming panel radius $r_2$ (which is part of the peripheral cover hook) and the wall 24 (referred to in claim 13 as the can end wall).



The specification identifies radius $r_1$ as the "seaming panel/chuck wall radius" (Ex. 23, 826 patent at 4:17).

According to the specification, therefore, the can end wall and the seaming panel portion of the cover hook share a common radius in the preferred embodiment. Thus, in the preferred embodiment, the peripheral cover hook ends along a "curved or radiused portion(s)" and not where the "curved or radiused portion(s) stops" as urged by Rexam. Rexam's construction, therefore, must be rejected because it runs counter to the specification and would exclude the preferred embodiment. A construction that would exclude the preferred embodiment "is rarely,

if ever, correct." *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (quoting *Vitronics Corp.*, 90 F.3d at 1583).

> c)    ***seaming panel adapted to be formed into a portion of said double seam during said seaming operation***

The Court should construe the phrase "*seaming panel adapted to be formed into a portion of [a] double seam*" to refer to the "curved innermost portion of the ***peripheral cover hook*** [previously defined] adapted to be formed into a portion of the double seaming during the seaming operation."

The specification discloses a "*seaming panel*" as the innermost portion of the peripheral cover hook, sharing a radius ($r_1$) with the can end wall (Ex. 23, 826 patent at 4:11-25). This is confirmed by claim 32 of the 875 patent which specifies that the "first wall portion" of the can end wall "extend[s] from said seaming panel" (Ex. 24, 875 patent at 13:11-13). *NTP, Inc.*, 418 F.3d at 1293.

Rexam argues that a "*seaming panel*" must contain two additional and extraneous limitations, arguing that the seaming panel must not only be "formed by a constant radius," but also include "some treatment or conditioning that makes the seaming panel easier to deform than the rest of the can end to become part of the double seam during seaming to a can body."

Nothing in the claim language, however, requires that a "*seaming panel*" must have "a constant radius," as Rexam proposes. And the specification provides no indication whatever that the phrase "*seaming panel*" must be so limited. On the contrary, the preferred embodiment does not contain a "constant radius." The end illustrated in Figure 4 is labeled with radii $r_1$ and $r_2$, which are described in the specification as the "seaming panel radius" and "seaming panel/chuck wall radius," respectively (Ex. 23, 826 patent at 4:17-18). Thus, according to the example, the "*seaming panel*" is formed with more than one radius ($r_1$ and $r_2$) and is not limited to a "constant

radius." Rexam's construction, therefore, must be rejected because it runs counter to the specification and would exclude the preferred embodiment. A construction that would exclude the preferred embodiment "is rarely, if ever, correct." *Sandisk Corp.*, 415 F.3d at 1285 (quoting *Vitronics Corp.*, 90 F.3d at 1583).

Further, nothing in the claim language requires that a "*seaming panel*" be subjected to "some treatment or conditioning that makes [it] easier to deform than the rest of the can end merely because the claims note that the panel is "*adapted to be deformed.*" The claim term "*adapted*" is merely functional language that, in accordance with the Manual of Patent Examination Procedure ("MPEP"), § 2173.05(g) (Ex. 17), defines the seaming panel by what it does (or is capable of doing), rather than by what it is. Further, the patent specification includes no embodiments in which a "*seaming panel*" is first "treated or conditioned to make the panel easier to deform than the rest of the can end." Therefore, Rexam's construction must be rejected.

**d)    *wall extending inwardly and downwardly from said cover hook***

The Court should construe the phrase "*wall extending inwardly and downwardly from said cover hook*" to refer to a "*can end wall extending inwardly and downwardly from the **cover hook** [previously defined].*" This construction simply clarifies that the recited "*wall*" is the "can end wall," as opposed to a wall of the chuck, to assist the trier of fact in understanding the disputed phrase. The remaining terms of the phrase are sufficiently plain and require no construction.

Crown's proposed construction of the inwardly and downwardly extending wall is consistent with the patent specification. Figure 4 of the patent drawing provides an example of such a wall at element (24) (Ex. 23, 826 patent at Figure 4; 3:54-57) ("Figure 4 shows a can end .

. . comprising . . . wall 24 extending axially and inwardly from the interior of the peripheral cover hook").

Rexam claims that the phrase must be limited not only to walls that begin "where the peripheral cover hook ends" (an undisputed issue given the plain language of the claim), but also to walls that "extend[] to a lowermost point, which is located inwardly (toward the center of the can end) and downwardly (towards the bottom of the can) from the end of the cover hook."  But the disputed phrase merely defines the beginning point of the wall, *i.e.*, *"from the cover hook,"* and not the ending point proposed by Rexam, *i.e.,* "the lowermost point."  Rexam's proposal to define the ending point, therefore, adds unnecessary verbiage to the claim.  Further, elsewhere the claim defines the *"lowermost end"* of the wall, and thus Rexam's proposed "lowermost point" construction is not only unnecessary, but confusing and redundant.

### e)     *first portion of said wall extending from said cover hook*

The phrase *"first portion of said wall extending from said cover hook"* needs no construction and merely refers to a "first portion of the can end wall" extending from the previously defined *"cover hook."*

The phrase *"first portion of said wall"* is not defined in the patent specification and there is no indication that the term has any specialized meaning.  Therefore, the phrase should be given its plain meaning which is apparent on its face.  *Wilson Sporting Goods Co.*, 442 F.3d at 1328; *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language is apparent and claim construction involves little more than the application of the widely accepted meaning of commonly understood words").

Rexam, however, claims that the phrase should be limited to "the upper portion of the end wall (*or chuck wall*) that begins where the cover hook ends."  But Rexam's proposal would create confusion.  Claim 13 makes clear that a "*chuck wall*," at least as used in the claim, is part

-20-

of the seaming chuck, and not a part of the can end wall.  Rexam's reference to the "chuck wall"

to refer to the recited can end wall portion, therefore, merely adds confusion to an otherwise

plain phrase.

### f)  *first point on said wall*

Similarly, the phrase "*first point on the can end wall*" is plain and needs no construction.

Rexam, however, claims that the phrase is limited not only to a "point on the wall of the

can end," but also a point that "can only be determined by looking at a cross section of the end

with a seaming chuck in place, where the wall bends about the juncture of the two chuck walls of

the seaming chuck during seaming."  But Rexam's proposed construction grafts a proposed

claim application method by inserting the technique by which infringement must supposedly be

determined — "which can only be determined by looking at a cross section of the end with a

seaming chuck in place."  Claim construction and claim application, however, are distinct

inquiries.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)

(stating that a patent infringement analysis involves two steps: claim construction, and

application of the construed claim to the accused process or product), *aff'd*, 517 U.S. 370 (1996).

Rexam's construction is, therefore, erroneous.

### g)  *adapted to be deformed during said seaming operation*

The Court should construe the phrase "*[first wall portion] adapted to be deformed during

said seaming operation*" to mean "*adapted to have its shape altered during the seaming

operation.*"

The specification does not define the word "deformed."  Nor does it indicate that the term

has a specialized meaning to those skilled in the art.  Thus, the plain meaning of the term

"*deformed*" is appropriate.  *Agfa Corp.*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442

F.3d at 1328.  The word "deform" means "to alter the form or shape of" (Ex. 12, Webster's at

593).  This plain meaning is consistent with the patent specification which provides one example of a can end wall that is "deformed" during seaming by being "bent" (Ex. 23, 826 patent at 2:44-46; 4:64-65; 5:15-16).  Bending is a type of deformation or shape alteration.

Because the disputed phrase includes the word "*adapted*," however, Rexam claims that the recited can end wall must undergo "some treatment or conditioning, done to the first wall portion of the can end that makes the first wall portion easier to deform than the rest of the can end."[3]  But as with its usage elsewhere in the claim, the word "*adapted*" is merely functional language that, in accordance with MPEP, § 2173.05(g) (Ex. 17), defines the first wall portion by what it does (or is capable of doing), rather than by what it is.  Further, the patent specification includes no embodiments in which an end has a wall that is "treated or conditioned to make it "easier to deform than the rest of the can end."  Rexam's construction is, therefore, erroneous.

**h)** ***bent upwardly around said juncture of said chuck walls at said first point***

The Court should construe the phrase "*bent upwardly around said juncture of said chuck walls at said first point*" to mean "turned upwardly around the place at which the chuck walls meet and against the first chuck wall at the *first point* on the can end wall."

As shown in Figures 6 and 7 of the patent drawings and as described in the patent specification, the upper portion of the can end chuck wall is "bent [during seaming] to contact the cylindrical portion of the chuck" (Ex. 23, 826 patent at 2:44-46).  This has the effect of changing the shape of the upper portion of the can end wall to become more vertical.

---

[3] Rexam's construction is inconsistent with its own definition of seaming panel. According to Rexam, the seaming panel must also be "easier to deform than the rest of the can end."  But Rexam nowhere explains how the seaming panel can be easier to deform than the rest of the can end (which includes the first wall portion) while, at the same time, the first wall portion is also easier to deform than the seaming panel.



Fig.6.                                          Fig.7.

The specification does not define the term "bent." Nor does it indicate that the term has a specialized meaning to those skilled in the art. Thus, the plain meaning of the term "bent" is appropriate. *Agfa Corp.*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442 F.3d at 1328. The term "bent" means "turn[ed] at an angle or on a curve from a straight line, course, or pattern" (Ex. 12, Webster's at 204).

The phrase "*upwardly around said juncture*" refers to the direction toward which, and the location at which, the can end chuck wall is bent during seaming. The location at which the bending occurs is expressly set forth in the claim itself as the "*juncture*" between the walls of the chuck. The direction toward which the can end wall is bent during seaming is defined by the patent specification, which, as pointed out, describes the direction of bending as toward "the cylindrical portion of the chuck" (Ex. 23, 826 patent at 2:44-46). This is further confirmed by the prosecution history of the related 875 patent which reveals that the Examiner allowed the claims because, unlike the prior art, the upper portion of the patented can end wall is "reformed against" the wall of the chuck while the lower portion of the can end wall remains generally unchanged. *i.e.,* between about 20° and 60° (Ex. 26, 875 file history at P644; see *also* P634-5).

Accordingly, the phrase "*bent upwardly around said juncture*" simply refers to the fact that a portion of the can end wall is turned upwardly around the juncture of the first and second chuck walls and against the first chuck wall.

Rexam claims that the phrase "*bent upwardly around said juncture of said chuck walls at said first point*" means "bent around the juncture of the two chuck walls to rotate upwardly (away from the bottom of the can)." But Rexam's use of the word "rotate" merely adds confusion. The patent nowhere uses that term. And the definition of the term "rotate" indicates that the metal must "turn about an axis" (Ex. 12, Webster's at 1976) something not required in the claim.

### i)    *a second point forming a lowermost end of said wall*

The Court should rule that the phrase "*a second point forming a lowermost end of said wall*" means "a second point that marks the lowest end of said can end wall."

The specification does not define the term "lowermost point." Nor does it indicate that the term has a specialized meaning to those skilled in the art. Thus, the plain meaning of the term "lowermost point" is appropriate. *Agfa Corp*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442 F.3d at 1328. The plain meaning of the term "lowermost" is "lowest" (Ex. 12, Webster's at 1341). Thus, the phrase "a second point forming a lowermost end of said wall" simply refers to "a second point that marks the lowest end of said can end wall."

Crown's proposed construction of the disputed phrase is consistent with, but not limited to, the preferred embodiment set forth in the patent specification. Figure 5 of the patent drawing illustrates that the lowermost end of the can wall is located where lowermost point of the can end wall (24) meets the reinforcing bead (25) (Ex. 23, 826 patent at Fig. 5).

Rexam claims that the phrase "*second point forming a lowermost end of said wall*" is limited to that "portion of the wall that extends from the juncture of the seaming chuck to the

specific place on the wall nearest the central panel (toward the bottom of the can)." But Rexam's construction adds confusion because the subject of the disputed phrase is a *"point,"* whereas Rexam's proposed construction defines a region rather than a point, *i.e.,* a "portion of the wall." Further, Rexam limits the region to a wall portion that "extends from" one point, *i.e.,* the "juncture" of the seaming chuck walls to another point, *i.e.,* "the specific place on the [can end] wall nearest the central panel."

### j)    *annular reinforcing bead*

The Court should construe the phrase *"annular reinforcing bead"* to refer to a "ring-like stiffening channel."

Crown's proposed construction is supported by the plain meaning and is consistent with the patent specification. The term "annular" means "of or relating to a ring: forming a ring: shaped like a ring" (Ex. 12, Webster's at 88). The term "reinforce" means "to strengthen with additional force, assistance, material, or support: make stronger or more pronounced" *(Id.* at 1915). The term "bead" is defined as a "groove . . . on the surface of a metal can . . . or metal closure to improve appearance and to stiffen" *(Id.* at 190). A "groove," in turn is defined as a "narrow hollow or channel made artificially in a surface" *(Id.* at 1001). Taken together, the ordinary meaning of the phrase *"annular reinforcing bead"* is, therefore, a ring-like stiffening channel.

The specification is entirely consistent. First, the specification describes *"annular reinforcing beads"* as a type of channel, stating, for example, that in "one embodiment the reinforcing bead has an inner portion parallel to an outer portion joined by [a] concave radius" (Ex. 23, 826 patent at 2:17-19). Second, the specification describes the reinforcing bead as an "annulus" that supports the circular central panel and that has an inner diameter $d_1$ and an outer diameter $d_2$ *(Id.* at 2:7-8; 4:19-20). Thus, the specification discloses that the *"reinforcing bead"*

-25-

is an annulus or ring situated around the circular center panel. Finally, the patent specification discloses that the can ends of the invention "may be economically made of thinner metal" because they employ a *"stiffer* annulus" (*Id*. at 8:40-42) (emphasis added). Thus, the specification recognizes that the annular reinforcing bead provides a stiffening function. The patent specification, thus, discloses that the "annular reinforcing bead" is a ring-like stiffening channel.

Rexam claims that an "*annular reinforcing bead*" is limited to "an outwardly concave generally 'U' shaped groove (also called a countersink or anti peaking bead) that is stamped or pressed into the can end, and is located inwards from the bottom of the wall (chuck wall) when looking at a cross section of the can end, which encircles and supports the center panel of the can end." But this construction grafts *five* extraneous limitations that nowhere appear in the claim and that are not required by the specification or prosecution history.

The first extraneous limitation proposed by Rexam is that an "*annular reinforcing bead*" must be "outwardly concave," meaning that the bead must be oriented such that it appears concave when viewed from the public side of the can (as opposed to convex from the public side or concave from some other relative position). Nothing in the claim language itself, however, requires that the annular reinforcing bead must be "outwardly concave." *Phillips,* 415 F.3d at 1312. And while an outwardly concave annular reinforcing bead is shown in the schematic illustration of Figures 4-7, the specification provides no indication that the phrase "annular reinforcing bead" must be so limited. *Agfa Corp*, 451 F.3d at 1376-77. On the contrary, the patent expressly indicates that the ends of the figures are merely "embodiments" and "example[s]" (Ex. 23, 826 patent at 2:50-52, 4:11, 4:35-37). There is no indication that the claim

can ends are limited to the exemplary can end illustrated in the patent drawing.  *Id.*; *see Phillips*, 415 F.3d at 1323.

Moreover, unasserted claim 1 of the 826 patent expressly requires an "*outwardly concave* annular reinforcing bead."  But asserted claim 13 is not so limited.  The absence of the "outwardly concave" limitation from claim 13, and the presence of this limitation in claim 1, confirms that "outwardly concave" is not a limitation required by claim 13.  *Versa Corp.* 392 F.3d at 1330.

The recent *Agfa* decision is particularly on point.  In *Agfa*, the Federal Circuit cited with approval the district court's rejection of the accused infringer's argument that the term "stack" covered "only a horizontal arrangement, like [the arrangement] shown in figure 1 of the [patent]."  *Agfa Corp*, 451 F.3d at 1376.  According to the Court, "this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claim to that depicted scope."  *Id*.  The Court went on: "any depiction of any stack will necessarily show that stack arranged in a particular manner.  Nothing beyond that depiction, however, limits the claim language . . . to some particular orientation."  *Id*. at 1376-77.  The Court noted with approval that "trial court buttressed its construction with the observation that three of the asserted patents include dependent claims that further specify a horizontal (or other particular) arrangement of the claimed stacks."  *Id*. at 1376.  The Court found that the "trial court correctly found support for the proposition that those dependant claims suggest that the 'stack' standing alone is not limited to horizontally position stacks."  *Id*.

Here, as with the term "stack," the disputed term "*annular reinforcing bead*" should not be limited to the orientation ("outwardly concave") of the particular embodiment shown in the patent drawing, as Rexam urges.  Nothing in the specification mandates a particular orientation.

Further, as in *Agfa*, the fact that other claims in the asserted patents expressly recite an "outwardly concave" limitation confirms that the term "annular reinforcing bead," alone, is not limited to this orientation. *Id.*

The second extraneous limitation proposed by Rexam is that the recited "*annular reinforcing bead*" must be "generally U-shaped." Rexam's proposed definition is apparently based on a word picture of the annular reinforcing bead of in the schematic drawings of Figures 4-7. Nothing in the claim language, however, requires that an annular reinforcing bead must be "generally U-shaped." *Phillips,* 415 F.3d at 1312. Nor does the specification require that the "an annular reinforcing bead" must be "generally U-shaped." *See Agfa Corp*, 451 F.3d at 1376-77. On the contrary, the patent describes a reinforcing bead having "an inner portion parallel to an outer portion" (presumably U-shaped as Rexam intends) as merely "one embodiment" (Ex. 23, 826 patent at 2:17-19). In other embodiments, "an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel at an angle between -15° and +15°" (*Id.* at 2:13-16). These embodiments disclose annular reinforcing beads with non-parallel inner and outer walls.

The third extraneous limitation proposed by Rexam would limit the recited "*annular reinforcing bead*" to a particular method of manufacture, *i.e.,* beads that are "stamped or pressed into a can end." But asserted claim 13 is a *product* claim, not a *method* of manufacture claim. *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372-73 (Fed. Cir. 2000) ("A novel product that meets the criteria of patentability is not limited to the process by which it was made"). Nevertheless, nothing in the claim language limits the "annular reinforcing bead" to a particular method of manufacture. Nor is there any disclosure in the specification that would indicate that the "annular reinforcing bead" of the claim should be so limited. In fact, the patent nowhere discusses the method by which a reinforcing bead of the invention is made.

The fourth extraneous limitation proposed by Rexam would limit the "*annular reinforcing bead*" to one that is "located inwards from the bottom of the wall." Nothing in the claim language itself, however, requires that the annular reinforcing bead be "inwards from the bottom of the wall." The term "*inwardly*" is recited in claim 13 describes the *can end wall* and not the reinforcing bead. If the patentee intended to limit the reinforcing bead to one located "inwards from the bottom of the wall," it could have and would have expressly done so.

Moreover, an "*annular reinforcing bead extending inwardly and downwardly from the wall*" is expressly recited in unasserted claim 1 of the 826 patent (Ex. 23, 826 patent at 9:34-35). The absence of an "inwardly" limitation in claim 13, and the presence of the limitation in claim 1, confirms that the phrase "*inwards form the bottom of the wall*" is not a limitation required by the claim 13. *Versa Corp.* 392 F.3d at 1330 (Fed. Cir. 2004).

The fifth extraneous limitation proposed by Rexam would require that the recited "*annular reinforcing bead*" of claim 13 "support the central panel." Nothing in the claim language itself, however, requires that the annular reinforcing bead be "support the central panel." And while Figure 4 illustrates a can end having an annular reinforcing bead that supports the central panel, the patent specification expressly indicates that the ends shown in the patent drawing are merely "embodiments" or "example[s]" (Ex. 23, 826 patent at 2:50-52). Thus, the claims cannot be limited to what is drawn in the figures.

### C.    Construction of the Asserted Claims of the 875 Patent

Crown alleges that methods used to seam Rexam can ends to cans infringe claims 32-34 and 50-53 of the 875 patent.

Many of the disputed claim terms and phrases found in claims of the 875 patent are also recited in claims 13 and 14 of the 826 patent. These phrases have the same meaning in both the 826 and 875 patents. *See NTP, Inc.* 418 F.3d at 1293.

### 1.    Claims 32-34

32.    A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

(a) providing a can end having (i) a *circumferentially extending peripheral cover hook*, said peripheral cover hook comprising a *seaming panel* to be formed into a portion of said double seam during a seaming operation and ii) a *circumferentially extending wall comprising first and second portions,* said first wall portion to be formed into another portion of said double seam during said seaming operation, said *first wall portion extending from said seaming panel to a first location on said wall* and comprising a *radiused portion extending from said seaming panel*, said second wall portion extending from said first wall portion at said first wall location on said wall to a *second location on said wall*, whereby said first and second locations form end points of said second wall portion, said second wall location being the *lowermost point of said wall*, and wherein a straight line extending between said first and second locations on said wall is inclined *between about 20° and about 60°* with respect to an axial centerline of said can end;

(b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

(c) providing a rotatable chuck comprising a *first circumferentially extending wall*, said first chuck wall being *substantially cylindrical*;

(d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam,

said first portion of said can end wall being pressed against said chuck first wall so that at least *a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°*, said first location on said wall after said seaming operation forming the

*transition from said double seam to said second wall portion*, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.  (Ex. 24, 875 patent at 13:1-45) (emphasis added).

33.    The method according to claim 32 wherein said line between said first and second locations on said wall of said can end is inclined *between about 30° and 50°* with respect to said axial centerline of said can end prior to performing said seaming operation.  (*Id.* at 13:45-50) (emphasis added).

34.    The method according to claim 33 wherein during said seaming operation at least a portion of said *can end wall first portion is reformed by bending upward by an angle of at least about 26°*.  (*Id.* at 13:51-54) (emphasis added).

### 2.    Construction of Disputed Terms of Claims 32-34

#### a)    *circumferentially extending peripheral cover hook*

The Court should construe the phrase "*circumferentially extending peripheral cover hook*" to refer to the "curved portion encircling the can end that is to be formed into a portion of a double seam" (*see* above with respect to the 826 patent).  *Phillips*, 415 F.3d at 1314 ("claim terms are normally used consistently throughout the patent").

#### b)    *seaming panel*

The Court should construe the phrase "*seaming panel*" to refer to the "curved innermost portion of the peripheral cover hook" (*see* above with respect to the 826 patent).  *See NTP, Inc.*, 418 F.3d at 1293.

#### c)    *circumferentially extending wall comprising first and second portion*

The Court should construe the phrase "*circumferentially extending wall comprising first and second portion*" to refer to a "can end wall encircling the center of the can end comprising first and second portions."

The phrase "*circumferentially extending wall comprising first and second portions*" should be given its ordinary meaning.  *See Phillips,* 415 F.3d at 1312.  The phrase in question refers to the "*circumferentially*" extending can end walls (as opposed to walls of the seaming chuck).  The specification does not define the term "*circumferentially*."  Nor does it indicate that the term has a specialized meaning to one of ordinary skill.  Thus, the plain meaning of the term "*circumferentially*" is appropriate.  *Agfa Corp*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442 F.3d at 1328.  The term "*circumferentially*" means "encircling" (Ex. 12, Webster's at 409).

Therefore, the phrase "*circumferentially extending wall comprising first and second portions*" refer to a "can end wall encircling the center of the can end comprising first and second portions." The remaining terms of the phrase are sufficiently plain and require no construction.

Rexam claims that the phrase "*circumferentially extending wall comprising first and second portions*" refers not only to "an end wall extending around the center panel that has upper and lower parts," but also to parts that can and must "be identified only during and after seaming." Rexam's proposal to define the wall as one that "extends around the center panel that has upper and lower parts" is not objectionable. But its proposal to graft a method of determining infringement into the claim (by limiting the claim to parts that can "be identified only during and after seaming" would lead to error. Claim construction and claim application, however, are distinct exercises. *Markman,* 52 F.3d at 976. Rexam's construction blends the two and should, therefore, be rejected.

> ### d)    *first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel*

The Court should construe the phrase "*first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel*" to refer to "the first wall portion extending from the **seaming panel** [previously defined] to a first location on the can end wall and comprising a portion formed on an arc extending from the **seaming panel**."

The term "*radiused portion*" is not defined in the specification. Nor does the specification indicate that the phrase has a specialized meaning to those skilled in the art. Thus, construction in light of the plain meaning of "*radiused portion*" is appropriate. *Agfa Corp*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442 F.3d at 1328. The term "*radiused*" refers to cut on an arc (Ex. 12, Webster's at 1874). In the context of the claim 32, "*radiused portion,*"

therefore, refers to a portion formed on an arc. The remaining terms of the claim phrase are sufficiently plain and do not require construction.

Rexam claims that the phrase "*first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel*" should be limited to a can end wall in which:

(1) the "*first wall portion*" is not only "the upper portion of the end wall" that "begins where the seaming panel ends," but that is also limited to one having "a curved portion that is different from the radius of the seaming panel (*i.e.*, the radiused portion of the upper portion of the wall is [not, sic] a part of the cover hook);" and

(2) the "*first location*" is not only "the point on the wall of the can end . . . where the wall bends about the juncture of the two chuck walls of the seaming chuck during seaming," but also a point that "can only be determined by looking at a cross section of the end with a seaming chuck in place."

This construction is an invitation to error.

First, nothing in the claim language itself requires that the *first wall portion* include a "*radiused portion*" that is "different from the radius of the seaming panel." Nor does the specification require that that phrase must be so limited. On the contrary, the specification discloses an embodiment in which a can end wall and seaming panel *share* a common radius. The drawing of the embodiment in Figure 4 discloses a radius $r_1$ between the seaming panel radius $r_2$ and the wall 24 (referred to in claims 32-34 as the "*circumferentially extending wall*"). The radius $r_1$ is identified as the "seaming panel/chuck wall radius" (Ex. 24, 875 patent at 3:66). According to this embodiment, the can end wall and the seaming panel share a common radius. Thus, contrary to Rexam's construction, the "*radiused portion*" of the can end wall in the preferred embodiment shares a common radius with the seaming panel. A claim construction, such as that proposed by Rexam, that excludes a preferred embodiment, moreover, "is rarely, if ever, correct." *Sandisk Corp.*, 415 F.3d at 1285 (quoting *Vitronics Corp.*, 90 F.3d at 1583).

Second, Rexam's suggested construction grafts a mandated claim application method into the claim by inserting the technique by which infringement must supposedly be determined — which "can only be determined by looking at a cross section of the end with a seaming chuck in place." Claim construction and claim application, however, are distinct inquiries. *Markman*, 52 F.3d at 976.

        e)        ***second location on said wall . . . being the lowermost point of said wall***

The Court should construe the phrase "*second location on said wall . . . being the lowermost point of said wall*" to refer to "the second wall location marking the lowest point of the can end wall."

The specification does not define the term "*lowermost*." Nor does it indicate that the term has a specialized meaning to one of ordinary skill. Thus, the plain meaning of the term is appropriate. *Agfa Corp*, 451 F.3d at 1376-77; *Wilson Sporting Goods Co.*, 442 F.3d at 1328. The plain meaning of the term "*lowermost*" is "lowest" (Ex. 12, Webster's at 1341). Thus, the phrase "*second location on said wall . . . being the lowermost point of said wall*" simply refers to "the second wall location marking the lowest point of the can end wall." (*see* above in 826 patent). *See NTP, Inc.*, 418 F.3d at 1293.

Crown's proposed construction of the phrase is consistent with, but not limited to, the preferred embodiment set forth in the patent specification. Figure 5 of the patent drawing illustrates that the lowermost end of the can wall is located where the can end wall (24) meets the reinforcing bead (25).

Rexam claims that the phrase should be construed to refer to "the portion of the wall below the juncture of the seaming chuck and ending at a specific place on the wall nearest the central panel (toward the bottom of the can)." But the seaming chuck and the can end are not

integral items as this construction suggests. Thus, no portion of the can end wall is "below the juncture of the seaming chuck." Rexam's construction merely adds confusion to the claim.

### f)    *between about 20° and about 60°*

The Court should construe the phrase *"between about 20° and about 60°"* to refer to a "line through the first and second locations on the can end wall inclined between about 20 and about 60 degrees with respect to the centerline of the can."

Rexam's construction is similar except that it pointedly ignores the term *"about"* recited in the claim. Rexam proposes that the phrase *"between about 20° and about 60°"* refers to a "line through the first and second locations on the wall (chuck wall) [that] is inclined between 20 and 60 degrees with respect to the centerline of the can." Without the term "about," however, the phrase would have strict numerical boundaries that are not required. Further, Rexam's reference to the "chuck wall" merely adds confusion. The wall in question is a part of the can end and not a part of the seaming chuck.

### g)    *a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°*

The Court should construe the phrase *"a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°"* to refer to "at least part of the first portion of the can end wall is turned upwardly through an angle of at least about 16°" (*see* above with respect to the 826 patent, construing "bent upwardly"). *See NTP, Inc.*, 418 F.3d at 1293.

Rexam claims that the phrase should be construed to refer to "a portion of the upper wall (chuck wall), which is above the first location, [and that] is bent upwards, when looking at a cross section drawing, around the first location by 16 degrees (less 1 degree or plus 1 degree or more)." But this construction is legally erroneous because it defines the term *"about"* as a precise numerical boundary, which is improper. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842

F.2d 1275, 1280-81(Fed. Cir. 1988) ("whether an imprecise claim limitation, such as the phrase *about* 100% per second is literally met, is a question of fact [for the fact finder]. A term such as about is not subject to such a precise construction as Gore would give it but is dependent on the factual situation presented") (internal citations omitted). Moreover Rexam's construction adds confusion to the claim by referring to the "*upper wall*" of the can end as the "chuck wall." The "chuck wall," however, may be considered to be a wall of the seaming chuck, not the can end.

> **h)** *transition from said double seam to said second wall portion*

The Court should construe the phrase *"transition from said double seam to said second wall portion"* to refer to **"the first location, after seaming, at which the double seam region changes to the second wall portion."**

The term "*transition*" is not defined in the specification. Nor does the specification indicate that the term has any specialized meaning to those skilled in the art. Thus, it is appropriate to apply the plain meaning of "*transition*." The word "*transition*" refers to "a passage from one state, condition, or place to another: change" (Ex. 12, Webster's at 2428). In the context of claim 32, the "transition" is the place "at which the double seam region changes to the second wall portion." Claim 32 expressly states that the "first location" forms the transition after seaming.

Rexam claims that the phrase *"transition from said double seam to said second wall portion"* must be limited to "the location on the end wall at the lowermost extent of the double seam." This construction, however, ignores that the claim expressly identifies the "first location" as the "transition" after seaming. Under Rexam's construction, the "*transition*" could occur at a different location from the "*first location*." This runs counter to the claim language itself and should, therefore, be rejected.

### i)    *between about 30° and 50°*

The Court should construe the phrase "*between about 30° and 50°*" to refer to "a line through the first and second locations inclined between about 30 and about 50 degrees with respect to the centerline of the can." This construction tracks closely to the claim language.

Rexam claims that the phrase should be construed to refer to "the line through the first and second locations on the wall (chuck wall) is inclined between 30 and 50 degrees with respect to the centerline of the can." But Rexam again ignores the word "about," without which the phrase would have strict numerical boundaries. Moreover Rexam's construction adds confusion to the claim by referring to the "*wall*" of the can end as the "chuck wall." The "chuck wall" is the wall of the seaming chuck.

### j)    *upward by an angle of at least about 26°*

The Court should construe the phrase "*can end wall first portion is reformed by bending upward by an angle of at least about 26°*" to refer to "the can end wall first portion is formed again by turning upward by an angle of at least about 26°."

Rexam's construction is similar, except that it interprets "about" as a strict numerical boundary: "a portion of the upper wall (chuck wall), which is above the first location, is bent upwards, when looking at a cross section drawing, around the first location by 26 degrees (less 1 degree or plus 1 degree or more)." This is error. *W.L. Gore & Assoc.,*, 842 F.2d at 1280-81.

### 3.    **Claims 50, 51, 52 and 53**

Claim 50 is set forth below with the disputed terms in italics:

50.    A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of.

providing a can end having (i) a circumferentially extending **peripheral cover hook**, said peripheral cover hook comprising  a **seaming panel** to be formed into a portion of said double seam during a seaming operation, (ii) an **annular**

*reinforcing bead*, and (iii) a circumferentially extending **wall extending from said seaming panel** to said reinforcing bead, said wall and said reinforcing bead **forming a transition therebetween;**

placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

providing a rotatable chuck comprising **first and second circumferentially extending walls,** said second chuck wall **depending from said first chuck wall so as to form a juncture therebetween;**

bringing said chuck into engagement with said can end; and

performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and **to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall,** a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation. (Ex. 24, 875 patent at 15:8-41) (emphasis added).

Claims 51-53 each depend from claim 50 and incorporate by reference all of the

limitations set forth in claim 50.

51.    The method according to claim 50 wherein at least a portion of said can end wall bent upwardly during said seaming operation is bent upward **through an angle of at least about 16°.** (*Id.* at 15:41-45) (emphasis added).

52.    The method according to claim 50, wherein said line extending from said first location to said transition is inclined between about 30° and about 50° with respect to said axial centerline of said can end both before and after performing said seaming operation. (*Id.* at 15:46-50).

53.    The method according to claim 52, wherein at least a portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 26°. (*Id.* at 15:46-50).

4.    **Construction of Disputed Terms of Claims 50-53**

a)    *peripheral cover hook*

The Court should construe the phrase *"peripheral cover hook"* to mean "a curved portion encircling the can end that is to be formed into a portion of a double seam" (*see* above with respect to the 826 patent).  *See NTP, Inc.*, 418 F.3d at 1293.

b)    *seaming panel*

The Court should construe the phrase *"seaming panel"* to mean "curved innermost portion of the **peripheral cover hook**" (*see* above with respect to the 826 patent).  *See id.*.

c)    *annular reinforcing bead*

The Court should construe the phrase *"annular reinforcing bead"* to mean "a ring-like stiffening channel" (*see* above with respect to the 826 patent).  *See id.*

d)    *circumferentially extending wall extending from said seaming panel*

The Court should construe the phrase *"circumferentially extending wall extending from said seaming panel"* to mean a *"can end wall encircling the center of the can end and extending from the seaming panel"* (*see* above with respect to claim 32).  *See id.*

Rexam claims that the phrase requires that "the upper portion of the end wall (or chuck wall) that begins where the seaming panel ends with a radiused or curved portion that has a different radius than the seaming panel (*i.e.*, the radiused portion of the upper portion of the wall is a part of the cover hook)."  Nothing in the claim language, however, requires that the *"upper portion of the end wall"* must "begin[] where the seaming panel ends with a radiused or curved portion that has a different radius than the seaming panel," as Rexam proposes.  Nor does the specification require that phrase must be so limited.  On the contrary, the specification expressly discloses that the *"upper portion"* may have the same radius as the seaming panel.  The

embodiment drawn in Figure 4 describes a radius $r_1$ between a seaming panel radius $r_2$ and the chuck wall 24 (referred to in claim 50 as the wall of the can end). The specification identifies the radius $r_1$ as the "seaming panel/chuck wall radius" (Ex. 24, 875 patent at 3:66). Contrary to Rexam's construction, this example discloses an end having can end wall and a seaming panel that share a radius. Rexam's construction, therefore, invites error.

### e) *forming a transition therebetween*

The Court should construe the phrase "*forming a transition therebetween*" to mean "forming a place between two things at which one changes to the other" (*see* above with respect to claim 32). *See id.*

Rexam claims that the phrase refers to "a radiused portion of the can end, when looking at a cross section of the end, between the vertical wall of the annular reinforcing bead (countersink) and the second portion of the wall (chuck wall). Rexam's proposed definition is apparently based on a word picture of the end shown in the patent drawings. But nothing in the claim language requires that the "*annular reinforcing bead*" have a "vertical wall" or that the "*transition*" must be a "radiused portion." Nor does the specification limit the phrase as Rexam suggests. The patent expressly indicates that the ends shown in the patent drawing are merely "embodiments" or "example[s]" of the invention (Ex. 24, 875 patent at 2:42-44). Further, claim 32 describes a "radiused portion" on the can end wall. If the patentees intended "transition" to mean "radiused portion" they would have done so.

### f) *first and second circumferentially extending walls*

The Court should construe the phrase "*first and second circumferentially extending walls*" to mean "first and second walls encircling the chuck" (*see* above with respect to the 826 patent). *See id.*

g) ***depending from said first chuck wall so as to form a juncture therebetween***

The Court should construe the phrase "*depending from said first chuck wall so as to form a juncture therebetween*" to mean "the second wall encircling the chuck depending from the first wall encircling the chuck so as to form a place between them at which they meet." (*see* above with respect to the 826 patent). *See id.*

h) ***deform***

The Court should construe the word *"deform"* to mean "alter the shape of" (*see* above with respect to the 826 patent). *See id.*

i) ***bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall***

The Court should construe the phrase "*bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall*" to mean "turn a portion of the can end wall upwardly around the place at which the first and second chuck walls meet and against the first chuck wall at a first location on the can end wall" (*see* above with respect to the 826 patent) (construing "*bent upwardly around said juncture of said chuck walls at said first point*"). *See id.*

j) ***portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°***

The Court should construe the phrase "*portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°*" to mean "a portion of the can end wall is turned upwardly through an angle of at least about 16°." (*see* above with respect to claim 32). *See id.*

## VI.    CONCLUSION

In view of the foregoing points and authorities, the Court should adopt Crown's proposed constructions.

Respectfully submitted,

Dated: January 16, 2007

/s/ Barry Klayman

Barry M. Klayman, Esquire (#3676)
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 777-0313
Fax: (302) 778-7813

*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

*Of Counsel:*

Dale M. Heist
Lynn A. Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100

Michael Korniczky
Crown Cork & Seal USA, Inc.
One Crown Way
Philadelphia, Pennsylvania 19154

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **CROWN PACKAGING TECHNOLOGY, INC.'S AND CROWN CORK & SEAL USA, INC.'S CROWN'S OPENING CLAIM CONSTRUCTION BRIEF RELATING TO CROWN'S PATENTS** has been forwarded on this the 16th day of January, 2007, in accordance with the Federal Rules of Civil Procedure, to the following:

**VIA E-MAIL:**
Gerald C. Willis, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601

**VIA FEDERAL EXPRESS:**
Anne Shea Gaza, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Date: January 16, 2007

/s/ Barry Klayman
Barry M. Klayman, Esquire (#3676)
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 777-0313
Fax: (302) 778-7813

*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*