# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING
TECHNOLOGY, INC. AND CROWN
CORK & SEAL USA, INC.,

    PLAINTIFFS,

    V.

REXAM BEVERAGE CAN CO.,

    DEFENDANT.

)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. 05-608 (MPT)

> **REDACTED**
> **Non-Confidential**

## CROWN'S OPENING CLAIM CONSTRUCTION BRIEF
## RELATING TO REXAM'S PATENTS

Barry M. Klayman, Esquire (#3676)
WOLF, BLOCK, SCHORR and
 SOLIS-COHEN LLP
Wilmington Trust Center
1100 N. Market Street
Wilmington, DE 19801
(302) 777-0313

Dale M. Heist
Lynn Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

*Attorneys for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

## Table of Contents

I.      INTRODUCTION ............................................................................................... 1

II.     LAW OF CLAIM CONSTRUCTION ............................................................. 1

        A.      Claims Define the Invention ................................................................ 1

        B.      Role of the Patent Specification........................................................... 2

        C.      Role of the Prosecution History ........................................................... 4

        D.      Role of Unasserted and Dependent Claims .......................................... 5

        E.      Role of the Accused Device................................................................. 5

III.    REXAM'S SCORE PATENTS ........................................................................ 6

        A.      Background Of Rexam's Score Patents ................................................ 6

        B.      Claim Term For Which The Parties Agree Upon A Construction........ 10

        C.      Claim Terms For Which The Parties Dispute The Construction ......... 10

                1.      230 Patent, claim 1 ................................................................ 11

                2.      230 Patent, claim 13.............................................................. 11

                3.      728 Patent, claim 1 ................................................................ 12

                4.      728 Patent, claim 7 ................................................................ 12

        D.      Crown's Proposed Construction of Rexam's Score Patents ................ 13

                1.      *hinge segment*..................................................................... 13

                2.      *the hinge line* ...................................................................... 17

                3.      *adjacent area of the central panel* ...................................... 24

                4.      *passing through*................................................................... 27

                5.      *to direct fracture of metal* .................................................. 30

IV.     REXAM'S BOTTOM REFORMING PATENTS............................................ 34

        A.      Background Of Rexam's Bottom Reforming Patents........................... 34

        B.      Disputed Claim Terms of Rexam's Bottom Forming Patents ............. 34

      1.    242 Patent, claim 11 .................................................................... 34

      2.    242 Patent, claim 12 .................................................................... 34

      3.    242 Patent, claim 17 .................................................................... 34

      4.    385 Patent, claim 17 .................................................................... 35

  C.    Crown's Proposed Construction Of Rexam's Bottom Reforming Patents .......... 35

      1.    *moving said reforming roller radially* ...................................... 35

      2.    *reforming roller rotating along said longitudinal wall and about an arcuate path* ....................................................................... 38

      3.    *reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path* .................................... 40

      4.    *radial inward support* ............................................................. 43

      5.    *substantial radial alignment with said radial inward support* ................ 45

V.    REXAM NECKING PATENT ................................................................. 47

  A.    Background of Rexam's Necking Patent ................................................ 47

  B.    Disputed Claim Terms of Rexam's Necking Patent ................................. 47

      1.    839 Patent, claim 1 ...................................................................... 47

      2.    839 Patent, claim 2 ...................................................................... 47

      3.    839 Patent, claim 5 ...................................................................... 48

      4.    839 Patent, claim 11 (no terms in dispute) ................................. 48

  C.    Crown's Proposed Construction of Rexam's Necking Patent ..................... 48

      1.    *smoothly-shaped neck profile* ................................................. 48

      2.    *reformed as a part of said second taper* .................................... 51

      3.    *combine and blend* .................................................................. 53

      4.    *part formed by each die element partially integrates and blends with the portion formed by a preceding die element* ................................. 55

VI.    CONCLUSION ...................................................................................... 57

# TABLE OF AUTHORITIES
## FEDERAL CASES

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973 (Fed. Cir. 1999)........................................................................21

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366 (Fed. Cir. 2006)...............................................................18, 23

*Free Motion Fitness, Inc. v. Cybex Int'l Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005).......................................................................3

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001).......................................................................1

*Intervet Am., Inc. v. Kee-Yet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989).......................................................................2

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999).........................................................................2

*Jurgens v. McKasy*,
  927 F.2d 1552 (Fed. Cir. 1991).......................................................................6

*Mas-Hamilton Group v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998)...............................................................31, 32

*Massachusetts Inst. Of Tech. v. Elecs. For Imaging, Inc.*,
  462 F.3d 1344 (Fed. Cir. 2006).....................................................................31

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005).......................................................................5

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002).......................................................................5

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003)...............................................................18, 24

*Phillips v. AWH Corp*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................ *passim*

*Raytheon Co. v. Roper Corp.*,
  724 F.2d 951 (Fed. Cir. 1983).......................................................................32

# TABLE OF AUTHORITIES
## FEDERAL CASES

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973 (Fed. Cir. 1999)......................................................................................21

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366 (Fed. Cir. 2006)...........................................................................18, 23

*Free Motion Fitness, Inc. v. Cybex Int'l Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005)......................................................................................3

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001).......................................................................................1

*Intervet Am., Inc. v. Kee-Yet Labs., Inc.*,
  887 F.2d 1050 (Fed. Cir. 1989).......................................................................................2

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999).........................................................................................2

*Jurgens v. McKasy*,
  927 F.2d 1552 (Fed. Cir. 1991).......................................................................................6

*Mas-Hamilton Group v. LaGard, Inc.*,
  156 F.3d 1206 (Fed. Cir. 1998)...............................................................................31, 32

*Massachusetts Inst. Of Tech. v. Elecs. For Imaging, Inc.*,
  462 F.3d 1344 (Fed. Cir. 2006).....................................................................................31

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005).......................................................................................5

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
  287 F.3d 1062 (Fed. Cir. 2002).......................................................................................5

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003)...............................................................................18, 24

*Phillips v. AWH Corp*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................................. *passim*

*Raytheon Co. v. Roper Corp.*,
  724 F.2d 951 (Fed. Cir. 1983).......................................................................................32

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985)..............................................................5

*Specialty Composites v. Cabot Corp.*,
   845 F.2d 981 (Fed. Cir. 1988)................................................................4

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002)..............................................................3

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004)..............................................................5

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006 )....................................................... *passim*

## FEDERAL STATUTES

35 U.S.C. § 112, ¶ 2.............................................................................1, 24

35 U.S.C. § 112, ¶ 6.........................................................................30, 31, 32

## I.    INTRODUCTION

Plaintiffs Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (together "Crown") submit this opening brief in support of their proposed construction of disputed terms of the asserted claims of the patents asserted by Rexam in connection with its counterclaims, *i.e.,* Rexam's U.S. Patent Nos. 6,129,230 and 6,260,728 ("Score Line Patents"); 5,222,385 and 5,697,242 ("Bottom Reforming Patents"); and 4,774,839 ("Necking Patent").[1]

## II.    LAW OF CLAIM CONSTRUCTION

### A.    Claims Define the Invention

It is a "bedrock principle" of claim construction that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Thus, it is the words of the claims themselves that define the scope of the patented invention. *Phillips,* 415 F.3d at 1312, (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  For that reason, "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

---

[1] A copy of the 230 patent forms Ex. 1; a copy of the 728 patent forms Ex. 2 hereto. Copies of the of the 230 and 728 patent file histories form Exs. 3 and 4, respectively.  Both patents derive from a common patent application and have substantially identical patent specifications.  A copy of the 385 patent forms Ex. 5 and a copy of the 242 patent forms Ex. 6 hereto.  Copies of the 385 and 242 patent file histories form Exs. 7 and 8, respectively.  Both patents also derive from a common patent application and also have substantially identical patent specifications.  A copy of the 839 patent forms Ex. 9 and its file history forms Ex. 10.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'"
*Phillips,* 415 F.3d at 1312 (quoting *Vitronics,* 90 F.3d at 1582). "Dictionaries or comparable
sources are often useful to assist in understanding the commonly understood meaning of words
and have been used both by our court and the Supreme Court in claim interpretation." *Id.* at
1322.

"General descriptive terms will ordinarily be given their full meaning; modifiers will not
be added to broad terms standing alone." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175
F.3d 985, 989 (Fed. Cir. 1999).

In some cases, the ordinary meaning of claim language is apparent and claim construction
involves "little more than the application of the widely accepted meaning of commonly
understood words." *Phillips,* 415 F.3d at 1314. Therefore, if the meaning of a claim term is
clear on its face, there is no need for additional construction. In these cases, general purpose
dictionaries can be helpful. *Id.*

**B.      Role of the Patent Specification**

Claim terms, however, must be understood in the context of the written description of the
patent specification. *See id.* at 1313 ("Importantly, the person of ordinary skill in the art is
deemed to read the claim term not only in the context of the particular claim in which the
disputed term appears, but in the context of the entire patent, including the specification").

In claim construction, "interpreting what is *meant* by a word *in* a claim 'is not to be
confused with adding an extraneous limitation appearing in the specification, which is
improper.'" *Intervet Am., Inc. v. Kee-Yet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir. 1989)
(quoting *E. I. Du Pont De Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433
(Fed.Cir. 1988)). Accordingly, the Federal Circuit has expressly rejected the contention that "if a
patent describes only a single embodiment, the claims of the patent must be construed as being

limited to that embodiment." *Phillips,* 415 F.3d at 1323 (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,* 383 F.3d 1352, 1366 (Fed. Cir. 2004)). The disclosure of preferred embodiments or implementing examples should not be used to limit the scope of the claims absent a clear disavowal by the inventor. *See id.* at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments."); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("[A]n accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history.") (citing *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002)). It is "not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips,* 415 F.3d at 1323.

Therefore, "the rule that 'a court will give a claim term the full range of its ordinary meaning,' does not mean that the term will presumptively receive its broadest dictionary definition." *Free Motion Fitness, Inc. v. Cybex Int'l Inc.,* 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (quoting *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001)). "[I]n those circumstances where reference to dictionaries is appropriate, the task is to scrutinize the [specification and prosecution history] in order to determine the most appropriate definition." *Id.* at 1349.

"To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of ordinary skill in the art to make and use the invention and to provide a best mode for doing so." *Id.*

"One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case." *Id.* "[U]pon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

For that reason, "[w]here a specification does not require a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

Thus, where "[n]othing in the specification, including the claims, indicates explicitly or implicitly, that the inventor intended to impart a novel meaning to [the claim term] 'annular' [and] the record also contains no evidence that 'annular' has a peculiar meaning in the field of art encompassed by the [] patent, [the Federal Circuit has concluded] that the ordinary and customary meaning attributed to this term by those of ordinary skill in this art at the time of the invention involves little more the application of its widely accepted meaning." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006).

### C.    Role of the Prosecution History

Counsel's arguments in the prosecution history are far less important than the claim language allowed by the Examiner "because the prosecution history represents an on going negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Phillips,* 415 F.3d at 1317.

Arguments in the prosecution history, as opposed to claim amendments may only limit claims if they contain "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1308-09 (Fed. Cir. 2005) (citing *Gemstar-TV Guide*, 383 F.3d at 1366).

### D.    Role of Unasserted and Dependent Claims

"Other claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term." *Id.* at 1314.

"Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.*

Further, dependent claims are presumed to be narrower in scope than the independent claim from which they depend. Thus, a limitation added in a dependent claim is presumptively not to be read into the terms of the independent claim. *See id.* at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). In general, there is a "presumption that each claim in a patent has a different scope." *Versa Corp. v. Ag-Bag Int'l Ltd.,* 392 F.3d 1325, 1330 (Fed. Cir. 2004) (quoting *Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

### E.    Role of the Accused Device

It is improper to use the accused device as a form of extrinsic evidence in order to add limitations to patent claims. *Wilson Sporting Goods*, 442 F.3d at 1331. Thus, claims should not be construed with reference to the accused device. *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc). A claim construction should never be tailored "to fit the dimensions of the accused product or process and to reach a preconceived judgment of

infringement or noninfringement." *Wilson Sporting Goods,* 442 F.3d at 1331; *see also Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed. Cir. 1991) (noting that a claim should be construed "without regard to the accused product"). By doing so, a court would improperly impart a bias into the task of claim construction, instead of focusing on the plain meaning of the claims themselves.

## III.    REXAM'S SCORE PATENTS

### A.    Background Of Rexam's Score Patents

Rexam's U.S. Patent No. 6,129,230 ("230 patent") and U.S. Patent No. 6,260,728 ("728 patent") are directed to an easy open can end of the type that has a "stay-on-tab," such as conventionally used with metal cans for beer and carbonated soft drinks (Ex. 1, 230 patent; Ex. 2, 728 patent).[2] In such can ends, a double score in the metal is created in the central panel of the end. The double score is approximately in the shape of a circle. The first (outer) score is referred to a the primary score and forms a frangible (*i.e.*, breakable) panel, also referred to as a "tear panel" or "pour panel." The second (inner) score is referred to as the anti-fracture score. It is used to prevent premature fracture of the primary score and is not intended to fracture during normal use. A portion of the circle that would otherwise be encompassed by the scores is left unscored so as to form a hinge that connects the frangible pour panel to the portion of the central panel adjacent the hinge.

The user opens the end by lifting up the back of a tab that is attached to the can end by a rivet. The front of the tab presses down on the frangible pour panel, causing the primary score to fracture and then the hinge to bend downward. As the hinge bends, the frangible panel rotates down into the container, leaving an opening from which its contents may be poured.

---

[2] Since the 728 patent is a continuation of the 230 patent, the two patents share a common specification. Therefore, for simplicity, all citations in this brief are to the 230 patent, in the format column:line.   The prosecution history of these patents are shown in exhibits 3 and 4.

The frangible pour panel area in an early version prior art can end had a loop connecting the ends of the primary score and the anti-fracture score. In certain unusual circumstances, such as buckling of the end due to mishandling, a crack in the metal formed in the hinge when a user opened the frangible panel. The result was "often that the hinge segment 26 sever[ed], resulting in a fractured segment joining the first end 28 to the second end 30 [of the primary score]" (Ex. 1, 230 patent at 6:20-22). When the hinge segment completely severed the frangible pour panel became entirely detached from can end, an undesirable situation. As explained in the 230 patent:

> When the user applies such force [to open a buckled end], a common result is for the hinge-line region of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score. As a result, the tear panel is fully separated from the remainder of the end panel, and is usually pushed into the container. The fully detached tear panel then becomes a choking hazard or is otherwise a nuisance to the user and a potential pollutant.

(*Id.* at 2:35-44).

The first solution to the problem was to remove the loop connecting the ends of two scores and to move the second end of primary score away from the first end. A typical prior art end featuring this score configuration is shown below:



Ex. 11, U.S. Patent No. 6,234,336 ("336 patent") at Figure 3

If the path of the crack caused the metal to tear toward the tail of the anti-fracture score, as shown in the figure below on the left, its progress was stopped by the anti-fracture score without problem. Since the tail of the anti-fracture score in this type end was typically short – that is, not longer than the primary score, cracks could *potentially* reach the second end of the primary score, as shown in the figure below on the right depending on the direction of the tear:



Hinge Crack Reaches Anti-Fracture
Score and Stops

Hinge Crack Bypasses Anti-Fracture
Score and Reaches Primary Score

To solve the problem of an anti-fracture score that was too short to ensure that it would stop all potential hinge crack from reaching the primary score, the inventors of the 230 and 728 patents lengthened the anti-fracture score so that "the tail portion of the second [anti-fracture] groove is longer than the second end of the [primary] score groove" (Ex. 1, 230 patent at 3:34-36). As a result of this lengthening, the anti-fracture score has "a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel" (*Id.* at 3:24-27). An enlargement of Figure 2 of the 230 patent is reproduced below with the extended tail identified:



Ex. 1, 230 patent at Figure 2

The 230 patent claims are directed to the inventors' preferred embodiment shown in Figure 2 and require that the second score pass through, or transect, the hinge segment. In the continuation 728 patent, Rexam sought and obtained broader independent claims, requiring only that the second score be "adjacent" the hinge segment. As a result of prior art uncovered by Crown in this litigation, Rexam has withdrawn its assertion of those broader claims, and instead relies only upon claims of the 230 patent and a single dependent claim in the 728 patent, all of which require that the second score at least pass through the hinge segment (and in the case of claim 1 of the 230 patent, that it pass into the area of the central panel adjacent the hinge segment). The parties' claim construction dispute chiefly results from Rexam's improper attempt to morph the narrow claims it continues to assert against Crown into mini-versions of the broader claims it has already withdrawn in light of the prior art. It does this by misconstruing key terms ("hinge segment," "adjacent area of the central panel," and "passing through") in a

way that is inconsistent with the patent specification and with the ordinary meaning of the words, and by taking advantage of a claim drafting error ("the hinge line").

### B.    Claim Term For Which The Parties Agree Upon A Construction

The parties have agreed upon the construction of the following terms:

| Claim Term | Claims in which term appears | Agreed Upon Construction |
|---|---|---|
| *tail portion* | Claims 1 & 13 of 230 patent | The end portion |
| *adjacent* | Claims 1 & 5 of 230 patent Claim 1 of 728 patent | Near |
| *transecting* | Claim 1 of 230 patent | Cutting across |
| *thickness residual* | Claim 13 of 230 patent | the amount of frangible material remaining below the score groove |

### C.    Claim Terms For Which The Parties Dispute The Construction

In this action, Rexam has asserted the following claims

230 patent:    Claims 2 and 5 (each of which depend from claim 1) and claim 13

728 patent:    Claim 7 (which depends from claim 1)

The parties dispute the construction of the following five terms, which are set out in four claims – claims 1 and 13 of the 230 patent and claims 1 and 7 of the 728 patent:

- *hinge segment*

- *hinge line*

- *adjacent area of the central panel*

- *passing through*

- *second score groove ... to direct fracture of metal*

Each of the four claims in which these five terms appear is set out below, with the disputed terms highlighted:

### 1.    230 Patent, claim 1

1.    An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a means for opening a frangible panel segment of the panel wall, the end member comprising;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a vent region of the frangible panel segment and having a lift end opposite said nose;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment,

the score groove having a first end adjacent the vent region, and

a second end joined to the first end by a curvilinear segment of the score groove,

the first end and the second end being separated by a generally linear **hinge segment** of the central panel wall,

said hinge segment being non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel; and,

a second score groove having a tail portion passing from the frangible panel into **said adjacent area of the central panel** and transecting said hinge segment (Ex. 1, 230 patent at 7:62 – 8:17) (emphasis added).

### 2.    230 Patent, claim 13

13.    An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall, the end member comprising;

a frangible panel formed in the panel wall and being defined by a curvilinear score groove and a hinge segment,

the score groove having a thickness residual and having a first end and a second end,

said hinge segment having a length defined by a generally straight line between said first end and said second end;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel,

the tab having a nose portion overlying at least a region of the frangible panel segment and having a lift end opposite said nose; and,

a curvilinear anti-fracture score formed in the frangible panel generally parallel to said score groove,

said anti-fracture score having a tail portion *passing through* the *hinge segment* (*Id.* at 8:66 – 9:18) (emphasis added).

### 3.    728 Patent, claim 1

1.    An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a vent region and a means for opening a frangible panel segment of the panel wall, the end member comprising;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment,

the score groove having a first end adjacent the vent region and a second end,

the first end and the second end being separated by a generally linear *hinge segment* of the central panel wall,

said hinge segment integrally connecting the frangible panel segment to an adjacent area of the panel; and,

*a second score groove adjacent the second end of said primary score and adjacent said hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the score* (Ex. 2, 728 patent at 7:65 – 8:15) (emphasis added).

### 4.    728 Patent, claim 7

7.    The end member of claim 1, wherein, at least a portion of the second score groove *passes through the hinge line* generally transverse to a hinge line passing between the first end and the second end of the primary score groove (*Id.* at 7:38-41) (emphasis added).

D.    **Crown's Proposed Construction of Rexam's Score Patents**

1.    *hinge segment*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *Hinge segment* | Claims 1 & 13 of 230 patent<br><br>Claim 1 of 728 patent | The region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use. | The segment of metal between the first end and the second end of the primary score that stays attached to the central panel of the can end under normal operating conditions. |

a)    **Intrinsic Evidence Supports Crown's Construction**

The 230 patent contains no express definition of the term "hinge segment."  Nevertheless, the specification makes clear that the hinge segment is the portion of the can end that forms a hinge when the frangible pour panel is depressed into the can as a result of being pressed down by the tab during opening:

> The tear panel 20 of the central panel 12 may be opened, that is the frangible score 22 may be severed and the tear panel 20 displaced at an angular orientation relative to the remaining portion of the central panel 12, while the tear panel 20 remains **hingeably connected** to the central panel 12 **through the hinge segment** 26.  In this opening operation, the tear panel 20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12.

> (Ex. 1, 230 patent at 4:61 – 5:2) (emphasis added).

Thus, "hinge segment" should be defined as the region of metal that forms a hinge by undergoing bending as a result of angular displacement of the frangible pour panel during normal use.  This definition is entirely consistent with the ordinary meaning of the term "hinge."[3]  A section cut through an opened Crown end accused of infringement, shown below, illustrates the hinge segment – the region of bent metal -- connecting the frangible panel to the central panel:

---

[3] The dictionary defines "hinge" as: "a jointed or flexible device on which a door, lid or other swinging part turns…" (Ex. 12, Webster's Third New International Dictionary (2002) ("Webster's") at 1071).



**b)    Extrinsic Evidence Supports Crown's Construction**

The Court may consider extrinsic evidence from experts in construing claim terms. *Phillips*, 415 F.3d at 1317. Here, Crown's expert has confirmed that one skilled in the art, having read the specification and prosecution histories of the 230 and 728 patents, would conclude that the "hinge segment" is the region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use by a user, since it is this bending of the metal that creates the hinging effect (Ex. 13, Expert Report of Martin J. Higham Regarding Infringement at ¶ 17).

**Redacted**

Mr. Turner's testimony is consistent with Rexam's U.S. Patent No. 6,024,239 ("239 patent"), the application for which was filed by Turner and co-inventor Forrest the year before the 230 patent application was filed (Ex. 15, 239 patent). The 239 patent shows a hinge segment 24 in Figure 2, a portion of which is reproduced below:



Ex. 15, 239 patent at Figure 2

The 239 patent acknowledges that the hinge segment is the bent region of metal around which the angular displacement of the tear panel occurs during opening, stating "the tear panel 20 is deflected at an angle relative to the plane of the [center] panel 12, with the **vortex of the angular displacement being the hinge segment 24**" (*Id.* at 4:47-49) (emphasis added).

Crown's proposed construction is also supported by other prior art patents. U.S. Patent No. 5,711,448 ("448 patent"), assigned to Reynolds Metal Co., shows a hinge segment 28 in Figure 1, a portion of which is reproduced below:



Ex. 16, 448 patent at Figure 1

The 448 patent refers to the segment of metal 28 as "a **bend area or integral hinge** between the [frangible pour] panel and the remainder of the end wall" (Ex. 16, 448 patent at 5:6-9) (emphasis added).

### c)    Rexam's Proposed Construction Should Be Rejected

Rexam purports to construe the meaning of the term "hinge segment" almost entirely by restating a limitation already expressly placed on the hinge segment by the claims – the hinge segment is the segment of metal that is "between the first end and the second end of the primary score."[4]  Contrast Rexam's "definition" of the term hinge segment with the limitation in claim 13 of the 230 patent, for example, which recites "said hinge segment having a length defined by a generally straight line *between said first end and said second end*" (Ex. 1, 230 patent at 9:6-8).

Essentially, Rexam seeks to turn the claim construction-infringement analysis on its head. Rexam proposes that the Court define a "hinge segment" as the segment of metal that satisfies the limitation already present in the claim requiring that the hinge segment be located between the first and second ends of the primary score.  Thus, any end will automatically satisfy the claim

_____

[4] The second portion of Rexam's proposed construction – the hinge segment is the segment of metal "that stays attached to the central panel of the can end under normal operating conditions" – is meaningless verbiage.  Under normal operating conditions, the entire frangible panel stays attached to the central panel so this additional language does nothing to define the segment of metal that forms the hinge.

limitations concerning the location of the hinge segment because the hinge segment has been defined as the segment of metal in that location, **without regard to whether that segment of metal actually forms the hinge** when the pour panel is opened. Such a construction should be rejected.

### 2. *the hinge line*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *the hinge line* | Claim 7 of 728 patent | The hinge segment referred to in claim 1 of the 728 Patent. (The region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use.) | A line between the first end and the second end of the primary score. |

### a) *"The Hinge Line"* is the Result of a Drafting Error

Claim 1 of the 728 patent requires that the end have "a generally linear hinge segment." There is no mention in claim 1 of a "hinge line." Claim 7, however, which depends directly from claim 1, further specifies:

> at least a portion of the second score groove passes through *the hinge line* generally transverse to a hinge line passing between the first end and the second end of the primary score groove

(Ex. 2, 728 patent at 8:38-41) (emphasis added).

Claim 7 contains a drafting error. The term "**the** hinge line" appears without any earlier reference to "a hinge line" in either claims 1 or 7 so that it is unclear what "hinge line" is being referred to. In patent drafting parlance, the term "the hinge line" is said to "lack an antecedent basis," which potentially renders the claim indefinite:

> A claim is indefinite when it contains words or phrases whose meaning is unclear. The lack of clarity could arise where a claim refers to "said lever" or "the lever," where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference….

[H]owever, the failure to provide explicit antecedent basis for terms does not always render a claim indefinite.

(Ex. 17, U.S. PTO Manual Of Patent Examining Procedure, 8th ed. (2006), §2173.05(e) at 2100-218).

In general, courts may correct a drafting error "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). In *Novo Indus.*, the district court attempted to correct a drafting error in the claim language by substituting "a" for "and." *Id.* at 1357. The Federal Circuit reversed and found the claim invalid as indefinite "because we cannot know what correction is necessarily appropriate or how the claim should be interpreted." *Id.* at 1358. Here, therefore, the Court must ascertain whether the lack of antecedent basis renders claim 7 indefinite, and therefore invalid, or whether the drafting error can be corrected because the proper interpretation of the claim is not subject to reasonable debate.

In *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1369 (Fed. Cir. 2006), a claim recited "said zinc anode" without no antecedent basis. Rather than hold the claim invalid for indefiniteness, the Federal Circuit found that the term "said zinc anode" should be construed to refer to slightly different language appearing earlier in the claim ("an anode gel comprised of zinc as the active anode component") and thereby provide the necessary antecedent basis. *Id.* at 1371 ("[W]e conclude that "anode gel" is by implication the antecedent basis for "said zinc anode."). Notably, the Federal Circuit **did not** substitute "a" for "said," as Rexam proposes, so that the claim was construed as introducing a new element – "a zinc anode." Rather, the Court construed the claim to provide an antecedent basis based on an element already appearing in the claim.

Consideration of both intrinsic and extrinsic evidence makes clear that "*the* hinge line" in claim 7 should be understood as referring to the "hinge segment" introduced in claim 1 so that the necessary antecedent basis is provided – that is, so that it is clear that "the hinge line" in claim 7 refers to the "hinge segment" specified in claim 1.[5]   Thus, claim 7 should be construed to require that the second score groove pass through the hinge segment generally transverse to a line passing between the first end and the second end of the primary score groove.

### b)    Intrinsic Evidence Supports Crown's Construction

#### (1)    The Specification and Other Claims Make Apparent How Claim 7 Was Intended To Read

Consideration of the language used in the specification to specify the second score makes apparent how claim 7 was intended to read had it not been for the drafting error. The specification describes the second score as passing through "the hinge segment" (not "hinge line") in a direction transverse to a straight line that defines the hinge segment:

> The end 10 includes a score grove 62 that passes through **the hinge segment 26**, preferably generally transverse to **the straight line** defining the hinge segment 26.

(Ex. 1, 230 patent at 6:62-65).

The Summary of the Invention similarly states that the second score intersects "the hinge segment" and does so in a direction transverse to a straight line between the two ends of the score:

> A second groove is formed in the end, extending along a length that intersects the **hinge segment** generally transverse to the **generally straight line** between the two ends of the score groove.

(*Id.* at 3:46-49) (emphasis added).

---

[5] Claim 1 specifies several limitations concerning the hinge segment -- (i) the two ends of the primary score are "separated by a generally linear hinge segment," (ii) "said hinge segment integrally connecting the frangible panel segment to an adjacent area of the panel," and (iii) a second score groove is "adjacent said hinge segment" (Ex. 2, 728 patent at 8:7-13).

Crown's construction is also consistent with other claims. Consideration of claim 14 of the 230 patent, which depends from asserted claim 13, makes clear how claim 7 was intended to read had it not been for the drafting error:

> 14. The end member of claim 13, wherein, the tail portion passes through **the hinge segment** generally transverse to said **straight line** between the first and second end (*Id.* at 9:19-21) (emphasis added).

Thus, both the specification and other claims make clear that claim 7 was intended to specify that the second score pass through the hinge segment and that it does so in a direction that is transverse to a straight line between the two ends of the primary score.

### (2) The Specification Confirms that, Like Hinge Segment, "Hinge Line" Refers to a Region of Metal, Not a Mathematical Line

The patent specification contains only two references to the term "hinge line" and, in both instances, indicates that the term refers to refers to a "region" of metal that bends upon displacement of the frangible pour panel, not a mathematical line:

> This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-scored segment serving as the retaining fragment of metal at the **hinge-line of the displacement of the tear panel**.
>
> . . .
>
> When the user applies such force, a common result is for the **hinge-line region** of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score.

(*Id.* at 1:25-29 and 2:35-40) (emphasis added)

### (3) The Prosecution History Confirms that "Hinge Segment" and "Hinge Line" are Used Interchangeably and that "Hinge Line" Refers to a Region of Metal

The correctness of Crown's construction is also confirmed by the prosecution history of the 230 patent, the parent of the 728 patent,[6] which confirms that the terms "hinge segment" and "hinge line" were intended to be used interchangeably.

Claim 1 of the 230 patent application as originally filed in the PTO specified a "hinge segment" (Ex. 3, U.S. Patent No. 6,129,230 File History at P31). The Examiner rejected the claim over a prior art published Japanese Patent No. 8-244,769 ("769 patent") (Ex. 18, 769 patent; Ex. 3, U.S. Patent No. 6,129,230 File History at P57). A portion of Figure 2 of the 769 patent is reproduced below:



Ex. 18, 769 patent at Figure 2

In his arguments distinguishing claim 1 from the prior art 769 patent, the attorney referred interchangeably to a "hinge segment," "hinge line," "hinge region," and "hinge area," at no point suggesting that any of the these terms were intended to have different meanings:

> [T]he 769 patent discloses a distinctly different structure [from claim 1] wherein the second score clearly does not **transect** the **hinge segment**. As clearly shown in Figure 2 of the 769 patent, the second score 10 terminates short of the adjacent area, and is far short of even the areas near the **hinge line (axis lines "x-x" and "y-y")**. To the extent the 769 discloses any structure **passing through** the **hinge**

---

[6] *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation.").

**line**, such structure (shown as feature 9 in Figure 2 of the 769 patent) is clearly disclosed as a bead (Figures 3(a) – (c))....

. . .

Therefore, not only does the 769 patent specifically disclose the lack of a second score **transecting** the **hinge region**, but specifically discloses that any feature **passing through** the **hinge area** should be a bead or coined region rather than a score line. Accordingly, the 769 patent certainly does not disclose or teach the claimed structure of Claim 1, or the claims dependent therefrom (Claims 2-11 and 20).

(Ex. 3, U.S. Patent No. 6,129,230 File History at P65-P66) (emphasis added).

The attorney's reference to "the hinge line (axis lines 'x-x' and 'y-y')" in the quotation above is instructive. In particular, his identification of the "hinge line" (not "hinge lines") in Figure 2 of the 769 patent as being indicated by "axis lines 'x-x' and 'y-y'" (not "axis lines 'x-x or 'y-y'") illustrates he intended that term to refer to a region of metal – the region between axis lines x-x and y-y in Figure 2 of the 769 patent -- not a mathematical line.

### c)     Extrinsic Evidence Supports Crown's Construction

Crown's expert has confirmed that one skilled in the art would conclude that "the hinge line" referred to in claim 7 to be the same as the "hinge segment" referred to in claim 1, so that claim 7 requires that the second groove pass transversely (*i.e.*, in the crosswise direction) through the hinge segment (Ex. 13, Expert Report of Martin J. Higham Regarding Infringement at ¶ 42). Those skilled in the art would understand that hinging in a metal can end does not occur along a mathematical line, which has no thickness but, rather, occurs in a region of metal that undergoes bending during opening" (*Id.*).

**Redacted**

**Redacted**

**d)    Rexam's Proposed Construction Should be Rejected**

Rexam concedes that clam 7 contains a drafting error (Ex. 19, Rexam's Definitions of Disputed Claim Terms at 8) but argues that "the hinge line" should be corrected to "a hinge line," which it construes differently from the "hinge segment" introduced earlier in claim 1. Thus, under Rexam's proposed correction, the lack of antecedent basis in claim 7 should be corrected by construing the claim to introduce a new element not previously appearing in claim 7 or claim 1 from which claim 7 depends, contrary to *Energizer Holdings*. *See Energizer Holdings*, 435 F.3d at 1371 (correcting lack of antecedent basis by relying on previously recited element, not introducing a new element).   Such a construction is clearly subject to "reasonable debate based on consideration of the claim language and the specification" and the prosecution history suggests a different interpretation.   Therefore, Rexam's proposed construction, if

adopted, would render claim 7 invalid under 35 U.S.C. § 112, ¶ 2 for indefiniteness. *See Novo Indus.*, 350 F.3d at 1357-58.

Rexam's proposed construction should be rejected not only because it is contrary to the case law, but because it is inconsistent the patent specification, other claims, and the prosecution history. As discussed above, each of these items of intrinsic evidence indicates that the terms "hinge segment" and "hinge line" refer to the same thing. While the patent specification refers in several places to the fact that the hinge segment of the invention extends along a "generally straight line" between the ends of the primary score, it never refers to such line as a "hinge line" and nowhere suggests that the line along which the hinge segment extends is the same as the hinge itself (Ex. 1, 230 patent at 3:45-46, 4:59-60, and 6:61-62).

Rexam's proposed construction of "hinge line" also suffers from the same drawback as Rexam's proposed construction of "hinge segment." Rather than set out the meaning of "hinge line," Rexam purports to construe the term by merely reiterating the limitation in the claim that the hinge line pass between the two ends of the primary score. The effect of such a definition is to conflate the claim construction and infringement analyses because, under Rexam's proposal, any line passing between those ends will, by definition, satisfy the claim's requirement for a "hinge line" without regard to whether it bears any relation to the hinge that is formed when the frangible pour panel is opened.

### 3. *adjacent area of the central panel*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *adjacent area of the central panel* | Claim 1 of 230 patent | Portion of the central panel near the hinge segment | Area of the central panel near the frangible panel |

a)    **Intrinsic Evidence Supports Crown's Construction**

The final two elements of claim 1 of the 230 patent state:

> said hinge segment being non-frangible to integrally connect the frangible panel segment to ***an adjacent area of the panel***; and,
>
> a second score groove having a tail portion passing from the frangible panel into ***said adjacent area of the central panel*** and transecting said hinge segment (Ex. 1, 230 patent at 8:12-17).

Thus, the term "adjacent area of the central panel" should be construed to refer to the portion of the central panel near the hinge segment, which the hinge segment integrally connects to the frangible panel.[7] In other words, the claim refers to three regions – (1) a frangible panel, (2) a hinge segment, and (3) an area of the central panel that is adjacent the hinge segment (and is connected to the frangible panel by the hinge segment). These three regions can be seen, for example, in the photograph of the sectioned end accused of infringement (*see supra* p. 14).

The phrase "adjacent area of the central panel" should not be construed as merely the area adjacent the frangible panel, as Rexam proposes, since that area would include the hinge segment itself, which is "near the frangible panel."

In fact, the summary of the invention tracks the language of the last two elements of claim 1 and, in so doing, makes clear that there are three regions of metal and that the term "adjacent area of the central panel" refers to a region of metal beyond the hinge segment, not the hinge segment itself:

> The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel. A second groove is formed in the end, having a tail portion passing from [1] the frangible panel through [2] the hinge segment and extending into [3] the adjacent area of the central panel."

(*Id.* at 3:22-27) (annotations added).

---

[7] The parties agree that the term "adjacent" means "near."

Clearly, the term "adjacent area of the central panel" refers to the area of the central panel adjacent the hinge segment, not the area adjacent the frangible panel (*i.e.*, the hinge segment).

### b)      Extrinsic Evidence Supports Crown's Construction

Crown's expert has confirmed that one skilled in the art, having read the 230 patent and its prosecution history, would conclude that the last element of claim 1 requires that the anti-fracture score cut across, or 'transect,' the hinge segment and then continue beyond the hinge segment into the area of the central panel adjacent the hinge segment (Ex. 13, Expert Report of Martin J. Higham Regarding Infringement at ¶ 27).

### c)      Rexam's Proposed Construction Should Be Rejected

The import, and error, of Rexam's proposed claim construction is revealed by considering the opinion of its expert, Edmund Gillest.  Gillest has opined that the last element of claim 1 of the 230 patent "requires that the anti-fracture score (inner score) lie at least in part in the frangible panel and that it **extend into the generally linear hinge segment**" (Ex. 20, Expert Report of Edmund Gillest Regarding Infringement at 8) (emphasis added).  According to Gillest, the score need not extend beyond the hinge segment into the adjacent area of the central panel, it is sufficient that it extend into the hinge segment and stop there.

Rexam's proposed construction permits this tortured application of the claim.  Since the hinge segment is "near the frangible panel," Rexam can argue that, under its construction, the "hinge segment" itself can be the "adjacent area of the central panel."  As a result, the tail of the second score only need pass into the hinge segment to satisfy the last element of claim 1. Rexam's construction is incorrect because the language of the claim, as well as the specification, makes clear that the hinge segment connects the frangible panel to the adjacent portion of the central panel and that the hinge segment itself is not the "adjacent portion of the central panel."

If Rexam's proposed construction were correct and the "adjacent area of the central panel" referred to the hinge segment itself (because it is near the frangible panel under Rexam's construction), the description of the second groove in the specification as "passing from the frangible panel through the hinge segment and extending into the *adjacent area of the central panel*" (Ex. 1, 230 patent at 3:24-27) would be transformed into the meaningless "passing from the frangible panel through the hinge segment and extending into the *hinge segment*."

4.    *passing through*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *passing through/ passes through* | Claim 13 of 230 patent<br><br>Claim 7 of 728 patent | Going from one end to the other end. | Penetrating into. |

Claim 13 of the 230 patent requires "anti-fracture score having a tail portion ***passing through*** the hinge segment" (*Id.* at 9:17-18) (emphasis added).  Similarly, claim 7 of the 728 patent requires that the "second score groove ***passes through*** the hinge line" (Ex. 2, 728 patent at 8:39).  The requirement that the score "pass through" the hinge should be construed to require that it go from one end of the hinge to the other end of the hinge – in other words, pass through the entire hinge, not merely penetrate into a portion of the hinge as Rexam proposes.

a)    **Intrinsic Evidence Supports Crown's Construction**

The specification supports Crown's construction.  The 230 patent depicts four embodiment of the invention, which are shown Figures 2, 4, 6 and 7 (portions reproduced below) (Ex. 1, 230 patent).  In three of those embodiments (Figures 2, 4 and 7), the second score (24/62) is shown as passing through the hinge segment 26 from one end to the other:



Figure 2

Figure 4

Figure 7

Figure 6

The specification's description of the embodiment shown in Figure 4 states that the end has a "hinge segment 26 along a line between the ends of the score 22" and that the score 62 "passes through the hinge segment" (*Id.* at 6:58-65).

Only one embodiment, shown in Figure 6, depicts a second score with a tail portion 25 that appears to penetrate into but does not pass through the hinge segment 26. Rather than referring to the score groove shown in Figure 6 as "passing through" the hinge segment, per Rexam's construction, the specification uses different terminology, stating that "[i]n the alternative embodiment of FIG. 6, the tail portion 25 [of the second score] terminates in the end

-28-

wall 12 beyond the score 22, and at least **slightly transecting** the line defining the hinge segment 26" (*Id.* at 7:24-27) (emphasis added).

While the Figure 6 embodiment might be covered by claim 1 of the 728 patent, which only requires that the second score be "adjacent the hinge segment," that claim has not been asserted by Rexam in this litigation. Rexam's attempt to morph claim 13 of the 230 patent and claim 7 of the 728 patent, which require that the second score "pass through" the hinge segment, so as to cover such embodiment should be rejected.

Further, in other contexts, the patent specification makes clear that "passing through" means going from one end to the other, not merely penetrating into. Specifically, the specification refers to "a central longitudinal axis 52 of the end 10 **passing through** the rivet 44" (*Id.* at  5:58-59) (emphasis added). As clearly shown in Figure 2, the longitudinal axis 52 passes from one end of the rivet to the other end and does not merely "penetrate into" the rivet as Rexam's proposed construction indicates.

### b) Extrinsic Evidence Supports Crown's Construction

Crown's construction is also consistent with the ordinary meaning of "passing through." For example, the dictionary defines "through" as:

> 1(a) – used as a function word to indicate penetration or passage within, along or across an object, substance or space **usu[ally] from one side or surface to the opposite one** … (2) – used as a function word to indicate passage **from one side to another** of an object by means of an opening or openings … (3) used as a function word to indicate extension **from one end or boundary (as of a place or area) to another** ….

> (Ex. 12, Webster's Third New International Dictionary (2002) ("Webster's") at 2384) (emphasis added).

Crown's expert has confirmed that one skilled in the art, upon reading the specification and prosecution history of the 230 patent, would conclude that "passing through the hinge segment" referred to passing from one end to the other end of the hinge segment (Ex. 13, Expert

Report of Martin J. Higham Regarding Infringement at ¶ 32). Even Rexam's expert referred to

"the 'crossing the hinge line' requirement of clam 7 of the '728 patent," indicating that he did not

understand the requirement of claim 7 that the second score "passes through" the hinge line to

merely mean that it penetrated into the hinge line but that it cross the hinge line (Ex. 21, Edmund

Gillest's Rebuttal to Expert Report of Martin J. Higham Regarding Validity at 7).

### c)    Rexam's Proposed Construction Should Be Rejected

Rexam's proposed construction should be rejected as being inconsistent with the patent

specification and the ordinary meaning of the phrases "passing through" or "passes through."

### 5.    *to direct fracture of metal*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| a second score groove adjacent the second end of said primary score and adjacent said hinge segment *to direct fracture of metal* of said hinge segment in a direction away from said second end of the score | Claim 1 of 728 patent | Subject to §112, ¶ 6. A second score groove that is near the end of the primary score and the hinge segment and that performs the function of directing the fracture of metal of the hinge segment in a direction away from the end of the primary score. The structure for performing this function described in the specification is an anti-fracture score in which the tail portion 25 has a score residual differential that is less than that of the remaining portions of the anti-fracture score. | Not a means plus function limitation under 35 U.S.C. §112 ¶ 6.<br><br>The second score is near the second of the primary score and near the hinge segment to provide a path for a fracture of the hinge segment along the second score. |

The last element of claim 1 of the 728 patent contains a functional element – the

requirement that the second score perform the function of "direct[ing] fracture of metal of said

hinge segment in a direction away from said second end of the score" (Ex. 2, 728 patent at 8:13-

15). However, the claim recites no structure of the score for carrying out this function.

Therefore, pursuant to 35 U.S.C. § 112, ¶ 6, this element should be construed as a "means plus

function" element that is limited to the structures described in the patent specification for performing the fracture directing function and equivalents of such structure.[8]  As part of its claim construction, the court must identify the corresponding structure described in the patent specification for performing the fracture directing function recited in claim 1, as proposed by Crown.[9]

a)  <b>Claim 1 Does Not Recite Sufficient Structure To<br>Perform The Fracture Directing Function And<br>Therefore Is Subject To 35 U.S.C. § 112, ¶ 6</b>

Since the fracture directing element of claim 1 does not contain the term "means," it is subject to a presumption that 35 U.S.C. § 112, ¶ 6 does not apply.  However, "a limitation lacking the term 'means' may overcome the presumption against means-plus-function treatment if it is shown that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Massachusetts Inst. Of Tech. v. Elecs. For Imaging, Inc.*, 462 F.3d 1344, 1353 (Fed. Cir. 2006); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213 (Fed. Cir. 1998) ("Although such a presumption is a helpful in beginning the claim construction analysis, it is not the end of the inquiry.").

Here, the only structure recited in claim 1 is a "second score groove."  While various types of scores have been used in can ends, such as primary scores and anti-fracture scores, the claim nowhere specifies that the second score groove is any known type of score.   Nor does the

---

[8] 35 U.S.C. § 112, ¶ 6 states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

[9] *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998) ("A determination of corresponding structure, therefore, is a determination of the meaning of the 'means' term in the claim and is thus also a matter of claim construction.").

claim specify the depth, width, or shape of the second score groove, only its function and location.[10]  Although a claim need not recite a precise physical structure to avoid the applicabiliity of 35 U.S.C. § 112, ¶ 6, the mere recitation of a "second score groove" does not provide sufficiently definite structure to perform the fracture-directing function. *Mas-Hamilton*, 156 F.3d at 1213-14 (concluding that § 112, ¶ 6 applied "to limit the 'lever moving element' to structures disclosed in the specification and equivalents thereof" because a 'lever moving element' had not been shown to have a generally understood structural meaning in the art").  A second score that is too shallow, for example, will not sever easily enough to cause the fracture to follow the path of the score (Ex. 22, Expert Report of Martin J. Higham Regarding Validity at ¶ 29).

> **b)    The Corresponding Structure Described In The Patent Specification For Performing The Fracture-Directing Function**

The 728 patent states that to ensure that the fracture is directed along the path of the second score and away from the primary score – that is, that the second score performs the fracture-directing function -- the tail of the score should be made more easily severed compared to the remaining regions of the score along a minimum of its length and, in particular, specifies the "residual differential" of the score:

> Having a double score comprised of a frangible score 22 and an anti-fracture score 24 wherein there is a score residual differential is common in the industry.  The common types of end members have a differential maintained generally constant throughout the length of the score 22 and anti-fracture score 24.  For example, if the score residual

---

[10] Merely reciting the location of the second score is not sufficient structure.  In *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983), the claim recited a "blower inlet being located at a level below the bottom wall of the cavity so that …."  Despite the recitation of the location of the blower, and the fact that "so that" rather than "means for" was used, the Court found that "though the functional language is introduced by 'so that', we must read the phrase as the equivalent of one specifying as an element in the claim 'means for continuing convection during autoignition'." *Id.*

differential of **commonly-used ends is set at approximately 0.002 inch**, then that differential is maintained along the entire length of the double score, that is, along the entire length of the score 22 and the adjacent parallel area of the anti-fracture score 24. According to one aspect of the present invention, **the score residual differential is reduced in a tail portion 25 of the anti-fracture score 24.** This reduction of score residual differential at the tail portion 25 provides a tail segment of the anti-fracture score 24 that is **more easily severed relative to the remaining regions of the anti-fracture score 24.** In more general terms, the structure of the present invention is adapted to provide a tail portion of the inner score (the anti-fracture score) 24 that has a score residual 40 adapted to be severed. In the preferred embodiment of the invention the segment of the anti-fracture score that is adapted to be severed by having a **reduced score residual differential** is at least 0.050 inch in linear path length 80, and preferably in the range of 0.200 inch in linear path length 80 **to fully direct any fracture in the hinge segment 26.**

(Ex. 1, 230 patent at 5:28-53) (emphasis added) [11]

Thus, the "corresponding structure" for performing the fracture-directing function of claim 1 that is described in the patent specification is a second score in which, compared to the remaining regions of the second score, the tail has less residual so that the residual differential compared to the primary score is reduced (*i.e.*, to less than 0.002 inch) along a length of at least 0.050 inch.

---

[11] The amount of frangible material remaining below the score groove is referred to as the "score residual" and is indicated in Figure 5 of the 230 patent for the primary score 22 by the number 38 and for the second score 36 by the number 40:



The deeper a score groove, the thinner its residual; the shallower a score groove, the thicker its residual. According to the patent specification, the "difference between [primary] score residual 38 and adjacent anti-fracture score residual 40 is the **score residual differential**" (Ex. 1, 230 patent at 5:13-15).

## IV.    REXAM'S BOTTOM REFORMING PATENTS

### A.    Background Of Rexam's Bottom Reforming Patents

The asserted claims of Rexam's Bottom Reforming Patents are directed to methods of reforming the bottom of beer and beverage cans to improve the strength of the can.

### B.    Disputed Claim Terms of Rexam's Bottom Forming Patents

The parties dispute the construction of five terms in the asserted claims of the Bottom Reforming patents, *i.e.,* claims 11, 12 and 17 of the 242 patent and claim 17 of the 385 patent. Each of these claims is set out below, with the disputed terms in bold italics:

#### 1.    242 Patent, claim 11

11.    A method of reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising;

providing said drawn and ironed beverage container;

providing a reforming roller; and

***moving said reforming roller radially*** into engagement with said substantially longitudinal wall of said beverage container, said ***reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path***, wherein said reforming roller affects the angle of said substantially longitudinal wall (Ex. 6, 242 patent at 13:41-56) (emphasis added).

#### 2.    242 Patent, claim 12

12.    The method of claim 11 including the step of providing ***radial inward support*** for said container (*Id.* at 13:57-58) (emphasis added).

#### 3.    242 Patent, claim 17

17.    The method of claim 11, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container (*Id.* at 14:7-10).

### 4.    385 Patent, claim 17

17.    A method of reforming the bottom of a container, said container having a longitudinal and a radial axis, a generally cylindrical side wall parallel with said longitudinal axis; an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

providing **radially inward support** for said container;

providing a reforming roller; and

**moving said reforming roller radially** into engagement with said substantially longitudinal wall, said *reforming roller rotating along said longitudinal wall and about an arcuate path* in **substantial radial alignment with said radial inward support**;

wherein said reforming roller affects the angle of said substantially longitudinal wall (Ex. 5, 385 patent at 15:21-37) (emphasis added).

### C.    Crown's Proposed Construction Of Rexam's Bottom Reforming Patents

### 1.    *moving said reforming roller radially*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
| --- | --- | --- | --- |
| ***moving said reforming roller radially*** into engagement with said substantially longitudinal wall | Claim 11 of 242 patent<br><br>Claim 17 of 385 patent | Moving the reforming roller from a radially inward position to a radially outward position with respect to the longitudinal axis. | Moving said reforming roller in such a way that said roller's distance from said radial axis changes. |

The Court should rule that the phrase "*moving said reforming roller radially*" means moving a reforming roller from a radially inward position to a radially outward position with respect to the longitudinal axis of the can. This construction is consistent not only with the patent specification, but also with the ordinary meaning of the phrase.

### a)    Intrinsic Evidence Supports Crown's Construction

The 242 and 385 patent specifications and claims define a primary geometrical reference point in the claims as the longitudinal axis of the can, *i.e.,* an axis running through the can centerline.

The specifications describe six different embodiments in which one or more reforming rollers move with respect to the longitudinal axis of the can from a radially inward position at which the rollers do **not** engage the can wall, to a radially outward position at which the rollers are placed into engagement with the can wall to reform the bottom (Ex. 15, 385 patent at Figures 1-3, Figures 4-5, Figures 6-7, Figures 11-12, Figures 13-14, and Figure 19).[12]  For example, in the embodiment of Figures 1-3, rollers 34 are moved from a "radially inward, non-engaging position" (*Id.* at 3:23-25; 29-32 and Figure 1) to a "radially outward position and engaging a wall of a container" (*Id.* at 3:26-28 and Figure 1A).  The other five embodiments operate similarly.  Thus, the specification is consistent with Crown's proposed construction.

### b)    Crown's Construction Is Consistent With the Plain Meaning

The specification does not expressly define the term "radially."  Nor does it indicate that the term has a specialized meaning to those skilled in the art.  Thus, the plain meaning of the term "radially" is appropriate.  *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of the word *"radially"* is in a "radial manner" (Ex. 12, Webster's at 1871).  The ordinary meaning the word *"radial"* is "relating to or placed like a radius (*Id.*).  Thus, the plain meaning of the term "radially" is consistent with the specification and confirms

---

[12] The only embodiment that does not include rollers that move in this manner is that shown in Figures 16-18; this embodiment, however, includes "roller segments" that move with respect to the longitudinal axis from a radially inward position at which the rollers do not engage the can to a radially outward position at which the rollers are placed into engagement with the can wall, in a manner similar to the rollers of the other disclosed embodiments.

that the phrase "*moving said reforming roller radially*" requires movement of the reforming roller from a radially inward position with respect to the longitudinal axis of the can, to a radially outward position with respect to the longitudinal axis and against the can wall to be reformed.

### c)     Rexam's Proposed Construction Should be Rejected

Rexam claims that the phrase "moving said reforming roller radially" means moving the roller in such a way that its "distance from *said radial axis* changes" (emphasis added). But that proposed construction is nonsensical and should be rejected.

The term "radial axis" is undefined and, in the context of the Bottom Reforming patents, undefinable. An axis is a "line about which a body . . . may be supposed to rotate" (*Id*. at 153). Consistent with this plain meaning, the specification defines the longitudinal axis of the can as a line about which the can sidewalls may be supposed to rotate. But the specification nowhere defines a "radial axis" of the can about which any body or surface may be supposed to rotate.

Further, Rexam's proposed construction does not refer to any radial axis, but rather refers to the "*said* radial axis." But the term "radial axis" nowhere appears in claim 11 of the 242 patent, and thus Rexam's proposed construction should be rejected because there would be no antecedent basis in the claim for the "*said* radial axis" referenced in its proposed construction.

Further, while the term "radial axis" does appear in claim 17 of the 385 patent (and therefore provides some antecedent basis), the patent specification nowhere discloses any embodiment in which the distance between a roller and a radius of the can "changes" as required by Rexam's proposed construction. Thus, Rexam's proposed construction finds no support whatever in the patent specification.

2. *reforming roller rotating along said longitudinal wall and about an arcuate path*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *reforming roller rotating along said longitudinal wall and about an arcuate path* | Claim 17 of 385 patent | Reforming roller revolving around its own axis and rolling along the longitudinal wall on a curved path adjacent to the wall. | Reforming roller contacting said longitudinal wall while rotating around said radial axis. |

The Court should rule that the phrase "*reforming roller rotating along said longitudinal wall and about an arcuate path*" refers to a reforming roller revolving around its own axis and rolling along the longitudinal wall on a curved path adjacent to the wall.

### a)    Intrinsic Evidence Supports Crown's Construction

The language of the disputed phrase itself and its context in the claim support Crown's proposed construction, as does the patent specification.

The grammar of the disputed phrase requires that the "reforming roller" rotate, and the ordinary meaning of the word "rotate" is "to turn about an axis or a center: revolve" (*Id.* at 1976).

The context of the disputed phrase within the broader clauses of the claim 17 confirms that the rotation of the roller is rotation that occurs *after* the roller is brought into engagement with the can wall to be reformed.

Further, the specification confirms that after the roller is bought into engagement with the wall, it rotates in two different ways. First, friction between the wall and roller causes the roller to rotate or revolve *about* its own axis. Second, relative movement between the wall and the roller causes the roller to roll *along* the wall. And as the roller rolls *along* the wall, it rotates about the longitudinal axis of the can. In so doing, the roller traces a curved path adjacent to the

-38-

wall of the can.  The curved shape of the wall insures that the path traced by the roller is an arcuate path.

The grammar of the phrase, as written however, suggests that the reforming roller must rotate not only *along* the longitudinal wall, but also *about* an arcuate path.[13]  The use of the terms "along" and "about" to further define the nature of the recited rotation creates mischief and confusion.

As noted above, the ordinary meaning of the word "rotate" is "to turn about an axis or a center: revolve" (Ex. 12 at 1976).   Given that plain meaning, however, the disputed phrase requires that the roller rotate *about* the path.  In fact, however, the roller never rotates "*about*" an axis defined by the path.  Morever, given that the path is arcuate, it cannot define an axis about which the roller rotates because an axis, by definition, is a straight line.

The garbled grammar of the disputed phrase, however, can be clarified by reference to the patent specification.  The specification discloses seven different and alternate embodiments.  Six of the seven described embodiments include one or more reforming rollers that, after engagement with the can wall, revolve *about* or around their respective axes while they roll *along* the wall on a curved path adjacent to the wall (Ex. 5, 385 patent at Figures 1-3, Figures 4-5, Figures 6-7, Figures 11-12, Figures 13-14, and Figure 19).[14]   While each of the six embodiments includes a roller rotating *along* a curved path adjacent the wall, no embodiment includes a roller rotating *about* that path if the phrase "rotate . . . about" is given its plain meaning.

---

[13] The ordinary meaning of "arcuate" is "bent or curved in the form of a bow" (Ex. 12, Webster's at 115).

[14] The only embodiment that does not incorporate this type of movement is depicted in Figures 16-18, and that embodiment does not include a reforming roller.

Resolving the claim's misuse of the phrase "rotate about" by reference to the patent specification, the Court should rule that the phrase "*reforming roller rotating along said longitudinal wall and about an arcuate path*" refers to a reforming roller revolving around its own axis and rolling along the longitudinal wall on a curved path adjacent to the wall.

### b)    Rexam's Proposed Construction Should be Rejected

Rexam claims that the phrase "*reforming roller rotating along said longitudinal wall and about an arcuate path*" refers to a "reforming roller contacting said longitudinal wall while rotating around *said radial axis.*"  That construction is nonsensical and should be rejected.

As noted above, the term "radial axis" is undefined and, in the context of the Bottom Reforming patents, undefinable.  An axis is a "line about which a body . . . may be supposed to rotate" (Ex. 12, Webster's at 153).  The specification defines the longitudinal axis of the can, about which the can sidewalls may be supposed to rotate.  But the specification nowhere defines a "radial axis" about which any body or surface may be supposed to rotate.   Further, the patent specification nowhere discloses any embodiment in which a roller rotates about the radius of a can.  Thus, Rexam's proposed construction finds no support in the patent specification and should be rejected.

### 3.    *reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path* | Claim 11 of 242 patent | Reforming roller revolving around its own axis and rolling along the longitudinal wall on a circular path adjacent to the wall. | Reforming roller contacting said longitudinal wall while rotating around said radial axis. |

The Court should construe the phrase *"reforming roller rotating along said longitudinal wall and **circumferentially** about an arcuate path"* in claim 11 of the 242 patent exactly as it construed the phrase *"reforming roller rotating along said longitudinal wall and about an arcuate path"* found in claim 17 of the 385 patent, *except* that it should further limit the construction to require that the path be "circumferential," *i.e.,* circular.

### a)      Intrinsic Evidence Supports Crown's Construction

The disputed phrase in claim 11 of the 242 patent is identical to the disputed phrase in claim 17 of the 385 patent, with the exception that the roller must rotate ***circumferentially*** about an arcuate path.

The patent specification describes six different embodiments employing reforming rollers (Ex. 6, 242 patent at Figures 1-3, Figures 4-5, Figures 6-7, Figures 11-12, Figures 13-14, and Figure 19). Of these, the embodiment of Figure 19 employs a single roller 134 that rotates along a circular path defined by the can wall and that traces the entire circumference of the wall to be reformed. In contrast, the remaining five embodiments include multiple reforming rollers that rotate along arcuate paths defined by the can wall, but that may or may not trace the entire wall circumference. Claim 17 of the 385 patent, which does not require circumferential rotation, therefore embraces all embodiments that employ a roller. But claim 11 of the 242 patent, which requires *circumferential* rotation, embraces only those embodiments in which the roller path traces the entire circumference of the wall to be reformed, *i.e.*, only those embodiments in which the roller revolves around the wall in at least one complete circle.

### b)   Crown's Construction Is Consistent With the Plain Meaning

The specification does not expressly define the term "circumferentially." Nor does it indicate that the term has a specialized meaning to those skilled in the art. Thus, the plain meaning of the term "circumferentially" is appropriate. *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of the "circumferentially" is "of or relating to the circumference," and the plain meaning of circumference is "the perimeter of a great circle" (Ex. 12, Webster's at 409). The plain meaning of "circumferentially" therefore supports Crown's proposed construction of the phrase "*reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path.*"

### c)   Rexam's Proposed Construction Should be Rejected

Rexam's proposed construction of the disputed phrase in claim 11 of the 242 patent is identical to the construction it proposes with respect to claim 17 of the 385 patent. Rexam, therefore, proposes to give no meaning whatever to the term "circumferentially" in claim 11. Rexam's proposed construction should be rejected for that reason alone. Further, Rexam's proposed construction not only relies upon the undefined term "radial axis" but further relies upon the "*said radial axis,*" a term with no antecedent basis in claim 11. Rexam's construction should be rejected for that reason as well.

4. *radial inward support*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| The method of claim 11 including the step of providing *radial inward support* for said container. | Claim 12 of 242 patent | A device imparting a force directed against the outside of the container and radially inward toward the longitudinal axis. | Support that is generally directed towards the radial axis. |
| Providing *radially inward support* for said container | Claim 17 of 385 patent | A device imparting a force directed against the outside of the container and radially inward toward the longitudinal axis. | Support that is generally directed towards the radial axis. |

The Court should construe the phrase "*radial[ly] inward support*" as a "device imparting a force directed against the outside of the container and radially inward toward the longitudinal axis."

### a)    Intrinsic Evidence Supports Crown's Construction

The patent specification nowhere defines the phrase "radial inward support."  The specification, however, does describe various embodiments that include a device imparting a radially directed inward force against the outside of the can as the inside wall is reformed.  For example, the specification describes a "lower can support," which the specification alternately refers to as a "jig" for that purpose.  The specification states:

> a bottom peripheral profile 50 of the jig 48 substantially corresponds in shape to the outer annular wall 26 of the container 20 . . .  [and] is mated with the outer annular wall 26 of the container 20. . . .  The lowermost part 52 of the jig 48 also corresponds in shape to the radially outermost region of the convex U-shaped portion.  In this way, the jig 48 provides greater support around the circumference of the container 20

(Ex. 5, 385 patent at 6:2-12).

Figure 2 shows the container 20 mated with the jig 48 in the above-noted manner.  Figure 2 indicates that the jig 48 exerts a force directed against the outside of the container and radially

-43-

inward toward the longitudinal axis in response to the engagement of the reforming rollers 36 and the annular, substantially vertical wall 34.

The specification therefore indicates that the term "radial inward support" should be construed as a device imparting a force directed against the outside of the container and radially inward toward the longitudinal axis.

### b)    Crown's Construction Is Consistent With the Plain Meaning

The term "radial inward support" is not defined in the specification, and the specification does not indicate that the term has a specialized meaning to those skilled in the art.  Thus, the plain meaning of this tem is appropriate.  *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of "support" (or "jig") is something that "supports," *i.e.,* "hold[s] in position" (Ex. 12, Webster's at 2297).  The ordinary meaning of "support" therefore is consistent with Crown's construction of the phrase "radial inward support" as a "device imparting a force directed against the outside of the container and radially inward toward the longitudinal axis."

### c)    Rexam's Proposed Construction Should be Rejected

Rexam, however, claims that a "radial inward support" is "support that is generally directed towards the radial axis."   But the term "radial axis" is nowhere defined in the Bottom Reforming patents.  Moreover, it is unclear what supposed *radial axis* is referenced by Rexam's construction because neither the container nor the various bottom reforming embodiments disclosed in the specification have a radial axis about which the container or any other body rotates.  Rexam's proposed construction should therefore be rejected.

5.    *substantial radial alignment with said radial inward support*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| said reforming roller rotating along said longitudinal wall and about an arcuate path in *substantial radial alignment with said radial inward support* | Claim 17 of 385 Patent | The roller path having a height in the direction of the longitudinal axis, more than half of which overlaps with the height of the radial inward support. | At or almost absolute radial alignment with said radial inward support. |

The Court should construe the phrase "*substantial radial alignment with said radial inward support*" as requiring that "the roller path have a height in the direction of the longitudinal axis, more than half of which overlaps with the height of the radial inward support."

a)    **Intrinsic Evidence Supports Crown's Construction**

The context of the phrase "*substantial radial alignment with said radial inward support*" confirms that the phrase refers back to the "radial inward support" previously set forth in the claim.

The context thus confirms that the arcuate path of the reforming roller must be in "*substantial radial alignment*" with the previously defined "radial inward support." As discussed above, the roller path is the path defined by the roller as it revolves around its own axis and rolls along the longitudinal wall on a curved path adjacent to the wall.

The phrase "*substantial radial alignment*" is nowhere found in the patent specification. Figure 2 of the specification, however, indicates that the curved path traced by the rollers adjacent the wall 34 is completely aligned in the radial direction with the jig or lower can support 48, *i.e.*, the roller path and the vertical position the jig or support 48 lie along the same radii extending from the longitudinal axis of the container 20. The roller paths in the remaining

-45-

embodiments likewise are completely aligned in the radial direction with the corresponding jig or lower can support. The disputed phrase in claim 17, however, does not require complete radial alignment, but rather merely requires "substantial" radial alignment between the support and roller path.

### b) Crown's Construction Is Consistent With the Plain Meaning

The term "substantial" is not defined in the specification, and the specification nowehre indicates that the term should be given any specialized meaning. Thus, the plain meaning of the term is appropriate. *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of the term "*substantial*" is "in the main." (Ex. 12, Webster's at 2280). For that reason, Crown does not propose that the roller path have a height (in the direction of the longitudinal axis of the can) that completely overlaps with the height of the radial inward support, but proposes only that the roller path have a height that, "in the main" (more than half), overlaps with the height of the radial inward support.

### c) Rexam's Proposed Construction Should be Rejected

Oddly, Rexam seeks an even more restrictive construction than that proposed by Crown and claims that the phrase "*substantial radial alignment with said radial inward support*" requires that the alignment be "at or almost absolute" between the path and the radial support. Crown does not oppose Rexam's construction *provided* that it is clear that overlap or alignment between the path and support that is "less than half" is not "at or absolute" alignment under Rexam's proposed construction.

-46-

## V.    REXAM NECKING PATENT

### A.    Background of Rexam's Necking Patent

Rexam's U.S. Patent No. 4,774,839 ("839 patent") is directed to methods and apparatus used for forming a reduced diameter neck of beer and beverage containers.

### B.    Disputed Claim Terms of Rexam's Necking Patent

The parties dispute the construction of four terms in the asserted claims of the Rexam Necking Patent, *i.e.*, claims 1, 2, 5 and 11 of the 839 patent. Each of these claims is set out below, with the disputed terms in bold italics:

#### 1.    839 Patent, claim 1

1.    A method of necking an open end of a container side wall to form a *smoothly-shaped neck profile* comprising the steps of:

(a) producing relative axial movement between a container and a first necking die to engage the external surface of a portion of the open end of the container with said first die at a small acute angle to compress said side wall radially inwardly along a length of said container to produce a reduced cylindrical neck at said open end and form a first taper having a first arcuate segment on the end of said side wall and a second arcuate segment on the end of said reduced cylindrical neck;

(b) removing said container from said first necking die;

(c) producing relative axial movement between a second necking die and said container to engage the external surface of the container with the second die at an acute angle to further compress said reduced cylindrical neck inwardly along a length of the container and form a second taper; and

(d) forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper to produce an enlarged smoothly-shaped necked-in profile (Ex. 9, 839 patent at 18:14-40) (emphasis added).

#### 2.    839 Patent, claim 2

2.    A method of die necking as defined in claim 1, wherein said second arcuate segment is *reformed as a part of said second taper* on said first taper whereby the two tapers *combine and blend* into a smooth neck profile (*Id.* at 18:41-45) (emphasis added).

### 3.   839 Patent, claim 5

5.   A method of die necking as in claim 1, further comprising the steps of forming necked-in profile by a series of die elements with each die element forming only a part of the neck profile, and the *part formed by each die element partially integrates and blends with the portion formed by a preceding die element*, and in which the neck profile is axially enlarged by each of said die elements (*Id*. at 18:52-59) (emphasis added).

### 4.   839 Patent, claim 11 (no terms in dispute)

11.   A method of necking an open end of a cylindrical metal container to produce a reduced diameter generally cylindrical portion above a cylindrical side wall through a smooth-shaped portion comprising the steps of (a) forming a necked-in portion on the end of the cylindrical side wall and a reduced diameter cylindrical portion adjacent said open end with the necked-in portion having a first segment contiguous with said cylindrical side wall and a second segment contiguous with said reduced diameter portion; and, (b) reforming only an upper part of the necked-in portion including the second segment and the reduced diameter cylindrical portion to decrease the diameter and length of the reduced diameter cylindrical portion and increase the axial length of the necked-in portion while further compressing the metal therein (*Id*. at 19:17-32).

### C.   Crown's Proposed Construction of Rexam's Necking Patent

#### 1.   *smoothly-shaped neck profile*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *smoothly-shaped neck profile* | Claim 1 | Side view decreasing in diameter towards the open end with no substantial bumps, steps or ribs | Smooth shaped neck profile towards the top of the can |
| *[enlarged] smoothly-shaped necked-in profile* | Claim 1 | Same | Longer or taller section of a container sidewall that smoothly reduces in diameter |

The Court should rule that the phrases "*smoothly-shaped neck profile*" and "*enlarged smoothly-shaped necked-in profile*" mean "a side view decreasing in diameter towards the open end with no substantial bumps, steps or ribs."

-48-

### a)    Intrinsic Evidence Supports Crown's Construction

The phrases "*smoothly-shaped neck profile*" and "*enlarged smoothly-shaped necked-in profile*" are not defined in the specification.  The specification, however, provides guidance into the proper construction of these phrases.

Crown's proposed construction is consistent with the preferred embodiments set forth in the patent specification.  The specification teaches that it is desirable to eliminate steps or ribs from a container neck to produce a "smooth neck construction" (Ex. 9, 839 patent at 2:2-59).  Moreover, Figures 6-11 and 16-18 of the 839 patent include side views of the container as it undergoes the necking process.  The drawings confirm that the necked-in portions 212, 228, 234, 248, 254, and 266 formed during each operation decrease in diameter to become narrower towards the open end of the can, and have no substantial steps, ribs, or other types of bumps.

The specification draws no distinction between the phrases "*smoothly-shaped neck profile*" and "*enlarged smoothly-shaped necked-in profile.*"  The specification does state, however, that: "[i]n each necking operation, a small overlap is created between a previously-necked in portion while the overall necked-in portion is extended and axially enlarged . . . ." (*Id.* at 9:65-68).  The specification further states: "[i]it can be seen that the second or upper arcuate segment CR, which is the upper part of the necked-in portion, is reformed in each subsequent necking operation while the tapered portion is enlarged" (*Id.* at 15:19-22).  The specification thus indicates that the enlargement of the necked-in portion during each necking operation naturally follows from the necking process described therein.

### b)    Crown's Construction Is Consistent With the Plain Meaning

The specification does not define the terms "smoothly," "neck," and "profile."  Moreover, the specification nowhere indicates that these terms have a specialized meaning to

those skilled in the art. Thus, the plain meanings of the terms "smoothly," "neck," and "profile" are appropriate. *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of "profile" is a side or sectional elevation (Ex. 12, Webster's at 1811). The plain meaning of "neck" is a relatively narrow or constricted part joining two other parts or located at an end (*Id.* at 1511). The plain meaning of "smoothly" is being without bumps (*Id.* at 2152). The plain meanings of the terms "smoothly," "neck," and "profile" thus support Crown's position that the phrase "*smoothly-shaped neck profile*" and "*enlarged smoothly-shaped neck profile*" should be construed as "a side view decreasing in diameter towards the open end with no substantial bumps, steps or ribs."

**c)     Rexam's Proposed Construction Should be Rejected**

Rexam claims that the phrase *"smoothly-shaped neck profile"* refers to a "smooth shape neck profile toward the top of the can." That construction, however, merely defines the phrase "*smoothly shaped neck profile*" circularly to mean a "smooth shape neck profile" and would not be helpful to either the jury or the Court. Further, Rexam proposes that the phrase *"enlarged smoothly-shaped neck profile"* refers to a "longer or taller section of a container side wall that smoothly reduces in diameter." Quite apart from the fact that there appears to be no similarity or commonality between Rexam's definition of a "*smoothly-shaped neck profile*" as contrasted with the realted prhase "***enlarged** smoothly-shaped neck profile*," it is unclear what the term "longer or taller section of a container side wall" refers to. Rexam's proposed constructions therefore should be rejected.

2.    *reformed as a part of said second taper*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| wherein said second arcuate segment is *reformed as a part of said second taper* on said first taper | Claim 2 of 839 patent | Changed to become part of [said second taper]. | A second curved segment is changed as a result of the second taper being forced downwardly on the first taper. |

The court should construe the phrase *"reformed as a part of said second taper"* to mean that second arcuate segment is "changed to become part of [the second taper]" on the first taper.

### a)    Intrinsic Evidence Supports Crown's Construction

The specification contains no express definition of the phrase *"reformed as a part of said second taper."* The preferred embodiments described in the specification, however, provide guidance regarding the proper construction of this phrase.

The specification describes the configuration of the can end between the first and second necking operations as follows:

> FIG. 16(a) shows the configuration of the neck in dotted line before the second necking operation, and in solid line after the second necking operation. It will be noted that the lower segment of the tapered portion adjacent the cylindrical side wall remains substantially *unchanged* while the second arcuate segment or upper part of the tapered portion is reformed and the tapered portion is axially elongated.

> (Ex. 9, 839 patent at 12:37-46) (emphasis added).

The specification thus equates the term "reform" with "change," *i.e.*, with the opposite of "unchanged."

The patent drawings also support Crown's proposed construction of the phrase *"reformed as a part of said second taper."* Figure 16(a), reproduced below, shows that the upper part of the tapered portion formed during the first necking operation is changed during the second

-51-

necking operation from the shape indicated by the dotted line to the shape denoted by the adjacent portion of the solid line, so that the upper part of the first taper becomes part of the second taper formed during the second necking operation.[15]



Ex. 9, 839 patent at Figure 16(a)

### b)    Crown's Construction Is Consistent With the Plain Meaning

The plain meaning of "reformed" supports Crown's proposed construction of *"reformed as a part of said second taper."*   The specification does not expressly define the term "reformed."  Nor does it indicate that the term has a specialized meaning to those skilled in the art.  Thus, the plain meaning of the term "reformed" is appropriate.  *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

---

[15] Figures 16(b)-16(e) show that each subsequent necking operation likewise changes the upper part of the tapered portion formed during the previous necking operation to become part of the taper formed during the subsequent operation.

-52-

The plain meaning of "reform" is "to amend or improve by change of form." (Ex. 12, Webster's at 1909). The plain meaning of "reformed" therefore support Crown's proposed construction of "*reformed as a part of said second taper*" as "changed to become part of [the second taper]" on the first taper.

c)      <strong>Rexam's Proposed Construction Should be Rejected</strong>

Rexam claims that the phrase "*reformed as a part of said second taper*" should be construed to require that the second arcuate or curved segment is "changed as a result of the second taper being forced downwardly on the first taper." Rexam's proposed construction, therefore, addresses the technique used to reform the second arcuate segment (by being forced downwardly on the first taper), but fails to address the requirement in the disputed phrase that the curved segment must be reformed "as a part of" the second taper, which is an express requirement of the claim.

3.     *combine and blend*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| whereby the two tapers **combine and blend** into a smooth neck profile | Claim 2 of 839 Patent | Overlap. | Combine and blend. |

The court should construe the phrase *"combine and blend"* to mean "overlap."

a)      <strong>Intrinsic Evidence Supports Crown's Construction</strong>

The specification nowhere defines the terms "combine and blend." The specification provides the following guidance, however, concerning the meaning of the term "blend:"

> In each necking operation, a small *overlap* is created between a previously necked-in portion while the overall necked-in portion is extended and axially enlarged and small segments of reduction are taken so that the various operations *blend* smoothly into the finished necked-in portion.

-53-

(Ex. 9, 839 patent at 9:65-10:2) (emphasis added).

The specification thus equates "overlap" with "blend."

The term "combine" appears only once in the specification, as follows:

> During this second necking operation, the lower part of the first tapered portion remains essentially unchanged while the second tapered portion *combines and blends* with the first tapered portion to produce an extension thereof.

> (*Id.* at 12:42-46) (emphasis added).

The specification thus draws no distinction between the terms "combine" and "blend." The language of the specification therefore supports Crown's proposed construction of the phrase *"combine and blend"* as "overlap."

The patent drawings also support Crown's proposed construction of the disputed phrase. For example, Figures 16(a)-16(e) depict the can body before and after the second through sixth necking operations, and show that the tapered portions formed during each successive set of necking operations overlap to form a single continuous necked-in portion.

### b)    Crown's Construction Is Consistent With the Plain Meaning

The specification nowhere indicates that either of the terms "combined" or "blend" has a specialized meaning to one of ordinary skill. The plain meanings of these terms therefore are appropriate. *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

The plain meaning of "combine" is "blend" (Ex. 12, Webster's at 452). The plain meaning of "blend" is "to combine into an integrated whole" (*Id.* at 233). The lack of a distinction between the terms "combine" and "blend" is therefore supported by the plain meanings of both terms.

### c)     Rexam's Proposed Construction Should be Rejected

Rexam has not construed the term "combine and blend."  Since Crown's proposed
construction is consistent with the patent specification, and unopposed, Crown's proposed
construction should be adopted.

### 4.     *part formed by each die element partially integrates and blends with the portion formed by a preceding die element*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| the *part formed by each die element partially integrates and blends with the portion formed by a preceding die element* | Claim 5 of 839 patent | The portion of the necked-in profile formed by each necking die, other than the first, partially overlaps the portion formed during the preceding operation, so that no substantial bumps, steps, or ribs are present. | The portion of the neck profile formed by each die partially overlaps and is continuous with the profile formed by the preceding die. |

The Court should construe the phrase "*part formed by each die element partially
integrates and blends with the portion formed by a preceding die element*" as "the portion of the
necked-in profile formed by each necking die, other than the first, partially overlaps the portion
formed during the preceding operation, so that no substantial bumps, steps, or ribs are present."

### a)     Intrinsic Evidence Supports Crown's Construction

The phrase "*part formed by each die element partially integrates and blends with the
portion formed by a preceding die element*" is nowhere defined in the patent specification.  The
specification, however, does state:

> During the second necking operation, a second tapered portion is
> essentially freely formed in the reduced cylindrical neck being free of
> the die at its lower end and this second tapered portion is forced along
> the reduced cylindrical neck until it *integrates* with the arcuate
> segment CR1 of the first tapered portion.  During this second necking
> operation, the lower part of the first tapered portion remains essentially
> unchanged while the second tapered portion *combines and blends* with
> the first tapered portion to produce an extension thereof.

(Ex. 9, 839 patent at 12:37-46) (emphasis added).

The specification thus uses each of the terms "integrate," "combine," and "blend" to describe the manner in which the first and second tapers interact during the second necking operation.  As discussed above, the proper construction of combine and blend is "overlap."  The term "partially integrates and blends" should therefore be construed as "partially overlaps."

Figure 16(a), discussed and reproduced above, depicts the can body before and after the second necking operation.  Figure 16(a) shows that the tapered portions formed during the two necking operations overlap to form a single continuous necked-in portion with no substantial bumps, steps, or ribs.  The remainder of Figure 16, together with Figures 17 and 18, indicate that the container is reformed in a similar manner during the third, fourth, fifth, and sixth necking operations.   The first necking operation acts on the un-necked container, and therefore does not act on a portion formed by a preceding die element.

The specification thus indicates that the phrase "*the part formed by each die element partially integrates and blends with the portion formed by a preceding die element*" should be construed as "the portion of the necked-in profile formed by each necking die, other than the first, partially overlaps the portion formed during the preceding operation, so that no substantial bumps, steps, or ribs are present."

b)    **Crown's Construction Is Consistent With the Plain Meaning**

The specification nowehre defines the terms "combined," "blend," or "integrate."  Nor does the specification suggest that any of these terms has a specialized meaning to those skilled in the art.  The plain meanings of these terms therefore are appropriate.  *Wilson Sporting Goods Co.*, 442 F.3d at 1328.

-56-

The plain meaning of "combine," as discussed above, is "blend" (Ex. 12, Webster's at 452). The plain meaning of "blend" is "to combine into an integrated whole" (*Id.* at 233). The plain meaning of "integrate" is "to combine together" (*Id.* at 1174). The lack of a distinction between the terms "combine," "blend," and "integrate" is therefore supported by the plain meaning of the terms.

**c)     Rexam's Proposed Construction Should be Rejected**

Rexam claims that the phrase "*part formed by each die element partially integrates and blends with the portion formed by a preceding die element*" means that the portion of the neck profile formed by each die "partially overlaps and is continuous with the profile formed by the preceding die." The term "continuous," however, is unclear.   Any necking process produces a neck that is continuous, even those methods distinguished during patent prosecution that produce necks containing bumps, steps, or ribs. For that reason, the Court should construe the disputed phrase to require that the part formed by each die element have no substantial bumps, steps, or ribs.

## VI.    CONCLUSION

Based on the points and authorities set forth above, the Court should adopt Crown's proposed construction.

Dated: January 16, 2007

Respectfully submitted,

   /s/ Barry Klayman
Barry M. Klayman, Esquire (#3676)
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 777-0313


*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

*Of Counsel:*

Dale M. Heist
Lynn A. Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100

Michael Korniczky
Crown Cork & Seal USA, Inc.
One Crown Way
Philadelphia, Pennsylvania  19154

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of **CROWN'S OPENING CLAIM CONSTRUCTION BRIEF ELATING TO REXAM'S PATENTS** has been forwarded on this the 16th day of January, 2007, in accordance with the Federal Rules of Civil Procedure, to the following:

**VIA E-MAIL:**
Gerald C. Willis, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601

**VIA FEDERAL EXPRESS:**
Anne Shea Gaza, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899


Date: January 16, 2007                          ___/s/ Barry Klayman_____
                                                            Barry M. Klayman, Esquire (#3676)