# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Crown Packaging Technology, Inc. and
Crown Cork and Seal USA, Inc.,

            Plaintiff/Counter Defendant,

    v.

Rexam Beverage Can Company,

            Defendant/Counterclaimant

C. A. No. 05-608 (MPT)

**REDACTED - PUBLIC VERSION**

## REXAM BEVERAGE CAN COMPANY'S OPENING
## CLAIM CONSTRUCTION BRIEF

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
312-775-8000

Dated:  January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Defendant/Counterclaimant*
   *Rexam Beverage Can Co.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................................iv

INTRODUCTION ..............................................................................................................................1

I.    CLAIM CONSTRUCTION LAW ...........................................................................................1

    A.    General Claim Construction Principles ...........................................................................1

    B.    Claims Must Be Limited To The Described Invention ...................................................2

    C.    Claim Preambles ............................................................................................................3

    D.    Definiteness Under 35 U.S.C. § 112 ..............................................................................4

II.   CROWN'S '826 AND '875 PATENTS ...................................................................................5

    A.    Technical Background .....................................................................................................5

    B.    The Asserted Invention of Crown's '826 and '875 Patents ...........................................6

         1.    The Anti-Peaking Bead That Is Required by Crown's Invention ......................6
         2.    The Angled End Wall and Its Deformation During Seaming That
              Are Required by Crown's Invention ................................................................8

    C.    Rexam's Accused Rexam End ........................................................................................9

    D.    Claim Limitations of the '826 Patent ............................................................................10

         1.    First  And  Second  Chuck  Walls  Forming  A  Juncture
              Therebetween .................................................................................................10
         2.    Peripheral Cover Hook Of A Can End ............................................................11
         3.    Seaming Panel Adapted To Be Formed Into A Portion Of Said
              Double Seam During Said Seaming Operation ...............................................12
         4.    A Wall Extending Inwardly And Downwardly From Said Cover
              Hook ...............................................................................................................13
         5.    A First Portion Of Said Wall Extending From Said Cover Hook ....................14
         6.    A First Point on Said Wall ..............................................................................14
          7.    Adapted To Be Deformed During Said Seaming Operation" ..........................14
         8.    Bent Upwardly Around Said Juncture Of Said Chuck Walls At
              Said First Point On Said Wall .........................................................................15
         9.    A Second Point Forming A Lowermost End Of Said Wall ..............................15
         10.   Annular Reinforcing Bead ..............................................................................15

    E.    The Claim Limitations Of The '875 Patent ...................................................................16

         1.    A Circumferentially Extending Peripheral Cover Hook ..................................16
          2.    A Seaming Panel .............................................................................................16
          3.    A  Circumferentially  Extending  Wall  Comprising  First  And
              Second Portion[s] ............................................................................................16

i

4.  First Wall Portion Extending From Said Seaming Panel To A First Location On Said Wall And Comprising A Radiused Portion Extending From Said Seaming Panel .......................... 17

5.  A Second Location On Said Wall, The Second Wall Location Being The Lowermost Point Of Said Wall .......................... 17

6.  Wherein A Straight Line Extending Between Said First And Second Locations On Said Wall Is Inclined Between About 20° And About 60° With Respect To An Axial Centerline Of Said Can End .......................... 18

7.  Said First Portion Of Said Can End Wall Being Pressed Against Said Chuck First Wall So That At Least A Portion Of Said First Portion Of Said Can End Wall Is Bent Upward Through An Angle Of At Least About 16° .......................... 18

8.  Said First Location On Said Wall After Said Seaming Operation Forming The Transition From Said Double Seam To Said Second Wall Portion .......................... 18

9.  Inclined Between About 30° And About 50° .......................... 19

10. Said Can End Wall First Portion Is Reformed By Bending Upward By An Angle Of At Least About 26° .......................... 19

11. A Circumferentially Extending Peripheral Cover Hook .......................... 19

12. Said Peripheral Cover Hook Comprising A Seaming Panel .......................... 19

13. An Annular Reinforcing Bead .......................... 19

14. A Circumferential Extending Wall Extending from Said Seaming Panel .......................... 19

15. Forming A Transition Therebetween .......................... 19

16. First And Second Circumferentially Extending Walls .......................... 20

17. Said Second Chuck Wall Depending From Said First Chuck Wall So As To Form A Juncture Therebetween .......................... 20

18. To Bend A Portion Of Said Can End Wall Upwardly Around Said Juncture Of Said Chuck Walls At A First Location On Said Can End Wall .......................... 20

19. A Portion Of Said Can End Wall Being Bent Upwardly During Seaming Operation Is Bent Upward Through An Angle Of At Least About 16° .......................... 20

20. Between About 30° and about 50° .......................... 20

III.  REXAM'S '230 AND '728 PATENTS .......................... 21

A.  Technical Background Related to the '230 and '728 Patents .......................... 21

B.  The Claims of the '230 and '728 Patents .......................... 22

1.  Hinge Segment (Claims 1 & 13 of the '230, Claim 7 of the '728) .......................... 23

2.  Hinge Line (Claim 7 of '728) .......................... 24

3.  Passing Through (Claim 13 of '230)/Passes Through (Claim 7 of '728) .......................... 25

4.  Adjacent Area of the Central Panel (Claim 1 of '230) .......................... 26

5.  To Direct Fracture of Metal of Said Hinge Segment in a Direction Away from Said Second End of the Score (Claim 1 of '728) .......................... 27

IV.  REXAM'S '385 AND '242 PATENTS .......................... 28

ii

A.    Technical Background Related to the '385 and '242 Patents .................................28

B.    The Claims of the '385 and '242 Patents .....................................................29

    1.    Rexam Accepts Crown's Proposed Constructions of Terms for shich Rexam Offers Similar Constructions ............................................29

    2.    Substantial Radial Alignment with Said Radial Inward Support (Claim 17 of the '385 Patent) .................................................................30

    3.    Negative Angle (A) (Claim 17 of the '242 Patent) ...............................30

V.    REXAM'S '839 PATENT ..........................................................................................31

A.    Disputed Terms of the '839 Patent ....................................................................32

    1.    Forcing Said Second Taper Downwardly Until It Is Contiguous with Said First Taper and Reforms Only an Upper Portion of Said First Taper While Producing an Extension of Said First Taper ........................................................................................................32

    2.    [Enlarged] Smoothly-Shaped Neck Profile (Claim 1) ..........................33

    3.    Reformed as a Part of Said Second Taper on Said First Taper (Claim 2) ...............................................................................................34

    4.    Combine and Blend (Claim 2) ..............................................................35

    5.    Part Formed by Each Die Element Partially Integrates and Blends with the Portion Formed by the Preceding Die Element (Claim 2) ...............................................................................................35

    6.    Through a Smooth Shaped Portion (Claim 11) .....................................35

    7.    Reforming Only an Upper Part ... While Further Compressing (Claim 11) .............................................................................................35

VII.    CONCLUSION ..........................................................................................................36

## TABLE OF AUTHORITIES

### CASES

*Astrazeneca AB v. Mutual Pharmaceutical,*
    384 F.3d 1333 (Fed. Cir. 2004)............................................................................3

*Bancorp Servs., LLC v. Hartford Life Ins. Co.,*
    359 F.3d 1367 (Fed. Cir. 2004).......................................................................4, 5

*Bayer AG v. Biovail Corp.,*
    279 F.3d 1340 (Fed. Cir. 2002)............................................................................2

*Bell Atl. Network Srvs. v. Covad Communs. Group, Inc.,*
    242 F.3d 1258 (Fed. Cir. 2001)............................................................................1

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.,*
    289 F.3d 801 (Fed. Cir. 2002)..............................................................................3

*Clearstream Wastewater Sys. v. Hydro-Action, Inc.,*
    206 F.3d 1440 (Fed. Cir. 2000)..........................................................................25

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005).......................................................................4, 5

*Eaton Corp. v. Rockwell Int'l Corp.,*
    323 F.3d 1332 (Fed. Cir. 2003)............................................................................3

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)............................................................................4

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.,*
    356 F.3d 1348 (Fed. Cir. 2004)............................................................................3

*Honeywell Intern., Inc. v. ITT Industries, Inc.,*
    452 F.3d 1312 (Fed. Cir. 2006).......................................................................2, 3

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.,*
    401 F.3d 1367 (Fed. Cir. 2005)............................................................................4

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004)..............................................................................3

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)..............................................................................................4

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)...........................................................................3

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................1, 2

*S3 Inc. v. nVIDIA Corp.*,
    259 F.3d 1364 (Fed. Cir. 2001)...........................................................................4

*Sandisk Corp. v. Memorex Prods.*,
    415 F.3d 1278 (Fed. Cir. 2005)...........................................................................2

*Scimed Life Systems v. Advanced Cardiovascular*,
    242 F.3d 1337 (Fed. Cir. 2001)...........................................................................2

*Varco, L.P. v. Pason Sys. USA Corp.*,
    436 F.3d 1368 (Fed. Cir. 2006)........................................................................2, 3

*Wilson Sporting Goods Co. v. Hillerich & Bradsby*,
    442 F.3d 1322 (Fed. Cir. 2006)...........................................................................9

## STATUTES

35 U.S.C. § 112 ¶ 2 ...........................................................................................4

## INTRODUCTION

On December 15, 2006, the parties jointly submitted a table of the parties' proposed constructions of patent claim terms that are asserted in this action. Rexam Beverage Can Company ("Rexam") has construed the disputed terms of U.S. Patent Numbers 6,848,875 ("the '875 Patent") and 6,935,826 ("the '826 Patent") asserted by Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown"). Rexam has also construed the disputed claim terms in Rexam's asserted U.S. Patent Numbers 4,774,839 ("the '839 Patent"), 5,222,385 ("the '385 Patent"), 5,697,242 ("the '242 "Patent"), 6,129,230 ("the '230 Patent") and 6,260,728 ("the '728 Patent") as set forth below.

## I.    CLAIM CONSTRUCTION LAW

### A.    General Claim Construction Principles

The words of a claim "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Ordinary and customary meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. The sources used to derive the claim term's meaning "include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed.Cir. 2004)). The person of ordinary skill is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips* at 1313. The specification, as intrinsic evidence, "is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Even when guidance is not provided in explicit definitional format, "the specification may define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a reading of the patent documents.'" *Bell Atl. Network Srvs. v. Covad Communs. Group, Inc.*, 242 F.3d 1258, 1268 (Fed. Cir. 2001) (quoting *Vitronics*, 90 F.3d at 1582). The prosecution history is also intrinsic evidence, and should be considered where in evidence. *Phillips* at 1317.

In examining the specification to discern the meaning of a term, the court "will not at any time import limitations from the specification into the claims." *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006) (quoting *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005)); *see also Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002). Thus, "references to a preferred embodiment, such as those often present in a specification, are not claim limitations." *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) (citation omitted).

"In some cases, the ordinary meaning of claim language as understood by a person of ordinary skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. The person of ordinary skill in this art is submitted to be a person with a bachelor's degree in mechanical engineering or similar technical degree and three to four years of experience in the industry, or an individual without a technical degree who has six to ten years of experience in the field of can body and/or can end design, manufacture and seaming. (*See* Gillest Decl. ¶ 3.) (A 119-121.)

### B.  Claims Must Be Limited To The Described Invention

Patent claims must be read in view of the patent specification which is always highly relevant and is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The importance of the patent specification is based on the statutory requirement that the specification "describe the **claimed** invention in 'full, clear, concise, and exact terms.'" *Id.* at 1316 (quoting 35 U.S.C. 112 ¶ 1, emphasis added). One way that a patent specification limits a claim's construction is to exclude a feature from the scope of the claims, when the specification "makes clear that the invention does not include a particular feature." *Scimed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Such an exclusion by the specification requires that the claims be limited "even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.*

A specification can exclude all but a disclosed structure or particular types of structures. *Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). A specification does not limit the scope of claims only because it does not broadly describe embodiments of the

2

invention. Rather, a specification limits the scope of claims to a particular structure where it makes clear that the invention is limited to that particular structure. *See Liebel-Flarsheim Co. v Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (analyzing case law and finding that the specification at issue did not clearly limit the claims to a particular structure). A specification must clearly disclose that an invention is limited for the claims of the patent to be limited by the specification. However, no formal statement of limitation is necessary. *Astrazeneca AB v. Mutual Pharmaceutical*, 384 F.3d 1333, 1340 (Fed. Cir. 2004). A limiting specification cannot be broadened by later statements. "Where, as here, the written description clearly identifies what [the] invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight." *Honeywell*, 452 F.3d at 1319.

### C.    Claim Preambles

"No litmus test defines when a preamble limits claim scope." *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). "Whether to treat a preamble as a limitation is a determination 'resolved only on review of the entire patent ... to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" *Id.* (citation omitted). A claim preamble acts as a regular limitation on a claim if "it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim," *Glaxo Wellcome, Inc v Impax Labs., Inc.*, 356 F.3d 1348, 1353 (Fed. Cir. 2004) (citation omitted), but not "where it merely recites a purpose or intended use of the invention." *Varco L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006) (citation omitted).

In some cases, the preamble aids in determining the claim scope. *See NTP, Inc. v Research in Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005) (stating that the preamble was necessary to provide context for the claim limitations and therefore was used appropriately in claim construction); *see also Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

**D.    Definiteness Under 35 U.S.C. § 112**

Section 112, *inter alia*, requires that a specification conclude with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The test for meeting the statutory requirement that the claim be "definite" is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005). The requirement that the claims particularly point out and distinctly claim the invention is met "when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001).

Federal Circuit jurisprudence has made the direct relationship between definiteness and claim construction abundantly clear. Simply put, "the definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). Since the job of ascertaining the meaning of claim terms is "exclusively within the province of the court," *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), a determination that a patent claim is invalid for indefiniteness is "drawn from the court's performance of its duty as the construer of patent claims." *Bancorp Servs., LLC v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004); *see also S3 Inc.*, 259 F.3d at 1367 ("The question of whether the claims meet the statutory requirements of § 112 ¶ 2 is a matter of construction of the claims . . ."). Moreover, like claim construction, indefiniteness is solely a question of law and does not involve any underlying factual determinations. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*)). For a claim to be indefinite, it must not be amenable to construction. In other words, the court must determine that "those skilled in the art would [not] understand what is claimed when the claim is read in light of the specification." *Bancorp*, 359 F.3d at 1372. Although "a claim is not indefinite merely because it poses a difficult issue of claim construction," if the claim remains "insolubly ambiguous" after reasonable efforts

4

at claim construction, then it must be found invalid for indefiniteness. *Id.; accord Datamize,* 417 F.3d at 1347.

## II.    CROWN'S '826 AND '875 PATENTS

### A.    Technical Background

Crown's '826 and '875 Patents are directed to a can end that has a specified shape and to a method of forming a double seam joining a can end that has a specified shape to a can body, respectively. A can end is made in two operations. First, a shell press stamps a thin round disc of metal into the general shape of a can end. Second, a conversion press stamps a score that forms the panel that opens the end into the can end, makes a tab to open the panel, forms a rivet in the can end and attaches the tab to the end with the rivet. There is no accepted and precise terminology in the can industry that identifies the parts of a can end. The parts of a can end are referred to by



different names. The photograph above and excerpt from Fig. 1 of Crown's patents show the parts of the can end with the most commonly used terms.

The can end has a cover hook (or curl) at its outer edge that is designed to fit over a flange at the top of the can body. The can end also has an end wall (sometimes called a chuck wall), a countersink (also referred to as an anti-peaking bead or annular reinforcing bead), and a central panel.

Can ends are attached to can bodies by a process that is known as double seaming. Double seaming involves two seaming operations in a machine that is known as a double-seamer. The double-seamer places a can end onto the can body flange with the assistance of a driving piece known as the seaming chuck. As illustrated below, the two seaming operations roll the end's cover hook and the

5

body's flange together to form the double seam.  The figures below illustrate the process of double seaming a conventional can end.[1]



### B.    The Asserted Invention of Crown's '826 and '875 Patents

Crown's patents say that the inventors "have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall and limiting the width of the anti peaking bead." '875 Patent[2] col. 1 ln 32 – 34.  (A 22.)  Those patents identify the particular can end provided by the invention as having an angled wall **and** a narrow anti-peaking bead.

> [T]his invention provides a can end comprising a peripheral cover hook, a chuck wall dependant from the interior of the chuck wall, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterized in that, the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between 30° and 60°, and the concave bead narrower than 1.5 mm (0.060").

'875 Patent at col. 1 ln. 64 – col. 2 ln. 5.  (A 22.)  In the '826 and '875 Patents and during their prosecution, Crown argued that its can end was patentable because that end had a wall at a greater angle than prior can ends and because it deformed that end during seaming more than prior can ends.

### 1.    The Anti-Peaking Bead That Is Required by Crown's Invention

The anti-peaking bead, which Crown's patents also refer to as an outwardly concave annular reinforcing bead, is a generally U-shaped bead that was known in the prior art.  Crown's patents illustrate

---

[1] The seaming illustrations are from a Miller Brewing Company video made in 1992.  Rexam's expert reviewed the video, determined that the video accurately depicted the beverage can industry's standard end and the conventional seaming process for beverage cans and can ends as of 1992 and relied upon the video (A 290.) in addition to his own knowledge and experience in forming his opinions.

[2] Crown's '875 Patent and '826 Patent contain the same figures and description but the exact location of text varies between those patents.  (A15-41.)

a prior art annular reinforcing bead in Fig. 2 and describe that bead as the "outwardly concave anti-peaking bead 15." '875 Patent at col. 3 ln. 13 -14. (A 18, 23.) Crown's patents describe a prior art patent to Kraska and a prior art Crown patent as disclosing "an outwardly concave annular re-inforcing bead." *Id.* col. 1 ln. 22-23, 47-48. (A 22.) Crown's patents also acknowledge that a narrow generally U-shaped bead strengthens a can end. Those patents also describe a prior Crown patent as providing "a narrow, and therefore strong reinforcing bead." *Id.* col. 1 ln. 60 - 61. (A 22.)

In addition to providing strength to a can end, the generally U-shaped annular reinforcing bead serves another purpose. A tool, called a chuck that is identified as 5 in Fig 2 of Crown's patents, includes an annular projection, (referred to by Crown's patents as an annular bead, annulus, projecting bead, and chuck bead 19) that fits into the annular reinforcing bead as illustrated by Fig. 2. (A 18.) The chuck enters the can end from above, as depicted by Figs. 1 and 2, to support the can end during seaming of the can end to the can body. '875 Patent at col. 2 line 61 – col. 3 ln. 10. (A 22.) The chuck's projecting bead drives the can end by rotating it. *Id.* at col. 3 ln. 27 – 30 and 33 – 35. (A 23.) Because the chuck's annular projection enters into and exits from the annular reinforcing bead of the can end from above, that bead opens upwardly and extends up and down along the length of the can.

Though narrowing the U-shaped annular reinforcing bead strengthened the can, the problems with narrowing that bead, according to Crown's patents referring to Fig. 2, are that:

> As can ends are developed with narrower anti-peaking beads the chuck bead 19 becomes narrower and more likely to fracture. There is also a risk of scuffing of the can end at the drive position D which can leave unacceptable unsightly black marks after pasteurisation.

'875 Patent at col. 3 ln. 31 -35. (A 23.) To avoid these problems, Crown's patents say that the invention provides a chuck that contacts the can end on an angled wall above the annular reinforcing bead "without entering deeply into the anti-peaking bead 25." *Id* at col. 4 ln. 38 – 41. (A 23.) The anti-peaking bead of Crown's patents conventionally opens upward to allow the chuck to enter the bead, but the chuck does not enter "deeply" into the upwardly opening generally U-shaped anti-peaking bead.

Every embodiment of the invention that is shown and/or described by Crown's patents has the upwardly opening generally U-shaped anti-peaking or annular reinforcing bead positioned between the

7

can end wall and the central panel. '826 and '875 Patents, Figs. 4 – 7 and 9. (A 19-21.) Crown's patents make clear that the U-shaped annular reinforcing bead is the only configuration contemplated by the Crown patents by providing typical dimensions for the heights of the inner and outer legs of the bead, $h_3$ and $h_4$, and the radius of the bottom of the U, $r_3$. '875 Patent Fig. 4, col. 4 ln. 3, 8 – 9. (A 19, 23.) Tables that show performance of can ends according to the alleged invention show the dimensions of the U-shaped annular bead. *Id.* at tables 2 and 5 at cols. 6 and 8. (A24-25.) Crown's patents also specify the range of angles for the outer leg of the U-shaped bead. *Id.* col. 3 ln. 51 – 54. (A 23.)

Crown's patents clearly and consistently describe the invention as including a can end that has an improved (narrower), but otherwise conventional generally U-shaped annular reinforcing bead that opens upwardly and extends along the length of the can. Nothing in Crown's patents or their prosecution histories varies from that description.

### 2.    The Angled End Wall and Its Deformation During Seaming That Are Required by Crown's Invention

The end wall of a prior industry "standard can end" is inclined at an angle of approximately 12° - 15° from the vertical axis. '875 Patent at col. 3 ln. 15 – 17. (A 23.) Crown's alleged invention is a can end with end wall angles of between 20° and 60°. *Id.* at ln. 48. (A 23.) As shown by Figures 2 and 5 of Crown's patents, increasing the angle of the end wall reduces the diameter of the central panel. As was known in the prior art and as set out by the examples listed by table 6 of Crown's patents, increasing the angle of the wall also reduces the amount of metal needed to make the can end.



An additional advantage of reducing the size of the central panel and having a narrow anti-peaking bead, according to Crown's patents, is that the end is stronger and can be made from thinner metal.

The ends may be economically made of thinner metal if the pressure retention requirements permit because these can ends have a relatively small centre panel in a stiffer annulus.

'875 Patent at col. 8 ln. 25 –27. (A 25.)

8

Crown argued during prosecution of the '875 Patent that, as shown by Fig. 2 of its patents, conventional ends had a wall at a "relatively shallow angle" of 12° to 15° and that after being deformed during seaming to an angle of 4°, that wall remained essentially straight. '875 Prosecution Reply submitted 6/9/2004 at p. 2. (A 122-126.) Crown's invention was different, Crown argued, because it began with an end having a "particular geometry," including a wall as shown by Fig. 4 of its patents and as recited by the claims that require the wall to be at an angle greater than 20°, and the end was deformed during the seaming process as shown by Figs. 6 and 7 of its patents to an angle of 4°. *Id.* (A19-20.) During later prosecution of the '826 patent, Crown admitted that the prior art suggested walls at an angle up to 20°. Crown then submitted claims that required an angle of at least 30°. '826 prosecution Reply submitted 8/9/2004 at pp. 3 – 5, 8. (A 127-143.) Crown also submitted a declaration that called its deformation of its claimed ends during seaming "a radically different method of seaming." Higham Decl. at ¶ 52, July 29, 2004. (A 144-164.) Crown's prosecution statements make clear that both the angle of the can end wall and deforming the wall during seaming are essential elements of Crown's alleged invention.

### C.    Rexam's Accused Rexam End

Construction of the claims of Crown's patents cannot be based on the product that Crown accuses of infringement. *Wilson Sporting Goods Co. v. Hillerich* & Bradsby, 442 F.3d 1322, 1327 (Fed. Cir. 2006). However, "knowledge of that product . . . provides meaningful context for the first step of the infringement analysis, claim construction. *Id.* at 1326 – 27. Rexam's accused Rexam End is depicted adjacent. The Rexam End has a peripheral curl (cover hook) that is seamed to a can body in a nearly conventional manner. The wall of the Rexam End that extends from the



cover hook is smoothly, though not consistently, curved. The wall extends through a fold to the central panel. The fold, as is the entire wall, is above the central panel. The fold turns radially outwardly to join the central panel. The Rexam End is seamed to a can body using a seaming chuck that has an upper section that is straight (in cross section) and a lower section that extends downwardly from the upper section and is smoothly and continuously curved.



(A 346 )

### D.    Claim Limitations of the '826 Patent

The '826 patent has fourteen claims, and Crown has asserted that Rexam has infringed claims 13 and 14.

Can ends are generally disc shaped, can bodies are generally cylindrical with a closed bottom, and seaming chucks are generally cylindrical. Crown's patents, as do many patents for can ends and can bodies, show the shape of can ends, can bodies, and seaming chucks as cross sections. As is also conventional, the can ends and can bodies are shown in a conventional upright position, with the outer side of the can end facing upwardly whether positioned on a can body or not, and can bodies positioned having their closed bottom down and the open end to which a can end is seamed is at the top. In the joint table of disputed claim terms, Rexam included some descriptive language to refer to these conventional representations. In particular, Rexam included the phrase "when looking at a cross section." The parties apparently agree as to this convention for depicting can ends and can bodies, and for describing their shapes in cross sections and in the upright position. Rexam adopts those conventions here and will not explicitly state, for example, "when looking at a cross section" in each proposed construction.

### 1.    First And Second Chuck Walls Forming A Juncture Therebetween

The preamble of claim 13 of the '826 patent requires a rotatable chuck having "first and second chuck walls forming a juncture therebetween." (A41.) Rexam's proposed construction is "an upper wall and a lower wall of a seaming chuck (also referred to as the first and second walls) meet at a point (juncture) to form a distinct angle." (*See* Joint Claim Chart, at 2 ) (A 2 )

Every figure of Crown's patents that depicts a chuck, shows a chuck having upper and lower straight walls that meet at a point, as does Fig 6 reproduced adjacent. The



Fig 6

first and second chuck walls are shown in red and yellow respectively. Those two walls meet a point to form a distinct angle. The angle can easily be seen in Figs. 2, 5, 7 and 8 as well. Every chuck that is shown or described by Crown's patents has two walls that are straight and that meet to form an identifiable angle. (A15-41.) Crown's patents provide no basis to identify the boundaries adjacent chuck walls other than at the ends of the straight lines in their cross sections, and no basis to identify a juncture between two chuck walls other than at an identifiable angle as shown in every depiction of a seaming chuck. Rexam's proposed construction is clear, completely consistent with Crown's patents' specifications, and relies on the only characteristic of a juncture between chuck walls that is discernable from those patents.

Crown construes this term as "first and second walls encircling the chuck forming a place between them at which they meet." (A2.) That construction provides no basis to identify the required juncture.

### 2.    Peripheral Cover Hook Of A Can End

Claim 13 of Crown's '826 Patent requires a can end to have a peripheral cover hook. The term "peripheral cover hook" is generally used in the industry to refer to a section of a can end that is a portion of a double seam. Gillest Decl. at ¶ 7. (A 120-121.) However, the Crown patents use this term to refer to the outer portion of an unseamed can end. *See e.g.* '875 Patent at col. 3 ln. 40. (A 23.) Based on that usage, Rexam construes this limitation to mean "The outermost portion of the can end that is curved or conforms to one or more radii, which engages a can body flange to form at least a part of a double seam, and ends where the curved or radiused portion(s) stops." (A 4.) Rexam's proposed construction identifies both where the cover hook is located, where it should begin and where it should end – where the curved portion ends.

Rexam's proposed construction is proper in light of the further requirement of claim 13 of the '826 patent for "a wall extending inwardly and downwardly from said cover hook." '826 patent at col. 10 ln. 50. (A 41.) The location at which the wall extends from the peripheral cover hook can only be identified as the innermost


Fig 6.

extent of the peripheral cover hook. These claim requirements are consistent with the specification of Crown's patents that describe a can end that has "a peripheral cover hook 23, a chuck wall 24 extending axially and inwardly from the interior of the peripheral cover hook." '826 patent at col. 3 ln. 55-57. (A 38.) The peripheral cover hook is highlighted in red and engages the flange (item number 11) as shown above.

Crown's patents provide no description of a peripheral cover hook or of a wall that provides a basis to identify the location at which the cover hook ends and the wall begins. The only basis that Crown's patents provide to identify that location is, as shown by Figs. 4, 5 and 6 of those patents, that cover hook 23 is curved and wall 24 is not curved. (A 34-35.) Having used an imprecise term, cover hook, in a non-standard way, Crown's patents must be construed based on the only information they provide. That is the basis for Rexam's proposed construction. Rexam's proposed construction is equally applicable to "a circumferentially extending peripheral cover hook" of claim 32 of the '875 Patent. (A 28.)

Crown's proposed construction of this term gives no indication as to where the cover hook begins or where it ends in relation to the other part of the can end. That construction should not be adopted.

### 3. Seaming Panel Adapted To Be Formed Into A Portion Of Said Double Seam During Said Seaming Operation

Rexam's construction of this limitation is "an uppermost portion of the peripheral cover hook formed by a constant radius, that has some treatment or conditioning that makes the seaming panel easier to deform than the rest of the can end to become part of the double seam during seaming to a can body." (A 4.) Rexam's construction is based upon the plain and customary meaning of those terms and on the specification of Crown's patents.

Crown's patent's specifications contain only one reference to a seaming panel. That reference is to a "seaming panel radius" in the table in col. 4 of the '826 Patent at line 19. (A 38.) Figure 4 of the patent specification shows a diagram of an embodiment of the claimed can end that identifies heights, radii and diameters of portions of the can end. (A 34.) The table in column 4 provides values for those heights, radii and diameters shown in Figure 4. (A 38.) The table identifies "$r_2$" as the "seaming panel

radius." As shown by Fig. 4, that constant radius describes the upper section of the peripheral cover hook 23. (*Id.*) Crown relied on those during prosecution of the '875 Patent as supporting use of the term "seaming panel" in a claim. (A 34.)

Rexam's construction is also supported by claim 13. That claim recites both a cover hook and a seaming panel that comprises a portion of the cover hook, but requires "a wall extending inwardly and downwardly **from said cover hook**, ..." ('826 Patent, col. 10, ln. 44-46; ln. 50-51, emphasis added.) (A 41.) That requirement is inconsistent with the seaming panel being the innermost portion of the cover hook from which the wall extends, as Crown proposes.

There is nothing in the specification or claims to explain how the seaming panel is "adapted to be formed" or what is different about the seaming panel than the rest of the peripheral cover hook. However, the plain meaning of "adapted" implies that it has been modified in some way.

The specification clearly supports Rexam's proposed construction of "a seaming panel adapted to be formed into a portion of said double seam during said seaming operation". This construction of "seaming panel" is equally applicable to the "comprising a seaming panel" limitation of claim 32 of the '875 patent. (A 28.)

### 4.    A Wall Extending Inwardly And Downwardly From Said Cover Hook

Rexam's construction of this limitation requires that "when looking at a cross section of the can end, a wall that begins where the peripheral cover hook ends, and extends to a lowermost point, which is located inwardly (toward the center of the can end) and downwardly (towards the bottom of the can) from the end of the cover hook." (A 3.) Rexam's proposed construction of this limitation is based upon the plain and ordinary meaning of the terms and the further requirement of claim 13 that the wall reach a lowermost point. According to the plain language of claim 13, the wall begins where the cover hook ends and extends down and in from the cover hook towards the center and towards the bottom of the can. Rexam's construction specifies where the items of the limitation are located on the can end and relies on the plain and ordinary meaning of the terms set forth in this limitation.

13

### 5.    A First Portion Of Said Wall Extending From Said Cover Hook

Rexam construes this term to mean "the upper portion of the end wall (or chuck wall) that begins where the cover hook ends." Rexam's construction is based upon the plain and ordinary meaning of the disputed terms. (A 3.) Rexam's construction is based on the clear meaning of the claim term and explains, where the "first portion" is located in relation to the cover hook.

### 6.    A First Point on Said Wall

Rexam construes this claim to mean "the point on the wall of the can end, which can only be determined by looking at a cross section of the end with a seaming chuck in place, where the wall bends about the juncture of the two chuck walls of the seaming chuck during seaming." (A 3.) That construction is based on the ordinary meaning of the claim terms and on the further requirement, as discussed in section 8 below, that the end wall be adapted to be bent upwardly around the juncture of the seaming chuck walls at the first location.



Fig 6.

As shown by Fig. 6, if a seaming chuck is placed on the can end, one can estimate where the first point would be by locating the "juncture" of the seaming chuck's walls, as described in Section D.1 above.

Other than the figures, there is no guidance in the specification or the claims of the '826 patent for determining where the "first point" is located. Rexam's proposed construction is based on the only disclosed basis for locating the first point.

### 7.    Adapted To Be Deformed During Said Seaming Operation"

Rexam construes this limitation to mean "some treatment or conditioning, done to the first wall portion of the can end that makes the first wall portion easier to deform than the rest of the can end." (A 3.) The claim states that the wall is "adapted" to be deformed. There is nothing in the claims or the specification of the '826 patent that describes how the wall is "adapted" to be deformed or what is different about the first wall portion from the rest of the can end. The plain meaning of "adapted" implies that it has been modified in some way. Crown's proposed construction offers little, if any, explanation of this limitation. (A 3.)

8.    **Bent Upwardly Around Said Juncture Of Said Chuck Walls At Said First Point On Said Wall**

Rexam's and Crown's proposed constructions are not that different with respect to this limitation and either construction would be appropriate. (*See* Joint Claim Chart at 3.) (A 3.) Rexam understands this limitation to be directed to the portion of the can end that bends about the juncture. For example, the bending from angle C to angle B shown in Fig. 2 and the bending of the can end wall from the angle C to surface 33 of the chuck shown in Fig. 5. (A 18, 19.)

9.    **A Second Point Forming A Lowermost End Of Said Wall**

Rexam construes this limitation to mean "the specific place on the wall nearest the central panel (toward the bottom of the can)." (A 5.) The plain and customary meaning of the terms would imply that the lowest point of the wall would be the point closest to the central panel. This is based on every can end disclosed by Crown's patents in prior art and in embodiments of the invention that have a wall that meets an annular reinforcing bead (anti-peaking bead or countersink) located radially inward from the end wall and that extends below the central panel. As implicitly described by Crown's patents, the wall ends at the annular reinforcing bead which connects the wall and central panel.

Here again, Crown's proposed construction offers little explanation as to what this limitation means. (A 5.) Where Rexam's proposed construction provides a basis to locate the lower most point of the wall, Crown's does not. Rexam's construction is fully supported by the claims of the '826 Patent, its specification and the plain meaning of the claim terms.

10.    **Annular Reinforcing Bead**

Rexam construes this limitation to mean "an outwardly concave generally "U" shaped groove (also called a countersink or anti-peaking bead) that is stamped or pressed into the can end, and is located inwards from the bottom of the wall (chuck wall), which encircles and supports the center panel of the can end." (A 4.) This construction is consistent with all of the disclosures in Crown's patents.



Fig 4

The term "annular reinforcing bead" is used interchangeably in the specification with countersink and anti-peaking bead. ('826 patent, col. 1 ln. 37, col. 4 ln. 62 – 63.) (A 38.) As set out above in

Section III.B.1, an annular reinforcing bead as described by Rexam's proposed construction is essential to the invention described by Crown's patents. Rexam's construction is not only appropriate, but clearly required by the specifications of Crown's patents.

Crown's proposed construction, "a ring like stiffening channel" is vague and outside the clear requirements of Crown's specifications. (A 4.) Crown's construction is completely unsupported.

### E.    The Claim Limitations Of The '875 Patent

The '875 Patent has 62 claims and Crown has asserted that Rexam has infringed claims 32, 33, 34, 50, 51 and 52. Many of the disputed claim terms of the '875 Patent overlap with the disputed claim terms of claim 13 of the '826 Patent and have the same construction.

#### 1.    A Circumferentially Extending Peripheral Cover Hook

Rexam's construction of this limitation of claim 32 of the '875 Patent is the same as that proposed for a peripheral cover hook as required by claim 13 of the '826 Patent. Rexam's arguments for that construction in Section D.2 above apply to the limitation of claim 32 of the '875 Patent.

#### 2.    A Seaming Panel

Rexam's construction of this limitation of claim 32 of the '875 Patent is the same as that proposed for the seaming panel as required by claim 13 of the '826 Patent. Rexam's arguments for that construction in Section D.3 above apply to this limitation of claim 32 of the '875 Patent.

#### 3.    A Circumferentially Extending Wall Comprising First And Second Portion[s]

Rexam's construction of this limitation of claim 32 of the '875 Patent is "an end wall extending around the center panel that has upper and lower parts that can be identified only during and after seaming." (A 4.) Rexam's construction is based on the further requirements of claim 32 of the '875 Patent that identifies the location of the boundary between the first and second wall portions as set out in Sections 7 and 8 below. The requirement of Section 7 is directed to the process of seaming the can end to a can body, and the requirement of section 8 is directed to the configuration of the can end after seaming Those requirements cannot be met before seaming is complete. With the seaming chuck in place, one can arguably determine, depending on the geometry of the seaming chuck, whether those additional

16

requirements will be met and therefore where the first and second wall portions will be located. Rexam's proposed construction is consistent with and required by other requirements of claim 32 of the '875 Patent.

Crown's construction offers no guidance as to the location of the first and second wall portions. (A.4.)

### 4. First Wall Portion Extending From Said Seaming Panel To A First Location On Said Wall And Comprising A Radiused Portion Extending From Said Seaming Panel

Rexam construes this limitation to mean "the upper portion of the end wall begins where the seaming panel ends and the upper portion of the end wall has a curved portion that is different from the radius of the seaming panel (i.e., the radiused portion of the upper portion of the wall is a part of the cover hook)" and "the point on the wall of the can end, which can only be determined by looking at the end after seaming that is at the lowermost extent of the double seam." (A.5.) The construction of "first location" is addressed by Section E.3 above.

Rexam construes the term "seaming panel" as it did for claim 13 of the '826 patent. The basis for that construction is set out above for that claim. As discussed there, the only basis for identifying the seaming panel is its characteristic radius. Therefore, the end of the seaming panel can only be identified by a change in the radius of the can end. As shown by Fig. 4 of Crown's patents, the inner end of the seaming panel is the location at which the radius $r_1$, the seaming panel/chuck wall radius, represents the curvature of the can end. '875 Patent col. 3 ln. 67. (A.19, A.23, and A.34.) Rexam's construction is based on the only relevant disclosure of Crown's patents.

Here again, Crown offers very little, if any, construction for this limitation. (A.5.)

### 5. A Second Location On Said Wall, The Second Wall Location Being The Lowermost Point Of Said Wall

Rexam's proposed construction is the same that is proposed for the term "lowermost end" of the wall for claim 13 of the '826 patent and is proposed here for the reasons set out there. *See* Section D.9 above. As before, Crown's proposed construction does not provide any guidance as to where the

17

"lowermost point" of the wall is located. (A 5.) To the extent that construction of this term is possible,

Rexam's construction is supported by the specification of Crown's patents.

**6.      Wherein A Straight Line Extending Between Said First And Second Locations On Said Wall Is Inclined Between About 20° And About 60° With Respect To An Axial Centerline Of Said Can End**

The parties' proposed claim constructions of this term are very close to the extent that both are

based on the recited first and second locations. There is significant disagreement as to construction of

those terms. Crown proposes no basis to evaluate the scope of the word "about" as used here. Rexam

asserts that the term is vague and should be disregarded.

**7.      Said First Portion Of Said Can End Wall Being Pressed Against Said Chuck First Wall So That At Least A Portion Of Said First Portion Of Said Can End Wall Is Bent Upward Through An Angle Of At Least About 16°**

To the extent that this limitation can be construed, Rexam construes it to mean "a portion of the

upper wall (chuck wall), which is above the first location, is bent upwards, when looking at a cross

section drawing, around the first location by 16 degrees (less 1 degree or plus 1 degree or more)." (A 5.)

Rexam construes this term similarly to the bent upwardly term of claim 13 of the '826 patent and for the

same reasons. *See* Section D.7 above. Rexam asserts that this term refers to the section of the can end

that is bent against the first chuck wall at the first location as shown by Figs. 5 – 7 of the Crown patents

and the recited angle is determined at that location as is shown by Figs. 2 and 5 of those patents. This

construction is supported by clear disclosure of the Crown patents. (A 18-20.)

**8.      Said First Location On Said Wall After Said Seaming Operation Forming The Transition From Said Double Seam To Said Second Wall Portion**

Rexam construes this limitation of claim 32 of the '875 patent to mean "the location on the end

wall at the lowermost extent of the double seam." (A 6.) Rexam asserts that the plain meaning of the

claim terms means that the "first location" recited by claim 32 of the '875 Patent is the point or place

where the seam ends and the lower or "second wall portion" begins. That location is shown at the right

side of Fig. 7 of Crown's patents. (A 20.) Crown's

proposed construction does not provide any basis to identify

the location of the transition. (A 6.) It is no construction at



Fig. 7.

all. Rexam's proposed construction is clear and supported by Crown's patent's specification.

### 9. Inclined Between About 30° And About 50°

Claim 33 depends from claim 32 and further limits the requirements addressed by Section E.6 above. This requirement appears to raise no issues in addition to those addressed in Section E.6.

### 10. Said Can End Wall First Portion Is Reformed By Bending Upward By An Angle Of At Least About 26°

Claim 34 depends from claim 33 and recites this additional requirement to narrow the element addressed by Section E.7 above. This requirement of claim 34 raises no issues in addition to those addressed in Section E.7.

### 11. A Circumferentially Extending Peripheral Cover Hook

This limitation of claim 50 is the same as that of claim 13 of the '826 Patent. Rexam proposes the same construction for the reasons set out in Section D.2 above.

### 12. Said Peripheral Cover Hook Comprising A Seaming Panel

This limitation of claim 50 is the same as that of claim 13 of the '826 Patent. Rexam proposes the same construction for the reasons set out in Section D.3 above.

### 13. An Annular Reinforcing Bead

This limitation of claim 50 is the same as that of claim 14 of the '826 Patent. Rexam proposes the same construction for the reasons set out in Section D.10 above.

### 14. A Circumferential Extending Wall Extending from Said Seaming Panel

The requirement that the wall extend from the "seaming panel" is the same as that of claim 32 of the '875 Patent. Rexam proposes the same construction as that of claim 32 of the '875 Patent for the reasons set out in Section E.3 above.

### 15. Forming A Transition Therebetween

Rexam construes this limitation to mean "a radiused portion of the can end, between the vertical wall of the annular reinforcing bead (countersink) and the second portion of the wall (chuck wall)." (A 7.) Here again, Crown's proposed construction offers no guidance as to the location of this "transition." (A 7.) This is not surprising as there is nothing in the claims or the rest of the specification to support this

19

limitation. Crown's patents provide no specific disclosure where the second portion of the end wall ends and the annular reinforcing bead begins. To the extent that this limitation can be construed, Rexam's construction is based upon the plain and customary meaning of the terms at issue and provides guidance as to where the "transition" is located.

### 16. First And Second Circumferentially Extending Walls

This limitation of claim 50 is the same as that of the first claim term of claim 13 of the '826 Patent. Rexam proposes the same construction for the reasons set out by Section D.1 above.

### 17. Said Second Chuck Wall Depending From Said First Chuck Wall So As To Form A Juncture Therebetween

This limitation of claim 50 is the same as that of item number 1 in claim 13 of the '826 Patent. Rexam proposes the same construction for the reasons set out by Section D.1 above.

### 18. To Bend A Portion Of Said Can End Wall Upwardly Around Said Juncture Of Said Chuck Walls At A First Location On Said Can End Wall

This limitation is similar to that of claim 32 of the '875 Patent but omits the requirement of a specific amount of bonding. Rexam proposes the same construction as for that limitation of claim 32, though without the requirement for a specified amount of bonding, for the same reasons set out in Section E.7 above.

### 19. A Portion Of Said Can End Wall Being Bent Upwardly During Seaming Operation Is Bent Upward Through An Angle Of At Least About 16°

This limitation of claim 51 is the same as that of item number 7 in claim 32 of the '875 Patent. Rexam proposes the same construction for the reasons set out by Section E.7 above.

### 20. Between About 30° and about 50°

Both parties incorporated their respective definitions from claims 32 through 34 of the '875 Patent. Rexam relies on the arguments made for those claims.

20

## III.    REXAM'S '230 AND '728 PATENTS

### A.    Technical Background Related to the '230 and '728 Patents

Today, nearly all can ends are "ecology" can ends,

meaning they are designed to be opened without detaching

(and thus having to dispose of) any parts of the can end.



These can ends have a "frangible panel," (also known as a "tear panel," "opening panel," or "pour

panel"), the border of which is formed in the central panel by an incomplete circular-shaped score line

and a non-scored segment. This score line is called the "primary score." The non-scored segment of the

circular score line serves as a hinge portion and allows the frangible panel to be pushed downwards into

the can body without detaching from the central panel.

To open the container, a person simply

pulls the tab apparatus (which remains connected to

the central panel by a rivet) to fracture the primary

score of the frangible panel. As the tab is pulled

upward, the fracture progresses along the primary



score and the frangible panel is pushed downwards so that the beverage may flow freely from the can

Importantly, the frangible panel remains attached to the central panel via the non-scored hinge portion.

The primary score is a generally V-shaped groove which is formed by a score knife that is pushed

into the top side of the central panel. The amount of metal remaining underneath the score groove is

called the "score residual." The process of carving out the primary score creates forces which may cause

the residual metal to fracture. Engineers discovered long ago that fracture could be avoided by forming a

secondary or "anti-fracture" score parallel to the primary score at the same time that the main score is

being cut. The anti-fracture score is shallower than the primary score (in other words, it has a greater

score residual and is harder to tear). This ensures that, upon pulling the tab, the tear will progress along

the more easily severable primary score, rather than the secondary score.

The Rexam patents involve a new modification to the anti-fracture score. As manufacturers have reduced the gauge of their can ends, the ends have become more prone to buckling when subjected to greater internal pressures. A familiar example is the bulge that can form in a soda can after being dropped. Once this bulge forms, the can end no longer functions as designed. Instead, when the user pulls the tab, the primary score fractures at the wrong location and at the wrong time. Lacking leverage, the tab fails to open the frangible panel wide enough for the user to effectively drink from the can. At this point, the user often resorts to applying some outside force (possibly a finger or some other tool) to open the pour panel. However, the problem with this kind of "abuse opening" is that it often causes a fracture along the hinge portion and results in the complete detachment of the frangible panel from the can end – thereby creating a choking hazard and potential pollutant.

Rexam's solution to this detachment problem involves extending the end or tail portion of the anti-fracture score into the hinge portion of the frangible panel. The tail portion ensures that the frangible panel remains attached to the can end by preventing any tear during an abuse opening from reaching the primary score. Any unintended tear along the hinge portion is diverted along the secondary score line, while a span of metal keeps the pour panel attached to the can end.



### B.    The Claims of the '230 and '728 Patents

The '728 Patent is a continuation of the earlier-filed '230 Patent. (A 110.) This means that it does not disclose any new matter and is entitled to the same priority date as the '230 Patent. In fact, the specifications of the two patents are identical (all citations below are to the '230 specification unless noted otherwise). Therefore, claim terms that are used in both patents find the same support in the common specification.

### 1.     Hinge Segment (Claims 1 & 13 of the '230, Claim 7 of the '728)

Rexam construes this term to mean, the segment of metal between the first end and the second end of the primary score that stays attached to the central panel of the can end under normal opening conditions. (A 9.)

The hinge segment is clearly defined in the claims and specification of the Rexam patents. Time and time again, the text of the specification explains that the hinge segment is located between the two ends of the primary score. (A 101-118.) Furthermore, all of the patents' figures display the hinge segment, which is identified by the number 26, as the segment of metal between these two points. Because the specification is clear on this point, any construction of the hinge segment must involve the region of metal between the two ends of the primary score.

All of the claims asserted by Rexam in this case define the hinge segment via reference to the first and second ends of the primary score. *See* Claim 1 of both the '230 and '728 Patents ("the first end and the second end being separated by a generally linear hinge segment of the central panel wall"); Claim 13 of the '230 Patent ("said hinge segment having a length defined by a generally straight line between said first end and said second end") (A 108, 117.) The claims themselves therefore support the construction of the hinge segment as the segment of metal between the two ends of the primary score.

Turning to the specification, the "Detailed Description" section expressly defines the hinge segment:

> The hinge segment 26 is defined by a generally straight line between a first end 28 and a second end 30 of the frangible score.

Col. 4, ln. 59-61. (A 106.) In describing an alternative embodiment of the invention, the '230 specification again states:

> In this embodiment, the end member 10 has a panel wall 12 having a tear panel 20 defined by a frangible score 22 with a first end 28 and a second end 30, <u>and a hinge segment 26 along a straight line between the ends of the score 22.</u>

Col. 6, ln. 58-62 (emphasis added). (A 107.) In addition, the "Summary of the Invention" section explains:

> The score groove has a first end adjacent the vent region and a second end joined to the first by a curvilinear segment of the score groove, <u>whereby the first end and the second</u>

23

> end is [sic] separated by a generally linear hinge segment of the central panel wall. The
> hinge segment is non-frangible to integrally connect the frangible panel segment to an
> adjacent area of the panel.

Col. 3, ln. 17-24 (emphasis added). (A 106.) Finally, the summary section also notes:

> It is further an object of the invention to provide an end member having a curvilinear
> score groove with two ends separated by a hinge segment extending along a generally
> straight line between the two ends.

Col. 3, ln. 43-46 (emphasis added). (A 106.)

Just as a picture speaks a thousand words, so too do the figures of the '230 and '728 Patents. The

hinge segment is identified by the number 26 (in Figures 2, 4, 6, and 7) and clearly marks the region of

metal between the first and second ends of the primary score (identified by the numbers 28 and 30,

respectively). (A 102-104.)



### 2.    Hinge Line (Claim 7 of '728)

Rexam construes this term to mean, a line between the first end and the second end of the primary

score. Claim 7 of the '728 Patent expressly defines the hinge line as a line "passing between the first end

and the second end of the primary score groove." '728 Patent, col. 8, ln. 39-41. (A 117.) The claim

requires that a portion of the second score groove pass through this hinge line in a generally transverse

orientation.

While the hinge segment is the region of
metal "defined by a generally straight line" between
the two ends of the primary score, the hinge line is
the line itself. A person of ordinary skill in the art
would quickly recognize the hinge line in Figure 6
and Figure 7 of the specification. (A 113.)



The specification explains that, in Figure 6, the tail portion 25 is "at least slightly transecting the line defining the hinge segment 26." '728 Patent, col. 7, ln. 29-30. (A 117.) The line from which the hinge segment is defined (or from which it emanates) is the hinge line. The doctrine of claim differentiation supports Rexam's construction that the hinge line is distinct from the hinge segment. *See Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed Cir. 2000) ("Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims."). Dependent claim 7 introduces the claim term "hinge line," as opposed to the term "hinge segment" used earlier in claim 1. (A 117.) A person of ordinary skill in the art would recognize this distinction and would understand the hinge line to be a line between the first and second ends of the primary score.

### 3. Passing Through (Claim 13 of '230)/Passes Through (Claim 7 of '728)

Rexam construes this term to mean: penetrating into.

Claim 13 of the '230 Patent requires that the anti-fracture score have a tail portion "passing through the hinge segment." col. 9, ln. 16-17. (A 109.) Claim 7 of the '728 Patent requires that the second score "passes through the [*sic*, a] hinge line generally transverse to a [*sic*, the] hinge line passing between the first end and the second end of the primary score groove." col. 8, ln. 39-41. (A 117.) While the claim itself is silent as to the meaning of this term, the figures in the specification clearly show that the invention encompasses anti-fracture scores that penetrate into the hinge segment, *i.e.*, the region of metal defined by the line between the first and second ends of the primary score. For example, it is clear that the anti-fracture score (25) of the preferred embodiment depicted in Figure 2 passes through the hinge segment (26). (A 111.) The specification describes this embodiment by saying that the anti-fracture score's tail portion "intersects the hinge segment." '230 Patent, col. 6, ln. 42-43. (A 107.) Similarly, the alternative embodiment depicted in Figure 4 "includes a score groove 62 that passes through the hinge segment 26." '230 Patent, col. 6, ln. 63-64. (A 107.) However, the invention also includes the embodiment depicted in Figure 6. (A 104.) The specification states that: "In the alternative



embodiment of FIG. 6, the tail portion 25 terminates in the end wall 12 beyond the score 22, and <u>at least slightly transecting the line defining the hinge segment 26</u>." '230 Patent, col. 7, ln. 24-27 (emphasis added). (A 108.) Transecting the line defining the hinge segment must therefore also be included within "passing through" the hinge segment.

Since the term "through" does not have a specialized definition in the can industry, Rexam's construction uses the general meaning of the term.    This term will be examined at the time of filing of the '230 Patent, 1998. Webster's Third New International Dictionary defines through as:

> 1 a (1) – used as a function word to indicate **penetration of or passage within**, along, or across an object, substance, or space usu. from one side or surface to the opposite one

Webster's Third New International Dictionary, 2384 (1st ed. 1961)(7th ed. 2002)(same definition).    (A 208-211, A 214-A-216.)    The definition clearly states that through means "penetration...within" a space.  Rexam's proposed construction of "penetrating into" the hinge segment applies this definition.

### 4.    Adjacent Area of the Central Panel (Claim 1 of '230)

Rexam construes this term to mean, the area of the central panel near the frangible panel.  More specifically, Rexam believes that the frangible panel and "adjacent area of the central panel" lie next to each other.  The claims and the specification support this construction.

Claim 1 of the '230 Patent explains that the hinge segment serves to "integrally connect the frangible panel segment to an adjacent area of the [central] panel." '230 Patent, col. 8, ln 13-14).  (A 108.) Claim 1 also requires that the tail portion of the second score groove pass from "the frangible panel into said adjacent area of the central panel." '230 Patent, col. 8, ln. 16-17.  (A 108.)  The claim itself clearly suggests that the reference area of the central panel lies adjacent to the frangible panel.

The specification also supports Rexam's construction.  For example, at one point the hinge segment is referred to as a part of the frangible panel. '230 Patent, col. 3, ln. 53-54 (A 106.) ("the hinge region of the frangible tear panel").  This suggests that the hinge segment is not mutually exclusive of the frangible panel or the adjacent area of the central panel.

##### 5.    To Direct Fracture of Metal of Said Hinge Segment in a Direction Away from Said Second End of the Score (Claim 1 of '728)

Rexam construes this term to mean, to provide a path for a fracture of the hinge segment along the second score. (A 10.)

Claim 1 of the '728 Patent requires the can end to include:

a second score groove adjacent the second end of said primary score and adjacent said hinge segment <u>to direct fracture of metal of said hinge segment in a direction away from said second end of the score.</u>

col. 8, ln. 12-15 (emphasis added). (A 117.) The "directing away" term is a functional limitation, but should not be construed as a means plus function limitation under 35 U.S.C. § 112 ¶ 6. First, the claim doesn't use the term "means," and therefore does not trigger the presumption that it is a means plus function limitation. Furthermore, it recites sufficient structure to perform the function of directing the fracture away from the second end of the primary score. Specifically, the claim recites both a structure (a second score groove) and a location (adjacent the second end of the primary score and adjacent the hinge segment). A person of ordinary skill in the art would understand that a second score groove in that particular location would be able to receive fractures of metal and direct them away from the end of the primary score.

The specification explains: "Much like the operation and structure described above regarding the anti-fracture score 24, the second groove is a groove into the panel wall 12 that has a groove depth and remaining residual." '728 Patent, col. 6, ln. 67 – col. 7, ln. 3. (A 116.) A person of ordinary skill would recognize that fracturing metal will follow the path of least resistance. Therefore, since the second score groove is thinner than the full thickness of the central panel wall, the recited structure is able to perform the functional limitation of directing the metal away from reaching the primary score. Additionally, asserted claim 7 places a further structural limitation on the second score groove – namely that a portion of it must pass through the hinge line in a generally transverse orientation.

IV.    REXAM'S '385 AND '242 PATENTS

A.    Technical Background Related to the '385 and '242 Patents

Rexam's '385 and '242 Patents relate to a method of reforming the bottom of a can body, also known as the base of the can body. The base has a number of identifiable features. The diagram below is a cross section of the bottom of a can indicating the stand bead, dome, outer wall and inner wall (also known as the reverse wall, substantially vertical wall or substantially longitudinal wall).



The initial shape of the base is formed in a typical can bodymaker. After the basic shape has been formed, a doming station uses a die to create the dome and the inner wall of the base. After doming, the inner wall can be reformed using the method from Rexam's '385 and '242 Patents.

Rexam developed this method in response to can manufacturers' interest in decreasing the cost of can bodies by reducing the amount of metal used to form the body. In order to retain the strength of the base while decreasing the thickness of the metal, Rexam engineers determined optimal shapes for the inner wall. These shapes typically included angles that could not be formed using a doming station alone. To achieve these optimal shapes, Rexam developed a process called internal bottom reforming. The '385 and '242 Patents relate to Rexam's internal bottom reforming process.

Rexam's technique reforms the inner wall after the doming station operation using a reforming roller. A beverage can is held in place at its base. The reforming roller is positioned under the dome and is moved outwardly in order to contact and change the shape of the inner wall. After the roller makes contact with the inner wall and alters the shape of the wall in that spot, the roller is moved around the inside of the base of the can, thereby altering the shape of the inner wall around the entire can.



The reformed cans show significantly improved buckle resistance, decreased can growth when exposed to internal pressure, and significantly greater overall can strength. One large purchaser, Anheuser Busch, requires that all cans that they purchase have a reformed inner wall.

### B.    The Claims of the '385 and '242 Patents

The '385 and '242 Patents have 27 and 22 claims respectively, all relating to bottom reforming. Rexam is asserting that Crown has infringed the method of claim 17 of the '385 Patent and the method of claims 11, 12 and 17 of the '242 Patent.

The '242 Patent is related to the earlier-filed '385 Patent by a string of continuation applications. This means that it does not disclose any new matter and is entitled to the same priority date as the '385 Patent. The specifications of the two patents are largely identical. Where the two patents are identical, citation will be made to the '385 Patent specification. Where the two patents are different, it will be noted. Therefore, claim terms that are used in both patents find the same support in the common portions of the specification.

The relevant art is can and can end manufacturing, design and assembly. A person of ordinary skill in the art is the same as set forth above.

### 1.    Rexam Accepts Crown's Proposed Constructions of Terms for shich Rexam Offers Similar Constructions

In preparing this brief, Rexam has noted that proposed constructions of several terms are expressed differently by Rexam and Crown. They nevertheless appear to be based on the same underlying support and therefore are not substantively different. Rexam believes that the proposed constructions of the following terms are essentially the same:

- Moving said reforming roller radially (claim 17 of the '385, claims 11, 12, and 17 of the '242)

- Reforming roller rotating along said longitudinal wall and about an arcuate path (claim 17 of the '385)

29

- Reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path (claims 11, 12 and 17 of the '242)

- Radially inward support (claim 17 of the '385, claim 12 of the '242)

Since, in Rexam's opinion, the sides have not offered differing constructions for these claim terms, Crown's constructions of these claim terms are appropriate.

### 2.    Substantial Radial Alignment with Said Radial Inward Support (Claim 17 of the '385 Patent)

Rexam construes this term to mean, at or almost absolute radial alignment with said radial inward support. (A 11.) Rexam has already discussed its proposed claim construction for "radial inward support" and this limitation of claim 17 further supports that proposed construction. Rexam considers the word "substantial" to be the only term remaining to be construed in this limitation. Rexam's proposed construction applies the plain and customary meaning of the term "substantial."

Since the term "substantial" does not have a specialized definition in the can industry, Rexam's construction uses the general meaning of the term "substantial." This term will be examined at the time of filing of the '385 Patent, 1991. Webster's Third New International Dictionary defines substantial as:

> 4    a: being that specified to a large degree or in the main
> b: of or relating to the main part of something

Webster's Third New International Dictionary, 2280 (1st ed. 1961)(6th ed. 1993)(same definition). (A 208-211, A 212-214.) Rexam's proposed construction of "at or almost absolute" radial alignment applies this definition.

### 3.    Negative Angle (A) (Claim 17 of the '242 Patent)

Rexam construes this term to mean, slope that generally tends to move radially outwards as it moves axially upwards. (A 11.) Rexam's construction is supported by the '242 Patent specification. The specification supports an upper wall that "generally tends to move radially outwards."

> A goal of the invention was to create a substantially longitudinal wall having a negative angle. It is comprehended that the <u>reforming roller</u> affects the angle of the substantially longitudinal wall by <u>achieving a negative angle (A)</u> from the longitudinal axis of the container.

'242 Patent, col. 3, ln. 7-10 (emphasis added). (A 95.) Figure 21 shows a "cross-section of a lower portion of a can reformed by the process of the ['242 patent]." (A 93.)

30



FIG. 21

This picture shows that a wall that "generally tends to move radially outwards" but does have a slight inward sloping portion. Figure 21 supports Rexam's proposed construction.

As stated above, the reforming roller achieves the negative angle. The '242 Patent specification discusses the roller shape:

> The roller has a peripheral configuration which defines a substantially vertical upwardly and outwardly tapered wall having a generally arcuate upper portion.

'242 Patent, col. 4, ln. 44-46 (emphasis added). (A 95.) Rollers having the shape outlined above will create a substantially longitudinal wall having an upwardly and outwardly tapered slope with an arcuate upper portion. This arcuate upper portion of the reforming roller further supports Rexam's "generally tends to move radially outwards" construction.

The specification further discuses the roller shape and the angle achieved.

> As may be seen in greatest detail in FIGS. 2 and 3, the reforming rollers 36 have a perimeter portion 60 that is downwardly tapered. It is this downwardly tapered configuration 60 which, when rollers 36 are placed against the substantially vertical wall 34, results in the reformation of that substantially vertical wall 34 to a wall having a negative angle.

'242 Patent, col. 6, ln. 40-46 (emphasis added). (A 96.) Figure 3 shows the shape of the roller discussed above.

A substantially longitudinal wall created by the roller above will have an arcuate upper portion that slightly curves inwards. This drawing of a roller further supports Rexam's "generally tends to move radially outward" construction.



FIG. 3

## V.     REXAM'S '839 PATENT

The technology of Rexam's '839 Patent relates to what is now known as smooth die necking. The claims at issue regarding Rexam's smooth die necking patent are all method claims. Starting in the early 1980s and up until recent years, the beverage can industry has continually reduced the size of the

31

beverage can end that is attached to a beverage can in an effort to reduce the amount of metal that is used in the can end. In the late 1980s, Rexam's engineers invented a method to achieve a smooth profile for the neck of beverage cans that had never been seen or used before. The can industry had been using dies to reduce the diameter of can ends for many years, but the known method of using dies to reduce the diameter of the top of the can left ridges, bumps or steps on the neck of the can. In order to eliminate the ridges, bumps and steps left by the dies, the industry's can manufacturers would use rollers to smooth out the neck of the can in order to give the neck a smooth and clean profile. The industry believed that the die necking method could not be effective in producing a totally smooth neck construction in a fast, economical, efficient and reliable manner. '839 Patent, col. 2, ln. 56-59. (A 51.) However, the use of rollers required employing an additional station or stations in the manufacturing process and often left markings on the neck of the finished can. The inventors of the '839 Patent invented a method of using dies to achieve a smooth profile without resorting to the additional manufacturing step of using rollers. The method of using dies in a specific way creates a smooth profile as shown below.

The patented method requires that each die form a predetermined taper that only reforms an upper portion of what was reformed by the previous die. Claim 1 states in relevant part:

> Forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper to produce an enlarged smoothly-shaped necked in profile.

'839 Patent, col. 18, ln. 36-40. (A 59.) This method was a breakthrough in can manufacturing because it gave customers (beer and soft drink manufacturers) what they wanted – a smooth necked-in profile – and the can manufacturers what they wanted – a smooth necked-in profile without the need for an additional manufacturing station.

### A.    Disputed Terms of the '839 Patent

#### 1.    Forcing Said Second Taper Downwardly Until It Is Contiguous with Said First Taper and Reforms Only an Upper Portion of Said First Taper While Producing an Extension of Said First Taper

Rexam construes this term to mean, overlaps an upper portion of the first taper and extends the first taper, thereby forming a larger uninterrupted taper. (A 12.) The specification states that in the "second necking operation, the second tapered portion is essentially freely formed in the reduced

cylindrical neck being free of the die at its lower end … until it integrates with the arcuate segment of the first tapered portion." '839 Patent at col. 12, ln. 37-42. (A 56.) During the second operation, "the lower part of the first tapered portion remains essentially unchanged while the second tapered portion combines and blends with the first tapered portion to produce an extension thereof." *Id.*, at col. 12, ln. 42-46. (A 56.)

However, at each station, the neck is "compressed and reduced while the existing tapered or necked in portion is partially reformed and axially elongated or extended to produce a small annular inwardly tapered portion between the upper and lower arcuate segments." '839 Patent, col. 12, ln. 65 – col. 13, ln. 2. (A 56-57.) In other words, the necking dies are only reforming an upper portion, *i.e.*, overlapping the previous die, but the previously reformed section is reformed by the second die to be contiguous with the first taper, *i.e.*, the second taper overlaps a portion of the first taper to form an uninterrupted longer and more inward taper. Rexam's construction is based upon the plain and customary meaning of the disputed terms as supported by the specification and Rexam's proposed construction should be adopted by the Court.

### 2.    [Enlarged] Smoothly-Shaped Neck Profile (Claim 1)

Rexam construes this term to mean "smooth shaped neck profile towards the top of the can" and "longer or taller section of a container side wall that smoothly reduces in diameter." With respect to this limitation, the parties' proposed constructions are similar with the exception of Crown's addition of the term "substantial" into the limitation to modify bumps, steps or ribs. (A 12.) The specification clearly establishes that there are **no** bumps, steps or ribs and that the profile is "smooth." Thus, there is no need for employing rollers after the can has passed through the die necking stations. This fact is evidenced and supported by the claims and the rest of the specification. Element (d) of claim 1 states:

> Forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper to produce an enlarged <u>smoothly-shaped necked-in profile</u>.

'839 Patent, col. 18, ln. 36-40 (emphasis added.) (A 59.)

Similarly, claim 2 states:

> A method of die necking as defined in claim 1, wherein said second arcuate segment is reformed as a part of said second taper on said first taper whereby the two tapers combine and blend into <u>a smooth neck profile</u>.

*Id.*, at ln. 41-45 (emphasis added.)  (A 59.)  The abstract of the '839 states:

> The necked-in portion is reformed in each succeeding turret by dies to produce a <u>smooth tapered wall</u> between the arcuate segments.

*Id.*, at Abstract (emphasis added).  (A 42.)  In the summary of the invention, the specification states:

> A number of die necking sequences are performed to rapidly and efficiently produce a <u>smooth tapered neck</u> on the end of the cylindrical side wall of the container.
>
> *        *        *
>
> This process produces a <u>smooth tapered annular wall portion</u> between the cylindrical side wall and the reduced diameter cylindrical neck portion.

*Id.*, at col. 3, ln. 5-8, 12-20 (emphasis added).  (A 51-52.)

Rexam states that if the "substantial" term were eliminated from Crown's construction, either construction would be appropriate.

### 3.    Reformed as a Part of Said Second Taper on Said First Taper (Claim 2)

Rexam construes this claim to mean "a second curved segment is changed as a result of the second taper being forced downwardly on the first taper."  (A 12.)  As shown below in figure 16, the second arcuate segment is represented by the "CR" identification letters and refers to the second curved segment of the taper.  (A 49.)



The specification states:

> It will be noted that the arcuate segment CA2 remains essentially unchanged because there is no contact with the die while the arcuate segment CR2 is reformed and the center thereof is moved axially upwardly so that the tapered portion is extended.

'839 Patent, col. 13, ln. 16-20.  (A 57.)  As the figure shows, the second curved segment "CR" is changed as a result of the second taper being forced downwardly on the first taper.  However, the second taper is configured to be contiguous with the first taper resulting in a smooth necked in profile.  Rexam's construction is based upon the plain and customary meaning of the disputed terms as used in the specification and should be adopted by the Court.

### 4.    Combine and Blend (Claim 2)

Rexam construes this term to mean "combine and blend." Again, the terms "combine and blend" should be construed in the plain and customary meaning of those words. (A 12.) "Combine and blend" not only includes overlapping, but also "blending" to create a smooth profile that makes the two tapers appear as one – *i e*, blended together. Rexam's proposed construction is supported by the specification of the '839 Patent throughout which it continuously refers to a "smooth profile" as demonstrated in the quotes above, and should be adopted by the Court.

### 5.    Part Formed by Each Die Element Partially Integrates and Blends with the Portion Formed by the Preceding Die Element (Claim 2)

Rexam construes this term to mean "the portion of the neck profile formed by each die partially overlaps and is continuous with the profile formed by the preceding die." (A 12.)

The terms "integrates and blends with the portion formed by the preceding die element" should be construed in the plain and customary meaning of those words. (A 12.)

### 6.    Through a Smooth Shaped Portion (Claim 11)

Rexam construes this limitation to mean "through a portion that does not have steps or ribs." (A 12.) Smooth means smooth, which means no bumps, steps or ribs. Therefore, Rexam's proposed construction should be adopted by the Court.

### 7.    Reforming Only an Upper Part … While Further Compressing (Claim 11)

Rexam construes this terms to mean: (1) "Changing only an [upper] part of the necked in portion that is adjacent the cylindrical portion"; and (2) "while further compressing." (A 13.) (*See* Joint Claim Chart at 13.) (A 13.) The disputed terms of this limitation should again be given their plain and customary meaning. "Reforming only an upper part" is self explanatory and means changing only an upper part of the necked in portion that is adjacent the side wall.

Similarly, Rexam believes that the term "while further compressing the metal" is straight forward and should be given its plain and ordinary meaning. (A 13.)

## VI.    CONCLUSION

For all of the reasons set forth herein, most of Crown's proposed constructions are not constructions at all, and when Crown did offer a construction, it was not supported by any of the intrinsic evidence. Therefore, should the Court find that the ambiguous terms and limitations of Crown's '826 and '875 Patents can be construed, Rexam respectfully requests that the Court adopt Rexam's proposed construction of the disputed claim terms.

Similarly, the disputed terms of the '839, '385, '242, '230 and '728 Patents, should be given their plain and customary meaning. Crown should not be permitted to incorporate additional limitations from the specification for purposes of avoiding infringement, nor be permitted to broaden the scope of the claims in order to facilitate its invalidity arguments. For all of the reasons set forth herein, Rexam's proposed construction of the disputed terms should be adopted by the Court.


Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: January 16, 2007

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
    *Attorneys for Defendant/Counterclaimant*
    *Rexam Beverage Can Co.*

36

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on January 25, 2007,  I caused to be sent in the manner indicated below the foregoing document to the following non-registered participants:

| **VIA FACSIMILE** | **VIA ELECTRONIC MAIL** |
|---|---|
| Dale M. Heist, Esq. | Chad E. Ziegler, Esq. |
| Woodcock Washburn LLP | ziegler@woodcock.com |
| Cira Centre | Woodcook Washburn LLP |
| 2929 Arch Street, 12th Floor | Cira Centre |
| Philadelphia, PA 19104-2891 | 2929 Arch Street, 12th Floor |
| | Philadelphia, PA 19104-2891 |

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700