FIG.20



FIG.21



FIG.22



5,222,385

1

## METHOD AND APPARATUS FOR REFORMING CAN BOTTOM TO PROVIDE IMPROVED STRENGTH

### RELATED APPLICATIONS

This is a continuation-in-part of U.S. application Ser. No. 07/730,794, filed by Express Mail on Jul. 24, 1991, which is in turn based upon International Application No. PCT/US 90/00451, having an International filing date of Jan. 26, 1990.

### DESCRIPTION

1. Technical Field

The invention relates generally to a method and apparatus for forming an improved, reformed can bottom, with a result that the entire can is strengthened. Typically, this method and apparatus are used for reforming the bottoms of drawn and ironed beverage containers. The reformed can bottom is an integral part of beer and beverage cans, and increases the strength of those cans above that of prior art cans.

2. Background of the Invention

Drawn and ironed containers are among the most widely used containers for carbonated beverages, including such beverages as beer and soft drinks. Such drawn and ironed containers are made from a disc of stock material which is converted into a shallow "cup" with short side walls. The base of this cup ultimately forms the bottom of the container, and the short side walls of the cup become the elongated side walls of the container.

The shallow cup is passed through a succession of ironing rings. As the spacing between successive rings becomes increasingly narrow, passage of the cup through these successive rings decreases the thickness and increases the height of the side walls.

The configuration of the bottom of such drawn and ironed containers has, over the last several years, been a topic of interest to both can manufacturers, packagers, shippers, retailers and the ultimate consumer who purchases products in such containers. This is because the configuration of the bottom is a factor in the ability of the container to resist its internal pressures and achieve adequate columnar strength. These internal pressures result from the weight, pressurization and carbonation of the liquids in the container. Columnar strength is the ability of a container to resist axial loads imposed by cans that are stacked upon other cans, as during transport and storage.

Can manufacturers are constantly striving to obtain high strength with relatively low weight. Generally, however, these goals are incompatible. Low weight, and a lowering of material cost, is generally achieved by reducing the thickness of the stock material. A reduction in stock material thickness, without more, lowers the strength of the container. Retailers and consumers desire a container which is stackable and which is of the lowest possible weight for ease in handling.

The bottom shape of the container has been found to be of importance in determining its strength. Issued U.S. patents disclosing this importance include U.S. Pat. No. 4,685,582, issued to Pulciani et al. on Aug. 11, 1987, and entitled "Container Profile With Stacking Feature." This patent, which is assigned to the assignee of the present invention, discloses a so-called ANC-1A container having an inverted dome-shaped bottom. Other U.S. patents are also generally relevant. For example,

2

U.S. Pat. Nos. 3,904,069, 3,979,009 and 4,412,627 disclose containers having bottom wall constructions designed to permit selected and controlled outward flexing or bulging of the bottom wall when the container is sealed and subjected to internal pressures developed by the contents.

Reforming of the bottom wall of a container of the general type described in this application has also been described in an International Publication to Metal Box plc. This publication is International Publication Number WO 83/02577, published on Aug. 4, 1983. This reforming takes place by applying a roller along the exterior transition wall 7 of the container, rather than along its interior. See International Publication Number WO 83/02577, FIG. 7.

### SUMMARY OF THE INVENTION

The invention is a method of reforming the bottom of a drawn and ironed or a drawn beverage container. The container for which this method is suitable has a vertical axis, a generally cylindrical side wall parallel with the vertical axis, an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially vertical wall joining the domed portion and the convex U-shaped portion. The method comprises supporting the container in a jig, the jig having a bottom peripheral profile portion substantially corresponding in shape to the outer annular wall of the container. The bottom peripheral profile portion of the jig is then mated with the outer annular wall. A reforming roller is brought into engagement with the substantially vertical wall. The reforming roller rotates along the vertical wall and about an arcuate path, affecting the angle of the substantially vertical wall.

According to one aspect of the method, the reforming roller affects the angle of the substantially vertical wall, achieving a negative angle from the vertical axis of the container.

According to another aspect of the method, the reforming roller is rotated about an arcuate path equidistant from an axis that is coaxial with the axis of the container.

According to yet another aspect of the method, the roller has a peripheral configuration which, upon engagement with the substantially vertical wall, reforms the substantially vertical wall to achieve the desired negative angle from the vertical axis of the container.

In another aspect of the invention, an actuator moves upwardly and towards the can to cause radial outward movement of a camming surface. In this way, a roller that moves as a result of the movement of this camming surface is caused to engage a substantially vertical wall. This roller may pivot, about a horizontal pivot point, from an inward non-engaging position to a radially outward position where the roller engages the substantially vertical wall.

As will be seen below, this application is also directed to an apparatus which can be used to practice the method of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top view of a pivoting apparatus in accordance with the invention, and in a radially inward, non-engaging position.

5,222,385

3

FIG. 1A is a view of the apparatus of FIG. 1, but with the rollers in a radially outward position and engaging the wall of a container.

FIG. 2 is a side-sectional view of the apparatus of FIG. 1, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 3 is a detail of a portion of the apparatus of FIG. 2, showing the pivot about which the roller pivots.

FIG. 4 is a top view of a second pivoting embodiment of the apparatus in accordance with the invention.

FIG. 5 is a side-sectional view of the apparatus of FIG. 4, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 6 is a top view of a third pivoting embodiment of the apparatus in accordance with the invention.

FIG. 7 is a side-sectional view of the apparatus of FIG. 6, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 8 is a side perspective view of a container which is suitable for treatment by the process and apparatus of the invention.

FIG. 9 is an enlarged view of the lower left hand corner of the container of FIG. 8, prior to reforming.

FIG. 10 is an enlarged view of the lower left hand corner of the container of FIG. 8, after reforming.

FIG. 11 is a top view of a non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 12 is a side-sectional view of the apparatus of FIG. 11, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 13 is a top view of a second non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 14 is a side-sectional view of the apparatus of FIG. 13, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 15 is a detail of the roller and bearing of FIG. 14, taken ,along lines 15—15 of FIG. 13.

FIG. 16 is a top view of a third non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 17 is a side-sectional view of the apparatus of FIG. 16, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 18 is a detail of the actuator and dovetail slide portion of a portion of the apparatus of FIG. 16, taken along lines 18—18 of FIG. 16.

FIG. 19 is a side-sectional view of a fourth non-pivoting apparatus in accordance with the invention, including a single roller, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 20 is a photographic profile of a cross-section of a lower portion of a can reformed by a prior art process.

FIG. 21 is a photographic profile of a cross-section of a lower portion of a can reformed by the process of the present invention.

FIG. 22 is a photographic profile of a cross-section of a lower portion of a "control" can prior to reforming.

4

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

This invention is susceptible of embodiment in many different forms. The drawings and this specification show a preferred embodiment of the invention. It will be understood, however, that this disclosure is to be considered an exemplification of the principles of the invention. The inventor does not intend to limit the broadest aspect of the invention to the illustrated embodiments.

According to one aspect of the invention, the performance characteristics of a container formed by normal drawing and ironing procedures are improved by reforming the bottom end wall of the container from the initial configuration. This initial configuration is disclosed in the above-mentioned '582 patent and is shown in FIG. 8.

As described and shown in FIGS. 9 and 10 of co-pending International Application No. PCT/US 90/00451, after the fluted container has been necked, flanged, internally spray coated and externally printed, the bottom profile or countersink area of the bottom wall is reshaped. This is done by reforming the inner wall of the countersink to further improve buckle resistance and decrease can growth.

In the prior co-pending application, the finished drawn and ironed container of FIG. is supported in a suitable jig that has an internal opening which corresponds to the outer peripheral diameter of the container. The jig has a lower profile portion that conforms to the countersink wall portion the bottom wall of the container, as originally formed in accordance with the process disclosed in the '582 patent.

A plug is inserted into the upper end of the opening and securely held in the top of the container. During processing, this container is rotated about its axis. The bottom peripheral profile of the jig is in extended contact with the container bottom. A reforming roller is brought into engagement with the substantially vertical wall of the domed end of the container and is supported on a shaft. That shaft is designed to be rotated along an arcuate path around the center axis for the container. The roller has a peripheral configuration which defines a substantially vertical upwardly and outwardly tapered wall having a generally arcuate upper portion. The inner wall of the countersink is reformed to a more vertical profile while the dome is stretched to a small degree. The outer wall is held to its original configuration. Alternatively, the outer wall could also be reformed with the inner wall.

It was found in the co-pending application that this reforming operation significantly improves buckle resistance and decreases the amount of can growth, i.e., the amount that the bottom end wall is elongated when pressure is applied internally of the container.

The container produced according to the method and apparatus described in the co-pending application exhibited significantly greater column strength, i.e., resistance to crushing by vertical loads applied to the container side wall. That container also exhibited significantly less container growth during internal pressurization and improved buckle resistance. The container constructed in accordance with that invention was thus capable of being produced from stock flat disc material having a significantly reduced thickness.

The present invention is a further elaboration and refinement upon the invention described in the co-pend-

5,222,385

5

ing application. The invention is directed to the type of drawn or drawn and ironed container shown in FIG. 8. Such containers are well known in the art and are generally described and shown in U.S. Pat. No. 4,685,582, issued to the assignee of the present application on Aug. 11, 1987. This container 20 is symmetrical about a vertical axis 22. A generally cylindrical side wall 24 parallel with this vertical axis forms the panel on which graphics, such as a bottler's trademark, may be printed. An outer annular wall 26 forms a transitional portion between this side wall 24 and a convex, U-shaped portion 28 that defines a flange-like ridge. The outer annular wall 26 and U-shaped portion 28 enable these cans to be stacked. In particular, the bottom of a first can may be securely nested into the top of a second can.

The container 20 also includes a preformed bottom wall 30 including a center domed portion 32. An annular, substantially vertical wall 34 joins the domed portion 32 to the convex U-shaped portion 28. This "substantially vertical wall," for the purposes of this application, has an angle from the vertical of 0 to +5 degrees, and may be as high as +10 degrees. A positive angle is shown by angle C in FIG. 8.

Various kinds of apparatus may be used to effect the method of reforming container 20, as that method is described and claimed in the present application. As may be seen in FIGS. 1–3, one such apparatus includes a plurality of rollers 36. In a preferred embodiment, three rollers 36 may be used. The use of three rollers 36 has advantages over the use of fewer rollers, for example, a single roller. These rollers 36 are used to contact the annular, substantially vertical wall 34. The use of one roller would concentrate the forces transferred from the roller 36 to the wall 34 at one point. In contrast, three rollers 36 will spread the force on this wall 34 over three points.

As may be seen in FIG. 2, each of these rollers 36 is indirectly secured to a pivot plate 38. Securing the rollers 36 are a bearing clamp 40 and a bearing 42.

Each of the pivot plates 38 are designed to pivot around their respective pivot pin 44 (FIG. 1). In this embodiment, this pivot pin 44 is vertically disposed. As will be seen in other embodiments, however, other pivot pins may instead be horizontally disposed.

A tooling head collar 46 provides a support surface for a jig 48, or lower can support. This jig 48 is removable from the tooling head collar 46 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

Each jig 48 is manufactured so as to accommodate and support a given size container 20. Accordingly, a bottom peripheral profile portion 50 of the jig 48 substantially corresponds in shape to the outer annular wall 26 of the container 20. As will be explained below, this bottom peripheral profile portion 50 of the jig 48 is mated with the outer annular wall 26 of the container 20. In the embodiment shown in FIG. 2, it may be seen that the lowermost part 52 of this jig 48 also corresponds in shape to the radially outermost region of the convex U-shaped portion 28. In this way, the jig 48 provides greater support around the circumference of the container 20.

Supporting the bearings 42 and enclosing portions of the reforming rollers 36 are bearing housings 54. These bearing housings 54 are fixedly secured to their respective pivot plates 38. Thus, the motion of the pivot plates 38 and the bearing housings 54 is synchronous.

6

Movement of the pivot plates 38 and bearing housings 54 is facilitated by a vertically movable actuator ball 56. As shown in FIG. 2, this actuator ball 56 is positioned in a first, non-engaging position. In this position, the actuator ball 56 merely abuts against camming surfaces 58 on the bearing housing 54.

Upward, vertical movement urges the actuator ball 56 to a second position in which it contacts and pushes upwardly on camming surfaces 58. As a result of the shape of these camming surfaces 58, this upward movement causes the bearing housing 54 and pivot plate 38 to pivot together about the pivot pin 44 in a radially outward direction. This pivoting movement continues until rollers 36 contact the annular, substantially vertical wall 34.

The rollers 36, upon contact with this wall 34, rotate rapidly to force the wall from its configuration as shown in FIG. 9 to that shown in FIG. 10. Particularly, FIGS. 9 and 10 depict a vertical line V—V. Vertical line V—V is coincident with the vertical axis of container 20. FIG. 9 shows a container 20 before reforming. In this FIG. 9, the wall is substantially vertical and may even have a so-called "positive" angle. With reference to FIG. 9, a positive angle is one in which wall 34 angles upwardly and to the right of line V—V. An example of a positive angle appears as angle C in FIG. 9.

After contact by rollers 36, as described above, this wall 34 is reformed to achieve a negative angle A. The results of reforming are shown, for example, in FIG. 10. As a result of this negative angle, as will be described below, container 20 has enhanced physical characteristics.

In the apparatus of FIGS. 1–3, the pivot pin is substantially vertically disposed. As a result, the pivoting of the bearing housing 54 and the pivot plate 38 occur in a horizontal plane. Other embodiments, as described below, will include horizontal pivot pins, causing pivoting of the bearing housing and pivot plate in a vertical plane.

As may be seen in greatest detail in FIGS. 2 and 3, the reforming rollers 36 have a perimeter portion 60 that is downwardly tapered. It is this downwardly tapered configuration 60 which, when rollers 36 are placed against the substantially vertical wall 34, results in the reformation of that substantially vertical wall 34 to a wall having a negative angle.

After the completion of the reforming, the rollers 36 are retracted from the wall 34 and return from the position shown in FIG. 1A to the original position shown in FIG. 2. Each pivot plate 38 and bearing housing 54 assembly returns to this original position as a result of pressure from a compression spring 62.

A slight modification of the reforming apparatus described above is shown in FIGS. 4 and 5. Each of the components of the embodiments of FIGS. 1–3 are correspondingly numbered in FIGS. 4 and 5, except that the reference numerals for the corresponding components in the latter figures include the suffix "a." The only component which differs significantly is the spring. Spring 62 of FIGS. 1–3 is an extension spring, whereas spring 62a of FIGS. 4–5 is a compression spring. As a result, the apparatus of FIGS. 4–5 works in a slightly different manner than the apparatus of FIGS. 1–3. Particularly, in FIGS. 1–3, upon completion of reforming, the rollers 36 are retracted from the wall 34 and returned to their original position as a result of both applied pressure from an extension spring 62 and retraction of the actuator ball 56. In FIGS. 4–5, upon comple-

5,222,385

7

tion of the reforming, the rollers 36a are retracted from the wall 34 and returned to their original position as a result of both applied pressure from a compression spring 62a and retraction of actuator ball 56a.

Still another embodiment is shown in FIGS. 6 and 7. This embodiment also includes three rollers 64. As may be seen in FIG. 7, each of these rollers 64 is indirectly secured to a pivot plate 66. Securing the rollers 64 are a bearing clamp 68 and at least one bearing 70.

Each of the pivot plates 66 are designed to pivot around their respective pivot pin 72. As may be seen in FIG. 7, this pivot pin 72 is horizontally disposed. As a result, the pivoting of the bearing housing 74 and the pivot plate 66 occur in a vertical plane.

As in the embodiment of FIGS. 1–3, the embodiment includes a tooling head collar 76 to provide a support surface for a jig 78, or lower can support. This jig 78 is also removable from the tooling head collar 76 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

Movement of the pivot plates 66 and bearing housings 74 is facilitated by a vertically movable actuator 80. As shown in FIG. 7, this actuator 80 is positioned in a first, non-engaging position. In this position, the actuator 80 merely abuts against camming surfaces 82 on the bearing housing 74.

Upward, vertical movement urges the actuator 80 to a second position in which it contacts and pushes upwardly on camming surfaces 82. As a result, this upward movement causes the bearing housing 74 and pivot plate 66 to pivot together about the pivot pin 72 in a vertical plane and a radially outward direction. This pivoting movement continues until rollers 64 contact the annular, substantially vertical wall 34 of container 20.

After the completion of the reforming, the rollers 64 are retracted from the wall 34 and return from the position shown in the dotted lines of FIG. 7 to the original position shown the solid lines of FIG. 7. Each pivot plate 66 and bearing housing 74 assembly returns to this original position as a result of pressure from a coil spring 84. This coil spring 84 encircles and is held upon a retaining post 86. The coil spring 84 is tensioned by compressing it between the top, abutting surfaces of bearing housings 74 and hex nut 88 secured to retaining post 86.

Still other embodiments of the present apparatus are depicted at FIGS. 11–19. As will be seen, the apparatus of these embodiments does not include a pivot pin for moving the rollers into engagement with the vertical wall 34 of the container 20. In many other respects, however, these apparatus are similar to those shown in FIGS. 1–7.

For example, the apparatus of FIG. 11 includes three rollers 90 secured to a bearing housing 92 with a bearing 94 and a bearing clamp 96. The solid lines of FIG. 12 show these rollers in a radially inward position, where the rollers 90 do not contact the annular, substantially vertical wall 34. These rollers 90 are movable from this position to a radially outward position where the roller contacts the annular, substantially vertical wall 34

Bearing housings 92 are spring-biased. In particular, a tensioned garter spring 98 (FIG. 12) encircles the lower periphery of bearing housings 92. In their first, non-engaging position, as shown in the dotted lines of FIG. 11, the housings 92 and their related rollers 90 are re-

8

tained by the garter spring 98 in a radially inward position.

The second position of the bearing housings 92 is shown in the solid lines of FIG. 11. The housings 92 attain this position when actuator 100 is moved upwardly against camming surfaces 102 of housing 92. This upward movement of actuator 100 pushes housings 92 radially outwardly until rollers 90 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 90, the actuator 100 is withdrawn and garter spring 98 urges the bearing housings 92 back into their first position.

As in the prior embodiments, the embodiment of FIGS. 11 and 12 includes a jig 104 to support the container along a bottom peripheral profile portion 106 that substantially corresponds in shape to the outer annular wall 26 of the container 20. As in the prior embodiments, the perimeter 108 of the rollers 90 also include a downwardly tapered configuration which, when placed against the substantially vertical wall 34, reforms that wall 34 to achieve a negative angle relative to the vertical axis of the container 20.

Another three-roller, non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 13–15. In this embodiment, the spring 110 is horizontally disposed and acts along a horizontal plane. In particular, spring 110 is in contact with the bearing housing 112 to bias that housing 112 in a radially inward direction.

The apparatus of FIG. 13 also includes three rollers 114 secured to bearing housing 112 with a bearing 116 and a bearing clamp 118. These rollers 114 are movable from their first position, as shown in FIGS. 13–15, to a radially outward position where the rollers 114 contact the annular, substantially vertical wall 34 of container 20.

Upward movement of actuator 120 pushes housings 112 radially outwardly until rollers 122 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 122, the actuator 120 is withdrawn and spring 110 urges the bearing housings 112 back into their first position.

Still another non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 16–18. In this embodiment, however, conventional rollers are not used. Rather, four roller segments 124 are mounted to the apparatus for radial movement towards and away from the container 20. In the dashed lines of FIG. 16, these segments 124 are shown in their normal, radially inward position. They are held in this position by a plurality of horizontally tensioned springs 126.

Each of these roller segments 124 may be secured to a housing 128. When an actuator 130 is moved vertically upwardly against camming surfaces 132, housings 128 are pushed radially outwardly, as shown in the solid lines of FIG. 16, until roller segments 124 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with roller segments 124, the actuator 130 is withdrawn and springs 126 urge the housings 128 back into their first position.

A final version of a non-pivoting embodiment of the apparatus is shown in FIG. 19. In this embodiment, only one roller is used. This roller 134 has a substantially larger diameter than the rollers of the other embodiments. In fact, the diameter of this roller 134 is in excess of 80 percent of the distance between opposite, facing walls 34. This distance is referred to as "D" in FIG. 19.

Again, this embodiment includes a compression spring 136 which acts along a horizontal plane. Spring

5,222,385

| 9 | 10 |

136 is in contact with the housing 138 to bias that housing 138 in a rightward direction. Roller 134 is movable from its first position, as shown in FIG. 19, to a radially outward position where the roller 134 contacts the annular, substantially vertical wall 34.

In the embodiment of FIG. 19, actuator 140 is vertically movable, as in the apparatus of the previously described embodiments. The actuator 140 encircles a dovetailed collar 142, and this collar 142 is fixed. Housing 138, however, is horizontally movable when it is contacted by the upwardly-moving actuator 140. The horizontal movement of the housing 138 is guided by a dovetail groove in collar 142.

Housing 138 abuts against camming surface 146. In addition, with reference to the directions depicted in FIG. 19, spring 136 biases the housing 183 to the right. Thus, housing 138 is moved to the right along the camming surface 146. This rightward movement of the housing 138 continues until the periphery of roller 134 contacts the wall 34 of container 20. Reforming takes place in the same manner as with a three-roller apparatus, but at only one point along the wall 34.

Upon completion of treatment of the wall 34 with roller 134, the actuator 140 is lowered and the weight of the housing/roller combination moves that assembly 25 back onto the collar 142, i.e., to the first position of the device. This collar 142 acts as a limit on the downward movement of the housing 138. In this embodiment and in the others, it is preferred that the actuator 140 rotate at the same speed as housing 138.

A comparison of FIGS. 9 and 10 will disclose the differences in containers before and after bottom reforming in accordance with the method of the present invention. Particularly, FIG. 9 shows a container before bottom reforming. The wall 34 in this Figure is substantially vertical and may, in fact, have a slight positive angle. For the left portion of the container shown in FIG. 9, a wall 34 having a slight positive angle would angle upwardly and to the right from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a positive angle, diameter D1 is greater than diameter D2.

As stated above, the container of FIG. 8 that may be reformed in accordance with this invention is generally symmetrical about a vertical axis 22. The container includes a generally cylindrical side wall 24 parallel with the vertical axis 22. The container 20 also includes an outer annular wall 26, a convex U-shaped portion 28, a preformed bottom wall 30, including a center domed portion 32 and an annular, substantially vertical wall 34 joining the domed portion 32 and the convex U-shaped portion 28.

The method of the present invention may be described with reference to the apparatus of FIGS. 1–3, and comprises several steps. The container 20 is supported on a jig 48. This jig 48 has a bottom peripheral profile portion 50 substantially corresponding in shape to the outer annular wall 26 of the container 20.

The bottom peripheral profile portion 50 of jig 48 is mated with the outer annular wall 26. Reforming rollers 36 are brought into engagement with the substantially vertical wall 34. The reforming rollers 36 rotate along the vertical wall 34 and about an arcuate path. Through this action, the reforming rollers 36 affect the angle of the substantially vertical wall 34. In particular, the angle of the substantially vertical wall 34 is changed to a negative angle from the vertical axis of the container 20.

As may be seen in FIG. 1A, the reforming rollers 36 of this apparatus are rotated about an arcuate path equidistant from an axis that is coaxial with the axis 22 of the container. Alternatively, as may be appreciated from a review of FIG. 19 and the above description of that figure, the reforming roller 134 of that apparatus may be rotated about an arcuate path that is equidistant from an axis that is not coaxial with the axis 22 of the container 20. This occurs because in order to contact wall 34, the roller 134 is shifted to the right of its position as shown in FIG. 19.

In one aspect of the preferred method, the roller has a peripheral configuration which, upon engagement with the substantially vertical wall, reforms the substantially vertical wall to achieve a negative angle from the vertical axis of the container. Rollers having such peripheral configurations are shown in FIGS. 2, 5, 7, 12, 14, 17 and 19.

In another aspect of the preferred method, an actuator is moved upwardly and towards the can to move a camming surface and its housing in a radially outward direction. In this way, a roller movable with the camming surface engages the substantially vertical wall.

In still another aspect of the preferred method, the roller pivots about a horizontal pivot point. In particular, the apparatus may include a horizontal pivot point about which the roller pivots from an inward non-engaging position to a radially outward position wherein the roller engages the substantially vertical wall.

After this method of bottom reforming, as may be seen in FIG. 10, the wall 34 exhibits a slight negative angle A. The preferred angle A for an ANC-2A can should be no more than approximately −4 degrees from the vertical line V—V. It is believed that enhanced container characteristics could be attained by providing a wall 34 with an angle of as much as −8 to −10 degrees. For the left portion of the container shown in FIG. 10, a wall 34 having a slight negative angle would angle upwardly and to the left from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a negative angle, diameter D1 would be less than diameter D2. The value of the preferred negative angle will vary with each different type of container.

Containers treated by the apparatus of the present invention exhibit distinctly superior characteristics when compared with prior art, untreated containers. Actual tests were conducted with so-called "ANC-2A" cans, manufactured by American National Can Company. These cans have the general configurations shown in FIGS. 8 and 9, and were made with aluminum having a gauge of 0.120. Prior to treatment of these cans by the method and apparatus of the invention, they exhibited the following characteristics:

TABLE 1

| ANC-2A Dome Profile | | | |
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Minimum | .394 | .052 | 98 | .0120 |
| Maximum | .396 | .060 | 99 | .0120 |
| Average | .396 | .054 | 98 | .0120 |
| Spec/Aim | .394 | .064 | 90 | Ref. |
| | ±.004 | Max. | Min. | |

After treatment of these cans by the method and one roller apparatus of the invention, they exhibited the following characteristics:

5,222,385

11 12

TABLE 2

graphic profile of a lower portion of one of these cans is shown in FIG. 21.

TABLE 4

| | | Body Strength 206/211 × 413 ANC Reformed Dome Cans | | | | |
|---|---|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness | Vertical Crush | Sidewall Thickness |
| Minimum | .397 | .003 | 104 | .0120 | 305 | .0045 |
| Maximum | .410 | .007 | 114 | .0120 | 321 | .0047 |
| Average | .404 | .004 | 110 | .0120 | 313* | .0046 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. | 250 Min. | |

Table 5 shows results from "control" cans, i.e., standard ANC-2A cans prior to reforming of any kind. A photographic profile of a lower portion of one of these cans is shown in FIG. 22.

TABLE 5

| | | Body Strength 206/211 × 413 ANC-2A Control Cans | | | | |
|---|---|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness | Vertical Crush | Sidewall Thickness |
| Minimum | .396 | .042 | 98 | .0120 | 310 | .0045 |
| Maximum | .398 | .059 | 99 | .0120 | 322 | .0046 |
| Average | .397 | .048 | 99 | .0120 | 317* | .0046 |
| Spec/Aim | .394 ±.004 | .064 Max. | 90 Min. | Ref. | 250 Min. | |

| ANC Reformed Dome Profile | | | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Minimum | .398 | .005 | 110 | .0120 |
| Maximum | .401 | .006 | 113 | .0120 |
| Average | .400 | .006 | 112 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |

As can be seen from a comparison of these Tables, Buckles Strength of treated cans increased from an average of about 99 to an average of 112. The growth in the dome, which results in a downward extension of the U-shaped portion 28 of the container of FIG. 9, decreased markedly from an average of 0.555 to 0.006 inches.

When these same tests were conducted with cans produced from 0.110 gauge aluminum, Buckle Strength increased from an average of 90 to an average of 98. Dome growth tests after 90 PSIG were not meaningful, as the non-reformed cans failed and buckled at 90 PSIG or less.

A number of standard ANC-2C cans were reformed. In the first set, the outside of the countersink was reformed in accordance with a CMB method, and its results are shown in Table 3. A photographic profile of a lower portion of one of these cans is shown in FIG. 20.

As may be seen by a comparison of these Tables, dome growth in the untreated can of Table 5 averages 0.050 inches. Both reformed cans show improvement, but the average dome growth of the can reformed in accordance with the present invention is significantly superior (0.005 vs. 0.010 inches). Buckle strength is also somewhat improved (109 vs. 106). Finally, while average vertical crush of the present reformed cans (313) remains virtually the same as the control can (317), average vertical crush drops significantly (279) after reforming by the CMB method.

As may be seen by a comparison of FIGS. 20 and 21, the can that has been reformed in accordance with the present invention is less sharply peaked along its bottom. As a result, this can will exhibit more stability when moving along fill lines.

While the specific embodiments have been demonstrated and described, numerous modifications come to mind without markedly departing from the spirit of the invention. The scope of protection is, thus, only intended to be limited by the scope of the accompanying Claims.

We claim:
1. A method of reforming the bottom of a container,

TABLE 3

| | | Body Strength 206/211 × 413 CMB Reformed Dome Cans | | | | |
|---|---|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness | Vertical Crush | Sidewall Thickness |
| Minimum | .385 | .008 | 104 | .0120 | 266 | .0045 |
| Maximum | .395 | .012 | 109 | .0120 | 292 | .0046 |
| Average | .392 | .010 | 106 | .0120 | 279* | .0046 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. | 250 Min. | |

The second set of cans was reformed on the inside of the countersink in accordance with the present invention, and its results are shown in Table 4. A photo-

said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis;

5,222,385

13

an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

supporting said container in a jig, said jig having a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container;

mating the bottom peripheral profile portion of said jig with said outer annular wall; and

bringing a reforming roller into engagement with said substantially longitudinal wall, said reforming roller rotating along said longitudinal wall and about an arcuate path in substantially radial alignment with said mating of said jig and said outer annular; wherein said reforming roller affects the angle of said substantially longitudinal wall.

2. The method of claim 1, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle from the longitudinal axis of said controller.

3. The method of claim 1, said reforming roller being rotated about an arcuate path equidistant from an axis that is coaxial with the axis of the container.

4. The method of claim 3, wherein an actuator moves longitudinally said container to thereby radially outwardly move a camming surface so that a roller actuatable with said camming surface is moved into engagement with said substantially longitudinal wall.

5. The method of claim 1, said roller having a longitudinally tapered peripheral configuration which, upon engagement with said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle from the longitudinal axis of said container.

6. The method of claim 1, including a radial pivot point about which said roller pivots from an inward non-engaging position to a radially outward position wherein said roller engages said substantially longitudinal wall.

7. An apparatus for the reforming of the bottom of a container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said apparatus comprising:

means for radially inwardly supporting said outer annular wall;

a plurality of rollers, each of said rollers movable from a radially inward position where said each of rollers does not contact said annular, substantially longitudinal wall to a radially outward position where each of said rollers contact said annular, substantially longitudinal wall;

a plurality of pivot plates, one associated with a respective one of said rollers, to which each of said rollers is secured;

a plurality of pins, one associated with each of said pivot plates, about which each of said pivot plates pivots; and

a movable actuator, said actuator being movable from a first, non-engaging position to a second position in which said actuator contacts a camming surface to move each of said pivot plates and said respective rollers into engagement with said annular,

14

substantially longitudinal wall in substantial radial alignment with said radial inward supporting means.

8. The apparatus of claim 7, wherein said pin is substantially vertical.

9. The apparatus of claim 7, wherein said pin is substantially horizontal.

10. The apparatus of claim 7, wherein said radially inwardly supporting means comprises a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container.

11. The apparatus of claim 7, wherein the perimeter of each of said rollers has downwardly tapered configuration which, when placed against said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle relative to the longitudinal axis of said container.

12. The apparatus of claim 7, wherein said apparatus includes three rollers.

13. An apparatus for the reforming of the bottom of a container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said apparatus comprising:

a roller being movable from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular, substantially longitudinal wall, the perimeter of said rollers having a downwardly tapered configuration which, when placed against said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle relative to the longitudinal axis of said container;

a pivot plate to which said roller is secured;

a pin about which said pivot plate pivots;

a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container; and

an actuator being movable from a first, non-engaging position to a second position in which said actuator contacts a camming surface to move said pivot plate and said rollers into engagement with said annular, substantially longitudinal wall in substantially radial alignment with said mating of said jig and said outer annular wall.

14. The apparatus of claim 13, wherein said pin is substantially vertical.

15. The apparatus of claim 13, wherein said pin is substantially horizontal.

16. An apparatus for the reforming of the bottom of a container, said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis; an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said apparatus comprising:

5,222,385

15

a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container;

a roller movable from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular substantially longitudinal wall;

a spring;

a housing biased by said spring, said roller being secured to said housing;

an actuator being movable from a first, non-engaging position to a second position in which said actuator contacts said housing to move said housing and said roller into engagement with said annular, substantially longitudinal wall in substantial radial alignment with said jig.

17. A method of reforming the bottom of a container, said container having a longitudinal and a radial axis, a generally cylindrical side wall parallel with said longitudinal axis; an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

providing radially inward support for said container;

providing a reforming roller; and

moving said reforming roller radially into engagement with said substantially longitudinal wall, said reforming roller rotating along said longitudinal wall and about an arcuate path in substantial radial alignment with said radial inward support;

wherein said reforming roller affects the angle of said substantially longitudinal wall.

18. The method of claim 17, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle from the longitudinal axis of said container.

19. The method of claim 17, said reforming roller being rotated about an arcuate path equidistant from an axis that is coaxial with the longitudinal axis of the container.

20. The method of claim 19, wherein an actuator moves upwardly and towards said container to thereby radially outwardly move a camming surface so that a roller actuatable with said camming surface is moved into engagement with said substantially longitudinal wall.

21. The method of claim 17, said roller having a tapered peripheral configuration which, upon engage-

16

ment with said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle from the longitudinal axis of said container.

22. The method of claim 17, including a radial pivot point about which said roller pivots from an inward non-engaging position to a radially outward position wherein said roller engages said substantially longitudinal wall.

23. An apparatus for the reforming of a bottom of a container, said container having a longitudinal axis; a side wall parallel with said axis; an outer annular wall; a convex U-shaped wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said apparatus comprising:

means for radially inwardly supporting said container;

a roller means movable from a radially inward position where said roller does not contact said longitudinal wall to a radially outward position where said roller contacts said annular, substantially vertical wall;

a pivot plates to which said roller is secured;

a pin about which said pivot plate pivots; and

means for moving said pivot plate about said pivot pin to engage said roller with said longitudinal wall in substantially radial alignment with said supporting means to affect the angle of said substantially longitudinal wall.

24. The apparatus of claim 23 wherein said moving means comprises a vertically movable actuator, said actuator being movable from a first, non-engaging position to a second position in which said actuator contacts a camming surface to move said pivot plate and said rollers into engagement with said annular substantially longitudinal wall.

25. The apparatus of claim 23, wherein said radially inwardly supporting means comprises a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container.

26. The apparatus of claim 23, wherein the perimeter of said roller has a tapered configuration which, when placed against said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle relative to the longitudinal axis of said container.

27. The apparatus of claim 23, wherein said apparatus includes three rollers.

* * * * *

US005697242A

# United States Patent [19]

## Halasz et al.

[11] Patent Number: 5,697,242

[45] Date of Patent: *Dec. 16, 1997

[54] **METHOD AND APPARATUS FOR REFORMING CAN BOTTOM TO PROVIDE IMPROVED STRENGTH**

[75] Inventors: **Andrew Halasz**, Crystal Lake; **Sylvan Praturlon**, Oak Park; **Paul Azzaline**, Crystal Lake; **Christopher Caliendo**, Wood Dale, all of Ill.

[73] Assignee: **American National Can Company**, Chicago, Ill

[*] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,222,385.

[21] Appl. No.: **670,324**

[22] Filed: **Jun. 25, 1996**

### Related U.S. Application Data

[62] Division of Ser. No. 563,900, Nov. 22, 1995, abandoned, which is a continuation of Ser. No. 343,837, Nov. 23, 1994, abandoned, which is a continuation of Ser. No. 212,647, Mar. 3, 1994, abandoned, which is a continuation of Ser. No. 50,526, Apr. 20, 1993, abandoned, which is a continuation of Ser. No. 735,994, Jul. 25, 1991, Pat. No. 5,222,385, which is a continuation-in-part of Ser. No. 730,794, filed as PCT/US90/00451, Jan. 26, 1990, Pat. No. 5,349,837.

[51] Int. Cl.⁶ ............................................. **B21D 51/26**

[52] U.S. Cl. .............................. **72/117; 72/379.4**

[58] Field of Search ........................ 72/111, 110, 94, 72/117, 122, 123, 124, 125, 379.4; 413/69

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 994,468 | 6/1911 | Kane . |
| 1,031,264 | 7/1912 | Hinde et al . |
| 1,441,674 | 1/1923 | Foster et al . |
| 1,461,729 | 7/1923 | Foster et al . |
| 2,158,312 | 5/1939 | Terrell |
| 3,417,898 | 12/1968 | Bozek et al . |
| 3,693,828 | 9/1972 | Kneusel et al . |
| 3,904,069 | 9/1975 | Toukmanian . |
| 3,905,507 | 9/1975 | Lyu |
| 3,942,673 | 3/1976 | Lyu et al . |

| | | |
|---|---|---|
| 4,108,324 | 8/1978 | Krishnakumar et al . |
| 4,120,419 | 10/1978 | Saunders . |
| 4,134,354 | 1/1979 | Cvacho et al |
| 4,147,271 | 4/1979 | Yamaguchi . |
| 4,151,927 | 5/1979 | Cvacho et al |
| 4,199,073 | 4/1980 | Gombas . |
| 4,280,353 | 7/1981 | Murphy . |
| 4,289,014 | 9/1981 | Maeder et al . |
| 4,294,097 | 10/1981 | Gombas . |
| 4,294,373 | 10/1981 | Miller et al . |
| 4,341,321 | 7/1982 | Gombas . |
| 4,372,143 | 2/1983 | Elert et al . |
| 4,381,061 | 4/1983 | Cerny et al . |
| 4,402,419 | 9/1983 | MacPherson . |
| 4,412,627 | 11/1983 | Houghton et al. . |
| 4,419,319 | 12/1983 | Reynolds, Jr. et al . |
| 4,454,742 | 6/1984 | Gombas . |
| 4,470,281 | 9/1984 | Kaporovich et al |
| 4,515,284 | 5/1985 | Lee, Jr et al |

(List continued on next page.)

*Primary Examiner*—Lowell A. Larson
*Attorney, Agent, or Firm*—Wallenstein & Wagner, Ltd.

[57] **ABSTRACT**

A method and apparatus for reforming a bottom of a drawn and ironed beverage container is disclosed. The container has a longitudinal axis and a side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion and a preformed bottom wall. The preformed bottom wall includes a center domed portion. The bottom further has an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion. The apparatus comprises a roller movable from an inward position where the roller does not contact the annular, substantially longitudinal wall to an outward position where the roller contacts the annular, substantially longitudinal wall, and a movable actuator to move the roller into engagement with and circumferentially about the annular, substantially longitudinal wall. The movable actuator moves the roller into engagement with the annular, substantially longitudinal wall to reform the substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of the container.

**22 Claims, 10 Drawing Sheets**



5,697,242
Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,598,831 | 7/1986 | Nakamura et al . . |
| 4,620,434 | 11/1986 | Pulcimo et al . . |
| 4,650,628 | 3/1987 | Evely . |
| 4,685,582 | 8/1987 | Pulciani et al . |
| 4,717,523 | 1/1988 | Evely . |
| 4,722,215 | 2/1988 | Taube et al . . |
| 4,732,292 | 3/1988 | Supik . |
| 4,768,672 | 9/1988 | Pulciani et al . |
| 4,834,256 | 5/1989 | McMillin . |
| 4,885,924 | 12/1989 | Claydon et al . . |
| 4,919,294 | 4/1990 | Kawamoto et al . |

| | | | |
|---|---|---|---|
| 4,953,738 | 9/1990 | Stirbis . | |
| 5,016,463 | 5/1991 | Johmsson et al. | |
| 5,024,077 | 6/1991 | Bulso, Jr. et al. . | |
| 5,069,052 | 12/1991 | Porucznik et al . | |
| 5,105,973 | 4/1992 | Jentzsch et al . . | |
| 5,111,679 | 5/1992 | Kobayashi et al . . | |
| 5,222,385 | 6/1993 | Halasz et al . ..................... | 72/117 |
| 5,253,500 | 10/1993 | Willoughby . | |
| 5,341,667 | 8/1994 | Lee, Jr. . | |
| 5,372,028 | 12/1994 | Brilman et al . | |
| 5,433,098 | 7/1995 | Bowlin et al . . | |
| 5,467,628 | 11/1995 | Bowlin et al . | |



FIG. 1

FIG. 2

FIG. 3

# FIG. IA



# FIG. 4



# FIG. 5



## FIG. 6



## FIG. 7



A87



FIG. 8

FIG. 9

FIG. IO

# FIG. II



# FIG. I2



FIG. 13



FIG. 14



FIG. 15





FIG. 16

FIG. 18

FIG. 17

# FIG. 19



FIG.20



FIG.21



FIG.22



5,697,242

1

## METHOD AND APPARATUS FOR REFORMING CAN BOTTOM TO PROVIDE IMPROVED STRENGTH

### RELATED APPLICATIONS

This is a divisional application of U.S. application Ser. No. 08/563,900, filed Nov. 22, 1995, now abandoned, which is a continuation of U.S. application Ser. No. 08/343,837, filed Nov. 23, 1994, now abandoned, which is a continuation of U.S. application Ser. No. 08/212,647, filed Mar. 3, 1994, now abandoned, which is a continuation of U.S. application Ser. No. 08/050,526, filed Apr. 20, 1993, now abandoned, which is a continuation of U.S. application Ser. No. 07/735, 994, filed Jul. 25, 1991 (now U.S. Pat. No. 5,222,385) which is a continuation-in-part of U.S. application Ser. No. 07/730, 794, filed Jul. 24, 1991 (now U.S. Patent No. 5,349,837), which is in turn based upon International Application No. PCT/US 90/00451, having an International filing date of Jan. 26, 1990.

### TECHNICAL FIELD

The invention relates generally to a method and apparatus for reforming the bottoms of drawn and ironed beverage containers (or cans). The reformed can bottom is an integral part of beer and beverage cans, and increases the strength of those cans above that of prior art cans.

### BACKGROUND OF THE INVENTION

Drawn and ironed cans are among the most widely used cans for carbonated beverages, including such beverages as beer and soft drinks. Such drawn and ironed cans are made from a disc of stock material which is converted into a shallow "cup" with short side walls. The base of this cup ultimately forms the bottom of the can, and the short side walls of the cup become the elongated side walls of the can.

The shallow cup is passed through a succession of ironing rings. As the spacing between successive rings becomes increasingly narrow, passage of the cup through these successive rings decreases the thickness and increases the height of the side walls.

The configuration of the bottom of such drawn and ironed cans has, over the last several years, been a topic of interest to both can manufacturers, packagers, shippers, retailers and the ultimate consumer who purchases products in such cans. This is because the configuration of the bottom is a factor in the ability of the can to resist its internal pressures and achieve adequate columnar strength. These internal pressures result from the weight, pressurization and carbonation of the liquids in the can. Columnar strength is the ability of a can to resist axial loads imposed by cans that are stacked upon other cans, as during transport and storage.

Can manufacturers are constantly striving to obtain high strength with relatively low weight. Generally, however, these goals are incompatible. Low weight, and a lowering of material cost, is generally achieved by reducing the thickness of the stock material. A reduction in stock material thickness, without more, lowers the strength of the can. Retailers and consumers desire a container which is stackable and which is of the lowest possible weight for ease in handling.

The bottom shape of the container has been found to be of importance in determining its strength. Issued U.S. patents disclosing this importance include U.S. Pat. No. 4,685, 582, issued to Pulciani et al. on Aug. 11, 1987, and entitled "Container Profile With Stacking Feature." This patent,

2

which is assigned to the assignee of the present invention, discloses a so-called ANC-1A container having an inverted dome-shaped bottom. Other U.S. patents are also generally relevant. For example, U.S. Pat. Nos. 3,904,069, 3,979,009 and 4,412,627 disclose containers having bottom wall constructions designed to permit selected and controlled outward flexing or bulging of the bottom wall when the container is sealed and subjected to internal pressures developed by the contents.

Reforming of the bottom wall of a container of the general type described in this application has also been described in an International Publication to Metal Box plc. This publication is International Publication Number WO 83/02577, published on Aug. 4, 1983. This reforming takes place by applying a roller along the exterior transition wall 7 of the bottom of the container, rather than along its interior. See International Publication Number WO 83/02577, FIG. 7.

### SUMMARY OF THE INVENTION

It is an object of the invention to provide an apparatus for reforming a bottom of a drawn and ironed beverage container. The container has a longitudinal axis and a side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion, and an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion.

In accordance with the present invention, the apparatus comprises a roller movable from a radially inward position where the roller does not contact the annular, substantially longitudinal wall to a radially outward position where the roller contacts the annular, substantially longitudinal wall, and a movable actuator to move the roller into engagement with and circumferentially about the annular, substantially longitudinal wall to reform the substantially longitudinal wall.

It is comprehended that the movable actuator moves the roller into engagement with the annular, substantially longitudinal wall to reform the substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of the container.

It is further comprehended that the apparatus includes a plurality of rollers. Each of the rollers is movable from a radially inward position where the rollers do not contact the annular, substantially longitudinal wall to a radially outward position where the rollers contact the annular, substantially longitudinal wall.

It is still further comprehended that the apparatus includes a radially inward support for the container. The radially inward support may comprises a jig supporting the container in opposition to the rollers along a lower end of the container. For example, the jig may have a bottom peripheral profile portion substantially corresponding in shape to the outer annular wall of the container, such that the bottom peripheral profile portion of the jig is mated with the outer annular wall of the container.

It is a further object of the invention to provide a method of reforming a bottom of a drawn and ironed container. The container has a longitudinal axis and a generally cylindrical side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion.

In accordance with the invention, the method comprises providing the drawn and ironed container, providing a

A94

5,697,242

| 3 | 4 |

reforming roller, and moving the reforming roller radially into engagement with the substantially longitudinal wall. The reforming roller rotates along the longitudinal wall and circumferentially about an arcuate path, wherein the reforming roller affects the angle of the substantially longitudinal wall.

It is comprehended that the reforming roller affects the angle of the substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of the container.

It is further comprehended that a radial inward support for the container is provided. The radial inward support may include supporting the container in a jig which supports the container along a lower end of the container. For example, the jig may include a bottom peripheral profile portion substantially corresponding in shape to the outer annular wall of the container, and the bottom peripheral profile portion of the jig mates with the outer annular wall.

Other features and advantages of the invention will be apparent from the following specification taken in conjunction with the following drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top view of a pivoting apparatus in accordance with the invention, and in a radially inward, non-engaging position.

FIG. 1A is a view of the apparatus of FIG. 1, but with the rollers in a radially outward position and engaging the wall of a container.

FIG. 2 is a side-sectional view of the apparatus of FIG. 1, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 3 is a detail of a portion of the apparatus of FIG. 2, showing the pivot pin about which the roller pivots.

FIG. 4 is a top view of a second pivoting embodiment of the apparatus in accordance with the invention.

FIG. 5 is a side-sectional view of the apparatus of FIG. 4, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 6 is a top view of a third pivoting embodiment of the apparatus in accordance with the invention.

FIG. 7 is a side-sectional view of the apparatus of FIG. 6, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 8 is a side perspective view of a container which is suitable for treatment by the process and apparatus of the invention.

FIG. 9 is an enlarged view of the lower left hand corner of the container of FIG. 8, prior to reforming.

FIG. 10 is an enlarged view of the lower left hand corner of the container of FIG. 8, after reforming.

FIG. 11 is a top view of a non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 12 is a side-sectional view of the apparatus of FIG. 11, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 13 is a top view of a second non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 14 is a side-sectional view of the apparatus of FIG. 13, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 15 is a detail of the roller and bearing of FIG. 14, taken along lines 15—15 of FIG. 13.

FIG. 16 is a top view of a third non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 17 is a side-sectional view of the apparatus of FIG. 16, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 18 is a detail of the actuator and dovetail slide portion of a portion of the apparatus of FIG. 16, taken along lines 18—18 of FIG. 16.

FIG. 19 is a side-sectional view of a fourth non-pivoting apparatus in accordance with the invention, including a single roller, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 20 is a photographic profile of a cross-section of a lower portion of a can reformed by a prior art process.

FIG. 21 is a photographic profile of a cross-section of a lower portion of a can reformed by the process of the present invention.

FIG. 22 is a photographic profile of a cross-section of a lower portion of a "control" can prior to reforming.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

This invention is susceptible of embodiment in many different forms. The drawings and this specification show a preferred embodiment of the invention. It will be understood, however, that this disclosure is to be considered an exemplification of the principles of the invention. The inventors do not intend to limit the broadest aspect of the invention to the illustrated embodiments.

According to one aspect of the invention, the performance characteristics of a container formed by normal drawing and ironing procedures are improved by reforming the bottom end wall of the container from the initial configuration. This initial configuration is disclosed in the above-mentioned '582 patent and is shown in FIG. 8.

As described and shown in FIGS. 9 and 10 of copending International Application No. PCT/US 90/00451, after the fluted container has been necked, flanged, internally spray coated and externally printed, the bottom profile or countersink area of the bottom wall is reshaped. This is done by reforming the inner wall of the countersink to further improve buckle resistance and decrease can growth.

In the prior co-pending application, the finished drawn and ironed container of FIG. 11 is supported in a suitable jig that has an internal opening which corresponds to the outer peripheral diameter of the container. The jig has a lower profile portion that conforms to the countersink wall portion the bottom wall of the container, as originally formed in accordance with the process disclosed in the '582 patent.

A plug is inserted into the upper end of the opening and securely held in the top of the container. During processing, this container is rotated about its axis. The bottom peripheral profile of the jig is in extended contact with the container bottom. A reforming roller is brought into engagement with the substantially vertical wall of the domed end of the container and is supported on a shaft. That shaft is designed to be rotated along an arcuate path around the center axis for the container. The roller has a peripheral configuration which defines a substantially vertical upwardly and outwardly tapered wall having a generally arcuate upper portion. The inner wall of the countersink is reformed to a more

A95

5,697,242

5

vertical profile while the dome is stretched to a small degree. The outer wall is held to its original configuration. Alternatively, the outer wall could also be reformed with the inner wall.

It was found in the co-pending application that this reforming operation significantly improves buckle resistance and decreases the amount of can growth, i.e., the amount that the bottom end wall is elongated when pressure is applied internally of the container.

The container produced according to the method and apparatus described in the co-pending application exhibited significantly greater column strength, i.e., resistance to crushing by vertical loads applied to the container side wall. That container also exhibited significantly less container growth during internal pressurization and improved buckle resistance. The container constructed in accordance with that invention was thus capable of being produced from stock flat disc material having a significantly reduced thickness.

The present invention is a further elaboration and refinement upon the invention described in the copending application. The invention is directed to the type of drawn or drawn and ironed container shown in FIG. 8. Such containers are well known in the art and are generally described and shown in U.S. Pat. No. 4,685,582, issued to the assignee of the present application on Aug. 11, 1987. This container 20 is symmetrical about a vertical axis 22. A generally cylindrical side wall 24 parallel with this vertical axis forms the panel on which graphics, such as a bottler's trademark, may be printed. An outer annular wall 26 forms a transitional portion between this side wall 24 and a convex, U-shaped portion 28 that defines a flange-like ridge. The outer annular wall 26 and U-shaped portion 28 enable these cans to be stacked. In particular, the bottom of a first can may be securely nested into the top of a second can.

The container 20 also includes a preformed bottom wall 30 including a center domed portion 32. An annular, substantially vertical wall 34 joins the domed portion 32 to the convex U-shaped portion 28. This "substantially vertical wall," for the purposes of this application, has an angle from the vertical of 0 to +5 degrees, and may be as high as +10 degrees. A positive angle is shown by angle C in FIG. 8.

Various kinds of apparatus may be used to effect the method of reforming container 20, as that method is described and claimed in the present application. As may be seen in FIGS. 1–3, one such apparatus includes a plurality of rollers 36. In a preferred embodiment, three rollers 36 may be used. The use of three rollers 36 has advantages over the use of fewer rollers, for example, a single roller. These rollers 36 are used to contact the annular, substantially vertical wall 34. The use of one roller would concentrate the forces transferred from the roller 36 to the wall 34 at one point. In contrast, three rollers 36 will spread the force on this wall 34 over three points.

As may be seen in FIG. 2, each of these rollers 36 is indirectly secured to a pivot plate 38. Securing the rollers 36 are a bearing clamp 40 and a bearing 42.

Each of the pivot plates 38 are designed to pivot around their respective pivot pin 44 (FIG. 1). In this embodiment, this pivot pin 44 is vertically disposed. As will be seen in other embodiments, however, other pivot pins may instead be horizontally disposed.

A tooling head collar 46 provides a support surface for a jig 48, or lower can support. This jig 48 is removable from the tooling head collar 46 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

6

Each jig 48 is manufactured so as to accommodate and support a given size container 20. Accordingly, a bottom peripheral profile portion 50 of the jig 48 substantially corresponds in shape to the outer annular wall 26 of the container 20. As will be explained below, this bottom peripheral profile portion 50 of the jig 48 is mated with the outer annular wall 26 of the container 20. In the embodiment shown in FIG. 2, it may be seen that the lowermost part 52 of this jig 48 also corresponds in shape to the radially outermost region of the convex U-shaped portion 28. In this way, the jig 48 provides greater support around the circumference of the container 20.

Supporting the bearings 42 and enclosing portions of the reforming rollers 36 are bearing housings 54. These bearing housings 54 are fixedly secured to their respective pivot plates 38. Thus, the motion of the pivot plates 38 and the bearing housings 54 is synchronous.

Movement of the pivot plates 38 and bearing housings 54 is facilitated by a vertically movable actuator ball 56. As shown in FIG. 2, this actuator ball 56 is positioned in a first, non-engaging position. In this position, the actuator ball 56 merely abuts against camming surfaces 58 on the bearing housing 54.

Upward, vertical movement urges the actuator ball 56 to a second position in which it contacts and pushes upwardly on camming surfaces 58. As a result of the shape of these camming surfaces 58, this upward movement causes the bearing housing 54 and pivot plate 38 to pivot together about the pivot pin 44 in a radially outward direction. This pivoting movement continues until rollers 36 contact the annular, substantially vertical wall 34.

The rollers 36, upon contact with this wall 34, rotate rapidly to force this wall's configuration as shown in FIG. 9 to that shown in FIG. 10. Particularly, FIGS. 9 and 10 depict a vertical line V—V. Vertical line V—V is coincident with the vertical axis of container 20. FIG. 9 shows a container 20 before reforming. In this FIG. 9, the wall is substantially vertical and may even have a so-called "positive" angle. With reference to FIG. 9, a positive angle is one in which wall 34 angles upwardly and to the right of line V—V. An example of a positive angle appears as angle C in FIG. 9.

After contact by rollers 36, as described above, this wall 34 is reformed to achieve a negative angle A. The results of reforming are shown, for example, in FIG. 10. As a result of this negative angle, as will be described below, container 20 has enhanced physical characteristics.

In the apparatus of FIGS. 1–3, the pivot pin is substantially vertically disposed. As a result, the pivoting of the bearing housing 54 and the pivot plate 38 occur in a horizontal plane. Other embodiments, as described below, will include horizontal pivot pins, causing pivoting of the bearing housing and pivot plate in a vertical plane.

As may be seen in greatest detail in FIGS. 2 and 3, the reforming rollers 36 have a perimeter portion 60 that is downwardly tapered. It is this downwardly tapered configuration 60 which, when rollers 36 are placed against the substantially vertical wall 34, results in the reformation of that substantially vertical wall 34 to a wall having a negative angle.

After the completion of the reforming, the rollers 36 are retracted from the wall 34 and return from the position shown in FIG. 1A to the original position shown in FIG. 2. Each pivot plate 38 and bearing housing 54 assembly returns to this original position as a result of pressure from a compression spring 62.

A96

5,697,242

7

A slight modification of the reforming apparatus described above is shown in FIGS. 4 and 5. Each of the components of the embodiments of FIGS. 1–3 are correspondingly numeraled in FIGS. 4 and 5, except that the reference numerals for the corresponding components in the latter figures include the suffix "a." The only component which differs significantly is the spring. Spring 62 of FIGS. 1–3 is an extension spring, whereas spring 62a of FIGS. 4–5 is a compression spring. As a result, the apparatus of FIGS. 4–5 works in a slightly different manner than the apparatus of FIGS. 1–3. Particularly, in FIGS. 1–3, upon completion of reforming, the rollers 36 are retracted from the wall 34 and returned to their original position as a result of both applied pressure from an extension spring 62 and retraction of the actuator ball 56. In FIGS. 4–5, upon completion of the reforming, the rollers 36a are retracted from the wall 34 and returned to their original position as a result of both applied pressure from a compression spring 62a and retraction of actuator ball 56a.

Still another embodiment is shown in FIGS. 6 and 7. This embodiment also includes three rollers 64. As may be seen in FIG. 7, each of these rollers 64 is indirectly secured to a pivot plate 66. Securing the rollers 64 are a bearing clamp 68 and at least one bearing 70.

Each of the pivot plates 66 are designed to pivot around their respective pivot pin 72. As may be seen in FIG. 7, this pivot pin 72 is horizontally disposed. As a result, the pivoting of the bearing housing 74 and the pivot plate 66 occur in a vertical plane.

As in the embodiment of FIGS. 1–3, the embodiment includes a tooling head collar 76 to provide a support surface for a jig 78, or lower can support. This jig 78 is also removable from the tooling head collar 76 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

Movement of the pivot plates 66 and bearing housings 74 is facilitated by a vertically movable actuator 80. As shown in FIG. 7, this actuator 80 is positioned in a first, non-engaging position. In this position, the actuator 80 merely abuts against camming surfaces 82 on the bearing housing 74.

Upward, vertical movement urges the actuator 80 to a second position in which it contacts and pushes upwardly on camming surfaces 82. As a result, this upward movement causes the bearing housing 74 and pivot plate 66 to pivot together about the pivot pin 72 in a vertical plane and a radially outward direction. This pivoting movement continues until rollers 64 contact the annular, substantially vertical wall 34 of container 20.

After the completion of the reforming, the rollers 64 are retracted from the wall 34 and return from the position shown in the dotted lines of FIG. 7 to the original position shown in the solid lines of FIG. 7. Each pivot plate 66 and bearing housing 74 assembly returns to this original position as a result of pressure from a coil spring 84. This coil spring 84 encircles and is held upon a retaining post 86. The coil spring 84 is tensioned by compressing it between the top, abutting surfaces of bearing housings 74 and hex nut 88 secured to retaining post 86.

Still other embodiments of the present apparatus are depicted at FIGS. 11–19. As will be seen, the apparatus of these embodiments does not include a pivot pin for moving the rollers into engagement with the vertical wall 34 of the container 20. In many other respects, however, these apparatus are similar to those shown in FIGS. 1–7.

8

For example, the apparatus of FIG. 11 includes three rollers 90 secured to a bearing housing 92 with a bearing 94 and a bearing clamp 96. The solid lines of FIG. 12 show these rollers in a radially inward position, where the rollers 90 do not contact the annular, substantially vertical wall 34. These rollers 90 are movable from this position to a radially outward position where the roller contacts the annular, substantially vertical wall 34.

Bearing housings 92 are spring-biased. In particular, a tensioned garter spring 98 (FIG. 12) encircles the lower periphery of bearing housings 92. In their first, non-engaging position, as shown in the dotted lines of FIG. 11, the housings 92 and their related rollers 90 are retained by the garter spring 98 in a radially inward position.

The second position of the bearing housings 92 is shown in the solid lines of FIG. 11. The housings 92 attain this position when actuator 100 is moved upwardly against camming surfaces 102 of housing 92. This upward movement of actuator 100 pushes housings 92 radially outwardly until rollers 90 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 90, the actuator 100 is withdrawn and garter spring 98 urges the bearing housings 92 back into their first position.

As in the prior embodiments, the embodiment of FIGS. 11 and 12 includes a jig 104 to support the container along a bottom peripheral profile portion 106 that substantially corresponds in shape to the outer annular wall 26 of the container 20. As in the prior embodiments, the perimeter 108 of the rollers 90 also include a downwardly tapered configuration which, when placed against the substantially vertical wall 34, reforms that wall 34 to achieve a negative angle relative to the vertical axis of the container 20.

Another three-roller, non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 13–15. In this embodiment, the spring 110 is horizontally disposed and acts along a horizontal plane. In particular, spring 110 is in contact with the bearing housing 112 to bias that housing 112 in a radially inward direction.

The apparatus of FIG. 13 also includes three rollers 114 secured to bearing housing 112 with a bearing 116 and a bearing clamp 118. These rollers 114 are movable from their first position, as shown in FIGS. 13–15, to a radially outward position where the rollers 114 contact the annular, substantially vertical wall 34 of container 20.

Upward movement of actuator 120 pushes housings 112 radially outwardly until rollers 122 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 122, the actuator 120 is withdrawn and spring 110 urges the bearing housings 112 back into their first position.

Still another non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 16–18. In this embodiment, however, conventional rollers are not used. Rather, four roller segments 124 are mounted to the apparatus for radial movement towards and away from the container 20. In the dashed lines of FIG. 16, these segments 124 are shown in their normal, radially inward position. They are held in this position by a plurality of horizontally tensioned springs 126.

Each of these roller segments 124 may be secured to a housing 128. When an actuator 130 is moved vertically upwardly against camming surfaces 132, housings 128 are pushed radially outwardly, as shown in the solid lines of FIG. 16, until roller segments 124 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with roller segments 124, the actuator 130 is withdrawn and springs 126 urge the housings 128 back into their first position.

A97

5,697,242

9

A final version of a non-pivoting embodiment of the apparatus is shown in FIG. 19. In this embodiment, only one roller is used. This roller 134 has a substantially larger diameter than the rollers of the other embodiments. In fact, the diameter of this roller 134 is in excess of 80 percent of the distance between opposite, facing walls 34. This distance is referred to as "D" in FIG. 19.

Again, this embodiment includes a compression spring 136 which acts along a horizontal plane. Spring 136 is in contact with the housing 138 to bias that housing 138 in a rightward direction. Roller 134 is movable from its first position, as shown in FIG. 19, to a radially outward position where the roller 134 contacts the annular, substantially vertical wall 34.

In the embodiment of FIG. 19, actuator 140 is vertically movable, as in the apparatus of the previously described embodiments. The actuator 140 encircles a dovetailed collar 142, and this collar 142 is fixed. Housing 138, however, is horizontally movable when it is contacted by the upwardly-moving actuator 140. The horizontal movement of the housing 138 is guided by a dovetail groove in collar 142.

Housing 138 abuts against camming surface 146. In addition, with reference to the directions depicted in FIG. 19, spring 136 biases the housing 183 to the right. Thus, housing 138 is moved to the right along the camming surface 146. This rightward movement of the housing 138 continues until the periphery of roller 134 contacts the wall 34 of container 20. Reforming takes place in the same manner as with a three-roller apparatus, but at only one point along the wall 34.

Upon completion of treatment of the wall 34 with roller 134, the actuator 140 is lowered and the weight of the housing/roller combination moves that assembly back onto the collar 142, i.e., to the first position of the device. This collar 142 acts as a limit on the downward movement of the housing 138. In this embodiment and in the others, it is preferred that the actuator 140 rotate at the same speed as housing 138.

A comparison of FIGS. 9 and 10 will disclose the differences in containers before and after bottom reforming in accordance with the method of the present invention. Particularly, FIG. 9 shows a container before bottom reforming. The wall 34 in this Figure is substantially vertical and may, in fact, have a slight positive angle. For the left portion of the container shown in FIG. 9, a wall 34 having a slight positive angle would angle upwardly and to the right from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a positive angle, diameter D1 is greater than diameter D2.

As stated above, the container of FIG. 8 that may be reformed in accordance with this invention is generally symmetrical about a vertical axis 22. The container includes a generally cylindrical side wall 24 parallel with the vertical axis 22. The container 20 also includes an outer annular wall 26, a convex U-shaped portion 28, a preformed bottom wall 30, including a center domed portion 32 and an annular, substantially vertical wall 34 joining the domed portion 32 and the convex U-shaped portion 28.

The method of the present invention may be described with reference to the apparatus of FIGS. 1–3, and comprises several steps. The container 20 is supported on a jig 48. This jig 48 has a bottom peripheral profile portion 50 substantially corresponding in shape to the outer annular wall 26 of the container 20.

The bottom peripheral profile portion 50 of jig 48 is mated with the outer annular wall 26. Reforming rollers 36 are

10

brought into engagement with the substantially vertical wall 34. The reforming rollers 36 rotate along the vertical wall 34 and about an arcuate path. Through this action, the reforming rollers 36 affect the angle of the substantially vertical wall 34. In particular, the angle of the substantially vertical wall 34 is changed to a negative angle from the vertical axis of the container 20.

As may be seen in FIG. 1A, the reforming rollers 36 of this apparatus are rotated about an arcuate path equidistant from an axis that is coaxial with the axis 22 of the container. Alternatively, as may be appreciated from a review of FIG. 19 and the above description of that figure, the reforming roller 134 of that apparatus may be rotated about an arcuate path that is equidistant from an axis that is not coaxial with the axis 22 of the container 20. This occurs because in order to contact wall 34, the roller 134 is shifted to the right of its position as shown in FIG. 19.

In one aspect of the preferred method, the roller has a peripheral configuration which, upon engagement with the substantially vertical wall, reforms the substantially vertical wall to achieve a negative angle from the vertical axis of the container. Rollers having such peripheral configurations are shown in FIGS. 2, 5, 7, 12, 14, 17 and 19.

In another aspect of the preferred method, an actuator is moved upwardly and towards the can to move a camming surface and its housing in a radially outward direction. In this way, a roller movable with the camming surface engages the substantially vertical wall.

In still another aspect of the preferred method, the roller pivots about a horizontal pivot point. In particular, the apparatus may include a horizontal pivot point about which the roller pivots from an inward non-engaging position to a radially outward position wherein the roller engages the substantially vertical wall.

After this method of bottom reforming, as may be seen in FIG. 10, the wall 34 exhibits a slight negative angle A. The preferred angle A for an ANC-2A can should be no more than approximately –4 degrees from the vertical line V—V. It is believed that enhanced container characteristics could be attained by providing wall 34 with an angle of as much as –8 to –10 degrees. For the left portion of the container shown in FIG. 10, a wall 34 having a slight negative angle would angle upwardly and to the left from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a negative angle, diameter D1 would be less than diameter D2. The value of the preferred negative angle will vary with each different type of container.

Containers treated by the apparatus of the present invention exhibit distinctly superior characteristics when compared with prior art, untreated containers. Actual tests were conducted with so-called "ANC-2A" cans, manufactured by American National Can Company. These cans have the general configurations shown in FIGS. 8 and 9, and were made with aluminum having a gauge of 0.120. Prior to treatment of these cans by the method and apparatus of the invention, they exhibited the following characteristics:

TABLE 1

|  | ANC-2A Dome Profile | | | |
|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| --- | --- | --- | --- | --- |
| Minimum | .394 | .052 | 98 | .0120 |
| Maximum | .396 | .060 | 99 | .0120 |

5,697,242

11

TABLE 1-continued

ANC-2A Dome Profile

|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Average | .396 | .054 | 98 | .0120 |
| Spec/Aim | .394 ± .004 | .064 Max | 90 Min. | Ref. |

After treatment of these cans by the method and one roller apparatus of the invention, they exhibited the following characteristics:

TABLE 2

ANC Reformed Dome Profile

|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Minimum | .398 | .005 | 100 | .0120 |
| Maximum | .401 | .006 | 113 | .0120 |
| Average | .400 | .006 | 112 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |

As can be seen from a comparison of these Tables, Buckle Strength of treated cans increased from an average of about 99 to an average of 112. The growth in the dome, which results in a downward extension of the U-shaped portion 28 of the container of FIG. 9, decreased markedly from an average of 0.055 to 0.006 inches.

When these same tests were conducted with cans produced from 0.110 gauge aluminum, Buckle Strength increased from an average of 90 to an average of 98. Dome growth tests after 90 PSIG were not meaningful, as the non-reformed cans failed and buckled at 90 PSIG or less.

A number of standard ANC-2A cans were reformed. In the first set, the outside of the countersink was reformed in accordance with a CMB method, and its results are shown in Table 3. A photographic profile of a lower portion of one of these cans is shown in FIG. 20.

TABLE 3

Body Strength
206/211 × 413 CMB Reformed Dome Cans

|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Minimum | .385 | .008 | 104 | .0120 |
| Maximum | .395 | .012 | 109 | .0120 |
| Average | .392 | .010 | 106 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |

|  | Vertical Crush | | Sidewall Thickness |
|---|---|---|---|
| Minimum | 226 | | .0045 |
| Maximum | 292 | | .0046 |
| Average | 279* | | .0046 |
| Spec/Aim | 250 Min | | |

The second set of cans was reformed on the inside of the countersink in accordance with the present invention, and its results are shown in Table 4. A photographic profile of a lower portion of one of these cans is shown in FIG. 21.

12

TABLE 4

Body Strength
206/211 × 413 ANC Reformed Dome Cans

|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Minimum | .397 | .003 | 104 | .0120 |
| Maximum | .410 | .007 | 114 | .0120 |
| Average | .404 | .004 | 110 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |

|  | Vertical Crush | | Sidewall Thickness |
|---|---|---|---|
| Minimum | 305 | | .0045 |
| Maximum | 321 | | .0047 |
| Average | 313* | | .0046 |
| Spec/Aim | 250 Min | | |

Table 5 shows results from "control" cans, i.e., standard ANC-2A cans prior to reforming of any kind. A photographic profile of a lower portion of one of these cans is shown in FIG. 22.

TABLE 5

Body Strength
206/211 × 413 ANC-2A Control Cans

|  | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
|---|---|---|---|---|
| Minimum | .396 | .042 | 98 | .0120 |
| Maximum | .398 | .059 | 99 | .0120 |
| Average | .397 | .048 | 99 | .0120 |
| Spec/Aim | .394 ± .004 | .064 Max. | 90 Min. | Ref. |

|  | Vertical Crush | | Sidewall Thickness |
|---|---|---|---|
| Minimum | 310 | | .0045 |
| Maximum | 322 | | .0046 |
| Average | 317* | | .0046 |
| Spec/Aim | 250 Min | | |

As may be seen by a comparison of these Tables, dome growth in the untreated can of Table 5 averages 0.050 inches. Both reformed cans show improvement, but the average dome growth of the can reformed in accordance with the present invention is significantly superior (0.005 vs. 0.010 inches). Buckle strength is also somewhat improved (109 vs. 106). Finally, while average vertical crush of the present reformed cans (313) remains virtually the same as the control can (317), average vertical crush drops significantly (279) after reforming by the CMB method.

As may be seen by a comparison of FIGS. 20 and 21, the can that has been reformed in accordance with the present invention is less sharply peaked along its bottom. As a result, this can will exhibit more stability when moving along fill lines.

While the specific embodiments have been demonstrated and described, numerous modifications come to mind without markedly departing from the spirit of the invention. The scope of protection is, thus, only intended to be limited by the scope of the accompanying claims.

We claim:

1. An apparatus for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said apparatus comprising:

A99

5,697,242

13

a roller movable from an inward position where said roller does not contact said annular, substantially longitudinal wall to an outward position where said roller contacts said annular, substantially longitudinal wall; and

a movable actuator to move said roller into engagement with and circumferentially about said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

2. The apparatus of claim 1 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

3. The apparatus of claim 1, wherein said apparatus includes a plurality of rollers, each of said rollers movable from a radially inward position where said rollers do not contact said annular, substantially longitudinal wall to a radially outward position where said rollers contact said annular, substantially longitudinal wall.

4. The apparatus of claim 1 including a container support for inwardly supporting said container.

5. The apparatus of claim 4 wherein said container support supports said container along a lower end of said container.

6. The apparatus of claim 4 wherein said container support comprises a jig, said jig supporting said container along a lower end of said container.

7. The apparatus of claim 4, wherein said container support comprises a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container.

8. The apparatus of claim 4 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall in opposition to said container support.

9. The apparatus of claim 1, wherein the perimeter of said roller has a downwardly tapered portion which, when placed against said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of said container.

10. The apparatus of claim 1 wherein said apparatus includes three rollers.

11. A method of reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

providing said drawn and ironed beverage container;

providing a reforming roller; and

moving said reforming roller radially into engagement with said substantially longitudinal wall of said beverage container, said reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path, wherein said reforming roller affects the angle of said substantially longitudinal wall.

12. The method of claim 11 including the step of providing radial inward support for said container.

13. The method of claim 12, wherein said reforming roller is rotated about an arcuate path equidistant from an axis that is coaxial with the longitudinal axis of the container.

14. The method of claim 12 wherein said providing radial inward support includes supporting said container along a lower end of said container.

15. The method of claim 12 wherein said providing radial inward support includes supporting said container in a jig, said jig supporting said container along a lower end of said container.

14

16. The method of claim 12 wherein said providing radial inward support includes supporting said container in a jig, said jig supporting a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, and mating the bottom peripheral profile portion of said jig with said outer annular wall.

17. The method of claim 11, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container.

18. The method of claim 11, wherein said roller has a tapered peripheral portion which, upon engagement with said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle from the longitudinal axis of said container.

19. An apparatus for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said apparatus comprising:

means for radially inwardly supporting a lower end of said container;

a roller movable from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular, substantially longitudinal wall; and

a movable actuator to move said roller in opposition to said radial inward supporting means and into engagement with and circumferentially about said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

20. The apparatus of claim 19 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

21. A method for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said method comprising:

providing said drawn and ironed beverage container;

radially inwardly supporting a lower end of said container;

providing a roller;

moving said roller from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular, substantially longitudinal wall; and

circumferentially moving said roller in opposition to said radial inward supporting means and in engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

22. The method of claim 21 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

*  *  *  *  *



US006129230A

# United States Patent [19]

## Turner et al.

| [11] | Patent Number: | **6,129,230** |
|---|---|---|
| [45] | Date of Patent: | Oct. 10, 2000 |

[54] **END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL**

[75] Inventors: **Timothy L. Turner**, Cary; **Randy G. Forrest**, Park Ridge, both of Ill

[73] Assignee: **American National Can Company**, Chicago, Ill

[21] Appl. No.: 09/215,897

[22] Filed: **Dec. 18, 1998**

[51] Int. Cl.[7] .................................. B65D 17/34
[52] U.S. Cl. ................................... 220/269
[58] Field of Search ......................... 220/269

[56] **References Cited**

U S PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,952,912 | 4/1976 | Perry |
| 3,967,752 | 7/1976 | Cudzik |
| 4,015,744 | 4/1977 | Brown |
| 4,024,981 | 5/1977 | Brown |
| 4,084,721 | 4/1978 | Perry .................. 220/269 |
| 4,184,607 | 1/1980 | Potts |
| 4,363,419 | 12/1982 | Walz, Sr. |
| 4,402,421 | 9/1983 | Ruemer, Jr |
| 4,901,880 | 2/1990 | Tatham et al |
| 5,011,037 | 4/1991 | Moen et al |

| | | |
|---|---|---|
| 5,064,087 | 11/1991 | Koch |
| 5,219,257 | 6/1993 | Koch |
| 5,307,947 | 5/1994 | Moen et al |
| 5,375,729 | 12/1994 | Schubert |
| 5,405,039 | 4/1995 | Komura |
| 5,555,992 | 9/1996 | Sedgeley |
| 5,692,636 | 12/1997 | Schubert |
| 5,738,237 | 4/1998 | McEldowney |
| 5,860,553 | 11/1999 | Schubert .................. 220/271 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1-308744 | 12/1989 | Japan |
| 8-244769 | 9/1996 | Japan .................. 220/269 |

*Primary Examiner*—Stephen K Cronin
*Attorney, Agent, or Firm*—Wallenstein & Wagner, Ltd

[57] **ABSTRACT**

A stay-on-tab container end having a panel wall with a tab attached by a rivet and having a tear panel. The tear panel being defined by a frangible score with a first end and a second end and a non-frangible hinge segment A second groove is formed in the panel wall with a tail portion extending from the tear panel through the hinge segment. The second groove tail portion has a reduced residual differential compared to the frangible score residual Also the tail portion includes a curved terminal end that partially surrounds the second end of the score.

**23 Claims, 3 Drawing Sheets**



**U.S. Patent**          Oct. 10, 2000          Sheet 1 of 3          **6,129,230**



FIG.1



FIG.2

A102



FIG.3

FIG.4

FIG.5

**U.S. Patent**        Oct. 10, 2000        Sheet 3 of 3        6,129,230



6,129,230

1

## END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL

### DESCRIPTION

1. Technical Field

The present invention relates to end closures for two-piece beer and beverage metal containers having a non-detachable operating panel. More specifically, the present invention relates to improved characteristics of a frangible panel of the end with integral attachment of the frangible panel to prevent full detachment of the frangible panel

2. Background of the Invention

Common end closures for beer and beverage containers have a central panel that has a frangible panel (sometimes called a "tear panel," "opening panel," or "pour panel") defined by a score formed on the outer surface, the "consumer side," of the end closure. Popular "ecology" can ends are designed to provide a way of opening the end by fracturing the scored metal of the panel, while not allowing separation of any parts of the end. For example, the most common such beverage-container end has a tear panel that is retained to the end by a non-scored hinge region joining the tear panel to the remainder of the end, with a rivet to attach a leverage tab provided for opening the tear panel. This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-scored segment serving as the retaining fragment of metal at the hinge-line of the displacement of the tear panel

The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum. End closures for such containers are also typically constructed from a cut-edge of thin plate of aluminum or steel, formed into a blank end, and manufactured into a finished end by a process often referred to as end conversion. These ends are formed in the process of first forming a cut-edge of thin metal, forming a blank end from the cut-edge, and converting the blank into an end closure which may be seamed onto a container. Although not presently a popular alternative, such containers and/or ends may be constructed of plastic material, with similar construction of non-detachable parts provided for openability

These types of "stay-on-tab" ecology container ends have been used for many years, with a retained tab and a tear panel of various different shapes and sizes. Throughout the use of such ends, manufacturers have sought to save the expense of the metal by down-gauging the metal of the ends and the tabs. However, because ends are used for containers with pressurized contents and are sometimes subject to pasteurization, there are conditions causing great stresses to the components of the end during pasteurization, transit and during opening by a user. These conditions limit the available gauge reduction of the end metal, and make it difficult to alter design characteristics of the end, such as by reducing metal gauge or the thickness of the metal residual in the score defining the tear panel

Further, abuse during shipping, retail stocking and vending, due to rough handling of the filled containers, often causes problems with openability of the end. As an example of a problematic condition caused by handling abuse is the poor openability of a buckled container end. Due to dropping or abusive handling of filled containers, excessive pressure loads on regions of the end may cause a buckle of the end material. Such abuse, typically caused by dropping an upright container that is filled with carbonated fluid, results in a buckled end panel that deforms to form a bulge of metal of the panel

2

The possibility of such buckling is a prevalent concern due to down-gauging of the end material, pressurization of the container, pasteurizing filled containers, environmental conditions such as excessive heat, and rough handling of pallets or cases of filled containers. In a metal container end, the buckle appears as a deformation or bulge of the metal in a region of the end panel, a condition that adversely effects the users ability to open the end. Due to the geometry of the container and the ecology end panel, buckling of the end frequently is noticeable as a bulge of the end with a buckle in the 5:00 to 7:00 range of the end (with the middle of the tear panel positioned at 6:00). This type of buckled container end very often results in opening failure and resulting problems of a user trying to open the end

Such a buckled end usually cannot be opened properly by the user. Instead, when the user lifts the tab and applies pressure on the tear panel with the tab nose, the score fractures at the wrong locations at the wrong time, usually resulting in a dramatic loss in leverage of the tab for opening the panel. In this situation, the tab is actuated against the tear panel by lifting the finger pull end of the tab, but the tab nose passes beyond the proximal peripheral edge of the tear panel, a condition often called "tuck under" of the tab

The tab that tucks under is, therefore, fully lifted by the user, though the tear panel is still not fully opened. In this situation, the tear panel remains attaches by a segment of the score usually at about the 5:00 to 11:00 of the tear panel (defined with the tab nose being at about the 12:00 region of the tear panel). When this condition occurs, the user often tries to open the tear panel with something other than the tab, often by applying force by an object or the user's finger. However, such attempts at completing the opening sequence of the tear panel often causes fracture of the hinge of the tear panel, causing the tear panel to open entirely and become detached from the remainder of the end. When the user applies such force, a common result is for the hinge-line region of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score. As a result, the tear panel is fully separated from the remainder of the end panel, and is usually pushed into the container. The fully detached tear panel then becomes a choking hazard or is otherwise a nuisance to the user and a potential pollutant. Therefore, there is a need for an end having design characteristics that prevents separation of the tear panel during user manipulation of ends with opening failure

Further, with the more recent popular use of large-open ends, such problems with buckled ends are potentially greater. Because of the enlarged size and the shape of the opening panel (or tear panel), the score in certain regions of the large-open tear panel are more difficult to open by the tab leveraging against the tear panel. This is especially true for the region of the score which is in the 5:00 to 6:00 clock position. Therefore, large-opening ends may be difficult to open even when there is no noticeable sign of damage or buckle. Because of the additional force that may be required to open the large-opening tear panel with a tab, there may be more likelihood for non-specific tear of the metal away from the score. Also, because of the difficulty in opening the large-opening end, there is an increase in potential opening failure that results in "tuck tinder" of the tab. This type of opening failure also may result from the user opening the container too rapidly, not permitting proper venting of pressure from the container

Because of these conditions, and the problem of potential tuck under of the tab and subsequent detachment of the tear

A105

6,129,230

| 3 | 4 |

panel when a buckled end results in opening failure and the user manipulates the end to open it, there is a need for an improved end structure that prevents or inhibits the total removal of the tear panel in the situation of an opening failure

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide an end closure for a container having a circumferential sidewall and a peripheral seaming edge adapted to be integrally connected to the sidewall. The end has a central panel wall with a means for opening a frangible panel segment of the panel wall and a rivet in the central panel adapted to integrally attach a tab lever having a nose portion overlying at least a vent region of the frangible panel segment and a lift end opposite said nose. A score groove is formed in the central panel wall to define an outer perimeter of the frangible panel. The score groove has a first end adjacent the vent region and a second end joined to the first end by a curvilinear segment of the score groove, whereby the first end and the second end is separated by a generally linear hinge segment of the central panel wall. The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel. A second groove is formed in the end, having a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel.

It is also an object of the present invention to provide such an end member wherein the second groove has a curvilinear segment generally parallel an extent of the score groove. The invention further provides an end member in which the score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the score groove, such that the tail portion of the second groove is longer than the second end of the score groove.

It is another object of the present invention to provide such an end member whereby the score groove is a generally v-shaped recess having a score depth into the thickness of the central panel, and the second groove is also a generally v-shaped recess having a groove depth into the thickness of the central panel less than that of the score groove.

It is further an object of the invention to provide an end member having a curvilinear score groove with two ends separated by a hinge segment extending along a generally straight line between the two ends. A second groove is formed in the end, extending along a length that intersects the hinge segment generally transverse to the generally straight line between the two ends of the score groove.

It its yet another object of the present invention to provide an ecology end having a frangible panel with an outer score and an inner anti-fracture score, wherein the anti-fracture score has a tail portion that passes through the hinge region of the frangible tear panel. It is an object of the invention to provide an anti-fracture score that extends beyond the score groove to at least partially surround the end of the score groove.

It is further an object of the present invention to provide an ecology stay-on-tab end having a frangible panel defined by a score and first hinge region between a first and second end of the score groove, and having a second hinge region passing between a second groove and the second end of the score groove

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG 1 is a plan view of the upper side an end closure of one embodiment of the present invention;

FIG 2 is a plan view of the under side of the end of FIG 1;

FIG 3 is a cross-sectional view along 3—3 of FIG 1;

FIG 4 is a plan view of the upper side of an end closure of an alternative embodiment of the present invention;

FIG 5 is a cross-sectional view depicting the score and second groove of the present invention, with a partial sectional view depiction of the score tooling used to form the score and groove;

FIG 6 is a plan view of the scoreline of an embodiment of the present invention;

FIG 7 is a plan view of the scoreline of an alternative embodiment of the present invention

## DETAILED DESCRIPTION

While this invention is susceptible of embodiment in many different forms, there is shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The container end of the present invention is a stay-on-tab end member 10 with improved opening characteristics, having structure adapted to prevent detachment of the tear panel, which potentially results from a user forcing open a damaged end with opening failure. Essentially, the present invention provides a score groove inward from the main score to guard the main score when a fracture forms in the hinge of the opening panel of the end, as explained below.

In the preferred embodiment of FIGS 1–3, the end closure 10 for a container (not shown) has a central panel wall 12 having a seaming curl 14 for joining the wall to the container. The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum or steel, such as the common beer and beverage containers. End closures for such containers are also typically constructed from a cutedge of thin plate of aluminum or steel, formed into blank end, and manufactured into a finished end by a process often referred to as end conversion. In the embodiment shown in the Figures, the central panel is joined to a container by a seaming curl 14 which is joined to a mating curl of the container. The seaming curl 14 of the end closure 10 is integral with the central panel 12 by a countersink area 16 which is joined to the panel outer edge 18 of the central panel 12. This type of means for joining the central panel 12 to a container is presently the typical means for joining used in the industry, and the structure described above is formed in the process of forming the blank end from a cutedge of metal plate, prior to the end conversion process. However, other means for joining the central panel 12 to a container may be employed with the present invention

The central panel wall 12 has a displaceable tear panel 20 defined by a curvilinear frangible score 22 with an adjacent anti-fracture score 24 on the tear panel 20, and a non-frangible hinge segment 26 is definable by a generally straight line between a first end 28 and a second end 30 of the frangible score 22. The tear panel 20 of the central panel 12 may be opened, that is the frangible score 22 may be severed and the tear panel 20 displaced at an angular orientation relative to the remaining portion of the central panel 12, while the tear panel 20 remains hingeably connected to the central panel 12 through the hinge segment 26 In this opening operation, the tear panel

A106

6,129,230

5

20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12

As best shown in FIG 5, the frangible score 22 is preferably a generally V-shaped groove formed into the public side 34 of the panel wall 12 Similarly, the anti-fracture score 24, is preferably a generally V-shaped groove 36 formed into the public side 34 of the panel wall 12 on the tear panel 20 As is explained in more detail below, the score groove 32 is preferably deeper than the anti-fracture score groove 36. Accordingly, the score residual 38, being the amount of frangible material remaining below the score groove 32, is greater than the adjacent anti-fracture score residual 40 This difference between score residual 38 and adjacent anti-fracture score residual 40 is the score residual differential.

The score 22 and the second groove or anti-fracture score 24 are formed using conventional-type of scoring operation during the can end conversion process, using a tools that include an upper (public side) die with a score knife and a lower (product side) die with an anvil surface As is partially shown in cross-section view in FIG 5, the upper die 35 is applied to the public side 34 of the end wall 12 to form the V-shaped groove 32 of the score 22 and the V-shaped groove 36 of the second groove 24 on the tear panel 20

The score residual differential is adapted to provide a tear panel 20 with a score 22 more readily frangible than the anti-fracture score 24, a significant factor for providing efficient opening of the end member 10 Having a double score comprised of a frangible score 22 and an anti-fracture score 24 wherein there is a score residual differential is common in the industry. The common types of end members have a differential maintained generally constant throughout the length of the score 22 and anti-fracture score 24 For example, if the score residual differential of commonly-used ends is set at approximately 0 002 inch, then that differential is maintained along the entire length of the double score, that is, along the entire length of the score 22 and the adjacent parallel area of the anti-fracture score 24 According to one aspect of the present invention, the score residual differential is reduced in a tail portion 25 of the anti-fracture score 24 This reduction of score residual differential at the tail portion 25 provides a tail segment of the anti-fracture score 24 that is more easily severed relative to the remaining regions of the anti-fracture score 24 In more general terms, the structure of the present invention is adapted to provide a tail portion of the inner score (the anti-fracture score) 24 that has a score residual 40 adapted to be severed In the preferred embodiment of the invention the segment of the anti-fracture score that is adapted to be severed by having a reduced score residual differential is at least 0 050 inch in linear path length 80, and preferably in the range of 0 200 inch in linear path length 80 to fully direct any fracture in the hinge segment 26.

The stay-on-tab end member 10 has a tab 42 secured to the end panel 12 adjacent the tear panel 20 by a rivet 44 The tab has a lift end 46, a central region 48, and a nose portion 50. The lift end 46 and the nose portion 50 are generally aligned along a central longitudinal axis 52 of the end 10 passing through the rivet 44. A bead 54 is optionally formed in the tear panel 20 inward of the score 22 and the anti-fracture score 24. The tear panel bead 54 is useful to draw excess metal, or slack of metal, from the tear panel 20 to tighten the metal of the tear panel and improve opening characteristics of the end member 10 by the tab 42 being lifted to push against the ear panel 20

During opening of the end member 10 by the user, the user lifts the lift end 46 of the tab 42 to displace the nose

6

portion 50 downward against the tear panel 20 The force of the nose portion 50 against the tear panel 20 causes the score 22 to fracture, typically in a vent region 56 of the tear panel 20. As the tab displacement is continued, the fracture of the score 22 propagates around the tear panel 20, preferably in progression from the first end 28 of the score 22 toward the second end 30 of the score 22

When the end member 10 has sustained damage, such as physical deformation often referred to as "buckle" due to dropping a filled container, then opening failure may result. The common buckle of an end is a bulge of the end panel wall 12, usually in the region of 5:00 to 7:00 (the central longitudinal axis 52 of the end 10 bing the 12:00 to 6:00 axis). This type of buckled end often results in an opening failure when the user tries to open the container tear panel 20. When the user lifts the lift end 46 of the tab 42 and the nose portion 50 is forced against the tear panel 20, the buckle in the end causes resistance to the propagation of the score 22 being severed in progression from the first end 28 toward the second end 30 The result is often that the hinge segment 26 severs, resulting in a fractured segment joining the first end 28 to the second end 30, and the tear panel 20 being held in place by a remaining segment of the frangible score 22 that has not yet fractured due to the buckle in the panel 12. Further, because the user continues to lift the tab 42 lift end 46 in attempt to open the tear panel 20, the nose 50 of the tab 42 is pushed downward into the container and back toward the rivet 44, such that the nose 50 goes beyond the tear panel 20 and is then in a position called "tuck under."

With prior art type ends, when the tab 42 is in tuck under position, the tab 42 is then useless for opening the tear panel 20 The user often then tries to open the tear panel 20 by pushing down on the tear panel 20 with his or her finger, or with some object. The force applied by the user results in completion of the fracture of the score 22, such that the tear panel is then fully severed, and is free of the panel wall 12, without attachment by the hinge segment 26 The structure of the present invention prevents such full separation of the tear panel 20 when the above-described conditions exist, by providing a ribbon of metal of the end wall 12, regardless of fracture of the hinge segment 26 With the present invention, the anti-fracture score 24 has a tail portion 25 that intersects the hinge segment 26 When the user pushes down on the tear panel 20 of the buckled end 10, and such force causes the hinge segment 26 to be severed, the fracture of the metal tends to follow the path of the tail portion 25 when the fracture propagation reaches the score groove 36 of the tail portion 25 The end result of the present invention being so opened, therefore, is that a ribbon 58 of material between the second end 30 of the score and the terminal end of the tail portion 60 of the tail portion 25 This ribbon 58 of material also includes the area between remaining area of the tail portion 25 and the adjacent parallel area of the score 22.

In alternative embodiments of the present invention, the tail portion 25 and/or the second end 30 of the score 22 vary in specific design or arrangements Also, as an another alternative embodiment, the anti-fracture score 24 is absent except for the tail portion 25, as shown in FIG. 4. In this embodiment, the end member 10 has a panel wall 12 having a tear panel 20 defined by a frangible score 22 with a first end 28 and a second end 30, and a hinge segment 26 along a straight line between the ends of the score 22 The end 10 includes a score grove 62 that passes through the hinge segment 26, preferably generally transverse to the straight line defining the hinge segment 26. Much like the operation and structure described above regarding the anti-fracture score 24, the second groove is a groove into the panel wall

6,129,230

7

12 that has a groove depth and remaining residual. The residual in the tail portion of the second groove is preferably approximately the same as or only slightly less than the score residual 38 of the score 22. For example, in a preferred embodiment of this invention, the tail portion 64 of the second groove 62 has groove score residual that is approximately 0.000 to 0.002 inch greater than the score residual 38 at the adjacent area of the end of the score 22.

In the alternative embodiment of FIGS. 6 and 7, the score 22 and the anti-fracture score 24 follow a specific shape that is adapted to permit unrestricted deflection of the tab 42. In this embodiment, the curvilinear score 22 has a hip region 70 with a radius of curvature that is adapted to provide clearance for the tab 42 being deflected into the container. In the preferred embodiment, the radius of curvature of the hip region 70 is approximately 0.120 inch. Another preferred embodiment provides a score 22 wherein the hip region 70 is aligned with the score first end 28 along an transverse axis 72, that is a linear alignment 72 that is generally transverse to the central longitudinal axis 52 of the end member 10.

According to another aspect of an alternative embodiment of the invention as is best shown in FIGS. 6 and 7, the cord shape of the score 24 proximal to the second end 30, and the cord shape of the tail portion 25, may vary from that which is shown in FIGS. 1 and 2. In the alternative embodiment of FIG. 6, the tail portion 25 terminates in the end wall 12 beyond the score 22, and at least slightly transecting the line defining the hinge segment 26. Alternatively, the tail portion 25 extends further away from the tear panel 20 and curves away from the tab 42 and rivet 44 to at least partially surround the second end 30 of the score 22. This embodiment results in a tail portion 25 that not only transects the line defining the hinge segment 26, but also extends and encircles the second end 30 to transect arcuate or some other curvilinear path of a fracture through the hinge segment 26 between the first end 28 and the second end 30. Therefore, having the tail portion 25 at least partially surrounding the second end 30 ensures that the path of a fracture of the metal of the hinge segment 26 can avoid being transected by the tail portion 25. In another embodiment of the invention, the cord shape of the second end 30 of the score 22 shown in FIG. 7 may alternatively curve outward away from the tear panel 20.

In the preferred embodiment of the present invention, the tail portion 25 that transects the line defining the hinge segment 26 has a length adapted to direct a path of fracture in the metal of the hinge segment 26, directing the path of fracture along the cord shape of the tail portion 25. In the preferred embodiment, the length of the tail portion 25 is at least 0.050 inch, as measured in overall linear-path length shown as 80 in the Figures, and preferably having a length in the range of approximately 0.200 inch.

While the invention has been described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the broader aspects of the invention. Also, it is intended that broad claims not specifying details of a particular embodiment disclosed herein as the best mode contemplated for carrying out the invention should not be limited to such details.

We claim:

1. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a means for opening a frangible panel segment of the panel wall, the end member comprising;

8

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a vent region of the frangible panel segment and having a lift end opposite said nose;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region, and a second end joined to the first end by a curvilinear segment of the score groove, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment being non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel; and,

a second score groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment.

2. The end member of claim 1, wherein, the second score groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

3. The end member of claim 1, wherein, at least a terminal length of the second score groove curves to a direction away from said first end of the primary score score.

4. The end member of claim 1, wherein, the tail of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

5. The end member of claim 1, wherein, said second end of the score groove curves away from an adjacent segment of said second groove.

6. The end member of claim 1, wherein, the primary score groove has a score residual of the central panel wall, and said second score groove has a groove residual of the central panel wall, the primary score residual being less than the second score groove residual along said tail portion.

7. The end member of claim 6, wherein, the primary score residual of said second end is in the range of 0.003 to 0.005 inches, and the second score groove residual along the tail portion is between 0.001 to 0.002 inch greater than the score residual of said second end.

8. The end member of claim 1, wherein, the tail portion of the second score groove end extends into said adjacent area of the central panel and partially surrounds the second end of the primary score groove.

9. The end member of claim 8, wherein, the tail portion has a curvilinear end extending generally away from the first end of the primary score groove to partially surround said second end of the primary score groove.

10. The end member of claim 1, wherein, the primary score groove and the second score groove together form a double scoreline, the double scoreline being separated at the second end of the primary score groove and said tail portion of the second score groove extending longer than said primary score groove second end.

11. The end member of claim 10, wherein, the primary score groove has a score residual at terminal region of said second end and the second score groove has a groove residual at the tail portion, the groove residual of the second score being less than 0.002 inch greater than said score residual of said terminal region of the primary score.

12. The end member of claim 11, wherein, the tail of the second score groove tail portion is approximately 0.020 inches in length.

13. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming

A108

6,129,230

9

edge adapted to be integrally connected to the sidewall, and having a central panel wall, the end member comprising;

a frangible panel formed in the panel wall and being defined by a curvilinear score groove and a hinge segment, the score groove having a thickness residual and having a first end and a second end, said hinge segment having a length defined by a generally straight line between said first end and said second end;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a region of the frangible panel segment and having a lift end opposite said nose; and,

a curvilinear anti-fracture score formed in the frangible panel generally parallel to said score groove, said anti-fracture score having a tail portion passing through the hinge segment

14 The end member of claim 13, wherein, the tail portion passes through the hinge segment generally transverse to said straight line between the first and second end

15 The end member of claim 13, wherein the anti-fracture groove has a thickness residual greater than said score groove thickness residual, said greater thickness defining a thickness residual differential between said score groove and said anti-fracture score, said thickness differential being reduced along the tail portion of said anti-fracture score

16 The end member of claim 15, wherein said residual differential along an extent of said score groove is approximately 0.002 inch, and said residual differential being approximately 0.001 inch along said tail portion of the anti-fracture groove

17. The end member of claim 16, wherein the tail portion is at least 0.050 inch in length.

10

18 The end member of claim 13 wherein, said curvilinear score groove has a first segment leading from said first end to a hip region of said score groove, said first segment passing under a nose portion of said tab and said hip region having a radius of curvature adapted to permit unobstructed passage of the tab when a user lifts the tab to open the frangible tear panel

19 The end member of claim 18 wherein, the radius of curvature of said hip region is approximately 0.120 inch

20 The end member of claim 18 wherein, the end member has a central longitudinal axis, the hip region and said first end of the score groove being generally aligned along a transverse axis relative to said central longitudinal axis

21 An end member for a container, the end member having a central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising;

a frangible panel formed in the panel wall and at least partially defined by a score groove with a first end and a second end, wherein the score groove at the second end is curved outward toward the outer edge of the panel;

a hinge line passing between the first and second end of the score groove; and,

a second score groove in the panel wall and transecting the hinge line

22 The end member of claim 21, wherein the second score groove is an anti-fracture score with an extended end passing through the hinge line

23 The end member of claim 21, wherein the second score groove has a terminal end curved outward toward the outer edge of the panel.

*  *  *  *  *

US006260728B1

(12) **United States Patent**     (10) Patent No.:   **US 6,260,728 B1**

Turner et al.     (45) **Date of Patent:**   *Jul. 17, 2001

| | | |
|---|---|---|
| (54) | **END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL** | |
| (75) | Inventors: | Timothy L. Turner, Cary; Randy G. Forrest, Park Ridge, both of IL (US) |
| (73) | Assignee: | Rexam Beverage Can Company, Chicago, IL (US) |
| (*) | Notice: | Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days. |
| | | This patent is subject to a terminal disclaimer. |
| (21) | Appl. No.: | 09/618,898 |
| (22) | Filed: | Jul. 18, 2000 |

**Related U.S. Application Data**

(63) Continuation of application No. 09/215,897, filed on Dec. 18, 1998, now Pat. No. 6,129,230.

(51) Int. Cl.⁷ ........................................... B65D 17/34
(52) U.S. Cl. .................................................. 220/269
(58) Field of Search ...................................... 220/269

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,952,912 | 4/1976 | Perry |
| 3,967,752 | 7/1976 | Cudzik |
| 4,015,744 | 4/1977 | Brown |
| 4,024,981 | 5/1977 | Brown |
| 4,084,721 | 4/1978 | Perry |
| 4,184,607 | 1/1980 | Potts |

| | | | |
|---|---|---|---|
| 4,363,419 | 12/1982 | Walz, Sr. | |
| 4,402,421 | 9/1983 | Ruemer, Jr | |
| 4,901,880 | 2/1990 | Tatham et al. | |
| 5,011,037 | 4/1991 | Moen et al. | |
| 5,064,087 | 11/1991 | Koch | |
| 5,219,257 | 6/1993 | Koch | |
| 5,307,947 | 5/1994 | Moen et al. | |
| 5,375,729 | 12/1994 | Schubert | |
| 5,405,039 | 4/1995 | Komura | |
| 5,555,992 | 9/1996 | Sedgeley | |
| 5,692,636 | 12/1997 | Schubert | |
| 5,711,448 | * 1/1998 | Clarke, III | 220/269 |
| 5,738,237 | 4/1998 | McEldowney | |
| 5,860,553 | * 1/1999 | Schubert | 220/271 |
| 6,079,583 | * 6/2000 | Chasteen | 220/269 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 0432659 | * 6/1991 | (EP) | | 220/269 |
| 1-308744 | 12/1989 | (JP) | | |
| 8-244769 | * 9/1996 | (JP) | | 220/269 |

* cited by examiner

*Primary Examiner*—Stephen K. Cronin
(74) *Attorney, Agent, or Firm*—Wallenstein & Wagner

(57) **ABSTRACT**

A stay-on-tab container end having a panel wall with a tab attached by a rivet and having a tear panel. The tear panel being defined by a frangible score with a first end and a second end and a non-frangible hinge segment. A second groove is formed in the panel wall with a tail portion extending from the tear panel through the hinge segment. The second groove tail portion has a reduced residual differential compared to the frangible score residual. Also, the tail portion includes a curved terminal end that partially surrounds the second end of the score.

**18 Claims, 3 Drawing Sheets**



A110

FIG.1



FIG.2



A111





FIG.6

FIG.7

US 6,260,728 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL

This application is a continuation of prior U.S. application Ser. No. 09/215,897 filed Dec. 18, 1998, now U.S. Pat. No. 6,129,230

### TECHNICAL FIELD

The present invention relates to end closures for two-piece beer and beverage metal containers having a non-detachable operating panel More specifically, the present invention relates to improved characteristics of a frangible panel of the end with integral attachment of the frangible panel to prevent full detachment of the frangible panel

### BACKGROUND OF THE INVENTION

Common end closures for beer and beverage containers have a central panel that has a frangible panel (sometimes called a "tear panel", "opening panel", or "pour panel") defined by a score formed on the outer surface, the "consumer side", of the end closure. Popular "ecology" can ends are designed to provide a way of opening the end by fracturing the scored metal of the panel, while not allowing separation of any parts of the end. For example, the most common such beverage-container end has a tear panel that is retained to the end by a non-scored hinge region joining the tear panel to the reminder of the end, with a rivet to attach a leverage tab provided for opening the tear panel This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-scored segment serving as the retaining fragment of metal at the hinge-line of the displacement of the tear panel

The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum End closures for such containers are also typically constructed from a cut-edge of thin plate of aluminum or steel, formed into a blank end, and manufactured into a finished end by a process often referred to as end conversion. These ends are formed in the process of first forming a cut-edge of thin metal, forming a blank end from the cut-edge, and converting the blank into an end closure which may be seamed onto a container Although not presently a popular alternative, such containers and/or ends may be constructed of plastic material, with similar construction of non-detachable parts provided for openability.

These types of "stay-on-tab" ecology container ends have been used for many years, with a retained tab and a tear panel of various different shapes and sizes Throughout the use of such ends, manufacturers have sought to save the expense of the metal by down-gauging the metal of the ends and the tabs However, because ends are used for containers with pressurized contents and are sometimes subject to pasteurization, there are conditions causing great stresses to the components of the end during pasteurization, transit and during opening by a user These conditions limit the available gauge reduction of the end metal, and make it difficult to alter design characteristics of the end, such as by reducing metal gauge or the thickness of the metal residual in the score defining the tear panel

Further, abuse during shipping, retail stocking and vending, due to rough handling of the filled containers, often causes problems with openability of the end. As an example of a problematic condition caused by handling abuse is the poor openability of a buckled container end Due to dropping or abusive handling of filled containers, excessive pressure loads on regions of the end may cause a buckle of the end material Such abuse, typically caused by dropping an upright container that is filled with carbonated fluid, results in a buckled end panel that deforms to form a bulge of metal of the panel

The possibility of such buckling is a prevalent concern due to downgauging of the end material, pressurization of the container, pasteurizing filled containers, environmental conditions such as excessive heat, and rough handling of pallets or cases of filled containers In a metal container end, the buckle appears as a deformation or bulge of the metal in a region of the end panel, a condition that adversely effects the users ability to open the end Due to the geometry of the container and the ecology end panel, buckling of the end frequently is noticeable as a bulge of the end with a buckle in the 5:00 to 7:00 range of the end (with the middle of the tear panel positioned at 6:00) This type of buckled container end very often results in opening failure and resulting problems of a user trying to open the end

Such a buckled end usually cannot be opened properly by the user Instead, when the user lifts the tab and applies pressure on the tear panel with the tab nose, the score fractures at the wrong locations at the wrong time, usually resulting in a dramatic loss in leverage of the tab for opening the panel. In this situation, the tab is actuated against the tear panel by lifting the finger pull end of the tab, but the tab nose passes beyond the proximal peripheral edge of the tear panel, a condition often called "tuck under" of the tab

The tab that tucks under is, therefore, fully lifted by the user, though the tear panel is still not fully opened. In this situation, the tear panel remains attaches by a segment of the score usually at about the 5:00 to 11:00 or the tear panel (defined with the tab nose being at about the 12:00 region of the tear panel) When this condition occurs, the user often tries to open the tear panel with something other than the tab, often by applying force by an object or the user's finger. However, such attempts at completing the opening sequence of the tear panel often causes fracture of the hinge of the tear panel, causing the tear panel to open entirely and become detached from the remainder of the end When the user applies such force, a common result is for the hinge-line region of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score As a result, the tear panel is fully separated from the remainder of the end panel, and is usually pushed into the container The fully detached tear panel then becomes a choking hazard or is otherwise a nuisance to the user and a potential pollutant Therefore, there is a need for an end having design characteristics that prevents separation of the tear panel during user manipulation of ends with opening failure

Further, with the more recent popular use of large-open ends, such problems with buckled ends is potentially greater Because of the enlarged size and the shape of the opening panel (or tear panel), the score in certain regions of the large-open tear panel are more difficult to open by the tab leveraging against the tear panel This is especially true for the region of the score which is in the 5:00 to 6:00 clock position Therefore, large-opening ends may be difficult to open even when there is no noticeable sign of damage or buckle Because of the additional force that may be required to open the large-opening tear panel with a tab, there may be more likelihood for non-specific tear of the metal away from the score Also, because of the difficulty in opening the large-opening end, there is an increase in potential opening failure that results in "tuck under" of the tab This type of

A114

US 6,260,728 B1

3

opening failure also may result from the user opening the container too rapidly, not permitting proper venting of pressure from the container.

Because of these conditions, and the problem of potential tuck under of the tab and subsequent detachment of the tear panel when a buckled end results in opening failure and the user manipulates the end to open it, there is a need for an improved end structure that prevents or inhibits the total removal of the tear panel in the situation of an opening failure.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide an end closure for a container having a circumferential sidewall and a peripheral seaming edge adapted to be integrally connected to the sidewall. The end has a central panel wall with a means for opening a frangible panel segment of the panel wall and a rivet in the central panel adapted to integrally attach a tab lever having a nose portion overlying at least a vent region of the frangible panel segment and a lift end opposite said nose. A score groove is formed in the central panel wall to define an outer perimeter of the frangible panel. The score groove has a first end adjacent the vent region and a second end joined to the first end by a curvilinear segment of the score groove, whereby the first end and the second end is separated by a generally linear hinge segment of the central panel wall. The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel. A second groove is formed in the end, having a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel.

It is also an object of the present invention to provide such an end member wherein the second groove has a curvilinear segment generally parallel an extent of the score groove. The invention further provides an end member in which the score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the score groove, such that the tail portion of the second groove is longer than the second end of the score groove.

It is another object of the present invention to provide such an end member whereby the score groove is a generally v-shaped recess having a score depth into the thickness of the central panel, and the second groove is also a generally v-shaped recess having a groove depth into the thickness of the central panel less than that of the score groove.

It is further an object of the invention to provide an end member having a curvilinear score groove with two ends separated by a hinge segment extending along a generally straight line between the two ends. A second groove is formed in the end, extending along a length that intersects the hinge segment generally transverse to the generally straight line between the two ends of the score groove.

It its yet another object of the present invention to provide an ecology end having a frangible panel with an outer score and an inner anti-fracture score, wherein the anti-fracture score has a tail portion that passes through the hinge region of the frangible tear panel. It is an object of the invention to provide an anti-fracture score that extends beyond the score groove to at least partially surround the end of the score groove.

It is further an object of the present invention to provide an ecology stay-on-tab end having a frangible panel defined by a score and first hinge region between a first and second end of the score groove, and having a second hinge region passing between a second groove and the second end of the score groove.

4

## BRIEF DESCRIPTION OF THE INVENTION

FIG. 1 is a plan view of the upper side an end closure of one embodiment of the present invention;

FIG. 2 is a plan view of the under side of the end of FIG. 1;

FIG. 3 is a cross-sectional view along 3—3 of FIG. 1;

FIG. 4 is a plan view of the upper side of an end closure of an alternative embodiment of the present invention;

FIG. 5 is a cross-sectional view depicting the score and second groove of the present invention, with a partial sectional view depiction of the score tooling used to form the score and groove;

FIG. 6 is a plan view of the scoreline of an embodiment of the present invention;

FIG. 7 is a plan view of the scoreline of an alternative embodiment of the present invention.

## DETAILED DESCRIPTION

While this invention is susceptible of embodiment in many different forms, there is shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The container end of the present invention is a stay-on-tab end member 10 with improved opening characteristics, having structure adapted to prevent detachment of the tear panel, which potentially results from a user forcing open a damaged end with opening failure. Essentially, the present invention provides a score groove inward from the main score to guard the main score when a fracture forms in the hinge of the opening panel of the end, as explained below.

In the preferred embodiment of FIGS. 1–3, the end closure 10 for a container (not shown) has a central panel wall 12 having a seaming curl 14 for joining the wall to the container. The container is typically a drawn and ironed metal can, usually constricted from a thin plate of aluminum or steel, such as the common beer and beverage containers. End closures for such containers are also typically constructed from a cutedge of thin plate of aluminum or steel, formed into blank end, and manufactured into a finished end by a process often referred to as end conversion. In the embodiment shown in the Figures, the central panel is joined to a container by a seaming curl 14 which is joined to a mating curl of the container. The seaming curl 14 of the end closure 10 is integral with the central panel 12 by a countersink area 16 which is joined to the panel outer edge 18 of the central panel 12. This type of means for joining the central panel 12 to a container is presently the typical means for joining used in the industry, and the structure described above is formed in the process of forming the blank end from a cutedge of metal plate, prior to the end conversion process. However, other means for joining the central panel 12 to a container may be employed with the present invention.

The central panel wall 12 has a displaceable tear panel 20 defined by a curvilinear frangible score 22 with an adjacent anti-fracture score 24 on the tear panel 20, and a non-frangible hinge segment 26. The hinge segment 26 is defined by a generally straight line between a first end 28 and a second end 30 of the frangible score 22. The tear panel 20 of the central panel 12 may be opened, that is the frangible score 22 may be severed and the tear panel 20 displaced at an angular orientation relative to the remaining portion of

A115

US 6,260,728 B1

5

the central panel 12, while the tear panel 20 remains hingeably connected to the central panel 12 through the hinge segment 26 In this opening operation, the tear panel 20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12

As best shown in FIG 5, the frangible score 22 is preferably a generally V-shaped groove formed into the public side 34 of the panel wall 12. Similarly, the anti-fracture score 24, is preferably a generally V-shaped groove 36 formed into the public side 34 of the panel wall 12 on the tear panel 20 As is explained in more detail below, the score groove 32 is preferably deeper than the anti-fracture score groove 36. Accordingly, the score residual 38, being the amount of frangible material remaining below the score groove 32, is greater than the adjacent anti-fracture score residual 40 This difference between score residual 38 and adjacent anti-fracture score residual 40 is the score residual differential

The score 22 and the second groove or anti-fracture score 24 are formed using conventional-type of scoring operation during the can end conversion process, using a tools that include an upper (public side) die with a score knife and a lower (product side) die with an anvil surface As is partially shown in crosssection view in FIG 5, the upper die 35 is applied to the public side 34 of the end wall 12 to form the V-shaped groove 32 of the score 22 and the V-shaped groove 36 of the second groove 24 on the tear panel 20.

The score residual differential is adapted to provide a tear panel 20 with a score 22 more readily frangible than the anti-fracture score 24, a significant factor for providing efficient opening of the end member 10 Having a double score comprised of a frangible score 22 and an anti-fracture score 24 wherein there is a score residual differential is common in the industry The common types of end members have a differential maintained generally constant throughout the length of the score 22 and anti-fracture score 24 For example, if the score residual differential of commonly-used ends is set at approximately 0.002 inch, then that differential is maintained along the entire length of the double score, that is, along the entire length of the score 22 and the adjacent parallel area of the anti-fracture score 24 According to one aspect of the present invention, the score residual differential is reduced in a tail portion 25 of the anti-fracture score 24 This reduction of score residual differential at the tail portion 25 provides a tail segment of the anti-fracture score 24 that is more easily severed relative to the remaining regions of the anti-fracture score 24 In more general terms, the structure of the present invention is adapted to provide a tail portion of the inner score (the anti-fracture score) 24 that has a score residual 40 adapted to be severed In the preferred embodiment of the invention, the segment of the anti-fracture score that is adapted to be severed by having a reduced score residual differential is at least 0 050 inch in linear path length 80, and preferably in the range of 0 200 inch in linear path length 80 to fully direct any fracture in the hinge segment 26

The stay-on-tab end member 10 has a tab 42 secured to the end panel 12 adjacent the tear panel 20 by a rivet 44 The tab has a lift end 46, a central region 48, and a nose portion 50 The lift end 46 and the nose portion 50 are generally aligned along a central longitudinal axis 52 of the end 10 passing through the rivet 44. A bead 54 is optionally formed in the tear panel 20 inward of the score 22 and the anti-fracture score 24 The tear panel bead 54 is useful to draw excess metal, or slack of metal, from the tear panel 20 to tighten the metal of the tear panel and improve opening characteristics of the end member 10 by the tab 42 being lifted to push against the ear panel 20

6

During opening of the end member 10 by the user, the user lifts the lift end 46 of the tab 42 to displace the nose portion 50 downward against the tear panel 20 The force of the nose portion 50 against the tear panel 20 causes the score 22 to fracture, typically in a vent region 56 of the tear panel 20 As the tab displacement is continued, the fracture of the score 22 propagates around the tear panel 20, preferably in progression from the first end 28 of the score 22 toward the second end 30 of the score 22

When the end member 10 has sustained damage, such as physical deformation often referred to as "buckle" due to dropping a filled container, then opening failure may result. The common buckle of an end is a bulge of the end panel wall 12, usually in the region of 5:00 to 7:00 (the central longitudinal axis 52 of the end 10 being the 12:00 to 6:00 axis) This type of buckled end often results in an opening failure when the user tries to open the container tear panel 20 When the user lifts the lift end 46 of the tab 42 and the nose portion 50 is forced against the tear panel 20, the buckle in the end causes resistance to the propagation of the score 22 being severed in progression from the first end 28 toward the second end 30 The result is often that the hinge segment 26 severs, resulting in a fractured segment joining the first end 28 to the second end 30, and the tear panel 20 being held in place by a remaining segment of the frangible score 22 that has not yet fractured due to the buckle in the panel 12. Further, because the user continues to lift the tab 42 lift end 46 in attempt to open the tear panel 20, the nose 50 of the tab 42 is pushed downward into the container and back toward the rivet 44, such that the nose 50 goes beyond the tear panel 20 and is then in a position called "tuck under "

With prior art type ends, when the tab 42 is in tuck under position, the tab 42 is then useless for opening the tear panel 20 The user often then tries to open the tear panel 20 by pushing down on the tear panel 20 with his or her finger, or with some object The force applied by the user results in completion of the fracture of the score 22, Such that the tear panel is then fully severed, and is free of the panel wall 12, without attachment by the hinge segment 26 The structure of the present invention prevents such full separation of the tear panel 20 when the above-described conditions exist, by providing a ribbon of metal of the end wall 12, regardless of fracture of the hinge segment 26 With the present invention, the anti-fracture score 24 has a tail portion 25 that intersects the hinge segment 26 When the user pushes down on the tear panel 20 of the buckled end 10, and such force causes the hinge segment 26 to be severed, the fracture of the metal tends to follow the path of the tail portion 25 when the fracture propagation reaches the score groove 36 of the tail portion 25 The end result of the present invention being so opened, therefore, is that a ribbon 58 of material between the second end 30 of the score and the terminal end of the tail portion 60 of the tail portion 25 This ribbon 58 of material also includes the area between remaining area of the tail portion 25 and the adjacent parallel area of the score 22

In alternative embodiments of the present invention, the tail portion 25 and/or the second end 30 of the score 22 vary in specific design or arrangements Also, as an another alternative embodiment, the anti-fracture score 24 is absent except for the tail portion 25, as shown in Figure 4 In this embodiment, the end member 10 has a panel wall 12 having a tear panel 20 defined by a frangible score 22 with a first end 28 and a second end 30, and a hinge segment 26 along a straight line between the ends of the score 22 The end 10 includes a score grove 62 that passes through the hinge segment 26, preferably generally transverse to the straight line defining the hinge segment 26 Much like the operation

US 6,260,728 B1

7

and structure described above regarding the anti-fracture score 24, the second groove is a groove into the panel wall 12 that has a groove depth and remaining residual. The residual in the tail portion of the second groove is preferably approximately the same as or only slightly less than the score residual 38 of the score 22. For example, in a preferred embodiment of this invention, the tail portion 64 of the second groove 62 has groove score residual that is approximately 0.000 to 0.002 inch greater than the score residual 38 at the adjacent area of the end of the score 22.

In the alternative embodiment of FIGS. 6 and 7, the score 22 and the anti-fracture score 24 follow a specific shape that is adapted to permit unrestricted deflection of the tab 42. In this embodiment, the curvilinear score 22 has a hip region 70 with a radius of curvature that is adapted to provide clearance for the tab 42 being deflected into the container. In the preferred embodiment, the radius of curvature of the hip region 70 is approximately 0.120 inch. Another preferred embodiment provides a score 22 wherein the hip region 70 is aligned with the score first end 28 along an transverse axis 72, that is a linear alignment 72 that is generally transverse to the central longitudinal axis 52 of the end member 10.

According to another aspect of an alternative embodiment of the invention as is best shown in FIGS. 6 and 7, the cord shape of the score 24 proximal to the second end 30, and the cord shape of the tail portion 25, may vary from that which is shown in FIGS. 1 and 2. In the alternative embodiment of FIG. 6, the tail portion 25 terminates in the end wall 12 beyond the score 22, and at least slightly transecting the line defining the hinge segment 26. Alternatively, the tail portion 25 extends further away from the tear panel 20 and curves away from the tab 42 and rivet 44 to at least partially surround the second end 30 of the score 22. This embodiment results in a tail portion 25 that not only transects the line defining the hinge segment 26, but also extends and encircles the second end 30 to transect arcuate or some other curvilinear path of a fracture through the hinge segment 26 between the first end 28 and the second end 30. Therefore, having the tail portion 25 at least partially surrounding the second end 30 ensures that the path of a fracture of the metal of the hinge segment 26 can avoid being transected by the tail portion 25. In another embodiment of the invention, the cord shape of the second end 30 of the score 22 shown in FIG. 7 may alternatively curve outward away from the tear panel 20.

In the preferred embodiment of the present invention, the tail portion 25 that transects the line defining the hinge segment 26 has a length adapted to direct a path of fracture in the metal of the hinge segment 26, directing the path of fracture along the cord shape of the tail portion 25. In the preferred embodiment, the length of the tail portion 25 is at least 0.050 inch, as measured in overall linearpath length shown as 80 in the Figures, and preferably having a length in the range of approximately 0.200 inch.

While the invention has been described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the broader aspects of the invention. Also, it is intended that broad claims not specifying details of a particular embodiment disclosed herein as the best mode contemplated for carrying out the invention should not be limited to such details.

We claim:

1. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and

8

having a central panel wall with a vent region and a means for opening a frangible panel segment of the panel wall, the end member comprising;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region and a second end, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment integrally connecting the frangible panel segment to an adjacent area of the panel wall; and,

a second score groove adjacent the second end of said primary score groove and adjacent said hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the score.

2. The end member of claim 1, wherein an extent of metal generally defined by a distance between said second score groove and said second end of the score provides a connection of said frangible panel segment to said panel wall in event of fracture of a portion of said hinge segment.

3. The end member of claim 1, wherein, the second score groove has a curvilinear segment generally parallel to an extent of the primary score groove.

4. The end member of claim 1, wherein, the primary score groove and the second score groove together form a double scoreline, the double scoreline being separated at the second end of the primary score groove and said tail portion of the second score groove extending away from said frangible panel beyond said primary score groove second end.

5. The end member of claim 1, wherein, the primary score groove has a score residual of the central panel wall, and at least a portion of said second score groove has a groove residual of the central panel wall less than the second score groove residual along said tail portion.

6. The end member of claim 1, wherein, at least a terminal length of the second score groove curves to a direction away from said first end of the primary score.

7. The end member of claim 1, wherein, at least a portion of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

8. The end member of claim 1, wherein, at least a portion of the second score groove end extends into said adjacent area of the central panel and partially surrounds the second end of the primary score groove.

9. The end member of claim 1, wherein, the second score groove has a tail portion with a curvilinear end extending generally away from the first end of the primary score groove to partially surround said second end of the primary score groove.

10. An end member for a container, the end member having a metal central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising;

a frangible panel formed in the panel wall and at least partially defined by a primary score with a first end at a vent region and a second end, the first end and second end being separated by a hinge segment, the hinge segment being a generally linear region of the metal, adapted to form a bend for angular displacement of the frangible panel during normal use by a user;

a means for providing an extent of metal joining said frangible panel to said panel wall in event of abuse opening of the end member with fracture being formed in a portion of said hinge segment;

said means for providing an extent of metal joining said frangible panel comprises a second groove adjacent

US 6,260,728 B1

9

said second end of the primary score and adjacent the hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the primary score.

11. The end member of claim 10, wherein, the second groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

12. The end member of claim 10, wherein, the primary score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the primary score and a tail portion of the second groove extending away from said frangible panel.

13. The end member of claim 10, wherein, the primary score groove has a score residual of the central panel wall, and said second groove has a groove residual of the central panel wall, the primary score residual being less than the groove residual along at least a portion of said second groove.

14. The end member of claim 10, wherein, at least a terminal length of the second groove curves to a direction away from said first end of the primary score.

15. The end member of claim 10, wherein, at least a portion of the second score groove passes through a hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score

10

16. The end member of claim 10, wherein, a tail portion of the second groove extends into said adjacent area of the central panel and partially surrounds the second end of the primary score.

17. The end member of claim 10, wherein, a tail portion of said second groove has a curvilinear end extending generally away from the first end of the primary score to partially surround said second end of the primary score.

18. An end member for a container, the end member having a metal central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising;

a frangible panel formed in the panel wall, the frangible panel having a vent region and being at least partially defined by a score groove with a first end adjacent said vent region and a second end separated from said first end by a hinge segment, the hinge segment with a hinge line area adapted to bend for angular displacement of the frangible panel during normal use by a user;

the end member having a second groove adjacent the second end of the score and positioned in said hinge segment to direct fracture of metal in the hinge segment in a direction away from said second end of the score.

* * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, )
INC. and CROWN CORK & SEAL USA, )
INC., )
                                    )
Plaintiffs/Counterclaim Defendants, )
                                    )   Civil Action No. 05-608 (MPT)
v. )
                                    )
REXAM BEVERAGE CAN COMPANY, )

Defendant/Counterclaimant.

### DECLARATION OF EDMUND GILLEST

I, Edmund Gillest, declare as follows:

1.     I have been retained by Rexam to testify as an expert in the above identified action. I am currently the owner of Gillest & Associates, LLC, a company founded in 2006, to do research, development and engineering for the metal packaging and golf industry. In addition to my consulting work at Gillest & Associates, LLC, I have worked in the metal (automotive and packaging) industry for over 40 years. From 1964 to1977, I worked for Ford Motor Co. in the automobile industry; from 1978 to 1996, I worked for Ball Corp. in the metal packaging industry; and from 1996 to 2006, I worked for Alcan, currently Novelis Corp., in the metal processing/packaging area.

2.     As a result of my education, training and experience, I have developed knowledge of metal forming and metal packaging that includes can end and can body research, design, manufacturing and implementation. I have extensive experience with

can body and can end development and engineering in addition to can end and can body
manufacturing processes at Ball Corp.

    3.    The relevant art is can body and can end manufacturing, design and
assembly. It is my opinion that one of ordinary skill in the art would be someone with a
mechanical engineering or technical degree and three to four years of experience working
in the field of can body and/or can end designing, manufacture and seaming, or someone
without a mechanical engineering or technical degree with six to ten years of experience
working in the field of can body and/or can end designing, manufacture and seaming.

    4.    I was an individual of skill in the relevant art in 1995. In the field of can
end designing, manufacture and seaming, certain terms were used in the industry in 1995
to describe conventional ends. I am familiar with the terms used in the industry in 1995.

    5.    In 1995, the term can body flange was used to describe the outwardly
curved section at the top of a can body that is folded together with a can end to form a
double seam that joins the can end and the can body. A can body flange was understood
to be formed into the body hook of the double seam.

    6.    In 1995, the term can end curl was used to describe the outer curved
section of a can end that is folded with the can body flange to become a part or all of the
section of the can end that becomes part of the double seam that joins a can end to a can
body. A can end curl was understood to be formed into the cover hook of the double
seam.

    7.    In 1995, the term can end cover hook was used to describe the portion of
the can end curl after seaming to a can body that extends downwardly from the top of the
double seam on the outside of the double seam and then turns upwardly against the can

body and into the seam to form a hermetically sealed container. It was understood that a can end cover hook is in the form of a tight hooked-like shape.

8.    In 1995, the term can end wall (also referred to as a chuck wall or countersink wall or even countersink) was used to describe the section of the can end that extends downwardly from the inside of the can end curl to the can end countersink.

9.    In 1995, the term can end countersink (also referred to as an anti-peaking bead or annular reinforcing bead) was used to describe a U-shaped section of the can end that extends downwardly into the can from the can end wall and outwardly of the central panel of the can end. It was understood that from the top of the can, the can end countersink appears to be a groove that extends around the can end just inwardly from the double seam and that opens upwardly from the top of the can.

10.    In 1995, the term can end central panel was used to describe a generally flat panel that extends inwardly from the can end countersink makes up the inner section of the can end and that has a tear panel that opens when a tab is pulled to open the can end/package.

I declare under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746 under the laws of the United States of America, that based upon a review of the facts reasonably available to me, I believe the foregoing to be true and correct.

Respectfully submitted,

Dated: January / 5 , 2007

Edmund Gillest

.Jun-09-04  05:16pm .  Fron-WOODCOCK WASHBURN 33          +2155683430      T-426   P.06/10   F-010

DOCKET NO.: CC-3397, A4772US4                                              PATENT
Application No.: 10/024,862
Office Action Dated:  May 4, 2004

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    Confirmation No.: 1866
Brifcani, et al.

Application No.: 10/024,862               Group Art Unit: 3725

Filing Date:  December 18, 2001          Examiner:  Larson

For:   Can End and Method for Fixing Same to a Can Body

                                                    CCS0016990

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450                 Crown Packaging, et al. v. Rexam
                                          USDC District of DE CA 05-608

Sir:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated May 5, 2004, reconsideration is respectfully requested in view of the following remarks.

As a preliminary matter, the undersigned wishes to thank Examiner Larson for the courtesies extended during the personal interview on June 3, 2004.

In the May 5, 2004, Office Action, all of the pending claims were rejected as being obvious over the prior art – *i.e.*, the combination of applicants' admitted prior art and either U.S. Patent 4,448,322 ("Kraska") or Japanese Kokai JP 57-117323 ("JP reference"). As discussed in the interview, neither Kraska nor the JP reference render the claimed seaming method obvious when combined with applicants' admitted prior art.

Applicants admitted prior art, set out in the instant application at page 5, line 3, to page 6, line 19, describes conventional seaming of a can end onto the flange of a can body.[1]

---

1 As discussed at the interview, conventional seaming is also described in the document "Modern Beverage Can Double Seaming" by Continental Beverage Packaging, already made of record in the IDS filed on October 11, 2002 (reference CJ in the PTO 1449 form)  As also discussed at the interview, although U.S. Patent 5,911,551 ("Moran") is not prior art with respect to the current invention as established by the declaration accompanying Applicants' response to the August 7, 2003 Office Action, insofar as it relates to the current invention, the seaming method disclosed in Moran amounts to no more than the conventional method (the invention of Moran

Page 1 of 5

PAGE 6/10 * RCVD AT 6/9/2004 6:16:45 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/6 * DNIS:8729306 * CSID:+2155683439 * DURATION (mm-ss):02-48

A122

.Jun-08-04  05:16pm  From-WOODCOCK WASHBURN 33                    +2155683438            T-426  P.07/10  F-010

DOCKET NO.: CC-3397; A4772US4                                          **PATENT**
Application No.: 10/024,862
Office Action Dated: May 4, 2004

Prior to seaming, the entire wall of a conventional end is oriented vertically or at a relatively shallow angle to axis of the end, typically approximately 12° to 15°. As shown in Figure 2, a seaming chuck is inserted into the end so that the lower portion of the chuck engages the interior surface of the reinforcing bead to create a driving force for imparting relative rotational motion between the end and the seaming rolls during the seaming process. The seaming rolls press the end's peripheral cover hook against the wall of the chuck so as to form the double seam. After retraction of the seaming roll, the wall springs back slightly. While the wall is deformed as a result of the seaming operation, the *entire* wall from the top of the seam down to the start of the reinforcing bead is essentially straight, or may have a slightly concave profile, and remains oriented at a relatively shallow angle. Consequently, the seamed end may be weaker than the unseamed end.

As discussed at the interview, Applicants have discovered that both the thickness of the can end necessary to achieve adequate buckle resistance and the overall diameter of the flat metal sheet from which the end is formed (*i.e.*, the "cut diameter") could be significantly reduced by providing a can end having a particular geometry, including a wall as recited in the pending claims, and deforming it *in a seaming operation* so as to produce a seamed end having a different geometry.

As shown in Figure 4 and described in the corresponding text of the instant application, according to the preferred embodiment, the seaming operation begins by providing a can end comprising a wall extending from the seaming panel portion of the cover hook 23 (the radius of the seaming panel is designated $r_3$ in Figure 4) to an annular reinforcing bead 25. The wall of the can end is then engaged by a chuck 31 having a substantially cylindrical wall 33 and an inclined wall 32, as shown in Figure 5. Preferably, the rotation of the can end is driven through driving contact between the juncture formed by the chuck walls 32 and 33 and the can end wall.

As shown in Figures 6 and 7, according to the preferred embodiment, during the seaming operation, seaming rolls 34 and 38 deform an upper portion of the can end wall by pressing it against a substantially cylindrical (preferably within ±4° of vertical) upper wall of the chuck so as to form, along with the peripheral curl, a double seam. Although the upper

is directed to certain details concerning the relationship between the radii of the seaming panel and can body flange so as to increase the length of the seam).

CCS0016991

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

PAGE 7/10 * RCVD AT 6/9/2004 6:16:45 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/6 * DNIS:8729306 * CSID:+2155683439 * DURATION (mm-ss):02-48

.Jun-08-04  05:16pm-  From-WOODCOCK WASHBURN 33                    +2155683439        T-426  P.09/10  F-810

DOCKET NO.: CC-3397, A4772US4
Application No.: 10/024,862
Office Action Dated: May 4, 2004                                    PATENT

wall portion will typically spring back a few degrees when the seaming roll is retracted, it
remains oriented substantially cylindrically. However, the lower portion of the wall (and, of
most importance for present purposes, a straight line extending between its two ends) remains
inclined at an angle between about 20° and about 60° with respect to the axial centerline.
The deformation of the upper portion of the wall so as to form a seam is accomplished by
causing the juncture formed by the walls 32 and 33 of the chuck to engage the can end wall
so that the upper portion of the can end wall is bent upwardly around the juncture by the
seaming rolls. The resulting seamed end, shown in Figures 7 and 9, has greater buckle
resistance than the unseamed end since the gas pressure forces imparted to the lower portion
of the chuck wall are directed to the base of the relatively strong seam, which resists buckling
deformation. Since commercialization in about early 2001, Crown Cork & Seal Company
sold approximately 35 billion ends worldwide that were seamed onto can bodies using the
claimed seaming method by carbonated beverage companies such as Coca Cola, Pepsi Cola,
RC Cola, Labatt's, and Rolling Rock.

Accordingly, claim 68, for example, specifies a seaming method that comprises the
step of "deforming said first wall portion such that at least a portion of said first wall portion
after seaming is substantially cylindrical. . . . said line between said first and second locations
on said wall remaining inclined between about 20° and about 60° with respect to said axial
centerline after completion of said seaming operation."

Claim 77, which unlike claim 68 does not require that the can end have a reinforcing
bead, recites that the "first portion of said can end wall is bent upward through an angle of at
least about 16°" and "said line between said first and second locations remaining inclined
between about 20° and about 60° with respect to said axial centerline."

Claim 88 specifies that the seaming operation "bend[s] a portion of said can end wall
upwardly around said juncture of said chuck walls at a first location on said can end wall, a
straight line extending from said first location on said can end wall to said transition between
said can end wall and said reinforcing bead inclined between about 20° and about 60° with
respect to said axial centerline both before and after said seaming operation."

Claim 11 is directed to another aspect of the invention and specifies that "rotation of
said can end during said first seaming operation driven by said rotating chuck through driving
contact between said juncture of said first and second walls of said chuck and said inclined
                                Page 3 of 5

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

CCS0016992

A124

. Jun-09-04  05:16pm.  From-WOODCOCK WASHBURN 33                    +2155683439        T-425  P.09/10  F-810

DOCKET NO.: CC-3397, A4772US4
Application No.: 10/024,862
Office Action Dated: May 4, 2004                                                PATENT

wall of said can end without driving contact between said chuck and said can end bead
interior surface."

The claimed method for seaming a can end onto a can body is neither taught not
suggested by the prior art. Although Kraska discloses an end that, prior to seaming, has a
wall oriented at an angle greater than that conventionally used (*i.e.*, 25 °), it does not disclose
seaming according to the claimed method. Rather, unlike the claimed method, Kraska
stresses the importance of seaming using conventional seaming tooling:

> [T]he particular dimensions, specifically the location of the countersink with
> respect to the remainder of the end is such that *conventional seaming tooling*
> can be utilized for double tooling the present end onto a container body . . . .
> Thus, the fully converted end can readily be double seamed to a container
> body utilizing commercial equipment that packagers are presently using.

(Kraska at col. 7, line 64, to col. 8, line 17).

Further, seaming Kraska's end using a conventional seaming chuck would not amount
to practicing the claimed method nor result in the end produced by the claimed method.

The JP reference shows only an end *after seaming* onto a can body and provides no
details concerning the configuration of the can end prior to seaming or, more importantly, the
method used to yield the seamed can end shown in the figures of the JP reference.

Additionally, with respect to claim 11, neither Kraska nor the JP reference teaches or
suggests that "said rotation of said can end during said first seaming operation [is] driven by
said rotating chuck through driving contact between said juncture of said first and second
walls of said chuck and said inclined wall of said can end without driving contact between
said chuck and said can end bead interior surface."

CCS0016993

Page 4 of 5

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A125

. . . . Jun-09-04  05:17pm  From-WOODCOCK WASHBURN 33                    +2156683480        T-425  P.10/10  F-910

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: May 4, 2004

PATENT

For the foregoing reasons, Applicants respectfully submit that the rejection should be withdrawn and that each of the claims is in allowable condition.

Applicants request that, in the next communication, the Examiner forward an initialed copy of the PTO-1449 form submitted in the Information Disclosure Statement filed on May 4, 2004.

Date: June 9, 2004

Harold Pullmer
Registration No. 42,560

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

CCS0016994

Page 5 of 5

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

PAGE 10/10 * RCVD AT 6/9/2004 6:16:45 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/6 * DNIS:8729305 * CSID:+2155683439 * DURATION (mm-ss):02:48

08/04/04                     41 3725/

PATENT

DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                      Confirmation No.: 8930
Brifcani, et al

Application No.: 10/417,980                Group Art Unit: 3725

Filing Date: April 17, 2003                Examiner: Nguyen, Jimmy T.

For:    Can End and Method for Fixing Same to a Can Body

EXPRESS MAIL LABEL NO:
DATE OF DEPOSIT: August 3, 2004

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450                  

Sir:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated February 3, 2004, reconsideration is
respectfully requested in view of the amendments and/or remarks as indicated below:

☒    Amendments to the Specification begin on page 2 of this paper.

☒    Amendments to the Claims are reflected in the listing of the claims which
     begins on page 3 of this paper.

☒    Amendments to the Drawings begin on page 6 of this paper and include an
     attached replacement sheet.

☒    Remarks/Arguments begin on page 7 of this paper.

Page 1 of 16

CCS0000104

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A127

DOCKET NO.: CC-3545/ 4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

In The Specification

Replace the paragraph [0003] with the following re-written paragraph:

US Patent 4,217,843 (KRASKA) describes an alternative design of can end in which the countersink has inner and outer flat walls, and a bottom radius which is less than three times the metal thickness. The can end has a chuck wall extending at an angle of approximately 24° to the vertical. Conversely, ~~the specification of~~ our ~~European Patent application EP0340955A~~ United States Patent Number 5,046,637 describes a can end in which the chuck wall extends at an angle of between 12° and 20° to the vertical.

Replace the paragraph [0004] with the following re-written paragraph:

The detailed description of our ~~Our European Patent No. 0153115~~ United States Patent Number 4,571,978 describes a method of making a can end suitable for closing a can body containing a beverage such as beer or soft drinks. This can end comprises a peripheral flange or cover hook, a chuck wall dependant from the interior of the cover hook, an outwardly concave reinforcing bead extending radially inwards from the chuck wall from a thickened junction of the chuck wall with the bead, and a central panel supported by an inner portion of the reinforcing bead. Such can ends are usually formed from a prelacquered aluminum alloy such as an aluminum magnesium manganese alloy such as alloy 5182.

Replace the paragraph [0005] with the following re-written paragraph:

The specification of our ~~Our International Patent Application published no. WO93/17864~~ United States Patent Number 5,582,319 describes a can end suitable for a beverage can and formed from a laminate of aluminum/manganese alloy coated with a film of semi crystalline thermoplastic polyester. This polyester/aluminum alloy laminate permitted manufacture of a can end with a narrow, and therefore strong reinforcing bead in the cheaper aluminum manganese alloy.

Replace the paragraph [0026] with the following re-written paragraph:

As shown in Figure 1 the chuck 5 holds a can end 10 firmly on the flange 11 of a can body 12 against the support provided by the lifter plate 4. Each of the first operation roll 6 and second ~~operation roll 7~~ operation roll 8 are shown clear of chuck before the active seam forming profile of each roll is moved in turn to form the curl of the can end and body flange to a double seam as shown in Figure 3.

Page 2 of 16

CCS0000105

Crown Packaging, et al. v. Rexam
USDC District of DE CA. 05-608

A128

DOCKET NO.: CC-3545/ 4772US8                                    PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

This listing of claims will replace all prior versions, and listings, of claims in the application.

Listing of Claims:

1.   (currently amended) A metal can end adapted to be joined to a can body for packaging
     beverages under pressure, said can end comprising;
            a peripheral cover hook adapted to be seamed onto a can body so as to form a
     joint therewith;
            a chuck wall extending inwardly and downwardly from the cover hook;
            an outwardly concave annular reinforcing bead extending inwardly and
     downwardly from the chuck wall; and
            a central panel supported by and extending inwardly from the reinforcing
     bead;
            wherein, prior to being joined to said can body: (i) the location at which said
     chuck wall extends from said peripheral cover hook defines a first point, (ii) the
     location at which said reinforcing bead extends from said chuck wall defines a second
     point, and (iii) a line extending between the first point and the second point is inclined
     to an axis perpendicular to the exterior of the central panel at an angle of between 30°
     and 60°.

2.   (original) The can end of claim 1, wherein a base of the concave reinforcing bead is
     arcuate in cross-section and has a cross-sectional radius of less than 0.75 mm.

3.   (original) The can end of claim 1, wherein the base of the concave reinforcing bead is
     approximately semi-circular in cross section.

4.   (original) The can end of claim 1, wherein the reinforcing bead comprises an outer
     wall that is inclined to said axis at an angle between –15° and +15°.

5.   (original) The can end of claim 1, wherein the reinforcing bead has inner and outer
     walls, a lower portion of the outer wall spaced apart from a lower portion of the inner
     wall by less than 1.5 mm.

Page 3 of 16

CCS0000106

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A129

DOCKET NO.: CC-3545/4772USB
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

6.    (currently amended) The can end of claim 4, wherein the reinforcing bead has an outer wall and an inner wall that is parallel to the outer wall, said inner wall and said outer wall being joined by a concave radius.

7.    (currently amended) The can end of claim 1, wherein the ~~chuck~~ wall extends between said first and second points along an essentially straight line.

8    (original) The can end of claim 7, wherein the line extending between the first point and the second point is inclined to said axis at an angle between 40° and 45°.

9.    (original) The can end of claim 1, wherein the ratio of the diameter of the central panel to the diameter of the peripheral cover hook is 80% or less.

10.    (original) The can end of claim 1, wherein the can end is made of a laminate of thermoplastic polymer film and a sheet aluminium alloy.

11.    (previously presented) The can end of claim 1, wherein the can end is made of tinplate.

12.    (original) The can end of claim 1, wherein the can end is made of electrochrome coated steel.

13.    (new)  A metal can end for use in packaging beverages under pressure and adapted to be joined to a can body by a seaming process so as to form a double seam therewith using a rotatable chuck comprising first and second circumferentially extending walls, said first and second chuck walls forming a juncture therebetween, said can end comprising;

        a peripheral cover hook, said peripheral cover hook comprising a seaming panel adapted to be formed into a portion of said double seam during said seaming operation;

        a central panel;

        a wall extending inwardly and downwardly from said cover hook, a first portion of said wall extending from said cover hook to a first point on said wall, said first wall portion adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall,

Page 4 of 16

CCS0000107

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A130

DOCKET NO.: CC-3545/ 4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

a second portion of said wall extending from said first point to a second point forming a lowermost end of said wall, a line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle of between 30° and 60°.

14.    (new)  The end according to claim 13, further comprising an annular reinforcing bead connected to said wall at said second point, said annular reinforcing bead connecting said wall to said central panel.

Page 5 of 16

CCS0000108

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A131

DOCKET NO.: CC-3545/ 4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

Amendments to the Drawings

The attached sheet of drawings includes changes to Fig(s) 1, 2, 3. The sheet, which includes

Fig(s) 1, 2, 3, replaces the original sheet including Fig(s) 1, 2, 3.

Attachment: Replacement Sheet

Page 6 of 16

CCS0000109

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A132



Docket No.: CC-0345/1772US8
App No.: 10/417,950
Office Action Dated: February 3, 2004
Replacement Sheet 1 of 1

**FIG. 1**
**PRIOR ART**

**FIG. 2**
**PRIOR ART**

**FIG. 3**
**PRIOR ART**

CCSR000110

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

DOCKET NO.: CC-3545/ 4772US8                                            PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

REMARKS/ARGUMENTS

OBJECTIONS TO THE DRAWINGS AND SPECIFICATION

The pending office action states that Figures 1, 2, and 3 should be designated by a legend indicating that the Figures illustrate only "that which is old." On the attached replacement sheet 1, Figures 1, 2, and 3 each bear the designation "Prior Art" to overcome the objection to the drawings.

Regarding the objection to the drawings as not showing the subject matter or features of claim 4, the outer wall of the reinforcing bead is clearly shown inclined at an angle within the range of claim 4 (for example, in Figure 4). Accordingly, Applicants submit that the drawings satisfy all of the requirements of Rule 1.83(a). If the examiner determines, however, that Applicants' explanation is not persuasive and requires a drawing actually showing the outer wall of the reinforcing bead at +15° and another at -15°, Applicants will submit drawings showing the angles.

The office action states that the specification improperly incorporates essential matter by reference to foreign applications or patents. Without taking a position regarding whether the matter contained in the referenced documents constitutes essential matter, this amendment replaces the references to the EP application, EP patent, and international application in the specification with a reference to the specification (or a portion thereof) of the patent number of the corresponding U.S. patent. Accordingly, the specification after entry of this amendment refers only to material in a United States patent, thereby overcoming the objection without the need for a declaration or affidavit.

REJECTION OF THE CLAIMS

Claims 1-9 have been rejected under Section 103 based on United States Patent Number 5,046,637 ("Kysh") in view of Unexamined Japanese Utility Model Application No. 57-117323 ("JP Reference"). Claims 9-12 have been rejected based on Kysh and the JP Reference in further combination with other references. Claim 6 has been rejected under Section 112, and is herein amended to depend from claim 1 and to provide proper antecedent

Page 7 of 16

CCS000331

Crown Packaging, et al. r. Rexam
USDC District of DE  CA 05-608

DOCKET NO.: CC-3545/4772USB
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

basis to overcome the Section 112 rejection. Claims 1 and 7 are also amended to delete the word "chuck" for clarity.

Applicants request reconsideration of the pending rejection in light of the following remarks and the declaration of Messrs. Martin Higham (Exhibit A), Brian Fields (Exhibit B), and Leonard Jenkins (Exhibit C) submitted herewith. As explained below, the Examiner has not established a *prima facie* case of obviousness. Moreover, obviousness is rebutted by evidence of secondary considerations.

## I. The Examiner Has Not Established a *Prima Facie* Case of Obviousness

Claim 1 is directed to an end, adapted to be joined to a can body, having a peripheral curl, a wall extending from the curl, a reinforcing bead extending from the wall, and a central panel. Claim 1 requires that a line extending between a first point defined by the location at which the wall extends from the peripheral cover hook and a second point defined by the location at which the reinforcing bead extends from the wall is inclined to an axis perpendicular to the central panel at an angle of between 30° and 60°.

Claim 1 has been rejected as obvious over Kysh in view of the JP Reference. According to the Examiner:

> [I]t would have been obvious to one having ordinary skill in the art the time the invention was made to incline the wall of Kysh between about 20° to about 70° in view of JP to provide a can end for internally pressurized cans which can realize high pressure resistance and which can reduce the volume of raw material used. Additionally, the angle of inclination is not given patentable weight because the type of can end as claimed is well known as described above, and changing the inclination angle of the wall required only a change in the chuck wall to accommodate any angle of inclination.

(Office Action at 4)

Although the Kysh patent suggests that angles "in the range from 12° to 20°" might be used, it teaches that the preferred range is *less* than 20° — specifically, the angle is *"more preferably* in the range from 12° to 15°" (Kysh at col. 6, line 42). The Examiner argues that one skilled in the art would ignore this teaching and seek to improve the Kysh end by doing just the opposite of Kysh's teaching and increase the angle beyond the most preferred range of 12° to 15°, beyond the less preferred range of 12° to 20°, and farther, until the angle was

Page 8 of 16

CCS0000112

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A135

DOCKET NO.: CC-3545/ 4772US6
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

30° or more. According to the Examiner, one skilled in the art would do so based solely on the JP Reference.

As explained below, Applicants respectfully submit that the Examiner's *prima facie* case of obviousness is flawed because (1) the JP Reference does not disclose any can end prior to seaming, (2) the claimed end is radically different from Kysh, and (3) the JP Reference does not provide a motivation to modify the Kysh end as the Examiner suggests.

### A. The JP Reference Does Not Disclose Any End Geometry Prior To Seaming

The pending claims are directed to the geometry of an unseamed beverage can end -- that is, a can end *before* it has been seamed onto a can body. Kysh also discloses an unseamed end, although the geometry of the claimed end is radically different from that of Kysh, as discussed below. However, the JP Reference discloses only a can end *after* it has been seamed onto a can body and provides no information on the geometry of the end prior to seaming. In fact, claim 1 of the JP Reference suggests that the disclosed 20°to 70° wall angle is obtained as a result of the *manner* in which the can end is joined to the can body, rather than as a result of the geometry of the can end before it is deformed in the seaming operation:

> A can top comprising a plate-like chuck panel . . . that is to be *rolled and connected to a can body* and a center panel . . . *in such a manner* that said plate-like chuck panel is inclined at 20 to 70 degrees . . . ."

(JP Reference at page 1) (italics added)

The JP Reference contains no disclosure whatsoever of the geometry of the end, much less the angle of the wall, before the end is deformed by the seaming operation into the portions 15b and 18b. Thus, there is no teaching in the JP Reference concerning the geometry of an unseamed end that would suggest to one skilled in the art a modification to the geometry of the unseamed end disclosed in Kysh.

### B. The Claimed End Is of Radically Different Geometry From Kysh

The claimed end is of radically different geometry from Kysh because the wall angle of the claimed end is significantly greater than that of Kysh and all other conventional seamed ends at the time. As discussed in the enclosed Declaration of Mr. Martin Higham,

Page 9 of 16

CCS0000113

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3. 2004

PATENT

although the diameter of beverage can ends have been progressively reduced over the past twenty years, the inclination of the wall of the end has varied little (Higham dec. at ¶ 6 ). In fact the geometry of the ends are so tightly controlled that ends manufactured by different can end makers are often used interchangeably by fillers (id. at ¶ 9 & 11 ).[1] The uniformity of beverage can end configuration is further illustrated by the Society of Soft Drink Technologists "Beverage Can, End, & Double Seam Dimensional Specifications," and the United States Brewers Association "Brewing Industry Recommended Specifications Manual," already made of record (items 64 & 63 of July 28, 2004 IDS).



1983 U.S. Brewers Association
Brewing Industry Recommended
Can Specifications Manual

1993 Society of Soft Drink Technologists
Beverage Can, End, & Double Seam
Dimensional Specifications

The geometry of the Kysh end is clearly of the conventional configuration except for a modification to the bead (which is inconsistent with the JP Reference, as discussed below). Other than the JP Reference, which does not appear to have ever been commercialized (Higham dec. at ¶ 25) the Examiner has pointed to no prior art suggesting an end having a wall inclined at an angle of 30° or more.

Applicants submit, therefore, that the differences between the can end specified in the pending claims and that of Kysh would be considered truly radical by those skilled in the art

---

1 The can end is seamed onto the can body in a filling plant after the can body has been filled with beverage.

Page 10 of 16

CCS0000114

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A137

DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

(*id.* at ¶ 51 ) and only the strongest and clearest teaching would be sufficient to motivate one to make such a radically different end. As discussed below, one skilled in the art would not be motivated to modify the geometry of the Kysh end as suggested by the Examiner based merely on the JP Reference.

### C. The JP Reference Does Not Provide A Motivation To Modify The Kysh End

The Examiner argues that one skilled in the art would act contrary to the express teaching of Kysh – *i.e.*, an angle of 12° to 15° is more preferred than a larger angle of up to 20° -- so as to increase the angle to more than 30° based on a motivation to combine the teachings of Kysh with those of the JP Reference. However, as discussed below, at the time of the invention, no such motivation existed for at least two reasons.

#### 1. Kysh and the JP Reference Contain Inconsistent Teachings

Kysh and the JP Reference are fundamentally at odds with each other and an attempt to combine the two would push one in opposite directions.

The JP Reference teaches that a can end is strengthened by reducing the diameter of the central panel 3b. In particular, the JP Reference states:

> In order to reduce this buckling, the *size of the center panels* . . . may be *reduced* to thereby reduce, in turn, the internal pressure applied thereto . . . .
>
> . . . .
>
> [F]or use as can tops of the cans 11a, 11b to which internal pressure is applied, the *areas of the center panels* . . . *become smaller* by, respectively areas corresponding to projected areas of the chuck panels 18a, 18b, and *this reduces their pressure receiving areas*, respectively, whereby axial loads acting thereon become smaller, thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance.

(JP Reference at pages 2 and 4-5) (italics added)

Kysh teaches that the reinforcing bead should have an outer wall that is almost vertical -- *i.e.*, inclined at an angle D that is "in the range of 2° to 10° and more preferably is in the range of 2° to 4°" (Kysh at col. 6, lines 42-45). As indicated by Mr. Higham's sketch, reproduced below (Higham dec. at ¶ 47), displacing the lower portion of the outer wall in the

Page 11 of 16

CCS0000115

Crown Packaging, et al. v. Rexam . . .
USDC District of DE CA 05-608

A138

DOCKET NO.: CC-3545/ 4772US8                                        PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

JP Reference outward so as to render its angle almost vertical according to the teachings of
Kysh would have the effect of *increasing* the center panel, contrary to the teachings of the JP
Reference.



    Thus, one skilled in the art would not be motivated to combine the teachings of Kysh
and the JP Reference because they drive one in opposite directions – increase center panel
diameter according to Kysh, reduce center panel diameter according to the JP Reference.
Only impermissible hindsight would cause one to seek to combine these two disparate
teachings in the manner suggested by the Examiner.

### 2. Modifying the Kysh End According to the JP Reference Would Not Result in Any Improvement, Absent Impermissible Hindsight

    The Examiner argued that one would be motivated to increase Kysh's wall angle
beyond the preferred range because one would expect to "reduce the volume of raw material
used" as a result of increased pressure resistance (Office Action at 4). However, as explained
in the Higham declaration (Higham dec at ¶ 36-42), although the JP Reference contains test
data showing that the increase in pressure resistance can be used to reduce metal thickness,
one skilled in the art would not necessarily believe that this resulted in overall metal savings,
or a reduction in metal cost. In fact, depending on the dimensions assumed for the "prior art"

Page 12 of 16

CCS0000116

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A139