DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

end disclosed in the JP Reference, following the teachings of the JP Reference could result in an overall *increase* in metal usage (*id.* at ¶ 38, 39).

Perhaps more importantly, one skilled in the art would not be motivated to modify Kysh as suggested by the Examiner because neither Kysh nor the JP Reference teach how to seam such a radically different end onto a can body. As indicated in Mr. Higham's declaration, one skilled in the art would have expected that the use of a conventional chuck (12° lower wall and 4° upper wall) in a Kysh end modified as the Examiner suggests would have resulted in unacceptable wrinkling during seaming (*id.* at ¶ 49).[2] One skilled in the art would have been reluctant to modify the basic geometry of the conventional chuck. As indicated in the Higham and Fields declarations, even the minor modification to the chuck necessary to accommodate the modified bead of Kysh was a factor in preventing its successful commercialization, despite the fact that it offered a modest improvement in pressure resistance (Higham dec at ¶ 21-23; Fields dec at ¶ 5-6). The questionable benefits disclosed by the JP Reference would surely not provide sufficient motivation to engage in a much more radical chuck re-design.

Finally, even if one undertook to redesign the chuck to accommodate the increased wall angle of the "modified" Kysh end, using the conventional approach to chuck design, one skilled in the art would not expect that the resulting seamed end would have improved pressure resistance (Higham dec at ¶ 51). In fact, Mr. Fields' calculations indicate that the pressure resistance of a Kysh end, modified as the Examiner suggests so as to have a wall inclined at 43° (near the middle of the angle range taught by the JP Reference), when seamed onto a can body using a chuck re-designed according to conventional thinking (*i.e.*, keeping the amount of metal deformation during seaming low) is about 20% less (73.8 psi versus 91.7 psi) than that of the unmodified Kysh end disclosed in the Kysh patent (Fields dec at ¶ 7).

In fact, as explained by Mr. Fields, a Kysh end modified as the Examiner suggests is very *unobvious* because such an end would be expected to be weaker than the unmodified Kysh end (*id.* at ¶ 12-13). The inventors achieved the benefits of the invention because they seamed their end using the tooling described in the instant application, including a radically

---

2 Conventional seaming chucks are described in a number of references already of record -- U.S. Patent No. 5,911,551 (Moran) (at col. 4, lines 16-18), IDS Doc. No. 36; P. Moran, "Beverage Can Mfn Seams, IDS Doc. No. 65;" Continental Beverage Packaging, "Modern Beverage Can Double Seaming," IDS Doc. No. 66.

Page 13 of 16

CCS0000117

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A140

DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

different chuck design -- *e.g.*, a lower wall of the chuck is inclined at 43° and an upper at ±4° (page 8, lines 14-28). However, such a seaming method is nowhere disclosed in Kysh or the JP Reference. Nor is it disclosed in any other prior art. Applicants point out that in an interview held on June 3, 2004, in connection with co-pending application Serial No. 10/024,862, which is the parent of the instant application and is directed to the method of seaming the end, Examiner Larson indicated that the prior art does not show the seaming method of the current invention.[3]

Absent impermissible hindsight based on knowledge of Applicants' improved seaming method (disclosed in the instant application), one skilled in the art would not have expected that the Kysh end modified as the Examiner suggests would yield an improved end.

New claim 13 is specifically directed to a can end having a first wall portion, extending from the cover hook to a first point, that is adapted to be bent upwardly at the first point around the juncture of the chuck walls during seaming, and in which a line extending between the first point and a second point forming the lowermost end of the wall is inclined to an axis perpendicular to the central panel at an angle of between 30° and 60°, as described in the instant application at page 8, line 10, to page 9, line 32, and shown in Figures 5-7.

## II. Secondary Considerations Warrant Withdrawal of the Examiner's Obviousness Rejection

The declarations of Messrs. Higham, Fields and Jenkins submitted herewith provide ample evidence of secondary considerations to warrant withdrawal of the Examiner's obviousness rejection even if a *prima facie* case of obviousness had been made out (and as explained above, it has not).

The nonobviousness of the claimed end is supported by the skepticism of persons skilled in the art upon first observing an unseamed end according to the current invention, as evidenced by the declarations of Mr. Higham (Higham dec. at ¶ 17-18) and Mr. Fields (Fields dec. at ¶ 16-19).

---

3 A copy of the Interview Summary is attached as Exhibit D.

Page 14 of 16

CCS0000118

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A141

DOCKET NO.: CC-3545/ 4772USB
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

The nonobviousness of the claimed invention is also supported by the commercial success enjoyed by 202 and 206 size "SuperEnds" falling with the scope of claims 1 and 13 sold by Crown and its licensees (Jenkins dec. at ¶ 3-6).

The nonobviousness of the claimed invention is also supported by the evidence of a long felt need in the beverage can industry for a can end that reduced metal usage, which need is satisfied by the claimed invention (Higham dec. at ¶ 4-18). Crown's 202 and 206 size SuperEnds yield considerable metal savings compared to conventional 202 and 206 ends. (id.)

The nonobviousness of the claimed invention is also supported by the recognition of the importance of the current invention by others in the beverage can industry. For example, in 2001, SuperEnd won the gold award (that is, first place) in the CanMaker Summit's Can-of-the-Year Awards in the category of "Ends, Caps & Closures." (Jenkins dec. at ¶ 7 & Press Release attached to Jenkins dec.).

Further, in patent applications filed after the publication of the parent of the instant application (that matured into United States Patent Number 6,065,634 and was published as WO96/37414 on November 28, 1996), competitors in the beverage can industry have tacitly acknowledged the inventiveness and importance of the claimed end by describing preferred embodiments in which the wall is inclined between 30° and 60°, as follows:

Page 15 of 16

CCS0000119

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A142

DOCKET NO.: CC-3545/ 4772US8                                              PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

## COMPETITORS' PATENTS DISCLOSING A PERFERRED WALL RANGE
### WITHIN THE CLAIMED RANGE OF 30° AND 60°

| Assignee/ Pat No./ Filing Date | Disclosure in Specification |
|---|---|
| Metal Container Corp.'s U.S. Pat. No 6,499,622 Dec. 8, 1999<br><br>& U.S. Pat. No. 6,702,142 (Cont. of the 622 patent) | The arcuate chuckwall 132 is such that a line passing through the innermost end of arcuate chuckwall 132, near the terminus of curved juncture 30, and the outermost end of the arcuate chuckwall 132, near the beginning of step portion 34, forms an acute angle with respect to central axis 14 of the center panel 12. This acute angle is from about 20° to about 80°, and more preferably from about 30° to about 60°, and still more preferably from about 40° to about 50° (Col. 2, lines 28 – 36) |
| Metal Container Corp.'s U.S. Pat. No. 6,561,004 (CIP of the 622 patent) Nov. 28, 2000 | The arcuate portion 132 is configured such that a line passing through the innermost end of arcuate portion 132, near the terminus of curved juncture 130, and the outermost end of the arcuate portion 132, near the beginning of step portion 134, forms an acute angle with respect to central axis 114 of the center panel 112. This acute angle is from about 20° to about 80°, and more preferably from about 35.degree. to about 65°, and still more preferably from about 45° to about 55°. The current lid design uses an angle of about 50°. (col. 6, lines 8 – 37) |
| Ball Corp.'s U.S. Pat. No. 6,460,723, filed May 18, 2001 (claiming priority to January 1991 documents) | Several examples, for example, embodiments of:<br>Figure 5:  35° to 45°;<br>Figure 6:  35° to 45°;<br>Figure 7:  35° to 45°;<br>Figure 8:  30° to 40°. |

## CONCLUSION

For at least the reasons set forth above, Applicants submit that the claims are in condition for allowance and request withdrawal of the Section 103 and 112 rejections.

Date:  August 3, 2004

Harold Fulmer
Registration No. 42,560

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA  19103
Telephone: (215) 568-3100
Facsimile:  (215) 568-3439

CCS0000120

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A143



CC-3545;4772US8

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:
**Brifcani et al.**

| Serial No.: | **10/417,980** | Group Art Unit: | **3727** |
|---|---|---|---|
| Filed: | **April 17, 2003** | Examiner: | **Nguyen, Jimmy T** |

For:   **Can End And Method For Fixing The Same To A Can Body**

Assistant Commissioner for Patents
Washington, D.C. 20231

## DECLARATION OF MR. MARTIN HIGHAM

I, Martin Higham ,make the following declaration:

1.    I, Martin Higham, am an independent consultant to the beverage can industry and have been so since 1999. I have spent the past forty years in the can making industry. From 1966 to 1999 I worked for Metal Box, which became CarnaudMetalBox ("CMB") in the 1980's and, in the 1990's, was acquired by Crown Cork & Seal Company, which is the parent of the assignee of the patent application that is the subject of this declaration.

2.    I am familiar with U.S. Patent Application Serial No. 10/417,980 and the development of the end that is the subject of the application. Such end is referred to within the industry as the "SuperEnd" and I will refer to this application as the "SuperEnd Application." During the development of the SuperEnd in the early 1990's I was the supervisor of inventors Kysh and Hinton. As consultant, I have advised Nampak, a can end maker licensed to make SuperEnds. In addition, I have acted as a consultant to Crown Cork & Seal Technology ("Crown"), the assignee of the SuperEnd Application, in connection with litigation between Crown Cork & Seal Technologies Corp, et al., ("Crown") and Anheuser Busch Companies Inc. and Metal Container Corp., et al., "("Anheuser-Busch") in the United States District Court for

1

A144

CC-3545;4772US8

the Western District of Wisconsin related to U.S. Patent No. 6,064,634, which I understand issued from one of the earlier applications from which the currently pending SuperEnd Application claims priority. During the course of that litigation, I submitted an expert report on the subject of patent validity and infringement and was deposed by attorneys for Anheuser-Busch. I have been engaged by Crown as a consultant in connection with the prosecution of the currently pending SuperEnd Application in order to provide information to the Examiner concerning the beverage can industry and my opinion concerning the propriety of the rejection of claims in that application.

### Background on Beverage Can End Development Since the 1970's

3.      The beverage can industry in the 1970's developed the "easy open" aluminum beverage can. The easy opening end (*e.g.*, a end having a ring pull opening) was introduced to the market on 211 end diameter[1] from coated aluminum approximately 0.35 mm (0.0138 inches) thick. During most of its life, the 211 end was used on beverages cans of three piece design, with a seamed-on steel bottom and the easy open, aluminum top.

4.      The 211 easy open end was commercially successful with large annual market growth; it essentially replaced most other ends worldwide. Further development of the easy open end focused on techniques for cost reduction. Such cost reduction was achieved primarily by reducing the diameter of the cut edge[2] and/or reducing the metal thickness. Eventually, the can body diameter was reduced by necking its top to enable a smaller diameter end, which by itself reduced metal volume usage because of the

---

[1] The conventional nomenclature for can end diameter provides the diameter in inches followed by the fraction in 16ths. For example, a 211 can end has a seamed end diameter of two and eleven sixteenths inches.
[2] "Cut edge" is the diameter of the flat, circular metal blank from which the unseamed end is formed. The cut edge for various ends is listed in Table 6 of the patent application.

2

A145

CC-3545;4772US8

reduced cut edge of the smaller diameter ends and the thickness reduction that results from the increased strength associated with a smaller diameter end.

5.      The progression on the easy open end diameter reduction, began in the early 1980's and was driven by the desire to save metal costs. Soft drink companies, lead by Coca Cola, went from 211 to 209 to 206 and eventually to 202 ends. Brewers went from 211 to 209 to 207½ to 204. Each time such a change was made, the fillers incurred a significant capital cost to purchase new tooling to handle and seam the new cans with smaller diameter necks. High capital costs were also associated with forming the ends and forming the necks on the can bodies. In general, it was thought that the savings resulting from reduced size justified the enormous capital cost associated with such a modification only if the reduction was of at least two sizes -- that is, a reduction from 206 to 204 was not thought economically justified, whereas a reduction from 206 to 202 was economically justified.

6.      Throughout this development, the angle of the wall of the end extending below the seaming panel remained below 20°, typically 12° to 15°. The angle of the wall of the seaming chuck was typically close to, but slightly less than, that of the wall of the end. At some point, a chuck with a two part wall was introduced. The lower wall of the chuck remained inclined at an angle slightly less than that of the end, while the upper wall was inclined at a smaller angle, typically 4°. Since the inclination of the wall was typically about 14°, this resulted in bending the metal during the seaming operation by no more than 10°.

7.      Seaming of the end onto the can body became more difficult as the diameter of the end became smaller and the metal thinner. A mini seam was developed that not

A146

CC-3545;4772US8

only made seaming easier on the smaller, thinner ends, but allowed the cut edge to be further reduced.[3]

8.    Eventually, the shell design itself was reconsidered by end designers as a possible option to reduce the metal cost. An end with a deeper countersink, as well as a deeper panel, was developed. The larger metal area required for the deeper countersink was more than offset by the thickness reduction enabled by the stronger shell. This end configuration was commercialized in a 206 diameter end using what was referred to as a midi seam.

9.    Up until the introduction of the 206 ends in the mid-1980's, virtually all of the beverage can end shells of a given size, regardless of the manufacturer, were of the same configuration so as to be interchangeable by the filler that seamed the ends onto the can body in the filling line. The standard 206 shell was generally referred to as a B52 shell and was characterized by a 0.250 inch countersink height and 0.080 inch panel height.[4] The 206 ends (which were used by soft drinkers) and 204 ends (which were used by brewers) were commercialized in more than one non-interchangeable configuration. This lead to problems for the fillers because switching to ends supplied by a different manufacturer required changing the seaming chucks on the filling lines.

10.    In Europe at this time, virtually all aluminum beverage cans/ends were 206 B52 design both for the carbonate soft drink companies, such as Coca-Cola, and brewers such as Scottish and Newcastle, Interbrew, etc. The soft drink companies lead the evaluation of the 202 ends supported by all can/end manufacturers, filler equipment manufacturers, and seamer machine producers.

---

[3] The mini seam is described in the manual "Mini Seams" by Pete Moran, published by CMB Engineering Group plc, a copy of which I understand has already been given to the Examiner.
[4] The countersink height and panel height are indicated in the patent application in Figure 4 as $h_2$ and h3, respectively.

4

A147

CC-3545;4772US8

11.    In the early 1990's, the soft drink companies, led by Coca-Cola, prodded can end makers to develop a 202 end and to do so in such a manner that the end would be interchangeable – that is, all 202 ends could be seamed using the same chuck. This chuck, which was eventually became the industry standard for 202 ends, employed the same design principles as the chucks used on prior ends in that the lower wall was inclined at 12° and the upper wall was inclined at 4°. The 202 can end wall itself was inclined at about 14°. The 202 end was first commercialized in Europe by Coca Cola in the 1994-1995 time frame and was eventually adopted by most soft drink companies in Europe and the United States.

12.    As is now well known, the project was successful and the 202 can/end has become the standard can size for carbonated soft drink fillers. A major factor in the success was that the economics of the conversion from the standpoint of the carbonated soft drink fillers and from the standpoint of the can/end makers justified the total capital investment. The metals savings paid back the capital investment of the carbonated soft drink fillers (such as Coca-Cola) in approximately two years.

13.    The payback calculation for some brewers in the UK at the time was very different because the brewers' filling lines were typically older and slower and therefore has lower annual throughput. For example, a newer carbonated soft drink line (as of the early 1990's) had a capacity of approximately 600 million cans per year, compared with an older beer line which had a capacity of approximately 240 million cans per year (that is, only 40% of the capacity of the new lines of the carbonated soft drink lines).

14.    The brewers not only could obtain less absolute savings per line because of the slower throughput, but they had other disincentives to changing can diameter: expensive changes to the pasteurizer. Beer filling lines will contain a pasteurizer, which is a very large, complex machine requiring significant costs to convert it to

5

CC-3545;4772US8

handle 202 ends. As a result, for a beer filling line the capital cost to convert to 202 may be close to double the cost required to convert a carbonated soft drink line.

15.     Hence for a relatively slow beer line, the payback as a function of the payback of a carbonated soft drink line could be fairly approximated to be 2 (that is, double the absolute cost) divided by 0.4 (that is, the ratio of the throughput and therefore the metal saving potential) or 5 times that for the carbonated soft drink line, and thus provide a payback of approximately 8 to 10 years compared with a payback of roughly 2 years for carbonated soft drink (depending on the assumption used).

16.     This long payback period explains why the brewers in the UK, when presented with the option of changing to 202 cans/ends, concluded that they could not justify the change financially and formally requested that CMB develop a cheaper and hence more materially efficient 206 end. Brewers in the UK made the request to me personally. This was the motivation for the "lightweight" 206 can end project, which ultimately lead to the development of the SuperEnd described in the instant patent application.

17.     For illustration, the tables below provide an overview of the metal cost reduction with the development of can ends and includes both conventional ends and SuperEnds. The units are English except for metal thickness, which is provided in millimeters, for ease of showing the calculation of additional metal cost on a price per unit pound basis for thinner aluminum. As explained more fully in paragraph 39, aluminum suppliers charge approximately 1.0% to 1.2% more on a price per unit weight basis for each 0.01 mm reduction in metal thickness, which is reflected in sixth column.

6

CC-3545;4772US8

### Metal Usage and Costs for Various 206, 204, and 202 End Designs

| End Size & Design | Cut Edge Dia. (in) | Thickness (mm) | Metal Vol. (in³) | Metal Vol. as % of 206 std. B52 | Cost adder as % change from 0.27 mm | Metal Cost as % of 206 std. B52 |
|---|---|---|---|---|---|---|
| 206 std. B52 | 3.008 | 0.27 | 0.0755 | 100.00% | 0.00% | 100.0% |
| 206 B64 | 3.047 | 0.245 | 0.0703 | 93.11% | 3.00% | 96.1% |
| 206 SuperEnd | 2.935 | 0.245 | 0.0652 | 86.39% | 3.00% | 89.4% |
| 204 std. | 2.944 | 0.235 | 0.0629 | 83.37% | 4.20% | 87.6% |
| 202 std. | 2.844 | 0.224 | 0.0560 | 74.16% | 5.52% | 79.7% |
| 202 Superend | 2.735 | 0.208 | 0.0481 | 63.69% | 7.44% | 71.1% |

18.    The following table is based on the foregoing table and provides the decrease in metal cost from one end to another. The SuperEnd described in the instant patent application provides metal cost savings roughly equivalent to a decrease in end size.

### Metal Cost Savings By End Size and Type

| Changing From | To | Metal Savings |
|---|---|---|
| 206 std. | 206 B64 | 3.9% |
| 206 std. | 206 S/E | 10.6% |
| 206 std. | 202 std. | 20.3% |
| 206 std. | 204 std | 12.4% |
| 204 std. | 202 std. | 9.85% |
| 204 std. | 202 S/E | 20.4% |
| 202 std. | 202 S/E | 12.2% |

### Initial Reactions to SuperEnd by Others in the Field

19.    In South Africa in the mid/late 1990's Bevcan (a division of Nampak) were considering the 202 change that had been made in Europe. Their customers were aware of 202 and wanted the cost savings. Bevcan had been a licensee of Metal Box but this had ceased when Metal Box was taken over by Crown Cork. The only alternative to 202 appeared to be the 206 Superend which was being talked about by Metal Box/Crown in

7

CC-3545;4772US8

Europe but without any commercial experience being developed. Details of this end were available to Bevcan. The director responsible for customer seaming assistance and the Operations director were of the considered opinion that, although the end was strong, the seaming process was significantly different from proven current techniques in commercial use. These differences were likely to cause inconsistent and variable seams leading to possible leakage. Any leakage is totally unacceptable.

20.    I have been told that when the subject of 206 Superends was raised at Bevcan board meetings this seaming process change was identified and the project taken no further until practical proof was available. They were not prepared to spend time and money on a project that the technical experts considered had little chance of success. Also if Crown/Metal Box were not commercialising the technology, there must be some technical problems. This position only changed when I became a consultant to Bevcan and was able to convince them that the potential benefits were worth practical trials to evaluate the reliability/consistency of the new Superend seaming process.

**The Kysh End**

21.    I am familiar with U.S. Patent No. 5,046,637 (the "Kysh Patent") and had managerial responsibility for the group in which Mr. Kysh worked when he developed the end that is the subject of that application.

22.    The Kysh end was aimed at improving the strength, specifically the buckle pressure resistance, of a 206 end by changing the geometry of the reinforcing bead. Such a strength improvement would facilitate a reduction in the thickness of the end. We anticipated that the angle of the wall in the Kysh end, indicated as "C" in Figure 18 of the Kysh Patent, would remain at the conventional value of about 15°, which is reflected in the Kysh Patent by the statement that the angle should "preferably be in the range from 12° to 15°" (column 6, lines 40-43). We hoped that maintaining the wall at the conventional angle of inclination would allow the use of a conventional chuck, which, as

8

A151

CC-3545;4772US8

explained above, has a wall angle of about 14°. However, the Kysh Patent indicates that Mr. Kysh apparently considered the possibility of employing an angle within the broader range of 12° to 20°.

23.    Even though the wall angle of the Kysh end, as we attempted to commercialize it, remained at the conventional value of about 15°, the changes in the bead geometry made it difficult to seam the end using a conventional seaming chuck unless the chuck were modified slightly to accommodate the revised bead geometry. Despite the fact that the Kysh end achieved a modest increase in pressure resistance, beverage can fillers were unwilling undertake the capital investment and commercial risk associated with using even a slightly modified seaming chuck. Consequently, our attempts to commercialize the Kysh end were unsuccessful and the project was eventually abandoned.

**Analysis of Japanese JP 57-117323 Published Unexamined Utility Model Application**

24.    I have studied Japanese JP 57-117323 published unexamined utility model application (the "JP Reference").

25.    The JP Reference describes, among other things, a seamed can end having an chuck panel inclined at about 45 degrees. As far as I am aware, the seamed end shown in Figure 4 of the JP Reference was never commercially produced.

26.    From the information provided in the JP reference, I performed the calculations and made the observations below. The JP Reference states that it shows a "conventional . . . carbonated beverage can 1b" (JP Reference, page 1, last paragraph) in its Figure 2 ("JP Reference's conventional end") and "an example in which [the] invention is applied to a carbonated beverage can" (JP Reference, page 3, last paragraph) in its Figure 4 ("JP Reference's modified end").

· 9

CC-3545;4772US8

27.   I assessed the countersink height of both the JP Reference's conventional seamed
end (Figure 2) and modified seamed end (Figure 4). Based on the fact that the beverage
can disclosed in the JP Reference has a straight wall without a necked-in portion at its top
and based on the can body diameter stated in its Table 2, it is clear the can disclosed in
the JP Reference is a 211 diameter can.

28.   The JP Reference does not state the material of which the end if made, but it is my
opinion that it discloses a steel, non-easy open end in its Figure 4. I reached this
conclusion because the pressure data for the particular plate thickness provided in Table 2
could only be obtained with a steel end and because no evidence of an easy open end type
pour aperture is mentioned in the JP Reference. At the time of filing of the JP Reference,
it would not be uncommon for a beverage can to be a three piece design with a pair of
seamed ends.

29.   Based on my experience in the can industry, the countersink height of a 211 steel,
non-easy open end as shown in the JP Reference's Figure 2 would be about 0.150 inches.
I have calculated the corresponding countersink height of the JP Reference's modified
end of Figure 4 to be 0.378 inches. I arrived at the latter figure by adding the seam height
of a standard full seam in use at the filing date of the JP Reference, 0.125 inches, plus the
calculated height from the bottom of the seam to the bead. The latter dimension can be
approximately calculated from the data provided by the JP Reference: angle of chuck
panel 18b of 45 degrees, can body diameter of 65.35 mm, and chuck wall radius diameter
of 52.50 mm.

A153

. CC-3545;4772US8



JP Reference's Figure 2          JP Reference's Figure 4

30.     Accordingly, the JP Reference teaches – in accordance with its goal of reducing the center panel diameter – not only to reduce the center panel diameter but also to have an unusually long chuck wall, which necessarily results in an unusually deep end. Thus, in the only example provided, the JP Reference's modified end has a countersink height (0.378 inches), which is 0.228 inches deeper than that of its "conventional" end (0.150 inches).

31.     The large countersink height of JP's modified end would have inherent drawbacks in end manufacturing, such as problems associated with shell ejection from the shell press, and in seaming, such as in end handling. But more significantly, the extremely large depth of the countersink of the JP Reference's modified end would likely result in diminished headspace volume of the seamed can end and be difficult to drink from.

32.     Specifically, the large countersink height and correspondingly large dimension from the center panel to the top of the seam yields a reduced headspace volume, which is the freeboard volume above the liquid within a seamed can. Employing the configuration taught by the JP Reference would likely unacceptably diminish the head space of a can unless the entire can would be redesigned (such as, by changing its diameter and/or height), which would be commercially infeasible.

11

CC-3545;4772US8

33.    For example, if a particular can's volume is designed to receive an intended volume of a beverage within a volume tolerance, increasing the depth of the countersink radius and corresponding vertical dimension from the center panel to the seam would require either: (1) the beverage volume to be diminished to maintain the headspace volume, which would shortchange customers; or (2) the headspace volume to be diminished to maintain the beverage volume, which will result in increased headspace pressure and possible over-filling.

34.    Considering the JP Reference's teaching to reduce the center panel diameter, and the long, inclined chuck panel wall 18b as the means to achieve the goal of the reduced center panel diameter, there is no incentive to modify Kysh to incorporate a long, inclined wall because the resulting deep center panel would likely interfere with head space requirements. In my opinion, a person skilled in the art would not choose one aspect of JP's teaching (that is, inclination of the wall) while ignoring another aspect (that is, length of the wall to form a deep center panel), especially because ignoring the teaching of the length of the wall would be contrary to the goal and principle of operation of the JP Reference -- that is, contrary to forming a small center panel.

35.    The other disincentive to modifying Kysh according to the teachings of the JP Reference inherent in its smaller center panel is that the smaller center panel provides less area in which to fit a relatively large pour opening and positions the opening farther from the can's outer rim, which makes the end more difficult to drink from.

36.    Also, the JP Reference would not offer the benefits that may appear from a superficial reading of it. Even though Table 2 of the JP Reference shows a decrease in material *thickness* from 0.32 mm to 0.28 mm between its Figure 2 and Figure 4, that data provides only part of the story for the real commercial goal: reduction in metal volume and cost. The parameter that is missing from the JP Reference is the cut edge diameter required to make the modified end. I made calculations to compare the total metal usage of the JP Reference's "conventional" end (Figure 2) with the JP Reference's modified

12

CC-3545;4772US8

end (Figure 4). As explained below, by my calculations the JP Reference would provide little metal cost savings and possibly result in a metal cost increase compared to its "conventional" end.

37. Referring to the figures of the JP Reference provided above, I calculated the cut edge diameter of the blank from which the seamed ends were formed by adding the length of the conventional full seams, plus the outer radii of the bead, plus the center panel diameter, as summarized in the table below:

**Cut Edge Diameter Estimates (Inches) for the JP Reference's Figure 2 and Figure 4**

| Figure 2: conventional end | | Figure 4: modified end | |
|---|---|---|---|
| 2 x seam (0.3245) | 0.649 | 2 x seam (0.3245) | 0.649 |
| 2 x radius (0.0625) | 0.125 | 2 x radius (0.358) | 0.716 |
| 1 x center panel dia. | 2.402 | 1 x center panel dia. | 2.067 |
| cut edge dia. (sum of above) | 3.176 | cut edge dia. (sum of above) | 3.432 |

38. Calculating the area of the cut edge from the above diameters yields that the modified end uses a cut edge area that is 16.7% larger than that of the conventional end (that is, $100 \times (3.432/3.176)^2$). Now, considering the purported reduction in metal thickness shown in the JP Reference's Table 2 from 0.32 mm to 0.28 mm, I calculate that the JP Reference's modified end of Figure 4 would actually use more metal than its conventional end of Figure 2 (that is, 116.7% x (0.28 mm/0.32 mm) = 102.1%). The actual increase in metal volume usage of the JP Reference's Figure 4 may be conceptually explained by the increase in countersink height explained elsewhere in my declaration.

39. Further, reducing metal volume by reducing the metal thickness does not produce a proportionate decrease in material cost because suppliers charge a slight premium for thinner material on a cost per weight basis. As a rule of thumb which is often used in the can making industry, a reduction of metal thickness of 0.01 mm increases the cost of the

13

CC-3545;4772US8

metal on a cost per weight basis (such as $/lb.) by 1.0 to 1.2%. For example, if a technical improvement would enable the end thickness to be reduced by 0.01 mm but would result in an increase in the cut edge diameter such that the overall metal volume is reduced by 1.0%, the metal cost would be the same because the increase in material cost would offset the metal volume reduction.

40.    The calculations provided above are not intended to be exact, but merely to explain that it is incorrect to conclude that a person skilled in the art would understand that following the teaching of the JP Reference would result in a significant decrease in metal volume and metal cost. By my estimates, in fact, the JP Reference's modified end would save little or nothing in cost and would likely result in a net increase in the cost of material to produce its modified end, despite what the JP Reference appears to teach.

41.    The offsetting costs and benefits of reducing end metal thickness while increasing the cut edge diameter that occurs in the JP Reference was not unusual at the time of the filing of the JP Reference and even into the 1990's. In fact, is was common in the history of the development of end technology before SuperEnd's radical technology was invented.

42.    Accordingly, one skilled in the art studying the JP Reference would not be motivated to modify an end according to its teaching (even presuming, of course, that someone could divine what the JP Reference looked like in its unseamed state) because the JP Reference provided very little, if any, commercial benefit, and possibly would cost more, not less, to manufacture.

14

A157

CC-3545;4772US8

**One Skilled in the Art Would not have been motivated by the JP Reference to
Increase the Chuck Wall Angle of the Kysh End into the range of 30° to 60°**

43.    I have considered the rejection of the claims of the currently pending SuperEnd

Application over the Kysh Patent in view of the JP Reference.  As I understand it, the

Examiner's position, as set out in his paper dated February 3, 2004, is that:

> it would have been obvious to one having ordinary skill in the art the time
> the invention was made to incline the wall of Kysh between about 20° to
> about 70° in view of JP to provide a can end for internally pressurized
> cans which can realize high pressure resistance and which can reduce the
> volume of raw material used.  Additionally, the angle of inclination is not
> given patentable weight because the type of an can end as claimed is well
> known as described above, and changing the angle of the wall required
> only a change in the chuck wall to accommodate any angle of inclination.

44.    The Examiner's position is incorrect.  One skilled in the art would not have been

motivated to revise the angle of inclination of the Kysh can end wall according to the JP

Reference so as to increase the angle of inclination of the wall to 30° or more.  This is so

for at least three reasons.

45.    First, the JP Reference describes only a can end after it has been seamed onto the

can body.  It provides no information on the shape of the can end prior to seaming, nor

the type of tooling to be used in the seaming operation.  Thus, it would have provided no

suggestion to modify the unseamed end described in the Kysh Patent.

46.    Second, the Kysh end is fundamentally inconsistent with the invention described

in the JP Reference.  According to the JP Reference, the improvement in pressure

resistance results from a reduction in the diameter of the center panel, indicated by $D_b$ in

Figures 2 and 4 of the JP Reference.  The JP Reference states that "in order to reduce this

buckling, the size of the center panels 3a, 3b may be reduced to thereby reduce, in turn,

the internal pressure applied thereto" (page 2) and that "in a case where the can tops 12a,

12b, 12b' constructed [according to the invention] . . ., the areas of the center panels 13a,

13b, 13b' become smaller . . . and this reduces their pressure receiving areas, whereby

15

CC-3545;4772US8

axial loads acting thereon become smaller, thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance" (JP Reference, pages 4-5).

47.    However, the invention of Kysh improves pressure resistance by incorporating a vertical outside wall on the bead.  As indicated in the Figure below, combining the teachings of Kysh with the JP Reference by forming a wall onto the JP Reference while keeping the chuck panel wall angle and countersink height constant will increase the diameter of the center panel.  Therefore, one skilled in the art would not consider combining these two references because they push the design in opposite directions.



Combination of Kysh and the JP Reference

48.    The third reason why one skilled in the art would not have been motivated to revise the angle of inclination of the wall of the unseamed can end described in the Kysh Patent according to the description of the seamed end in the JP Reference, so as to increase the angle of inclination of Kysh's wall to 30° or more, is because one would not have expected that any increase in pressure resistance would have been achieved as a result of such a modification.

16

A159

CC-3545;4772US8

49.    As explained above, by the mid-1990's, the industry had standardized on a
seaming chuck with a lower wall angle of about 12° and an upper wall angle of about 4°.
Seaming a Kysh end modified as suggested by the Examiner using a chuck of the
conventional design would have resulted in unacceptable pressure resistance due to the
wrinkling that would likely have occurred as a result of the very large inward deflection
of the metal toward the upper portion of the seaming chuck.  A sketch showing a
conventional chuck inserted into a Kysh end modified according to the JP Reference so
as to increase the angle of inclination of the wall to about 45° is shown below:



Kysh Modified to Increase Its Chuck Wall Angle

50.    Therefore, one skilled in the art would have concluded that such a modified end,
assuming it could be successfully seamed at all, would require the use of a chuck that was
not designed according to the generally accepted configuration.  The relatively modest
reduction in metal usage (if any) resulting from the use of a can end according to the JP
Reference would not have justified the use of a chuck of non-standard design.

51.    Even if one were to modify the design of the chuck, according to the conventional
thinking, to accommodate the increased angle of inclination, one would not have

17

CC-3545;4772US8

expected that an increase in pressure resistance would result. The conventional thinking, prior to and at the time of the development project that resulted in SuperEnd, was that increasing the chuck wall angle from the standard 14° would weaken the end. Accordingly, significantly increasing the chuck wall angle of Kysh would have been considered a radical idea. And according to the conventional thinking of those in the seaming field at the time of the development of SuperEnd, the angle of the upper portion of the chuck wall, against which the metal is pressed by the seaming rolls, should be set so that metal is bent through an angle of no more than about 10°. Therefore, according to conventional chuck design principles, a can end wall inclined at 43° would indicate that the angle of the upper portion of the chuck wall against which the metal is pressed by the seaming rolls should be no less than about 33°. One skilled in the art would not expect that seaming a can end having a 43° wall using such a chuck would result in a significant increase in pressure resistance.

52.    The inventors of the SuperEnd Application discovered that increasing the overall angle of inclination of the end wall results in improved pressure resistance only when seamed using a radically different method of seaming. In particular, they discovered that improved pressure resistance is obtained by imparting an increased overall angle of inclination to the can end wall but then reforming an upper portion of that wall so that, in the seamed configuration, the lower portion of the wall remains inclined at a large angle but the upper portion becomes substantially vertical. This method is shown in the SuperEnd Application in Figures 5 to 7 and involves the use of a chuck in which the lower wall is inclined at a large angle but the upper wall is substantially cylindrical. This method of seaming was not taught or suggested by the prior art and there is nothing in the prior art cited by the Examiner that teaches or suggests seaming the end described in the Kysh Patent using such a method.[5]

---

[5] I understand that in another patent application pending in the U.S. Patent Office, the Examiner has determined that the method of seaming disclosed in the SuperEnd application is novel and nonobvious.

18

CC-3545;4772US8

53.    In short, without having discovered the seaming method described in the SuperEnd Application, one skilled in the art would not have been motivated to modify the end disclosed in Kysh so as to increase the overall angle of inclination of the end wall into the 30° to 60° range.

54.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___29th July 2004.___

Martin Higham_____

19

A162



**CURRICULUM VITAE**
**MARTIN HIGHAM**

I am a graduate mechanical engineer (Cambridge University). I joined Metal Box, pre-University, as the first College Apprentice for a 1-year Practical Engineering course. I rejoined with an Honours Degree as a Graduate Trainee.

I have had over 30 years' experience in management of packaging manufacture in the UK, Kenya, S. E. Asia and South Africa.

This broad experience is in four significantly different cultures, and included management training courses – one of which was a PMD course at Cape Town Business School.

My early experience was in production management and continued through Technical management as Technical Director in S. E. Asia across a wide range of technologies in 3 separate countries, followed by Technical Director of a division in Nampak, South Africa, and finally as senior manager / director in Technology Development in the Internationally renowned Metal Box Research Centre at Wantage, UK.

My management style is characterised by:
- Appreciation of peoples' needs and capabilities
- Determination and drive
- Team working, both as leader and participant

My key strengths are:
- Technical understanding of equipment and manufacturing processes
- An appreciation of the "value" of Technology Development
- An ability to make things happen quickly and effectively

| Personal Details: | Education: |
|---|---|
| - Married – 4 children<br>- Born – 30.03.1941 – England<br>- Home<br>    398 Julius Jeppe Street<br>    Waterkloof 0181<br>    Pretoria<br>    South Africa<br>- UK Citizen<br>- Willingness to travel and work abroad | - Epsom College 1954 – 1958<br>    3 "A" levels – 8 "O" levels<br>- Cambridge University<br>    Mechanical Science Tripos<br>- P.M.D. course, Cape Town Business School<br>- Various management courses |

Employment History – all within Metal Box / CMB/ Crown Cork & Seal

1. 2003 – present - Bevcan Division – various positions. Currently working as a consultant mainly for Nampak resolving issues on their 206 SuperEnd project, as well as technical support and a new promotional development.

2. 1999 – 2002 – Project Manager for 206 SuperEnd. Introduction into South African Beverage industry in all respects from material qualifications/supply, equipment choice and proving, plant development, initial production trials, customer presentations, initial customer conversions and final industry conversions covering 33 filling lines in 8 regions in Southern Africa and on 13 different seamer types. Capital cost for Nampak – US$10 million and annual production capacity of 4 billion.

3. 1997 – 1999 – Technical director Crown Cork & Seal in South Africa, involved in the manufacture of Crowns, beverage cans and ends, food cans, aerosols and general packaging.

4. CEO Dufalco – JV CMB/Hoogovens Aluminium, Belgium. Managing a technology development team of 30+ people with an annual budget of £1.8M. Identifying appropriate new technology, managing the development and technology transfer into commercial production.

5. Technical Director, Bevcan Division – Europe
New innovations, either invented or chosen, using appropriate management techniques. Major successes as follows:

- 202 conversion for steel and aluminium cans
- Super End through need to prototype manufacture
- POP end, instant prize can and other promotional developments
- Customer presentations to demonstrate innovation capability of CMB for Bevcan customers and its mutual value.
- Lightweighting programmes

6. R&D Management projects whilst in Wantage Management team.
   - Warehouse – identified need, designed, capexed, directed project through to successful operation to time and cost (£0.6M).
   - T.Q. programme – responsible for identifying the need and choosing the Consultant, David Hutchins. Then setting up and managing the programme for 4 years.

7. 1988 – 1990 – Genesis Project Manager – Metal Box R&D, Wantage.
   The project was a JV – MB/Alcoa – to make plastic packaging in the USA. My role – manage technology development programmes and technology transfer into commercial production.

8. 1982 – 1988 – Technical Director – Beverage Division, Nampak
   Initially as Technical Manager at Rosslyn Plant to resolve output restrictions caused by technical problems. Major success with improvements to all important criteria.
   Promoted to Technical Director on setting up separate Beverage Can Division – 3 plants, 1.5 billion cans/ends capability.
   Major successes included:
   - Setting up technical support team
   - Introduction of technical manuals system
   - Direction of capital project for new Beverage line in Durban – cost £8M – output 300M – to time and cost.
   - Direction of capital Project converting SOT – EO Ends, using the very latest equipment to a very tight timescale dictated by the customer. The project was completed to time and cost.
   - Development of locally made production equipment to required standards for use instead of high cost imports.

9. 1976 – 1982 – Technical Director – Metal Box South East Asia.
   Metal Box had a regional organisation to support manufacturing activities in Singapore, Malaysia and Thailand. I provided technical and operational support for current production and planning of new projects.
   Major successes included:
   - Improvement to output performance in spoilage reductions, output improvement and resolution of major quality problems.
   - Direction/management of large projects to time and cost –
     - in 209 to 206 conversion – own and customer plants
     - purchase of second-hand can line, conversion to beverage and installation in Singapore to time and cost
     - development of local tool room to become profitable from a loss potion. Employment – 50 people.
     - Installation of DWI canmaking facility

1975 – 1976 DWI Operations Manager, Metal Box UK
1972 – 1975  Works Manager, Thika, Kenya
1969 – 1972 Technical Manager – Winsford Factory, Metal Box UK
   I was responsible for building co-ordination and for equipment scheduling installation.
1963 – 1969 Various management roles from Trainee Foreman to Manafacturing Managing in the following factories, Wisbech, Westhoughton, Worcester, Arbroath.

M.J. Higham
21 May 2003

# PAGES A165-A207
# REDACTED

**India Paper**

# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE
## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster dictionaries*

EDITOR IN CHIEF
PHILIP BABCOCK GOVE, Ph.D.
AND
THE MERRIAM-WEBSTER
EDITORIAL STAFF



G. & C. MERRIAM COMPANY, *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

1966

COPYRIGHT © 1961 BY G. & C. MERRIAM CO.

PREVIOUS EDITIONS
COPYRIGHT © 1909, 1913, 1923, 1924, 1926, 1927, 1930, 1934, 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.


PHILIPPINES COPYRIGHT 1961 BY G. & C. MERRIAM CO.
PREVIOUS EDITIONS PHILIPPINES COPYRIGHT 1950, 1953, 1954, 1957, 1959
BY G. & C. MERRIAM CO.
PREVIOUS EDITION COPYRIGHT 1925 IN PHILIPPINE ISLANDS
BY G. & C. MERRIAM CO.


ALL RIGHTS RESERVED
UNDER INTERNATIONAL AND PAN-AMERICAN COPYRIGHT CONVENTIONS
BY G. & C. MERRIAM CO.


*All rights reserved*


MADE IN THE U. S. A.

R. R. DONNELLEY & SONS COMPANY, THE LAKESIDE PRESS, CHICAGO, ILL., U. S. A
COMPOSITORS
H. O. HOUGHTON AND COMPANY, THE RIVERSIDE PRESS, CAMBRIDGE, MASS., U. S. A.
PRINTERS AND BINDERS

substandard 2280 subsumption

A210

throatily

2384

through bond

A211

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE
## UNABRIDGED

### A Merriam-Webster
REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF
PHILIP BABCOCK GOVE, Ph.D.
AND
THE MERRIAM-WEBSTER
EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*
SPRINGFIELD, MASSACHUSETTS, U.S.A.

A212



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1993 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 1993 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language,
unabridged: a Merriam-Webster/editor in chief, Philip Babcock
Gove and the Merriam-Webster editorial staff.
    p.    cm.
    ISBN 0-87779-201-1 (blue sturdite).—ISBN 0-87779-202-X
(carrying case). — ISBN 0-87779-206-2 (imperial buckram).
    1. English language—Dictionaries.    I. Gove, Philip Babcock,
1902–1972.  II. Merriam-Webster, Inc.
PE1625.W36 1993
423—dc20                                                    93-10630
                                                               CIP

*All rights reserved. No part of this book covered by the copyrights hereon may be
reproduced or copied in any form or by any means—graphic, electronic, or mechanical,
including photocopying, taping, or information storage and retrieval systems—without
written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA
454647AG/H959493

substandard                2280                subsumption

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

A214-A



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 2002 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 2002 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language,
unabridged: a Merriam-Webster/editor in chief, Philip Babcock Gove
and the Merriam-Webster editorial staff.
    p.    cm.
    ISBN 0-87779-201-1 (blue sturdite).—ISBN 0-87779-202-X
(carrying case).—ISBN 0-87779-206-2 (imperial buckram).
    1. English language—Dictionaries.  I. Gove, Philip Babcock,
1902–1972.  II. Merriam-Webster, Inc.
PE1625.W36
423-dc20

*All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA

5152535455QKY05040302

**PCT**

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau



INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 5 : | | (11) International Publication Number: | WO 91/11275 |
|---|---|---|---|
| B21D 51/26, 22/10 | A1 | (43) International Publication Date: | 8 August 1991 (08.08.91) |

(21) International Application Number: PCT/US90/00451

(22) International Filing Date: 26 January 1990 (26.01.90)

(71) Applicant *(for all designated States except US)*: AMERI-CAN NATIONAL CAN COMPANY [US/US]; 8770 West Bryn Mawr Avenue, Chicago, IL 60631 (US).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)* : HALASZ, Andrew [US/US]; 3007 Springbrook Road, Crystal Lake, IL 60012 (US). PRATURLON, Sylvan [US/US]; 4822 South Ellis, Chicago, IL 60615 (US).

(74) Agent: RATH, Ralph, R.; 100 South Wacker Drive - 2100, Chicago, IL 60606 (US).

(81) Designated States: AT, AT (European patent), AU, BB, BE (European patent), BF (OAPI patent), BG, BJ (OAPI patent), BR, CA, CF (OAPI patent), CG (OAPI patent), CH, CH (European patent), CM (OAPI patent), DE*, DE (European patent)*, DK, DK (European patent), ES, ES (European patent), FI, FR (European patent), GA (OAPI patent), GB, GB (European patent), HU, IT (European patent), JP, KP, KR, LK, LU, LU (European patent), MC, MG, ML (OAPI patent), MR (OAPI patent), MW, NL, NL (European patent), NO, RO, SD, SE, SE (European patent), SN (OAPI patent), SU, TD (OAPI patent), TG (OAPI patent), US.

Published
*With international search report.*
*With amended claims.*

(54) Title: METHOD AND APPARATUS FOR PROCESSING CONTAINERS

(57) Abstract

A drawn and ironed container (C) that includes a cylindrical side wall, a smoothly-tapered neck (134) with an open end and an integral bottom wall (137) at the opposite end has a plurality of inwardly-deformed panel segments (130) located in the side wall between adjacent arcuate segments (132) with the panel defining generally chordal bottom walls for the panel segments. The container is formed using a multi-station processing apparatus that consists of a plurality of identical stations (30) located around the periphery of a rotating turret (26). Each station includes a support mandrel (50), a container loading means (52, 53) and an impression mandrel (54), with the impression mandrel being pivoted into and out of pressure engagement with the support mandrel to deform the side wall of the container. The support mandrel has a cylindrical peripheral surface (102) that conforms to the inner diameter of the container side wall and has circumferentially-spaced, axially-extending pockets (104). The pockets have sharp opposite edges (108a) that cooperate with the impression mandrel to produce the panel segments in the side wall.



## DESIGNATIONS OF "DE"

Until further notice, any designation of "DE" in any international application whose international filing date is prior to October 3, 1990, shall have effect in the territory of the Federal Republic of Germany with the exception of the territory of the former German Democratic Republic.

---

### FOR THE PURPOSES OF INFORMATION ONLY

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | | |
|----|----------------------------|----|-------------------------------|----|-----------------------------|
| AT | Austria | ES | Spain | MG | Madagascar |
| AU | Australia | FI | Finland | ML | Mali |
| BB | Barbados | FR | France | MN | Mongolia |
| BE | Belgium | GA | Gabon | MR | Mauritania |
| BF | Burkina Faso | GB | United Kingdom | MW | Malawi |
| BG | Bulgaria | GN | Guinea | NL | Netherlands |
| BJ | Benin | GR | Greece | NO | Norway |
| BR | Brazil | HU | Hungary | PL | Poland |
| CA | Canada | IT | Italy | RO | Romania |
| CF | Central African Republic | JP | Japan | SD | Sudan |
| CG | Congo | KP | Democratic People's Republic | SE | Sweden |
| CH | Switzerland | | of Korea | SN | Senegal |
| CI | Côte d'Ivoire | KR | Republic of Korea | SU | Soviet Union |
| CM | Cameroon | LI | Liechtenstein | TD | Chad |
| CS | Czechoslovakia | LK | Sri Lanka | TG | Togo |
| DE | Germany | LU | Luxembourg | US | United States of America |
| DK | Denmark | MC | Monaco | | |

WO 91/11275                                         PCT/US90/00451

## METHOD AND APPARATUS FOR PROCESSING CONTAINERS

### DESCRIPTION

Technical Field

     This invention relates generally to
two-piece container constructions, and more
particularly to a method and apparatus for
processing such containers to increase the
strength thereof, as well as improve the
appearance.

2

Background Prior Art

Two-piece cans are the most common
type of metal container used in the beer and
beverage industry, as well as for aerosol and
food packaging. The two-piece container
consists of a unitary body, including a side
wall open at one end with an integral end wall
at the other end. The integral end wall is
usually formed to a domed-shaped configuration
to increase the overall strength of the
container. An annular portion is usually
formed to a special configuration between the
center dome panel of the bottom wall and the
side wall that defines a reduced diameter
support for the container and also provides a
nesting feature for nesting with the end of an
adjacent container, which is seamed to the
open end thereof.

An exemplary bottom profile for a
drawn and ironed container that has achieved a
remarkable degree of commercial success is
disclosed in U.S. Patent No. 4,685,582. The
container disclosed therein also includes an
upper end portion that has a reduced neck so
that a second end panel or end having a
smaller diameter can be utilized to enclose
the open-ended drawn and ironed container.

In most cases, containers that are
used for beer and carbonated beverages are

formed from a flat aluminum disc to an outside
diameter of 2-11/16th inch (referred to as a
"211-container") and the upper open end is
reduced in diameter to form a 209-neck (2-
9/16th inch) or any other smaller diameter,
such as a 207½-neck, a 206-neck, and even a
204-neck or smaller so that smaller diameter
ends can be utilized in the finished package.

         An important competitive objective
in the packaging industry is to reduce the
total can weight as much as possible, while
maintaining its strength and performance, in
accordance with industry requirements.  For
pressurized contents, such as soft drinks or
beer, the integral bottom end wall of the
container usually has the same metal thickness
gauge as the initial disc and the side wall is
reduced through a drawing and ironing process
to a thickness approaching one-third of the
thickness of the original metal disc.
Accordingly, to minimize overall weight, the
can top or end panel that forms the second
piece of the two-piece can is made as
diametrically small as possible, while still
maintaining the structural integrity of the
container, the functionality thereof, and an
aesthetically-pleasing appearance.

         In the manufacture of containers of
this type, a sheet of stock material of

4

predetermined thickness is fed to a cupping
press, wherein circular discs are cut from the
stock material and are transformed into cups
having a diameter which is considerably larger
than the ultimate diameter of the finished
container.

The preformed cups are then
transferred to a container-forming apparatus,
commonly referred to as a "bodymaker", wherein
the cup is aligned with a punch carried on a
reciprocable ram which cooperates with a
plurality of spaced ironing dies and a doming
mechanism located at the end of the path of
the punch.  During the forming process, the
punch initially cooperates with a redraw
assembly in which the shallow cup is redrawn
to a smaller diameter that has an internal
diameter approximately equal to the internal
diameter of the ultimately-finished container
and a height that is greater than the height
of the original cup.

Each cup then passes through a
series of ironing dies having progressively
reduced diameters so that the side wall of the
container is progressively reduced in
thickness, while the height of the container
increases.  At the end of the stroke for the
punch or ram, the end of the container is
forced into a predetermined configuration to

form an integral end wall that has a central
inwardly-domed panel and a specially-
configured peripheral annular bead or support
portion.  The drawn and ironed container is
then trimmed to a selected height and coated
and labeled, and a reduced tapered neck is
produced on the open end.

To produce a container that can be
price competitive and yet meet the rigid
industry requirements, particularly for
pressurized contents, such as beer and
carbonated beverages, the Assignee of the
present invention has developed a die necking
operation for sequentially reducing the upper
open end of the container to a smooth die neck
configuration.  This is done through a
plurality of steps until the desired reduction
for an end, such as a 206- or 204-end, is
achieved.  This process is disclosed in U.S.
Patent No. 4,774,839, incorporated herein by
reference.  A container of the type having a
bottom profile, such as disclosed in U.S.
Patent No. 4,685,582, and a smooth die neck
configuration illustrated in the above-
referenced patent has increased strength
characteristics and the overall aesthetic
appearance has been enhanced.

In order to further enhance the
overall appearance of the two-piece drawn and

6

ironed container, it has also been proposed to
deform the container side wall to produce a
fluted appearance, such as disclosed in U.S.
Patent Nos. DES 283,011 and DES 290,688.

## Summary of the Invention

According to the present invention,
a unique drawn and ironed container has been
developed which can be formed from a minimum
amount of stock material and yet be capable of
meeting all of the strenuous requirements for
such containers that are particularly adapted
for use in the beer and beverage industry.

More specifically, the container of
the present invention can be formed from a
stock material, preferably an aluminum flat
disc having a thickness of less than 0.0120
inch and meet the minimum crush and buckle
requirements of 250 pounds and 90 psi,
respectively.

The container, which is formed from
a flat metal disc, preferably aluminum,
includes a bottom wall that has a thickness
substantially equal to the thickness of the
stock material and a reduced side wall
thickness that is on the order of 1/3 the
thickness of the stock material, with the
bottom wall having a central inwardly-domed
panel connected to the side wall through a

countersink that has outer and inner,
generally flat, substantially vertical walls.

The side wall of the container has a
plurality of circumferentially-spaced,
axially-extending, inwardly-deformed panel
segments.  The panel segments are formed
between substantially axial lands or arcuate
segments that are co-terminus with the
remainder of the side wall and opposite ends
of the panel segments merge smoothly with the
side wall adjacent opposite ends thereof.  The
panel segments are located within the confines
of the side wall between the juncture of the
countersink at the bottom and the juncture of
the inwardly-tapered neck at the upper open
end of the container.

According to one aspect of the
invention, the panel segments are formed in
the side wall in a continuous process through
an apparatus that includes a turret mounted
for fixed rotation on a support column.  The
turret has a plurality of identical deforming
stations circumferentially spaced around the
periphery thereof.  Each deforming station
includes a support mandrel supported for
rotation about a fixed axis on the turret and
has an axially-aligned loading mechanism for
loading the container onto the support
mandrel.  Each station also incorporates a

8

compressible impression mandrel that is
mounted on the turret adjacent the support
mandrel for movement into and out of pressure
contacting engagement with the support mandrel
to deform a container therebetween.

According to another aspect of the
invention, a pair of adjacent impression
mandrels are mounted on a common support
shaft.  The support shaft is rotated on the
fixed axis on the turret to simultaneously
pivot two impression mandrels into and out of
pressure contacting engagement with an
associated support mandrel.

The support mandrel has a plurality
of circumferentially-spaced pockets formed
between adjacent lands.  Each pocket has
opposite edges which are defined by generally
radial walls that extend inwardly from the
outer wall and terminate in a bottom wall that
defines a generally chordal segment between
adjacent lands.  The opposite ends of the
bottom wall of the respective pockets are
smoothly tapered to merge with the periphery
of the support mandrel.  This defines a smooth
transition between the bottom wall of the
pocket and the periphery of the mandrel.

Preferably, the pockets are
positioned on the mandrel such that the panel
segments are formed in the side wall of the

container between the juncture of the bottom
wall and the tapered neck at opposite ends of
the side wall.

According to one further aspect of
the present invention, the support mandrel and
impression mandrel at each station are driven
in synchronized relation.  This defines a
common speed for the peripheral surfaces of
the respective mandrels.  The drive mechanism
for the impression mandrel incorporates a
frictional drive arrangement to accommodate
any required differences in peripheral
velocity because of compression of the
periphery of the impression mandrel during
pressure contact with the support mandrel.

In the method of operating the
apparatus for deforming the container having
the superior characteristics described above,
containers are sequentially fed from a source
to respective support or loading means at each
of the stations on the turret and are cammed
onto the respective support mandrels by
suitable cams interposed between the support
and the turret.  Also, the respective
impression mandrels are pivoted through a
suitable cam mechanism to produce pressure
contact engagement between the impression
mandrel and associated support mandrel at each