IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC., Plaintiff, and CROWN CORK & SEAL USA, INC., | ) ) ) | Civil Action No. 05-608 (MPT) |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) ) | **REDACTED - PUBLIC VERSION** |
| | ) | |
| v. | ) | |
| | ) | |
| REXAM BEVERAGE CAN CO., | ) | |
| | ) | |
| Defendant Counterclaimant. | ) | |

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY
OF U.S. PATENT NOS. 6,935,826 AND 6,848,875

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
    *Attorneys for Defendant/Counterclaimant*
    *Rexam Beverage Can Co.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

NATURE OF THE PROCEEDINGS ....................................................... 1

SUMMARY OF THE ARGUMENT ......................................................... 1

CONCISE STATEMENT OF THE FACTS ............................................... 2

ARGUMENT ..................................................................................... 3

  I.        Summary Judgment Standard ................................................. 3

      A.      Anticipation (or Lack of Novelty) ...................................... 4

      B.      Obviousness ................................................................... 5

      C.      Failure to Comply with the Written Description Requirement ... 6

      D.      Indefiniteness Under 35 U S C § 112 ................................ 8

      E.      Claim 13 of the '826 Patent is Invalid Because it is Anticipated by the Japanese Reference ............................................... 9

      F.      Claim 14 of the '826 Patent is Invalid Because it is Anticipated by the Japanese '323 Reference ......................................... 18

      G.      Claim 32 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference .......................................... 19

  II.       Claim 33 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference ......................................... 26

      A.      Claim 34 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference ...................................... 26

      B.      Claim 50 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference ...................................... 26

      C.      Claim 51 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference ...................................... 27

      D.      Claim 52 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference ...................................... 28

      E.      Claims 32, 50 and 51 of Crown's 875 Patent are Anticipated by the Dynamic III Can End and the Method of Seaming the Dynamic III Can End ....................................................... 28

      F.      Crown's Asserted Claims are Obvious in Light of the Prior Art ... 30

      G.      Claim 13 of the '826 Patent ............................................. 30

      H.      Claim 14 of the '826 Patent ............................................. 34

      I.      Claim 32 of the '875 Patent ............................................. 34

      J.      Claim 33, 34 and 50-52 of the '875 Patent .......................... 35

Page

K.    Crown's Written Description Does Not Adequately Support
Claims Covering A Can End Without An Annular Reinforcing
Bead ........................................................................................................... 35

L.    INDEFINITENESS OF CROWN'S CLAIMS ........................................ 38

CONCLUSION ............................................................................................................... 39

RLF1-3103785-1

Page

## TABLE OF AUTHORITIES

### CASES

*Abbott Labs  v. Syntron Bioresearch, Inc.,*
    334 F.3d 1343 (Fed. Cir. 2003) ............................................................. 5

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986). ............................................................................ 3

*Atlas Powder Co. v. Ireco, Inc.,*
    190 F.3d 1342 (Fed. Cir. 1999) ........................................................... 5

*Avia Group Int'l v. L.A. Gear Cal., Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988) ........................................................... 3

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,*
    72 F.3d 1577 (Fed. Cir. 1996). ............................................................ 6

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989) ...................................................................... 5, 30

*Callaway Golf Co. v. Dunlop Slazenger Group,*
    318 F. Supp. 2d 205 (D. Del. 2004) .................................................... 3

*Carnegie Steel Co. v. Cambria Iron Co.,*
    185 U.S. 403, 46 L. Ed. 968, 22 S. Ct. 698 (1902). ........................... 20

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................ 3

*Chiron Corp. v. Genentech, Inc.,*
    363 F.3d 1247 (Fed. Cir. 2004) ........................................................... 5

*In re Cruciferous Sprout Litigation,*
    301 F.3d 1343 (Fed. Cir. 2002) ........................................................... 3

*Datamize, LLC v. Plumtree Software, Inc.,*
    417 F.3d 1342 (Fed. Cir. 2005) ........................................................... 8

*Dayco Prods., Inc. v. Total Containment, Inc.,*
    329 F.3d 1358 (Fed. Cir. 2003) ......................................................... 10

*EMI Group North America, Inc. v. Cypress Semi-Conductor Corp.,*
    268 F.3d 1342 (Fed. Cir. 2001) ......................................................... 20

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001) ........................................................... 9

Page

*Gentry Gallery, Inc v. Berkline Corp,*
    134 F.3d 1473 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Graham v. John Deere Co,*
    383 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Howmedica Osteonics Corp v. Tranquil Prospects, Ltd,*
    401 F.3d 1367 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 39

*Iron Grip Barbell Co v. USA Sports, Inc,*
    392 F.3d 1317 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re King,*
    801 F.2d 1324 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*LizardTech, Inc v. Earth Res. Mapping, Inc,*
    424 F.3d 1336 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 38

*Lockwood v. American Airlines, Inc,*
    107 F.3d 1565 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Novo Indus., L.P. v. Micro Molds Corp,*
    350 F.3d 1348 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Pentec, Inc. v. Graphic Controls Corp,*
    776 F.2d 309 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Polaroid Corp v. Eastman Kodak Co,*
    789 F.2d 1556 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*S3 Inc. v. nVIDIA Corp,*
    259 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Sand Technologies, Ltd v. Resco Metal & Plastics Corp,*
    264 F.3d 1344 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Schering Corp v. Geneva Pharms, Inc,*
    339 F.3d 1373 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Schreiber,*
    128 F.3d 1473 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

*Scripps Clinic & Research Found v. Genentech, Inc,*
    927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc,*
    183 F.3d 1347 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

iv

Page

*Synbiotics Corp v Heska Corp*,
   137 F Supp 2d 1198 (S D Cal 2000) .......................................................... 4

*Telemac Cellular Corp v Topp Telecom, Inc*,
   247 F 3d 1316 (Fed Cir 2001) ................................................................... 3

*Titanium Metals Corp of Am v Banner*,
   778 F 2d 775 (Fed Cir 1985) ..................................................................... 4

*Tronzo v Biomet, Inc*,
   156 F 3d 1154 (Fed Cir 1998) *aff'd in part, rev'd in part on other grounds at* 236
   F 3d 1342 (Fed Cir 2001) ...................................................................... 6, 7

*University of Rochester v G D Searle & Co*,
   358 F 3d 916 (Fed Cir 2004) ..................................................................... 4

## STATUTES AND OTHER AUTHORITIES

35 U S C § 112, para 2 ............................................................................... 8

*Chisum on Patents* § 5 01 (2005) ................................................................ 5
Patent") ...................................................................................................... 1

v

## NATURE OF THE PROCEEDINGS

Pursuant to Federal Rule of Civil Procedure 56, Defendant/Counterclaimant Rexam Beverage Can Company ("Rexam") respectfully requests this Court to grant summary judgment that the asserted claims of Crown's U.S Patent No. 6,935,826 ("'826 Patent") and U.S Patent No. 6,848,875 ("'875 Patent") are invalid (A1-15; A16-27). Crown's "invention" (can ends and methods of seaming can ends), the purpose of the "invention," and each of the limitations of Crown's "invention" were clearly described in a publication that predated Crown's patent filing date by more than 13 years. In other words, Crown's invention was not new and was therefore ineligible for patent protection under U.S. laws

Rexam and Plaintiffs/Counterclaim Defendants Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown") are in the business of making and selling, among other things, beverage cans and beverage can components. The subject matter of the '826 and '875 Patents is "can end" technology. "Can end" is the industry name for the "lid" or "top" of a beverage can. Crown contends in this case that Rexam's can ends, known as Rexam Ends, infringe Claims 13 and 14 of the '826 Patent and Claims 32-34 and 50-52 of the '875 Patent.[1] (A1-15; A16-27.) Rexam moves for summary judgment that Crown's asserted patent claims are invalid.

## SUMMARY OF THE ARGUMENT

1)    The asserted claims of the '826 and '875 Patents are invalid due to anticipation under 35 U.S.C. § 102(b).

2)    The asserted claims of the '826 and '875 Patents are invalid as they would have been obvious to a person of ordinary skill in the art in light of the prior art under 35 U.S.C. § 103.

3)    Claim 13 of the '826 Patent and Claims 32 through 34 of the '875 Patent are invalid for failure to comply with the written description requirement of 35 U.S.C. § 112.

4)    The asserted claims of the '826 and '875 Patents are invalid due to indefiniteness under 35 U.S.C. § 112.

---

[1] Rexam's noninfringement defenses are the subject of another motion for summary judgment in this case.

5)      The Federal Circuit "has repeatedly emphasized that 'summary judgment is as appropriate in a patent case as in any other '" *Avia Group Int'l v L A Gear Cal , Inc ,* 853 F 2d 1557, 1561 (Fed. Cir. 1988) (citation omitted)

## CONCISE STATEMENT OF THE FACTS

Crown's patents relate to can ends - - the lids or tops of beverage cans - - and methods of seaming those can ends to can bodies  Typically, a filled beverage can consists of two main parts, the can body (which includes the side walls and the bottom of the can) and the can end, which is "seamed" onto the can body after the can is filled, as illustrated to the right



Fig. 6 of the '826 Patent

During Seaming

Before Seaming

The stated purpose of the "invention" in the original application[2] is to reduce metal usage in the manufacture of can ends without sacrificing the strength of the can end  *See* '875 Patent col  1, lns 32-33, 62; '826 Patent, col  1, lns 32-33 and col  2, ln 1.  Strength is important for resistance to buckling when a can contains carbonated beverages such as soda or beer  The can end of the patents-in-suit saves metal by orienting the end wall or chuck wall closer to horizontal than in commonly used can ends, thereby decreasing the size of the central panel and, consequently, the amount of metal used  The sequence to the right (created for illustrative purposes) shows the very simple concept involved  The patents teach this concept and, as will be discussed in detail, at least one publication that predates the invention by over a decade teaches this exact approach to metal-savings in detail



Crown's asserted patents are invalid because they are anticipated under 35 U S C  § 102, obvious under 35 U S C  § 103, and because the inventors failed to comply with the written description

---

[2] Both of Crown's patents-in-suit derive from a common "parent" application which issued as U S  Patent 6.065,634 ("'634 Patent") (A-186-195)

2

requirement and definiteness requirement mandated by 35 U.S.C. §112. The "invention" of Crown's asserted patent claims is not new, having been described in multiple publications before the critical date of May 24, 1995 cited in Crown's '634 Patent [3] (A186-195). Furthermore, Crown's patent specification impermissibly fails to describe the full scope of what Crown now claims to be its invention.

## ARGUMENT

### I.    Summary Judgment Standard

The Federal Rules of Civil Procedure provide that summary judgment shall be entered if "there is no genuine issue as to any material fact and    the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "The availability of summary judgment turn[s] on whether a proper jury question [has been] presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* "In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor." *Callaway Golf Co. v. Dunlop Slazenger Group*, 318 F. Supp. 2d 205, 210 (D. Del. 2004) (citing *Anderson*, 477 U.S. at 255). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The Federal Circuit "has repeatedly emphasized that 'summary judgment is as appropriate in a patent case as in any other.'" *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988) (citation omitted). Indeed, summary judgment of patent invalidity is frequently granted and affirmed by the Federal Circuit. *See Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373 (Fed. Cir. 2003) (affirming summary judgment that the patent-in-suit was invalid under 35 U.S.C. § 102 as anticipated by prior art); *In re Cruciferous Sprout Litigation*, 301 F.3d 1343 (Fed. Cir. 2002) (affirming summary judgment that the patent-in-suit was invalid due to anticipation); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001) (affirming summary judgment of invalidity due

---

[3] The critical date of a patent is one year prior to the filing date. 35 U.S.C. § 102(b)

RLF1 3108785-1

to anticipation and explaining that "although anticipation is a question of fact, it still may be decided on summary judgment    "); *Lockwood v American Airlines. Inc*, 107 F 3d 1565 (Fed Cir 1997) (invalidating patent for anticipation and obviousness); *Iron Grip Barbell Co v USA Sports, Inc.*, 392 F 3d 1317, 1325 (Fed Cir. 2004) (affirming summary judgment of invalidity due to obviousness); *Sand Technologies, Ltd v Resco Metal & Plastics Corp*, 264 F 3d 1344, 1356 (Fed Cir 2001) (affirming summary judgment of anticipation and obviousness); *University of Rochester v G D Searle & Co*, 358 F 3d 916, 917 (Fed Cir 2004) (affirming summary judgment of invalidity for failure to comply with the written description requirement); *LizardTech, Inc v Earth Res Mapping, Inc*, 424 F 3d 1336, 1346-47 (Fed Cir. 2005) (affirming summary judgment of invalidity due to a failure to comply with the written description and enablement requirements of 35 U S C § 112)

## A. Anticipation (or Lack of Novelty)

Novelty or newness is a fundamental requirement of patentability   A patent claim is invalid if it is anticipated by the prior art, and anticipation is a question of fact   *Scripps Clinic & Research Found v Genentech, Inc*, 927 F 2d 1565, 1576 (Fed Cir 1991)   In order to prove that a claim is anticipated under 35 U S C § 102, each and every claim element must be shown, either expressly or inherently, in a single prior art reference   *In re Schreiber*, 128 F 3d 1473, 1477 (Fed Cir 1997)   "While every element must appear in a single reference, additional references may be used to reveal what it would have meant to those skilled in the art at the time of the invention." *Synbiotics Corp v Heska Corp*, 137 F Supp 2d 1198, 1203 (S D Cal 2000)

Another way to determine whether a prior art reference anticipates a patent is to determine whether the prior art reference would infringe the patent if it came after the patent   *Polaroid Corp v Eastman Kodak Co*, 789 F 2d 1556, 1573 (Fed Cir 1986) ("'[T]hat which infringes, if later, would anticipate if earlier '") (citation omitted)   Also, when a claim covers a range of values, the claim is anticipated by any value within the claimed range   *Titanium Metals Corp of Am v Banner*, 778 F 2d 775, 782 (Fed Cir 1985) ("It is    an elementary principle of patent law that <u>when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art.</u>") (emphasis added)

4

A prior art reference may anticipate a patent claim even if the claim limitation or limitations are not expressly found in the reference, but are nonetheless inherent. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *Id.*

Patents are presumed to be valid, but even prior art references that were reviewed by a patent examiner before patent issuance can be used to overcome the presumption and invalidate those same patents during litigation. "The presumption of validity remains the same whether or not the art relied upon at trial was before the examiner." *Abbott Labs v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1357 (Fed. Cir. 2003). "The presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against the challenger's evidence." *Chiron Corp. v. Genentech. Inc.*, 363 F.3d 1247, 1258-59 (Fed. Cir. 2004). In other words, an invalidating prior art reference does not carry less evidentiary weight if a patent examiner already considered it.

### B.    Obviousness

The "nonobviousness" requirement of 35 U.S.C. § 103(a) is closely related to the novelty requirement of § 102 in that it limits the grant of patents to innovative subject matter. However, "[n]onobviousness is distinct from novelty in the sense that an invention may be obvious even though it is not identically disclosed anywhere in the prior art." *Chisum on Patents* § 5.01 (2005) (A28-31). "The nonobviousness requirement extends the field of unpatentable material beyond that which is known to the public under § 102, to include that which could readily be deduced from publicly available material by a person of ordinary skill in the pertinent field of endeavor." *Bonito Boats, Inc. v. Thunder Craft Boats. Inc.*, 489 U.S. 141, 150 (1989). Those of ordinary skill in the art may be presumed to have knowledge of arts "reasonably pertinent to the particular problem with which the inventor was involved." *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 313 (Fed. Cir 1985). In other words, prior art references may be combined to render patent claims obvious, and therefore invalid.

> Taken together, the novelty and nonobviousness requirements express a congressional determination that the purposes behind the Patent Clause [of the U.S. Constitution] are best served by free competition and exploitation of either that which is already available to the public or that which may be readily discerned from publicly available material.

*Bonito Boats, Inc.*, 489 U.S. at 150.

5

The question of whether a patent claim is obvious under § 103, and therefore invalid, turns on specific factual inquiries, namely:

> [T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1582 (Fed. Cir. 1996).

In order to invalidate a patent claim due to obviousness, it is not enough that each of the component parts are simply located somewhere in the prior art. Rather, there must also be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999). "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id.*

## C.    Failure to Comply with the Written Description Requirement

A patent applicant must provide a "written description of the [claimed] invention." 35 U.S.C. § 112, para. 1. To do so, a patent specification "must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech. Inc. v. Regents of the Univ. of California*, 424 F.3d 1336, 1345 (Fed. Cir. 2005). Where, as here, claims are added after the original filing date, an adequate written description is not provided unless "the disclosure of the [original] application . . . reasonably convey[s] to one of ordinary skill in the art that the inventor possessed the later-claimed subject matter at the time the [original] application was filed." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) *aff'd in part, rev'd in part on other grounds at* 236 F.3d 1342 (Fed. Cir. 2001). By focusing on what the patentee "possessed" at the time of the application, the written description requirement protects the public from the issuance of patent claims that are broader in scope than what the patentee actually invented. In other words, it guards against overreaching by the patentee.

6

Broad claims are often invalidated for failing to comply with the written description requirement when the specification indicates that the invention is of a narrower scope. *See, e g , Tronzo* 156 F 3d at 1159 (finding that the parent application failed to provide the written description necessary to support a later claim to hip sockets of all shapes when the specification emphasized the benefits of one shape in particular); *LizardTech*, 424 F 3d at 1345-46 (affirming summary judgment of invalidity because the invention was a particular method of achieving a result, but the invalid claim could generically achieve that result); *Gentry Gallery. Inc v Berkline Corp* , 134 F 3d 1473, 1479 (Fed Cir 1998) (claims invalid where the specification indicated that a feature was required, but subsequently-added, broad claim omitted that feature).

These overreaching claims fail because there is nothing in the specification to suggest that the applicant had invented such a broad product or method. In fact, the specification in cases where these extra-broad claims have been held to be invalid often suggests the opposite, i e it teaches away from the notion that the inventor was in possession of the broad claim. *See. e g , Tronzo.* 156 F 3d at 1159 (noting "the specification specifically distinguishes the prior art as inferior and touts the advantages of the conical shape").

It is important to note that broad claims do not fail § 112's written description requirement "simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech*, 424 F 3d at 1345. In other words, if the inventor only describes one particular embodiment, it does not necessarily follow that any broader claims should be invalidated. This is because, as noted above, the standard for § 112 requires viewing the patent through the eyes of "a person of skill in the art " Because "such a person comes to the patent with the knowledge of what has come before." satisfying the written description requirement requires that "only enough [information] be included [in the specification] to convince a person of skill in the art that the inventor possessed the invention " *Id*

Thus, while it is true that the specification does not have to describe details that have long been understood in the field, it does have to convey to one of ordinary skill in the art that the applicant was in possession of the broad invention that he now claims. If instead the specification teaches away from the

7

broad claims, e g , by expressly stating that only a narrower product or method had been found to be useful, then those broad claims must be invalidated for failing to satisfy § 112's written description requirement. To hold otherwise would violate the *quid pro quo* that drives our patent system: inventors should only receive patent rights to what they actually invented and described to the public

### D.    Indefiniteness Under 35 U.S.C. § 112

Section 112, inter alia, requires that a specification conclude with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention " 35 U S C § 112, para 2  The test for meeting the statutory requirement that the claim be "definite" is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Howmedica Osteonics Corp v Tranquil Prospects, Ltd*, 401 F 3d 1367, 1371 (Fed Cir 2005)  The requirement that the claims particularly point out and distinctly claim the invention is met "when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification " *S3 Inc v nVIDIA Corp*, 259 F 3d 1364, 1367 (Fed Cir 2001)  "A claim is indefinite if its legal scope is not clear enough that a person ordinary skill in the art could determine whether a particular [product or method] infringes or not " *Howmedica*, 401 F 3d at 1371 (brackets in original) (citing *Geneva Pharms . Inc v Glaxosmithkline PLC*, 349 F 3d 1373, 1384 (Fed Cir 2003))  "In the face of an allegation of indefiniteness, general principles of claim construction apply " *Datamize, LLC v Plumtree Software, Inc*, 417 F 3d 1342, 1348 (Fed Cir 2005)  Intrinsic evidence in the form of the patent specification and file history should guide a court toward an acceptable claim construction *Id* (citing *Phillips v AWH Corp*, 415 F 3d 1303, 1323 (Fed Cir 2005) (en banc))  In addition, district courts may also rely on extrinsic evidence, such as expert testimony *Id*

"The definiteness requirement, however, does not compel absolute clarity " *Datamize. LLC v Plumtree Software, Inc . 417* F 3d 1342, 1348 (Fed Cir 2005)  A claim is not "indefinite" simply because it is hard to understand when viewed without benefit of the specification. *S3 Inc v nVIDIA Corp*, 259 F 3d 1364, 1369 (Fed Cir 2001)  The purpose of claims is not to explain the technology or how it works, but to state the legal boundaries of the patent grant  Only claims "not amenable to construction" or "insolubly ambiguous" are indefinite *See Novo Indus . L P v Micro Molds Corp . 350*

8

F.3d 1348, 1353 (Fed Cir 2003); *Exxon Research & Eng'g Co v United States*, 265 F 3d 1371, 1375 (Fed Cir 2001). The definiteness of claim terms depends on whether those terms can be given any reasonable meaning *Exxon Research & Eng'g, 265* F 3d at 1375 Furthermore, a difficult issue of claim construction does not ipso facto result in a holding of indefiniteness *Id* "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds " *Id*

### E.  Claim 13 of the '826 Patent is Invalid Because it is Anticipated by the Japanese Reference

The '826 Patent purports to describe a new can end having a unique end wall design "This invention relates to <u>an end wall</u> for a container and more particularly but not exclusively to an end wall of a can body and a method for fixing the end wall to the can body by means of a double seam " '826 Patent, col 1, lns 16-19 (emphasis added). The supposedly new part of the can end is quite simply the angle of the wall By changing the angle of the can end's wall, can-makers can use less metal on a similar-sized end The method of seaming the can end to the can body is exactly the same as the method of seaming older can ends with the exception of requiring new wear parts (seaming chucks and seaming rolls) These are the same as the old wear parts, but have different angles to match the angles of the new ends

Claim 13 covers a can end with end walls (also known as "chuck walls") "being inclined . at an angle of between 30° and 60° " '826 Patent, col 10, lns 60-61 This feature, as well as each of the other elements of Claim 13. was contained in a single prior art reference several years before the inventors began work on this "new" technology By increasing the angle (from vertical) of the end wall (shown as angle C in Figure 4 below) of a can end, a manufacturer may reduce the size of the center disk of metal (known as the "central panel"). thereby saving metal and. consequently. money The end wall (marked as 24 in Figure 4) is also referred to as a chuck wall or a countersink wall The following figures from Crown's patents-in-suit illustrate before- (Figure 4) and during-seaming (Figure 7) drawings of Crown s can end:

9

Fig. 4 of the '826 Patent

Fig. 7 of the '826 Patent



Fig 4



Fig.7.

The subject matter of Claim 13 is not new   Multiple references disclose angles within the claimed ranges and even describe, in detail, the purpose of manufacturing can ends with the claimed angle ranges - - that is, metal savings and increased strength  *See. e g ,* JP 57-117323 (translation produced by Crown) ("'323 Reference)  (A32-41)  "'The dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the [prior art reference's] teaching that every claim [limitation] was disclosed in that single reference '" *Dayco Prods , Inc  v  Total Containment, Inc ,* 329 F 3d 1358, 1368 (Fed  Cir  2003) (quoting *In re Baxter Travenol Labs ,* 952 F 2d 388, 390 (Fed  Cir 1991))

Unexamined Utility Model Application No  57-117323 ("'323 Reference") is a Japanese patent application that was "laid open," or made public on July 21, 1982  '323 Reference, p 1 (A32-41)  The earliest priority date claimed on Crown's patents-in-suit is May 24, 1995, more than thirteen years after the publication of the Japanese Reference  '826 Patent, p 1; '875 Patent, p 1  (A1-15)  Because this foreign application was published more than one year prior to the earliest filing date of the '826 patent, it constitutes prior art as defined by statute  35 U S C  §102(b)  Crown has also admitted that the Japanese Reference is prior art  (Crown's Responses to Rexam's Requests to Admit, No  19 ) (A42-43)

The '826 and '875 Patents describe previous can ends and prior art related to previous can ends as having end walls of between 14 and 24 degrees from vertical  '826 Patent, col  1, lns 29, 39  (A16-27) The "improvement" both publications (that is, the '826 Patent and the '323 Reference) tout over the prior art can ends relates to making this wall angle less steep - - the '826 Patent discusses angles from 30 to 60 degrees, while the '323 Reference discusses using angles from 20 to 70 degrees  *Id* at col  2, lns 1-12, '323 Reference, p  5  (A16-27; A32-41)  The following table illustrates what the authors of both publications (Crown's '826 Patent and the '323 Reference) saw as the difference between their "invention" and the prior art

10

| Old Can Ends | Metal-Saving Improvement |
|---|---|
| Closeup of Figure 3 from Crown's '826 Patent | Mirror Image of Figure 7 from the '826 Patent |
| Closeup of Figure 2 from the old Japanese '323 Reference | Closeup of Figure 4 from the '323 Reference |
| | Image from Crown sales document (CCS0018141) showing the "strong profile" of Crown's SuperEnd can end (the embodiment of the patents) |

As the images illustrate, the '826 Patent and the '323 Reference describe the same improvement over the same prior art. The '323 Reference discloses precisely the same modification to the can (i.e., changing the angle of the end wall) for precisely the same purpose (i.e., saving metal while increasing strength) as Crown's '826 and '875 patents. The '323 Reference discusses the problem with "center panels" on can tops being "forcibly raised by virtue of the internal pressure." *Id* at 2. (A32-41) The '323 Reference explains how this raising of the center panel can lead to "buckling" of the can top. *Id*

The reference further details that "[t]his invention was made in view of the aforesaid situation, and an object thereof is <u>to provide a can top</u> for internally pressurized can <u>which can realize high pressure resistance</u> with a simple construction <u>and which can reduce the volume of raw material used</u>." *Id* *(emphasis added)*. In other words, the purpose of the invention is to increase strength and decrease the amount of metal used, which is exactly the same as the purpose described in Crown's patents-in-suit. "We <u>have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall</u> . . . ." '826 Patent, col 1, lns 33-55 *(emphasis added)*. (A16-27) "The can ends may be <u>economically made of thinner metal if pressure retention requirements permit because these can ends have a relatively small centre panel in a stiffer annulus</u>."



Fig. 4 of the Japanese '323 Reference
**Figure 4**

'826 Patent, col 8, lns 39-42 *(emphasis added)* (A16-27) The use of a "relatively small centre panel" for the purpose of adding strength and metal-savings is a central teaching of the '323 Reference. The '323 Reference explains, and illustrates in Figure 4 (to the right), "[i]n a case where the can tops 12a, 12b, 12b' constructed as described above [with shallow-angled walls] are rolled to the can bodies . " containing pressurized beverages, "the areas of the center panels 13a, 13b, 13b' become smaller by, respectively, areas corresponding to projected areas of the chuck panels 18a, 18b, and this reduces their pressure receiving areas, respectively, whereby axial loads acting thereon become smaller, thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance." '323 Reference, p 4-5 *(emphasis added)* (A32-41) The sequence on page 2 *(supra)* illustrates why a change in the end wall angle also results in a corresponding change in the size of the central panel This, according to Crown's patents and the '323 Reference, is what enables the use of less metal and what increases buckle resistance

The '323 Reference teaches all of the elements of Claim 13, and therefore renders the claim invalid for lack of novelty (i e , anticipation) 35 U S C § 102 (2004)

The first limitation of Claim 13 of the '826 patent is:

A metal can end for use in packaging beverages under pressure and adapted to be joined to a can body by a seaming process so as to form a double seam therewith using a rotatable chuck comprising first and second circumferentially extending walls, said first and second chuck walls forming a juncture therebetween, said can end comprising:

('826 patent, col 10 *(emphasis added)* ) (A16-27) Interpreted according to the ordinary meaning of the terms of the first limitation, the Japanese Reference clearly falls within the limitation A "double seam" refers to the overlapping metal of the can end and the can body, as illustrated in the partial images from the '826 Patent and '323 References respectively (left to right below):



*Higham Deposition*, p 493-496 (A49-52) The seaming chuck is the piece of tooling used to hold the can end onto the can body during the seaming operations Figures 2 and 7 of the '826

Patent demonstrate the relationship between the rotatable seaming chuck and the can end   '826 Patent,

Figs  2 and 7  (A16-27)



The shape of the seaming chuck is closely related to the final shape of the seamed can end   As can be

seen from the two illustrations from the patent, the final shape of the can end is limited by the seaming

chuck

*Deposition*, p  22-23, 158-159    (A236-37; A59-60)  In other words, the geometry of the can end

disclosed in the '323 Reference indicates that the seaming process necessarily used a "rotatable chuck

comprising first and second circumferentially extending walls "  '826 Patent, col  10 (*emphasis added*)

(A16-27)  The sequence below shows the illustration of the can end in the '323 Reference, the same can

end with the seaming chuck from the '826 Patent superimposed near it, and Figure 7 of the '826 Patent

The sequence illustrates the relationship between the seamed can end and the rotatable chuck   Since the

can end of the '323 Reference had a 45 degree angle on its lower wall and a roughly vertical upper wall,

the seaming chuck would necessarily have shared that shape.



The second limitation of Claim 13 is "a peripheral cover hook comprising a seaming panel

adapted to be formed into a portion of said double seam during said seaming operation "  ('826 patent,

col. 10.) (A16-27) This "peripheral cover hook" is also present in the Japanese design, but is described as a "rolled flange." Japanese '323 Reference, p. 7. (A32-41) The '826 Patent uses the terms "peripheral cover hook" and "flange" interchangeably, and the terms are used to describe a portion near the top of the chuck wall that rests on a portion of the can body before being seamed to that portion of the can body. "Fig. 5 shows the peripheral flange ... of [the] can end ... resting on the flange ... of [the] can body before formation of a double seam ...." ('826 Patent, col. 4 ; *See* Figure 5 from '826 Patent below.) (A16-27) The Japanese Reference discloses this limitation explicitly (refer to Figure 4 of Japanese '323 Reference below): "The can end 12b concentrically has a centre panel 13b constituting the centre part of the can end 12b, a chuck wall 15b having seaming flange 14b to be to be seamed and bonded with the can body 17b at the circumferential edge part, and also a chuck wall radius 16b." (Japanese '323 Reference, (*emphasis added*); See Figure 4 of Japanese Reference below.) (A32-41)



The third limitation of Claim 13 of the '826 Patent is "a central panel." ('826 Patent, col. 10.) (A 16-27) The Japanese Reference explicitly refers to a "centre panel," shown in part 13b of Figure 4 (to the right and above). The "central panel" of the '826 patent (marked as 26 in the figure below and to the left) is the same feature as the "centre panel" (marked as 13b on Fig. 4 of the Japanese '323 Reference below).

The fourth and final limitation of Claim 13 of the '826 Patent is as follows:

A wall extending inwardly and downwardly from said cover hook, a first portion of said wall extending from said cover hook to a first point on said wall, said first wall portion

14

adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall, a second portion of said wall extending from said first point to a second point forming a lowermost end of said wall, a line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle between 30° to 60°

'826 Patent, col 10 (A16-27)

Fig 4 of the Japanese Reference



Combination of Japanese Reference's End with seaming chuck from the 826 Patent



Fig 7 of the 826 Patent



Whereas the first limitation of Claim 13 discusses the first and second walls of the rotatable chuck, this element describes the analogous two "portions" of the can end wall  Due to the nature of the seaming process (and as shown above), the angle created by the upper and lower wall portions of a can end necessarily approximates the angle created by the upper and lower wall portions of the chuck  Therefore, the only additional limitation of this element (over the first element) is the range of angles for the bottom portion of the end wall   "[A] line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle between 30° to 60°."  Id (A27)  The Japanese '323 Reference discloses end wall angles of between 20 and 70 degrees for the end prior to seaming ("It is made clear from the results of experiments that the inclined angle θ of the chuck panels 18a, 18b preferably ranges from 20 to 70 degrees")  Japanese '323 Reference, p  5  (A36)  Figure 4 and Table 2 from the Japanese '323 Reference clearly illustrate and describe a seamed can end with a 45 degree 'chuck panel" which corresponds with the 'line extending between said first





and second points" from Claim 13   Japanese '323 Reference, pp  6, 8; '826 Patent, Claim 13   (A37-39; A27)

  After numerous claim rejections by the patent examiners in light of the Japanese '323 Reference (as well as other references), Crown's final response to the rejection of Claim 13 included a crucial "misstatement" about the teaching of the Japanese Reference, one that likely persuaded the examiner to distinguish Crown's "invention" from the July 21, 1982 Japanese Reference  Regarding Claims 1 and 13 of the '826 patent, Crown's patent attorney stated that "the pending claims are directed to the geometry of an <u>unseamed beverage can end</u> - - that is, a can end before it has been seamed onto a can body " (Crown's Reply Pursuant to 37 CFR § 1 111, dated August 3, 2004 (emphasis added) )  (A145-161, A154)  He continued, "<u>the Japanese Reference discloses only a can end after it has been seamed onto a can body</u> and provides no information on the geometry of the end prior to seaming " (*Id* (emphasis added) )  (A154)  It is true that the Japanese '323 Reference illustrates and describes in detail the geometry of the end <u>after</u> it is seamed to a can body, but it also clearly describes the geometry of the can end <u>before</u> it is seamed to the can body  The Japanese '323 Reference that Crown provided to Rexam in this case describes a "can top comprising a plate-like chuck panel   <u>that is to be rolled and connected</u> to a can body and a center panel   in such a manner that said plate-like chuck panel is inclined at 20 to 70 degrees " (Japanese Reference at p 1  (emphasis added) )  (A32)  The first claim of the Japanese '323 Reference is directed to:

> [a] can top comprising a plate-like chuck panel positioned between a <u>chuck wall that is to be rolled and connected to a can body</u> and a center panel constituting a central portion of said can top in such a manner that said plate-like chuck panel is inclined at 20 to 70 degrees relative to a horizontal plane

Japanese '323 Reference, p 1  (emphasis added)  (A32)  A can end that is "to be rolled and connected to a can body" is a can end that is <u>yet to be</u> rolled and connected in precisely the same way that the can end of Crown's Claim 13 covers an unseamed can end by describing it as being adapted "to be joined" to a can body  These phrases from the Japanese Reference ("to be rolled" and "to be connected"), like Claim 13's "to be joined" language, refer to an unseamed can end  (Japanese '323 Reference; '826 Patent )  (A32-41; A16-27)  "[I]s to be rolled and connected" reflects an act that is to take place in the future  *See* BBC World Service, Learning English (Roger Woodham of the UK publishing house, Macmillan Distribution

16

Ltd., and language expert discussing formation of future tenses using "is to be" plus a past participle, *available at* http://www.bbc.co.uk/worldservice/learningenglish/grammar/learnit/learnitv213.shtml and http://www.bbc.co.uk/worldservice/learningenglish/grammar/learnit/learnitv33 1.shtml    (A63-64; A65-67)    Additionally, Claim 2 of the Japanese '323 Reference refers to a "can top" in which the "chuck wall" is inclined "relative to said horizontal plane" at "about 45 degrees." Japanese '323 Reference, p. 1. (A32)    The "chuck wall" of the Japanese '323 Reference is actually the upper portion of the can end wall, label "15b" in the illustration. *Id.* at p. 7    (A38) The illustration below shows, in order, the unseamed can end of Crown's '875 Patent (Figure 4), the can end being seamed in Crown's '875 Patent and, finally, Figure 4 from the Japanese '323 Reference, which shows a seamed can end



FIG. 4            FIG. 7

The wall portion marked in blue on the three images corresponds with the "first portion" or upper wall portion or "chuck wall" portion of the can end. The seamed end of the Japanese Reference has a roughly vertical upper end wall (or chuck wall) in the same way that the right side of Figure 7 from the '875 Patent has a roughly vertical upper end wall (or chuck wall). The only way for this wall to have a 45 degree angle is for the end to have been unseamed (as in Figure 4 of Crown's '875 Patent)



*Deposition of Daniel Abramowicz, p. 124-25. Deposition of Martin Higham, p. 470.* (A69-70; A48)

        ⁷ *Deposition of Peter Moran*, p. 63. (A57) Also, Crown's designee to testify about, among other things, "general details regarding can ends and methods of making can ends sold by Crown . . ." discussed the known relationship between the angle of the seam and strength against buckling. *Crown's*

17

*Supplemental Initial Disclosures*, at p 2  (A72)  The further from vertical that the seam is oriented, the weaker the seam.

REDACTED

*Deposition*, p 619  (A74)  In other words, a 45 degree "first portion" or upper portion or "chuck wall" portion could only have been oriented that way *before seaming*

     The Japanese Reference clearly illustrates and describes a can end that would infringe Claim 13 of the '826 patent if it was made today   Using the classic test for anticipation - - "that which will [literally] infringe, if later, will anticipate, if earlier" - - the Japanese Reference unquestionably anticipates Claim 13 of the '826 Patent and therefore renders it invalid  *Lewmar Marine*, 827 F 2d at 747 (Fed Cir 1987).

     **F.    Claim 14 of the '826 Patent is Invalid Because it is Anticipated by the Japanese '323 Reference**

     Claim 14 covers "[t]he end according to claim 13, further comprising an annular reinforcing bead connected to said wall at said second point, said annular reinforcing bead connecting said wall to said central panel." (A27)  For the reasons stated above, the Japanese '323 Reference discloses each of the other elements of Claim 14  Additionally, the Japanese '323 Reference discloses an "annular reinforcing bead"  Rexam construes this term to be "an outwardly concave generally 'U' shaped groove (also called a countersink or anti-peaking bead) that is stamped or pressed into the can end, and is located inwards from the bottom of the wall (chuck wall), which encircles and supports the center panel of the can end."  *Rexam Beverage Can Company's Opening Claim Construction Brief*, p 15



Fig 4

(A76)  Crown ignores the fact that claim terms are to be given their ordinary meaning and construed in light of the specification by construing an "annular reinforcing bead" to simply be a "ring-like stiffening channel"  *Crown's Opening Claim Construction Brief Relating to Crown's Patents*, p 25  (A78)  The images to the right illustrate the "annular reinforcing



bead" from Figure 4 of Crown's '826 Patent, marked "25"  By either definition, the Japanese '323 Reference discloses an "annular reinforcing bead"  In the "Background of the Invention" section of the '826 Patent,

18

Crown describes U.S. Patent 4,571,978 ("'978 Patent") as having such a "reinforcing bead." '826 Pat.,
col. 1, lns 44-56. (A23)   Figure 12 from the '978 Patent (left) illustrates an almost identical feature to
that of the Japanese '323 Reference. (A32-41)   The table below illustrates that these are <u>both</u> the same
feature—what Crown calls an "annular reinforcing bead."

| | |
|---|---|
| '978 Patent's "annular reinforcing bead" |  |
| Japanese '323 Reference's "annular reinforcing bead" | |

The Japanese '323 Reference describes the feature as a "chuck wall radius." The prior art
reference describes how increasing the width of the feature reduces "the pressure resistance." Japanese
'323 Reference, p. 2. (A33)   A central teaching of Crown's patents is "limiting the width of the anti-
peaking bead." '826 Patent, col. 1, lns 33-35. (A23)   Crown uses "anti-peaking" bead and "annular
reinforcing bead" interchangeably.   Therefore, the Japanese '323 Reference has a feature that shares the
function and general shape as what the '826 Patent has described as an "annular reinforcing bead."
Because the Japanese '323 Reference includes an "annular reinforcing bead," as well as all of the other
limitations of Claim 14 (as described above), the Reference anticipates Claim 14 of the '826 Patent.

G.    **Claim 32 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference**

If the claim terms of Claim 32 of the '875 patent are construed according to their ordinary
meaning, the claim is anticipated and therefore invalid.   The Japanese Reference meets every limitation of
the method claim and therefore anticipates it.   A person of "ordinary skill in the art" would understand
that even the portions of the method that are not explicitly described in the Japanese Reference are
inherently disclosed because of the nature of the seaming process.   Because such a person would know
that the can end disclosed in the Japanese Reference would necessarily be seamed according to claimed
method 32, the patent claim is anticipated by the Japanese Reference.   "A prior art reference anticipates a
patent claim if the reference discloses <u>either expressly or inherently</u>, all of the limitations of the claim."

19

*EMI Group North America, Inc. v. Cypress Semi-Conductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001) (emphasis added). "Under the principles of inherency, if a structure in the prior art necessarily functions in accordance with the limitations of a process or method claim of an application, the claim is anticipated." *In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986); *see also Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 46 L. Ed. 968, 22 S. Ct. 698 (1902) (noting that a prior art device anticipates a later process if device carries out process in normal operation).

Claim 32 of the '875 Patent is a method claim directed to:

A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation and (ii) a circumferentially extending wall comprising first and second portion, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location to a second location on said wall, said second wall location being the lowermost point of said wall, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising a first circumferentially extending wall, said chuck first wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°, said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.

'875 Patent, col. 13 (A14.)

The structure described in the Japanese '323 Reference "necessarily functions in accordance with the limitations of [the] process or method claim of [the '875 Patent]," so therefore, "the claim is anticipated." *In re King*, 801 F.2d at 1326 (Fed. Cir. 1986). Method Claim 32 describes the process of

20

double-seaming a can end onto a can body   Taking the ordinary meaning of the first limitation of Claim 32 (limitation "a" from the claim language), the claim requires that the method of double-seaming a can end to a can body comprises a can end with a peripheral cover hook that becomes a part of the double seam; an end wall comprising a top portion adapted to become another part of the double seam during the seaming operation; and a lower portion that extends from the bottom of said top portion to the lowermost point of the wall, wherein a straight line extending from the bottom of the bottom portion to the bottom of the top portion is inclined between 20 and 60 degrees

The Japanese '323 Reference consists of an upper and lower wall portion, with the upper wall portion adapted to make up a portion of the double seam and the lower portion being inclined to an angle of between 20 and 70 degrees ("a plate-like chuck panel positioned between a chuck wall that is to be rolled and connected to a can body and a center panel constituting a central portion of said can top in such a manner that said plate-like chuck panel is inclined at 20 to 70 degrees relative to a horizontal plane ")

Japanese '323 Reference, p 1   (A32)   As stated earlier, the Japanese '323 Reference clearly discloses an unseamed can end, as well as one that is seamed (as illustrated in Figure 4 below and described in Table 2)

Table 2 of the Japanese Reference

| [2] Results of experiments on carbonated beverage can | | | | |
|---|---|---|---|---|
| [can body diameter 65.35mm] | | | | |
| | Plate thickness (mm) | Pressure resistance (Kg/cm²) | Diameter of chuck wall radius (mm) | Inclined angle of chuck panel | Shape of center panel |
| Prior art top | 0.32 | 7.8 | 61.00 | – | Fig. 2 |
| Improved top No. 1 | 0.32 | 8.5 | 52.50 | 45° | Fig. 4 |
| Improved top No. 2 | 0.28 | 7.2 | " | " | Fig. 4 |
| Improved top No. 3 | 0.32 | 9.1 | " | " | Fig. 5 |
| Improved top No. 4 | 0.26 | 6.7 | " | " | Fig. 5 |

Fig. 4 of the Japanese Reference



Figure 4

In other words, the Japanese '323 Reference describes an unseamed can end with a lower end wall inclined at between 20 and 70 degrees   Also, by knowing the angle of the lower end wall on the seamed can ends of Figure 4 and Table 2, a person of ordinary skill in the art would know the angle of the lower end wall prior to seaming   Though the upper end wall bends upward during seaming, lower end walls do not "reform" during the seaming process

21

*Crown employee Peter Moran*, p. 157-58    (A58-59)  This is because of the intimate fit between the

rotatable seaming chuck and the unseamed can end

    *Id* at p. 52-54   (A54-56)  Therefore, a person of ordinary skill in the art would

know that the '323 Reference discloses a lower end wall (as Claim 32 requires) inclined at between 20

and 60 degrees prior to seaming because; first, the Japanese '323 Reference explicitly describes an

unseamed end with a lower wall inclined between 20 and 70 degrees, and second, a person of ordinary

skill in the art understands that a seamed can end with a lower end wall inclined at 45 degrees would

necessarily have had a lower end wall inclined at near 45 degrees (certainly between 20 and 60 degrees)

prior to seaming

    Taking the ordinary meaning of the terms of limitation "b" of Claim 32, the limitation requires

that the "cover hook" of the can end be rested on the flange or cover hook of the can body  Similarly, the

Japanese '323 Reference describes and illustrates that "[t]he can top <u>12b</u>

comprises concentrically a center panel <u>13b</u> constituting a central portion

of the can top <u>12b</u>, a chuck wall <u>15b</u> having an outer circumferential edge

portion thereof, <u>a rolled flange 14b which is rolled and secured to the</u>

<u>can body 17b</u> and a chuck wall radius <u>16b</u> "  Japanese '323 Reference, p

3-4  (A34-35)



    The Japanese Reference inherently discloses to one of ordinary skill in the art limitation "c" from

Claim 32  Taking the ordinary meaning of limitation "c", the limitation simply consists of a rotatable

chuck (used for seaming) comprising an upper and lower wall portion, with the upper wall portion being

substantially cylindrical



Fig  4 of the Japanese Reference          Combination of Japanese
                                          Reference's End with
                                          seaming chuck from the
                                          '826 Patent



Fig  7 of the '826 Patent

RLF1-3108785-1

(JP Reference; '875 Patent, Fig 7) (emphasis added)  (A32-41; A6)  The method of forming a double

seam has been well known in the beverage can industry  Figure 1 of the '875 Patent (below) depicts a

prior art seaming apparatus that includes a rotatable chuck at the point marked #5  Indeed, Crown

described it as a "diagrammatic sketch of <u>known</u> apparatus for forming a

double seam "  ('875 Patent, col. 2, lines 45-47) (emphasis added).  (A8)



Prior Art depicted in the '875 Patent

FIG. 1
PRIOR ART

*Moran*, p.

161-162.  (A61-62)

*Deposition of Martin Higham*, p. 494-96.  (A50-52)  Crown's '875

Patent's specification says that the method of seaming the new can end is performed "using apparatus as

described with reference to [prior art] Figure 1 "  '875 Patent, col. 4, lines 48-50  (A9)  The method of

Crown's invention is not different from the traditional method of seaming at all  Only the can end wall

angles and the corresponding angles of simple wear parts on the traditional seaming equipment are

different.

CCS0071061-106, CCS0071073  (A79-124, A91)  Because of these basic

seaming principles and the principles described above regarding the seaming chuck/can end fit, a person

of ordinary skill in the art would understand that the method of seaming used to seam the can ends in the

Japanese '323 Reference would necessarily have used a seaming chuck as the claim limitation describes

Limitation "d" of Claim 32 (see page 16. *supra*) requires that the rotatable chuck referred to in

limitation "c" be brought into engagement with the can end that is to be seamed  The rotatable chuck

necessarily has to engage with the can end in order to perform the seaming process  For the reasons

stated above, outside of the angles on the wear parts, the seaming process would have been the same as

with the traditional can ends  In order to seam a can end to a can body, the seaming chuck is necessarily brought into engagement with the can end  Because engagement between the seaming chuck and the can end is a necessary step in double-seaming, the Japanese '323 Reference (which includes a double-seam) meets limitation "d "

Limitation "e" of Claim 32 occurs by placing one or more seaming rolls into contact with the peripheral cover hook or the flange of the can end while the can end rotates so as to deform the upper portion of the can end wall upward  In this way, it creates a double seam between the flanges of the can body and the can end  The upper portion of the can end wall is bent during this operation upward by at least about 16 degrees and the lower wall portion remains inclined between 20 and 60 degrees  The Japanese Reference necessarily discloses the method of limitation "e "

First, even the '875 Patent recognizes that the seaming apparatus (except for the angle requirements) was known in the art  Figure 1 from the '875 Patent (shown below) illustrates what the patent describes as "a diagrammatic sketch of <u>known apparatus for forming a double seam</u> " '875 Patent, col  2, lines 45-46  (A8)  Figure 7 is an illustration of an embodiment of the '875 Patent during the final stage of the seaming operation  *Id*  at lines 57-58  Figure 4 shows the seamed Japanese can end, necessarily seamed according to the "known" method for the reasons stated above



Prior Art depicted in the '875 Patent

Fig 4 of the Japanese Reference

Fig 7 of the '875 Patent

Second, the upper portion of the can end described in the Japanese Reference must necessarily bend upwards by at least 16 degrees  The unseamed Japanese can end starts with an upper portion (called a "chuck wall" and marked as 15b in the Japanese '323 Reference) inclined at 45 degrees  Japanese '323 Reference, p  1  (A32)  The final orientation of the angle is roughly vertical, which is illustrated in Figure 4 of the Japanese '323 Reference and is customary in the industry (due to the strength issues described

24

earlier)   Forty-five degrees minus zero degrees (from vertical) equals total "bending upwards" of the upper portion (chuck wall) by 45 degrees, which is "at least about 16 degrees" during seaming

Finally, the claim requires that a line drawn from the lowermost point of the lower portion of the can end creates a line that is between 20 and 60 degrees from vertical after seaming   The Japanese Reference very clearly illustrates and describes a seamed can end with a lower end wall that has a lower wall portion ("chuck panel") angle of 45 degrees to the horizontal (which is also 45 degrees to vertical)   The 1982 reference's wall angle (45 degrees) falls well within the claim range of 20 and 60 degrees.

Fig 4 of the Japanese Reference

Table 2 of the Japanese Reference



Figure 4

| (2) Results of experiments on carbonated beverage cans (can body diameter 65.33mm) | | | | | |
|---|---|---|---|---|---|
| | Plate thickness (mm) | Pressure resistance (kgf/cm²) | Diameter of chuck wall radius prov. | Incline angle of chuck panel | Shape of center panel |
| Prior art top | 0.32 | 1 6 | 61 00 | - | Fig 2 |
| Improved top No. 1 | 0.32 | 9 5 | 53 16 | 45 | Fig. 4 |
| Improved top No 2 | 0.31 | 7.2 | " | " | Fig. 4 |
| Improved top No 3 | 0.31 | 9.1 | " | " | Fig 5 |
| Improved top No. 4 | 0 24 | 6 7 | " | " | Fig. 5 |

Japanese '323 Reference, Figure 4 and Table 2   (A37;
A40)

Because the Japanese Reference describes each limitation of Claim 32 of the '875 Patent, "either expressly or inherently, in a single prior art reference," the claim is anticipated and therefore invalid under 35 U S C  § 102(b)  *In re Schreiber*, 128 F 3d 1473, 1477 (Fed Cir 1997)

25

II.    Claim 33 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference

Claim 33 of the '875 Patent is a dependent claim that adopts each of the limitations of Claim 32 and simply adds a limitation  "The method according to claim 32, wherein said line between said first and second locations on said wall of said can end is inclined between about 30° and 50° with respect to said axial centerline of said can end prior to performing said seaming operation " '875 Pat , col 13, lns 46-50  (A14)  In other words, the claim simply narrows the range of angles for the lower portion of the can end wall before seaming

As stated above, the "chuck panel" (lower end wall) of the Japanese '323 Reference is described as being inclined generally between 20 and 70 degrees prior to seaming  More specifically, the seamed can end illustrated in Figure 4 and described in Table 2 has a "chuck panel" inclined at 45 degrees after seaming, which means that the angle before seaming would be close to that angle, because only the upper portion of the can end wall is designed to bend upwards during seaming

*Deposition of Peter Moran*, p  157-158   (A58)

Because each of the other claim limitations are the same as those of Claim 32, Claim 33 is anticipated for the same reasons

A.    Claim 34 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference

Claim 34 is simply "[t]he method according to claim 33, wherein during said seaming operation at least a portion of said can end wall first portion is reformed by bending upward by an angle of at least about 26° "  '875 Pat , col 13, lns 55-58  (A14)  For the reasons stated above, the Japanese '323 Reference discloses a can end wherein the first portion (upper portion or "chuck wall") changes from 45 degrees prior to seaming to roughly zero degrees after seaming, meaning it "bends upwards" by roughly 45 degrees, which is "at least about 26° "

B.    Claim 50 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference

Claim 50 states:

26

A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation, (ii) an annular reinforcing bead, and (iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall and said reinforcing bead forming a transition therebetween;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can while said can end rotates so as to deform said seaming panel of said cover hook and to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation

'875 Patent, col 15 (A15)

Claim 50 is very similar to Claim 32. The only differences are the addition of the extra limitation "annular reinforcing bead" and the omission of the limitation that the first wall portion be "bent upwards by at least about 16 degrees" during seaming. Since the specifications of the '826 and '875 Patents describe annular reinforcing beads in identical ways, this annular reinforcing bead is present in the Japanese '323 Reference as described above in the section related to Claim 14 of the '826 Patent. The only other meaningful difference is the absence of the requirement that the can end be bent upwards by "at least about 16 degrees" during seaming. Each of the other limitations are met as described in the section related to Claim 32. Because each element of Claim 50 was disclosed in the Japanese '323 Reference either expressly or inherently, the claim is anticipated and, therefore, invalid.

### C.    Claim 51 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference

Claim 51 covers "[t]he method according to claim 50 wherein a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°." '875 Pat, col 15, lns 42-45 (A15) For the same reasons described in the section about

Claim 50, the Japanese '323 Reference discloses each of those elements of Claim 51. For the reasons previously stated in the section related to Claim 32, the Japanese '323 Reference also teaches the additional element of bending the upper wall portion ("chuck wall" from the Japanese '323 Reference) upwards by "at least about 16°" during seaming. Because each element of Claim 51 was disclosed in the Japanese '323 Reference either expressly or inherently, the claim is anticipated and, therefore, invalid.

**D.    Claim 52 of the '875 Patent is Invalid Because it is Anticipated by the Japanese Reference**

Claim 52 states "[t]he method according to claim 50, wherein said line extending from said first location to said transition is inclined between about 30° and about 50° with respect to said axial centerline of said can end both before and after performing said seaming operation." '875 Pat., col. 15, lns 46-50 (A15). For the reasons previously discussed as to why the Japanese '323 Reference anticipates Claims 32, 33 and 50, the Japanese '323 Reference anticipates Claim 52.

**E.    Claims 32, 50 and 51 of Crown's 875 Patent are Anticipated by the Dynamic III Can End and the Method of Seaming the Dynamic III Can End**

One of Rexam's predecessor company's was known as National Can Company. National merged with American Can becoming American National Can and, eventually, the company was purchased by Rexam. *Declaration of Timothy Turner*, p.1 (A201-234, 201). National Can Company sold millions of can ends known as the Dynamic III can end during the 1970s and early 1980s. *Id.*, p 1-2 (A201-202). Along with Dynamic III was a seaming chuck that fit the geometry of the can end. *See Engineering Drawing of Seaming Chuck* at REX056553; *See also Chuck Fit Digitizations* at REX056559 and REX056562 (A206; A212; A215). Because these sales and public use of the Dynamic III can end and the method of seaming it were used in the United States more than a year prior to May 24, 1995, Crown's earliest filing date, Dynamic III can ends and the method used for seaming them to can bodies is prior art under 35 U.S.C. Section 102(b).



Tim Turner, current Rexam employee and former National Can employee, has worked with Rexam and National's can ends, including Dynamic III and has firsthand knowledge of the can end's geometry and the method of seaming the can end. *Turner*

28

*Declaration*, p 1-2 (A201-202) The Dynamic III can end was made according to specifications that called for an approximately 25° can end wall *Id* Accordingly, the specifications for the seaming chuck were designed to closely match the shape of the can end *Id* To confirm the geometry of the can end and the seaming chuck, Rexam's engineers recently performed numerous tests Old Dynamic III can ends (both seamed and unseamed) were analyzed using an autocad system *Id* The angles corresponded with the expected numbers based on National Can's tooling drawings Additionally, because Rexam was no longer in possession of the seaming chucks used to seam the Dynamic III can end, Rexam's engineers contracted with Gage Grinding of Cary, Illinois to make a seaming chuck based on the old specifications *Id* The angle of the seaming chuck wall closely matched the angle of the seamed and unseamed Dynamic III can end. *Id*, REX056553, REX056559 and REX056562 (A206; A212; A215) The lower wall portion (above the annular reinforcing bead) was inclined at approximately 25 degrees (the angle varied by a few degrees) *See Tooling Drawing* at REX056557; *Digitization* at REX056560 (A210; A213)

The document labeled as REX056557 (A210) depicts a piece of tooling from the final stage of the equipment that forms and refines the end before the seaming operations The 25 degree wall of the tooling die closely corresponds with the angle of the wall of the unseamed can end The document labeled REX056552 (A205) is a computer depiction of that piece of tooling forming the approximately 24 degree angle on the can end wall REX056559 (A212) is an accurate depiction of the fit between the specially-designed seaming chuck and the Dynamic III can end

The animated seaming sequence accurately illustrates the seaming operations that were used to seam the Dynamic III can end throughout the 1970's and early 1980's *Declaration of Timothy Turner*, p 2 (A202) The Dynamic III can end had a peripheral cover hook, a can end wall extending inwards from the peripheral cover hook, an annular reinforcing bead and a central panel



The can end wall was inclined at between 20 and 60 degrees before seaming and it remained inclined between 20 and 60 Additionally, the upper portion of the can end wall was "bent upwards by at least

29

about 16°" by virtue of reforming from approximately 25 degrees to approximately 5 degrees during the seaming operation (roughly 19 degrees)  Because the method of seaming the Dynamic III can end met each and every limitation of Claim 32, 50 and 51 of Crown's '875 Patent, the '875 Patent is anticipated and, therefore, invalid  Documents are attached to verify that Dynamic III was sold to customers (REX074194-196) (A224-226), that it was commercialized and that testable versions exist and have been produced to Crown (REX074248-254 and REX056582) (A227-233; A234), that the tooling matches Rexam's asserted descriptions (REX056553-558) (A ), and that the can end and the method of seaming fit the description in Crown's Claim 32 (REX056561-562 and REX049819)  (A214-215; A204)

### F.    Crown's Asserted Claims are Obvious in Light of the Prior Art

Each of Crown's asserted claims is obvious because the subject matter of each "could readily be deduced from publicly available material by a person of ordinary skill in the pertinent field of endeavor . "  *Bonito Boats, Inc  v  Thunder Craft Boats, Inc* , 489 U S  141, 150 (1989)  As described above, Claims 13 of the '826 Patent and Claims 32-34 and 50-52 of the '875 Patent are anticipated by the Japanese '323 Reference  If the Court determines that summary judgment of invalidity is not appropriate based on anticipation of Crown's asserted claims by the Japanese '323 Reference, the Court should still find that Crown's claims would have been obvious to one of ordinary skill in the art at the time of Crown's filing of the patent applications  Any limitations deemed to be missing from the Japanese '323 Reference would have been well known to those of skill in the art at the time of the earliest filing date of the patents-in-suit, May 24, 1995  The claimed subject matter would have been "readily deduc[ible]" based on the prior art and on the knowledge of those of skill in the art  The asserted claims are therefore invalid due to obviousness

### G.    Claim 13 of the '826 Patent

As described above, Claim 13 of the '826 Patent is unique from traditional can ends only in the fact that the angle of the lower portion of the can end wall was shallower (further from vertical) than the angle of most industry ends  If the Court determines that the Japanese '323 Reference did not, for example, disclose to a person of ordinary skill in the art a can end with a lower wall portion inclined at between 30 and 60 degrees, the Japanese '323 Reference would still provide more than sufficient

motivation to design an end with that geometry. Crown's very own '826 Patent describes various pieces of prior art as having every component of Claim 13 outside of the proper angles. The "Background of the Invention" section of Crown's '826 Patent describes the first piece of prior art, U.S. Patent 4,093,102, as teaching can ends "comprising a peripheral cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall and a central panel joined to an inner wall of the reinforcing bead by an annular outwardly convex bead." '826 Pat., col. 1, lns. 20-25. (A23) Crown's patent explains that this end teaches "chuck wall slope[s]" of between "14° and 16°." Id. at ln. 29. (A23) One piece of prior art, according to the '826 Patent, teaches chuck wall angles of "between 12° and 20°" and, still another, teaches chuck wall angles of "approximately 24 degrees." Id. at lns. 39-43. (A23) Those are just the cited pieces of prior art. As described above, the Dynamic III can end manufactured and sold by National Can during the 1970's and 1980's also had a can end wall with angles of greater than 20 degrees.

Even assuming that the Japanese '323 Reference does not adequately describe the geometry of an unseamed can end prior to seaming (which it does for the aforementioned reasons), the Reference clearly provides the motivation and the teaching to make ends with greater angles than those mentioned in Crown's cited prior art. The demonstrative illustration to the right indicates the very simple concept taught by the Japanese '323 Reference.



Regarding the end wall angle, the Japanese '323 Reference explains that "[p]referably, this inclined angle θ ranges from 20 to 70 degrees." Japanese '323 Reference, p. 3. (A34) But the reference does not simply state a range of angles without enunciating the purpose. To the contrary, the reference very clearly describes the strength and metal-saving implications of adjusting the wall angle of the prior art end. The '323 Reference explains and illustrates in Figure 4 (to the right), "[i]n a case where the can tops 12a, 12b, 12b' constructed as described above [with shallow-angled walls] are rolled to the can bodies … " containing pressurized beverages, "the areas of the center panels 13a, 13b, 13b'



Figure 4

31

become smaller by, respectively, areas corresponding to projected areas of the chuck panels 18a, 18b, <u>and this reduces their pressure receiving areas</u>, respectively, whereby axial loads acting thereon become smaller, <u>thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance</u> " '323 Reference, p. 4-5 *(emphasis added)*  (A35-36)

Can ends that were described in the prior art, according to Crown's '826 Patent, had can end walls of at least "approximately 24 degrees." '826 Pat., col. 1, ln. 40  (A23) A person of ordinary skill in the art would have found the change of the angle from "approximately 24 degrees" to "between 30 and 60 degrees" to be obvious in light of the Japanese '323 Reference's clear teaching about the strength and metal-savings benefits of using such angles

Though Crown has touted its commercial success in selling SuperEnd,



In other words, Crown's end doesn't drive the market  To the contrary, the can ends don't drive sales, but can drive customers away



\* \* \* \* \* \* \* \* \*



*Deposition of John Conway. p. 38, 193-194*  (A126; A129-130)



CCS0059945-953, CCS00599945  (A131-139; A131)  Other Crown documents make clear that

Coke, while discussing SuperEnd, is



CCS0066621 *(emphasis added)*  (A140)

CCS0070576-79, 77  (A141-144; A142)



*Id* (emphasis

added)  CCS0070576-79, 77  (A141-144; A142)

All of this means that Crown's use of its SuperEnd in great quantities does not indicate

that the product is commercially successful

For

all of the foregoing reasons, Claim 13 of the '826 Patent would have been obvious to those of

ordinary skill in the art at the time of filing

RLF1-3108785-1

### H.    Claim 14 of the '826 Patent

For the same reasons that Claim 13 would have been obvious to a person of ordinary skill in the art at the time Crown filed its patent application, so too would it be obvious to have added the limitation of an "annular reinforcing bead." The prior art can ends referred to in the "Background of the Invention" section from the '826 Patent contain "annular reinforcing beads." '826 Pat., Col. 1. (A23) Modifying the can ends cited in that section of Crown's patent based on the preceding argument (related to Claim 13) would not remove those annular reinforcing beads. Therefore, for the same reasons cited above, Claim 14 would have been obvious to those of ordinary skill in the art at the time of filing.

### I.    Claim 32 of the '875 Patent

Crown's '875 Patent simply discusses (and claims) well known methods of seaming, with the exception of the angle of the can end walls and the corresponding angles of the



CCS0071061-106, CCS0071073    (A79-124; A91)    Because the geometry of the can end would have been obvious (as stated above regarding Claims 13 and 14 of the '826 Patent), so too would the method of seaming that end be obvious.    A person of ordinary skill in the art would have known how to change the wall angles of the "rotatable chuck" and "seaming rolls" because of the knowledge about the relationship between the can end wall and the seaming tooling. *See p. 22-24 supra.* The method according to Claim 32 would have been obvious to those of ordinary skill in the art because the geometry of the end would have been obvious and the method of seaming would be the same but for the obvious and "easy" changes to the "wear parts." The Dynamic III can end and the method of seaming it (described above) also demonstrates the knowledge that a seaming chuck must fit the shape of a can end. On a can end with an end wall inclined at between 30 and 60 degrees (as would have been obvious), the upper wall portion would bend upwards by almost that much because of the conventional angle of roughly vertical (4 degrees) for that portion of the wall. Also, because the lower portion does not reform, it would remain

inclined between 30 and 60 degrees                                            *Deposition of Peter*

*Moran*, p. 157. (A58) The same "commercial success" problems as previously stated would apply to

Claim 32 as well.

J.    Claim 33, 34 and 50-52 of the '875 Patent

Claim 33, 34 and 50-52 of the '875 Patent would have been obvious to a person of ordinary skill

in the art for the same reasons that Claim 32 would have been obvious. The geometry of the can end

would have been obvious and the "easy" changes to the seaming "wear parts" would have been obvious,

thereby rendering each of the claims obvious as of the time of Crown's earliest filing date, May 24, 1995.

K.    Crown's Written Description Does Not Adequately Support Claims Covering
       A Can End Without An Annular Reinforcing Bead

Crown's Claim 13 of the '826 Patent and Claim 32, 33, and 34 of the '875 Patent are invalid for

failure to comply with the written description requirement of 35 U.S.C. § 112, para. 1. These asserted

claims are differentiated from the other claims of their respective patents in that they have been drafted so

as to remove the "annular reinforcing bead" limitation. However, the specification (necessarily the same

for both patents since both are continuations from the '634 Patent) demonstrates that the applicant was not

in "possession" of a can end that has each of the other limitations (e.g. 30° to 60° end wall), but does not

have an "annular reinforcing bead".

The parent patent's "abstract" (or brief summary of the invention located on the cover page)

makes clear that Crown considered its invention to include a particular kind of "annular reinforcing

bead":

> A can end comprising a peripheral cover hook, a chuck wall dependent from the interior
> of the cover hook, an outwardly concave annular reinforcing bead extending radially
> inwards from the chuck wall, and a central panel supported by an inner portion of the
> reinforcing bead, characterized in that, the chuck wall is inclined to an axis perpendicular
> to the exterior of the central panel at an angle between 20° and 60°, and the concave
> cross-sectional radius of the reinforcing bead is less than 0.75 mm

'634 Patent, p.1. (A186) Later in the specification, the inventors explain that their modified

chuck is "designed to drive initially on the relatively large chuck wall ... without entering

deeply into the anti-peaking bead ..." '634 Patent, col. 4, lines 25-28. (A192) Indeed, each

figure illustrating the "invention" includes such an "annular reinforcing bead".



Fig. 4 of the '634 Patent

Fig 4

Table from the '634 Patent

| d5 | overall diameter (as stamped) | 65.43 mm |
|---|---|---|
| d4 | PC diameter of seaming panel radius | 61.54 mm |
| d3 | PC diameter of seaming panel/chuck wall radius | 59.91 mm |
| $r_1$ | seaming panel/chuck wall radius | 1.27 mm |
| $r_2$ | seaming panel radius | 5.56 mm |
| | | |
| | | |
| | | |
| | overall height | 1.52 mm |
| | | |
| $h_2$ | outer wall height | 1.78 mm |
| e | chuck wall angle to vertical | 41 |

'634 Patent, p. 3, and col. 3, lines 52-64 (emphasis added)  (A192)

Describing a specific embodiment of the "invention," the applicants admitted that "[a]lthough this example shows an overall [can end] height $h_2$ at 6.86 mm, we have also found that useful can ends may be made with an overall height as little as 6.35 mm." ('634 Patent, col. 4)  (A192)  In other words, the inventors found can ends to be "useful" only when they had an overall height of 6.35 mm or greater. Since the "height to the top of the anti-peaking bead" (meaning the total height of the can end minus the height of the anti-peaking bead) was 5.02 mm in the example with "typical" dimensions, the depth of the anti-peaking bead would have been roughly 1.84 mm (6.86 mm – 5.02 mm)  Without an anti-peaking bead, the overall height of the can would be 5.02 mm, far under what the inventor had found to be "useful." As a matter of fact, a can end as described without the annular reinforcing bead would have a height more than 20% ((6.35 mm – 5.02)/6.35 mm = 20.9%) less than what the inventor described as a "useful" can end height. Moreover, if the other dimensions were adjusted to make the height greater without an annular reinforcing bead, the chuck wall angles would be greatly altered, with unpredictable results based on the inventors' own arguments to the patent examiner:

> In rejecting claim 1 over Kraska, the Examiner has failed to appreciate that the selection of wall angles of the can end is critical to the overall strength of the can end, and that relatively small changes in angle can radically affect the performance of the can end. Even Kraska recognizes that "all of the parameters or dimensions of the respective portions which form a countersink 20 are critical and are interrelated to each other to optimize the maximum pressures that the end is capable of withstanding without buckling or rocking."

('634 File History, Response to Office Action, dated September 16, 1999, (quoting '843 Patent, col. 4, lines 19-24 *emphasis added*))  (A196-200)  The inventors adopted the '843 reference's criticality argument for the purpose of limiting the teaching of its angle to one specific embodiment. Crown has since taken the opposite track, ignoring the fact that "critical" parts of the "invention" as described in the

36

'634 Patent are missing from the ultra-broad Claim 13 of the '826 Patent and Claims 32 - 34 of the '875 Patent (A186-195) If Crown had "possessed" a can end without an annular reinforcing bead, Crown's specification would have mentioned it, especially in light of the criticality of "all of the parameters or dimensions" involved in maintaining strength

Various points in the text of the '634 Patent suggest the necessity of the annular reinforcing bead to the applicant's invention For example, in describing the invention, the applicant stated, "We have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall and limiting the width of the anti-peaking bead " (Id, Col 1, lines 33-35) (A191) Later, in an attempt to describe an advantage of the invention, the applicant noted that "the modified chuck is designed to drive initially on the relatively large chuck wall without entering deeply into the anti-peaking bead " (Id, Col 4, lines 59-61) (A192) Each of these statements presupposes the existence of an "annular reinforcing bead."

Furthermore, the name of the element itself, "annular reinforcing bead," suggests that Crown's stated goal of metal savings while retaining strength could not be achieved in its absence Interchangeably used throughout the specification are different terms for the "annular reinforcing bead," such as "anti-peaking bead," "outwardly concave reinforcing bead," "reinforcing bead," "outwardly concave anti-peaking bead," and "countersink " Though the patent specification and file history are replete with statements about the importance of the "annular reinforcing bead" by one name or another, nothing in the specification suggests that the inventor was in possession of a beadless can end that had the requisite limitations such as the claimed chuck wall angles and the strength necessary to adequately contain carbonated beverages Additionally, the only available inventor of the Crown patents testified that he did not consider the invention to include a can end without a "countersink " (Hinton Deposition, page 282) (A163)

While Claim 13 of the '826 Patent and Claims 32 - 34 of the '875 Patent are broad enough to cover a can end containing an annular reinforcing bead, the doctrine of claim differentiation demands that those claims also cover a can end that does not have an annular reinforcing bead If this were not the

37

case, the claims would be "essentially redundant" of earlier claims in their respective patents  *Compare* Claim 13 and Claim 1 of the '826 Patent; *see Lizardtech*, 424 F 3d at 1344

Because the specification of the Crown patents could not possibly demonstrate that the applicants were in possession of beadless can ends meeting the other limitations of their alleged invention, Claim 13 of the '826 Patent and Claims 32, 33, and 34 of the '875 Patent are invalid for failure to comply with the written description requirement of 35 U S C  § 112, para  1

## L.    INDEFINITENESS OF CROWN'S CLAIMS

In this case, the claims that Crown has asserted against Rexam contain limitations that cannot be given any reasonable meaning  Specifically, claim 13 of the '826 Patent refers to first and second wall portions and first and second "points" while the claims of the '875 Patent refer to first and second wall portions and first and second "locations "  The first and second "points" and "locations" are critical to the asserted claims because they are to define the points on the can end that are to be used to determine the angle of the second wall portion of the can end wall in order to determine whether the angle of the second wall portion falls within the range claimed (20 to 60 degrees and/or 30 to 60 degrees) in the asserted claims  However, neither the claims nor the rest of the specification provide any guidance as to where those "points" and "locations" are on the can end  Arguably, the first "point" and "location" may be determined once a seaming chuck that has two distinct angels on its outer wall configuration is placed onto the can end  However, that means that the first "point" and "location" will change depending on the geometry of the seaming chuck that is to be used

Even assuming, *arguendo*, that the first "point" or "location" could be determined, there is no way to determine where the "second point" or "second location" is located on the can end  Claim 13 describes the second point as "forming a lowermost end of said wall " ('826 Patent. Col 10, lns  58-59 ) (A27)  There is no written guidance in the specification to tell one of ordinary skill where the "lowermost end" of the wall is located  Each of the figures in the specification shows a can end that has a countersink (annular reinforcing bead)  Somewhere on the can end, the wall ends and the countersink begins, but none of the fact witnesses or experts can specifically say where that point is on the can end, at best they can offer a guess  The same argument is true for determining the "second location" in the claims of the '875 Patent  This ambiguity is further demonstrated by the language of claim 50 of the '875 Patent which

38

references a transition between the annular reinforcing bead and the circumferentially extending wall, i e , it is not clear where the wall ends and the reinforcing bead begins

If one of ordinary skill cannot determine where the second point or second location is located, he or she could not "determine whether a particular [product or method] infringes or not " *Howmedica*, 401 F 3d at 1371 (brackets in original)  This is particularly true where moving the "point" or "location" a millimeter or two can significantly change the "angle" of end wall  These limitations of the asserted claims of the '826 and '875 Patents render the claims "insolubly ambiguous" and they should be held invalid for failing to comply with 35 U S C  § 112

Similarly, Claim 32 of the '875 Patent describes the first wall portion of the can end as: "said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel "  (A14)  Here again there is no guidance or direction in the claims or the specification to determine where the first wall portion begins and the seaming panel ends  This information is critical because the claim requires that "at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16 degrees "  *Id*  There is no guidance as to where to attempt to make this determination or which portion of the wall to measure from, or how far out on the radius of the seaming panel the first wall portion extends  This is information that one of ordinary skill in the art would need in order to "determine whether a particular [product or method] infringes or not "  *Howmedica*, 401 F 3d at 1371 (brackets in original)  Each of the claims that requires determining a measurement of how much a portion of the first wall portion is bent upwards (claims 32, 33, 34 and 51) is "insolubly ambiguous" and invalid for failing to comply with 35 U S C  § 112

## CONCLUSION

The '826 and '875 Patents contain claims that cover can ends that were well known in the art long before Crown's earliest possible filing date  The Japanese '323 Reference as well as numerous others demonstrate the lack of novelty of Crown's "invention "  The same references also describe in detail the motivation for making the claimed can ends  Finally, the references gave explicit instructions on how to make such can ends and gave thorough explanations for the reason the can ends functioned properly

Crown's asserted claims should be held invalid for a lack of novelty, obviousness, and for a failure to comply with the written description requirement  As previously stated, the purpose for the

39

patent system is to create an incentive to innovate. Crown's claimed can and methods of seaming it are not new, nonobvious, adequately described or sufficiently definite. Accordingly, and for the aforementioned reasons, each asserted claim of Crown's '826 and '875 Patents (Claims 13 and 14 from the '826 Patent and Claims 32, 33, 34, 50, 51 and 52 of the '875 Patent) should be held invalid as a matter of law.

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
312-775-8000

Dated: January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
  *Attorneys for Defendant/Counterclaimant*
  *Rexam Beverage Can Co.*

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 1, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700

RLF1-3000496-1