Exhibit 7

US006129230A

# United States Patent [19]

## Turner et al.

[11]    **Patent Number:**    **6,129,230**

[45]    **Date of Patent:**    **Oct. 10, 2000**

[54]    **END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL**

[75]    Inventors:    **Timothy L. Turner**, Cary; **Randy G. Forrest**, Park Ridge, both of Ill.

[73]    Assignee:    **American National Can Company**, Chicago, Ill.

[21]    Appl. No.:    **09/215,897**

[22]    Filed:    **Dec. 18, 1998**

[51]    **Int. Cl.**[7]    ......................................... **B65D 17/34**
[52]    **U.S. Cl.**    ............................................... **220/269**
[58]    **Field of Search**    ............................. 220/269

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,952,912 | 4/1976 | Perry . |
| 3,967,752 | 7/1976 | Cudzik . |
| 4,015,744 | 4/1977 | Brown . |
| 4,024,981 | 5/1977 | Brown . |
| 4,084,721 | 4/1978 | Perry ........................................ 220/269 |
| 4,184,607 | 1/1980 | Potts . |
| 4,363,419 | 12/1982 | Walz, Sr. . |
| 4,402,421 | 9/1983 | Ruemer, Jr. . |
| 4,901,880 | 2/1990 | Tatham et al. . |
| 5,011,037 | 4/1991 | Moen et al. . |
| 5,064,087 | 11/1991 | Koch . |
| 5,219,257 | 6/1993 | Koch . |
| 5,307,947 | 5/1994 | Moen et al. . |
| 5,375,729 | 12/1994 | Schubert . |
| 5,405,039 | 4/1995 | Komura . |
| 5,555,992 | 9/1996 | Sedgeley . |
| 5,692,636 | 12/1997 | Schubert . |
| 5,738,237 | 4/1998 | McEldowney . |
| 5,860,553 | 11/1999 | Schubert ................................ 220/271 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1-308744 | 12/1989 | Japan . |
| 8-244769 | 9/1996 | Japan ...................................... 220/269 |

*Primary Examiner*—Stephen K. Cronin
*Attorney, Agent, or Firm*—Wallenstein & Wagner, Ltd.

[57]    **ABSTRACT**

A stay-on-tab container end having a panel wall with a tab attached by a rivet and having a tear panel. The tear panel being defined by a frangible score with a first end and a second end and a non-frangible hinge segment. A second groove is formed in the panel wall with a tail portion extending from the tear panel through the hinge segment. The second groove tail portion has a reduced residual differential compared to the frangible score residual. Also the tail portion includes a curved terminal end that partially surrounds the second end of the score.

**23 Claims, 3 Drawing Sheets**



U.S. Patent          Oct. 10, 2000          Sheet 1 of 3          6,129,230



FIG.1



FIG.2





6,129,230

1

# END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL

## DESCRIPTION

### 1. Technical Field

The present invention relates to end closures for two-piece beer and beverage metal containers having a non-detachable operating panel. More specifically, the present invention relates to improved characteristics of a frangible panel of the end with integral attachment of the frangible panel to prevent full detachment of the frangible panel.

### 2. Background of the Invention

Common end closures for beer and beverage containers have a central panel that has a frangible panel (sometimes called a "tear panel," "opening panel," or "pour panel") defined by a score formed on the outer surface, the "consumer side," of the end closure. Popular "ecology" can ends are designed to provide a way of opening the end by fracturing the scored metal of the panel, while not allowing separation of any parts of the end. For example, the most common such beverage-container end has a tear panel that is retained to the end by a non-scored hinge region joining the tear panel to the reminder of the end, with a rivet to attach a leverage tab provided for opening the tear panel. This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-scored segment serving as the retaining fragment of metal at the hinge-line of the displacement of the tear panel.

The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum. End closures for such containers are also typically constructed from a cut-edge of thin plate of aluminum or steel, formed into a blank end, and manufactured into a finished end by a process often referred to as end conversion. These ends are formed in the process of first forming a cut-edge of thin metal, forming a blank end from the cut-edge, and converting the blank into an end closure which may be seamed onto a container. Although not presently a popular alternative, such containers and/or ends may be constructed of plastic material, with similar construction of non-detachable parts provided for openability.

These types of "stay-on-tab" ecology container ends have been used for many years, with a retained tab and a tear panel of various different shapes and sizes. Throughout the use of such ends, manufacturers have sought to save the expense of the metal by down-gauging the metal of the ends and the tabs. However, because ends are used for containers with pressurized contents and are sometimes subject to pasteurization, there are conditions causing great stresses to the components of the end during pasteurization, transit and during opening by a user. These conditions limit the available gauge reduction of the end metal, and make it difficult to alter design characteristics of the end, such as by reducing metal gauge or the thickness of the metal residual in the score defining the tear panel.

Further, abuse during shipping, retail stocking and vending, due to rough handling of the filled containers, often causes problems with openability of the end. As an example of a problematic condition caused by handling abuse is the poor openability of a buckled container end. Due to dropping or abusive handling of filled containers, excessive pressure loads on regions of the end may cause a buckle of the end material. Such abuse, typically caused by dropping an upright container that is filled with carbonated fluid, results in a buckled end panel that deforms to form a bulge of metal of the panel.

2

The possibility of such buckling is a prevalent concern due to down-gauging of the end material, pressurization of the container, pasteurizing filled containers, environmental conditions such as excessive heat, and rough handling of pallets or cases of filled containers. In a metal container end, the buckle appears as a deformation or bulge of the metal in a region of the end panel, a condition that adversely effects the users ability to open the end. Due to the geometry of the container and the ecology end panel, buckling of the end frequently is noticeable as a bulge of the end with a buckle in the 5:00 to 7:00 range of the end (with the middle of the tear panel positioned at 6:00). This type of buckled container end very often results in opening failure and resulting problems of a user trying to open the end.

Such a buckled end usually cannot be opened properly by the user. Instead, when the user lifts the tab and applies pressure on the tear panel with the tab nose, the score fractures at the wrong locations at the wrong time, usually resulting in a dramatic loss in leverage of the tab for opening the panel. In this situation, the tab is actuated against the tear panel by lifting the finger pull end of the tab, but the tab nose passes beyond the proximal peripheral edge of the tear panel, a condition often called "tuck under" of the tab.

The tab that tucks under is, therefore, fully lifted by the user, though the tear panel is still not fully opened. In this situation, the tear panel remains attaches by a segment of the score usually at about the 5:00 to 11:00 of the tear panel (defined with the tab nose being at about the 12:00 region of the tear panel). When this condition occurs, the user often tries to open the tear panel with something other than the tab, often by applying force by an object or the user's finger. However, such attempts at completing the opening sequence of the tear panel often causes fracture of the hinge of the tear panel, causing the tear panel to open entirely and become detached from the remainder of the end. When the user applies such force, a common result is for the hinge-line region of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score. As a result, the tear panel is fully separated from the remainder of the end panel, and is usually pushed into the container. The fully detached tear panel then becomes a choking hazard or is otherwise a nuisance to the user and a potential pollutant. Therefore, there is a need for an end having design characteristics that prevents separation of the tear panel during user manipulation of ends with opening failure.

Further, with the more recent popular use of large-open ends, such problems with buckled ends is potentially greater. Because of the enlarged size and the shape of the opening panel (or tear panel), the score in certain regions of the large-open tear panel are more difficult to open by the tab leveraging against the tear panel. This is especially true for the region of the score which is in the 5:00 to 6:00 clock position. Therefore, large-opening ends may be difficult to open even when there is no noticeable sign of damage or buckle. Because of the additional force that may be required to open the large-opening tear panel with a tab, there may be more likelihood for non-specific tear of the metal away from the score. Also, because of the difficulty in opening the large-opening end, there is an increase in potential opening failure that results in "tuck tinder" of the tab. This type of opening failure also may result from the user opening the container too rapidly, not permitting proper venting of pressure from the container.

Because of these conditions, and the problem of potential tuck under of the tab and subsequent detachment of the tear

6,129,230

3

panel when a buckled end results in opening failure and the user manipulates the end to open it, there is a need for an improved end structure that prevents or inhibits the total removal of the tear panel in the situation of an opening failure.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide an end closure for a container having a circumferential sidewall and a peripheral seaming edge adapted to be integrally connected to the sidewall. The end has a central panel wall with a means for opening a frangible panel segment of the panel wall and a rivet in the central panel adapted to integrally attach a tab lever having a nose portion overlying at least a vent region of the frangible panel segment and a lift end opposite said nose. A score groove is formed in the central panel wall to define an outer perimeter of the frangible panel. The score groove has a first end adjacent the vent region and a second end joined to the first end by a curvilinear segment of the score groove, whereby the first end and the second end is separated by a generally linear hinge segment of the central panel wall. The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel. A second groove is formed in the end, having a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel.

It is also an object of the present invention to provide such an end member wherein the second groove has a curvilinear segment generally parallel an extent of the score groove. The invention further provides an end member in which the score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the score groove, such that the tail portion of the second groove is longer than the second end of the score groove.

It is another object of the present invention to provide such an end member whereby the score groove is a generally v-shaped recess having a score depth into the thickness of the central panel, and the second groove is also a generally v-shaped recess having a groove depth into the thickness of the central panel less than that of the score groove.

It is further an object of the invention to provide an end member having a curvilinear score groove with two ends separated by a hinge segment extending along a generally straight line between the two ends. A second groove is formed in the end, extending along a length that intersects the hinge segment generally transverse to the generally straight line between the two ends of the score groove.

It its yet another object of the present invention to provide an ecology end having a frangible panel with an outer score and an inner anti-fracture score, wherein the anti-fracture score has a tail portion that passes through the hinge region of the frangible tear panel. It is an object of the invention to provide an anti-fracture score that extends beyond the score groove to at least partially surround the end of the score groove.

It is further an object of the present invention to provide an ecology stay-on-tab end having a frangible panel defined by a score and first hinge region between a first and second end of the score groove, and having a second hinge region passing between a second groove and the second end of the score groove.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view of the upper side an end closure of one embodiment of the present invention;

4

FIG. 2 is a plan view of the under side of the end of FIG. 1;

FIG. 3 is a cross-sectional view along 3—3 of FIG. 1;

FIG. 4 is a plan view of the upper side of an end closure of an alternative embodiment of the present invention;

FIG. 5 is a cross-sectional view depicting the score and second groove of the present invention, with a partial sectional view depiction of the score tooling used to form the score and groove;

FIG. 6 is a plan view of the scoreline of an embodiment of the present invention;

FIG. 7 is a plan view of the scoreline of an alternative embodiment of the present invention.

## DETAILED DESCRIPTION

While this invention is susceptible of embodiment in many different forms, there is shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The container end of the present invention is a stay-on-tab end member **10** with improved opening characteristics, having structure adapted to prevent detachment of the tear panel, which potentially results from a user forcing open a damaged end with opening failure. Essentially, the present invention provides a score groove inward from the main score to guard the main score when a fracture forms in the hinge of the opening panel of the end, as explained below.

In the preferred embodiment of FIGS. 1–3, the end closure **10** for a container (not shown) has a central panel wall **12** having a seaming curl **14** for joining the wall to the container. The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum or steel, such as the common beer and beverage containers. End closures for such containers are also typically constructed from a cutedge of thin plate of aluminum or steel, formed into blank end, and manufactured into a finished end by a process often referred to as end conversion. In the embodiment shown in the Figures, the central panel is joined to a container by a seaming curl **14** which is joined to a mating curl of the container. The seaming curl **14** of the end closure **10** is integral with the central panel **12** by a countersink area **16** which is joined to the panel outer edge **18** of the central panel **12**. This type of means for joining the central panel **12** to a container is presently the typical means for joining used in the industry, and the structure described above is formed in the process of forming the blank end from a cutedge of metal plate, prior to the end conversion process. However, other means for joining the central panel **12** to a container may be employed with the present invention.

The central panel wall **12** has a displaceable tear panel **20** defined by a curvilinear frangible score **22** with an adjacent anti-fracture score **24** on the tear panel **20**, and a non-frangible hinge segment **26**. The hinge segment **26** is defined by a generally straight line between a first end **28** and a second end **30** of the frangible score **22**. The tear panel **20** of the central panel **12** may be opened, that is the frangible score **22** may be severed and the tear panel **20** displaced at an angular orientation relative to the remaining portion of the central panel **12**, while the tear panel **20** remains hingeably connected to the central panel **12** through the hinge segment **26**. In this opening operation, the tear panel

6,129,230

5

20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12.

As best shown in FIG. 5, the frangible score 22 is preferably a generally V-shaped groove formed into the public side 34 of the panel wall 12. Similarly, the anti-fracture score 24, is preferably a generally V-shaped groove 36 formed into the public side 34 of the panel wall 12 on the tear panel 20. As is explained in more detail below, the score groove 32 is preferably deeper than the anti-fracture score groove 36. Accordingly, the score residual 38, being the amount of frangible material remaining below the score groove 32, is greater than the adjacent anti-fracture score residual 40. This difference between score residual 38 and adjacent anti-fracture score residual 40 is the score residual differential.

The score 22 and the second groove or anti-fracture score 24 are formed using conventional-type of scoring operation during the can end conversion process, using a tools that include an upper (public side) die with a score knife and a lower (product side) die with an anvil surface. As is partially shown in cross-section view in FIG. 5, the upper die 35 is applied to the public side 34 of the end wall 12 to form the V-shaped groove 32 of the score 22 and the V-shaped groove 36 of the second groove 24 on the tear panel 20.

The score residual differential is adapted to provide a tear panel 20 with a score 22 more readily frangible than the anti-fracture score 24, a significant factor for providing efficient opening of the end member 10. Having a double score comprised of a frangible score 22 and an anti-fracture score 24 wherein there is a score residual differential is common in the industry. The common types of end members have a differential maintained generally constant throughout the length of the score 22 and anti-fracture score 24. For example, if the score residual differential of commonly-used ends is set at approximately 0.002 inch, then that differential is maintained along the entire length of the double score, that is, along the entire length of the score 22 and the adjacent parallel area of the anti-fracture score 24. According to one aspect of the present invention, the score residual differential is reduced in a tail portion 25 of the anti-fracture score 24. This reduction of score residual differential at the tail portion 25 provides a tail segment of the anti-fracture score 24 that is more easily severed relative to the remaining regions of the anti-fracture score 24. In more general terms, the structure of the present invention is adapted to provide a tail portion of the inner score (the anti-fracture score) 24 that has a score residual 40 adapted to be severed. In the preferred embodiment of the invention the segment of the anti-fracture score that is adapted to be severed by having a reduced score residual differential is at least 0.050 inch in linear path length 80, and preferably in the range of 0.200 inch in linear path length 80 to fully direct any fracture in the hinge segment 26.

The stay-on-tab end member 10 has a tab 42 secured to the end panel 12 adjacent the tear panel 20 by a rivet 44. The tab has a lift end 46, a central region 48, and a nose portion 50. The lift end 46 and the nose portion 50 are generally aligned along a central longitudinal axis 52 of the end 10 passing through the rivet 44. A bead 54 is optionally formed in the tear panel 20 inward of the score 22 and the anti-fracture score 24. The tear panel bead 54 is useful to draw excess metal, or slack of metal, from the tear panel 20 to tighten the metal of the tear panel and improve opening characteristics of the end member 10 by the tab 42 being lifted to push against the ear panel 20.

During opening of the end member 10 by the user, the user lifts the lift end 46 of the tab 42 to displace the nose

6

portion 50 downward against the tear panel 20. The force of the nose portion 50 against the tear panel 20 causes the score 22 to fracture, typically in a vent region 56 of the tear panel 20. As the tab displacement is continued, the fracture of the score 22 propagates around the tear panel 20, preferably in progression from the first end 28 of the score 22 toward the second end 30 of the score 22.

When the end member 10 has sustained damage, such as physical deformation often referred to as "buckle" due to dropping a filled container, then opening failure may result. The common buckle of an end is a bulge of the end panel wall 12, usually in the region of 5:00 to 7:00 (the central longitudinal axis 52 of the end 10 bing the 12:00 to 6:00 axis). This type of buckled end often results in an opening failure when the user tries to open the container tear panel 20. When the user lifts the lift end 46 of the tab 42 and the nose portion 50 is forced against the tear panel 20, the buckle in the end causes resistance to the propagation of the score 22 being severed in progression from the first end 28 toward the second end 30. The result is often that the hinge segment 26 severs, resulting in a fractured segment joining the first end 28 to the second end 30, and the tear panel 20 being held in place by a remaining segment of the frangible score 22 that has not yet fractured due to the buckle in the panel 12. Further, because the user continues to lift the tab 42 lift end 46 in attempt to open the tear panel 20, the nose 50 of the tab 42 is pushed downward into the container and back toward the rivet 44, such that nose 50 goes beyond the tear panel 20 and is then in a position called "tuck under."

With prior art type ends, when the tab 42 is in tuck under position, the tab 42 is then useless for opening the tear panel 20. The user often then tries to open the tear panel 20 by pushing down on the tear panel 20 with his or her finger, or with some object. The force applied by the user results in completion of the fracture of the score 22, such that the tear panel is then fully severed, and is free of the panel wall 12, without attachment by the hinge segment 26. The structure of the present invention prevents such full separation of the tear panel 20 when the above-described conditions exist, by providing a ribbon of metal of the end wall 12, regardless of fracture of the hinge segment 26. With the present invention, the anti-fracture score 24 has a tail portion 25 that intersects the hinge segment 26. When the user pushes down on the tear panel 20 of the buckled end 10, and such force causes the hinge segment 26 to be severed, the fracture of the metal tends to follow the path of the tail portion 25 when the fracture propagation reaches the score groove 36 of the tail portion 25. The end result of the present invention being so opened, therefore, is that a ribbon 58 of material between the second end 30 of the score and the terminal end of the tail portion 60 of the tail portion 25. This ribbon 58 of material also includes the area between remaining area of the tail portion 25 and the adjacent parallel area of the score 22.

In alternative embodiments of the present invention, the tail portion 25 and/or the second end 30 of the score 22 vary in specific design or arrangements. Also, as an another alternative embodiment, the anti-fracture score 24 is absent except for the tail portion 25, as shown in FIG. 4. In this embodiment, the end member 10 has a panel wall 12 having a tear panel 20 defined by a frangible score 22 with a first end 28 and a second end 30, and a hinge segment 26 along a straight line between the ends of the score 22. The end 10 includes a score grove 62 that passes through the hinge segment 26, preferably generally transverse to the straight line defining the hinge segment 26. Much like the operation and structure described above regarding the anti-fracture score 24, the second groove is a groove into the panel wall

6,129,230

7                                          8

12 that has a groove depth and remaining residual. The residual in the tail portion of the second groove is preferably approximately the same as or only slightly less than the score residual **38** of the score **22**. For example, in a preferred embodiment of this invention, the tail portion **64** of the second groove **62** has groove score residual that is approximately 0.000 to 0.002 inch greater than the score residual **38** at the adjacent area of the end of the score **22**.

In the alternative embodiment of FIGS. **6** and **7**, the score **22** and the anti-fracture score **24** follow a specific shape that is adapted to permit unrestricted deflection of the tab **42**. In this embodiment, the curvilinear score **22** has a hip region **70** with a radius of curvature that is adapted to provide clearance for the tab **42** being deflected into the container. In the preferred embodiment, the radius of curvature of the hip region **70** is approximately 0.120 inch. Another preferred embodiment provides a score **22** wherein the hip region **70** is aligned with the score first end **28** along an transverse axis **72**, that is a linear alignment **72** that is generally transverse to the central longitudinal axis **52** of the end member **10**.

According to another aspect of an alternative embodiment of the invention as is best shown in FIGS. **6** and **7**, the cord shape of the score **24** proximal to the second end **30**, and the cord shape of the tail portion **25**, may vary from that which is shown in FIGS. **1** and **2**. In the alternative embodiment of FIG. **6**, the tail portion **25** terminates in the end wall **12** beyond the score **22**, and at least slightly transecting the line defining the hinge segment **26**. Alternatively, the tail portion **25** extends further away from the tear panel **20** and curves away from the tab **42** and rivet **44** to at least partially surround the second end **30** of the score **22**. This embodiment results in a tail portion **25** that not only transects the line defining the hinge segment **26**, but also extends and encircles the second end **30** to transect arcuate or some other curvilinear path of a fracture through the hinge segment **26** between the first end **28** and the second end **30**. Therefore, having the tail portion **25** at least partially surrounding the second end **30** ensures that the path of a fracture of the metal of the hinge segment **26** can avoid being transected by the tail portion **25**. In another embodiment of the invention, the cord shape of the second end **30** of the score **22** shown in FIG. **7** may alternatively curve outward away from the tear panel **20**.

In the preferred embodiment of the present invention, the tail portion **25** that transects the line defining the hinge segment **26** has a length adapted to direct a path of fracture in the metal of the hinge segment **26**, directing the path of fracture along the cord shape of the tail portion **25**. In the preferred embodiment, the length of the tail portion **25** is at least 0.050 inch, as measured in overall linear-path length shown as **80** in the Figures, and preferably having a length in the range of approximately 0.200 inch.

While the invention has been described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the broader aspects of the invention. Also, it is intended that broad claims not specifying details of a particular embodiment disclosed herein as the best mode contemplated for carrying out the invention should not be limited to such details.

We claim:

1. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a means for opening a frangible panel segment of the panel wall, the end member comprising;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a vent region of the frangible panel segment and having a lift end opposite said nose;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region, and a second end joined to the first end by a curvilinear segment of the score groove, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment being non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel; and,

a second score groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment.

2. The end member of claim **1**, wherein, the second score groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

3. The end member of claim **1**, wherein, at least a terminal length of the second score groove curves to a direction away from said first end of the primary score.

4. The end member of claim **1**, wherein, the tail of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

5. The end member of claim **1**, wherein, said second end of the score groove curves away from an adjacent segment of said second groove.

6. The end member of claim **1**, wherein, the primary score groove has a score residual of the central panel wall, and said second score groove has a groove residual of the central panel wall, the primary score residual being less than the second score groove residual along said tail portion.

7. The end member of claim **6**, wherein, the primary score residual of said second end is in the range of 0.003 to 0.005 inches, and the second score groove residual along the tail portion is between 0.001 to 0.002 inch greater than the score residual of said second end.

8. The end member of claim **1**, wherein, the tail portion of the second score groove end extends into said adjacent area of the central panel and partially surrounds the second end of the primary score groove.

9. The end member of claim **8**, wherein, the tail portion has a curvilinear end extending generally away from the first end of the primary score groove to partially surround said second end of the primary score groove.

10. The end member of claim **1**, wherein, the primary score groove and the second score groove together form a double scoreline, the double scoreline being separated at the second end of the primary score groove and said tail portion of the second score groove extending longer than said primary score groove second end.

11. The end member of claim **10**, wherein, the primary score groove has a score residual at terminal region of said second end and the second score groove has a groove residual at the tail portion, the groove residual of the second score being less than 0.002 inch greater than said score residual of said tail terminal region of the primary score.

12. The end member of claim **11**, wherein, the tail of the second score groove tail portion is approximately 0.020 inches in length.

13. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming

6,129,230

| 9 | 10 |

edge adapted to be integrally connected to the sidewall, and having a central panel wall, the end member comprising;

a frangible panel formed in the panel wall and being defined by a curvilinear score groove and a hinge segment, the score groove having a thickness residual and having a first end and a second end, said hinge segment having a length defined by a generally straight line between said first end and said second end;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a region of the frangible panel segment and having a lift end opposite said nose; and,

a curvilinear anti-fracture score formed in the frangible panel generally parallel to said score groove, said anti-fracture score having a tail portion passing through the hinge segment.

**14.** The end member of claim **13**, wherein, the tail portion passes through the hinge segment generally transverse to said straight line between the first and second end.

**15.** The end member of claim **13**, wherein the anti-fracture groove has a thickness residual greater than said score groove thickness residual, said greater thickness defining a thickness residual differential between said score groove and said anti-fracture score, said thickness differential being reduced along the tail portion of said anti-fracture score.

**16.** The end member of claim **15**, wherein said residual differential along an extent of said score groove is approximately 0.002 inch, and said residual differential being approximately 0.001 inch along said tail portion of the anti-fracture groove.

**17.** The end member of claim **16**, wherein, the tail portion is at least 0.050 inch in length.

**18.** The end member of claim **13** wherein, said curvilinear score groove has a first segment leading from said first end to a hip region of said score groove, said first segment passing under a nose portion of said tab and said hip region having a radius of curvature adapted to permit unobstructed passage of the tab when a user lifts the tab to open the frangible tear panel.

**19.** The end member of claim **18** wherein, the radius of curvature of said hip region is approximately 0.120 inch.

**20.** The end member of claim **18** wherein, the end member has a central longitudinal axis, the hip region and said first end of the score groove being generally aligned along a transverse axis relative to said central longitudinal axis.

**21.** An end member for a container, the end member having a central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising:

a frangible panel formed in the panel wall and at least partially defined by a score groove with a first end and a second end, wherein the score groove at the second end is curved outward toward the outer edge of the panel;

a hinge line passing between the first and second end of the score groove; and,

a second score groove in the panel wall and transecting the hinge line.

**22.** The end member of claim **21**, wherein the second score groove is an anti-fracture score with an extended end passing through the hinge line.

**23.** The end member of claim **21**, wherein the second score groove has a terminal end curved outward toward the outer edge of the panel.

*   *   *   *   *

Exhibit 8

US006260728B1

(12) **United States Patent**

Turner et al.

(10) Patent No.: **US 6,260,728 B1**

(45) Date of Patent: ***Jul. 17, 2001**

(54) **END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL**

(75) Inventors: **Timothy L. Turner**, Cary; **Randy G. Forrest**, Park Ridge, both of IL (US)

(73) Assignee: **Rexam Beverage Can Company**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/618,898**

(22) Filed: **Jul. 18, 2000**

**Related U.S. Application Data**

(63) Continuation of application No. 09/215,897, filed on Dec. 18, 1998, now Pat. No. 6,129,230.

(51) Int. Cl.[7] .................................................... **B65D 17/34**
(52) U.S. Cl. ............................................. **220/269**
(58) Field of Search ........................................... 220/269

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,952,912 | 4/1976 | Perry . |
| 3,967,752 | 7/1976 | Cudzik . |
| 4,015,744 | 4/1977 | Brown . |
| 4,024,981 | 5/1977 | Brown . |
| 4,084,721 | 4/1978 | Perry . |
| 4,184,607 | 1/1980 | Potts . |

| | | | |
|---|---|---|---|
| 4,363,419 | 12/1982 | Walz, Sr. . | |
| 4,402,421 | 9/1983 | Ruemer, Jr. . | |
| 4,901,880 | 2/1990 | Tatham et al. . | |
| 5,011,037 | 4/1991 | Moen et al. . | |
| 5,064,087 | 11/1991 | Koch . | |
| 5,219,257 | 6/1993 | Koch . | |
| 5,307,947 | 5/1994 | Moen et al. . | |
| 5,375,729 | 12/1994 | Schubert . | |
| 5,405,039 | 4/1995 | Komura . | |
| 5,555,992 | 9/1996 | Sedgeley . | |
| 5,692,636 | 12/1997 | Schubert . | |
| 5,711,448 | * 1/1998 | Clarke, III | .......................... 220/269 |
| 5,738,237 | 4/1998 | McEldowney . | |
| 5,860,553 | * 1/1999 | Schubert | .............................. 220/271 |
| 6,079,583 | * 6/2000 | Chasteen | .............................. 220/269 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0432659 | * 6/1991 | (EP) | ...................................... 220/269 |
| 1-308744 | 12/1989 | (JP) . | |
| 8-244769 | * 9/1996 | (JP) | ...................................... 220/269 |

* cited by examiner

*Primary Examiner*—Stephen K. Cronin
(74) *Attorney, Agent, or Firm*—Wallenstein & Wagner

(57) **ABSTRACT**

A stay-on-tab container end having a panel wall with a tab attached by a rivet and having a tear panel. The tear panel being defined by a frangible score with a first end and a second end and a non-frangible hinge segment. A second groove is formed in the panel wall with a tail portion extending from the tear panel through the hinge segment. The second groove tail portion has a reduced residual differential compared to the frangible score residual. Also, the tail portion includes a curved terminal end that partially surrounds the second end of the score.

**18 Claims, 3 Drawing Sheets**



**U.S. Patent**      Jul. 17, 2001      Sheet 1 of 3      US 6,260,728 B1



FIG.1



FIG.2





US 6,260,728 B1

1

# END CLOSURE WITH IMPROVED NON-DETACHABLE OPENING PANEL

This application is a continuation of prior U.S. application Ser. No. 09/215,897 filed Dec. 18, 1998, now U.S. Pat. No. 6,129,230.

## TECHNICAL FIELD

The present invention relates to end closures for two-piece beer and beverage metal containers having a non-detachable operating panel. More specifically, the present invention relates to improved characteristics of a frangible panel of the end with integral attachment of the frangible panel to prevent full detachment of the frangible panel.

## BACKGROUND OF THE INVENTION

Common end closures for beer and beverage containers have a central panel that has a frangible panel (sometimes called a "tear panel", "opening panel", or "pour panel") defined by a score formed on the outer surface, the "consumer side", of the end closure. Popular "ecology" can ends are designed to provide a way of opening the end by fracturing the scored metal of the panel, while not allowing separation of any parts of the end. For example, the most common such beverage-container end has a tear panel that is retained to the end by a non-scored hinge region joining the tear panel to the reminder of the end, with a rivet to attach a leverage tab provided for opening the tear panel. This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-scored segment serving as the retaining fragment of metal at the hinge-line of the displacement of the tear panel.

The container is typically a drawn and ironed metal can, usually constructed from a thin plate of aluminum. End closures for such containers are also typically constructed from a cut-edge of thin plate of aluminum or steel, formed into a blank end, and manufactured into a finished end by a process often referred to as end conversion, These ends are formed in the process of first forming a cut-edge of thin metal, forming a blank end from the cut-edge, and converting the blank into an end closure which may be seamed onto a container. Although not presently a popular alternative, such containers and/or ends may be constructed of plastic material, with similar construction of non-detachable parts provided for openability.

These types of "stay-on-tab" ecology container ends have been used for many years, with a retained tab and a tear panel of various different shapes and sizes. Throughout the use of such ends, manufacturers have sought to save the expense of the end metal by down-gauging the metal of the ends and the tabs. However, because ends are used for containers with pressurized contents and are sometimes subject to pasteurization, there are conditions causing great stresses to the components of the end during pasteurization, transit and during opening by a user. These conditions limit the available gauge reduction of the end metal, and make it difficult to alter design characteristics of the end, such as by reducing metal gauge or the thickness of the metal residual in the score defining the tear panel.

Further, abuse during shipping, retail stocking and vending, due to rough handling of the filled containers, often causes problems with openability of the end. As an example of a problematic condition caused by handling abuse is the poor openability of a buckled container end. Due to dropping or abusive handling of filled containers, excessive pressure loads on regions of the end may cause a buckle of the end material. Such abuse, typically caused by dropping an upright container that is filled with carbonated fluid, results in a buckled end panel that deforms to form a bulge of metal of the panel.

The possibility of such buckling is a prevalent concern due to downgauging of the end material, pressurization of the container, pasteurizing filled containers, environmental conditions such as excessive heat, and rough handling of pallets or cases of filled containers. In a metal container end, the buckle appears as a deformation or bulge of the metal in a region of the end panel, a condition that adversely effects the users ability to open the end. Due to the geometry of the container and the ecology end panel, buckling of the end frequently is noticeable as a bulge of the end with a buckle in the 5:00 to 7:00 range of the end (with the middle of the tear panel positioned at 6:00). This type of buckled container end very often results in opening failure and resulting problems of a user trying to open the end.

Such a buckled end usually cannot be opened properly by the user. Instead, when the user lifts the tab and applies pressure on the tear panel with the tab nose, the score fractures at the wrong locations at the wrong time, usually resulting in a dramatic loss in leverage of the tab for opening the panel. In this situation, the tab is actuated against the tear panel by lifting the finger pull end of the tab, but the tab nose passes beyond the proximal peripheral edge of the tear panel, a condition often called "tuck under" of the tab.

The tab that tucks under is, therefore, fully lifted by the user, though the tear panel is still not fully opened. In this situation, the tear panel remains attaches by a segment of the score usually at about the 5:00 to 11:00 of the tear panel (defined with the tab nose being at about the 12:00 region of the tear panel). When this condition occurs, the user often tries to open the tear panel with something other than the tab, often by applying force by an object or the user's finger. However, such attempts at completing the opening sequence of the tear panel often causes fracture of the hinge of the tear panel, causing the tear panel to open entirely and become detached from the remainder of the end. When the user applies such force, a common result is for the hinge-line region of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score. As a result, the tear panel is fully separated from the remainder of the end panel, and is usually pushed into the container. The fully detached tear panel then becomes a choking hazard or is otherwise a nuisance to the user and a potential pollutant. Therefore, there is a need for an end having design characteristics that prevents separation of the tear panel during user manipulation of ends with opening failure.

Further, with the more recent popular use of large-open ends, such problems with buckled ends is potentially greater. Because of the enlarged size and the shape of the opening panel (or tear panel), the score in certain regions of the large-open tear panel are more difficult to open by the tab leveraging against the tear panel. This is especially true for the region of the score which is in the 5:00 to 6:00 clock position. Therefore, large-opening ends may be difficult to open even when there is no noticeable sign of damage or buckle. Because of the additional force that may be required to open the large-opening tear panel with a tab, there may be more likelihood for non-specific tear of the metal away from the score. Also, because of the difficulty in opening the large-opening end, there is an increase in potential opening failure that results in "tuck under" of the tab. This type of

US 6,260,728 B1

3

opening failure also may result from the user opening the container too rapidly, not permitting proper venting of pressure from the container.

Because of these conditions, and the problem of potential tuck under of the tab and subsequent detachment of the tear panel when a buckled end results in opening failure and the user manipulates the end to open it, there is a need for an improved end structure that prevents or inhibits the total removal of the tear panel in the situation of an opening failure.

SUMMARY OF THE INVENTION

It is an object of the present invention to provide an end closure for a container having a circumferential sidewall and a peripheral seaming edge adapted to be integrally connected to the sidewall. The end has a central panel wall with a means for opening a frangible panel segment of the panel wall and a rivet in the central panel adapted to integrally attach a tab lever having a nose portion overlying at least a vent region of the frangible panel segment and a lift end opposite said nose. A score groove is formed in the central panel wall to define an outer perimeter of the frangible panel. The score groove has a first end adjacent the vent region and a second end joined to the first end by a curvilinear segment of the score groove, whereby the first end and the second end is separated by a generally linear hinge segment of the central panel wall. The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel. A second groove is formed in the end, having a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel.

It is also an object of the present invention to provide such an end member wherein the second groove has a curvilinear segment generally parallel an extent of the score groove. The invention further provides an end member in which the score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the score groove, such that the tail portion of the second groove is longer than the second end of the score groove.

It is another object of the present invention to provide such an end member whereby the score groove is a generally v-shaped recess having a score depth into the thickness of the central panel, and the second groove is also a generally v-shaped recess having a groove depth into the thickness of the central panel less than that of the score groove.

It is further an object of the invention to provide an end member having a curvilinear score groove with two ends separated by a hinge segment extending along a generally straight line between the two ends. A second groove is formed in the end, extending along a length that intersects the hinge segment generally transverse to the generally straight line between the two ends of the score groove.

It its yet another object of the present invention to provide an ecology end having a frangible panel with an outer score and an inner anti-fracture score, wherein the anti-fracture score has a tail portion that passes through the hinge region of the frangible tear panel. It is an object of the invention to provide an anti-fracture score that extends beyond the score groove to at least partially surround the end of the score groove.

It is further an object of the present invention to provide an ecology stay-on-tab end having a frangible panel defined by a score and first hinge region between a first and second end of the score groove, and having a second hinge region passing between a second groove and the second end of the score groove.

4

BRIEF DESCRIPTION OF THE INVENTION

FIG. 1 is a plan view of the upper side an end closure of one embodiment of the present invention;

FIG. 2 is a plan view of the under side of the end of FIG. 1;

FIG. 3 is a cross-sectional view along 3—3 of FIG. 1;

FIG. 4 is a plan view of the upper side of an end closure of an alternative embodiment of the present invention;

FIG. 5 is a cross-sectional view depicting the score and second groove of the present invention, with a partial sectional view depiction of the score tooling used to form the score and groove;

FIG. 6 is a plan view of the scoreline of an embodiment of the present invention;

FIG. 7 is a plan view of the scoreline of an alternative embodiment of the present invention.

DETAILED DESCRIPTION

While this invention is susceptible of embodiment in many different forms, there is shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The container end of the present invention is a stay-on-tab end member **10** with improved opening characteristics, having structure adapted to prevent detachment of the tear panel, which potentially results from a user forcing open a damaged end with opening failure. Essentially, the present invention provides a score groove inward from the main score to guard the main score when a fracture forms in the hinge of the opening panel of the end, as explained below.

In the preferred embodiment of FIGS. 1–3, the end closure **10** for a container (not shown) has a central panel wall **12** having a seaming curl **14** for joining the wall to the container. The container is typically a drawn and ironed metal can, usually constricted from a thin plate of aluminum or steel, such as the common beer and beverage containers. End closures for such containers are also typically constructed from a cutedge of thin plate of aluminum or steel, formed into blank end, and manufactured into a finished end by a process often referred to as end conversion. In the embodiment shown in the Figures, the central panel is joined to a container by a seaming curl **14** which is joined to a mating curl of the container. The seaming curl **14** of the end closure **10** is integral with the central panel **12** by a countersink area **16** which is joined to the panel outer edge **18** of the central panel **12**. This type of means for joining the central panel **12** to a container is presently the typical means for joining used in the industry, and the structure described above is formed in the process of forming the blank end from a cutedge of metal plate, prior to the end conversion process. However, other means for joining the central panel **12** to a container may be employed with the present invention.

The central panel wall **12** has a displaceable tear panel **20** defined by a curvilinear frangible score **22** with an adjacent anti-fracture score **24** on the tear panel **20**, and a non-frangible hinge segment **26**. The hinge segment **26** is defined by a generally straight line between a first end **28** and a second end **30** of the frangible score **22**. The tear panel **20** of the central panel **12** may be opened, that is the frangible score **22** may be severed and the tear panel **20** displaced at an angular orientation relative to the remaining portion of

US 6,260,728 B1

5
6

the central panel 12, while the tear panel 20 remains hingeably connected to the central panel 12 through the hinge segment 26. In this opening operation, the tear panel 20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12.

As best shown in FIG. 5, the frangible score 22 is preferably a generally V-shaped groove formed into the public side 34 of the panel wall 12. Similarly, the anti-fracture score 24, is preferably a generally V-shaped groove 36 formed into the public side 34 of the panel wall 12 on the tear panel 20. As is explained in more detail below, the score groove 32 is preferably deeper than the anti-fracture score groove 36. Accordingly, the score residual 38, being the amount of frangible material remaining below the score groove 32, is greater than the adjacent anti-fracture score residual 40. This difference between score residual 38 and adjacent anti-fracture score residual 40 is the score residual differential.

The score 22 and the second groove or anti-fracture score 24 are formed using conventional-type of scoring operation during the can end conversion process, using a tools that include an upper (public side) die with a score knife and a lower (product side) die with an anvil surface. As is partially shown in crosssection view in FIG. 5, the upper die 35 is applied to the public side 34 of the end wall 12 to form the V-shaped groove 32 of the score 22 and the V-shaped groove 36 of the second groove 24 on the tear panel 20.

The score residual differential is adapted to provide a tear panel 20 with a score 22 more readily frangible than the anti-fracture score 24, a significant factor for providing efficient opening of the end member 10. Having a double score comprised of a frangible score 22 and an anti-fracture score 24 wherein there is a score residual differential is common in the industry. The common types of end members have a differential maintained generally constant throughout the length of the score 22 and anti-fracture score 24. For example, if the score residual differential of commonly-used ends is set at approximately 0.002 inch, then that differential is maintained along the entire length of the double score, that is, along the entire length of the score 22 and the adjacent parallel area of the anti-fracture score 24. According to one aspect of the present invention, the score residual differential is reduced in a tail portion 25 of the anti-fracture score 24. This reduction of score residual differential at the tail portion 25 provides a tail segment of the anti-fracture score 24 that is more easily severed relative to the remaining regions of the anti-fracture score 24. In more general terms, the structure of the present invention is adapted to provide a tail portion of the inner score (the anti-fracture score) 24 that has a score residual 40 adapted to be severed. In the preferred embodiment of the invention, the segment of the anti-fracture score that is adapted to be severed by having a reduced score residual differential is at least 0.050 inch in linear path length 80, and preferably in the range of 0.200 inch in linear path length 80 to fully direct any fracture in the hinge segment 26.

The stay-on-tab end member 10 has a tab 42 secured to the end panel 12 adjacent the tear panel 20 by a rivet 44. The tab has a lift end 46, a central region 48, and a nose portion 50. The lift end 46 and the nose portion 50 are generally aligned along a central longitudinal axis 52 of the end 10 passing through the rivet 44. A bead 54 is optionally formed in the tear panel 20 inward of the score 22 and the anti-fracture score 24. The tear panel bead 54 is useful to draw excess metal, or slack of metal, from the tear panel 20 to tighten the metal of the tear panel and improve opening characteristics of the end member 10 by the tab 42 being lifted to push against the ear panel 20.

During opening of the end member 10 by the user, the user lifts the lift end 46 of the tab 42 to displace the nose portion 50 downward against the tear panel 20. The force of the nose portion 50 against the tear panel 20 causes the score 22 to fracture, typically in a vent region 56 of the tear panel 20. As the tab displacement is continued, the fracture of the score 22 propagates around the tear panel 20, preferably in progression from the first end 28 of the score 22 toward the second end 30 of the score 22.

When the end member 10 has sustained damage, such as physical deformation often referred to as "buckle" due to dropping a filled container, then opening failure may result. The common buckle of an end is a bulge of the end panel wall 12, usually in the region of 5:00 to 7:00 (the central longitudinal axis 52 of the end 10 being the 12:00 to 6:00 axis). This type of buckled end often results in an opening failure when the user tries to open the container tear panel 20. When the user lifts the lift end 46 of the tab 42 and the nose portion 50 is forced against the tear panel 20, the buckle in the end causes resistance to the propagation of the score 22 being severed in progression from the first end 28 toward the second end 30. The result is often that the hinge segment 26 severs, resulting in a fractured segment joining the first end 28 to the second end 30, and the tear panel 20 being held in place by a remaining segment of the frangible score 22 that has not yet fractured due to the buckle in the panel 12. Further, because the user continues to lift the tab 42 lift end 46 in attempt to open the tear panel 20, the nose 50 of the tab 42 is pushed downward into the container and back toward the rivet 44, such that the nose 50 goes beyond the tear panel 20 and is then in a position called "tuck under."

With prior art type ends, when the tab 42 is in tuck under position, the tab 42 is then useless for opening the tear panel 20. The user often then tries to open the tear panel 20 by pushing down on the tear panel 20 with his or her finger, or with some object. The force applied by the user results in completion of the fracture of the score 22, Such that the tear panel is then fully severed, and is free of the panel wall 12, without attachment by the hinge segment 26. The structure of the present invention prevents such full separation of the tear panel 20 when the above-described conditions exist, by providing a ribbon of metal of the end wall 12, regardless of fracture of the hinge segment 26. With the present invention, the anti-fracture score 24 has a tail portion 25 that intersects the hinge segment 26. When the user pushes down on the tear panel 20 of the buckled end 10, and such force causes the hinge segment 26 to be severed, the fracture of the metal tends to follow the path of the tail portion 25 when the fracture propagation reaches the score groove 36 of the tail portion 25. The end result of the present invention being so opened, therefore, is that a ribbon 58 of material between the second end 30 of the score and the terminal end of the tail portion 60 of the tail portion 25. This ribbon 58 of material also includes the area between remaining area of the tail portion 25 and the adjacent parallel area of the score 22.

In alternative embodiments of the present invention, the tail portion 25 and/or the second end 30 of the score 22 vary in specific design or arrangements. Also, as an another alternative embodiment, the anti-fracture score 24 is absent except for the tail portion 25, as shown in Figure 4. In this embodiment, the end member 10 has a panel wall 12 having a tear panel 20 defined by a frangible score 22 with a first end 28 and a second end 30, and a hinge segment 26 along a straight line between the ends of the score 22. The end 10 includes a score grove 62 that passes through the hinge segment 26, preferably generally transverse to the straight line defining the hinge segment 26. Much like the operation

US 6,260,728 B1

7

and structure described above regarding the anti-fracture score 24, the second groove is a groove into the panel wall 12 that has a groove depth and remaining residual. The residual in the tail portion of the second groove is preferably approximately the same as or only slightly less than the score residual 38 of the score 22. For example, in a preferred embodiment of this invention, the tail portion 64 of the second groove 62 has groove score residual that is approximately 0.000 to 0.002 inch greater than the score residual 38 at the adjacent area of the end of the score 22.

In the alternative embodiment of FIGS. 6 and 7, the score 22 and the anti-fracture score 24 follow a specific shape that is adapted to permit unrestricted deflection of the tab 42. In this embodiment, the curvilinear score 22 has a hip region 70 with a radius of curvature that is adapted to provide clearance for the tab 42 being deflected into the container. In the preferred embodiment, the radius of curvature of the hip region 70 is approximately 0.120 inch. Another preferred embodiment provides a score 22 wherein the hip region 70 is aligned with the score first end 28 along an transverse axis 72, that is a linear alignment 72 that is generally transverse to the central longitudinal axis 52 of the end member 10.

According to another aspect of an alternative embodiment of the invention as is best shown in FIGS. 6 and 7, the cord shape of the score 24 proximal to the second end 30, and the cord shape of the tail portion 25, may vary from that which is shown in FIGS. 1 and 2. In the alternative embodiment of FIG. 6, the tail portion 25 terminates in the end wall 12 beyond the score 22, and at least slightly transecting the line defining the hinge segment 26. Alternatively, the tail portion 25 extends further away from the tear panel 20 and curves away from the tab 42 and rivet 44 to at least partially surround the second end 30 of the score 22. This embodiment results in a tail portion 25 that not only transects the line defining the hinge segment 26, but also extends and encircles the second end 30 to transect arcuate or some other curvilinear path of a fracture through the hinge segment 26 between the first end 28 and the second end 30. Therefore, having the tail portion 25 at least partially surrounding the second end 30 ensures that the path of a fracture of the metal of the hinge segment 26 can avoid being transected by the tail portion 25. In another embodiment of the invention, the cord shape of the second end 30 of the score 22 shown in FIG. 7 may alternatively curve outward away from the tear panel 20.

In the preferred embodiment of the present invention, the tail portion 25 that transects the line defining the hinge segment 26 has a length adapted to direct a path of fracture in the metal of the hinge segment 26, directing the path of fracture along the cord shape of the tail portion 25. In the preferred embodiment, the length of the tail portion 25 is at least 0.050 inch, as measured in overall linearpath length shown as 80 in the Figures, and preferably having a length in the range of approximately 0.200 inch.

While the invention has been described with reference to a preferred embodiment, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the broader aspects of the invention. Also, it is intended that broad claims not specifying details of a particular embodiment disclosed herein as the best mode contemplated for carrying out the invention should not be limited to such details.

We claim:

1. An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and

8

having a central panel wall with a vent region and a means for opening a frangible panel segment of the panel wall, the end member comprising:

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region and a second end, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment integrally connecting the frangible panel segment to an adjacent area of the panel; and,

a second score groove adjacent the second end of said primary score and adjacent said hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the score.

2. The end member of claim 1, wherein an extent of metal generally defined by a distance between said second score groove and said second end of the score provides a connection of said frangible panel segment to said panel wall in event of fracture of a portion of said hinge segment.

3. The end member of claim 1, wherein, the second score groove has a curvilinear segment generally parallel an extent of the primary score groove.

4. The end member of claim 1, wherein, the primary score groove and the second score groove together form a double scoreline, the double scoreline being separated at the second end of the primary score groove and said tail portion of the second score groove extending away from said frangible panel beyond said primary score groove second end.

5. The end member of claim 1, wherein, the primary score groove has a score residual of the central panel wall, and at least a portion of said second score groove has a groove residual of the central panel wall less than the second score groove residual along said tail portion.

6. The end member of claim 1, wherein, at least a terminal length of the second score groove curves to a direction away from said first end of the primary score.

7. The end member of claim 1, wherein, at least a portion of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

8. The end member of claim 1, wherein, at least a portion of the second score groove end extends into said adjacent area of the central panel and partially surrounds the second end of the primary score groove.

9. The end member of claim 1, wherein, the second score groove has a tail portion with a curvilinear extent extending generally away from the first end of the primary score groove to partially surround said second end of the primary score groove.

10. An end member for a container, the end member having a metal central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising:

a frangible panel formed in the panel wall and at least partially defined by a primary score with a first end at a vent region and a second end, the first end and second end being separated by a hinge segment, the hinge segment being a generally linear region of the metal, adapted to form a bend for angular displacement of the frangible panel during normal use by a user;

a means for providing an extent of metal joining said frangible panel to said panel wall in event of abuse opening of the end member with fracture being formed in a portion of said hinge segment;

said means for providing an extent of metal joining said frangible panel comprises a second groove adjacent

US 6,260,728 B1

<table>
<tr><td>9</td><td>10</td></tr>
</table>

said second end of the primary score and adjacent the hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the primary score.

**11**. The end member of claim **10**, wherein, the second groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

**12**. The end member of claim **10**, wherein, the primary score groove and the second groove together form a double scoreline, the double scoreline being separated at the second end of the primary score and a tail portion of the second groove extending away from said frangible panel.

**13**. The end member of claim **10**, wherein, the primary score groove has a score residual of the central panel wall, and said second groove has a groove residual of the central panel wall, the primary score residual being less than the groove residual along at least a portion of said second groove.

**14**. The end member of claim **10**, wherein, at least a terminal length of the second groove curves to a direction away from said first end of the primary score.

**15**. The end member of claim **10**, wherein, at least a portion of the second score groove passes through a hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score.

**16**. The end member of claim **10**, wherein, a tail portion of the second groove extends into said adjacent area of the central panel and partially surrounds the second end of the primary score.

**17**. The end member of claim **10**, wherein, a tail portion of said second groove has a curvilinear end extending generally away from the first end of the primary score to partially surround said second end of the primary score.

**18**. An end member for a container, the end member having a metal central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising:

a frangible panel formed in the panel wall, the frangible panel having a vent region and being at least partially defined by a score groove with a first end adjacent said vent region and a second end separated from said first end by a hinge segment, the hinge segment with a hinge line area adapted to bend for angular displacement of the frangible panel during normal use by a user;

the end member having a second groove adjacent the second end of the score and positioned in said hinge segment to direct fracture of metal in the hinge segment in a direction away from said second end of the score.

\*   \*   \*   \*   \*

Exhibit 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, )
INC., Plaintiff, and CROWN CORK & SEAL )
USA, INC., )
                                    )

      Plaintiff and Counterclaim Defendant )
                                    )   Civil Action No. 05-608 (MPT)

v. )

REXAM BEVERAGE CAN COMPANY, )
                                    )

      Defendant Counterclaimant. )

## DEFENDANT COUNTERCLAIMANT REXAM BEVERAGE CAN COMPANY'S RESPONSES TO CROWN PACKAGING TECHNOLOGY, INC.'S AND CROWN CORK & SEAL USA INC.'S SECOND SET OF REQUESTS FOR ADMISSION (NOS. 52-210)

Defendant-Counterclaimant Rexam Beverage Can Company ("Rexam"), through its counsel, hereby submits its responses to Crown Packaging Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s ("Plaintiffs") Second Set Of Requests For Admission (Nos. 52-210).

## GENERAL OBJECTIONS:

Rexam objects to Plaintiffs' Requests For Admissions to the extent they seek disclosure of information, documents or things protected by the attorney-client privilege, immune from discovery pursuant to the work product doctrine, or protected or immunized by any other applicable privilege, immunity, doctrine or protection from discovery. All of the following responses and answers are made subject to this objection and none of the following Answers or the information, documents or things identified in these Answers will include any such privileged, protected or immune information, documents or things.

Rexam objects to each Request For Admission, including all accompanying Definitions and Instructions, to the extent that they attempt to impose upon Rexam obligations beyond those required by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for

the District of Delaware, the judge's rules or orders, and/or the Court's scheduling order establishing a discovery schedule and pretrial requirements.

Rexam objects to each Definition and/or Instruction to the extent it is overly broad, unduly burdensome, vague, ambiguous, indefinite, lacking in reasonable particularity, untimely, premature or seeks information, documents or things uniquely in the possession, custody or control of Plaintiffs, its divisions, affiliates, officers, directors, employees, agents, representatives, distributors and/or customers.

To the extent that Rexam's Answers are arguably within the scope of any definition set forth by Plaintiffs, such Answer by Rexam shall not be construed to be an admission by Rexam as to the validity or scope of any such definition.

Rexam objects to the definition of 'Rexam as including Rexam PLC. Rexam PLC is not a party to this action, and all responses will be based on knowledge of Rexam Beverage Can Co.

Rexam objects to the definition of "Rexam End" or Rexam Ends" as vague to the extent that the definition encompasses "variations, modifications, predecessors, or prototypes of the can end identified by Rexam in response to Crowns's interrogatories nos. 1 and 4.   Rexam's responses to requests for admissions that are directed to a "Rexam End" or "Rexam Ends" will be limited to ends identified by Rexam in response to Crowns's interrogatories nos. 1 and 4.

Rexam objects to each Request For Admission to the extent that it seeks confidential, proprietary, and/or sensitive business information.  Any Answers or information provided by Rexam, are subject to the Protective Order entered in this case.

Discovery is ongoing, and Rexam is continuing its preparation for trial. All responses to the following Requests For Admissions are based on information presently known to Rexam after a reasonable effort to compile information called for by these Requests For Admissions. All Answers are given without prejudice to Rexam's right to supplement and/or modify its

2

responses at a later time. In addition, Rexam's objections as set forth herein are made without

prejudice to Rexam's right to assert any additional or supplemental objections.

Rexam objects to these Requests For Admissions as they seek Admissions that are not

relevant to any claim or defense of any party in this case.

## REQUEST FOR ADMISSION NO. 52:

Crown Packaging Technology, Inc. is a Delaware corporation having a principal place of
business at 11535 South Central Avenue, Alsip, IL 60803.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006.

## REQUEST FOR ADMISSION NO. 53:

Crown Packaging Technology, Inc. is a research, development, and engineering company
specializing in metal packaging for the beverage and food industry.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006.

## REQUEST FOR ADMISSION NO. 54:

Crown Cork & Seal Company USA, Inc. is a Delaware corporation having a principal
place of business at One Crown Way, Philadelphia, PA 19154.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006.

## REQUEST FOR ADMISSION NO. 55:

Crown Cork & Seal Company USA, Inc. is in the business of manufacturing and selling
metal beverage can components, including can ends and can bodies.

**ANSWER:**

Rexam objects to this request for admission as vague for failing to define the scope of "components". Rexam admits that Crown Cork & Seal USA, Inc. manufactures and sells metal beverage can bodies and ends.

**REQUEST FOR ADMISSION NO. 56:**

Rexam Beverage Can Co. is a Delaware corporation having a principal place of business at 8770 W. Bryn Mawr Ave., Chicago, IL 60631.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 57:**

Rexam Beverage Can Co. is in the business of manufacturing and selling metal beverage can components, including can ends and can bodies.

**ANSWER:**

Rexam objects to this request as vague to the extent that it does not specify the scope of the term components. Rexam admits that it manufactures and sells metal beverage can bodies and metal beverage can ends.

**REQUEST FOR ADMISSION NO. 58:**

Rexam makes or manufactures Rexam Ends within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it makes Rexam Ends within the United States.

**REQUEST FOR ADMISSION NO. 59:**

Rexam intends on continuing in the future to make or manufacture Rexam Ends within the United States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of time to which it is directed. Subject to that objection and Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it presently intends to continue to make Rexam Ends within the United States until such time as facts, circumstances or conditions change or additional facts, circumstances or conditions, including decisions by the court in this action, affect Rexam's decision whether to make Rexam Ends.

**REQUEST FOR ADMISSION NO. 60:**

Rexam sells Rexam Ends within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it sells Rexam Ends within the United States..

**REQUEST FOR ADMISSION NO. 61:**

Rexam intends on continuing in the future to sell Rexam Ends within the United States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of time to which it is directed. Subject to that objection and Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it presently intends to continue to sell Rexam Ends within the United States until such time as facts, circumstances or conditions change or additional facts, circumstances or conditions, including decisions by the court in this action, affect Rexam's decision whether to sell Rexam Ends.

**REQUEST FOR ADMISSION NO. 62:**

Rexam offers Rexam Ends for sale within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits

that it offers Rexam Ends for sale within the United States.

**REQUEST FOR ADMISSION NO. 63:**

Rexam intends on continuing in the future to offer Rexam Ends for sale within the United

States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of

time to which it is directed. Subject to that objection and Rexam's objection to the definition of

the term "Rexam Ends", Rexam admits that it presently intends to continue to offer to sell

Rexam Ends within the United States until such time as facts, circumstances or conditions

change or additional facts, circumstances or conditions, including decisions by the court in this

action, affect Rexam's decision whether to offer to sell Rexam Ends.

**REQUEST FOR ADMISSION NO. 64:**

This civil action arises under the Patent Act, Title 35 of the United States Code.

**ANSWER:**

Rexam admits that its counterclaims for infringement in this action arise under Title 35 of

the United States Code. Rexam admits that Crown pleaded that its claims in this action arise

under Title 35 of the United States Code.

**REQUEST FOR ADMISSION NO. 65:**

The United States District Court for the District of Delaware has subject matter
jurisdiction over this civil action under 28 U.S.C. §§ 1331, 1338(a), and 2201.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 66:**

Venue in the United States District Court for the District of Delaware is proper under 28 U.S.C. §§ 1391(b) & (c) and 1400(b).

**ANSWER:**

Rexam admits that venue is proper in this district under 28 U.S.C. §§ 1391(b) & (c).

Rexam denies that venue is proper under 28 U.S.C. § 1400(b).


**REQUEST FOR ADMISSION NO. 67:**

The document bearing production numbers CCS 39475 to CCS 39484 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,065,634.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.


**REQUEST FOR ADMISSION NO. 68:**

The document bearing production numbers CCS 39474 to CCS 39725 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,065,634.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, subject to a determination of completeness.


**REQUEST FOR ADMISSION NO. 69:**

U.S. Patent No. 6,065,634 was issued by the Patent and Trademark Office on May 23, 2000.

**ANSWER:**

Admitted.


**REQUEST FOR ADMISSION NO. 70:**

Crown Cork & Seal Technologies Corporation was the owner of U.S. Patent No. 6,065,634 at the time of its issuance.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

**REQUEST FOR ADMISSION NO.71:**

Effective January 1, 2004, Crown Cork & Seal Technologies Corporation changed its name to Crown Packaging Technology, Inc.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

**REQUEST FOR ADMISSION NO. 72:**

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,065,634, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Rexam objects to this request as not relevant to any claim or defense in this action.

**REQUEST FOR ADMISSION NO. 73:**

The document bearing production numbers CCS 62069 to CCS 62084 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.

**RUEST FOR ADMISSION NO. 74:**

The document bearing production numbers CCS 715 to CCS 1042 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, subject to a determination of completeness.

**REQUEST FOR ADMISSION NO. 75:**

U.S. Patent No. 6,848,875 was issued by the Patent and Trademark Office on February 1, 2005.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 76:**

Crown Packaging Technology, Inc. is the owner of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006.

**REQUEST FOR ADMISSION NO. 77:**

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,848,875, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Denied.    Rexam admits that the "Amendment to Patent & Technology License

Agreement" found at CCS 54446 to CCS 54450 states that Crown Cork & Seal Company USA,

Inc. is the exclusive licensee of U.S. Patent No. 6,848,875, including of the right to bring suit

against infringement of the patent and to recover damages for past, present, and future

infringement of the patent.    Rexam admits, pursuant to the agreement between Rexam's counsel

and Crown's counsel of November 17, 2006, that Crown Cork & Seal USA, Inc. is the exclusive

licensee of U.S. Patent No. 6,848,875, including of the right to bring suit against infringement of

the patent and to recover damages for past, present, and future infringement of the patent.

**REQUEST FOR ADMISSION NO. 78:**

U.S. Patent No. 6,848,875 has the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**ANSWER:**

Rexam admits that U.S. Patent No. 6,848,875 claims the benefit of the filing date of

United Kingdom Application No. UK 9510515.1, filed May 24, 1995.


**REQUEST FOR ADMISSION NO. 79:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was disclosed to the Patent and Trademark
Office examiner during the prosecution of the application that issued as U.S. Patent No.
6,848,875.

**ANSWER:**

Admitted.


**REQUEST FOR ADMISSION NO. 80:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered by the Patent and Trademark
Office examiner during the prosecution of the application that issued as U.S. Patent No.
6,848,875.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including

whether U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered.  Therefore, Rexam can

neither admit nor deny this request.


**REQUEST FOR ADMISSION NO. 81:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was disclosed to the Patent and Trademark
Office examiner during the prosecution of the application that issued as U.S. Patent No.
6,848,875.

**ANSWER:**

Admitted.


**REQUEST FOR ADMISSION NO. 82:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered by the Patent and Trademark
Office examiner during the prosecution of the application that issued as U.S. Patent No.
6,848,875.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,848,875 cited U.S. Patent No. 4,448,322 as a basis for rejecting claims. Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 83:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was disclosed to the Patent and Trademark office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 84:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered by the Patent and Trademark office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,848,875 cited Japanese Unexamined Utility Model Publication No. JP 57-117323 as a basis for rejecting claims. Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which whether Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 85:**

The document bearing production numbers CCS 62056 to CCS 62068 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 86:**

The document bearing production numbers CCS 30 to CCS 714 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006, subject to a determination of completeness.

**REQUEST FOR ADMISSION NO. 87:**

U.S. Patent No. 6,935,826 was issued by the Patent and Trademark Office on August 30, 2005.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 88:**

Crown Cork & Seal Packaging Technology Inc. is the owner of U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam admits, pursuant to the agreement between Rexam's counsel and Crown's counsel

of November 17, 2006, that Crown Packaging Technology, Inc. is the owner of U.S. Patent No.

6,935,826.

**REQUEST FOR ADMISSION NO. 89:**

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Denied.   Rexam admits that the "Amendment to Patent & Technology License Agreement" found at CCS 54446 to CCS 54450 states that Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent.  Rexam admits, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, that Crown Cork & Seal USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent..

**REQUEST FOR ADMISSION NO. 90:**

U.S. Patent No. 6,935,826 has the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**ANSWER:**

Rexam admits that U.S. Patent No. 6,935,826 claims the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**REQUEST FOR ADMISSION NO. 91:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 92:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including whether U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO.93:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 94:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including whether U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 95:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 96:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,935,826 cited Japanese Unexamined Utility Model Publication No. JP 57-117323 as a basis for rejecting claims. Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which whether Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 97:**

The document bearing production numbers CCS 35169 to CCS 35198 is a true, correct, authentic, and genuine copy of European Patent EP 0 828 663.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 98:**

European Patent EP 0 828 663 is the European counterpart to U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as vague and ambiguous because the term "counterpart" has not been defined or framed in any context. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 99:**

The document bearing production numbers CCS 35199 to CCS 36553 is a true, correct, authentic, and genuine copy of the European prosecution file history of European Patent EP 0 828 663.

**ANSWER:**

Rexam objects to this request as overly broad and burdensome as it requires Rexam to obtain a true, correct, authentic, and genuine copy of the prosecution file history of European Patent EP 0 828 663 and then compare that copy to all identified pages. Rexam did not

prosecute European Patent EP 0 828 663 and has no way of determining whether the identified documents are the complete prosecution history of that patent. Therefore, Rexam cannot admit or deny the matter set out by this request.

## REQUEST FOR ADMISSION NO. 100:

European Patent EP 0 828 663 was issued by the European Patent Office on December 22, 1999.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 101:

On August 31, 2000, Rexam's predecessor entity, American National Can Company, filed an opposition in the European Patent Office to European Patent EP 0 828 663.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 102:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company provided the European Patent Office with a copy of U.S. Patent No. 4,217,843 (Kraska 8/1980).

## ANSWER:

Admitted.

## REQUEST TOR ADMISSION NO. 103:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company provided the European Patent Office with a copy of Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 104:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company argued to the European Patent Office that the inventions claimed in European Patent EP 0 828 663 were not patentable over, among other references, U.S. Patent No. 4,217,843 (Kraska 8/1980) and Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 105:

After oral proceedings held on March 18, 2003, the European Patent Office's Opposition Division upheld the patentability of European Patent EP 0 828 663, as amended, over Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) and U.S. Patent No. 4,217,843 (Kraska 8/1980), issuing a written decision to that effect on May 5, 2003.

## ANSWER:

Rexam admits that the European Patent Office's Opposition Division upheld the patentability of European Patent EP 0 828 663 but only after it was amended to narrow the claims.

## REQUEST FOR ADMISSION NO. 106:

On June 30, 2003, Rexam appealed the May 5, 2003 decision of the European Patent Office's Opposition Division upholding the patentability of European Patent EP 0 828 663, as amended.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO.107:

During its appeal of the Opposition Division's decision, Rexam presented the European Patent Office's Technical Board of Appeal with, among other references, U.S. Patent No. 4,217,843 (Kraska 8/1980) and Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

## ANSWER:

Admitted.

**REQUEST FOR ADMISSION NO. 108:**

After oral proceedings held on February 10, 2005, the European Patent Office's Technical Board of Appeal upheld the patentability of European Patent EP 0 828 663, as amended, over Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) and U.S. Patent No. 4,217,843 (Kraska 8/1980), issuing a written decision to that effect on February 10, 2005.

**ANSWER:**

Rexam admits that the European Patent Office's Technical Board of Appeal upheld the patentability of European Patent EP 0 828 663 but only after it was amended to narrow the claims.

**REQUEST FOR ADMISSION NO. 109:**

Metal Container Corporation, or "MCC," is a wholly-owned subsidiary of Anheuser-Busch Companies, Inc.

**ANSWER:**

Rexam objects to this request as nor relevant to any claim or defense in this action.

**REQUEST FOR ADMISSION NO. 110:**

MCC participated in the development of a can end known as the "LOF."

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 111:**

MCC and Ball participated in the development of a can end known as "LOF+"

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 112:**

On March 24, 2003, Anheuser-Busch and Metal Container Corporation filed a lawsuit in the District Court for the Western District of Wisconsin against Crown Cork & Seal Company USA, Inc. and Crown Cork & Seal Technologies Corporation, seeking a declaratory judgment that the LOF and LOF+ can ends did not infringe U.S. Patent No. 6,065,634, and that U.S. Patent No. 6,065,634 is invalid.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 113:**

In the Anheuser-Busch Litigation, on August 13, 2003, Crown Cork & Seal Company USA, Inc. and Crown Cork & Seal Technologies Corporation filed counterclaims against MCC and Anheuser-Busch, setting forth allegations of antitrust and unfair competition violations on the part of MCC, Anheuser-Busch, and Ball.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 114:**

In the Anheuser-Busch Litigation, on January 5, 2004, Crown Cork & Seal Technologies Corporation appealed to the Court of Appeals for the Federal Circuit the District Court for the Western District of Wisconsin's decision on summary judgment that Anheuser-Busch and MCC did not infringe U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 115:**

In the Anheuser-Busch Litigation, on December 23, 2004, the Court of Appeals for the Federal Circuit vacated the order of the District Court for the Western District of Wisconsin granting summary judgment of non-infringement of U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 116:**

Following the December 23, 2004 decision of the Court of Appeals for the Federal Circuit, Anheuser-Busch and MCC settled the Anheuser-Busch Litigation.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

Further, Rexam is skeptical that less than all the parties to the Annheuser-Busch Litigation could

settle that action as asserted by this request for admission.

## REQUEST FOR ADMISSION NO. 117:

The document bearing production numbers REX 043176 to REX 043222, marked in discovery as Defendant's Deposition Exhibit DDX 2, is a true, correct, authentic, and genuine copy of an intellectual property license agreement entered into between American National Can Company, Rexam's predecessor entity, and Belgium Tool and Die Co., also referred to as Belvac, effective March 19, 1993.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 118:

The document bearing production numbers BEL 000021 to BEL 000038, marked in discovery as Defendant's Deposition Exhibit DDX 3, is a true, correct, authentic, and genuine copy of a license agreement entered into between American National Can Company, Rexam's predecessor entity, and Belvac, effective April 17, 1994.

## ANSWER:

Admitted, except as to the handwritten notation at the top right corner of page

BEL000021.

## REQUEST FOR ADMISSION NO. 119:

The document bearing production numbers BEL 000106 to BEL 000108, marked in discovery as Defendant's Deposition Exhibit DDX 18, is a true, correct, authentic, and genuine copy of a record prepared by Belvac showing Crown's historical purchases of necker/reformer equipment from Belvac between 1990 and 2005. (*See* Transcript of 30(b)(6) Deposition of Belvac Production Machinery, Inc. 6/7/2006, at 120:18-123:11).

## ANSWER:

Rexam admits that the document bearing production numbers BEL 000106 to BEL

000108 purports to be a copy of a record prepared by Belvac showing Crown's historical

purchases of necker/reformer equipment from Belvac between 1990 and 2005. However, Rexam

cannot verify that it is true, correct, authentic or genuine as it is not a Rexam document.

Therefore, Rexam cannot admit or deny this request.

## REQUEST FOR ADMISSION NO. 120:

U.S. Patent 6,848,875 will expire on March 30, 2016.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 121:

U.S. Patent 6,935,826 will expire on March 25, 2016.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 122:

U.S. Patent 4,774,839 expired on October 4, 2005.

**ANSWER:**

Admitted.

## REQUEST FOR ADMISSION NO. 123:

In 1992, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 124:

In 1993, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 125:

In 1994, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 126:**

In 1995, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 127:**

In 1996, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 128:**

In 1997, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 129:**

In 1998, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 130:**

In 1999, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 131:**

In 2000, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 132:**

In 2001, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMSSION NO. 133:**

In 2002, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 134:**

In 2003, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 135:**

In 2004, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 136:**

As of 1993, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 137:**

As of 1994, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 138:**

As of 1995, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 139:**

As of 1996, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 140:**

As of 1997, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 141:**

As of 1998, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 142:**

As of 1999, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 143:**

As of 2000, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 144:**

As of 2001, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMTS5SION NO. 145:**

As of 2002, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See. for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 146:**

As of 2003, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 147:**

As of 2004, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 148:**

Antonio Caleffi, an inventor named on U.S. Patent No. 4,774,839, is deceased.

**ANSWER:**

Admitted.

## REQUEST FOR ADMISSION NO.149:

Edward S. Traczyk, an inventor named on U.S. Patent No. 4,774,839, is deceased.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 150:

The tapered neck of an aluminum beverage can body formed using a smooth die necking method as claimed in U.S. Patent No. 4,774,839 will not have striations on the tapered neck, as such terms are used in Rexam's Response and Supplemental Response to Crown's Amended Interrogatory No. 7.

## ANSWER:

Rexam admits that a tapered neck of an aluminum beverage can body formed exclusively using a smooth die necking method as claimed in U.S. Patent No. 4,774,839 will not have striations on the tapered neck, as such terms are used in Rexam's Response and Supplemental Response to Crown's Amended Interrogatory No. 7.

## REQUEST FOR ADMISSION NO. 151:

The tapered neck of an aluminum beverage can body formed using a smooth die necking method has a different appearance than the tapered neck of an aluminum beverage can body formed using a spin necking method.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 152:

The tapered neck of an aluminum beverage can body formed using a smooth die necking method has a different appearance than the tapered neck of an aluminum beverage can body formed using a bump necking method.

## ANSWER:

Rexam objects to the term "bump necking" as vague and undefined.  As Rexam understands that term, admitted.

## REQUEST FOR ADMISSION NO. 153:

Since 1985, there has been only one smooth die necking method for forming a tapered neck of an aluminum beverage can body.

## ANSWER:

Rexam does not know all smooth die necking methods used by every manufacturer and therefore cannot admit or deny this request.

## REQUEST FOR ADMISSION NO. 154:

By the end of 1992, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 155:

By the end of 1993, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 156:

By the end of 1994, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 157:

By the end of 1995, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 158:

By the end of 1996, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 159:

By the end of 1997, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 160:

By the end of 1998, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 161:

By the end of 1999, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 162:

By the end of 2000, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 163:

By the end of 2001, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 164:

By the end of 2002, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

**REQUEST FOR ADMISSION NO. 165:**

By the end of 2003, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 166:**

By the end of 2004, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 167:**

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" in any way.

**ANSWER:**

Rexam objects to this request as vague for not specifying the configurations of the two cans for which it seeks an admission.    Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997)  Rexam admits that reforming the bottom of an aluminum beverage container by the method claimed in claim 17 of U.S. Patent No. 5,222,385 changes the appearance of the reformed portion of the bottom.

**REQUEST FOR ADMISSION NO. 168:**

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" in any way.

**ANSWER:**

Rexam objects to this request as vague for not specifying the configurations of the two cans that it seeks an admission for.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D.

100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§

36.10[6] (3d ed. 1997)  Rexam admits that reforming the bottom of an aluminum beverage

container by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 changes

the appearance of the reformed portion of the bottom.

## REQUEST FOR ADMISSION NO. 169:

The bottom of an aluminum beverage container "reformed" by the method claimed in
claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum
beverage container that has not been "reformed" by that method.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by

the method claimed" are not defined.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D.

100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§

36.10[6] (3d ed. 1997).  Rexam further objects to this request as premature to the extent these

terms are understood in the context of the claims- either as claim terms or analogues- because no

claim construction determination has been made by the Court. *Id.*  Rexam further objects to this

request as unanswerably vague for failing to specify the configuration of the aluminum beverage

container that has not been "reformed" by the method of claim 17 of U.S. Patent No. 5,222,385.

## REQUEST FOR ADMISSION NO. 170:

The bottom of an aluminum beverage container "reformed" by the method claimed in
claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of
an aluminum beverage container that has not been "reformed" by that method.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by

the method claimed" are not defined.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request as unanswerably vague for failing to specify the configuration of the aluminum beverage container that has not been "reformed" by the method of claims 11, 12, and 17 of U.S. Patent No. 5,697,242.

## REQUEST FOR ADMISSION NO. 171:

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum beverage container subjected to an external bottom reforming process.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

## REQUEST FOR ADMISSION NO. 172:

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of an aluminum beverage container subjected to an external bottom reforming process.

**ANSWER:**

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

**REQUEST FOR ADMISSION NO. 173:**

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 will be different in appearance than the bottom of an aluminum beverage container, identical to the aforementioned container in every other respect, that has been "reformed" through a process in which a "reforming roller" is brought into engagement with the container bottom's external wall opposite its "substantially longitudinal wall."

**ANSWER:**

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed", "reforming roller" and "substantially longitudinal wall" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

**REQUEST FOR ADMISSION NO. 174:**

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 will be different in appearance than the bottom of an aluminum beverage container, identical to the aforementioned container in every other respect, that has been "reformed" through a process in which a "reforming roller" is brought into engagement with the container bottom's external wall opposite its "substantially longitudinal wall."

**ANSWER:**

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed", "reforming roller" and "substantially longitudinal wall" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice* § 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

**REQUEST FOR ADMISSION NO. 175:**

By the end of 1992, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 176**

By the end of 1993, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 177:

By the end of 1994, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 178:

By the end of 1995, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage cam bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 179:

By the end of 1996, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 180:

By the end of 1997, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 181:

By the end of 1998, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 182:

By the end of 1999, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 183:

By the end of 2000, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 184:

By the end of 2001, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 185:

By the end of 2002, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 186:

By the end of 2003, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 187:

By the end of 2004, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 188:

By the end of 1996, Rexam was aware that Belvac was manufacturing and selling equipment for internal base reforming of can bottoms.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 189:

By the end of 1996, Rexam had accused Belvac of infringement of U.S. Patent No. 5,222,385 based on Belvac's manufacture and sale of equipment for internal base reforming of can bottoms.

## ANSWER:

Denied.


## REQUEST FOR ADMISSION NO.190:

Prior to the filing of this Action, Rexam had never informed Belvac of the existence of U.S. Patent No. 5,697,242.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 191:

Effective April 17, 1994, Belvac and American National Can Company, Rexam's predecessor entity, entered into a license agreement relating to U.S. Patent No. 4,774,839, (*See* 1994 License Agreement).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 192:

Rexam succeeded to all rights, privileges, and liabilities of its predecessor entity, American National Can Company, under the 1994 License Agreement.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 193:

Under the 1994 License Agreement, Belvac was licensed to manufacture and sell container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 1.4, 3.1).

## ANSWER:

Rexam objects to this request as vague for not accurately setting out the terms and conditions of the Agreement to which this request is directed. Rexam admits that limited rights

were granted to Belvac by the 1994 License Agreement, but denies that those rights are accurately stated by this request.

## REQUEST FOR ADMISSION NO. 194:

Under the 1994 License Agreement, Belvac was licensed to manufacture and sell tooling for performing a. smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 1.3, 3.1).

## ANSWER:

Rexam objects to this request as vague for not accurately setting out the terms and conditions of the Agreement to which this request is directed. Rexam admits that limited rights were granted to Belvac by the 1994 License Agreement, but denies that those rights are accurately stated by this request.

## RESIUEST FOR ADMISSION NO. 195:

Under the 1994 License Agreement, Belvac was obligated to pay certain royalties to Rexam for the license to manufacture and sell container necking equipment and tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 4.1-4.3).

## ANSWER:

Rexam objects to this request as vague for not accurately setting out the terms and conditions of the Agreement to which this request is directed. Rexam admits that limited rights were granted to Belvac by the 1994 License Agreement, and that Belvac was obligated to pay royalties for exercising those rights. Rexam denies that those rights are accurately stated by this request.

## REQUEST FOR ADMISSION NO. 196:

The term of the 1994 License Agreement expired on October 4, 2005. (*See* 1994 License Agreement, § 12.1).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 197:

Belvac has paid to Rexam all royalties due under the 1994 License Agreement.

## ANSWER:

Rexam does not have information as to Belvac's activities that triggered royalty obligations and therefore cannot admit or deny this request.

## REQUEST FOR ADMISSION NO. 198:

Belvac has paid to Rexam $2,434,000 in royalties under the terms of the 1994 License Agreement. (*See* Transcript of Rule 30(b)(6) Deposition of Terry Babbit 6/7/2006, at 138:1622).

## ANSWER:

Rexam admits that Terry Babbit of Belvac said that Belvac paid Rexam $2,434,000 during his deposition. Rexam's records do not sufficiently identify payments from Belvac to determine the amount that Belvac paid under the 1994 License Agreement so Rexam cannot admit or deny the requested matter.

## REQUEST FOR ADMISSION NO. 199:

Under the 1994 License Agreement, Belvac was not obligated to affix notices or labels comprising the word "patent" or the abbreviation "pat.," together with the number of U.S. Patent No. 4,774,839, on container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

## ANSWER:

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

## REQUEST FOR ADMISSION NO. 200:

Under the 1994 License Agreement, Belvac was not obligated to affix notices or labels comprising the word "patent" or the abbreviation "pat.," together with the number of U.S. Patent

No. 4,774,839, on tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 201:**

Under the 1994 License Agreement, Belvac was not obligated to mark, within the meaning of 35 U.S.C. § 287, container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 202:**

Under the 1994 License Agreement, Belvac was not obligated to mark, within the meaning of 35 U.S.C. § 287, tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 203:**

With respect to all or substantially all container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005, Belvac failed to affix notices or labels comprising the word "patent" or the "abbreviation pat.," together with the number of U.S. Patent No. 4,774,839.

**ANSWER:**

The information that would establish whether the matter set out by this request for admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 204:**

With respect to all or substantially all tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005, Belvac failed to affix notices or labels comprising the word "patent" or the "abbreviation pat.," together with the number of U.S. Patent No. 4,774,839.

**ANSWER:**

The information that would establish whether the matter set out by this request for admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 205:**

Belvac failed to mark, within the meaning of 35 U.S.C. § 287, all or substantially all container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of US. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005.

**ANSWER:**

The information that would establish whether the matter set out by this request for admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 206:**

Belvac failed to mark, within the meaning of 35 U.S.C. § 287, all or substantially all tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005.

**ANSWER:**

The information that would establish whether the matter set out by this request for admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 207:**

SuperEnd does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd." Rexam is not asserting that the Crown ends produced in this action having production nos. ccs29433A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

**REQUEST FOR ADMISSION NO. 208:**

SuperEnd SP does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd SP." Rexam is not asserting that the Crown ends produced in this action having production nos. CCS0029435A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

**REQUEST FOR ADMISSION NO. 209:**

SuperEnd DA does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd DA." Rexam is not asserting that the Crown ends produced in this action having production nos. CCS0029432A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

## REQUEST FOR ADMISSION NO. 210:

Unexamined Japanese Patent Publication No. H 09-142467 was published on June 3, 1997.

## ANSWER:

Admitted.

Of Counsel:                          Frederick L. Cottrell, III (#2555)
George P. McAndrews                  cottrell@rlf.com
Steven J. Hampton                    Anne Shea Gaza (#4093)
Gerald C. Willis                     gaza@rlf.com
Paul W. McAndrews                    Richards, Layton & Finger, P.A.
McAndrews, Held & Malloy, Ltd.       One Rodney Square
500 W. Madison Street, Suite 3400    920 North King Street
Chicago, IL  60601                   Wilmington, DE 19801
312-775-8000                         302-651-7700
                                         *Attorneys for Defendant/Counterclaimant*
Dated: November 17, 2006                 *Rexam Beverage Can Co.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2006, true and correct copies of the foregoing were

caused to be served on counsel of record at the addresses and in the manner indicated below:

**VIA ELECTRONIC MAIL
AND HAND DELIVERY**
Barry M. Klayman
bklayman@wolfblock.com
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market Street, Suite 1001
Wilmington, DE   19801

**VIA FACSIMILE**
Dale M. Heist
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

**VIA ELECTRONIC MAIL**
Chad E. Ziegler
ziegler@woodcock.com
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

Anne Shea Gaza (#4093)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY,      )
INC., Plaintiff, and CROWN CORK & SEAL   )
USA, INC.,                       )
                                 )
    Plaintiff and Counterclaim Defendant,   )
                                 )
v.                               )    Civil Action No. 05-608 (MPT)
                                 )
REXAM BEVERAGE CAN CO.,          )
                                 )
    Defendant Counterclaimant.    )

## NOTICE OF SERVICE

    PLEASE TAKE NOTICE that on November 17, 2006, counsel for defendant

counterclaimant served copies of Defendant/Counterclaimant Rexam Beverage Can Company's

Responses to Crown Technology's and Crown USA's Second Set of Requests for Admissions

(Nos. 52-210) upon the following counsel of record in the manner indicated below:


**VIA ELECTRONIC MAIL**
**& HAND DELIVERY**
Barry M. Klayman
bklayman@wolfblock.com
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market Street
Suite 1001
Wilmington, DE   19801

**VIA ELECTRONIC MAIL**
Chad E. Ziegler
ziegler@woodcock.com
Woodcook Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

**VIA FACSIMILE**
Dale M. Heist
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

Of Counsel:                          Frederick L. Cottrell, III (#2555)
George P. McAndrews                  cottrell@rlf.com
Steven J. Hampton                    Anne Shea Gaza (#4093)
Gerald C. Willis                     gaza@rlf.com
Paul W. McAndrews                    Richards, Layton & Finger, P.A.
McAndrews, Held & Malloy, Ltd.       One Rodney Square
500 W. Madison Street, Suite 3400    920 North King Street
Chicago, IL  60601                   Wilmington, DE 19801
312-775-8000                         302-651-7700

                                        *Attorneys for Defendant/Counterclaimant*
Dated:  November 17, 2006               *Rexam Beverage Can Co.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2006, I caused to be served by hand delivery and

electronic mail the foregoing document and electronically filed the same with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>   and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on November 17, 2006,  I caused to be sent in the manner indicated

below the foregoing document to the following non-registered participants:

| VIA FACSIMILE | VIA ELECTRONIC MAIL |
|---|---|
| Dale M. Heist, Esq. | Chad E. Ziegler, Esq. |
| Woodcock Washburn LLP | ziegler@woodcock.com |
| One Liberty Place, 46th Floor | Woodcock Washburn LLP |
| Philadelphia, PA 19103 | One Liberty Place, 46th Floor |
|  | Philadelphia, PA 19103 |

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Exhibit 10

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 11

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 12

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit A

LEXSEE 2003 U.S. DIST. LEXIS 10202



Positive
As of: Jan 22, 2007

**ENZO LIFE SCIENCES, INC., Plaintiff/Counterclaim Defendant, v.
DIGENE CORPORATION, Defendant/Counterclaim Plaintiff v.
ENZO BIOCHEM, INC., Additional Counterclaim Defendant.**

**Civil Action No. 02-212-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE**

*2003 U.S. Dist. LEXIS 10202*

**June 10, 2003, Decided**

**SUBSEQUENT HISTORY:** Motion granted by *Enzo Life Scis., Inc. v. Digene Corp., 270 F. Supp. 2d 484, 2003 U.S. Dist. LEXIS 11657 (D. Del., 2003)*

**PRIOR HISTORY:** *Enzo Life Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 2003 U.S. Dist. LEXIS 23839 (D. Del., Mar. 31, 2003)*

**DISPOSITION:** [*1] Enzo Biochem's motion to strike expert report denied. Joint motion to bifurcate and stay discovery granted in part and denied in part. Motions for protective orders denied. Motion to compel denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendant competitor for patent infringement. The competitor brought counterclaims against the patent holder and a related corporation. The corporation moved to strike an

expert's report and moved jointly with the patent holder to bifurcate trial and stay discovery.

**OVERVIEW:** The patent holder and the competitor were involved in development of RNA and DNA testing systems. The patent involved technology used in diagnostic medical applications. The competitor counterclaimed under 15 U.S.C.S. § 1125(a) and for unfair competition and tortious interference with prospective business relations under Delaware law. The corporation claimed that the competitor's expert report was based on factual allegations not asserted in the counterclaims, but the court found that the competitor provided the relevant discovery as to the facts relied on by the expert. The expert's report raised no new causes of action. The court found that bifurcation of the patent issues and counterclaims was appropriate in order to avoid jury confusion on complex legal issues. Separating the issues into sequential phases for trial on infringement, validity, and the counterclaims would allow the jury to focus on one body of law at a time. However,

2003 U.S. Dist. LEXIS 10202, *

the court declined to stay discovery on the counterclaims, in the interest of efficiently moving on with their resolution.

**OUTCOME:** The corporation's motion to strike the expert's report was denied. The motion to bifurcate was granted, but a stay of discovery was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > General Overview*
[HN1] All that a plaintiff is required to do in its complaint, under notice pleading, is to provide a short and plain statement showing that it is entitled to relief. Fed. R. Civ. P. 8(a)(2).

*Civil Procedure > Pretrial Matters > Separate Trials*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN2] See Fed. R. Civ. P. 42(b).

*Civil Procedure > Pretrial Matters > Separate Trials*
[HN3] Under Fed. R. Civ. P. 42(b), a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management. Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case. In deciding whether one trial or separate trials will best serve the above factors, the major consid-

eration is directed toward the choice most likely to result in a just final disposition of the litigation.

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Civil Procedure > Pretrial Matters > Separate Trials*
[HN4] In the context of patent cases, experienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury. In fact, bifurcation of complex patent trials has become common.

*Civil Procedure > Pretrial Matters > Separate Trials*
[HN5] Typically, courts bifurcate patent cases into liability and damage trials. Courts also bifurcate complex patent cases in such a way to prevent jury confusion. This reasoning is also applicable to cases involving both patent and non-patent claims.

*Civil Procedure > Pretrial Matters > Separate Trials*
*Civil Procedure > Trials > Jury Trials > Jurors > General Overview*
[HN6] Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them. Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: (1) by presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

2003 U.S. Dist. LEXIS 10202, *

**COUNSEL:** Josy W. Ingersoll, and Sara Beth Reyburn Esquires of YOUNG, CONAWAY, STARGATT & TAYLOR, L.L.P., Wilmington, Delaware.

Of Counsel: Richard L. DeLucia, Jeffrey M. Butler, and Paul M. Richter, Jr., Esquires of KENYON & KENYON, New York, New York. Attorneys for Plaintiff, Enzo Life Sciences, Inc. and Additional Counterclaim Defendant, Enzo Biochem, Inc.

Richard D. Kirk, Esquire of MORRIS, JAMES, HITCHENS & WILLIAMS L.L.P., Wilmington, Delaware.

Of Counsel: Mark R. Labgold, Ph.D., Kevin M. Bell, Laura A. Donnelly, Esquires of PATTON BOGGS L.L.P., McLean, Virginia. Richard J. Oparil, Esquire of PATTON BOGGS L.L.P., Washington, DC. Attorneys for Defendant, Digene Corporation.

**JUDGES:** JOSEPH J.  [*2]  FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOSEPH J. FARNAN, JR.

**OPINION: FARNAN, District Judge**

A teleconference was held in this case on Wednesday, June 4, 2003, to discuss the pending motions. During the teleconference, the Court ruled on several motions. Specifically, for the reasons discussed below, the Court: 1) denied Enzo Biochem, Inc.'s ("Enzo Biochem") Motion to Strike the Expert Report of Stephen Jizmagian (D.I. 144); (2) granted in part and denied in part Enzo Biochem's and Enzo Life Sciences Inc.'s ("Enzo Life Sciences") Joint Motion to Bifurcate Trial on Digene's Business Tort Claims (Counterclaims III-V) and Stay Discovery on Them (D.I. 145); 3) denied Digene Corporation's ("Digene") Motions for Protective Orders (D.I. 104, 113); and 5) denied Enzo Life Sciences' Motion to Compel (D.I. 94).

**I. Factual Background**

This is a patent infringement action brought by Plaintiff Enzo Life Sciences against defendant Digene involving *U.S. Patent No. 6,221,581*B1 (the "'581 Patent"), issued on April 24, 2001. Both Enzo Life Sciences and Digene are companies involved in the development, manufacture and distribution of proprietary RNA and DNA testing systems.  [*3] The *'581 Patent* concerns hybrid capture technology used in diagnostic medical applications.

Plaintiff, Enzo Life Sciences has alleged that Digene is infringing claims 16-26, 30-40, 44-53, 73-87, 91-100 and 104-107 of the *'581 Patent* by making, selling and offering for sale its "Hybrid Capture" diagnostic products. This action began on March 15, 2002 when Digene filed a Summons and Complaint for Declaratory Judgment. Enzo Life Sciences filed a separate lawsuit for patent infringement on March 20, 2002. During a May 2, 2002 status conference, the Court suggested that the parties stipulate to a dismissal of Digene's declaratory judgment Complaint, without prejudice and proceed with Enzo Life Sciences' patent infringement complaint. The Court further explained that Digene would be permitted to bring other claims against any Enzo entity, including Enzo Biochem, as permissive counterclaims. Thereafter, the parties filed a Stipulated Proposed Scheduling Order dismissing Digene's declaratory judgment action without prejudice, and the parties agreed to proceed with all pending and all related claims in Enzo Life Sciences' patent infringement action. Additionally, Digene filed Counterclaims  [*4] against Enzo Life Sciences and Enzo Biochem.

On June 28, 2002, Enzo Life Sciences, Inc. and Enzo Biochem, Inc. moved to dismiss Digene's Counterclaims. On March 31, 2003, the Court denied the motion to dismiss Digene's Counterclaims. (D.I. 124). Fact discovery closed on February 24, 2003 and the parties are

currently conducting expert discovery which is scheduled to close on June 20, 2003.

## II. Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I. 144)

A. Parties' Contentions

Enzo Biochem contends that the expert report of Dr. Stephen Jizmagian should be stricken in its entirety. Specifically, it contends that Digene's counterclaims III-V should be limited to those that were actually pled in the case, namely those that are based upon the two, 2001 press releases by Enzo Biochem regarding the *'581 Patent*. Enzo Biochem points out that Digene, in its counterclaims, alleging causes of action under: 1) § 43(a) of the Lanham Act, *15 U.S.C. § 1125 (a)* (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, *6 Del. C. § § 2531 et seq.* (Count IV); and 3) Tortious Interference With Prospective [*5] Business Relations (Count V), listed two press releases as the factual basis for such claims. However, at this juncture, Enzo Biochem argues that Dr. Jizmagian's expert report concerning damages as to these claims does not mention the press releases, but rather details alleged instances that are not asserted in Digene's counterclaims. For instance, Enzo, points out that the report states that Dr. Jizmagian was told by Digene that Enzo Biochem somehow prevented Digene from obtaining one million dollars in capital through Goldman Sachs in 2000. As a result, Enzo argues that Digene's new claim, as suggested by the expert report, is not that Enzo Biochem interfered with customers seeking to purchase the Hybrid Capture product, but that Enzo Biochem somehow interfered with Digene's ability to raise capital through Goldman Sachs, which allegedly led to lost sales. Based on these facts, Enzo Biochem claims that it is improper for Digene to amend its counterclaims through Dr. Jizmagian's expert report, and therefore, the report should be stricken in its entirety.

In response, Digene asserts that its responses to Enzo Biochem's interrogatories plainly set forth the factual basis for its damages [*6] claims, where Digene listed all parties that it had contracts and/or agreements with from as early as 1992 that were terminated. See Ex. 1 to Kirk Decl. Further, in regard to the time period of damages, Digene contends that it affirmatively stated that Biochem's actions before or at the time the case was filed resulted in direct harm to Digene, where in an interrogatory response they stated:

> As a direct result of Biochem's actions Digene was forced to respond to, participate in or otherwise conduct extensive due diligence, including requests from potential funding entities as well as requests from potential joint venturers. Such requests include but are not limited to requests made when Digene completed its IPO and subsequent follow-on private placement transaction and includes potential follow-on public offering and potential strategic partners such as requests from Cytyc, Affymetrix, Applera Corporation and Roche.

Ex. 1 to Kirk Decl. Further, Digene argues that all of the documents relied on by Dr. Jizmagian were produced during discovery, with the bulk of the disclosures, consisting of four hundred boxes of documents, produced as early as October 2002. Moreover, [*7] Digene argues that Enzo Biochem failed to pursue available discovery, because it did not take any depositions until the last week of extended fact discovery and points to the fact that during Ms. Seyfried's, Digene's Vice President of Business Development, deposition, she mentioned that the financing opportunities which were adversely affected by Enzo's actions included

Goldman Sachs. See Ex. 6 to Kirk Decl. at 176-180. Digene contends that based on the fact that the Court determined that it properly pled the allegations in its Business Tort Counterclaims in its Memorandum Opinion regarding the motion to dismiss (D.I. 124), and the fact that Digene provided all necessary discovery, Enzo's motion to strike should be denied.

B. Discussion

The Motion to Strike will be denied because the Court concludes that Digene pled the necessary elements and provided the relevant discovery.

First, in its Memorandum Opinion denying Enzo's Motion to Dismiss, the Court stated that: 1) the alleged factual basis for the counterclaims were the press releases, and 2) that in the context of interference with business relationships Biochem's alleged actions constitute attempts to induce third parties, [*8] namely customers buying Digene's Hybrid Capture(R) products, not to enter into or continue their business relations with Digene. (D.I. 124 at 2-3, 12). However, after finding that Digene had properly pled these counterclaims for purposes of a motion to dismiss, the Court qualified its conclusions and noted that "there are discovery mechanisms, such as interrogatories, for ascertaining more details regarding the allegations of the complaint." (D.I. 124 at 14).

Here, Digene's Counterclaims involve claims under: 1) § 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)* (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, *6 Del. C. § § 2531 et seq.* (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V). Although Digene listed two press releases as the factual basis for such counterclaims in its Complaint, [HN1] all that it was required to do in its Complaint, under notice pleading, was to provide a short and plain statement showing that they are entitled to relief. *Fed. R. Civ. P. 8(a)(2).* The Court, in its Opinion regarding

Enzo's Motion to Dismiss Digene's Counterclaims determined that Digene had fulfilled [*9] this requirement. (D.I. 124). After this, and in line with the Court's suggestion, the parties conducted fact discovery to ascertain more details regarding the factual allegations of the Complaint. Although Digene did not give Enzo a factual roadmap for all of its allegations, it disclosed all the documents relied upon by Dr. Jizmagian in his report, disclosed potential contractual relationships and financial opportunities affected, including Goldman Sachs, and the relevant time periods, through discovery mechanisms such as interrogatories and depositions. In this case, Digene pled all relevant causes of action, and the parties were supposed to parse out the facts underlying those allegations through discovery. The Court concludes that the facts outlined by Enzo as not disclosed, were in fact disclosed through discovery, and were facts; not new causes of action as Enzo contends. Further, because Dr. Jazmagian's report does not discuss any new causes of action, and the dispute is not raised in the context of a Pretrial Order, the cases relied on by Enzo are inapposite. See, e.g., *Wilson v. Muckula, 303 F.3d 1207, 1216* (10th Cir. 2003) (finding insufficient support [*10] in the amended complaint and ambiguous pretrial order to support a claim for negligent infliction of emotional distress); *Sound Video Unlimited, Inc. v. Video Shack, Inc., 700 F. Supp. 127, 148-149 (S.D N.Y. 1998)* (dealing with time period for calculation of damages in the context of a dispute over a proposed pretrial order). Based on the following: 1) the Court has already determined that Digene has properly pled all the causes of action alleged in their Business Tort Counterclaims; 2) no new causes of action are raised by Dr. Jizmagian's report; and 3) all documents relied upon by Dr. Jizmagian have been provided to Enzo through discovery mechanisms such as interrogatories, depositions and document production, the Motion to Strike will be denied.

## III. Enzo Biochem and Enzo Life Science's Joint Motion to Bifurcate and Stay Discovery (D.I. 145)

### A. Parties' Contentions

Enzo Biochem and Enzo Life Sciences (collectively "Enzo") contend that whether or not Dr. Jizmagian's report is stricken, further discovery on Digene's Counterclaims should be stayed and any trial on them should be bifurcated from the patent infringement claims. First, Enzo [*11] contends that trial of these Counterclaims and any further discovery would be simplified if not mooted upon a finding of invalidity or infringement of the *'581 Patent*. Further, Enzo claims that the issues raise by Counts III-V of Digene's Counterclaims are prime for bifurcation because many of the issues to be tried on the Counterclaims have little or no evidentiary overlap with the issues to be tried in the patent infringement action. For instance, Enzo points out that in the patent infringement trial, evidence regarding the amount of Digene's sales will be at issue, whereas these topics will not be raised in the context of the Counterclaims. Instead, Enzo argues, the Counterclaim trial will deal with issues related to Digene's relationship with third parties and how Digene contends that Enzo harmed these relationships. Enzo also contends that bifurcation is called for because of the complexities involved with having a trial involving not only the issues of infringement and validity but also the issues involved in the Counterclaims. Finally, Enzo argues that if Dr. Jizmagian's expert report is not stricken, bifurcating the Business Tort Counterclaims and staying discovery on them [*12] is even more appropriate and urgent. Specifically, it argues that it should not be denied a speedy trial on the issue of patent infringement, while additional discovery is taken regarding Dr. Jizmagian's expert report. For example, Enzo points out that it would need to seek discovery regarding the financing of Goldman Sachs and would have to serve subpoenas on Goldman Sachs and its intellectual property counsel to determine why the funds were unavailable to Digene.

In response, Digene contends that Enzo's request for bifurcation is neither warranted nor proper given the facts of the case. First, Digene contends that there is significant evidentiary overlap between the Counterclaims and the patent claims. For example, Digene's validity defenses which contend that Enzo's amended claims (1) are not supported by the specifications; (2) claim subject matter that Enzo did not invent; and (3) encompass prior art known to both Enzo an Digene, are the facts that Enzo intends to rely on for its willful infringement, are the same facts which Digene will rely on in support of its validity arguments and in turn are the same facts which Digene relies on in its Counterclaims. Therefore, Digene argues, [*13] bifurcation is not warranted because it would require the Court and the jury to hear the same facts as many as three times. Further, Digene argues that recent discovery has shown the interrelated nature of the Counterclaims, where documents received in the past two weeks from Johnson & Johnson demonstrate that the claims of the *'581 Patent* are not supported by the patent specification and that those limited embodiments which were disclosed in the patent specification were derived from another party. Digene argues that these documents further demonstrate the bad faith and anti-competitive nature of Enzo's acts which preceded the filing of this action and form a basis for Digene's Counterclaims. Finally, Digene argues that Enzo's request to stay further discovery on the Business Tort Counterclaims is untimely, where Enzo has been given unfettered access to Counterclaim discovery and has failed to pursue such discovery as evidenced by its failure to take any depositions until the last week of an already extended fact discovery.

### B. Discussion

The Court concludes that the Counterclaim and patent issues will be bifurcated in order to avoid jury confusion on complex legal issues.

Federal [*14] *Rule of Civil Procedure 42(b)* ("*Rule 42(b)*") governs the bifurcation of trials and, in relevant part, provides:

> [HN2] The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or ... issues, always preserving inviolate the right of trial by jury as declared by the *Seventh Amendment to the Constitution* or as given by a statute of the United States.

*Fed. R. Civ. P. 42(b)*.

[HN3] Under *Rule 42(b)*, "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed. Cir. 1987)*; see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under *Rule 42(b)* should be, and is, a matter left to the discretion of the trial court ...."). Courts, when exercising their broad discretion to bifurcate issues for trial under *Rule 42(b)*, should consider whether bifurcation will avoid prejudice, conserve judicial resources, [*15] and enhance juror comprehension of the issues presented in the case. *Union Carbide Corp. v. Montell N.V., 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998)*. "In deciding whether one trial or separate trials will best serve [the above factors] ... the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." *In re Innotron Diagnostics, 800 F.2d 1077, 1084 (Fed. Cir. 1986)*; see also Wright & Miller, supra, § 2388.

[HN4] In the context of patent cases, "experienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." Thomas L. Creel & Robert P. Taylor, Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice, 424 PLI/Pat 823, 826 (1995); see also Manual for Complex Litigation (Third) § 33.62 (1995) (advising trial judges to bifurcate or trifurcate overly complex patent trials). In fact, bifurcation of complex patent trials has become common. Steven S. Gensler, Bifurcation Unbound, *75 Wash. L. Rev. 705, 725 (2000)*("Bifurcation is [*16] also common in patent litigation ...."); Creel & Taylor, supra, at 825 ("Bifurcation or even trifurcation is common in patent cases.").

[HN5] Typically, courts bifurcate patent cases into liability and damage trials. *Swofford v. B&W, Inc., 336 F.2d 406 (5th Cir. 1964)*, cert. denied, *379 U.S. 962, 13 L. Ed. 2d 557, 85 S. Ct. 653 (1965)* (bifurcating patent case into liability and damage trials). Courts also bifurcate complex patent cases in such a way to prevent jury confusion. *Smith v. Alyeska Pipeline Service Co., 538 F. Supp. 977, 984 (D. Del. 1982)* (finding "that one trial of both issues [i.e., liability and damages] would tend to clutter the record and to confuse the jury."). This reasoning is also applicable to cases involving both patent and non-patent claims.

[HN6] Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.

> Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: [*17] (1) by

presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

Gensler, *supra, at 751*.

In this case, the bifurcation of issues would prevent jury confusion, in that it would enable a jury to concentrate on one complex body of law at a time. Also, in order to enhance jury comprehension and avoid prejudice, the Court will separate the issues into three sequential phases for trial in the following manner: 1) infringement; 2) validity; and 3) Business Tort Counterclaims. Although the Court recognizes that there is some evidentiary overlap, the parties will not be prejudiced by separate trials and the procedure will produce an efficient and fair disposition of the parties' claims.

The issue of staying discovery on the Counterclaims, however, is a more difficult question. The discovery phase in this case has already been extended and the Court is concerned that a stay of discovery on the Business Tort Counterclaims will prevent a fair and efficient resolution to the Counterclaims. Although the Court recognizes that the Counterclaims may be mooted or simplified [*18] depending on the outcome of the patent issues, this must be weighed against the importance of judicial efficiency and fairness. After weighing the relevant factors, the Court will deny the motion to stay because the Court finds that the interest in efficiently moving on with the resolution of the Counterclaims outweighs Enzo's concerns. Additionally, the Court concludes that the interest of fairness is served by a further extension of fact discovery as to those claims. Thus, the Motion to Bifurcate and Stay discovery will be granted in part and denied in part.

## IV. Digene's Protective Orders (D.I. 104, 113)

Digene has filed two Protective Orders in the instant case. The first, D.I. 104, asks the Court for a Protective Order to preclude Enzo from disclosing Digene's confidential or outside counsel only information to Enzo's proposed expert Dr. James Wetmur. The Court concludes that Digene has not met its burden of proof with regard to this issue and also concludes that the Stipulated Protective Order is sufficient at this time. Therefore, Digene's Motion for a Protective Order (D.I. 104), will be denied.

The second motion requests a Protective Order precluding Enzo Life [*19] Sciences from taking Digene's Deposition pursuant to *Rule 30(b)(6)* because it is unnecessarily duplicative and unduly burdensome. After reviewing the parties' arguments, the Court finds that the deposition notice was not unreasonably duplicative or unduly burdensome, and therefore, Digene's Motion for a Protective Order (D.I. 113) will be denied.

An appropriate Order will be entered.

### ORDER

NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY ORDERED this 10th day of June 2003, that:

1) Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I. 144) is **DENIED;**

2) Enzo Biochem's and Enzo Life Sciences' Joint Motion to Bifurcate and Stay Discovery (D.I. 145) is **GRANTED** as to Bifurcation of issues but **DENIED** as to the Stay of Discovery on the Business Tort Counterclaims;

3) Fact Discovery as to the Business Tort Counterclaims shall be extended so as to be completed by August 15, 2003;

4) Digene's Motion for Protective Order (D.I. 104) is **DENIED;**

5) Digene's Motion for Protective Order (D.I. 113) is **DENIED;**

6) Plaintiff's Motion to Compel Digene to Produce a 30(b)(6) Deponent [*20] is **DENIED** as moot because the Parties have resolved the issue;

7) As discussed at the teleconference on Wednesday, June 4, 2003, Enzo counsel is permitted to show their clients an unredacted version of Dr. Jizmagian's expert report;

8) The parties shall submit a letter with a Proposed Agreed Upon Trial Date for February or March, 2004;

9) A Pretrial Conference will be held on **Thursday, November 6, 2003** at 2:30 p.m., in Courtroom No. 4B on the 4th Floor, Boggs Federal Building, Wilmington, Delaware.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# Exhibit B

LEXSEE 1991 U.S. DIST. LEXIS 20492



Caution
As of: Jan 22, 2007

**AVIA GROUP INTERNATIONAL, INC., Plaintiff and Counterdefendant, v. NIKE, INC., Defendant and Counterclaimant.**

**Cv. No. 91-326-JU**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

***1991 U.S. Dist. LEXIS 20492; 22 U.S.P.Q.2D (BNA) 1475***

**September 17, 1991, Decided
September 17, 1991, Filed**

**SUBSEQUENT HISTORY:**  [*1]  *Adopting Order of November 15, 1991, Reported at 1991 U.S. Dist. LEXIS 20493.*

**DISPOSITION:** Defendant's motion for separate trials of the issues of liability, damages, enhanced damages and attorneys' fees and for a stay of discovery related to willfulness (docket #13) is GRANTED. Separate jury trials for the issues of liability and damages will be held. After these trials a separate court trial on the issue of enhanced damages and attorneys' fees will be held. Discovery related to willfulness is stayed until after a determination of liability, but this stay is limited to attorney-client privileged information and attorney work product.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder brought an infringement action against defendant corporation and the corporation counterclaimed. The corporation requested separate trials on the issues of liability, damages, enhanced damages, and attorney fees under *35 U.S.C.S. § § 284* & 285. The corporation also requested a stay of discovery related to discovery of enhanced damages and attorneys' fees.

**OVERVIEW:** The corporation contended that separate trials would have promoted judicial economy; the issues of liability and damages were substantially distinct; and there was no right to a jury trial on the issues of enhancement and attorney fees. The court held that the jury's findings on infringement could have eliminated the damages issue or encourage settlement. The court also held that the issue of intent was irrelevant to determine infringement but crucial to the issue of enhanced damages. In addition, the court held that there was no right to a jury trial on the issue of enhanced damages and attorney fees and no Seventh Amendment violation would have occurred. Finally, the court held that it was reasonable to prevent discovery of all attorney-client privileged and

1991 U.S. Dist. LEXIS 20492, *; 22 U.S.P.Q.2D (BNA) 1475

work-product information until after the determination of liability. The corporation would have been forced to waive its attorney-client privilege on the intent issue because the court could have inferred that the corporation failed to obtain an attorney's opinion if the corporation did not produce an exculpatory opinion of counsel.

**OUTCOME:** The court granted the corporation's request for separate trials. The issues of liability and damages were to be decided in jury trials and the issues of enhanced damages and attorney fees were to be heard by the court. The court also stayed discovery of attorney-client privileged information and attorney work product until after liability was determined.

## LexisNexis(R) Headnotes

*Civil Procedure > Pretrial Matters > Separate Trials*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > General Overview*
[HN1] Fed. R. Civ. P. 42(b) provides in relevant part: The court, in furtherance of convenience or to avoid prejudice or when separate trials will be conducive to expedition and economy, may order a separate trial of any separate issue or issues, always preserving inviolate the rights of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Pretrial Matters > Separate Trials*
[HN2] Bifurcation of trial liability and damages issues is to be decided on a case-by-case basis at the informed discretion of the trial judge. The trial court has broad discretion to deny or

grant separate trials under Fed. R. Civ. P. 42(b). Notwithstanding this broad discretion, a court should not routinely order separate trials.

*Civil Procedure > Pretrial Matters > Separate Trials*
*Copyright Law > Civil Infringement Actions > Remedies > Damages > General Overview*
[HN3] The issues of validity, title, infringement, and damages in patent and copyright cases may be separately tried, unless this course will inconvenience the court or seriously prejudice the rights of some of the parties.

*Civil Procedure > Pretrial Matters > Separate Trials*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > General Overview*
[HN4] An important limitation under Fed. R. Civ. P. 42(b) is that the issues to be tried must be sufficiently distinct and separable such that separate trials will not result in overlap.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN5] In determining the question of infringement, the desire or intent to infringe a patent is irrelevant. However intent is crucial to the imposition of increased damages.

*Civil Procedure > Pretrial Matters > Separate Trials*
*Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions*
[HN6] Separate trials only violate the Seventh Amendment when they involve both overlapping issues and different juries.

1991 U.S. Dist. LEXIS 20492, *; 22 U.S.P.Q.2D (BNA) 1475

*Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards*
*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN7] *35 U.S.C.S. § 284* provides that the court may increase damages up to three times the amount found or assessed in patent infringement cases. *35 U.S.C.S. § 285* allows the court to award reasonable attorneys' fees to the prevailing party in an exceptional case.

*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
*Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN8] there is no constitutional right to a jury trial on issues under either *35 U.S.C.S. § 284* or § 285.

*Civil Procedure > Discovery > Privileged Matters > Work Product > Waivers*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN9] When a party charged with patent infringement fails to produce exculpatory opinion of counsel, the court may infer that the party fails to obtain such an opinion or that the opinion advised against the party's continued use of its product. A party may be forced to waive the attorney-client privilege and the work product immunity in order to defend against a charge of willful infringement.

**JUDGES:** Juba

**OPINION BY:** GEORGE E. JUBA

**OPINION:**

ORDER

JUBA, Magistrate:

### INTRODUCTION

This is an action for patent infringement brought by plaintiff, AVIA Group International, Inc. ("Avia") against defendant, Nike, Inc. ("Nike"). Avia is a Delaware corporation having its principal place of business in Portland, Oregon. Nike is an Oregon corporation having its principal place of business in Beaverton, Oregon. This court has jurisdiction over the subject matter of this action pursuant to *28 U.S.C. § 1338*(a). Venue is proper in the District of Oregon under *28 U.S.C. § § 1391*(c) and 1400(b).

Avia charges Nike with infringement [*2] of Avia's U.S. Patent Nos. *4,372,058* ("the *'058* Patent"); *4,741,114* ("the *'114* Patent"), and *4,449,307* ("the *'307* Patent"). Avia requests preliminary and permanent injunctive relief, damages, treble damages for willful infringement, and reasonable attorneys' fees and costs. Avia has demanded a trial by jury of all issues.

Nike denies any allegations of infringement on its part and asserts affirmative defenses challenging the validity and enforceability of the three Avia Patents. Nike also asserts counterclaims charging Avia with infringement of Nike's U.S. Patent Nos. *4,439,936* ("the *'936* Patent") and *4,562,651* ("the *'651* Patent"). In the counterclaims, Nike requests an injunction, damages, treble damages for willful infringement, and attorneys' fees and costs. Nike has also demanded a jury trial.

Defendant Nike has brought this motion for separate trials of the issues of liability and damages, separate trial to the court of the issues of enhancement of damages under *35 U.S.C. § 284* and awarding of attorneys' fees under *35*

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 89 of 134

Page 4

1991 U.S. Dist. LEXIS 20492, *; 22 U.S.P.Q.2D (BNA) 1475

*U.S.C. § 285,* and a stay of discovery on enhanced damages and attorneys' fees.

### STANDARDS[HN1]

*F. R. Civ. P. 42(b)* provides in relevant part:

The court, [*3] in furtherance of convenience or to avoid prejudice or when separate trials will be conducive to expedition and economy, may order a separate trial . . . of any separate issue . . . or issues, always preserving inviolate the rights of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a Statute of the United States.

[HN2]
Bifurcation of trial liability and damages issues is to be decided on a case-by-case basis at the informed discretion of the trial judge. *Lis v. Robert Packer Hospital, 579 F.2d 819, 824 (3rd Cir. 1978),* cert. denied, *439 U.S. 955 (1978).* The trial court has broad discretion to deny or grant separate trials under *F. R. Civ. P. 42(b). Davis & Cox v. Summa Corp., 751 F.2d 1507, 1517 (9th Cir. 1985).* Notwithstanding this broad discretion, a court should not routinely order separate trials. *Keyes Fibre Co. v. Packaging Corp. of America, 763 F.Supp. 374, 375-376 (N.D. Ill. 1991).*

### DISCUSSION

A. The Issues of Liability Should Be Tried Separately From and Prior to the Issues of Damages.

A leading patent infringement case notes that although a normal [*4] law suit seldom requires bifurcation, [HN3] "the issues of validity, title, infringement, and damages in patent and copyright cases may be separately tried, unless this course will inconvenience the court or seriously prejudice the rights of some of the parties." *Swofford v. B & W, Inc., 34 F.R.D. 15 (S.D. Tex. 1963),* aff'd, *336 F.2d 406, 415 (5th Cir. 1964).*

1. Separate Trials Will Promote Judicial Economy and Efficiency.

Currently five patents are at issue in this case, and there are at least eight allegedly infringing products. Defendant's Memorandum, Page 5. Through highly technical proof, the jury will be required to interpret the patents and the allegedly infringing products. Evidence regarding damages may also be complex and involved with the potential for calculations of reasonable royalties and lost profits.

A separate trial on liability will likely result in a simplification of damage issues or the elimination of such an inquiry altogether. Should the jury find any of the patents invalid, unenforceable, or not infringed, no damages inquiry need be presented for those patents nor for any non-infringing product. Furthermore, a jury [*5] finding on liability may encourage settlement of the damages issue and thereby eliminate the need for a second trial.

2. The Issues of Liability and Damages are Substantially Distinct To Permit Separate Trials.

[HN4] An important limitation under *F. R. Civ. P. 42(b)* is that the issues to be tried must be sufficiently distinct and separable such that separate trials will not result in overlap. *Swofford, 336 F.2d at 415.* Here the liability issues will require proof of the specifics of the invention, the validity of the patent, and the structure and operation of the allegedly infringing product. The damages issue is substantially different and will require proof of sales, costing factors, profit levels and offsetting costs.

Plaintiff contends that the issue of willfulness will overlap under both liability and damages and therefore result in violation of the Seventh Amendment. The Ninth Circuit has unequivocally asserted, [HN5] "In determining the question of infringement, the desire or intent to infringe a patent is irrelevant. However intent is crucial to the imposition of increased

damages." *Wilden Pump & Engineering Co. v. Pressed & Welded Products Co., 655 F.2d 984, 989 (9th Cir. 1981)* [*6] (emphasis added) (citations omitted). Because intent is irrelevant to a determination of patent infringement, there is no overlap concerning willfulness between the issue of liability and damages.

Although an overlap regarding evidence of the "commercial success" of the products is likely to occur, this court is not convinced that such an overlap is great enough to justify denial of bifurcation. One court granting separate trials for liability and damages in a patent infringement dispute explains, "The question of commercial success is not ordinarily determined by a detailed analysis of exhaustive and intricate financial data, such as is required for proof of damages, but rather by whether the claimed invention is, broadly speaking, an accepted product and a big seller." *Paine, Webber, Jackson & Curtis v. Merrill Lynch, 587 F.Supp. 1112, 1116 (D. Del. 1984).*

Plaintiff also contends that defendant's request for bifurcation is premature because discovery has just commenced. It is not uncommon, however, for courts to bifurcate issues of liability and damages before substantial discovery has occurred and there is time to stay discovery of damages. See, e.g., [*7] *Giro Sport Design, Inc. v. Pro-Tec, Inc., 10 U.S.P.Q.2d 1863 (N.D. Cal. 1989); Eaton Corp. v. Auburn Gear, Inc., 8 U.S.P.Q.2d 1373 (N.D. Ind. 1988).*

3. Plaintiff Will Not Be Prejudiced by Separate Trials.

[HN6] Separate trials only violate the Seventh Amendment when they involve both overlapping issues and different juries. *Paine, Webber, 587 F. Supp. at 1116* (emphasis in original). Because this court has found no substantial overlap between the issues of liability and damages, there is no Seventh Amendment violation.

B. There Is No Right to a Jury Trial On The Issue of Enhancement of Damages and Awarding Attorneys' Fees.

[HN7] *35 U.S.C. § 284* provides that the court may increase damages up to three times the amount found or assessed in patent infringement cases. *35 U.S.C. § 285* allows the court to award reasonable attorneys' fees to the prevailing party in an exceptional case. After both a detailed analysis of the language of *35 U.S.C. § 284* and prior patent case law, the leading case on this issue held that [HN8] there is no constitutional right to a jury trial on issues under either § 284 or § 285. *Swofford, 336 F.2d at 411-414.* [*8] See also *White v. Mar-Bel, Inc., 509 F.2d 287, 292 (5th Cir. 1975)* (jury's finding that compensatory damages should be trebled is advisory only). Therefore the issues of enhancement of damages and awarding of attorneys' fees must be presented to the court in a separate trial.

C. Discovery of Attorney-Client Privileged Information and Attorney Work-Product Related to Enhanced Damages and Attorneys' Fees Shall Be Stayed Until After a Determination of Liability.

The Federal Circuit has asserted that [HN9] when a party charged with patent infringement fails to produce exculpatory opinion of counsel, the court may infer that the party failed to obtain such an opinion or that the opinion advised against the party's continued use of its product. *Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1672-73 (Fed. Cir. 1988).* A party may be forced to waive the attorney-client privilege and the work product immunity in order to defend against a charge of willful infringement.

Because willfulness is not relevant to the issue of liability, Nike's request to stay all attorney-client privileged information and attorney work-product related to willfulness [*9] until after a determination of liability is reasonable. Nike will be unfairly prejudiced if it is required

1991 U.S. Dist. LEXIS 20492, *; 22 U.S.P.Q.2D (BNA) 1475

to divulge the contents of its private communication with counsel prior to a determination on liability because such communications typically discuss legal theories and strategy. The rationale for staying privileged information or attorney work product does not extend to a stay of all discovery relating to enhanced damages or awarding attorneys' fees. Therefore, discovery of attorney-client privileged information and attorney work product relating to enhanced damages and attorneys' fees is stayed until after a determination of liability.

## CONCLUSION

Defendant's motion for separate trials of the issues of liability, damages, enhanced damages and attorneys' fees and for a stay of discovery related to willfulness (docket #13) is GRANTED. Separate jury trials for the issues of liability and damages will be held. After these trials a separate court trial on the issue of enhanced damages and attorneys' fees will be held. Discovery related to willfulness is stayed until after a determination of liability, but this stay is limited to attorney-client privileged information and [*10] attorney work product.

Dated this 17th day of September, 1991.

George E. Juba

United States Magistrate

Exhibit C

LEXSEE 2006 U.S. DIST. LEXIS 18655



Analysis
As of: Jan 24, 2007

**MCKESSON INFORMATION SOLUTIONS LLC, Plaintiff, v. THE TRIZETTO GROUP, INC., Defendant.**

**Civ. No. 04-1258-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 18655*

**April 11, 2006, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at *McKesson Info. Solutions LLC v. Trizetto Group, Inc., 2006 U.S. Dist. LEXIS 20078 (D. Del., Apr. 17, 2006)*

**PRIOR HISTORY:** *McKesson Info. Solutions LLC v. TriZetto Group, Inc., 2006 U.S. Dist. LEXIS 16097 (D. Del., Apr. 5, 2006)*

**COUNSEL:** [*1] For McKesson Information Solutions LLC, Plaintiff: Thomas J. Allingham, II, Michael A. Barlow, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE.

For Trizetto Group Inc., Defendant: Jack B. Blumenfeld, Rodger Dallery Smith, II, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Blue Cross Blue Shield of Michigan, Movant: Thomas P. Preston, Blank Rome LLP, Wilmington, DE.

For Trizetto Group Inc., Counter Claimant: Jack B. Blumenfeld, Rodger Dallery Smith, II,

Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For McKesson Information Solutions LLC, Counter Defendant: Thomas J. Allingham, II, Michael A. Barlow, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

At Wilmington this 11th day of April, 2006, having heard oral argument at the pretrial conference and having reviewed the papers submitted in connection with the issues;

**IT IS ORDERED** that:

1. Defendant's claim of inequitable conduct will be separated and heard with the validity portion of the case, as yet unscheduled for trial.

2006 U.S. Dist. LEXIS 18655, *

The current trial will be conducted in two phases. First, the parties [*2] will try to the jury the issue of infringement. The jury will deliberate and return a verdict on infringement. If necessary, the parties will next try willfulness and damages to the jury. The preliminary jury instructions have been amended to reflect this arrangement.

2. The entire history of the relationship between the parties will be admissible. See *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1342 (Fed. Cir. 2004)* ("Determination of willfulness is made on consideration of the totality of the circumstances"). Such evidence, including evidence of laches, n1 prior art known to the defendant and the parties' prior negotiations, is relevant to a willfulness defense, as well as for impeachment purposes. *Fed. R. Evid. 408.*

3. Roger Blakely must be made available for a three hour deposition prior to testifying at trial.

4. Jeff Margolis need not appear in the plaintiff's case in chief.

5. Defendant must make all three 30(b)(6) witnesses on the accused products available.

6. Evidence of the license agreement in the GMIS litigation is admissible, but nothing else.

7. The court will not visit, at this [*3] stage of the proceedings, the issue of whether plaintiff complied with the special master's request of turning over privileged documents.

8. TriZetto's fact witnesses may testify as to their knowledge of whether the accused products perform a stated function. This testimony may not be referred to as an "admission of infringement."

9. The hypothetical negotiations presented by McKesson's expert are admissible.

10. The court re-affirms its position that plaintiff's experts, specifically Dr. Johnson, did not perform the requisite infringement determi-

nation for a means plus function claim. Dr. Johnson extracted the functionality described in the claims and specification and constructed her own algorithm incorporating these functions. Dr. Johnson then searched for her own algorithm in the accused products; i.e., Dr. Johnson did not go through and take each "means for" limitation from the claims and find corresponding structure in both the patent and product. To the extent that "software" is the court's defined structure in the means plus function limitations, Dr. Johnson's analysis may be adequate. To the extent that the court required the means plus function limitations be limited to [*4] a specific algorithm from the patent (i.e., the "means for determining" limitations), Dr. Johnson's analysis is inadequate. Summary judgment on these limitations remains granted.

11. It is not clear to the court how the claim limitation "**predetermined** database" relates to the portions of the specification that would appear to contemplate updates and modifications to the expert database to reflect a user's particular experience. As noted by McKesson, the specification describes "HISTORY database 40" "as a means to study" "'case histories' and refine, update and **change the rules** and the knowledge base interpreter 5" which, along with the "knowledge base 6", constitute the predetermined database of the claims. ('164 patent, col. 10, 11 4-7) Nevertheless, mindful of the admonition that the court's claim construction be consistent with the specification rather than necessarily consistent with the dictionary meaning of the language used in the claims by the patentee, "predetermined database" is construed to mean: "A set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment."

12. The court has reviewed in camera [*5] the documents submitted by McKesson as being at issue in connection with McKesson's appeal from Special Master Order No. 9.

a. With respect to exhibit A (identified as "H" in Special Master Order No. 4), plaintiff's appeal is denied, as the Special Master did not commit error in ordering the production of the document as redacted per Special Master Order No. 9.

b. With respect to exhibit B (identified as "J" in Special Master Order No. 4), plaintiff's appeal is denied, as the Special Master did not commit error in ordering the production of the document as redacted per Special Master Order No. 9.

c. With respect to exhibit C (addressed in Special Master Order No. 8, McK 030145-46), plaintiff's appeal is denied, as the Special Master did not commit error in ordering the production of the document as redacted per Special Master Order No. 8.

d. With respect to exhibit D (addressed in Special Master Order No. 8), the court sees no reference to this document in Special Master Order No. 9; therefore, the appeal is untimely and denied.

e. These documents, consistent with Special Master Orders 8 and 9, shall be produced on or before Friday, April 14, 2006.

n1 See *Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1555 (Fed. Cir. 1996)*. Because evidence of laches and, to some extent, estoppel will be presented to the jury as relevant, inter alia, to TriZetto's willfulness defense, the parties need not repeat this evidence for the court's substantive decisions on TriZetto's equitable defenses. To the extent that there is additional evidence, the parties will need to allocate some portion of their trial hours to make their record for the court.

[*6]

Sue L. Robinson

United States District Judge

# Exhibit D

LEXSEE 1998 U.S. DIST. LEXIS 7825



Warning
As of: Jan 22, 2007

**ACCUSCAN, INC., Plaintiff, -against- XEROX CORPORATION, Defendant.**

**96 Civ. 2579 (HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 7825*

**May 26, 1998, Decided
May 27, 1998, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A jury rendered a verdict in favor of plaintiff patent holder, finding that defendant corporation infringed on the patent holder's patent, awarded damages and found that the corporation did not willfully infringe. The court requested an advisory verdict on the issue of the equitable defense of laches asserted by the corporation. The jury found that the patent holder was not guilty of unreasonable and inexcusable delay in filing the action.

**OVERVIEW:** The patent holder brought suit against the corporation six years after the corporation was explicitly accused of infringement. The patent holder argued that the corporation's conduct in failing to obtain an outside legal opinion on the issues of infringement of the patent at issue until three years after receiving notice of the alleged infringement constituted egregious conduct which defeated a defense of laches. The court found that the corporation did not engage in egregious conduct which defeated a defense of laches finding that it did not willfully ignore the patent holder's charges, but instead pursued the investigation internally, albeit slowly. The court held that use of in house counsel to pursue investigation was not inherently wrong. The court further found that the patent holder knew or should have known of its claim six years prior to it filing suit. The court held that a six year delay established a presumption of laches, but that that the corporation failed to prove by a preponderance of the evidence that the patent holder's delay was unreasonable and inexcusable as the parties had been engaged in license negotiations sporadically throughout the six year delay.

**OUTCOME:** The court affirmed the jury's advisory verdict and found that the corporation failed to establish its affirmative defense of laches.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN1] Laches is a defense to a patent infringement suit that arises when a patent holder neglects or delays bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar. The rationale underlying the doctrine of laches has been expressed as follows: laches assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN2] See *35 U.S.C.S. § 282.*

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN3] See *35 U.S.C.S. § 286.*

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN4] The application of the defense of laches is left to the sound discretion of the district court. Determination of laches is not made upon the application of mechanical rules; rather, a court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties. If a laches defense is successful, it bars the right to recover damages only with respect to damages accrued before suit is filed.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN5] The defense of laches requires that the defendant prove the following two elements by a preponderance of the evidence: (1) that the plaintiff engaged in unreasonable and inexcusable delay in the assertion of its claim from the time plaintiff knew or reasonably should have known of its claim against the defendant; and (2) prejudice or injury to the defendant resulting from the plaintiffs delay.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN6] Even if the elements of laches are established, a court need not bar a plaintiffs suit. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, a laches defense may be denied. A laches defense may be defeated if the infringer has engaged in particularly egregious conduct which would change the equities significantly in plaintiffs favor. When determining whether a laches defense is appropriate, a court must weigh the length of the delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability.

*Evidence > Inferences & Presumptions > Creation of Presumptions*
*Evidence > Inferences & Presumptions > Presumptions*

1998 U.S. Dist. LEXIS 7825, *

*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*

[HN7] A delay of six years in filing suit creates a presumption of laches. This presumption compels an inference of unreasonable delay and resulting prejudice to the defendant. The plaintiff then has the burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay or prejudice. This burden is simply a burden of production; the presumption may be eliminated even if the evidence introduced by the plaintiff is ultimately found not persuasive. The presumption of laches arising after a six year delay is a double bursting bubble which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice. Once the presumption is overcome, the defendant is required to affirmatively prove both elements of laches. The ultimate burden of persuasion is never shifted from the defendant.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Notice*

[HN8] A defense of laches can be defeated, even where the elements of laches have been established by a showing that the infringer has engaged in particularly egregious conduct.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*

[HN9] Use of in house counsel to pursue investigation is not inherently wrong but should be viewed on a case by case basis.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Infringement Actions > Summary Judgment > Appeals*

[HN10] The period of delay for laches purposes is measured from when the plaintiff had actual notice of its claim or reasonably should have known of its claim.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*

[HN11] In determining when a party knew or should have known of the defendant's infringement, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*

[HN12] Involvement in other litigation has been recognized as a reasonable excuse for laches purposes. In general, in order for other litigation to excuse a delay in bringing suit, there must be adequate notice of the other proceedings to the accused infringer and of the patentee's intent to enforce its patent upon completion of the proceedings.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*

[HN13] There can be no rigid requirement in judging a laches defense that such notice must be given. If a defendant is aware of the litigation from other sources, it would place form over substance to require a specific notice. Where there is prior contact, the overall equi-

ties may require appropriate notice. However, a notice requirement is not to be rigidly imposed.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN14] Where formal notice has not been given of another litigation, but the alleged infringer is otherwise aware of the other litigation, depending on the circumstances, actual notice may not be required. The determinative question is whether the alleged infringer had reason to believe it was likely to be sued. Where the alleged infringer is aware of the ongoing litigation and is also aware that the patentee is likely to subsequently file suit against it, express notice is not always necessary. If the parties prior contact has led the alleged infringer to believe that it is not likely to be sued, actual notice of the litigation and the intent to enforce the patent may is required.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN15] License negotiations can push back the running of time in a laches defense under appropriate circumstances. In order for such tolling to occur, the negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN16] Where the parties' license negotiations are sporadic and unfruitful, those negotiations do not excuse a significant delay. When negotiations are too sporadic or one-sided to constitute sufficient excuses for a delay, the defendant clearly expresses that it is not interested in negotiations during the period of delay.

**COUNSEL:**   [*1]   For ACCUSAN, INC., plaintiff: Xerox Corporation, Hill, Betts & Nash, NY, NY.

For ACCUSAN, INC., plaintiff: John Francis Sweeney, Morgan & Finnegan, NY, NY.

For XEROX CORP., defendant: Thomas L. Creel, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY.

For XEROX CORP., counter-claimant: Thomas L. Creel, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York, NY.

For ACCUSAN, INC., counter-defendant: Xerox Corporation, Hill, Betts & Nash, NY, NY.

For ACCUSAN, INC., counter-defendant: John Francis Sweeney, Morgan & Finnegan, NY, NY.

**JUDGES:** Harold Baer, Jr., U.S.D.J.

**OPINION BY:** Harold Baer, Jr.

**OPINION:**

### OPINION AND ORDER

**Hon. Harold Baer, Jr., District Judge:**

I. Procedural History

This is a patent infringement action instituted by plaintiff AccuScan, Inc. ("AccuScan"), in which AccuScan alleged that defendant Xerox Corporation ("Xerox") infringed its U.S. Patent No. *3,952,144* ("the *'144* patent"). Prior to the trial in this matter, Xerox moved for summary judgment on several grounds, including laches. I denied Xerox's motion for summary judgment; with respect to its laches defense, I found that there were genuine issues of fact for trial. This [*2]  case was tried before this Court and a jury on March 23-27, and

March 30, 1998. During trial, Xerox also asserted the equitable defense of laches. On April 1, 1998, the jury rendered a verdict in favor of AccuScan, finding that several of Xerox's products infringed AccuScan's *'144* patent. The jury awarded damages for such infringement in the amount of $ 40 million. The jury also found that Xerox did not willfully infringe.

Since laches is an equitable defense, I asked the jury only for an advisory verdict on this issue. The jury found that AccuScan was not guilty of unreasonable and inexcusable delay in filing this action. Because that advisory verdict has no binding effect on this Court, however, I have examined the evidence with respect to Xerox's defense of laches. For the reasons set forth below and based upon the evidence at trial, I concur with the jury's advisory verdict and find that Xerox has failed to establish its affirmative defense of laches.

## II. Background and Findings of Fact

In this action, plaintiff AccuScan alleged that Xerox's facsimile machines, scanners and copiers infringed claims 1 and 17 of its *'144* patent. The *'144* patent issued on April 20, 1976. The [*3] first accused infringing Xerox product, its model 7020 facsimile machine, was commercially introduced in 1986. In March 1989, AccuScan sent a letter to Xerox stating that Xerox's 4,216,503 patent (the "'503 patent") "appears to describe a system falling within the scope of claim 1 in AccuScan's" *'144* patent, but offered to "pursue the possibility of a license to Xerox." Plaintiff's Trial Exhibit ("PTX") 61. Xerox responded in May 1989 that it had never commercialized the '503 patent. PTX 62. In March 1990, AccuScan again wrote Xerox, providing details as to the scope of its *'144* patent, and offering Xerox a license for $ 150,000. Defendant's Trial Exhibit ("DTX") YN. In a subsequent letter dated October 12, 1990, AccuScan accused several Xerox facsimile machines, including the model 7020, of infringement, and again offered a license to

Xerox. PTX 64. Xerox never accepted AccuScan's offer of a license.

Almost three years after explicitly being accused of infringement, in March 1993, Xerox obtained an opinion of outside legal counsel concerning invalidity and infringement with respect to *'144* patent. Prior to this opinion, Xerox pursued its investigation of the *'144* patent internally. [*4] Tr. n1 at 424-425. In late 1993, AccuScan instituted patent infringement litigations regarding the *'144* patent against Murata and Matsushita. n2 Xerox was aware of these other litigations, at the latest by early 1994. Tr. 441; PTX 73. On April 11, 1996, AccuScan brought the instant action against Xerox.

n1 Tr. refers to the transcript of the trial in this matter.

n2 AccuScan was also involved in litigation with Ricoh Company Ltd. over the *'144* patent in 1990. DTX YN.

## III. Legal Standard

### A. Elements of A Laches Defense

[HN1] Laches is a long-recognized defense to a patent infringement suit that arises when a patent holder neglects or delays "bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)*(in banc). The rationale underlying the doctrine of laches has been expressed as follows: "[laches] [*5] assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by de-

lay in asserting them." *Envt'l Defense Fund, Inc. v. Alexander, 614 F.2d 474, 481 (5th Cir.), cert. denied, 449 U.S. 919 (1980).*

The doctrine of laches was developed by chancellors of equity to prevent the assertion of stale claims and to remedy the inequity that sometimes arose because of the existence of a separate system of equity: when an equitable remedy was sought, the statute of limitations that ordinarily would apply to a legal right was inapplicable. This doctrine was eventually adopted by common law courts, and following the merger of law and equity "became part of the general body of rules governing relief in the federal court system." *Envt'l Defense Fund, 614 F.2d at 478.* As a defense to a claim of patent infringement, "laches was well established at the time of recodificaiton of the patent laws in 1952." *Aukerman, 960 F.2d at 1029* (collecting cases). In *J.P. Stevens & Co. v. Lex Tex Ltd. Inc., 747 F.2d 1553, 1561 (Fed.* [*6] *Cir. 1984), cert. denied, 474 U.S. 822, 88 L. Ed. 2d 60, 106 S. Ct. 73 (1985),* the Federal Circuit confirmed the applicability of the doctrine of laches to patent suits. In *Stevens,* the court held that *35 U.S.C. § 282,* which delineates the defenses available in a patent infringement action, includes "equitable defenses such as laches, estoppel and unclean hands." n3 Subsequently, the Federal Circuit reconfirmed that the doctrine of laches applies to patent suits in *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)*(in banc), despite the argument that the defense of laches was inapplicable because it conflicts with *35 U.S.C. § 286* (1986). n4

n3 3 [HN2] *35 U.S.C. § 282* reads in part: "The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded: (1) Noninfringement, absence of liability for infringement, or unenforceability... ."

n4 [HN3] *35 U.S.C. § 286* reads: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

[*7] [HN4]

The application of the defense of laches is left to the sound discretion of the district court. Determination of laches is not made upon the application of "mechanical rules;" rather, a court "must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." *Aukerman, 960 F.2d at 1032.* If a laches defense is successful, it bars the right to recover damages only with respect to damages accrued before suit is filed. *Id at 1041; Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 773 (Fed. Cir. 1995).* Here, since the *'144 patent* expired prior to the date AccuScan filed this suit, the application of the defense of laches would preclude any recovery.

[HN5] The defense of laches requires that the defendant prove the following two elements by a preponderance of the evidence: (1) that the plaintiff engaged in unreasonable and inexcusable delay in the assertion of its claim from the time plaintiff knew or reasonably should have known of its claim against the defendant; and (2) prejudice or injury to the defendant resulting from the plaintiffs delay. *Aukerman, 960 F.2d at 1032; Gasser Chair Co., 60 F.3d at 773.* The first [*8] factor, the length of time which may be considered unreasonable, "has no fixed boundaries but rather depends on the circumstances." *Aukerman, 960 F.2d at 1032.* In examining whether a delay is unreasonable and inexcusable, a court must consider any excuse for the delay offered by the plaintiff. *Id. at 1033.* If the court finds the delay was justified under all of the circumstances, a laches defense may be defeated. With respect to the

second element, prejudice may be either economic or evidentiary. Evidentiary prejudice results where a defendant is unable to present a full and fair defense due to the loss of records, the death of witnesses, or the unreliability of memories of past events. Economic prejudice arises where a defendant will suffer the loss of monetary investment or otherwise incur damages, which likely would have been prevented by earlier suit. *Id. at 1033.*

[HN6] Even if the elements of laches are established, a court need not bar a plaintiffs suit. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, a laches defense may be denied. *Id. at 1036; Gasser Chair Co., 60 F.3d at 773.* [*9] Thus, a laches defense may be defeated if the infringer "has engaged in particularly egregious conduct which would change the equities significantly in plaintiffs favor." *960 F.2d at 1033* (quoting *Bott v. Four Star Corp., 807 F.2d 1567, 1576 (Fed. Cir. 1986)).* Accordingly, when determining whether a laches defense is appropriate, a court must weigh "the length of the delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability." *960 F.2d at 1034.*

### B. Presumption of Laches

[HN7] A delay of six years in filing suit creates a presumption of laches. *Aukerman, 960 F.2d at 1035-36.* This presumption compels an inference of unreasonable delay and resulting prejudice to the defendant. The plaintiff then has the burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay or prejudice. *Id. at 1037-39.* This burden is simply a burden of production; the presumption may be eliminated even if the evidence introduced by the plaintiff is ultimately found not persuasive. *Id.; Cover v. Hydramatic Packing Co., Inc., 1994 U.S. Dist. LEXIS 10417, 1994 WL 396423, 34 U.S.P.Q.2D (BNA)* [*10]

*1128, 1130 (E.D. Pa. July 27, 1994).* Thus, the presumption of laches arising after a six year delay is a "'double bursting bubble' which the plaintiff punctures with introduction of evidence sufficient to raise a genuine dispute as to either delay or prejudice." Once the presumption is overcome, the defendant is required to affirmatively prove both elements of laches. *Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992).* Indeed, the ultimate burden of persuasion is never shifted from the defendant. *Aukerman, 960 F.2d at 1037.*

### IV. Discussion and Conclusions of Law

### A. Xerox's Conduct Was not Sufficiently Egregious

As discussed above, [HN8] a defense of laches can be defeated, even where the elements of laches have been established by a showing that the infringer has engaged in particularly egregious conduct. *Aukerman, 960 F.2d at 1036.* AccuScan argues that Xerox's conduct in failing to obtain an outside legal opinion on the issues of validity and infringement of the *'144* patent until 1993, after receiving notice of the alleged infringement in October 1990 constitutes such egregious conduct. I find that Xerox did not engage in sufficiently [*11] egregious conduct as would defeat a defense of laches.

As an initial matter, the jury found that Xerox had not engaged in willful infringement, which weighs against a finding of egregious conduct by Xerox. Moreover, on October 12, 1990, AccuScan accused several of Xerox's facsimile machines of infringement; it had also communicated with Xerox prior to this in March 1989 and March 1990 regarding its *'144* patent. PTX 61, 64, and DTX-YN. Following such notification, Xerox engaged in an internal investigation of infringement and validity issues. Tr. 424-425. Xerox analyzed prior art patents, as well as the *'144* patent and concluded the *'144* patent was invalid because it was anticipated by the prior art. PTX 152A.

Xerox also reviewed its documents and concluded that the patent was invalid for the additional reason that the patent was in public use or on sale more than one year prior to the date the application was filed. *Id.* Thus, Xerox did not willfully ignore AccuScan's charges, but pursued the investigation internally, albeit slowly. *See Studiengesellschaft Kohle, m.b. H. v. Dart Industries, Inc., 862 F.2d 1564, 1574 (Fed. Cir. 1988)*(use [HN9] of in house counsel to pursue investigation [*12] is not inherently wrong but should be viewed on a case by case basis). Moreover, Xerox did obtain an opinion of outside counsel on the *'144* patent in March 1993. PTX 175. Although this certainly could not be called an expeditious handling of this matter, I find that Xerox's conduct was not sufficiently egregious to preclude a defense of laches.

The cases cited by AccuScan do not support its position that Xerox's failure to obtain outside legal advice for several years precludes a defense of laches. In none of the cases cited by AccuScan was the failure to obtain legal advice the sole factor in the court's determination that the defendant had engaged in egregious conduct. In *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995)*, the court emphasized the undisputed evidence that defendant intentionally copied its competitor's invention. Similarly, in *Ramos v. Biomet, Inc., 828 F. Supp. 1570, 1583 (S.D. Fla. 1993), aff'd in part, rev'd in part on other grounds, 69 F.3d 553 (Fed. Cir. 1993)*, there was evidence of intentional pirating of plaintiffs invention. Moreover, in *Cover v. Hydramatic Packing Co., 1994 U.S. Dist. LEXIS 10417, 1994 [*13] WL 396423, 34 U.S.P.Q.2D (BNA) 1128* (E.D. Pa. July 27, 1994), the defendant first began to manufacture the infringing product after receiving notice of a competitor's patent, and delayed five years before it sought any legal opinion or engaged in any investigation whatsoever of the alleged infringement. In *A.C. Aukerman Co. v. R.L. Chaides Const. Co., 1993 U.S. Dist. LEXIS 17101, 1993 WL 379548, 29 U.S.P.Q.2D (BNA) 1054* (N.D. Cal. Sept. 13, 1993), the defendant began building infringing products after receiving notice that another party had the exclusive license to do so, and even built additional infringing products after plaintiff had filed suit, without disclosing this during the litigation. Moreover, the defendant in *Aukerman* undertook no inquiry at all as to its conduct. Thus, these cases simply do not support the proposition that Xerox's conduct in this case was sufficiently egregious to preclude a defense of laches.

## B. Length of the Delay and the Presumption of Laches

Since I have found that Xerox's conduct was not sufficiently egregious as to bar a laches defense, the first issue to consider is the length of AccuScan's delay in filing suit. [HN10] The period of delay for laches [*14] purposes is measured from when the plaintiff had actual notice of its claim or reasonably should have known of its claim. *Aukerman, 960 F.2d at 1032.* I find that AccuScan knew or should have known of its claim by March 1989. n5 First, in opposing Xerox's motion for summary judgment, AccuScan argued that it "first became aware of the possibility that Xerox could be infringing its *'144* patent when it first reviewed Xerox U.S. Patent No. *4,216,503* in early 1989." AccuScan's Memorandum in Response to Xerox's Summary Judgment Motion at 19.

n5 AccuScan argues that this finding is inconsistent with this Court's ruling in its summary judgment opinion that AccuScan did not provide notice of infringement to Xerox until the October 1990 letter for purposes of *35 U.S.C. § 287*. However, with respect to laches, the period of delay is measured from when *AccuScan knew or should have known* of the infringement, whereas the notice provisions of *35 U.S.C. § 287* focus on

when *Xerox had actual knowledge* of the alleged infringement.

[*15]

Moreover, [HN11] in determining when a party knew or should have known of the defendant's infringement, "the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Aukerman, 960 F.2d at 1032.* On March 6, 1989, AccuScan sent Xerox a letter which stated that the *'503* patent "appears to describe a system falling within the scope of claim 1 in AccuScan's" *'144* patent and further stated that "this apparent use of AccuScan technology by Xerox is disturbing... ." PTX-61. Upon becoming aware of possible infringement by Xerox in 1989 after reviewing the *'503* patent, AccuScan was in possession of facts which should have put upon it the duty of inquiry as to whether Xerox was in fact selling any allegedly infringing products under the *'503* patent or otherwise. n6 Since Xerox's 7020 facsimile machine, which was found to have infringed the *'144* patent by the jury, had been on the market since 1986, plaintiffs inquiry would have led to knowledge of the alleged infringement. n7

n6 The fact that Xerox responded in May 1989 that it had never commercialized the *'503* patent, PTX 63, does not alter this conclusion, since Xerox's response simply speaks to an investigation by Xerox of the *'503* patent. Although Xerox may not have commercialized the *'503* patent, it nevertheless may have otherwise had infringing products on the market. Indeed, AccuScan recognized this in its subsequent letter to Xerox in which it stated that Xerox should look further at the *'144* patent "since our prior correspondence was limited to the application of a certain Xerox patent, which

you claimed was not commercialized... ." DTX-YN.

[*16]

n7 Xerox's argument that AccuScan should have known of the infringement in 1986 -- the year Xerox first introduced the 7020 facsimile model -- is unpersuasive. Xerox argues that since the availability of the 7020 facsimile machine was known though publicly available materials at that time, Tr. at 344, AccuScan should have know of the infringement then. The mere fact that the 7020 facsimile machine was on the market does not indicate that AccuScan knew or should have known of the infringement of that time. Xerox has presented no evidence that AccuScan was in possession of any facts in 1986 such that it was under a duty to inquire as to whether any Xerox products infringed its *'144* patent at that time.

Since plaintiff should have been aware of its potential claim by March 1989, but did not bring suit until over six years later, on April 11, 1996, Xerox has established a presumption of laches. In order to defeat this presumption, AccuScan has the burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay or prejudice. *Aukerman,* [*17] *960 F.2d at 1035-39.* AccuScan has come forward with two justifications for its delay: (1) it was involved in ongoing negotiations with Xerox from March 6, 1989 to April 1993 and (2) it was involved in other litigation regarding the *'144* patent from 1994 through the filing of this action. I find that this evidence is sufficient to raise a genuine issue as to whether AccuScan's delay was reasonable. Thus, the presumption of laches is burst, and Xerox is required to affirmatively prove the elements of laches -- un-

reasonable delay and prejudice. *Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992).* I will now go on to address these issues.

*C. Reasonableness and Excusability of the Delay*

*1. Other Litigation*

AccuScan argues that its delay should be excused from 1994 through the filing of this action because it was involved in other litigation regarding the *'144* patent. I agree. [HN12] Involvement in other litigation has been recognized as a reasonable excuse for laches purposes. *Aukerman, 960 F.2d at 1033.* In general, in order for other litigation to excuse a delay in bringing suit, there must be adequate notice of the other proceedings to the [*18] accused infringer and of the patentee's intent to enforce its patent upon completion of the proceedings. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 877 (Fed. Cir. 1991).* Xerox contends that the other litigations do not excuse the delay because formal notice of the litigation was not provided by AccuScan. However, such formal notice is not necessarily required. As the Federal Circuit has stated:

> ...there [HN13] can be no rigid requirement in judging a laches defense that such notice must be given. If a defendant is, for example, aware of the litigation from other sources, it would place form over substance to require a specific notice. Where there is prior contact, the overall equities may require appropriate notice, as in Jamesbury. However, a notice requirement is not to be rigidly imposed... .

*Aukerman, 960 F.2d at 1039* (Citations omitted).

Therefore, [HN14] where formal notice has not been given of another litigation, but the alleged infringer is otherwise aware of the other litigation, depending on the circumstances, actual notice may not be required. The determinative question is whether the alleged infringer had reason to believe it was [*19] likely to be sued. *Vaupel, 944 F.2d at 878; North American Philips Corp. v. Taito America Corp., 1997 U.S. Dist. LEXIS 13264, 93 C 3261, 1997 WL 543111* (N.D. Ill. Aug. 29, 1997). Therefore, where the alleged infringer is aware of the ongoing litigation and is also aware that the patentee is likely to subsequently file suit against it, express notice is not always necessary. *See Vaupel, 944 F.2d at 878.* However, for example, if the parties prior contact has led the alleged infringer to believe that it is not likely to be sued, actual notice of the litigation and the intent to enforce the patent may is required. *See Hall v. Aqua Queen Manf'g, Inc., 93 F.3d 1548, 1554 (Fed. Cir. 1996).*

Here, the evidence is undisputed that Xerox was aware of AccuScan's litigations with Murata and Mitsubishi since at least January 1994. Tr. at 441 (indicating that in 1994 Xerox knew about and was following the *Matsushita* litigation); PTX 73 (internal Xerox memorandum dated January 19, 1994 which refers to both litigations). Indeed, Xerox was assisting behind the scenes in the *Matsushita* litigation, as indicated in Xerox's internal memorandum of January 19, 1994, which states:

> ...You noted the suit [*20] against Murata by Accuscan but did not mark the one a few pages back against Matsushita.
>
> You may recall that we studied this patent ourselves and Mark came up with an excellent public use de-

fense and a § 102 reference. ... Do you think Matsushita would be interested in trading on of these references for a couple of future license designations? I don't know what art they now have but this art could save them considerable litigation expense and possible future damages. It might be worth it to them.

PTX 73. This memo goes on to state that "we could reserve one of the references and the public use defense for our own security." *Id.* Thus, not only was Xerox aware of these litigations, it was also aware that AccuScan was likely to sue it. In light of these circumstances, I find that AccuScan's involvement in this other litigation excuses its delay in filing suit from January 1994 to April 11, 1996.

### 2. Negotiations with Xerox

AccuScan argues that its delay from March 6, 1989 to April 1993 is justified because it was involved in ongoing license negotiations with Xerox from March 6, 1989 to April 1993. [HN15] License negotiations can push back the running of time in a laches [*21] defense under appropriate circumstances. In order for such tolling to occur, "the negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." *A.C. Aukerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 701 (7th Cir. 1982).*

Here, AccuScan sent a letter dated March 6, 1989 to Xerox that Xerox's *'503* patent appears to describe a system falling within AccuScan's *'144* patent, and offered to "pursue the possibility of a license to Xerox" regarding its *'144* patent. PTX 61. Xerox replied on May 9, 1989, stating that it never commercialized the *'503* patent. PTX 62. On March 30, 1990, AccuScan wrote Xerox, stating that in light of the fact that the prior correspondence was limited to a cer-

tain Xerox patent, AccuScan would set forth a description of the scope of the *'144* patent. AccuScan also offered Xerox a fully paid-up license for $ 150,000 for the *'144* patent. DTX YN. On October 12, 1990, AccuScan wrote to Xerox, accusing specific products of infringement of the *'144* patent and again offering a license to Xerox. PTX 64. Meanwhile, Xerox pursued an internal investigation of AccuScan's *'144* patent and then [*22] obtained an outside legal opinion on the patent in March 1993. Xerox ultimately never accepted AccuScan's offer of a license. n8

n8 Xerox sent AccuScan a letter dated April 9, 1993 refusing to take a license from AccuScan, which letter was presented to the jury during closing, but was not moved into evidence.

Thus, AccuScan contacted Xerox several times from March 1989 to October 1990 to negotiate a license. Indeed, in March and October 1990, AccuScan offered Xerox a specific price for its license and detailed the scope of its patent and its case of infringement. Xerox did not formally decline the offer during the period from 1989 to 1993, nor did it express to AccuScan that it believed the *'144* patent was invalid or unenforceable. Under these circumstances, I find that this AccuScan's delay was excused. During this period of delay, Xerox was slowly investigating AccuScan's patent internally. Xerox then waited until 1993 to obtain outside counsel's opinion. Thus, the reason it took Xerox several years to decide [*23] whether a licensing agreement was possible was because of Xerox's lengthy investigation of AccuScan's patent. Xerox cannot now in equity accuse AccuScan of unfair delay where the delay was the result of the fact that it took Xerox several years to investigate validity and infringement with respect to AccuScan's patent after receiving an offer for a license under the *'144* patent. Since it is Xerox who bears the

burden of proof on the issue of the reasonable-ness and excusability of AccuScan's delay, given Xerox's own delay regarding these negotiations, and in light of all of the circumstances, I find that Xerox has failed to prove the delay was unreasonable and inexcusable.

The cases cited by Xerox do not support Xerox's proposition that under the circumstances here, AccuScan's delay was inexcusable. In *Aukerman, 693 F.2d at 701,* the court held that [HN16] where the parties' license negotiations were sporadic and unfruitful, these negotiations did not excuse a significant delay. In that case, however, throughout the period that plaintiff claimed it was negotiating with defendant, defendant unequivocally and explicitly expressed its belief that plaintiffs patents were invalid and unenforceable [*24] and that defendant was not infringing them. *Id. at 701.* Similarly, in the other cases cited by Xerox, in which courts held that the negotiations were too sporadic or one-sided to constitute sufficient excuses for a delay, the defendant clearly expressed that it was not interested in negotiations during the period of delay. *See MGA, Inc. v. Centri-Spray Corp., 639 F. Supp. 1238, 1242 (E.D. Mich. 1986)*(plaintiff claimed that negotiations were taking place from 1978 to 1980, but defendant had declined plaintiffs invitation to enter into negotiations in 1978 and subsequently); *Western Electric Co., Inc. v. Piezo Tech. Inc., 1990 U.S. Dist. LEXIS 12678, 1990 WL 126269, 15 U.S.P.Q.2D (BNA) 1401, 1409* (M.D. Fla. Mar. 22, 1990)(throughout licensing attempts, defendant continually declined a license and maintained the patent was not valid). In addition, *Valutron, N.V. v. NCR Corp., 1992 U.S. Dist. LEXIS 22129, 1992 WL 698780, 33 U.S.P.Q.2D (BNA) 1986, 1990 (S.D. Ohio Aug. 18, 1992), aff'd, 5 F.3d 1506 (Fed. Cir. 1993), cert. denied, 510 U.S. 1164, 127 L. Ed. 2d 540, 114 S. Ct. 1190 (1994),* is distinguishable because there, the plaintiff testified at trial that during the claimed [*25] negotiation period, it did not believe that successful negotiations were realistic.

In summary, based on AccuScan's licensing negotiations with Xerox from 1989 to 1993 and its involvement in other litigation from January 1994 to the filing of this suit, and considering all of the circumstances of this case, I find that Xerox has failed to prove by a preponderance of the evidence that AccuScan's delay is unreasonable and inexcusable and has thus failed to establish its defense of laches. n9

> n9 Because Xerox has failed to establish the first element of its laches defense, I need not reach the second element -- prejudice or injury to Xerox.

V. Conclusion

For the foregoing reasons, I find that Xerox has failed to establish its affirmative defense of laches.

**SO ORDERED.**

New York, New York
May 26, 1998

Harold Baer, Jr.

U.S.D.J.

# Exhibit E

LEXSEE 1996 U.S. DIST. LEXIS 8514



Warning
As of: Jan 24, 2007

**VIRGINIA PANEL CORPORATION, Plaintiff, v. MAC PANEL
COMPANY, Defendant.**

**CIVIL ACTION NO. 93-0006-H**

**UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF VIRGINIA, HARRISONBURG DIVISION**

*1996 U.S. Dist. LEXIS 8514; 1996-2 Trade Cas. (CCH) P71,483*

**May 29, 1996, Decided
May 29, 1996, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The parties, plaintiff corporation and defendant competitor, filed eighteen post-trial motions requiring decision by the court.

**OVERVIEW:** The corporation filed suit against the competitor for patent infringement and false advertising. The competitor responded with, inter alia, the affirmative defense of patent misuse and a counterclaim for anticompetitive behavior in violation of § 2 of the Sherman Antitrust Act. The jury found that the competitor had willfully infringed two of the corporation's patents and had engaged in false advertising and awarded damages. The jury also awarded the competitor untrebled damages on its antitrust claim. The parties then filed a multitude of post-trial motions. The court granted the corporation's motions for attorney fees in connection with its false advertising claim and for a permanent injunction on its pat-

ent infringement claims. The court also granted the competitor's motions for treble damages and attorney fees on its Sherman Act § 2 claims, to set aside the jury's award for patent infringement damages, and for entry of judgment. The court denied the parties' remaining motions.

**OUTCOME:** The court overruled all of the parties' motions, with the exception of (1) the corporation's motions for attorney fees in connection with its false advertising claim and for a permanent injunction on its patent infringement claims, and (2) the competitor's motions for treble damages and attorney fees on its Sherman Act § 2 claims, to set aside the jury's award for patent infringement damages, and for entry of judgment.

**LexisNexis(R) Headnotes**

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

***Patent Law > Remedies > Collateral Assessments > Costs***
***Patent Law > Remedies > Collateral Assessments > Increased Damages***
***Patent Law > Remedies > Damages > General Overview***
[HN1] The enhancement pursuant to *35 U.S.C.S. § 284,* if any, of damages is committed to the sound discretion of the trial court.

***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement***
***Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge***
[HN2] In order to prevail on a claim of contributory infringement, the plaintiff must establish: (1) direct infringement of the patent involved by a combination incorporating a component sold by the defendant; (2) knowledge by the defendant of the patent and that the combination infringes the patent; (3) lack of substantial non-infringing use of the component; and, (4) that the component is a material part of the combination. *35 U.S.C.S. § 274*(c).

***Civil Procedure > Trials > Jury Trials > Actions in Equity***
[HN3] Pursuant to *Fed. R. Civ. P. 39(c),* the trial court may submit a determination of an equitable matter to a jury upon the consent of all parties. Where there is not the consent of all parties, the court must treat the jury's findings as advisory. The district court may accept or reject the findings of the advisory jury and must provide its own findings of fact and conclusions of law with respect to the equitable issue.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
***Tax Law > Federal Income Tax Computation > Compensation & Welfare Benefits > Fringe Benefits (IRC secs. 61, 132) > General Overview***
[HN4] In order to invoke the defense of laches, the accused infringer has the burden of proving that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant.

***Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview***
***Evidence > Testimony > Examination > General Overview***
[HN5] Products within a relevant product market must be reasonable substitutes or be interchangeable in order to compete within the specified market.

***Antitrust & Trade Law > Monopolization > Predatory Practices > General Overview***
[HN6] Courts find that litigation threats and harassment directed toward a competitor's customers violate the antitrust laws. Where the threats of litigation have the effect of eliminating competition and of monopolizing by 90 percent the relevant market, then the conduct may reasonably be characterized as anti-competitive.

***Patent Law > Inequitable Conduct > Anti-competitive Conduct***
[HN7] Anti-competitive practices may exist where a patent holder uses an unpatented product or intangible business practice to exploit the legal monopoly obtained via the patented product.

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

***Antitrust & Trade Law > Monopolization > Attempts to Monopolize > Sherman Act***
***Antitrust & Trade Law > Sherman Act > General Overview***
[HN8] To prevail upon a claim of attempted monopolization pursuant to § 2 of the Sherman Act, a plaintiff must demonstrate that (1) the defendant formed a specific intent to monopolize the relevant product market; (2) the defendant engaged in anti-competitive or predatory conduct designed to further that intent; and, (3) there existed a dangerous probability that the defendant would succeed.

***Antitrust & Trade Law > Intellectual Property > Misuse of Rights > Patent Misuse Defense***
***Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview***
***Patent Law > Infringement Actions > Defenses > Misuse***
[HN9] Where there is conflicting evidence on the issue of price, quality and efficiency, the question is properly before a jury.

***Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview***
[HN10] If the proffered evidence permits no more than pure speculation and guesswork, then the damage evidence is insufficient as a matter of law.

***Antitrust & Trade Law > Clayton Act > Remedies > Damages***
***Antitrust & Trade Law > Private Actions > Costs & Attorney Fees > Clayton Act***
[HN11] See *15 U.S.C.S. § 15*(a).

***Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview***

[HN12] Once a plaintiff establishes actual injury and damage, trebling of established damages follows as a matter of law.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN13] See § 43(a) of the Lanham Act, *15 U.S.C.S. § 1501* et seq.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
***Civil Procedure > Trials > Judgment as Matter of Law > Alternative Motions***
[HN14] The court will join many courts in requiring that there be actual deception of a significant portion of the advertising market before a claim under the Lanham Act, *15 U.S.C.S. § 1501* et seq., is established. Certainly, proof of only one actual deception cannot serve as establishing by a preponderance evidence that there was actual deception.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN15] See *Va. Code Ann. § 18.2-216*.

***Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview***
[HN16] See *Va. Code Ann. § 59.1-68.3*.

***Civil Procedure > Judgments > Relief From Judgment > General Overview***
***Civil Procedure > Appeals > Standards of Review > Substantial Evidence > Sufficiency of Evidence***
[HN17] The court will not disturb a jury verdict where there exists sufficient evidence to support such a verdict.

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

*Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview*
[HN18] *Va. Code Ann. § 18.2-216* clearly contemplates recovery by a business competitor of the corporation committing the false advertising. Where the Virginia legislature drafts the language of a provision permitting civil recovery in very broad terms, it is not the role of the courts, especially federal courts, to provide exceptions to such a provision.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN19] An injunction will issue when infringement has been adjudged, absent a sound reason for denying it.

*Patent Law > Remedies > Bad Faith Enforcement*
[HN20] Once the misuse of a patent has been purged, then the patent may be enforced.

**COUNSEL:** [*1] For VIRGINIA PANEL CORPORATION, plaintiff: David A. Penrod, HOOVER, PENROD, DAVENPORT & CRIST, HARRISONBURG, VA USA. Kenneth E. Krosin, Timothy R. DeWitt, Christopher W. Brody, LOWE, PRICE, LEBLANC & BECKER, ALEXANDRIA, VA.

For MAC PANEL COMPANY, defendant: Holmes Conrad Harrison, III, HARRISON, THUMMA & START, P.C., HARRISONBURG, VA USA. C. William Craycroft, Neal J. Stephens, Jennifer L. Tsay, MCCUTCHEN, DOYLE, BROWN & ENERSEN, SAN JOSE, CA. Dalbert U. Shefte, SHEFTE, PINCKNEY & SAWYER, CHARLOTTE, NC.

For MAC PANEL COMPANY, counterclaimant: Holmes Conrad Harrison, III, HARRISON, THUMMA & START, P.C., HARRISONBURG, VA USA.

For VIRGINIA PANEL CORPORATION, counter-defendant: David A. Penrod, HOOVER, PENROD, DAVENPORT & CRIST, HARRISONBURG, VA USA. Kenneth E. Krosin, LOWE, PRICE, LEBLANC & BECKER, ALEXANDRIA, VA.

**JUDGES:** James H. Michael, Jr., Senior United States District Judge

**OPINION BY:** James H. Michael, Jr.

**OPINION:**

MEMORANDUM OPINION

JUDGE JAMES H. MICHAEL, JR.

This matter comes before the court upon eighteen post-trial motions filed by both parties to the instant civil action. The plaintiff in this case, Virginia Panel Corporation ("VPC"), filed a complaint and amended complaint against the defendant, Mac Panel Company ("MPC"), for patent infringement and false advertising. MPC responded with several counterclaims and affirmative defenses, specifically patent misuse and anti-competitive behavior in violation of Section 2 of the so-called Sherman Antitrust Act. The court bifurcated the trial into two phases: 1) patent infringement issues; and 2) patent misuse, anti-competitive behavior, and false advertising issues. From February 21 to March 10, 1995, this court conducted a jury trial of the patent infringement phase of this case in which the jury found that MPC had willfully infringed two of VPC's patents -- U.S. Patent Numbered *4,329,005* [hereinafter "the *'005* patent"] and U.S. Patent Number *4,655,530* [hereinafter "the *'530* patent]. The jury awarded VPC $ 1,207,534.00 for MPC infringement of [*2] the *'005* patent and $ 20,300.00 for MPC's infringement of the *'530* patent. n1

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

n1 The court enhanced these damage awards by ten percent. See *Virginia Panel Corp. v. Mac Panel Co., 887 F. Supp. 880, 885-86 (W.D. Va. 1995)* ("Virginia Panel I").

On September 11 to 28, 1995, the court conducted the second phase of trial. In this phase, the jury concluded that VPC had misused its patents; that VPC had engaged in anticompetitive behavior as a result of such patent misuse; and that MPC had engaged in false advertising in violation of *Virginia Code § 18.2-216*. In this second phase, the jury awarded MPC $ 152,222 in untrebled damages on the antitrust claim and awarded VPC $ 64,853 on the Virginia False Advertising claim. The parties then presented the court with the instant post-trial motions which the court must now address.

I.

VPC first renews is motion for treble damages, attorneys fees and costs for MPC's willful infringement of the *'005* patent, pursuant to *35 U.S.C. § 284.* [HN1] The enhancement, if any, [*3] of damages is committed to the sound discretion of the trial court. See *Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992).* In Virginia Panel I, the court considered several factors which, in this court's opinion, mitigated against a significant enhancement of damages. First, the court concluded that MPC's infringement of VPC's patents was more "recklessly indifferent" than it was intentional. Secondly, the court concluded that MPC's attempts to research the scope of VPC's patents was marginally sufficient, albeit based upon incomplete information. Third, the court found that MPC's behavior in the instant action was acceptable; in other words, MPC's counterclaims and defenses were neither frivolous nor asserted in bad faith. Finally, the court considered it inappropriate to levy a large enhancement which could lead to MPC's demise. Accord-

ingly, this court affixed the enhancement of damages at ten percent.

The court will again deny VPC's motion for trebled damages. The court's conclusion is fortified by MPC's successful prosecution of its remaining counterclaims and defenses on the patent misuse, monopolization and attempted monopolization claims at the second phase [*4] of the trial.

II.

MPC has moved the court for judgment as a matter of law on contributory infringement and willful infringement and, in the alternative, for a new trial. In essence, MPC claims that VPC failed to prove the essential elements of a claim of contributory infringement and willful infringement with regard to the *'005* patent. Specifically, MPC argues that VPC failed to prove that MPC had knowledge of the *'005* patent prior to November 1991.

[HN2] In order to prevail on a claim of contributory infringement, the plaintiff must establish:

(1) direct infringement of the patent involved by a combination incorporating a component sold by the defendant;

(2) knowledge by the defendant of the patent and that the combination infringes the patent;

(3) lack of substantial non-infringing use of the component; and,

(4) that the component is a material part of the combination.

*35 U.S.C. § 274*(c); *Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 12 L. Ed. 2d 457, 84 S. Ct. 1526 (1964).* MPC argues that the evidence adduced at the first phase of the trial clearly demonstrated that no member of MPC management "with significant authority" had knowledge of the *'005* patent until November 1991. In November [*5] 1991, a cus-

tomer of MPC received an infringement notice from VPC. MPC claims that it immediately sought advise of counsel and was advised that VPC's *'005* patent was invalid.

MPC discounts the fact that Troy Rector ("Rector"), a former employee of VPC and later an employee of MPC, had knowledge of the *'005* patent. MPC claims that Rector had "limited" decision-making authority and had "no strategic responsibilities" within MPC. Thus, MPC argues that Rector's knowledge of the *'005* patent cannot be imputed to MPC. In essence, MPC argues that there was insufficient evidence to support the jury's determination that MPC had knowledge, either actual or constructive, of VPC's *'005* patent. The court disagrees.

At the February-March 1995 trial, there was substantial evidence suggesting that MPC had constructive knowledge of VPC's *'005* patent. First, Kim Stowers testified that in 1983 he informed Joe Craycroft, MPC's president, that the Mac Panel Series 96 infringed the VPC patent on the QUADRATRACK system. Secondly, there was testimony that MPC had attained knowledge of the existence of the QUADRATRACK system from one of the interface's inventors, Paul Braginetz. Additionally, there is evidence [*6] that Rector took documents and drawings related to the QUADRATRACK system from VPC to MPC when he changed employment in 1984. While the evidence suggests that Rector was not a decision-making member of management with significant authority in 1984, the evidence demonstrates also that Rector was involved in the design of the MPC Series 06 rotating latch device. The court concludes that this evidence provides a sufficient basis for the jury's determination that MPC both contributorily and willfully infringed the *'005* patent. Accordingly, the court will overrule MPC's motion for judgment as a matter of law. In addition, the court will overrule MPC's motion for a new trial on the issue of contributory infringement

and willful infringement because there is no evidence that "prejudicial error had crept into the record and substantial justice has not been done." *Anthony v. Baker, 808 F. Supp. 1523, 1525 (D. Colo. 1992).*

### III.

MPC moves this court for a decision by the court on the issue of laches or, in the alternative, for a new trial. The essence of MPC's motion is that the court erred in submitting this issue of laches to the jury because the defense of laches is an equitable [*7] defense to a claim of patent infringement and thus is a determination to be made by the court, not the jury. See *Brunswick Corp. v. Spirit Reel Co., 832 F.2d 513 (10th Cir. 1987).*

At the February and March 1995 trial, the jury returned a verdict finding no laches. [HN3] Pursuant to *Federal Rule of Civil Procedure 39(c)*, the trial court may submit a determination of an equitable matter to a jury upon the consent of all parties. Where there is not the consent of all parties, the court must treat the jury's findings as advisory. Id. The district court may accept or reject the findings of the advisory jury and must provide its own findings of fact and conclusions of law with respect to the equitable issue. See *Troy v. City of Hampton, 756 F.2d 1000 (4th Cir. 1985); Cox v. Babcock & Wilcox, 471 F.2d 13 (4th Cir. 1972).*

The essence of MPC's laches defense is that VPC waited nine years before informing MPC of MPC's infringement of its *'005* patent. MPC claims that VPC knew as early as 1982 that MPC may have been infringing upon VPC's rotating latch devices but that VPC waited until 1991 to advise MPC of such possible infringement. The court, however, disagrees that this provides [*8] the appropriate standard for analyzing MPC's defense of laches. In *A. C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992),* the court held that [HN4] in order to invoke the defense of laches,

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 116 of 134

Page 7

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

the accused infringer has the burden of proving that "(1) the plaintiff delayed filing suit for an *unreasonable* and *inexcusable* length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *Id. at 1032.* In this case, MPC argues that VPC's "excuses" of *de minimis* sales and "government immunity" n2 are insufficient to constitute reasonable and excusable factors justifying delay in bringing suit. The court disagrees.

> n2 As the court understands the "government immunity" defense, the patent holder is excused for not bringing suit to enforce its patent against an alleged infringer where the patent holder believes that the suspect sales are made to the government because the patent holder is barred from bringing suit against such an alleged infringer and must bring suit against the government directly.

[*9]

The evidence at the first phase of trial suggests that VPC had knowledge only of MPC's sales to the government of devices which are alleged to infringe upon the *'005* patent. The evidence suggests that VPC saw MPC's data relating to the sale of MPC's Series 06 MATE systems to the government. Even if VPC was aware of MPC's sales to the government of devices which possibly infringed upon VPC's *'005* patent, VPC would not have known of its right to assert a claim against MPC until after VPC learned of MPC's commercial sales of the possibly infringing devices. Thus, the court finds that VPC articulates a reasonable excuse for failing to bring suit against MPC at a significantly earlier point in time.

Furthermore, the court agrees with VPC that it was reasonable excuse for it to delay bringing suit where the commercial sales of

which it had knowledge, if any, were *de minimis.* MPC argues that VPC remained under an obligation to notify MPC of alleged infringement before its claim of *de minimis* sales can operate to shield it from MPC's defense of laches. MPC, however, fails to recognize that testimony was adduced, which testimony suggested that Kim Stowers informed Joe Craycroft of [*10] possible infringement by MPC as early as 1983. Thus, the court concludes that, as a matter of law, VPC has demonstrated that its delay in bringing suit against MPC for alleged infringement of its *'005* patent was both reasonable and excusable both because VPC believed that MPC's sales were to the government, which sales, standing alone, would not have provided VPC with a claim against MPC; and because VPC believed that commercial sales by MPC, if any, were *de minimis,* and VPC notified MPC of possible infringement as early as 1983.

Regarding the *'530* patent, VPC claims that it did not have notice of possible infringing sales by MPC of devices until after it filed its initial complaint in the instant action. VPC claims that its prior knowledge of MPC's sales was limited to knowledge of sales to the government. VPC amended its complaint to allege infringement against MPC within a reasonable period after learning that MPC had made commercial sales of devices that possibly infringed upon its *'530* patent. Thus, the court finds that such delay was reasonable and that VPC articulates a proper defense to MPC's assertion of the defense of laches. Consequently, the court will overrule MPC's [*11] motion for a decision by the court that VPC enforcement of its *'005* and *'530* patents was barred by the defense of laches.

*IV.*

VPC renews its motion requesting that this court enter judgment as a matter of law and, in the alternative for a new trial, on MPC's patent misuse defense. MPC bases its patent misuse defense upon the following allegations: (1)

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

VPC's sending of patent infringement notices to government contractors" and government agencies who purchased infringing interface devices from MPC without advising such purchasers of their rights pursuant to *35 U.S.C. § 271*; (2) VPC's threatening to void warranties for patented VPC devices if unpatented MPC products were used with the VPC devices; (3) VPC's negotiations with ASCOR, Inc. as a result of which an ASCOR employee testified that VPC conditioned a proposed license to the *'005* patent on ASCOR's purchase of unpatented products; and, (4) VPC's meetings with ASCOR and GDE Systems during which meetings VPC allegedly threatened to enforce by suit the *'005* patent. At the second phase of the trial, the jury returned a verdict in favor of MPC on the issue of patent misuse. VPC argues that there was no legally sufficient basis [*12] for the jury verdict.

As the court recalls the evidence, there was evidence which, if believed by a reasonable jury, is sufficient to support a jury verdict on any of the four allegations advanced by MPC. First, a reasonable jury could have found that some of the letters mailed by VPC to government contractors threatened to bring suit against these contractors pursuant to § 271 where VPC knew or should have known that proper recourse for alleged infringement was suit against the government pursuant to *29 U.S.C. § 1498.* n3 Secondly, there was evidence in the form of trial testimony that VPC threatened to void warranties of VPC patented devices if unpatented MPC devices were used with such VPC devices. At trial, the court, at least, was influenced by the fact that VPC's warranty provision failed to specify such a condition in the initial warranty provided to the customer at the time of sale. A reasonable jury could have concluded that VPC's conduct constitutes patent misuse where VPC threatened to void the warranty *after* the point of purchase where such a condition was not disclosed prior to the purchase. Third, based upon the testimony of Jeffrey Lum of ASCOR, the jury

could [*13] have reasonably concluded that VPC's sale to ASCOR of Interchangeable Test Adapters ("ITAs") at a certain price was conditioned upon ASCOR's acceptance of VPC's licensing terms and conditions. Lum testified that VPC's licensing terms included ASCOR's promise to purchase unpatented VPC products. If, on the other hand, ASCOR did not agree to VPC's licensing terms and conditions, then VPC offered the ITAs at a price which was higher than the price listed in VPC's catalog. Finally, Russell Steward, a purchasing agent for GDE Systems, testified that one of VPC's salesmen suggested to Steward that GDE, a government contractor, could be sued for GDE's purchase of MPC's infringing interface devices. Again, the court believes that a reasonable jury could conclude that such threats of infringement suits constitute patent misuse. Accordingly, the court will overrule VPC's motion for judgment as a matter of law on this issue of patent misuse and will likewise overrule VPC's motion for a new trial.

> n3 For example, one letter to the Department of the Air Force stated: We [VPC] bring this matter to your attention in order to avoid future controversy. Anyone making, using or selling the above [*14] MAC Panel device would be an infringer in violation of *35 U.S.C. § 271* et seq..

MPC has moved the court for a partial new trial on the issue of VPC's misuse of the *'530* patent during the period in which VPC had failed to pay the applicable fees to maintain its patent. After hearings on motions for summary judgment, this court held that the *'530* patent was valid and enforceable. Before trial, VPC moved the court to exclude evidence related to the alleged misuse of the *'530* patent because such evidence would be prejudicial to VPC and not probative of MPC's claim of misuse of the *'005* patent. The court agreed with VPC and

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

excluded all such evidence at phase two of the trial. The court reaffirms its prior decision and overrules MPC's motion for a partial new trial.

Finally, MPC has moved the court to set aside the patent infringement damages award from the first phase of the trial based upon the fact that the jury in phase two concluded that VPC had misused its '005 patent during the period of alleged infringement and that, therefore, VPC's '005 patent was unenforceable. The patent remains unenforceable until the misuse is purged. MPC argues that patent misuse renders a patent [*15] holder's patent unenforceable, not invalid, and that, therefore, VPC cannot recover damages for alleged infringement during the period in which VPC misused its '005 patent. VPC argues that the doctrine of patent misuse is equitable in nature and that the court has discretion in deciding whether to set aside an award of damages for patent infringement. After considerable examination of the applicable case law, the court has concluded that it should grant MPC's motion to set aside the award of damages on VPC's patent infringement claim.

*V*

Regarding the counterclaim for monopolization, VPC requests that the court set aside the jury verdict finding that VPC engaged in monopolization of the Consolidated Automated Support System Test Program Sets ("CASS TPS") market, in violation of the so-called Sherman Antitrust Act. Essentially, VPC argues the following:

(1) that MPC impermissibly limited the relevant product market to include only those products covered by the '005 patent;

(2) that VPC's infringement notices do not constitute anti-competitive behavior;

(3) that VPC's voiding of warranties does not constitute illegal anti-competitive behavior; and,

(4) that [*16] MPC failed to make a legally sufficient showing of antitrust injury.

Regarding VPC's first contention, the court considers the question of the relevant product market to be properly characterized as the quintessential "battle of the experts." VPC attacks the methodology employed by MPC's antitrust expert to determine characteristics of devices sold in the relevant product market. VPC attacks also the expert's conclusion that the relevant product market consisted only of those products characterized by discrete attributes, which products were manufactured by VPC and MPC only. As asserted by MPC, MPC's expert gathered information from VPC's sales reports, the parties' sales literature, and customer requirement documents. MPC's expert conducted telephone interviews of customers and participants in the Automated Test Equipment (ATE") market. The court finds that there was a reasonable basis on which the jury could have concluded that MPC's expert applied appropriate methods to determine the relevant product market.

Likewise, the court cannot conclude that the relevant product market as identified by MPC's expert was too narrow. First, the court recalls testimony that the ATE product [*17] market is relatively small -- approximately $ 6.5 million in annual sales. MPC's expert testified that such a market was too small to attract numerous competitors and that his research revealed that VPC and MPC were the major competitors with a third competitor poised to enter the market. Additionally, MPC's expert identified numerous characteristics common to interface devices on ATEs. [HN5] Products within a relevant product market must be reasonable substitutes or be interchangeable in order to compete

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 119 of 134

Page 10

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

within the specified market. See *International Wood Processors v. Power Dry, Inc., 792 F.2d 416, 430 (4th Cir. 1986)*. VPC had ample opportunities at the second phase of trial to present evidence suggesting that the relevant product market was broader, and indeed, VPC introduced the testimony of its own expert witness. The court is convinced that the jury verdict in this case was the result of the jury finding one expert witness more convincing than it found the other. Consequently, the court concludes that there was ample evidence to suggest that MPC's expert witness applied proper methodology to arrive at the relevant product market which the jury found to exist.

[HN6] Courts have found [*18] that litigation threats and harassment directed toward a competitor's customers violate the antitrust laws. *Kobe v. Dempsey, 198 F.2d 416, 424-25* (10th Cir.), cert. denied, *344 U.S. 837, 97 L. Ed. 651, 73 S. Ct. 46 (1952)*. Where the threats of litigation had the effect of eliminating competition and of monopolizing by 90% the relevant market, then the conduct may reasonably be characterized as anti-competitive. In the instant case, there was evidence adduced at trial suggesting that VPC used its monopoly power in its receivers and ITAs to foreclose and destroy competition in the interface component market. As MPC was the only viable competitor in the relevant market, VPC's threats to sue customers of MPC is especially probative of VPC's effecting its plan to monopolize the market. Indeed, evidence suggested that VPC's attempts were successful: MPC's market share in the relevant product market dropped from twenty-one percent to ten percent.

Likewise, the court concludes that VPC's threats to void warranties if customers used non-VPC components with VPC's patented receivers and ITAs constitutes anti-competitive behavior. There was evidence presented at trial suggesting that VPC's purpose in threatening [*19] to void warranties was to force customers into purchasing non-patented VPC compo-

nents to be used with VPC patented items. Clearly, a reasonable jury could have concluded that such conduct effectively extended VPC's monopoly power to include those items which VPC's sole competitor -- MPC -- could legally sell without infringing upon VPC's '005 patent. [HN7] Anti-competitive practices may exist where a patent holder uses an unpatented product or intangible business practice -- here, the practice of providing product warranties -- to exploit the legal monopoly obtained via the patented product. See *Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 84 L. Ed. 852, 60 S. Ct. 618 (1940)*.

Finally, there was ample evidence from which a reasonable jury could conclude that MPC suffered antitrust injury. Before the second phase of trial, MPC estimated that its total actual loss attributable to VPC's anti-competitive conduct approximated $ 178,898. MPC arrived at its actual lost profits by calculating the actual amount of lost sales over a nine-quarter period during which MPC's market share diminished in the relevant product market. The actual amount of lost sales is applied to MPC's incremental profit margin of 30.6% to [*20] arrive at an actual lost profits figure of $ 178,898. The court is not convinced that the jury failed to consider the evidence that suggested that MPC's loss of market share in the relevant product market was attributable to legitimately competitive factors. n4 However, the jury declined to award MPC its full requested amount of alleged damages. Thus, the court concludes that there was ample evidence demonstrating that MPC suffered antitrust injury and that the jury considered VPC's proffered argument that legitimate business practices accounted for a portion of MPC's injury. Accordingly, the court will overrule VPC's motion for judgment as a matter of law on MPC's counterclaim of monopolization and, in the alternative, for a new trial.

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 120 of 134

Page 11

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

n4 VPC claims that MPC's experts failed to consider the effect of the 1988 CASS contract on market share; that MPC's experts failed to consider the effect of the termination of the MATE program on market share; that more than 50% of MPC's lost profits resulted from VPC's legitimate business practices; and that VPC increased its sales force three-fold.

[*21]

Similarly, VPC argues that there was insufficient evidence to support a jury verdict that VPC acted with the specific intent to monopolize a relevant product market. [HN8] To prevail upon a claim of attempted monopolization pursuant to Section 2 of the Sherman Act, MPC must demonstrate that (1) VPC formed a specific intent to monopolize the relevant product market; (2) VPC engaged in anti-competitive or predatory conduct designed to further that intent; and, (3) there existed a dangerous probability that VPC would succeed. See, e.g., *Abcor Corp. AM Int'l Inc., 916 F.2d 924, 926 (4th Cir. 1990); Advanced Health-Care Servs., Inc. v. Radford Community Hospital, 910 F.2d 139, 147 (4th Cir. 1990).* VPC, of course, argues that it did not have the specific intent to monopolize the relevant market; that it did not engage on predatory or anti-competitive behavior; n5 and that there was no dangerous probability that it would succeed in monopolizing the relevant market.

n5 The court does not find it necessary to repeat its analysis of VPC's argument that its practices which the jury found to constitute patent misuse do not constitute predatory or anticompetitive conduct.

[*22]

VPC argues that the specific intent element is proved when it is shown by direct evidence that a defendant sought to create a monopoly by circumventing the competitive process. *Abcor 916 F.2d at 927.* MPC, on the other hand, argues that "specific intent may be inferred from the defendant's anti-competitive practices." *M&M Medical Supplies & Servs., Inc. v. Pleasant Valley Hosp., 981 F.2d 160, 166 (4th Cir. 1992)* (citing *Abcor, 916 F.2d at 926).* MPC attempted to imply VPC's intent to monopolize by demonstrating (1) that VPC competed on a basis other than price, quality or efficiency; and (2) that the relevant market was limited to the CASS TPS market. VPC argues that its prices were approximately ten percent lower than MPC's prices and that its warranty was far superior to MPC's warranty offer. At the second phase of trial, MPC introduced evidence suggesting that VPC had encountered quality control problems with some of its devices, specifically pin problems and connector failures. MPC specifically refers to memoranda from Allied Signal, Lockheed Sanders, Inc., General Electric, and the United States Navy, which memoranda each discusses some performance problems with [*23] VPC equipment [HN9] Where there is conflicting evidence on the issue of price, quality and efficiency, the question is properly before a jury. Furthermore, as discussed *supra,* the jury could have inferred that VPC possessed anti-competitive intent by engaging in the conduct constituting patent misuse: the sending of threatening infringement notices; the threatening to void warranties; and the exploiting of its patented products to achieve increased sales of its unpatented products. Consequently, the court finds that a reasonable jury could have concluded that VPC formed the specific intent to monopolize the relevant product market because there were questions regarding the quality of VPC products and because VPC engaged in specified conduct shown to constitute patent misuse from which conduct intent to monopolize may have been reasonably inferred.

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

The court finds that there was sufficient evidence from which a reasonable jury could conclude that there existed a dangerous probability that VPC's anti-competitive conduct would result in the monopolization of the relevant product market. Given the tight parameters of the relevant product market, the jury could have concluded that VPC's [*24] attempts to squeeze out the one viable competitor in the market had a significantly dangerous probability of success. Indeed, there was evidence that MPC's market share was reduced significantly as a result of VPC's conduct. Consequently, the court will overrule VPC's motion for judgment as a matter of law and, in the alternative for a new trial, on MPC's counterclaim of attempted monopolization.

MPC has moved the court for a partial new trial on the issue of damages predicated upon VPC's anti-competitive conduct in the past. At the second phase of trial, MPC sought to introduce evidence of its future lost profits. MPC arrived at its projected lost profits by taking MPC's historic market share of 16.3% and applying that percentage to the total amount of sales in the CASS TPS market projected for 1995-1998. MPC then applied its historic incremental profit margin of 30.6% to the projected amount of MPC CASS TPS sales. After reducing to present value, MPC estimates its projected lost profits in the amount of $ 236,925. The court considered MPC's estimates to be highly speculative and therefore excluded MPC's evidence of future profits from jury consideration.

It is well settled that [*25] [HN10] if the "proffered evidence permits no more than 'pure speculation and guesswork,' then the damage evidence is insufficient as a matter of law." *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816* (1st Cir.), cert. denied, *488 U.S. 955, 102 L. Ed. 2d 381, 109 S. Ct. 392 (1988).* The court considers MPC's estimate of its future losses to be highly speculative. While MPC's expert testified that it would

take a number of years for MPC to regain its lost market share, the expert failed to distinguish between the portion of the market share which would be regained upon VPC's cessation of its anti-competitive practices and the portion of the market share attributable to the CASS TPS program which MPC would not be able to regain due to VPC's contract with the Navy. MPC arrives at its estimate of future lost profits based upon an extension of its damages calculation based upon its historic injury for the time period relevant to this litigation. In the court's viewpoint, such an estimate is too speculative. Consequently, the court will overrule MPC's motion for a partial new trial in the issue of damages predicated upon VPC's anti-competitive conduct in the past.

Finally, MPC has moved the court [*26] for an award of treble damages, an award of attorneys' fees and an award of costs, all pursuant to Section 4(a) of the Clayton Act, *15 U.S.C. § 15*(a) (1995). [HN11] Section 4(a) provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in [the] district court of the United States and *shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.*

*15 U.S.C. § 15*(a) (emphasis added). [HN12] Once a plaintiff establishes actual injury and damage, trebling of established damages follows as a matter of law. See *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 113 n.8, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969).* Accordingly, the court will enter an order trebling the damages award to MPC on the monopolization and attempted monopolization

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 122 of 134

Page 13

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

claims in the amount of $ 152,222 to the amount of $ 456,666.

Pursuant to the language of section 4(a), the court will also award MPC costs and its reasonable attorneys' fees. See *Christiansburg Garment Co. v. E.E.O.C., 434 U.S. 412, 54 L. Ed. 2d 648, 98 S. Ct. 694 (1978)* (attorney's fees awarded); *Sun Pub. Co., Inc. v. Mecklenberg News, Inc., 823 F.2d 818,* [*27] *819 (4th Cir. 1987)* (same); *Seven Gables Corp. v. Sterling Recreation Organization Co., 686 F. Supp. 1418, 1423-24 (W.D. Wash 1988)* (costs). The court has carefully considered MPC's request for costs and attorneys' fees, particularly the request of attorneys' fees. The court is unable to conclude that an award of attorneys' fees in the amount requested of $ 1,429,623.63 is consistent with this court's viewpoint on reasonable attorneys' fees under the circumstances of this case, namely, the amount of actual damages recovered by MPC. The court considers it more appropriate and reasonable that an award of attorneys' fees reflect the prevailing party's degree and scope of success in the case. Accordingly, the court will order an award of costs to MPC in the amount of$ 157,928; and will order an award of attorneys' fees in the amount of $ 913,332.

*VI*

VPC renews its motion for judgment as a matter of law on its claim of false advertising pursuant to the so-called Lanham Act, *15 U.S.C. § § 1501* et seq. (1995). At the close of evidence during the second phase of the trial, the court instructed the jury that to prove its Lanham Act claim, VPC must demonstrate:

(1) that [*28] Mac Panel has attempted to sell its modular interface connectors for the U.S. Navy CASS TPS program by making false or deceptive advertisements and representations to CASS TPS customers;

(2) that Mac Panel's false and deceptive representations and advertisements have actually deceived a significant portion of the CASS TPS customers; and

(3) that Virginia Panel has been injured by Mac Panel's conduct.

VPC assigns error to this court's instruction regarding element numbered (2). Specifically, VPC argues that it was error for this court to instruct the jury that it was necessary that MPC's representations and advertisements *have actually deceived a significant portion* of the CASS TPS customers.

VPC relied upon the language of § 43(a) of the Lanham Act in arguing that it is not necessary that MPC's false representations and advertisements have actually deceived a significant portion of the market; rather, it is sufficient that the representations or advertisements merely caused actual deception or have a tendency to deceive. n6 VPC argues that to recover damages under § 43(a), it need only prove "some customer reliance on the false advertisement." *Parkway Baking* [*29] *Co. v. Freihofer Baking Co., 255 F.2d 641, 648 (3rd Cir. 1958).* VPC contends that there was sufficient evidence adduced at trial to demonstrate that there had been at least one occurrence of actual deception: Pat Dunham of the Naval Depot in San Diego, California, testified that his organization purchased one of MPC's CASS components based upon MPC's representation in its catalog that MPC had been qualified by the Navy or General Electric as a supplier for CASS components.

n6 [HN13] Section 43(a) of the Lanham Act provides, in relevant part, that:

Case 1:05-cv-00608-MPT Document 225 Filed 02/01/2007 Page 123 of 134

Page 14

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

Any person who...uses in commerce...any false or misleading description of fact, or false or misleading representations of fact, which --

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such persons with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another persons goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

[*30]

MPC responds that numerous court have required proof of actual deception by a substantial segment of the advertiser's audience. See *Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 208 (9th Cir. 1989); American Rockwool, Inc. v. Owens-Corning Fiberglas, 640 F. Supp. 1411, 1439, 1443 (E.D.N.C. 1986); Max Daetwyler Corp. v. Input Graphics, Inc., 608 F. Supp. 1549, 1551 (C.D. Pa. 1985); Olsonite Corp. v. Bemis Mfg. Co., 610 F. Supp. 1011, 1025-26 (D.C. Wis. 1985); Walker-Davis Publications, Inc. v. Penton/IPC, Inc., 509 F. Supp. 430, 435 (E.D. Pa. 1981); Skil Corp. v.*

*Rockwell Int'l Corp., 375 F. Supp. 777, 783 (E.D. Ill. 1974).* [HN14] This court will join these courts in requiring that there be actual deception of a significant portion of the advertising market before a Lanham Act claim is established. Certainly, proof of only one actual deception cannot serve as establishing by a preponderance evidence that there was actual deception. Accordingly, the court will overrule VPC's motion for judgment as a matter of law on the Lanham Act claim or, in the alternative, for a new trial.

*VII*

MPC moves the court for judgment as a matter of law on the claim of [*31] false advertising pursuant to *Virginia Code Ann. § 18.2-216.* n7 In essence, MPC claims (1) that the jury could not have concluded that MPC committed false advertising in Virginia because there was no evidence that MPC committed false advertising in Virginia; (2) that the Virginia False Advertising statute does not permit business competitors to recover for potential lost sales; and, (3) that it is unconstitutional for a state to apply its laws to conduct that has no connection to that state.

n7 [HN15] Section 18.2-216 provides, in relevant part, that

Any...corporation...who, with the intent to sell or in any way dispose of merchandise,..., offered by such...corporation..., directly or indirectly, to the public for sale..., makes, publishes, disseminates, circulates, or places before the public, directly or indirectly,...in the form of a pamphlet or letter or in any other way, an advertisement of any sort re-

Case 1:05-cv-00608-MPT    Document 225    Filed 02/01/2007    Page 124 of 134

Page 15

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

garding merchandise. representation or statement of fact which is untrue, deceptive or misleading shall be guilty of a misdemeanor.

[HN16]
Section 59.1-68.3 provides for a civil remedy for a violation of § 18.2-216:

Any person who suffers a loss as the result of a violation...shall be entitled to bring an individual action to recover damages...

[*32]

First, there was sufficient evidence adduced at trial from which evidence a reasonable jury could conclude that MPC committed false advertising within the Commonwealth of Virginia. The most probative evidence is that MPC disseminated its challenged catalogs to NAVAIR, which served as the headquarters of both the CASS and the CASS TPS programs and is located in Arlington, Virginia. There was evidence also that MPC personnel attended a so-called Pre-Solicitation Conference held at the Naval Depot in Norfolk, Virginia. MPC presented testimony of its president to the effect that MPC had not distributed its catalogs to either the Norfolk Naval Depot or NAVAIR headquarters. However, it is clear to this court that the jury, by returning a verdict in favor of VPC, discounted the testimony of MPC's president. [HN17] The court will not disturb the jury verdict where there exists sufficient evidence to support such a verdict. Furthermore, because there was sufficient evidence to suggest that MPC committed false advertising within the Commonwealth of Virginia, MPC's argument that the application of the Virginia False Advertising Statute is unconstitutional is not well-taken.

Secondly, the court agrees [*33] with VPC that [HN18] the Virginia statute clearly contemplates recovery by a business competitor of the corporation committing the false advertising. VPC notes that the language of the statute - - "any person who suffers a loss...shall recover...." -- supports a conclusion that injured competitors, as well as injured customers, may recover under a claim of false advertising. n8 Where the Virginia legislature has drafted the language of the provision permitting civil recovery in very broad terms, it is not the role of the courts, especially federal courts, to provide exceptions to such a provision. Consequently, the court will overrule MPC's motion for judgment as a matter of law of the Virginia False Advertising claim.

n8 The court notes additionally that the nexus between MPC's false advertising and the constitutional applicability of the Virginia statute is strengthened when one considers that the alleged loss was suffered by a Virginia corporation -- VPC.

MPC has moved also that the court order a partial new trial [*34] on the issue of damages on the Virginia False Advertising claim. At the second phase of the trial, the jury awarded VPC $ 64,853.00, which amount represents approximately one-third of the amount that VPC had requested in its amended complaint. MPC asserts that the testimony of VPC's damages expert was speculative and unsupported by the record. The court disagrees.

As argued by VPC, the damages expert testified that he reached his conclusions in reliance upon (1) information provided to him by VPC regarding expenses incurred in combating MPC's false advertising claim, as verified by Sandra Stowers, VPC's chief financial officer; (2) MPC's sales of CASS ITAs and related products from February 1, 1992 through Au-

gust 28, 1993, as obtained from MPC sales invoices; and, (3) VPC's incremental profitability calculations, based upon the expert's analysis of VPC's book, records, and operations. The court does not accept MPC's assertion that the expert was required to independently audit the sources of his information. Rather, the court believes that it is sufficient that the expert articulate the sources of his analysis and that such sources be deemed reliable. After considering the testimony [*35] of VPC's expert and the amount of damages awarded on this issue, the court concludes that MPC has failed to demonstrate either substantial injustice or prejudicial error, and, therefore, the court will overrule MPC's motion for a new trial on the issue of damages on the Virginia False Advertising claim.

Finally, VPC has requested that the court award attorneys' fees and costs associated with the Virginia False Advertising claim. n9 VPC has requested $ 145,506 in attorneys' fees and $ 135,166 in costs. Pursuant to § 59.1-68.3, the court will award VPC its attorneys' fees in the amount requested, $ 145,506; however, the court will overrule VPC's motion for costs.

> n9 *Va. Code Ann. § 59.1-68.3* provides that
>
>> Notwithstanding any other provision of law to the contrary, in addition to the damages recovered by the aggrieved party, such person may be awarded reasonable attorney's fees.

## VII

On July 27, 1995, this court entered an Order which (1) temporarily enjoined MPC from infringing the *'005* [*36] patent "by manufacturing, using or selling for commercial non-government purposes the adjudged infringing receivers or ITAs it was making, using, and selling as of March 6, 1995," or devices "no more than colorably different from such infringing devices;" and, (2) temporarily enjoining MPC from infringing the *'530* patent "by manufacturing, using or selling snap-in modules with side springs." Relative to the *'005* patent, the temporary injunction specifically excluded ITAs manufactured and sold for use with VPC receivers purchased prior to January 1993. VPC now requests that this court enter an Order converting the July 27, 1995 temporary injunction into a permanent injunction. MPC, on the other hand, has moved the court to vacate the temporary injunction and to enforce surety's liability on bond.

As noted by VPC, [HN19] "an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." *Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226, 1247 (Fed. Cir. 1989).* MPC argues that an injunction should not issue where the patent holder has been found to have misused the patent. See, e.g., *Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 668 n.10 (Fed. Cir.* [*37] *1986).* However, [HN20] once the misuse has been purged, then the patent may be enforced. See e.g., *The Rawlplug Co., Inc. v. Illinois Tool Works, Inc., 1994 U.S. Dist. LEXIS 7148 (S.D.N.Y. 1994).* In the instant matter, VPC has proffered the affidavit of Sandra Stowers, in which affidavit Ms. Stowers represents to the court that prior to the trial VPC discontinued all practices which MPC alleged to constitute patent misuse. MPC observes that the requirement of demonstrating that misuse has been purged is two-fold: first, that the patent holder demonstrate that the misuse has been abandoned, and secondly, that the effects of the misuse have been dissipated in order to render the patent once again enforceable. See *B.B. Chemical Co. v. Ellis, 314 U.S. 495, 86 L. Ed. 367, 62 S. Ct. 406 (1942); Morton Salt Co. v. G.S. Suppiger, 314 U.S. 488, 86 L. Ed. 363, 62 S. Ct. 402 (1942).* MPC argues that the a court may re-

Case 1:05-cv-00608-MPT     Document 225     Filed 02/01/2007     Page 126 of 134

Page 17

1996 U.S. Dist. LEXIS 8514, *; 1996-2 Trade Cas. (CCH) P71,483

quire a patent holder to affirmatively act to counteract the detrimental effects of the misuse. See *The Ansul Co. v. Uniroyal, Inc., 306 F. Supp. 541 (S.D.N.Y. 1969),* aff'd in relevant part, *448 F.2d 872, 169 U.S.P.Q. 759 (2d Cir. 1971),* cert. denied, *404 U.S. 1018, 30 L. Ed. 2d 666, 92 S. Ct. 680 (1972).* The court concludes likewise that the detrimental effects [*38] of VPC's patent misuse have been dissipated, inasmuch as VPC has affirmatively ceased all conduct constituting patent misuse. The court notes that it is difficult to measure the impact of VPC's patent misuse upon MPC's loss of market share in the relatively tight ATE interface market. Indeed, it is difficult for this court to hypothesize on the affirmative steps that VPC could take which would negate the detrimental effects of its patent misuse where the quantitative measure of such effects is so difficult to ascertain. Accordingly, the court concludes that VPC's steps to cease the conduct constituting patent misuse is the only viable affirmative step which VPC could take under the circumstances of this case. Accordingly, the court will grant VPC's motion to convert the July 27, 1995 temporary injunction into a permanent injunction. n10

n10 Consequently, MPC's motion to vacate the temporary injunction and to enforce the bond posted by VPC in the amount of $ 50,000.00 will be overruled.

## VIII

MPC has moved [*39] the court to enter final judgment in this case. The court considers MPC's motion well-taken. Consequently, for the reasons stated herein, the court will this day issue an appropriate Order.

ENTERED: James H. Michael, Jr.

Senior United States District Judge

May 29, 1996

Date

ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED

as follows:

(1) The plaintiff's "Renewed Motion for Treble Damages, Attorneys Fees and Costs for Defendant Mac Panel Company's Willful Infringement of the " *'005*" Patent" shall be, and it hereby is, OVERRULED.

(2) The plaintiff's "Renewed Motion for Treble Damages, Attorney Fees and Costs for Defendant Mac Panel Company's Willful Infringement of the " *'530*" Patent" shall be, and it hereby is, OVERRULED.

(3) The plaintiff's "Renewed Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial on Defendant Mac Panel Company's Counterclaim for Monopolization" shall be, and it hereby is, OVERRULED.

(4) The plaintiff's "Renewed Motion for Judgment as a Matter of Law, or in the Alternative for New Trial on Defendant Mac Panel Company's Counterclaim for Attempted Monopolization" shall [*40] be, and it hereby is, OVERRULED.

(5) The plaintiff's "Renewed Motion for Judgment as a Matter of Law on the Defense of Patent Misuse" shall be, and it hereby is, OVERRULED.

(6) The plaintiff's "Motion for Judgment as a Matter of Law, or in the Alternative for New Trial on Virginia Panel's Lanham Act Claim" shall be, and it hereby is, OVERRULED.

(7) The plaintiff's "Motion for Attorney Fees and Costs for Defendant Mac Panel Company's False Advertising in Violation of the Virginia Code" shall be, and it hereby is, GRANTED inasmuch as attorneys' fees are

awarded in the amount of $ 145,506, and OVERRULED with respect to costs.

(8) The plaintiff's "Motion for Entry of Permanent Injunction on Patent Infringement Claims" shall be, and it hereby is, GRANTED.

(9) The defendant's "Renewed Motion for Judgment as a Matter of Law on Contributory Infringement and Willful Infringement, and in the Alternative for New Trial" shall be, and it hereby is, OVERRULED.

(10) The defendant's "Motion for Decision by the Court of the Issue of Laches, or in the Alternative for New Trial" shall be, and it hereby is, OVERRULED.

(11) The defendant's "Motion for a Partial New Trial on the Issue of Damages [*41] Predicated upon Virginia Panel Corporation's Anti-Competitive Conduct in the Past" shall be, and it hereby is, OVERRULED.

(12) The defendant's "Motion for Award of Treble Damages and Attorneys Fees on the Sherman Act Section 2 Claims" shall be, and it hereby is, GRANTED. The damages award shall be, and it hereby is, trebled and affixed in the amount of $ 456,666. The award of attorneys' fees shall be, and it hereby is, affixed in the amount of $ 913,332. The award of costs shall be, and it hereby is, affixed in the amount of $ 157,928.

(13) The defendant's "Motion for Judgment as a Matter of Law on Virginia False Advertising Statute Claim, or in the Alternative for New Trial on the Virginia False Advertising Statute Claim" shall be, and it hereby is, OVERRULED.

(14) The defendant's "Renewed Motion for Judgment as a Matter of Law on Virginia Panel Corporation's False Advertising Claim, and, in the Alternative for New Trial on the Virginia False Advertising Claim" shall be, and it hereby is, OVERRULED.

(15) The defendant's "Motion for a Partial New Trial on the Issue of Virginia Panel Corporation's Misuse of U.S. Patent No. *4,655,530*" shall be, and it hereby is, OVERRULED.

(16) The [*42] defendant's "Motion to Dismiss Patent Infringement Claims of Virginia Panel, and to Set Aside Patent Infringement Damages Based on Jury Verdict Finding Patent Misuse" shall be, and it hereby is, OVERRULED with respect to the dismissal of the infringement claims, and shall be, and hereby is, GRANTED, with respect to setting aside the patent infringement damages.

(17) The defendant's "Motion to Vacate Temporary Injunction and Enforce Surety's Liability on Bond shall be, and it hereby is, OVERRULED, and the temporary injunction shall be, and it hereby is, made permanent.

(18) The defendant's "Motion for Entry of Judgment" shall be, and it hereby is, GRANTED.

(19) The instant action, Civil Action Numbered 93-0006-H, shall be, and it hereby dismissed with prejudice and stricken from the active docket of this court.

The Clerk of the Court is hereby directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record.

ENTERED: James H. Michael, Jr.

Senior United States District Court

May 29, 1996

Date

Exhibit F

LEXSEE 1992 U.S. DIST. LEXIS 4648


**COLLINS LICENSING L.P., Plaintiff, v. AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

**MO-90-CA-201**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, MIDLAND-ODESSA DIVISION**

*1992 U.S. Dist. LEXIS 4648*

**March 21, 1992, Decided**
**March 23, 1992, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee brought a patent infringement action against defendant alleged infringer. Defendant asserted the affirmative defense of laches. The matter was tried before a jury and the jury made an advisory finding of fact regarding laches.

**OVERVIEW:** Plaintiff filed a reexamination of the patent-in-suit in the United States Patent Office. Defendant alleged that plaintiff had been aware of the alleged infringement long before the patent infringement action was filed and, thus, was barred by laches. The court entered its findings of fact and conclusions of law, determining that plaintiff's claim was not barred by laches. The court adopted the jury's advisory finding of fact and determined the date when plaintiff first knew or should have known of defendant's alleged infringement, which was the date from which laches began to run. The period of laches was less than six years, and thus defendant had the burden of proving an unreasonable delay in plaintiff's assertion of the claim and prejudice or injury to

defendant resulting from the delay. Defendant did not do so. Plaintiff avoided the consequences of what would have otherwise been nearly a four year laches period by establishing that it was engaged in other litigation. United States Patent Office proceedings such as the reexamination filed by plaintiff constituted other litigation which tolled the laches period.

**OUTCOME:** The court entered findings of fact and conclusions of law in which it determined that plaintiff's patent infringement claim was not barred by laches.

**LexisNexis(R) Headnotes**


*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Trials > Bench Trials*
[HN1] The equitable defense of laches is an issue for the court to resolve. *Fed. R. Civ. P. 39(c)* governs the resolution of issues not triable to a jury. This rule permits the court upon motion or its own initiative to try such issues with an advisory jury or, with the consent of

1992 U.S. Dist. LEXIS 4648, *

both parties, to try the issue to a jury whose verdict would be binding.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
***Patent Law > Ownership > Conveyances > Licenses***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations***
[HN2] A reexamination of a patent is analogous to a reissue proceeding and thus constitutes other litigation sufficient to toll the laches clock.

***Civil Procedure > Trials > Bench Trials***
[HN3] Pursuant to *Fed. R. Civ. P. 52(a)*, in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. The court is free to adopt the jury's advisory finding in whole or in part, or disregard it altogether.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses***
***Civil Procedure > Judicial Officers > Judges > Discretion***
***Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review***
[HN4] Laches and estoppel are equitable defenses whose appropriateness must be determined in each case under its particular factual situation. Whether the plaintiff should be barred by laches or estoppel is to be determined by the trial judge in the exercise of judicial discretion, and his findings will be reversed only if they are clearly erroneous.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements***
***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse***
[HN5] The affirmative defense of laches requires two elements: (1) unreasonable and inexcusable delay in the assertion of the claim; and (2) prejudice or injury resulting from the delay. Mere delay in bringing suit is not, of itself, sufficient to constitute laches in a patent infringement action.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN6] Laches begins to run not on the date the patent issued, but when the patentee first knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action.

***Evidence > Inferences & Presumptions > General Overview***
***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN7] When a patentee delays more than six years before filing suit, the delay is presumed to be unreasonable. The burden then shifts to the plaintiff to prove the existence and reasonableness of an excuse for the delay, as well as to show the lack of prejudice to the infringer. Otherwise, the defendant has the burden of proving both elements of the defense.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN8] In patent infringement cases, the doctrine of laches bars recovery of damages for

any infringement occurring prior to the filing of the suit.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements**
**Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > Requirements**
[HN9] A patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing that it was engaged in other litigation. Patent office proceedings constitute other litigation. Reissue proceedings should be treated similarly to infringement litigation for purposes of laches.

**JUDGES:** [*1] BUNTON

**OPINION BY:** LUCIUS D. BUNTON

**OPINION:**

FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING LACHES

BEFORE THIS COURT came the above-captioned cause for trial before a jury on January 27, 1992. In its verdict, the jury made the following advisory finding of fact regarding laches:

> 4. On what date do you find AT&T proved by a preponderance of the evidence Arthur A. Collins, Inc., or its successors, knew or should have known of the alleged infringing activity by AT&T?

1/86

[HN1] The equitable defense of laches is an issue for the Court to resolve. *Federal Rule of Civil Procedure 39(c)* governs the resolution of issues not triable to a jury. This rule permits the Court "upon motion or its own initiative" to

try such issues "with an advisory jury", or "with the consent of both parties" to try the issue to a jury whose verdict would be binding. This Court chose to try this issue with an advisory jury. Pursuant to *Federal Rule of Civil Procedure 52(a)*, the Court enters its Findings of Fact and Conclusions of Law with respect to the laches issue in the above-captioned cause.

FINDINGS OF FACT

1. Arthur A. Collins, Inc., or its successors, knew or should have known of the infringing [*2] activity by AT&T in January, 1986.

2. Although four articles describing the 5ESS Switch were included in the 1981 International Switching Symposium in Montreal, the first detailed description of the 5ESS was published by AT&T in the July/August, 1985 AT&T Technical Journal. This Journal was entirely dedicated to the 5ESS. Prior to this publication, AT&T had not disseminated detailed information regarding the 5ESS.

3. After receiving the July/August, 1985 AT&T Technical Journal, Plaintiff reviewed the detailed description of the 5ESS presented in the Journal.

4. Plaintiff contacted AT&T in April, 1986, and for three years thereafter, numerous settlement meetings were conducted between the parties. Throughout these meetings, AT&T never denied infringement, and AT&T refused to provide further details regarding the 5ESS, although requested to do so.

5. On June 21, 1989, Plaintiff filed a Reexamination of the patent-in-suit in the United States Patent Office. Plaintiff advised AT&T of the reexamination request.

6. The 1989 [HN2] reexamination is analogous to a reissue proceeding, and thus it constitutes "other litigation" sufficient to toll the laches clock.

1992 U.S. Dist. LEXIS 4648, *

7.  Both [*3] prior to the filing of the reexamination and thereafter, AT&T was informed if a license agreement was not reached, Collins Licensing would seek to enforce its patent through litigation.

8.  It was not until after discovery commenced in this litigation that Plaintiff received information regarding the loop back mux, i.e., the 5ESS.  During discovery, AT&T marked as confidential the technical documentation regarding the 5ESS, including the loop back mux.

9.  Plaintiff did not have sufficient information to determine whether AT&T's 5ESS infringed its '593 patent until after the lawsuit was filed.  Only then did AT&T produce documents that showed the design of the space stage of the 5ESS.

10.  The relevant time period for laches is January, 1986 through December, 1990, when the Complaint was filed in this cause.

CONCLUSIONS OF LAW

1.  [HN3] Pursuant to *Rule 52(a), F.R.Civ.P.*, "in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; . . ." The Court is free to adopt the jury's advisory finding in whole or in part, [*4] or disregard it altogether.  *Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114 (5th Cir. 1973); Aetna Insurance Company v. Paddock, 301 F.2d 807, 810-811 (5th Cir. 1962).*

2.  As the Fifth Circuit admonished, [HN4] "laches and estoppel are equitable defenses whose appropriateness must be determined in each case under its particular factual situation." *Studiengesellschaft Kohle v. Eastman Kodak Co., 616 F.2d 1315, 1325 (5th Cir. 1980); Meyers v. Brooks Shoe, Inc., 912 F.2d 1459,* *1462-63 (Fed. Cir. 1990).* "Whether the plaintiff should be barred by laches or estoppel is to be determined by the trial judge in the exercise of judicial discretion, and his findings will be reversed only if they are clearly erroneous." Id.; *Jamesbury Corp. v. Litton Indus. Products, Inc., 839 F.2d 1544, 1551 (Fed. Cir. 1988); Vaupel Textilmaschinen v. Meccanica Euro Italia, 944 F.2d 870, 876 (Fed. Cir. 1991).*

3.  [HN5] The affirmative defense of laches requires two elements: "(1) unreasonable and inexcusable delay in the assertion of the claim, and (2) prejudice or injury resulting [*5] from the delay." *Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1572 (Fed. Cir. 1987); Bott v. Four Star Corp., 807 F.2d 1567, 1575 (Fed. Cir. 1986); Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 741 (Fed. Cir. 1984).* "Mere delay in bringing suit is not, of itself, sufficient to constitute laches in a patent infringement action." Studiengesellschaft Kohle, at 1326.

4.  [HN6] Laches begins to run not on the date the patent issued, but when the patentee first "knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action." Studiegesellschaft Kohle, at 1326; Jamesbury, at 1552.

5.  [HN7] When a patentee delays more than six years before filing suit, the delay is presumed to be unreasonable.  The burden then shifts to the plaintiff "to prove the existence and reasonableness of an excuse for the delay, as well as to show the lack of prejudice to the infringer." Jamesbury, at 1552; Meyers, at 1461; Hottel, at 1572. n1 "But otherwise, the defendant has the burden of proving both elements of the defense." Meyers, at 1461.

     n1 The recent Federal Circuit decision of *A.C. Aukerman Co. v. R.L. Chaides Construction Co., 18 U.S.P.Q.2d 1618 (Fed. Cir. 1991)* held this six-year presumption no longer ap-

1992 U.S. Dist. LEXIS 4648, *

plies. The decision was withdrawn by the Federal Circuit sua sponte on May 22, 1991 for rehearing en banc *(935 F.2d 1262)*. The case was reheard on September 16, 1991 (No. 90-1137), but as of March 20, 1992, the Court has not issued its decision.

[*6]

6. As applied [HN8] in patent infringement cases, the doctrine of laches "bars recovery of damages for any infringement occurring prior to the filing of the suit." Meyers, at 1461; Jamesbury, at 1551; Studiengesellschaft Kohle, at 1325.

7. [HN9] A patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing that it was engaged in "other litigation." Vaupel Textilmaschinen, at 876-77. The Vaupel court noted patent office proceedings constitute "other litigation," stating:

Although here we are dealing with a reissue proceeding, such proceedings should be treated similarly to infringement litigation for purposes of laches. There is no demonstrable distinction for this purpose between judicial proceedings raising the issue of patent validity and a PTO proceeding involving patentability.

Id., at 877. The 1989 reexamination is analogous to a reissue proceeding, and thus it constitutes "other litigation" sufficient to toll the laches clock.

8. After consideration of the facts presented at trial, along with applicable case law, this Court finds Plaintiff's claim is not barred by laches.

SIGNED [*7] this 21st day of March, 1992.

HONORABLE LUCIUS D. BUNTON, III

CHIEF JUDGE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Redacted Public Version of Appendix to Crown's Redacted Memorandum In Support of Its Motion To Bifurcate Trial Of Rexam's Counterclaims I-V And To Submit Evidence Relating To Laches To The Jury has been served on this the 1st day of February, 2007, in accordance with the Federal Rules of Civil Procedure, on the following in the manner indicated below:

**<u>VIA EMAIL & FEDERAL EXPRESS:</u>**

Gerald C. Willis, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601

Anne Shea Gaza, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Attorneys for Defendant Rexam*
*Beverage Can Co.*

Dated: February 1, 2007
                                         __/s/ Barry Klayman_____
                                         Barry M. Klayman, Esquire (ID # 3676)
                                         Wolf, Block, Schorr and Solis-Cohen LLP
                                         Wilmington Trust Center
                                         1100 N. Market Street, Suite 1001
                                         Wilmington, DE 19801
                                         (302) 777-0313

                                         *Attorney for Plaintiffs*
                                         *Crown Packaging Technology, Inc. and*
                                         *Crown Cork & Seal USA, Inc.*