DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

h) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end ~~curl~~ peripheral cover hook while said can end is rotated so as to partially deform said ~~curl~~ cover hook and said first wall portion and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially deformed can end ~~curl~~ cover hook so as to further deform said ~~curl~~ cover hook and said first wall portion and said can body flange so as to further form said seam;

i) said rotation of said can end during said first seaming operation is accomplished by imparting driving contact between said juncture of said first and second walls of said chuck and said ~~inclined~~ wall of said can end but without imparting driving contact between said chuck and said can end bead interior surface.

41.    (currently amended) The method according to claim ~~34~~77, further comprising the step of filling the can body with a carbonated beverage prior to performing said seaming operation.

42    (withdrawn) An apparatus for seaming a peripheral curl of a can end onto a flange of a can body, said can end having a wall extending radially inward from said cover hook and inclined between about 20° and about 60° with respect to a central axis of said can end, comprising:
        a) a chuck adapted to hold said can end on said can body, said chuck comprising upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical; and
        b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

43.    (withdrawn) The apparatus according to claim 42, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°.

44.    (withdrawn) The apparatus according to claim 42, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

45.    (withdrawn) The apparatus according to claim 44, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

CCS0016570

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A81

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

46.    (withdrawn) An apparatus for seaming a can end onto a flange of a can body, said can end having a circumferentially extending peripheral curl and a wall extending circumferentially and radially inward from said curl and an annular reinforcing bead extending radially inward from said wall, said reinforcing bead having an interior surface, said peripheral curl comprising a seaming panel and a radiused portion extending from said seaming panel to said wall, said wall inclined between about 20° and about 60° with respect to an axial centerline of said can end, comprising:

a) a chuck for holding said can end on said can body, said chuck comprising (i) upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical, and (ii) a downwardly extending annular bead, said chuck annular bead sized and located so as not to contact said inner interior surface of said chuck annular reinforcing bead when said chuck holds said can end on said can body; and

b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

47.    (withdrawn) The apparatus according to claim 46, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°

48.    (withdrawn) The apparatus according to claim 46, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

49.    (withdrawn) The apparatus according to claim 48, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

50.    (withdrawn) The apparatus according to claim 46, wherein said lower wall of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

51.    (withdrawn) The apparatus according to claim 46, wherein said juncture between said upper and lower walls of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

52.    (withdrawn)   A method of seaming a can end to a can body, comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral curl, said peripheral curl forming a lip at one end thereof, (ii) a circumferentially extending wall extending downwardly and radially inwardly from an opposite end of said peripheral curl, at least an upper portion of said wall inclined with respect to an axial centerline of said can end, and (iii) a circumferentially extending annular bead

Page 8 of 23

CCS0016571

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003                                     PATENT

extending downwardly and radially inwardly from said wall, the distance from the lowermost point on said bead to the uppermost point on said curl defining a height of said can end;

      b) placing said peripheral curl of said can end into contact with a circumferentially extending flange of a can body;

      c) bringing a rotatable chuck into engagement with said can end;

      d) bringing a seaming roll having a lower forming surface into rolling engagement with said curl, said seaming roll being positioned so that said lower forming surface is disposed above said lip of said curl upon initial engagement with said curl so that said seaming roll (i) displaces said curl upwardly as said curl is displaced inwardly and (ii) permanently bends said upper portion of said can end wall towards the axial direction so as to permanently increase said height of said can end.

53.     (withdrawn) The method of claim 52, wherein at least said upper portion of said wall is inclined between about 20° and about 60° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

54.     (withdrawn) The method of claim 53, wherein at least said upper portion of said wall is inclined between about 30° and about 50° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

55.     (withdrawn) The method of claim 54, wherein at least said upper portion of said wall is inclined between about 40° and about 45° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

56.     (withdrawn) The method according to claim 53, wherein said bending of said upper portion of said can end wall forms a crease between said upper portion of said can end wall and a lower portion of said can end wall.

57.     (withdrawn) The method of claim 52, wherein the rotatable chuck has first and second circumferentially extending walls, the first wall being substantially cylindrical, and wherein said bending of said upper portion of said can end wall causes said upper portion of said can end wall to be pressed against said chuck first wall, whereby said upper portion of said can end wall becomes substantially cylindrical.

58.     (withdrawn) The method according to claim 57, wherein at least said upper portion of said can end wall is inclined between about 20° and about 60° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

59.     (withdrawn) The method according to claim 58, wherein at least said upper portion of said can end wall is inclined between about 30° and about 50° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

60.     (withdrawn) The method according to claim 59, wherein at least said upper portion of said can end wall is inclined between about 40° and about 45° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

CCS0016572

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024 862
Office Action Dated: August 7, 2003

61.      (withdrawn): A method of seaming a can end to a can body, comprising the
steps of:

a) providing a can end having (i) a circumferentially extending peripheral curl,
(ii) a circumferentially extending wall extending downwardly and radially inwardly
from an opposite end of said peripheral curl, and (iii) a circumferentially extending
annular bead extending downwardly and radially inwardly from said wall, said bead
having inner and outer walls and a substantially convex base so as to form an interior
surface thereof having a bottom;

b) placing said curl of said can end into contact with a circumferentially
extending flange of a can body;

c) bringing a rotatable chuck into engagement with said can end;

d) performing at least a first seaming operation, said first seaming operation
comprising placing a seaming roll into contact with said can end curl while rotating
said can end so as to partially deform said curl and said can body flange into a partial
seam, said rotation of said can end during said first seaming operation driven by said
rotating chuck through driving contact between said chuck and said wall of said can
end without driving contact between said chuck and said base of said can end bead
interior surface.

62.      (withdrawn)The method of claim 61, wherein an upper portion of said can
end wall is inclined at an angle to an axial centerline of said can end prior to said seaming
operation, and further comprising a second seaming operation that bends said wall upper
portion into an approximately cylindrical shape.

63.      (withdrawn) The method according to claim 62, wherein said upper portion
of said can end wall is inclined between about 20° and about 60° with respect to said axial
centerline of said can end prior to said first seaming operation.

64.      (withdrawn) The method according to claim 63, wherein said upper portion
of said can end wall is inclined between about 30° and about 50° with respect to said axial
centerline of said can end prior to said first seaming operation.

65.      (withdrawn) The method according to claim 64, wherein said upper portion
of said can end wall is inclined between about 40° and about 45° with respect to said axial
centerline of said can end prior to said first seaming operation.

66.      (withdrawn) The method according to claim 63, wherein said upper portion
of said wall is bent towards the axial direction so as to permanently increase the height of
said can end during said first and second seaming operations.

67.      (withdrawn) The method according to claim 63, wherein said rotation of said
can end during said first seaming operation is driven by said rotating chuck through driving
contact between said chuck and said wall of said can end without driving contact between
said chuck and any portion of said can end bead interior surface.

CCS0016573

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A84

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

68.    (new) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation, (ii) an annular reinforcing bead, and (iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall comprising first and second wall portions, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location to a second location on said wall that forms a transition with said reinforcing bead, whereby said first and second locations form end points of said second wall portion, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising a first circumferentially extending wall, said chuck first wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, said first location on said wall after said seaming operation forming the transition from said substantially cylindrical wall portion to said second wall portion, said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation.

69.    (new) The method according to claim 68, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall not being substantially cylindrical whereby said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall.

Page 11 of 23

CCS0016574

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A85

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

70.    (new) The method according to claim 69, wherein the step of performing said seaming operation further comprises bending said first wall portion of said can end upwardly around said chuck wall juncture so as to permanently deform said first wall portion.

71.    (new) The method according to claim 68, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

72.    (new) The method according to claim 68, wherein said first and second portions of said wall of said can end lie along a substantially straight line prior to performing said seaming operation.

73.    (new) The method according to claim 68, wherein said line between the first and second locations on said second wall remains inclined between about 30° and about 50° after seaming.

74.    (new) The method according to claim 68, wherein said line between the first and second locations on said second wall remains inclined between about 40° and about 45° after seaming.

75.    (new) The method according to claim 68, wherein, in said step e) of performing the seaming operation, rotation of said can end is achieved without imparting driving contact between said chuck and a bottom interior surface of said reinforcing bead.

76.    (new) The method according to claim 68, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall being substantially frustoconical.

77.    (new) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation and (ii) a circumferentially extending wall comprising first and second portion, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location on said wall to a second location on said wall, whereby said first and second locations form end points of said second wall portion, said second wall location being the lowermost point of said wall, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

Page 12 of 23

CCS0016575

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A86

DOCKET NO.: CC-3397; A4772US4                                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

c) providing a rotatable chuck comprising a first circumferentially extending wall, said first chuck wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 15°, said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.

78.    (new) The method according to claim 77, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall not being substantially cylindrical whereby said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said second location on said can end wall.

79.    (new) The method according to claim 78, wherein said bending of said first wall portion during said seaming operation comprises bending said first wall portion upwardly around said chuck wall juncture.

80.    (new) The method according to claim 78, wherein said end includes an annular reinforcing bead extending from said second wall portion and, in said step e) of performing the seaming operation, rotation of said can end is achieved without imparting driving contact between said chuck and a bottom interior surface of said reinforcing bead.

81.    (new) The method according to claim 77, wherein the can end includes a reinforcing bead extending radially inward from said lowermost point of said second portion of the wall.

82.    (new) The method according to claim 77, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

83.    (new) The method according to claim 77, wherein said first and second portions of said wall of said can end lie along a substantially straight line prior to performing said seaming operation.

84.    (new) The method according to claim 77, wherein after said seaming operation said first and second portions of said can end wall intersect at an obtuse angle.

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

85.    (new) The method according to claim 77, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall being substantially frustoconical.

86.    (new) The method according to claim 35, wherein said line between the first and second locations on said second wall portion remains inclined between about 30° and about 50° after seaming.

87.    (new) The method according to claim 37, wherein said line between the first and second locations on said second wall portion remains inclined between about 40° and about 45° after seaming.

88.    (new) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation; (ii) an annular reinforcing bead, and (iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall and said reinforcing bead forming a transition therebetween;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation.

89.    (new) The method according to claim 88 wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°.

90.    (new) The method according to claim 88, wherein said line extending from said first location to said transition is inclined between about 30° and about 50° with respect

CCS0016577

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A88

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003                                    PATENT

to said axial centerline of said can end both before and after performing said seaming operation.

91.        (new) The method according to claim 90, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 26°.

92.        (new) The method according to claim 88, wherein said line extending from said first location to said transition is inclined between about 40° and about 45° with respect to said axial centerline of said can end both before and after performing said seaming operation

93.        (new) The method according to claim 92, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 36°.

94.        (new) The method according to claim 88, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward into a substantially cylindrical configuration.

95.        (new) The method according to claim 88, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

96.        (new) The method according to claim 88, wherein said first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

97.        (new) The method according to claim 88, wherein said first wall of said chuck is substantially cylindrical.

98.        (new) The method according to claim 97, wherein said said second chuck wall being substantially frustoconical.

99.        (new) The method according to claim 88, wherein the distance from a lowermost point on said annular bead to the uppermost point on said cover hook defines a height of said can end, and said seaming operation increases said height of said can end.

100.      (new) The method according to claim 88, wherein

f) said annular bead has an interior surface thereof;

g) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end curl while said can end is rotated so as to partially deform said cover hook and a first portion of said can end wall and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially

CCS0016578

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

deformed can end cover hook so as to further deform said cover hook and said can
end wall first portion and said can body flange so as to further form said seam;

h) said rotation of said can end during said first seaming operation is
accomplished without imparting driving contact between said chuck and said can end
bead interior surface.

Page 16 of 23

CCS0016579

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A90

DOCKET NO : CC-3397; A4772US4
Application No.: 10/024 862
Office Action Dated: August 7, 2003

PATENT

## Amendments to the Drawings

The attached sheet of drawings includes changes to Figures 1 through 9. The attached sheet, which includes Figures 1 through 9, replaces the original sheet including Figures 1 through 9.

Attachment:  Replacement Sheet 1

CCS0016580

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A91



Docket No : CC-3397/A4772US4
Serial No : 10/024,862
Filing Date: December 18, 2001
Replacement Sheet 1 of 4

**FIG. 1**
**PRIOR ART**

CCS0016581

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

**FIG. 2**
**PRIOR ART**

**FIG. 3**
**PRIOR ART**

A92



Docket No : CC-3397/A4772US4
Serial No.: 10/024,862
Filing Date: December 18, 2001
Replacement Sheet 2 of 4



## FIG. 4



## FIG. 5

CCS0016582

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608



Docket No : CC-3397/A4772US4
Serial No : 10/024,862
Filing Date: December 18, 2001
Replacement Sheet 3 of 4



## FIG. 6



## FIG. 7

CCS0016583

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A94



Docket No.: CC-3397/A4772US4
Serial No.: 10/024,862
Filing Date: December 18, 2001
Replacement Sheet 4 of 4

FIG. 8

FIG. 9

12a

31a

34

24

12b

CCS0016584

Crown Packaging, et al, v. Rexam
USDC District of DE CA 05-608

31b

A95

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024.862
Office Action Dated: August 7, 2003

## REMARKS/ARGUMENTS

### OBJECTIONS TO THE DRAWINGS AND SPECIFICATION

The pending office action states that Figures 1, 2, and 3 should be designated by a legend indicating that the Figures illustrate only "that which is old." On the attached replacement sheet 1, Figures 1, 2, and 3 each bear the designation "Prior Art" to overcome the objection to the drawings.

The office action also states that the specification improperly incorporates essential matter by reference to foreign applications or patents. Without taking a position regarding whether the matter contained in the referenced documents constitutes essential matter, this amendment replaces the references to the EP application, EP patent, and international application in the specification with a reference to the specification (or a portion thereof) of the patent number of the corresponding U.S. patent. Accordingly, the specification after entry of this amendment refers only to material in a United States patent, thereby overcoming the objection without the need for a declaration or affidavit.

### REJECTIONS OF THE CLAIMS

All of pending claims 11 – 41 have been rejected under Section 103 based on United States Patent Number 5,911,551 ("Moran 551") in view of Japanese Utility Model Application No. 57-117323 (the "JP Reference"). Applicants submit that the rejection is improper, first, because Moran 551 does not constitute prior art against the present application and, second, because the limitations of the claims are neither taught nor suggested from the cited prior art.

Claims 24 and 34 have been cancelled and replaced by new claims 68 and 76. Claims 25-33 and 35-41, which previously depended from claims 24 and 34, have been amended to depend from new claims 68 and 77, respectively. In addition, new claims 69-76 (which depend from claim 68) and new claims 78-87 (which depend from claim 77) have been added to round out the scope of the claims. New independent claim 88 and dependent claims 89-100 have been added.

CCS0016585

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A96

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated:  August 7, 2003                                    PATENT

### The Cited Moran Reference Is Not Prior Art

Moran 551, which was asserted as prior art presumably under Section 102(e), does not constitute prior art against the present application because the claimed invention of the present application and the subject matter of Moran 551 were, at the time the invention of the present application was made, owned by the same entity. As stated in paragraphs 3 and 5 of the attached declaration of Ms. Ismay Ratliff, at the time the subject matter of the Moran 551 patent was developed and at the time the invention claimed in the 862 application was conceived and reduced practice, the subject matter of the 551 patent and the invention disclosed and claimed in the present application were owned by the same identity -- CarnaudMetalbox plc.

Accordingly, the Moran 551 reference does not constitute prior art against the present application according to 35 U.S.C. § 103(c) because of the common ownership at the time the invention was made. On the basis, alone, that the primary reference -- on which the pending rejection is based -- does not constitute prior art, Applicants submit that the pending claims are allowable.

### The Claimed Invention Is Patentable Over Any Other Prior Art Reference in Combination with the JP Reference

The office action states that "the angle of inclination is not given patentable weight as it does not affect the method steps claimed." (Office Action, 8/7/03, at 3). As an initial matter, Applicants submit that not giving patentable weight to the configuration of the unseamed can end, on which the method steps are performed, is incorrect as a matter of law.

In this regard, M.P.E.P. § 2116 et seq. requires that all limitations must be considered in determining patentability of a method claim, including beginning and ending materials: "The materials on which a process is carried out must be accorded weight in determining the patentability of a process." M.P.E.P. § 2116 (Edition 8 , August, 2001, latest revision February 2003) (citing Ex parte Leonard, 187 USPQ 122 (Bd. App. 1974)). Moreover, M.P.E.P. § 2116.01 expressly states "All the limitations of a claim must be considered when weighing the differences between the claimed invention and the prior art in determining the obviousness of a process or method claim." Id. (emphasis in original). "[P]roper claim

CCS0016586

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003                                    PATENT

construction requires treating language in a process claim which recites the making or using of a nonobvious product as a material limitation  Motivation to make or use the nonobvious product must be present in the prior art for a 35 U.S.C. 103 rejection to be sustained." *Id.* (emphasis added)  Accordingly, the claim limitations reciting structure of the can end before and after the method steps must be considered in determining patentability.

Furthermore, limitations relating to the "angle of inclination" should be given patentable weight because, for example, some of the claims recite reforming the can end wall in the seaming operation such that the angle of inclination of a portion of the wall is altered. For example, claim 68 recites that although "said seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, . . . said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation" Accordingly, the numeric range of the "angle of inclination" does, in contrast the statement in the office action, "affect the method step."

Regarding the patentability of the pending claims, and as discussed in the background section of Applicants' specification, traditional unseamed metal can ends included a peripheral cover hook, a steeply inclined wall, an outwardly concave annular reinforcing bead, and a center panel. Such conventional unseamed metal can ends are joined to a metal can body by a seaming operation, in which the peripheral cover hook and can body flange are deformed together by seaming rolls to form the seam, as shown in Applicants' Figure 3.

Surprisingly, Applicants have discovered that both the thickness of the can end necessary to contain a given internal pressure and the overall diameter of the flat metal sheet from which the end is formed (that is, the "cut diameter") could be significantly reduced by providing a can end having a particular geometry, including a wall as recited in the pending claims, and deforming it *in a seaming operation* so as to produce a seamed end having a different geometry.

As shown in Figure 4 and described in the corresponding text of the instant application, the seaming operation begins by providing a can end that has a wall extending from the seaming panel portion of the cover hook 23 (the radius of the seaming panel is designated $r_2$ in Figure 4) to an annular reinforcing bead 25. The wall of the can end is then engaged by a chuck 31 having a substantially cylindrical wall 33 and an inclined wall 32, as

CCS0016587

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4                                      PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

shown in Figure 5. As shown in Figures 6 and 7, during the seaming operation, seaming rolls 34 and 38 deform an upper portion of the can end wall so it becomes substantially cylindrical after seaming so as to form, along with the peripheral curl, a double seam. However, the lower portion of the wall (and, of most importance for present purposes, a straight line extending between its two ends) remains inclined at an angle between about 20° and about 60° with respect to the axial centerline. The deformation of the upper portion of the wall so as to form a seam is accomplished by causing the juncture formed by the walls 32 and 33 of the chuck to engage the can end wall so that the upper portion of the can end wall is bent upwardly around the juncture by the seaming rolls. Further, the rotation of the can end is driven through driving contact between the juncture formed by the chuck walls 32 and 33 and the can end wall.

Accordingly, claim 68, for example, specifies a seaming method that comprises the step of "deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical,  .  . said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation." Claim 69, which depends from claim 68, further requires that "said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall." Claim 70, which depends from claim 69, further requires "bending said first wall portion of said can end upwardly around said chuck wall juncture so as to permanently deform said first wall portion." Claim 25, which also depends from claim 68, specifies that "at least a portion of said can end wall first portion is reformed by bending upward by an angle of at least about 16°" during the seaming operation.

Claim 77 is similar to claim 68 but does not require that the can end have a reinforcing bead and specifies that the "first portion of said can end wall is bent upward through an angle of at least about 16°."

Claim 88 specifies that the seaming operation "bend[s] a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between

Page 21 of 23                          CCS0016588

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A99

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation."

Claim 11 specifies that "rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end without driving contact between said chuck and said can end bead interior surface."

The claimed method for seaming the disclosed can end onto a can body is neither taught not suggested by the prior art. In particular, the JP reference shows only an end after seaming onto a can body and provides no details concerning the configuration of the can end prior to seaming or, more importantly, the method used to yield the seamed can end shown in the figures of the JP reference.

The JP reference merely discloses a can end in which the wall is oriented at an angle θ of 20° to 70° after the can end is deformed by the seaming operation. To the extent that the JP reference provides any disclosure of a method of seaming, it teaches away from the current invention. The JP reference explains that the seamed can ends shown in the figures of JP reference comprise "a plate-like chuck panel positioned between a chuck wall that is to be **rolled and connected to a can body . . . in such a manner that said plate-like chuck panel is inclined at 20 to 70 degrees . . . .**" (JP reference, page 1) Thus, unlike the instant invention in which the lower portion of the wall remains substantially undeformed by the seaming operation while the upper portion of the wall is deformed so as to be substantially cylindrical, the JP reference teaches that seaming is performed in such a manner as to incline the lower portion of wall at an angle of 20 to 70 degrees. This suggests that the lower portion of the can end wall prior to seaming was not inclined at such an angle but was reformed during an undisclosed seaming operation so as to achieve that angle of inclination. In general, the configuration of the can end of the JP reference prior to seaming is unknown.

The claims that depend from claims 68 and 77 further distinguish the invention from the JP reference. Dependent claims 69 and 70 (further to the explanation above) and 78 and 79 recite a chuck having two walls that form a juncture therebetween that engages the can end wall during seaming so as to deform the upper portion of the can end wall into a substantially cylindrical configuration. By contrast, the JP reference provides no information

CCS0016589

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A100

DOCKET NO.: CC-3397; A4772US4                                              PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

concerning the shape of the chuck to be used and the manner in which it is applied to the unseamed can end so as to deform it into a seamed can end.

Additionally, with respect to claim 11, the JP reference neither teaches nor suggests that "said rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end without driving contact between said chuck and said can end bead interior surface."

## CONCLUSION

Based on the foregoing, Applicants respectfully submit that the rejection is improper at least because (i) the primary reference relied upon (Moran) is not prior art, (ii) the limitations relating to starting configuration of the can end prior to seaming must be given patentable weight, and (iii) the prior art, including the JP reference, neither teaches nor suggests the claimed method for seaming a can end having the specified configuration prior to seaming so as to produce an end having the specified configuration after seaming. Applicants submit, accordingly, that each of the claims is in allowable condition, and request favorable reconsideration of the pending rejection.

Date: February 9, 2004

Harold Fullmer
Registration No. 42,560

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

Page 23 of 23                                   CCS0016590

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

08/04/04                 41 3725/#

PATENT

DOCKET NO.: CC-3545/4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

re Application of:           Confirmation No.: 8930
Brifconi, et al

Application No : 10/417,980           Group Art Unit: 3725

Filing Date: April 17, 2003           Examiner: Nguyen, Jimmy T.

For:    Can End and Method for Fixing Same to a Can Body

EXPRESS MAIL LABEL NO:
DATE OF DEPOSIT: August 3, 2004

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

*RECEIVED*
*AUG 0 9 2004*
*TECHNOLOGY CENTER R3700*

REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated February 3, 2004, reconsideration is respectfully requested in view of the amendments and/or remarks as indicated below:

☒    Amendments to the Specification begin on page 2 of this paper.

☒    Amendments to the Claims are reflected in the listing of the claims which begins on page 3 of this paper.

☒    Amendments to the Drawings begin on page 6 of this paper and include an attached replacement sheet.

☒    Remarks/Arguments begin on page 7 of this paper.

Page 1 of 16                    CCS0017669

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3545/ 4772US8
Application No.: 10/417,980
Office Action Dated: February 3, 2004

PATENT

This listing of claims will replace all prior versions, and listings, of claims in the application.

**Listing of Claims:**

1.  (currently amended) A metal can end adapted to be joined to a can body ~~for packaging beverages under pressure~~, said can end comprising:

    a peripheral cover hook adapted to be seamed onto a can body so as to form a joint therewith;

    a ~~cheek~~ wall extending inwardly and downwardly from the cover hook;

    an outwardly concave annular reinforcing bead extending inwardly and downwardly from the ~~cheek~~ wall; and

    a central panel supported by and extending inwardly from the reinforcing bead;

    wherein, prior to being joined to said can body: (i) the location at which said ~~cheek~~ wall extends from said peripheral cover hook defines a first point, (ii) the location at which said reinforcing bead extends from said ~~cheek~~ wall defines a second point, and (iii) a line extending between the first point and the second point is inclined to an axis perpendicular to the exterior of the central panel at an angle of between 30° and 60°.

2.  (original) The can end of claim 1, wherein a base of the concave reinforcing bead is arcuate in cross-section and has a cross-sectional radius of less than 0.75 mm.

3.  (original) The can end of claim 1, wherein the base of the concave reinforcing bead is approximately semi-circular in cross section.

4.  (original) The can end of claim 1, wherein the reinforcing bead comprises an outer wall that is inclined to said axis at an angle between –15° and +15°.

5.  (original) The can end of claim 1, wherein the reinforcing bead has inner and outer walls, a lower portion of the outer wall spaced apart from a lower portion of the inner wall by less than 1.5 mm.

CCS0017670

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A103

DOCKET NO.: CC-3545/ 4772US8                                          PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

6.      (currently amended) The can end of claim 4, wherein the reinforcing bead has an
        outer wall and an inner wall that is parallel to the outer wall, said inner wall and said
        outer wall being joined by a concave radius.

7.      (currently amended) The can end of claim 1, wherein the chuck wall extends between
        said first and second points along an essentially straight line.

8.      (original) The can end of claim 7, wherein the line extending between the first point
        and the second point is inclined to said axis at an angle between 40° and 45°.

9       (original) The can end of claim 1, wherein the ratio of the diameter of the central
        panel to the diameter of the peripheral cover hook is 80% or less.

10.     (original) The can end of claim 1, wherein the can end is made of a laminate of
        thermoplastic polymer film and a sheet aluminium alloy.

11.     (previously presented) The can end of claim 1, wherein the can end is made of
        tinplate.

12.     (original) The can end of claim 1, wherein the can end is made of electrochrome
        coated steel.

13.     (new)  A metal can end for use in packaging beverages under pressure and adapted to
be joined to a can body by a seaming process so as to form a double seam therewith using a
rotatable chuck comprising first and second circumferentially extending walls, said first and
second chuck walls forming a juncture therebetween, said can end comprising;

        a peripheral cover hook, said peripheral cover hook comprising a seaming
        panel adapted to be formed into a portion of said double seam during said seaming
        operation;

        a central panel;

        a wall extending inwardly and downwardly from said cover hook, a first
        portion of said wall extending from said cover hook to a first point on said wall, said
        first wall portion adapted to be deformed during said seaming operation so as to be
        bent upwardly around said juncture of said chuck walls at said first point on said wall,

                                  Page 4 of 16

                                                          CCS0017671

Crown Packaging, et al. v Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3545/ 4772US8                                        PATENT
Application No.: 10/417,980
Office Action Dated: February 3, 2004

a second portion of said wall extending from said first point to a second point forming

a lowermost end of said wall, a line extending between said first and second points

being inclined to an axis perpendicular to said central panel at an angle of between

30° and 60°.

14.    (new)   The end according to claim 13, further comprising an annular reinforcing bead

connected to said wall at said second point, said annular reinforcing bead connecting said

wall to said central panel.

CCS0017672

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A105



Docket No.: CC-3345/3373US8
App No.: 10/417,980
Office Action Dated: February 3, 2004
Replacement Sheet 1 of 1

OIPE

AUG 0 3 2004

PATENT & TRADEMARK OFFICE

FIG. 1
PRIOR ART

FIG. 2
PRIOR ART

FIG. 3
PRIOR ART

CCS0017673

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608



BEST AVAILABLE COPY

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:
Brifcani et al.

Serial No :   10/417,980              Group Art Unit:   3727
Filed:        April 17, 2003          Examiner:         Nguyen, Jimmy T

For:    Can End And Method For Fixing The Same To A Can Body

Assistant Commissioner for Patents
Washington, D C. 20231

### DECLARATION OF MR. BRIAN FIELDS

I, Brian Fields, make the following declaration:

1.    I, Brian Fields, am employed by Crown Technologies Corporation, where my present capacity is End Development Manager. I have a bachelors degree in Mechanical Engineering from Loughborough University, U.K., and have been involved in engineering and development in the field of metal containers for 23 years.

2.    I am familiar with United States Patent Application Number 10/417,980, which I will refer to herein as the "subject application" and with the Examiner's rationale in the corresponding office action.

### Seamers Tend To Reject Ends That Are Non-Standard

3.    While working with Mark Kysh in 1993, we at CarnaudMetalBox ("CMB"), which is a predecessor to Crown, commercialized the beverage can end design described in United States Patent Number 5,046,637 (the "Kysh patent"). Measurements (in the industry standard Altek loose end tester) of buckle performance of the end modified according to the teaching of the Kysh patent did show an improvement of approximately 3 psi in buckle performance. This was sufficient to enable a 0.005 mm reduction in end gauge. The initial filling trials were successful in that at least 10 million cans were successfully seamed onto cans. Even though the ends were

CCS0017674

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

not leaking at the seams, customers noticed that the seamed countersink height[1] of the trial ends varied around the end's circumference by a wider range than ends not having the modifications taught by the Kysh patent.

4.     There was a requirement that the ends be interchangeable with competing ends such that standard seaming chucks had to be used with any end. Seaming chuck configurations were standard among all major customers at the time.

5.     Upon investigation by both customers and CMB, it was realized that the cause of the increased countersink variation was due to the Kysh's "kink" (reference numeral 42 in the Kysh patent) interfering with the proper seating of the end onto the seaming chuck. This caused the end to tend to wobble and thus caused the higher variation in seamed countersink height. The consequence of the investigation was that the customers determined that the chuck fit of the Kysh end was unacceptable. And CMB was forced to withdraw the Kysh end from the marketplace.

6.     Even though Kysh provided an increase in pressure performance, customers rejected it because of the industry acceptance of standard chucks. The modifications to the chuck would have been small to accommodate the Kysh end, yet customers were unwilling to change from the industry standard. Part of the reason for customers' generally refusal to modify the chucks at all was that end suppliers would only warrant the can and end package when industry standard chucks and rolls were used.

**Our Modeling Shows That The Kysh End Modified To Have A Wall Inclined At 43° Would Produce A Weaker End Using Conventional Seaming Procedures Even Using A Matching Chuck**

7.     I understand that the pending office action in the instant application suggests that it would have been obvious at the time of the development of the SuperEnd to have more steeply inclined the wall of the end in the Kysh patent. We recently mathematically modeled and calculated the buckle pressure of the end disclosed in the Kysh patent and a Kysh end modified as suggested in the office action. The calculations show that the modification suggested in the office action

---

[1] Seamed countersink height is the vertical distance from the bottom of the bead to the top of the seam.

CCS0017675

Crown Packaging, et al, v. Rexam
USDC District of DE CA 05-608



CC-3397                                                                    PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:

Brifcani et al.

Serial No.: 10/024,862                    Group Art Unit: 3727

Filed: December 18, 2001                  Examiner: Not yet assigned

For:    CAN END AND METHOD FOR FIXING THE SAME TO A CAN BODY

EXPRESS MAIL LABEL NO: EL568092851US
DATE OF DEPOSIT: April 30, 2002

Assistant Commissioner
for Patents
Washington, D.C. 20231

Dear Sir:

## SUPPLEMENTAL PRELIMINARY AMENDMENT

Please make the amendments to the above-identified application as follows:

**In the Specification:**

At Page 1, after the title, replace the first paragraph of continuing information as follows:

--Cross-Reference to Related Applications

This is a continuation of United States Patent Application Number 09/650,664, filed August 30, 2000, which is a continuation of United States Patent Application Number 09/552,668, filed April 19, 2000, now abandoned, which is a continuation of United States Patent Application Number 08/945,698, filed November 21, 1997, which issued May 23, 2000 as U.S. Patent 6,065,634, which is the U.S. National Phase of PCT/GB96/00709, filed March 25, 1996, which claims priority to UK 9510515.1, filed May 24, 1995.--

1

A109

CC-3397                                                    PATENT

Amend Table 6, which appears on page 13 of the substitute specification and page 17 of the as-filed specification, as follows:

<u>TABLE 6</u>

| END SIZE: Bead OD:ID | OVERALL DIA | PANEL DIA d₁ | RATIO OVERALL DIA: PANEL DIA | CHUCK WALL ANGLE C° | CHUCK WALL LENGTH L | RE-ENFORCING RAD r₃ | INNER WALL HEIGHT b₃ | OUTER WALL HEIGHT h₄ | PREDICTED CUT EDGE ø (*DENOTES ACTUAL) | ACTUAL THICKNESS TO CONTAIN PSI |
|---|---|---|---|---|---|---|---|---|---|---|
| | mm | mm | | | mm | mm | mm | mm | | |
| 206-204 | 64.39 (2.535") | 49.49 (1.9485") | 1.3010 | 33.01° | 4.22 (0.166") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 75.230 (2.9618") | 0.255 |
| 206-202 | 64.39 (2.535") | 47.33 (1.8634") | 1.3604 | 42.69° | 4.95 (0.195") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 74.272 (2.9241")* | 0.255 |
| 206-200 | 64.39 (2.535") | 45.07 (1.7744") | 1.4287 | 50.053° | 5.82 (0.229") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.713 (2.9021") | 0.255 |
| 204-202 | 62.18 (2.448") | 47.33 (1.8634") | 1.3137 | 29.78° | 3.96 (0.156") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.767 (2.9042") | 0.24 |
| 204-200 | 62.18 (2.448") | 45.07 (1.7744") | 1.3796 | 40.786° | 4.70 (0.185") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 72.911 (2.8705") | 0.24 |
| 202-200 | 71.98 (2.834") | 45.07 (1.7744") | 1.597 | 38.266° | 4.09 (0.161") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 71.984 (2.834") | 0.225 |
| 206 std | 64.69 (2.547") | 51.92 (2.044") | 1.2461 | 15.488° | 4.39 (0.173") | 0.56 (0.022") | 2.03 (0.080") | - | 76.454 (3.010")* | 0.28 |
| KRASKA ESTIMATE | 64.39 (cg 2.535") | - | - | 15° | 2.54 (0.100") | 0.81 (0.032") | 1.65 (0.065") | 2.29 (0.090") | 78.080 (3.074") | 0.292 (0.0115") |
| All experiments modelled on a notional aluminium alloy of yield strength 310 mpa 0.25 mm thick.  The standard was also 310 mpa BUT 0.275 mm thick. | | | | | | | | | | |

2

A110

CC-3397                                              PATENT

13.    (New) The method according to claim 11, wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is oriented substantially cylindrically.

14.    (New) The method according to claim 11, wherein prior to performing said first seaming operation said wall of said can end is inclined between about 30° and about 50° with respect to said axial centerline of said can end.

15.    (New) The method according to claim 14, wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is oriented substantially cylindrically.

16.    (New) The method according to claim 14, wherein said first and second seaming operations reform said can end inclined wall by bending a first portion of said inclined wall upward by an angle of at least about 26°.

17.    (New) The method according to claim 11, wherein prior to performing said first seaming operation said wall of said can end is inclined between about 40° and about 45° with respect to an axial centerline of said can end.

18.    (New) The method according to claim 17, wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is oriented substantially cylindrically.

19.    (New) The method according to claim 17, wherein said first and second seaming operations reform said can end inclined wall by bending a first portion of said inclined wall upward by an angle of at least about 36°.

20.    (New) The method according to claim 11, wherein said first circumferentially extending wall of said chuck is oriented so as to be substantially cylindrical.

4

CC-3397                                              PATENT

In the Claims:

Cancel claims 1 through 10, and add claims 11 through 51, as follows:

11.    (New) A method of forming a double seam between a can body and a can end, said method comprising the steps of:

a) providing a can end having a circumferentially extending peripheral curl and a wall extending circumferentially and radially inward from said curl and an annular reinforcing bead extending radially inward from said wall, said reinforcing bead having an interior surface, said peripheral curl comprising a seaming panel and a radiused portion extending from said seaming panel to said wall, said wall inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said curl of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck having first and second circumferentially extending walls, said first and second walls forming a juncture therebetween; bringing said chuck into engagement with said can end so that said juncture of said first and second walls of said chuck contacts said inclined wall of said can end;

d) rotating said chuck;

e) performing a first seaming operation by placing a first seaming roll into contact with said can end curl while rotating said can end so as to partially deform said curl and said can body flange into a partial seam, said rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end without driving contact between said chuck and said can end bead interior surface;

f) performing a second seaming operation by placing a second seaming roll into contact with said partially deformed can end curl so as to further deform said curl and said can body flange so as to further form said seam.

12    (New) The method according to claim 11, wherein said first and second seaming operations reform said can end inclined wall by bending a first portion of said inclined wall upward by an angle of at least about 16°.

3

A112

CC-3397                                                                                  PATENT

21.    (New) The method according to claim 20, wherein said substantially cylindrical first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

22.    (New) The method according to claim 11, wherein the distance from the lowermost point on said annular bead to the uppermost point on said curl defines a height of said can end, and wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is bent upwardly so as to substantially increase said height of said can end.

23.    (New) The method according to claim 11, wherein said chuck second wall is inclined with respect to an axial centerline of said chuck that substantially matches said inclination of said can end wall, and wherein said rotation of said can end during said first seaming operation is aided by driving contact between said second wall of said chuck and said inclined wall of said can end.

24.    (New) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having a circumferentially extending peripheral curl and a wall extending circumferentially and radially inward from said curl and an annular reinforcing bead extending radially inward from said wall, said peripheral curl comprising a seaming panel and a radiused portion extending from the seaming panel to said wall, said wall inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said curl of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck having first and second circumferentially extending walls, said first wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end;

e) performing a seaming operation by placing one or more seaming rolls into contact with said curl of said can end while said can end rotates so as to deform said curl and said can body flange into a seam, said seaming operation deforming said can end inclined wall into distinct first and second portions, said first wall portion being reformed

5

A113

CC-3397                                              PATENT

so as to be substantially cylindrical, said second wall portion remaining inclined between about 20° and about 60° with respect to said axial centerline.

25.    (New) The method according to claim 24, wherein during said seaming operation said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 16°.

26.    (New) The method according to claim 24, wherein said wall of said can end is inclined between about 30° and about 50° with respect to an axial centerline of said can end.

27.    (New) The method according to claim 26, wherein during said seaming operation said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 26°.

28.    (New) The method according to claim 24, wherein said wall of said can end is inclined between about 40° and about 45° with respect to an axial centerline of said can end.

29.    (New) The method according to claim 28, wherein during said seaming operation said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 36°.

30.    (New) The method according to claim 24, wherein said substantially cylindrical first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

31.    (New) The method according to claim 24, wherein the distance from the lowermost point on said annular bead to the uppermost point on said curl defines a height of said can end, and wherein as a result of said seaming operation said can end inclined wall is reformed so that said first portion of said wall is bent upwardly into said substantially cylindrical orientation so as to substantially increase said height of said can end.

6



PATENT

32.    (New) The method according to claim 24, wherein

f) said annular bead has an interior surface thereof;

g) said first and second walls of said chuck form a juncture therebetween;

h) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end curl while said can end is rotated so as to partially deform said curl and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially deformed can end curl so as to further deform said curl and said can body flange so as to further form said seam;

i) said rotation of said can end during said first seaming operation is accomplished by imparting driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end but without imparting driving contact between said chuck and said can end bead interior surface.

33.    (New) The method according to claim 24, further comprising the step of filling the can body with a carbonated beverage prior to performing said seaming operation.

34.    (New) A method of forming a double seam between a can body and a can end, said method comprising the steps of:

a) providing a can end having a circumferentially extending inclined wall and a peripheral curl extending circumferentially and radially outward from said inclined wall, said peripheral curl comprising a seaming panel and a radiused portion extending from the seaming panel to said inclined wall, said wall inclined between about 30° and about 60° with respect to an axial centerline of said can end;

b) placing said curl of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck having first and second circumferentially extending walls, said first wall being oriented at an angle within the range of +4° to -4° with respect to an axial centerline of said chuck;

d) bringing said chuck into engagement with said can end;

e) performing a seaming operation by placing one or more seaming rolls into contact with said curl of said can end so as to deform said curl and said can body flange into a seam, a first portion of said inclined can end wall being pressed against said chuck

7

first wall, whereby said first portion of said inclined can end wall is bent upward through an angle of at least about 16° so as to reform said can end wall into distinct first and second portions, said second wall portion remaining inclined between about 20° and about 60° with respect to said axial centerline.

35.    (New) The method according to claim 34, wherein said wall of said can end is inclined between about 30° and about 50° with respect to said axial centerline of said can end.

36.    (New) The method according to claim 35, wherein during said seaming operation said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 26°.

37.    (New) The method according to claim 34, wherein said wall of said can end is inclined between about 40° and about 45° with respect to said axial centerline of said can end

38.    (New) The method according to claim 37, wherein during said seaming operation said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 36°.

39.    (New) The method according to claim 34, wherein the distance from the lowermost point on said annular bead to the uppermost point on said curl defines a height of said can end, and wherein said upward bending of said first portion of can end inclined wall during said seaming operation substantially increase said height of said can end

40.    (New) The method according to claim 34, wherein
f) said can end comprises an annular reinforcing bead extending radially inward from said inclined wall, said annular bead having an interior surface thereof;
g) said first and second walls of said chuck form a juncture therebetween;
h) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end curl while said can end is rotated so as to partially deform said curl and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into

8

A116

CC-3397                                          PATENT

contact with said partially deformed can end curl so as to further deform said curl and said can body flange so as to further form said seam;

i) said rotation of said can end during said first seaming operation is accomplished by imparting driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end but without imparting driving contact between said chuck and said can end bead interior surface.

41.     (New) The method according to claim 34, further comprising the step of filling the can body with a carbonated beverage prior to performing said seaming operation.

42.     (New) An apparatus for seaming a peripheral curl of a can end onto a flange of a can body, said can end having a wall extending radially inward from said cover hook and inclined between about 20° and about 60° with respect to a central axis of said can end, comprising:

a) a chuck adapted to hold said can end on said can body, said chuck comprising upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical; and

b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

43.     (New) The apparatus according to claim 42, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°.

44.     (New) The apparatus according to claim 42, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

45.     (New) The apparatus according to claim 44, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

9

CC-3397              ·                         PATENT

46.    (New) An apparatus for seaming a can end onto a flange of a can body, said can end having a circumferentially extending peripheral curl and a wall extending circumferentially and radially inward from said curl and an annular reinforcing bead extending radially inward from said wall, said reinforcing bead having an interior surface, said peripheral curl comprising a seaming panel and a radiused portion extending from said seaming panel to said wall, said wall inclined between about 20° and about 60° with respect to an axial centerline of said can end, comprising:

      a) a chuck for holding said can end on said can body, said chuck comprising (i) upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical, and (ii) a downwardly extending annular bead, said chuck annular bead sized and located so as not to contact said inner interior surface of said chuck annular reinforcing bead when said chuck holds said can end on said can body; and

      b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

47.    (New) The apparatus according to claim 46, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°.

48.    (New) The apparatus according to claim 46, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

49.    (New) The apparatus according to claim 48, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

10

CC-3397                                                    PATENT

50.    (New) The apparatus according to claim 46, wherein said lower wall of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

51    (New) The apparatus according to claim 46, wherein said juncture between said upper and lower walls of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

## REMARKS

Claims 1-10 were pending in this application and have been cancelled. New claims 11-51 have been added. Therefore, upon entry of the foregoing amendment, claims 11-51 will be pending in this application.

A substitute specification is being filed concurrently with the present Supplemental Preliminary Amendment in response to a request therefore the Notice to File Missing Parts. The substitute specification has been prepared by retyping the as-filed specification. Although no new matter has been added in the retyping, the retyping has changed the pagination of the specification. Therefore, the citations provided below are with respect to the pagination of the substitute specification.

Further, Applicants submit an amendment to the Cross Reference to Related Applications to update information and to correct an inadvertent typographical error.

The current application claims priority, through several continuation applications, from Application Serial No. 08/945,698 (now U.S. Patent No. 6,065,634), claims 9 and 10 of which, as originally filed, recited a method of forming a double seam between a can body and a can end. Such method claims were subject to a restriction requirement and have not heretofore been examined. By the foregoing amendment, Applicants cancel all the original claims and submit new claims that recite methods of forming a double seam between a can body and a can end. Applicants also submit new claims directed to the apparatus for seaming a can end onto a can body.

11

CC-3397                                                                    PATENT

Support for the claimed methods is generally provided, *inter alia*, at page 6, line 9 through page 7, line 13, of the instant application, as well as Figures 5 through 8. In particular, support for the limitations concerning the structure of the can end set out in element a) of independent claims 11, 24 and 34 can be found, *inter alia*, in Figure 4 and at page 5, lines 3-9, and page 5, lines 20-23. Support for the chuck wall angles recited in claims 14, 17, 26, 28, 35, and 37 can be found, *inter alia*, at page 5, lines 8-9 and in Table 6 on page 13. Support for the limitations found in elements b) and c) of independent claims 11, 24 and 34 can be found, *inter alia*, in Figure 5 and at page 6, lines 17-19. Support for elements d), e) and f) of independent claims 11, 24 and 34 may be found, *inter alia*, in Figures 6 and 7 and at page 6, line 21, to page 7, line 13. Support for the reference to bending a portion of the wall of the can end by an angle of at least about 16° recited in element e) of claim 34 and in claims 12 and 25, and by an angle of at least about 26° recited in claims 16, 27, and 36, and by an angle of at least about 36° recited in claims 19, 29, 38 and may be found, *inter alia*, in Figure 7 and at page 5, lines 8-9, and in Table 6 on page 13, and on page 6, lines 17-19 — recognizing that when, as shown in Figure 7, a portion of the chuck wall 24 of the can end that is originally inclined at an angle of at least about 20° is pressed against the substantially cylindrical portion 33 of the chuck wall, which is oriented at an angle of +/- 4°, such portion of the chuck wall 24 of the can end will be bent by an angle of at least about 16° (*i.e.*, 20° – 4° = 16°), and that when the chuck wall 24 of the can end is originally inclined at an angle of at least about 30°, it will be bent by an angle of at least about 26°, and when the chuck wall 24 of the can end is originally inclined at an angle of at least about 40°, it will be bent by an angle of at least about 36°. Support for claims 22, 31, and 39 may be found, *inter alia*, in Figures 4-7 and at page 7, lines 4-13. Support for claims 33 and 41 may be found, *inter alia*, at page 10, lines 4-5, and page 10, line 25, to page 11, line 2.

Support for apparatus claims 42-49 may be found, *inter alia*, at page 6, lines 12-27, and Figures 1 and 5-7.

Regarding the amendments to the table, the specification on page 12, lines 8-11, explains that Table 6 relates to "can ends when joined to containers containing pressurized beverage[s]." Thus, Table 6, in the columns referring to can ends, refers to can ends after seaming onto a can

12

CC-3397                                                    PATENT

body, as distinguished from an unseamed can end. The amendments to the table headings submitted herein merely correct typographical or inadvertent errors to make it clear that the data relates to seamed can ends, and thereby conform the table to other portions of the specification.

In this regard, the heading of the first column is amended to recite "OD:ID", rather than "0:D:ID" as inadvertently submitted in the as-filed table. The heading of the second column is amended to delete the reference to "$d_2$", as the "OVERALL DIA[METER]" of the seamed can end is the curled diameter, for which there is no reference letter or numeral. Similarly, the heading of the first column is also amended to delete the reference to "$d_2$-$d_1$", and the heading of the fourth column is amended to replace "$D_2$:$D_1$" with "OVERALL DIA: PANEL DIA.". The heading of column 5 is changed from "B°" to "C°" to reflect that the column provides the angle relating to the "chuck wall 24" of the can end, as distinguished from the "surface 32" of the "chuck 30," as shown in Figures 4 and 5.

Attached hereto is a marked-up version of the changes made to the specification by the current amendment. The attached page is captioned "Version With Markings To Show Changes Made."

13

CC-3397                                              PATENT

## CONCLUSION

Applicants request favorable examination of the new claims. If the examiner determines that a telephone conference would further prosecution of the pending claims, he is invited to telephone the undersigned at his convenience.

Respectfully submitted,

Harold H. Fullmer
Registration No. 42,560

Date: *April 30, 2002*
WOODCOCK WASHBURN LLP
One Liberty Place - 46th Floor
Philadelphia, PA 19103
(215) 568-3100

14

A122

CC-3545;4772US8

OIPE
AUG 0 3 2006
PATENT & TRADEMARK OFFICE

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:
Brifcani et al.

Serial No.:     10/417,980              Group Art Unit:     3727
Filed:          April 17, 2003          Examiner:           Nguyen, Jimmy T

For:    Can End And Method For Fixing The Same To A Can Body

Assistant Commissioner for Patents
Washington, D.C. 20231

## DECLARATION OF MR. MARTIN HIGHAM

I, Martin Higham , make the following declaration:

1.    I, Martin Higham, am an independent consultant to the beverage can industry and
have been so since 1999. I have spent the past forty years in the can making industry.
From 1966 to 1999 I worked for Metal Box, which became CarnaudMetalBox
("CMB") in the 1980's and, in the 1990's, was acquired by Crown Cork & Seal
Company, which is the parent of the assignee of the patent application that is the
subject of this declaration

2.    I am familiar with U.S. Patent Application Serial No. 10/417,980 and the
development of the end that is the subject of the application. Such end is referred to
within the industry as the "SuperEnd" and I will refer to this application as the
"SuperEnd Application." During the development of the SuperEnd in the early 1990's
I was the supervisor of inventors Kysh and Hinton. As consultant, I have advised
Nampak, a can end maker licensed to make SuperEnds. In addition, I have acted as a
consultant to Crown Cork & Seal Technology ("Crown"), the assignee of the
SuperEnd Application, in connection with litigation between Crown Cork & Seal
Technologies Corp, et al., ("Crown") and Anheuser Busch Companies Inc. and Metal
Container Corp., et al., "("Anheuser-Busch") in the United States District Court for

1

A123

CC-3545;4772US8

the Western District of Wisconsin related to U.S. Patent No. 6,064,634, which I understand issued from one of the earlier applications from which the currently pending SuperEnd Application claims priority. During the course of that litigation, I submitted an expert report on the subject of patent validity and infringement and was deposed by attorneys for Anheuser-Busch. I have been engaged by Crown as a consultant in connection with the prosecution of the currently pending SuperEnd Application in order to provide information to the Examiner concerning the beverage can industry and my opinion concerning the propriety of the rejection of claims in that application.

## Background on Beverage Can End Development Since the 1970's

3.    The beverage can industry in the 1970's developed the "easy open" aluminum beverage can. The easy opening end (e.g., a end having a ring pull opening) was introduced to the market on 211 end diameter[1] from coated aluminum approximately 0.35 mm (0.0138 inches) thick. During most of its life, the 211 end was used on beverages cans of three piece design, with a seamed-on steel bottom and the easy open, aluminum top.

4.    The 211 easy open end was commercially successful with large annual market growth; it essentially replaced most other ends worldwide. Further development of the easy open end focused on techniques for cost reduction. Such cost reduction was achieved primarily by reducing the diameter of the cut edge[2] and/or reducing the metal thickness. Eventually, the can body diameter was reduced by necking its top to enable a smaller diameter end, which by itself reduced metal volume usage because of the

---

[1] The conventional nomenclature for can end diameter provides the diameter in inches followed by the fraction in 16ths. For example, a 211 can end has a seamed end diameter of two and eleven sixteenths inches.
[2] "Cut edge" is the diameter of the flat, circular metal blank from which the unseamed end is formed. The cut edge for various ends is listed in Table 6 of the patent application

2

A124

CC-3545;4772US8

reduced cut edge of the smaller diameter ends and the thickness reduction that results from the increased strength associated with a smaller diameter end.

5.    The progression on the easy open end diameter reduction, began in the early 1980's and was driven by the desire to save metal costs. Soft drink companies, lead by Coca Cola, went from 211 to 209 to 206 and eventually to 202 ends. Brewers went from 211 to 209 to 207½ to 204. Each time such a change was made, the fillers incurred a significant capital cost to purchase new tooling to handle and seam the new caps with smaller diameter necks. High capital costs were also associated with forming the ends and forming the necks on the can bodies. In general, it was thought that the savings resulting from reduced size justified the enormous capital cost associated with such a modification only if the reduction was of at least two sizes -- that is, a reduction from 206 to 204 was not thought economically justified, whereas a reduction from 206 to 202 was economically justified

6.    Throughout this development, the angle of the wall of the end extending below the seaming panel remained below 20°, typically 12° to 15°. The angle of the wall of the seaming chuck was typically close to, but slightly less than, that of the wall of the end. At some point, a chuck with a two part wall was introduced. The lower wall of the chuck remained inclined at an angle slightly less than that of the end, while the upper wall was inclined at a smaller angle, typically 4°. Since the inclination of the wall was typically about 14°, this resulted in bending the metal during the seaming operation by no more than 10°.

7.    Seaming of the end onto the can body became more difficult as the diameter of the end became smaller and the metal thinner. A mini seam was developed that not

3

A125

CC-3545;4772USB

only made seaming easier on the smaller, thinner ends, but allowed the cut edge to be further reduced.[3]

8.    Eventually, the shell design itself was reconsidered by end designers as a possible option to reduce the metal cost. An end with a deeper countersink, as well as a deeper panel, was developed. The larger metal area required for the deeper countersink was more than offset by the thickness reduction enabled by the stronger shell. This end configuration was commercialized in a 206 diameter end using what was referred to as a midi seam.

9.    Up until the introduction of the 206 ends in the mid-1980's, virtually all of the beverage can end shells of a given size, regardless of the manufacturer, were of the same configuration so as to be interchangeable by the filler that seamed the ends onto the can body in the filling line. The standard 206 shell was generally referred to as a B52 shell and was characterized by a 0.250 inch countersink height and 0.080 inch panel height.[4] The 206 ends (which were used by soft drinkers) and 204 ends (which were used by brewers) were commercialized in more than one non-interchangeable configuration. This lead to problems for the fillers because switching to ends supplied by a different manufacturer required changing the seaming chucks on the filling lines.

10.    In Europe at this time, virtually all aluminum beverage cans/ends were 206 B52 design both for the carbonate soft drink companies, such as Coca-Cola, and brewers such as Scottish and Newcastle, Interbrew, etc. The soft drink companies lead the evaluation of the 202 ends supported by all can/end manufacturers, filler equipment manufacturers, and seamer machine producers.

---

[3] The mini seam is described in the manual "Mini Seams" by Pete Moran, published by CMB Engineering Group plc, a copy of which I understand has already been given to the Examiner.
[4] The countersink height and panel height are indicated in the patent application in Figure 4 as h₂ and h3, respectively.

4

A126

CC-3545;4772US8

11.     In the early 1990's, the soft drink companies, led by Coca-Cola, prodded can end makers to develop a 202 end and to do so in such a manner that the end would be interchangeable — that is, all 202 ends could be seamed using the same chuck. This chuck, which was eventually became the industry standard for 202 ends, employed the same design principles as the chucks used on prior ends in that the lower wall was inclined at 12° and the upper wall was inclined at 4°. The 202 can end wall itself was inclined at about 14°. The 202 end was first commercialized in Europe by Coca Cola in the 1994-1995 time frame and was eventually adopted by most soft drink companies in Europe and the United States.

12.     As is now well known, the project was successful and the 202 can/end has become the standard can size for carbonated soft drink fillers. A major factor in the success was that the economics of the conversion from the standpoint of the carbonated soft drink fillers and from the standpoint of the can/end makers justified the total capital investment. The metals savings paid back the capital investment of the carbonated soft drink fillers (such as Coca-Cola) in approximately two years.

13.     The payback calculation for some brewers in the UK at the time was very different because the brewers' filling lines were typically older and slower and therefore has lower annual throughput. For example, a newer carbonated soft drink line (as of the early 1990's) had a capacity of approximately 600 million cans per year, compared with an older beer line which had a capacity of approximately 240 million cans per year (that is, only 40% of the capacity of the new lines of the carbonated soft drink lines).

14.     The brewers not only could obtain less absolute savings per line because of the slower throughput, but they had other disincentives to changing can diameter: expensive changes to the pasteurizer. Beer filling lines will contain a pasteurizer, which is a very large, complex machine requiring significant costs to convert it to

5

A127

CC-3545;4772US8

handle 202 ends. As a result, for a beer filling line the capital cost to convert to 202 may be close to double the cost required to convert a carbonated soft drink line.

15.    Hence for a relatively slow beer line, the payback as a function of the payback of a carbonated soft drink line could be fairly approximated to be 2 (that is, double the absolute cost) divided by 0.4 (that is, the ratio of the throughput and therefore the metal saving potential) or 5 times that for the carbonated soft drink line, and thus provide a payback of approximately 8 to 10 years compared with a payback of roughly 2 years for carbonated soft drink (depending on the assumption used).

16.    This long payback period explains why the brewers in the UK, when presented with the option of changing to 202 cans/ends, concluded that they could not justify the change financially and formally requested that CMB develop a cheaper and hence more materially efficient 206 end. Brewers in the UK made the request to me personally. This was the motivation for the "lightweight" 206 can end project, which ultimately lead to the development of the SuperEnd described in the instant patent application.

17     For illustration, the tables below provide an overview of the metal cost reduction with the development of can ends and includes both conventional ends and SuperEnds. The units are English except for metal thickness, which is provided in millimeters, for ease of showing the calculation of additional metal cost on a price per unit pound basis for thinner aluminum. As explained more fully in paragraph 39, aluminum suppliers charge approximately 1.0% to 1.2% more on a price per unit weight basis for each 0.01 mm reduction in metal thickness, which is reflected in sixth column.

6

CC-3545;4772US8

## Metal Usage and Costs for Various 206, 204, and 202 End Designs

| End Size & Design | Cut Edge Dia. (in) | Thickness (mm) | Metal-Vol. (in³) | Metal Vol. as % of 206 std. B52 | Cost adder as % change from 0.27 mm | Metal Cost as % of 206 std. B52 |
|---|---|---|---|---|---|---|
| 206 std. B52 | 3.008 | 0.27 | 0.0755 | 100.00% | 0.00% | 100.0% |
| 206 B64 | 3.047 | 0.245 | 0.0703 | 93.11% | 3.00% | 96.1% |
| 206 SuperEnd | 2.935 | 0.245 | 0.0652 | 86.39% | 3.00% | 89.4% |
| 204 std. | 2.944 | 0.235 | 0.0629 | 83.37% | 4.20% | 87.6% |
| 202 std. | 2.844 | 0.224 | 0.0560 | 74.16% | 5.52% | 79.7% |
| 202 Superend | 2.735 | 0.208 | 0.0481 | 63.69% | 7.44% | 71.1% |

18.    The following table is based on the foregoing table and provides the decrease in metal cost from one end to another. The SuperEnd described in the instant patent application provides metal cost savings roughly equivalent to a decrease in end size.

## Metal Cost Savings By End Size and Type

| Changing From | To | Metal Savings |
|---|---|---|
| 206 std. | 206 B64 | 3.9% |
| 206 std. | 206 S/E | 10.6% |
| 206 std. | 202 std. | 20.3% |
| 206 std. | 204 std | 12.4% |
| 204 std. | 202 std. | 9.85% |
| 204 std. | 202 S/E | 20.4% |
| 202 std. | 202 S/E | 12.2% |

Initial Reactions to SuperEnd by Others in the Field

19.    In South Africa in the mid/late 1990's Bevcan (a division of Nampak) were considering the 202 change that had been made in Europe. Their customers were aware of 202 and wanted the cost savings. Bevcan had been a licensee of Metal Box but this had ceased when Metal Box was taken over by Crown Cork. The only alternative to 202 appeared to be the 206 Superend which was being talked about by Metal Box/Crown in

7

A129

CC-3545;4772US8

Europe but without any commercial experience being developed. Details of this end were available to Bevcan. The director responsible for customer seaming assistance and the Operations director were of the considered opinion that, although the end was strong, the seaming process was significantly different from proven current techniques in commercial use. These differences were likely to cause inconsistent and variable seams leading to possible leakage. Any leakage is totally unacceptable

20.    I have been told that when the subject of 206 Superends was raised at Bevcan board meetings this seaming process change was identified and the project taken no further until practical proof was available. They were not prepared to spend time and money on a project that the technical experts considered had little chance of success. Also if Crown/Metal Box were not commercialising the technology, there must be some technical problems  This position only changed when I became a consultant to Bevcan and was able to convince them that the potential benefits were worth practical trials to evaluate the reliability/consistency of the new Superend seaming process.

The Kysh End

21.    I am familiar with U S. Patent No. 5,046,637 (the "Kysh Patent") and had managerial responsibility for the group in which Mr. Kysh worked when he developed the end that is the subject of that application.

22.    The Kysh end was aimed at improving the strength, specifically the buckle pressure resistance, of a 206 end by changing the geometry of the reinforcing bead. Such a strength improvement would facilitate a reduction in the thickness of the end. We anticipated that the angle of the wall in the Kysh end, indicated as "C" in Figure 18 of the Kysh Patent, would remain at the conventional value of about 15°, which is reflected in the Kysh Patent by the statement that the angle should "preferably be in the range from 12° to 15°" (column 6, lines 40-43). We hoped that maintaining the wall at the conventional angle of inclination would allow the use of a conventional chuck, which, as

8

CC-3545;4772US8

explained above, has a wall angle of about 14°. However, the Kysh Patent indicates that Mr. Kysh apparently considered the possibility of employing an angle within the broader range of 12° to 20°.

23.     Even though the wall angle of the Kysh end, as we attempted to commercialize it, remained at the conventional value of about 15°, the changes in the bead geometry made it difficult to seam the end using a conventional seaming chuck unless the chuck were modified slightly to accommodate the revised bead geometry. Despite the fact that the Kysh end achieved a modest increase in pressure resistance, beverage can fillers were unwilling undertake the capital investment and commercial risk associated with using even a slightly modified seaming chuck. Consequently, our attempts to commercialize the Kysh end were unsuccessful and the project was eventually abandoned.

Analysis of Japanese JP 57-117323 Published Unexamined Utility Model Application

24.     I have studied Japanese JP 57-117323 published unexamined utility model application (the "JP Reference").

25.     The JP Reference describes, among other things, a seamed can end having an chuck panel inclined at about 45 degrees. As far as I am aware, the seamed end shown in Figure 4 of the JP Reference was never commercially produced.

26.     From the information provided in the JP reference, I performed the calculations and made the observations below. The JP Reference states that it shows a "conventional . . . carbonated beverage can 1b" (JP Reference, page 1, last paragraph) in its Figure 2 ("JP Reference's conventional end") and "an example in which [the] invention is applied to a carbonated beverage can" (JP Reference, page 3, last paragraph) in its Figure 4 ("JP Reference's modified end").

· 9

A131

CC-3545;4772US8

27    I assessed the countersink height of both the JP Reference's conventional seamed end (Figure 2) and modified seamed end (Figure 4). Based on the fact that the beverage can disclosed in the JP Reference has a straight wall without a necked-in portion at its top and based on the can body diameter stated in its Table 2, it is clear the can disclosed in the JP Reference is a 211 diameter can.

28.    The JP Reference does not state the material of which the end if made, but it is my opinion that it discloses a steel, non-easy open end in its Figure 4. I reached this conclusion because the pressure data for the particular plate thickness provided in Table 2 could only be obtained with a steel end and because no evidence of an easy open end type pour aperture is mentioned in the JP Reference. At the time of filing of the JP Reference, it would not be uncommon for a beverage can to be a three piece design with a pair of seamed ends.

29.    Based on my experience in the can industry, the countersink height of a 211 steel, non-easy open end as shown in the JP Reference's Figure 2 would be about 0.150 inches. I have calculated the corresponding countersink height of the JP Reference's modified end of Figure 4 to be 0.378 inches. I arrived at the latter figure by adding the seam height of a standard full seam in use at the filing date of the JP Reference, 0.125 inches, plus the calculated height from the bottom of the seam to the bead. The latter dimension can be approximately calculated from the data provided by the JP Reference: angle of chuck panel 18b of 45 degrees, can body diameter of 65.35 mm, and chuck wall radius diameter of 52.50 mm.

10

CC-3545;4772USB



JP Reference's Figure 2          JP Reference's Figure 4

30.    Accordingly, the JP Reference teaches – in accordance with its goal of reducing the center panel diameter – not only to reduce the center panel diameter but also to have an unusually long chuck wall, which necessarily results in an unusually deep end. Thus, in the only example provided, the JP Reference's modified end has a countersink height (0.378 inches), which is 0.228 inches deeper than that of its "conventional" end (0.150 inches).

31.    The large countersink height of JP's modified end would have inherent drawbacks in end manufacturing, such as problems associated with shell ejection from the shell press, and in seaming, such as in end handling.  But more significantly, the extremely large depth of the countersink of the JP Reference's modified end would likely result in diminished headspace volume of the seamed can end and be difficult to drink from.

32.    Specifically, the large countersink height and correspondingly large dimension from the center panel to the top of the seam yields a reduced headspace volume, which is the freeboard volume above the liquid within a seamed can.  Employing the configuration taught by the JP Reference would likely unacceptably diminish the head space of a can unless the entire can would be redesigned (such as, by changing its diameter and/or height), which would be commercially infeasible.

11

A133

CC-3545;4772USB

33.    For example, if a particular can's volume is designed to receive an intended volume of a beverage within a volume tolerance, increasing the depth of the countersink radius and corresponding vertical dimension from the center panel to the seam would require either: (1) the beverage volume to be diminished to maintain the headspace volume, which would shortchange customers; or (2) the headspace volume to be diminished to maintain the beverage volume, which will result in increased headspace pressure and possible over-filling.

34.    Considering the JP Reference's teaching to reduce the center panel diameter, and the long, inclined chuck panel wall 18b as the means to achieve the goal of the reduced center panel diameter, there is no incentive to modify Kysh to incorporate a long, inclined wall because the resulting deep center panel would likely interfere with head space requirements. In my opinion, a person skilled in the art would not choose one aspect of JP's teaching (that is, inclination of the wall) while ignoring another aspect (that is, length of the wall to form a deep center panel), especially because ignoring the teaching of the length of the wall would be contrary to the goal and principle of operation of the JP Reference — that is, contrary to forming a small center panel.

35.    The other disincentive to modifying Kysh according to the teachings of the JP Reference inherent in its smaller center panel is that the smaller center panel provides less area in which to fit a relatively large pour opening and positions the opening farther from the can's outer rim, which makes the end more difficult to drink from.

36.    Also, the JP Reference would not offer the benefits that may appear from a superficial reading of it. Even though Table 2 of the JP Reference shows a decrease in material *thickness* from 0.32 mm to 0.28 mm between its Figure 2 and Figure 4, that data provides only part of the story for the real commercial goal: reduction in metal volume and cost. The parameter that is missing from the JP Reference is the cut edge diameter required to make the modified end. I made calculations to compare the total metal usage of the JP Reference's "conventional" end (Figure 2) with the JP Reference's modified

12

CC-3545;4772US8

end (Figure 4). As explained below, by my calculations the JP Reference would provide little metal cost savings and possibly result in a metal cost increase compared to its "conventional" end.

37.     Referring to the figures of the JP Reference provided above, I calculated the cut edge diameter of the blank from which the seamed ends were formed by adding the length of the conventional full seams, plus the outer radii of the bead, plus the center panel diameter, as summarized in the table below:

Cut Edge Diameter Estimates (Inches) for the JP Reference's Figure 2 and Figure 4

| Figure 2: conventional end | | Figure 4: modified end | |
|---|---|---|---|
| 2 x seam (0.3245) | 0.649 | 2 x seam (0.3245) | 0.649 |
| 2 x radius (0.0625) | 0.125 | 2 x radius (0.358) | 0.716 |
| 1 x center panel dia. | 2.402 | 1 x center panel dia. | 2.067 |
| cut edge dia. (sum of above) | 3.176 | cut edge dia. (sum of above) | 3.432 |

38.     Calculating the area of the cut edge from the above diameters yields that the modified end uses a cut edge area that is 16.7% larger than that of the conventional end (that is, 100 x (3.432/3.176)$^2$). Now, considering the purported reduction in metal thickness shown in the JP Reference's Table 2 from 0.32 mm to 0.28 mm, I calculate that the JP Reference's modified end of Figure 4 would actually use more metal than its conventional end of Figure 2 (that is, 116.7% x (0.28 mm/0.32 mm) = 102.1%). The actual increase in metal volume usage of the JP Reference's Figure 4 may be conceptually explained by the increase in countersink height explained elsewhere in my declaration.

39.     Further, reducing metal volume by reducing the metal thickness does not produce a proportionate decrease in material cost because suppliers charge a slight premium for thinner material on a cost per weight basis. As a rule of thumb which is often used in the can making industry, a reduction of metal thickness of 0.01 mm increases the cost of the

13

A135

CC-3545;4772USB

metal on a cost per weight basis (such as $/lb.) by 1.0 to 1.2%. For example, if a technical improvement would enable the end thickness to be reduced by 0.01 mm but would result in an increase in the cut edge diameter such that the overall metal volume is reduced by 1.0%, the metal cost would be the same because the increase in material cost would offset the metal volume reduction.

40.     The calculations provided above are not intended to be exact, but merely to explain that it is incorrect to conclude that a person skilled in the art would understand that following the teaching of the JP Reference would result in a significant decrease in metal volume and metal cost. By my estimates, in fact, the JP Reference's modified end would save little or nothing in cost and would likely result in a net increase in the cost of material to produce its modified end, despite what the JP Reference appears to teach.

41.     The offsetting costs and benefits of reducing end metal thickness while increasing the cut edge diameter that occurs in the JP Reference was not unusual at the time of the filing of the JP Reference and even into the 1990's. In fact; is was common in the history of the development of end technology before SuperEnd's radical technology was invented.

42.     Accordingly, one skilled in the art studying the JP Reference would not be motivated to modify an end according to its teaching (even presuming, of course, that someone could divine what the JP Reference looked like in its unseamed state) because the JP Reference provided very little, if any, commercial benefit, and possibly would cost more, not less, to manufacture.

14

A136

CC-3545;4772US8

**One Skilled in the Art Would not have been motivated by the JP Reference to Increase the Chuck Wall Angle of the Kysh End into the range of 30° to 60°**

43. I have considered the rejection of the claims of the currently pending SuperEnd Application over the Kysh Patent in view of the JP Reference. As I understand it, the Examiner's position, as set out in his paper dated February 3, 2004, is that:

> it would have been obvious to one having ordinary skill in the art the time the invention was made to incline the wall of Kysh between about 20° to about 70° in view of JP to provide a can end for internally pressurized cans which can realize high pressure resistance and which can reduce the volume of raw material used. Additionally, the angle of inclination is not given patentable weight because the type of an can end as claimed is well known as described above, and changing the angle of the wall required only a change in the chuck wall to accommodate any angle of inclination.

44. The Examiner's position is incorrect. One skilled in the art would not have been motivated to revise the angle of inclination of the Kysh can end wall according to the JP Reference so as to increase the angle of inclination of the wall to 30° or more. This is so for at least three reasons.

45. First, the JP Reference describes only a can end after it has been seamed onto the can body. It provides no information on the shape of the can end prior to seaming, nor the type of tooling to be used in the seaming operation. Thus, it would have provided no suggestion to modify the unseamed end described in the Kysh Patent.

46. Second, the Kysh end is fundamentally inconsistent with the invention described in the JP Reference. According to the JP Reference, the improvement in pressure resistance results from a reduction in the diameter of the center panel, indicated by $D_b$ in Figures 2 and 4 of the JP Reference. The JP Reference states that "in order to reduce this buckling, the size of the center panels 3a, 3b may be reduced to thereby reduce, in turn, the internal pressure applied thereto" (page 2) and that "in a case where the can tops 12a, 12b, 12b' constructed [according to the invention] . . ., the areas of the center panels 13a, 13b, 13b' become smaller . . . and this reduces their pressure receiving areas, whereby

15

A137

CC-3545;4772US8

axial loads acting thereon become smaller, thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance" (JP Reference, pages 4-5).

47.    However, the invention of Kysh improves pressure resistance by incorporating a vertical outside wall on the bead. As indicated in the Figure below, combining the teachings of Kysh with the JP Reference by forming a wall onto the JP Reference while keeping the chuck panel wall angle and countersink height constant will increase the diameter of the center panel. Therefore, one skilled in the art would not consider combining these two references because they push the design in opposite directions.



Combination of Kysh and the JP Reference

48.    The third reason why one skilled in the art would not have been motivated to revise the angle of inclination of the wall of the unseamed can end described in the Kysh Patent according to the description of the seamed end in the JP Reference, so as to increase the angle of inclination of Kysh's wall to 30° or more, is because one would not have expected that any increase in pressure resistance would have been achieved as a result of such a modification.

16

A138

CC-3545;4772USB

49.    As explained above, by the mid-1990's, the industry had standardized on a seaming chuck with a lower wall angle of about 12° and an upper wall angle of about 4°. Seaming a Kysh end modified as suggested by the Examiner using a chuck of the conventional design would have resulted in unacceptable pressure resistance due to the wrinkling that would likely have occurred as a result of the very large inward deflection of the metal toward the upper portion of the seaming chuck. A sketch showing a conventional chuck inserted into a Kysh end modified according to the JP Reference so as to increase the angle of inclination of the wall to about 45° is shown below:



Kysh Modified to Increase Its Chuck Wall Angle

50.    Therefore, one skilled in the art would have concluded that such a modified end, assuming it could be successfully seamed at all, would require the use of a chuck that was not designed according to the generally accepted configuration. The relatively modest reduction in metal usage (if any) resulting from the use of a can end according to the JP Reference would not have justified the use of a chuck of non-standard design.

51.    Even if one were to modify the design of the chuck, according to the conventional thinking, to accommodate the increased angle of inclination, one would not have

17

CC-3545;4772USB

expected that an increase in pressure resistance would result. The conventional thinking, prior to and at the time of the development project that resulted in SuperEnd, was that increasing the chuck wall angle from the standard 14° would weaken the end. Accordingly, significantly increasing the chuck wall angle of Kysh would have been considered a radical idea. And according to the conventional thinking of those in the seaming field at the time of the development of SuperEnd, the angle of the upper portion of the chuck wall, against which the metal is pressed by the seaming rolls, should be set so that the metal is bent through an angle of no more than about 10°. Therefore, according to conventional chuck design principles, a can end wall inclined at 43° would indicate that the angle of the upper portion of the chuck wall against which the metal is pressed by the seaming rolls should be no less than about 33°. One skilled in the art would not expect that seaming a can end having a 43° wall using such a chuck would result in a significant increase in pressure resistance.

52.    The inventors of the SuperEnd Application discovered that increasing the overall angle of inclination of the end wall results in improved pressure resistance only when seamed using a radically different method of seaming. In particular, they discovered that improved pressure resistance is obtained by imparting an increased overall angle of inclination to the can end wall but then reforming an upper portion of that wall so that, in the seamed configuration, the lower portion of the wall remains inclined at a large angle but the upper portion becomes substantially vertical. This method is shown in the SuperEnd Application in Figures 5 to 7 and involves the use of a chuck in which the lower wall is inclined at a large angle but the upper wall is substantially cylindrical. This method of seaming was not taught or suggested by the prior art and there is nothing in the prior art cited by the Examiner that teaches or suggests seaming the end described in the Kysh Patent using such a method.[5]

---

[5] I understand that in another patent application pending in the U.S. Patent Office, the Examiner has determined that the method of seaming disclosed in the SuperEnd application is novel and nonobvious

18

A140

CC-3545;4772USB

53.    In short, without having discovered the seaming method described in the SuperEnd Application, one skilled in the art would not have been motivated to modify the end disclosed in Kysh so as to increase the overall angle of inclination of the end wall into the 30° to 60° range.

54.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _29__ᵗʰ __July__ _2004_.

Martin Higham _____

19

A141

## CURRICULUM VITAE
### MARTIN HIGHAM

I am a graduate mechanical engineer (Cambridge University). I joined Metal Box, pre-University, as the first College Apprentice for a 1-year Practical Engineering course. I rejoined with an Honours Degree as a Graduate Trainee.

I have had over 30 years' experience in management of packaging manufacture in the UK, Kenya, S. E. Asia and South Africa.

This broad experience is in four significantly different cultures, and included management training courses – one of which was a PMD course at Cape Town Business School.

My early experience was in production management and continued through Technical management as Technical Director in S. E. Asia across a wide range of technologies in 3 separate countries, followed by Technical Director of a division in Nampak, South Africa, and finally as senior manager / director in Technology Development in the Internationally renowned Metal Box Research Centre at Wantage, UK.

My management style is characterised by:
- Appreciation of peoples' needs and capabilities
- Determination and drive
- Team working, both as leader and participant

My key strengths are:
- Technical understanding of equipment and manufacturing processes
- An appreciation of the "value" of Technology Development
- An ability to make things happen quickly and effectively

| Personal Details: | Education: |
|---|---|
| - Married – 4 children<br>- Born – 30.03.1941 – England<br>- Home<br>    398 Julius Jeppe Street<br>    Waterkloof 0181<br>    Pretoria<br>    South Africa<br>- UK Citizen<br>- Willingness to travel and work abroad | - Epsom College 1954 – 1958<br>    3 "A" levels – 8 "O" levels<br>- Cambridge University<br>    Mechanical Science Tripos<br>- P.M.D. course, Cape Town Business School<br>- Various management courses |

Employment History – all within Metal Box / CMB/ Crown Cork & Seal

1. 2003 – present - Bevcan Division – various positions. Currently working as a consultant mainly for Nampak resolving issues on their 206 SuperEnd project, as well as technical support and a new promotional development.

2. 1999 – 2002 – Project Manager for 206 SuperEnd. Introduction into South African Beverage Industry in all respects from material qualifications/supply, equipment choice and proving, plant development, initial production trials, customer presentations, initial customer conversions and final industry conversions covering 33 filling lines in 8 regions in Southern Africa and on 13 different seamer types. Capital cost for Nampak – US$10 million and annual production capacity of 4 billion.

3. 1997 – 1999 – Technical director Crown Cork & Seal in South Africa, involved in the manufacture of Crowns, beverage cans and ends, food cans, aerosols and general packaging.

4. CEO Dufalco – JV CMB/Hoogovens Aluminium, Belgium. Managing a technology development team of 30+ people with an annual budget of £1.8M. Identifying appropriate new technology, managing the development and technology transfer into commercial production.

5. Technical Director, Bevcan Division – Europe
New Innovations, either invented or chosen, using appropriate management techniques
Major successes as follows:

A142

- 202 conversion for steel and aluminium cans
- Super End through need to prototype manufacture
- POP end, instant prize can and other promotional developments
- Customer presentations to demonstrate innovation capability of CMB for Bevcan customers and its mutual value.
- Lightweighting programmes

6. R&D Management projects whilst in Wantage Management team.
- Warehouse – identified need, designed, capexed, directed project through to successful operation to time and cost (£0.6M).
- T.Q. programme – responsible for identifying the need and choosing the Consultant, David Hutchins. Then setting up and managing the programme for 4 years.

7. 1988 – 1990 – Genesis Project Manager – Metal Box R&D, Wantage:
The project was a JV – MB/Alcoa – to make plastic packaging in the USA. My role – manage technology development programmes and technology transfer into commercial production.

8. 1982 – 1988 – Technical Director – Beverage Division, Nampak
Initially as Technical Manager at Rosslyn Plant to resolve output restrictions caused by technical problems. Major success with improvements to all important criteria.
Promoted to Technical Director on setting up separate Beverage Can Division – 3 plants, 1.5 billion cans/ends capability.
Major successes included:
- Setting up technical support team
- Introduction of technical manuals system
- Direction of capital project for new Beverage line in Durban – cost £8M – output 300M – to time and cost.
- Direction of capital Project converting SOT – EO Ends, using the very latest equipment to a very tight timescale dictated by the customer. The project was completed to time and cost.
- Development of locally made production equipment to required standards for use instead of high cost imports

9. 1976 – 1982 – Technical Director – Metal Box South East Asia.
Metal Box had a regional organisation to support manufacturing activities in Singapore, Malaysia and Thailand. I provided technical and operational support for current production and planning of new projects.
Major successes included:
- Improvement to output performance in spoilage reductions, output improvement and resolution of major quality problems
- Direction/management of large projects to time and cost –
  o in 209 to 206 conversion – own and customer plants
  o purchase of second-hand can line, conversion to beverage and installation in Singapore to time and cost
  o development of local tool room to become profitable from a loss potion Employment – 50 people.
  o Installation of DWI canmaking facility

1975 – 1976 DWI Operations Manager, Metal Box UK
1972 – 1975 Works Manager. Thika, Kenya
1969 – 1972 Technical Manager – Winsford Factory, Metal Box UK
I was responsible for building co-ordination and for equipment scheduling installation.
1963 – 1969 Various management roles from Trainee Foreman to Manufacturing Managing in the following factories, Wisbech, Westhoughton, Worcester, Arbroath.

M.J. Higham
21 May 2003

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 1, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700