# Exhibit 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC., Plaintiff, and CROWN CORK & SEAL USA, INC., | ) ) ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) ) | |
| | ) | Civil Action No. 05-608 (KAJ) |
| v. | ) | |
| | ) | |
| REXAM BEVERAGE CAN COMPANY, | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |
| | ) | |

**DEFENDANT-COUNTERCLAIMANT REXAM BEVERAGE CAN COMPANY'S SUPPLEMENTAL RESPONSES TO CROWN TECHNOLOGY, INC.'S AND CROWN CORK & SEAL USA, INC.'S SECOND SET OF INTERROGATORIES**

Defendant-Counterclaimant Rexam Beverage Can Company ("Rexam"), through its counsel, hereby submits its general objections, specific objections and responses to Crown Packaging Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s ("Plaintiffs") Second Set Of Interrogatories.

**GENERAL OBJECTIONS:**

Rexam objects to Plaintiffs' Interrogatories to the extent they seek information, documents or things protected by the attorney-client privilege, are immune from discovery pursuant to the work product doctrine, or are protected or immunized by any other applicable privilege, immunity, doctrine or protection from discovery. All of the following responses and answers are made subject to this objection and none of the following responses or answers, none of the information, documents or things identified in

these Interrogatory responses, and none of the responses or answers to any other discovery attempts by Plaintiffs (including, but not limited to, questions posed at any oral deposition) will include any such privileged, protected or immune information, documents or things.

Rexam objects to each Interrogatory, including all accompanying Definitions and Instructions, to the extent that they attempt to impose upon Rexam discovery obligations beyond those required by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Delaware and/or judge specific rules and/or the Court's scheduling order establishing a discovery schedule and pretrial requirements.

Rexam objects to Plaintiffs' definition of the phrase "provide a detailed description of the factual basis" to the extent it renders the scope of any Interrogatory overly broad and/or unduly burdensome. Rexam objects to Plaintiffs' Interrogatories to the extent they pertain to former counsel, agents, employers or employees or other persons who formerly acted on behalf of Rexam. Rexam cannot reasonably be expected in all instances to speak now for former counsel, agents or employees or other persons who formerly acted on behalf of Rexam.

Rexam objects to each Interrogatory and each Definition and/or Instruction to the extent it is overly broad, unduly burdensome, vague, ambiguous, indefinite, lacking in reasonable particularity, untimely, premature or seeks information, documents or things uniquely in the possession, custody or control of Plaintiffs, its divisions, affiliates, officers, directors, employees, agents, representatives, distributors and/or customers.

*Rexam's Supplemental Responses to Crown's*
*Second Set of Interrogatories*

*Page 2*

To the extent that Rexam provides a response arguably within the scope of any definition set forth by Plaintiffs, such response by Rexam shall not be construed to be an admission by Rexam as to the validity or scope of any such definition.

Rexam objects to each Interrogatory to the extent that it seeks confidential, proprietary, and/or sensitive business information. Any answers, responses, documents, things or information provided by Rexam, should be treated as "Outside Attorneys' Eyes Only," limiting disclosure to Plaintiffs' outside **trial** counsel, Woodcock Washburn, LLP and Wolf, Block, Schorr and Solis-Cohen, LLP until an appropriate protective order is entered in this case.

Discovery is ongoing, and Rexam is continuing its preparation for trial. All responses to the following Interrogatories are based on information presently known to Rexam after a reasonable effort to compile information called for by these Interrogatories. All answers are given without prejudice to Rexam's right to supplement and/or modify its responses at a later time. In addition, Rexam's objections as set forth herein are made without prejudice to Rexam's right to assert any additional or supplemental objections.

## **RESPONSES**

### **INTERROGATORY NO. 12:**

Identify the date of, all persons having knowledge of, and identify all documents demonstrating, the conception, reduction to practice, diligence from conception to reduction to practice, first sale, first offer for sale, and first disclosure to any other person of the alleged inventions claimed in the 230 and 728 patents.

*Rexam's Supplemental Responses to Crown's*
*Second Set of Interrogatories*

*Page 3*

**RESPONSE TO INTERROGATORY NO. 12:**

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity. Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory. Subject to those objections and the General objections, Rexam believes that the following individuals have knowledge about the information sought in this Interrogatory:

> Timothy A. Turner
> Manager End Development
> Rexam Beverage Can Company
> 2250 Lively Blvd.
> Elk Grove Village, IL 60007
>
> Randy Forest
> Rexam Beverage Can Company
> 2250 Lively Blvd.
> Elk Grove Village, IL 60007

Further responding, Rexam first sold and offered to sell can ends incorporating the technology of the inventions of the 230 and 728 Patents after March 22, 1999, which is when Rexam completed its final testing of the patented anti-fracture score technology. Documents corroborating the final testing are identified as REX042539.

At this time, after a reasonable inquiry, Rexam is claiming a conception date of at least as early as July 12, 1995. (REX049262.) Examples of documents showing diligence

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 4*

in reduction to practice were previously submitted, including production numbers REX042527 through REX042593.

Pursuant to Rule 33(d), Rexam has produced or is in the process of producing documents that demonstrate conception and reduction to practice as identified above. If Rexam learns of documents evidencing an earlier conception date than that disclosed above, Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

**INTERROGATORY NO. 13:**

Identify the date of, all persons having knowledge of, and identify all documents demonstrating, the conception, reduction to practice, and diligence from conception to reduction to practice, first sale, first offer for sale, and first disclosure to any other person of the alleged inventions claimed in the 839 patent, including the first sale, and disclosure to any other person of cans formed using methods claimed in the 839 patent.

**RESPONSE TO INTERROGATORY NO. 13:**

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity. Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory. Subject to those objections and the General objections, Rexam reasonably believes that the following individuals who are former employees of Rexam have knowledge about the information sought in this Interrogatory:

T. William Ames
(Last Known Address)
2010 Garden Street
Park Ridge, IL 60068

Dietrich K. Naggert
10920 Bear Island Ave
Orland Park, IL 60467

Christopher Caliendo
(Last Known Address)
235 North Harvey
Wood Dale, IL 60191.

Additionally, Andrew Halasz and Sylvon Praturlon (addresses below) may have information that is relevant to this interrogatory.

Further responding, Rexam first sold and offered to sell can ends incorporating the technology of the inventions of the 839 Patent on or about 1986. The product number of the first smooth die necking machine was model number 587 (changed later to 588) and was sold to a Rexam affiliate in Kent, Washington in November 1986. (REX049268.)

At this time, Rexam is not claiming a priority date earlier than the filing date and/or the priority date stated on the face of the 839 patent. Conception and constructive reduction to practice are established as of the filing date of the patent application. *Stevens v. Tamai* 366 F.3d 1325, 1330-31 (Fed. Cir. 2004) ("To establish priority, parties may rely on earlier filed applications because conception and constructive reduction to practice of the subject matter described in an application occur when the application is filed.") *See also, Hyatt v. Boone,* 146 F.3d 1348, 1352 (Fed. Cir. 1998).

Pursuant to Rule 33(d), Rexam has produced or is in the process of producing documents that demonstrate conception and reduction to practice if it is necessary to establish an earlier conception date than the priority date set forth on the face of the 839 Patent and those documents will be identified as being responsive to this Interrogatory. Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

**INTERROGATORY NO. 14:**

Identify the date of, all persons having knowledge of, and identify all documents demonstrating, the conception, reduction to practice, diligence from conception to reduction to practice, first sale, first offer for sale, and first disclosure to any other person of the alleged inventions claimed in the 385 and 242 patents, including the first sale, offer for sale, and disclosure to any other person of cans formed using [sic] claimed in the 385 and 242 patents.

**RESPONSE TO INTERROGATORY NO. 14:**

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity.   Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory.  Subject to those objections and the General objections, Rexam reasonably believes that the following individuals have knowledge about the information sought in this Interrogatory:

Andrew Halasz
Rexam Beverage Can Company (retired)

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 7*

2250 Lively Blvd.
Elk Grove Village, IL 60007;

Sylvan Praturlon
Rexam Beverage Can Company (retired)
2250 Lively Blvd.
Elk Grove Village, IL 60007; and

Paul Azzaline
Rexam Beverage Can Company (retired)
2250 Lively Blvd.
Elk Grove Village, IL 60007.

Further responding, Rexam believes it first sold and offered to sell equipment incorporating the technology of the inventions of the 385 and 242 Patents in or about January 1994. The "sale" was an internal sale to one of Rexam's affiliates and the documents corroborating the sale are submitted herewith and identified with production numbers REX049263.

Rexam also states that at this time it is claiming a conception date of at least as early as August 3, 1989 which is corroborated by the documents identified by production number REX042594. Documents demonstrating diligence in reduction to practice have been produced, including, for example: REX019031-032; REX019175-182; REX027103-107; REX027108; REX027112; REX027113-116; REX027173-183; REX027196-201; REX027203; REX027228-229, REX027725 and REX042594 through REX042629.

At this time, Rexam is not claiming that it reduced the inventions of the 385 and 242 Patents prior to the filing date and/or the priority date stated on the face of the 385 patent. Constructive reduction to practice is established as of the filing date of the patent

application. *Stevens v. Tamai* 366 F.3d 1325, 1330-31 (Fed. Cir. 2004) ("To establish priority, parties may rely on earlier filed applications because conception and constructive reduction to practice of the subject matter described in an application occur when the application is filed.") *See also, Hyatt v. Boone,* 146 F.3d 1348, 1352 (Fed. Cir. 1998). Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

## INTERROGATORY NO. 15:

Identify the date (or dates) Rexam first became aware, or first came to an understanding or belief, that Crown was 1) selling smooth die-necked cans, 2) using methods of smooth die necking, and 3) was using methods that infringed the 839 patent, identify all persons knowledgeable about the same, identify how Rexam first became aware of this, and identify the circumstances surrounding the same.

## RESPONSE TO INTERROGATORY NO. 15:

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity. Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory. Subject to those objections and the General objections, Rexam still does not "know" that Crown's smooth die necking processes infringe the method claims of the 839 Patent, which is why Rexam pled: "Upon information and belief, a reasonable opportunity for discovery will produce evidence that can bodies that

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 9*

Crown USA has made in the United States are made by a method as claimed by the '839 Patent." (Rexam's Answer and Counterclaims ¶ 9.)

After Crown filed suit against Rexam in August of 2005, Rexam reviewed its patent portfolio and after a reasonable inquiry under the circumstances, specifically identified certain patents that Rexam believed discovery would provide evidentiary support for the contentions alleged in its counterclaims. *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 844-45 (D.Md. 2005).

> Counsel is reminded of the provisions of Rule 11(b)(3) that specify that by presenting a pleading to the court, an attorney or a representative party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

*Id.*

Thus, although Rexam may have been aware that Crown was selling cans that appeared to be manufactured using some form of a smooth die necking process at least as of March 1998, there was no way to be certain that Crown was employing the methods claimed in the 839 Patent because the documents, information and equipment that will show that Crown is in fact infringing the methods claimed in the 839 Patent are in the possession, custody and control of Crown.

Rexam states that it reasonably believes that the following individuals have knowledge about the information sought in this Interrogatory:

> Andrew Halasz
> Rexam Beverage Can Company (retired)

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 10*

2250 Lively Blvd.
Elk Grove Village, IL 60007;

Sylvan Praturlon
Rexam Beverage Can Company (retired)
2250 Lively Blvd.
Elk Grove Village, IL 60007; and

Timothy A. Turner
Manager End Development
Rexam Beverage Can Company
2250 Lively Blvd.
Elk Grove Village, IL 60007.

Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

**INTERROGATORY NO. 16:**

Identify the date Rexam first became aware that Crown was using equipment that it purchased from Belvac for which Belvac paid Rexam a royalty under the License Agreement between American National Can Company and Belvac effective April 17, 1994, identify all persons knowledgeable about the same, identify how Rexam first became aware of this, and identify the circumstances surrounding the same.

**RESPONSE TO INTERROGATORY NO. 16:**

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity. Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory. Rexam further objects to this interrogatory to the

*Rexam's Supplemental Responses to Crown's*
*Second Set of Interrogatories*

*Page 11*

extent it implies that Rexam received any royalties from Belvac relating to the method claims of the 839 Patent, which it did not.

Subject to those objections and the General objections, Rexam, at this time, is not aware of ever being advised by Belvac or anyone else that Crown had purchased equipment under the 1994 License Agreement with Belvac. Belvac was not required to disclose the names of companies that it sold necking machinery to and did not identify any such companies when it paid royalties to Rexam as confirmed by Mr. Babbitt. However, Belvac was required to notify its customers of Rexam's patent rights.

Additionally, even if Belvac or some third party had advised Rexam that Belvac had sold necking equipment to Crown, it would not necessarily mean that Belvac sold Crown the tooling equipment that was needed to perform the claimed smooth die necking methods of the 839 Patent. Crown could have purchased the tooling needed to practice the methods claimed in the 839 Patent from any number of tooling manufacturers. That information is known by Crown and not by Rexam. Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

## INTERROGATORY NO. 17:

Identify the date or dates Rexam first became aware, or first came to an understanding or belief, that Crown was 1) selling cans having an internally-reformed base, 2) using methods of internal base reforming, and 3) infringing either or both of the 385 and 242 patents, identify how Rexam first became aware of this, and identify the circumstances surrounding the same.

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 12*

**RESPONSE TO INTERROGATORY NO. 17:**

Rexam objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege and/or the work product immunity doctrine or any other applicable immunity. Rexam also objects to this Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts) rather than a single Interrogatory. Subject to those objections and the General objections, Rexam, at this time, still does not "know" that Crown's bottom reforming equipment and methods of reforming can bottoms infringe the method and apparatus claims of the 385 and 242 Patents, which is why Rexam pled: "Upon information and belief, a reasonable opportunity for discovery will produce evidence that can bodies that Crown USA has made in the United States are made by a method and/or using an apparatus as claimed by the '385 [and '242] Patent[s]." (Rexam's Answer and Counterclaims ¶¶ 17 and 26.)

After Crown filed suit against Rexam in August of 2005, Rexam reviewed its patent portfolio and after a reasonable inquiry under the circumstances, specifically identified certain patents that Rexam believed discovery would provide evidentiary support for the contentions alleged in its counterclaims. *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 844-45 (D.Md. 2005).

> Counsel is reminded of the provisions of Rule 11(b)(3) that specify that by presenting a pleading to the court, an attorney or a representative party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions have evidentiary support or, if

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 13*

specifically so identified, are likely to have evidentiary support after a
reasonable opportunity for further investigation or discovery.

*Id.*

Thus, although Rexam may have been aware that Crown was selling cans that
appeared to be manufactured using some type of bottom reforming process at least as of
March 1998, there was no way to be certain that Crown was or is using an apparatus
and/or employing the methods claimed in the 385 and 242 Patents because the
documents, information and equipment that will show that Crown is in fact infringing the
apparatus and method claims of the 385 and 242 Patents are in the possession, custody
and control of Crown. Rexam recognizes its obligation to supplement this answer upon
discovering additional relevant information and expressly reserves the right to do so.

## INTERROGATORY NO. 18:

Identify the date Rexam first became aware that Crown was using equipment that
it purchased from Belvac which performed a process of internal base reforming,
including the Belvac N-595 High Speed necker/flanger/reformer system, identify all
persons knowledgeable about the same, identify how Rexam first became aware of this,
and identify the circumstances surrounding the same.

## RESPONSE TO INTERROGATORY NO. 18:

Rexam objects to this Interrogatory to the extent that it seeks to discover
information that is subject to the attorney/client privilege and/or the work product
immunity doctrine or any other applicable immunity. Rexam also objects to this
Interrogatory to the extent that it is multiple Interrogatories (*i.e.*, has multiple subparts)
rather than a single Interrogatory. Subject to those objections and the General objections,

*Rexam's Supplemental Responses to Crown's*
*Second Set of Interrogatories*

*Page 14*

Rexam, at this time, is not aware of ever being advised by Belvac or anyone else that Crown had purchased bottom reforming equipment, including the Belvac N-595 High Speed necker/flanger/reformer system, from Belvac.

Additionally, even if Belvac or some third party had advised any of Rexam's employees that Belvac had sold bottom reforming equipment to Crown, it would not necessarily mean that Belvac sold Crown bottom reforming equipment that infringes the 385 and 242 Patents. The documents, information and equipment that will show that Crown is in fact infringing the apparatus and method claims of the 385 and 242 Patents are in the possession, custody and control of Crown. Rexam recognizes its obligation to supplement this answer upon discovering additional relevant information and expressly reserves the right to do so.

**FOR THE OBJECTIONS TO INTERROGATORY NOS. 12-18, THE LEGAL CONTENTIONS SET FORTH HEREIN AND THE LEGAL AUTHORITY SET FORTH IN THE ANSWERS TO INTERROGATORY NOS. 12-18:**

Date: _6-23-06_                    _[signature]_

George P. McAndrews
Steven J. Hampton
Richard T. McCaulley
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60661
Tel:  312.775.8000
Fax:  312.775.8100

Frederick L. Cottrell, III,
Anne Shea Gaza
Richards, Layton & Finger, P.A.
One Rodney Square, 920 N. King Street,
P.O. Box 551
Wilmington, Delaware 19899-0551
Telephone: 302-651-7700
Telecopier: 302-651-7701

*Rexam's Supplemental Responses to Crown's Second Set of Interrogatories*

*Page 16*

## **VERIFICATION**

I, Timothy Turner, being duly sworn, state that I am the Manager, Beverage End Development for Rexam Beverage Can Company, have read the foregoing Interrogatory responses and, believe that the information contained in the answers is true and correct based on the use of channels of communication which I would normally rely upon in my position with Rexam Beverage Can Company  As presently informed, Rexam Beverage Can Company understands that it is bound by the information set forth in the foregoing Interrogatory responses unless future information received indicates that a correction must be made.

Date: _____                    _____
                                          Timothy Turner
                                          Title: Manager, Beverage End
                                          Development

**Sworn to before me this _____ day**

**of June, 2006**

_____
Notary Public
My commission expires on _____ .

*Verification*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date this proof of service is signed below, I served the foregoing

**DEFENDANT COUNTERCLAIMANT REXAM BEVERAGE CAN COMPANY'S RESPONSES TO CROWN TECHNOLOGY'S AND CROWN USA'S FIRST SET OF INTERROGATORIES**

in the above identified action, addressed as follows:

Barry Klayman
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801

Tel.: (302) 777-0313
Fax: (302) 778-7813

**(BY FACSIMILE)**

**(BY MAIL)** By placing a true copy thereof enclosed in a sealed envelope. I placed each such sealed envelope, with postage thereon fully prepaid for first-class mail.

**(BY OVERNIGHT COURIER)** By placing a true copy thereof enclosed in a sealed envelope. I placed each such sealed envelope, with fees paid for overnight delivery.

Courier

Date: ___6/23/06___          _____

*Certificate of Service*

Exhibit 9

400 P 677                                              PATENTS

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of          )
Antonio Caleffi, et al.              )
                                     )
Serial No. 07/957,629                )  Group Art Unit 2401
                                     )
Filed: October 10, 1992              )  Examiner: S. Pollard
                                     )
For: "METHOD AND APPARATUS FOR       )
     NECKING CONTAINERS"             )

Commissioner of Patents
     and Trademarks
Washington, D.C.  20231

DECLARATION OF ANDY HALASZ PURSUANT TO 37 C.F.R. 1.132

I, Andy Halasz, declare and state as follows:

1.    I am a resident of the state of Illinois and am employed by American National Can Company ("ANC") in the position of Manager of Machine Design.

2.    In my capacity as Manager of Machine Design, my duties include the development of new products and processes relating to the design and manufacture of metal containers, including development of the tooling and the necessary machinery or equipment to manufacture the new products.  This includes the development work from laboratory models through prototypes to production equipment.

3.    Prior to my present position, I was Manager of Tooling and Equipment Design for three-piece and two-piece can bodies and ends.

4.    I have over 29 years experience in the metal container and packaging art.  I have approximately 25 years experience in the design of tooling and equipment for manufacturing drawn and ironed can bodies.

REX 032471

Crown Packaging Technology v. Rexam Beverage Can
05-608

EXHIBIT
c

5.   I obtained a Bachelor of Science degree in Mechanical Engineering in Hungary and a Master's degree in Mechanical Engineering from Fairleigh Dickinson University.

6.   I am extremely familiar with the formation of metal articles, and specifically with the manufacture of drawn and ironed, two piece aluminum alloy beverage containers. A two-piece container includes a can body having a sidewall integrally connected to a bottom wall. The can body is drawn and ironed from a single piece of metal, typically referred to as a blank. Such containers have extremely thin sidewalls which make it very difficult to form various structural features in the sidewalls.

7.   I have reviewed the Examiner's Office Action of April 22, 1993 and the cited references, U.S. Patents Nos. 4,173,883 (Boik) and 3,786,957 (Hilgenbrink). In light of this review, I must respectfully disagree with the Examiner's conclusion that the necking die set forth in the device of Hilgenbrink is capable of producing the "smooth dome appearance" set forth in Boik. I must further disagree that the teachings of the two references can be combined to produce the claimed container.

8.   The above Application is directed to a container having an integrally formed bottom wall at one end, and a single smooth necked-in portion between the sidewall and a reduced diameter neck at an opposing open end. The necked-in portion includes a first singly compressed segment integral with the sidewall. The necked-in portion further includes a second multiply compressed segment integral with the first segment and the reduced diameter neck.

9.   As disclosed in the above Application, the first singly compressed segment is formed by producing relative axial movement between the container and a first necking die. The first necking die engages the external surface of a portion of the open end of the container at a small acute angle to compress the sidewall radially inward to form a first taper, that is, necked-in portion,

2

REX 032472

Crown Packaging Technology v. Rexam Beverage Can
05-608

between the sidewall and a reduced diameter neck. The second multiply compressed segment is formed by producing relative axial movement between a second necking die and the container. The second necking die engages the external surface of the container at a small acute angle to further compress the reduced diameter neck radially inward and form a second taper. The second taper is forced axially downwardly until it is contiguous with the first taper and reforms only an upper portion of the first taper to produce a single smooth neck profile. Accordingly, a multiply compressed segment is formed between the first singly compressed segment and the further reduced diameter neck. Subsequent necking operations may be performed, similar to the second necking operation described, to further reduce the diameter of the reduced diameter neck and maintain a single smooth neck profile.

10. The novel method described to obtain the claimed container of the present application is claimed in U.S. Patent No. 4,774,839. This Patent issued from one of the parent Applications of the present Application.

11. As is well known in the art, it is extremely difficult to compress metal. This is particularly valid with respect to compressing the cylindrical sidewall of a thin, drawn and ironed container. Various problems result from imposing axial loads or stresses to the sidewall during a necking operation. Such stresses can develop wrinkling in the necked-in portion of the container. Such wrinkling can cause undesired cracks or openings in the later formed flange. Wrinkling often occurs when too large of a reduction in diameter is attempted in a single die necking operation.

12. Additionally, load stress imposed during the necking operation can cause the sidewall or the bottom wall of the container to collapse.

3

REX 032473

*Crown Packaging Technology v. Rexam Beverage Can*
114468

13.  As pointed out in Hilgenbrink, early attempts at die necking a container were able to reduce the diameter of the neck from 2 and 11/16 inches, the diameter of the sidewall, to 2 and 9/16 inches in a single die necking operation (see Hilgenbrink, column 3, lines 35-60).  Further reduction required performing a subsequent necking operation on the reduced diameter neck which formed an additional shoulder or step in the neck profile.

14.  Prior to the present invention, the industry standard practice in die necking a two-piece container was to obtain the maximum amount of reduction in the fewest number of die necking operations.  Thus, a container necked-in from 2 and 11/16 inches to 2 and 9/16 inches and then to 2 and 7.5/16 inches would only undergo two necking operations.  This produced two shoulders or steps in the neck profile.  A third necking operation would further reduce the neck from 2 and 7.5/16 inches to 2 and 6/16 inches to form a third shoulder or step.

15.  Hilgenbrink fully appreciated the difficulties in compressing metal and forming a necked-in portion on a container (see Hilgenbrink, column 1, lines 15-45).  Hilgenbrink's solution, like the industry standard practice described above, was to reduce the diameter of the neck as much as possible in a first step and then to perform a subsequent necking operation on the reduced diameter neck to further reduce the diameter of the neck and to form a second shoulder.  Specifically, Hilgenbrink teaches necking a container from 2 and 11/16 inches to 2 and 9/16 inches to 2 and 7.5/16 inches (see Hilgenbrink, column 3, lines 35-60).

16.  However, die geometries used to achieve the maximum amount of reduction in the fewest number of necking operations are not capable of producing a single smooth neck profile.  In other words, the surface (17) of the second necking die (shown in Figure 3 of Hilgenbrink) cannot be advanced to the container shoulder (8) to produce the single smooth necked-in profile as maintained by the Examiner.  Such advancement would create undo load stresses on the

4

REX 032474

Crown Packaging Technology v. Rexam Beverage Can
05-608

necked-in portion and would cause the sidewall and/or bottom wall of the container to fully or partially collapse due to load forces applied to form the neck.

17.  The Applicants of the present invention were able to overcome such problems by departing from the previously accepted industry practice of attempting to obtain maximum reduction in the fewest number of steps.  For example, as disclosed in the above Application, a container having the claimed necked-in profile is gradually necked-in from a sidewall diameter of 2 and 11/16 inches to a reduced diameter neck of 2 and 6/16 inches in six necking operations as opposed to the three necking operations described above.  As mentioned above, only the upper portion of the previously formed taper is reformed in each subsequent necking operation, not the entire necked-in portion.  This helps avoid the load stresses or forces which could collapse the sidewall and/or bottom wall of the container.  Further, this gradual reforming combined with precisely designed die geometries avoids wrinkling from forming in creating the claimed necked-in portion.

18.  Others  in  the  industry,  also  appreciating  the difficulties of compressing metal, completely abandoned multiple die necking to further reduce the diameter of the neck and took a different  approach  at  necking-in  a  container.    This  approach included spin necking the necked-in portion of a container after performing a first die necking operation.  This allowed for further reduction in diameter while maintaining a single neck.  However, the spin-necking operation produced visible ridges in the necked-in portion and caused undesired thinning and stretching of the metal. The spin necking process does not produce the claimed container.

19.  The container disclosed in Boik, and the method of forming the necked-in portion of such container, are not applicable to the present invention.  Boik discloses a three piece container wherein the sidewall of the container is formed from a rectangular piece of metal rolled into a cylindrical shape.  The ends of the

5

REX 032475

Crown Packaging Technology v. Rexam Beverage Can
05-608

metal piece are then welded together to form a longitudinal side seam. Accordingly, the sidewall has two open ends. This is critical in order to provide the necked-in portion of Boik.

20. Boik utilizes a progressive necking process involving a plurality of necking operations. In every necking operation, an inside tool is used to support the previously formed necked-in portion (see Boik, column 1, lines 34-43). Since the bottom end of the sidewall is open, the inside tool is allowed to easily enter the interior of the sidewall. The metal in the necked-in portion is then trapped between the inside tool and the outside tool (i.e., die) during the necking operation.

21. The inside tool of Boik absorbs load forces generated in fully reforming the necked-in portion in each of the necking operations disclosed. This avoids collapse of the sidewall and/or bottom wall of the container during the necking operation.

22. The presently claimed container includes an integrally formed bottom wall. Thus, it is not possible to insert the inside tool of Boik through this end of the container to trap the metal when forming the necked-in portion and absorb the load forces. Therefore, one skilled in the art would not look to Boik to formed the claimed necked-in portion on a two-piece container.

23. In order to even attempt to utilize the teachings of Boik, an inside tool would have to be reconfigured to be able to be inserted through the open, necked-in end of the container (i.e. the top of the container). Such an inside tool would have to have a diameter which would allow it to pass through the reduced diameter neck formed from a previous operation to enter the interior of the container. It would then have to be capable of expanding radially outward to provide support to the necked-in portion. However, such a tool would not be able to entirely support 360° of the necked-in portion of the container. In order to expand to support the necked-in portion, gaps will form between expanding segments of the

6

REX 032476

Crown Packaging Technologies v. Rexam Beverage Can
US-078

inside tool. In other words, it would not be possible to form a solid supporting ring with an expanding tool. These gaps would leave segments of the necked-in portion unsupported during the necking operation. This would cause deformation of the necked-in portion and possibly damage the internal coating of the container. Further, use of such an inside tool would slow down the necking operation to a point where it would not be cost effective. Regardless of the problems associated with providing an inside tool through the necked-in end, Boik does not disclose or suggest such a radical modification to enable necking-in a container having an integrally formed bottom wall.

24. Notwithstanding the fact that it is not possible to utilize an inside tool in the manner disclosed in Boik to form a necked-in portion on a container having an integrally formed bottom wall, Boik does not disclose a necked-in portion having a first singly compressed segment. The entire necked-in portion of Boik is reformed in each necking operation. Thus, the entire necked-in portion of Boik comprises only a multiply compressed segment.

25. As shown in Figure 5 of Boik, the outer necking tool (32) engages the reduced diameter neck (45) and forces it against the inside tool (41). In completing the necking operation, the outer tool (32) (as shown in phantom) is moved axially downward relative to the container, to completely contact the previously necked-in portion (50) to a point where it is integral with the sidewall.

26. While not explicitly shown in the drawings, the previously necked-in portion (50) will not precisely conform to the tapered surface (43) of the inside tool (41) due to springback in the metal after the previous necking operation. Thus, the subsequent necking operation must necessarily further compress this segment to force it to contact the inside tool (41) unless the inside tool geometry was configured to compensate for such springback. However, nothing in Boik suggests that the inside tools were so configured.

7

REX 032477

Crown Packaging Technology v. Rexam Beverage Can
05-608

27.  Even assuming that the die geometry has been modified to accommodate springback, the previously formed necked-in portion would still be further compressed in the subsequent necking operation shown in Figure 5 of Boik.  As the surface (47) of the outer tool (32) engages the reduced diameter neck (45) of the container (18), load stresses will cause the previously necked-in portion (50) to slightly bow, or distort, radially outward (inward bowing would be prevented by the inside tool).  Since the outer tool (32) is brought into contact with the container (18) all the way down to the shoulder, it necessarily compresses this bowed necked-in portion (50) again to trap this portion (50) against the inside tool (41).

28.  The multiply compressed segment of the necked-in portion of the claimed container, as mentioned above, is produced by forming a second taper and forcing the second taper downward until it is contiguous with and reforms only the upper portion of the first taper.  Thus, the lower portion of the first taper remains a singly compressed segment throughout the necking operations.  The second and subsequent necking operations do not compress this segment a second time unlike the operations shown in Boik.

29.  In conclusion, the device disclosed in Hilgenbrink is incapable of producing the claimed container.  Further, the teachings of Boik cannot be combined with Hilgenbrink to form the necked-in portion of Boik on a container having an integrally formed bottom wall.  In any event, the necked-in portion of Boik is not the same as the necked-in portion of the claimed container.

30.  I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful and false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of title 128 of the United States Code, and that such willful and false statements may

8

REX 032478

Crown Packaging Technology v. Rexam Beverage Can
05-608

jeopardize the validity of the Application or any patent issued thereon.

Dated: _____    By: _____
                                   Andy Halasz

REX 032479

Crown Packaging Technology v. Rexam Beverage Can
05-608

Exhibit 10

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 11

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 12

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 13

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 14

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 15

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 1

1

2     IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF DELAWARE

4                    -   -   -

5  CROWN PACKAGING          :  C.A. NO.
   TECHNOLOGY, INC.,        :  05-608(KAJ)
6  Plaintiff, and CROWN     :
   CORK & SEAL USA, INC.,   :
7  Plaintiff and           :
   Counterclaim Defendant   :

8
        vs.                  :
9
   REXAM BEVERAGE CAN CO.,:  JURY TRIAL
10  Defendant Counterclaim :   DEMANDED
11                  -   -   -
12          Friday, July 21, 2006
13                  -   -   -
           C O N F I D E N T I A L
14                  -   -   -
15              Videotape Deposition of
   JOSEPH F. BAUDER, taken pursuant to
16  notice, was held at the law offices of
   WOODCOCK WASHBURN, LLP, One Liberty
17  Place, 46th Floor, Philadelphia,
   Pennsylvania 19103, beginning at 9:09
18  a.m., on the above date, before MARIA
   NOELLE DAMIANI, Registered Merit
19  Reporter, Certified Realtime Reporter,
   Certified Shorthand Reporter (NJ License
20  No. 30XI00224100; DE License No. RPR-117)
   and a Notary Public.

21
                    -   -   -
22        ESQUIRE DEPOSITION SERVICES
         Four Penn Center, Suite 1210
23        1600 John F. Kennedy Boulevard
       Philadelphia, Pennsylvania 19103
24              (215) 988-9191

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 66

1   necking in some of its cans; is that
2   correct?
3       A.   I -- I think they do.  I'm
4   not a --
5       Q.   Would that process be
6   performed on the 595 necker?
7       A.   The spin neck process?
8       Q.   Yes.
9       A.   No, it's a separate machine.
10  That's the CMB machine, the spin necker.
11      Q.   Is there a distinction in
12  the necking machine between the term
13  station and stage?
14      A.   I think they are talking
15  about the same thing.
16      Q.   And what are they talking
17  about there when you say --
18      A.   Station one or stage one
19  would be -- we do the first necking
20  operation.  Station one or stage two
21  would do the second and so forth and so
22  on, depending on how many operations you
23  have in there.
24      Q.   How about bottom reforming,

Page 67

1   are you familiar with the term "reforming
2   pockets"?
3       A.   Reforming pockets?  Not
4   really.  I mean, I would guess that
5   they're talking about each operation.
6   Just like you have 12 pockets on a
7   necking operation --
8       Q.   Right.
9       A.   -- on a turret, they are
10  probably talking about 12 pockets on the
11  reforming turret.
12      Q.   Why would you need different
13  pockets for a bottom reforming, for
14  different cans performing the same
15  operation on them?
16      A.   Well, to match what you're
17  doing on the, uhm -- on the necking
18  operation.
19      Q.   So the bottom reforming
20  would take place during the necking
21  operation?
22      A.   After the necking operation
23  in the same machine, if it was a Belvac
24  machine.

Page 68

1       Q.   Would that take up a single
2   stage, I guess we called that?
3       A.   Yes, a single stage, the
4   turret, the turret position, you know.
5       Q.   Okay.  So -- okay.
6           So what we were calling,
7   say, operations, the first die would
8   perform an operation, the bottom
9   reforming would take place -- the entire
10  internal bottom reforming process would
11  take place during a single, say, die
12  necking operation?
13      A.   After the operation.  It
14  would pass through -- the die neck -- the
15  can would pass through a number of
16  turrets where it die necked them down to
17  a specific dimension.  Then it would pass
18  from that turret into a reforming turret
19  where they did the bottom reforming.
20      Q.   Okay.
21      A.   Then in -- well, I don't
22  know what sequence, but then into the
23  flanging turret or so forth and so on.
24      Q.   I'm sorry, we just discussed

Page 69

1   the 595 Belvac necker.  You -- are you
2   aware of any other necker machines out of
3   -- outside of the Belvac 595 that Crown
4   uses in the United States?
5           MS. MALINOSKI:  As of time?
6           THE WITNESS:  This die
7       necking process?
8           MR. McANDREWS:  As of the
9       mid-'90s, we will say.  Any -- any
10      process?
11          THE WITNESS:  Uhm, well, no,
12      I -- other than the spin necking,
13      which is, you know, the metal box
14      machine, no, not really.  I can't
15      think of any.
16  BY MR. McANDREWS:
17      Q.   You're saying no, or you --
18  you can't think of any?
19      A.   I don't know of any.
20      Q.   Okay.  Do you know who would
21  know that definitively, about the types
22  of --
23      A.   Again, I guess you would
24  have to go back to the people at the tech

18 (Pages 66 to 69)

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 70

1  center or that are associated with that.
2      Q.   Would Richard Golding be a
3  good person to --
4      A.   I would think so, yeah.
5      Q.   How about product manuals,
6  who -- who would be a good person that --
7  that might have product manuals for the
8  necking machines?
9          MS. MALINOSKI:  As of today?
10         MR. McANDREWS:  As of today?
11  The -- the machines that -- that
12  Crown is currently operating, who
13  -- who would have copies of the
14  manuals on those?
15         THE WITNESS:  I'm not
16  certain who has -- you know, where
17  they're maintained.  Certainly
18  someone in the manufacturing, uhm,
19  group for the beverage division.
20  Richard probably may have manuals.
21  I don't know.
22         I mean, it was an
23  engineering function years ago so
24  I used to have a lot of the

Page 71

1      manuals in the engineering
2      department.
3  BY MR. McANDREWS:
4      Q.   All right.  During the
5  necking operation, what is it that moves
6  the -- let's take the first necking
7  operation in -- in Crown's typical
8  necking machine.  What is it that moves
9  the can in the -- the open end of the can
10  and the first set of dies together?
11     A.   The can is pushed into the
12  die.
13     Q.   Is that -- is that done at
14  an angle or is it done straight using --
15     A.   Straight.  I mean, the can
16  has to be maintained --
17     Q.   Okay.  Using the vertical
18  axis?
19     A.   -- perpendicular to the die,
20  yeah.
21     Q.   So using the vertical axis
22  of the can, it would be moved in that
23  direction toward the open end of the can
24  into the die?

Page 72

1      A.   Yes.
2      Q.   The can is moved and not the
3  die?
4      A.   Yes.
5      Q.   Okay.
6      A.   The can is pushed into the
7  die.
8      Q.   On -- on a typical 202 --
9  I'm sorry, can you -- can you describe,
10  if you know, what -- what does the 202
11  signify, what do the numbers mean?
12     A.   2 and 2/16.
13     Q.   Inches?
14     A.   Yeah, inches.
15     Q.   That's the diameter of
16  something?
17     A.   Yeah, it's -- God, you're
18  testing my -- I believe it refers to the
19  diameter of the seamed can; in other
20  words, if you have a can over the seamed
21  diameter, I believe if you measure that,
22  it's 2 and 2/16, or close to it, but I'm
23  not a hundred percent certain.  I forget
24  just how those -- you know, I used to

Page 73

1  know all those things, I just don't
2  remember anymore.
3      Q.   All right.  So your
4  understanding is that a 202 end or neck
5  would be measured after seaming from,
6  say, the highest point on the can across
7  through the center point on the can?
8          MS. MALINOSKI:  Objection.
9  Vague.
10         THE WITNESS:  It's -- I
11  don't know how -- how -- I don't
12  know if we are saying the same
13  thing or not, but it's the
14  diameter over the -- over the --
15  the seamed diameter over the end
16  portion of the can.  If I measured
17  that, I believe it would be 2 and
18  2/16 or close to that dimension.
19  BY MR. McANDREWS:
20     Q.   So it's measured from the
21  outside of the end?
22     A.   Yes.
23     Q.   Through the center point?
24     A.   Yes, obviously through the

19 (Pages 70 to 73)

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 98

1  again.  Is that not the shape of the
2  second die as it comes into contact?
3       MS. MALINOSKI:  Objection.
4  Vague.
5       THE WITNESS:  Well, the --
6       MR. McANDREWS:  I'm sorry,
7  you were saying something?
8       THE WITNESS:  It's -- it's a
9  continual blending of the
10  operations, so you don't always --
11  in the first operation, you -- the
12  can profile would look like the
13  die profile that you used to make
14  the reduction.  In the sequential
15  operations that take place after
16  that, it -- it's just a blending
17  of one to the other to form a
18  different profile on the can.  I
19  don't know -- maybe I'm not
20  describing that very well, and I
21  apologize if I am not, but that's
22  the only way I can think of to
23  describe it.
24       MR. McANDREWS:  All right.

Page 99

1  BY MR. McANDREWS:
2       Q.   The second die is moved in
3  to contact with the already-partially
4  necked can?
5       A.   Yes.
6       Q.   The first bend or the -- the
7  part of the die that will form the
8  lowermost point that the second die will
9  form hits the can where?
10       MS. MALINOSKI:  Objection.
11  Vague.
12       MR. McANDREWS:  Where does
13  the lowest point of the second die
14  hit the can?
15       MS. MALINOSKI:  Same
16  objection.
17       THE WITNESS:  The lowest
18  point of the second die?  When you
19  say "the lowest point of the
20  second die," I assume you're
21  referring to the -- the diameter
22  of that die?
23       MR. McANDREWS:  Let me ask
24  you a different question.

Page 100

1  BY MR. McANDREWS:
2       Q.   Where does the second die on
3  the can first make contact with the can?
4       MS. MALINOSKI:  Objection.
5  Vague.
6       THE WITNESS:  At the -- at
7  the --
8       MR. McANDREWS:  On the upper
9  vertical portion, on one of the
10  bent portions, on the portion
11  that's --
12       THE WITNESS:  As you would
13  describe, the upper vertical
14  portion, which has already been
15  reduced in diameter.
16  BY MR. McANDREWS:
17       Q.   And then it is compressed
18  downward?
19       A.   Again, yes, to reduce it
20  again in diameter.  It's compressed
21  inward, the can body is, or neck diameter
22  is reduced in size again.
23       Q.   Okay.  Now, --
24       MR. McANDREWS:  Now would be

Page 101

1  a good time to break.
2       MS. MALINOSKI:  Okay.
3       THE VIDEOGRAPHER:  We are
4  going off the record.  The time is
5  10:41 a.m.
6       - - -
7       (Whereupon, there was a
8  recess held at this time, 10:41 to
9  10:50 a.m.)
10       - - -
11       THE VIDEOGRAPHER:  We are
12  back on the record.  The time is
13  10:50 a.m.
14  BY MR. McANDREWS:
15       Q.   Mr. Bauder, earlier I asked
16  you when Crown started purchasing necking
17  equipment from Belvac, and you mentioned
18  that it was back in the 1970s.  Do you
19  recall that?
20       A.   Yes, I -- I believe it was
21  in the 1970s.
22       Q.   Okay.  Do you recall when
23  Crown started purchasing necking
24  equipment that was capable of performing

26 (Pages 98 to 101)

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 102

1   smooth die necking from Belvac?
2       A.   I -- I think it's the same
3   equipment.
4       Q.   You said you're familiar
5   with the 595 K necker, I believe it is,
6   from Belvac?
7           MS. MALINOSKI:  Objection.
8       It mischaracterizes his testimony.
9           THE WITNESS:  I believe --
10          MR. McANDREWS:  Are you
11      familiar with that piece of
12      equipment?
13          THE WITNESS:  I'm -- I --
14      yes.
15  BY MR. McANDREWS:
16      Q.   When did Belvac start
17  selling that piece of equipment?
18          MS. MALINOSKI:  Lack of
19      foundation.
20          THE WITNESS:  I don't
21      remember, really.
22  BY MR. McANDREWS:
23      Q.   Do you know when Crown first
24  started purchasing that equipment from

Page 103

1   Belvac?
2       A.   Probably, uhm, in the early
3   '90s.  I don't know.  I'm not a hundred
4   percent certain.
5       Q.   Okay.  If you know, how many
6   manufacturing facilities does Crown have
7   in the United States?
8       A.   I don't know.  I don't
9   recall.
10      Q.   Roughly, is it hundreds,
11  twenty?
12      A.   No, I don't think -- you
13  mean manufacturing facilities for --
14      Q.   Manufacturing?
15      A.   -- for the beverage can or
16  for everything?
17      Q.   For the beverage cans or can
18  ends.
19      A.   I'm not sure.  I -- I don't
20  think there's more than 12 or 15 now.  I
21  don't -- I don't -- I don't really know.
22  I used to know.  Maybe I just have not
23  kept up to speed on that.
24      Q.   Okay.  Who would know that?

Page 104

1       A.   Uhm, some -- obviously, some
2   of our manufacturing people.
3       Q.   And who would be a good
4   person to contact in manufacturing who
5   would probably know that type of
6   information?
7       A.   Uhm, well, the manufacturing
8   people or -- our tech center people or
9   probably the guys like Golding, Richard
10  Golding, Armen Zakarian.
11      Q.   What is Mr. Zakarian's
12  title?
13      A.   Armen -- Armen Zakarian's
14  title?
15      Q.   Yes.
16      A.   He is, uhm -- I think he's
17  the director of the beverage
18  manufacturing, I believe.  I -- I believe
19  that's his title, but I'm not a hundred
20  percent certain.
21      Q.   Do you know roughly how many
22  of -- let me rephrase that.
23          You mentioned earlier that
24  Crown uses CMB spin necking equipment?

Page 105

1       A.   Yes.
2       Q.   At how many facilities,
3   would you say?
4       A.   I don't know.
5       Q.   Do you know roughly how
6   many?
7           MS. MALINOSKI:  And lack of
8       foundation.
9           THE WITNESS:  I just -- no,
10      I don't, really.  I -- I don't
11      know where they are today with
12      that.
13  BY MR. McANDREWS:
14      Q.   Were you involved with the
15  purchase of necking equipment?
16      A.   Not today, no.
17      Q.   Have you been at any point
18  since 1995?
19      A.   No.
20      Q.   Were you before 1995?
21      A.   Yes.
22      Q.   Was one of the things you
23  would take into consideration when buying
24  a piece of equipment the longevity of the

27 (Pages 102 to 105)

# Exhibit 16

RICHARD GOLDING - JUNE 14, 2006

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4    CROWN PACKAGING TECHNOLOGY, INC. )

5    and CROWN CORK & SEAL USA, INC., )

6            Plaintiffs and          )

7            Counterclaim Defendants,) Civil Action

8        vs.                         ) No. 05-608(KAJ)

9    REXAM BEVERAGE CAN COMPANY,      )

10           Defendant and           )

11           Counterclaimant.        )

12

13           The videotaped deposition of RICHARD

14    GOLDING, called for examination, taken pursuant to

15    the Federal Rules of Civil Procedure of the United

16    States District Courts pertaining to the taking of

17    depositions, taken before JULIANA F. ZAJICEK, CSR

18    No. 84-2604, a Notary Public within and for the

19    County of Kane, State of Illinois, and a Certified

20    Shorthand Reporter of said state, at Crown

21    Packaging Technologies, 11535 South Central Avenue,

22    Alsip, Illinois, on the 14th day of June, A.D.

23    2006, at 9:09 a.m.

24

RICHARD GOLDING - JUNE 14, 2006

Page 10

1    Schedule A of this document?
2         A.    In Schedule A.
3         Q.    And I believe it is Item No. 7, would be
4    one.
5         MR. ZIEGLER:  Jerry, are you going to go
6    through the 7 --
7         MR. WILLIS:  7, 20, 22 and 23 I think is what
8    you said.
9         MR. ZIEGLER:  I'll represent that he is.
10        MR. WILLIS:  Okay.
11        MR. ZIEGLER:  By the way, he is subject to
12   objections including to the extent any of the
13   designated topics assume that documents still exist
14   or ever existed --
15        MR. WILLIS:  Okay.
16        MR. ZIEGLER:  -- for some of the document
17   categories.
18   BY MR. WILLIS:
19        Q.    Did you review any documents in
20   preparation for your deposition here today, other
21   than the one I just showed you?
22        A.    No.
23        Q.    Was there anything that you had to
24   review in order to be able to testify about the

Page 11

1    topics that you are going to testify about in the
2    30(b)(6) notice?
3         A.    No.
4         Q.    I'm going to talk a little bit now about
5    Crown's relationship with Belvac.  And basically
6    that's a customer relationship from Crown's
7    perspective?
8         A.    That's correct.
9         Q.    So Crown purchases manufacturing
10   equipment from Belvac?
11        A.    Correct.
12        Q.    And who are the individuals at Belvac
13   that you know?
14        A.    That I know.  Well, do you want me to
15   list them all, all I know?
16        Q.    Well, who do you work with I would say
17   on -- at Belvac on a regular basis?
18        A.    Well, the most common contact is
19   probably Charlie Price who is -- I don't know what
20   his exact title is.  It is along the lines of
21   senior sales director, something along those lines,
22   a Robert Williamson who is the account coordinator
23   in Belvac for Crown business.  Those are the most
24   frequent contacts nowadays.

Page 12

1         If there is questions on some more
2    technical details, some other people that I use
3    there is a Dennis Shuey who is their tooling
4    specialist.  And again on details of new equipment,
5    there is people like Steve Burnett who does some of
6    the sort of technical interpretation.
7         Q.    And does Crown purchase base reforming
8    equipment from Belvac?
9         A.    They have purchased base reforming
10   equipment from Belvac, yes.
11        Q.    Do you know what models?
12        A.    I don't know any model specification of
13   them.  We've just referred to them as bottom
14   reforming turrets.
15        Q.    Have you heard of something called --
16   that they referred to as the 595?
17        A.    I'm familiar with the 595 system of
18   turrets, yes.
19        THE COURT REPORTER:  I'm sorry.  The system
20   of?
21        THE WITNESS:  Of turrets.
22   BY MR. WILLIS:
23        Q.    Which is t-u-r-r-e-t-s?
24        A.    Correct, yes.

Page 13

1         Q.    Are there any other systems, bottom
2    reforming systems that you purchased from Belvac
3    that you would recognize by a number or a brand
4    name or is the 595 the only one?
5         MR. ZIEGLER:  Objection; lacks foundation.
6    BY MR. WILLIS:
7         Q.    You can answer.
8         A.    Essentially, as far as my understanding
9    of what Belvac produces, there are different
10   necking systems.  You mentioned the 595 which is a
11   machine-based system and a sort of set of standard
12   engineering practice that's incorporated in that
13   design.  There have been some upgrades to that.
14        So there is a 595K which has some extra
15   features on the equipment to enable it to run
16   faster.  There is a -- what they call a Super K.
17   I'm not aware of whether the bottom reforming part
18   of those packages are any different.  And there is
19   also the modular 595 series as well.  But as far as
20   I'm aware, the bottom reforming turrets are
21   essentially identical on all of those systems.
22        Q.    Is there any way to estimate how many
23   595 or 595K bottom reforming systems Crown has
24   purchased from Belvac?

4 (Pages 10 to 13)

RICHARD GOLDING - JUNE 14, 2006

Page 14

1    A.    Are you talking globally or in the U.S.?
2    Q.    In the U.S.
3    A.    In the U.S. we have three running and
4  there was one on the shelf in the plant in
5  Fort Bend as well that was experimental at one time
6  and ran for a very short period and then was taken
7  out and just used as spares on the shelf.  So in
8  the U.S. I'm only aware of four turrets.
9    Q.    And you mentioned Fort Bend.  Are they
10 all at the Fort Bend manufacturing facility?
11   A.    The -- yes.  They certainly -- I can't
12 guarantee the fourth one is still there.  The last
13 time I knew of that fourth one, it was sitting on
14 the shelf in Fort Bend.
15   Q.    And when I said "Fort Bend," just for
16 the record, that's Crown's manufacturing facility
17 in Fort Bend, Texas?
18   A.    That's correct, yes.
19   Q.    Are there any other companies that Crown
20 purchases base reforming equipment from?
21      MR. ZIEGLER:  Objection to form; vague.  Do
22 you mean currently?
23 BY MR. WILLIS:
24   Q.    During the past 12 years.

Page 15

1    A.    In the U.S.?
2    Q.    Yes.
3    A.    We only have those bottom reformers that
4  were running.  There has been an experimental piece
5  of kit that was purchased and tested, but it
6  failed.  So it was not continued.
7    Q.    Is that the machine that was tested at
8  the LaCrosse manufacturing facility?
9    A.    No.  That was one of the Belvac ones
10 that was tested in the LaCrosse facility.
11   Q.    Okay.  And who was the manufacturer of
12 the one you tested?
13   A.    The other one was manufactured from
14 Shipley, the CarnaudMetalbox engineering in
15 Shipley.
16   Q.    So Shipley is a subsidiary of some sort
17 of CarnaudMetalbox?
18   A.    Yes.
19   Q.    You said that bottom reformer failed?
20   A.    Yes.
21   Q.    And it never got beyond the testing
22 stage with that bottom reformer?
23   A.    No, it didn't.
24   Q.    And just to make sure I was clear about

Page 16

1  it, there are three Belvac bottom reforming
2  machines currently operating at the Fort Bend,
3  Texas manufacturing facility?
4    A.    Correct.
5    Q.    And you said there are how many turrets?
6    A.    I'm sorry.  I don't understand the
7  question.
8    Q.    Is it just -- is it -- are there
9  multiple turrets on each bottom reforming machine?
10   A.    Okay.  A bottom reforming turret is one
11 shaft that has placed around it 12 sets of tooling
12 and processes.  So there are -- for each turret
13 there are 12 tooling locations.  So it is a
14 multi-head turret.
15   Q.    And just so I'm clear, so there are
16 three turrets?
17   A.    There are three turrets.
18   Q.    At the Fort Bend, Texas manufacturing
19 facility?
20   A.    That's correct, yes.
21   Q.    Can you describe for me what the base
22 reforming machine does?
23   A.    In simple terms, it puts a bead on the
24 inside wall of the can or the reverse wall of the

Page 17

1  can.
2    Q.    Is there a difference between internal
3  base reforming and external base reforming?
4    A.    The -- they work on different areas of
5  the can, yes.
6    Q.    And an external would be on the outside
7  of the bottom of the can?
8    A.    Yes.  It is outside working inwards as
9  opposed to inside working outwards.
10   Q.    And the three machines that are at the
11 Fort Bend facility in Texas, those are internal
12 based reformers?
13   A.    That's how we described them, yes.
14   Q.    Now, does Crown also purchase necking
15 machines from Belvac?
16   A.    Yes.
17   Q.    And are those necking machines part of
18 the 595 system that --
19   A.    Yes.
20   Q.    -- you've mentioned?  Okay.
21   A.    Yes.
22   Q.    So on a -- can you describe for me what
23 would be an example if you -- if you purchased a
24 full 595K system from Belvac, what would that

5 (Pages 14 to 17)

RICHARD GOLDING - JUNE 14, 2006

Page 18

1  system entail?
2      MR. ZIEGLER:  Objection to form.
3  BY THE WITNESS:
4      A.   The -- there is different setups in
5  different parts and different locations.  So there
6  is no one answer to that question.
7          The most -- and we're not -- in the U.S.
8  we've not put any new plants in for many years.  If
9  we were to put the latest system into the U.S., it
10 would be a 14-stage die making system with a
11 flanging turret on it.  And depending on the can
12 that we were wanting to make, we may or may not put
13 a reformer.  It would probably include a light
14 tester as well all in the one piece of equipment.
15     Q.   I asked this of another witness, but can
16 you tell me again what the light tester is?
17     A.   It's a machine that tests for pin holes
18 in the can.  So it has a light cell that measures
19 light intensity and we put the can in a vapor
20 right light bath and you see whether you can see
21 any light inside the can to test for holes.
22     Q.   And when Crown purchases necking
23 machines from Belvac, does Crown also purchase what
24 they call "smooth die necking tooling"?

Page 19

1      MR. ZIEGLER:  Objection to form; vague.  Do
2  you mean from Belvac?
3  BY MR. WILLIS:
4      Q.   From Belvac.  Sorry.
5      A.   We have purchased smooth die making
6  systems from Belvac, yes.
7      Q.   And of the smooth die necking
8  machines -- I'll strike that.
9          Of the necking equipment that you've
10 purchased from Belvac with the smooth die necking
11 tooling that was purchased from Belvac, can you
12 explain to me how that necking process would work?
13     A.   The -- well, there is two aspects of it.
14 There is the straightforward die necking process
15 that's achieved by very simply pressing a can, the
16 top edge of a can into a die that has a profile in
17 it and that profile is imparted onto the can
18 producing the neck diameter.  So that's the sort of
19 simple basis for all of the die making processes.
20         With the smooth die necking system the
21 first up is a standard die neck that has a profile
22 with -- I'm trying to verbalize this.  It is hard
23 to do with hands.
24     Q.   I appreciate with hands.

Page 20

1      A.   If you come up the sidewall, then it has
2  an arc bending inwards and then it has another arc
3  bending back the other way to a straight portion or
4  chimney on the neck.
5          The subsequent operations reduce the
6  diameter of that chimney further in smaller stages
7  than achieved in the first stage, and that profile
8  is moved down the can to create a smooth geometry
9  when it's finished.  So the tooling is positioned
10 in the machine to leave a smooth profile on the
11 can.
12     Q.   And depending on the size of the can end
13 that is going to be seemed onto the can after it is
14 filled with a beverage, that -- would that
15 determine how many stages or how many times the can
16 is necked in by these -- by the smooth die necking
17 dies?
18     A.   That in combination with the wall
19 thickness and the coatings that are applied to the
20 can.  So it is part of the can design associated
21 with the diameter reduction that's needed.
22     Q.   Does Crown always purchase this smooth
23 die tooling from Belvac when it purchases a necking
24 machine from Belvac?

Page 21

1      MR. ZIEGLER:  Objection to form.  Do you mean
2  has it to date?
3  BY MR. WILLIS:
4      Q.   In the past, historically since you've
5  been with the company.
6      A.   I think it's --
7      Q.   Because I think you testified earlier
8  that they haven't purchased any new equipment in
9  quite some time.
10     A.   In a number of years, that's correct.
11 Or not entire machines, but bits of -- replacement
12 bits as it happened.
13         With the -- the tools themselves are
14 currently not purchased from Belvac.  We purchase
15 the physical tools from other toolmakers.  In the
16 past though we purchased the draw -- the
17 engineering drawings that the tools are made from
18 from Belvac.
19     Q.   So in the past -- sometime in the past
20 Belvac supplied Crown with the drawings that would
21 demonstrate to a tooling manufacturer how to make
22 the smooth die necking tooling?
23     A.   That's correct for the -- again, I'm
24 talking about what's happened during my time

6 (Pages 18 to 21)

RICHARD GOLDING - JUNE 14, 2006

Page 22

1  frame --
2      Q.  Sure.
3      A.  -- with the company.  And, yes, we --
4  the 14-state system, we purchased that from Belvac.
5  They supplied the tooling drawings that we had, the
6  first sets of toolings made against.
7      Q.  What are some of the other toolmakers
8  that Crown has purchased smooth die necking tooling
9  from?
10     A.  Again, the people who would make the
11 tools against the drawings we supply, there is
12 Wissota Tool.
13     Q.  I'm sorry.
14     A.  Wissota Tool, W-i-s-s-o-t-a.
15     Q.  Where are they located?
16     A.  In Chippewa Falls, Wisconsin.  And there
17 is now what is called Lieb Precision Engineering.
18     Q.  L-e-e-b?
19     A.  L-i-e-b.
20     Q.  L-i-e-b.  0 for 2 today on spellings.
21     A.  They used to be known -- or they used to
22 be part of St. Gobain.  So, again --
23     Q.  Could you spell that one for me?
24     A.  S-t, abbreviation for Saint, and Gobain,

Page 23

1  G-o-b-a-i-n.
2      Q.  And are they a U.S. company, do you
3  know?
4      A.  Lieb Precision Engineering is a U.S.
5  company.  I don't know the origins of St. Gobain.
6      Q.  And Wissota Tool is a U.S. company in
7  Wisconsin, right?
8      A.  Yes.  They are owned by -- they are a
9  subsidiary of Crown.
10     Q.  Do you know when they became a
11 subsidiary of Crown?
12     A.  No, I don't.
13     Q.  Has it been since you've been with the
14 company?
15     A.  No.
16     Q.  It was before you came?
17     A.  It was before.
18     Q.  Okay.  What are some of the other
19 necking methods or necking processes that Crown
20 uses in manufacturing its cans currently?
21     MR. ZIEGLER:  Objection; lacks foundation.
22 BY THE WITNESS:
23     A.  If we are talking about aluminum cans --
24 aluminum beverage cans in the U.S., the systems we

Page 24

1  use are either all die necking systems as I
2  described earlier or we have a combination of die
3  necking and spin neck and flanging systems.
4  BY MR. WILLIS:
5      Q.  So at this point does Crown use smooth
6  die necking in manufacturing all of its cans, at
7  least partially?
8      MR. ZIEGLER:  In the United States?
9  BY MR. WILLIS:
10     Q.  In the United States.  I'm sorry.
11     A.  Yes, that is correct.
12     Q.  And they may combine that in the
13 United States with spin necking?
14     A.  Spin neck and flanging, yes.
15     Q.  Spin neck and flanging.  And what is the
16 spin neck and flanging?  Can you describe what that
17 is for me?
18     A.  That is a -- the equipment for it is
19 produced by Shipley, and common terms for that are
20 160s or 240 neckers.  They reduce the diameter of
21 the can by a process.  The can is fed onto a chuck
22 and is rotated.  The can is then pushed off the
23 chuck in a controlled way, and while it is being
24 removed from the chuck, there are two disks that

Page 25

1  move radially, again, through cammed motions to
2  form a -- to complete the neck and the flange in
3  one operation.
4      Q.  And why would -- why would you combine
5  the smooth die necking with the spin neck and
6  flanging operation?
7      A.  In the past the spin neck and flanging
8  process was the most common process.  So we had the
9  equipment existing.
10     Q.  Where are the two disks located in
11 relation to the can?  Are they both on the outside
12 of the can?
13     A.  Yes, they are.
14     Q.  Do you know if it is more expensive to
15 manufacture cans using the smooth die necking
16 process that you described than it is to use some
17 other process?
18     MR. ZIEGLER:  Objection to form.
19 BY THE WITNESS:
20     A.  There are too many factors that go into
21 the -- it is not one thing that you can pull out
22 and change between the two systems.  There is a
23 number of other things that -- you know, to extract
24 what is solely due to the system would be a very

7 (Pages 22 to 25)

Page 26

1  difficult task. And I've never been through that
2  detailed exercise.
3      Q.   So cost isn't really a consideration
4  then as far as the manufacturing process with
5  respect to necking?
6  BY THE WITNESS:
7      A.   There are --
8      MR. ZIEGLER: Objection to form.
9  BY THE WITNESS:
10     A.   There are many considerations in there.
11 BY MR. WILLIS:
12     Q.   But you've never analyzed cost in your
13 experience with respect to smooth die necking
14 versus spin neck and flanging or bump necking or
15 anything like that?
16     A.   No, I haven't.
17     Q.   Does Crown currently or within the last
18 five years, do they use what's -- I've read as
19 referred to as bump necking?
20     MR. ZIEGLER: Again, inside the United States?
21     MR. WILLIS: In the United States.
22 BY THE WITNESS:
23     A.   In the last five years in -- does the
24 U.S. include Puerto Rico?

Page 27

1  BY MR. WILLIS:
2      Q.   Sure.
3      A.   We've used it in Puerto Rico in the last
4  five years, but not in -- not anywhere else in the
5  U.S.
6      Q.   The contiguous United States?
7      A.   Yes.
8      Q.   Now, as -- for my own education, is bump
9  necking the neck -- kind of necking where you can
10 actually see the steps?
11     A.   Actually, I'll correct that. Puerto
12 Rico is the last place we did do it, but that
13 finished more than five years ago.
14     Q.   Okay.
15     MR. ZIEGLER: Mr. Golding, make sure you allow
16 him to finish his question and then answer so that
17 the court reporter can get the -- can get all of
18 the words down.
19 BY MR. WILLIS:
20     Q.   So Crown doesn't use that type of
21 necking operation anymore in the U.S.?
22     A.   That's correct.
23     Q.   But from my own education again, would
24 bump necking be the same thing as step necking?

Page 28

1      A.   Probably, yes. Yes.
2      Q.   Okay. In the process of going from
3  start to finish for making the entire can, there
4  are multiple stages, are there not? You start with
5  a piece of aluminum?
6      A.   Yeah.
7      Q.   And then you've got to draw and iron it
8  until you have a -- the basic form of a can shape?
9      A.   Yes.
10     Q.   And then I think we talked a little bit
11 about this. It's necked to correlate it with
12 whatever size end is supposed to be attached to the
13 can?
14     MR. ZIEGLER: Objection to form. Do you mean
15 in the next step after it's been drawn and ironed?
16 BY MR. WILLIS:
17     Q.   The next step after, right. You go step
18 by step. After it's been drawn and ironed, you've
19 got the general shape of a can. Is the next step
20 the necking step?
21     A.   No.
22     Q.   What would the next step be?
23     A.   It would be trimming the can to the
24 initial height to clean up the can after the

Page 29

1  ironing process.
2      Q.   And then after it is trimmed, what's the
3  next step?
4      A.   Then washed and etched.
5      Q.   What's etching?
6      A.   It changes the surface property of the
7  aluminum so that you can print on the can.
8      Q.   And then what's the next step?
9      A.   Then there is a bottom rim coat process
10 where we put on the stand of the can, we put a
11 lacquer type material so that it aids mobility down
12 the rest of the production line.
13     Q.   So that would be on the outside of the
14 can?
15     A.   On the outside of the can, yes.
16     Q.   And then what's next?
17     A.   In the U.S. plants, from there it goes
18 into a decorator.
19     Q.   So it is decorated before it's necked?
20     A.   Yes, correct.
21     Q.   And then so would the next step after
22 decorating be the necking?
23     A.   We've then got -- no.
24     Q.   Okay. We are going to get there though

8 (Pages 26 to 29)

RICHARD GOLDING - JUNE 14, 2006

Page 34

1  percentage?
2      A.   No, I couldn't.
3      Q.   You talked a little bit about the smooth
4  die necking process in the United States, and I
5  believe you testified that in the first die the can
6  will be reformed a predetermined amount.  Is that
7  fair?
8      A.   Yes.
9      Q.   And then when the can goes to the next
10 die, that die is set to reform the neck again at a
11 predetermined amount, correct?
12     A.   Yes.
13     Q.   Do you know whether during that
14 reforming process whether the second die is
15 reforming all or any portion of what was already
16 reformed by the first die?
17     MR. ZIEGLER:  Objection to form.
18 BY MR. WILLIS:
19     Q.   Do you understand?
20     A.   The -- well, the first one formed that
21 chimney on the can.
22     Q.   Okay.
23     A.   You are totally changing that chimney on
24 the can.  So the answer to your question is yes.

Page 35

1      Q.   So the second die reforms the chimney
2  portion as you described it?
3      A.   Yes.
4      Q.   And that would be the only thing that
5  would be being reformed in the second die?
6      A.   There will be some blending between that
7  and what the previous one left behind.
8      Q.   So maybe an upper portion of what the
9  first die reformed prior to the chimney, where the
10 chimney starts?
11     A.   I'm not sure I understand what you mean
12 by upper portion between the two there.
13     Q.   Okay.  You said that it would reform a
14 portion of what was -- the second die --
15     A.   Yes.
16     Q.   -- would reform a portion of what was --
17     A.   Yeah.
18     Q.   -- reformed in the first die, right?
19     A.   Yes.  We said that, yes.
20     Q.   And that would just go -- that would go
21 so on and so on and so on as many dies as you used,
22 correct?
23     A.   Yes.
24     Q.   And how many dies in Crown's

Page 36

1  manufacturing process based on your experience in
2  the U.S.?  Is there a typical number of dies that
3  Crown uses on its necking machines?
4      A.   Yes.  The most common one we use at the
5  moment is 14.  We have some locations on 9 and some
6  on 11 as well for a 211 body can which is your
7  standard beverage can.  If you are talking some of
8  the smaller diameter cans, then there are less
9  necking stages because you are starting with a
10 smaller diameter.
11     Q.   Oh, 211 is your standard can size?
12     A.   It's the -- yes, it's the common can
13 size, but we do make some other can sizes as well.
14     Q.   Okay.  For products like Red Bull or
15 energy drinks that are thinner?
16     A.   We don't make any of those, the Red Bull
17 type in the U.S.  But we do do what's called a 10
18 ounce can which is -- we make it to a 7-1/2 body
19 diameter.  So it's a slimmer can than the regular
20 211 diameter.
21     Q.   How many manufacturing facilities does
22 Crown have in the United States?
23     A.   I'd have to add them up.  I don't know
24 off the top of my head.

Page 37

1      Q.   Is it more than 10?
2      A.   It's probably about 10.  I'd have to go
3  through and add them up.  I don't know.
4      MR. ZIEGLER:  I'll just state an objection as
5  vague.  I'm not sure whether you mean can bodies,
6  can ends, both.
7  BY MR. WILLIS:
8      Q.   For purposes right now, can bodies.
9      A.   Again, it would be around beverage can
10 bodies, around -- around 10, but that's without --
11 that's without going through the list and checking
12 them off.
13     Q.   Okay.  Is there a document that would --
14 that you know of or you are aware of that would --
15     A.   Yes.
16     Q.   -- definitely let us know how many
17 manufacturing facilities --
18     A.   There is a list of --
19     Q.   -- there are in the United States?
20     A.   There is a list of the beverage
21 manufacturing facilities in the U.S., yes.
22     MR. WILLIS:  Do you know whether you've
23 produced that or not, Jerry?
24     MR. ZIEGLER:  Off the top of my head, no, but

10 (Pages 34 to 37)

ESQUIRE DEPOSITION SERVICES-CHICAGO
312-782-8087  800-708-8087  FAX 312-704-4950

Page 38

1  we'll check.
2      MR. WILLIS: We'd like to get it if we could.
3  BY MR. WILLIS:
4      Q.  And in those roughly 10 can body
5  manufacturing facilities that -- Crown's can body
6  manufacturing facilities in the United States,
7  approximately how many necking machines would you
8  estimate that Crown has?
9      A.  The necking -- what do you mean by
10  necking machines, the first part of the question,
11  because you talked about the 595 being a system of
12  turrets?
13          If you mean bodies all bolted onto a
14  single machine base and called part of the 595
15  system, then there is around -- probably around 25
16  in the U.S. -- sorry -- 26 in the U.S.
17      Q.  So that -- and that you are saying when
18  you said 26 and you went through -- so it is
19  twenty-six 595 either K or 595 --
20      A.  Yes.
21      Q.  -- Super and that's the system?
22      A.  Yes.
23      Q.  So there is twenty-five 595 whatever the
24  sub designation is systems that Crown is using at

Page 39

1  its various manufacturing facilities in the
2  United States?
3      A.  Yes.
4      Q.  And you've seen the -- and maybe this is
5  confusing to me too.
6          When you that -- when you say a machine,
7  do you mean turrets?  And earlier you had said that
8  typically on a regular 211 can Crown has 14 die
9  stations.  Can I call them stations --
10      A.  Stages.
11      Q.  -- that a can would go through?
12      A.  Yeah, stages.
13      Q.  And I'm having trouble with this term.
14  Is each station a turret?
15      A.  Yes, as we've just talked about it.
16  Earlier, again, we talked about station pockets,
17  heads are not used consistently, but in the way we
18  were talking earlier that is consistent.
19      Q.  So the typical 595 call it system would
20  include 14 turrets for the smooth die necking
21  operation?
22      MR. ZIEGLER: Objection; form.
23  BY THE WITNESS:
24      A.  There would -- as we -- with reference

Page 40

1  to the bottom reforming when I described the
2  turret, then by analogy to necking, yes.
3      THE COURT REPORTER: I'm sorry.  Then by?
4      THE WITNESS: Analogy to the necking process.
5  BY MR. WILLIS:
6      Q.  Can you remind me what you said about
7  the bottom reforming turret, so that I could see if
8  I can see understand the analogy.
9      A.  Okay.  The turret is comprised of a
10  shaft, around that 12 locations which hold tooling
11  and process the can as the turret rotates.  So for
12  each necking turret or each necking stage that's
13  comprised of a shaft with 12 tooling locations
14  housed around that.
15      Q.  So each turret is working on 12 cans at
16  the same time?
17      A.  Not at identical same time.  They
18  follow -- as the turret rotates, each head goes
19  past the camming profile.  So they happen very
20  quickly one after another.
21      Q.  Is there anyone else at Crown who would
22  have say greater knowledge than you about Crown's
23  necking process?
24      A.  Of die necking in the U.S., then I don't

Page 41

1  think so, currently employed at Crown.
2      Q.  Currently employed at Crown, okay.
3          Are all of the roughly 26 -- well, if
4  they are 595 systems, then they are all from
5  Belvac, correct?
6      A.  That's correct.
7      Q.  Are there any other necking machines in
8  any of Crown's manufacturing facilities in the
9  United States that are purchased from someone other
10  than Belvac?
11      A.  Currently running for die necking
12  processes, no.
13      Q.  How about within the last six years?
14      A.  I think within the last six years that's
15  also true.  The timing I would be a little
16  uncertain of.  Certainly 10 years ago we were
17  still running Continental die neckers in the
18  LaCrosse plant.  I don't know when they were
19  finally removed.
20      Q.  Were the Continental die necking
21  machines capable of performing the smooth die
22  necking operation that you've described today?
23      A.  Yes, they were.
24      Q.  And did the Continental necking machines

11 (Pages 38 to 41)

RICHARD GOLDING - JUNE 14, 2006

Page 42

1  require separate tooling as the Belvac machines
2  require to perform the smooth die necking
3  operation?
4      A.   Yes, the tools were designed on that to
5  do the process, yes.
6      Q.   And who designed the tooling that was
7  used with the Continental necking machines in order
8  to perform the smooth die necking operation?
9      A.   I don't know.  That was before my --
10     Q.   Okay.
11     A.   -- my time of arrival over here.
12     Q.   So currently, just to summarize, all of
13 the necking machines or necking systems currently
14 being operated and within the last several years
15 current -- being operated by Crown in the
16 United States are all Belvac 595 systems?
17     A.   All of the die necking systems, yes.
18     Q.   And what about the bottom reforming
19 systems?  There is only three in Fort Bend, Texas?
20     A.   That's correct.
21     Q.   Okay.  Is it possible for -- to change
22 the tooling from say Crown to decide, well, we
23 don't want to do hypothetically smooth die necking
24 for this one customer.  For some reason they want

Page 43

1  bump necking.  Can you change the tooling to make
2  it capable of doing that type of necking?
3      MR. ZIEGLER:  Objection; calls for a
4  hypothetical.
5  BY MR. WILLIS:
6      Q.   Or is the tooling set pretty much?
7      A.   You can remove tooling from machines.
8      Q.   You can?
9      A.   Yes.
10     Q.   Has Crown done that to any of its
11 machines in the last five years other than for
12 maintenance type things?
13     A.   We have replaced the 14-stage tooling by
14 some other designs that achieve the same thing,
15 yes.
16     Q.   Can you tell me about that?
17     A.   Well, the -- we looked at the process.
18 So some of the criteria for the process is the
19 individual radii in the dies and the clearances
20 with the knock-out which is the opposing tool, and
21 adjusting those radii and the clearances believe
22 we were getting a more efficient process.
23     Q.   Was that to change the smooth die
24 necking process or was that to speed up the

Page 44

1  process?
2      A.   To get less spoilage.
3      Q.   Less?
4      A.   Less spoilage.
5      Q.   And that is cans that are damaged?
6      A.   That's correct.
7      Q.   And why would it give you less spoilage?
8      A.   It works the metal better.
9      Q.   Okay.  And who designed or developed the
10 new type of tooling that you are talking about?
11     A.   We developed those modifications.
12     Q.   Crown did itself?
13     A.   Yes.
14     Q.   Were you involved in that?
15     A.   Someone who works for me was.
16     Q.   And who was that?
17     A.   Alan Beyer.
18     Q.   How do you spell his last name?
19     A.   B-e-y-e-r.
20     Q.   Okay.  You said you would have a
21 document that would show exactly how many can body
22 manufacturing facilities Crown has in the
23 United States.  Do you know if there is a document
24 that would show how many 595 necking systems Crown

Page 45

1  has operating in the United States?
2      A.   There probably is.  I don't know how
3  up-to-date it is.  It may show some plants that
4  have now since closed.  So there may be some
5  additional ones in there that are no longer
6  running.  But, yes, there is a document that has
7  the -- at one point in time.  As I said, I don't
8  know how up-to-date that document is.
9      Q.   But it would be pretty easy to look at
10 that list and figure out which plants have closed
11 and are now no longer operating?
12     A.   It could be -- yes, it could be put
13 up-to-date comparatively simply if it is not
14 up-to-date today.
15     Q.   And do you know who would be the most
16 likely person that would have that document?
17     A.   Armand Zakarien.
18     Q.   Armand?
19     A.   Zakarien.
20     Q.   Can you spell Zakarien?
21     A.   If I get it right.  Z-a-k-a-r-i-e-n.
22     Q.   Is Mr. Zakarien -- is he still an
23 employee of Crown?
24     A.   Yes, he is.

12 (Pages 42 to 45)

RICHARD GOLDING - JUNE 14, 2006

Page 46

1    Q.   Is he still at this facility?
2    A.   His office is here.  He is a frequent
3  traveler.
4    Q.   What is the typical life of a necking
5  machine based on your experience?
6    MR. ZIEGLER:  Objection to form.
7  BY THE WITNESS:
8    A.   The -- are we talking Belvac necking
9  equipment?
10 BY MR. WILLIS:
11   Q.   Years, yes.
12   A.   I don't know the life of the equipment.
13 It's -- it depends on how much it's maintained and
14 looked after.  We've got -- most of the equipment
15 we have running in the U.S. is more than 12 years
16 old and is still running.
17   Q.   Okay.  Would that statement also be true
18 with respect to bottom reforming machines that
19 Crown has purchased from Belvac?
20   MR. ZIEGLER:  Objection to form.
21 BY MR. WILLIS:
22   Q.   You said most of the necking machines
23 had been running for more than 12 years?
24   A.   Yeah.

Page 47

1    Q.   And I'm just asking if that would also
2  be true with bottom reforming machines?
3    A.   I don't know the date that the machines
4  in Fort Bend were purchased.
5    Q.   Okay.
6    A.   They were there before -- before I
7  arrived over here.  But since that time they are
8  the same ones.
9    Q.   And you arrived over here when?
10   A.   '96.
11   Q.   '96.  Okay.  We are going to change
12 gears here a little.
13       Since you've been employed by Crown and
14 since you've been here in the United States since
15 1996, have you ever become aware that Belvac had a
16 license agreement with Rexam who at the time was
17 American National Can with respect to necking --
18 smooth die necking tooling?
19   A.   Sorry.  With who again, can you say
20 that?
21   Q.   Belvac and Rexam who used to be American
22 National Can.
23   A.   My understanding when I first was
24 involved with this was that Belvac had a license

Page 48

1  from Ball.
2    Q.   So you never heard that they had a
3  license with American National Can with respect to
4  smooth die necking technology?
5    A.   No.  No, I didn't.  Sorry.  The Ball
6  license was on the reforming.
7    Q.   Bottom reforming?
8    A.   Bottom reforming.
9    Q.   Okay.  And you weren't aware of any
10 licenses with respect to necking technology?
11   A.   No, I wasn't.
12   Q.   Prior to this lawsuit, did you ever
13 become aware of a license agreement between Rexam
14 and Belvac with respect to necking technology?
15   A.   No.
16   MR. ZIEGLER:  Objection; asked and answered.
17       Would this be a good time for a break?
18 We've been going about an hour.
19   MR. WILLIS:  Yes.
20   THE VIDEOGRAPHER:  We are going off the video
21 record.  The time is 10:09 a.m.
22       (WHEREUPON, a recess was had
23        from 10:09 to 10:18 a.m.)
24   THE VIDEOGRAPHER:  Back on the video record.

Page 49

1  The time is 10:18 a.m.
2  BY MR. WILLIS:
3    Q.   Mr. Golding, I just want to clear
4  something up.  A few minutes ago we were discussing
5  whether or not Crown had changed its tooling or
6  could change its tooling from -- with respect to
7  smooth die necking tooling to some other form of
8  tooling.  And I believe you said that Crown hadn't
9  done that in like the last at least six years.  Is
10 that accurate?
11   A.   Sorry.  We -- we talked about modifying
12 the tool clearances and the radii.
13   Q.   Right.
14   A.   It did do that.
15   Q.   Right.  Okay.  So -- and that was on how
16 many machines?
17   A.   I don't know the exact number.  It is
18 most of those have been done now that are 14 stage,
19 which, again, is the majority of those.  If you
20 were to subtract something like six probably from
21 that total is probably pretty close to the number
22 that's been changed --
23   Q.   And when did Crown --
24   A.   -- of systems.

13 (Pages 46 to 49)

RICHARD GOLDING - JUNE 14, 2006

Page 50

1    Q.   I'm sorry. I didn't mean to interrupt
2  you.
3         When did Crown make those changes?
4    A.   When it was part of a development
5  program. So, the development covers several years.
6  The first trial installation on a single pocket was
7  probably around 2002.
8    Q.   Okay. And when was the -- you know, the
9  trial period over and actually Crown decided we're
10 going to install these on our machines?
11   A.   That was probably towards the end of
12 2003.
13   Q.   And the only difference or the primary
14 difference was a different radius in the die casts?
15   MR. ZIEGLER: Objection to form.
16 BY MR. WILLIS:
17   Q.   If you understand my question, you can
18 answer it.
19   MR. ZIEGLER: Different from the original
20 tools?
21 BY MR. WILLIS:
22   Q.   Sorry, yes. Different from the original
23 tooling that Crown was using for smooth die
24 necking.

Page 51

1    A.   From the original Belvac tooling, the
2  changes were in radii and clearances. And so if
3  you change the radii, everything has to still fit
4  together.
5    Q.   Right.
6    A.   So that necessitates some other changes.
7  There was some adjustment in the distribution of
8  the reductions during the 14-stage system, but the
9  final result is obviously the same.
10   Q.   Now, I know you said that -- that Crown
11 didn't change its smooth die necking tooling from
12 smooth die necking back to bump necking because you
13 said that Crown hadn't done bump necking in many
14 years.
15   MR. ZIEGLER: Objection; mischaracterizes
16 prior testimony. Object to form.
17 BY MR. WILLIS:
18   Q.   Is that -- okay. Is that close to
19 what -- summarizing what you said earlier?
20   MR. ZIEGLER: Same objection.
21 BY THE WITNESS:
22   A.   Can you say it again? Can you ask the
23 question again?
24   MR. ZIEGLER: Maybe you should ask it again.

Page 52

1  BY MR. WILLIS:
2    Q.   I believe you testified generally that
3  Crown did not switch out its smooth die necking
4  tooling to say another type of necking tooling, for
5  example, bump necking, because Crown hadn't done
6  bump necking except for Puerto Rico in quite some
7  time. Is that accurate?
8    A.   Yes.
9    Q.   Okay. Now, even though Crown didn't do
10 that as a practice, do you know whether it was
11 possible to simply change from a smooth die necking
12 to some other form of necking by changing the
13 tooling?
14   MR. ZIEGLER: Objection as to the form. It is
15 a vague question. It also calls for a hypothetical
16 and calls for speculation. You can answer if you
17 can.
18 BY THE WITNESS:
19   A.   Well, I can certainly speculate if you
20 are asking me to on can that be done.
21 BY MR. WILLIS:
22   Q.   Do you know of other companies that did
23 it?
24   A.   I'm not aware of anyone actually doing

Page 53

1  that, no.
2    Q.   Do you know whether it was possible to
3  do that?
4    MR. ZIEGLER: The same series of objections.
5  BY THE WITNESS:
6    A.   It depends on what you are trying to
7  achieve. If you are trying to achieve a different
8  can, then it may make sense.
9  BY MR. WILLIS:
10   Q.   Okay. What is your level of
11 involvement -- level of involvement with respect to
12 purchasing equipment from Belvac?
13   A.   Generally speaking, apart from defining
14 the processes that we are looking for, the actual
15 equipment side of it, I don't normally get involved
16 with.
17   Q.   Do you review quotes that come in from
18 Belvac for machines when Crown is considering
19 purchasing equipment?
20   A.   Not normally, no.
21   Q.   How about ever?
22   A.   There has been the occasional instance
23 when we are doing something that is a little
24 different that you might get involved with.

14 (Pages 50 to 53)

RICHARD GOLDING - JUNE 14, 2006

Page 58

1      A.    Then no, I don't think I've seen this
2  before.
3      Q.    So prior to this lawsuit, you've never
4  seen the '839 patent?
5      A.    I don't believe so.
6      Q.    Prior to this lawsuit, have you ever
7  heard anybody talking about this patent other than
8  your attorneys?
9      A.    No.
10     Q.    Okay.  One quick question for you.  If
11 you look at the diagram on the front of the '839
12 patent.
13     A.    Yes.
14     Q.    What I want to clear up is earlier you
15 referred during the smooth die necking process the
16 die reforms part of the neck and there's -- then
17 you referred to something as a chimney.  And I was
18 wondering if anything on this diagram would help me
19 understand what you are talking about when you
20 refer to the chimney?
21     MR. ZIEGLER:  Objection; lacks foundation.  It
22 calls for legal conclusions.
23 BY THE WITNESS:
24     A.    Well, as I described it before, it's the

Page 59

1  reduced portion at the top of the can.
2  BY MR. WILLIS:
3      Q.    Is the chimney the part that is going
4  vertical, like a chimney on a house would?
5      MR. ZIEGLER:  Objection; ambiguous.  Are you
6  referring to the patent or are you referring to --
7      MR. WILLIS:  I'm referring to his prior
8  testimony.  I'm just trying to understand it.
9  BY THE WITNESS:
10     A.    I was -- yeah, I was talking about
11 substantially vertical portion that's created on
12 the can after it's been die necked.
13 BY MR. WILLIS:
14     Q.    Okay.  Thanks.
15     You testified earlier that Crown does,
16 in fact, purchase base reform equipment from Belvac
17 or has in the past and has three reforming turrets
18 in Fort Bend, Texas, right?
19     A.    Yes, we've said that.
20          (WHEREUPON, a certain document was
21           marked Defendant's Deposition
22           Exhibit No. 26, for identification,
23           as of 6/14/06.)
24 BY MR. WILLIS:

Page 60

1      Q.    Okay.  I'm going to show you what has
2  been produced to us.  We don't have three of these,
3  so we are going to have to share.
4          It is designated by the Bates number
5  CCS0029420, and I believe that's a double I, not a
6  Roman Numeral II, and this is a sample of a
7  Budweiser beer can that was produced to us from
8  Crown.  And I'll just put that out there for you to
9  look at.  And I'm also going to -- but I need to
10 mark that with an exhibit sticker.  I'm going to
11 mark that as Defendant's Deposition Exhibit 26.
12          Now, looking at Deposition Exhibit 26,
13 is that, in fact, a can that was manufactured by
14 Crown?
15     A.    I believe so.  You stuck the sticker
16 over any location -- any identifying feature.
17     MR. ZIEGLER:  Good job, Jerry.
18 BY MR. WILLIS:
19     Q.    I thought that I -- I looked to see if I
20 could see the symbol of it.
21     A.    It is probably underneath there.
22     MR. ZIEGLER:  Why don't you mark it after he
23 has identified it or at the end of his testimony.
24     MR. WILLIS:  I can't get it off.  Okay.

Page 61

1  BY THE WITNESS:
2      A.    Yes, there you go.  It has the Crown
3  logo right there.
4  BY MR. WILLIS:
5      Q.    So that's Crown's?
6      A.    Yes.
7      Q.    Now I'll mark it.  I was trying to keep
8  the deposition sticker near the Bates number.  I'll
9  just leave the Crown uncovered there.
10          So that is a can that was manufactured
11 by Crown?
12     A.    Yes.
13     Q.    Is there anything on the can that would
14 tell you where or what facility it was manufactured
15 at?
16     A.    There are lots of clues as to where it
17 was manufactured.  Again, underneath the sticker
18 there is probably a plant code printed on that.
19 But even despite that, looking at that base
20 profile, I know that came out of our Fort Bend
21 location.
22     Q.    Okay.  So looking at that base profile,
23 what about it tells you that it came out of the
24 Fort Bend plant?

16 (Pages 58 to 61)

Page 62

1    A.   It's bottom reformed.
2    Q.   And how can you tell it is bottom
3 reformed?
4    A.   Because it has got this bead on the
5 inside.  You can sort of feel it with your finger.
6 You can see it with your eye.  There is that what I
7 described as a bead that goes around the inside of
8 the can.
9    Q.   And that's the internal base reforming?
10    A.   That is internal base reforming.
11    Q.   Can you tell if there has been external
12 base reforming?
13    A.   It is more difficult to tell, but this
14 hasn't.  We don't use that process in the U.S.
15         (WHEREUPON, a certain document was
16         marked Defendant's Deposition
17         Exhibit No. 27, for identification,
18         as of 6/14/06.)
19 BY MR. WILLIS:
20    Q.   Okay.  I'm going to mark this as --
21 well, do I have one with the Bates label.
22         Now I'm going to show you what we are
23 going to mark, after we identify it, as Defendant's
24 Deposition Exhibit 27, which is a Shasta can that

Page 63

1 was produced to us by Crown with the Bates label
2 CCS0029419B, as in boy.
3         Now, is that also a can that was
4 manufactured by Crown?
5    A.   Yes.
6    Q.   And do you know where that can was
7 manufactured or what facility it was manufactured
8 in?
9    A.   The -- I can't remember the deciphering
10 of the codes without reference to a cheat sheet,
11 but this was not the Fort Bend location.  I
12 suspect -- well, there are separate locations.  It
13 could be.  I would have to decipher the code.
14    Q.   Okay.  And has that can been bottom
15 reformed?
16    A.   No.
17    Q.   There is no internal reforming on the
18 bottom of that can?
19    A.   There is no internal reforming of that
20 base at all.
21    Q.   Okay.  I'm going to put the
22 exhibit sticker on.
23         Now, looking back at the Deposition
24 Exhibit 26, which is the Budweiser can, what -- is

Page 64

1 there a name for that internal portion of the
2 bottom that you identified as being reformed?  Is
3 there a term that's used for it?
4    A.   I normally refer to that as the reverse
5 wall.
6    Q.   The reverse wall, okay.  I've seen some
7 documents of yours that have referred to it as the
8 inner chime.  Have you heard that before, the inner
9 chimed wall?
10    A.   I doubt I've used that term because to
11 me the chime is a different area on the can.
12    Q.   Perhaps it was Belvac, Belvac documents.
13         (WHEREUPON, a certain document was
14         marked Defendant's Deposition
15         Exhibit No. 28, for identification,
16         as of 6/14/06.)
17 BY MR. WILLIS:
18    Q.   I'm going to mark this as Defendant's
19 Deposition Exhibit 28, which is an electronic
20 photograph of the two physical exhibits that I just
21 identified.  You can see that the Bates labels are
22 the same.
23         And can you just give me the term one
24 more time so I can use it in my question as to what

Page 65

1 you refer to that inner bottom wall as?
2    A.   I call it the reverse wall.
3    Q.   The reverse wall.
4         Okay.  Can I ask you to mark on that
5 drawing with an arrow what the reverse -- where the
6 reverse wall is, if I give you a pen?
7    A.   On which can?
8    Q.   On the Budweiser can, the one that has
9 been reformed.
10    A.   Okay.  That's more difficult because
11 you've destroyed the reverse wall when you were
12 reforming.  You change it.
13    Q.   Okay.  What did you call it after it has
14 been changed?
15         MR. ZIEGLER:  Objection; lacks foundation.
16 BY THE WITNESS:
17    A.   I -- what I call the -- I talk about a
18 bead profile is what I normally talk about.
19 BY MR. WILLIS:
20    Q.   Okay.  Of so it's -- before the can
21 undergoes bottom reforming, there is a reverse
22 wall?
23    A.   Yes.
24    Q.   Okay.  And the reverse wall is reformed

17 (Pages 62 to 65)

# Exhibit 17

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 18

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 19

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 20

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 21

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 22

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 23

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 24

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY,       )
INC., Plaintiff, and CROWN CORK & SEAL   )
USA, INC.,                        )
                                  )
Plaintiff and Counterclaim Defendant   )
                                  )    Civil Action No. 05-608 (MPT)
v.                                )
                                  )
REXAM BEVERAGE CAN COMPANY,       )
                                  )
Defendant Counterclaimant.        )

## DEFENDANT COUNTERCLAIMANT REXAM BEVERAGE CAN COMPANY'S RESPONSES TO CROWN PACKAGING TECHNOLOGY, INC.'S AND CROWN CORK & SEAL USA INC.'S SECOND SET OF REQUESTS FOR ADMISSION (NOS. 52-210)

Defendant-Counterclaimant Rexam Beverage Can Company ("Rexam"), through its counsel, hereby submits its responses to Crown Packaging Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s ("Plaintiffs") Second Set Of Requests For Admission (Nos. 52-210).

## GENERAL OBJECTIONS:

Rexam objects to Plaintiffs' Requests For Admissions to the extent they seek disclosure of information, documents or things protected by the attorney-client privilege, immune from discovery pursuant to the work product doctrine, or protected or immunized by any other applicable privilege, immunity, doctrine or protection from discovery. All of the following responses and answers are made subject to this objection and none of the following Answers or the information, documents or things identified in these Answers will include any such privileged, protected or immune information, documents or things.

Rexam objects to each Request For Admission, including all accompanying Definitions and Instructions, to the extent that they attempt to impose upon Rexam obligations beyond those required by the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for

the District of Delaware, the judge's rules or orders, and/or the Court's scheduling order establishing a discovery schedule and pretrial requirements.

Rexam objects to each Definition and/or Instruction to the extent it is overly broad, unduly burdensome, vague, ambiguous, indefinite, lacking in reasonable particularity, untimely, premature or seeks information, documents or things uniquely in the possession, custody or control of Plaintiffs, its divisions, affiliates, officers, directors, employees, agents, representatives, distributors and/or customers.

To the extent that Rexam's Answers are arguably within the scope of any definition set forth by Plaintiffs, such Answer by Rexam shall not be construed to be an admission by Rexam as to the validity or scope of any such definition.

Rexam objects to the definition of 'Rexam as including Rexam PLC. Rexam PLC is not a party to this action, and all responses will be based on knowledge of Rexam Beverage Can Co.

Rexam objects to the definition of "Rexam End" or Rexam Ends" as vague to the extent that the definition encompasses "variations, modifications, predecessors, or prototypes of the can end identified by Rexam in response to Crowns's interrogatories nos. 1 and 4. Rexam's responses to requests for admissions that are directed to a "Rexam End" or "Rexam Ends" will be limited to ends identified by Rexam in response to Crowns's interrogatories nos. 1 and 4.

Rexam objects to each Request For Admission to the extent that it seeks confidential, proprietary, and/or sensitive business information. Any Answers or information provided by Rexam, are subject to the Protective Order entered in this case.

Discovery is ongoing, and Rexam is continuing its preparation for trial. All responses to the following Requests For Admissions are based on information presently known to Rexam after a reasonable effort to compile information called for by these Requests For Admissions. All Answers are given without prejudice to Rexam's right to supplement and/or modify its

responses at a later time. In addition, Rexam's objections as set forth herein are made without prejudice to Rexam's right to assert any additional or supplemental objections.

Rexam objects to these Requests For Admissions as they seek Admissions that are not relevant to any claim or defense of any party in this case.

## REQUEST FOR ADMISSION NO. 52:

Crown Packaging Technology, Inc. is a Delaware corporation having a principal place of business at 11535 South Central Avenue, Alsip, IL 60803.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

## REQUEST FOR ADMISSION NO. 53:

Crown Packaging Technology, Inc. is a research, development, and engineering company specializing in metal packaging for the beverage and food industry.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

## REQUEST FOR ADMISSION NO. 54:

Crown Cork & Seal Company USA, Inc. is a Delaware corporation having a principal place of business at One Crown Way, Philadelphia, PA 19154.

### ANSWER:

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

## REQUEST FOR ADMISSION NO. 55:

Crown Cork & Seal Company USA, Inc. is in the business of manufacturing and selling metal beverage can components, including can ends and can bodies.

**ANSWER:**

Rexam objects to this request for admission as vague for failing to define the scope of "components". Rexam admits that Crown Cork & Seal USA, Inc. manufactures and sells metal beverage can bodies and ends.

**REQUEST FOR ADMISSION NO. 56:**

Rexam Beverage Can Co. is a Delaware corporation having a principal place of business at 8770 W. Bryn Mawr Ave., Chicago, IL 60631.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 57:**

Rexam Beverage Can Co. is in the business of manufacturing and selling metal beverage can components, including can ends and can bodies.

**ANSWER:**

Rexam objects to this request as vague to the extent that it does not specify the scope of the term components. Rexam admits that it manufactures and sells metal beverage can bodies and metal beverage can ends.

**REQUEST FOR ADMISSION NO. 58:**

Rexam makes or manufactures Rexam Ends within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it makes Rexam Ends within the United States.

**REQUEST FOR ADMISSION NO. 59:**

Rexam intends on continuing in the future to make or manufacture Rexam Ends within the United States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of time to which it is directed. Subject to that objection and Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it presently intends to continue to make Rexam Ends within the United States until such time as facts, circumstances or conditions change or additional facts, circumstances or conditions, including decisions by the court in this action, affect Rexam's decision whether to make Rexam Ends.

**REQUEST FOR ADMISSION NO. 60:**

Rexam sells Rexam Ends within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it sells Rexam Ends within the United States..

**REQUEST FOR ADMISSION NO. 61:**

Rexam intends on continuing in the future to sell Rexam Ends within the United States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of time to which it is directed. Subject to that objection and Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it presently intends to continue to sell Rexam Ends within the United States until such time as facts, circumstances or conditions change or additional facts, circumstances or conditions, including decisions by the court in this action, affect Rexam's decision whether to sell Rexam Ends.

**REQUEST FOR ADMISSION NO. 62:**

Rexam offers Rexam Ends for sale within the United States.

**ANSWER:**

Subject to Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it offers Rexam Ends for sale within the United States.

**REQUEST FOR ADMISSION NO. 63:**

Rexam intends on continuing in the future to offer Rexam Ends for sale within the United States.

**ANSWER:**

Rexam objects to this request as vague for failing to specifically identify the period of time to which it is directed. Subject to that objection and Rexam's objection to the definition of the term "Rexam Ends", Rexam admits that it presently intends to continue to offer to sell Rexam Ends within the United States until such time as facts, circumstances or conditions change or additional facts, circumstances or conditions, including decisions by the court in this action, affect Rexam's decision whether to offer to sell Rexam Ends.

**REQUEST FOR ADMISSION NO. 64:**

This civil action arises under the Patent Act, Title 35 of the United States Code.

**ANSWER:**

Rexam admits that its counterclaims for infringement in this action arise under Title 35 of the United States Code. Rexam admits that Crown pleaded that its claims in this action arise under Title 35 of the United States Code.

**REQUEST FOR ADMISSION NO. 65:**

The United States District Court for the District of Delaware has subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331, 1338(a), and 2201.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 66:**

Venue in the United States District Court for the District of Delaware is proper under 28 U.S.C. §§ 1391(b) & (c) and 1400(b).

**ANSWER:**

Rexam admits that venue is proper in this district under 28 U.S.C. §§ 1391(b) & (c).

Rexam denies that venue is proper under 28 U.S.C. § 1400(b).

**REQUEST FOR ADMISSION NO. 67:**

The document bearing production numbers CCS 39475 to CCS 39484 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,065,634.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

**REQUEST FOR ADMISSION NO. 68:**

The document bearing production numbers CCS 39474 to CCS 39725 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,065,634.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, subject to a determination of completeness.

**REQUEST FOR ADMISSION NO. 69:**

U.S. Patent No. 6,065,634 was issued by the Patent and Trademark Office on May 23, 2000.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 70:**

Crown Cork & Seal Technologies Corporation was the owner of U.S. Patent No. 6,065,634 at the time of its issuance.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

## REQUEST FOR ADMISSION NO. 71:

Effective January 1, 2004, Crown Cork & Seal Technologies Corporation changed its name to Crown Packaging Technology, Inc.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

## REQUEST FOR ADMISSION NO. 72:

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,065,634, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Rexam objects to this request as not relevant to any claim or defense in this action.

## REQUEST FOR ADMISSION NO. 73:

The document bearing production numbers CCS 62069 to CCS 62084 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.

## RUEST FOR ADMISSION NO. 74:

The document bearing production numbers CCS 715 to CCS 1042 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, subject to a determination of completeness.

**REQUEST FOR ADMISSION NO. 75:**

U.S. Patent No. 6,848,875 was issued by the Patent and Trademark Office on February 1, 2005.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 76:**

Crown Packaging Technology, Inc. is the owner of U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006.

**REQUEST FOR ADMISSION NO. 77:**

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,848,875, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Denied.    Rexam admits that the "Amendment to Patent & Technology License Agreement" found at CCS 54446 to CCS 54450 states that Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,848,875, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent.    Rexam admits, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, that Crown Cork & Seal USA, Inc. is the exclusive licensee of U.S. Patent No. 6,848,875, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent.

**REQUEST FOR ADMISSION NO. 78:**

U.S. Patent No. 6,848,875 has the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**ANSWER:**

Rexam admits that U.S. Patent No. 6,848,875 claims the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.


**REQUEST FOR ADMISSION NO. 79:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.


**REQUEST FOR ADMISSION NO. 80:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including whether U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered.  Therefore, Rexam can neither admit nor deny this request.


**REQUEST FOR ADMISSION NO. 81:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.


**REQUEST FOR ADMISSION NO. 82:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,848,875 cited U.S. Patent No. 4,448,322 as a basis for rejecting claims. Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 83:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was disclosed to the Patent and Trademark office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 84:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered by the Patent and Trademark office examiner during the prosecution of the application that issued as U.S. Patent No. 6,848,875.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,848,875 cited Japanese Unexamined Utility Model Publication No. JP 57-117323 as a basis for rejecting claims. Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which whether Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 85:**

The document bearing production numbers CCS 62056 to CCS 62068 is a true, correct, authentic, and genuine copy of U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 86:**

The document bearing production numbers CCS 30 to CCS 714 is a true, correct, authentic, and genuine copy of the prosecution file history of U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted, pursuant to the agreement between Rexam's counsel and Crown's counsel of

November 17, 2006, subject to a determination of completeness.

**REQUEST FOR ADMISSION NO. 87:**

U.S. Patent No. 6,935,826 was issued by the Patent and Trademark Office on August 30, 2005.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 88:**

Crown Cork & Seal Packaging Technology Inc. is the owner of U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam admits, pursuant to the agreement between Rexam's counsel and Crown's counsel

of November 17, 2006, that Crown Packaging Technology, Inc. is the owner of U.S. Patent No.

6,935,826.

**REQUEST FOR ADMISSION NO. 89:**

Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. (*See* Amendment to Patent & Technology License Agreement, CCS 54446 to CCS 54450).

**ANSWER:**

Denied. Rexam admits that the "Amendment to Patent & Technology License Agreement" found at CCS 54446 to CCS 54450 states that Crown Cork & Seal Company USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent. Rexam admits, pursuant to the agreement between Rexam's counsel and Crown's counsel of November 17, 2006, that Crown Cork & Seal USA, Inc. is the exclusive licensee of U.S. Patent No. 6,935,826, including of the right to bring suit against infringement of the patent and to recover damages for past, present, and future infringement of the patent..

**REQUEST FOR ADMISSION NO. 90:**

U.S. Patent No. 6,935,826 has the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**ANSWER:**

Rexam admits that U.S. Patent No. 6,935,826 claims the benefit of the filing date of United Kingdom Application No. UK 9510515.1, filed May 24, 1995.

**REQUEST FOR ADMISSION NO. 91:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 92:**

U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including whether U.S. Patent No. 4,217,843 (Kraska 8/1980) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO.93:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 94:**

U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam cannot know the mental process of the examiner during the prosecution, including whether U.S. Patent No. 4,448,322 (Kraska 5/1984) was considered. Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 95:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was disclosed to the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 96:**

Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered by the Patent and Trademark Office examiner during the prosecution of the application that issued as U.S. Patent No. 6,935,826.

**ANSWER:**

Rexam admits that he examiner of the application for U.S. Patent No. 6,935,826 cited Japanese Unexamined Utility Model Publication No. JP 57-117323 as a basis for rejecting claims.   Rexam cannot know the mental process of the examiner during the prosecution, including the extent to which whether Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) was considered.   Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 97:**

The document bearing production numbers CCS 35169 to CCS 35198 is a true, correct, authentic, and genuine copy of European Patent EP 0 828 663.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 98:**

European Patent EP 0 828 663 is the European counterpart to U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as vague and ambiguous because the term "counterpart" has not been defined or framed in any context.   Therefore, Rexam can neither admit nor deny this request.

**REQUEST FOR ADMISSION NO. 99:**

The document bearing production numbers CCS 35199 to CCS 36553 is a true, correct, authentic, and genuine copy of the European prosecution file history of European Patent EP 0 828 663.

**ANSWER:**

Rexam objects to this request as overly broad and burdensome as it requires Rexam to obtain a true, correct, authentic, and genuine copy of the prosecution file history of European Patent EP 0 828 663 and then compare that copy to all identified pages.   Rexam did not

prosecute European Patent EP 0 828 663 and has no way of determining whether the identified

documents are the complete prosecution history of that patent. Therefore, Rexam cannot admit

or deny the matter set out by this request.

## REQUEST FOR ADMISSION NO. 100:

European Patent EP 0 828 663 was issued by the European Patent Office on December 22, 1999.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 101:

On August 31, 2000, Rexam's predecessor entity, American National Can Company, filed an opposition in the European Patent Office to European Patent EP 0 828 663.

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 102:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company provided the European Patent Office with a copy of U.S. Patent No. 4,217,843 (Kraska 8/1980).

## ANSWER:

Admitted.

## REQUEST TOR ADMISSION NO. 103:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company provided the European Patent Office with a copy of Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 104:

During its opposition to European Patent EP 0 828 663, Rexam/American National Can Company argued to the European Patent Office that the inventions claimed in European Patent EP 0 828 663 were not patentable over, among other references, U.S. Patent No. 4,217,843 (Kraska 8/1980) and Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

### ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 105:

After oral proceedings held on March 18, 2003, the European Patent Office's Opposition Division upheld the patentability of European Patent EP 0 828 663, as amended, over Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) and U.S. Patent No. 4,217,843 (Kraska 8/1980), issuing a written decision to that effect on May 5, 2003.

### ANSWER:

Rexam admits that the European Patent Office's Opposition Division upheld the patentability of European Patent EP 0 828 663 but only after it was amended to narrow the claims.

## REQUEST FOR ADMISSION NO. 106:

On June 30, 2003, Rexam appealed the May 5, 2003 decision of the European Patent Office's Opposition Division upholding the patentability of European Patent EP 0 828 663, as amended.

### ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO.107:

During its appeal of the Opposition Division's decision, Rexam presented the European Patent Office's Technical Board of Appeal with, among other references, U.S. Patent No. 4,217,843 (Kraska 8/1980) and Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982).

### ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 108:

After oral proceedings held on February 10, 2005, the European Patent Office's Technical Board of Appeal upheld the patentability of European Patent EP 0 828 663, as amended, over Japanese Unexamined Utility Model Publication No. JP 57-117323 (Toyo Seikan 7/1982) and U.S. Patent No. 4,217,843 (Kraska 8/1980), issuing a written decision to that effect on February 10, 2005.

## ANSWER:

Rexam admits that the European Patent Office's Technical Board of Appeal upheld the

patentability of European Patent EP 0 828 663 but only after it was amended to narrow the

claims.

## REQUEST FOR ADMISSION NO. 109:

Metal Container Corporation, or "MCC," is a wholly-owned subsidiary of Anheuser-Busch Companies, Inc.

## ANSWER:

Rexam objects to this request as nor relevant to any claim or defense in this action.

## REQUEST FOR ADMISSION NO. 110:

MCC participated in the development of a can end known as the "LOF."

## ANSWER:

Rexam objects to this request as not relevant to any claims or defenses in this action.

## REQUEST FOR ADMISSION NO. 111:

MCC and Ball participated in the development of a can end known as "LOF+"

## ANSWER:

Rexam objects to this request as not relevant to any claims or defenses in this action.

## REQUEST FOR ADMISSION NO. 112:

On March 24, 2003, Anheuser-Busch and Metal Container Corporation filed a lawsuit in the District Court for the Western District of Wisconsin against Crown Cork & Seal Company USA, Inc. and Crown Cork & Seal Technologies Corporation, seeking a declaratory judgment that the LOF and LOF+ can ends did not infringe U.S. Patent No. 6,065,634, and that U.S. Patent No. 6,065,634 is invalid.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 113:**

In the Anheuser-Busch Litigation, on August 13, 2003, Crown Cork & Seal Company USA, Inc. and Crown Cork & Seal Technologies Corporation filed counterclaims against MCC and Anheuser-Busch, setting forth allegations of antitrust and unfair competition violations on the part of MCC, Anheuser-Busch, and Ball.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 114:**

In the Anheuser-Busch Litigation, on January 5, 2004, Crown Cork & Seal Technologies Corporation appealed to the Court of Appeals for the Federal Circuit the District Court for the Western District of Wisconsin's decision on summary judgment that Anheuser-Busch and MCC did not infringe U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 115:**

In the Anheuser-Busch Litigation, on December 23, 2004, the Court of Appeals for the Federal Circuit vacated the order of the District Court for the Western District of Wisconsin granting summary judgment of non-infringement of U.S. Patent No. 6,065,634.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

**REQUEST FOR ADMISSION NO. 116:**

Following the December 23, 2004 decision of the Court of Appeals for the Federal Circuit, Anheuser-Busch and MCC settled the Anheuser-Busch Litigation.

**ANSWER:**

Rexam objects to this request as not relevant to any claims or defenses in this action.

Further, Rexam is skeptical that less than all the parties to the Annheuser-Busch Litigation could settle that action as asserted by this request for admission.

### REQUEST FOR ADMISSION NO. 117:

The document bearing production numbers REX 043176 to REX 043222, marked in discovery as Defendant's Deposition Exhibit DDX 2, is a true, correct, authentic, and genuine copy of an intellectual property license agreement entered into between American National Can Company, Rexam's predecessor entity, and Belgium Tool and Die Co., also referred to as Belvac, effective March 19, 1993.

### ANSWER:

Admitted.

### REQUEST FOR ADMISSION NO. 118:

The document bearing production numbers BEL 000021 to BEL 000038, marked in discovery as Defendant's Deposition Exhibit DDX 3, is a true, correct, authentic, and genuine copy of a license agreement entered into between American National Can Company, Rexam's predecessor entity, and Belvac, effective April 17, 1994.

### ANSWER:

Admitted, except as to the handwritten notation at the top right corner of pge BEL000021.

### REQUEST FOR ADMISSION NO. 119:

The document bearing production numbers BEL 000106 to BEL 000108, marked in discovery as Defendant's Deposition Exhibit DDX 18, is a true, correct, authentic, and genuine copy of a record prepared by Belvac showing Crown's historical purchases of necker/reformer equipment from Belvac between 1990 and 2005. (*See* Transcript of 30(b)(6) Deposition of Belvac Production Machinery, Inc. 6/7/2006, at 120:18-123:11).

### ANSWER:

Rexam admits that the document bearing production numbers BEL 000106 to BEL 000108 purports to be a copy of a record prepared by Belvac showing Crown's historical purchases of necker/reformer equipment from Belvac between 1990 and 2005. However, Rexam cannot verify that it is true, correct, authentic or genuine as it is not a Rexam document. Therefore, Rexam cannot admit or deny this request.

### REQUEST FOR ADMISSION NO. 120:

U.S. Patent 6,848,875 will expire on March 30, 2016.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 121:**

U.S. Patent 6,935,826 will expire on March 25, 2016.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 122:**

U.S. Patent 4,774,839 expired on October 4, 2005.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 123:**

In 1992, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 124:**

In 1993, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 125:**

In 1994, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 126:**

In 1995, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 127:**

In 1996, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 128:**

In 1997, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 129:**

In 1998, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.


**REQUEST FOR ADMISSION NO. 130:**

In 1999, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 131:

In 2000, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 132:

In 2001, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMSSION NO. 133:

In 2002, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 134:

In 2003, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

## REQUEST FOR ADMISSION NO. 135:

In 2004, the only can body manufacturers against which Rexam competed in the United States were Crown, MCC, and Ball.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 136:**

As of 1993, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 137:**

As of 1994, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 138:**

As of 1995, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 139:**

As of 1996, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 140:**

As of 1997, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 141:**

As of 1998, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 142:**

As of 1999, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 143:**

As of 2000, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

Rexam objects to this request as vague. Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 144:**

As of 2001, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

    Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMTS5SION NO. 145:**

    As of 2002, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See. for example*, REX 22542 to REX 22547).

**ANSWER:**

    Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 146:**

    As of 2003, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

    Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 147:**

    As of 2004, Rexam was conducting analyses of competitors' cans, can bodies, and can ends. (*See, for example*, REX 22542 to REX 22547).

**ANSWER:**

    Rexam objects to this request as vague.  Rexam admits that it has periodically examined some features of some cans made by some competitors and has done so for many years.

**REQUEST FOR ADMISSION NO. 148:**

    Antonio Caleffi, an inventor named on U.S. Patent No. 4,774,839, is deceased.

**ANSWER:**

    Admitted.

**REQUEST FOR ADMISSION NO.149:**

Edward S. Traczyk, an inventor named on U.S. Patent No. 4,774,839, is deceased.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 150:**

The tapered neck of an aluminum beverage can body formed using a smooth die necking method as claimed in U.S. Patent No. 4,774,839 will not have striations on the tapered neck, as such terms are used in Rexam's Response and Supplemental Response to Crown's Amended Interrogatory No. 7.

**ANSWER:**

Rexam admits that a tapered neck of an aluminum beverage can body formed exclusively using a smooth die necking method as claimed in U.S. Patent No. 4,774,839 will not have striations on the tapered neck, as such terms are used in Rexam's Response and Supplemental Response to Crown's Amended Interrogatory No. 7.

**REQUEST FOR ADMISSION NO. 151:**

The tapered neck of an aluminum beverage can body formed using a smooth die necking method has a different appearance than the tapered neck of an aluminum beverage can body formed using a spin necking method.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO. 152:**

The tapered neck of an aluminum beverage can body formed using a smooth die necking method has a different appearance than the tapered neck of an aluminum beverage can body formed using a bump necking method.

**ANSWER:**

Rexam objects to the term "bump necking" as vague and undefined. As Rexam understands that term, admitted.

### REQUEST FOR ADMISSION NO. 153:

Since 1985, there has been only one smooth die necking method for forming a tapered neck of an aluminum beverage can body.

### ANSWER:

Rexam does not know all smooth die necking methods used by every manufacturer and therefore cannot admit or deny this request.

### REQUEST FOR ADMISSION NO. 154:

By the end of 1992, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

### ANSWER:

Denied.

### REQUEST FOR ADMISSION NO. 155:

By the end of 1993, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

### ANSWER:

Denied.

### REQUEST FOR ADMISSION NO. 156:

By the end of 1994, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

### ANSWER:

Denied.

### REQUEST FOR ADMISSION NO. 157:

By the end of 1995, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked in portion.

### ANSWER:

Denied.

### REQUEST FOR ADMISSION NO. 158:

By the end of 1996, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

### ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 159:

By the end of 1997, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 160:

By the end of 1998, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 161:

By the end of 1999, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 162:

By the end of 2000, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 163:

By the end of 2001, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 164:

By the end of 2002, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 165:

By the end of 2003, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 166:

By the end of 2004, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with a smooth necked-in portion.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 167:

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" in any way.

## ANSWER:

Rexam objects to this request as vague for not specifying the configurations of the two cans for which it seeks an admission.   Rexam is not required to respond to a request containing vague and ambiguous statements.  *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice* § 36.10[6] (3d ed. 1997)   Rexam admits that reforming the bottom of an aluminum beverage container by the method claimed in claim 17 of U.S. Patent No. 5,222,385 changes the appearance of the reformed portion of the bottom.

## REQUEST FOR ADMISSION NO. 168:

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" in any way.

## ANSWER:

Rexam objects to this request as vague for not specifying the configurations of the two cans that it seeks an admission for.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D.

100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§

36.10[6] (3d ed. 1997)  Rexam admits that reforming the bottom of an aluminum beverage

container by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 changes

the appearance of the reformed portion of the bottom.

## REQUEST FOR ADMISSION NO. 169:

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" by that method.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by

the method claimed" are not defined.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D.

100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§

36.10[6] (3d ed. 1997).  Rexam further objects to this request as premature to the extent these

terms are understood in the context of the claims- either as claim terms or analogues- because no

claim construction determination has been made by the Court. *Id*.  Rexam further objects to this

request as unanswerably vague for failing to specify the configuration of the aluminum beverage

container that has not been "reformed" by the method of claim 17 of U.S. Patent No. 5,222,385.

## REQUEST FOR ADMISSION NO. 170:

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of an aluminum beverage container that has not been "reformed" by that method.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by

the method claimed" are not defined.  Rexam is not required to respond to a request containing

vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request as unanswerably vague for failing to specify the configuration of the aluminum beverage container that has not been "reformed" by the method of claims 11, 12, and 17 of U.S. Patent No. 5,697,242.

### REQUEST FOR ADMISSION NO. 171:

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 is different in appearance than the bottom of an aluminum beverage container subjected to an external bottom reforming process.

### ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

### REQUEST FOR ADMISSION NO. 172:

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 is different in appearance than the bottom of an aluminum beverage container subjected to an external bottom reforming process.

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

## REQUEST FOR ADMISSION NO. 173:

The bottom of an aluminum beverage container "reformed" by the method claimed in claim 17 of U.S. Patent No. 5,222,385 will be different in appearance than the bottom of an aluminum beverage container, identical to the aforementioned container in every other respect, that has been "reformed" through a process in which a "reforming roller" is brought into engagement with the container bottom's external wall opposite its "substantially longitudinal wall."

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed", "reforming roller" and "substantially longitudinal wall" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice*§ 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

## REQUEST FOR ADMISSION NO. 174:

The bottom of an aluminum beverage container "reformed" by the method claimed in claims 11, 12, and 17 of U.S. Patent No. 5,697,242 will be different in appearance than the bottom of an aluminum beverage container, identical to the aforementioned container in every other respect, that has been "reformed" through a process in which a "reforming roller" is brought into engagement with the container bottom's external wall opposite its "substantially longitudinal wall."

## ANSWER:

Rexam objects to this request as vague and ambiguous because the terms "reformed by the method claimed", "reforming roller" and "substantially longitudinal wall" are not defined. Rexam is not required to respond to a request containing vague and ambiguous statements. *Tulip Computers Int'l v. Dell Computer Corp.*, 210 F.R.D. 100, 107-8 (D. Del. 2002) (citing 7 James Wm. Moore, et al. *Moore's Federal Practice* § 36.10[6] (3d ed. 1997). Rexam further objects to this request as premature to the extent these terms are understood in the context of the claims- either as claim terms or analogues- because no claim construction determination has been made by the Court. *Id.* Rexam further objects to this request unanswerably vague for failing to sufficiently specify the configurations of the two cans for which it seeks an admission.

## REQUEST FOR ADMISSION NO. 175:

By the end of 1992, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 176

By the end of 1993, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 177:

By the end of 1994, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 178:

By the end of 1995, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage cam bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 179:

By the end of 1996, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 180:

By the end of 1997, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 181:

By the end of 1998, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 182:

By the end of 1999, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 183:

By the end of 2000, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 184:

By the end of 2001, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 185:

By the end of 2002, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 186:

By the end of 2003, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 187:

By the end of 2004, Rexam was aware that Crown had purchased equipment from Belvac for the manufacture of aluminum beverage can bodies with "reformed" bottoms.

## ANSWER:

Denied.

## REQUEST FOR ADMISSION NO. 188:

By the end of 1996, Rexam was aware that Belvac was manufacturing and selling equipment for internal base reforming of can bottoms.

## ANSWER:

Admitted.

**REQUEST FOR ADMISSION NO. 189:**

By the end of 1996, Rexam had accused Belvac of infringement of U.S. Patent No. 5,222,385 based on Belvac's manufacture and sale of equipment for internal base reforming of can bottoms.

**ANSWER:**

Denied.

**REQUEST FOR ADMISSION NO.190:**

Prior to the filing of this Action, Rexam had never informed Belvac of the existence of U.S. Patent No. 5,697,242.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 191:**

Effective April 17, 1994, Belvac and American National Can Company, Rexam's predecessor entity, entered into a license agreement relating to U.S. Patent No. 4,774,839, (*See* 1994 License Agreement).

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 192:**

Rexam succeeded to all rights, privileges, and liabilities of its predecessor entity, American National Can Company, under the 1994 License Agreement.

**ANSWER:**

Admitted.

**REQUEST FOR ADMISSION NO. 193:**

Under the 1994 License Agreement, Belvac was licensed to manufacture and sell container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 1.4, 3.1).

**ANSWER:**

Rexam objects to this request as vague for not accurately setting out the terms and

conditions of the Agreement to which this request is directed. Rexam admits that limited rights

were granted to Belvac by the 1994 License Agreement, but denies that those rights are accurately stated by this request.

## REQUEST FOR ADMISSION NO. 194:

Under the 1994 License Agreement, Belvac was licensed to manufacture and sell tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 1.3, 3.1).

## ANSWER:

Rexam objects to this request as vague for not accurately setting out the terms and conditions of the Agreement to which this request is directed. Rexam admits that limited rights were granted to Belvac by the 1994 License Agreement, but denies that those rights are accurately stated by this request.

## RESIUEST FOR ADMISSION NO. 195:

Under the 1994 License Agreement, Belvac was obligated to pay certain royalties to Rexam for the license to manufacture and sell container necking equipment and tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839. (*See* 1994 License Agreement, §§ 4.1-4.3).

## ANSWER:

Rexam objects to this request as vague for not accurately setting out the terms and conditions of the Agreement to which this request is directed. Rexam admits that limited rights were granted to Belvac by the 1994 License Agreement, and that Belvac was obligated to pay royalties for exercising those rights. Rexam denies that those rights are accurately stated by this request.

## REQUEST FOR ADMISSION NO. 196:

The term of the 1994 License Agreement expired on October 4, 2005. (*See* 1994 License Agreement, § 12.1).

## ANSWER:

Admitted.

## REQUEST FOR ADMISSION NO. 197:

Belvac has paid to Rexam all royalties due under the 1994 License Agreement.

## ANSWER:

Rexam does not have information as to Belvac's activities that triggered royalty

obligations and therefore cannot admit or deny this request.


## REQUEST FOR ADMISSION NO. 198:

Belvac has paid to Rexam $2,434,000 in royalties under the terms of the 1994 License Agreement. (*See* Transcript of Rule 30(b)(6) Deposition of Terry Babbit 6/7/2006, at 138:1622).

## ANSWER:

Rexam admits that Terry Babbit of Belvac said that Belvac paid Rexam $2,434,000

during his deposition. Rexam's records do not sufficiently identify payments from Belvac to

determine the amount that Belvac paid under the 1994 License Agreement so Rexam cannot

admit or deny the requested matter.


## REQUEST FOR ADMISSION NO. 199:

Under the 1994 License Agreement, Belvac was not obligated to affix notices or labels comprising the word "patent" or the abbreviation "pat.," together with the number of U.S. Patent No. 4,774,839, on container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

## ANSWER:

Admitted, because Belvac was authorized to manufacture machinery that could perform

the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture

machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License

Agreement.


## REQUEST FOR ADMISSION NO. 200:

Under the 1994 License Agreement, Belvac was not obligated to affix notices or labels comprising the word "patent" or the abbreviation "pat.," together with the number of U.S. Patent

No. 4,774,839, on tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 201:**

Under the 1994 License Agreement, Belvac was not obligated to mark, within the meaning of 35 U.S.C. § 287, container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 202:**

Under the 1994 License Agreement, Belvac was not obligated to mark, within the meaning of 35 U.S.C. § 287, tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers.

**ANSWER:**

Admitted, because Belvac was authorized to manufacture machinery that could perform the methods patented by U.S. Patent No. 4,774,839, but Belvac not authorized to manufacture machinery that is patented by U.S. Patent No. 4,774,839. See Section 1.1 of the 1994 License Agreement.

**REQUEST FOR ADMISSION NO. 203:**

With respect to all or substantially all container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005, Belvac failed to affix notices or labels comprising the word "patent" or the "abbreviation pat.," together with the number of U.S. Patent No. 4,774,839.

**ANSWER:**

The information that would establish whether the matter set out by this request for

admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam

can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 204:**

With respect to all or substantially all tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005, Belvac failed to affix notices or labels comprising the word "patent" or the "abbreviation pat.," together with the number of U.S. Patent No. 4,774,839.

**ANSWER:**

The information that would establish whether the matter set out by this request for

admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam

can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 205:**

Belvac failed to mark, within the meaning of 35 U.S.C. § 287, all or substantially all container necking equipment that included tooling for performing smooth die necking within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005.

**ANSWER:**

The information that would establish whether the matter set out by this request for

admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam

can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 206:**

Belvac failed to mark, within the meaning of 35 U.S.C. § 287, all or substantially all tooling for performing a smooth die necking operation within the scope of claims 1-31 of U.S. Patent No. 4,774,839 that Belvac sold to its customers through October 4, 2005.

**ANSWER:**

The information that would establish whether the matter set out by this request for admission is accurate are not in Rexam's possession nor reasonably available to Rexam. Rexam can therefore neither admit nor deny the matter requested.

**REQUEST FOR ADMISSION NO. 207:**

SuperEnd does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd." Rexam is not asserting that the Crown ends produced in this action having production nos. ccs29433A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

**REQUEST FOR ADMISSION NO. 208:**

SuperEnd SP does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd SP." Rexam is not asserting that the Crown ends produced in this action having production nos. CCS0029435A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

**REQUEST FOR ADMISSION NO. 209:**

SuperEnd DA does not infringe the claims of U.S. Patents Nos. 6,129,230 and 6,260,728.

**ANSWER:**

Rexam objects to this request as vague for failing to define "SuperEnd DA." Rexam is not asserting that the Crown ends produced in this action having production nos. CCS0029432A-R infringe U.S. Patents Nos. 6,129,230 and 6,260,728.

## REQUEST FOR ADMISSION NO. 210:

Unexamined Japanese Patent Publication No. H 09-142467 was published on June 3, 1997.

## ANSWER:

Admitted.

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
312-775-8000

Dated: November 17, 2006

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant/Counterclaimant*
*Rexam Beverage Can Co.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2006, true and correct copies of the foregoing were

caused to be served on counsel of record at the addresses and in the manner indicated below:

**VIA ELECTRONIC MAIL**
**AND HAND DELIVERY**
Barry M. Klayman
bklayman@wolfblock.com
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market Street, Suite 1001
Wilmington, DE  19801

**VIA FACSIMILE**
Dale M. Heist
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

**VIA ELECTRONIC MAIL**
Chad E. Ziegler
ziegler@woodcock.com
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

Anne Shea Gaza (#4093)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY,           )
INC., Plaintiff, and CROWN CORK & SEAL )
USA, INC.,                             )
                                       )
    Plaintiff and Counterclaim Defendant,  )
                                       )
v.                                     )   Civil Action No. 05-608 (MPT)
                                       )
REXAM BEVERAGE CAN CO.,                )
                                       )
    Defendant Counterclaimant.         )

## NOTICE OF SERVICE

PLEASE TAKE NOTICE that on November 17, 2006, counsel for defendant counterclaimant served copies of Defendant/Counterclaimant Rexam Beverage Can Company's Responses to Crown Technology's and Crown USA's Second Set of Requests for Admissions (Nos. 52-210) upon the following counsel of record in the manner indicated below:

**VIA ELECTRONIC MAIL**
**& HAND DELIVERY**
Barry M. Klayman
bklayman@wolfblock.com
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market Street
Suite 1001
Wilmington, DE   19801

**VIA FACSIMILE**
Dale M. Heist
Woodcock Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

**VIA ELECTRONIC MAIL**
Chad E. Ziegler
ziegler@woodcock.com
Woodcook Washburn LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
312-775-8000

Dated:  November 17, 2006

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Defendant/Counterclaimant
Rexam Beverage Can Co.*

2

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2006, I caused to be served by hand delivery and

electronic mail the foregoing document and electronically filed the same with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>   and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on November 17, 2006,  I caused to be sent in the manner indicated

below the foregoing document to the following non-registered participants:

| **VIA FACSIMILE** | **VIA ELECTRONIC MAIL** |
|---|---|
| Dale M. Heist, Esq. | Chad E. Ziegler, Esq. |
| Woodcock Washburn LLP | ziegler@woodcock.com |
| One Liberty Place, 46th Floor | Woodcock Washburn LLP |
| Philadelphia, PA 19103 | One Liberty Place, 46th Floor |
| | Philadelphia, PA 19103 |

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Exhibit 25

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

# Exhibit 26

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

Exhibit 27

# - CONFIDENTIAL - Subject to Protective Order Filed Under Seal