# Exhibit 43



Exhibit 83

# Exhibit 44

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

Exhibit 45

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 46

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

# Exhibit 47

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

# Exhibit 48

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 49

# - CONFIDENTIAL -
# Subject to
# Protective Order
# Filed Under Seal

Exhibit 50

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 51

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

Exhibit 52

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit 53

- CONFIDENTIAL -
Subject to
Protective Order
Filed Under Seal

# Exhibit A

2006 U.S. Dist. LEXIS 87660, *

LEXSEE 2006 U.S. DIST. LEXIS 87660



Analysis
As of: Jan 22, 2007

### INLINE CONNECTION CORPORATION, BROADBAND TECHNOLOGY INNOVATIONS, LLC, AND PIE SQUARED, LLC, Plaintiffs, v. AOL TIME WARNER INCORPORATED, et al., Defendants. INLINE CONNECTION CORPORATION, BROADBAND TECHNOLOGY INNOVATIONS, LLC, AND PIE SQUARED, LLC, Plaintiffs, v. EARTHLINK, INC., Defendant.

### C. A. No. 02-272-MPT, C. A. No. 02-477-MPT

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *2006 U.S. Dist. LEXIS 87660*

### December 5, 2006, Decided

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Inline Connection Corp. v. AOL Time Warner, Inc., 2007 U.S. Dist. LEXIS 756 (D. Del., Jan. 8, 2007)*

**PRIOR HISTORY:**  *Inline Connection Corp. v. AOL Time Warner, Inc., 2006 U.S. Dist. LEXIS 72724 (D. Del., Oct. 5, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendants, internet service providers (ISP), and alleged infringement of three patents. The ISPs jointly filed a motion for partial summary judgment of limitation of damages pursuant to *35 U.S.C.S. § 287(a)* for failure to mark. In its opinion, the court addressed the motion on limitation of damages under § 287(a) regarding one patent at issue.

**OVERVIEW:** The ISPs argued that the holder was precluded from recovering damages for any alleged infringement which occurred prior to the dates on which the holder provided actual notice by filing suit. Specifically, the ISPs claimed that the holder and/or its licensee sold or offered to sell the patented system without proper marking before the filing of the lawsuits. Therefore, the notice requirements set forth by *35 U.S.C.S. § 287(a)* were not satisfied. The holder's position was that it never sold products embodying the patent after the patent issued and therefore, it did not have a duty to mark. The holder pointed to a licensing agreement as evidence of its intent to abandon the

part of its business covered by the patent. Under the agreement, however, the preclusive effect of §
287(a) was triggered because the licensee was still authorized as a nonexclusive licensee to sell
products and systems covered by the patents. The court held that the holder was not entitled to dam-
ages until the date on which actual notice of infringement was provided to the ISPs, because its li-
censee continued to sell and offer for sale, services and products embodying the patent after that
patent issued.

**OUTCOME:** The ISPs' joint motion for partial summary judgment limiting damages pursuant to
*35 U.S.C.S. § 287(a)* was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN1] Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and
admissions on file, together with affidavits, if any, show that there is no genuine issue as to any ma-
terial fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*.
This standard also applies to patent cases.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN2] The party seeking summary judgment bears the initial burden of establishing the lack of a
genuinely disputed material fact by demonstrating that there is an absence of evidence to support
the nonmoving party's case. Summary judgment is appropriate when there is no genuine issue of
material fact or, when drawing all factual inferences in favor of the nonmoving party, no reasonable
jury could return a verdict for the nonmoving party. The court is to give the non-moving party the
benefit of all justifiable inferences and must resolve disputed issues of fact in favor of the non-
movant. If the non-moving party fails to make a sufficient showing on an essential element of its
case on which it has the burden of proof, summary judgment is appropriate.

*Patent Law > Infringement Actions > Defenses > Marking*
*Patent Law > Remedies > Damages > General Overview*
[HN3] As a general matter, patentees must comply with the marking statute in order to recover
damages for infringement. *35 U.S.C.S. § 287(a)* provides as follows: patentees, and persons mak-
ing, offering for sale, or selling within the United States any patented article for or under them may
give notice to the public that the same is patented by fixing thereon the word "patent" or the abbre-
viation "pat.," together with the number of the patent, or when, from the character of the article, this
can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label
containing a like notice. In the event of failure to do so, no damages shall be recovered by the pat-
entee in any action for infringement, except on proof that the infringer was notified of the infringe-
ment and continued to infringe thereafter, in which event damages may be recovered only for in-
fringement occurring after such notice. Filing of an action for infringement shall constitute such no-
tice.

*Patent Law > Infringement Actions > Defenses > Marking*

[HN4] *35 U.S.C.S. § 287(b)(5)(a)* further defines "notice of infringement" as actual knowledge, or receipt by a person of a written notification, or a combination thereof, or information sufficient to persuade a reasonable person that it is likely that a product is made by a process patented in the United States.

*Patent Law > Infringement Actions > Defenses > Marking*
*Patent Law > Remedies > Damages > Time Limitations*

[HN5] A patentee is entitled to damages from the time when it either began marking products in compliance with *35 U.S.C.S. § 287(a)*, or when it notified the infringer through actual notice, whichever is earlier. Section 287(a) permits either constructive notice, where the patentee marks the article or product with the patent number, or actual notice. Actual notice is an affirmative communication by the patentee of a specific charge of infringement against an accused product, device or process.

**COUNSEL:** [*1] Thomas C. Grimm, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Of Counsel: Ky E. Kirby, Esquire, and C. Joel Van Over, Esquire, Bingham McCutchen LLP, Washington, D.C., James B. Lewis, Esquire, Binghan McCutchen LLP, Palo Alto, CA, Donn P. Pickett, Esquire, Bingham McCutchen LLP, San Francisco, California; Counsel for Plaintiffs Inline Connection Corporation, Broadband Technology Innovations, LLC and Pie Squared, LLC.

Frederick L. Cottrell, III, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Kelly E. Farnan, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Robert J. Gunther, Jr., Esquire and Kurt M. Rogers, Esquire, Latham & Watkins LLP, New York, New York, David A. Nelson, Esquire, Latham & Watkins LLP, Chicago, Illinois; Counsel for Defendant America Online, Inc.

Gary W. Lipkin, Esquire, Duane Morris LLP, Wilmington, Delaware. Of Counsel: L. Norwood Jameson, Esquire and Matthew C. Gaudet, Esquire, Duane Morris LLP, Atlanta, Georgia, Mark Comtois, Esquire, Duane Morris LLP, Washington, D.C.; Counsel for Defendant EarthLink, Inc.

**JUDGES:** Mary Pat Thynge, UNITED STATES MAGISTRATE JUDGE. [*2]

**OPINION BY:** Mary Pat Thynge

**OPINION:**

   Consolidated Cases

   **MEMORANDUM OPINION**

December 5, 2006

**Thynge, U.S. Magistrate Judge**

## I. INTRODUCTION

In this patent infringement case, Inline Communication Corporation n1 ("Inline") sued America Online Inc. ("AOL") on April 12, 2002, and EarthLink, Inc. ("EarthLink") on June 4, 2002, alleging infringement of *U.S. Patent Nos. 5,844,596* ("the *'596 patent*"), 6,243,446 ("the '446 patent"), and 6,236,718 ("the '718 patent"). n2

> n1 Inline initially sued AOL and Earthlink. Since the original filing of the complaints, other plaintiffs have been added because of their contractual relationships with Inline. For ease of reference, all plaintiffs shall be referred to as Inline.

> n2 Inline's *U.S. Patent No. 6,542,585* ("the *'585 patent*") was subsequently added to the litigation after it was issued in 2003. The '718 patent is no longer at issue in the litigation. Further, the subject matter of the current motions for summary judgment address damages only with respect to two of the three patents in suit: the *'596 patent* issued on December 1, 1998 and the '446 patent issued on June 5, 2001.

[*3]

On August 31, 2006, AOL and EarthLink jointly filed a motion for partial summary judgment of limitation of damages pursuant to *35 U.S.C. § 287(a)* for failure to mark and motions for partial summary judgment and *in limine* to preclude damages for customers provisioned through non-infringing central office ("CO") DSLAMS. n3 On September 20, 2006, Inline responded that 1) its expert's damages' methodology is supported by substantial evidence and therefore, any disagreement regarding appropriate methodologies is not properly determined on summary judgment, and 2) damages should not be limited under *§ 287(a)* because there is no product to mark, since Inline did not sell or license to self products or systems embodying the '446 patent after the June 5, 2001 issuance date. n4

> n3 D.I. 445 (Defendants' Joint Opening Brief in Support of Their Motion for Partial Summary Judgment Limiting Damages Pursuant to *35 U.S.C. § 287(a)*); D.I. 441 (Defendants' America Online, Inc.'s and EarthLink, Inc.'s Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned Through Non-Infringing Central Office DSLAMS).

[*4]

> n4 D.I. 473 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment Limiting Damages Pursuant to *35 U.S.C. § 287(a)*); D.I. 476 (Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Partial Summary Judgment and Motion *In Limine* Precluding Damages for Customers Provisioned Through Non-Infringing Central Office DSLAMS).

In this opinion, the court will only address the motion on limitation of damages under *§ 287(a)* regarding the '446 patent. Since the motion on preclusion of damages for non-infringing CO DSLAMS is intrinsically related to the motion *in limine* to exclude the expert testimony of James E. Malackowski, the court will address those matters in a later opinion.

## II. STANDARD OF REVIEW

[HN1] Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. Pro. 56(c)*. This standard [*5]  also applies to patent cases. *Johnston v. IVAC Corp., 885 F.2d 1574, 1576-77 (Fed. Cir. 1989)*. [HN2] The party seeking summary judgment bears the initial burden of establishing the lack of a genuinely disputed material fact by demonstrating that there is an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Summary judgment is appropriate when there is no genuine issue of material fact or, when drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The court is to give the non-moving party the benefit of all justifiable inferences and must resolve disputed issues of fact in favor of the non-movant. *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*. If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, summary judgment is appropriate. *Celotex, 477 U.S. at 323*.

## III. POSITION OF THE PARTIES

AOL and EarthLink [*6]  argue that Inline should be precluded from recovering damages for any alleged infringement which occurred prior to the dates on which Inline provided actual notice by filing suit on April 12, 2002 and June 4, 2002 respectively. Their primary argument is that Inline and/or its licensee, CAIS, n5 did not provide constructive notice of the '446 patent because it failed to mark any tangible components of the OverVoice system embodying the *'596* and '446 patents after they issued. n6 AOL and EarthLink argue that Inline and/or CAIS sold or offered to sell the patented OverVoice system without proper marking before the filing of the lawsuits; therefore, the notice requirements set forth by *35 U.S.C. Section 287(a)* were not satisfied. AOL and EarthLink also offer evidence that the OverVoice system contained physical components, such as wall jacks and filters, that could have been marked with the patent numbers. n7

N5 CAIS is also referred to as Ardent Communication, its successor during bankruptcy proceedings.

n6 The OverVoice system is covered by the *'596* and the '446 patents. *See* D.I. 443, Ex. F at 878:5-879:5 (Goodman.Dep. Tr. dated Mar. 21, 2003) (noting that the wall jack for the OverVoice system corresponds to the '446 patent). David Goodman is the owner of Inline and the inventor of the *'596* and '446 patents.

[*7]

n7 *See* D.I. 443, Ex. D, CAIS Prospectus (showing an image of a wall jack component of the OverVoice system).

Inline concedes that damages related to the *'596 patent* should begin on the dates on which the lawsuits were filed because it can not demonstrate "consistent and continuous" marking. n8 Inline asserts, that "[t]he same analysis, however, does not apply to the '446 patent." n9 Inline contends that damages for infringement of the '446 patent should begin on June 5, 2001, its issuance date, rather than from the filing of the actions, because there is no evidence after June 5, 2001 of any sales of products or systems that embody the '446 patent. Therefore, the requirements of *§ 287(a)* were not triggered and a duty to mark on the part of Inline or its licensee, CAIS, did not exist. n10

n8 In light of Inline's concession regarding the *'596 patent*, the court's focus on the marking issue will be directed to the '446 patent.

n9 D.I. 473 at 1.

n10 As discussed later herein, Inline licensed CAIS prior to the issuance of the '446 patent.

[*8]

## IV. ANALYSIS

[HN3] As a general matter, patentees must comply with the marking statute in order to recover damages for infringement. The statute provides as follows in pertinent part:

[p]atentees, and persons *making, offering for sale, or selling* within the United States any patented article for or under them . . . may give notice to the public that the same is patented by fixing thereon the word "patent" or the abbreviation "pat.," together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. *In the event of failure to do so,* no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice. n11 (emphasis added).

n11 [HN4] *35 USC § 287(b)(5)(A)* further defines "notice of infringement" as actual knowledge, or receipt by a person of a written notification, or a combination thereof, or information sufficient to persuade a reasonable person that it is likely that a product was made by a process patented in the United States.

[*9]

*35 U.S.C. § 287(a).* The purpose of the statute is threefold in that it gives patentees the incentive to mark their product and, thus, place the world on notice of the existence of a patent, avoids innocent infringement, and aids the public in identifying patented articles. *Nike, Inc. v. Wal-Mart Stores, Inc., 138 F.3d 1437, 1446 (Fed. Cir. 1998).* Consequently, [HN5] a patentee is entitled to damages from the time when it either began marking products in compliance with § 287(a), or when it notified the infringer through actual notice, whichever is earlier. *Am. Med. Sys., Inc., v. Med. Eng'g Corp., 6 F.3d 1523, 1537 (Fed. Cir. 1993). Section 287(a)* permits either constructive notice, where the patentee marks the article or product with the patent number, or actual notice. *Devices for Medicine, Inc. v. Boehl, 822 F.2d 1062 (Fed. Cir. 1987).* Actual notice is an affirmative communication by the patentee of a specific charge of infringement against an accused product, device or process. *Gart v. Logitech, Inc., 254 F.3d 1334, 1345 (Fed. Cir. 2001).*

At issue is whether Inline's failure to mark products [*10] embodying the '446 patent after the June 5, 2001 issuance date creates a genuine issue of material fact regarding period of time when AOL and EarthLink are potentially liable for damages under § 287(a). AOL and EarthLink contend that Inline's licensee, CAIS, sold unmarked products, which embodied the '446 patent, after the issuance date. According to AOL and EarthLink, absent evidence of continuous and consistent marking, notice was not provided until the filing of the lawsuits. Inline asserts that it did not sell or license products embodying the '446 patent after June 5, 2001. Inline supports its position by referring to the June 1, 2001 Termination/Nonexclusive License Agreement with CAIS. Although not entirely clear, Inline seems to argue that, because it was a "non-producing patentee," absent evidence of sales of products embodying the '446 patent after June 5, 2001, recordation of the patent in the USPTO satisfies the notice requirement under § 287(a). n12

    n12 In the case of a "non-producing patentee," § 287(a) does not preclude recovery of damages for the period of time when *no product covered by the patent is produced or sold. Tulip Computers Int'l B.V. v. Dell Computer Corp., 00-981-KAJ, 2003 U.S. Dist. LEXIS 5409, *50 (D. Del. Feb. 4, 2003), rev'd on other grounds, 262 F.Supp.2d 358 (D. Del. 2003).* Thus, recordation of a patent with the USPTO will serve as constructive notice of the patent's existence and § 287(a) will not limit damages. *Id. at *51. See also Wine Railway Appliance Co. v. Enterprise Ry. Equipment Co., 297 U.S. 387, 56 S. Ct. 528, 80 L. Ed. 736, 1936 Dec. Comm'r Pat. 657 (1936); Texas Digital Sys., Inc., v. Telegenix, Inc., 308 F.3d 1193 (Fed Cir. 2002)* (holding that constructive notice of a patent is presumed in the case of the non-producing patentee). As discussed herein, the court need not address whether Inline is a non-producing patentee for the purposes of § 287(a).

[*11]

Although Inline was neither required to mark nor have CAIS, its licensee, mark products or systems prior to the issuance of the '446 patent, Inline is not entitled to damages until the date on which actual notice of infringement was provided to AOL and EarthLink, because its licensee continued to sell and offer for sale, services and products embodying the '446 patent after that patent issued. Moreover, Inline authorized its licensee to continue sell systems covered by the '446 patent after it issued, as evidenced by the Termination/Nonexclusive License Agreement.

There can be no dispute that the '446 patent is a continuation of the *'596 patent*. *See U.S. Patent No. 6,243,446* B1 (related U.S. Application Data indicates that patent '446 is a "[c]ontinuation of . . . *Pat. No. 5,844,596*," (issued December 1, 1998.)). The *'596 patent* itself is a continuation of Pat. No. 5,010,399, which issued on April 23, 1991. As a result, the *'446 patent* is a progeny of the '399 patent.

The "Agreement for Cooperative Use of Communication Patents" executed in 1996 between Inline and CAIS ("1996 Agreement") granted CAIS exclusive intellectual property rights in the Twisted Pair Patents ("TWP").  [*12]  n13 The opening paragraph of the 1996 Agreement specifically states that Inline

> owns patents . . . describing new techniques for, among other things, communicating video and high data rate digital signals over twisted pair wires . . . (these patents are listed in Appendix I) which patents and applications, together with all presently existing and hereafter created inventions, improvements or ideas related thereto and all subsequent modifications, divisions, *continuations,* reissues, extensions . . . or *otherwise arising from such patents or applications* being collectively referred to [as] the "twisted pair patents" or "TWP patents. (emphasis added). n14

Appendix I of the 1996 Agreement lists those patents and patent applications which are encompassed by that paragraph. The first patent listed in the appendix is the '399 patent. Also contained in Appendix I are three pending applications filed on December 5, 1991, one of which is the *'596 patent* (entitled "Two-Way RF Communication at Points of Convergence of Wire Pairs from Separate Internal Telephone Networks"). Because the *'446 patent* is a continuation of the *'596 patent*, it falls within the broad language [*13]  of the 1996 Agreement which provides that the CAIS' license extended to later created continuations n15 and those *"otherwise arising from* such patents or applications." n16 On June 1, 2001, under the Termination/Nonexclusive License Agreement, CAIS' exclusive license was terminated. Contrary to Inline's position, that agreement did not end CAIS' right to sell products covered by the TWP patents. n17 Therefore, the *'446 patent* falls squarely within the purview of Termination/Nonexclusive License Agreement which continued after the issuance of the *'446 patent*.

> n13 D.I. 475, Ex. 1. The provisions of 1996 Agreement make it clear that CAIS purchased rights to the TWP patents and became Inline's exclusive licensee "to use, make, sub-license or sell on a world-wide basis . . . any technology covered by the TWP patents," along with the obligation to fully exploit the technology. *Id.* at 1, 4, 11.

> n14 *Id.*

> n15 That language includes presently existing inventions and "*hereafter created . . . continuations*" of those inventions. (emphasis added).

n16 *Id.* Section 2 of the 1996 Agreement also expressly grants to CAIS in its *sole and exclusive discretion* to use, as it determines necessary, desirable or appropriate, any technology covered by the TWP patents.

[*14]

n17 D.I. 492, Ex. JJ. In the Termination/Nonexclusive License Agreement, CAIS assigned and transferred all right, title, and interest in the TWP patents to Inline, for which CAIS was granted a nonexclusive license for only its hotel and other hospitality customers.

CAIS first installed the OverVoice system that embodied the *'596 patent* (and later the *'446 patent*) in 1997, which predates the issuance of either patent, in hotels and apartments in Arlington, Virginia. n18 No party disputes that the OverVoice system encompasses both patents. In fact, both sides rely on the testimony of Inline's President, David Goodman as proving that the OverVoice system is covered by the *'596* and *'446 patents*. n19

n18 *See* D.I. 445 at 3.

n19 *See* D.I. 443, Ex. F at 878:5-879:5

Inline's position is that it never sold products embodying the *'446 patent* after the patent issued and therefore, it did not have a duty to mark. In support [*15] of its position, Inline relies on § 20.03[7][c][i] of *Chisum on Patents,* which states, "[t]here is no duty to mark or give notice in lieu thereof if the patent owner neither sells *nor authorizes others* to sell articles covered by the patent." (emphasis added). Inline also points to the 2001 Termination/Nonexclusive License Agreement as evidence of its intent to "abandon the part of its business covered by" the *'446 patent*. n20 Although that agreement ended the 1996 Agreement, the preclusive effect of *§ 287(a)* is triggered because CAIS was still authorized as a nonexclusive licensee to sell or offer for sale products and systems covered by the TWP patents. Inline expressly granted CAIS a

non-exclusive fully paid-up perpetual right and license to make equipment and systems *embodying any inventions in the TWP patents,* to sell and offer for sale such equipment and systems to, and to use such equipment and systems, at hotels and hospitality facilities only. . . [it] shall further include the right and license to use any equipment and systems embodying the inventions claimed in the TWP patents, such use to be only in connection with the making of such equipment [*16] and systems . . . in, hotel and hospitality facilities. The right and license to CAIS shall extend *also to the hotel and facilities' owners, and their successors,* for their use of such equipment and systems at the hotel and hospital facilities. n21 (emphasis added).

The language above clearly demonstrates that CAIS continued as a licensee of Inline, whereby it was authorized to sell or offer for sale, without any obligation to mark, patented products and methods when a duty to mark existed under *§ 287(a)*. Therefore, Inline's inference that the 2001 Termination/Nonexclusive License Agreement ended its business relationship with CAIS is inaccurate. Moreover, the quoted language does not demonstrate its intent to "abandon" any business related to the *'446 patent*. Whether, as a result of that agreement, Inline received or continued to receive any payments, royalties or other compensation is irrelevant. It is the right to make, sell, offer for sale or publically use the patented article that triggers the obligation to mark.

n20 *See* D.I. 473 at 2.

n21 *See* D.I. 492, Ex. JJ at Section 3.

[*17]

The remaining dispositive issue is whether CAIS produced, sold, or offered for sale, products or methods covered by the *'446 patent* without proper marking after June 5, 2001. On that issue, the court concludes that CAIS did, in fact, sell and offer to sell the OverVoice system to customers after June 5, 2001.

In support of their position, AOL and EarthLink contend that the bankruptcy court proceedings involving CAIS and several Hilton Hotels demonstrate that CAIS sold the OverVoice system after June 5, 2001. In 1998, CAIS executed a Master License Agreement with the Hilton Hotels Corporation ("HHC") to provide high speed internet access to hotel guests. n22 Under the agreement, CAIS provided high speed data communications service for use with computer equipment "to access the public Internet through dedicated . . . telecommunication lines." Further, CAIS, at its expense, was to install, maintain, operate, repair, upgrade, replace and construct necessary improvements, which included connections for power and telephone lines, for the equipment and service. Each hotel was to pay CAIS usage fees on a monthly basis." n23 On October 10, 2001, Ardent Communications (successor to CAIS) filed [*18] a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. n24 Following those proceedings, CAIS/Ardent sued multiple Hilton entities for failure to remit the proper amount of usage fees between 1999 and October 2002. n25

n22 The Master License Agreement was executed approximately three years before the 2001 Termination/Nonexclusive License Agreement between Inline and CAIS.

n23 D.I. 492, Ex. KK at 4.

n24 D.I. 492, Ex. KK at 5.

n25 In February 2004, Ardent brought suit against 6 Hilton entities for collection of fees allegedly owed by each defendant under the Master License Agreement.

Contrary to Inline's argument that the various Hilton entities used the OverVoice systems on an unlicensed basis, there is ample evidence which shows that such use was authorized. As noted previously herein, the Master License Agreement authorizes use of the system installed by CAIS/Ardent. There is no evidence presented that the agreement was terminated by either HHC or CAIS/Ardent either shortly after [*19]  the Termination/Nonexclusivity License Agreement between Inline and Cais or shortly after the issuance of the *446 patent*. Further, in its itemization of damages against one HHC entity, CAIS/Ardent lists the amount of $ 18,954.32 as damages for guest room use in 2001 and estimated damages of $ 13,241.40 for such use between March 1, 2002 and October 8, 2002. n26 Against another hotel, CAIS/Ardent claims damages in the amount of $ 51,041.46 for use occurring between August 2000 and July 2001 and estimated damages of $ 68,943.42 from August 2001 to October 2002. n27 Clearly, CAIS/Ardent is relying on the Master Licensing Agreement with HHC in support of its adversary action for non-payment of usage fees. The fact that CAIS/Ardent entered an agreement with HHC authorizing it to use the OverVoice system for internet services and subsequently sued HHC entities on that agreement for failure to pay, refutes Inline's argument that HHC's activities were somehow unauthorized. Whether certain HHC entities failed to properly pay for that usage goes to the issue of contractual damages, not authorized use. There is no evidence that Inline has objected to or intervened for infringement or unauthorized [*20]  use in the CAIS/Ardent actions against HHC entities. There is no evidence that Inline has sued those entities or CAIS/Ardent for infringement or unauthorized use. There has been no suggestion that Inline objected to CAIS/Ardent's right to pursue its claims against the HHC entities. Such conduct shows that CAIS/Ardent had a limited right to sell products and methods covered by the *446 patent*. Moreover, CAIS/Ardent sued for usage fees incurred *after* June 5, 2001 which confirms, that it offered and provided services embodied by the *446 patent* after its issuance date.

n26 D.I. 492, Ex. KK at 13 (Itemization of Plaintiff's [Ardent] Damages). Those figures are damages calculated against the defendant, San Francisco Hilton, Inc.

n27 D.I. 492, Ex. KK. Those figures are damages calculated against the defendant, FC 42 Hotel, LLC.

All parties acknowledge that the OverVoice system is covered by the *596* and *446 patents*. n28 Inline suggests that CAIS' sale of a service, the highspeed internet, is not a "product"  [*21]  for purposes of *§ 287(a)*; rather, it contends that CAIS was merely selling or offering to sell internet access through "previously installed" OverVoice systems. This argument fails. The Federal Circuit has consistently held that "where there are both product and method claims being claimed infringed, the patentee must mark the product" pursuant to *§ 287(a)* in order to recover damages. n29 Therefore, Inline's failure to require CAIS to mark components of the OverVoice system, specifically the wall jack, after the *446 patent* issued precludes it from recovering pre-litigation damages.

n28 D.I. 443, Ex. F. In his deposition testimony, Goodman acknowledges that the wall jack for the OverVoice system is covered by the *596* and *446 patents*. Goodman also admits that, although the wall jack is only "one component of the OverVoice System," it "in its totality . . . embodies the teachings of [the '596 and '446] patents."

n29 *See American Med. Sys., Inc. v. Medical Eng'g Corp., 6 F.3d 1523, 1538-1539 (Fed. Cir. 1993)*("To the extent that there is a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of *section 287(a)*."); *see also IMX, Inc. v. Lendingtree, LLC, No. 03-1067-SLR, 2005 U.S. Dist. LEXIS 33179 (D. Del. Dec. 14, 2005)* (holding that "where there is a tangible item to mark by which notice of the asserted patent can be given" a party is required to do so in order to satisfy the requirements of *§ 287(a)*).

[*22]

Since there is no genuine issue of material fact, AOL and EarthLink's motion to for partial summary judgment limiting damages pursuant to *35 U.S.C. § 287(a)* is granted.

### ORDER

IT IS ORDERED, ADJUDGED AND DECREED that consistent with the Memorandum Opinion of December 5, 2006, Defendants' Joint Motion for Partial Summary Judgment Limiting Damages pursuant to *35 U.S.C. § 287(a)* (D.I. 442) is GRANTED.

/s/ Mary Pat Thynge

UNITED STATES MAGISTRATE JUDGE

# Exhibit B

LEXSEE 2006 U.S. DIST. LEXIS 91748

**BARRY W. THOMAS, Plaintiff, v. ECHOSTAR SATELLITE L.L.C. et al., Defendants. BARRY W. THOMAS, Plaintiff, v. DIRECTV, INC. et al., Defendants.**

**3:05CV494, 3:05CV496**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION**

*2006 U.S. Dist. LEXIS 91748*

**December 19, 2006, Signed**

**COUNSEL:** [*1] For Barry W. Thomas, Plaintiff: James M. Harrington, LEAD ATTORNEY, The Harrington Practice PLLC, Charlotte, NC.

For Echostar Satellite L.L.C., a Colorado limited liability company, Echostar Technologies Corporation, a Texas corporation, Defendants: James M Heintz, LEAD ATTORNEY, DLA Piper US LLP, DLA Piper, Washington, DC; Larry Stephen McDevitt, LEAD ATTORNEY, Van Winkle, Buck, Wall, Starnes and Davis, P.A., Asheville, NC; Phillip L. Cohan, LEAD ATTORNEY, DLA Piper Rodnick Gray Cary US LLP, San Francisco, CA.

For Echostar Satellite L.L.C., a Colorado limited liability company, Counter Claimant: James M Heintz, LEAD ATTORNEY, DLA Piper US LLP, DLA Piper, Washington, DC; Phillip L. Cohan, LEAD ATTORNEY, DLA Piper Rodnick Gray Cary US LLP, San Francisco, CA.

For Barry W. Thomas, Counter Defendant: James M. Harrington, LEAD ATTORNEY, The Harrington Practice PLLC, Charlotte, NC.

For Directv, Inc., a California corporation, Defendant: Irving M. Brenner, LEAD ATTORNEY, Helms, Mulliss & Wicker, PLLC, Charlotte, NC; Paul Edward Torchia, LEAD ATTORNEY, Steven J Rizzi, Esq., LEAD ATTORNEY, Weil, Gotshal & Manges LLP, New York, NY.

For National Rural Telecommunications [*2] Cooperative, a District of Columbia cooperative association, Defendant: Christopher L. Wanger, LEAD ATTORNEY, Jeffrey J. Lokey, LEAD ATTORNEY, Manatt Phelps & Phillips LLP, Palo Alto, CA; Irving M. Brenner, LEAD ATTORNEY, Helms, Mulliss & Wicker, PLLC, Charlotte, NC; Robert D. Becker, LEAD ATTORNEY, Stephen M. Ryan, LEAD ATTORNEY, Manatt, Phelps & Phillips, LLP, Washington, DC.

For National Rural Telecommunications Cooperative, a District of Columbia cooperative association, Counter Claimant: Christopher L. Wanger, LEAD ATTORNEY, Jeffrey J. Lokey, LEAD ATTORNEY, Manatt Phelps & Phillips LLP, Palo Alto, CA.

**JUDGES:** Robert J. Conrad, Jr., Chief United States District Judge.

**OPINION BY:** Robert J. Conrad, Jr.

**OPINION:**

### ORDER

### INTRODUCTION

These are two related patent infringement actions. Plaintiff Barry Thomas is the sole named inventor of the now expired *United States Patent No. 4,777,354* ("the *'354 patent*"), entitled "System for Controlling the Supply of Utility Services to Consumers." The *'354 patent* was filed on January 27, 1986, and issued on October 11, 1988. It expired on January 27, 2006. In November 2005, Thomas filed separate complaints against Defendants Echostar and [*3] DIRECTV, alleging that each infringed, induced infringement, and contributorily infringed the *'354 patent* by offering for sale, manufacturing, and/or selling satellite television receiving equipment that is covered by the patented invention. The defendants each answered the complaints by denying the allegations, and asserting various affirmative defenses and counterclaims for declaratory relief. The Court has jurisdiction over these matters. *28 U.S.C. § § 1331, 1338(a)*.

Currently before the Court are motions by DIRECTV (Doc. No. 35) and EchoStar (Doc. No. 26) for summary judgment under the doctrine of laches barring Thomas from recovering pre-suit damages. The Court finds that Thomas's delay in filing both complaints is presumed unreasonable and prejudicial, and that in both cases Thomas has failed to identify any circumstance or excuse that would counter the presumption that his delays of more than eight years were unreasonably long, or to offer proof that puts the presumed facts of economic or evidentiary prejudice in issue. Thomas also has failed to offer evidence of either egregious conduct on the part of DIRECTV or other factors [*4] which make it inequitable to recognize the defense, or any material difference between the defendants' receivers known to Thomas in 1997 and the newer accused models in these cases that would preclude the application of laches to all accused devices. Therefore, the Court grants EchoStar's and DIRECTV's motions for summary judgment on the issue of laches. Plaintiff Thomas is barred from recovering any pre-suit damages against either. The reasons for the Court's decision follow, beginning with the following facts that it finds to be material and undisputed.

### FINDINGS OF FACT

It was in November of 1996 that Thomas first asked the law firm of Nixon & Vanderhye P.C. (his and his company's patent counsel since 1986) to investigate possible infringement of the *'354 patent* by DIRECTV. (DIRECTV Mem. Ex. 6; Ex. 4A, Tr. at 53). Specifically, Thomas was curious about the "Smart Card" that was used in DIRECTV's satellite receivers. (EchoStar Mem. Ex. 6, Tr. at 63-4; DIRECTV Mem. Ex. 4, Tr. at 50-51). His suspicion of DIRECTV also was prompted by the fact that the copies of his application and the *'354 patent* that he had sent to DIRECTV's predecessor, Hughes Electronics, were returned to [*5] him years later without any discussion. (DIRECTV Mem. Ex. 4E, Tr. 229-231; Ex. 10, Tr. at 120-21). n1 Dr. Mitchard (the attorney who had prepared and prosecuted the *'354* application) and Al Kagan handled the infringement analysis. Thomas himself subscribed to the DIRECTV service and obtained a "HIRD" receiver for the purpose of analyzing the equipment for potential infringement of the *'354 patent*. (DIRECTV Mem. Ex. 4, Tr. at 49-50).

---

n1 More precisely, in 1986 Thomas had sent his a copy of his patent application to Ernie Culver, an acquaintance of his who worked for Hughes Aircraft Company. Then, in 1990, Thomas sent

Culver a copy of the *'354 patent*. Although Culver allegedly later indicated that Hughes was interested in a "utility controller," Hughes returned the materials to Thomas in 1991, with a letter from Hughes' legal department stating that it was "returning certain information sent by Ernie [Culver] to Jim Roberts ... which was directly forwarded to [the legal department] and sequestered. The information is being returned and there will be no discussions related to the subject matter thereof with Ernie Culver, to protect any proprietary position you may have in such information from public disclosure."

[*6]

Thomas continued to communicate with his attorneys over the course of the next year about possible infringement by DIRECTV and by cellular phone companies BellSouth and Motorola. In November, Thomas sent his attorneys his annotated user manual and his own comparison of the features of the HIRD receiver to his patent. n2 He included an article describing four satellite television providers, including EchoStar and DIRECTV, with a note stating "[a] listing of 5 companies now providing digital satellite services. All have their own satellites and use a card in the receiver."

　　　　n2 Thomas specifically noted, *inter alia,* that DIRECTV's receiver used an "access card" with "stored information" to allow customer to receive and "control" the distribution of multiple television services, including subscription and "pay-per-view" programming. (EchoStar Mem. Ex. 5).

On December 19, 1997, Al Kagen called Thomas and said that he "[didn't] have any infringement case" against DIRECTV, Motorola,

BellSouth. (DIRECTV Mem. [*7] Ex. 4, Tr. at 88). According to Thomas, he accepted the conclusion, although he "never ... had an in-depth discussion with Kagan, nor did [he] ever argue with him on certain claim construction" or ask Dr. Mitchard any questions. (DIRECTV Mem. Ex. 8, Tr. at 392-394; EchoStar Mem. Ex. 7, Tr. at 63, 114-115). Thomas never examined EchoStar's DISH network receiver by himself or with his attorney. (DIRECTV Mem. Ex. 6, Tr. at 98; EchoStar Reply Ex. 4, Tr. at 50; Ex. 9, Tr. At 45).

Thomas took no further action regarding DIRECTV or EchoStar (or any other company) during the next seven years, although both companies continued to make, sell and use satellite television receivers. In 2003, however, Thomas, concerned with the looming expiration of his patent, sought a second infringement opinion. (DIRECTV Mem. Ex. 4A, Tr. at 45; Ex. 8, Tr. at 393-96). He met with his current counsel that November. In September 2004, Thomas's counsel sent letters to DIRECTV and EchoStar, advising that their receivers may infringe the *'354 patent* and offering a license under the patent. n3 When both companies requested the basis for any claim of infringement of the *'354 patent*, Thomas followed-up a year later [*8] with a claim chart detailing his infringement allegations. No agreement was reached, and Thomas subsequently filed complaints against EchoStar, DIRECTV and a number of other defendants in November and December 2006.

　　　　n3 Specifically, the letters alleged that the particular defendant's "digital satellite service makes use of "Smart Card" technology to enable the distribution of television service to subscribers over predetermined time periods, particularly with respect to pay-per-view services."

2006 U.S. Dist. LEXIS 91748, *

## LEGAL STANDARDS

DIRECTV and EchoStar have filed separate motions for summary judgment barring any pre-suit damages for Thomas's claim of infringement under the doctrine of laches.

Laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992)* (en [*9] banc). When laches is applied, the patentee may not recover any damages for the period of time prior to filing suit. *Id. at 1028*. It is an equitable determination, amenable to being resolved on summary judgment where the facts necessary for determining laches are not genuinely disputed, the burden of proof of an issue is allocated correctly, and all pertinent factors are considered. *Id. at 1039* (citations omitted).

To establish a defense of laches, the defendant has the burden of proving by a preponderance of the evidence that the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of the defendant's alleged infringing activity, and the delay resulted in material prejudice to the defendant.

With regard to the first element, the Court looks to the period of time beginning when the plaintiff knew or reasonably should have known of the facts underlying right or cause of action. *Id. at 1033*. While the length of time that may be considered unreasonable "has no fixed boundaries but rather depends on the circumstances," a delay of six years or more raises [*10] a presumption that the delay is unreasonable, inexcusable, and prejudicial. *Id. at 1032, 1035-36*. The plaintiff may rebut the presumption by demonstrating a genuine issue of material fact respecting either the reasonableness of the delay, or the alleged prejudice. The

Court must also consider and weigh excuse for the delay offered by the plaintiff. *Id. at 1033*. n4

> n4 These excuses include, but are not limited to: (1) other litigation; (2) negotiations with the accused; (3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent of the alleged infringement; and (6) a dispute over the ownership of the asserted patent.

With respect to the second element, the defendant can establish either economic prejudice or evidentiary prejudice. Evidentiary prejudice may arise where the delay has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of [*11] memories. *Id. at 1033*. Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages that would have been prevented if the plaintiff had filed suit earlier. Id; *Hemstreet v. Computer Entry Sys. Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992)* (the "change must be because of and as a result of the [patentee's] delay, not simply a business decision to capitalize on a market opportunity.").

Finally, because the defense of laches is an equitable doctrine that must be considered in light of the facts and circumstances of the case, "mechanical rules" do not govern its application. *Id. at 1032*. Thus, even if the critical elements of delay and prejudice are established, the Court may deny a laches defense where there is evidence of other factors which would make it inequitable to recognize the defense. *Id. at 1034*.

Based on this standard, the Court finds that the laches defense is appropriate as to both defendants and will grant summary judgment in favor of DIRECTV and EchoStar.

## DISCUSSION

### 1. The Presumption of Laches Applies and Both Defendants Also Have Demonstrated Actual Material Prejudice. [*12]

The Court finds that EchoStar and DIRECTV have proved that eight and nine years elapsed between the time Thomas first was aware of their respective receivers and believed that they involved technology similar to the *'354 patent*, and when he filed his complaints. Thomas concedes that the delay in bringing suit is presumed unreasonable and prejudicial.

The Court also finds that the EchoStar and DIRECTV have offered actual evidentiary prejudice, namely that due to the passage of time: (1) Dr. Mitchard no longer has any independent recollection of the prosecution of the *'354 patent*; (2) nearly all documents referenced in the relevant billing records of Nixon & Vanderhye pertinent to the 1997 infringement investigation with respect to DIRECTV - including the assessment of non-infringement - are no longer available; and (3) Mitchard and Kagan do not have any independent recollection of the infringement analysis, and Thomas's recollection of certain events pertinent to his allegations is, at best, minimal. While "[c]onclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient" to prove [*13] that the defendant suffered injury" (*Meyers v. Asics Corp., 974 F.2d 1304, 1308 (Fed. Cir. 1992)*), the absence of testimonial and documentary evidence from the attorney who wrote and prosecuted the *'354 patent* and later found that the products here accused did not infringe clearly inhibits the defendants' ability to present a full and fair defense, particularly with respect to claim construction, their defenses of inequitable conduct, and Thomas's allegations willful infringement. See, e.g., *Odetics, 919 F.Supp. at 922* ("Odetics' patent counsel responsible for

prosecuting the '151 patent no longer have any recollection regarding their representation of Odetics with respect to that patent, including the meaning or intent of the patent claims.").

As the presumption applies in this case, the burden of proof, although not the burden of persuasion, now shifts to Thomas to introduce "a minimum quantum of evidence" that his delay was reasonable under the circumstances, or whether an unreasonable delay can be shown due to any alleged excuses. If Thomas meets his burden, the presumption of laches "completely vanishes." *Aukerman, 960 F.2d at 1037.* [*14]

### 2. Thomas Has Failed to Counter the Presumption That His Delay Was Unreasonably Long.

Thomas contends that his decision to refrain from filing earlier against DIRECTV was reasonable in light of: (1) Hughes's alleged disinterest in 1991 in licensing his patent; (2) his attorneys' 1997 opinion of non-infringement; (3) his inability to determine infringement on his own. And he contends his delay in filing suit against EchoStar also is reasonable because "EchoStar has a system that is visually very similar to the DirecTV system and appears to perform in exactly the same way," and therefore Thomas was reasonable to impute "his counsel's opinion of noninfringement by DirecTV to the EchoStar system." The Court finds none of these identified circumstance counter the presumption that his delay of more than six years was unreasonably and inexcusably long.

First, Thomas's argument that the 1991 letter from Hughes on the subject of the *'354 patent* influenced him against a belief that Hughes would infringe his patent is belied by the fact that he did, in fact, suspect infringement, both in 1996, when he first began investigating DIRECTV's receivers, and in 2003, when he sought a second [*15] infringement analysis. n5

n5 Indeed, Thomas admits that he had been "obsessed" with Hughes "with their turn down, having had my patent." (DIRECTV Mem. Ex. 10, Tr. at 120-121).

Second, Thomas's inability to conclusively determine infringement on his own does not justify his laches. It is well-settled that the knowledge relevant to the laches inquiry is the plaintiff's knowledge of the facts and features of the accused product that form his infringement allegation. Knowledge as to whether the device itself actually infringe one's patent is not required to establish laches. See *ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1391 (Fed. Cir. 1995)* ("It is settled that the laches period begins when the plaintiff discovers the facts which create his right or cause of action. ... Even if Dr. Coleman did not know whether the Corvac was technically an 'infringement' ... he knew all the facts concerning the Corvac project.") (citing *Coleman v. Corning Glass Works, 619 F.Supp. 950, 954 (W.D.N.Y. 1985),* [*16] aff'd, *818 F.2d 874 (Fed. Cir. 1987).* n6

n6 See also *Alexander v. Phillips Petroleum Co., 130 F.2d 593, 606 (10th Cir. 1942)* ("[W]here the facts were known to the plaintiff, ignorance of the law ... will not ordinarily excuse delay in asserting the claim."); *Wanless v. General Elec. Co., 148 F.3d 1334 (Fed. Cir. 1998)* ("the means of knowledge are generally equivalent to actual knowledge") (citing *Potash Co. of America v. International Minerals & Chemical Corp., 213 F.2d 153, 155 (10th Cir. 1954)); Odetics, Inc. v. Storage Tech. Corp., 919 F.Supp. 911, 922 (E.D.Va. 1996),* remanded on other grounds, *116 F.3d 1497 (Fed. Cir. 1997)* ("delay in filing suit is not justified

where "the patentee already knew about the product, knew that it involved technology similar to the patented invention, and knew that it accomplished a similar result.").

Similarly, Thomas's acceptance of Kagen's opinion in 1997 (that Thomas [*17] had no case against DIRECTV) likewise does not appear to be a legally cognizable reason for his delay in filing suit. See, e.g., *Coleman, 619 F.Supp at 954* (rejecting the idea that the laches period begins running only after a patent holder receives a favorable legal opinion, as the fact that is "critical for the measurement of laches, [is] that [the plaintiff] waited more than six [] years to apprise the defendant of those plans."). n7 However, even if it justifies his decision not to file suit in December of 1997, it did not suspend indefinitely Thomas's duty to pursue his claim against DIRECTV. Thomas fails to explain why it was reasonable for him to delay six years to seek a second opinion and another two in filing suit, other than to say that he is "a very patient individual" who was "not in any hurry," and his patent "still had years on its life." These clearly do not justify the delay, particularly since, as Thomas admits, "nothing prevented him from getting an second opinion [earlier]," and the circumstance that prompted him to seek a second opinion was that "[Thomas] realized [his patent] was going to expire."

n7 See also *TRIPLE A PSHP. v. MPL COMMUNS., INC., 1986 U.S. Dist. LEXIS 23132, at * 11 (D. Kan. July 7, 1986)* ("Faulty advice, however, even from counsel, 'is no defense against the charge of laches.' ") (citations omitted); *Charles Hall v. Aqua Queen Manufacturing, 93 F.3d 1548, 1554 (Fed. Cir. 1996)* ("[a] patentee's inability to find willing counsel ... is widely rejected as a legally cognizable reason to excuse an unreasonable delay"); cf. *Wanless v. General*

*Elec. Co., 148 F.3d at 1339* ("Determining that GE was not infringing his patent ... did not absolve Wanlass of his duty to conduct future investigations.").

 [*18]

The Court similarly finds that Thomas has failed show that his delay with respect to EchoStar was justified. Moreover, Thomas's contention that he was reasonable to apply Kagan's opinion of non-infringement by DIRECTV to the EchoStar system is belied by that fact that Thomas had never seen an EchoStar receiver, and there is no evidence that his attorneys ever performed or discussed any comparison of an EchoStar receiver to a DIRECTV receiver.

### 3. Thomas has Failed to Offer Affirmative Evidence Rebutting the Presumption of Prejudice

To succeed in rebutting the presumption that the defendants suffered material prejudice, Thomas is required to affirmatively prove that "no additional prejudice occurred in the six-year time period, i.e., that evidence respecting an alleged infringer's defenses remains available substantially as before the delay and that economic prejudice ... has not occurred." *Aukerman, 960 F.2d at 1038*. Thomas, however, merely disputes the relevance and/or credibility of the defendants' evidence of evidentiary prejudice, and thus has failed to demonstrate the "minimum quantum of evidence" necessary to rebut the presumption.

For example, Thomas [*19]  contests the relevance of the fact that Dr. Mitchard has no independent recollection of the prosecution of the *'354 patent* application. According to Thomas, the loss of this information is not prejudicial because (1) "the evidence that is relevant ... is amply covered in the official prosecution history, which is not lost"; (2) "there is no proof that anything that would have been in [Dr. Mitchard's] memory in 1997 but not today is rele-

vant to any question of fact or law in this case"; (3) "this evidence had already been lost well in advance of the 1997 investigation"; and (4) the allegations of inequitable conduct (involving undisclosed prior art) are "spurious." Thomas also contests the relevance of testimonial and documentary evidence concerning Nixon & Vanderhye's analysis of the *'354 patent* with respect to DIRECTV, asserting that (1) the evidence in question "related solely to the propriety of DIRECTV's laches claim, and not to any question of infringement or any other matter in this case"; and (2) "The Court need not know whether Mr. Kagen agreed in fine detail with EchoStar's position in 2004 in order to determine whether EchoStar's position was reasonable."

The Court notes [*20]  none of Thomas's contentions are supported with references to the record. Even had Thomas supported his positions, however, it would not have been enough. Once the presumption is established, Thomas was required to do more than just merely point to alleged weaknesses in the defendants' evidence of prejudice; he was required to make an affirmative showing of a lack of prejudice. n8 *Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1554 (Fed. Cir. 1996)* ("[T]he defendant[s] could have remained utterly mute on the issue of prejudice and nonetheless prevailed."). n9

n8 The Court in North American Philips Corp. v. Taito America Corp., articulated the burden as follows: "It would be very difficult for a plaintiff to marshal enough facts to show that the relevant evidence remained substantially the same throughout the six-year period. However, a concerted effort that discusses the type of evidence a defendant would need to put forth in order to succeed on its defenses and some offer of proof showing that the relevant evidence did not dissipate as a result of the delay, would have been enough to raise a genuine issue.

Plaintiffs do not attempt systematically to show that the evidence defendant needs to mount a defense has not dissipated." *No. 93-3261, 1997 U.S. Dist. LEXIS 13264, 1997 WL 543111, at *9 (N.D. Ill. Aug. 29, 1997).*

[*21]

n9 In light of the Court's finding of evidentiary prejudice, it need not address whether Thomas has rebutted the presumption of economic prejudice as to either defendant.

### 3. The Plaintiff Has Fail to Offer Evidence of Any "Misrepresentation" or Other Egregious Conduct by DIRECTV.

The party advancing the unclean hands argument must prove that "the infringer has engaged in particularly egregious conduct [that] would change the equities significantly in plaintiff's favor." *Aukerman, 960 F.2d at 1033* (internal quotation marks omitted). What constitutes egregious conduct is not clear. Where the one asserting the defense of laches was responsible for the plaintiff's delay, or allayed the plaintiff's suspicions through deception, or evidence of plagiarism, harassment, or intentional copying of the plaintiff's product may qualify. *Potash Co. of America v. International Minerals & Chemical, 213 F.2d 153, 155 (10th Cir. 1954); TWM Mfg. Co., Inc. v. Dura Corp., 592 F.2d 346, 349 (6th. Cir. 1979); Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995).* [*22] In such circumstances, "the assertion of a laches defense would be not only inequitable but unsound, for the plaintiff's delay would have given the defendant no good reason to believe that the patent rights were worthless or abandoned." *Corning Glass Works, 619 F. Supp. 950, 955 (citing*

*Galliher v. Cadwell, 145 U.S. 368, 372, 12 S. Ct. 873, 36 L. Ed. 738 (1892)).*

Thomas contends that Hughes had knowledge of the '354 patent and knowledge of its own efforts to develop a satellite television service," and then "affirmatively misrepresented to Thomas that it would not be utilizing his invention, and cut off all communications with him." He, however, has presented no evidence that he and Culver (or anyone at Hughes) discussed the applicability of the patent to satellite television. Moreover, Thomas's interpretation of the 1991 letter from an attorney at Hughes to Thomas returning materials and informing him that it would not have further discussions with Culver "as an affirmative representation. ... that Hughes would not be operating in this area" is not evidence that DIRECTV acted with unclean hands. And the Court finds nothing in any of the documents provided by Thomas or elsewhere [*23] in the record supporting his argument that Hughes made any misrepresentation. While the non-moving party is entitled to have conflicting inferences resolved in its favor, those inferences must flow rationally from the underlying facts. The Court will not consider conclusory allegations, improbable inferences and unsupported speculation. *General Mills. Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 980 (Fed. Cir. 1997).* Nor will it distort the plain meaning of words or conveniently read them out of context. *Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 821-22 (4th Cir. 1995).*

### 4. Laches Applies to All Accused Receivers

Where an alleged infringer's conduct changes over time "as, for example, where the infringer begins to manufacture a different product-a new period of delay begins for laches purposes with each change in conduct, unless the infringer can show that its prior conduct is substantially similar to the more recent conduct." *Intertech Licensing Corp. v. Brown & Sharpe Manufacturing Co., 708 F. Supp. 1423,*

2006 U.S. Dist. LEXIS 91748, *

1435 (D.Del. 1989) (citations omitted). A change in a product giving rise to a new laches period, however, must be [*24] a change that is material to the case. See, e.g., id. at 1435-37

Here, Thomas contends that any finding of laches finding should not apply to "other models not known to Thomas during the delay" since there are differences between the model in Thomas's possession in 1997 and subsequently released models. The Court, however, finds that Thomas's infringement theory against DIRECTV is the same for all accused models. He has admitted that (1) all known models of DIRECTV receivers, including the receiver in his possession since 1997, infringe the '354 patent for the same reasons; and (2) the his HIRD receiver contains the same features that he now alleges form the basis for his contention that all other accused models of DIRECTV receivers infringe.

Nor does Thomas explain how the differences the that he has identified - "dual tuners" and "digital video recording," - are material to this case. He merely argues is that these changes "are potentially relevant to an inquiry regarding infringement." And while Thomas asserts that these features may qualify as additional "potential services," he does not explain why this would matter given his allegation that the "plurality of [*25] services" requirement of the patent is already satisfied by the accused model in Thomas's possession since 1997. n10

n10 The Court agrees with DIRECTV that "Thomas's argument concerning product differences" is the sort of "litigation-induced, after the fact" gamesmanship expressly rejected by the court in Intertech. 708 F.Supp. at 1431 ("In what appears to have been an effort by Lemelson to avoid a finding of laches, plaintiff abruptly turned its attention to the question of whether Brown &

Sharpe's measuring machines contained touch sensitive probes and operated under direct computer control.").

The Court is likewise unpersuaded by Thomas's argument that the absence of a claim construction ruling by the Court precludes a finding of laches with respect to all DISH network receivers, since he cannot determine whether they "infringe in the same way." Thomas, however, has failed to offer evidence - or argue- that there is any material difference between that receiver and any other EchoStar receiver [*26] that would prevent the application of laches.

**CONCLUSION**

Thus, having weighed the length of the delay, the seriousness of prejudice, the reasonableness of Thomas's excuses, and the defendants' conduct, the Court finds that a defense of laches barring pre-suit damages is appropriate as to EchoStar and DIRECTV.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. In Case 3:5cv494, Defendant EchoStar partial Motion For Summary Judgment on the Doctrine of Laches (Doc. No. 26) be **GRANTED.**

2. In Case 3:5cv496, Defendant DIRECTV's partial Motion For Summary Judgment on the Doctrine of Laches (Doc. No. 35) be **GRANTED.**

Signed: December 19, 2006

Robert J. Conrad, Jr.

Chief United States District Judge

# Exhibit C

LEXSEE 2004 U.S. DIST. LEXIS 29580

ULTIMAX CEMENT MANUFACTURING, et al., Plaintiffs, v. CTS
CEMENT MANUFACTURING CORPORATION, et al., Defendants.
AND RELATED COUNTERCLAIMS

SA CV 02-578 AHS (ANx)

UNITED STATES DISTRICT COURT FOR THE CENTRAL
DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

*2004 U.S. Dist. LEXIS 29580*

**December 6, 2004, Decided
December 6, 2004, Filed**

**COUNSEL:** [*1] For Ultimax Cement Manufacturing Corporation, a California corporation, Hassan Kunbargi, an individual, Plaintiffs: Larry L Shatzer, II, Foley & Lardner, Washington, DC; Laurie Erin Barnes, Seyfarth Shaw, Los Angeles, CA; Leila S Nourani, Lori Victoria Minassian, Mir Saied Kashani, Foley and Lardner, Los Angeles, CA; William J Robinson, Foley and Lardner, Los Angeles, CA.

For CTS Cement Manufacturing Corporation, a Nevada corporation doing business as CTS Cement Manufacturing Company, Edward K Rice, an individual, Rapid-Set Products Co, doing business as RSC Inc, CTS Bulk Terminals Co, a Nevada corporation, Chem-Comp Systems Inc, a corporation, Defendants: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Fulwider Patton Lee & Utecht, Los Angeles, CA; Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For Jack V Goodman, an individual, Paragon Building Products Inc, a California corporation, Lawrence B Collins, an individual, Blue Daisy Cement Products Inc, a California corporation, Defendants: Andrea Levitan Reeves, Richard C Goodman, Stradling Yocca Carlson & Rauth, Newport Beach, CA; Michael G Ermer, Irell [*2] & Manella, Newport Beach, CA.

For Kurt Caillier, an individual, A & A Ready Mixed Concrete Inc, a California corporation, Defendant: Michael G Ermer, Irell & Manella, Newport Beach, CA; Steven P O'Neill, Wayne Keith Lemieux, Lemieux & O'Neill, Westlake Village, CA.

For Ryan Vanderhook, Sr, an individual, Short Load Concrete Inc, a California corporation, Defendants: Eric P Francisconi, Barnes Crosby Fitzgerald & Zeman, Irvine, CA; Michael G Ermer, Irell & Manella, Newport Beach, CA; Michael J Fitzgerald, Barnes Crosby Fitzgerald & Zeman, Irvine, CA.

For Sir-Mix Concrete Products, a corporation, White Cap Industries Inc, a Delaware corporation, Grupo Cementos De Chihuahua, a Mexican corporation, Defendants: Michael G Ermer, Irell & Manella, Newport Beach, CA.

2004 U.S. Dist. LEXIS 29580, *

For Heartland Cement Sales Company, a Delaware corporation, Plaintiff: Christopher Andrew Perrin, Blackwell Sanders Peper Martin, St. Louis, MO; Laurie Erin Barnes, Seyfarth Shaw, Los Angeles, CA; Leila S Nourani, Lori Victoria Minassian, Mir Saied Kashani, Foley and Lardner, Los Angeles, CA; Michael R Annis, Blackwell Sanders Peper Martin, St Louis, MI; Richard D Gluck, Fairbank & Vincent, Los Angeles, CA; [*3] William J Robinson, Foley and Lardner, Los Angeles, CA.

For Paragon Building Products Inc, Blue Daisy Cement Products Inc, Jack V Goodman, Paragon Building Products Inc, Lawrence B Collins, Blue Daisy Cement Products Inc, Counter Claimants: Andrea Levitan Reeves, Richard C Goodman, Stradling Yocca Carlson & Rauth, Newport Beach, CA; Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA.

For Ultimax Cement Manufacturing Corporation, Counter Defendant: Mir Saied Kashani, Foley and Lardner, Los Angeles, CA.

For Hassan Kunbargi, Counter Defendant: Mir Saied Kashani, Peter Aronson, Foley & Lardner, Los Angeles, CA.

For CTS Cement Manufacturing Corporation doing business as CTS Cement Manufacturing Company, Cross Defendant: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Fulwider Patton Lee & Utecht, Los Angeles, CA; Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For CTS Cement Manufacturing Corporation, doing business as CTS Cement Manufacturing Company, Counter Claimant: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Fulwider Patton Lee & Utecht, [*4] Los Angeles, CA; Michael Farjami, Farjami & Farjami, Mission Viejo, CA;

Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For Ultimax Cement Manufacturing Corporation, Counter Defendant: Larry L Shatzer, II, Foley & Lardner, Washington, DC; Mir Saied Kashani, Foley & Lardner, Los Angeles, CA.

For Hassan Kunbargi, Counter Defendant: Larry L Shatzer, II, Foley & Lardner, Washington, DC; Mir Saied Kashani, Peter Aronson, Foley & Lardner, Los Angeles, CA.

For Heartland Cement Sales Company, Counter Defendant: Christopher Andrew Perrin, Blackwell Sanders Peper Martin, St. Louis, MO; Mir Saied Kashani, Foley & Lardner, Los Angeles, CA; Kelly K Pilla, Blackwell Sanders Peper Martin, St Louis, MI; Dirk L Vincent, Fairbank & Vincent, Los Angeles, CA; Michael R Annis, Blackwell Sanders Peper Martin, St Louis, MI; Richard D Gluck, Fairbank & Vincent, Los Angeles, CA.

For KA Group, a California limited partnership, Plaintiff: William J Robinson, Mir Saied Kashani, Foley and Lardner, Los Angeles, CA.

For The Quikrete Companies, a Delaware corpoaration, Defendant: Michael G Ermer, Irell & Manella, Newport Beach, CA, Thomas W Rhodes, [*5] Smith Gambrell & Russell, Atlanta, GA.

For Eric Bescher, Defendant: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Fulwider Patton Lee & Utecht, Los Angeles, CA; Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For CTS Cement Manufacturing Corporation, doing business as CTS Cement Manufacturing Company, Counter Claimant: Douglas Robert Peterson, Jennifer L Webber, Richard A

Bardin, Ronald E Perez, Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For Edward K Rice, Counter Claimant: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For Rapid-Set Products Co, doing business as RSC Inc, CTS Bulk Terminals Co, Chem-Comp Systems Inc, Counter Claimants: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Michael G Ermer, Scott D Baskin, Irell & Manella, [*6] Newport Beach, CA.

For Jack V Goodman, Paragon Building Products Inc, Counter Claimants: Andrea Levitan Reeves, Richard C Goodman, Stradling Yocca Carlson & Rauth, Newport Beach, CA; Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA.

For Counter Claimant: Andrea Levitan Reeves, Richard C Goodman, Stradling Yocca Carlson & Rauth, Newport Beach, CA; Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Ronald E Perez, Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA.

For Kurt Caillier, A & A Ready Mixed Concrete Inc, Counter Claimants: Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA; Steven P O'Neill, Wayne Keith Lemieux, Lemieux & O'Neill, Westlake Village, CA.

For Ryan Vanderhook, Sr, Short Load Concrete Inc, Counter Claimants: Eric P Francisconi, Barnes Crosby Fitzgerald & Zeman, Irvine, CA; Michael J Fitzgerald, Barnes Crosby Fitzgerald & Zeman, Irvine, CA; Michael Farjami, Farshad [*7] Farjami, Farjami & Farjami, Mission Viejo, CA.

For Sir-Mix Concrete Products, White Cap Industries Inc, Grupo Cementos De Chihuahua, Counter Claimants: Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA.

For Eric Bescher, Counter Claimant: Douglas Robert Peterson, Jennifer L Webber, Richard A Bardin, Fulwider Patton Lee & Utecht, Los Angeles, CA; Samuel L Alberstadt, Fulwider Patton Lee & Utecht, Los Angeles, CA; Melissa R McCormick, Michael G Ermer, Scott D Baskin, Irell & Manella, Newport Beach, CA.

For Heartland Cement Sales Company, Counter Defendant: Michael R Annis, Blackwell Sanders Peper Martin, St Louis, MI; Mir Saied Kashani, Foley & Lardner, Los Angeles, CA; Richard D Gluck, Fairbank & Vincent, Los Angeles, CA.

For Heartland Cement Company, Counter Defendant: Christopher Andrew Perrin, Blackwell Sanders Peper Martin, St. Louis, MO.

For RC Cement Holding Company, RC Cement Company, Counter Defendant: Dirk L Vincent, Fairbank & Vincent, Los Angeles, CA; Richard D Gluck, Fairbank & Vincent, Los Angeles, CA.

For Signal Mountain Cement Company, River Cement Company, Counter Defendants: Dirk L Vincent, Richard D Gluck, Fairbank [*8] &

Vincent, Los Angeles, CA; Kelly K Pilla, Blackwell Sanders Peper Martin, St Louis, MI.

For Hercules Cement Company, Counter Defendant: Dirk L Vincent, Richard D Gluck, Fairbank & Vincent, Los Angeles, CA; Michael R Annis, Blackwell Sanders Peper Martin, St Louis, MI; Kelly K Pilla, Blackwell Sanders Peper Martin, St Louis, MI.

For The Quikrete Companies, Counter Claimant: Michael Farjami, Farshad Farjami, Farjami & Farjami, Mission Viejo, CA; Thomas W Rhodes, Smith Gambrell & Russell, Atlanta, GA.

For Ultimax Cement Manufacturing Corporation, Hassan Kunbargi, Counter Defendant: Larry L Shatzer, II, Foley & Lardner, Washington, DC; William J Robinson, Mir Saied Kashani, Foley and Lardner, Los Angeles, CA.

For Heartland Cement Sales Company, Counter Defendant: Michael R Annis, Blackwell Sanders Peper Martin, St Louis, MI; Mir Saied Kashani, William J Robinson, Foley & Lardner, Los Angeles, CA; Richard D Gluck, Fairbank & Vincent, Los Angeles, CA.

For KA Group, Counter Defendant: William J Robinson, Foley & Lardner, Los Angeles, CA.

**JUDGES:** ALICEMARIE H. STOTLER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ALICEMARIE H. STOTLER

**OPINION:**

ORDER (1) GRANTING DEFENDANTS AND COUNTERCLAIMANTS' [*9] MOTION FOR SUMMARY JUDGMENT FOR INVALIDITY; (2) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT 556; (3) GRANTING IN PART AND DENYING IN PART, DEFENDANT CTS'S MOTION FOR SUMMARY JUDGMENT ON NON-TECHNICAL GROUNDS RE: U.S. PATENT 556; (4) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PATENT VALIDITY AND ENFORCEABILITY; (5) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' DEFENSES OF ALLEGED AGREEMENT TO INVENT, SHOP RIGHTS, AND LACHES

ORDER SETTING JURY TRIAL MARCH 1, 2005, AT 9:00 A.M.; PRETRIAL CONFERENCE FEBRUARY 7, 2005, AT 2:00 P.M.; MOTIONS IN LIMINE FEBRUARY 18, 2005, AT 1:30 P.M.

**I.**

**PROCEDURAL HISTORY**

On March 1, 2004, defendant and counterclaimant CTS Manufacturing Corp. filed a Motion for Summary Judgment on Non-Technical Grounds Re: U.S. Patent 556. Plaintiffs Ultimax Cement Manufacturing Corp. (hereafter "Ultimax"), Hassan Kunbargi and Heartland Cement Sales Co. filed opposition thereto on March 23, 2004. Defendants filed a reply on March 29, 2004, and a supplemental brief on April 30, 2004, occasioned by issuance of the preliminary report by the Court-appointed [*10] expert, Dr. Frieder Seible. Plaintiffs filed a response to the supplemental brief on May 6, 2004.

On June 2, 2004, defendants and counterclaimants Eric Bescher, CTS, CTS Bulk Terminals Co., CTS, Chem-Corp Systems Inc., Rapid-Set Products and Edward K. Rice filed a Motion for Summary Judgment of Invalidity for Indefiniteness and Partial Summary Judgment of Non-Infringement Re: U.S. Patent 556. Ultimax filed opposition on June 14, 2004, and on July 26, 2004, the moving parties filed their reply brief. On July 28, 2004, plaintiffs filed a supplemental memorandum incorporating the

deposition of Dr. Seible. Defendants and counterclaimants filed their response to plaintiffs' memorandum on August 2, 2004.

On July 9, 2004, plaintiffs filed a Motion for Partial Summary Judgment on Patent Validity and Enforceability. Defendants, joined by A&A Ready, Blue Daisy, Jack V. Goodman, Short Load Concrete, Ryan Vanderhook Sr., and White Cap Industries, filed opposition on July 26, 2004. Plaintiffs filed their reply on August 2, 2004.

Plaintiffs also filed a Motion for Partial Summary Judgment on Defendants' Defenses of Alleged Agreement to Invent, Shop Rights and Laches on July 9, 2004. Defendants [*11] opposed the motion on July 26, 2004, and plaintiffs filed their reply on August 2, 2004.

The Court heard oral arguments on these and other motions on September 13 and September 27, 2004.

The Court, having considered the parties' arguments, both oral and written, and the authorities raised in the parties' papers, issues its rulings as hereinafter set forth.

## II.

### FACTUAL BACKGROUND

Plaintiffs Ultimax, Hassan Kunbargi, Heartland Cement Sales Co., and KA Group are the patent holder and licensees of *U.S. Patent Nos. 6,113,684* ('*684*), 6,406,534 ('534), and 4,957,556 ('556). n1 All patents are for a precursor compound to cement known as "clinker" n2 and the resulting cement that rapidly hardens into early, high-strength concrete. Clinker is mixed with hydraulic n3 or portland-type cement and water to form concrete. *684* 5:33; 556 1:17-20. The resulting concrete becomes very strong exceptionally quickly; however, it also dries very fast. At times certain retarding agents must be added to the cement mix to prevent rapid hardening and to increase workable time. The number of hours the cement takes to harden, and to what strength, varies according

to each patent. For example, [*12] the resulting cement taught by the 556 patent hardens to 3000 pounds per square inch ("psi") in one hour, while the cement taught by the *684 patent* reaches 5,000 psi in one hour. The greater the psi, the stronger the cement. Rapid hardening and early high strength cement is particularly useful for certain projects, such as roads and bridges, where it is advantageous to expedite the construction process.

n1 A claim of infringement of the 556, the earliest of the three patents, was added in the First Amended Complaint, filed March 12, 2003.

n2 "Clinker" is one of the main building blocks of the cement taught in the patents. Its production is the first stage of the cement manufacturing process. *684* 5:26-35. Clinker, when formed, is a grayish granular substance made up of various raw materials or compounds that come from limestone, bauxite, and gypsum. Limestone, bauxite and gypsum are themselves made up of compounds, the composition of which can be determined by one skilled in the art. *684* 13:4-12. These "raw materials" are heated in a kiln to create clinker. 556 3:27-35.

n3 "Hydraulic" simply means that the substance is "effected by water." Portland cement is hydraulic. McGraw-Hill Dictionary of Scientific and Technical Terms at 1643 (hereinafter McGraw-Hill).

[*13]

Hassan Kunbargi and Ed Rice, two central figures in this case, have a long history together. Defendant Rice first met Kunbargi

when Kunbargi was a graduate student in the 1980's at the University of California at Los Angeles ("UCLA"). In 1984, as Kunbargi began experimenting with cement chemistry, Rice became Kunbargi's mentor and sought an adjunct faculty position at UCLA so that he could serve as Kunbargi's advisor. According to plaintiffs, Kunbargi conceived the clinker/cement embodied in the 556 patent at this time. In late 1985, Kunbargi began to work for Rice's company. Plaintiffs assert that this employment was merely on a contract basis. During such employment, according to defendants, Kunbargi "reduced to practice" the cement taught by the 556 patent during a testing procedure known as "Burn One" that took place at a Heartland Cement Co. (hereafter "HCC") facility in Kansas. The cement produced at Burn One may have included certain raw materials, such $CaSO_4$ anhydride/anhydrite, and $C4A3Sbar$. Plaintiffs, for their part, argue that Kunbargi conceived of these formulae in his UCLA lab in 1984.

After Burn One, and in response to a letter from Rice, Kunbargi stated that the [*14] "new cement" was patentable and requested additional compensation. (Kashani decl. Ex. M at 4). Rice denied this request. Later in April of 1990, Rice and Kunbargi exchanged letters regarding the "ownership of technology." The parties did not reach any agreement and, in September 1990, after Kunbargi and Rice had terminated their relationship, Kunbargi received the 556 patent.

### III.

### SUMMARY OF PARTIES' CONTENTIONS

#### A. The Parties' Motions Re: Patent Invalidity

CTS contends that both the 556 and *684 patents* are indefinite and thus invalid. The patents teach that after heating, the clinker will have high concentrations of three special types of crystals, described in the patents as Crystal X, Crystal Y, and Crystal Z. *684* 5:30-35. The *684 patent* states that Crystal Y and Crystal Z are "new and unexpected crystals" that "have never been formed in a cement kiln." *684* 5:63-65.

Defendants contend that, because the chemical formulae for Crystal X n4 and Crystal Y n5 are indefinite, they cannot form the basis of a valid patent. In particular, defendants point out that the chemical notation for Crystal X does not correspond to any recognized chemical compound [*15] and, rather, the formula for Crystal X could potentially include over 5,500 chemical compounds. As such, defendants charge that one skilled in the art would find the formula ambiguous and indefinite. According to defendants, the formula for Crystal Y is similarly indefinite because it is riddled with errors that make it ambiguous and that any attempts to "clarify" are in fact attempts to rewrite the formula post-litigation which is impermissible.

n4 The formula for Crystal X is:

$[(C, K, N, M) 4 (A, F, Mn, P, T, S) 3 (cl, S bar)]$

n5 The formula for Crystal Y is: $C9Ss(bar)3Ca(f cl)2$.

In plaintiffs' opposition and in their own motion for a declaration of validity, plaintiffs contend that defendants are precluded from asserting invalidity as to the 556 patent because they have not claimed invalidity, but instead asserted equitable rights in the inventions. Plaintiffs further allege that the patent is valid and definite because certain CTS employees, namely, Dr. Eric Bescher, implemented a testing [*16] protocol to analyze Crystal X. Additionally, plaintiffs contend that others in the

industry are aware of its composition. According to plaintiffs, these facts demonstrate that one skilled in the art could easily understand the chemistry taught by the patents for Crystal X and Crystal Y, and, thus, the patents are definite.

The next indefiniteness issue concerns compression strength and testing methods. Defendants allege that Claim 17 of the *684 patent*, claims 9-11 of the 556 patent and claims 10-11 of the 534 patent are indefinite because the psi of cement varies depending on the test employed. Neither the 534 patent nor the *684 patent* refer to a testing protocol. While the 556 refers to a "standard ASTM procedure 109" for testing, defendants contend this is a series of tests which can be altered in numerous ways that in turn can alter the compression strength measurements. n6 Defendants allege that the lack of specific instruction as to how to test the cement renders all three patents invalid for indefiniteness. In response, plaintiffs reiterate their contention above that defendants' ability to analyze and compare the cement, and specifically the compression strength, demonstrates [*17] the definiteness and clarity of the teachings in the patent.

n6 Cement is measured in terms of "compression strength" which refers to the cement's ability to withstand certain pressures. *684* 5:50-56; Seible at 5. In the patents, compression strength is measured in pounds per square inch. The higher the psi, the stronger the cement.

## B. Motion for Non-Infringement

The parties divide sharply over whether claims 9-11 of the 556 patent should read "anhydrite" rather than "anhydride," which is how it is stated in the patent. CTS's accused cement does not contain the latter compound; therefore, if the patent does not cover anhydride, CTS's cement cannot infringe the 556 patent. Plaintiffs respond that anhydyride and anhydrite are synonymous in the context in claims 9-11 of the 556 patent.

## C. Motions Re: Estoppel, Laches and Shop Rights

Plaintiffs seek partial summary judgment on defendants' defenses of alleged agreement to invent, shop rights, and laches/equitable estoppel. The defenses [*18] of the agreement to invent and shop rights are based on Kunbargi's employment with CTS and Ed Rice. The parties dispute both the nature of the employment and the scope of the employment relationship vis-a-vis ownership of inventions. Plaintiffs further contend that even if the employment relationship involved an agreement covering certain inventions, both the statute of limitations and the statute of frauds render this agreement unenforceable.

As to the defenses of laches and equitable estoppel, plaintiffs argue that the burden is on the defendants to show that Kunbargi was able to determine the infringement at an earlier date and file suit. Plaintiffs also allege that even if Kunbargi could have filed suit sooner, CTS's alleged assurances of non-infringement negate any inference of unreasonable delay. Moreover, according to plaintiffs, defendants have not shown any prejudice, and, even if the elements of unreasonable delay and prejudice are shown, the egregious conduct of defendants defeats the equitable defense of laches.

For their part, defendants respond that Kunbargi had knowledge of the potential legal entanglements over the ownership of technology for over twelve years, yet [*19] at no time did he make efforts to investigate any infringements or otherwise enforce his rights. According to CTS, this delay is not only unreasonable, it has also caused CTS prejudice be-

cause a number of key players involved in the relevant events have either passed away or are no longer available.

## IV.

## DISCUSSION

### A. Plaintiff's Motion for a Declaration of Validity

As a preliminary matter, plaintiffs' motion for "Partial Summary Judgment on Patent Validity and Enforceability" appears procedurally improper. Plaintiffs cite no Federal Circuit authority which holds that a patentee may affirmatively move for a judgment of validity. A patent enjoys a presumption of validity. *35 U.S.C. § 282*. *Fed. R. Civ. P. 56(a)* states that a "party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment" may move for summary judgment. "Validity" is not a claim or defense in this action. The cited case law permits "a moving party seeking to have a patent held not invalid" to move for summary judgment where the opposing party has asserted a declaratory relief claim of [*20] invalidity. *Eli Lilly & Co. v. Barr Labs., 251 F.3d 955, 962 (Fed. Cir. 2001)* (emphasis added). Although the court in L.A. Gear v. E.S. Originals permitted a motion for summary judgment for enforceability even though this issue was not raised as a claim or defense, that court cited no authority in support of ruling on enforceability where it was not pleaded as a claim or defense. *1995 U.S. Dist. LEXIS 2578, 35 U.S.P.Q.2d (BNA) 1497, 1500 (C.D. Cal. 1995)*.

A declaration of "validity" has potentially far-reaching implications, and the Court declines to enter unnecessarily into vague and vast territories of uncertainty. For instance, it is unclear whether a judgment of validity could be used for the purposes of collateral estoppel against other accused infringers. Perhaps third-parties, not present in this action, might discover invalidating prior art or prosecution fraud

which has not been raised in this case. Clear guidance by a higher court would be required before this Court would contemplate such a broad decree. The Court thus elects to treat plaintiffs' motion as one that seeks to have the patents found "not invalid" on the grounds raised by defendants. In the context of these motions, [*21] plaintiffs' motion serves as a cross-motion that the patent is not invalid for indefiniteness.

### B. Defendants' Motion for Summary Judgment of Patent Invalidity for Indefiniteness

"*Section 112 paragraph 2* of the Patent Act requires that a patent specification conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." *Exxon Research & Eng'g v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001)*; *35 U.S.C. § 112, ¶ 2*. Whether a claim is invalid under *§ 112, P 2* is a question of law "arising out of the court's performance of its duty construing the claims." *BJ Servs. Co. v. Halliburton Energy Servs., 338 F.3d 1368, 1372 (Fed. Cir. 2003)*; *Union Pac. Resources Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692 (Fed. Cir. 2001)*. A claim satisfies *§ 112* "if one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research, 265 F.3d at 1376*. Thus, the issue of definiteness is nearly always resolvable at summary judgment because a claim [*22] term is either clearly defined or it is not, and underlying factual disputes do not generally prevent summary judgment on the issue. Id.; cf. *BJ Serv., 338 F.3d at 1372-73* (finding a genuine issue of material fact where there was evidence that appellant's expert had fabricated test results).

"In determining whether that standard is met, i.e., whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing" a claim is not indefinite merely because it is dif-

ficult to understand. *Morton Int'l v. Cardinal Chem. Co., 5 F.3d 1464, 1470 (Fed. Cir. 1993).* However, one who is ordinarily skilled in the art must "understand the bounds of the claims" otherwise the claim is invalid. *Miles Labs., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed. Cir. 1993).*

The patents are presumed valid, and defendants, as the moving parties, must present clear and convincing evidence that the claims at issue are indefinite. *S3 Inc. v. Nvidia Corp., 259 F.3d 1364, 1367 (Fed. Cir. 2001).* In contrast, for plaintiffs to prevail on their motion (as construed) they must show that defendants [*23] cannot meet their "clear and convincing" burden. *Eli Lilly, 251 F.3d at 962.* The Court overrules defendants' objections to plaintiffs' evidence in opposition and grants plaintiffs' request for judicial notice of the Bescher declaration.

### 1. Crystal X

Defendants argue that the term Crystal X, and its chemical notation of ((C, K, N, M) 4 (A, F, Mn, P,T,S) 3 (cl, s bar)), is indefinite because one ordinarily skilled in the art could not understand the metes and bounds of this term. *Exxon Research, 265 F.3d at 1376.* Additional support for this contention is found in the report of the court-appointed expert, Dr. Frieder Seible and his assistant, Dr. Karen Arnett. In "technical issue 8," Ultimax asked if "The term [(C,K,N,M)4(A,F,Mn,P,T,S)3(cl,s  bar)],  or Crystal X, refers to, among other compounds, C4A3Sbar,  or  calcium  sulphoaluminate." (Seible rpt. at 5). In response, Drs. Seible and Arnett stated that "there are over 5500 possible numerical combinations presented by this formula'" and that "it is not possible to conclude that Crystal X, which as stated could be multiple  compounds,  refers  specifically  to C4A3Sbar. It may be a number of other [*24] compounds instead." (Id. at 6).

### a. The Court-Appointed Expert's role

Plaintiffs object to Dr. Seible (and to a lesser extent) Dr. Arnett's qualifications. Supp. Opp. at 3. Plaintiffs contend that because Dr. Seible is an engineer and not a chemist, he is not qualified to opine on the meaning of Crystal X. Additionally, plaintiffs assert Dr. Arnett, who is a chemist, is not qualified to offer an opinion because she was not separately appointed as an expert and her expertise in not in "solid solution mineralogy" or cement chemistry.

Defendants respond that Dr. Seible was plaintiffs' candidate for appointment, that plaintiffs' procedures for presentation of issues were adopted by the court-appointed expert, that they did not object to the additional appointment of Dr. Arnett to the team, that plaintiff posed chemistry issues to Drs. Seible and Arnett and raised objections only after the outcome of the expert opinions turned unfavorable. These points are well taken. To illustrate the point, there are other instances where Dr. Seible's chemistry conclusions are favorable to plaintiffs. (See Seible rpt. at 6, 18) n7. In those instances, no objection is raised.

n7 Plaintiffs would have the Court adopt Dr. Seible's interpretation that there should be a comma between (f, cl) in the final parenthetical of the Crystal Y formula. The presence of the comma dramatically changes the meaning of the compound and is supportive of plaintiffs' argument as to Crystal Y.

[*25]

It must be noted that in a February 23, 2003 response to the Court's "Order re: Appointment of Neutral Expert," the parties did state that they believed it would be difficult to find a neutral expert in cement chemistry not already retained by the parties but that an expert could be identified to aid the Court in "areas outside ce-

ment chemistry." (2/23/03 parties response at 2). Nonetheless, the parties both subscribed to a neutral expert process which cost thousands of dollars and consumed a significant amount of time. The Court infers that the parties believed, as did the Court, that the opinions of that expert could be helpful to the Court with respect to major issues in the case. A review of the issues put before Drs. Seible and Arnett indicates that nearly all of the disputes involve cement chemistry in one way or another. Given the amount of time expended in the neutral-expert process, the appointment of Dr. Arnett, a chemist, to assist Dr. Seible, the helpful opinions thereby secured, and plaintiffs' strategic behavior of objecting only after the fact and only to selected opinions, the Court concludes that consideration of Dr. Seible's final report, along with all [*26] the other evidence presented, is proper in evaluating the instant motions. Plaintiffs' objections are overruled.

### b. The Indefiniteness of Crystal X

Turning to the merits of the motion, it is undisputed between the parties that the crystals at issue in these motions (X, Y and Z) are "solid solutions" which is part of the field of mineralogy. (Kashani supp. decl. Ex. B, Klemm depo. at 41-43). Dr. Seible states in his deposition that he clearly understands this concept. Solid solutions are crystalline compounds where various elements can substitute for one another at a particular site on the crystalline structure. (Adams rpt. at 20-21; McGraw Hill, at 1973). The ability of one element to substitute for another is what makes a solid solution so complex. For instance, the compound (Mg, Fe)2, (Mg = magnesium and Fe = iron) can have four different combinations because the Mg can substitute after the comma for Fe and vice versa. With Crystal X, the formula is much more complex: [(C, K, N, M) 4 (A, F, Mn, P, T, S) 3 (cl, s bar)]. The number of elements in the formula means that C can be substituted by K, N and M in such a way that over 5000 possible

combinations can come out of [*27] this formula. (Seible rpt. at 6).

Initially, plaintiffs argued that the formula [(C, K, N, M) 4 (A, F, Mn, P, T, S) 3 (cl, s bar)] should be construed to mean C4A3Sbar, or calcium sulphoaluminate. As Dr. Seible notes, this is one possible compound out of the 5000. (Id.) The formula could be C4A3Sbar, but only if the following substitutions are made (C, K, N, M) 4 (A, F, Mn, P, T, S) 3 (cl, s bar). In the first parenthetical, C would have to substitute for K, N and M, A would substitute for F, Mn, P, T and S in the second parenthetical, and S bar would substitute for cl in the third. While this is a possible combination, it is not mandated by the formula. (Id.; see also Adams rpt. at 21). Moreover, as defendants point out, even if this is a possible combination, given the number of other possible combinations arising therefrom, potential infringers are not put on sufficient notice as to the bounds of the claim. *Honeywell, 341 F.3d 1332 at 1340*.

Plaintiffs attempt to refute this indefiniteness charge by directing the Court to references to the formula they call Crystal X in the prior art and by relying on declarations, in addition to other evidence, [*28] from those who are of ordinary skill in the art. See, e.g., *Honeywell, 341 F.3d at 1340*; *Morton Int'l, 5 F.3d at 1470-71*. However, the prior art, which is cited in the 556 patent, does little to clarify the formula.

In the 556 patent, Kunbargi cites the Klein and Ost patents which discuss the hydration of C4A3Sbar. 556 2:33-39. Plaintiffs assert that these references indicate Crystal X is actually C4A3Sbar; however, the prior art actually undercuts plaintiffs' position. It seems unlikely that a skilled chemist would use a broad formula to identify a compound already known in the prior art where it could have been more simply and clearly expressed as C4A3Sbar. The more likely scenario is that Kunbargi used a complex formula in order "to reflect the fact that C4A3Sbar can be a solid solution with substitution of ions." (Adams rpt. at 13). More-

over, if Crystal X was defined merely as C4A3Sbar, there would be nothing novel about Crystal X in the patent. (See Bescher decl. Ex. C at 1 (Molina paper)). The 556 patent fails for indefiniteness.

As to the *684 patent*, plaintiffs contend that the claims are not indefinite because defendants have [*29] a clear understanding of what Crystal X means. A defendant's understanding of the disputed claim term is relevant evidence that "the term was in use and had a discernible meaning to at least some persons in the field." *Bancorp Servs., L.L.C., 359 F.3d 1367 at 1376 (2004)*. The Federal Circuit has also acknowledged, however, that "the proper test is not what the parties know but what one who is ordinarily skilled in the art would know." Id.

The evidence plaintiffs provide to show that CTS understands the term Crystal X (as well as Crystal Y) is a "testing protocol" which has been the subject of intense discovery disputes. n8 (Kashani Ex. P). The "protocol" is a document created by CTS's expert Waldemar Klemm, which provides instructions for testing cement produced at the Juarez, Mexico plant. The protocol instructs CTS to "[a]nalyze [both clinker and cement] quantitatively for crystals X, Y and Z." (Id.)

n8 Plaintiffs argue that the test results generated by the implementation of this protocol should have been turned over pursuant to Magistrate Judge Nakazato's July 10, 2003 order ("July 10 Order"). This testing was discussed in the Klemm June 24, 2004 deposition. (Id. Ex. B at 69). Arguing that these documents would show that Crystal X and Crystal Y are definite because they are compounds for which tests can be devised, plaintiffs seek to strike all portions of defendants' motion which discuss Crystal X and Y pursuant to *Fed. R. Civ. P. 37*. Defen-

dants contend that this "discovery" motion is untimely under the Court's jury trial order, that plaintiffs failed to show that the documents exist, that if they do exist they are work product, and that they are not relevant. (See defts' response to obj. to evid. 7-9).

A review of the July 10 Order indicates that the test results fall outside its scope. (Pltf. obj. Ex. E at 2). Plaintiffs' objection is based upon two interrogatories. (Id. Ex. D at 7; obj. at 15). Interrogatory no. 2 calls for all documents relating to the manufacture of clinker or cement while no. 3 seeks the production of documents "relating to testing of clinker, cement or cement-containing products . . ."(Id. at 7). Plaintiffs list both interrogatories in their brief and assert that Judge Nakazato ordered compliance. (Obj. at 15). The July 10 Order, however, requires a response to no. 2, but omits no. 3. (Pltf. obj. to evid. Ex. E at 2). Thus, the interrogatory which specifically addressed documents related to testing was not discussed in the July 10 Order. The Court overrules plaintiffs' objection and denies plaintiffs' motion to strike because it does not appear that the testing protocol falls within the scope of interrogatory no. 2 which called for manufacture-related, rather than testing-related, documents.

[*30]

When the evidence is viewed as a whole, plaintiff fails to put forth a workable claim interpretation for Crystal X. Dr. Seible's report, the prior art, as well as the equation in the *684* all support the conclusion that while C4A3Sbar is one compound described by Crystal X, it is only one of thousands of possibilities. If Kunbargi intended Crystal X to mean C4A3Sbar, the claim should have been drafted to so state. Otherwise, it is simply too broad to be con-

strued and the claims fail to put potential infringers on notice regarding the metes and bounds of the invention. *Exxon Research, 265 F.3d at 1376*.

### 2. Crystal Y

Given all claims which contain Crystal Y also contain Crystal X, the Court's discussion above resolves all motions for invalidity. Nonetheless, the Court also addresses the issues presented with respect to Crystal Y.

This dispute centers on a possible drafting error in the *684 patent*, namely, that there should be a comma between the symbols for fluorine and chlorine in the formula for Crystal Y. Plaintiff asserts that the omission of a comma is a drafting error, and, after correction by the Court, the comma would render the term and the accompanying [*31] claims definite. n9

n9 Plaintiffs' assertion is not surprising in light of the numerous drafting errors contained within the *684 patent*. On April 17, 2001, a certificate of correction was issued for the formula for Crystal Y. (See *684* last page). The corrected formula for Crystal Y found in the claims of the *684* is C9S3Sbar3Ca(f cl)2.

As with Crystal X, the parties made use of Dr. Seible's expertise to analyze technical issues presented with Crystal Y. Ultimax presented the formula for Crystal Y to Dr. Seible and asked whether the formula, after correction, was the same as a compound listed on "card 45-009" as published by the International Centre for Diffraction Data (ICDD). (Seible at 6; Adams decl. PP 16-18). Dr. Seible answered in the negative. The formula for Crystal Y is C9S3Sbar3Ca(f cl)2. See, e.g., *684* claim 1. The formula on Card 45-009 is Ca10(SiO4) (SO4)3F2. (Seible at 6). While Crystal Y does

not call for the breadth of substitutions as is present with Crystal X, Dr. Seible concluded [*32] that it could still refer to at least two compounds other than the one listed on the ICDD Card. (Id.). Thus, he could not conclude that Crystal Y referred "specifically" to Ca10(SiO4) (SO4)3F2 (the Card's formula).

However, based on Dr. Seible's evaluation, the formula for Crystal Y references a much smaller universe of possible compounds (three) as compared to Crystal X (five thousand). Necessarily, the potential metes and bounds of this portion of the invention are much more focused than with Crystal X. *Miles Labs., 997 F.2d at 875 (Fed. Cir. 1993)*. Potential infringers need only be aware of a handful of formulae rather than the numerous potential combinations expressed in the notation for Crystal X.

As the formula for Crystal Y is currently written, there is no comma between the f (fluorine) and cl (chlorine). (*684* 2:4-6). In cement chemistry, this means that both fluorine and chlorine must be present in the compound. A comma changes the possible makeup of the formula allowing for the presence of either fluoride or chloride or both, but not requiring the presence of both molecules. (Adams decl. Ex. 2 at 15). Defendants argue that the formula [*33] should be read as is and that in this form it is indefinite. Plaintiffs assert that one who is ordinarily skilled in the art would recognize, as did Dr. Seible, that there should be a comma between f and cl. (Seible at 6; Adams decl. Ex. 2 at 15).

The Court can correct obvious typographical errors or "Essex errors" only if: "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation." *Novo Indus., L.P., 350 F.3d 1348 at 1357 (2003)*. These factors overshadow the understandings of one who is skilled in the art, and here, they militate against finding the absence of a comma as a typographical error. Cf. *Winn*

*Corp.*, 272 F. Supp. 2d 968, 981 (C.D. Cal., 2003).

Both the corrected specification and the claims as stated in the provided portion of the file wrapper do not show a comma between the f and cl. (*'684* 5:31 as corrected; Baskin decl. Ex. 8 at 72). Strikingly, the formula for Crystal Y set forth in the pre-corrected specification actually contained a comma between the f and cl, but the certificate of correction fails to reflect [*34] this. (*'684* 5:31 pre-correction). While a comma is present in an alternative version of the Crystal Y formula in the specification, the post-correction formula in the specification, as well as the patent's claims, lack a comma. (Id.)

The Novo Indust. factors weigh in favor of adjudicating the motion according to the patent's current claim, which lacks a comma between fluorine and chlorine. One of the preferred embodiments (Example I) lists a number of required compounds but both f and cl are absent. (*'684* 13:5-12). Under plaintiffs' interpretation, all embodiments should contain either f, cl, or both. Example II lists only F. (Id. 14:13).

Because there is a "reasonable debate" as to the proper formulation of Crystal Y and "the nature of the error is not apparent from the face of the patent," the Court lacks authority to correct the patentee's drafting error. *Novo Indust., 350 F.3d at 1357*.

Plaintiffs fail to offer a definite claim interpretation if the Court declines to correct the alleged error. (Adams decl. Ex. 2 at 15). If no comma is added, plaintiffs' preferred construction that Crystal Y is the same mineral as found on Card 45-009 is untenable. [*35] The formula for Card 45-009 contains no chlorine, which would be a required component according to the formula as currently written. (Seible at 6). As defendants maintain, C9S3Sbar3Ca(f cl)2 corresponds to no known mineral. (Klemm decl. Ex. 1 at 16). Crystal Y (without a comma)

is an indefinite term. Thus, defendants' motion for invalidity based on indefiniteness as to Crystal Y is also well taken.

### 3. Compression Strength

Defendants seek to invalidate claims 9-11 of the 556 patent, claim 17 of the *684 patent* and claims 10-11 of the 534 patent. CTS argues that these claims are indefinite because compression strength of concrete is in part determined by the test employed. The *684* and *534* patents do not state which test should be used and the *556* patent omits key variables of the C109 test which can impact the resulting psi reading.

In response, Ultimax contends that "compression strength" in the *684 patent* refers to the ASTM modified C109 cube strength test as stated in 9:47-54 of the 556 patent. The neutral expert, however, disagreed with this interpretation, and instead, Dr. Seible adopted the dictionary definition, which states that "compression strength is the ability [*36] of a material to withstand compressive forces." (Seible at 5). According to Dr. Seible, "compressive strength is not determined by the ASTM modified C109 test, nor does it need to refer to the ASTM test." (Id.) He also noted that the 556 patent was confusing because its reference to "molar composition" n10 is nonsensical in the context of discussing the ratio of cement and sand. ('556 9:51-52).

---

n10 Plaintiffs contend that "molar" is a typographical error which should properly read "mortar."

---

While the Court finds that there are genuine issues of fact for trial regarding compression strength, the claims at issue are not so "insolubly ambiguous" as to prevent a proper claim construction. *Honeywell Int'l, 341 F.3d at 1339*. Both the specifications of the *684* and the

534 refer to the 556 patents procedures when discussing the measurement of compression strength. *684* 5:47; 534 6:15-19. Direct references to prior art in a patent may be examined to aid in the construction of the disputed [*37] term because they are often indicia of the meaning of the term to one of ordinary skill in the art. *Arthur A. Collins, Inc. v. N. Telecom Ltd., 216 F.3d 1042, 1045 (Fed. Cir. 2000).*

The 556 does describe a test for measuring compressive strength. 556 9:47-53. It calls for the use of the "modified C109-cube strength test" and it provides time/compressive strength results for the cement taught by Example I of the 556. Id. This is distinct from the "standard ASTM procedure C109" referred to earlier in the specification. 556 1:55-56. There are key differences between the "modified" and the "standard" tests. The latter has a specific cement to sand ratio, whereas the former allows for adjustments to both the cement to sand and water to cement ratios. (Baskin decl. Ex. 9 PP 4-6, Ex. 11). The 556 provides these necessary modifications. The cement to sand ratio used to produce the reported compressive strengths in the table is 1:1 while the water to cement ratio is 1:3. 556 9:47-51.

Additionally, Ed Rice testified during his deposition that the defaults for the modified C109 test provided much of the necessary information for assessing compressive strength. (Kashani [*38] decl. Ex. KK at 128-30). He stated that the "109" provided both the water to cement and the sand to cement ratios. (Id.) It is unclear, however, if the default ratios that Rice testified about are the same as provided for in the 556 patent. Defendants' expert contends that they are different, but his arguments seem to address the workability of the testing procedure rather than the adequacy of the information provided. (Klemm decl. Ex. 1 at 10-11). Although the prior art does not specify a particular test for measuring compressive strength, the prior art does indicate that one of ordinary skill in the art could determine the compression strength even where no test is disclosed, so long as the appropriate ratios are provided. n11 Here, not only is a test provided but the "modified" ratios of cement to sand and water to cement are also given. Thus, while plaintiffs have taken inconsistent positions as to the meaning of "compressive strength," the term is not so overly broad as to defy proper construction. Likewise, the term does not fail to put potential infringers on notice. *Honeywell Int'l, 341 F.3d at 1339.* Thus, in the context of the disputed claims, the [*39] Court finds that the term "compressive strength" means the ability of cement to withstand compressive forces as reflected by the testing procedures set forth in the 556 patent at 9:47-53. The Court thus rejects defendants' motion on *§ 112, P 2* grounds as to compression strength.

n11 For example, the Beretka article, which discusses "calcium sulphoaluminate cements" and is thus is within the relevant art, does not mention a particular test. (Bescher decl. Ex. C at 3). Instead, the article provides a water to sand ratio. (Id.)

## C. Defendants' Motion for Declaration of Non-Infringement

"An infringement analysis is a two-step process in which the court first determines, as a matter of law, the correct claim scope, and then compares the properly-construed claim to the accused device to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1999).* [*40] The Court may grant summary judgment where there is no dispute regarding the functioning of

2004 U.S. Dist. LEXIS 29580, *

the technology and the application of the properly construed claims does not create additional disputes. *Wiener v. NEC Elecs., 102 F.3d 534, 540 (Fed. Cir. 1997).*

At issue here is the term "anhydride" used in claims 9-11 of the 556 patent. Specifically, the claims refer to "soluble CaSO4 anhydride." Defendants argue that since their cement contains no anhydride, there can be no infringement. Plaintiffs assert that one of ordinary skill in the art would know that, as used in claims 9-11, anhydride actually means anhydrite. As this latter compound is found in defendants' cement, plaintiffs contend the motion should be denied.

The ordinary meaning of anhydride and anhydrite belies plaintiff's claim. There is a "heavy presumption" that claims carry their "ordinary meaning" as understood by one of ordinary skill in the relevant art. *Hoganas AB v. Dresser Indus., 9 F.3d 948, 951 (Fed. Cir. 1993); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).* An interpretation should not deviate from a claim's "ordinary meaning" [*41] unless (1) the patentee has chosen to be his own lexicographer and has specifically defined the term in the specification; (2) if the patentee distinguished the term from the prior art on the basis of a specific embodiment; and (3) applying the ordinary meaning to the disputed claim would deprive the claim of "clarity" thus requiring the examination of other intrinsic evidence. *Id.*

Neutral expert Dr. Seible describes in his report anhydride and anhydrite as two very different chemical compounds. (Seible rpt. at 17-18). Anhydride is "a compound formed from an acid by removal of water." (Id. at 18; McGraw Hill at 103. In contrast, anhydrite, which is also known as "anhydrous calcium sulphate, or anhydrous CaSO4" is calcium sulphate without water. McGraw Hill provides a similar definition: "CaSO4: A mineral that represents gypsum without its water of crystallization . . ."(Id.)

Nowhere in the teachings of patent 556 is there a discussion of forming a compound from an acid by removal of its water. While plaintiffs point to instances where defendants have used the term anhydride where they likely meant anhydrite, and to Dr. Seible's observations that "given the context [*42] in which anhydride' is used in Patent 556, claims 9-11, it is not unreasonable to assume that the author meant anhydrite and not anhydride." (Seible rpt. at 18), the ordinary meaning of anhydride is not altered. Moreover, with respect to anhydride, Kunbargi did not elect to be his own lexicographer for there is no definition of the term provided in the specification or the prosecution history. There is no evidence that "anhydride" was distinguished from the prior art in any way.

Plaintiffs' argument that one of ordinary skill in the art would know that the reference to anhydride meant anhydrite is unavailing. *Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1349 (Fed. Cir. 2002).* In Bartell the Federal Circuit refused to read the term "perpendicular" to mean "parallel" in order to preserve the validity of the patent, even where plaintiff asserted that one skilled in the art would have understood perpendicular to mean parallel in the context of the claims. Id. Likewise, the Court declines to substitute terms merely because one skilled in the art might realize the claim intends to refer to anhydrite instead of anhydride.

While plaintiffs do not specifically [*43] state that the reference to anhydride was a typographical error or an outright mistake, it is apparent that they would like the patent to read "anhydrite." This is clear from the numerous references to CaSO4 anhydrite (rather than anhydride) in the issues posed to Dr. Seible. (See, e.g., Seible rpt. at 4). The Federal Circuit permits the correction of "obvious minor typographical errors in patents" in limited circumstances; however, the court cautions against redrafting claim terms, even where necessary to avoid a strange result. *Novo Indust. v. Micro*

*Molds Corp., 350 F.3d 1348, 1357 (Fed. Cir. 2003)*; *Bartell, 299 F.3d at 1349 (Fed. Cir. 2002)*; *Chef America, Inc. v. Lamb-Weston, 358 F.3d 1371, 1374 (Fed. Cir. 2004)*. The Federal Circuit "repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity . . . [e]ven a nonsensical result does not require the court to redraft the claims." Id. (internal quotations and citations omitted). In Chef America, the Court refused to rewrite a claim "heating batter-coated dough to a temperature in the range of [*44] about 400 degrees F. to 850 degrees F" to refer to the oven rather than the temperature of the dough, even where it meant that following the teachings of the claim would result in the dough being "burned to crisp" rather than exhibiting a "light, flaky, crispy texture" as called for in the specification. Id. The Court stated "in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it." Id.

Here, it seems that Kunbargi may have intended to write anhydrite rather than anhydride. Anhydrites are compounds that are part and parcel of the high-strength cement world -- soluble $CaSO_4$ -- whereas an anhydride could be present, but there is little discussion of forming compounds from acids by removing water. Tellingly, the term anhydrite is not mentioned in the 556, nor can plaintiffs point to any portion of the specification or the prosecution history to support their contention. Cf. *Winn Incorp. v. Eaton Corp., 272 F. Supp. 2d 968, 981 (C.D. Cal. 2003)*. Because the issue is non-infringement and not invalidation, this ruling is consistent with the maxim that claims should be interpreted to preserve their [*45] validity. See *Modine Mfg. Co. v. United States Int'l Trade Commission, 75 F.3d 1545 (Fed. Cir. 1996)*. In accordance with the prevailing line of Federal Circuit cases, the Court declines to redraft the claims and finds instead that the ordinary meaning is applicable. Consequently, because CTS cement does not contain anhydride,

CTS has not infringed the patent, and CTS motion for summary judgment on grounds of non-infringement is granted.

## D. Motions Re: Laches, Equitable Estoppel & Shop Rights

The parties have also submitted cross motions for summary judgment regarding defendants' defenses of laches, equitable estoppel and shop rights. As an initial matter, plaintiffs argue that defendants are precluded from asserting the invalidity of the 556 patent. Plaintiffs contend that defendants' never asserted the invalidity of the 556 in their interrogatory responses. In fact, defendants' Answer to plaintiffs' Second Amended Complaint asserts an affirmative defense of invalidity against all three patents in suit (Answer at 7 P 2). Accordingly, the Court considers the merits of the motion.

### 1. Laches

The equitable defense of laches is cognizable [*46] under *35 U.S.C. § 282* and its application is "accorded to the sound discretion of the district court." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992)*; see *Chisum § 19.05*. Laches offers a defense to infringement which has occurred prior to the filing of the suit. *Chisum § 19.05*. To establish a defense of laches, defendant has the burden of showing: (1) plaintiff has delayed filing suit for an unreasonable time after he knew or should have known of his infringement claim (but no earlier than the date the patent issued); and (2) the delay prejudices the defendant. *Aukerman; 960 F.2d at 1032*. Prejudice may be evidentiary -- the loss of documents or witnesses' memories over time -- or economic -- the loss of monetary investments which would have been prevented via an earlier suit. Id.

A presumption of laches arises from "a more than six-year delay in filing suit." Id. Defendant makes out a prima facie defense of la-

ches upon proof that the patentee delayed more than six years from the date he knew or should have known [*47] of defendant's infringement. "In determining the date of constructive knowledge, a patentee is charged with such knowledge as it might have obtained upon inquiry, provided the facts already known to it were such as to put upon a man of ordinary intelligence the duty to inquire." *R2 Med. Sys. v. Katecho, 931 F. Supp. 1397, 1409-10 (N.D. Ill. 1996)* quoting *Advanced Cardiovascular Sys, Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1162 (Fed Cir. 1993)* (internal quotation omitted). Absent this presumption, a defendant may still prevail by showing unreasonable delay and prejudice, but with the presumption "these facts must be inferred, absent rebuttal evidence." *Id. at 1037*. The presumption does not shift the burden of proof to the patentee, but rather "vanishes upon introduction of evidence" demonstrating a reasonable delay or the lack of prejudice. Id. Once the presumption is destroyed, unreasonable delay and prejudice "must be proved and judged on the totality of the evidence presented." Id.

The presumption of laches, however, does not mandate a finding for defendant. *Id. at 1036*. Rather, the presumption lays "the foundation for the trial court's [*48] exercise of discretion. Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *Id. at 1036*. Such evidence may include conscious copying of the patent-in-suit. *Id. at 1033*.

Plaintiffs argue that Kunbargi was not on notice of CTS's infringing activities because it was not possible to "reverse engineer" CTS Rapid-Set cement to determine if it infringed the 556. (Kunbargi decl. P 60). Kunbargi also maintains he hired a private investigator in 1997, but the results of that investigation were not conclusive. (Id. P 59). Finally, plaintiffs maintain that Rice assured Kunbargi that CTS's products did not infringe the 556 patent.

The obligation falls to a patentee to police the marketplace in order to protect his patent rights. *Wanless v. General Electric Co., 148 F.3d 1334, 1339 (Fed. Cir. 1998)*. Based upon his relationship with Rice, Kunbargi was on inquiry notice regarding defendants' accused cement from the date of the issuance of the 556. Plaintiffs concede that Kunbargi "demonstrated his invention to Rice" and, in July of 1988, he applied this invention [*49] to the clinker produced from the so-called "Burn One" at the Heartland facility in order to form rapid hardening cement. (Kunbargi decl. PP 14, 39). Additionally, letters between Kunbargi and Rice indicate that "new cement" was created while Kunbargi was affiliated with CTS. (Rice decl. Ex. 6 at 20; Ex. 10).

CTS's competition in the rapid hardening cement market should have heightened Kunbargi's vigilance. *Wanless, 148 F.3d at 1340*. Plaintiffs provide no evidence regarding the scope of the private investigator's inquiry, just that one occurred. (Kunbargi decl. P 59). Plaintiffs' assertion regarding the inability to reverse engineer the 556 is also unavailing. While the feasibility or expense of testing is a factor in determining if a patentee conducted an adequate investigation, hiring a private investigator once during the twelve-year period prior to filing suit does not fulfill Kunbargi's obligations. *Wanless, 148 F.3d at 1339-40*. Additionally, if Kunbargi was concerned about the method claims of the 556, he could have investigated CTS's production processes for Rapid Set. The record indicates plaintiffs made no inquiry. The friendly notes written [*50] by Rice to Kunbargi, and Kunbargi's bare assertions that Rice maintained that CTS was not using "soluable anhydrite" in Rapid Set, are insufficient to contradict the other evidence that demonstrates that plaintiffs should have been on inquiry notice from the date of the issuance of the 556 patent in 1990. Moreover, defendants offer the Collins declaration in which he states that Kunbargi expressed his intent to sue CTS as early as

1997, but was waiting for Rice to build up the business. (Collins decl. PP 2-4).

Given the twelve-year delay between the issuance of the patent and the filing of the present suit, and the fact that plaintiffs were on inquiry notice of potential infringement well before 1997 when plaintiffs admit Kunbargi contemplated filing suit, prejudice is presumed. Plaintiffs' conclusory assertions that defendants have kept backup files from Burn One and that the two witnesses who have become unavailable could not offer relevant testimony do not adequately rebut this presumption. (See Rice decl. P 17). Specifically, plaintiffs fail to demonstrate that the destruction of records from Burn One and the loss of testimony from John Bush, the former head of the CTS lab [*51] during Kunbargi's tenure, is not prejudicial. (Id. PP 17-18). These assertions are insufficient to create a genuine issue as to laches, particularly given the length of the delay. *Auckerman, 960 F.2d at 1039.* While evidence of inequitable conduct can defeat the application of laches, the record demonstrates that defendants do not willfully infringe claims 9-11 of the 556, based on the Court's interpretation of those claims. *Id. 960 F.2d at 1039.* CTS' objections to plaintiffs' evidence in opposition are overruled. The Court thus grants defendants' motion with respect to laches and denies plaintiffs' cross motion.

### 2. Equitable Estoppel

Equitable estoppel is a complete defense to an infringement suit. *Chisum § 19.05[3] [a]*; *Aukerman, 960 F.2d at 1041.* Estoppel is established where: (1) defendant demonstrates a misrepresentation; (2) reliance; and (3) prejudice (economic or evidentiary). Id. While "silence alone will not create estoppel unless there is a clear duty to speak" the Court must focus on whether the patentee's conduct "reasonably gave rise to an inference" of non-enforcement [*52] of the patent-in-suit. Id. Plaintiff may defeat a motion for summary judgment by demonstrating a genuine factual issue with respect to any of these prongs. *Id. at 1043.*

Defendants' motion relies heavily on *ABB Robotics, Inc. v. GMFanuc Robotics Corp., 52 F.3d 1062, 1064 (Fed. Cir. 1995).* There, the court found that the long delay after defendant denied infringement, combined with "other factors," gave rise to an estoppel defense. Id. The court found that the circumstances of the relationship between the licensor and defendant, including negotiations between the licensor and defendant with respect to other patents, allowed defendant to conclude that the patent would not be asserted against it. Id.

Here, CTS argues that, given the close relationship between the parties, Kunbargi's failure to respond to Rice's April 16, 1990 letter wherein he sought a meeting to discuss "the ownership of certain technologies" gave rise to a reasonable belief that the 556 patent would not be asserted against it. The elements present in ABB Robotics, such as continued negotiations between the parties, are absent here. An estoppel defense where the potential [*53] infringer initiates the contact is not readily supportable by the case law, even where the parties had a mentor relationship. Defendants' estoppel defense lacks merit, and thus, plaintiffs' motion is granted.

### 3. Shop Rights

Shop rights are doctrinally rooted in the concepts of implied license and equity. They provide an employer with "a nonexclusive, royalty-free, nontransferable license" to practice the patent when an employee used the employer's resources "to conceive of an invention or to reduce it to practice." *Chisum § 22.03[3].* A shop right is not a true ownership interest, but rather operates as a defense to a claim of infringement. The classic shop right scenario is found when an employee (1) develops an idea during work hours for which he was compensated; (2) uses his employer's resources or facilities and his time at work to produce an embodiment of the invention; and (3) introduces the embodiment into his employer's facilities. Id.; *Francklyn v. Guilford Packing Co., 695*

*F.2d 1158, 1160-61 (9th Cir. 1983)* (finding that a shop right need not arise out of employer-employee relationship alone). All three elements need [*54] not be satisfied for a shop right to be established. Though often applied in the context of patent law, a "shop right" arises under state law. *Chisum § 22.03[4]*; see *McElmurry, 995 F.2d 1576 at 1581*.

There are cross motions on this issue, and several disputed factual issues preclude summary judgment. Of crucial importance is the time when the invention was reduced to practice. Reduction to practice occurs where an inventor determines that his invention would work for its intended purpose. *Slip Track Sys., Inc. v. Metal Lite, Inc., 304 F.3d 1256 (Fed. Cir. 2002)*.

Here, there are factual disputes surrounding when and where Kunbargi conceived of and reduced to practice the inventions which are now embodied in claims 1, 2 and 9-11 of the 556 patent. At the very least, Kunbargi's UCLA lab notes indicate that he had not reduced to practice the invention at that time. (Kashani decl. Ex. C. See, e.g., statements: "what has happened is not clear yet" and "I think the following reaction happened"). Kunbargi states that he formed cement composition matching claims 9-11 in 1985 prior to his arrival at CTS (Kunbargi P 13). However, [*55] there is also evidence in the form of a flurry of letters between Rice and Kunbargi discussing the creating of a "new cement," suggesting that reduction to practice did not occur until Burn One at the Heartland facility. (Rice decl. Ex. 6 at 18, 20).

Similarly, the scope of Kunbargi's duties while employed at CTS and whether he was "employed to invent," such that any new cement produced at Burn One would be impliedly assigned to CTS, is a disputed factual issue. While Ultimax contends that the agreement is negated by CTS's failure to give the mandatory notice of inventor's rights as required by the *California Labor Code § 2872*, any assignment was not embodied in a written employment agreement or contract and thus this statutory provision is inapplicable. Plaintiffs arguments regarding statute of frauds is equally unavailing. Because any assignment would be a judicially-created fiction and not based on an oral agreement for services that could not be performed within one year, the statute of frauds does not apply. The parties' motions for partial summary judgment of defendant's shop rights defenses are denied.

**V.**

**CONCLUSION AND TRIAL SETTING** [*56]

For the foregoing reasons, the Court: (1) grants defendants' Motion for Summary Judgment for Invalidity and Indefiniteness as to the *684 patent*; (2) grants defendants' Motion for Partial Summary Judgment of Non-Infringement as to the 556 patent; (3) grants CTS's Motion for Summary Judgment on NonfsTechnical Grounds as to the 556 patent, ruling that laches bars prosecution of the 556 patent, but otherwise denies the parties' motions for partial summary judgment on defendants' remaining equitable defenses of alleged agreement to invent and shop rights; and (4) denies plaintiffs' Motion for Partial Summary Judgment on Patent Validity and Enforceability. Defendants' proposed Statement of Uncontroverted Facts and Conclusions of Law as to the first motion has been modified, signed, and filed; the remaining proposed Orders and Statements of Uncontroverted Pacts and Conclusions of Law have been ordered placed in file, not used.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that trial on the remaining claims and defenses is hereby scheduled for March 1, 2005, at 9:00 a.m. Pretrial Conference is hereby scheduled for February 7, 2005, at 2:00 p.m. The hearing on the motions in limine is hereby [*57] scheduled for February 18, 2005 at 1:30 p.m.

2004 U.S. Dist. LEXIS 29580, *

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties in this action.

DATED: December 6, 2004.

ALICEMARIE H. STOTLER

UNITED STATES DISTRICT JUDGE

# Exhibit D

LEXSEE 2004 U.S. DIST. LEXIS 585



Caution
As of: Jan 22, 2007

**TRISTRATA TECHNOLOGY, INC., Plaintiff, v. CARDINAL HEALTH, INC., PLAN B, INC., NALKCO INC., SKIN BIOLOGY, INC., BEAUTICONTROL, INC., GUTHER-REKER CORP., and AP PHARMA, INC., Defendants.**

**Civil Action No. 02-1290-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 585*

**January 16, 2004, Decided**

**SUBSEQUENT HISTORY:** Injunction granted at *Tristrata Tech., Inc. v. Cardinal Health, Inc., 2004 U.S. Dist. LEXIS 19870 (D. Del., Sept. 30, 2004)*

**DISPOSITION:** [*1] Defendant's motion for summary judgement denied. Plaintiff's motion for leave to conduct discovery denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendants, among them an alleged infringer. The alleged infringer moved for summary judgment asserting the defense of laches. The holder moved for leave to conduct limited discovery.

**OVERVIEW:** The alleged infringer asserted that there was a presumption of laches in the filing of the present lawsuit, and that the holder was under an affirmative duty to investigate possible infringement and asserted that the holder's 1995 and 1996 letters indicated the holder knew of the alleged infringer's products more than six years prior to the filing of the instant action. The alleged infringer asserted that the labeling of its products in question made it clear that the products might violate the holder's patents. The alleged infringer asserted both economic and evidentiary prejudice. The label of the allegedly infringing products, the simplicity of the patents, and the holder's solicitation letters indicated that it had, at least, constructive knowledge that the alleged infringer's products might infringe its patents. The alleged infringer could be considered to have had either indirect or constructive notice of its possible infringement and of the holder's intent to sue over such infringement. Additionally, the alleged infringement may have been willful. The equities of the case were split, and a grant of summary judgment was premature.

2004 U.S. Dist. LEXIS 585, *

**OUTCOME:** The motion for summary judgment was denied. The motion for leave to conduct limited discovery was denied as moot.

## LexisNexis(R) Headnotes

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
***Civil Procedure > Summary Judgment > Standards > Materiality***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN1] A party is entitled to summary judgment if a court determines from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN2] In determining whether there is a triable dispute of material fact in deciding a summary judgment motion, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party.

***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN3] When deciding a summary judgment motion, a court should not make credibility determinations or weigh the evidence.

***Civil Procedure > Summary Judgment > Evidence***
***Civil Procedure > Summary Judgment > Standards > General Overview***

[HN4] To properly consider all of the evidence in deciding a motion for summary judgment, a court should give credence to the evidence favoring the non-movant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule***
***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN5] To defeat a motion for summary judgment, Fed. R. Civ. P. 56(c) requires the non-moving party to show that there is more than some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN6] When deciding a motion for summary judgment, a court should consider the evidentiary standard that applies at trial.

***Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview***
[HN7] Laches is an equitable defense to a claim for patent infringement.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN8] Laches is defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN9] To establish the defense of laches, defendant has the burden of proving two elements: (1) that plaintiff delayed in filing suit for an unreasonable and inexcusable length of time after plaintiff knew or reasonably should have known of its claim against defendant, and (2) that defendant suffered material prejudice or injury as a result of plaintiff's delay.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
*Patent Law > Remedies > Damages > Time Limitations*
[HN10] The underlying critical factors of laches are presumed upon proof that the patentee delayed filing suit for more than six years after actual or constructive knowledge of defendant's alleged infringing activity. That presumption may be overcome if the patentee raises a genuine issue respecting either element of the laches defense.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
[HN11] In determining whether plaintiff's delay in filing suit was unreasonable, a court must look to the period of time beginning when plaintiff knew or reasonably should have known of defendant's alleged infringing activity and ending when plaintiff filed suit. In addition, a court should consider any reasonable excuses by plaintiff for the delay including, but not limited to: (1) other litigation; (2) negotiations with the accused; (3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent of the alleged infringement; and (6) a dispute over the ownership of the asserted patent.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN12] In showing prejudice in a laches defense in a patent infringement case, defendant can establish either economic prejudice or evidentiary prejudice. Evidentiary prejudice may arise where the delay has curtailed defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories. Economic prejudice arises where defendant suffers the loss of monetary investments or incurs damages which would have been prevented if plaintiff had filed suit earlier.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN13] Because the defense of laches is equitable in nature, mechanical rules do not govern its application. Rather, the court must consider all of the facts and circumstances of the case

and weigh the equities of the parties. Whether the defense of laches applies in a given case is committed to the sound discretion of the district court.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN14] Egregious conduct by the alleged infringer can prevent a finding of laches by demonstrating that the equities of the case favor plaintiff. What constitutes egregious conduct is not clear. Plagiarism, harassment, and intentional copying of plaintiff's product may qualify.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN15] A showing of willful infringement may preclude an alleged infringer from obtaining equitable relief.

**COUNSEL:** Arthur G. Connolly, III, Esquire of CONNOLLY, BOVE, LODGE & HUTZ, Wilmington, Delaware.

Of Counsel: Michael O.Warnecke, Esquire, Donald W. Rupert, Esquire, David R. Melton, Esquire, and Douglas L. Sawyer, Esquire of MAYER, BROWN, ROWE & MAW LLP.

Kevin M. McGovern, Esquire and Brian T. Foley, Esquire of MCGOVERN & ASSOCIATES, Greenwich, Connecticut. Counsel for Plaintiff Tristrata Technology, Inc.

R.H. Richards, III, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware.

Of Counsel: Thomas V. Heyman, Esquire of JONES DAY, New York, New York.

Paul W. Schrier, Esquire of JONES DAY, Dallas, Texas. Counsel for Defendant BeautiControl, Inc.

Josy W. Ingersoll, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware. Counsel for Defendant Cardinal Health, Inc.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOSEPH J. FARNAN, JR.

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

### Farnan, District Judge

Presently [*2] before the Court are the Motion for Summary Judgement of Laches (D.I. 73-1) filed by Defendant BeautiControl, Inc. ("Beauticontrol") and the Motion for Leave to Conduct Discovery (D.I. 82-1) filed by Plaintiff Tristrata Technology, Inc. ("Tristrata"). For the reasons discussed, the Motion for Summary Judgement of Laches will be denied and the Motion for Leave to Conduct Discovery will be denied as moot.

### BACKGROUND

Tristrata holds three patents each of which claims a method for removing wrinkles using alpha hydroxyacids (compounds such as citric acid, malic acid, lactic acid, quinic acid, and tartaric acid). Beauticontrol manufactures wrinkle removal products that allegedly infringe on the claims of Tristrata's patents.

In 1995 and 1996, Tristrata sent Beauticontrol two letters. In these letters, Tristrata mentioned Beauticontrol's position in the cosmetics industry, stated that Beauticontrol's products might include a certain named alpha hydroxya-

2004 U.S. Dist. LEXIS 585, *

cid (a different alpha hydroxy acid was named in each of the first two letters), and encouraged Beauticontrol to look into licensing agreements with Tristrata. Tristrata did not file the instant action alleging patent infringement [*3] until 2002. Beauticontrol asserts that Tristrata's present claims are barred by laches. Tristrata asserts that dismissal on grounds of laches is not warranted, and therefore, seeks to defer consideration of laches until after discovery.

## DISCUSSION

## I. The Legal Standard for Summary Judgement

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that [HN1] a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. [HN2] In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)*. However, [HN3] a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)*. [*4] Thus, [HN4] to properly consider all of the evidence, the "court should give credence to the evidence favoring the non-movant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*

[HN5] To defeat a motion for summary judgment, *Rule 56(c)* requires the non-moving party to show that there is more than "some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(c)*). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Additionally, [HN6] the Court should consider the evidentiary standard that [*5] applies at trial. See *Eli Lilly & Co. v. Barr Labs.., 251 F.3d 955, 962 (Fed Cir. 2001)* (stating that "when evaluating a motion for summary judgment, the court views the record evidence through the prism of the evidentiary standard of proof that would pertain at trial to the merits.") (citations omitted).

## II. The Legal Standard for Laches

[HN7] Laches is an equitable defense to a claim for patent infringement. *A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992)* (en banc). [HN8] Laches is defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Id. at 1028-1029*. [HN9] To establish the defense of laches, the defendant has the burden of proving two elements: (1) that the plaintiff delayed in filing suit for an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) that the defendant suffered material prejudice or injury as a result of the plaintiff's delay. [*6] *Id. at 1028*.

[HN10] "The underlying critical factors of laches are presumed upon proof that the patentee delayed filing suit for more than six years

2004 U.S. Dist. LEXIS 585, *

after actual or constructive knowledge of the defendant's alleged infringing activity." *Id. at 1035-36.* This presumption may be overcome if the plaintiff raises a genuine issue respecting either element of the laches defense. *Id. at 1038.*

[HN11] In determining whether the plaintiff's delay in filing suit was unreasonable, the court must look to the period of time beginning when the plaintiff knew or reasonably should have known of the defendant's alleged infringing activity and ending when the plaintiff filed suit. In addition, the court should consider any reasonable excuses by the plaintiff for the delay including, but not limited to: (1) other litigation; (2) negotiations with the accused; (3) possible poverty or illness under limited circumstances; (4) wartime conditions; (5) the extent of the alleged infringement; and (6) a dispute over the ownership of the asserted patent. *A.C. Aukerman Co., 960 F.2d at 1033* (citations omitted).

[HN12] The defendant can establish either economic prejudice [*7] or evidentiary prejudice. Evidentiary prejudice may arise where the delay has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories. *Id. at 1033.* Economic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the plaintiff had filed suit earlier. *Id.*

[HN13] Because the defense of laches is equitable in nature, "mechanical rules" do not govern its application. *Id. at 1032.* Rather, the court must consider all of the facts and circumstances of the case and weigh the equities of the parties. *Id.* Whether the defense of laches applies in a given case is committed to the sound discretion of the district court. *Id.*

[HN14] Egregious conduct by the alleged infringer can prevent a finding of laches by demonstrating the equities of the case favor the plaintiff. *Id. at 1033.* What constitutes egregious conduct is not clear. Plagiarism, harassment, and intentional copying of the plaintiff's product may qualify. *TWM Mfg. Co., Inc. v. Dura Corp., 592 F.2d 346, 349 (6th. Cir. 1979);* [*8] *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995).*

## III. Allegations of the Parties

Beauticontrol alleges that because Tristrata abstained from filing suit for over 6 years, there is a presumption of laches in the filing of this lawsuit. Beauticontrol contends that Tristrata was under an affirmative duty to investigate possible infringement and asserts that Tristrata's 1995 and 1996 letters indicate Tristrata knew of Beauticontrol's "Regeneration" products more than six years prior to the filing of the instant action. Beauticontrol asserts that the labeling of its Regeneration products makes it clear that the products might violate Tristrata's patents.

Beauticontrol asserts that it has suffered prejudice because of Tristrata's delay. Beauticontrol asserts that over the last few years it has invested in and grown its Regeneration products line on the assumption that the line is lawful. Beauticontrol asserts that it would be unfair to allow Tristrata to capitalize on these efforts and on the delay in bringing the instant claims.

Beauticontrol asserts that there will also be evidentiary prejudice from the delay. Beauticontrol [*9] contends that the memories of key witnesses will be duller and that relevant evidence has been destroyed.

Tristrata asserts that it has not unjustifiably delayed in bringing the instant suit. Tristrata asserts that any delay that may have occurred was reasonable and asserts that some of Beauticontrol's products may have been on sale for less than six years and be precluded from a finding of laches.

Tristrata asserts that its letters were part of an informational campaign to inform potential clients about its patents and licensing program and do not reflect knowledge of infringing products. Tristrata contends that its resources did not allow it to investigate every possibly infringing product or sue every possible infringer at the same time. Tristrata asserts that it was diligent in pursuing disposition for those cases its resources allowed it to discover and pursue. Tristrata asserts that it did not investigate or test Beauticontrol's products between 1995 and 2002 and did not know it had a cause of action against Beauticontrol.

Tristrata asserts that Beauticontrol has not given sufficient evidence to show it suffered prejudice from any delay that may have occurred in bringing this [*10] case to trial. Tristrata contends that Beauticontrol has not demonstrated that relevant evidence was lost due to a delay.

Tristrata asserts that Beauticontrol may have known that it was selling infringing products and contends that this willful infringement would constitute egregious conduct and precludes a finding of laches.

Tristrata asserts that during a previous lawsuit the scope of its patents were challenged and its patents were reexamined by the PTO. Tristrata asserts that the patents were, in 1997, found valid and enforceable and that a subsequent Markman hearing and construction determined the scope of its patents. Tristrata asserts that any delay that may have occurred is excused by the aforementioned examination and litigation.

Tristrata contends that more discovery is needed on the issue of laches and asserts that material issues of fact relevant to laches exist. Tristrata contends that discovery on laches would most efficiently be done as part of general discovery.

Beauticontrol contends that willful infringement is not egregious conduct that pre-

vents a finding of laches. Beauticontrol contends that Tristrata's licensing efforts and litigations are not relevant [*11] to the instant motion because Tristrata did not inform Beauticontrol of any intention to sue for infringement.

## IV. Analysis

The label of the allegedly infringing products, the simplicity of the patents, and Tristrata's solicitation letters indicate that Tristrata had, at least, constructive knowledge that Beauticontrol's products might infringe Tristrata's patents.

Likewise, Beauticontrol could be considered to have had either indirect or constructive notice of its possible infringement and of Tristrata's intent to sue over such infringement and Beauticontrol's alleged infringement may have been willful. In such circumstances, [HN15] "a showing of willful infringement may 'preclude the alleged infringer from obtaining equitable relief.'" Cedarapids, Inc. v. CMI Corp. 1999 WL 33656876, *2 (N.D. Iowa 1999) (quoting Wang Lab. v. Mitsubishi Elecs. Am.., 1994 U.S. Dist. LEXIS 19612, 31 U.S.P.Q.2d 1139, 1141 (C.D. Cal.1994). However,"Several courts have specifically held that wilful infringement, by itself, is insufficient to preclude application of the laches defense." *Odetics, Inc. v. Storage Technology Corp., 14 F. Supp.2d 800, 806 (E.D. Va. 1998).* [*12] But, such infringement can and should be weighed in the balancing of equities.

Tristrata has submitted evidence indicating that it faced a long list of possible infringers and infringing products. Tristrata has also submitted evidence that it was previously engaged in litigation that challenged the scope of its patents. Although it was within Tristrata's power to send all possible infringers a minimally researched notice of an intent to sue, the merits of giving possible infringers such a notice must be balanced against the disadvantages of encouraging empty threats and gratuitous gestures.

2004 U.S. Dist. LEXIS 585, *

Beauticontrol has offered evidence that it will suffer economic injury based on the trial's delay but has not demonstrated that it will suffer prejudice from a loss of evidence. Beauticontrol has credibly asserted that it would have allocated its resources differently had it known that it would be sued for infringement; however, evidence contradicting this assertion may exist but be unrevealed because the parties have yet to engage in discovery.

On the facts presented at this juncture of the case, I find the equities of the case are split and a grant of summary judgement at this time may be premature. [*13] Also, factual disputes may exist that could affect a finding of laches. Therefore, I will deny Beauticontrol's Motion for Summary Judgment of Laches; however, as part of the pre-trial process, Beauticontrol will be granted leave to file a motion in limine to limit the period for which damages may be assessed or to renew its motion at the close of fact discovery. Plaintiff Tristrata's Motion for Leave to Conduct Discovery will be denied as moot; however, Tristrata may seek additional discovery relevant to the laches defense during the discovery period.

**CONCLUSION**

For the reasons discussed, the Motion for Summary Judgement of Laches filed by Defendant Beauticontrol, Inc. and the Motion for Leave to Conduct Discovery filed by Plaintiff Tristrata Technology, Inc. will be denied. An Order consistent with this Memorandum Opinion will be entered.

**ORDER**

At Wilmington, this 16th day of January, 2004, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1) The Motion for Summary Judgement of Laches (D.I. 73-1) filed by Defendant BeautiControl, Inc. is **DENIED.**

2) The Motion for Leave to Conduct Discovery (D. [*14] I. 82-1) filed by Plaintiff Tristrata Technology, Inc. is **DENIED.**

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# Exhibit E

LEXSEE 2002 U.S. DIST. LEXIS 2591



Caution
As of: Jan 22, 2007

## IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION

**C.A. Nos.: 01-082 GMS; 01-083 GMS, 01-084 GMS; 01-085 GMS, 01-086 GMS; 01-087 GMS, 01-088 GMS; 01-089 GMS, 01-090 GMS; 01-091 GMS, 01-092 GMS; 01-093 GMS, 01-095 GMS; 01-096 GMS, 01-097 GMS; 01-098 GMS, 01-099 GMS; 01-100 GMS, 01-101 GMS; 01-102 GMS, 01-103 GMS; 01-104 GMS**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2002 U.S. Dist. LEXIS 2591*

**February 20, 2002, Decided**

**DISPOSITION:** [*1] Compal's motion for summary judgment granted in part and denied in part. Compaq's motion for summary judgment denied in its entirety. Elonex's letter requesting that portions of Compal's brief be stricken, or for leave to file a sur-reply, is declared moot.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, a licensee and an assignee of several patents, sued defendant competitors for patent infringement. Two competitors moved for summary judgment.

**OVERVIEW:** The first competitor based its motion on the alleged lack of notice of infringement, *35 U.S.C.S. § 287*(a). The second based its motion on the lack of marking and notice, again relying on § 287a. The court held that, where the licensee was neither selling nor manufacturing the patented products in the United States, it had no products to mark; thus, for the early part of the alleged damages period, the provisions of § 287(a) could not apply to bar pre-suit damages. During a middle part of the alleged damages period, the licensee failed to mark its products. However, the licensee alleged it gave notice of infringement to the competitors. When it gave notice to the competitors, the licensee was the exclusive licensee of the patents-in-suit and had been granted all substantial rights under the patents; thus, the licensee was capable of giving actual notice of infringement. The issue of whether the notice given was adequate, however, was not before the court. Finally, the court could not determine the extent of an agreement between the licensee and a sublicensee; thus, the court could not de-

termine whether the sublicensee was competent to give notice to the first competitor.

**OUTCOME:** The court denied the first competitor's summary judgment motion; a fact question existed about whether a competent party gave notice to the first competitor. The court granted in part and denied in part the second competitor's motion; the court granted the motion only regarding the period between the date the patented products were first sold in the United States and the date the licensee first gave notice to the second competitor.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN1] The court may grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. A fact is material if it might affect the outcome of the suit. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party.

*Patent Law > Inequitable Conduct > General Overview*

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Marking*
[HN2] *35 U.S.C.S. § 287*(a) limits a patentee's ability to recover if the patentee or persons making, offering for sale, or selling within the United States any patented article for or under the patentee failed to mark the patented article. If a patentee or someone acting "for or under" it does fail to so mark, § 287(a) allows the patentee to recover on proof that the infringer was notified of the infringement and continued to infringe thereafter. § 287(a). In that event, damages may be recovered only after such notice. § 287(a). The plaintiffs bear the burden of proving their compliance with § 287(a) before they may collect pre-suit damages.

*Contracts Law > Sales of Goods > General Overview*
*Patent Law > Infringement Actions > Defenses > Marking*
*Patent Law > Ownership > Conveyances > Licenses*
[HN3] The court concludes that, if the patentee or its licensee neither sells, nor manufactures, the patented product, the notice provisions of *35 U.S.C.S. § 287*(a) do not apply. Indeed, a patentee with an unutilized patent may do nothing before bringing a suit to collect damages for infringement, while one producing or selling the goods is under an obligation to provide notice before exercising patent rights.

*Patent Law > Infringement Actions > Summary Judgment > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN4] A plaintiff cannot create a genuine issue of fact as to whether particular licensed products are covered by the patent-in-suit simply by arguing the possibility of such a result.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN5] The United States Court of Appeals for the Federal Circuit has concluded that the definition of "patentee" or "successor in title to the patentee" under *35 U.S.C.S. § 100*(d) includes parties to whom all substantial rights under the patent have been transferred in the form of an exclusive license. Conversely, any less than a complete transfer of these rights is merely a license, in which case the title remains with the owner of the patent. Although cases so construing § 100(d) have dealt with the issue of whether the party has standing to bring suit in its own name, the United States District Court for the District of Delaware holds that terms "patentee" or "successor in title to the patentee" set forth in § 100(d) cannot be construed differently for purposes of conferring standing rights and notice rights on parties. A party that has standing to bring suit in its own name must necessarily be capable of giving actual notice of infringement.

*Patent Law > Infringement Actions > Defenses > Marking*
[HN6] A licensee's right to sub-license is an important consideration when determining whether the licensee was competent to give notice of infringement.

*Patent Law > Infringement Actions > Defenses > Marking*
*Patent Law > Ownership > Conveyances > Assignments*
*Patent Law > Ownership > Conveyances > Licenses*
[HN7] While it is true that a license may be written, verbal, or implied, if the license is to be considered a virtual assignment for the purpose of conveying notice under *35 U.S.C.S. § 287*, it must be in writing. Thus, logically, the licensing arrangement must resemble an actual assignment in both form and substance.

**COUNSEL:** For ELONEX I.P. HOLDINGS, LTD, EIP LICENSING B.V., IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION, plaintiffs (01-CV-82): Andre G. Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE.

For IN RE: ELONEX PHASE II POWER MANAGEMENT LITIGATION, plaintiff (01-CV-82): Donald F. Parsons, Jr., Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For COMPAQ COMPUTER CORP, PROVIEW INTERNATIONAL HOLDINGS LTD., defendants (01-CV-82): William J. Wade, Richards, Layton & Finger, Wilmington, DE.

For LG ELECTRONICS INC., defendant (01-CV-82): Richard K. Herrmann, Blank, Rome, Comisky & McCauley, Wilmington, DE.

For DELTA ELECTRONICS INC., DAEWOO ELECTRONICS CO., LTD., COMPAL ELECTRONICS, INC., COMPAL ELECTRONICS INC. (U.S.), SCEPTRE TECHNOLOGIES, INC, BIZCOM ELECTRONICS, INC., defendants (01-CV-82): Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE.

For NEC CORP, defendant: Steven J. Balick, [*2] Ashby & Geddes, Wilmington, DE.

For GATEWAY INC., NECX DIRECT LLC, GATEWAY COMPANIES, INC., GATEWAY.COM LP, GATEWAY DIRECT LP, GATEWAY BUSINESS LLC, GATEWAY COUNTRY STORES LLC,

GATEWAY GW RETAIL LLC, GATEWAY MANUFACTURING, INC, defendants (01-CV-82): Allen M. Terrell, Jr., Dominick T. Gattuso, Richards, Layton & Finger, Wilmington, DE.

For LITE-ON TECHNOLOGY CORP, defendant (01-CV-82): Robert W. Whetzel, Richards, Layton & Finger, Wilmington, DE.

For ADI CORP, defendant (01-CV-82): Josy W. Ingersoll, John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For CHUNTEX ELECTRONICS CO., LTD, CTX INTERNATIONAL INC., defendants (01-CV-82): Rudolf E. Hutz, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For ACER COMMUNICATIONS & MULTIMEDIA, INC., defendant (01-CV-82): John C. Andrade, Parkowski & Guerke, Dover, DE.

For TATUNG CORP, defendant (01-CV-82): James C. Strum, Stradley, Ronon, Stevens & Young, Wilmington, DE.

For APPLE COMPUTER, defendant (01-CV-82): Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

For KOREA DATA SYSTEMS CO., LTD., defendant (01-CV-82): Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, [*3] DE.

For ENVISION PERIPHERALS INC., TOP VICTORY ELECTRONICS (TAIWAN) CO, LTD., AOC INTERNATIONAL, defendants (01-CV-82): Richard D. Kirk, Morris, James, Hitchens & Williams, Wilmington, DE.

For CTX INTERNATIONAL INC., defendant (01-CV-82): Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For KOREA DATA SYSTEMS CO., LTD., counter-claimant (01-CV-82): Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For ELONEX I.P. HOLDINGS, LTD, EIP LICENSING B.V., counter-defendants (01-CV-82): Andre G. Bouchard, Bouchard, Margules & Friedlander, Wilmington, DE.

For COMPAQ COMPUTER CORP, counter-claimant (01-CV-82): William J. Wade, Richards, Layton & Finger, Wilmington, DE.

For TATUNG CORP, counter-claimant (01-CV-82): James C. Strum, Stradley, Ronon, Stevens & Young, Wilmington, DE.

For NEC CORP, counter-claimant (01-CV-82): Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For TOP VICTORY ELECTRONICS (TAIWAN) CO, LTD., ENVISION PERIPHERALS INC., AOC INTERNATIONAL, counter-claimants (01-CV-82): Richard D. Kirk, Morris, James, Hitchens & Williams, Wilmington, DE.

For GATEWAY COMPANIES, INC., GATEWAY COUNTRY STORES LLC, [*4] GATEWAY BUSINESS LLC, GATEWAY MANUFACTURING, INC, GATEWAY INC., NECX DIRECT LLC, GATEWAY GW RETAIL LLC, counter-claimants (01-CV-82): Allen M. Terrell, Jr., Dominick T. Gattuso, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION:**

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

On February 13, 2001, the plaintiffs, Elonex I.P. Holdings, Ltd. and EIP Licensing, B.V. (collectively "Elonex"), filed this action against certain companies that manufacture and sell computer systems or computer monitors. n1 The complaint alleges infringement of U.S. Patent Numbers 5,389,952 ("the 952 patent"), 5,648,799 ("the 799 patent"), and 5,649,719 ("the 719 patent"). The lawsuit relates to technology that concerns power management in computer monitors.

> n1 In December 1998, Elonex I.P. Holdings Ltd. and Elonex PLC filed a related lawsuit against another group of defendants on substantially the same grounds ("Elonex Phase I litigation").

Presently [*5] before the court are Compaq Computer Corp.'s ("Compaq") and Compal Electronics, Inc.'s ("Compal") motions for summary judgment. Compaq bases its motion on the issue of notice under *35 U.S.C. § 287*(a) ("Section 287(a)"). Compal bases its motion on the issues of marking and notice under Section 287(a).

For the reasons discussed below, the court will grant Compal's motion in part and deny it in part. The court will deny Compaq's motion in its entirety.

## II. STANDARD OF REVIEW

[HN1] The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also  Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 392 (3d Cir. 1998)*.

Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See  Boyle, 139 F.3d at 392*. A fact is material if it might [*6] affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*. An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also  Assaf v. Fields, 178 F.3d 170, 173-174 (3d Cir. 1999)*.

With these standards in mind, the court will briefly describe the facts and procedural history that led to the motions presently before the court.

## III. BACKGROUND

The patents-in-suit are a family of related patents directed to the field of power management in computer monitors and systems. The first of the patents-in-suit, the 952 patent, was issued on February 14, 1995. The 799 patent was issued on July 15, 1997. Finally, on March 9, 1999, the 719 patent was issued. Elonex I.P. Holdings, Ltd. ("EIPH") is the assignee of the 952, 799 and 719 patents. Elonex PLC ("PLC") is an affiliate of EIPH and the parent of EIP Licensing. The holding/parent company, EIPH, contends [*7] that its affiliate, PLC, was EIPH's exclusive licensee with respect to these patents during the time period in question. PLC's exclusive licensee rights terminated on October 15, 1999.

By virtue of its license, PLC had the exclusive right to license and sub-license throughout all parts of the world, and to make, sell and have made all goods protected by the patents. PLC also had the right to prosecute and settle any claims on behalf of itself or EIPH. On May 13, 1996, PLC granted the first license under

the patents-in-suit to Hewlett-Packard Company ("Hewlett-Packard"). On April 1, 1998, PLC licensed Hitachi, Ltd ("Hitachi").

Elonex alleges that PLC first notified Compal of infringement by a letter dated October 11, 1999. Elonex further alleges that PLC charged Compal with infringement at an in-person meeting in Taiwan on October 26, 1999. At a second licensing negotiation meeting on March 30, 2000, PLC reiterated the infringement charge and specifically identified particular Compal monitors that it believed infringed the patents in suit.

On May 5, 1995, Compaq received a letter from Elonex Technologies, Inc., which announced an "industry-wide patent licensing program." Between [*8] July 18, 1995 and November 16, 1995, Elonex Technologies wrote three additional letters to Compaq's in-house counsel. On April 27, 1999, PLC itself wrote to Compaq concerning the Elonex licensing program.

On February 13, 2001, Elonex brought an infringement suit against Compaq, Compal, and numerous other defendants who had not taken part in the Elonex Phase I litigation.

## IV. DISCUSSION

### A. Marking

Compal asserts that Elonex failed to mark its products and, absent actual notice, is therefore barred from collecting pre-suit damages. [HN2] Section 287(a) limits a patentee's ability to recover if the patentee or "persons making, offering for sale, or selling within the United States any patented article for or under [the patentee]" failed to mark the patented article. *35 U.S.C. § 287*(a). If a patentee or someone acting "for or under" it does fail to so mark, Section 287(a) allows the patentee to recover "on proof that the infringer was notified of the infringement and continued to infringe thereafter." *Id.* In that event, damages may be recovered only after such notice. *See id.* The plain-

tiffs bear the burden of proving their compliance with [*9] Section 287(a) before they may collect pre-suit damages. *See Nike, Inc. v. Wal-Mart Stores, Inc. et al., 138 F.3d 1437, 1446 (Fed. Cir. 1998).*

PLC did not begin to license its products until May 13, 1996. It thus contends that, prior to that time, it had no licensees in the United States, nor did it directly sell its products in the United States. As it had no products to mark, the provisions of Section 287(a) cannot apply to bar pre-suit damages. In response, Compal argues that allowing such a "carve-out" of time is in direct contravention to Section 287(a)'s statutory language. Compal's reasoning for its position, however, assumes that there is in fact a product to mark. *See, e.g.*, Compal's Reply Brief at 9 (stating that "with [Elonex's position], the public could not rely on the lack of marking on an article for sale as an indication that the design is free to use."); Compal's Reply Brief at 11 (arguing that "by barring the collection of *any* damages prior to providing actual notice of the infringement, Section 287 gives a strong incentive to patentees to mark their products.")

Compal also imagines a situation where a patentee sells an unmarked product [*10] for two years, and then stops selling the product for four years. In such a situation, Compal argues that a defendant who was deceived by the unmarked products would be subject to four years of damages for the period when the patentee was under no duty to mark. The court need not address this situation, however, as there is no indication that Elonex sold unmarked products for any length of time, then stopped, and is now claiming that Compal should be liable for the period of time during which it stopped selling the unmarked products.

[HN3] The court concludes that, if the patentee or its licensee neither sells, nor manufactures, the patented product, Section 287(a)'s notice provisions do not apply. *See Refac Electronics v. A&B Beacon Business Machines, 695*

*F. Supp. 753, 755 (S.D.N.Y. 1988)* (citing *Wine Railway Appliance Co. v. Enterprise Railway Equipment Co., 297 U.S. 387, 80 L. Ed. 736, 56 S. Ct. 528 (1936)).* Indeed, "a patentee with an unutilized patent may do nothing before bringing a suit to collect damages for infringement, while one producing or selling the goods is under an obligation to provide notice before exercising patent rights." *Id.* However, [*11] on the present facts, the record is unclear as to when, or if, Elonex and its licensees began selling the patented products in the United States prior to May 13, 1996. If Elonex had an unutilized patent during that time period, it had no duty to mark or provide actual notice. For the present purposes, however, whether Elonex and its licensees actually sold or manufactured patented products prior to that time remains a genuine issue of material fact. Accordingly, the court will deny Compal's motion for summary judgment with regard to the pre-May 13, 1996 period.

Compal next contends that Elonex failed to mark its products after May 13, 1996. The court agrees. It is undisputed that several companies selling computer monitors in the United States have taken licenses under the patents-in-suit. Hewlett-Packard became licensed on May 13, 1996. Hitachi became licensed on April 1, 1998. Further, as Elonex admitted in its October 20, 2000 response to interrogatory number 15, "plaintiffs are unaware of any licensee of the patents-in-suit having marked any of its products with the numbers of the patents-in-suit." It further declared in the Elonex Phase I litigation revised Joint Pretrial Order [*12] that "plaintiffs do not claim that Hewlett-Packard or plaintiffs' other licensees have ever marked products sold in the United States with the numbers of the patents-in-suit. Rather, plaintiffs claim they provided notice of infringement to the defendants." n2

n2 Although the Proposed Pre-Trial Order concerns the Elonex Phase I litiga-

tion, this admission is directly applicable to the related Elonex Phase II litigation.

Elonex now argues that Compal has failed to prove that Elonex or its licensees actually sold patented products in the United States prior to the initiation of this lawsuit. This argument must fail. Elonex itself stated in its February 22, 2001 Joint Proposed Pretrial Order that "Hewlett-Packard's products were the first subject to the marking or notice requirements of *35 U.S.C. § 287*(a)." Furthermore, in an October 12, 2001 letter to the court, Elonex stated that, "no notice requirement existed in this case from February 1995 (when the 952 patent issued) to May 1996 (when [*13] plaintiffs first licensed the technology to Hewlett-Packard Co.)" In light of these admissions, the court concludes that there is no genuine issue of material fact that Elonex's duty to provide notice arose at least as early as May 13, 1996.

Moreover, Compal has provided a declaration from Benoit Montfort, Hewlett-Packard's Quality Control Manager, that "Hewlett-Packard has been selling computer monitors in the United States since May 1996 . . . that employ the VESA DPMS standard." Further, by a letter dated October 11, 1999, Elonex itself informed Hewlett-Packard that monitors employing the VESA DPMS standard infringe its patent. Accordingly, Elonex cannot now set forth a series of "possibilities" that Hewlett-Packard did not sell products which would have triggered its Section 287(a) duties. Absent concrete evidence, Elonex's argument will not preclude summary judgment. *See Loral Fairchild Corp. v. Victor Co. of Japan Ltd., 906 F. Supp. 813, 818 (E.D.N.Y. 1995)* (holding that [HN4] "[plaintiff] cannot create a genuine issue of fact as to whether these licensed [products] are covered by the [patent-in-suit] simply by arguing the possibility of such a result.")

For [*14] the foregoing reasons, absent having provided actual notice as discussed below, Elonex is not entitled to damages from the

period of May 13, 1996 to February 13, 2001, the date on which Elonex filed suit.

## B. Actual Notice

Compaq joins Compal in contending that PLC was not competent to provide actual notice of infringement in compliance with Section 287(a) because it was not the patent owner. In response, Elonex argues that PLC was an exclusive licensee and, therefore, the equivalent of the patent owner.

It is undisputed that PLC was the exclusive licensee of the patents-in-suit from August 1, 1997 to October 15, 1999. n3 The court must now determine whether PLC's exclusive licensee status is such that it would be considered the patentee, or successor in title to the patentee, for purposes of providing Section 287(a) notice. [HN5] The Federal Circuit has concluded that the definition of "patentee" or "successor in title to the patentee" under *35 U.S.C. § 100*(d) ("Section 100(d)") includes parties to whom all substantial rights under the patent have been transferred in the form of an exclusive license. *See Enzo APA & Son v. Geapag A.G., 134 F.3d 1090, 1093 (Fed. Cir. 1998);* [*15] *see also Speedplay Inc., v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000)* (holding that "[a] party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights.") Conversely, "any less than a complete transfer of these rights is merely a license, in which case the title remains with the owner of the patent . . . ." *Enzo, 134 F.3d at 1093.* The court recognizes that cases so construing Section 100(d) have dealt with the issue of whether the party has standing to bring suit in its own name. However, the court is persuaded that the terms "patentee" or "successor in title to the patentee" set forth in Section 100(d) cannot be construed differently for purposes of conferring standing rights and notice rights on parties. A party that has standing to bring suit in its own name must necessarily be capable of giving actual notice of infringement.

> n3 This was not PLC and Elonex I.P.'s first exclusive licensing agreement. Specifically, PLC had previously entered into an exclusive licensing agreement with EIPH in 1995.

[*16]

Having concluded that certain exclusive licensees may provide actual notice, the court must now determine if PLC qualifies for this treatment. PLC entered into an agreement to become EIPH's exclusive licensee on August 1, 1997. Under that agreement, PLC enjoyed substantial rights as EIPH's exclusive licensee. PLC had the world-wide right to "exploit and use in all ways" the patents. Specifically, this right included "the right to make, sell, and have made goods protected by the patents," and the right to grant sub-licenses in PLC's discretion. There were two minor restrictions placed on PLC's right to grant the sub-licenses. First, such a grant must have occurred at arms length, and second, it must have been for lump-sum and/or periodic royalties. PLC agreed to pay EIPH 80% if the royalties resulting from the use of existing patents. The agreement further granted PLC the right to "prosecute or settle" any proceedings on its own behalf, or on behalf of EIPH. EIPH retained the ability to assign ownership rights of its patents, expressly subject to PLC's rights under the agreement.

Based on this information, the court concludes that EIPH assigned substantially all the rights in the [*17] patents-in-issue. There were no substantial restrictions on PLC's use of the patents, in any manner, or in any geographic location. Moreover, PLC had the right to sub-license at its discretion. *See Prima Tech II L.L.C. v. A-Roo Co., 222 F.3d 1372, 1380 (Fed. Cir. 2000)* (noting that [HN6] "[a] licensee's right to sub-license is an important considera-

tion . . . .") Finally, it had the right to prosecute and settle suits on behalf of itself or EIPH. n4 *See Vaupel Textilmachinene KG v. Meccanica Euro Italia S.P.S., 944 F.2d 870, 875 (Fed. Cir. 1991)* (noting the importance of the right to sue.)

> n4 Compaq makes much of the fact that, because the agreement does not explicitly give PLC the right to "initiate" lawsuits, PLC's rights under the agreement were restricted. The agreement does, however, explicitly grant PLC the right to "prosecute" lawsuits. Black's Law Dictionary explains "prosecute" by stating that, "to prosecute an action is not merely to commence it, but includes following it to an ultimate conclusions." *See* BLACK'S LAW DICTIONARY 1221 (6th ed. 1990). Accordingly, the court finds Compaq's distinction meritless.

[*18]

Compal admits to receiving a letter from PLC dated October 11, 1999. PLC was EIPH's exclusive licensee until October 15, 1999. PLC was thus competent to provide actual notice of infringement to Compal at that time. Compal argues, however, that the October 11, 1999 notice lacked sufficient specificity and was thus inadequate. The court declines to address this issue because the issue presented in the motion presently before the court relates squarely to whether PLC was a proper party to give actual notice of infringement. The court has simply found that PLC could have given notice as of the October 11, 1999 letter. n5 In accordance with its November 19, 2001 order, the court thus expresses no opinion on the adequacy of any notice.

> n5 The court recognizes, however, that if the October 11, 1999 letter is deemed inadequate notice, the subse-

quent communications from PLC cannot be considered actual notice because PLC was no longer EIPH's exclusive licensee.

Compaq likewise admits to receiving communications from PLC. [*19] The earliest such communication is a letter dated April 27, 1999. As set forth more clearly above in relation to Compal's argument, PLC, as the exclusive licensee, was competent to give notice of infringement on April 27, 1999. Accordingly, at the latest, a proper party gave notice to Compaq in April 1999. n6

> n6 The court again expresses no opinion on the adequacy of the April 27, 1999 notice.

With regard to Compaq, Elonex further argues that Elonex Technologies, another "exclusive licensee," gave Compaq actual notice as early as May 5, 1995. The court must thus decide if Elonex Technologies was, in fact, a party capable of giving actual notice.

On April 3, 1995, PLC and EIPH entered into their first exclusive licensing agreement with regard to the 952 patent. Pursuant to its powers under that agreement, PLC sub-licensed its rights in this patent to Elonex Technologies in April 1995. Elonex maintains that Elonex Technologies "stepped in the shoes" of PLC, and thus, had the same rights and ability to give actual [*20] notice that PLC enjoyed.

[HN7] While it is true that a license may be written, verbal, or implied, if the license is to be considered a virtual assignment for the purpose of conveying notice under Section 287, it must be in writing. *See Enzo, 134 F.3d at 1093* (noting this principle in the context of when an exclusive licensee becomes the effective owner of the patent for purposes of standing.) Thus, logically, the licensing arrangement must resemble an actual assignment in both form and

substance. *See id.* Under *35 U.S.C. § 261,* "applications for patent, patents or any interest therein, shall be assignable in law by an instrument in writing." With this principle in mind, the court concludes that it is unable to determine the actual extent of the agreement between PLC and Elonex Technologies. The parties have not provided contemporaneous written documentation of the relationship between PLC and Elonex Technologies, and indeed, it is possible that none exists. Accordingly, there remains a genuine issue of material fact on this point, and the court declines to decide whether Elonex Technologies was competent to provide actual notice.

## V. CONCLUSION [*21]

It is undisputed that Elonex or its licensees failed to mark products from May 13, 1996 to February 13, 2001. However, a company competent to give actual notice notified Compal of its alleged infringement on October 11, 1999. The court will thus grant Compal's motion for summary judgment with regard to the period between May 13, 1996 to October 11, 1999 only. The court will deny Compaq's motion for summary judgment in its entirety because it concludes that Compaq received notice from a competent party in April 1999. As it is unclear whether Compaq had notice from a competent party as early as 1995, there remains a genuine issue of material fact with regard to any time period prior to April 1999.

For the foregoing reasons, IT IS HEREBY ORDERED that:

> 1. Compal's motion for summary judgment (D.I. 320) is GRANTED in part and DENIED in part;

> 2. Compaq's motion for summary judgment (D.I. 323) is DENIED; and

> 3. Elonex's letter requesting that portions of Compal's brief be stricken, or for leave to file a sur-reply, (D.I. 387) is declared MOOT.

Date: February 20, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# Exhibit F

LEXSEE 2004 U.S. DIST. LEXIS 30048



Analysis
As of: Jan 24, 2007

**THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY, et al.,
Plaintiff, v. ABACUS SOFTWARE, INC., et al., Defendant.**

**Civil Action No. 5:01-CV344**

**UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF TEXAS, TEXARKANA DIVISION**

*2004 U.S. Dist. LEXIS 30048*

**September 29, 2004, Decided
September 29, 2004, Filed**

**SUBSEQUENT HISTORY:** Motion dismissed by *Mass. Inst. of Tech. v. Abacus Software, Inc., 2004 U.S. Dist. LEXIS 30047 (E.D. Tex., Sept. 29, 2004)*

**PRIOR HISTORY:** *Mass. Inst. of Tech. v. Abacus Software, 2004 U.S. Dist. LEXIS 30049 (E.D. Tex., Sept. 29, 2004)*

**COUNSEL:** [*1] Robert M Parker, Mediator, Mediator, Pro se, Tyler, TX.

Gail Peterson, Special Master, Pro se, San Antonio, TX.

For Massachusetts Institute of Technology, Plaintiff: Nicholas H Patton, Patton & Tidwell, Texarkana, TX; Karen Gibbs, Kevin Cheatham, Phoebe Liu, Rob Nagel, Russell B Hill, Tom Crunk, William C Rooklidge, Howrey Simon Arnold & White, Irvine, Ca.

For Electronics for Imaging, Plaintiff: Nicholas H Patton, Patton & Tidwell, Texarkana, TX;

Karen Gibbs, Kevin Cheatham, Phoebe Liu, Rob Nagel, Russell B Hill, Tom Crunk, William C Rooklidge, Howrey Simon Arnold & White, Irvine, Ca; Jennifer Sim, Attorney at Law, Foster City, CA.

For ACD Systems, Cerious Software, Inc., Deneba Systems, Inc., Defendants: Alan David Harrel, Atchley Russell Waldrop & Hlavinka, Texarkana, TX.

For AFGA Corporation, Largan, Incorporated, Defendants: Theodore Stevenson, III, McKool Smith, Dallas, TX.

For Arcsoft, Incorporated, Argus Cameras, Inc., Defendants: Richard P Doyle, Jr, Janssen Doyle, Lafayette, Ca.

For Argus Cameras, Inc., Defendant: Richard P Doyle, Jr, Janssen Doyle, Lafayette, Ca; Sunday M Yokubaitis, Janssen Doyle, Lafayette, Ca.

For Boomerang Software, [*2] Inc, Defendant: Damon Michael Young, Lance Lee, Young Pickett & Lee, Texarkana, TX; David P Enziminger, Dennis R Gallagher, O'Melveny & Myers, Los Angeles, Ca.

For Corel Corporation, Defendant: Carl R Roth, The Roth Law Firm, P.C., Marshall, Tx; David L Haga, Jeffrey D Sanok, Michael H Jacobs, Michael Charles Smith, Richard McMillan, Jr., Crowell & Moring LLP, Washington, DC.

For Dell Computer Corporation, Defendant: James N Haltom, Haltom and Doan LLP, Texarkana, Tx.

For Ezonics Corporation, Defendant: Angela Annette Hunt, McKool Smith, Dallas, TX; Theodore Stevenson, III, McKool Smith, Dallas, TX.

For Macmillan Software, also known as Macmillan USA and Macmillan Publishing, Defendant: Richard P Doyle, Lafayette, Ca; Sunday M Yokubaitis, Janssen Doyle, Lafayette, Ca.

For MGI Software Corporation, Defendant: Damon Michael Young, Lance Lee, Young Pickett & Lee, Texarkana, TX; David P Enziminger, Dennis R Gallagher, O'Melveny & Myers, Los Angeles, Ca.

For Micrografx, Incorporated, Defendant: Carl R Roth, The Roth Law Firm, P.C., Marshall, Tx; David L Haga, Jeffrey D Sanok, Michael H Jacobs, Michael Charles Smith, Richard McMillan, Jr., Crowell & Moring LLP, [*3] Washington, DC.

For Microsoft Corporation, Defendant: Thomas George Yoxall, Roy William Hardin, Locke Liddell & Sapp, Dallas, TX; G William Lavender, Lavender Law, Texarkana, AR.

For Newsoft America, Incorporated, Pacific Image Electronics, Inc, also known as P.I.E., Defendants: Theodore Stevenson, III, McKool Smith, Dallas, TX.

For Photoworks, Incorporated, Defendant: Benton J Gaffney, Bruce A Kaser, Stuart R Dunwoody, Davis Wright Tremaine LLP, Seattle, WA.

For Sanyo North America Corporation, Defendant: Damon Michael Young, Lance Lee, Young Pickett & Lee, Texarkana, TX; David P Enziminger, Dennis R Gallagher, O'Melveny & Myers, Los Angeles, Ca.

For Sipix Incorporated, Stomp, Inc, Acer Communications & Multimedia, Incorporated, Achiever Industrise Limited, World Office Products Manufacturing, Incorporated, Defendants: Richard P Doyle, Jr, Lafayette, Ca; Sunday M Yokubaitis, Janssen Doyle, Lafayette, Ca.

For Umax Technologies, Inc., Defendant: Lawrence Ira Fleishman, Browning & Fleishman - Ennis, Ennis, TX; John Garrett Browning, Browning & Fleishman, Dallas, TX.

L Computerinsel GmbH, Defendant, Pro se.

For Autologic Information International, [*4] Incorporated, A Delaware Corporation, Defendant: Theodore Stevenson, III, McKool Smith, Dallas, TX.

For Buy.Com, Incorporated, Compusa, Incoporated, Defendants: Herbert J Hammond, Vernon Goodrich, Dallas, TX; Richard Lawrence Wynne, Jr., Thompson & Knight - Dallas, Dallas, TX.

For Circuit City Stores Inc., A Delaware Corporation, Defendant: Richard M Knoth, Breaden M Douthett, Baker & Hostetler - Cleveland, Cleveland, OH; Jayne Lee Jaku-

baitis, Alan J Ross, Bricker & Eckler - Cleveland, Cleveland, OH; George E Badenoch, Kenyon & Kenyon, New York, NY.

For Costco Wholesale, Costco Wholesale Corporation, Defendant: G William Lavender, Lavender Law, Texarkana, AR.

For Fry's Electronics Inc., Defendant: James D Claytor, Foley McIntosh Frey & Claytor, Lafayette, Ca; Richard P Doyle, Jr, Lafayette, Ca; Sunday M Yokubaitis, Janssen Doyle, Lafayette, Ca.

For Hemera Technologies, A foreign corporation, NEC Computers Incorporated, Ofoto, Incoporated, Defendants: Carl R Roth, The Roth Law Firm, P.C., Marshall, Tx.

For Kyocera International, Inc., Kyocera Optics, Incorporated, World Office Products Manufacturing, Incorporated, Defendants: Richard P Doyle, Jr, Lafayette, [*5] Ca; Sunday M Yokubaitis, Janssen Doyle, Lafayette, Ca.

For Pixel Magic Imaging, Incorporated, Defendant: Matthew James Booth, Booth & Wright, Austin, TX; Dirk Jordan, Austin, Tx; Karen S Wright, Austin, TX.

For Roxio, Incorporated, Defendant: Damon Michael Young, Lance Lee, Young Pickett & Lee, Texarkana, TX; David P Enziminger, Dennis R Gallagher, O'Melveny & Myers, Los Angeles, Ca.

For Massachusetts Institute of Technology, Electronics for Imaging, Counter Defendants: Nicholas H Patton, Patton & Tidwell, Texarkana, TX; Karen Gibbs, Kevin Cheatham, Phoebe Liu, Rob Nagel, Tom Crunk, Howrey Simon Arnold & White - Irvine, Irvine, Ca; William C Rooklidge, Howrey LLP - Irvine CA, Irvine, Ca.

For Photodex Corp, Counter Claimant: Randall Louis Sarosdy, Akin Gump Strauss Hauer & Feld, Austin, TX.

For Pixel Magic Imaging, Incorporated, Counter Claimant: Matthew James Booth, Booth & Wright, Austin, TX.

For Matsushita Electric Industrial, Company, LTD, Counter Claimant: Roy William Hardin, Locke Liddell & Sapp - Dallas, Dallas, TX.

For Dell Computer Corporation, Counter Claimant: James N Haltom, Haltom and Doan LLP, Texarkana, Tx.

For Circuit City Stores [*6] Inc, Counter Claimant: Breaden M Douthett, Baker & Hostetler - Cleveland, Cleveland, OH; Jayne Lee Jakubaitis, Bricker & Eckler - Cleveland, Cleveland, OH; Melvin R Wilcox, III, Smead Anderson & Dunn, Longview, TX.

For Costco Wholesale, Microsoft Corporation, Counter Claimant: G William Lavender, Lavender Law, Texarkana, AR; Thomas George Yoxall, Roy William Hardin, Locke Liddell & Sapp, Dallas, TX.

For Boomerang Software, Inc, MGI Software Corporation, Roxio, Incorporated, Sanyo North America Corporation, Counter Claimant: Damon Michael Young, Lance Lee, Young Pickett & Lee, Texarkana, TX.

For Umax Technologies, Inc, Counter Claimant: Lawrence Ira Fleishman, John Garrett Browning, Browning & Fleishman - Ennis, Ennis, TX.

For Nova Development, Counter Claimant: Alan David Harrel, Atchley Russell Waldrop & Hlavinka, Texarkana, TX.

**JUDGES:** HON. CAROLINE M. CRAVEN, U.S. Magistrate Judge.

**OPINION BY:** Caroline M. Craven

**OPINION:**

HON. DAVID J. FOLSOM

U.S. District Judge.

HON. CAROLINE M. CRAVEN

U.S. Magistrate Judge

**ORDER ON PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

**I.**

On August 4, 2004, U.S. Magistrate Judge [*7] Caroline M. Craven issued a report and recommendation on several motions for summary judgment filed by the parties ("Report and Recommendation"). Insofar as is pertinent here, ArcSoft, Inc. ("ArcSoft") filed a Motion for Summary Judgment Regarding Noncompliance With Marking Requirements of *35 U.S.C. Section 287(a)* (Docket Entry # 1406) ("ArcSoft's Marking Motion") on behalf of itself and its indemnities (and fellow defendants) Achiever, Inc. ("Achiever"), Argus Industries d/b/a Argus Cameras ("Argus"), Kyocera International ("Kyocera Int'l"), Kyocera Optics, SiPix, Inc. ("SiPix"), Stomp, Inc. ("Stomp"), PTG Software f/k/a and sued as Macmillan Software ("Macmillan"), and World Office Products, Inc. ("World Office Products"). ArcSoft's Marking Motion urged lack of both actual and constructive notice.

In response, Plaintiffs filed their Opposition to and Cross-Motion for Summary Judgment Re Compliance With Marking Requirements of *35 U.S.C. § 287(a)* (Docket Entry # 1415) ("Plaintiffs' Marking Opposition" and "Plaintiffs' Marking Cross-Motion," respectively). In general, Plaintiffs' Marking Opposition addressed the issue of constructive notice. [*8] Plaintiffs addressed the issue of actual notice in

a separate submission entitled "Plaintiffs' Opposition to ArcSoft's Motion for Summary Judgment Regarding Noncompliance With Marking Requirements of *35 U.S.C. Section 287(a)* (Actual Notice Portion) (Docket Entry # 1416) ("Plaintiffs' Actual Notice Opposition").

Defendant Fry's Electronics, Inc. ("Fry's") then filed Fry's Electronics, Inc. Adoption of and Joinder in Microsoft Corporation's and ArcSoft's Motions for Summary Judgment of Noncompliance With Marking Requirements Under *35 U.S.C. Section 287(a)* (Docket Entry # 1420) ("Fry's Marking Motion").

Lastly, again insofar as pertinent here, Corel Corporation and Corel, Inc. (collectively, "Corel") filed Corel Corp.'s and Corel, Inc.'s Cross-Motion for Summary Judgment of Non-Infringement (Docket Entry # 1430) ("Corel's Non-Infringement Cross-Motion").

The Report and Recommendation recommended, *inter alia*, that:

1. ArcSoft's Marking Motion, with respect to constructive notice, should be DENIED, and with respect to actual notice should be GRANTED.

2. Fry's Marking Motion, with respect to having joined and adopted Microsoft's [*9] and ArcSoft's motions on constructive notice, should be DENIED, and with respect to having joined and adopted ArcSoft's motion on actual notice should be GRANTED.

3. Plaintiffs' Marking Cross-Motion should be DENIED.

4. Corel's Non-Infringement Cross-Motion should be DISMISSED WITHOUT PREJUDICE.

## II.

Plaintiffs have filed Plaintiffs' Objections to the Report and Recommendation of the United States Magistrate Judge (Docket Entry # 1500) ("Plaintiffs' Objections"). ArcSoft has filed ArcSoft's Reply to Plaintiffs' Objections to the Court's Order of August 4, 2004 (Docket Entry # 1507) ("ArcSoft's Reply"), on behalf of itself and its indemnities, Achiever, Argus, Kyocera Int'l, SiPix, Stomp, Macmillan, and World Office Products. Corel has filed Defendants Corel Corporation and Corel, Inc.'s Response to the Plaintiffs' Objections to the Report and Recommendation of the United States Magistrate Judge (Docket Entry # 1511) ("Corel's Response"). Plaintiffs raise four objections. Accordingly, the Court has made a *de now* review and determination of those portions of the Report and Recommendation to which those objections have been made. *28 U.S.C § 636(b)(1)(C)* [*10] .

## III.

Plaintiffs urge that the Court should deny ArcSoft's Marking Motion with respect to actual notice, and raise two objections, namely, (1) the Report and Recommendation failed to draw all reasonable inferences regarding certain "notice" letters in Plaintiffs' favor, and (2) the date of actual notice requires clarification. As discussed below, the second objection is no longer an issue based on ArcSoft's Reply.

The "actual notice" controversy centers on a letter sent by EFI in the Fall of 2001 to (1) ArcSoft and Macmillan on September 27, 2001, (2) Argus, SiPix, and Stomp on October 29, 2001, and (3) Achiever on November 29, 2001. Those letters have been collectively referred to as "the Fall 2001 letter(s)." Those letters all contain the same letter body:

I am writing to you because your company is commercially involved with digital color image editing.

Electronics for Imaging, Inc., is the exclusive licensee of *United States Patent No. 4,500,919* relating to technology developed by Massachusetts Institute of Technology. This patent broadly covers a system for controlling color reproduction. Considered a pioneer patent in this field, it has been widely licensed on [*11] a non-exclusive basis to companies including Adobe, Kodak, Apple, Xerox, Canon and Minolta.

To remain competitive, companies involved in the scanning, processing and editing of digital color images greatly benefit from a license to use the patented technology, particularly if they currently use the technology without benefit of a license. EFI is willing to license these patent rights to any interested party.

We encourage you to review *U.S. Patent No. 4,500,919* and consider its relevance to your products and the value of licensing this important technology. If you are interested, we are pleased to discuss a nonexclusive license arrangement.

The parties agree that actual notice requires informing the recipient "of [1] the identity of the patent and [2] the activity that is believed to be an infringement, [3] accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI Int'l v. Advanced Tech. Lab., 127 F.3d 1462, 1470 (Fed. Cir. 1997)*.

The Report and Recommendation concluded that the foregoing letter satisfied the first requirement by clearly identifying the *'919 patent*. However, the Report and Recommendation [*12] concluded that the letter could not

be reasonably characterized as notifying the recipient of infringement.

That requirement, of course, is found in the language of the statute itself. The marking statute, *35 U.S.C. § 287(a)*, provides for both actual and constructive notice (bracketed titles and paragraphs added):

> [Constructive Notice] Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.

> [Actual Notice] In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement [*13] occurring after such notice. Filing of an action for infringement shall constitute such notice. [Emphasis added.]

Constructive notice thus requires "that the infringer was notified of the infringement." The Report and Recommendation notes that although the Federal Circuit wrote in *Amsted Indus. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994)*, that "[a]ctual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device," the court, in *SRI Int'l.*, held that a direct charge of infringement was not required. *127 F.3d at 1469-70*, Report and Recommendation at 126. The Report and Recommendation notes that the Federal Circuit explained in *SRI Int'l.* that "[i]t is not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent. * * * Although there are numerous possible variations in form and content, the purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer. [*14] [Emphasis added.] *127 F.3d at 1470*, Report and Recommendation at 127. *See also Gart v. Logitech, 254 F.3d 1334, 1345-46 (Fed. Cir. 2001)*; *Lans v Digital Equip. Corp., 252 F.3d 1320, 1327 (Fed. Cir. 2001)*.

After a *de now* review and determination, the Court concludes that, on a fair reading, the Fall 2001 letter does not reasonably provide notice that the recipient may be an infringer. The letter begins by telling the recipient the purpose of the letter, namely "I am writing to you because your company is commercially involved with digital color image editing." That, of course, says nothing about potential infringement, either expressly or impliedly. Nor could a charge of infringement be reasonably inferred therefrom. The remainder of the first paragraph of the letter goes on to identify the *'919 patent* and informs the reader that the patent has been licensed. But, again, the first paragraph, fairly read as a whole, cannot be reasonably construed as putting the recipient on notice of a possible infringement.

The second paragraph similarly, in tenor and substance, does not give notice of possible infringement, but rather refers to [*15] remaining "competitive." The recipient is told that

2004 U.S. Dist. LEXIS 30048, *

"companies involved in the scanning, processing, and editing of digital color images greatly benefit from a license to use the patented technology." On its face, the message is that other companies have licensed the technology and, to remain "competitive," the recipient should consider a license as well. The message being conveyed is an offer to license the technology, not that the patentee believes that the recipient is currently using the technology and infringing the '919 patent. In short, the tenor and substance cannot be reasonably interpreted as conveying a message that the patent holder believes that the recipient of the notice may be an infringer, even resolving all reasonable inferences in the Plaintiffs' favor. Although this sentence goes on to say that a company would "greatly benefit" from a license "particularly if they currently use the technology without benefit of a license," in the context of the letter as a whole, that clause too cannot be realistically construed as notice that the patentee believes that the recipient may be an infringer.

Although, as the court in *SRI Int'l* noted, "there are numerous possible [*16] variations in form and content" and thus letters such as this must be evaluated independently, letters considered in other cases provide at least some guidance. The letter at issue in *SRI Int'l*, for example, identified products that "may infringe" one or more claims of the identified patent, and reinforced the suggestion by providing: "If you are of the opinion that you do not need a license from SRI, it would be helpful if you could give us some insight into your reasons." In contrast, the Fall 2001 letter simply states: "We encourage you to review *U.S. Patent No. 4,500,919* and consider its relevance to your products and the value of licensing this important technology. If you are interested, we are pleased to discuss a nonexclusive license arrangement." Report and Recommendation at 129-130. The Report and Recommendation concluded that the Fall 2001 letter was thus more analogous to the "informational" type of letter that the *Amsted court* had concluded did

not provide actual notice of infringement under *§ 287(a)*.

In *Amsted*, the patent owner had "broadcast to a number of other companies, not only to Buckeye," a letter stating:

> This is to advise you that Amsted [*17] * * * has acquired a number of properties [from Dresser] * * * including [the '269 patent] * * * .
>
> It is our understanding that Dresser Industries actively sought to enforce its patent * * * and those rights have been heretofore respected in the industry. AMSTED-ASF expects to continue to enforce those rights which it has acquired and similarly expects our industry to respect its patents. Accordingly, you should acquaint yourself with the ['269 patent] and refrain from supplying or offering to supply component parts which would infringe or contribute to the infringement of the patent[]. You should not offer to supply items which are copies of or designed to replace our LOW PROFILE center plate. [Emphasis added.]

*24 F.3d at 186*, Report and Recommendation at 130. The language used in the Fall 2001 letter, *i.e.*, "We encourage you to review *U.S. Patent No. 4,500,919* and consider its relevance to your products and the value of licensing this important technology," is analogous.

Also, unlike the letter at issue in *SRI Int'l*, the Fall 2001 letter does not identify any particular products. The Plaintiffs, however, urged before the Magistrate [*18] Judge that "[n]otice of infringement by a class of products is sufficient under *Section 287(a)*" citing *Novo*

Case 1:05-cv-00608-MPT   Document 236   Filed 02/01/2007   Page 95 of 100

Page 8
2004 U.S. Dist. LEXIS 30048, *

*Nordisk A/S v. Becton Dickinson & Co.,* 96 F. Supp. 2d 309 (S.D.N.Y. 2000). As the Report and Recommendation pointed out, however, in actuality the district court in *Novo Nordisk* relied on one of its earlier cases, *Eastman Kodak u Eastman Kodak,* 1977 U.S. Dist. LEXIS 15837, 195 U.S.P.Q. 644 (S.D.N.Y. 1977), in holding that "an accusation of infringement by class of product ('type of developer') is sufficient actual notice under § 287(a) under at least some circumstances." [Emphasis added.] *96 F. Supp. 2d at 319.* The *Novo Nordisk* court observed that *Kodak* involved a case in which there had been license negotiations between the parties over patented photographic developer formulations, and found language in the letter sufficient to constitute adequate notice of infringement "in the context of the overall dealings between the parties." Report and Recommendation at 131, quoting *Now Nordisk,* 96 F. Supp. 2d at 319. As the Report and Recommendation notes, unlike the situation in *Kodak* and *Novo Nordisk* [*19]  , here there was no "context of overall dealing" between EFI and ArcSoft, *et al.* The Fall 2001 letter was the first contact between EFI and ArcSoft *et al.*

Plaintiffs now urge that "Plaintiffs submitted undisputed evidence that EFI delivered to ArcSoft, as well as its indemnities * * * a letter [1] identifying the patent-in-suit, [2] warning the Defendants of its applicability to Defendants' color image editing products and [3] offering a non-exclusive license to the patent-in-suit." Plaintiffs' Objections at 2. Plaintiffs are correct that the Fall 2001 letter (1) identifies the patent-in-suit, and (2) expresses EFI's willingness to discuss a "non-exclusive license arrangement," in the context of "[i]f you are interested" and "[w]e encourage you to review *U.S. Patent No. 4,500,919* and consider its relevance to your products and the value of licensing this important technology." It is a stretch, however, to fairly construe the Fall 2001 letter as "warning the Defendants of its applicability to Defendants' color image editing products." Indeed, one is hard pressed to con-

strue that letter in overall context as a "warning." Rather, the tenor and substance of the letter [*20]  is more in the nature of informing the recipient of a licensing opportunity, as opposed to a "warning" of potential infringement. Although the letter offered to discuss licensing, that was not, in the context of the letter as a whole, "a proposal to abate the infringement." *SRI Int'l., 127 F.3d at 1470.* One may certainly offer to license technology without accusing the prospective licensee of infringement.

Additionally, the statute does not refer to a "warning," but rather provides "[i]n the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages shall be recovered only for infringement occurring after such notice." [Emphasis added.] "The clear meaning of this section is that the patentee or his assignee, if he makes or sells the article patented, cannot recover damages against infringers of the patent, unless he has given notice of his right, either to the whole public by marking his article 'patented,' or to the particular defendants by informing them of his patent and of their [*21]  infringement of it." *Dunlap v Schofield,* 152 U.S. 244, 247-48, 14 S. Ct. 576, 38 L. Ed. 426, 1894 Dec. Comm'r Pat. 224 (1894).

Plaintiffs assert that "ArcSoft admits that its entire product line consists of image editing software products bundled with cameras, scanners, computers and electronic devices to provide digital image editing and enhancement," Plaintiffs' Objections at 3, citing ArcSoft's Marking Motion at 2. Plaintiffs assert that "the Magistrate Judge should have drawn the inference that EFI's Fall 2001 letter identified ArcSoft's entire product line as the activity believed to infringe the patent-in-suit." *Id.*

The Fall 2001 letter refers to "companies involved in the scanning, processing and editing of digital color images" as those that would

"greatly benefit from a license to use the patented technology." ArcSoft stresses "Plaintiffs have presented no evidence that ArcSoft is such a company," and that "Plaintiffs have presented no evidence" that the foregoing reference to "companies involved in the scanning, processing and editing of digital color images" can be "reasonably inferred to address ArcSoft's entire product line." ArcSoft's Reply at 8. Whether or not ArcSoft's "entire product line" [*22] consists of "image editing software products bundled with cameras, scanners, computers and electronic devices to provide digital image editing and enhancement," as Plaintiffs assert, however, is not the issue here. Once again, the issue is whether the Fall 2001 letter complies with the statutory mandate of *§ 287(a)*.

As explained in the Report and Recommendation, in portions that no party has raised any objection to, the marking statute imposes certain obligations on the patentee. Report and Recommendation at 13-17, 125-127. The Report and Recommendation, indeed, outlined the legislative history of the marking statute, and, as is clear from that legislative history, the marking requirements have consistently defined obligations imposed on the patentee. Report and Recommendation at 38-42. The knowledge or understanding of the accused infringer is irrelevant. The Report and Recommendation, for example, notes that:

> [b]ecause actual notice under *§ 287(a)* requires action by the patentee, deciding whether a patentee's communication complies with the statute does not turn on the knowledge or understanding of the accused infringer. *Amsted, 24 F.3d at 187* ("it [*23] is irrelevant * * * whether the defendant knew of * * * his own infringement"). "Absent notice, [the infringer's] 'knowledge of the patents' is irrele-

vant. *Section 287* requires 'proof that the infringer was notified of the infringement.'" *Devices for Medicine [v. Boehl], 822 F.2d [1062] at 1066-67 n.5 (Fed. Cir. 1987)* [Emphasis in original].

Report and Recommendation at 125-26. That is, under the legislative history of the marking statute, as well as its underlying purpose and intent, and under current prevailing law, it is irrelevant whether the accused infringer otherwise had knowledge of the patent-in-suit or that its activities constituted an infringement. The patentee, after all, in this instance having failed to provide constructive notice, is seeking damages because the accused infringer continued to infringe after the patentee gave the accused infringer actual notice of infringement. The burden remains on the patentee to provide the notice required by *§ 287(a)*.

Also, Plaintiffs' suggestion that there should be a reasonable inference that the Fall 2001 letter charges ArcSoft *et al.* with infringement for their "entire product line" [*24] is not a reasonable construction of, or inference flowing from, that letter. As a recipient, ArcSoft is informed: (1) that it is receiving the letter because ArcSoft is "commercially involved with digital color image editing," (2) EFI is the exclusive licensee of the '919 patent that, in a broad sense, "covers a system for controlling color reproduction," (3) that patent has been viewed as a "pioneer patent" and has been licensed to several companies, and (4) "[t]o remain competitive, companies involved in the scanning, processing and editing of digital color images greatly benefit from a license to use the patented technology, particularly if they currently use the technology without benefit of a license." ArcSoft is told that EFI is willing to grant such a license, and ArcSoft is encouraged to review the *'919 patent* to "consider its relevance to your products and the value of licensing this important technology." There is noth-

ing in the substance of the letter that can be reasonably construed as charging ArcSoft *et al.* with infringement, much less for their "entire product line."

Viewing the substance of Fall 2001 letter objectively, and bearing in mind that the obligations [*25] under *§ 287(a)* fall on the patentee, the Court agrees with the conclusion of the Report and Recommendation that the Fall 2001 letter cannot be fairly read to provide actual notice to the recipients of infringement of the *'919 patent* as required by *§ 287(a)*, even giving all reasonable inferences to the non-movant, namely, the Plaintiffs.

It should be emphasized, of course, that this decision deals solely with the text of the Fall 2001 letter, and the context thereof, eg, no prior dealings between the parties. Whatever the relationship of the parties, though, a patentee has command over the content of its "notice" letters. In choosing that content, patentees bear both the consequences of failing to provide adequate notice, as well as the rewards for having done so. Once again, the actual notice required under *§ 287(a)* is to permit a patentee who has not given constructive notice to nevertheless recover damages "on proof that the infringer was notified of the infringement" and "continued to infringe thereafter." [Emphasis added.]

A patentee thus may choose how "general" or "specific" such letters should be (or need to be) in a particular context. However, overall, to secure [*26] a right to recover damages for "continued infringement," the patentee must provide adequate notice of infringement under *§ 287(a)*. The more a patentee chooses to draft such letters as leaning toward "informational" types of letters such as discussed by the *Amsted court*, the less likely it will be that the patentee can justifiably rely on such letters as constituting actual notice of infringement under *§ 287(a)*. Accordingly, the less likely it will be that the patentee can recover damages for "continued infringement" after serving such a letter.

On the other hand, of course, the more such letters lean toward "specific" charges of infringement, the more a patentee may be assured that such letters will be construed to constitute actual notice under *§ 287(a)*, and consequently justify damages for "continued infringement." Although more specific charges of infringement potentially raise the possibility of a declaratory judgment action, the Federal Circuit has held that a patentee may provide actual notice of infringement under *§ 287(a)* without creating a case of actual controversy in terms of *28 U.S.C. § 2201*, justifying a declaratory judgment action. *SRI Int'l, 127 F.3d at 1470*. [*27] In all events, somewhere between the extremes of a purely "informational" letter and a letter directly charging infringement there is a line separating "informational" type letters from those that provide sufficient notice of infringement under *§ 287(a)* to justify recovering damages for continued infringement.

The Report and Recommendation concluded that the Fall 2001 letter fell on the "informational" rather than "notice of infringement" side of the line. Based on an independent *de now* review and determination, *28 U.S.C § 636(b)(1)(C)*, the Court agrees with the rationale and conclusion of the Report and Recommendation.

Accordingly, insofar as the Plaintiffs' first objection is concerned, the Court OVERRULES that objection.

## IV.

Plaintiffs' second objection is that the relief sought by the ArcSoft defendants conflicts with the Report and Recommendation. Specifically, the Plaintiffs assert that the Report and Recommendation correctly recognized that the filing of a lawsuit constituted actual notice under *35 U.S.C. § 287*. The Plaintiffs, however, contend that the relief sought by the ArcSoft defendants was that actual notice [*28] would occur on the date they were served with the Complaint. In their response, the ArcSoft de-

fendants confirm that the applicable date is the date of filing, which, of course, is also the date set out in *§ 287(a)*: "Filing of an action for infringement shall constitute such notice."

Accordingly, to the extent there was any uncertainty, the actual date of notice for defendants ArcSoft, Argus, Macmillan, SiPix, and Stomp, is December 28, 2001, namely, the filing date of the Complaint in this cause, and the actual date of notice for defendants Kyocera Int'l, Kyocera Optics, Achiever, and World Office Products is April 25, 2002, namely, the date the First Amended Complaint was filed in this cause. ArcSoft's Reply at 9-10.

**V.**

Plaintiffs' third objection is that the Report and Recommendation did not adopt the rationale of *Toro Ca v McCulloch Corp., 898 F. Supp. 679, 684 (D. Minn. 1995)*. Plaintiffs' Objections at 6-7. Plaintiffs assert that the Court should either adopt Plaintiffs' construction of *Toro*, or adopt another standard and allow the Plaintiffs to pursue a motion for summary judgment on the standard adopted by the Court.

The Report and Recommendation [*29] rejected Plaintiffs' contention that *§ 287(a)* was only applicable to the particular claims of a patent being asserted. The Court has, in light of the Plaintiffs' assertion, reviewed and determined *de now* whether the portion of the Report and Recommendation to which that objection relates is correct. In general, Plaintiffs urge that whether there has been constructive notice under *§ 287(a)* should be decided only *vis-a-vis* the asserted claim (or claims). In this case, only claim 1 of the *'919 patent* is being asserted. Under Plaintiffs' view, compliance with the marking requirements of *§ 287(a)* is irrelevant other than insofar as the scope of the asserted claim or claims is concerned. That argument was considered thoroughly and rejected in the Report and Recommendation. The Court agrees with that rationale and conclusion. As the Report and Recommendation acknowl-

edges, if the Federal Circuit were to adopt the district court's reasoning in *Toro*, there may be instances in which *§ 287(a)* is not implicated when the actual product made, used, sold, or offered for sale unmarked is sufficiently distinct from the subject matter of the claim (or claims) charged to be infringed. [*30] Plaintiffs have not shown that this is one of those potential cases.

Overall, the Report and Recommendation notes that the obligations of *§ 287(a)* extend to any "patented article." That is the statutory standard, and is the standard that is applicable to Plaintiffs' contentions. The Report and Recommendation did not alter that standard.

Consequently, Plaintiffs' objection is OVERRULED and Plaintiffs' suggestion that the Court should order new briefing on the issue is DENIED.

**VI.**

Lastly, Plaintiffs contend that the Court should deny Corel's Non-Infringement Cross-Motion because Corel failed to meet its burden. That issue is addressed in the Court's order on Corel's objections. Suffice it to say that upon independent and *de now* review and determination, *28 U.S.C § 636(b)(1)(C)*, Corel's motion is properly DISMISSED WITHOUT PREJUDICE.

**VII.**

Accordingly, the Court adopts the Report and Recommendation:

1. ArcSoft's Marking Motion, with respect to constructive notice, is DENIED, and with respect to actual notice is GRANTED.

2. The date of actual notice for defendants ArcSoft, Argus, Macmillan, SiPix, and Stomp, is December 28, 2001, namely, [*31] the

2004 U.S. Dist. LEXIS 30048, *

filing date of the Complaint in this cause, and the date of actual notice for defendants Kyocera Int'l, Kyocera Optics, Achiever, and World Office Products is April 25, 2002, namely, the date the First Amended Complaint was filed in this cause.

3. Fry's Marking Motion, with respect to having joined and adopted Microsoft's and ArcSoft's motions on constructive notice, is DENIED, and with respect to having joined and adopted ArcSoft's

motion on actual notice is GRANTED.

4. Plaintiffs' Marking Cross-Motion is DENIED.

5. Corel's Non-Infringement Cross-Motion is DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

SIGNED this 29th day of September, 2004.

David Folsom

United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Redacted Public Version of Appendix to Crown's Memorandum In Support of Motion For Partial Summary Judgment Dismissing Rexam's Counterclaim I And Limiting Damages On Counterclaims Ii-Iii Based On Laches And Failure To Comply With 35 U.S.C. § 287(A) has been forwarded on this the 1st day of February, 2007, in accordance with the Federal Rules of Civil Procedure, to the following:

**<u>VIA EMAIL & FEDERAL EXPRESS:</u>**

Gerald C. Willis, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601

Anne Shea Gaza, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Attorneys for Defendant Rexam*
*Beverage Can Co.*

Dated: February 1, 2007

    __/s/ Barry Klayman_____
Barry M. Klayman, Esquire (ID # 3676)
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 777-0313

*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*