IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC. )
and CROWN CORK & SEAL USA, INC., )
　　　　　　　　　　　　　　　　　　　 )　Civil Action No. 05-608 (MPT)
　　　Plaintiffs/Counterclaim Defendants, )
　　　　　　　　　　　　　　　　　　　 )
v. 　　　　　　　　　　　　　　　　　 )　REDACTED - PUBLIC VERSION
　　　　　　　　　　　　　　　　　　　 )
REXAM BEVERAGE CAN COMPANY, 　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　Defendant/Counterclaimant. 　　　　 )
　　　　　　　　　　　　　　　　　　　 )

**DEFENDANT REXAM BEVERAGE CAN COMPANY'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT THAT THE "REXAM
END" CAN END DOES NOT INFRINGE CROWN'S UNITED STATES PATENTS NOS.
6,848,875 AND 6,935,826**

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
　　*Attorneys for Defendant/Counterclaimant
　　Rexam Beverage Can Co.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

I.    SCOPE OF THIS MOTION AND THE RELEVANT CURRENT STATUS OF
      THIS ACTION ........................................................................................................................ 1

II.   SUMMARY OF THE ARGUMENT ....................................................................................... 1

      1.    Standard For Infringement Of A Patent Claim ............................................................. 1

      2.    Relationship Of Crown's Patents To Each Other ......................................................... 2

      3.    Subject of Crown's Patents ........................................................................................... 2

      4.    The Annular Reinforcing Bead That Is Essential To The Invention Described By
            Crown's Patents ............................................................................................................. 3

      5.    Rexam's Accused Rexam End Does Not Have An Annular Reinforcing Bead As
            Required For Crown's Invention And Explicitly Required By '826 Patent Claim
            14 And '875 Patent Claims 50 Through 53 .................................................................... 3

      6.    Rexam's Rexam End Chuck Does Not Have Two Walls That Meet At A Juncture
            As Required By '826 Patent Claims 13 and 14 .............................................................. 4

      7.    Rexam's Rexam End Chuck Does Not Have Two Walls That Meet At A Juncture
            As Required By '875 Patent Claims 50 Through 54 ....................................................... 5

      8.    Rexam's Rexam End Does Not Have A Wall With A Lowermost Point That
            Creates A Line At An Angle Between 30°and 60° As Required By '826 Patent
            Claims 13 And 14 .......................................................................................................... 5

      9.    Rexam's Rexam End Does Not Have A Wall With A Lowermost Point That
            Creates A Line At An Angle Between 20°and 60° As Required By '875 Patent
            Claims 32 Through 34 .................................................................................................... 6

      10.   Rexam's Rexam End Does Not Have A First Wall Portion That Is Adapted To
            Be Bent Upwardly During Seaming As Required By '826 Patent Claims 13 And
            14 ................................................................................................................................... 7

      11.   The Wall Of Rexam's Rexam End Is Not Bent Upwardly At Least About 16°
            During Seaming With The Rexam End Chuck As Required By '875 Patent
            Claims 32 Through 34, 51 and 53 .................................................................................. 7

III.  FACTS SUPPORTING THIS MOTION ................................................................................. 8

IV.   ARGUMENT ........................................................................................................................... 8

      A.    Summary Judgment of Noninfringement Should Be Entered When Infringement
            Cannot Or Is Not Shown ............................................................................................... 8

      B.    Construction Of The Asserted Claims Of Crown's Patents ........................................ 11

      C.    The Invention Described By Crown's Patents .............................................................. 13
            1.    The Anti-Peaking Bead That Is Required by Crown's Invention ........................ 14
            2.    The Angled End Wall and Its Deformation During Seaming Required by
                  Crown's Invention ............................................................................................... 15

      D.    The Rexam End ........................................................................................................... 17

      E.    The Rexam End Chuck ................................................................................................ 18

      F.    Noninfringement Of Crown's Patents – The Rexam End Has No Annular
            Reinforcing Bead ......................................................................................................... 19

G. Noninfringement Of Claims 13 And 14 Of The '826 Patent and Claims 50 Through 54 Of The '875 Patent – The Rexam End Does Not Bend Upwardly At A Point Around A Juncture Of Chuck Walls During Seaming ........................................ 22

H. Noninfringement Of Claims 13 And 14 Of The '826 Patent and Claims 32 Through 34 Of The '875 Patent – The Rexam End Does Not Have A Wall With A Lowermost End Through Which A Line From The Double Seam Is At An Angle Between 20° and 60° To A Perpendicular Line To The Central Panel .................. 25

I. Noninfringement Of Claims 13 And 14 Of The '826 Patent – The Rexam End Does Not Have A First Wall Portion That Is Bent Upwardly During Seaming ............... 27

J. Noninfringement Of Claims 32 Through 34, 51 and 53 Of The '875 Patent – The Rexam End Is Not Bent Upwardly At Least About 16° During Seaming ......................... 30

## TABLE OF AUTHORITIES

**Cases**

*Alloc, Inc. v. ITC,*
342 F.3d 1361 (Fed. Cir. 2003) .................................................................................... 12, 13

*Alza Corp. v. Mylan Labs.,*
391 F.3d 1365 (Fed. Cir. 2004) .......................................................................................... 13

*ASM Am., Inc. v. Genus, Inc.,*
401 F.3d 1340 (Fed. Cir. 2005) ............................................................................................ 8

*Astrazeneca AB v. Mutual Pharmaceutical Co., Inc.,*
384 F.3d 1333 (Fed. Cir. 2004) .......................................................................................... 13

*Ballard Medical Products v. Allegiance Healthcare Corp.,*
268 F.3d 1352 (Fed. Cir. 2001) ............................................................................................ 9

*Boss Control, Inc. v. Bombardier, Inc.,*
410 F.3d 1372 (Fed. Cir. 2005) ..................................................................................... 8, 13

*C.R. Bard, Inc. v. United States Surgical Corp.,*
388 F.3d 858 (Fed. Cir. 2004) ........................................................................................... 12

*Comark Communications v. Harris Corp.,*
156 F.3d 1182 (Fed. Cir. 1998) ......................................................................................... 12

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,*
389 F.3d 1370 (Fed. Cir. 2004) ............................................................................................ 8

*General Elec. Co. v. Nintendo Co., Ltd.,*
179 F.3d 1350 (Fed. Cir. 1999) ......................................................................................... 10

*General Mills, Inc. v. Hunt-Wesson, Inc.,*
103 F.3d 978 (Fed. Cir. 1997) ......................................................................................... 9, 11

*Honeywell Intern., Inc. v. ITT Industries, Inc.,*
452 F.3d 1312 (Fed. Cir. 2006) .......................................................................................... 13

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.,*
401 F.3d 1367 (Fed. Cir. 2005) .......................................................................................... 11

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
450 F.3d 1350 (Fed. Cir. 2006) ............................................................................................ 2

*Kao Corp. v. Unilever United States, Inc.,*
441 F.3d 963 (Fed. Cir. 2006) ............................................................................................. 8

*Lava Trading, inc. v. Sonic Trading Mgmt.,*
445 F.3d 1348 (Fed. Cir. 2006) ............................................................................................ 1

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
358 F.3d 898 (Fed. Cir. 2004) ........................................................................................... 13

*London v. Carson Pirie Scott & Co.,*
946 F.2d 1534 (Fed. Cir. 1991) ........................................................................................ 2, 9

*Markman v. Westview Instruments, Inc.,*
517 U.S. 370 (1996) ............................................................................................................. 9

*Molinaro v. Fannon/Courier Corp.,*
745 F.2d 651 (Fed. Cir. 1984) ............................................................................................. 9

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001) ................................................................................. 13

*Network Commerce, Inc. v. Microsoft Corp.,*
  422 F.3d 1353 (Fed. Cir. 2005) ................................................................................. 10

*Novartis Corp. v. Ben Venue Labs.,*
  271 F.3d 1043 (Fed. Cir. 2001) ............................................................................... 8, 9

*PC Connector Solutions LLC v. SmartDisk Corp.,*
  406 F.3d 1359 (Fed. Cir. 2005) ................................................................................. 10

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 11, 12, 22

*Porter v. Farmers Supply Serv., Inc.,*
  790 F.2d 882 (Fed. Cir. 1986) ................................................................................... 10

*Renishaw PLC v. Marposs Societa' per Azioni,*
  158 F.3d 1243 (Fed. Cir. 1998) ................................................................................. 12

*S3 Inc. v. nVIDIA Corp.,*
  259 F.3d 1364 (Fed. Cir. 2001) ................................................................................. 11

*Schoell v. Regal Marine Indus. Inc.,*
  247 F.3d 1202 (Fed. Cir. 2001) ............................................................................... 9, 10

*Schoenhaus v. Genesco, Inc.,*
  440 F.3d 1354 (Fed. Cir. 2006) ................................................................................... 8

*Scimed Life Systems v. Advanced Cardiovascular,*
  242 F.3d 1337 (Fed. Cir. 2001) ................................................................................. 12

*Techsearch, LLC v. Intel Corp.,*
  286 F.3d 1360 (Fed. Cir. 2002) ................................................................................... 8

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.,*
  90 F.3d 1558 (Fed. Cir. 1996) ................................................................................... 10

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,*
  212 F.3d 1377 (Fed. Cir. 2000) ................................................................................. 10

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 11, 12

*Wahpeton Canvas Co. v. Frontier, Inc.,*
  870 F.2d 1546 (Fed. Cir. 1989) ................................................................................... 2

*Wang Labs., Inc. v. America Online, Inc.,*
  197 F.3d 1377 (Fed. Cir. 1999) ................................................................................. 10

*Warner-Jenkinson Co. v. Hilton Davis Chem.,*
  520 U.S. 17 (1997) ....................................................................................................... 1

*Zygo Corp. v. Wyco Corp.,*
  79 F.3d 1563 (Fed. Cir. 1996) ..................................................................................... 9

**Statutes**
35 U.S.C. § 112 ........................................................................................................... 11

iv

**Other Authorities**

Chisum on Patents § 13.03[2] (2006) ........................................................................................ 2

**Rules**

Fed. R. Civ. P. 56 ........................................................................................ 8

RLF1-3108794-1

I.    SCOPE OF THIS MOTION AND THE RELEVANT CURRENT STATUS
OF THIS ACTION

Plaintiffs Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively
"Crown") brought this action for patent infringement and now assert that Rexam Beverage Can
Company's ("Rexam") Rexam End infringes claims 32 through 34 and 50 through 53 of Crown's U.S.
Patent No. 6,848,875 ("the '875 Patent") and claims 13 and 14 of Crown's U.S. Patent No. 6,935,826
("the '826 Patent") (collectively "Crown's patents"). (A 32-46, A 47-58.) This motion is directed to that
assertion of infringement and requests pursuant to Fed. R. Civ. P. 56 that the Court enter judgment that
the Rexam End does not infringe any claim of Crown's patents.

At this point, there is substantial disagreement between the parties as to the exact scope and
meaning of terms of the claims of Crown's patents. That disagreement is the subject of the parties'
briefing on claim construction, and will be resolved as a matter of law by the Court's decision on claim
construction. By this motion, Rexam requests summary judgment that the Rexam End does not infringe
either of Crown's patents on two bases. First, that the Rexam End does not infringe Crown's patents even
under Crown's proposed constructions of the disputed claim terms of Crown's patents. Second, that the
Rexam End does not infringe Crown's patents based on Rexam's proposed claim construction.

II.    SUMMARY OF THE ARGUMENT

1.    **Standard For Infringement Of A Patent Claim**

[A]n infringement analysis is a two-step process: "First, the court determines the scope
and meaning of the patent claims asserted . . . [and second,] the properly construed claims
are compared to the allegedly infringing device." *Cybor Corp.*, 138 F.3d at 1454
(citations omitted). "Step one, claim construction, is a question of law, that we review de
novo. Step two, comparison of the claims to the accused device, is a question of fact, and
requires a determination that every claim limitation or its equivalent be found in the
accused device." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335,
1344 (Fed. Cir. 2005) (citations omitted).

*Lava Trading, Inc. v. Sonic Trading Mgmt.*, 445 F.3d 1348, 1352 (Fed. Cir. 2006) (ellipses and insertions
in original). "Each element contained in a patent claim is deemed material to defining the scope of the
patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem.*, 520 U.S. 17, 29 (1997). "To
establish infringement, <u>every element and limitation of the claim must be present</u> in the accused

1

device, literally or by an equivalent." *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357-58 (Fed. Cir. 2006) (citation omitted) (emphasis added). There is no infringement as a matter of law if even one claim element is totally missing. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991). In addition, and relevant to the claims at issue in this case, if an independent claim is not infringed, its dependent claims cannot be infringed as a matter of law. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed. Cir. 1989).[1] This motion is not directed to every basis on which Rexam asserts that the Rexam End does not infringe Crown's patents. Rather, this motion is directed only to those bases for which there can be no genuine issue of material fact.

## 2.    Relationship Of Crown's Patents To Each Other

The '826 Patent and the '875 Patent disclose the same invention, as they share the same patent specification. The '826 Patent issued from a continuation application from the '875 Patent, which issued from a series of continuation applications that began with an original application filed in the United Kingdom on May 24, 1995. "A continuation application is a second application that contains the same disclosure as the original application. . . . Such an application is fully entitled to the benefit of the filing date of the original application." Chisum on Patents § 13.03[2] (2006), A 59-60. Those patents contain the same figures and description, but the exact location of text varies between those patents.

## 3.    Subject of Crown's Patents

Crown's patents are directed to beverage can ends, which are the tops of beverage cans and include the panel on which the opening tab is located. A beverage can end is joined to a filled beverage can body by a process known as "double seaming." Double seaming is the conventional process of placing a can end on the open upper end of a can body and deforming the outer section of the can end together with the upper portion of the can body to form the "double seam." Crown's patents say that the invention to which they are directed is a can end that has an outer wall, "chuck wall" 24 shown below in

_____

[1] In this case, claim 14 depends from claim 13 in the '826 Patent, claims 33-34 depend from claim 32 in the '875 Patent, and claims 51-53 depend from claim 50 in the '875 Patent.

Fig. 4 from Crown's patents, that is at a greater angle than conventional can ends and that has a narrower than conventional "anti-peaking bead" or "outwardly concave reinforcing anti-peaking bead" 25. '875 Patent col.1 ln.32-34; col.3 ln.40-44 (A.39, A.40.)

## Fig.4.



### 4. The Annular Reinforcing Bead That Is Essential To The Invention Described By Crown's Patents

Though asserted claim 13 of the '826 Patent and asserted claims 32 through 34 of the '875 Patent don't explicitly require an annular reinforcing bead, they can only be valid if construed to include that requirement. Claim 14 of the '826 Patent and claims 50 through 53 of the '875 Patent explicitly require an annular reinforcing bead. As shown by Fig. 4 above, every annular reinforcing bead, disclosed by Crown's patents and every one known in the art, was the conventional generally U-shaped groove that extends down into the can at the outer edge of the round central panel. Those conventional reinforcing beads provided strength to can ends and provided a location for a ring-like projection from a tool, called a seaming chuck, to be inserted into and removed from the can end from above the can end.

### 5. Rexam's Accused Rexam End Does Not Have An Annular Reinforcing Bead As Required For Crown's Invention And Explicitly Required By '826 Patent Claim 14 And '875 Patent Claims 50 Through 53

The Rexam End does not fall within the scope of that invention and does not infringe any asserted claim of Crown's patents. Most clearly different from the can ends to which Crown's patents are directed, the Rexam End (as illustrated below and by A 8) does not have the "annular reinforcing bead" that Crown's patents say is an essential part of the invention that is the basis for those patents. The

3

Rexam End has a flat central panel that extends beyond the inner extent of the wall to join the wall. The wall is folded outwardly to extend first up from the central panel and then down to join the central panel. Rexam refers to the configuration that is behind a portion of the wall as a fold. The folded wall

REDACTED

eliminates the otherwise universally present groove in the top of beverage can ends that collects dirt and debris making drinking from the can unappealing. The Rexam End has no annular reinforcing bead and its folded wall is not an equivalent of an annular reinforcing bead. Crown's Ph.D. Executive Vice-President of Technology and Regulatory Affairs, Daniel Abramowicz, described the Rexam End as "the folded end with the countersink bent ~ 90° behind the countersink wall. **This essentially forms a flat panel with no countersink**." (emphasis added)(A 1 ) The Rexam End does not infringe Crown's patents on this basis alone.

### 6. Rexam's Rexam End Chuck Does Not Have Two Walls That Meet At A Juncture As Required By '826 Patent Claims 13 and 14

REDACTED

Claims 13 and 14 require a "first wall portion [of a can end] adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall." '826 Patent col.10 ln.52–56. (A 58). Crown asserts that the "first point" should be construed to be "a first point on the can end wall." (A 16.) For the can end to be bent upwardly around a juncture at a point, the juncture around which the point on the can end is bent, must be a point. Crown's patents provide a basis to determine what is not a point. They refer to Fig. 8, an excerpt of which is reproduced adjacent,



Patent Fig. 8

and describe the two chuck walls meeting in two ways, at a "sharp transition" and with a "blend radius" R of .5 millimeters (.020 inches), A 38. As illustrated adjacent by an excerpt from Rexam's tooling drawing of a Rexam End seaming chuck, A 6,

REDACTED

If the Rexam End chuck has a juncture between two walls as required by Crown's patents, that juncture is not at a "point" around which a can end can be bent upwardly. The Rexam End therefore is not bent upwardly at a point at a juncture of two chuck walls. For this reason, even under Crown's proposed claim construction, the Rexam End and Rexam End chuck cannot infringe claims 13 and 14 of the '826 Patent.

7.    **Rexam's Rexam End Chuck Does Not Have Two Walls That Meet At A Juncture As Required By '875 Patent Claims 50 Through 54**

Claims 50 through 53 of the '875 Patent similarly require "a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween." '875 Patent col.15 ln.24–27. (A 46.) Those claims further require that the can end deform to "bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall." *Id.* at ln. 34–36. (A 46.) Crown asserts that the first location is "the place at which the first and second chuck walls meet." (A 14-27.) The Rexam End chuck does not have walls that meet at a place around which a can end wall can bend and therefore the Rexam End chuck cannot and does not bend the Rexam End upwardly at a place. Even under Crown's proposed claim construction and for this reason, the Rexam End and Rexam End chuck cannot infringe claims 50 through 53 of the '875 Patent.

8.    **Rexam's Rexam End Does Not Have A Wall With A Lowermost Point That Creates A Line At An Angle Between 30°and 60° As Required By '826 Patent Claims 13 And 14**

Claims 13 and 14 of the '826 Patent also require "a second point forming a lowermost end of said wall" and that "a line extending between said first and second points being inclined to an axis

5

perpendicular to said central panel at an angle of between 30° and 60°." (A 58.) Crown construes the second point to be "a second point that marks the lowest end of the can end wall." (A 16.) Assuming that the first point can be located somewhere near the lowest extent of the double seam that joins the can end to the can body, the Rexam End does not meet this requirement. As shown below, the wall of the Rexam end forms a fold and then joins the central panel. The lowest point on the wall is the location at which the wall joins the central panel. A line from that point to the bottom of the double seam is at an angle of less than 20° to the line perpendicular to the central panel, as illustrated in the figure to the right below. Again under Crown's proposed claim construction, the Rexam End does not infringe claims 13 and 14 of the '826 Patent.

REDACTED

9.    **Rexam's Rexam End Does Not Have A Wall With A Lowermost Point That Creates A Line At An Angle Between 20° and 60° As Required By '875 Patent Claims 32 Through 34**

Similarly, claims 32 through 34 require a "first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion," a "second wall location being the lowermost point of said wall," and "a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60°." (A 45.) As shown above, the Rexam End does not infringe claims 32 through 34 even under Crown's claim construction because such a line to the bottom of the Rexam End wall does not fall within this range.

6

10. **Rexam's Rexam End Does Not Have A First Wall Portion That Is Adapted To Be Bent Upwardly During Seaming As Required By '826 Patent Claims 13 And 14**

Claims 13 and 14 of the '826 Patent require a can end "comprising a cover hook," "a wall extending from the cover hook," "a first portion of the wall extending from the cover hook to a first point on the wall," and the "first portion of the wall to be adapted to be deformed during seaming to be bent upwardly at the first point on the wall." (A 58.) The cover hook, not the wall, of the Rexam End is the only portion of the Rexam End that is bent upwardly during seaming. The Rexam End does not infringe claims 13 and 14 of the '826 Patent for this reason as well.

11. **The Wall Of Rexam's Rexam End Is Not Bent Upwardly At Least About 16° During Seaming With The Rexam End Chuck As Required By '875 Patent Claims 32 Through 34, 51 and 53**

Claim 32 of the '875 Patent requires a first portion of a can end wall to be pressed against a chuck

REDACTED

wall "so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°." (A 45.) Claim 51 similarly requires bending upwardly around a chuck wall juncture through an angle of at least about 16°. Claims 34 and 52 require bending through an angle of at least about 26°. (A45-46.) As shown below, the only place that a Rexam End bends upward during seaming is at a location at which the Rexam End is curved.                REDACTED

7

REDACTED        The Rexam End does not infringe claims 32 through 34 of the '875 Patent for this

reason as well. *Id.*

### III.    FACTS SUPPORTING THIS MOTION

The issues of fact relevant to this motion relate to the configuration of the Rexam End before and

after seaming, and to the configuration of the Rexam End chuck.

The configuration of the unseamed Rexam End is shown by Rexam's Drawing    REDACTED

REDACTED    attached at A 8.

The configuration of the seaming chuck used during commercial seaming of the Rexam End is

shown by Rexam's Drawing    REDACTED    attached at A 6.

The configuration of a Rexam End, Rexam End chuck, and can body prior to the first seaming

operation is shown by Exhibit 1 to the Declaration of Michael R. Gogola, attached at A9-13.

The configuration of a Rexam End, Rexam End chuck, and can body at the end of the second

seaming operation is also shown by Exhibit 1 to the Declaration of Michael R. Gogola, attached at A9-13.

The configuration of a seamed Rexam End and can body shown by a cross-section of a seamed

Rexam End and can body is shown by Exhibit 2 to the Declaration of Michael R. Gogola, attached at *Id.*

### IV.    ARGUMENT

#### A.    Summary Judgment of Noninfringement Should Be Entered When Infringement Cannot Or Is Not Shown

Summary judgment "shall be rendered forthwith" where "there is no genuine issue as to any

material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Federal Circuit regularly affirms the grant of summary judgment of noninfringement. *See, e.g., Kao*

*Corp. v. Unilever United States, Inc.,*441 F.3d 963, 975 (Fed. Cir. 2006); *Schoenhaus v. Genesco, Inc.,*

440 F.3d 1354, 1359 (Fed. Cir. 2006); *Boss Control, Inc. v. Bombardier, Inc.,* 410 F.3d 1372, 1381 (Fed.

Cir. 2005); *ASM Am., Inc. v. Genus, Inc.,* 401 F.3d 1340, 1342 (Fed. Cir. 2005); *Frank's Casing Crew &*

*Rental Tools, Inc. v. Weatherford Int'l, Inc.,* 389 F.3d 1370, 1372 (Fed. Cir. 2004); *Techsearch, LLC v.*

*Intel Corp.,* 286 F.3d 1360, 1381 (Fed. Cir. 2002); *Novartis Corp. v. Ben Venue Labs.,* 271 F.3d 1043,

8

1055 (Fed. Cir. 2001); *Ballard Medical Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1363 (Fed. Cir. 2001).

The first step of an infringement analysis is claim construction, which is a matter of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Even though Crown disputes Rexam's interpretation of the asserted claims, that disagreement does not preclude entry of summary judgment that Crown's patents are not infringed. *See Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed. Cir. 1984) ("Claim interpretation, however, is an issue *of law*, and a dispute respecting that legal issue does not preclude summary judgment.").

The second step of the infringement inquiry, determining whether the accused product is within the scope of the properly construed claims, is a question of fact. *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997). Crown has the burden of showing that the Rexam End is within the scope of its asserted claims. *Novartis Corp.*, 271 F.3d at 1046. To prove infringement, Crown must show, by a preponderance of the evidence, "the presence of <u>every</u> [claim] element or its substantial equivalent in the accused device." *Zygo Corp. v. Wyco Corp.*, 79 F.3d 1563, 1568 (Fed. Cir. 1996). Failing to show even one claim element in the accused product precludes a finding of infringement. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed. Cir. 1991) (emphasis added). Because Crown has the burden of proving infringement, Rexam can prevail on this motion for summary judgment by either providing evidence that precludes a finding of infringement, or, by showing that Crown has failed to establish proof of an essential element of its infringement case. *Novartis Corp.*, 271 F.3d at 1046.

The doctrine of equivalents offers a patentee who cannot prove literal infringement an opportunity to establish infringement where "the differences between the element of the accused product at issue in the product and the claim limitation at issue are insubstantial." *Schoell v. Regal Marine Indus. Inc.*, 247 F.3d 1202, 1209 (Fed. Cir. 2001). The doctrine of equivalents "is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances." *Id.* at 1210. Crown bears the burden of proving equivalence at trial. *Id.*

9

In a summary judgment context:

> a patentee must provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. Such evidence must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). One way a patentee can establish insubstantial differences is to show that "the element performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation." *Schoell*, 247 F.3d at 1210. Where the patent recites certain functions, "an accused device which does not perform [a] central function could rarely, if ever, be considered to be insubstantially changed from the claimed invention." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382 (Fed. Cir. 2000). In *Vehicular Techs. Corp.*, the patent enunciated multiple functions in the specification. *Id.* The court found that the accused device did not infringe under the doctrine of equivalents where it performed some but not all of the functions. *Id.*

In order for summary judgment of non-infringement to be appropriate, Rexam must only establish that Crown has not raised a genuine issue of material fact as to whether it has met its burden. *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005). The Federal Circuit commonly affirms summary judgment of non-infringement under the doctrine of equivalents. *See, e.g., Schoell*, 247 F.3d at 1210; *Network Commerce, Inc.*, 422 F.3d at 1364; *Vehicular Techs. Corp.*, 212 F.3d at 1383; *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1365 (Fed. Cir. 2005); *General Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1363 (Fed. Cir 1999); *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1386 (Fed. Cir. 1999).

Summary judgment of noninfringement is appropriate where, under a proper claim construction, a finding of infringement is not possible. *Porter v. Farmers Supply Serv., Inc.*, 790 F.2d 882, 884–86 (Fed. Cir. 1986). "Where the parties do not dispute any relevant facts regarding the accused product ..., but disagree over possible claim interpretations, the question of literal infringement collapses into claim

10

construction and is amenable to summary judgment." *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983. There can be no dispute as to the structure of Rexam's accused Rexam End or the chuck that is used to seam that end to a can body. Summary judgment that the Rexam End does not infringe asserted claims 13 and 14 of Crown's '826 Patent and that seaming of the Rexam End to a can body using the Rexam End chuck does not infringe asserted claims 32 through 34 and 50 through 53 of Crowns '875 Patent should be entered based on clear constructions of those claims.

### B.    Construction Of The Asserted Claims Of Crown's Patents

Rexam's proposed constructions of the asserted claims of Crown's patents is discussed in depth by Rexam's briefing on the issue of claim construction in this case. To limit duplication, Rexam will here address only issues that are raised by construction of the claim terms on which this motion is based.

It is a "bedrock principle" of patent law that the claims define the metes and bounds of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Fairness dictates that the public be able to ascertain what falls within the scope of patent claims when the patent issues, not during the middle of a lawsuit. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The patent statute requires clear notice as to the scope of patent claims in requiring that a patent have "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. The test for this statutory requirement of "definiteness" is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005). The requirement that the claims particularly point out and distinctly claim the invention is met "when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when the claim is read in conjunction with the rest of the specification." *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001).

In construing the claims, the words "are generally given their ordinary and customary meaning." *Vitronics Corp.*, 90 F. 3d at 1582. "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."

*Phillips*, 415 F.3d at 1313. In making this determination, the court must view the claim terms in light of the entire intrinsic record, i.e., the claim language, the specification, and the prosecution record. *See id.* at 1314. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). In addition to the intrinsic record, extrinsic evidence, such as expert testimony, dictionaries, and technical treatises, may be used by the court in construing the claims. However, this outside evidence should always be "considered in the context of the intrinsic evidence" in order to avoid contradicting any definition or meaning found therein. *Id.* at 1319.

Patent claims must be read in view of the patent specification which is always highly relevant and is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582). The Federal Circuit has explained that the specification should be consulted "to ascertain the meaning of a claim term as it is used by the inventor in the context of the entirety of his invention." *Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). The importance of the patent specification is based on the statutory requirement that the specification "describe the **claimed** invention in 'full, clear, concise, and exact terms.'" *Id.* at 1316 (quoting 35 U.S.C. 112 ¶ 1) (emphasis added).

One way that a patent specification limits a claim's construction is to exclude a feature from the scope of the claims when the specification "makes clear that the invention does not include a particular feature." *Scimed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims." *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (holding that the claims require "play" in the subject flooring systems because the specification teaches that the invention provides for "play" in the positioning of floor panels, even though the claims at issue do not recite the term "play"); *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 865-66 (Fed. Cir. 2004) (holding that the specification of the patent-in-suit

12

required that the claim term "plug" must be a pleated plug); *Astrazeneca AB v. Mutual Pharmaceutical Co., Inc.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004) (holding that the specification limited the scope of the claim term "solubilizer" to surfactants); *Boss Control, Inc. v. Bombardier, Inc.*, 410 F.3d 1372 (Fed. Cir. 2005) (holding that the specification limited the construction of the claim term "interrupt" to a definition more detailed than simple on-off control and, in doing so, rejecting plaintiff's arguments that ordinary meaning and dictionary definitions of "interrupt" should be applied); *Alza Corp. v. Mylan Labs.*, 391 F.3d 1365, 1370 (Fed. Cir. 2004) (holding that the specification and file history required the claim term "skin permeable form" be construed to exclude fentanyl citrate). Claims cannot enlarge the scope of the patent grant beyond what the inventor has described as the invention. *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

A specification can exclude all but a disclosed structure or particular types of structures. *Honeywell Intern., Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006). A specification limits the scope of claims to a particular structure where it makes clear that the invention is limited to that particular structure. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (analyzing case law and finding that the specification at issue did not clearly limit the claims to a particular structure). A specification must clearly disclose that an invention is limited in order for the claims of the patent to be limited by the specification. However, no formal statement of limitation is necessary. *Astrazeneca AB v. Mutual Pharmaceutical*, 384 F.3d 1333, 1340 (Fed. Cir. 2004).

C.    **The Invention Described By Crown's Patents**

Crown's patents say that the inventors "have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall and limiting the width of the anti peaking bead." '875 Patent col.1 ln.32–34. (A 39.) Those patents identify the particular can end provided by the invention as having an angled wall **and** a narrow anti-peaking bead.

> [T]his invention provides a can end comprising a peripheral cover hook, a chuck wall dependant from the interior of the chuck wall, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterized in that, the chuck wall is inclined to

an axis perpendicular to the exterior of the central panel at an angle between 30° and 60°, and the concave bead narrower than 1.5 mm (0.060").

'875 Patent col.1 ln.64–col.2 ln.5.  (A 39.)  During prosecution of the '826 and '875 Patents, Crown argued that those patents disclosed can ends that were patentable because those ends had a wall at a greater angle than walls of prior can ends and because the wall of their can ends were deformed during seaming more than walls of prior can ends.  The claims of the '826 Patent are directed to an unseamed can end and a chuck that is used to seam the unseamed can end to a can body.  The '875 Patent is directed to a "can end and method for fixing the same to a can body."

1.    The Anti-Peaking Bead That Is Required by Crown's Invention

The anti-peaking bead, which Crown's patents also refer to as an outwardly concave annular reinforcing bead, is a generally U-shaped bead that was known in the prior art.  Crown's patents illustrate a prior art annular reinforcing bead in Fig. 2 and describe that bead as the "outwardly concave anti-peaking bead 15."  '875 Patent col.3 ln.13-14.  (A 40.)  Crown's patents describe a prior art patent to Kraska and a prior art Crown patent as disclosing "an outwardly concave annular re-inforcing bead."  Id. at col.1 ln.22-23, 47-48.  Crown's patents also acknowledge that a narrow generally U-shaped bead strengthens a can end.  Those patents also describe a prior Crown patent as providing "a narrow, and therefore strong reinforcing bead."  Id. at col.1 ln.60-61.

In addition to providing strength to a can end, the generally U-shaped annular reinforcing bead serves another purpose.  A tool, called a chuck that is identified as 5 in Fig 2 of Crown's patents, includes an annular projection, (referred to by Crown's patents as an annular bead, annulus, projecting bead, and chuck bead 19) that fits into the annular reinforcing bead as illustrated by Fig. 2.  (A 35.)  The chuck enters the can end from above, as depicted by Figs. 1 and 2, to support the can end during seaming of the can end to the can body.  '875 Patent col.2 ln.61–col.3 ln.10.  (A 39-40.)  The chuck's projecting bead drives the can end by rotating it.  Id. at col.3 ln.27-30, 33-35.  (A 40.)  Because the chuck's annular projection enters into and exits from the annular reinforcing bead of the can end from above, that bead opens upwardly and extends up and down along the length of the can.

14

Though narrowing the U-shaped annular reinforcing bead strengthened the can, the problems with narrowing that bead, according to Crown's patents referring to Fig. 2, are that:

> As can ends are developed with narrower anti-peaking beads the chuck bead 19 becomes narrower and more likely to fracture. There is also a risk of scuffing of the can end at the drive position D which can leave unacceptable unsightly black marks after pasteurisation.

'875 Patent col.3 ln.31-35. (A 40.) To avoid these problems, Crown's patents say that the invention provides a chuck that contacts the can end on an angled wall above the annular reinforcing bead "without entering deeply into the anti-peaking bead 25." *Id.* at col.4 ln.38-41. (A 40.) The anti-peaking bead of Crown's patents opens upward to allow the chuck to enter the bead, but the chuck does not enter "deeply" into the upwardly opening generally U-shaped anti-peaking bead.

Every embodiment of the invention that is shown and/or described by Crown's patents has the upwardly opening generally U-shaped anti-peaking or annular reinforcing bead positioned between the can end wall and the central panel. '826 and '875 Patents, Figs. 4-7, 9. (A 36-38.) Crown's patents make clear that the U-shaped annular reinforcing bead is the only configuration contemplated by the Crown patents by providing typical dimensions for the heights of the inner and outer legs of the bead, $h_3$ and $h_4$, and the radius of the bottom of the U, $r_3$. '875 Patent Fig. 4, col.4 ln.3, 8–9. (A 36, A40.) Tables that show performance of can ends according to the alleged invention show the dimensions of the U-shaped annular bead. *Id.* at tables 2 and 5. (A41, A42.) Crown's patents also specify the range of angles for the outer leg of the U-shaped bead. *Id.* at col.3 ln. 51-54. (A40.)

Crown's patents clearly and consistently describe the invention as including a can end that has an improved (narrower), but otherwise conventional generally U-shaped annular reinforcing bead that opens upwardly and extends along the length of the can. Nothing in Crown's patents or their prosecution histories varies from that description.

      2. **The Angled End Wall and Its Deformation During Seaming Required by Crown's Invention**

The end wall of a prior industry "standard can end" is inclined at an angle of approximately 12° - 15° from the vertical axis. '875 Patent col.3 ln.15-17. (A 40.) Crown's alleged invention is a can end

with end wall angles of between 20° and 60°. *Id* at ln.48. As shown by Figures 2 and 5 of Crown's patents, increasing the angle of the end wall reduces the diameter of the central panel (A35, A36.) As was known in the prior art and as set out by the examples listed in table 6 of Crown's patents, increasing the angle of the wall also reduces the amount of metal needed to make the can end.



FIG. 2 PRIOR ART

Fig.5.

An additional advantage of reducing the size of the central panel and having a narrow anti-peaking bead, according to Crown's patents, is that the end is stronger and can be made from thinner metal

> The ends may be economically made of thinner metal if the pressure retention requirements permit because these can ends have a relatively small centre panel in a stiffer annulus.

'875 Patent col. 8 ln.25-27. (A.42.)

Crown argued during prosecution of the '875 Patent that, as shown by Fig. 2 of its patents, conventional ends had a wall at a "relatively shallow angle" of 12° to 15° and that after being deformed during seaming to an angle of 4°, that wall remained essentially straight. '875 Prosecution Reply submitted 6/9/2004 at p. 2, A.70-74. Crown's invention was different, Crown argued, because it began with an end having a "particular geometry," including a wall as shown by Fig. 4 of its patents and as recited by the claims that require the wall to be at an angle greater than 20 °. *Id.* Additionally, Crown argued that the end was deformed during the seaming process as shown by Figs. 6 and 7 of its patents to an angle of 4°. *Id.* During later prosecution of the '826 Patent, Crown admitted that the prior art suggested walls at an angle up to 20°. Crown then submitted claims that required an angle of at least 30°.

16

'826 Prosecution Reply submitted 8/9/2004 at pp 3-5, 8. (A. 102-108.) Crown also submitted a declaration that called its deformation of its claimed ends during seaming "a radically different method of seaming." (Higham Decl. at ¶ 52, July 29, 2004. (A 140.) Crown's prosecution statements make clear that both the angle of the can end wall and deforming the wall during seaming are essential elements of Crown's alleged invention.

### D.    The Rexam End

The accused Rexam End differs dramatically from the can end that Crown's inventors claim to have invented, and is not seamed to a can end as claimed by the '875 Patent. Most clearly different from the can ends disclosed by Crown's patents, and from every other prior and current beverage can end, the Rexam End does not have a generally U-shaped anti-peaking bead extending inwardly from the chuck wall to the central panel. The Rexam End includes a curved chuck wall that

REDACTED

extends to the central panel, folds outwardly and upwardly from the central panel, and then back down to join the central panel.

Though the lower portion of the can wall that includes the fold, as well as the way that wall joins the center panel of the Rexam End are radically different from all other beverage can ends, including those of Crown's patents, the outermost portion of the Rexam End that is deformed during seaming to join a can body is little, if any, different from long-known conventional can ends. Unlike the "radically different" seaming that Crown argued was disclosed by its patents, the Rexam End has a cover hook that is formed into a double seam with a can body in a way that differs little, if at all, from seaming of a conventional end. As shown below by excerpts from drawings of the Rexam End and Rexam's standard end (A 5, A 31), the portion of the Rexam End that is deformed to become part of a double seam with a

17

can body is a curved "curl" region that is nearly identical to the curl of the conventional can end. The conventional end shown by Fig. 2 of Crown's patents likewise shares nearly that configuration. (A 35.) The Rexam End is seamed in a conventional manner using conventional seaming rolls. A 12, A 30.

The Rexam End is curved in that region, as indicated by the tangent line to the curve at the inner and lower extent of the curl portion.

REDACTED

REDACTED

(A 31.) That wall angle is consistent with the description of standard ends by Crown's patents as having a wall at an angle of "about 12° to 15°." '875 Patent col.3 ln.15-17. (A 40.)

REDACTED

Because the Rexam End does not have an anti-peaking bead that opens upwardly from the can end between the chuck wall and the central panel, the Rexam End does not have a smaller central panel than a conventional can end. As shown by the profiles of the Rexam End (as excerpted from A8, and a profile of a Rexam standard shell, excerpted from A31) the diameter of the inner extent of the fold is not smaller, and is actually slightly larger, than the diameter of the central panel of Rexam's standard end. (*Compare* A8 and A 31.)

E.    The Rexam End Chuck

The chuck that is used to seam the Rexam End to can bodies differs significantly from the chuck that is disclosed by Crown's patents. As illustrated below by an excerpt from Fig. 8 of Crown's patents,

18

the chuck that is depicted and described as being used to seam the can end depicted by Figs. 4 through 7, has an upper straight (in cross section) wall 33 and a lower straight (in cross section) wall 32. (A 36-38.) The walls 33 and 32 are depicted as meeting at a sharp point. Crown's patents describe those walls



Fig.5.

REDACTED



meeting in two ways, by a "sharp transition" and by a "blend" radius. '875 Patent col.7 ln 5-6, col.7 ln 42-col.8 ln.2 (A 42.) As shown by the Figure to the right having a profile excerpt from Rexam's chuck drawing, A 6, and an excerpt from Fig. 8 of Crown's patents,

REDACTED

The Rexam End chuck does not have upper and lower walls that meet at a point or a sharp transition.

### F. Noninfringement Of Crown's Patents – The Rexam End Has No Annular Reinforcing Bead

For the reasons set out above and by Rexam's briefs on claim construction, every claim of Crown's patents should be construed to require the "annular reinforcing bead" that is explicitly required by claims 50 through 53 of the '875 Patent. Also for the reasons set out above and by Rexam's brief on claim construction, the required "annular reinforcing bead" should be construed to be an outwardly concave generally "U" shaped groove (also called a countersink or anti peaking bead) that is stamped or pressed into the can end, and is located inwards from the bottom of the wall (chuck wall) when looking at a cross section of the can end. It encircles and supports the center panel of the can end.

19

As shown in Section D above and by A 8, Rexam's Rexam End does not have the generally U-shaped and upwardly opening annular reinforcing bead that extends inwardly from the can end chuck wall to the central panel that Crown's patents specifically describe and state is an essential part of Crown's alleged invention. (A 8.) Every claim of Crown's patents that requires a can end having that annular reinforcing bead cannot be infringed by the Rexam End.

Crown's patents describe the functions of the "annular reinforcing bead." First, the annular reinforcing bead strengthens the can end. '875 Patent col.1 ln.60-61. (A 39.) During prosecution of an earlier patent from the same specification as Crown's patents, Crown reproduced and embraced a prior art statement that the shape of a countersink (reinforcing bead) is critical to its strength:

> In rejecting claim 1 over Kraska, the Examiner has failed to appreciate that the selection of wall angles of the can end is critical to the overall strength of the can end, and that relatively small changes in angle can radically affect the performance of the can end. Even Kraska recognizes that "all of the parameters or dimensions of the respective portions which form a countersink 20 are critical and are interrelated to each other to optimize the maximum pressures that the end is capable of withstanding without buckling or rocking."

U.S. Patent No. 6,065,634 File History, Response to Office Action, dated September 16, 1999, (quoting U.S. Patent No. 4,217,843 col.4.) (emphasis added). (A 65-69.) Crown cannot now argue that the specific shape of the annular reinforcing bead that it depicted and described is of no consequence to the alleged invention of its patents.

Second, the annular reinforcing bead supports the central panel of the can end. '875 Patent col.2 ln.1-2. (A 39.) The annular reinforcing bead also strengthens the can end by extending radially inwardly from the chuck wall to the central panel and thereby reduces the size of the central panel. "The can ends may be economically made of thinner metal if pressure retention requirements permit because these can ends have a relatively small centre panel in a stiffer annulus." '875 Patent col.8 ln.25-27. (A 42.)

20



Third, the annular reinforcing bead provides an opening into which a seaming chuck enters from above. In drawing a contrast between the older wider annular reinforcing beads, the specification explains this function of the narrower annular reinforcing bead: "In contrast to the [prior art] chuck of Fig. 2 the modified chuck 30 is designed to drive initially on the relatively large chuck wall 32 <u>without entering deeply into the anti-peaking bead 25</u>." '875 Patent col 4 ln 37-40, A 40 (emphasis added). To the extent that prior art chucks entered larger beads, a portion of the chuck still enters into the anti-peaking bead. This is only possible if the aforementioned bead is outwardly concave and located radially inward from the chuck wall.

REDACTED

demonstrating

---

[2] The '875 Patent was filed on Dec. 18, 2001. '875 Patent, p. 1 A 32.
[3] The SuperEnd is Crown's first commercial embodiment of the '826 and '875 Patents.

REDACTED                          Since the "ordinary

and customary meaning of a claim term is the meaning that the term would have to a person of ordinary

skill in the art in question at the time of the invention," the known function of such a feature at that time is

highly relevant to the meaning of the claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir.

2005).

In addition to being radically different in shape from the annular reinforcing bead of Crown's

patents, the folded portion at the bottom of the wall of the Rexam End does not reduce the size of the

central panel and does not allow a chuck to enter it.  The Rexam End is not an equivalent to the annular

reinforcing bead of Crown's patents because it fails to function as the annular reinforcing bead as

Crown's patents does.  As a matter of law, the fold of the Rexam End wall is not an equivalent of the

annular reinforcing bead.

G.    **Noninfringement Of Claims 13 And 14 Of The '826 Patent and Claims 50 Through 54 Of The '875 Patent – The Rexam End Does Not Bend Upwardly At A Point Around A Juncture Of Chuck Walls During Seaming**

Claim 13 of the '826 Patent requires "a rotatable chuck comprising first and second

circumferentially extending walls, said first and second chuck walls forming a juncture therebetween."  A

58.  Rexam asserts that requirement should be construed to require "When looking at a cross section of a

seaming chuck, an upper wall and a lower wall of a seaming chuck (also referred to the first and second

walls) meet at a point (juncture) to form a distinct angle." (A14-27.)  There are two bases for this

proposed construction, additional requirements of claim 13 itself, and the chuck that is disclosed by

Crown's patents.

Claim 13 of the '826 Patent additionally requires "a first portion of said wall extending from said

cover hook <u>to a first point on said wall</u>", '826 Patent col. 10 ln.51-52, A 58 (emphasis added), and "said

first wall portion adapted to be deformed during said seaming operation so as to be <u>bent upwardly</u>

---

REDACTED

<u>around said juncture of said chuck walls at said first point on said wall</u>." '826 Patent col.10 ln.52-56,

A.58 (emphasis added)  Taken together, those requirements are that there is a point on the wall and the

wall is bent upwardly at that point and around the juncture of the chuck walls.  The only construction of

"juncture" of the two chuck walls that is consistent with the wall bending at a point around the juncture is

that the juncture is a point.

A juncture between walls that is a point is exactly what is depicted and described by the '826

Patent  Referring to the chuck that is shown by Fig. 5 of the '826 Patent, "a modified chuck 30 comprises

a chuck body 31 having a frustoconical drive surface 32", and "[t]he frustoconical drive surface is

inclined outwardly and axially at an angle substantially equal to the angle of inclination C° of between

20° and 60°; in this particular example on chuck angle C of 43° is preferred. . . .The substantially

cylindrical surface portion 33, rising above the drive surface 32, may be inclined at an angle between +4°

and -4° to a longitudinal axis of the chuck."  '826 Patent col.4 ln.44-45, 48-55, A.55



Fig.5.

In addition to depicting and describing walls of different angles that meet each other, the '826

Patent distinguishes between different ways that chuck walls

can meet.  Referring to Fig. 8, that patent describes two

chuck walls meeting in two ways, at a "sharp transition" and

with a "blend radius" R of .5 millimeters (.020 inches).  A.                    REDACTED

42.  In view of this description, walls that meet at a point

must do so with a radius that is significantly less than .5 millimeters.

Crown disagrees that the chuck walls required by claim 13 must meet at a point and that they must form an angle. Crown asserts that all claim 13 requires of the two chuck walls is: "[f]irst and second walls encircling the chuck forming a place between them at which they meet." A 15. These are no requirements at all. If a wall can be any shape, and a juncture can be any shape, there is no way to identify the end of one wall and the beginning of another. If a juncture need have no particular characteristics, there is no way to determine whether a juncture exists or not. Crown's proposed construction is an attempt to rewrite claim 13 of the '826 Patent to remove any requirement that walls meet at a juncture. That attempt should be rejected.

The Rexam End chuck does not meet the requirements of claim 13 of the '826 Patent that two walls meet at a juncture. First, if there are no requirements for the shape of a chuck wall, there is no basis to assert that the surface that contacts the can end is two walls rather than a single wall.

REDACTED

The Rexam End chuck does not have two chuck walls that meet at a juncture as required by claim 13 of the '826 Patent.

Independent claim 50 of the '875 Patent has similar requirements for two chuck walls. Claim 50 requires "providing a rotatable chuck comprising first and second circumferentially extending walls, said **second chuck wall depending from said first chuck wall so as to form a juncture therebetween**." '875 Patent col.15 ln.24-27, A 46 (emphasis added). That claim further requires "to **bend a portion of said can end wall upwardly around said juncture** of said chuck walls **at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60°** with respect to said axial centerline both before and after said seaming operation." '875 Patent col.15 ln.34-41, A 46. The only possibly relevant difference between claim 13 of the '826 Patent and claim 50 of the '875

24

Patent concerning the juncture requirement is that bending is at a "point" on the can end wall in the case of claim 13 of the '826 Patent, and bending is at a "location" in the case of claim 50 of the '875 Patent.

Neither Crown nor Rexam ascribe any significance to this difference in construing the juncture requirements of those claims. *Compare* A16, A21. Because claim 50 requires that a line be drawn based on the first location, Rexam believes that the first location of claim 50 of the '875 Patent is not different from the first point required by claim 13 of the '826 Patent. The Rexam End chuck does not meet the juncture requirements of claim 50 of the '875 Patent for the same reasons that it does not meet the juncture requirements of claim 13 of the '826 Patent.

> H.    **Noninfringement Of Claims 13 And 14 Of The '826 Patent and Claims 32 Through 34 Of The '875 Patent – The Rexam End Does Not Have A Wall With A Lowermost End Through Which A Line From The Double Seam Is At An Angle Between 20° and 60° To A Perpendicular Line To The Central Panel**

Claim 13 of the '826 Patent requires:

> a first portion of said wall extending from said cover hook <u>to a first point on said wall</u>, said first wall portion adapted to be deformed during said seaming operation so as to be <u>bent upwardly around said juncture of said chuck walls at said first point on said wall</u>, a second portion of said wall extending from said first point to <u>a second point forming a lowermost end of said wall, a line extending between said first and second points being inclined to an axis perpendicular to said central panel at an angle of between 30° and 60°</u>.

'826 Patent col. 10 ln. 50-61, A 58. As set out by Rexam's motion for summary judgment that claims of the '826 Patent are invalid, Rexam asserts that the '826 Patent does not provide a basis for construing those requirements. Those points cannot be accurately identified based on the '826 Patent. Nevertheless, assuming that the first point is near the portion of the can end that will be adjacent to the double seam, and the second point is the location at which the wall of the Rexam End meets the central panel, as shown by the configuration of the Rexam End in A8 and the excerpt with generally representative lines below, the angle of a line through those points will be at an angle that is less than 20° to an axis that is perpendicular to the central panel.

25

REDACTED

The Rexam End does not have a wall for which a line through points located as required by claim 13 of the '826 Patent will be at an angle of between 30° and 60° to a line that is perpendicular to the central panel.

Claim 32 of the '875 Patent has requirements for two locations on a wall that are similar to the requirements for two points of claim 13 of the '826 Patent. Claim 32 requires a "first wall portion extending from said seaming panel to a first location on said wall," a "second wall portion extending from said first wall portion at said first wall location on said wall to a second location on said wall, whereby said first and second locations form end points of said second wall portion, said second wall location being the lowermost point of said wall, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end" and "said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion." '875 Patent col. 13 ln.11-13, 14-19, A 45. Again, as set out by Rexam's motion for summary judgment that Crown's patents are invalid, Rexam believes that these locations cannot be determined based on the '875 Patent. However, making the same assumptions as to possible locations for these locations as for the points required by claim 13 of the '826 Patent, it is clear that the Rexam End does not meet these requirements of claim 32 of the '875 Patent.

26

I.    **Noninfringement Of Claims 13 And 14 Of The '826 Patent – The Rexam End Does Not Have A First Wall Portion That Is Bent Upwardly During Seaming**

Claim 13 of the '826 Patent requires, *inter alia*, a can end comprising:

<u>a peripheral cover hook</u>, said peripheral cover hook <u>comprising a seaming panel</u> adapted to be formed into a portion of said double seam during said seaming operation; a central panel; <u>a wall extending inwardly and downwardly from said cover hook, a</u> <u>first portion of said wall extending from said cover hook to a first point on said wall,</u> <u>said first wall portion adapted to be deformed during said seaming operation so as</u> <u>to be bent upwardly around said juncture of said chuck walls at said first point on</u> <u>said wall</u>

'826 Patent col.10 ln.44-56, A 58. Collectively, these require a wall that extends from a cover hook and a portion of the wall adjacent to the cover hook to be between the cover hook and the juncture of chuck walls so that this portion of the wall is bent upwardly around the juncture of the chuck walls. In addition to the fact that the Rexam End chuck has no juncture of chuck walls and the impossibility of locating the required first point on the Rexam End based on the specification of Crown's patents, the Rexam End cannot meet this requirement. The Rexam End has a cover hook that extends throughout the entire region of the Rexam End that becomes part of the double seam. No wall portion below the cover hook is bent upwardly.

The claim terms that are relevant to this issue are "peripheral cover hook" and "seaming panel." Rexam construes the peripheral cover hook to be, "When looking at a cross section of the can end, the outermost portion of the can end that is curved or conforms to one or more radii, which engages a can body flange to form at least a part of a double seam, and ends where the curved or radiused portion(s) stops." A 14-27. Crown construes that term to be, "Curved portion of the can end that is to be formed into a portion of a double seam." A 14-17. Rexam's construction provides a basis for identifying the end of the peripheral cover hook, and thereby the beginning of the wall that extends from that location. Crown's construction provides no basis for locating the end of the cover hook and the beginning of the wall. Rexam construes the term "seaming panel" to be "an uppermost portion of the peripheral cover hook formed by a constant radius." This construction is based on the only disclosure of a seaming panel in Crown's patents. Crown argues, in its stricken claim construction brief, that Crown's patents disclose

27

that the seaming panel is the innermost portion of the cover hook. That position is directly contradicted by Crown's patent and by a statement Crown made to the patent examiner during prosecution of the '875 Patent. Crown's construction is wrong.

Crown's patents identify the outermost portion of an unseamed can end as either a "peripheral curl" or a "peripheral cover hook." '826 Patent Fig.2, (A50) col.3 ln.24-25 (A55); Fig.4, (A51) col.3 ln.54-57, (A 55.) A chuck wall extends inwardly from the curl or cover hook. *Id.* Crown, in its stricken claim construction brief acknowledged that the terms "cover hook" and "curl" are used synonymously by Crown's patents. Neither Fig. 2 for a prior art can end, nor Figs. 4, 5, 6 or 7, all of which depict the same embodiment of Crown's alleged invention, indicate the location at which the curl or cover hook ends and the chuck wall begins.

The seaming panel is not even disclosed to the extent of the peripheral cover hook. Fig. 4 of Crown's patents includes dimension lines for both linear measurements, height, and depth, and for curved features, radii and diameters. The table in col. 4 of the '826 Patent show "typical dimensions" for those measurements. Those dimensions include a "seaming panel radius" identified as $r_2$ and a "seaming panel/chuck wall radius" identified as $r_1$. Rexam believes that the portion that conforms to the seaming panel radius is the seaming panel, and the portion that conforms to the "seaming panel/chuck wall radius" is a region of the cover hook that extends from the seaming panel to the chuck wall. The curved sections that conform to $r_1$ and $r_2$ are part of the cover hook, and the flat section adjacent to the region that conforms to $r_1$ is the chuck wall. Crown's patents provide no other basis for locating the end of the cover hook or the beginning of the chuck wall.

The table at column 4 of the '826 Patent confirms Rexam's understanding of the Crown patents. That table states that the regions of the can end that conform to the "seaming panel radius" and to the "seaming panel/chuck wall radius" are part of the peripheral curl. It does so by identifying diameters, $d_3$ and $d_4$ as "PC diameter of seaming panel /chuck wall radius" and "PC diameter of seaming panel radius," respectively. As shown by Fig. 4, diameters, $d_3$ and $d_4$ are the locations at the peripheral curl portion of the can end at which the centers of radii $r_1$ and $r_2$, respectively, are located. The letters "P" and "C" can

28

only refer to the "Peripheral Curl." The regions conforming to radii $r_1$ and $r_2$ are thereby labeled as parts of that peripheral curl.

The claims of the '875 Patent confirm Rexam's proposed construction by clearly stating that the region of the peripheral curl that conforms to radius $r_1$ is not part of the seaming panel. Claim 1 of the '875 Patent requires "a can end having a circumferentially extending peripheral curl and a **wall extending circumferentially and radially inward from said curl.**" '875 Patent col.9 ln.22-24, A 43. Claim 1 makes clear that the seaming panel is not the innermost portion of the curl by further requiring that the curl include a radiused portion that is interposed between the seaming panel and the wall: "said peripheral curl comprising a seaming panel and a **radiused portion extending from said seaming panel to said wall.**" *Id* at ln. 27-29, A 43. That claim makes clear that a wall that extends from the peripheral curl, or cover hook in the case of claim 13 of the '826 Patent. It does not extend from the seaming panel. The seaming panel is not the innermost portion of the peripheral cover hook.

During prosecution of the '875 Patent, Crown specifically told the patent examiner that the seaming panel disclosed by Crown's patents was limited to the region that conforms to radius $r_2$.

REDACTED

As shown in Figure 4 and described in the corresponding text of the instant application, the seaming operation begins by providing a can end that has a wall extending from the seaming panel portion of the cover hook 23 (**the radius of the seaming panel is designated $r_2$ in Figure 4**) to an annular reinforcing bead 25.

(2/09/2004 amendment) at p. 20, A 98. The seaming panel disclosed by Crown's patents is limited to the region that conforms to the radius $r_2$ and is characterized by that single uniform curvature.

The seaming panel is not the innermost section of the peripheral cover hook. Rather, as disclosed by Crown's patents, the cover hook extends inwardly the extent of the curvature. Applying that construction to the Rexam end demonstrates that the cover hook of the Rexam End is the only portion that is bent upwardly during the seaming operation.

REDACTED

The Rexam End does not have a wall portion that is "deformed during said seaming operation so as to be bent upwardly." The Rexam End therefore cannot infringe claim 13 of the '826 Patent.

### J. Noninfringement Of Claims 32 Through 34, 51 and 53 Of The '875 Patent – The Rexam End Is Not Bent Upwardly At Least About 16° During Seaming

Claim 32 of the '875 patent requires, *inter alia*,:

said first portion of said can end wall being pressed against said chuck first wall so that **at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°**

'875 Patent col.15 ln.37-40. Similarly, claim 51 of the '875 patent requires

at least a portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°.

Claim 33 depends from claim 32, and claim 34 depends from claim 33 and further requires bending of at least about 26°. Claim 52 depends from claim 51, and claim 53 depends from claim 52 and further requires bending of at least about 26°. Rexam construes those to require "A portion of the upper wall (chuck wall), which is above the first location, is bent upwards, when looking at a cross section drawing, around the first location by 16 degrees (less 1 degree or plus 1 degree or more)." Crown construes this to require "At least part of the first

portion of the can end wall is turned upwardly through an angle of at least about 16°." Construction of claims 33 and 52 differ by substitution of 26° for 16°.

Bending required by claims 51 and 53 is "around said juncture of said chuck walls at a first location," as recited by claim 50 from which claims 51 and 53 depend. 875 Patent col.15 ln. 34-36, A 46 Rexam asserts that bending takes place at the first location recited by claim 32 based on two other requirements  The first is that the first location is the transition from the double seam to the second wall portion  '875 Patent col 13 ln. 40-43, A 45 The second is that a line from the first location to a second location remain inclined in a stated range of angles. *Id* at lines 43-45, A 45 Because the region above the first location is the double seam, and the region below the first location remains inclined, the first location is the location of bending as illustrated by Fig. 7 of Crowns patents.

## Fig.7.



This limitation is directed to the portion that pressed against the chuck wall and is bent upwardly around the "juncture" of the upper and lower chuck walls.  Crown specifically told the examiner that this bending is what its claims referred to.

> recognizing that when, as shown in Figure 7, a portion of the chuck wall 24 of the can end that is originally inclined at an angle of at least about 20°is pressed against the substantially cylindrical portion 33 of the chuck wall, which is oriented at an angle of +/- 4°, such portion of the chuck wall 24 of the can end will be bent by an angle of at least about 16°(*i e.*, 20°-4°=16°), and that when the chuck wall 24 of the can end is originally inclines at an angle of at least about 30°, it will be bent by an angel of at least about 26°, when the chuck wall 24 of

31

the can end is originally inclined at an angle of at least about 40°, it will be bent
by an angle of at least about 36°.

'875 Patent application amendment dated 4/30/2002 at p. 12, A 120. The only section of the can

end that is bent is the portion at the juncture.

Seaming the Rexam End with the Rexam End chuck cannot meet this requirement.

REDACTED

IV.    CONCLUSION

Since the present issues revolve around claim construction, a question of law, no genuine issues

of fact remain. Summary judgment should be entered that Rexam's Rexam end does not infringe either

32

Crown's '875 Patent or Crown's '826 Patent

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL   60601
312-775-8000

Dated:  January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Defendant/Counterclaimant*
   *Rexam Beverage Can Co.*

33

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2007, I caused to be served by hand delivery and

electronic mail the foregoing document and electronically filed the same with the Clerk of Court

using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on January 25, 2007,  I caused to be via electronic mail the foregoing

document to the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 1, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700