**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CROWN PACKAGING TECHNOLOGY, INC. AND CROWN CORK & SEAL USA, INC.,** | ) ) ) ) | |
| **PLAINTIFFS,** | ) ) | **CIVIL ACTION NO. 05-608 (MPT)** |
| **V.** | ) ) | |
| **REXAM BEVERAGE CAN CO.,** | ) ) | |
| **DEFENDANT.** | ) ) ) | |

**Redacted Public Version**

**CROWN'S OPENING CLAIM CONSTRUCTION BRIEF
RELATING TO CROWN'S AND REXAM'S PATENTS**

Barry Klayman
WOLF, BLOCK, SCHORR and
   SOLIS-COHEN LLP
Wilmington Trust Center
1100 N. Market Street
Wilmington, DE 19801
(302) 777-0313

Dale M. Heist
Lynn Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

*Attorneys for Plaintiffs
Crown Packaging Technology, Inc. and
Crown Cork & Seal USA, Inc.*

February 12, 2007

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   THE NATURE OF THE PRESENT DISPUTE ......................................................... 1

III.  LAW OF CLAIM CONSTRUCTION ........................................................................ 2

      A.    Claims Define the Invention ............................................................................ 2

      B.    Role of the Patent Specification ...................................................................... 2

      C.    Role of the Prosecution History ...................................................................... 4

      D.    Role of Unasserted and Dependent Claims .................................................... 4

      E.    Role of the Accused Device ............................................................................. 5

IV.   CROWN'S 826 AND 875 PATENTS .......................................................................... 5

      A.    Background Of The Inventions ........................................................................ 5

            1.    The Origins of Can Ends ....................................................................... 5

            2.    Conventional Can End Geometry ......................................................... 6

            3.    Conventional Seaming .......................................................................... 6

      B.    The 826 And 875 Patent Specifications ........................................................... 7

      C.    Crown's Proposed Construction of the 826 And 875 Patent Claims ............ 9

            1.    "*first and second chuck walls forming a juncture therebetween*" and
                  "*first and second circumferentially extending walls, said second chuck
                  wall depending from said first chuck wall so as to form a juncture
                  therebetween*" ........................................................................................ 9

            2.    *peripheral cover hook* and *circumferentially extending peripheral cover
                  hook* ...................................................................................................... 12

            3.    *seaming panel adapted to be formed into a portion of said double seam
                  during said seaming operation* ............................................................ 13

            4.    *wall extending inwardly and downwardly from said cover hook* ....... 15

            5.    *first portion of said wall extending from said cover hook* ................. 15

            6.    *first point on said wall* ........................................................................ 16

            7.    *adapted to be deformed during said seaming operation* ..................... 16

8.  *bent upwardly around said juncture of said chuck walls at said first point* and *to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall* .................. 17

9.  *a second point forming a lowermost end of said wall* ........................... 19

10. *annular reinforcing bead* ................................................................. 19

11. *circumferentially extending wall comprising first and second portion* ............. 23

12. *first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming pane* .............................................................................. 24

13. *second location on said wall . . . being the lowermost point of said wall* ........... 25

14. *between about 20° and about 60°* ......................................................... 26

15. *bent upward through an angle of at least about 16°* ............................... 27

16. *transition from said double seam to said second wall portion* ..................... 28

17. *forming a transition therebetween* ...................................................... 28

18. *between about 30° and 50°* ................................................................ 29

19. *upward by an angle of at least about 26°* ............................................. 29

20. *circumferentially extending wall extending from said seaming panel* ................ 30

V.   REXAM'S SCORE PATENTS .................................................................. 30

     A.   Background Of Rexam's Score Patents ............................................ 30

     B.   Terms In Dispute In Rexam's Score Line Patents .............................. 32

     C.   Crown's Proposed Construction of Rexam's Score Patents ................. 32

          1.   *hinge segment* ...................................................................... 32

          2.   *the hinge line* ....................................................................... 34

          3.   *adjacent area of the central panel* ........................................... 38

          4.   *passing through* .................................................................... 39

          5.   *to direct fracture of metal* ..................................................... 41

VI.  REXAM'S BOTTOM REFORMING PATENTS .......................................... 42

     A.   Rexam Agrees To Crown's Constructions For All But One  Term .................. 42

B.  Crown's Proposed Constructions of the Remaining Disputed Term Should Be Adopted.................................................................................................................43

VII.  REXAM'S NECKING PATENT ...............................................................................44

A.  Disputed Claim Terms of Rexam's Necking Patent ........................................44

B.  Crown's Proposed Construction of Rexam's Necking Patent ..........................44

    1.  *smoothly-shaped neck profile* ..............................................................44

    2.  *reformed as a part of said second taper* .............................................46

    3.  *combine and blend* ..............................................................................47

    4.  *part formed by each die element partially integrates and blends with the portion formed by a preceding die element* ..........................................48

VIII.  CONCLUSION ..........................................................................................................50

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agfa Corp. v. Creo Prods. Inc.*,
    451 F.3d 1366 (Fed. Cir. 2006) ........................................................................*passim*

*E-Pass Techs., Inc. v. 3Com Corp.*,
    2007 U.S. App. LEXIS 644 (Fed. Cir. Jan. 12, 2007).............................. 4

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999) ........................................................... 37

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006) ......................................................... 35

*Free Motion Fitness, Inc. v. Cybex Int'l Inc.*,
    423 F.3d 1343 (Fed. Cir. 2005) ....................................................... 3, 4

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ........................................................... 2

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
    887 F.2d 1050 (Fed. Cir.  1989) .......................................................... 2

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ............................................................ 2

*Jurgens v. McKasy*,
    927 F.2d 1552 (Fed. Cir. 1991) ........................................................... 5

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ......................... 16, 24, 25

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998) ......................................................... 42

*Massachusetts Inst. Of Tech. v. Elecs. For Imaging, Inc.*,
    462 F.3d 1344 (Fed. Cir. 2006) ......................................................... 41

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ........................................................... 4

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
    287 F.3d 1062 (Fed. Cir. 2002) ........................................................... 5

*Novo Indus., L.P. v. Micro Molds Corp.*,
    350 F.3d 1348 (Fed. Cir. 2003) ......................................................... 35

*Phillips v. AWH Corp*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... *passim*

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
   400 F.3d 901 (Fed. Cir. 2005) ....................................................................... 26, 29

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006) ............................................................................ 4

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985) ............................................................................ 5

*Sandisk Corp. v. Memorex Prods., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005) ............................................................... 13, 14, 30

*Specialty Composites v. Cabot Corp.*,
   845 F.2d 981 (Fed. Cir. 1988) ............................................................................. 3

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
   234 F.3d 1370 (Fed. Cir. 2000) ........................................................................ 22

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004) .............................................................. 4, 21, 23

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.*,
   842 F.2d 1275 (Fed. Cir. 1988) .................................................................. 27, 29

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006) ..................................................................... *passim*

## FEDERAL STATUTES

35 U.S.C. § 112 ....................................................................................... 2, 41, 42

## OTHER

Manual of Patent Examination Procedure § 2173.05(g) ....................................... 14, 17

Manual of Patent Examination Procedure § 2173.05(e) ............................................. 35

I.    **INTRODUCTION**

Crown submits this opening brief in support of its proposed construction of its own U.S. Patent Nos. 6,848,875 and 6,935,826 and also of Rexam's U.S. Patent Nos. 6,129,230 and 6,260,728 ("Score Line Patents"), 5,222,385 and 5,697,242 ("Bottom Reforming Patents"), and 4,774,839 ("Necking Patent").[1]

II.    **THE NATURE OF THE PRESENT DISPUTE**

Crown Packaging Technology is the owner of the 826 and 875 patents.  Its sister company, Crown Cork & Seal USA, makes and sells aluminum cans used for beer and carbonated beverages and "can ends" used to seal the cans after they have been filled.

Crown's 826 patent is directed to a novel can-end geometry that provides improved strength compared to prior can ends.  The increased strength allows the patented can ends to be made using less aluminum (Ex. 1 at 8:40-43).  Because of the billions of can ends made each year, the metal savings are significant.  The 875 patent is directed to an improved method of joining the can ends to cans.  Crown makes and sells the patented can ends under the brand "Superend®."

Rexam is a direct competitor of Crown.  Rexam makes and sells can ends called "Rexam ends."  Crown contends that the manufacture and sale of Rexam can ends in the United States infringes claims 13 and 14 of the 826 patent.  Crown also contends that methods used by Rexam's customers to join the can ends to cans infringe claims 32-34 and 50-52 of the 875 patent and that Rexam contributes to and induces that infringement.

---

[1] Copies of Crown's 826 and 875 patents form Exs. 1 and 2.  Copies of Rexam's 230 and 728 patents form Exs. 3 and 4.  Copies of the 230 and 728 patent file histories form Exs. 17 and 18.  Copies of Rexam's 385 and 242 patents form Exs. 5 and 6.  Copies of the 385 and 242 patent file histories form Exs. 19 and 20.  A copy of Rexam's 839 patent forms Ex. 7 and its file history forms Ex. 21.

### III.    LAW OF CLAIM CONSTRUCTION

#### A.    Claims Define the Invention

It is a "bedrock principle" of claim construction that the "claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Thus, it is the words of the claims themselves that define the scope of the patented invention. *Id.* For that reason, "the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

The words of a claim "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (citation omitted). "Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation." *Id.* at 1322.

"General descriptive [claim] terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). In some cases, the ordinary meaning of claim terms is apparent and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Therefore, if the meaning of a term is clear on its face, there is no need for additional construction. In these cases, general purpose dictionaries can be helpful. *Id.*

#### B.    Role of the Patent Specification

Claim terms, however, must be understood in the context of the written description of the patent specification. *Id.* at 1313. In claim construction, "interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir.

1989) (citation omitted). Accordingly, the Federal Circuit has expressly rejected the contention that "if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips,* 415 F.3d at 1323 (citation omitted). The disclosure of preferred embodiments or implementing examples should never be used to limit the scope of the claims absent a clear disavowal by the inventor. *Id.* at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments.").

The rule that "'a court will give a claim term the full range of its ordinary meaning,' does not mean that the term will presumptively receive its broadest dictionary definition." *Free Motion Fitness, Inc. v. Cybex Int'l Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005). Thus, where reference to dictionaries is appropriate "the task is to scrutinize the [specification and prosecution history] in order to determine the most appropriate definition." *Id.* at 1349.

"To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of ordinary skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips,* 415 F.3d at 1323. "One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case." *Id.* "[U]pon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* For that reason, "[w]here a specification does not require a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir. 1988).

Importantly, a series of recent cases have held that where "[n]othing in the specification, including the claims, indicates explicitly or implicitly, that the inventor intended to impart a novel meaning to [a claim term and] the record also contains no evidence that [the term] has a peculiar

meaning in the field of art encompassed by the [] patent," the Court should apply "the ordinary and customary meaning attributed to this term by those of ordinary skill in this art at the time of the invention" and this "involves little more the application of its widely accepted meaning."[2]

### C.    Role of the Prosecution History

Arguments in the prosecution history are far less important than the allowed claim language "because the prosecution history represents an on going negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Phillips,* 415 F.3d at 1317. Thus, arguments, as opposed to claim amendments, may only limit claims if they contain "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *NTP, Inc. v. Research in Motion, Ltd*., 418 F.3d 1282, 1308-09 (Fed. Cir. 2005).

### D.    Role of Unasserted and Dependent Claims

"Other claims of the patent in question, both asserted and unasserted, can be valuable sources of enlightenment as to the meaning of a claim term." *Phillips,* 415 F.3d at 1314. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*. Further, dependent claims are presumed to be narrower in scope than the independent claim from which they depend. Thus, a limitation added in a dependent claim is presumptively not to be read into the terms of the independent claim. *Id.* at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). In general, there is a "presumption that each claim in a patent has a different scope." *Versa Corp. v. Ag-Bag Int'l Ltd.,* 392 F.3d 1325, 1330 (Fed. Cir. 2004).

---

[2] *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006); *see also E-Pass Techs., Inc. v. 3Com Corp.*, 2007 U.S. App. LEXIS 644, at *15-16 (Fed. Cir. Jan. 12, 2007); *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006); *Purdue Pharma L.P. v. Endo Pharm. Inc.* 438 F.3d 1123, 1135-36 (Fed. Cir. 2006); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

### E.    Role of the Accused Device

It is improper to use the accused device as a form of extrinsic evidence in order to add limitations to patent claims. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006). Thus, claims should not be construed with reference to the accused device. *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (*en banc*). A claim construction should never be tailored "to fit the dimensions of the accused product or process and to reach a preconceived judgment of infringement or noninfringement." *Wilson,* 442 F.3d at 1331; *see also Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed. Cir. 1991) (noting that a claim should be construed "without regard to the accused product"). By doing so, a court would improperly impart a bias into the task of claim construction, instead of focusing on the plain meaning of the claims themselves.

## IV.    CROWN'S 826 AND 875 PATENTS

### A.    Background Of The Inventions

#### 1.    The Origins of Can Ends

Ermal Fraze is credited with having invented the first "flip-top" or "easy-opening" can end. All major can companies entered into license agreements to make Mr. Fraze's patented can ends. Later, others improved upon Mr. Fraze's idea by developing can ends with a "stay-on tab" in which the easy-opening tab did not detach from the can end when the can was opened (Ex. 22 at P93). Can ends embodying Mr. Fraze's flip-top concept and the later-developed "stay-on tab" proliferated and were sold by the hundreds of billions. Consequently, over the last thirty years, the industry has searched for ways to reduce the amount of aluminum consumed in each can end. Historically, efforts were made to reduce metal consumption by minimizing the overall diameter of the can ends (*id*. at P93-P94). But each can end diameter reduction required a corresponding can "neck" diameter reduction (*id.* at P94). Reducing can diameter, however, is very capital intensive (*id.*). Other efforts were made to reduce the thickness of the aluminum used in can

-5-

ends. But cans and can ends must withstand the internal pressures developed from the beer and carbonated beverages contained in the finished package and, as metal thickness is reduced, the likelihood of metal failure increases.

Despite major efforts to reduce aluminum consumption, conventional can end geometry remained virtually unchanged for decades as billions and billions of can ends were sold (*see id.* at P95). Then Crown developed its patented end. The patented geometry permits a significant reduction in aluminum consumption with no change in can diameter and corresponding capital investment. And even though the patented can ends are made from thinner aluminum, they still have adequate strength to withstand the internal pressure caused by beer and carbonated beverages (Ex. 1 at 8:41-43).

### 2.    Conventional Can End Geometry

The geometry of conventional can ends, before they were joined to a can, is shown in cross-section in Figure 2 of Crown's patents (*id.* at Fig. 2).



Conventional can ends included a "center panel" (16), a "reinforcing bead" (15), a "chuck wall" (14), and a peripheral curl" (13) (*id.* at 3:24-27). The wall (14) of conventional can ends was typically inclined from the vertical at an angle of about 12-15° (*id.* at 3:27-29).

### 3.    Conventional Seaming

After a can is filled with a beer or carbonated beverage, a can end must be joined to the can to secure the contents. The process of joining can ends to filled cans is called "seaming." The process used to seam conventional can ends to cans is shown in Figure 1 of Crown's patents (*id.* at Fig. 1).



FIG. 1
PRIOR ART

During the seaming process, a conventional can end (11) was placed over the open can such that a flange or rim of the can contacted the peripheral curl of the can end (*id*.). A rotating chuck (5) then engaged the can end causing the end to rotate relative to two seaming rolls (6, 8) (*id.*). The seaming rolls successively contacted the rotating can end at the peripheral curl, causing the curl and can flange to roll into a "double seam" (*id.* at Fig. 3). With conventional can ends, the can end wall (14), after seaming, was vertically oriented from the top of the seam along its entire length toward the bottom of the reinforcing bead (15).

**B.    The 826 And 875 Patent Specifications**

The inventions described in Crown's patent specification involved a new can end geometry and a modified seaming process to provide significant metal savings while avoiding the enormous capital investment typically required for can diameter reduction. The new can end geometry described in Crown's patents is based upon an increase in the wall angle of the unseamed can end — from about 12-15° to between about 30°-60° (as recited in the asserted 826 patent claims) and between 20°-60° (as recited in the 875 patent claims). One illustrative embodiment of the patented can end is set forth in patent Figure 4 (*id*. at Fig. 4):



The specification discloses that the new geometry, including the increased wall angle (denoted as angle "C" in Fig. 4), results in significant metal savings (*id*. at 1:33-35; 2:1-12; 8:40-43).

In the new seaming method, the upper portion of the chuck wall of the can end is deformed against the wall of the rotatable chuck while the remainder or lower portion of the wall remains inclined at its original angle between about 20° (or 30°) and about 60° (*id.* at 5:21-28; Ex. 23 at P644).  An illustration of the resulting seamed can end and can, including the deformed portion and the remaining inclined portion of the can end wall, are shown on the right side of Figure 7 of the patent drawing (Ex. 1 at Fig. 7):



The new can end geometry exhibits greatly enhanced strength (*id.* at 1:33-35; 2:1-12; 8:40-43; *see also* Ex. 23 at P635).  Because the patented can ends are stronger, they can be made with thinner metal and still satisfy pressure requirements (Ex. 1 at Table 6).  Because cost savings are derived from the new geometry and modified seaming process, rather than a can diameter change, the invention may be employed without significant capital investment.  Crown has thus far sold more than 70 billion of the new ends worldwide.

C.    **Crown's Proposed Construction of the 826 And 875 Patent Claims**

The disputed claim terms are set forth below. Because there is significant overlap in the disputed terms between the 826 and 875 patents, they are grouped together where possible.

1.    **"*first and second chuck walls forming a juncture therebetween*" and "*first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween*"**

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| first and second circumferentially extending walls*,* said *first and second chuck walls forming a juncture therebetween,* said can end comprising:<br><br>providing a rotatable chuck comprising *first and second circumferentially extending walls,* said second chuck wall *depending from said first chuck wall so as to form a juncture therebetween;* | Claim 13 of the 826 patent<br><br><br><br><br><br>Claim 50 of the 875 Patent | First and second walls encircling the chuck forming a place between them at which they meet. | "Juncture" is limited to a "point" rather than a "place or point" and that the entire phrase "first and second chuck walls forming a juncture therebetween" is limited to an "upper wall and a lower wall of a seaming chuck meet[ing] at a **point** (juncture) to form a distinct angle." |

The phrases "*first and second chuck walls forming a juncture therebetween*" in the 826 patent and "*first and second circumferentially extending walls,* said second chuck wall *depending from said first chuck wall so as to form a juncture therebetween*" in the 875 patent should be given their plain meaning. *See Phillips,* 415 F.3d at 1312. This language refers to the "circumferentially" extending walls of the chuck recited elsewhere in the claims. The specification does not define the term "circumferentially" nor indicate that it has a specialized meaning to those skilled in the art. Thus, the plain meaning of "circumferentially" is proper. *Agfa Corp. v. Creo Prods. Inc.,* 451 F.3d 1366, 1376 (Fed. Cir. 2006); *Wilson,* 442 F.3d at 1328. "Circumferentially" means "encircling" (Ex. 12 at 409). In claims 13 and 50, the "chuck" comprises "first and second *circumferentially* extending walls," and thus the phrase refers to "first and second walls encircling the chuck."

The phrase "*juncture therebetween*" means "a place between two things at which they meet." The specification neither defines the term "juncture" nor indicates that it has a specialized meaning. Thus, again, the plain meaning of "juncture" is proper. The plain meaning of "*juncture*" is "a place *or* point of . . . meeting (Ex. 12 at 1226) (emphasis added). Consequently, the phrase "*juncture therebetween*" simply means "a place between two things at which they meet." In claims 13 and 50, the "two things" are the first and second walls encircling the chuck.

Crown's proposed plain-meaning construction is consistent with, but not limited to, the preferred embodiment in the patent specification (Ex. 1 at Fig. 5):



Figure 5 illustrates an embodiment of a "juncture" that is consistent with the plain meaning of the phrase "*juncture therebetween.*" The drawing shows the first and second walls (32, 33) of the chuck (30) in cross-section. The cross-sectional view shows a juncture at which the first chuck wall (33) and second chuck wall (32) meet.

Rexam's construction limiting a "*juncture*" to a "point" rather than a "place *or* point," and further requiring that the entire phrase be limited to an "upper wall and a lower wall of a seaming chuck meet[ing] at a ***point*** (juncture) to form a distinct angle," is incorrect. Nothing in the claim language indicates that "*juncture*" must be "a point" or that the "*chuck walls*" must "meet at a point (juncture) to form a distinct angle." Further, the specification nowhere describes a "*juncture*" as "a point" or specifies that the "*chuck walls*" must form a "distinct angle." Rexam's proposed construction is based solely on a word depiction of the chuck profile shown in the patent drawing. But that approach invites error. *See Agfa*, 451 F.3d at 1376.

In *Agfa*, the Federal Circuit affirmed a district court that had relied upon the plain meaning of a disputed term — "*stack*" — as set forth in a general dictionary and rejected the accused infringer's arguments that the term was limited to a "horizontal arrangement" of the "stack" as illustrated in the drawing. *Id.* According to the Court, because "[t]he customary meaning within this field of art does not limit the term 'stack'" and because "nothing in the disclosures of the asserted patents suggests that 'stack' has any meaning in the art that would limit its scope" the case "falls squarely" within the principal recited in *Phillips* that "the ordinary meaning of some claim terms 'may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words.'" *Id.* (quoting *Phillips*, 415 F.3d at 1314).

The Federal Circuit also approved the district court's rejection of the accused infringer's argument that the term "stack" "covers only a horizontal arrangement, like [the arrangement] shown in figure 1 of the [patent]." *Id.* at 1376. The Court emphasized that it "has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claim to that depicted scope." *Id.* Here, as in *Agfa*, the claims are not limited to the drawing. Rather, the patent expressly indicates that the drawings are merely "embodiments" or "example[s]" of the invention (Ex. 1 at 2:50-52, 4:11, 4:35-37). Nothing suggests that the claims are limited to the illustrated chuck profile. *See id.* at 1377 ("Without any indication beyond some necessary depiction [in the figures] to suggest limiting the invention to this single embodiment, the broader language of the claims cannot carry that unexpressed and unintended . . . limitation"). Because the specification has no limiting disclosure, Rexam's construction is erroneous.

**2.**     ***peripheral cover hook*** and ***circumferentially extending
peripheral cover hook***

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| a ***peripheral cover hook***, said peripheral cover hook comprising<br><br>a ***circumferentially extending peripheral cover hook*** | Claim 13 of the 826 patent<br><br><br>Claims 32 and 50 of the 875 patent | A "curved portion of the can end that is to be formed into a portion of a double seam." | Limited to "the outermost portion of the can end that is curved or conforms to one or more radii, which engages a can body flange to form at least a part of a double seam, and ends where the curved or radiused portion(s) stops." |

The specification uses the term "*cover hook*" synonymously with the term "curl" and both indicate curvature (Ex. 1 at 3:23-27). Thus, the peripheral cover hook is a curved portion of the recited can end. The specification describes the "cover hook" as a "flange" (*id.* at 4:39-42), and describes it as resting on the "flange" of the can before formation of the double seam (*id.*). This suggests that the "cover hook" is to be formed into a portion of a double seam.[3]

Claim 13 itself confirms that at least a part of the *cover hook* is formed into a portion of the double seam by reciting a "cover hook [which includes a seaming panel is] adapted to be formed into a portion of said double seam during said seaming operation." Taken together, the phrase "*peripheral cover hook*" simply refers to a curved portion of the can end that is to be formed into a portion of a double seam.

Rexam's limiting construction is unsupported by the intrinsic record. Nothing in the claim language requires that the "*peripheral cover hook*" must "end[] where the curved or radiused portion(s) stops," as Rexam proposes. Nor does the specification require that the disputed phrase be so limited. To the contrary, the specification expressly discloses that the "*peripheral cover hook*" may end *along* a "curved or radiused portion(s)." Figure 4 shows a

---

[3] The specification does not define the term "*peripheral*." Nor does it indicate that the term has a specialized meaning. Thus, as with "circumferentially," the plain meaning of the term "*peripheral*" is appropriate. *Wilson*, 442 F.3d at 1328. The plain meaning of "*peripheral*" is "of, relating to, involving, or forming a periphery or surface part;" the term periphery, in turn, refers to "the perimeter of a circle or other closed curve" (Ex. 12 at 1681). Thus, the "peripheral cover hook" forms the perimeter or outer portion of the can end. This further confirms that this portion is to be formed into a portion of the double seam during seaming.

radius $r_1$ between a seaming panel radius $r_2$ (which is part of the peripheral cover hook) and the wall 24 (referred to in claim 13 as the can end wall) (*id*. at Fig. 4).



The specification identifies radius $r_1$ as the "seaming panel/chuck wall radius" (*id*. at 4:17). The specification, therefore, confirms that the can end wall and the seaming panel portion of the cover hook may share a common radius. Thus, in the preferred embodiment, the peripheral cover hook ends along a "curved or radiused portion(s)" and not where the "curved or radiused portion(s) stops" as urged by Rexam. Rexam's construction, therefore, must be rejected because it runs counter to the specification and would exclude the preferred embodiment. A construction that excludes the preferred embodiment "is rarely, if ever, correct." *Sandisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (citation omitted).

**3.**    *seaming panel adapted to be formed into a portion of said double seam during said seaming operation*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
| --- | --- | --- | --- |
| a ***seaming panel adapted to be formed into a portion of said double seam during said seaming operation***;<br><br>a ***seaming panel*** to be formed into a portion of said double seam during a seaming operation | Claim 13 of the 826 patent<br><br><br><br><br>Claims 32 and 50 of the 875 patent | The "curved innermost portion of the ***peripheral cover hook*** [previously defined] adapted to be formed into a portion of the double seaming during the seaming operation." | "Seaming panel" must be "formed by a constant radius," and include "some treatment or conditioning that makes the seaming panel easier to deform than the rest of the can end to become part of the double seam during seaming to a can body." |

The specification discloses a "*seaming panel*" as the innermost portion of the peripheral cover hook, sharing a radius ($r_1$) with the can end wall (Ex. 1 at 4:11-25). Claim 32 of the 875

patent confirms that the "first wall portion" of the can end wall "extend[s] from said seaming panel" (Ex. 2 at 13:11-13).

Rexam claims that a "*seaming panel*" must contain two additional and extraneous limitations, *i.e.,* that it not only be formed with a "constant radius" but also have been subjected to some pre-treatment or pre-conditioning.  But that claim is unsupported and incorrect.  Nothing in the claim language or patent specification requires that a "*seaming panel*" have "a constant radius," as Rexam proposes.   To the contrary, the preferred embodiment does not show a "constant radius."  Figure 4 shows an end labeled with radii $r_1$ and $r_2$, which are described as the "seaming panel radius" and "seaming panel/chuck wall radius," respectively (Ex. 1 at 4:17-18; Fig. 4).  Thus, according to the example, the "*seaming panel*" is formed with more than one radius ($r_1$ and $r_2$) and is not limited to a "constant radius."  Rexam's construction, therefore, must be rejected not only because it runs counter to the specification, but also because it would exclude the preferred embodiment.  *Sandisk*, 415 F.3d at 1285 (citation omitted).

Further, nothing in the claim language or specification requires that a "*seaming panel*" be subjected to  "some treatment or conditioning that makes [it] easier to deform than the rest of the can end merely because the claims note that the panel is "*adapted to be deformed.*"  The claim term "*adapted*" is merely functional language that, in accordance with the Manual of Patent Examination Procedure ("MPEP") § 2173.05(g), defines the seaming panel by what it does (or is capable of doing), rather than by what it is (Ex. 14 at 2100-219).  Further, the patent specification includes no embodiments in which a "*seaming panel*" is first pre-treated or conditioned to make it easier to deform than the rest of the can end.  Therefore, Rexam's construction must be rejected.

4.     *wall extending inwardly and downwardly from said cover hook*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| *a wall extending inwardly and downwardly from said cover hook* | Claim 13 of the 826 patent | A **"**can end wall extending inwardly and downwardly from the **cover hook** [previously defined]." | Must be limited not only to walls that begin "where the peripheral cover hook ends" (an undisputed issue given the plain language of the claim), but also to walls that "extend[] to a lowermost point, which is located inwardly (toward the center of the can end) and downwardly (towards the bottom of the can) from the end of the cover hook." |

Crown's proposed construction of the inwardly and downwardly extending wall is consistent with the patent specification. Figure 4 is an example of such a wall at element (24) (Ex. 1 at Fig. 4; 3:54-57) ("Figure 4 shows a can end . . . comprising . . . wall 24 extending axially and inwardly from the interior of the peripheral cover hook").

Rexam's limiting construction must be rejected. The disputed phrase merely defines the beginning point of the wall, *i.e.*, "*from the cover hook,*" and not the ending point proposed by Rexam, *i.e.,* "the lowermost point." Rexam's proposal to define the ending point, therefore, adds unnecessary verbiage to the claim. Further, the claim elsewhere defines the "*lowermost end*" of the wall, and thus Rexam's proposed "lowermost point" construction is not only unnecessary, but confusing and redundant.

5.     *first portion of said wall extending from said cover hook*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| a *first portion of said wall extending from said cover hook* | Claim 13 of the 826 patent. | "First portion . . . " needs no construction and merely refers to a "first portion of the can end wall" extending from the previously defined **"cover hook."** | "First portion . . ." is the upper portion of the end wall (*or chuck wall*) that begins where the cover hook ends. |

The specification does not define the phrase "*first portion of said wall*" nor is there any indication that it has any specialized meaning. Therefore, the phrase should be given its plain meaning. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. Rexam's proposal to equate

the "the upper portion of the end wall" with the "chuck wall" creates confusion.  Claim 13 makes clear that a "**chuck wall,**" at least as used in the claim, is part of the seaming chuck and not a part of the can end wall.

### 6.    *first point on said wall*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| To a ***first point on said wall*** | Claim 13 of the 826 patent. | *First point on the can end wall* is plain and needs no construction. | "First point" is limited not only to a "point on the wall of the can end," but also a point that "can only be determined by looking at a cross section of the end with a seaming chuck in place, where the wall bends about the juncture of the two chuck walls of the seaming chuck during seaming." |

The phrase "*first point on the can end wall*" is plain and requires no construction. Rexam, however, claims that the phrase must be limited not only to a "point on the wall of the can end," but also a point that "can only be determined by looking at a cross section of the end with a seaming chuck in place."  But Rexam's proposed construction grafts a proposed claim application method into the claim by inserting a technique by which infringement must supposedly be determined — "which can only be determined by looking at a cross section of the end with a seaming chuck in place."  Claim construction and claim application, however, are distinct inquiries.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (patent infringement analysis involves two steps: claim construction, and application of construed claim to accused process or product), *aff'd*, 517 U.S. 370 (1996).  Rexam's construction is, therefore, erroneous.

### 7.    *adapted to be deformed during said seaming operation*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said first wall portion ***adapted to be deformed during said seaming operation*** | Claim 13 of the 826 patent | have its shape altered during the seaming operation." | some treatment or conditioning, done to the first wall portion of the can end that makes the first wall portion easier to deform than the rest of the can end. |

The specification neither defines the word "deformed" nor indicate that it has a specialized meaning to those skilled in the art. Thus, the plain meaning is appropriate. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. The word "deform" means "to alter the form or shape of" (Ex. 12 at 593). This plain meaning is consistent with the specification, which provides one example of a can end wall that is "deformed" during seaming by being "bent" (Ex. 1 at 2:44-46; 4:64-65; 5:15-16). Bending is a type of deformation or shape alteration.

Because the disputed phrase includes the word "*adapted*," however, Rexam claims that the recited can end wall must undergo "some treatment or conditioning, done to the first wall portion of the can end that makes the first wall portion easier to deform than the rest of the can end." But as with its usage elsewhere in the claim, the word "*adapted*" is merely functional language that, per MPEP § 2173.05(g), defines the first wall portion by what it does (or is capable of doing), rather than by what it is (Ex. 14 at 2100-219). Further, the patent specification includes no embodiments in which an end has a wall that is "treated or conditioned to make it "easier to deform than the rest of the can end." Rexam's construction is, therefore, erroneous.

> **8.**     ***bent upwardly around said juncture of said chuck walls at said first point*** and ***to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall***

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| so as to be ***bent upwardly around said juncture of said chuck walls at said first point on said wall;***<br><br>***to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall*** | Claim 13 of the 826 patent<br><br>Claim 50 of the 875 patent | turned upwardly around the place at which the chuck walls meet and against the first chuck wall at the *first point* on the can end wall. | bent around the juncture of the two chuck walls to rotate upwardly (away from the bottom of the can). |

As shown in Figures 6 and 7 of the drawing and described in the specification, the upper portion of the can end chuck wall is "bent [during seaming] to contact the cylindrical portion of

the chuck" (Ex. 1 at 2:44-46; Figs. 6, 7). This has the effect of changing the shape of the upper

portion of the can end wall to become more vertical.



Fig.6. Fig.7.

The specification neither defines the term "bent" nor indicates that it has a specialized

meaning. Thus, the plain meaning is proper. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at

1328. The term "bent" means "turn[ed] at an angle or on a curve from a straight line, course, or

pattern" (Ex. 12 at 204).

The phrase "*upwardly around said juncture*" refers to the direction toward which, and the

location at which, the can end chuck wall is bent during seaming. The location at which the

bending occurs is expressly set forth in the claim itself as the "*juncture*" between the walls of the

chuck. The specification defines the direction toward which the can end wall is bent during

seaming, which, as pointed out, describes the direction of bending as toward "the cylindrical

portion of the chuck" (Ex. 1 at 2:44-46). The prosecution history further confirms this and

reveals that the Examiner allowed the claims because, unlike the prior art, the upper portion of the

patented can end wall is "reformed against" the wall of the chuck while the lower portion of the

can end wall remains generally unchanged. *i.e.,* between about 20° and about 60° (Ex. 23 at

P634-35, P644). Accordingly, the phrase "*bent upwardly around said juncture*" simply refers to

the fact that a portion of the can end wall is turned upwardly around the juncture of the first and

second chuck walls and against the first chuck wall.

Rexam's construction is unsupported. Its use of the word "rotate" merely adds

confusion. The patent nowhere uses that term. And the definition of the term "rotate" indicates

that the metal must "turn about an axis" (Ex. 12 at 1976), something not required in the claim.

### 9.     *a second point forming a lowermost end of said wall*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| to *a second point forming a lowermost end of said wall,* | Claim 13 of the 826 patent | a second point that marks the lowest end of said can end wall. | portion of the wall that extends from the juncture of the seaming chuck to the specific place on the wall nearest the central panel (toward the bottom of the can). |

The specification does not define the term "lowermost point" nor indicate that it has a specialized meaning. Thus, the plain meaning should be adopted. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. The plain meaning of "lowermost" is "lowest" (Ex. 12 at 1341). Thus, the phrase "a second point forming a lowermost end of said wall" simply refers to "a second point that marks the lowest end of said can end wall."

Crown's proposed construction is consistent with, but not limited to, the preferred embodiment set forth in the patent specification. Figure 5 illustrates that the lowermost end of the can wall is located where lowermost point of the can end wall (24) meets the reinforcing bead (25) (Ex. 1 at Fig. 5).

Rexam's proposed construction again adds confusion because the subject of the disputed phrase is a "*point,*" whereas Rexam's proposed construction defines a region rather than a point, *i.e.,* a "portion of the wall." Further, Rexam limits the region to a wall portion that "extends from" one point on the seaming chuck walls, *i.e.,* the "juncture," to another point on the can end, *i.e.,* "the specific place on the [can end] wall nearest the central panel."

### 10.     *annular reinforcing bead*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said *annular reinforcing bead* connecting said wall to said central panel | Claim 14 of the 826 patent<br><br>Claim 50 of the 875 patent | ring-like stiffening channel. | An outwardly concave generally 'U' shaped groove (also called a countersink or anti peaking bead) that is stamped or pressed into the can end, and is located inwards from the bottom of the wall (chuck wall) when looking at a cross section of the can end, which encircles and supports the center panel of the can end. |

Crown's proposed construction is not only consistent with the patent specification but supported by the plain meaning. The term "annular" means "of or relating to a ring: forming a ring: shaped like a ring" (Ex. 12 at 88). The term "reinforce" means "to strengthen with additional force, assistance, material, or support: make stronger or more pronounced" *(id.* at 1915). The term "bead" is defined as a "groove . . . on the surface of a metal can . . . or metal closure to improve appearance and to stiffen" *(id.* at 190). A "groove," in turn is defined as a "narrow hollow or channel made artificially in a surface" *(id.* at 1001). Taken together, the ordinary meaning of "*annular reinforcing bead*" is, therefore, a ring-like stiffening channel

The specification is consistent. First, the specification describes "*annular reinforcing beads*" as a type of channel, stating, for example, that in "one embodiment the reinforcing bead has an inner portion parallel to an outer portion joined by [a] concave radius" (Ex. 1 at 2:17-19). Second, the specification describes the reinforcing bead as an "annulus" that supports the circular central panel and that has an inner diameter $d_1$ and an outer diameter $d_2$ (*id*. at 2:7-8; 4:19-20). Thus, the specification discloses that the "*reinforcing bead*" is an annulus or ring situated around the circular center panel. Finally, the patent specification discloses that the can ends of the invention "may be economically made of thinner metal" because they employ a "*stiffer* annulus" (*id*. at 8:40-42) (emphasis added). Thus, the specification recognizes that the annular reinforcing bead provides a stiffening function. The patent specification, thus, discloses that the "annular reinforcing bead" is a ring-like stiffening channel.

Rexam's limiting construction of "*annular reinforcing bead*" is unsupported and proposes to graft *five* extraneous limitations to the claim language that neither the specification nor prosecution history requires or permits.

First, Rexam would require that an "*annular reinforcing bead*" be "outwardly concave," meaning that it must be oriented such that it appears concave when viewed from the public side of the can (as opposed to convex from the public side or concave from some other relative position). Nothing in the claim language itself, however, requires that the bead be "outwardly

concave." *See Phillips,* 415 F.3d at 1312.  And while an outwardly concave bead is shown in Figures 4-7, the specification nowhere indicates that it must be so limited.  *See Agfa*, 451 F.3d at 1376-77.  To the contrary, the specification expressly states that the drawings are merely "embodiments" or  "example[s]" (Ex. 1 at 2:50-52, 4:11, 4:35-37).  There is no indication that the claims are limited to the exemplary can end illustrated in the patent drawing.  *Id.*; *see also Phillips*, 415 F.3d at 1323.  Moreover, unasserted claim 1 of the 826 patent expressly requires an "*outwardly concave* annular reinforcing bead."  But asserted claim 13 is not so limited.  The absence of the "outwardly concave" limitation from claim 13, and its presence in claim 1, confirm that "outwardly concave" is not a limitation required by claim 13.  *See Versa,* 392 F.3d at 1330.

The recent *Agfa* decision is directly on point.  In *Agfa*, the Federal Circuit cited with approval the district court's rejection of the accused infringer's argument that the term "stack" covered "only a horizontal arrangement, like [the arrangement] shown in figure 1 of the [patent]." *Agfa*, 451 F.3d at 1376.  The Court emphasized that "this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claim to that depicted scope."  *Id.*  The Court noted with approval that the "trial court buttressed its construction with the observation that three of the asserted patents include dependent claims that further specify a horizontal (or other particular) arrangement of the claimed stacks."  *Id.* at 1376.  Moreover, the Court found that the "trial court correctly found support for the proposition that those dependant claims suggest that the 'stack' standing alone is not limited to horizontally position stacks."  *Id.*

Here, as with the term "stack," the disputed term "*annular reinforcing bead*" should not be limited to the orientation ("outwardly concave") shown in the patent drawing.  Nothing in the specification mandates a particular orientation.  Further, as in *Agfa*, the fact that other claims in the asserted patents expressly recite an "outwardly concave" limitation confirms that the term "annular reinforcing bead," alone, is not limited to this orientation.  *Id.*

Rexam's second extraneous limitation would require that an "*annular reinforcing bead*" be "generally U-shaped." Rexam's proposed definition is apparently based on a word picture of the bead depicted in Figures 4-7. Nothing in the claim language or the specification, however, requires that a bead be "generally U-shaped." *See Phillips,* 415 F.3d at 1312; *Agfa*, 451 F.3d at 1376-77. To the contrary, the specification describes one reinforcing bead type in which "an inner portion [is] parallel to an outer portion" (presumably U-shaped as Rexam intends) noting that it is merely "one embodiment" (Ex. 1 at 2:17-19). But in other embodiments, only "an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel at an angle between -15º and +15º" (*id.* at 2:13-16). These other embodiments include beads with non-parallel walls.

Rexam's third extraneous limitation would limit the recited "*annular reinforcing bead*" to a particular method of manufacture, *i.e.,* beads that are "stamped or pressed into a can end." But asserted claim 13 is a *product* claim, not a *method* of manufacture claim. *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372-73 (Fed. Cir. 2000) ("A novel product that meets the criteria of patentability is not limited to the process by which it was made"). Further, nothing in the claim language limits the "annular reinforcing bead" to a particular method of manufacture. Nor does the specification anywhere indicate that the claimed "bead" is limited to any particular manufacturing method. In fact, the specification nowhere discusses the method by which a reinforcing bead of the invention is made.

Rexam's fourth extraneous limitation would limit the "*annular reinforcing bead*" to only those "located inwards from the bottom of the wall." Nothing in the claim language itself, however, requires that the bead be "inwards from the bottom of the wall." The term "*inwardly*" in claim 13 describes the *can end wall* and not the reinforcing bead. If the patentee intended to limit the reinforcing bead to one located "inwards from the bottom of the wall," it could have and would have expressly done so.

Moreover, an "*annular reinforcing bead* **extending inwardly and downwardly from the wall**" is expressly recited in unasserted claim 1 of the 826 patent (Ex. 1 at 9:34-35). The absence of an "inwardly" limitation in claim 13, and the presence of the limitation in claim 1, confirms that the phrase "*inwards form the bottom of the wall*" is not a required limitation of claim 13. *See Versa,* 392 F.3d at 1330.

Rexam's fifth extraneous limitation would require that the recited "*annular reinforcing bead*" of claim 13 "support the central panel." Nothing in the claim language itself, however, requires that the bead "support the central panel." And while Figure 4 illustrates a can end having a bead that supports the central panel, the specification expressly indicates that the drawings are merely "embodiments" or "example[s]" (*id.* at 2:50-52).

11. *circumferentially extending wall comprising first and second portion*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| A *circumferentially extending wall comprising first and second portions,* | Claim 32 of the 875 patent | Can end wall encircling the center of the can end comprising first and second portions. | an end wall extending around the center panel that has upper and lower parts," but also to parts that can and must "be identified only during and after seaming. |

The phrase "*circumferentially extending wall comprising first and second portions*" should be given its ordinary meaning. *See Phillips,* 415 F.3d at 1312. The phrase refers to the "*circumferentially*" extending can end walls (as opposed to walls of the seaming chuck). The specification does not define the term "*circumferentially*" nor anywhere indicate that it has a specialized meaning. Thus, the plain meaning should be adopted. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. The term "*circumferentially*" means "encircling" (Ex. 12 at 409). Therefore, the phrase "*circumferentially extending wall comprising first and second portions*" refers to a "can end wall encircling the center of the can end comprising first and second portions." The remaining terms of the phrase are sufficiently plain and require no construction.

Rexam's proposal to define the wall as one that "extends around the center panel that has upper and lower parts" is not objectionable. But its proposal to graft a method of determining infringement into the claim (by limiting the claim to parts that can "be identified only during and after seaming") would lead to error. Claim construction and claim application are distinct. *Markman,* 52 F.3d at 976. Rexam's construction should be rejected because it blends the two.

**12.    *first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming pane***

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said *first wall portion extending from said seaming panel to a first location on said wall* and comprising a *radiused portion extending from said seaming panel*, | Claim 32 of the 875 patent | "First wall portion extending from the **seaming panel** [previously defined] to a first location on the can end wall and comprising a portion formed on an arc extending from the **seaming panel**." | limited to a can end wall in which:<br><br>(1) the "*first wall portion*" is not only "the upper portion of the end wall" that "begins where the seaming panel ends," but that is also limited to one having "a curved portion that is different from the radius of the seaming panel (*i.e.*, the radiused portion of the upper portion of the wall is [not, sic] a part of the cover hook);" and<br><br>(2) the "*first location*" is not only "the point on the wall of the can end . . . where the wall bends about the juncture of the two chuck walls of the seaming chuck during seaming," but also a point that "can only be determined by looking at a cross section of the end with a seaming chuck in place. |

The Court should construe the phrase "*first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel*" as set forth above.

The specification does not define the phrase "*radiused portion*" nor indicate that it has a specialized meaning. Thus, the plain meaning of "*radiused portion*" should govern. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. The term "*radiused*" refers to cut on an arc (Ex. 12 at 1874). In claim 32, therefore, "*radiused portion*" refers to a portion formed on an arc. The remaining terms of the disputed phrase are sufficiently plain and require no construction.

Rexam's proposal to limit the "*first wall portion*" to one that is "different from the radius of the seaming panel" and includes a "*radiused portion*" that is not a "part of the cover hook" should be rejected for two separate reasons.

First, nothing in the claim language or specification requires that the *first wall portion* include a "*radiused portion*" that is "different from the radius of the seaming panel." To the contrary, the specification discloses an embodiment in which a can end wall and seaming panel *share* a common radius. Figure 4 discloses a radius $r_1$ between the seaming panel radius $r_2$ and the wall 24 (referred to in claims 32-34 as the "*circumferentially extending wall*") (Ex. 2 at Fig. 4). The radius $r_1$ is identified as the "seaming panel/chuck wall radius" (*id*. at 3:66). According to drawing, therefore, the can end wall and the seaming panel share a common radius. Thus, contrary to Rexam's construction, the "*radiused portion*" of the can end wall share a common radius with the seaming panel in the preferred embodiment. Because Rexam's proposed construction would exclude a preferred embodiment, it should be rejected. *Sandisk*, 415 F.3d at 1285.

Second, Rexam's suggested construction grafts a mandated claim application method into the claim by inserting the technique by which infringement supposedly must be determined,. *i.e.,* "only . . .by looking at a cross section of the end with a seaming chuck in place." Claim construction and claim application, however, are distinct. *Markman,* 52 F.3d at 976.

13.    *second location on said wall . . . being the lowermost point of said wall*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| wall to a **second location on said wall**, whereby said first and second locations form end points of said second wall portion, said second wall location being the **lowermost point of said wall**, | Claim 32 of the 875 patent | Second wall location marking the lowest point of the can end wall." | The portion of the wall below the juncture of the seaming chuck and ending at a specific place on the wall nearest the central panel (toward the bottom of the can). |

The specification does not define the term "*lowermost*" nor indicate that it has a specialized meaning to those skilled in the art. Thus, the plain meaning of the term should be applied. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328. The plain meaning of "*lowermost*" is "lowest" (Ex. 12 at 1341). Thus, the phrase "*second location on said wall . . . being the lowermost point of said wall*" simply refers to "the second wall location marking the lowest point of the can end wall." Crown's proposed construction is consistent with, but not limited to, the preferred embodiment in the patent specification. Figure 5 illustrates that the lowermost end of the can wall is located where the wall (24) meets the reinforcing bead (25) (Ex. 2 at Fig. 5).

Rexam's contrary construction should be rejected. Rexam proposes to define a point on the can end wall in terms of the seaming chuck. But the chuck and can end are not integral items as Rexam's construction suggests. Thus, no portion of the wall is "below the juncture of the seaming chuck." Rexam's construction merely adds confusion.

**14.**      *between about 20• and about 60•*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said wall is inclined ***between about 20• and about 60•*** with respect to an axial centerline of said can end | Claim 32 of the 875 patent | A line through the first and second locations on the can end wall inclined between about 20 and about 60 degrees with respect to the centerline of the can." | A line through the first and second locations on the wall (chuck wall) [that] is inclined between 20 and 60 degrees with respect to the centerline of the can. |

The Court should construe the phrase **"***between about 20° and about 60°***"** to refer to a "line through the first and second locations on the can end wall inclined between ***about*** 20 and ***about*** 60 degrees with respect to the centerline of the can."

Rexam's construction is similar to Crown's but for the fact that it pointedly ignores the term "*about.*" It would be error, however, to exclude the word "about" from the construction. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005) (rejecting proposed construction defining "substantially flattened" as "flat" because "this view reads out the

essence of the claim limitation "substantially flattened [and] contradicts the unambiguous meaning of the term"); Further, Rexam's reference to the "chuck wall" merely adds confusion. The wall in question is a part of the can end and not a part of the seaming chuck.

> **15.** *bent upward through an angle of at least about 16•*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said first portion of said can end wall being pressed against said chuck first wall so that at least *a portion of said first portion of said can end wall is bent upward through an angle of at least about 16•*, said first location on said wall after said seaming operation forming the | Claim 32 of the 875 patent | At least part of the first portion of the can end wall is turned upwardly through an angle of at least about 16°" (*see* above with respect "bent upwardly"). | A portion of the upper wall (chuck wall), which is above the first location, [and that] is bent upwards, when looking at a cross section drawing, around the first location by 16 degrees (less 1 degree or plus 1 degree or more). |
| said can end wall bent upwardly during said seaming operation is bent upward *through an angle of at least about 16•*. | Claim 51 of the 875 patent. | | |

The Court should construe the phrase "*a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°*" to refer to "at least part of the first portion of the can end wall is turned upwardly through an angle of at least about 16.°

Rexam's proposed construction would lead to error because it restricts the word "*about*" to a precise numerical boundary. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1280-81 (Fed. Cir. 1988) ("A term such as 'about' is not subject to such a precise construction as Gore would give it but is dependent on the factual situation presented"). Moreover Rexam's construction adds confusion by referring to the "*upper wall*" of the can end as the "chuck wall." The "chuck wall," however, is a wall of the seaming chuck, not the can end.

**16.** *transition from said double seam to said second wall portion*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| ***Transition from said double seam to said second wall portion***, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline. | Claim 32 of the 875 patent | "The first location, after seaming, at which the double seam region changes to the second wall portion." | Limited to "the location on the end wall at the lowermost extent of the double seam." |

The specification neither defines the term "*transition*" nor indicates that it has any specialized meaning. Thus, it is appropriate to apply the plain meaning. *See Agfa*, 451 F.3d at 1376-77; *Wilson*, 442 F.3d at 1328.

The word "*transition*" refers to "a passage from one state, condition, or place to another: change" (Ex. 12 at 2428). In claim 32, the "transition," therefore, is the place "at which the double seam region changes to the second wall portion." In fact, in the context of claim 32, the word "transition" is the place at which the double seam changes to the second wall portion *after* seaming which, by definition in the claim itself, must be the "first location" *before* seaming: "said first location on said wall *after said seaming operation* forming the transition from said double seam to said second wall portion" (emphasis added).

**17.** *forming a transition therebetween*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| said wall and said reinforcing bead ***forming a transition therebetween;*** | Claim 50 of the 875 patent. | Forming a place between two things at which one changes to the other. | A radiused portion of the can end, when looking at a cross section of the end, between the vertical wall of the annular reinforcing bead (countersink) and the second portion of the wall (chuck wall). |

For the reasons set forth above, the word "*transition*" refers to "a passage from one state, condition, or place to another: change" (Ex. 12 at 2428) and the disputed phrase refers to the place at which the can end wall changes to the reinforcing bead.

Rexam's proposal to read a word depiction of the reinforcing bead from the patent drawing into the claim invites error. Nothing in the claim language requires that the "*reinforcing bead*" have a "vertical wall" or that the "*transition*" between the wall and the bead be a "radiused portion" as shown in the drawing. Rather, the specification expressly states that the patent drawings are merely "embodiments" or "example[s]" of the invention (Ex. 2 at 2:42-44). Further, a "radiused portion" on the can end wall is expressly described elsewhere in claim 32. If the patentees intended "transition" to mean "radiused portion" they would have used the word "radiused portion" and not the more general term "transition."

18.     *between about 30° and 50°*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| is inclined *between about 30° and 50°* with respect to said axial centerline of said can end | Claim 33 of the 875 patent | A line through the first and second locations inclined between about 30 and about 50 degrees with respect to the centerline of the can." | The line through the first and second locations on the wall (chuck wall) is inclined between 30 and 50 degrees with respect to the centerline of the can. |

Crown's construction is correct. Rexam again ignores "about" and seeks to limit the claim to an express numerical boundary which, as explained above, is improper. *See Playtex Prods.*, 400 F.3d at 908; *W.L. Gore & Assoc.*, 842 F.2d at 1280-81. Rexam also continues the confusion by referring to the "*wall*" of the can end as the "chuck wall." The "chuck wall" is the wall of the seaming chuck.

19.     *upward by an angle of at least about 26°*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| a portion of said *can end wall first portion is reformed by bending upward by an angle of at least about 26* | Claim 34 of the 875 patent | The can end wall first portion is formed again by turning upward by an angle of at least about 26°. | A portion of the upper wall (chuck wall), which is above the first location, is bent upwards, when looking at a cross section drawing, around the first location by 26 degrees (less 1 degree or plus 1 degree or more). |

Again, the parties' constructions differ in that Rexam construes the word "about" as connoting a strict numerical boundary. This is error. *See W.L. Gore & Assoc.*, 842 F.2d at 1280-

81. ("A term such as about is not subject to such a precise construction as Gore would give it but is dependent on the factual situation presented").

        **20.**    *circumferentially extending wall extending from said seaming panel*

| Claim Term | Claims Where Term Appears | Crown's Proposed Construction | Rexam's Proposed Construction |
|---|---|---|---|
| circumferentially extending *wall extending from said seaming panel* to said reinforcing bead, | Claims 32 and 50 of the 875 patent | can end wall encircling the center of the can end and extending from the seaming panel. | The upper portion of the end wall (or chuck wall) that begins where the seaming panel ends with a radiused or curved portion that has a different radius than the seaming panel (*i.e.*, the radiused portion of the upper portion of the wall is a part of the cover hook). |

Crown's plain meaning construction is correct. Nothing in the claim language, however, requires that the "*upper portion of the end wall*" must "begin[] where the seaming panel ends with a radiused or curved portion that has a different radius than the seaming panel" as Rexam proposes. Nor does the specification require that phrase must be so limited. On the contrary, the specification expressly discloses that the "*upper portion*" may have the same radius as the seaming panel. Figure 4 describes a radius $r_1$ between a seaming panel radius $r_2$ and the chuck wall 24 (referred to in claim 50 as the wall of the can end) (Ex. 2 at Fig. 4). The specification identifies the radius $r_1$ as the "seaming panel/chuck wall radius" (*id.* at 3:66). Contrary to Rexam's construction, therefore, this example describes a can end wall and seaming panel that share a radius. Rexam's construction, therefore, invites error. *Sandisk*, 415 F.3d at 1285.

## V. REXAM'S SCORE PATENTS

### A. Background Of Rexam's Score Patents

Rexam's Scrore Patents are directed to an easy open can end of the type that has a "stay-on-tab," such as that conventionally used with metal cans for beer and carbonated soft drinks (Ex. 3; Ex. 4). The frangible pour panel area in an early version prior art can end had a loop connecting the ends of the primary score and an anti-fracture score. In certain unusual

circumstances, such when the end buckled due to mishandling, a crack in the metal formed in the hinge when a user opened the frangible panel.  If the hinge completely severed, the frangible pour panel was entirely detached from the can end, an undesirable situation.

The first prior-art solution was to remove the loop connecting the ends of two scores and move the end of primary score away from the end of the anti-fracture score.  Then if the path of the crack caused the metal to tear to the end of the anti-fracture score, its progress was stopped without problem.  However, since the end of the anti-fracture score was typically short – that is, not longer than the primary score, cracks could *potentially* reach the end of the primary score and completely sever the hinge. A typical prior art end featuring this score configuration is shown below:



Ex. 8, U.S. Patent No. 6,234,336 ("336 patent") at Figure 3

To solve the problem of an anti-fracture score that was too short, the inventors of the Score Patents lengthened the anti-fracture score so that "the tail portion of the [anti-fracture score was] longer than the second end of the [primary] score groove" (Ex. 3 at 3:34-36).  As a result of this lengthening, the anti-fracture score has "a tail portion passing from the frangible panel through the hinge segment and extending into the adjacent area of the central panel" (*id.* at 3:24-27).  A typical prior art end (Ex. 8 at Fig. 3) and an enlargement of the supposed invention (Ex. 3 at Fig. 2) illustrate the extended tail of the anti-fracture score:






|  |  |
|:---:|:---:|
| Ex. 8 at Fig. 3 | Ex. 3 at Fig. 2 |

### B. Disputed Terms In Rexam's Score Line Patents

Rexam has asserted claims 2 and 5 (each of which depend from claim 1) and claim 13 of the 230 patent, and claim 7 (which depends from claim 1) of the 728 patent. The parties dispute the construction of five terms found in claims 1 and 13 of the 230 patent and claims 1 and 7 of the 728 patent: *hinge segment*; *hinge line*; *adjacent area of the central panel*; *passing through*; and *second score groove … to direct fracture of metal.*

### C. Crown's Proposed Construction of Rexam's Score Patents

#### 1. *hinge segment*

| Claim Term | Claims where term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *Hinge segment* | Claims 1 & 13 of 230 patent<br><br>Claim 1 of 728 patent | The region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use. | The segment of metal between the first end and the second end of the primary score that stays attached to the central panel of the can end under normal operating conditions. |

The 230 patent contains no express definition of the term "hinge segment." Nevertheless, the specification makes clear that the hinge segment is the portion of the can end that forms a hinge when the frangible pour panel is displaced down into the can by the tab during opening:

> The tear panel 20 of the central panel 12 may be opened, that is the frangible score 22 may be severed and the tear panel 20 displaced at an angular orientation relative to the remaining portion of the central panel 12, while the tear panel 20 remains **hingeably connected** to the central panel 12 **through the hinge segment** 26. In this opening operation, the tear panel 20 is displaced at an angular deflection, as it is opened by being displaced away from the plane of the panel 12 (Ex. 3 at 4:61–5:2) (emphasis added).

Crown's definition of "hinge segment" is consistent with the ordinary meaning of "hinge" (Ex. 12 at 1071: "a jointed or flexible device on which a door, lid or other swinging part turns…").  A section through an opened accused Crown end illustrates the hinge segment – the region of bent metal – connecting the frangible panel to the central panel:



The Court may consider extrinsic evidence from experts in construing claim terms. *Phillips*, 415 F.3d at 1317.  Here, Crown's expert has confirmed that one skilled in the art, having read the specification and prosecution histories, would conclude that the "hinge segment" is the region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use by a user, since it is this bending of the metal that creates the hinging effect (Ex. 15 at ¶ 17).

**Redacted**

Mr. Turner's testimony is consistent with Rexam's U.S. Patent No. 6,024,239 (Ex. 9), the application for which was filed by Turner and co-inventor Forrest the year before the 230 patent

application was filed. The 239 patent shows a hinge segment 24 in Figure 2, a portion of which is reproduced below:



Ex. 9 at Fig. 2

The 239 patent shows a hinge segment 24 and acknowledges that the hinge segment is the bent region of metal around which the angular displacement of the tear panel occurs during opening, stating "the tear panel 20 is deflected at an angle relative to the plane of the [center] panel 12, with the **vortex of the angular displacement being the hinge segment 24**" (*id.* at 4:47-49 & Fig. 2) (emphasis added).

Crown's proposed construction is also supported by other prior art patents. U.S. Patent No. 5,711,448, assigned to Reynolds Metal Co., shows a hinge segment 28 in Figure 1 and refers to the segment of metal 28 as "a bend area or integral hinge between the [frangible pour] panel and the remainder of the end wall" (Ex. 10 at 5:6-9, Fig. 1).

    2.     *the hinge line*

| Claim Term | Claims where term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *the hinge line* | Claim 7 of 728 patent | The hinge segment referred to in claim 1 of the 728 Patent. (The region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use.) | A line between the first end and the second end of the primary score. |

Claim 1 of the 728 patent requires that the end have "a generally linear hinge segment." There is no mention in claim 1 of a "hinge line." Claim 7, however, which depends directly from claim 1, further specifies:

at least a portion of the second score groove passes through **the hinge line** generally transverse to a hinge line passing between the first end and the second end of the primary score groove (Ex. 4 at 8:38-41) (emphasis added).

Claim 7 contains a drafting error. The term "***the*** hinge line" appears without any earlier reference in either claims 1 or 7 so that it is unclear what "hinge line" is being referred to. In patent drafting parlance, the term is said to "lack an antecedent basis," which potentially renders the claim indefinite:

> A claim is indefinite when it contains words or phrases whose meaning is unclear. The lack of clarity could arise where a claim refers to "said lever" or "the lever," where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference…. [H]owever, the failure to provide explicit antecedent basis for terms does not always render a claim indefinite (Ex. 14 at 2100-218 (quoting § 2173.05(e)).[4]

In *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1369 (Fed. Cir. 2006), a claim recited "said zinc anode" without no antecedent basis. Rather than hold the claim invalid for indefiniteness, the Federal Circuit found that the term "said zinc anode" should be construed to refer to slightly different language appearing earlier in the claim ("an anode gel comprised of zinc as the active anode component") and thereby provide the necessary antecedent basis. *Id.* at 1371 ("[W]e conclude that "anode gel" is by implication the antecedent basis for "said zinc anode."). Notably, the Federal Circuit **did not** substitute "a" for "said," as Rexam proposes, so that the claim was construed as introducing a new element – "a zinc anode." Rather, the Court construed the claim to provide an antecedent basis for an element already present.

Both the intrinsic and extrinsic evidence makes clear that "***the*** hinge line" in claim 7 should be understood as referring to the "hinge segment" introduced in claim 1 so that the necessary antecedent basis is provided. Thus, claim 7 should be construed to require that the

---

[4] In general, courts may correct a drafting error "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). In *Novo Indus.*, the district court's attempt to correct a drafting error in the claim language by substituting "a" for "and" was reversed and the claim held invalid for indefiniteness. *Id.* at 1357-58. Here the Court must ascertain whether the lack of antecedent basis renders claim 7 indefinite, and therefore invalid, or can be corrected because the proper interpretation is not subject to reasonable debate.

second score groove pass through the hinge segment generally transverse to a line passing between the first end and the second end of the primary score groove.

Considering the language used in the specification to specify the second score makes it apparent how claim 7 was intended to read had it not been for the drafting error. The specification describes the second score as passing through "the hinge segment" (not "hinge line") in a direction transverse to a straight line that defines the hinge segment:

> The end 10 includes a score groove 62 that passes through **the hinge segment 26**, preferably generally transverse to **the straight line** defining the hinge segment 26 (Ex. 4 at 6:62-65) (emphasis added).

The Summary of the Invention similarly states that the second score intersects "the hinge segment" and does so in a direction transverse to a straight line between the two ends of the score:

> A second groove is formed in the end, extending along a length that intersects the **hinge segment** generally transverse to the **generally straight line** between the two ends of the score groove (*id.* at 3:46-49) (emphasis added).

Crown's construction is also consistent with other claims. Considering claim 14 of the 230 patent, which depends from asserted claim 13, makes clear how claim 7 was intended to read had it not been for the drafting error:

> 14.   The end member of claim 13, wherein, the tail portion passes through **the hinge segment** generally transverse to said **straight line** between the first and second end (*id*. at 9:19-21) (emphasis added).

Thus, both the specification and other claims make clear that claim 7 was intended to specify that the second score pass through the hinge segment and that it does so in a direction that is transverse to a straight line between the two ends of the primary score.

The intrinsic record confirms that hinge segment and hinge line refer to a region of metal and not a line. The patent specification contains only two references to hinge line" and, in both instances, it refers to refers to a "region" of metal that bends upon displacement of the frangible pour panel, not a mathematical line:

> This type of container end, typically called a "stay-on-tab" ("SOT") end has a tear panel that is defined by an incomplete circular-shaped score, with the non-

scored segment serving as the retaining fragment of metal at the **hinge-line of the displacement of the tear panel**.

   . . .

When the user applies such force, a common result is for the **hinge-line region** of the metal, the non-scored fragment of metal that is intended to not fracture and to retain the tear panel, fails by fracturing along a non-specific tear of the metal away from the score (*id.* at 1:25-29 & 2:35-40) (emphasis added).

The prosecution history of the 230 patent, the parent of the 728 patent,[5] confirms that Crown's construction is the correct one because it reveals that "hinge segment" and "hinge line" were used interchangeably. Claim 1 of the 230 patent application as originally filed specified a "hinge segment" (Ex. 17 at P31). The Examiner rejected the claim over a prior art published Japanese Patent No. 8-244,769 (Ex. 11; Ex. 17 at P57). A portion of Figure 2 of the 769 patent is reproduced below:



Ex. 11 at Fig. 2

In his arguments distinguishing claim 1 from the prior 769 patent, the attorney referred interchangeably to a "hinge segment," "hinge line," "hinge region," and "hinge area," at no point suggesting that any of the these terms were intended to have different meanings:

[T]he 769 patent discloses a distinctly different structure [from claim 1] wherein the second score clearly does not **transect** the **hinge segment**. As clearly shown in Figure 2 of the 769 patent, the second score 10 terminates short of the adjacent area, and is far short of even the areas near the **hinge line (axis lines "x-x" and "y-y")**. To the extent the 769 discloses any structure **passing through** the **hinge line**, such structure (shown as feature 9 in Figure 2 of the 769 patent) is clearly disclosed as a bead (Figures 3(a) – (c))....

   . . .

Therefore, not only does the 769 patent specifically disclose the lack of a second score **transecting** the **hinge region**, but specifically discloses that any feature

---

[5] *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation").

**passing through** the **hinge area** should be a bead or coined region rather than a score line. Accordingly, the 769 patent certainly does not disclose or teach the claimed structure of Claim 1, or the claims dependent therefrom (Claims 2-11 and 20) (Ex. 17 at P65-P66) (emphasis added).

The attorney's reference to "the hinge line (axis lines 'x-x' and 'y-y')" in the quotation above is instructive. In particular, his identification of the "hinge line" (not "hinge line**s**") in Figure 2 of the 769 patent as being indicated by "axis lines 'x-x' and 'y-y'" (not "axis lines 'x-x **or** 'y-y'") illustrates he intended that term to refer to a region of metal – the region between axis lines x-x and y-y in Figure 2 of the 769 patent -- not a mathematical line.

Crown's expert has confirmed that one skilled in the art would conclude that "the hinge line" referred to in claim 7 to be the same as the "hinge segment" referred to in claim 1, so that claim 7 requires that the second groove pass transversely (*i.e.*, in the crosswise direction) through the hinge segment (Ex. 15 at ¶ 42). Those skilled in the art would understand that hinging in a metal can end does not occur along a mathematical line, which has no thickness but, rather, occurs in a region of metal that undergoes bending during opening" (*id.*).

**Redacted**

3.    *adjacent area of the central panel*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *adjacent area of the central panel* | Claim 1 of 230 patent | Portion of the central panel near the hinge segment | Area of the central panel near the frangible panel |

The intrinsic record supports Crown's construction.  The language "adjacent area of the central panel" should be construed to refer to the portion of the central panel near the hinge segment, which the hinge segment integrally connects to the frangible panel.  In other words, the claim refers to three regions – (1) a frangible panel, (2) a hinge segment, and (3) an area of the central panel that is adjacent the hinge segment (and is connected to the frangible panel by the hinge segment).  These three regions can be seen, for example, in the photograph of the sectioned end accused of infringement (*see supra* at 33).

The phrase "adjacent area of the central panel" should not be construed as merely the area adjacent the frangible panel, as Rexam proposes, since that area would include the hinge segment itself, which is "near the frangible panel."  In fact, the summary of the invention tracks the language of the last two elements of claim 1 and, in so doing, makes clear that there are three regions of metal and that the term "adjacent area of the central panel" refers to a region of metal beyond the hinge segment, not the hinge segment itself:

> The hinge segment is non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel.  A second groove is formed in the end, having a tail portion passing from [1] the frangible panel through [2] the hinge segment and extending into [3] the adjacent area of the central panel" (Ex. 3 at 3:22-27) (annotations added).

If Rexam's proposed construction were correct and the "adjacent area of the central panel" referred to the hinge segment itself (because it is near the frangible panel under Rexam's construction), the description of the second groove in the specification as "passing from the frangible panel through the hinge segment and extending into the *adjacent area of the central panel*" (*id.* 3 at 3:24-27) would be transformed into the meaningless "passing from the frangible panel through the hinge segment and extending into the *hinge segment.*"

### 4.    *passing through*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *Passing through/ passes through* | Claim 13 of 230 patent  Claim 7 of 728 patent | Going from one end to the other end. | Penetrating into. |

Claim 13 of the 230 patent requires "anti-fracture score having a tail portion **passing through** the hinge segment" (*id.* at 9:17-18) (emphasis added).  Similarly, claim 7 of the 728 patent requires that the "second score groove **passes through** the hinge line" (Ex. 4 at 8:39) (emphasis added).  The requirement that the score "pass through" the hinge should be construed to require that it go from one end of the hinge to the other end of the hinge – in other words, pass through the entire hinge, not merely penetrate into a portion of the hinge as Rexam proposes.

The specification supports Crown's construction.  The 230 patent depicts four embodiment of the invention, which are shown Figures 2, 4, 6 and 7 (Ex. 3).  In three of those embodiments (Figures 2, 4 and 7), the second score is shown as passing through the hinge segment 26 from one end to the other.  The specification's description of the embodiment shown in Figure 4 states that the end has a "hinge segment 26 along a line between the ends of the score 22" and that the score 62 "passes through the hinge segment" (*id.* at 6:58-65).[6]

Only one embodiment, shown in Figure 6, depicts a second score with a tail portion 25 that appears to penetrate into but does not pass through the hinge segment 26.  Rather than referring to the score groove shown in Figure 6 as "passing through" the hinge segment, per Rexam's construction, the specification uses different terminology, stating that "[i]n the alternative embodiment of FIG. 6, the tail portion 25 [of the second score] terminates in the end wall 12 beyond the score 22, and at least **slightly transecting** the line defining the hinge segment 26" (*id.* at 7:24-27) (emphasis added).

Crown's construction is also consistent with the ordinary meaning of "passing through." For example, the dictionary defines "through" as:

> 1(a) – used as a function word to indicate penetration or passage within, along or across an object, substance or space **usu[ally] from one side or surface to the opposite one** … (2) – used as a function word to indicate passage **from one side**

---

[6] Further, in other contexts, the patent specification makes clear that "passing through" means going from one end to the other, not merely penetrating into.  Specifically, the specification refers to "a central longitudinal axis 52 of the end 10 **passing through** the rivet 44" (*id.* at 5:58-59) (emphasis added).  As clearly shown in Figure 2, the longitudinal axis 52 passes from one end of the rivet to the other end and does not merely "penetrate into" the rivet as Rexam's proposed construction indicates.

**to another** of an object by means of an opening or openings … (3) used as a function word to indicate extension **from one end or boundary (as of a place or area) to another** …. (Ex. 12 at 2384) (emphasis added).

5.     *to direct fracture of metal*

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| a second score groove adjacent the second end of said primary score and adjacent said hinge segment *to direct fracture of metal* of said hinge segment in a direction away from said second end of the score | Claim 1 of 728 patent | Subject to §112, ¶ 6.  A second score groove that is near the end of the primary score and the hinge segment and that performs the function of directing the fracture of metal of the hinge segment in a direction away from the end of the primary score.  The structure for performing this function described in the specification is an anti-fracture score in which the tail portion 25 has a score residual differential that is less than that of the remaining portions of the anti-fracture score. | Not a means plus function limitation under 35 U.S.C. §112 ¶ 6.

The second score is near the second of the primary score and near the hinge segment to provide a path for a fracture of the hinge segment along the second score. |

The last element of claim 1 of the 728 patent contains a functional element – the requirement that the second score perform the function of "direct[ing] fracture of metal of said hinge segment in a direction away from said second end of the score" (Ex. 4 at 8:13-15). Pursuant to 35 U.S.C. § 112, ¶ 6, this element should be construed as a "means plus function" element that is limited to the structures described in the patent specification for performing the fracture directing function and equivalents.

Since the fracture directing element of claim 1 does not contain the term "means," it is subject to a presumption that 35 U.S.C. § 112, ¶ 6 does not apply.  *Massachusetts Inst. Of Tech. v. Elecs. For Imaging, Inc.*, 462 F.3d 1344, 1353 (Fed. Cir. 2006).  However, "a limitation lacking the term 'means' may overcome the presumption against means-plus-function treatment if it is shown that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."  *Id*.

Here, the only structure recited in claim 1 is a "second score groove."  While various types of scores have been used in can ends, such as primary scores and anti-fracture scores, the claim nowhere specifies that the second score groove is any known type of score.  Nor does the

claim specify the depth, width, or shape of the second score groove, only its function and location. Although a claim need not recite a precise physical structure to avoid the applicability of 35 U.S.C. § 112, ¶ 6, the mere recitation of a "second score groove" does not provide sufficiently definite structure to perform the fracture-directing function. *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (concluding that § 112, ¶ 6 applied "to limit the 'lever moving element' to structures disclosed in the specification and equivalents thereof" because "a 'lever moving element' had not been shown to have a generally understood structural meaning in the art"). A second score that is too shallow will not sever easily enough to cause the fracture to follow the path of the score (Ex. 16 at ¶ 29).

The score line patents state that to ensure that the fracture is directed along the path of the second score and away from the primary score – that is, that the second score performs the fracture-directing function – the tail of the score should be made more easily severed compared to the remaining regions of the score along a minimum of its length and, in particular, specifies the "residual differential" of the score: "the segment of the anti-fracture score that is adapted to be severed by having a **reduced score residual differential** is at least 0.050 inch in linear path length 80, and preferably in the range of 0.200 inch in linear path length 80 **to fully direct any fracture in the hinge segment 26**" (Ex. 3 at 5:28-53) (emphasis added).

Thus, the "corresponding structure" for performing the fracture-directing function of claim 1 that is described in the patent specification is a second score in which, compared to the remaining regions of the second score, the tail has less residual so that the residual differential compared to the primary score is reduced (*i.e.*, to less than 0.002 inch) along a length of at least 0.050 inch.

## VI.    REXAM'S BOTTOM REFORMING PATENTS

### A.    Rexam Agrees To Crown's Constructions For All But One Term

In Rexam's opening claim construction brief, it agreed to Crown's construction for the terms: m*oving said reforming roller radially*; r*eforming roller rotating along said longitudinal*

*wall and about an arcuate path*; *reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path*; and *radially inward support.* Accordingly, Crown's construction for these terms should be adopted.

**B.    Crown's Proposed Constructions of the Remaining Disputed Term Should Be Adopted**

The only remaining dispute in connection with Rexam's Bottom Reforming Patents is the language "*substantial radial alignment with said radial inward support.*"

| Claim Term | Claims in which term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| said reforming roller rotating along said longitudinal wall and about an arcuate path in ***substantial radial alignment with said radial inward support*** | Claim 17 of 385 Patent | The roller path having a height in the direction of the longitudinal axis, more than half of which overlaps with the height of the radial inward support. | At or almost absolute radial alignment with said radial inward support. |

Crown's construction is correct. The context of the phrase "*substantial radial alignment with said radial inward support*" confirms that the phrase refers back to the "radial inward support" previously set forth in the claim. This confirms that the arcuate path of the reforming roller must be in "*substantial radial alignment*" with the previously defined "radial inward support." As the parties now agree, the roller path is defined by the roller as it revolves around its own axis and rolls along the longitudinal wall on a curved path adjacent to the wall.

The phrase "*substantial radial alignment*" is nowhere found in the patent specification. Figure 2 of the specification, however, confirms that the curved path traced by the rollers adjacent the wall 34 is completely aligned in the radial direction with the jig or lower can support 48, *i.e.*, the roller path and the vertical position the jig or support 48 lie along the same radii extending from the longitudinal axis of the container 20. The roller paths in the remaining embodiments likewise are completely aligned in the radial direction with the corresponding jig or lower can support. Although shown in the drawing, the disputed phrase in claim 17, however, does not require complete radial alignment, but rather merely requires "substantial" radial alignment between the support and roller path.

-43-

The term "substantial" is not defined in the specification, and the specification nowhere indicates that it should be given any specialized meaning.  Thus, the plain meaning is appropriate.  *See Wilson*, 442 F.3d at 1328.  The plain meaning of "*substantial*" is "in the main" (Ex. 12 at 2280).   For that reason, Crown does not propose that the roller path have a height (in the direction of the longitudinal axis of the can) that completely overlaps with the height of the radial inward support, but proposes only that the roller path have a height that, "in the main" (more than half), overlaps with the height of the radial inward support.

Oddly, Rexam seeks a restrictive construction requiring the alignment be "at or almost absolute" between the path and the radial support.  Crown does not oppose Rexam's construction *provided* that it is clear that overlap or alignment between the path and support that is "less than half" is not "at or absolute" alignment under Rexam's proposed construction.

## VII.    REXAM'S NECKING PATENT

### A.    Disputed Claim Terms of Rexam's Necking Patent

The parties dispute the construction of four terms in Rexam's Necking Patent: *smoothly-shaped neck profile*; *formed as part of said second taper*; *combine and blend*; and  *part formed by each die element partially integrates and blends with the portion formed by a preceding die element*.

### B.    Crown's Proposed Construction of Rexam's Necking Patent

#### 1.    *smoothly-shaped neck profile*

| Claim Term | Claims in which Term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| *[enlarged] smoothly-shaped necked-in profile* | Claim 1 | Side view decreasing in diameter towards the open end with no substantial bumps, steps or ribs | Longer or taller section of a container sidewall that smoothly reduces in diameter |

The Court should construed the phrase *smoothly-shaped necked-in profile* to refer a side view of a container decreasing un diameter towards the open end with no substantial bumps, steps

or ribs.[7] Crown's construction is consistent with the patent specification. While the specification does not define the phrase "*smoothly-shaped neck profile,* it does provide guidance as to proper construction, teaching that it is desirable to eliminate steps or ribs from a container neck to produce a "smooth neck construction" (Ex. 7 at 2:2-59). The drawings confirm that the necked-in portions 212, 228, 234, 248, 254, and 266 formed during each operation decrease in diameter toward the open end of the container, and have no substantial steps, ribs, or other types of bumps.

Crown's construction is also consistent with the plain meaning. The specification does not define the terms "smoothly," "neck," or "profile." Moreover, the specification nowhere indicates that these terms have a specialized meaning to those skilled in the art. Thus, the plain meanings of these terms are appropriate. *See Wilson*, 442 F.3d at 1328.

The plain meaning of "profile" is a side or sectional elevation (Ex. 12 at 1811). The plain meaning of "neck" is a relatively narrow or constricted part joining two other parts or located at an end (*id.* at 1511). The plain meaning of "smoothly" is being without bumps (*id.* at 2152). The plain meanings of the terms "smoothly," "neck," and "profile" thus support Crown's position that the phrase "*smoothly-shaped neck profile*" should be construed as "a side view decreasing in diameter towards the open end with no substantial bumps, steps or ribs."

Rexam's construction should be rejected. Rexam claims that the phrase *"smoothly-shaped neck profile"* refers to a "smooth shape neck profile toward the top of the can." That circular construction, however, would not be helpful to either the jury or the Court. Further, Rexam proposes that the phrase *"enlarged smoothly-shaped neck profile"* refers to a "longer or taller section of a container side wall that smoothly reduces in diameter." Quite apart from the fact that there appears to be no similarity or commonality between Rexam's definition of a "*smoothly-shaped neck profile*" as contrasted with the related phrase "**enlarged smoothly-shaped**

---

[7] The specification draws no distinction between the phrases "*smoothly-shaped neck profile*" and "*enlarged smoothly-shaped necked-in profile.*" The specification does state, however, that: "[i]n each necking operation, a small overlap is created between a previously-necked in portion while the overall necked-in portion is extended and axially enlarged . . . ." (Ex. 7 at 9:65-68).

*neck profile,*" it is unclear what the term "longer or taller section of a container side wall" refers to. Rexam's proposed constructions therefore should be rejected.

### 2.     *reformed as a part of said second taper*

| Claim Term | Claims where term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| wherein said second arcuate segment is ***reformed as a part of said second taper*** on said first taper | Claim 2 of 839 patent | Changed to become part of [said second taper]. | A second curved segment is changed as a result of the second taper being forced downwardly on the first taper. |

The specification contains no express definition of the phrase **"*reformed as a part of said second taper.***"  The preferred embodiments described in the specification, however, provide guidance regarding the proper construction of this phrase.  The specification describes the configuration of the can end between the first and second necking operations as follows:

> FIG. 16(a) shows the configuration of the neck in dotted line before the second necking operation, and in solid line after the second necking operation.  It will be noted that the lower segment of the tapered portion adjacent the cylindrical side wall remains substantially **unchanged** while the second arcuate segment or upper part of the tapered portion is reformed and the tapered portion is axially elongated (Ex. 7 at 12:28-36) (emphasis added).

The specification thus equates "reform" with "change," *i.e.*, with the opposite of "unchanged."

The patent drawings also support Crown's proposed construction of the phrase "*reformed as a part of said second taper.*"  Figure 16(a) shows that the upper part of the tapered portion formed during the first necking operation is changed during the second necking operation so that the upper part of the first taper becomes part of the second taper formed during the second necking operation.

The plain meaning of "reformed" supports Crown's proposed construction of **"*reformed as a part of said second taper.***"  The specification does not expressly define the term "reformed."  Nor does it indicate that the term has a specialized meaning to those skilled in the art.  Thus, the plain meaning of the term "reformed" is appropriate.  *See Wilson*, 442 F.3d at 1328.

The plain meaning of "reform" is "to amend or improve by change of form."  (Ex. 12 at 1909).  The plain meaning of "reformed" therefore support Crown's proposed construction of

"r*eformed as a part of said second taper*" as "changed to become part of [the second taper]" on the first taper.

Rexam claims that the phrase" *reformed as a part of said second taper*" should be construed to require that the second arcuate or curved segment is "changed as a result of the second taper being forced downwardly on the first taper." Rexam's proposed construction, therefore, addresses the technique used to reform the second arcuate segment (by being forced downwardly on the first taper), but fails to address the requirement in the disputed phrase that the curved segment must be reformed "as a part of" the second taper, which is an express requirement of the claim.

3.    *combine and blend*

| Claim Term | Claims where term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| whereby the two tapers *combine and blend* into a smooth neck profile | Claim 2 of 839 Patent | Overlap. | Combine and blend. |

The specification nowhere defines the terms "combine and blend" but does provide guidance concerning the meaning of the word "blend:"

> In each necking operation, a small *overlap* is created between a previously necked-in portion while the overall necked-in portion is extended and axially enlarged and small segments of reduction are taken so that the various operations **blend** smoothly into the finished necked-in portion (*id*. at 9:65-10:2) (emphasis added).

The specification thus equates "overlap" with "blend." The term "combine" appears only once in the specification, as follows:

> During this second necking operation, the lower part of the first tapered portion remains essentially unchanged while the second tapered portion **combines and blends** with the first tapered portion to produce an extension thereof (*id*. at 12:42-46) (emphasis added).

The specification thus draws no distinction between the terms "combine" and "blend." The language of the specification therefore supports Crown's proposed construction of the phrase *"combine and blend"* as "overlap."

The patent drawings also support Crown's proposed construction of the disputed phrase. For example, Figures 16(a)-16(e) depict the can body before and after the second through sixth necking operations, and show that the tapered portions formed during each successive set of necking operations overlap to form a single continuous necked-in portion. The specification nowhere indicates that either of the terms "combined" or "blend" has a specialized meaning to one of ordinary skill. The plain meanings of these terms therefore are appropriate. *See Wilson*, 442 F.3d at 1328. The plain meaning of "combine" is "blend" (Ex. 12 at 452). The plain meaning of "blend" is "to combine into an integrated whole" (*id.* at 233). The lack of a distinction between the terms "combine" and "blend" is therefore supported by the plain meanings of both terms.

Rexam has not construed the term "combine and blend." Since Crown's proposed construction is consistent with the patent specification, and unopposed, Crown's proposed construction should be adopted.

**4.**     *part formed by each die element partially integrates and blends with the portion formed by a preceding die element*

| Claim Term | Claims where term appears | Crown's construction | Rexam's construction |
|---|---|---|---|
| the *part formed by each die element partially integrates and blends with the portion formed by a preceding die element* | Claim 5 of 839 patent | The portion of the necked-in profile formed by each necking die, other than the first, partially overlaps the portion formed during the preceding operation, so that no substantial bumps, steps, or ribs are present. | The portion of the neck profile formed by each die partially overlaps and is continuous with the profile formed by the preceding die. |

The phrase "part formed by each die element partially integrates and blends with the portion formed by a preceding die element" is nowhere defined in the patent specification. The specification, however, does state:

> During the second necking operation, a second tapered portion is essentially freely formed in the reduced cylindrical neck being free of the die at its lower end and this second tapered portion is forced along the reduced cylindrical neck until it *integrates* with the arcuate segment CR1 of the first tapered portion. During this second necking operation, the lower part of the first tapered portion remains essentially unchanged while the second tapered portion *combines and*

*blends* with the first tapered portion to produce an extension thereof (Ex. 7 at 12:37-46) (emphasis added).

The specification thus uses each of the terms "integrate," "combine," and "blend" to describe the manner in which the first and second tapers interact during the second necking operation. As discussed above, the proper construction of combine and blend is "overlap." The term "partially integrates and blends" should therefore be construed as "partially overlaps."

Figure 16(a), discussed and reproduced above, depicts the can body before and after the second necking operation. Figure 16(a) shows that the tapered portions formed during the two necking operations overlap to form a single continuous necked-in portion with no substantial bumps, steps, or ribs. The remainder of Figure 16, together with Figures 17 and 18, indicate that the container is reformed in a similar manner during the third, fourth, fifth, and sixth necking operations. The first necking operation acts on the un-necked container, and therefore does not act on a portion formed by a preceding die element.

The specification thus indicates that the phrase "*the part formed by each die element partially integrates and blends with the portion formed by a preceding die element*" should be construed as "the portion of the necked-in profile formed by each necking die, other than the first, partially overlaps the portion formed during the preceding operation, so that no substantial bumps, steps, or ribs are present."

The specification nowhere defines the terms "combined," "blend," or "integrate." Nor does the specification suggest that any of these terms has a specialized meaning to those skilled in the art. The plain meanings of these terms therefore are appropriate. *Wilson*, 442 F.3d at 1328.

The plain meaning of "combine," as discussed above, is "blend" (Ex. 12 at 452). The plain meaning of "blend" is "to combine into an integrated whole" (*id.* at 233). The plain meaning of "integrate" is "to combine together" (*id.* at 1174). The lack of a distinction between the terms "combine," "blend," and "integrate" is therefore supported by the plain meaning.

Rexam's construction that the portion of the neck profile formed by each die "partially overlaps and is continuous with the profile formed by the preceding die" should be rejected. The

term "continuous," however, is unclear.  Any necking process produces a neck that is continuous, even those methods distinguished during patent prosecution that produce necks containing bumps, steps, or ribs.  For that reason, the Court should construe the disputed phrase to require that the part formed by each die element have no substantial bumps, steps, or ribs.

## VIII.    CONCLUSION

Based on the points and authorities set forth above, the Court should adopt Crown's proposed construction.

Dated: February 12, 2007

Respectfully submitted,

  /s/ Barry Klayman
Barry Klayman
WOLF, BLOCK, SCHORR and
   SOLIS-COHEN LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 777-0313

*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

*Of Counsel:*

Dale M. Heist
Lynn A. Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

Michael Korniczky
Crown Cork & Seal USA, Inc.
One Crown Way
Philadelphia, Pennsylvania  19154