# Attachment 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC., Plaintiff, and CROWN CORK & SEAL USA, INC., | ) ) ) | Civil Action No. 05-608 (MPT) |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) ) | **CONFIDENTIAL** **FILED UNDER SEAL** |
| v. | ) ) | |
| REXAM BEVERAGE CAN CO., | ) ) | |
| Defendant Counterclaimant. | ) | |

### APPENDIX TO
### DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF U.S. PATENT NOS. 4,774,839 AND 5,697,242

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: January 25, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
  *Attorneys for Defendant/Counterclaimant*
  *Rexam Beverage Can Co.*

# TABLE OF CONTENTS

1. U.S. Patent No. 4,774,839 ................................................................... A001-21

2. U.S. Patent No. 5,697,242 ................................................................... A022-40

3. Deposition excerpts of Richard Golding ............................................. A041-49

4. Deposition excerpts of Sylvon Praturlon ............................................ A050-53

5. Deposition excerpts of Paul Azzaline ................................................. A054-56

6. Deposition excerpts of Joseph Bauder ................................................ A057-59

7. Smooth Die Necking Documents .......................................................... A060-93

8. Bottom Reformin Documents ............................................................... A094-104

9. Expert Report of Ed Gillest Regarding Infringement ........................ A105-153

10. Rebuttal Report of Anton Aschberger ................................................ A154-158

11. Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc.'s
    Responses to Rexam's Beverage Can Co.'s Fourth Set of Interrogatories..... A159-169

# United States Patent [19]

## Caleffi et al.

[11] Patent Number: 4,774,839

[45] Date of Patent: Oct. 4, 1988

[54] **METHOD AND APPARATUS FOR NECKING CONTAINERS**

[75] Inventors: Antonio Caleffi, Nogara, Italy; T. William Ames, Park Ridge, Ill.; Edward S. Traczyk, Lockport, Ill.; Dietrich K. Naggert, Oak Forest, Ill.

[73] Assignee: American National Can Company, Chicago, Ill.

[21] Appl. No.: 11,760

[22] Filed: Feb. 6, 1987

### Related U.S. Application Data

[60] Continuation-in-part of Ser. No. 696,322, Jan. 30, 1985, abandoned, and Ser. No. 725,945, Apr. 22, 1985, Pat. No. 4,693,108, each is a division of Ser. No. 453,232, Dec. 27, 1982, Pat. No. 4,519,232.

[51] Int. Cl.$^4$ ................................. B21D 19/10
[52] U.S. Cl. ................. 72/354; 72/356; 72/370; 413/1
[58] Field of Search ............ 72/94, 306, 352, 354, 72/356, 370; 413/1, 69, 76

[56] References Cited

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,755,839 | 7/1956 | Garrock et al. | 72/306 |
| 3,581,542 | 6/1971 | Wahler et al. | |
| 3,600,927 | 8/1971 | Wahler | 413/69 |
| 3,687,098 | 8/1972 | Maytag | |
| 3,757,558 | 9/1973 | Heinle | |
| 3,763,807 | 10/1973 | Hilgenbrink | |
| 3,812,696 | 5/1974 | Kneusel et al. | |
| 3,845,653 | 11/1974 | Hilgenbrink | |
| 3,964,412 | 6/1976 | Kitsuda | |
| 3,964,413 | 6/1976 | Saunders | |
| 3,983,729 | 10/1976 | Traczyk et al. | |
| 3,995,572 | 12/1976 | Saunders | |
| 4,173,883 | 11/1979 | Bolk | |
| 4,603,493 | 9/1983 | Atkinson | 72/354 |
| 4,527,412 | 7/1985 | Stoffel et al. | |
| 4,578,007 | 3/1986 | Diekhoff | |

Primary Examiner—Lowell A. Larson
Attorney, Agent, or Firm—Robert A. Stenzel; Ralph R. Rath

[57] **ABSTRACT**

A die necking method and apparatus for producing a smooth tapered wall between the container side wall and a reduced diameter neck includes a plurality of rotatable necking turrets that each have a plurality of identical necking substations each having a necking die. The necking dies in the respective turrets have an internal configuration to produce a necked-in portion on the container which has a first arcuate segment integral with the container side wall and a second arcuate segment integral with the reduced diameter neck. The necking substations also have a floating form control element that engages the inner surface of the container to control the portion of the container to be necked. The necked-in portion is reformed in each succeeding turret by dies to produce a smooth tapered wall between the arcuate segments.

43 Claims, 8 Drawing Sheets



**U.S. Patent**    Oct. 4, 1988    Sheet 1 of 8    **4,774,839**



Crown Packaging Technology v. Rexam Beverage Can 05-608

REX000886

A002



**U.S. Patent**    Oct. 4, 1988    Sheet 2 of 8    **4,774,839**













**U.S. Patent**    Oct. 4, 1988    Sheet 7 of 8    4,774,839



Crown Packaging Technology v. Rexam Beverage Can 05-608

REX000892
A008





REX000893
A009

4,774,839

| 1 | 2 |

## METHOD AND APPARATUS FOR NECKING CONTAINERS

### REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. Ser. No. 696,322, filed Jan. 30, 1985, abandoned and refiled as Ser. No. 915,143, Oct. 3, 1986, now U.S. Pat. No. 4,732,027, and U.S. Ser. No. 725,945, filed Apr. 22, 1985, now U.S. Pat. No. 4,693,108, which are divisional applications of U.S. Ser. No. 453,232, filed Dec. 27, 1982, now U.S. Pat. No. 4,519,232, entitled "Method and Apparatus for Necking Containers", issued to Edward S. Traczyk and Michael M. Shulski and assigned to National Can Corporation, the same Assignee as the present invention.

### TECHNICAL FIELD

This invention relates generally to an improved two-piece container construction and the method and apparatus for necking and flanging such containers and, more particularly, concerns a versatile high-speed system for producing these containers.

### BACKGROUND PRIOR ART

Two-piece cans are the most common type of metal containers used in the beer and beverage industry and also are used for aerosol and food packaging. They are usually formed of aluminum or tin-plated steel. The two-piece can consists of a first cylindrical can body portion having an integral bottom end wall and a second, separately-formed, top end panel portion which, after the can has been filled, is double-seamed thereon to close the open upper end of the container.

An important competitive objective is to reduce the total can weight as much as possible while maintaining its strength and performance in accordance with industry requirements. For pressurized contents such as soft drinks or beer, the end panel must be made of a metal thickness gauge that is on the order of at least twice the thickness of the side wall. Accordingly, to minimize the overall container weight the second end panel should be diametrically as small as possible and yet maintain the structural integrity of the container, the functionality of the end, and also the aesthetically-pleasing appearance of the can.

In most cases, containers used for beer and carbonated beverages have an outside diameter of 2-11/16 inches (referred to as a 211-container) and are reduced to open end diameters of (a) 2-9/16 inches (referred to as a 209-neck) typically in a single-necking operation for a 209 end; or, (b) 2-(7.5)/16 (referred to as a 207½-neck) typically in a double-necking operation for a 207½ end; or, (c) 2-6/16 (referred to as a 206-neck) in a triple- or quad-necking operation for a 206 end. In the future, it is expected that even smaller diameter ends will be used, e.g., 204, 202, 200 or smaller. Further, different can fillers use cans with varying neck size. Hence, it is very important for the can manufacturer to quickly adapt its necking machines and operations from one neck size to another.

Until recently, the process used to reduce the open end diameter of two-piece containers to accommodate smaller diameter second end panels typically comprised a die necking operation wherein the open end is sequentially formed by one, two, three or four die-sets to produce respectively a single-, double-, triple- or quad-necked construction. Examples of such proposals are

disclosed in U.S. Pat. Nos. 3,687,098; 3,812,896; 3,983,729; 3,995,572; 4,070,888; and, 4,519,232. It will be noted in these instances that for each die necking operation, a very pronounced circumferential step or rib is formed. This stepped rib arrangement was not considered commercially satisfactory by various beer and beverage marketers because of the limitations on label space and fill capacity.

In an effort to offset the loss of volume or fill capacity resulting from the stepped rib configuration of the container, efforts have been directed towards eliminating some of the steps or ribs in a container neck. Thus, U.S. Pat. No. 4,403,493 discloses a method of necking a container wherein a taper is formed in a first necking operation and this tapered portion is reshaped and enlarged while the angle of the taper is increased. A second step or rib neck is then formed between the end of the tapered portion and the reduced cylindrical neck.

U.S. Pat. No. 4,578,007 also discloses a method of necking a container in a multiple necking operation to produce a plurality of ribs. The necked-in portion is then reformed with an external forming roller to eliminate at least some of the ribs and produce a frustoconical portion having a substantially uniform inwardly curving wall section defining the necked-in portion.

In recent times beer and beverage marketers have preferred a neck construction having a relatively smooth neck shape between, for example, the 206 opening and the 211 diameter can. This smooth can construction is made by a spin necking process, and apparatus as shown, for example, in U.S. Pat. Nos. 4,058,998 and 4,512,172.

For various reasons, the can manufacturing industry believed that spin necking was the only method of producing a smooth neck configuration. Applicants have found, however, that presently available spin necking devices and their operation are not entirely satisfactory. It was found that commercial spin necking stretches and thins the neck metal and thereby tends to weaken the neck. From applicants' experience, at commercial production speeds, the presently known spin forming apparatus and process requires frequent maintenance and attention and yet produces considerable scratches and ridges in the neck surface that are undesirable in the marketplace. Moreover, the spin-necked containers did not meet the performance standards set by the equivalent-sized can necked container. For example, applicants experienced distortions in the symmetry of spin-necked containers, crush problems and uneven edges, which resulted in variations in flange width.

While presently-available spin necking equipment and operations have various shortcomings, no one to the knowledge of the Applicants has tried to make high-performance smooth necked cans by die necking, as taught herein. Apparently, the industry believed that the die necking process could not be effective in producing a totally smooth neck construction in a fast, economical, efficient and reliable manner.

### SUMMARY OF THE INVENTION

According to the present invention, Applicants have developed a die necking process for making a high performance smooth neck construction in metal, two-piece, thin-walled containers. Applicants also have developed a versatile and readily changeable high-speed die necking apparatus and method that can produce at least 1,500 containers per minute.

Crown Packaging Technology v. Rexam Beverage Can 05-608

4,774,839

| 3 | 4 |

The invention may be employed to die neck containers of various sizes. For purposes of explanation, the preferred embodiment of the invention is described with reference to necking the widely-used 211-diameter two-piece container down to a 206-diameter neck. A number of die necking sequences are performed to rapidly and efficiently produce a smooth tapered neck on the end of the cylindrical side wall of the container. In the embodiment shown, six necking operations are utilized to neck the "211" container to the "206" neck in sequential operations.

In operation, as the can passes through the apparatus after the initial operation, each of the die necking operations partially overlaps and reforms only a part of a previously-formed portion to produce a necked-in portion on the end of the cylindrical side wall until the necked-in portion extends the desired length. This process produces a smooth tapered annular wall portion between the cylindrical side wall and the reduced diameter cylindrical neck portion. The tapered annular wall portion which has arcuate portions on either end may be characterized as the necked-in portion or taper between the cylindrical side wall and the reduced diameter neck.

It has further been found that in practicing this method, the metal in the neck, which includes the necked-in portion and the reduced diameter neck portion, the metal is thickened and thus provides greater crush strength for the can independent of the profile and greater fill capacity.

The method of the present invention contemplates forming a cylindrical neck portion adjacent the cylindrical open end of a container so that the cylindrical neck merges with the cylindrical side wall through a generally smoothly tapered neck portion. The tapered neck portion between the cylindrical neck portion and the cylindrical container side wall initially is defined by a lower, generally arcuate segment having a relatively large internal curvature at the upper end of the cylindrical side wall and an upper, generally arcuate segment having a relatively large external curvature at the lower end of the reduced diameter cylindrical neck.

A further tapered portion is then formed at the open end and is forced downwardly while the cylindrical neck is further reduced. The further tapered portion freely integrates with the second arcuate segment which is reformed and the tapered portion is extended. This process is repeated sequentially until the cylindrical neck is reduced to the desired diameter and a smoothly tapered necked-in portion is formed on the end of the side wall. In each necking operation, the tapered portion is not constrained by the die and is freely formed without regard to the specific dimensions of the die transition zone.

The container that is formed by the above die necking process has an aesthetically-pleasing appearance, greater strength and crush resistance and is devoid of the scratches or wrinkles in the neck produced in the spin necking operation.

Each container necking operation is preferably performed in a necking module consisting of a turret which is rotatable about a fixed vertical axis. Each turret has a plurality of identical exposed necking substations on the periphery thereof with each necking substation having a stationary necking die, a form control member reciprocable along an axis parallel to the fixed axis for the turret, and a platform being movable by cams and cam followers, as also explained in the above-cited U.S. Pat.

No. 4,519,232, of which this application forms a continuation-in-part and which is incorporated herein by reference.

The form control member of the inventive system has a double or dual floating feature including a floating sleeve which engages the inner surface of the container adjacent the open end during the necking operation. Also, the entire form control member is mounted for floating radial movement on its support shaft. The dual floating form control element in the necking modules will produce a form control of the area of the container to be necked. Such form control assists in preventing any deformation along the open end from being moved into the necked portion of the container. It has been found that the floating form control member reduces spoilage significantly.

The necking modules are substantially identical in most respects and this allows maximum flexibility in installing and maintaining the system with minimum cost.

BRIEF DESCRIPTION OF SEVERAL VIEWS OF DRAWINGS

FIG. 1 of the drawings discloses in plan view a necking and flanging apparatus incorporating the modular nature of the present invention;

FIG. 2 is a cross-sectional view of one module showing two necking substations, as viewed along line 2—2 in FIG. 1;

FIG. 3 is a cross-sectional view of one of the necking substations;

FIG. 4 is an enlarged fragmentary cross-sectional view of the form control member;

FIG. 5 is an enlarged fragmentary sectional view showing the relation between a container edge and a die-forming surface;

FIGS. 6–11 respectively show in sequence the six stages of tooling used in the necking operation;

FIG. 12 shows a finished necked and flanged container;

FIG. 13 is a fragmentary cross-sectional view of the upper end of the container before being necked;

FIG. 14 is a fragmentary enlarged cross-sectional view showing the finished necked and flanged container;

FIGS. 15(a) and (b) show the configuration of a portion of the cams that move the container and the form control member;

FIGS. 16(a–e) show the progression of the container neck profile during the various necking operation;

FIG. 17 is substantially an actual size view showing the neck profile after each of the six necking operations;

FIG. 18 is an enlarged sectional view showing the neck of the container after each necking operation;

FIGS. 19(a–e) show the progression of a modified container neck profile during the various necking operations;

FIG. 20 is substantially an actual-size view showing the modified neck profile after each of the six necking operations; and,

FIG. 21 is an enlarged cross-sectional view of the finished modified neck profile.

While this invention is susceptible of embodiments in many different forms, there is shown in the drawings and will herein be described in detail preferred embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not in-

REX000895
A011

4,774,839

5

tended to limit the broad aspect of the invention to the embodiments illustrated.

## DETAILED DESCRIPTION

FIG. 1 of the drawings discloses in plan view a necking and flanging system or apparatus, generally designated as 18, for producing containers according to the invention herein which containers have a smooth-shaped neck profile and an outwardly-directed flange.

As will be described more specifically below, the necking and flanging apparatus 18 includes a plurality of substantially identical modules comprising the necking stations that are positioned in a generally C-shaped pattern, as shown in FIG. 1. A single operator can visually observe and control the operation of all modules from a central location. The plurality of individual modules are interconnected to provide the complete necking and flanging system or apparatus, as will be explained.

FIG. 1 depicts metal container bodies 16 being fed along a path 20 for necking to apparatus 18. As mentioned above, the embodiment of FIG. 1 has six container necking station modules, identified by numerals 22, 24, 26, 27, 32, 34, respectively, and a flanging station module 36. Nine transfer wheels 21, 23, 25, 28, 29, 31, 33, 35 and 38 move the containers serially and in a serpentine path through the various necking stations.

Each of the necking station modules 22, 24, 26, 27, 32 and 34 are substantially identical in construction so as to be interchangeable, and can be added to or subtracted from the system depending upon the type of continer that is to be formed. Each of the necking station modules has a plurality of circumferentially-spaced individual, substantially identical necking substations (FIG. 3). The number of stations and substations can be increased or decreased to provide the desired necking operation for various sizes of cans. The details of the necking substations will be described in further detail later.

An additional advantage of utilizing substantially identical modules is that many of the components of the modules are identical in construction, thus enabling a reduction of inventory of parts.

The arrangement of FIG. 1 shows cylindrical metal container bodies 16 which are made of conventional materials in any conventional manner, being fed sequentially by suitable conveyor means (not shown) into the necking and flanging apparatus 18. The conveyor means feeds the containers to a first transfer wheel 21, as is known in the art. The containers are then fed serially through the necking modules by the interconnecting 50 transfer wheels.

More specifically, the first transfer wheel 21 delivers containers 16 to the first necking module, generally designated by reference numeral 22, where a first necking operation is performed on the container, as will be described later. The containers 16 are then delivered to a second transfer wheel 23 which feeds the containers to a second necking module 24 where a second necking operation is performed on the container. The container is then removed from the second module by a third transfer wheel 25 and fed to a third necking module 26 where a third necking operation is performed.

As will be explained in more detail hereinbelow, each station is concurrently operating on, or forming, a number of containers with each container being in a different state of necking as it is being processed from the entry point to the exit point of each necking station module.

6

The containers are then sequentially moved through he fourth, fifth and sixth necking modules 27, 32 and 34 to complete the necking operation. The necked containers 16 are next moved by transfer wheel 35 to a flanging module 36 where an outwardly-directed flange is produced on the container, as is well known in the art, and is delivered to a transfer wheel 38 for delivery to an exit conveyor (not shown).

All of the moving members in the necking and flanging apparatus are driven by a single drive means 44 which includes a variable-speed motor connected to an output transmission 46. Each of the transfer wheels, as well as the necking modules and flanging module, have gears in mesh with each other to produce a synchronized continuous drive means for all of the components.

The variable-speed drive feature of drive means 44 allows automatic increase and decrease of speed of the module to match the quantity of containers flowing through the module to the flow in the remainder of the container line. The variable-speed drive also allows the operator to accurately index the components of the system relative to each other.

The necking and flanging apparatus also has suitable container guide elements 48 associated with each of the modules and on each of the transfer wheels to assure that the containers remain in the conveyor track.

A suitable interconnecting and supporting framework, generally designated by reference numeral 50, is provided for supporting rotatable turrets 70 that are part of the modules. Referring now to FIG. 2, the fixed or stationary framework 50 is supported on a platform or base 51 and includes a lower frame member 52 and an upper frame member 54 interconnected by columns 56. Collars 58 suitably connect columns 56 to frame members 52, 54 by bolts (not shown) so that a solid structure is provided to assure the accuracy of alignment of the various movable components, which will be described later.

The frame structure 50 provides a fixed support above the base 51 for a rotary turret assembly 70 that holds a plurality of identical necking substations, generally designated as 72 in FIG. 1, around he periphery thereof and in fixed relation to each other. FIG. 2, which is a view partially in cross-section, taken along line 2—2 of FIG. 1, shows two of the substations 72a and 72b. The turret assembly 70 as shown in FIG. 2 comprises a lower turret portion 74 and an upper turret portion 76 supported on a central drive shaft 78 that extends through openings 80 and 82 in frame members 52 and 54. Turret assembly 70 is rotatably supported on the frame members by suitable bearing means 84a and 84b. Note that substations 72a and 72b, as well as all the other substations 72, rotate with shaft 78 while columns 56 remain substantially stationary. The upper turret portion 76 is of hollow cylindrical shape and is slidably positionable on shaft 78, being secured in an adjusted position by a wedge mechanism 86 and a collar 88. The lower turret portion 74 is fixed to the lower part of shaft 78. The slidably-positionable feature of the upper turret portion 76 allows the turret portion 76 to be accurately repositioned longitudinally on shaft 78 relative to turret portion 76 without changing the alignment of the necking substations; this permits the turret assemblies 70 to accommodate containers of different heights.

A radially-extending upper hub means 90 forms part of the upper turret portion 76 and provides support means for the upper portion of the necking substations 72, to be described. Likewise, lower hub means 92 ex-

REX000896
A012

4,774,839

7

tend radially outwardly to form part of the lower turret portion 74 and to support the lower portion of the necking substations 72, to be described. The hub means 90, 92 have aligned pockets 94 on the outer periphery thereof which are machined as matching pairs to receive the components of the substations 72 and insure accurate alignment of the upper and lower portions of the necking substations 72. Also, the upper hub means 90 also has pockets 96 which cooperate with guide elements 48 to control the position of the containers as they are moved through the necking station module.

As stated above and as shown in FIG. 2, the substations are substantially identical, and a description of one substation 72 exemplifies the structure of the other substations in each of the station modules.

FIG. 3 discloses in greater detail necking substation 72 comprising a lower container-lifting portion, generally indicated at 100, and an upper forming or necking portion, generally indicated at 102. Referring now to both FIGS. 2 and 3, the container-lifting portion 100 includes an outer cylindrical member or sleeve 108 that has a generally circular opening 110 with a ram or piston 112 reciprocally movable in the opening 110. The lower end of ram 112 has a cam follower 116 (see FIG. 2) which rides on an upper exposed camming surface of a face cam 118 supported on lower frame member 52. The upper end of ram 112 has a container supporting platform 120 secured thereto by fastener means 122. The support platform or container support means has an inner upwardly-arcuate extension 124 for engaging the inner lower surface of the container. Ram 112 cooperates with sleeve 108 to provide both a fluid centering mechanism and to bias the cam followers 116 into engagement with the cam 118, as described in more detail in U.S. Pat. No. 4,519,232, incorporated herein by reference.

The cam 118 essentially comprises a fixedly-mounted ring circumferentially seated on lower frame member 52. The cam is of selected height and configuration and aligned with the lower end of the substations 72 to control the upward and downward movement of the piston 112 and hence of the container 16 as the turret is rotated on the fixed frame 50. Since the cam followers 116 are biased into engagement with the cam 118, the configuration of the camming surface of the face cam 118 will dictate the position of the container 16, as will be described later.

The upper necking portion 102 includes a fixed necking die element 130 that is secured to a hollow cylinder 132 by means of a threaded cap 134. The cylinder 132 has an axial opening 136 in which a hollow plunger or shaft 137 is reciprocally mounted. A cam follower 138 (see FIG. 2) is mounted on the upper end of shaft 137 and rollably abuts on an exposed camming surface of a fixed upper face cam 139 secured to upper frame member 54.

Plunger 137 and cam follower 138 are maintained in engagement with the cam 139 by fluid pressure which also centers the shaft 137 in the opening 136, all as explained in U.S. Pat. No. 4,519,232. The lower end of plunger 137 supports a form control member 140, to be explained. Also, the plunger 137 and the fixed control member 140 have an opening 141 for introducing pressurized air into the container during the necking operation, as will be explained later.

In operation of the module, shaft 78 is caused to rotate about a fixed axis on the stationary frame 50. Containers 16 are moved onto the platform 120 and into

8

engagement with arcuate extension 124 when the lower lifting portion is in the lower-most position, shown in substation 72a at the left-hand side of FIG. 2. The configuration of the lower cam 118 is such that the container is moved up into the die 130 as the shaft 78 is rotated and therefore the upper open end of the container is incrementally reformed. At about the time the upper edge of the container contacts the die 130, pressurized air is introduced into the container from a source (not shown) through opening 141. As the turret assembly 70 is rotated about 120° of turret rotation, the upper cam 139 is configured to allow the form control member 140 to move upwardly based on the configuration of the cam. As mentioned above, shaft 137 including the form control member 140 is biased upwardly by fluid pressure, and will move upwardly to the position shown at substation 72b as the turret assembly rotates. Thereafter, during the remainder of the 360° rotation, the cams 118 and 139 are configured to return the platform 120 and form control member 140 to their lowermost positions at substantially matched speeds while the necked container is removed from the die. During this downward movement, the pressurized air in the container will force the container from the die onto the platform 120. Containers 16 are continually being introduced onto platform 120, processed and removed as indicated in FIG. 1.

The relative vertical movement of the container 16 and the form control member 140 is important to minimize frictional forces developed between the container and the necking die during the necking operation. Thus, the vertical or upward velocity of the form control member is greater than the vertical or upward velocity of the container during the portion of the cycle of revolution where the necking takes place and preferably is about 5% greater. This relative movement is controlled by the configuration of the cams 118 and 139 and is illustrated in FIG. 15.

The cams are preferably segmented into three equal segments of about 120°, and one segment is shown in FIG. 15. The camming surface segment 118a of cam 118, FIG. 15(a), moves the container 16 upward until the upper edge of the container contacts the die 130. The upward velocity of the container is then reduced by the flattened camming surface segment 118b between the time the container 16 edge contacts the die 130 and the time the container edge contacts the form control member 140. This allows the container to be centered in the die and the form control member 140 to be centered in the container. The upward velocity of the container is then increased by the camming surface segment 118c during the remainder of the necking cycle. At the same time, the cam surface 137a of the upper cam 137 is configured to begin upward movement of the form control member at a constant velocity as the container edge engages the die 130.

The container and form control member are then lowered at about the same velocity while the pressurized air forces the container out of the die.

Refer now to FIG. 4, as well as FIGS. 2 and 3, according to one aspect of the invention, the form control member 140 has an internal forming sleeve or element 150 which is supported for radial floating movement to accommodate relative movement of the forming element with respect to a fixed necking die 130.

More specifically, the form control member 140 consists of a hollow cylindrical member 142 that has a stepped lower end portion 144 of reduced external di-

4,774,839

9

ameter 146. A forming sleeve 150 is mounted on the end portion 144. Sleeve 150 has a diameter 152 which is slightly larger than the external diameter 146 of end portion 144 and is held on member 142 by a cap that has an integral elongated section or rod 162 which extends through the axial opening 164 in the member 142. The rod 162 has an opening 166 therethrough which receives a hollow bolt 168 to fixedly secure the cap to the plunger 137, and the hollow bolt 168 defines part of an axial opening 141. The lower edge of sleeve 150 has a tapered outer edge 170 which will act to center the forming sleeve 150 with respect to the container 16 as it is entering the open end.

Thus, the diameter of the axial opening 164 is slightly larger than the external diameter of rod 162 and the axial length of the member 142 is slightly less than the length of the rod. The foregoing provides a slight vertical spacing 165 between the upper end of member 142 and the lower edge of shaft 137 to allow for radial play or movement of the body 142 on the rod 162.

Thus, the forming sleeve 150 is mounted for floating radial movement on the cylindrical member 142 while the cylindrical member 142 is mounted for floating radial movement on the plunger or shaft 137 to provide a double floating feature or movement for forming element or sleeve 150.

It will be appreciated that, in the embodiment shown, the clearances have been exagerated in FIG. 4 and that the clearance between the member 142 and the forming element 150 is about 0.003±0.001 inch. Also, it is desirable to have no clearance between the external surface of the member 142 and the internal surface of the upper portion 130 of the die 130. The clearance between the member 142 and the support rod 162 is about 0.005 inch.

As mentioned above, the "double float" of the forming sleeve or element 150 will accommodate alignment of the main body 142 of the form control member 140 with the fixed necking die 130 while the floating or radially-movable forming element 150 will move with respect to the fixed necking die 130 and the cylindrical member 142 to be centered in the container. The internal opening in the upper portion 130U of the necking die 130 and the external diameter of the forming sleeve or element 150 are dimensioned such that there is minimal clearance, referably less than 0.0002 inch between the two when the edge of the container 16 is received therein. Thus, the metal of the the container 16 becomes trapped or confined between the forming sleeve or element 150 and the upper portion 130U of die 130 and the double floating forming element will result in "form control" to maintain the concentricity of the container for all of the area that is to be necked. This is particularly true in the first necking operation where the upper portion of the container is conformed to the desired concentricity, and wherein wall variations are minimized, and any container defects, particularly nicks or dents adjacent the edge, are minimized or eliminated.

The present invention provides a method whereby a container can be necked to have a smaller opening by utilizing a plurality of necking modules. In the illustrated embodiment of FIG. 1, six different necking operations and one flanging operation are performed on the neck of the container. An upper part of the necked-in or inwardly-tapered portion is reshaped during each of the necking operations. In each necking operation, a small overlap is created between a previously necked-in portion while the overall necked-in portion is extended and axially enlarged and small segments of reduction

10

are taken so that the various operations blend smoothly into the finished necked-in portion. The resultant necked-in portion has a rounded shoulder on the end of the cylindrical side wall which merges with an inwardly-tapered annular straight segment through an arcuate portion. The opposite end of the annular straight segment merges with the reduced cylindrical neck through a second arcuate segment.

The necking operation will be described by reference to FIGS. 6–11. In the embodiment described, a "211" aluminum container is necked to have a "206" neck in six operations. Assume that a container 16 carried by a conveyor, as indicated in FIG. 1, has been moved into position, such as shown in substation 72a in FIG. 2, and the necking operation is being initiated. FIGS. 6–11 depict the necking operation performed in the six necking station modules.

Referring briefly to FIG. 13, the container 16 typically has a thickened portion adjacent its upper open end before the necking operations are performed. In the embodiment shown, container 16 has a side wall that has a thickness (W) which is on the order of about 0.0040–0.0050 inch thick, while an upper neck area (N) has a thickness (t) that is on the order of about 0.0075 inch down to about 0.0050 inch while the length (L) is on the order of about 0.37 to 0.90 inch.

The left side portion of FIG. 6 shows a container 16 being moved upwardly into a necking die 130A. As the open end of the container 16 is moved into engagement with the die, the forming angle in the die results in large radial forces on the container wall and small axial forces so that there is radial compression of the wall of the container, as will become clear.

FIG. 6 shows a necking die 130A having a first cylindrical wall portion 202a, a transition zone surface 204, and a second cylindrical wall portion 205. The first cylindrical wall portion 202a has a diameter approximately equal to the external diameter of the container 16 with a clearance of about 0.006 inch. The second cylindrical wall portion 205 has a reduced diameter equal to the external diameter of the reduced neck that is being formed in the first necking operation.

The transition zone or intermediate surface 204 has a first arcuate surface segment A1 at the end of the first cylindrical wall portion 202 which has a radius of about 0.220 inch and a second arcuate surface segment R1 at the end of the second cylindrical wall portion 205 which has a radius of about 0.120 inch.

As the container 16 is moved upwardly into the die element 130A, as depicted on the right-hand side of FIG. 6, the diameter of the container neck is reduced and a slight curvature 211 is formed on the container body between the reduced cylindrical neck 212 and the container side wall 210.

In the first operation, the diameter of the neck is reduced only a very small amount, e.g., about 0.030 inch, while the portion of the container to be necked is conditioned for subsequent operations. In other words, a form control operation is performed on the ultimate neck portion to prepare the container for subsequent operations.

This is accomplished by tightly controlling the dimensions and tolerances of reduced cylindrical surface 205 of die 130A and the external surface diameter of the forming sleeve or element 150A. The external diameter of sleeve or element 150A is equal to the internal diameter of cylindrical surface 205 less two times the thickness of the container side wall (t) with a maximum of

REX000898
A014

4,774,839

11

10% clearance of the wall thickness. By thus tightly controlling these dimensions, dents or imperfections in the container are removed or minimized, and also any variations in wall thickness around the perimeter of the neck are reduced to provide concentricity of the side wall of the container with the die.

Also, as mentioned above, during the movement of container 16 from the position illustrated at the left of FIG. 6 to the position at the right of FIG. 6, pressurized air may be introduced into the container through opening 141 (FIG. 4) to pressurize it, if considered necessary, and thereby temporarily strengthen the container. This air is used primarily to strip the container from the necking die 130A after the necking operation is completed. As explained above during the upward movement of the container 16, the forming control member 140A and forming sleeve or element 150A are moved upwardly slightly faster than the container 16 to aid in drawing or pulling the metal of the container wall into the die.

At the first forming station, the die element 130A forms the container 16 to have a tapered-in or necked portion 211 between a cylindrical side wall 210 and a reduced cylindrical neck 212; the tapered portion 211 includes first and second arcuate segments CA1, CR1, respectively.

After the first necking operation is completed, the partially-necked container 16 exits therefrom and is fed to the second forming station module. In the second necking operation, the necked-in portion is axially elongated while the reduced cylindrical neck portion 212 is further reduced in diameter by compression of the metal therein. This is accomplished by a second necking die 130B (FIG. 7) that has a transition zone 222 between a cylindrical first surface 202b, which has the same internal diameter as the external diameter of the container, and a reduced cylindrical surface 226 at the upper end thereof. The transition zone 222 again has a first arcuate surface segment A2 integral with the cylindrical wall surface 202b and a second arcuate surface segment R2 integral with the reduced diameter cylindrical surface 226.

Referring to FIG. 7, the surface 222 of die element 130B of the second necking station initially engages the upper edge of the container 16 with arcuate die surface R2 at a small acute forming angle.

It has been found that the curvature or radius at the point which the container 16 is contacted by the die 130B and the forming angle produced between the contact point and a plane parallel to the axis of the container are critical to produce a necked-in container that is free of wrinkles. This angle, which is also referred to as the forming or locking angle, must be kept small so that radial forces known as radial hoop stresses rather than axial forces are developed to neck the container.

In FIG. 5, the tangent line T to the die wall surface defines the point of contact with the upper edge of the container 16 and results in a small impingement or forming angle "F" with a plane "P" extending parallel to the side wall of the container. It has been found that if this angle "F" is maintained in the range of about 15° to 20°, most of the forces will be radial forces to compress the neck of the container rather than axial forces. Axial forces will tend to provide more of a bending action as in conventional die necking operations.

It has also been determined that having a die contact the container 16 at the small forming angle "F" allows

12

the container 16 necked-in portion to essentially "free form" or taper toward the point where the upper end of the container 16 engages the outer surface of the forming sleeve or element 150B. This allows the container to freely define or assume its own profile rather than having a die inner wall surface dictate the shape of the profile, as has been accepted technology in prior necking operations. This is in contrast to prior die necking processes, such as disclosed in U.S. Pat. No. 3,995,572 wherein the metal is forced to assumed the shape of the inner surface of the necking die.

The radius of curvature of the arcuate surface segment A2 in the second necking die is on the order of about 0.280 inch, while the radius of curvature of the second arcuate surface segment R2 is about 0.180 inch. Thus, as the container is moved from the left-hand position, shown in FIG. 7, to the right-hand position, the original tapered portion is axially elongated to produce a tapered portion 228 having arcuate segments CA2, CR2 while the reduced diameter cylindrical portion 212 is reduced to a further reduced diameter, as shown at 229.

In the second necking operation, the diameter of the reduced cylindrical neck is reduced by about 0.070 inch, while the metal is further radially compressed therein. In the second necking die 130B, the forming angle described above is defined by the arcuate surface segment R2. FIG. 16(a) shows the configuration of the neck in dotted line before the second necking operation, and in solid line after the second necking operation. It will be noted that the lower segment of the tapered portion adjacent the cylindrical side wall remains substantially unchanged while the second arcuate segment or upper part of the tapered portion is reformed and the tapered portion is axially elongated.

During the second operation, a second tapered portion is essentially freely formed in the reduced cylindrical neck being free of the die at its lower end and this second tapered portion is forced along the reduced neck portion until it integrates with the arcuate segment CR1 of the first tapered portion. During this second operation, the lower part of the first tapered portion remains essentially unchanged while the second tapered portion combines and blends with the first tapered portion to produce an extension thereof.

It will be appreciated that the necking operation performed at each of the various stations is somewhat repetitive; however, for completeness of description, each of the necking operations at the various stations and the pertinent angles and curvatures will be described hereinbelow. It should be appreciated that, in fact, each station performs a part, and not all, of the necked-in portion while the cylindrical neck is sequentially and progressively reduced in diameter. That is, each station adds to and at least partially reforms and extends the necked-in portion produced on the container by the previous operation.

The third, fourth and fifth necking operations are illustrated in FIGS. 8, 9 and 10 and are essentially identical to the second necking operation. The dies and the form control members of the third, fourth and fifth stations are substantially identical in construction except for the slight change in the dimensions.

At each subsequent station, the cylindrical neck is compressed and reduced while the existing tapered or necked-in portion is partially reformed and axially elongated or extended to produce a small annular inwardly-

Crown Packaging Technology v. Rexam Beverage Can 05-608

4,774,839

13

tapered portion between the upper and lower arcuate segments described above.

In the third necking die 130C (FIG. 8), the transition surface 230 is located above cylindrical member 202c and includes an upper arcuate surface segment R3 having a radius of about 0.260 inch, with a straight tapered wall surface T3 which defines an inclined angle of about 27°. The lower arcuate surface segment includes a relief area on the end of the cylindrical wall surface and a second arcuate surface segment CR3 having an external radius of about 0.180 inch. The reforming operation between the second and third operations is illustrated in FIG. 16(b) where the necked-in portion 234 of the container has a first arcuate segment CA3, a tapered segment CT3, a second arcuate portion CR3 and a reduced neck 236. It will be noted that the arcuate segment CA2 remains essentially unchanged because there is no contact with the die while the arcuate segment CR2 is reformed and the center thereof is moved axially upwardly so that the tapered portion is extended. Also, the tapered portion CT3 does not conform to the flat tapered wall surface T3 and instead has a compound curve after the third necking operation.

In the fourth necking die 130D (FIG. 9), the transition zone 240 above the cylindrical surface 202d includes straight tapered wall segment T4 that defines an angle of about 25° and the arcuate surface R4 has a radius of about 0.298 inch while the outside radius OR4 is very small and about 0.058 inch. A reduced diameter cylindrical surface 244 extends above the arcuate surface R4. Thus, the cylindrical neck 236 is further reduced in diameter by about 0.050 inch, while the tapered-in portion is axially enlarged and the angle of the straight tapered neck portion between the two arcuate segments is reformed while the metal in the reduced cylindrical neck and the necked-in portion are further compressed. The arcuate shoulder or bump becomes set in the fourth operation in view of the small radius OR4 engaging the upper end thereof.

The resultant tapered-in portion 246 includes an upper arcuate segment CR4, a tapered portion CT4 and a lower arcuate segment CA4 having an upper arcuate portion COR4, along with reduced cylindrical neck portion 248. The fourth operation is illustrated in FIG. 16(c) and it should again be noted that the tapered portion CT4 does not conform to the configuration of the die surface T4 and is a compound curve in the axial direction.

The fifth necking die 130E (FIG. 10), has a reduced diameter surface 250 above a transition zone 252 which includes an arcuate surface R5 that has a radius of about 0.230 inch. The transition zone also includes a tapered surface T5 which defines an angle of 20° with a surface OR5 having an external radius of about 0.180 inch above cylindrical surface 202e. The fifth operation is illustrated in FIG. 16(d) where the container has a tapered portion 256 including a lower segment CA5, COR5, a tapered segment CT5 and an upper arcuate segment CR5 with a reduced diameter neck 254.

In the final and sixth necking die 130F is shown in FIG. 11, where the transition zone 260 above a lower cylindrical surface portion 202f, includes a first lower arcuate surface segment OR6 having an external radius of about 0.180 inch which merges with a flat tapered portion T6 that defines an angle of about 20° and a second arcuate surface segment R6 that has an external radius of about 0.220 inch which merges with a reduced diameter surface 264.

14

In the sixth necking operation, the reduced diameter portion 264 of the die reduces the cylindrical neck by about 0.050 inch while the necked-in portion is reformed to its final configuration, illustrated in FIG. 14, to be described later. The final reduction is illustrated in FIG. 16(e) wherein the tapered portion 265 has a first arcuate segment CA6, COR6, a tapered portion CT6 and a second arcuate segment CR6 below a reduced cylindrical neck 266. It will be noted that the entire tapered segment CT6 is reformed inwardly from the position shown in dotted line to that shown in solid line.

Thus, the necking operation forms a smooth tapered necked-in portion between the container side wall and the reduced diameter cylindrical neck. This necked-in portion or taper includes a first arcuate segment integral with the side wall and a second arcuate segment integral with the reduced cylindrical neck. During the necking operation, the neck, comprising the reduced diameter cylindrical neck and the necked-in portion, is formed in segments while the axial dimension is increased and the cylindrical neck is further reduced in diameter and in axial length while a rounded shoulder is formed at the end of the side wall. At the same time, a straight tapered wall section or segment is created in the necked-in or tapered portion.

In each of the six necking operations, the principal forces applied to the neck of the container, which includes the tapered or necked-in portion are radially inwardly-directed forces and therefore the metal is primarily compressed and localized bending is minimized. The tapered portion is allowed to determine its profile because it is not constrained by the die below the contact area and is thus not dependent on the configuration of the lower portion of the transition zone of the die. Of course, the forming sleeve or element 150 will direct the upper edge of the container 16 into the annular slot defined between the forming sleeve or element and the reduced cylindrical portion of the die 130. Stated another way, the forming element 150 which engages the inner surface of the container 16 provides a guiding function or form control function.

As indicated above, the necked-in portion between the reduced diameter cylindrical wall portion and the cylindrical side wall is freely formed and its configuration does not conform to the transition zone of the die. The following tables illustrate the die dimensions and the amount of forming that takes place in each of the necking operations. In a preferred embodiment of the invention, where a 211 aluminum container is reduced to a 206 neck in six operations, the following die dimensions were used:

TABLE I

| | Die Dimensions | | | |
| --- | --- | --- | --- | --- |
| Operation | A | OR | R | T |
| I | .220 | | .120 | |
| II | .280 | | .180 | |
| III | .030 | .180 | .260 | 27 |
| IV | .058 | .058 | .298 | 25 |
| V | — | .180 | .230 | 20 |
| VI | — | .180 | .220 | 20 |

These dimensions are the actual dimensions in inches and degrees utilized in the transition zone of the die where A is the internal radius of the first lower arcuate segment surface, R is the radius of the second upper arcuate surface segment and T is the angle of the tapered surface therebetween, while OR is the external

Crown Packaging Technology v. Rexam Beverage Can 05-608

15                                    4,774,839                                    16

radius of the upper portion of the first arcuate segment surface. These dies produced a neck having the following dimensions in inches and degrees:

### TABLE II

| Operation | Can Dimensions | | | |
|---|---|---|---|---|
|  | CA | CR | COR | CT |
| I | .29 | .33 | | |
| II | .24 | .22 | | |
| III | .21 | .38 | | |
| IV | .20 | .49 | .64 | |
| V | .23 | .31 | .28 | 21 |
| VI | .12 | .37 | .25 | 21 |

where CA is the radius of the first lower arcuate segment, CR is the radius of the second upper arcuate segment, COR is the external radius of the upper portion of the first arcuate segment and CT is the angle of taper between the arcuate segments.

It can be seen that the second or upper arcuate segment CR, which is the upper part of the necked-in portion, is reformed in each subsequent necking operation while the tapered portion is enlarged. At the same time, the first arcuate segment CA, while not being positively reformed by the die, will have a change in its radius of curvature due to a free forming resulting from the inherent spring back characteristics of the metal. It should be noted that the dies in the third and fourth operations have flat tapered surfaces T but that the tapered wall segment CT is not formed in the container until the fifth and sixth necking operations. This is believed to result from the free forming of the necked-in portion rather than conforming the necked-in portion to the die. The necking operation causes a thickening of the metal which is greatest adjacent the upper open end where a flange is formed. This strengthens the flange and minimizes flange cracks.

The finished 206-neck on the upper end of a 211-cylindrical side wall of the container is shown in enlarged view in FIG. 14 wherein a first arcuate segment 280 is formed on the end of the cylindrical side wall 282, a straight smooth flat inwardly-tapered segment 284 is formed on the end of the arcuate segment 280 and a second arcuate segment 286 merges with the reduced cylindrical neck portion 288 of the container. In the final configuration, shown in FIG. 14, the first or lower arcuate segment 280 is essentially a compound curve that has a first arcuate segment having an internal radius R7 and a second arcuate segment having an external radius R8. The final radius R7 in the embodiment described is preferably on the order of about 0.119 inch, while the external radius R8 is on the order of about 0.253 inch. The tapered flat segment 284 defines an angle of about 20°±1 with respect to the center axis of the container or a plane extending parallel to the side wall 282 while the external radius R9 of the second arcuate segment is about 0.371 inch.

An outwardly-directed flange 290 is then formed on the reduced neck by the flanging module 36, which may be of the type disclosed in U.S. Pat. No. 3,983,729.

The container produced by the die necking method described above has improved crush resistance and strength because the metal in the neck of the container is thicker due to the radial compression of the metal therein.

The container neck made in accordance with the invention also has better symmetrical geometry when compared to spin necked containers produced by presently-known commercial spin-necking operations because the container is devoid of the ridges produced in the neck during the spin forming process. The die-necked container also has less symmetrical distortion and flanges of more consistent width. The die-necked smooth-tapered wall and its inclination gives the container greater crush resistance and column strength when compared with spin necked containers.

The die-necking method of the invention also eliminates deterioration of the coating or label which is usually applied before the necking operation is performed. The necked-in container also is devoid of any scratches as compared to a spin-necked container. The smooth-tapered necked-in portion can also be used as part of the label.

A slightly modified neck profile is illustrated in FIGS. 19–21 wherein the necked-in portion of the neck is of a different configuration than that shown in FIGS. 16–18 to produce a shorter neck on a 211-container which thereby increases the fill capacity. In this embodiment, a 211-container is necked down to a 206-diameter in six necking operations producing substantially equal reductions using necking dies and form control members similar to those described above but having different configurations.

The following table shows the die dimensions of the six dies used in forming a 206-neck, shown in FIG. 21, on a 211-aluminum container wherein FSR is the radius of the lower arcuate surface segment of the die, SSR is the radius of the upper arcuate surface segment, NSD is the diameter of the reduced diameter neck surface and T is a reference angle of the tapered surface between the two segments, while S is the spacing between the centers of the two radii.

### TABLE III

| OP | Die Dimensions | | | | |
|---|---|---|---|---|---|
|  | FSR | SSR | S | T | NSD |
| I | 0.280 | 0.200 | 0.173 | | 2.529 |
| II | 0.280 | 0.260 | 0.244 | | 2.479 |
| III | 0.250 | 0.250 | 0.291 | 28 | 2.427 |
| IV | 0.250 | 0.240 | 0.345 | 28 | 2.375 |
| V | 0.250 | 0.260 | 0.396 | 28 | 2.323 |
| VI | 0.250 | 0.260 | 0.429 | 28 | 2.273 |

FIGS. 19(a) through 19(e) shows the radial compression of the neck in each of the necking operations wherein the first or lower arcuate segment is identified by the reference CFSR, the upper or second arcuate segment is identified by the reference CSSR, all expressed in inches, while the taper angle between the arcuate segments is identified by reference CT in degrees.

Thus, the configuration of the neck after the first necking operation is illustrated in dotted line in FIG. 19(a), while the solid line therein shows the neck configuration after the second necking operation. FIGS. 19(b), 19(c), 29(d) and 19(e) show the same sequence for the next four sequential necking operations while the following table shows the respective container dimensions in inches:

### TABLE IV

| OPERATION | Can Dimensions | | | |
|---|---|---|---|---|
|  | CFSR | CSSR | CS | CT |
| I | 0.28 | 0.25 | 0.19 | 20° |
| II | 0.32 | 0.35 | 0.28 | 23° |
| III | 0.23 | 0.23 | 0.29 | 24° |
| IV | 0.25 | 0.31 | 0.36 | 26.5° |
| V | 0.25 | 0.35 | 0.38 | 26°, |

4,774,839

17

### TABLE IV-continued

| OPERATION | Can Dimensions | | | |
|---|---|---|---|---|
| | CFSR | CSSR | CS | CT |
| VI | 0.23 | 0.30 | 0.43 | 26° |

The finished necked and flanged container is illustrated in FIG. 21 and includes a cylindrical side wall 300 having a first or lower arcuate portion 302 which has a radius CFSR of about 0.23 inch that merges with an inwardly-smooth tapered portion 304 which defines an angle of about 26°±2°. The upper or second arcuate segment 306 has a radius CSSR of about 0.30 inch which merges with the reduced cylindrical neck 307 that has the flange 308 formed on the upper free end thereof. The spacing CS, between the centers of the radii of the two arcuate segments is about 0.43 inches.

As in the previous embodiment, the lower arcuate segment is minimally freely reformed in the six necking operations while the upper part of the necked-in portion, including the second arcuate segment, is repeatedly reformed and integrates with a previously-formed portion to produce the smooth inwardly-tapered flat segment between the arcuate segments of the necked-in portion.

The neck of the container again is devoid of any marks or scratches and the tapered portion is suitable for use as part of the label that is usually applied to the container prior to the necking operation.

In the embodiment illustrated in FIGS. 19–21, the necking is done in equal increments in the six necking operations and the initial forming of the portion of the container that has the neck formed therein has been omitted. However, in certain instances, the initial forming operation described in connection with FIG. 6 can be utilized. This, to some measure, will be dependent upon the condition of the containers received by the necking system. Of course, the specific configuration of the tapered portion of the neck can be changed to any desired profile by proper selection of die dimensions and operations.

The system has great flexibility in that a "211" container can be necked to a "209" diameter, a "207.5" diameter or a "206" diameter merely by eliminating stations. For example, a "209" diameter neck can be produced on a "211" diameter container utilizing only the first and second necking operations, illustrated in FIGS. 6 and 7. A "207.5" necked container can be produced with the four necking dies illustrated in FIGS. 6–9 and a "206" necked container can be produced with the six dies illustrated in FIGS. 6–11. This can be performed in the die necking system disclosed by replacing the appropriate necking cam segments with dwell cam segments, as explained in U.S. Pat. No. 4,519,232. Alternatively, selected necking station modules could be by-passed, if desired.

The use of two additional modules can produce a "204" diameter neck utilizing two additional necking dies. Further reductions to a "202" or a "200" diameter or less can be produced utilizing additional necking dies. Also, the system can be used to produce triple or quad necked-in portions as disclosed in U.S. Pat. No. 4,519,232.

As mentioned above, the number of necking dies can be varied and the amount of reduction in each operation can be changed without departing from the spirit of the invention. For example, it is possible to reduce a "211" can down to a "206" diameter neck utilizing, for exam-

18

ple, five die necking operations. The containers that are necked could also be initially smaller in diameter, such as, for example, a "209" or smaller diameter. When necking a "209" or smaller diameter container, the dies in the necking modules are changed to accommodate the different size of container, and to produce the desired reductions in each of the necking modules.

Although the invention has been described in terms of a preferred embodiment, it will be apparent that various modifications may be made without departing from the true spirit and scope thereof, as set forth in the following claims.

We claim:

1. A method of necking an open end of a container side wall to form a smoothly-shaped neck profile comprising the steps of:

(a) producing relative axial movement between a container and a first necking die to engage the external surface of a portion of the open end of the container with said first die at a small acute angle to compress said side wall radially inwardly along a length of said container to produce a reduced cylindrical neck at said open end and form a first taper having a first arcuate segment on the end of said side wall and a second arcuate segment on the end of said reduced cylindrical neck;

(b) removing said container from said first necking die;

(c) producing relative axial movement between a second necking die to engage the external surface of the container with the second die at an acute angle to further compress said reduced cylindrical neck inwardly along a length of the container and form a second taper; and,

(d) forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper to produce an enlarged smoothly-shaped necked-in profile.

2. A method of die necking as defined in claim 1, wherein said second arcuate segment is reformed as a part of said second taper on said first taper whereby the two tapers combine and blend into a smooth neck profile.

3. A method of die necking as defined in claim 2, including the further step of allowing the second taper to freely integrate with the first taper.

4. A method of die necking as defined in claim 3, wherein said tapered neck profile is a curvilinear profile extending upwardly and inwardly from said container.

5. A method of die necking as in claim 1, further comprising the steps of forming necked-in profile by a series of die elements with each die element forming only a part of the neck profile, and the part formed by each die element partially integrates and blends with the portion formed by a preceding die element, and in which the neck profile is axially enlarged by each of said die elements.

6. A method of die necking as defined in claim 1, further comprising the steps of initially reforming the open end of said container to improve imperfections (a) in the wall of the container; (b) in the concentricity of the container; and, (c) irregularities on the surface and edge of the container.

7. A method of die necking as defined in claim 6, further comprising the step of reforming said container by means of a floating form control member.

19                    4,774,839                    20

8. A method of die necking as defined in claim 7, wherein a minimum of four die elements operate on the container after said reforming step to successively engage four limited sections thereof and form the neck profile.

9. A method of die necking as defined in claim 8, in which the tapered portion includes said first arcuate segment on the end of said wall having an internal radius, a smooth tapered inwardly-inclined portion and said second arcuate segment having an external radius at between said inclined portion and said reduced cylindrical neck.

10. A method of necking as defined in claim 9, in which said first arcuate segment has an arcuate portion having an external radius on an upper portion integral with said smooth tapered, inwardly-inclined portion.

11. A method of necking an open end of a cylindrical metal container to produce a reduced diameter generally cylindrical portion above a cylindrical side wall through a smooth shaped portion comprising the steps of (a) forming a reduction in portion on the end of the cylindrical side wall and a reduced diameter cylindrical portion adjacent said open end with the necked-in portion having a first segment contiguous with said cylindrical side wall and a second segment contiguous with said reduced diameter portion; and, (b) reforming only an upper part of the necked-in portion including the second segment and the reduced diameter cylindrical portion to decrease the diameter and length of the reduced diameter cylindrical portion and increase the axial length of the necked-in portion while further compressing the metal therein.

12. A method as defined in claim 11, including the further step of further reforming an upper portion of the necked-in portion and reduced diameter portion in a subsequent necking operation to form a smooth frusto-conical tapered portion extending at a predetermined angle inwardly from the cylindrical side wall.

13. A method as defined in claim 12, in which said first segment includes a rounded annular shoulder between said cylindrical side wall and said smooth frusto-conical tapered portion.

14. A method as defined in claim 12, in which said upper portion of the necked-in portion and said reduced diameter portion are further reformed to increase the axial length of the necked-in portion while reducing the diameter and length of said reduced diameter portion.

15. A method as defined in claim 12, in which said predetermined angle is less than 30°.

16. A method as defined in claim 15, in which said predetermined angle is about 21°.

17. A method as defined in claim 15, in which said predetermined angle is about 26°.

18. A method as defined in claims 14, 15, 16 or 17, in which said upper portion of the necked-in portion and said reduced diameter neck are reformed in three further reforming steps to produce a necked-in portion having a first arcuate segment on the end of said cylindrical side wall, a smooth frusto-conical tapered portion defining said predetermined angle and a second arcuate segment on said reduced diameter neck.

19. A method as defined in claim 18, in which said reduced diameter neck is reduced in substantially equal increments in each of said three further reforming steps.

20. A method of necking an open end of a thin-walled cylindrical container to produce a reduced cylindrical neck merging with a cylindrical side wall through a necked-in portion comprising the steps of engaging an outside surface of the container with a first necking die having a first cylindrical wall surface substantially equal in diameter to said cylindrical side wall and a second cylindrical wall surface of a lesser diameter than said first cylindrical wall surface with an intermediate wall surface between said first and second cylindrical wall surfaces to produce said necked-in portion, said intermediate wall surface having a first arcuate annular surface segment at the end of said first cylindrical wall surface and a second arcuate annular surface segment at the end of said second cylindrical wall surface and engaging an inside surface of said container with a floating form control member including a forming element mounted for radial flowing movement on a body which is mounted for radial floating movement on a support to produce a reduced cylindrical neck that is confined between said first necking die and said form control element to minimize any irregularities in wall thickness and concentricity in said reduced cylindrical neck while a necked-in portion is formed between the side wall and reduced cylindrical neck and has first and second segments between said side wall and said reduced cylindrical neck.

21. A method of necking as defined in claim 20, including the further step of engaging said outside surface with a second necking die to reform at least an upper portion of said necked-in portion and increase the axial length thereof and reduce the diameter and length of said reduced cylindrical neck.

22. A method of necking as defined in claim 21, including the further step of engaging said inner surface with a second floating form control member to confine said reduced cylindrical neck between said form control member and said second necking die.

23. A method of necking as defined in claim 22, including the further step of engaging said outer surface with a third necking die having a smooth frusto-conical tapered annular surface segment having a predetermined included angle with respect to a plane extending through said side wall between said first and second arcuate surface segments and a reduced diameter cylindrical neck surface to produce a tapered necked-in portion having a first arcuate segment on the end of said side wall and a second arcuate segment on the end of said reduced cylindrical neck and an inclined portion therebetween.

24. A method of necking as defined in claim 23, in which said first segment of said necked-in portion is freely reformed without any contact by said third necking die to produce a rounded shoulder on the end of said side wall.

25. A method as defined in claim 23, including the further step of engaging said outer surface with a fourth necking die to reform an upper portion of said inclined portion and said second arcuate segment while increasing the axial length thereof and reducing the axial length and diameter of said cylindrical neck.

26. A method as defined in claim 25, including the further step of engaging said outer surface with a fifth necking die to reform at least said second arcuate segment while increasing the axial length of said inclined portion and reducing the axial length and diameter of said cylindrical neck.

27. A method as defined in claim 26, including the further step of engaging said outer surface with a sixth necking die to reform and enlarge said second arcuate segment and said inclined portion while increasing the

4,774,839

21

axial length thereof and reducing the axial length and diameter of said cylindrical neck.

28. A method as defined in claim 27, in which the container formed by said method has a first arcuate segment which includes a first arcuate portion and a second arcuate portion on the end of said side wall.

29. A method as defined in claim 28, in which said inclined portion defines frusto-conical tapered annular flat segment having an inward taper of about 21°.

30. A method as defined in claim 27, in which said inclined portion defines a frustoconical tapered annular flat segment having an inward taper of about 26°.

31. A method of necking as defined in any of claims 28–30, in which said necking die is fixed and said floating form control member is mounted for radial floating movement in said die and has a forming element mounted for floating radial movement thereon to accommodate centering in said container.

32. Necking apparatus for producing a reduced cylindrical neck portion and a smooth inwardly-taped necked-in portion adjacent an open end of a metal container side wall comprising a plurality of substantially identical necking turrets respectively rotatable about fixed axes with each turret having a plurality of substantially identical necking substations on the periphery thereof, each necking substation including an annular necking die, a form control member, a container support means spaced from and aligned with said necking die for supporting a container and means on respective turrets for producing relative movement between said necking dies, said form control members in at least a first one of said turrets including a main body mounted for radial movement on a support and forming element mounted for radial floating movement on said main body and engaging an inner surface of said container and the necking dies in said first turret having a first cylindrical surface portion having a diameter substantially equal to the diameter of the container and a second cylindrical surface portion of reduced diameter and a transition surface therebetween to radially compress said metal adjacent said open end and produce a reduced cylindrical neck and a necked-in portion having a first arcuate segment on the end of said reduced cylindrical neck, and in which the necking dies in each of the succeeding turrets have transition surfaces configured to reshape the necked-in portion and increase the axial dimension thereof and have progressively reduced diameter second cylindrical surfaces to progressively decrease the diameter and length of the reduced diameter neck while further compressing the metal therein.

33. Necking apparatus as defined in claim 32, in which said dies in a third and succeeding turrets have a straight tapered annular surface between a first cylindrical surface portion and a second reduced cylindrical surface to produce an inclined portion in said necked-in portion between said arcuate segments.

22

34. Necking apparatus as defined in claim 33, in which there are six turrets with transfer wheels between each pair of turrets and synchronized drive means for all of said turrets and transfer wheels to said second arcuate segment and said inclined portion are reformed to produce a smooth frusto-conical inclined portion between said arcuate segments.

35. Necking apparatus as defined in claim 33, in which the necking dies of succeeding turrets have transition surfaces that prevent engagement with at least said first arcuate segment to allow independent free forming of said first arcuate segment without being constrained by the die surface.

36. Necking apparatus as defined in claim 32, in which the form control members in a second of said turrets have floating forming elements.

37. Necking apparatus as defined in claim 32, in which the form control members in all of said turrets have floating forming elements engaging the inner surface of said container.

38. Necking apparatus as defined in claim 32, in which said necking dies are fixed on said turrets and in which said form control members and said container support means are moved relative to said necking dies to freely form the metal of the containers in the necking dies.

39. Necking apparatus as defined in claim 38, in which said form control members are moved at a velocity greater than the velocity of said container support means.

40. Necking apparatus as defined in claim 39, in which said means for producing relative movement includes face cam means and in which said face cam means are segmented for ease in removal and replacement.

41. Necking apparatus as defined in claim 40, in which said face cam means include a first cam for moving said container support means and a second cam for moving said form control members and in which said first and second cams are segmented.

42. Necking apparatus as defined in claim 39, in which the velocity of said container support means is reduced as the container edges engage the necking dies to allow the container to be centered in the necking die and the form control member centered in the container.

43. A form control member for use in necking a container comprising a plunger having a main body supported for radial floating movement thereon, said main body having a circular reduced diameter portion at one end with an external diameter thereon, a forming element received on said reduced diameter portion and having an internal diameter greater than the external diameter of reduced diameter portion to accommodate radial floating movement of said forming element on said main body and said main body and forming element can move radially on said plunger to produce a double floating action for said forming element on said plunger.

* * * * *

REX000904
A020

UNITED STATES PATENT OFFICE

CERTIFICATE OF CORRECTION

PATENT NO. : 4,774,839

DATED : October 4, 1988

INVENTOR(S) : Antonio Caleffi, T. William Ames, Edward S. Traczyk, Dietrich K. Naggert

It is certified that error appears in the above–identified patent and that said Letters Patent are hereby corrected as shown below:

Column 4, line 41, delete "ofthe" and insert --of the--.

Column 21, line 34, after "and" insert --a--.

Column 22, Claim 34, should be amended as follows:

-- 34.  Necking apparatus as defined in Claim 33, in which there are six turrets with transfer wheels between each pair of turrets and synchronized drive means for all of said turrets and transfer wheels[ to said second arcuate segment and said inclined portion are reformed to produce a smooth frusto-conical inclined portion between said arcuate segments]. --

Signed and Sealed this

Twenty-eighth Day of February, 1989

Attest:

DONALD J. QUIGG

Attesting Officer          Commissioner of Patents and Trademarks

US005697242A

# United States Patent [19]

## Halasz et al.

[11]  Patent Number:  **5,697,242**

[45]  Date of Patent:  *Dec. 16, 1997

[54] **METHOD AND APPARATUS FOR REFORMING CAN BOTTOM TO PROVIDE IMPROVED STRENGTH**

[75] Inventors: **Andrew Halasz**, Crystal Lake; **Sylvan Praturlon**, Oak Park; **Paul Azzaline**, Crystal Lake; **Christopher Caliendo**, Wood Dale, all of Ill.

[73] Assignee: **American National Can Company**, Chicago, Ill.

[*] Notice: The term of this patent shall not extend beyond the expiration date of Pat. No. 5,222,385.

[21] Appl. No.: **670,324**

[22] Filed: **Jun. 25, 1996**

### Related U.S. Application Data

[62] Division of Ser. No. 563,900, Nov. 22, 1995, abandoned, which is a continuation of Ser. No. 343,837, Nov. 23, 1994, abandoned, which is a continuation of Ser. No. 212,647, Mar. 3, 1994, abandoned, which is a continuation of Ser. No. 50,526, Apr. 20, 1993, abandoned, which is a continuation of Ser. No. 735,994, Jul. 25, 1991, Pat. No. 5,222,385, which is a continuation-in-part of Ser. No. 730,794, filed as PCT/US90/00451, Jan. 26, 1990, Pat. No. 5,349,837

[51] Int. Cl.$^6$ .................................. B21D 51/26
[52] U.S. Cl. ..................... 72/117; 72/379.4
[58] Field of Search ................ 72/111, 110, 94, 72/117, 122, 123, 124, 125, 379.4; 413/69

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 994,468 | 6/1911 | Kane . |
| 1,031,264 | 7/1912 | Hinde et al. . |
| 1,641,674 | 1/1923 | Foster et al . |
| 1,461,729 | 7/1923 | Foster et al . |
| 2,158,312 | 5/1939 | Terrell |
| 3,417,898 | 12/1968 | Bozek et al . |
| 3,693,828 | 9/1972 | Kneusel et al . |
| 3,904,069 | 9/1975 | Toukmanian |
| 3,905,507 | 9/1975 | Lyu |
| 3,942,673 | 3/1976 | Lyu et al . |

| | | |
|---|---|---|
| 4,108,324 | 8/1978 | Krishnakumar et al . |
| 4,120,419 | 10/1978 | Saunders . |
| 4,134,354 | 1/1979 | Cvacho et al |
| 4,147,271 | 4/1979 | Yamaguchi . |
| 4,151,927 | 5/1979 | Cvacho et al |
| 4,199,073 | 4/1980 | Gombas . |
| 4,280,353 | 7/1981 | Murphy |
| 4,289,014 | 9/1981 | Maeder et al. . |
| 4,294,097 | 10/1981 | Gombas . |
| 4,294,373 | 10/1981 | Miller et al . |
| 4,341,321 | 7/1982 | Gombas . |
| 4,372,143 | 2/1983 | Elert et al. |
| 4,381,061 | 4/1983 | Cerny et al |
| 4,402,419 | 9/1983 | MacPherson . |
| 4,412,627 | 11/1983 | Houghton et al. . |
| 4,419,319 | 12/1983 | Reynolds, Jr. et al. . |
| 4,454,742 | 6/1984 | Gombas . |
| 4,470,281 | 9/1984 | Kaporovich et al . |
| 4,515,284 | 5/1985 | Lee, Jr. et al. . |

(List continued on next page.)

*Primary Examiner*—Lowell A. Larson
*Attorney, Agent, or Firm*—Wallenstein & Wagner, Ltd.

[57]                 **ABSTRACT**

A method and apparatus for reforming a bottom of a drawn and ironed beverage container is disclosed. The container has a longitudinal axis and a side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion and a preformed bottom wall. The preformed bottom wall includes a center domed portion. The bottom further has an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion. The apparatus comprises a roller movable from an inward position where the roller does not contact the annular, substantially longitudinal wall to an outward position where the roller contacts the annular, substantially longitudinal wall, and a movable actuator to move the roller into engagement with and circumferentially about the annular, substantially longitudinal wall. The movable actuator moves the roller into engagement with the annular, substantially longitudinal wall to reform the substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of the container.

22 Claims, 10 Drawing Sheets



**5,697,242**
Page 2

---

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,598,831 | 7/1986 | Nakamura et al. . |
| 4,620,434 | 11/1986 | Pulciano et al |
| 4,650,628 | 3/1987 | Evely |
| 4,685,582 | 8/1987 | Pulciani et al. . |
| 4,717,523 | 1/1988 | Evely |
| 4,722,215 | 2/1988 | Taube et al. . |
| 4,732,292 | 3/1988 | Supik |
| 4,768,672 | 9/1988 | Pulciani et al. . |
| 4,834,256 | 5/1989 | McMillin . |
| 4,885,924 | 12/1989 | Claydon et al. . |
| 4,919,294 | 4/1990 | Kawamoto et al. . |
| 4,953,738 | 9/1990 | Stirbis . |
| 5,016,463 | 5/1991 | Johansson et al. . |
| 5,024,077 | 6/1991 | Bulso, Jr. et al. . |
| 5,069,052 | 12/1991 | Porucznik et al. . |
| 5,105,973 | 4/1992 | Jentzsch et al. . |
| 5,111,679 | 5/1992 | Kobayashi et al. . |
| 5,222,385 | 6/1993 | Halasz et al. ........................ 72/117 |
| 5,253,500 | 10/1993 | Willoughby . |
| 5,341,667 | 8/1994 | Loc, Jr. . |
| 5,372,028 | 12/1994 | Brilman et al. . |
| 5,433,098 | 7/1995 | Bowlin et al. . |
| 5,467,628 | 11/1995 | Bowlin et al. : |

A023



FIG. 1

FIG. 3

FIG. 2

A024

# FIG. IA



A025

# FIG. 4



# FIG. 5



# FIG. 6



# FIG. 7





FIG. 8

FIG. 9

FIG. 10

A028

## FIG. II



## FIG. I2



FIG. 13



FIG. 14



FIG. 15





FIG. 16

FIG. 18

FIG. 17

A031

# FIG. 19



FIG.20



FIG.21



FIG.22



A033

5,697,242

1

## METHOD AND APPARATUS FOR REFORMING CAN BOTTOM TO PROVIDE IMPROVED STRENGTH

### RELATED APPLICATIONS

This is a divisional application of U.S. application Ser. No. 08/563,900, filed Nov. 22, 1995, now abandoned, which is a continuation of U.S. application Ser. No. 08/343,837, filed Nov. 23, 1994, now abandoned, which is a continuation of U.S. application Ser. No. 08/212,647, filed Mar. 3, 1994, now abandoned, which is a continuation of U.S. application Ser. No. 08/050,526, filed Apr. 20, 1993, now abandoned, which is a continuation of U.S. application Ser. No. 07/735, 994, filed Jul. 25, 1991 (now U.S. Pat. No. 5,222,385) which is a continuation-in-part of U.S. application Ser. No. 07/730, 794, filed Jul. 24, 1991 (now U.S. Patent No. 5,349,837), which is in turn based upon International Application No. PCT/US 90/00451, having an International filing date of Jan. 26, 1990.

### TECHNICAL FIELD

The invention relates generally to a method and apparatus for reforming the bottoms of drawn and ironed beverage containers (or cans). The reformed can bottom is an integral part of beer and beverage cans, and increases the strength of those cans above that of prior art cans.

### BACKGROUND OF THE INVENTION

Drawn and ironed cans are among the most widely used cans for carbonated beverages, including such beverages as beer and soft drinks. Such drawn and ironed cans are made from a disc of stock material which is converted into a shallow "cup" with short side walls. The base of this cup ultimately forms the bottom of the can, and the short side walls of the cup become the elongated side walls of the can.

The shallow cup is passed through a succession of ironing rings. As the spacing between successive rings becomes increasingly narrow, passage of the cup through these successive rings decreases the thickness and increases the height of the side walls.

The configuration of the bottom of such drawn and ironed cans has, over the last several years, been a topic of interest to both can manufacturers, packagers, shippers, retailers and the ultimate consumer who purchases products in such cans. This is because the configuration of the bottom is a factor in the ability of the can to resist its internal pressures and achieve adequate columnar strength. These internal pressures result from the weight, pressurization and carbonation of the liquids in the can. Columnar strength is the ability of a can to resist axial loads imposed by cans that are stacked upon other cans, as during transport and storage.

Can manufacturers are constantly striving to obtain high strength with relatively low weight. Generally, however, these goals are incompatible. Low weight, and a lowering of material cost, is generally achieved by reducing the thickness of the stock material. A reduction in stock material thickness, without more, lowers the strength of the can. Retailers and consumers desire a container which is stackable and which is of the lowest possible weight for ease in handling.

The bottom shape of the container has been found to be of importance in determining its strength. Issued U.S. patents disclosing this importance include U.S. Pat. No. 4,685, 582, issued to Pulciani et al. on Aug. 11, 1987, and entitled "Container Profile With Stacking Feature." This patent,

2

which is assigned to the assignee of the present invention, discloses a so-called ANC-1A container having an inverted dome-shaped bottom. Other U.S. patents are also generally relevant. For example, U.S. Pat. Nos. 3,904,069, 3,979,009 and 4,412,627 disclose containers having bottom wall constructions designed to permit selected and controlled outward flexing or bulging of the bottom wall when the container is sealed and subjected to internal pressures developed by the contents.

Reforming of the bottom wall of a container of the general type described in this application has also been described in an International Publication to Metal Box plc. This publication is International Publication Number WO 83/02577, published on Aug. 4, 1983. This reforming takes place by applying a roller along the exterior transition wall 7 of the bottom of the container, rather than along its interior. See International Publication Number WO 83/02577, FIG. 7.

### SUMMARY OF THE INVENTION

It is an object of the invention to provide an apparatus for reforming a bottom of a drawn and ironed beverage container. The container has a longitudinal axis and a side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion, and an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion.

In accordance with the present invention, the apparatus comprises a roller movable from a radially inward position where the roller does not contact the annular, substantially longitudinal wall to a radially outward position where the roller contacts the annular, substantially longitudinal wall, and a movable actuator to move the roller into engagement with and circumferentially about the annular, substantially longitudinal wall to reform the substantially longitudinal wall.

It is comprehended that the movable actuator moves the roller into engagement with the annular, substantially longitudinal wall to reform the substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of the container.

It is further comprehended that the apparatus includes a plurality of rollers. Each of the rollers is movable from a radially inward position where the rollers do not contact the annular, substantially longitudinal wall to a radially outward position where the rollers contact the annular, substantially longitudinal wall.

It is still further comprehended that the apparatus includes a radially inward support for the container. The radially inward support may comprises a jig supporting the container in opposition to the rollers along a lower end of the container. For example, the jig may have a bottom peripheral profile portion substantially corresponding in shape to the outer annular wall of the container, such that the bottom peripheral profile portion of the jig is mated with the outer annular wall of the container.

It is a further object of the invention to provide a method of reforming a bottom of a drawn and ironed container. The container has a longitudinal axis and a generally cylindrical side wall parallel with the longitudinal axis. The bottom has an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, an annular, substantially longitudinal wall joining the domed portion and the convex U-shaped portion.

In accordance with the invention, the method comprises providing the drawn and ironed container, providing a

5,697,242

3

reforming roller, and moving the reforming roller radially into engagement with the substantially longitudinal wall. The reforming roller rotates along the longitudinal wall and circumferentially about an arcuate path, wherein the reforming roller affects the angle of the substantially longitudinal wall.

It is comprehended that the reforming roller affects the angle of the substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of the container.

It is further comprehended that a radial inward support for the container is provided. The radial inward support may include supporting the container in a jig which supports the container along a lower end of the container. For example, the jig may include a bottom peripheral profile portion substantially corresponding in shape to the outer annular wall of the container, and the bottom peripheral profile portion of the jig mates with the outer annular wall.

Other features and advantages of the invention will be apparent from the following specification taken in conjunction with the following drawings

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a top view of a pivoting apparatus in accordance with the invention, and in a radially inward, non-engaging position.

FIG. 1A is a view of the apparatus of FIG. 1, but with the rollers in a radially outward position and engaging the wall of a container.

FIG. 2 is a side-sectional view of the apparatus of FIG. 1, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 3 is a detail of a portion of the apparatus of FIG. 2, showing the pivot pin about which the roller pivots.

FIG. 4 is a top view of a second pivoting embodiment of the apparatus in accordance with the invention.

FIG. 5 is a side-sectional view of the apparatus of FIG. 4, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 6 is a top view of a third pivoting embodiment of the apparatus in accordance with the invention.

FIG. 7 is a side-sectional view of the apparatus of FIG. 6, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 8 is a side perspective view of a container which is suitable for treatment by the process and apparatus of the invention.

FIG. 9 is an enlarged view of the lower left hand corner of the container of FIG. 8, prior to reforming.

FIG. 10 is an enlarged view of the lower left hand corner of the container of FIG. 8, after reforming.

FIG. 11 is a top view of a non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 12 is a side-sectional view of the apparatus of FIG. 11, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 13 is a top view of a second non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 14 is a side-sectional view of the apparatus of FIG. 13, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

4

FIG. 15 is a detail of the roller and bearing of FIG. 14, taken along lines 15—15 of FIG. 13.

FIG. 16 is a top view of a third non-pivoting embodiment of the apparatus in accordance with the invention.

FIG. 17 is a side-sectional view of the apparatus of FIG. 16, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 18 is a detail of the actuator and dovetail slide portion of a portion of the apparatus of FIG. 16, taken along lines 18—18 of FIG. 16.

FIG. 19 is a side-sectional view of a fourth non-pivoting apparatus in accordance with the invention, including a single roller, and with a container shown in solid lines above the apparatus and in phantom lines in place for processing by the apparatus.

FIG. 20 is a photographic profile of a cross-section of a lower portion of a can reformed by a prior art process.

FIG. 21 is a photographic profile of a cross-section of a lower portion of a can reformed by the process of the present invention.

FIG. 22 is a photographic profile of a cross-section of a lower portion of a "control" can prior to reforming.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

This invention is susceptible of embodiment in many different forms. The drawings and this specification show a preferred embodiment of the invention. It will be understood, however, that this disclosure is to be considered an exemplification of the principles of the invention. The inventors do not intend to limit the broadest aspect of the invention to the illustrated embodiments.

According to one aspect of the invention, the performance characteristics of a container formed by normal drawing and ironing procedures are improved by reforming the bottom end wall of the container from the initial configuration. This initial configuration is disclosed in the above-mentioned '582 patent and is shown in FIG. 8.

As described and shown in FIGS. 9 and 10 of copending International Application No. PCT/US 90/00451, after the fluted container has been necked, flanged, internally spray coated and externally printed, the bottom profile or countersink area of the bottom wall is reshaped. This is done by reforming the inner wall of the countersink to further improve buckle resistance and decrease can growth.

In the prior co-pending application, the finished drawn and ironed container of FIG. 11 is supported in a suitable jig that has an internal opening which corresponds to the outer peripheral diameter of the container. The jig has a lower profile portion that conforms to the countersink wall portion the bottom wall of the container, as originally formed in accordance with the process disclosed in the '582 patent.

A plug is inserted into the upper end of the opening and securely held in the top of the container. During processing, this container is rotated about its axis. The bottom peripheral profile of the jig is in extended contact with the container bottom. A reforming roller is brought into engagement with the substantially vertical wall of the domed end of the container and is supported on a shaft. That shaft is designed to be rotated along an arcuate path around the center axis for the container. The roller has a peripheral configuration which defines a substantially vertical upwardly and outwardly tapered wall having a generally arcuate upper portion. The inner wall of the countersink is reformed to a more

A035

5,697,242

<table>
<tr><td>5</td><td>6</td></tr>
</table>

vertical profile while the dome is stretched to a small degree. The outer wall is held to its original configuration. Alternatively, the outer wall could also be reformed with the inner wall.

It was found in the co-pending application that this reforming operation significantly improves buckle resistance and decreases the amount of can growth, i.e., the amount that the bottom end wall is elongated when pressure is applied internally of the container.

The container produced according to the method and apparatus described in the co-pending application exhibited significantly greater column strength, i.e., resistance to crushing by vertical loads applied to the container side wall. That container also exhibited significantly less container growth during internal pressurization and improved buckle resistance. The container constructed in accordance with that invention was thus capable of being produced from stock flat disc material having a significantly reduced thickness.

The present invention is a further elaboration and refinement upon the invention described in the copending application. The invention is directed to the type of drawn or drawn and ironed container shown in FIG. 8. Such containers are well known in the art and are generally described and shown in U.S. Pat. No. 4,685,582, issued to the assignee of the present application on Aug. 11, 1987. This container 20 is symmetrical about a vertical axis 22. A generally cylindrical side wall 24 parallel with this vertical axis forms the panel on which graphics, such as a bottler's trademark, may be printed. An outer annular wall 26 forms a transitional portion between this side wall 24 and a convex, U-shaped portion 28 that defines a flange-like ridge. The outer annular wall 26 and U-shaped portion 28 enable these cans to be stacked. In particular, the bottom of a first can may be securely nested into the top of a second can.

The container 20 also includes a preformed bottom wall 30 including a center domed portion 32. An annular, substantially vertical wall 34 joins the domed portion 32 to the convex U-shaped portion 28. This "substantially vertical wall," for the purposes of this application, has an angle from the vertical of 0 to +5 degrees, and may be as high as +10 degrees. A positive angle is shown by angle C in FIG. 8.

Various kinds of apparatus may be used to effect the method of reforming container 20, as that method is described and claimed in the present application. As may be seen in FIGS. 1–3, one such apparatus includes a plurality of rollers 36. In a preferred embodiment, three rollers 36 may be used. The use of three rollers 36 has advantages over the use of fewer rollers, for example, a single roller. These rollers 36 are used to contact the annular, substantially vertical wall 34. The use of one roller would concentrate the forces transferred from the roller 36 to the wall 34 at one point. In contrast, three rollers 36 will spread the force on this wall 34 over three points.

As may be seen in FIG. 2, each of these rollers 36 is indirectly supported on a pivot plate 38. Securing the rollers 36 are a bearing clamp 40 and a bearing 42.

Each of the pivot plates 38 are designed to pivot around their respective pivot pin 44 (FIG. 1). In this embodiment, this pivot pin 44 is vertically disposed. As will be seen in other embodiments, however, other pivot pins may instead be horizontally disposed.

A tooling head collar 46 provides a support surface for a jig 48, or lower can support. This jig 48 is removable from the tooling head collar 46 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

Each jig 48 is manufactured so as to accommodate and support a given size container 20. Accordingly, a bottom peripheral profile portion 50 of the jig 48 substantially corresponds in shape to the outer annular wall 26 of the container 20. As will be explained below, this bottom peripheral profile portion 50 of the jig 48 is mated with the outer annular wall 26 of the container 20. In the embodiment shown in FIG. 2, it may be seen that the lowermost part 52 of this jig 48 also corresponds in shape to the radially outermost region of the convex U-shaped portion 28. In this way, the jig 48 provides greater support around the circumference of the container 20.

Supporting the bearings 42 and enclosing portions of the reforming rollers 36 are bearing housings 54. These bearing housings 54 are fixedly secured to their respective pivot plates 38. Thus, the motion of the pivot plates 38 and the bearing housings 54 is synchronous.

Movement of the pivot plates 38 and bearing housings 54 is facilitated by a vertically movable actuator ball 56. As shown in FIG. 2, this actuator ball 56 is positioned in a first, non-engaging position. In this position, the actuator ball 56 merely abuts against camming surfaces 58 on the bearing housing 54.

Upward, vertical movement urges the actuator ball 56 to a second position in which it contacts and pushes upwardly on camming surfaces 58. As a result of the shape of these camming surfaces 58, this upward movement causes the bearing housing 54 and pivot plate 38 to pivot together about the pivot pin 44 in a radially outward direction. This pivoting movement continues until rollers 36 contact the annular, substantially vertical wall 34.

The rollers 36, upon contact with this wall 34, rotate rapidly to force the wall from its configuration as shown in FIG. 9 to that shown in FIG. 10. Particularly, FIGS. 9 and 10 depict a vertical line V—V. Vertical line V—V is coincident with the vertical axis of container 20. FIG. 9 shows a container 20 before reforming. In this FIG. 9, the wall is substantially vertical and may even have a so-called "positive" angle. With reference to FIG. 9, a positive angle is one in which wall 34 angles upwardly and to the right of line V—V. An example of a positive angle appears as angle C in FIG. 9.

After contact by rollers 36, as described above, this wall 34 is reformed to achieve a negative angle A. The results of reforming are shown, for example, in FIG. 10. As a result of this negative angle, as will be described below, container 20 has enhanced physical characteristics.

In the apparatus of FIGS. 1–3, the pivot pin is substantially vertically disposed. As a result, the pivoting of the bearing housing 54 and the pivot plate 38 occur in a horizontal plane. Other embodiments, as described below, will include horizontal pivot pins, causing pivoting of the bearing housing and pivot plate in a vertical plane.

As may be seen in greatest detail in FIGS. 2 and 3, the reforming rollers 36 have a perimeter portion 60 that is downwardly tapered. It is this downwardly tapered configuration 60 which, when rollers 36 are placed against the substantially vertical wall 34, results in the reformation of that substantially vertical wall 34 to a wall having a negative angle.

After the completion of the reforming, the rollers 36 are retracted from the wall 34 and return from the position shown in FIG. 1A to the original position shown in FIG. 2. Each pivot plate 38 and bearing housing 54 assembly returns to this original position as a result of pressure from a compression spring 62.

5,697,242

7

A slight modification of the reforming apparatus described above is shown in FIGS. 4 and 5. Each of the components of the embodiments of FIGS. 1–3 are correspondingly numbered in FIGS. 4 and 5, except that the reference numerals for the corresponding components in the latter figures include the suffix "a." The only component which differs significantly is the spring. Spring 62 of FIGS. 1–3 is an extension spring, whereas spring 62a of FIGS. 4–5 is a compression spring. As a result, the apparatus of FIGS. 4–5 works in a slightly different manner than the apparatus of FIGS. 1–3. Particularly, in FIGS. 1–3, upon completion of reforming, the rollers 36 are retracted from the wall 34 and returned to their original position as a result of both applied pressure from an extension spring 62 and retraction of the actuator ball 56. In FIGS. 4–5, upon completion of the reforming, the rollers 36a are retracted from the wall 34 and returned to their original position as a result of both applied pressure from a compression spring 62a and retraction of actuator ball 56a.

Still another embodiment is shown in FIGS. 6 and 7. This embodiment also includes three rollers 64. As may be seen in FIG. 7, each of these rollers 64 is indirectly secured to a pivot plate 66. Securing the rollers 64 are a bearing clamp 68 and at least one bearing 70.

Each of the pivot plates 66 are designed to pivot around their respective pivot pin 72. As may be seen in FIG. 7, this pivot pin 72 is horizontally disposed. As a result, the pivoting of the bearing housing 74 and the pivot plate 66 occur in a vertical plane.

As in the embodiment of FIGS. 1–3, the embodiment includes a tooling head collar 76 to provide a support surface for a jig 78, or lower can support. This jig 78 is also removable from the tooling head collar 76 and may be interchanged with another jig having a different shape to accommodate containers having various different lower end configurations.

Movement of the pivot plates 66 and bearing housings 74 is facilitated by a vertically movable actuator 80. As shown in FIG. 7, this actuator 80 is positioned in a first, non-engaging position. In this position, the actuator 80 merely abuts against camming surfaces 82 on the bearing housing 74.

Upward, vertical movement urges the actuator 80 to a second position in which it contacts and pushes upwardly on camming surfaces 82. As a result, this upward movement causes the bearing housing 74 and pivot plate 66 to pivot together about the pivot pin 72 in a vertical plane and a radially outward direction. This pivoting movement continues until rollers 64 contact the annular, substantially vertical wall 34 of container 20.

After the completion of the reforming, the rollers 64 are retracted from the wall 34 and return from the position shown in the dotted lines of FIG. 7 to the original position shown the solid lines of FIG. 7. Each pivot plate 66 and bearing housing 74 assembly returns to this original position as a result of pressure from a coil spring 84. This coil spring 84 encircles and is held upon a retaining post 86. The coil spring 84 is tensioned by compressing it between the top, abutting surfaces of bearing housings 74 and hex nut 88 secured to retaining post 86.

Still other embodiments of the present apparatus are depicted at FIGS. 11–19. As will be seen, the apparatus of these embodiments does not include a pivot pin for moving the rollers into engagement with the vertical wall 34 of the container 20. In many other respects, however, these apparatus are similar to those shown in FIGS. 1–7.

8

For example, the apparatus of FIG. 11 includes three rollers 90 secured to a bearing housing 92 with a bearing 94 and a bearing clamp 96. The solid lines of FIG. 12 show these rollers in a radially inward position, where the rollers 90 do not contact the annular, substantially vertical wall 34. These rollers 90 are movable from this position to a radially outward position where the roller contacts the annular, substantially vertical wall 34.

Bearing housings 92 are spring-biased. In particular, a tensioned garter spring 98 (FIG. 12) encircles the lower periphery of bearing housings 92. In their first, non-engaging position, as shown in the dotted lines of FIG. 11, the housings 92 and their related rollers 90 are retained by the garter spring 98 in a radially inward position.

The second position of the bearing housings 92 is shown in the solid lines of FIG. 11. The housings 92 attain this position when actuator 100 is moved upwardly against camming surfaces 102 of housing 92. This upward movement of actuator 100 pushes housings 92 radially outwardly until rollers 90 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 90, the actuator 100 is withdrawn and garter spring 98 urges the bearing housings 92 back into their first position.

As in the prior embodiments, the embodiment of FIGS. 11 and 12 includes a jig 104 to support the container along a bottom peripheral profile portion 106 that substantially corresponds in shape to the outer annular wall 26 of the container 20. As in the prior embodiments, the perimeter 108 of the rollers 90 also include a downwardly tapered configuration which, when placed against the substantially vertical wall 34, reforms that wall 34 to achieve a negative angle relative to the vertical axis of the container 20.

Another three-roller, non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 13–15. In this embodiment, the spring 110 is horizontally disposed and acts along a horizontal plane. In particular, spring 110 is in contact with the bearing housing 112 to bias that housing 112 in a radially inward direction.

The apparatus of FIG. 13 also includes three rollers 114 secured to bearing housing 112 with a bearing 116 and a bearing clamp 118. These rollers 114 are movable from their first position, as shown in FIGS. 13–15, to a radially outward position where the rollers 114 contact the annular, substantially vertical wall 34 of container 20.

Upward movement of actuator 120 pushes housings 112 radially outwardly until rollers 122 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with rollers 122, the actuator 120 is withdrawn and spring 110 urges the bearing housings 112 back into their first position.

Still another non-pivoting embodiment of the apparatus of the invention is shown in FIGS. 16–18. In this embodiment, however, conventional rollers are not used. Rather, four roller segments 124 are mounted to the apparatus for radial movement towards and away from the container 20. In the dashed lines of FIG. 16, these segments 124 are shown in their normal, radially inward position. They are held in this position by a plurality of horizontally tensioned springs 126.

Each of these roller segments 124 may be secured to a housing 128. When an actuator 130 is moved vertically upwardly against camming surfaces 132, housings 128 are pushed radially outwardly, as shown in the solid lines of FIG. 16, until roller segments 124 contact the annular, substantially vertical wall 34. Upon completion of treatment of the wall 34 with roller segments 124, the actuator 130 is withdrawn and springs 126 urge the housings 128 back into their first position.

5,697,242

9

A final version of a non-pivoting embodiment of the apparatus is shown in FIG. 19. In this embodiment, only one roller is used. This roller 134 has a substantially larger diameter than the rollers of the other embodiments. In fact, the diameter of this roller 134 is in excess of 80 percent of the distance between opposite, facing walls 34. This distance is referred to as "D" in FIG. 19.

Again, this embodiment includes a compression spring 136 which acts along a horizontal plane. Spring 136 is in contact with the housing 138 to bias that housing 138 in a rightward direction. Roller 134 is movable from its first position, as shown in FIG. 19, to a radially outward position where the roller 134 contacts the annular, substantially vertical wall 34.

In the embodiment of FIG. 19, actuator 140 is vertically movable, as in the apparatus of the previously described embodiments. The actuator 140 encircles a dovetailed collar 142, and this collar 142 is fixed. Housing 138, however, is horizontally movable when it is contacted by the upwardly-moving actuator 140. The horizontal movement of the housing 138 is guided by a dovetail groove in collar 142.

Housing 138 abuts against camming surface 146. In addition, with reference to the directions depicted in FIG. 19, spring 136 biases the housing 183 to the right. Thus, housing 138 is moved to the right along the camming surface 146. This rightward movement of the housing 138 continues until the periphery of roller 134 contacts the wall 34 of container 20. Reforming takes place in the same manner as with a three-roller apparatus, but at only one point along the wall 34.

Upon completion of treatment of the wall 34 with roller 134, the actuator 140 is lowered and the weight of the housing/roller combination moves that assembly back onto the collar 142, i.e., to the first position of the device. This collar 142 acts as a limit on the downward movement of the housing 138. In this embodiment and in the others, it is preferred that the actuator 140 rotate at the same speed as housing 138.

A comparison of FIGS. 9 and 10 will disclose the differences in containers before and after bottom reforming in accordance with the method of the present invention. Particularly, FIG. 9 shows a container before bottom reforming. The wall 34 in this Figure is substantially vertical and may, in fact, have a slight positive angle. For the left portion of the container shown in FIG. 9, a wall 34 having a slight positive angle would angle upwardly and to the right from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a positive angle, diameter D1 is greater than diameter D2.

As stated above, the container of FIG. 8 that may be reformed in accordance with this invention is generally symmetrical about a vertical axis 22. The container includes a generally cylindrical side wall 24 parallel with the vertical axis 22. The container 20 also includes an outer annular wall 26, a convex U-shaped portion 28, a preformed bottom wall 30, including a center domed portion 32 and an annular, substantially vertical wall 34 joining the domed portion 32 and the convex U-shaped portion 28.

The method of the present invention may be described with reference to the apparatus of FIGS. 1–3, and comprises several steps. The container 20 is supported on a jig 48. This jig 48 has a bottom peripheral profile portion 50 substantially corresponding in shape to the outer annular wall 26 of the container 20.

The bottom peripheral profile portion 50 of jig 48 is mated with the outer annular wall 26. Reforming rollers 36 are

10

brought into engagement with the substantially vertical wall 34. The reforming rollers 36 rotate along the vertical wall 34 and about an arcuate path. Through this action, the reforming rollers 36 affect the angle of the substantially vertical wall 34. In particular, the angle of the substantially vertical wall 34 is changed to a negative angle from the vertical axis of the container 20.

As may be seen in FIG. 1A, the reforming rollers 36 of this apparatus are rotated about an arcuate path equidistant from an axis that is coaxial with the axis 22 of the container. Alternatively, as may be appreciated from a review of FIG. 19 and the above description of that figure, the reforming roller 134 of that apparatus may be rotated about an arcuate path that is equidistant from an axis that is not coaxial with the axis 22 of the container 20. This occurs because in order to contact wall 34, the roller 134 is shifted to the right of its position as shown in FIG. 19.

In one aspect of the preferred method, the roller has a peripheral configuration which, upon engagement with the substantially vertical wall, reforms the substantially vertical wall to achieve a negative angle from the vertical axis of the container. Rollers having such peripheral configurations are shown in FIGS. 2, 5, 7, 12, 14, 17 and 19.

In another aspect of the preferred method, an actuator is moved upwardly and towards the can to move a camming surface and its housing in a radially outward direction. In this way, a roller movable with the camming surface engages the substantially vertical wall.

In still another aspect of the preferred method, the roller pivots about a horizontal pivot point. In particular, the apparatus may include a horizontal pivot point about which the roller pivots from an inward non-engaging position to a radially outward position wherein the roller engages the substantially vertical wall.

After this method of bottom reforming, as may be seen in FIG. 10, the wall 34 exhibits a slight negative angle A. The preferred angle A for an ANC-2A can should be no more than approximately –4 degrees from the vertical line V—V. It is believed that enhanced container characteristics could be attained by providing wall 34 with an angle of as much as –8 to –10 degrees. For the left portion of the container shown in FIG. 10, a wall 34 having a slight negative angle would angle upwardly and to the left from vertical line V—V. Referring to FIG. 8, and stated differently, when wall 34 has a negative angle, diameter D1 would be less than diameter D2. The value of the preferred negative angle will vary with each different type of container.

Containers treated by the apparatus of the present invention exhibit distinctly superior characteristics when compared with prior art, untreated containers. Actual tests were conducted with so-called "ANC-2A" cans, manufactured by American National Can Company. These cans have the general configurations shown in FIGS. 8 and 9, and were made with aluminum having a gauge of 0.120. Prior to treatment of these cans by the method and apparatus of the invention, they exhibited the following characteristics:

TABLE 1

| | ANC-2A Dome Profile | | | |
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| --- | --- | --- | --- | --- |
| Minimum | .394 | .052 | 98 | .0120 |
| Maximum | .396 | .060 | 99 | .0120 |

5,697,242

11

TABLE 1-continued

| | | ANC-2A Dome Profile | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Average | .396 | .054 | '98 | .0120 |
| Spec/Aim | .394 ± .004 | .064 Max. | 90 Min. | Ref. |

After treatment of these cans by the method and one roller apparatus of the invention, they exhibited the following characteristics:

TABLE 2

| | | ANC Reformed Dome Profile | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Minimum | .398 | .005 | 100 | .0120 |
| Maximum | .401 | .006 | 113 | .0120 |
| Average | .400 | .006 | 112 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |

As can be seen from a comparison of these Tables, Buckle Strength of treated cans increased from an average of about 99 to an average of 112. The growth in the dome, which results in a downward extension of the U-shaped portion 28 of the container of FIG. 9, decreased markedly from an average of 0.055 to 0.006 inches.

When these same tests were conducted with cans produced from 0.110 gauge aluminum, Buckle Strength increased from an average of 90 to an average of 98. Dome growth tests after 90 PSIG were not meaningful, as the non-reformed cans failed and buckled at 90 PSIG or less.

A number of standard ANC-2A cans were reformed. In the first set, the outside of the countersink was reformed in accordance with a CMB method, and its results are shown in Table 3. A photographic profile of a lower portion of one of these cans is shown in FIG. 20.

TABLE 3

| | | Body Strength 206/211 × 413 CMB Reformed Dome Cans | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Minimum | .385 | .008 | 104 | .0120 |
| Maximum | .395 | .012 | 109 | .0120 |
| Average | .392 | .010 | 106 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref |
| | Vertical Crush | | Sidewall Thickness | |
| Minimum | 226 | | .0045 | |
| Maximum | 292 | | .0046 | |
| Average | 279* | | .0046 | |
| Spec/Aim | 250 Min | | | |

The second set of cans was reformed on the inside of the countersink in accordance with the present invention, and its results are shown in Table 4. A photographic profile of a lower portion of one of these cans is shown in FIG. 21.

12

TABLE 4

| | | Body Strength 206/211 × 413 ANC Reformed Dome Cans | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Minimum | .397 | .003 | 104 | .0120 |
| Maximum | .410 | .007 | 114 | .0120 |
| Average | .404 | .004 | 110 | .0120 |
| Spec/Aim | N/A | .064 Max. | 90 Min. | Ref. |
| | Vertical Crush | | Sidewall Thickness | |
| Minimum | 305 | | .0045 | |
| Maximum | 321 | | .0047 | |
| Average | 313* | | .0046 | |
| Spec/Aim | 250 Min | | | |

Table 5 shows results from "control" cans, i.e., standard ANC-2A cans prior to reforming of any kind. A photographic profile of a lower portion of one of these cans is shown in FIG. 22.

TABLE 5

| | | Body Strength 206/211 × 413 ANC-2A Control Cans | | |
|---|---|---|---|---|
| | Dome Depth | Dome Growth After 90 PSIG | Buckle Strength | Plate Thickness |
| Minimum | .396 | .042 | 98 | .0120 |
| Maximum | 398 | .059 | 99 | .0120 |
| Average | .397 | .048 | 99 | .0120 |
| Spec/Aim | .394 ± .004 | .064 Max | 90 Min. | Ref. |
| | Vertical Crush | | Sidewall Thickness | |
| Minimum | 310 | | .0045 | |
| Maximum | 322 | | .0046 | |
| Average | 317* | | .0046 | |
| Spec/Aim | 250 Min | | | |

As may be seen by a comparison of these Tables, dome growth in the untreated can of Table 5 averages 0.050 inches. Both reformed cans show improvement, but the average dome growth of the can reformed in accordance with the present invention is significantly superior (0.005 vs. 0.010 inches). Buckle strength is also somewhat improved (109 vs. 106). Finally, while average vertical crush of the present reformed cans (313) remains virtually the same as the control can (317), average vertical crush drops significantly (279) after reforming by the CMB method.

As may be seen by a comparison of FIGS. 20 and 21, the can that has been reformed in accordance with the present invention is less sharply peaked along its bottom. As a result, this can will exhibit more stability when moving along fill lines.

While the specific embodiments have been demonstrated and described, numerous modifications come to mind without markedly departing from the spirit of the invention. The scope of protection is, thus, only intended to be limited by the scope of the accompanying claims.

We claim:

1. An apparatus for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said apparatus comprising:

A039

5,697,242

13

a roller movable from an inward position where said roller does not contact said annular, substantially longitudinal wall to an outward position where said roller contacts said annular, substantially longitudinal wall; and

a movable actuator to move said roller into engagement with and circumferentially about said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

2. The apparatus of claim 1 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

3. The apparatus of claim 1, wherein said apparatus includes a plurality of rollers, each of said rollers movable from a radially inward position where said rollers do not contact said annular, substantially longitudinal wall to a radially outward position where said rollers contact said annular, substantially longitudinal wall.

4. The apparatus of claim 1 including a container support for inwardly supporting said container.

5. The apparatus of claim 4 wherein said container support supports said container along a lower end of said container.

6. The apparatus of claim 4 wherein said container support comprises a jig, said jig supporting said container along a lower end of said container.

7. The apparatus of claim 4, wherein said container support comprises a jig, said jig supporting said container along a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, said bottom peripheral profile portion of said jig being mated with said outer annular wall of said container.

8. The apparatus of claim 4 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall in opposition to said container support.

9. The apparatus of claim 1, wherein the perimeter of said roller has a downwardly tapered portion which, when placed against said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle (A) relative to the longitudinal axis of said container.

10. The apparatus of claim 1 wherein said apparatus includes three rollers.

11. A method of reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

providing said drawn and ironed beverage container;

providing a reforming roller; and

moving said reforming roller radially into engagement with said substantially longitudinal wall of said beverage container, said reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path, wherein said reforming roller affects the angle of said substantially longitudinal wall.

12. The method of claim 11 including the step of providing radial inward support for said container.

13. The method of claim 12, wherein said reforming roller is rotated about an arcuate path equidistant from an axis that is coaxial with the longitudinal axis of the container.

14. The method of claim 12 wherein said providing radial inward support includes supporting said container along a lower end of said container.

15. The method of claim 12 wherein said providing radial inward support includes supporting said container in a jig, said jig supporting said container along a lower end of said container.

14

16. The method of claim 12 wherein said providing radial inward support includes supporting said container in a jig, said jig supporting a bottom peripheral profile portion substantially corresponding in shape to said outer annular wall of said container, and mating the bottom peripheral profile portion of said jig with said outer annular wall.

17. The method of claim 11, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container.

18. The method of claim 11, wherein said roller has a tapered peripheral portion which, upon engagement with said substantially longitudinal wall, reforms said substantially longitudinal wall to achieve a negative angle from the longitudinal axis of said container.

19. An apparatus for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said apparatus comprising:

means for radially inwardly supporting of a lower end of said container;

a roller movable from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular, substantially longitudinal wall; and

a movable actuator to move said roller in opposition to said radial inward supporting means and into engagement with and circumferentially about said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

20. The apparatus of claim 19 wherein said movable actuator moves said roller into engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

21. A method for reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall, including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; said method comprising:

providing said drawn and ironed beverage container;

radially inwardly supporting a lower end of said container;

providing a roller;

moving said roller from a radially inward position where said roller does not contact said annular, substantially longitudinal wall to a radially outward position where said roller contacts said annular, substantially longitudinal wall; and

circumferentially moving said roller in opposition to said radial inward supporting means and in engagement with said annular, substantially longitudinal wall to reform said substantially longitudinal wall.

22. The method of claim 21 wherein said reforming actuator moves said roller into engagement with said annular, substantially longitudinal wall to achieve a negative angle (A) relative to said longitudinal axis of said container.

* * * * *

RICHARD GOLDING - JUNE 14, 2006

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF DELAWARE
 3
 4   CROWN PACKAGING TECHNOLOGY, INC. )
 5   and CROWN CORK & SEAL USA, INC., )
 6        Plaintiffs and        )
 7        Counterclaim Defendants,) Civil Action
 8        vs.           ) No. 05-608(KAJ)
 9   REXAM BEVERAGE CAN COMPANY,     )
10        Defendant and        )
11        Counterclaimant.     )
12
13        The videotaped deposition of RICHARD
14   GOLDING, called for examination, taken pursuant to
15   the Federal Rules of Civil Procedure of the United
16   States District Courts pertaining to the taking of
17   depositions, taken before JULIANA F. ZAJICEK, CSR
18   No. 84-2604, a Notary Public within and for the
19   County of Kane, State of Illinois, and a Certified
20   Shorthand Reporter of said state, at Crown
21   Packaging Technologies, 11535 South Central Avenue,
22   Alsip, Illinois, on the 14th day of June, A.D.
23   2006, at 9:09 a.m.
24
```

Page 2

```
 1   PRESENT:
 2
 3        WOODCOCK WASHBURN LLP,
 4        (One Liberty Place, 46th Floor,
 5        Philadelphia, Pennsylvania 19103,
 6        215-564-8934), by:
 7        MR. CHAD ZIEGLER and
 8        MR. SERGIO F. CHUNG,
 9        appeared on behalf of the Plaintiff and
10        Counterclaim Defendant;
11
12   McANDREWS, HELD & MALLOY, LTD.,
13        (500 West Madison Avenue, 34th Floor,
14        Chicago, Illinois 60661,
15        312-775-8000), by:
16        MR. GERALD C. WILLIS, JR. and
17        MR. PAUL W. McANDREWS,
18        appeared on behalf of the Defendant
19        and Counterclaimant.
20
21   ALSO PRESENT: MR. NOAH CARNEY, Videographer.
22
23   REPORTED BY: JULIANA F. ZAJICEK, C.S.R.
24        CERTIFICATE NO. 84-2604.
```

Page 3

```
 1        THE VIDEOGRAPHER: Good morning. We are going
 2   on the video record at 9:09 am. My name is Noah
 3   Carney, and I am a legal videographer in
 4   association with Esquire Deposition Services.
 5        The court reporter today is Juliana
 6   Zajicek, also of Esquire Deposition Services.
 7        Here begins the videotaped of Richard
 8   Golding, taking place at 11535 South Central
 9   Avenue, Alsip, Illinois. Today's date is June
10   14th, 2006.
11        This deposition is being taken in the
12   matter of Crown Packaging Technology, Incorporated,
13   Plaintiff, and Crown Cork & Seal USA, Incorporated,
14   Plaintiff and Counterclaim Defendant versus Rexam
15   Beverage Can Company in the United States District
16   Court for the District of Delaware.
17        Will counsel please state their names
18   for the record.
19        MR. WILLIS: Jerry Willis and Paul McAndrews
20   on behalf of Rexam Beverage Can Company.
21        MR. ZIEGLER: Chad Ziegler of Woodcock
22   Washburn on behalf of Plaintiff Crown Packaging
23   Technology and Crown USA. With me is Sergio Chung
24   also of Woodcock Washburn.
```

Page 4

```
 1        THE VIDEOGRAPHER: Will the court reporter
 2   please swear in the witness.
 3            (WHEREUPON, the witness was duly
 4            sworn.)
 5            RICHARD GOLDING,
 6   called as a witness herein, having been first duly
 7   sworn, was examined and testified as follows:
 8            EXAMINATION
 9   BY MR. WILLIS:
10   Q.   Good morning, Mr. Golding.
11   A.   Good morning.
12   Q.   Just to get some cleanup stuff out of
13   the way first, have you ever given a deposition
14   before?
15   A.   No, I haven't.
16   Q.   Then I'll quickly just go over the
17   ground rules. Maybe you've done this with your
18   counsel already, but there is a videographer taking
19   the video and a court reporter taking a written
20   record. And even though it's on video, all of your
21   responses need to be verbal so we can have a clean
22   written record. So uh-huh and uhn-uhn don't work
23   very well and nodding your head or shaking your
24   head doesn't show up very well in the transcript
```

1 (Pages 1 to 4)

RICHARD GOLDING - JUNE 14, 2006

Page 17

1  can.
2      Q.   Is there a difference between internal
3  base reforming and external base reforming?
4      A.   The -- they work on different areas of
5  the can, yes.
6      Q.   And an external would be on the outside
7  of the bottom of the can?
8      A.   Yes. It is outside working inwards as
9  opposed to inside working outwards.
10     Q.   And the three machines that are at the
11  Fort Bend facility in Texas, those are internal
12  based reformers?
13     A.   That's how we described them, yes.
14     Q.   Now, does Crown also purchase necking
15  machines from Belvac?
16     A.   Yes.
17     Q.   And are those necking machines part of
18  the 595 system that --
19     A.   Yes.
20     Q.   -- you've mentioned? Okay.
21     A.   Yes.
22     Q.   So on a -- can you describe for me what
23  would be an example if you -- if you purchased a
24  full 595K system from Belvac, what would that

Page 18

1  system entail?
2      MR. ZIEGLER: Objection to form.
3  BY THE WITNESS:
4      A.   The -- there is different setups in
5  different parts and different locations. So there
6  is no one answer to that question
7      The most -- and we're not -- in the U.S.
8  we've not put any new plants in for many years. If
9  we were to put the latest system into the U.S., it
10  would be a 14-stage die making system with a
11  flanging turret on it. And depending on the can
12  that we were wanting to make, we may or may not put
13  a reformer. It would probably include a light
14  tester as well all in the one piece of equipment.
15     Q.   I asked this of another witness, but can
16  you tell me again what the light tester is?
17     A.   It's a machine that tests for pin holes
18  in the can. So it has a light cell that measures
19  light intensity and we put the can in a vapor
20  right light bath and you see whether you can see
21  any light inside the can to test for holes.
22     Q.   And when Crown purchases necking
23  machines from Belvac, does Crown also purchase what
24  they call "smooth die necking tooling"?

Page 19

1      MR. ZIEGLER: Objection to form; vague. Do
2  you mean from Belvac?
3  BY MR. WILLIS:
4      Q.   From Belvac. Sorry.
5      A.   We have purchased smooth die making
6  systems from Belvac, yes.
7      Q.   And of the smooth die necking
8  machines -- I'll strike that.
9      Of the necking equipment that you've
10  purchased from Belvac with the smooth die necking
11  tooling that was purchased from Belvac, can you
12  explain to me how that necking process would work?
13     A.   The -- well, there is two aspects of it.
14  There is the straightforward die necking process
15  that's achieved by very simply pressing a can, the
16  top edge of a can into a die that has a profile in
17  it and that profile is imparted onto the can
18  producing the neck diameter. So that's the sort of
19  simple basis for all of the die making processes.
20     With the smooth die necking system the
21  first up is a standard die neck that has a profile
22  with -- I'm trying to verbalize this. It is hard
23  to do with hands.
24     Q.   I appreciate with hands.

Page 20

1      A.   If you come up the sidewall, then it has
2  an arc bending inwards and then it has another arc
3  bending back the other way to a straight portion or
4  chimney on the neck.
5      The subsequent operations reduce the
6  diameter of that chimney further in smaller stages
7  than achieved in the first stage, and that profile
8  is moved down the can to create a smooth geometry
9  when it's finished. So the tooling is positioned
10  in the machine to leave a smooth profile on the
11  can.
12     Q.   And depending on the size of the can end
13  that is going to be seemed onto the can after it is
14  filled with a beverage, that -- would that
15  determine how many stages or how many times the can
16  is necked in by these -- by the smooth die necking
17  dies?
18     A.   That in combination with the wall
19  thickness and the coatings that are applied to the
20  can. So it is part of the can design associated
21  with the diameter reduction that's needed.
22     Q.   Does Crown always purchase this smooth
23  die tooling from Belvac when it purchases a necking
24  machine from Belvac?

5 (Pages 17 to 20)

RICHARD GOLDING - JUNE 14, 2006

Page 25

1 move radially, again, through cammed motions to
2 form a -- to complete the neck and the flange in
3 one operation.
4     Q.   And why would -- why would you combine
5 the smooth die necking with the spin neck and
6 flanging operation?
7     A.   In the past the spin neck and flanging
8 process was the most common process. So we had the
9 equipment existing.
10     Q.   Where are the two disks located in
11 relation to the can? Are they both on the outside
12 of the can?
13     A.   Yes, they are.
14     Q.   Do you know if it is more expensive to
15 manufacture cans using the smooth die necking
16 process that you described than it is to use some
17 other process?
18     MR. ZIEGLER: Objection to form.
19 BY THE WITNESS:
20     A.   There are too many factors that go into
21 the -- it is not one thing that you can pull out
22 and change between the two systems. There is a
23 number of other things that -- you know, to extract
24 what is solely due to the system would be a very

Page 26

1 difficult task. And I've never been through that
2 detailed exercise.
3     Q.   So cost isn't really a consideration
4 then as far as the manufacturing process with
5 respect to necking?
6 BY THE WITNESS:
7     A.   There are --
8     MR. ZIEGLER: Objection to form.
9 BY THE WITNESS:
10     A.   There are many considerations in there.
11 BY MR. WILLIS:
12     Q.   But you've never analyzed cost in your
13 experience with respect to smooth die necking
14 versus spin neck and flanging or bump necking or
15 anything like that?
16     A.   No, I haven't.
17     Q.   Does Crown currently or within the last
18 five years, do they use what's -- I've read as
19 referred to as bump necking?
20     MR. ZIEGLER: Again, inside the United States?
21     MR. WILLIS: In the United States.
22 BY THE WITNESS:
23     A.   In the last five years in -- does the
24 U.S. include Puerto Rico?

Page 27

1 BY MR. WILLIS:
2     Q.   Sure.
3     A.   We've used it in Puerto Rico in the last
4 five years, but not in -- not anywhere else in the
5 U.S.
6     Q.   The contiguous United States?
7     A.   Yes.
8     Q.   Now, as -- for my own education, is bump
9 necking the neck -- kind of necking where you can
10 actually see the steps?
11     A.   Actually, I'll correct that. Puerto
12 Rico is the last place we did do it, but that
13 finished more than five years ago.
14     Q.   Okay.
15     MR. ZIEGLER: Mr. Golding, make sure you allow
16 him to finish his question and then answer so that
17 the court reporter can get the -- can get all of
18 the words down.
19 BY MR. WILLIS:
20     Q.   So Crown doesn't use that type of
21 necking operation anymore in the U.S.?
22     A.   That's correct:
23     Q.   But from my own education again, would
24 bump necking be the same thing as step necking?

Page 28

1     A.   Probably, yes. Yes.
2     Q.   Okay. In the process of going from
3 start to finish for making the entire can, there
4 are multiple stages, are there not? You start with
5 a piece of aluminum?
6     A.   Yeah.
7     Q.   And then you've got to draw and iron it
8 until you have a -- the basic form of a can shape?
9     A.   Yes.
10     Q.   And then I think we talked a little bit
11 about this. It's necked to correlate it with
12 whatever size end is supposed to be attached to the
13 can?
14     MR. ZIEGLER: Objection to form. Do you mean
15 in the next step after it's been drawn and ironed?
16 BY MR. WILLIS:
17     Q.   The next step after, right. You go step
18 by step. After it's been drawn and ironed, you've
19 got the general shape of a can. Is the next step
20 the necking step?
21     A.   No.
22     Q.   What would the next step be?
23     A.   It would be trimming the can to the
24 initial height to clean up the can after the

7 (Pages 25 to 28)

RICHARD GOLDING - JUNE 14, 2006

Page 77

1  inner stand radius.
2    Q.  Okay.
3    A.  And then that would link into what the
4  generic term of the dome profile would be inside
5  that.
6    Q.  Okay. And even after the can is
7  reformed, internally reformed, such as the
8  Budweiser can, there is still a dome profile on the
9  reformed can bottom, correct?
10   A.  Yes. There is a reformed -- there is
11  a -- it's different to prior to being reformed.
12  But there is a dome profile to it, yes.
13   Q.  When Crown uses a 595 base reformer
14  purchased from Belvac at its Fort Bend facilities,
15  what is the part or piece of equipment that holds
16  the can in place while it is being -- while the
17  internal base reforming process is occurring?
18   A.  You mean the base of the can?
19   Q.  Right.
20   A.  It is called a receptacle.
21   Q.  Have you ever heard it called a base
22  plate?
23   A.  No.
24   Q.  How about a jig?

Page 78

1    A.  It could be called a jig, but receptacle
2  is the term that Belvac used and that's the
3  equipment we use, so we use that term.
4    Q.  Okay. And the receptacle keeps the can
5  from moving while the internal base reforming is
6  occurring, right?
7    A.  Moving radially.
8    Q.  Moving radially, okay.
9        And is the -- is the receptacle formed
10  in a manner that would conform to the shape of the
11  bottom of the can?
12   A.  I don't know what you mean by conform to
13  the shape.
14   Q.  Is it designed so that it -- the
15  receptacle and the can fit like a male/female
16  piece?
17   A.  They are designed to fit together.
18   Q.  And does the receptacle prevent the can
19  from moving radially by imposing pressure from the
20  outside in?
21   A.  The receptacle is a groove that locates
22  that stand radius. So it is holding it on that
23  stand radius on both the inside and the outside of
24  that stand radius. And both of those features of

Page 79

1  it hold it from -- on center line.
2    Q.  Okay. And does the reforming process
3  that Crown uses at its Fort Bend facilities include
4  a -- what we call a reforming roller?
5    A.  Yes.
6        MR. ZIEGLER: Objection. It calls for a legal
7  conclusion, lacks foundation.
8  BY MR. WILLIS:
9    Q.  Does Crown refer to that -- the piece of
10  equipment that actually reforms the bottom as a
11  reforming roller?
12   A.  It has a roller, yes.
13   Q.  Do you call it a reforming roller?
14   A.  I call it a roller.
15   Q.  A roller, okay.
16       Does the process that Crown uses at its
17  Fort Bend facility for base reforming employ a
18  single roller or more than one roller in the
19  reforming process?
20   A.  In each tooling head setup, there is one
21  roller.
22   Q.  Can you show me on DDX 28 where the
23  reforming roller would contact what was previously
24  the reverse wall?

Page 80

1        MR. ZIEGLER: Objection; calls for a legal
2  conclusion, lacks foundation as well.
3  BY MR. WILLIS:
4    Q.  Do you understand the question?
5    A.  Well, I thought you said 20 and these
6  are 26 and 28, so.
7    Q.  26.
8    A.  26 here on the can. And what was it you
9  were asking me about that?
10   Q.  Where does the roller contact the base
11  of the can when it's reforming it?
12   A.  Well, when it's reforming it, that no
13  longer -- it is no longer there. So I can't point
14  to it because it no longer exists. At the end of
15  the process it's contacting the bottom of the bead
16  at the end because it's what is just formed.
17   Q.  Okay.
18   A.  But what it touched at the start is no
19  longer there.
20   Q.  So if you looked at the Shasta can,
21  could you tell me where the roller would contact
22  the reverse wall?
23   A.  This is not the same base coat from --
24  that's pre to bottom reforming. This is

20 (Pages 77 to 80)

A044

RICHARD GOLDING - JUNE 14, 2006

Page 81

1  different -- this looks different to this
2  pre-reforming.
3      Q.   So there is no way to use that as an
4  example of pre-reforming?
5      A.   This is a -- this is a different
6  process. Similar in features, but it is not the
7  same as that one pre-reformed.
8      Q.   Okay. Is the reforming performed on the
9  dome portion of the reverse wall?
10     A.   The reverse wall is part of what I call
11  the dome profile. So I don't think that -- they
12  are not -- I think that's the same thing then, from
13  what you said, isn't it? When I talk about it --
14     Q.   When I talk about the dome --
15     A.   You know, that's part of the dome
16  profile is the reverse wall and that is the area
17  that -- yeah, that the reformer works on, yes, part
18  of the dome, that part.
19     Q.   Okay. I'm trying to figure out how to
20  verbalize it. Is it the closest part of the
21  reverse wall to the center of the base of the can
22  that is being reformed by the roller?
23     MR. ZIEGLER: Objection to form, vague.
24  BY THE WITNESS:

Page 82

1      A.   Yes. I'm sorry. Can you ask that
2  again?
3  BY MR. WILLIS:
4      Q.   How about we do this: Did you
5  already -- you also showed me on the picture where
6  the bead is --
7      A.   Yes.
8      Q.   -- on the base of the --
9      A.   Yeah.
10     Q.   -- the Budweiser can. So whatever that
11  looked like before it was reformed, that's the part
12  of the can that was reformed by the roller?
13     A.   Yes.
14     Q.   Okay. Can you explain to me how the
15  reforming roller comes in contact with the reverse
16  wall on the machines that you all are using in your
17  Fort Bend facility?
18     A.   It is moved -- the roller is moved by a
19  cam motion on the machine and there is linkage in
20  there that moves the roller into contact.
21     Q.   Okay. When the -- and I know this all
22  happens very fast, but when the can first comes
23  into the reformer or onto the reformer, okay,
24  what's the first thing that happens?

Page 83

1      A.   It's loaded into the tooling so that it
2  is passed into the turret. There is a top tool
3  that comes down and holds the can in the
4  receptacle.
5      Q.   So the first thing that happens, the can
6  would be placed into the receptacle by the machine?
7      A.   That's right. It is held in place. It
8  is gripped in place.
9      Q.   Now, does it come in as you are holding
10  it horizontally?
11     A.   Horizontally.
12     Q.   It is horizontal. Okay.
13         And then what is the next thing that
14  would happen to that can during the base reforming
15  process?
16     A.   As the can goes around the turret, there
17  is a -- as I talked about, there is the cam
18  profile, there is a linkage and that moves the
19  roller to create the bead as the roller is also
20  rotating around its own axis.
21     Q.   Okay.
22     A.   And as the can goes around, that roller
23  is moved to form the bead in the can.
24     Q.   Where is it moved from to form the bead?

Page 84

1      MR. ZIEGLER: Objection; vague.
2  BY MR. WILLIS:
3      Q.   You said the roller is moved to
4  reform --
5      A.   From the starting position. The
6  starting position is defined by the linkages and
7  the size of the tooling.
8      Q.   Locationally speaking, within the bottom
9  of the can, where would the starting position of
10  the roller be -- you know, be in relation to the
11  rest of the bottom of the can?
12     MR. ZIEGLER: Objection to form.
13  BY THE WITNESS:
14     A.   It is difficult to describe without a
15  picture. It's --
16  BY MR. WILLIS:
17     Q.   Does it start -- for example, the
18  roller, does it start in the center and then move
19  in this case up or down to contact?
20     A.   It's -- its center line I don't think
21  can be on the same center as the can. So it starts
22  off center and then is moved further off center.
23     Q.   Okay. So it starts off center and then
24  it is moved further off center to come into contact

21 (Pages 81 to 84)

A045

RICHARD GOLDING - JUNE 14, 2006

Page 85

1 with the reverse wall?
2    A.   Yes.
3    Q.   Okay. What -- what piece of equipment
4 or tool do you call that causes it to move from
5 slightly off center to off center?
6    MR. ZIEGLER: Objection to form.
7 BY THE WITNESS:
8    A.   Belvac equipment, they call it the
9 H link.
10 BY MR. WILLIS:
11    Q.   An H link?
12    A.   Yeah.
13    Q.   Is that a type of spring?
14    A.   No.
15    Q.   No. What is an H link?
16    A.   It's a linkage that looks like the
17 letter H.
18    Q.   Okay.
19    A.   The link to the cam is on one end and
20 the link to the roller is on the other end.
21    Q.   And so when the roller moves from
22 slightly off center to more off center to come into
23 contact with the reverse wall, is that moving
24 radially outward?

Page 86

1    MR. ZIEGLER: Objection; calls for a legal
2 conclusion, lack of foundation.
3 BY MR. WILLIS:
4    Q.   From an engineering standpoint question?
5    MR. ZIEGLER: Not from the patent standpoint,
6 is that correct?
7    MR. WILLIS: From his understanding
8 engineering wise.
9    MR. ZIEGLER: Thank you.
10 BY THE WITNESS:
11    A.   Okay. You've confused me. From an
12 eng- -- from my understanding as an engineer, that
13 roller is moving -- as I said, moving outwards.
14 It's path outwards is defined by that H link and
15 the cam profile and on the Belvac equipment that's
16 radially.
17 BY MR. WILLIS:
18    Q.   So it would be radially outward?
19    A.   Yeah, moving away from center if that's
20 defining outwards.
21    Q.   Okay. Fair enough.
22       And when the roller moves from slightly
23 off center to further off center to contact the
24 reverse wall, does the roller itself go around the

Page 87

1 reverse wall? You said the roller spins on its own
2 axis as well. But does the roller move around the
3 axis of the base of the can as well?
4    A.   The -- the center of the roller
5 processes around the axis of the can so that the
6 contact point also processes around the can.
7    Q.   Okay. So during the reforming process
8 there is always -- the roller is always in contact
9 with that reverse wall until the bead is complete?
10    A.   Yes.
11    Q.   Okay. Does the reforming process that
12 Crown uses in its Fort Bend facility alter the
13 angle of the reverse wall or what used to be the
14 reverse wall?
15    MR. ZIEGLER: Objection to form, lacks
16 foundation, calls for legal conclusions.
17 BY THE WITNESS:
18    A.   I said earlier that the reverse wall
19 doesn't exist afterwards. So, I don't know how to
20 answer your question anyway.
21 BY MR. WILLIS:
22    Q.   So it has completely eliminated the
23 reverse wall, the reforming process has?
24    A.   Yeah.

Page 88

1    Q.   And it has created what you are calling
2 a bead?
3    A.   Yes.
4    Q.   Correct. Okay. And what is the purpose
5 for reforming a can bottom from Crown's
6 perspective?
7    A.   The --
8    MR. ZIEGLER: Just a -- I'm going to object.
9 I mean, this is from his perspective and not
10 Crown's, just to make that clear.
11 BY MR. WILLIS:
12    Q.   Okay. From your perspective.
13    A.   My perspective is that it increases the
14 control of growth and the buckle performance of a
15 given can.
16    Q.   And what's the benefit of increasing the
17 control of growth and buckle strength of the can,
18 or buckle performance, did you say?
19    A.   The buckle performance. The control of
20 growth is only relevant to pasteurized products,
21 like beer. Controlling growth is irrelevant for
22 CSDs. During the pasteurization process the can
23 sees -- it generates pressure inside the can. If
24 the can growth is not controlled, you get variation

22 (Pages 85 to 88)

RICHARD GOLDING - JUNE 14, 2006

Page 89

1 in can height coming out of the pasteurizers and
2 that causes problems when you try and pack the cans
3 into cases.
4    Q.   Okay.
5    A.   So if the can is coming out of
6 pasteurizers, you need to control that growth.
7    Q.   Okay.  So that's one benefit.
8    A.   That's one benefit, and that's my
9 understanding of the main reason for using it in
10 Fort Bend because Budweiser is a pasteurized
11 product and they need to control the growth.  You
12 get higher buckle performance for the same gauge,
13 but that's almost -- you can't get one without the
14 other.  It just doesn't -- the reason I say that is
15 we don't need it for buckle performance on our
16 regular can.
17    Q.   Okay.
18    A.   So, it does increase the buckle, but the
19 main reason is the growth control in Fort Bend.
20    Q.   Okay.  So, if you're able to increase
21 the buckle performance by using the base reforming,
22 does that enable a manufacturer to use a thinner
23 gauge for the can?
24    A.   To use -- to get the same pressure

Page 90

1 performance from a can without doing anything else
2 too radical, you'll get -- you could use a thinner
3 gauge to get the same pressure performance on the
4 same starting base profile.
5    Q.   Okay.  And if you are using less gauge,
6 you are saving metal, are you not?  Or thinner
7 gauge, I should say, you are using less metal?
8    A.   Yes, the can will be -- well, normally
9 would be lighter.  That's not always the case that
10 it...
11    MR. WILLIS:  Do you want to take another quick
12 break?
13    MR. ZIEGLER:  Sure.
14    THE VIDEOGRAPHER:  Going off the video record.
15 The time is 11:12 a.m.
16       (WHEREUPON, a recess was had
17         from 11:12 to 11:23 a.m.)
18    THE VIDEOGRAPHER:  Back on the video record.
19 The time is 11:23 a.m.
20 BY MR. WILLIS:
21    Q.   I just want to get back into one
22 follow-up question on the base reforming.  Prior to
23 reforming, there is a what you call reverse angle
24 wall?

Page 91

1    A.   Reverse wall.
2    Q.   A reverse wall.  And then after
3 reforming there is a bead?
4    A.   Yes.
5    Q.   Correct.  All right.
6        When the bead is formed, does that
7 change the angle or what was the angle of the
8 reverse wall?
9    MR. ZIEGLER:  Objection; lacks foundation,
10 calls for legal conclusions.
11 BY THE WITNESS:
12    A.   The reverse wall is not there anymore.
13 BY MR. WILLIS:
14    Q.   So it has been changed?
15    MR. ZIEGLER:  Objection; mischaracterizes his
16 testimony.
17 BY THE WITNESS:
18    A.   The wall is gone.  I mean, it no
19 longer -- can you -- I can't point to a reverse
20 wall on that (indicating).
21 BY MR. WILLIS:
22    Q.   Can you describe what the angle of that
23 part of the can bottom, including the bead, what
24 that angle is after the reforming process?

Page 92

1    A.   Do you want me to describe the -- this
2 profile shape after the reforming?
3    Q.   Correct.
4    A.   Well, I mean, you can see the shape of
5 what we have here.  It starts at a -- again, I'll
6 start at the stand diameter.  We have an inner
7 radius and it goes into the bead.  There is
8 sort of a transition bit.  Then after one would
9 normally call the outer dome radius and then the
10 spherical dome itself, the center dome portion.
11    Q.   So it's got multiple parts.  Are you
12 saying that you can't really determine what the
13 angle of the bottom -- that portion of the bottom
14 of the can is after reforming as compared to what
15 it was before reforming?
16    A.   You have to --
17    MR. ZIEGLER:  Objection -- sorry.  Objection;
18 form, calls for legal conclusions, calls for
19 opinion and it is a hypothetical.
20 BY MR. WILLIS:
21    Q.   Can you read my question back.
22       (WHEREUPON, the record was read
23         by the reporter as requested, as
24         follows:

23 (Pages 89 to 92)

A047

RICHARD GOLDING - JUNE 14, 2006

Page 181

1　domer."
2　　　And we tried to -- I tried to ask you
3　some questions about this early on this morning.
4　And is that -- is that an accurate understanding of
5　what -- how Crown was manufacturing its cans? And
6　I believe you called it a doming station.
7　　A.　Yes, as of what we do and what is
8　installed today, profiles of the domer today are
9　based around that. Well, hang on.
10　　Q.　So the radially tapering -- radially
11　inwardly tapering inner wall for ease of removal of
12　the domer, is that accurate as far as how --
13　　A.　It is a complicated --
14　　Q.　-- Crown --
15　　A.　It is a complicated way of saying --
16　　Q.　I agree, I agree.
17　　A.　They like that, okay. (Indicating).
18　　Q.　So there is at least a slight inward --
19　inwardly radially inward tapering angle so that you
20　can get the doming tool out, right?
21　　A.　That's -- yes.
22　　Q.　Okay.
23　　A.　Yeah.
24　　Q.　And then after the can is reformed with

Page 182

1　the base reformer, regardless of whether it's a
2　vertical profile, a negative profile or a hooked or
3　beaded profile, that radially inward taper is --
4　has changed, has it not?
5　　A.　Well, on the way we do it, there is no
6　taper any more.
7　　Q.　So it has changed. It has gone from a
8　taper to no taper. Is that accurate?
9　　A.　Yeah, the profile is different. It's
10　gone to a beaded profile.
11　　Q.　Okay.
12　　MR. WILLIS: Off the record for just a second.
13　　THE VIDEOGRAPHER: Off the video record at
14　2:31 p.m.
15　　(WHEREUPON, a recess was had
16　　　from 2:31 to 2:32 p.m.).
17　　THE VIDEOGRAPHER: Back on the video record.
18　The time is 2:32 p.m.
19　BY MR. WILLIS:
20　　Q.　Mr. Golding, I'm going to be showing you
21　a few more documents here and then try and get out
22　of here. This is going to be I believe Defendant's
23　Deposition Exhibit 41.
24　　(WHEREUPON, a certain document was

Page 183

1　　　marked Defendant's Deposition
2　　　Exhibit No. 41, for identification,
3　　　as of 6/14/06.)
4　BY MR. WILLIS:
5　　Q.　Do you recognize this document,
6　Mr. Golding?
7　　A.　This has me as being present. Yes, I
8　read that.
9　　Q.　For the record, this is production
10　number CCS 47184 and 185, which we just received
11　this weekend.
12　　　Okay. Looking at the first paragraph,
13　it says, "Crown has identified that to enable
14　continued down gauging of their aluminum can, it is
15　necessary to include an internal base reforming
16　operation in the can lines."
17　　　Do you see that?
18　　A.　I see that, yes.
19　　Q.　So as of July of 1996, had Crown not yet
20　incorporated an internal base reforming operation
21　into its can lines?
22　　A.　At that time the only location was
23　Fort Bend.
24　　Q.　And I believe you testified earlier that

Page 184

1　that's still the only location, is it not?
2　　A.　In the U.S., yes.
3　　Q.　Okay. In the U.S.
4　　　And what was the importance of enable --
5　enabling continued down gauging of their aluminum
6　can?
7　　MR. ZIEGLER: Objection; form, lacks
8　foundation.
9　BY MR. WILLIS:
10　　Q.　Do you know, since you were at the
11　meeting?
12　　A.　Well, I --
13　　MR. ZIEGLER: Object to form as to time. You
14　are asking whether he recalled during this time or
15　today?
16　BY MR. WILLIS:
17　　Q.　Okay. Do you recall today, sitting here
18　today, what the importance was as of July 15th -
19　16th, 1996 to continued down gauging the aluminum?
20　　A.　The -- my recall of it at that time was
21　that it enabled -- it was available and an easy way
22　to increase the performance on the base of the can
23　and that generally as we -- normally when we down
24　gauge, we, generally speaking, lose performance

46 (Pages 181 to 184)

A048

RICHARD GOLDING - JUNE 14, 2006

Page 209

1  outside of that is the outer stand radius.
2      Q.    What -- is there any name for the
3  section beyond what you just said was the outside
4  stand radius?
5      A.    Between that and the stacking radius,
6  not one that we regularly use.
7      Q.    And can you tell me, what is the
8  stacking radius again?
9      A.    It's this radius here which if you were
10  to stand -- sit this can on another can where the
11  seam would fit into that radius.
12      MR. WILLIS:  Okay.  That's all.
13      MR. ZIEGLER:  That's all from Crown.
14      THE VIDEOGRAPHER:  Going off the video record.
15  The time is 3:10 p.m.
16          FURTHER DEPONENT SAITH NOT.
17
18
19
20
21
22
23
24

Page 210

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3  CROWN PACKAGING TECHNOLOGY, INC.,)
4  and CROWN CORK & SEAL USA, INC., )
5      Plaintiffs and      )
6      Counterclaim Defendants,) Civil Action
7      vs.          ) No. 05-608(KAJ)
8  REXAM BEVERAGE CAN COMPANY,    )
9      Defendant and      )
10      Counterclaimant.    )
11      I hereby certify that I have read the
12  foregoing transcript of my deposition given at the
13  time and place aforesaid, consisting of Pages 1 to
14  209, inclusive, and I do again subscribe and make
15  oath that the same is a true, correct and complete
16  transcript of my deposition so given as aforesaid,
17  and includes changes, if any, so made by me.
18
19          RICHARD GOLDING
20  SUBSCRIBED AND SWORN TO
21  before me this      day
22  of        , A.D. 200 .
23
24      Notary Public

Page 211

1  STATE OF ILLINOIS )
2                ) SS:
3  COUNTY OF K A N E )
4      I, JULIANA F. ZAJICEK, a Notary Public
5  within and for the County of Kane, State of
6  Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8      That previous to the commencement of the
9  examination of the witness herein, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12      That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17      That the said deposition was taken
18  before me at the time and place specified;
19      That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set my

Page 212

1  hand and affix my seal of office at Chicago,
2  Illinois, this 1st day of July, 2006.
3
4
5      Notary Public, Kane County, Illinois.
6      My commission expires 8/30/06.
7
8  C.S.R. Certificate No. 84-2604.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

53 (Pages 209 to 212)

Sylvan Praturlon                                          July 12, 2006
                          Chicago, IL

                                                          Page 1

1              FOR THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE

2

3    CROWN PACKAGING TECHNOLOGY,)
     INC., Plaintiff, and CROWN )
4    CORK & SEAL USA, INC.,      )
                                 )
5      Plaintiff and            )
       Counterclaim Defendant,  )
6                                )
              -vs-               )   Civ Action No:
7                                )   05-608 (KAJ)
                                 )
8    REXAM BEVERAGE CAN COMPANY,)
                                 )
9      Defendant and            )
       Counterclaimant.         )
10
11              The Videotaped Deposition of SYLVAN
12   PRATURLON, taken in the above-entitled case before
13   KATHLEEN J. PACULT, a Certified Shorthand Reporter
14   within and for the County of Cook, State of
15   Illinois, taken pursuant to the provisions of the
16   Code of Civil Procedure of Illinois and the Rules of
17   the Supreme Court thereof pertaining to the taking
18   of depositions for the purpose of discovery, taken
19   on the 12th day of July 2006, at the hour of 9:00
20   a.m., at 500 West Madison Street, Suite 3400,
21   Chicago, Illinois.
22
23
24
25

Sylvan Praturlon                                                    July 12, 2006

Chicago, IL

Page 42

1   had been reformed. But the reformed can be the
2   Metal Box process, you could see the difference. It
3   was a much sharper type of profile.
4        Q.   But you don't know whether the cans
5   had any better or worse performance from the two
6   processes?
7        A.   That I -- that I don't know.
8        Q.   Now, generally what was your role in
9   connection with making of the inventions as
10  contrasted with the roles of your co-inventors?
11       A.   It was teamwork. We tossed ideas
12  around and then we decided that -- to try to move
13  the metal from inside would be feasible, a feasible
14  avenue. So that's what we pursued.
15       Q.   Are you a Cubs fan?
16       A.   No.
17       Q.   White Sox?
18       A.   Yeah, because they won the world
19  championship.
20       Q.   On every good team, players have
21  different positions that they play. There is
22  pitchers and catchers.
23       A.   Yeah.
24       Q.   So I am trying to figure out just
25  generally speaking what your role was, and what

Page 43

1   Mr. Hilasz's role was, and what Mr. Caliendo's role
2   was, and what Mr. Azzaline's role was. Can you --
3   can you discriminate among the four of you as to who
4   brought what to the party?
5        MR. WILLIS:   Object to asked and
6   answered.
7   BY THE WITNESS:
8        A.   Well, I know what I did. At that
9   time, we had in-house expertise for finite element
10  analysis. So we could see on the computer that by
11  modifying the shape of the bottom of the can from
12  the inside, we definitely increased the strength of
13  the bottom.
14  BY MR. HEIST:
15       Q.   Which one of the four of you or which
16  ones of the four of you had the expertise in finite
17  element analysis?
18       A.   None of us, but there was a gentleman
19  at that time who had that expertise.
20       Q.   Who was that?
21       A.   He is no longer with the company.
22       Q.   What was his name?
23       A.   His name was Victor Guarino.
24       Q.   Do you know where Mr. Victor Guarino
25  is today?

Page 44

1        A.   No.
2        Q.   All right. So you had in-house
3   expertise in finite element analysis.
4        A.   Yes.
5        Q.   And your group went to Mr. Guarino for
6   that?
7        A.   Yes.
8        Q.   And what was your specialty?
9        MR. WILLIS:   Objection to form.
10       A.   Well, after -- well, after seeing on
11  the computer screen that there was this improvement,
12  we had to prove it. And that is when I designed
13  tooling to test, to run tests. And there are
14  documents on that.
15  BY MR. HEIST:
16       Q.   Okay. What was Mr. Azzaline's
17  specialty?
18       MR. WILLIS:   Objection to form.
19  BY THE WITNESS:
20       A.   That I couldn't really say much in
21  specifics. He had that wide experience in can
22  making so, you know.
23
24
25  BY MR. HEIST:

Page 45

1        Q.   What was Mr. Caliendo's specialty?
2        MR. WILLIS:   Objection to form.
3   BY THE WITNESS:
4        A.   Well, it became soon involved in this
5   testing of the reform -- testing of -- how can I put
6   it? We designed -- I designed this test thing that
7   they would reform with one role, would reform the
8   inside of the bottom of the can, was done on a
9   lathe. And at a certain point, it got involved also
10  in improving these tests and he ran tests himself.
11  BY MR. HEIST:
12       Q.   And what was Mr. Hilasz's role?
13       A.   Well, he was supervising all of us and
14  giving inputs, suggestions while we were designing
15  this test equipment and running the tests.
16       Q.   Now, whose idea was it to run a finite
17  element analysis to see how the strength of the
18  container could be improved?
19       A.   Probably -- I don't remember, but it
20  -- this gentleman was known for his expertise, so it
21  came from all of us I imagine, yeah.
22       Q.   So your group asked Mr. Guarino to do
23  the finite element analysis?
24       A.   Basically, yes.
25       Q.   What was Guarino asked to look for?

12 (Pages 42 to 45)

A051

Sylvan Praturlon                                                        July 12, 2006

Chicago, IL

Page 46

1      MR. WILLIS: Objection to form.
2   BY THE WITNESS:
3      A.     Well, we knew that what caused the
4   lengthening of the deformation of the can was
5   internal pressure. So Mr. Guarino was able to
6   simulate this, what happens to a container with a
7   well-defined shape when it is submitted to an
8   internal pressure. And you put, you know, see it on
9   the screen what happened. What you see is the
10  product of extensive mathematical calculations done
11  by the system, but you see -- you see the new shape
12  -- the initial shape of the bottom before applying
13  the pressure, and the final shape after applying the
14  pressure. So it is quite, quite evident.
15  BY MR. HEIST:
16     Q.     And you could see that on the computer
17  screen?
18     A.     Yes.
19     Q.     And was there an effort made to
20  consider various changes in the shape of the can to
21  look at the finite element analysis on the computer
22  screen and see how changes in shape would effect
23  performance?
24     A.     Yes. That's where we could try
25  different shapes, different angles, and we say,

Page 47

1   well, it seems self evident that we are getting an
2   improvement. At that point, we stopped running
3   finite element analysis and we designed equipment to
4   prove it.
5      Q.     So you, as I understand it, then you
6   had Mr. Guarino run this finite element analysis and
7   then considered various changes in shape to the
8   bottom of the can that would improve the resistance
9   to pressure deformation?
10     A.     Yes.
11     Q.     And once you knew what shape you were
12  looking for, you then set about to design equipment
13  that would give you that shape?
14     A.     Test equipment.
15     Q.     Test equipment?
16     A.     Yes, yes.
17     Q.     And does the equipment to do finite
18  element analysis still exist at Rexam?
19     A.     There is much better equipment now,
20  not the original ones. I think it was used at that
21  time by this gentleman who, at a certain point, left
22  the company.
23     Q.     What kind of equipment was used at
24  that time?
25     A.     I don't remember.

Page 48

1      Q.     The finite element analysis is really
2   a computer simulation, right?
3      A.     Yes.
4      Q.     And was the programming done in
5   Fortran at this time?
6      A.     No. It is preprogrammed. It is part
7   of a package, a finite element package. So there is
8   no programming done, you just have to know how to
9   input.
10     Q.     And the shape that the finite element
11  analysis told you or suggested to you is the one
12  that should be pursued, could you describe that
13  shape?
14     MR. WILLIS: Objection to the
15  characterization. His testimony speaks for itself.
16  BY THE WITNESS:
17     A.     The only thing I remember is that by
18  changing the inside angle, you know, if it starts
19  positive like this and then you -- the more vertical
20  it becomes, the stronger it is. And even stronger
21  when it becomes negative, when it goes the other
22  way. That's as far as I could remember.
23  BY MR. HEIST:
24     Q.     So once you and your group concluded
25  that by changing the inside angle, and I think we'll

Page 49

1   come to -- actually before we do that, let's just
2   take a look at your patent so we know what we are
3   talking about for the record.
4         Let me direct your attention to
5   Exhibit 53, Figure 9.
6      A.     Yes.
7      Q.     Figure 9, when you say the -- changing
8   the angle, you are talking about the angle of wall
9   34?
10     A.     Yes, exactly.
11     Q.     And you are saying that Figure 34
12  shows the angle of the wall as positive?
13     MR. WILLIS: Objection to form. It is
14  not Figure 34.
15  BY MR. HEIST:
16     Q.     Figure 9?
17     A.     Figure 9, yes. You see it is small,
18  it is almost -- almost vertical.
19     Q.     And Figure 10 shows the angle as
20  negative?
21     A     Yes.
22     Q.     And do I understand that the computer
23  stimulation done with the finite element analysis by
24  Mr. Guarino indicated that by making the wall
25  vertical, or even negative, that the container would

13 (Pages 46 to 49)

Page 50

1   withstand greater pressure?
2       A.   Yes.
3       Q.   And that would allow the container to
4   be made with lighter weight metal to get the same
5   result?
6           MR. WILLIS: I just want to object. I
7   think that's mischaracterizing what he testified to
8   before, and just, your prior answer, I just want to
9   get that on the record before you answer.
10          Now you can answer.
11  BY THE WITNESS:
12      A.   Well, again, my task -- my task was to
13  come up with a stronger bottom of the can. The
14  implications of making it stronger, you know, I
15  don't know. I can't --
16  BY MR. HEIST:
17      Q.   But one implication is you can also
18  make the same can of lighter weight metal?
19      A.   Yes. I would -- yeah, I would common
20  sense, I would say.
21      Q.   Now, once the computer simulation
22  suggested that the container should have a vertical
23  wall or a possibly slightly negative wall, what, if
24  anything, did that suggest to you about the type of
25  equipment that would be needed to make that shape?

Page 51

1           MR. WILLIS: Object to the form of the
2   question.
3   BY THE WITNESS:
4       A.   Well, when we had to prove with
5   experiments that what the computer was telling us
6   was true, again, we designed the -- this test
7   equipment, which was a roller that had a negative
8   angle. And we, by rotating, I think we were
9   rotating the can and we were pushing this roller
10  against the side of the bottom, so and then -- so we
11  produced a number of samples. We gave the samples
12  to our R&D facilities, and then they examined it and
13  they ran tests. And yes, it confirmed that we had a
14  stronger can.
15  BY MR. HEIST:
16      Q.   Compared to what?
17      A.   To what we had before.
18      Q.   Which was not reformed on the bottom?
19      A.   Exactly. There was a significant
20  increase in the strength.
21      Q.   All right. I would like to show you a
22  copy of U.S. Patent 4885924. We will mark it as
23  Exhibit 55.
24
25

Page 52

1                   (Exhibit No. 55 was
2                   marked for
3                   identification.)
4   BY MR. HEIST:
5       Q.   Have you seen Exhibit 55 before?
6       A.   Not that I remember.
7       Q.   This is a patent that was granted to
8   Metal Box in the name of Paul Claydon. Did you come
9   to learn at any pointed that Metal Box had retained
10  a patent directed to its bottom reforming efforts?
11      A.   Not specifically, no, I don't
12  remember. I am sure I have never seen this before,
13  at least I don't remember.
14      Q.   I would like to show you a document
15  bearing production number Rexam 27112. We will mark
16  this Exhibit 56.
17                  (Exhibit No. 56 was
18                  marked for
19                  identification.)
20  BY MR. HEIST:
21      Q.   Have you seen Exhibit 56 before?
22      A    Not that I remember.
23      Q.   You are marked for a copy?
24      A.   Not that I remember, but since my name
25  is here, I certainly did see it.

Page 53

1       Q.   Let me just understand. This is a
2   memorandum from Mr. Azzaline to Mr. Atkinson?
3       A.   Yes.
4       Q.   Did Azzaline report directly or
5   indirectly to Atkinson?
6       A.   Not that I remember.
7       Q.   I think you mentioned Atkinson before.
8   Who was he?
9       A.   Who?
10      Q.   Atkinson.
11      A.   He was -- he was responsible for the
12  D&I group.
13      Q.   When it says department DIEG, is that
14  D&I engineering?
15      A.   Yes, yes.
16      Q.   And the memo says, "I have initiated a
17  project with machine design to do concepting and
18  prototype work on a bottom reformer. The objective
19  is to reduce costs through reduced gauge." Do you
20  see that?
21      A.   Yes.
22      Q.   And this project that Mr. Azzaline
23  initiated with machine design, that was a project
24  with your group?
25      A.   Yes.

14 (Pages 50 to 53)

Paul Azzaline                                                   July 13, 2006
                              Chicago, IL

                                                              Page 1

 1              FOR THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF DELAWARE

 2

 3    CROWN PACKAGING TECHNOLOGY,)
      INC., Plaintiff, and CROWN )

 4    CORK & SEAL USA, INC.,      )
                                  )

 5       Plaintiff and            )
         Counterclaim Defendant,  )

 6                                )
                    -vs-          )  Civ Action No:

 7                             .  )  05-608 (KAJ)
                                  )

 8    REXAM BEVERAGE CAN COMPANY,)
                                  )

 9       Defendant and           )
         Counterclaimant.        )

10

11              The Videotaped Deposition of PAUL

12    AZZALINE, taken in the above-entitled case before

13    KATHLEEN J. PACULT, a Certified Shorthand Reporter

14    within and for the County of Cook, State of

15    Illinois, taken pursuant to the provisions of the

16    Code of Civil Procedure of Illinois and the Rules of

17    the Supreme Court thereof pertaining to the taking

18    of depositions for the purpose of discovery, taken

19    on the 13th day of July 2006, at the hour of 9:00

20    a.m., at 500 West Madison Street, Suite 3400,

21    Chicago, Illinois.

22

23

24

25

A054

Paul Azzaline                                                                 July 13, 2006
Chicago, IL

---

**Page 2**

```
1        A P P E A R A N C E S
2
3    WOODCOCK WASHBURN
     BY: MR. DALE M. HEIST
4    and MR. FRANK T. CARROLL
     One Liberty Place
5    46th Floor
     Philadelphia, PA 19103
6    (215) 568-3100
7       appeared on behalf of the Plaintiff;
8
     McANDREWS HELD & MALLOY
9    BY: MR. GERALD C. WILLIS, JR.
     and MS. SARAH A. KOFFLIN
10   500 West Madison Street
     34th Floor
11   Chicago, Illinois 60661
     (312) 775-8000
12
        appeared on behalf of the Defendant.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            I N D E X
2
3    WITNESS           EXAMINATION
4    PAUL AZZALINE
5    BY MR. HEIST              5
6    BY MR. WILLIS           116
7
8
9
10
11         E X H I B I T S
12   NUMBER               PAGE
13   Nos. 82 & 83          103
14   No. 84                108
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1          THE VIDEOGRAPHER:  This is Ben Stanson
2    in association with Alderson Reporting, 1111 14th
3    Street in Washington, D.C.  I am the operator of
4    this camera.  Today's date is July 13, 2006.  The
5    time is 9:02 a.m. as indicated on the video screen.
6          This is the videotaped deposition
7    of Paul H. Azzaline, as being taken pursuant to
8    Federal Rules of Civil Procedure on behalf of the
9    plaintiff.
10         We are at 500 West Madison Street
11   in Chicago, Illinois.  This case is captioned Crown
12   Packaging Technology, Incorporated, et al., versus
13   Rexam Beverage Can Company, Case Number 05-608
14   (KAJ).
15         Will the attorneys please identify
16   themselves for the video record?
17         MR. HEIST:  Dale Heist, Woodcock
18   Washburn for the plaintiff.
19         MR. CARROLL:  Frank Carroll, Woodcock
20   Washburn for the plaintiff.
21         MR. WILLIS:  Jerry Willis for Rexam
22   Beverage Can Company.
23         THE VIDEOGRAPHER:  Thank you.
24         The court reporter today is Kathy
25   Pacult with Alderson Reporting.  Will you please
```

**Page 5**

```
1    swear in the witness.
2          (Witness duly sworn.)
3          THE VIDEOGRAPHER:  Thank you.  You may
4    proceed.
5          PAUL AZZALINE
6    called as a witness herein, having been first duly
7    sworn on oath, was examined and testified as
8    follows:
9            EXAMINATION
10   BY MR. HEIST:
11       Q.   Good morning, Mr. Azzaline.
12       A.   Good morning.
13       Q.   Would you just state your full name
14   and address for the record?
15       A.   Yes.  My name is Paul H. Azzaline.  My
16   address is 5512 Acacia Court, Crystal Lake, Illinois
17   60012.
18       Q.   Mr. Azzaline, have you been deposed
19   before?
20       A.   Yes, I have.
21       Q.   Many times or a few times?
22       A.   Once, sir.
23       Q.   Once.  Just to remind you what we are
24   going to be doing today, I am going to be asking you
25   a series of questions.  I will try to make my
```

2 (Pages 2 to 5)

Paul Azzaline                                                    July 13, 2006

Chicago, IL

## Page 34

1    A.   I may have, I don't recall exactly.
2    Q.   Can you tell me how the project got
3    started that resulted in your -- the filing of your
4    patent application?
5    A.   The project of bottom reforming?
6    Q.   Yes.
7    A.   How it got started?
8    Q.   Yes.
9    A.   We were always looking for a way to
10   down gauge our cans, improve their performance,
11   minimize cost.
12   Q.   And how did that lead to a project to
13   work on bottom reforming?
14   A.   The CMB bottom reforming method had
15   shown a way of doing it and we looked for a better
16   mousetrap.
17   Q.   What was the way that CMB had them
18   doing it?
19   A.   What they call the outside reforming,
20   working on the outside chime bottom radius, bottom
21   edge of the profile of the can.
22   Q.   And you said you -- I guess meaning
23   ANC, were looking for a better way of accomplishing
24   the same result?
25   A.   Yes.

## Page 35

1    Q.   What was it about the CMB way that you
2    didn't think was good enough or you wanted to
3    improve upon?
4    A.   Their method severely reformed the
5    outside writing radius of the can. Some of our
6    testing showed that it reduced the crush strength of
7    the can. It was a very expensive process, in that
8    you had to buy an expensive machine, add it to a
9    line that was already functioning, along with all
10   the can handling associated with adding another
11   machine to a line.
12   Q.   And so because of those things, ANC
13   decided to look for a better way of achieving the
14   result of improving buckle and reducing can growth?
15   A.   Yes.
16   Q.   And how would you characterize the way
17   that ANC proposed to go?
18   A.   Characterize?
19   Q.   You mentioned that the CMB method was
20   what you called outside reforming?
21   A.   Uh-huh.
22   Q.   Did the problems that you just noted
23   cause you and your co-inventors to consider what has
24   been referred to as inside bottom reforming?
25   A.   The problems we saw with the radius,

## Page 36

1    the reduction in crush, the fact that we had a piece
2    of equipment we felt would adapt to an inside
3    reforming process in our necker flangers. It was an
4    integrated process that led us to looking at that.
5    Q.   You said you had a piece of equipment,
6    a necker flanger that it would -- that would adapt
7    to inside reforming?
8    A.   That we felt we could adapt to the
9    inside reforming, yes. That we could put that in
10   there.
11   Q.   Whose idea was it to adapt a necker
12   flanger to include bottom reforming?
13   A.   I don't recall who made the very first
14   statement, but -- I don't recall who made the very
15   first statement.
16   Q.   Necker flangers were machines that ANC
17   already had operational in all of its plants at the
18   time, correct?
19   A.   Yes, that's correct.
20   Q.   And so the concept was rather than buy
21   a Metal Box bottom reforming machine and all the can
22   handling equipment that came along with it, it would
23   be cheaper to modify a necker flanger to include a
24   reforming station, if you will, if that's the right
25   term, in that preexisting machine?

## Page 37

1    A.   To incorporate it into the preexisting
2    machine, yes.
3    Q.   And was it believed that that would be
4    more cost effective rather than having to buy new
5    equipment?
6    A.   Yes.
7    Q.   What was it about the necker flanger
8    that led you and your co-inventors to conclude that
9    that would be a machine that could be adapted for
10   this use?
11   A.   In the flanging turf, for lack of a
12   better term, we were holding the bottom of the can
13   during the flanging operation. And it seemed like a
14   natural extension to try to put it in that area.
15   Q.   The bottom reform?
16   A.   Putting the bottom reforming into the
17   flanging station.
18   Q.   Because you were already holding the
19   bottom of can?
20   A.   We were -- we had the can, it was
21   there.
22   Q.   And you had to hold it from the bottom
23   in order to form the neck in the necking machine?
24        MR. WILLIS: Objection to form. I
25   think you met flange.

10 (Pages 34 to 37)

1

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

```
 1
 2      IN THE UNITED STATES DISTRICT COURT
 3        FOR THE DISTRICT OF DELAWARE
 4                  -   -   -
 5   CROWN PACKAGING          :  C.A. NO.
     TECHNOLOGY, INC.,        :  05-608(KAJ)
 6   Plaintiff, and CROWN     :
     CORK & SEAL USA, INC.,   :
 7   Plaintiff and           :
     Counterclaim Defendant  :
 8
        vs.                  :
 9
     REXAM BEVERAGE CAN CO.,: JURY TRIAL
10   Defendant Counterclaim :  DEMANDED
11                  -   -   -
12          Friday, July 21, 2006
13                  -   -   -
             C O N F I D E N T I A L
14                  -   -   -
15                  Videotape Deposition of
     JOSEPH F. BAUDER, taken pursuant to
16   notice, was held at the law offices of
     WOODCOCK WASHBURN, LLP, One Liberty
17   Place, 46th Floor, Philadelphia,
     Pennsylvania 19103, beginning at 9:09
18   a.m., on the above date, before MARIA
     NOELLE DAMIANI, Registered Merit
19   Reporter, Certified Realtime Reporter,
     Certified Shorthand Reporter (NJ License
20   No. 30XI00224100; DE License No. RPR-117)
     and a Notary Public.
21
                    -   -   -
22        ESQUIRE DEPOSITION SERVICES
          Four Penn Center, Suite 1210
23          1600 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
24               (215) 988-9191
```

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 225

1  process -- again, I'm not real
2  knowledgeable in this area, but I think
3  in the process you're heating the can up
4  and you need -- it needs to withstand the
5  higher buckle strength.
6      Q.  Okay.  I'm handing you what
7  we have just marked as Defendant's
8  Exhibit 52.
9          MS. MALINOSKI:  It might be
10  53.
11          MR. McANDREWS:  Is that --
12          MS. MALINOSKI:  No.  No.
13  Yeah, because this was 52.  The
14  power -- oh, wait.
15          MR. McANDREWS:  Did we just
16  mark -- I believe we marked the
17  Botcherby document as --
18          THE WITNESS:  53.
19          MR. McANDREWS -- 53.
20          MS. MALINOSKI:  And it
21  should have been 52, right.  Okay.
22          MR. WILLIS:  We will replace
23  it.
24          MS. MALINOSKI:  That's okay,

Page 226

1  the record should be clear.
2          MR. McANDREWS:  So, right
3  now, the Botcherby document is 53
4  and this document I just handed
5  Mr. Bauder is 52.  Sorry about
6  that.
7          THE WITNESS:  Okay.
8          - - -
9      (Whereupon, Exhibit 52 was
10  marked for identification.)
11          - - -
12      (Whereupon, there was a
13  discussion held off the record at
14  this time.)
15          - - -
16  BY MR. McANDREWS:
17      Q.  All right.  This is a Crown
18  internal correspondence from G.E.
19  Ellerbrock to R.J. Gruodis.  Do you see
20  that?
21      A.  I do see that, yes.
22      Q.  Dated February 16th, 1993,
23  Bates numbered CCS 0045867 through 45868.
24      Do you recognize this

Page 227

1  document?
2      A.  No, I don't.
3      Q.  All right.  If you flip over
4  to the second page, you'll see that it's
5  been cc'd to you at the bottom?
6      A.  I see that.
7      Q.  Okay.  On the first page
8  going down, do you see the bullet point
9  that says bottom reform technology?
10      A.  Yes.
11      Q.  If you go to the second
12  paragraph, there's a parenthetical there
13  that says -- I'm sorry.  Let's go up to
14  right after it says -- well, first, let's
15  look at the subject.  The subject is
16  Anheuser-Busch CCB II bottom profile.  Do
17  you see that?
18      A.  Yes.  I do see that, yes.
19      Q.  Okay.  And under bottom
20  reform technology, it says Norm and Dave.
21  Do you know who that would be?
22      A.  No, I don't.
23      Q.  Okay.  Norm and Dave
24  acknowledged that MCC -- that's

Page 228

1  Anheuser-Busch; correct?
2      A.  Let me -- let me say, yeah,
3  Norm, I recognize the Norm.  If I heard
4  his last name -- he was with
5  Anheuser-Busch, right?
6      Q.  Okay.
7      A.  And Dave I don't know, but
8  I'm pretty sure there's a Norm -- I can't
9  remember his last name.
10      Q.  Okay.  And MCC is -- is
11  Anheuser-Busch; is that correct?
12      A.  That is their metal
13  container division, yes, their --
14      Q.  Okay.  Well, it says, Norm
15  and Dave acknowledge that MCC is
16  currently running a can at their Arnold,
17  Missouri, plant that uses .0113 starting
18  gauge and metal box outside in bottom
19  reform technology.  By outside in --
20      A.  Yes.
21      Q.  -- what -- if you know, what
22  would outside in bottom reforming be?
23          MS. MALINOSKI:  Just lack of
24  foundation.  If you know, you can

57 (Pages 225 to 228)

A058

JOSEPH F. BAUDER, JULY 21, 2006
CONFIDENTIAL

Page 229

1    answer.
2        THE WITNESS: I can answer
3    it if I should? I mean --
4        MS. MALINOSKI: No. I was
5    just objecting because this was
6    not what you wrote, but if you
7    know, you can answer it.
8        THE WITNESS: Yeah, it's --
9    it's forming from the outside in.
10   It's on the outside rather than on
11   the inside.
12 BY MR. McANDREWS:
13   Q.   Does it reform what we
14 called the inner wall?
15   A.   Does it reform the inner
16 wall, did you say?
17   Q.   Correct. Would -- would
18 outside-in reforming affect the inner
19 wall?
20   A.   It may. I don't know.
21   Q.   Okay. Is there a contact on
22 the inner wall of the bottom of the can
23 in outside-in reforming, if you know?
24       MS. MALINOSKI: Objection.

Page 230

1    Vague.
2        THE WITNESS: I don't know,
3    but I don't think so.
4 BY MR. McANDREWS:
5    Q.   Okay. Continuing on, it
6 says, in addition, they are converting
7 systemwide to .0109 starting gauge and
8 .0038 side walls using this same
9 technology. We stated that this can was
10 utilizing inferior technology, had
11 wrinkles in the bottom, had a
12 cookie-cutter bottom and was
13 directionally opposite their advice to
14 us. Previously, they had advised us to
15 look at inside out bottom reform
16 technology which would make a smoother
17 bottom without the cookie-cutter effect.
18       Do you see that?
19   A.   Yes.
20   Q.   Do you know what the
21 cookie-cutter effect on a can bottom
22 would be?
23       MS. MALINOSKI: Again, lack
24 of foundation.

Page 231

1        THE WITNESS: I do know, but
2    I can -- if you -- it's the
3    sharpness on the bottom radius.
4        MR. McANDREWS: Okay.
5 BY MR. McANDREWS:
6    Q.   Is that a good thing or a
7 bad thing, to get sharpness in the radius
8 of the bottom?
9        MS. MALINOSKI: Objection.
10   Vague.
11       THE WITNESS: It's a matter
12   of opinion, I guess. Metal
13   Container has been doing it for
14   years and years, so I don't know.
15   It's a matter of preference, I
16   guess, what you think is good and
17   bad.
18 BY MR. McANDREWS:
19   Q.   Metal Container has been
20 doing what for years?
21   A.   The, uhm, outside reforming,
22 which gives you that cookie-cutter
23 effect.
24   Q.   Okay. Do you know of any

Page 232

1 other ways other than the use of rollers
2 to reform the inner base of a can, inner
3 bottom of a can?
4        MS. MALINOSKI: Objection.
5    Vague.
6        MR. McANDREWS: Do you
7    understand the question, Mr.
8    Bauder?
9        THE WITNESS: Yeah, you want
10   to know if there's another way
11   other than using the rollers to
12   reform?
13       MR. McANDREWS: Correct.
14       THE WITNESS: Do I know of
15   another way? Yeah, I was involved
16   in a patent for that.
17       MR. McANDREWS: All right.
18       - - -
19       (Whereupon, Exhibit 54 was
20       marked for identification.)
21       - - -
22 BY MR. McANDREWS:
23   Q.   I'm fairly certain we have
24 just marked Exhibit Number 54.

58 (Pages 229 to 232)

A059



CROWN CORK & SEAL COMPANY, INC.

# FAX

## CORPORATE TECHNOLOGIES
### 2-Pc. Engineering - Metals - (FAX: 708/239-5200)

Date: 6/19/97

Number of pages including cover sheet 3

To: MILES WATERWORH        From: RICHARD GOLDING

Phone        44 - 1274 - 846224        Phone        708/239- 5211
Fax Phone    44 - 1274 - 592 474      Fax Phone    708/239-5200
CC:

**REMARKS:**
☐ Urgent    ☐ For your review    ☐ Reply ASAP    ☐ Please comment

PLEASE FIND ATTACHED THE CAN INFO
YOU WANTED.

ALSO

THE BOTTOM REFORMING BEAD SHOULD
BE SET UP TO A ∅ 1.818"

CAPABILITY WILL BE CHECKED AGAINST 1.818 ± 0.010"

CAN YOU WRITE A SET UP PROCEDURE FOR THE
REFORMER HEAD WHILE YOU ARE DOING IT.

Regards.
Richard. Golding

CONFIDENTIAL

CCS0058041

A060





CONFIDENTIAL

CCS0058042

A061



| Operation: | Neck Dimension |
|---|---|
| 1st | ▲ 4.250  ±.010 |
| 2nd | ▲ 4.307  Ref. |
| 3rd | ▲ 4.349  Ref. |
| 4th | ▲ 4.391  Ref. |
| 5th | ▲ 4.433  Ref. |
| 6th | ▲ 4.475  Ref. |
| 7th | ▲ 4.517  Ref |
| 8th | ▲ 4.559  Ref |
| 9th | ▲ 4.601  ±.010 |

NOTE: REFER TO PROCESS/QUALITY MANUAL FOR EQUIPMENT SET UP PROCEDURES.

TRIM HEIGHT VARIATION PER CAN MUST NOT EXCEED .003 ON CIRCUMFERENCE (NO STEP ALLOWED).

▲ LUBE APPLICATION— CONTINUOUS COVERAGE OUTSIDE CAN BODY — NO LUBE ALLOWED ON THE INSIDE.

NOTE: BLEND NECKS SMOOTHLY AT 30'±1/2'

▲ = GA. POINT
(t) = TOOL CHECK

±.015 X LIMIT OF VARIATION TO BOTTOM OF LITHO DESIGN OF ANY LABEL

▲.405±.005 DOME DEPTH

| DRAWN | ISSUED | CROWN CORK & SEAL CO., INC. | 0.0109 | TWO PIECE | MANUFACTURING 202/211 |
|---|---|---|---|---|---|
| M. GOGOLA | | ALSIP, IL. | MINIMUM ORDERED GAUGE | ALUMINUM | 9–DIE NECK & SF |
| 7-26-96 | | | | PRODUCT STYLE | TITLE |

③

CONFIDENTIAL

CCS0058043

A062



## CROWN CORK & SEAL CO., INC.

IN CAD DISK FILE "UA2PC-ENG\End\DEV\Customer Drawings\Superend"

SPECIFICATIONS SHOWN APPLY AT DATE ISSUED AND MAY BE SUBJECT TO CHANGE WITHOUT NOTIFICATION. THIS DRAWING IS SCHEMATIC ONLY, AND MAY NOT SHOW EVERY ATTRIBUTE AND PROFILE IN ACCURATE PROPORTIONAL RELATIONSHIP.

MANUFACTURING DRAWING NUMBER:   ESM, 'TO BE SPECIFIED'

| | DIMENSION KEY | 202 DIAMETER – STANDARD | 202 DIAMETER – METRIC |
|---|---|---|---|
| A | CURL DIAMETER | 2.340 ±.010 | 59.43mm ±.254mm |
| B | | | |
| C | CURL HEIGHT | 24 TO 28 ENDS PER 2' | 24 TO 28 ENDS PER 50.8mm |
| D | CURL OPENING | .107 MINIMUM | 2.717mm MINIMUM |
| E | | | |
| F | COUNTERSINK DEPTH | .250 ±.005 | 6.35mm ±.127mm |
| G | PANEL HEIGHT | .096 ±.005 | 2.438mm ±.127mm |

REFERENCE EMBOSSING AND INCISING PADS.

| | UPPER PADS | | LOWER PADS |
|---|---|---|---|
| H | | H | |
| F | | F | |

' THIS DRAWING IS SUPPLIED EXPRESSLY FOR CROWN CORK & SEAL CO.,INC. CUSTOMERS. ALL INFORMATION CONTAINED HEREON IS CONFIDENTIAL AND NOT TO BE REPRODUCED, COPIED, OR DISCLOSED TO OTHERS.'

CUSTOMER SPECIFICATION FOR:- 202/114 ALUMINUM SUPER END WITH REDUCED RETAINED TAB & RAISED PANEL

202 no.

| DRAWN | B.FIELDS |
|---|---|
| DATE | 12/12/97 |

**C008793**

CONFIDENTIAL-OUTSIDE
COUNSEL EYES ONLY-W.D.
WISCONSIN C.A. 03 C 0137 S

CONFIDENTIAL



CONFIDENTIAL

CCS0045671

A064

 CROWN CORK & SEAL COMPANY, INC.

# FAX

## CORPORATE TECHNOLOGIES
### Engineering

**Date:** 2-23-98

Number of pages including cover sheet _____

**To:** Peter Hinton

**From:** Brian Fields

**Phone** _____   **Phone**     708 239 5287

**Fax Phone** _____   **Fax Phone**   708 239 5200

**CC:**

**REMARKS:**

| ☐ Urgent | ☒ For your review | ☐ Reply ASAP | ☐ Please comment |

Pete

Please find enclosed Customer drawings for 202 superend and can.  Can/end samples to follow

Brian



**CORPORATE TECHNOLOGIES**
11535 S. Central, Alsip IL  60482

**C008795**

CONFIDENTIAL-OUTSIDE COUNSEL EYES ONLY-W.D. WISCONSIN C.A. 03 C 0137 S

CONFIDENTIAL                                   CCS0045672

CONFIDENTIAL

CCS0062178



CONFIDENTIAL

CCS0062179

A067

A068

CCS0062182

CONFIDENTIAL



| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | | | | Olympia Conversion | | | |
| 2 | | | | Crown-14 Necker Tooling (original design) | | | |
| 3 | | | | | | | |
| 4 | Stage | Die PN | Bore Size | KO PN | KO OD | Gap | Pin Ht |
| 5 | 1 | 3503901 | 2.5460 | 6000252-1 | 2.5326 | 0.0132 | 0.448 |
| 6 | 2 | 3503902 | 2.5150 | 6000252-2 | 2.50166 | 0.0133 | 0.448 |
| 7 | 3 | 3503903 | 2.4850 | 6000252-3 | 2.46962 | 0.0135 | 0.323 |
| 8 | 4 | 3503904 | 2.4500 | 6000252-4 | 2.43638 | 0.0135 | 0.323 |
| 9 | 5 | 3503905 | 2.4160 | 6000252-5 | 2.40224 | 0.0138 | 0.323 |
| 10 | 6 | 3503906 | 2.3810 | 6000252-6 | 2.3671 | 0.0139 | 0.323 |
| 11 | 7 | 3503907 | 2.3450 | 6000252-7 | 2.33096 | 0.0140 | 0.323 |
| 12 | 8 | 3503908 | 2.3080 | 6000252-8 | 2.29382 | 0.0142 | 0.323 |
| 13 | 9 | 3503909 | 2.2700 | 6000252-9 | 2.25568 | 0.0143 | 0.323 |
| 14 | 10 | 3503910 | 2.2310 | 6000252-10 | 2.21654 | 0.0145 | 0.323 |
| 15 | 11 | 3503911 | 2.1910 | 6000252-11 | 2.1764 | 0.0146 | 0.323 |
| 16 | 12 | 3503912 | 2.1500 | 6000252-12 | 2.13526 | 0.0147 | 0.323 |
| 17 | 13 | 3503913 | 2.1080 | 6000252-13 | 2.09312 | 0.0149 | 0.323 |
| 18 | 14 | 3503914 | 2.0650 | 6000252-14 | 2.04998 | 0.0150 | 0.323 |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |
| 23 | | | | Crown-14 Necker Tooling (1st operation Modification No. 1) | | | |
| 24 | | | | | | | |
| 25 | 1 | 6000921 | 2.5460 | 6000252-1 | 2.5326 | 0.0132 | 0.448 |
| 26 | | | | | | | |
| 27 | | | | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | FRONT OF DIE | | | |
| 34 | | | | | | | |
| 35 | | | | | | | |
| 36 | | | | 0.0019" | | | |
| 37 | | | | REMOVED | | | |
| 38 | | | | | | | |
| 39 | | | | 30° | | | |
| 40 | | | | | | | |
| 41 | | | | | | | |
| 42 | | | | | | | |
| 43 | | | | 3503901A VS. 6000921A | | | |
| 44 | | | | | | | |
| 45 | | | | | | | |
| 46 | | | | | | | |
| 47 | | | | | | | |
| 48 | | | | | | | |

CONFIDENTIAL

CCS0062223



| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | Crown-14 Necker Tooling (1st operation Modification No. 2) | | | |
| 3 | | | | | | | |
| 4 | 1 | 6000923 | 2.5460 | 6000252-1 | 2.5328 | 0.0132 | 0.448 |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | Crown-14 Necker Tooling (1st operation Modification No. 3) | | | |
| 8 | | | | | | | |
| 9 | 1 | 6000924 | 2.5460 | 6000252-1 | 2.5328 | 0.0132 | 0.448 |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | FRONT OF DIE | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | 0.0026" | | | |
| 22 | | | | REMOVED | | | |
| 23 | | | | 5 5° | | | |
| 24 | | | | | | | |
| 25 | | | | | | | |
| 26 | | | | | | | |
| 27 | | | | | | | |
| 28 | | | | 6000923A  VS.  6000924A | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |

CONFIDENTIAL

CCS0062224

|  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 |  |  |  | Olympia Conversion |  |  |  |
| 2 |  |  |  | Crown-14 Necker Tooling (original design) |  |  |  |
| 3 |  |  |  |  |  |  |  |
| 4 | Stage | Die PN | Bore Size | KO PN | KO OD | Gap | Pin Ht |
| 5 | 1 | 3503901 | 2.5460 | 6000252-1 | 2.5326 | 0.0134 | 0.448 |
| 6 | 2 | 3503902 | 2.5150 | 6000252-2 | 2.5015 | 0.0135 | 0.448 |
| 7 | 3 | 3503903 | 2.4830 | 6000252-3 | 2.4693 | 0.0137 | 0.323 |
| 8 | 4 | 3503904 | 2.4500 | 6000252-4 | 2.4362 | 0.0138 | 0.323 |
| 9 | 5 | 3503905 | 2.4160 | 6000252-5 | 2.402 | 0.0140 | 0.323 |
| 10 | 6 | 3503906 | 2.3810 | 6000252-6 | 2.3669 | 0.0141 | 0.323 |
| 11 | 7 | 3503907 | 2.3450 | 6000252-7 | 2.3308 | 0.0142 | 0.323 |
| 12 | 8 | 3503908 | 2.3080 | 6000252-8 | 2.2936 | 0.0144 | 0.323 |
| 13 | 9 | 3503909 | 2.2700 | 6000252-9 | 2.2555 | 0.0145 | 0.323 |
| 14 | 10 | 3503910 | 2.2310 | 6000252-10 | 2.2163 | 0.0147 | 0.323 |
| 15 | 11 | 3503911 | 2.1910 | 6000252-11 | 2.1762 | 0.0148 | 0.323 |
| 16 | 12 | 3503912 | 2.1500 | 6000252-12 | 2.1351 | 0.0149 | 0.323 |
| 17 | 13 | 3503913 | 2.1080 | 6000252-13 | 2.0929 | 0.0151 | 0.323 |
| 18 | 14 | 3503914 | 2.0650 | 6000252-14 | 2.0498 | 0.0152 | 0.323 |
| 19 |  |  | . |  |  |  |  |
| 20 |  |  |  |  |  |  |  |
| 21 |  |  |  |  |  |  |  |
| 22 |  |  |  |  |  |  |  |
| 23 |  |  |  | Crown-14 Necker Tooling (1st operation Modification No. 1) |  |  |  |
| 24 |  |  |  |  |  |  |  |
| 25 | 1 | 6000921 | 2.5460 | 6000252-1 | 2.5326 | 0.0134 | 0.448 |
| 26 |  |  |  |  |  |  |  |
| 27 |  |  |  |  |  |  |  |
| 28 |  |  |  |  |  |  |  |
| 29 |  |  |  |  |  |  |  |
| 30 |  |  |  |  |  |  |  |
| 31 |  |  |  |  |  |  |  |
| 32 |  |  |  |  |  |  |  |
| 33 |  |  |  | FRONT OF DIE |  |  |  |
| 34 |  |  |  |  |  |  |  |
| 35 |  |  |  | 0.0019" |  |  |  |
| 36 |  |  |  | REMOVED |  |  |  |
| 37 |  |  |  |  |  |  |  |
| 38 |  |  |  | 3 0° |  |  |  |
| 39 |  |  |  |  |  |  |  |
| 40 |  |  |  |  |  |  |  |
| 41 |  |  |  |  |  |  |  |
| 42 |  |  |  |  |  |  |  |
| 43 |  |  |  | 3503901A VS. 6000921A |  |  |  |
| 44 |  |  |  |  |  |  |  |
| 45 |  |  |  |  |  |  |  |
| 46 |  |  |  |  |  |  |  |
| 47 |  |  |  |  |  |  |  |
| 48 |  |  |  |  |  |  |  |

CONFIDENTIAL

CCS0062225



| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | *Crown-14 Necker Tooling (1st operation Modification No. 2)* | | | |
| 3 | | | | | | | |
| 4 | 1 | 6000923 | 2.5460 | 6000252-1 | 2.5328 | 0.0134 | 0.448 |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | *Crown-14 Necker Tooling (1st operation Modification No. 3)* | | | |
| 8 | | | | | | | |
| 9 | 1 | 6000924 | 2.5460 | 6000252-1 | 2.5328 | 0.0134 | 0.448 |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |

FRONT OF DIE

0.0026"
REMOVED

5.5°

6000923A V.S. 6000924A

CONFIDENTIAL

CCS0062226

A072



| | | ALCOA | Crown-9 | Crown-11 | Belvac-14 | "NEW" Crown-14 | | |
|---|---|---|---|---|---|---|---|---|
| | Stage | Reduction | Reduction | Reduction | Reduction | Reduction | | |
| | 1st | 0.068 | 0.070 | 0.055 | 0.050 | 0.054 | | |
| | 2nd | 0.046 | 0.042 | 0.035 | 0.038 | 0.031 | | |
| | 3rd | 0.046 | 0.042 | 0.035 | 0.038 | 0.032 | | |
| | 4th | 0.046 | 0.045 | 0.037 | 0.038 | 0.033 | | |
| | 5th | 0.046 | 0.045 | 0.037 | 0.038 | 0.034 | | |
| | 6th | 0.046 | 0.047 | 0.038 | 0.038 | 0.035 | | |
| | 7th | 0.046 | 0.047 | 0.038 | 0.038 | 0.036 | | |
| | 8th | 0.046 | 0.048 | 0.039 | 0.038 | 0.037 | | |
| | 9th | 0.046 | 0.064 | 0.040 | .0.038 | 0.038 | | |
| | 10th | 0.046 | - | 0.042 | 0.038 | 0.039 | | |
| | 11th | 0.046 | - | 0.032 | 0.038 | 0.040 | | |
| | 12th | 0.046 | - | - | 0.034 | 0.041 | | |
| | 13th | 0.046 | - | - | 0.034 | 0.042 | | |
| | 14th | 0.046 | - | - | 0.033 | 0.043 | | |

CONFIDENTIAL

CCS0062227



CONFIDENTIAL

CCS0062357



202/211 x 413 (20x)
14 STAGE ROUND SHOULDER

| STAGE | "PIN" |
|-------|-------|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |

G-767-188-4

TITLE: 202/211 x 413 (DIE NECKED)

THIRD ANGLE PROJECTION

CONFIDENTIAL

CCS0062358



202/211 x 413 (20x)
14 STAGE ROUND SHOULDER

| STAGE | "PIN" |
|---|---|
| 1 | .448" |
| 2 | .448" |
| 3 | .323" |
| 4 | .323" |
| 5 | .323" |
| 6 | .323" |
| 7 | .323" |
| 8 | .323" |
| 9 | .323" |
| 10 | .323" |
| 11 | .323" |
| 12 | .323" |
| 13 | .323" |
| 14 | .323" |

G-767-1BB-4

4.450 (TO BOTTOM OF CAM)

CONFIDENTIAL

CCS0063071

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | **Necking Process Survey** | | | | | |
| 2 | Plant | Lawrence | | | | (Back End Information) | | | | Air Pressure | |
| 3 | Line | 1 | | | | | | | | | |
| 4 | Stages | 14 | | | | | | | | | |
| 5 | Shoulder | Sq. | | | | | | | | Waxer type / Degrees | Continental |
| 6 | Date | | | | | | | | | | |
| 7 | | | | | | | | | | Machine condition | |
| 8 | | | | | | | | | | (Excellent, Good, Fair) | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | KNOCKOUTS | | | |
| 11 | | DIES | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | Designed | | | | Designed | | | Designed | Actual |
| 14 | Stage | Part number | Diameter | Material | Stage | Part number | Diameter | 1 PC / 3 PC | Material | Gap | Gap (Avg) |
| 15 | 1 | 5-3502011B | 2.5500 | Carbide | 1 | 4-3503133-1 | 2.5364 | 1PC | Tool Steel | 0.0136 | 0.0135 |
| 16 | 2 | 5-3502012A | 2.5120 | Carbide | 2 | 4-3503133-2 | 2.4982 | 1PC | Tool Steel | 0.0138 | 0.0138 |
| 17 | 3 | 5-3501851A | 2.4740 | Carbide | 3 | 4-3503133-3 | 2.4600 | 1PC | Tool Steel | 0.0140 | 0.014 |
| 18 | 4 | 5-3501852A | 2.4360 | Carbide | 4 | 4-3503133-4 | 2.4218 | 1PC | Tool Steel | 0.0142 | 0.0141 |
| 19 | 5 | 5-3501853A | 2.3980 | Carbide | 5 | 4-3503133-5 | 2.3836 | 1PC | Tool Steel | 0.0144 | 0.0142 |
| 20 | 6 | 5-3501854A | 2.3600 | Carbide | 6 | 4-3503133-6 | 2.3454 | 1PC | Tool Steel | 0.0146 | 0.0145 |
| 21 | 7 | 5-3501855A | 2.3220 | Carbide | 7 | 4-3503133-7 | 2.3072 | 1PC | Tool Steel | 0.0148 | 0.015 |
| 22 | 8 | 5-3501802A | 2.2840 | Carbide | 8 | 4-3503133-8 | 2.2690 | 1PC | Tool Steel | 0.0150 | 0.0151 |
| 23 | 9 | 5-3501803A | 2.2460 | Carbide | 9 | 4-3503133-9 | 2.2308 | 1PC | Tool Steel | 0.0152 | 0.0152 |
| 24 | 10 | 5-3501804A | 2.2080 | Carbide | 10 | 4-3503133-10 | 2.1926 | 1PC | Tool Steel | 0.0154 | 0.0152 |
| 25 | 11 | 5-3501805A | 2.1700 | Carbide | 11 | 4-3503133-11 | 2.1544 | 1PC | Tool Steel | 0.0156 | 0.0155 |
| 26 | 12 | 5-3501806A | 2.1360 | Carbide | 12 | 4-3503133-12 | 2.1202 | 1PC | Tool Steel | 0.0158 | 0.0158 |
| 27 | 13 | 5-3501807A | 2.1020 | Carbide | 13 | 4-3503133-13 | 2.0860 | 1PC | Tool Steel | 0.0160 | 0.0159 |
| 28 | 14 | 5-3503136A | 2.0560 | Carbide | 14 | 4-3503133-14 | 2.0498 | 1PC | Tool Steel | 0.0162 | 0.0163 |
| 29 | | | | | | | | | | | |
| 30 | | | | | | page 1 of 4 | | | | | |

CONFIDENTIAL

CCS0063072

A077

| | L |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | *Pin* |
| 14 | *Height* |
| 15 | 0.448 |
| 16 | 0.448 |
| 17 | 0.323 |
| 18 | 0.323 |
| 19 | 0.323 |
| 20 | 0.323 |
| 21 | 0.323 |
| 22 | 0.323 |
| 23 | 0.323 |
| 24 | 0.323 |
| 25 | 0.323 |
| 26 | 0.323 |
| 27 | 0.323 |
| 28 | 0.323 |
| 29 | |
| 30 | |

CONFIDENTIAL

CCS0063073

A078

|   | A | B | C | D |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | Plant | Lawrence | | |
| 4 | Line | 1 | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | Neck Defects | | |
| 8 | Defect | Type | | % of total |
| 9 | Pleat | Stop trim | | 0.00% |
| 10 | | Silver | | 0.00% |
| 11 | | Burr | | 0.00% |
| 12 | | Glob on neck | | 0.00% |
| 13 | | Wax | | 0.00% |
| 14 | | Flat / Crown | | 0.00% |
| 15 | | Inside spray | | 0.00% |
| 16 | | Pucker | | 0.00% |
| 17 | | V crush | | 0.00% |
| 18 | | Bat wing | | 0.00% |
| 19 | | Other | | 0.00% |
| 20 | Shape | Neck misblend | | 0.00% |
| 21 | | | | |
| 22 | | Visual Defects | | % of total |
| 23 | Visual | Dirty can | | 0.00% |
| 24 | | Ink smear | | 0.00% |
| 25 | | Wax | | 0.00% |
| 26 | | Glob on body | | 0.00% |
| 27 | Handling | Dent | | 0.00% |
| 28 | | Lightning bolt | | 0.00% |
| 29 | | Contamination in can | | 0.00% |
| 30 | | Creases | | 0.00% |
| 31 | Other | Unknown | | 0.00% |
| 32 | | | | |
| 33 | | | Summary | |
| 34 | | | | |
| 35 | | | Total Camera Rejects % | |
| 36 | | | | |
| 37 | | | Bodymaker % | |
| 38 | | | | |
| 39 | | | Printer % | |
| 40 | | | | |
| 41 | | | Varnish % | |
| 42 | | | | |
| 43 | | | Inside spray % | |
| 44 | | | | |
| 45 | | | Wax % | |
| 46 | | | | |
| 47 | | | Unknown % | |
| 48 | | | | |
| 49 | | | % of Total (lines 1 & 2) = | |
| 50 | | | | |
| 51 | | | | |
| 52 | | | | |
| 53 | | | | |
| 54 | | | | |

CONFIDENTIAL

CCS0063074

| | E | F | G | H |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | SPOILAGE ANALYSIS WAS DONE ON LINE #1 ONLY, WHICH IS A HIGH SPEED LINE | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | BM 1/1 | BM 1/2 | BM 1/3 | BM 1/4 |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | BM 1/1 | BM 1/2 | BM 1/3 | BM 1/4 |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |
| 29 | | | | |
| 30 | | | | |
| 31 | | | | |
| 32 | | | | |
| 33 | | | | |
| 34 | | | | |
| 35 | | | | |
| 36 | | | | |
| 37 | | | | |
| 38 | 0% | | | |
| 39 | | | | |
| 40 | 0% | | | |
| 41 | | | | |
| 42 | 0% | | | |
| 43 | | | | |
| 44 | 0% | | | |
| 45 | | | | |
| 46 | 0% | | | |
| 47 | | | | |
| 48 | 0% | | | |
| 49 | | | | |
| 50 | 0% | | | |
| 51 | | | | |
| 52 | | | | |
| 53 | Total number of rejects per 20,000 production = | | | |
| 54 | Total number of V-crushes at the necker = | | | |

CONFIDENTIAL

CCS0063075

| | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|
| 1 | | Necking Process Survey | | | | | | |
| 2 | | (Spoilage Analysis) | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | Bodymaker | | | | | | |
| 8 | BM 1/5 | BM 1/6 | BM 2/1 | BM 2/2 | BM 2/3 | BM 2/4 | BM 2/5 | BM 2/6 |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | BM 1/6 | BM 1/6 | BM 2/1 | BM 2/2 | BM 2/3 | BM 2/4 | BM 2/5 | BM 2/6 |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | Spray machine I.D. markings are not used in the Lawrence plant | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |
| 41 | | | | | | | | |
| 42 | | | | | | | | |
| 43 | | | | | | | | |
| 44 | | | | | | | | |
| 45 | | | | | | | | |
| 46 | | | | | | | | |
| 47 | | | | | | | | |
| 48 | | | | | | | | |
| 49 | | | | | | | | |
| 50 | | | | | | | | |
| 51 | | | | | | | | |
| 52 | | | | | | | | |
| 53 | | | | | | | | |
| 54 | | | | | | | | |

CONFIDENTIAL

CCS0063076

| | Q | R | S | T | U |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | Date | | | | |
| 3 | Surveyed by | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |
| 51 | | | | | |
| 52 | | | | | |
| 53 | | | | | |
| 54 | | | | | |

CONFIDENTIAL

CCS0063077