

| | A | B | C | D |
|---|---|---|---|---|
| 55 | | | | |
| 58 | | | | |

CONFIDENTIAL

CCS0063078

A083

| | E | F | G | H |
|---|---|---|---|---|
| 55 | | | | |
| 56 | | | | |

CONFIDENTIAL

CCS0063079

| | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|
| 55 | | | | | | | | |
| 56 | | page 2 of 4 | | | | | | |

CONFIDENTIAL

CCS0063080

|   | A | B | C | D |
|---|---|---|---|---|
| 1 | | | . | |
| 2 | | | | |
| 3 | Plant | Lawrence | | |
| 4 | Line | 1 | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | Neck Defects | | |
| 8 | *Defect* | *Type* | | % of total |
| 9 | *Pleat* | Step trim | | 0.00% |
| 10 | | Sliver | | 0.00% |
| 11 | | Burr | | 0.00% |
| 12 | | Glob on neck | | 0.00% |
| 13 | | Wax | | 0.00% |
| 14 | | Flat / Crown | | 0.00% |
| 15 | | Inside spray | | 0.00% |
| 16 | | Pucker | | 0.00% |
| 17 | | V crush | | 0.00% |
| 18 | | Bat wing | | 0.00% |
| 19 | | Other | | 0.00% |
| 20 | *Shape* | Neck misblend | | 0.00% |
| 21 | | | | |
| 22 | | Visual Defects | | % of total |
| 23 | *Visual* | Dirty can | | 0.00% |
| 24 | | Ink smear | | 0.00% |
| 25 | | Wax | | 0.00% |
| 26 | | Glob on body | | 0.00% |
| 27 | *Handling* | Dent | | 0.00% |
| 28 | | Lightning bolt | | 0.00% |
| 29 | | Contamination in can | | 0.00% |
| 30 | | Creases | | 0.00% |
| 31 | *Other* | Unknown | | 0.00% |
| 32 | | | | |
| 33 | | | Summary | |
| 34 | | | | |
| 35 | | | Total Camera Rejects % | |
| 36 | | | | |
| 37 | | | Bodymaker % | |
| 38 | | | | |
| 39 | | | Printer % | |
| 40 | | | | |
| 41 | | | Varnish % | |
| 42 | | | | |
| 43 | | | Inside spray % | |
| 44 | | | | |
| 45 | | | Wax % | |
| 46 | | | | |
| 47 | | | Unknown % | |
| 48 | | | | |
| 49 | | | % of Total (lines 1 & 2) = | |
| 50 | | | | |
| 51 | | | | |
| 52 | | | | |
| 53 | | | | |
| 54 | | | | |

CONFIDENTIAL

CCS0063081

| | E | F | G | H |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | SPOILAGE ANALYSIS WAS DONE ON LINE #1 ONLY, WHICH IS A HIGH SPEED LINE | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | BM 1/1 | BM 1/2 | BM 1/3 | BM 1/4 |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | BM 1/1 | BM 1/2 | BM 1/3 | BM 1/4 |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |
| 29 | | | | |
| 30 | | | | |
| 31 | | | | |
| 32 | | | | |
| 33 | | | | |
| 34 | | | | |
| 35 | | | | |
| 36 | | | | |
| 37 | | | | |
| 38 | 0% | | | |
| 39 | | | | |
| 40 | 0% | | | |
| 41 | | | | |
| 42 | 0% | | | |
| 43 | | | | |
| 44 | 0% | | | |
| 45 | | | | |
| 46 | 0% | | | |
| 47 | | | | |
| 48 | 0% | | | |
| 49 | | | | |
| 50 | 0% | | | |
| 51 | | | | |
| 52 | | | | |
| 53 | Total number of rejects per 20,000 production = | | | |
| 54 | Total number of V-crushes at the necker = | | | |

CONFIDENTIAL

CCS0063082

| | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|
| 1 | | **Necking Process Survey** | | | | | | |
| 2 | | (Spoilage Analysis) | | | | | | |
| 3 | | | | | | | | |
| 4 | | | | | | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | Bodymaker | | | | | | |
| 8 | BM 1/5 | BM 1/0 | BM 2/1 | BM 2/2 | BM 2/3 | BM 2/4 | BM 2/5 | BM 2/6 |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | BM 1/5 | BM 1/0 | BM 2/1 | BM 2/2 | BM 2/3 | BM 2/4 | BM 2/5 | BM 2/5 |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |
| 29 | | | | | | | | |
| 30 | | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |
| 33 | | | | | | | | |
| 34 | | | | | | | | |
| 35 | | | | | | | | |
| 36 | | | | | | | | |
| 37 | Spray machine I.D. markings are not used in the Lawrence plant | | | | | | | |
| 38 | | | | | | | | |
| 39 | | | | | | | | |
| 40 | | | | | | | | |
| 41 | | | | | | | | |
| 42 | | | | | | | | |
| 43 | | | | | | | | |
| 44 | | | | | | | | |
| 45 | | | | | | | | |
| 46 | | | | | | | | |
| 47 | | | | | | | | |
| 48 | | | | | | | | |
| 49 | | | | | | | | |
| 50 | | | | | | | | |
| 51 | | | | | | | | |
| 52 | | | | | | | | |
| 53 | | | | | | | | |
| 54 | | | | | | | | |

CONFIDENTIAL

CCS0063083

| | Q | R | S | T | U |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | Date | | | | |
| 3 | Surveyed by | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |
| 41 | | | | | |
| 42 | | | | | |
| 43 | | | | | |
| 44 | | | | | |
| 45 | | | | | |
| 46 | | | | | |
| 47 | | | | | |
| 48 | | | | | |
| 49 | | | | | |
| 50 | | | | | |
| 51 | | | | | |
| 52 | | | | | |
| 53 | | | | | |
| 54 | | | | | |

CONFIDENTIAL

CCS0063084



| | A | B | C | D |
|---|---|---|---|---|
| 55 | | | | |
| 56 | | | | |

CONFIDENTIAL

CCS0063085



| E | F | G | H |
|---|---|---|---|
| | | | |
| | | | |

CONFIDENTIAL

CCS0063086

| | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|
| 55 | | | | | | | | |
| 56 | | page 3 of 4 | | | | | | |

CONFIDENTIAL

CCS0063087

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | **Necking Process Survey** | | | |
| 2 | | | | | | | (Notes & Comments) | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | Audit Notes | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | | | | | | | | | | |
| 16 | | | | | | | | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |
| 21 | | | | | | | | | | |
| 22 | | | | | | | | | | |
| 23 | | Recommendations | | | | | | | | |
| 24 | | | | | | | | | | |
| 25 | | | | | | | | | | |
| 26 | | | | | | | | | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |
| 32 | | | | | | | | | | |
| 33 | | | | | | | | | | |
| 34 | | | | | | | | | | |
| 35 | | | | | | | | page  4 of 4 | | | |

CONFIDENTIAL

CCS0063088



CONFIDENTIAL

CCS0057953

A094

CONFIDENTIAL
ATTORNEY'S EYES ONLY





CONFIDENTIAL
ATTORNEY'S EYES ONLY



CONFIDENTIAL
ATTORNEY'S EYES ONLY



CONFIDENTIAL
ATTORNEY'S EYES ONLY





SECTION A—A

PROPRIETARY INFORMATION
THIS DRAWING AND ITS CONTENTS ARE
CONFIDENTIAL AND ARE THE PROPERTY
OF BELVAC PRODUCTION MACHINERY.
ANY REPRODUCTION OF THIS DRAWING
OR ANY PART IN ANY MANNER IS
PROHIBITED WITHOUT THE WRITTEN
PERMISSION OF BELVAC.
COPYRIGHT 2006
BELVAC PRODUCTION MACHINERY

CONFIDENTIAL
ATTORNEY'S EYES ONLY

A099







CONFIDENTIAL
ATTORNEY'S EYES ONLY

PROPRIETARY INFORMATION
THIS DRAWING AND ITS CONTENTS ARE
CONFIDENTIAL AND ARE THE PROPERTY
OF BELVAC PRODUCTION MACHINERY.
ANY REPRODUCTION OF THIS DRAWING
OR OF GLEAN, PRODUCTION MACHINERY.
ANY REPRODUCTION OF THIS DRAWING
OR ANY PART IN ANY MANNER IS
PROHIBITED WITHOUT THE WRITTEN
PERMISSION OF BELVAC.
COPYRIGHT 2006
BELVAC PRODUCTION MACHINERY





CONFIDENTIAL
ATTORNEY'S EYES ONLY

A102

CONFIDENTIAL
ATTORNEY'S EYES ONLY

A103



PROPRIETARY INFORMATION
THIS DRAWING AND ITS CONTENTS ARE CONFIDENTIAL AND ARE THE PROPERTY OF BELVAC PRODUCTION MACHINERY. ANY REPRODUCTION OF THIS DRAWING OR ANY PART IN ANY MANNER IS PROHIBITED WITHOUT THE WRITTEN PERMISSION OF BELVAC.
COPYRIGHT 2006
BELVAC PRODUCTION MACHINERY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, ) 
INC. and CROWN CORK & SEAL USA, ) 
INC., ) 
       ) 
Plaintiffs/Counterclaim Defendants, ) 
       )    Civil Action No. 05-608 (MPT) 
v. ) 
       ) 
       ) 
REXAM BEVERAGE CAN COMPANY, ) 

Defendant/Counterclaimant.

**EXPERT REPORT OF EDMUND GILLEST REGARDING INFRINGEMENT OF U.S. PATENT NOS. 4,774,839, 5,222,385, 5,697,242, 6,129,230, AND 6,260,728**

## I.    INTRODUCTION

I have been retained by Rexam to testify as an expert in the above identified action. I am currently the owner of Gillest & Associates, LLC, a company founded in 2006, to do research, development and engineering for the metal packaging and golf industry. In addition to my consulting work at Gillest & Associates, LLC, I have worked in the metal (automotive and packaging) industry for over 40 years. From 1964 to1977, I worked for Ford Motor Co. in the automobile industry; from 1978 to 1996, I worked for Ball Corp. in the metal packaging industry; and from 1996 to 2006, I worked for Alcan, currently Novelis Corp., in the metal processing/packaging area.

As a result of my education, training and experience, I have developed knowledge of metal forming and metal packaging that includes can end and can body research, design, manufacturing and implementation. I have extensive experience with can and can end

1

development and engineering in addition to can end and can body manufacturing processes at Ball Corp. My attached résumé provides additional details related to my background.

It is my understanding that Rexam, filed counterclaims alleging that the Plaintiff's, Crown Cork & Seal USA, Inc.'s ("CC&S" or "Crown"), B-64 large opening can end infringes Rexam's 6,260,728 and 6,129,230 patents and that Crown has infringed the methods of necking and base reforming of can bodies claimed in US patents 5,222,385; 5,679,242; and 4,477,839.

The law firm of McAndrews, Held & Malloy, Ltd., is paying my consulting fee of $100.00 per hour and actual T & E expenses plus 10%. I have not been retained prior to this as an expert for litigation matters.

In the course of my analysis, I have considered and reviewed various materials, drawings, patents and products, in addition to my general knowledge based upon 28 years of experience in the packaging industry. These documents and information provided by counsel, which were produced in this case by both the Plaintiffs and Defendants, include the '728, '230, '385, '242, and '839 patents and their prosecution histories, deposition testimony, technical drawings and physical exhibits.

A listing of references and articles reviewed in connection with my analysis and opinion is included in Attachment 2.

## II.    INTRODUCTION TO CANMAKING AND RELATED TERMINOLOGY

Canmaking comprises manufacturing a can body and a can end. The can end is sometimes referred to as an end, lid, or closure. Both products are manufactured in two distinct processes. Cans are filled in the beverage filling operation. The can body and can end are then joined together in an operation known as double seaming. Double seaming joins the two parts

2

(can body and can end) together to form the completed package with the product inside the package.



The can body is manufactured in a metal stamping and drawn & ironed process that gives the can body its cylindrical shape. The can body is comprised of a bottom, a side wall, and a flange at the top of the open end of the can body.



The can end or lid is manufactured in a metal stamping process. To form the can end, a round disc of metal is stamped in a machine called a shell press into the general shape of a can end. That end shell is then further refined in what is called the conversion operation by forming the score and tab for easy opening.

The radially outermost part of a conventional can end is a cover hook (or curl) that is designed to fit over the can flange. The can end also has a chuck wall, countersink (also referred to as anti-peaking bead, annular reinforcing bead or annular reinforcement bead), and central panel.

3



As illustrated to the left, the can end is set on the flange at the top of top of the can body. The can body and can end are then joined (double seamed) together to form a hermetic sealed container/package to insure product/beverage is safe to consume/drink.

Double seaming consists of joining the can body and can end together with two seaming/rolling operations, known as first and second seaming operations. The can body is filled with beverage/product and then transferred to a double-seamer. The double-seamer places the can end onto the flange of the can body with the assistance of a driving piece known as the seaming chuck. As illustrated below, the seaming/rolling operations complete the process of rolling the cover hook and can flange together, forming/completing the double seam/seal.





Approximately 250 billion beverage cans are used annually worldwide, of which approximately 100 billion beverage cans are used annually in North America.

4

## III.    OPINION

It is my understanding that the claims of the asserted patents are viewed and interpreted by what one of ordinary skill in the art of can and can end manufacturing would understand. It is my opinion that one of ordinary skill in the art would be someone with a mechanical engineering or technical degree and three to four years of experience working in the field, or someone without a mechanical engineering or technical degree with six to ten years of experience working in the field.

Although I am not a patent attorney, I have learned the following about patent infringement and validity:

    a.  In order to literally infringe a patent claim, a device or method must contain all of the elements of that claim;

    b.  In order to prove that a claim is anticipated, each and every claim element must be shown, either expressly or inherently, in a single prior art reference;

    c.  Prior art references may be combined to render patent claims obvious, and therefore invalid if the subject matter could easily be deduced from publicly available material by a person of ordinary skill in the art. I also understand that there must be motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success;

    d.  Patent specifications must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed. If the specification teaches away from claims, e.g., by expressly stating that only a narrower product or method had been found to be useful, then those broad claims must be invalidated for failing to satisfy the written description requirement.

### A.    Crown's Cans Infringe Rexam's '230 Patent

It is my understanding that Rexam is asserting that Crown's standard B-64 large opening can end infringes claims 2, 5 and 13 of Rexam's '230 patent. Through examination of the accused commercial product, talking with the inventors of the '230 patent, reviewing the interrogatory responses and based upon my knowledge and experience, I have concluded that Crown's B-64 large opening can end infringes those claims of the '230 Patent.

5

### i) Claim 2 of the '230 Patent Is Infringed

Claim 2 of the '230 Patent depends from claim 1. Claim 1 recites:

An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a means for opening a frangible panel segment of the panel wall, the end member comprising;

I have concluded that this preamble requires a can end that includes a peripheral edge that is formed to be seamed to a can body and also has a central panel, a frangible panel (or pour panel), and a device for opening the pour panel. These elements are common to all or most beverage can ends and Crown's B-64 large opening can end is no exception. Crown's B-64 large opening can end has each of the elements set forth in the preamble of claim 1.

Claim 1 continues:

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a vent region of the frangible panel segment and having a lift end opposite said nose;

It is my interpretation that this limitation requires that the central panel of the claimed end member contain a rivet that can be formed to retain a tab on the central panel, as does rivet 44 depicted in Fig. 3 of the '230 Patent and as described at col. 5 lines 54 – 55. This limitation also requires a tab, as tab 42 shown in Figs. 1 and 3 of the '230 patent, that has a "nose portion," portion 50 of tab 42, that is adjacent to a frangible panel, and a lift end, such as lift end 46 of the tab 42. These elements are also common to all or most beverage can ends, including Crown's B-64 large opening can end. Crown's B-64 large opening can end has each of the elements set forth in this section of claim 1.

Claim 1 continues:

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region, and a second end joined to the first end by a curvilinear segment of the score groove,

6

This limitation requires that the central panel of the claimed end have a groove formed in the central member that extends from an end (a first end) that is near the region of the central panel that is adjacent to the nose of the tab, extending to another end (a second end). The groove is not a straight line, but rather a curvilinear line from the first end to the second end. The groove defines the boundary of the pour panel. Such grooves or "score profiles" are common in the industry and Crown's B-64 large opening can end has each of the elements of this limitation as the photograph of a Crown B-64 large opening end bearing Crown production no. CCS0029434G below demonstrates.



Claim 1 continues:

> the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment being non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel; and,

This limitation requires that a generally linear segment be between the first and second ends of the primary score and that the generally linear segment join the frangible panel that is bound by the groove to the central panel (during normal operation). The generally linear hinge segment is defined as the area between the looped portion of the groove and the end segment of the primary or outer score. Such grooves or "score profiles" are common in the industry and

7

Crown's B-64 large opening can end has each of the elements of this limitation as the photographs above demonstrate.

Claim 1 continues:

a second score groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment.

This limitation requires that the anti-fracture score (inner score) lie at least in part in the frangible panel and that it extend into the generally linear hinge segment between the first and second ends of the primary score groove. My examination of the accused B-64 large opening can end confirms that this limitation is present in Crown's standard B-64 large opening beverage can ends as generally indicated below.



Claim 2, which depends from claim 1, adds:

The end member of claim 1, wherein, the second score groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

This limitation requires a non-straight (curved) second score (commonly called the anti-fracture score, shown in purple) that generally parallels the primary score (shown in green) and is located to the inside of the primary score. This limitation requires that the score be continuous

A112

and parallel with the primary score. The photo of a Crown B-64 large opening end bearing Crown production no. CCS0029434G below clearly demonstrates that Crown's B-64 large opening can end has this limitation.



Having found each and every limitation of claims 1 and 2 of the '230 patent present in Crown's B-64 can end, I have concluded that Crown's B-64 can end infringes claim 2 of the '230 patent.

### ii)    Claim 5 of the '230 Patent Is Infringed

Claim 5 of the '230 Patent states:

The end member of claim 1, wherein, said second end of the score groove curves away from an adjacent segment of said second groove.

This claim requires that the primary or outer score groove be tailed or turned to the outside, away from the inner groove or anti-fracture score. This limitation is clearly present in Crown's B-64 large opening can end as can be seen in the photographs above. I have already concluded that each limitation of claim 1 is present in Crown's B-64 large opening can end and I have also concluded that the limitation of claim 5 is present in Crown's B-64 large opening can

9



end.  Therefore, I have concluded that Crown's B-64 large opening can end infringes claim 5 of the '230 Patent.

### iii)    Claim 13 of the '230 Patent Is Infringed

Claim 13 of the '230 Patent states:

An end member for a container having a circumferential side wall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall, the end member comprising;

The preamble of claim 13 is very similar to the preamble of claim 1.  However, claim 13 eliminates the "with a means for opening a frangible panel segment of the panel wall" element.  Since I have already concluded that each of the elements of the preamble of claim 1 are present in Crown's B-64 large opening can end, and for the same reasons as set forth above, each of the elements of the preamble of claim 13 are present in Crown's B-64 large opening can end.

Claim 13 continues:

a frangible panel formed in the panel wall and being defined by a curvilinear score groove and a hinge segment, the score grove having a thickness residual and having a first end and a second end, said hinge segment having a length defined by a generally straight line between said first end and said second end;

This limitation requires that the end have a frangible panel or pour panel formed in the panel wall.  The outer curved groove or primary score defines the pour panel.  The score groove has a thickness residual which is the thickness of the metal residual under the score defining the tear panel, and has a first and second end.  The hinge segment is the portion of the central panel between the first and second end.  These elements are common in all or most beverage can ends and are clearly present in Crown's B-64 large opening can end.  Thus, I have concluded that Crown's B-64 large opening can end has each of the elements in this preamble.

10



Claim 13 continues:

a rivet formed in the central panel adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a region of the frangible panel segment and having a lift end opposite said nose; and,

This limitation requires the central panel of the can end to have a rivet formed in it that is capable of retaining a tab on the central panel, as shown by item 44 in Fig. 3 of the '230 Patent and as described at col. 5 lines 54 – 55 of the '230 Patent. This limitation also requires a tab, as shown by item 42 in Figs. 1 and 3 of the '230 patent, that has a "nose portion," portion 50 of the tab, that is near the pour panel. At the opposite side of the "nose portion" is the lift end, which the user typically lifts with a finger.

These elements are common in all or most beverage can ends and are clearly present in Crown's B-64 large opening can end.

Claim 13 continues:

a curvilinear anti-fracture score formed in the frangible panel generally parallel to said score groove, said anti-fracture score having a tail portion passing through the hinge segment.

11

This limitation requires a non-straight (curved) second score (commonly called the anti-fracture score and shown in purple) that generally parallels the primary score (shown in green) and is located to the inside of the primary score. This limitation requires that the score be continuous and parallel with the primary score. The figure below clearly demonstrates that Crown's B-64 large opening can end has this limitation.

The limitation also requires that the tail portion of the anti-fracture score pass through the hinge segment. From my review, I have found that the tail portion of the anti-fracture score (shown in purple) passes through the hinge segment.



Having found each and every limitation of claim 13 of the '230 Patent present in Crown's B-64 can end, I have concluded that Crown's B-64 large opening can end infringes claim 13 of the '230 Patent.

**B.    Crown's Cans Infringe the '728 Patent**

It is my understanding that Rexam has asserted that Crown has infringed claim 7 of the '728 Patent. Claim 7 depends from claim 1, so I will discuss the elements of claim 1. Claim 1 states:

12

An end member for a container having a circumferential sidewall, the end member having a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a central panel wall with a vent region and a means for opening a frangible panel segment of the panel wall, the end member comprising:

I have concluded that the preamble requires a can end that includes a peripheral edge that is formed to be seamed to a can body and also has a central panel, a frangible panel (or pour panel), and a device for opening the pour panel. These elements are common to all or most beverage can ends and Crown's B-64 large opening end is no exception. Crown's B-64 large opening can end has each of the elements set forth in the preamble of claim 1.



FIG. 3

Claim 1 continues:

a primary score grove in the central panel wall defining an outer perimeter of the frangible panel segment, the score grove having a first end adjacent the vent region and a second end, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment integrally connecting the frangible panel segment to an adjacent area of the panel; and,

This limitation requires a primary score groove (an example from Fig. 7 of the '728 patent is shown in green below) which has a first end at the looped section near item 28 and a second end at item 30. The first and second ends of the primary score groove are separated by a hinge segment, which is the portion of metal between the first and second ends of the primary score that stays attached to the central panel during normal opening conditions.

13



FIG. 7

The elements of this limitation are common in the beverage can industry and Crown's B-64 large opening can end is no exception. Each of the elements of this limitation are present in Crown's B-64 large opening can end.

Claim 1 continues:

a second score groove adjacent the second end of said primary score and adjacent said hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the score

This limitation requires a second score groove (shown in purple) near the second end of the primary score groove and hinge segment. The second score groove is designed to direct a fracture in the hinge segment away from the primary score groove so the pour panel stays attached should the hinge segment tear during opening.

The elements of this limitation are present in Crown's B-64 large opening can ends as shown in the figure below.

14

A118



Claim 7, adds the following limitation to claim 1:

The end member of claim 1, wherein, at least a portion of the second groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

In addition to the limitations of claim 1, this limitation requires the second score groove to penetrate a line in a generally transverse manner along the hinge segment between the first and second ends of the primary score. As can be seen in the photo of a Crown B-64 large opening end bearing Crown production no. CCS0029434G below, Crown's B-64 large opening can end has a second groove that penetrates a line in a generally transverse manner along the hinge segment between the first and second ends of the primary score of the can end.



15

A119

Since Crown's B-64 large opening can end contains every element of claims 1 and 7, Crown's B-64 large opening can end infringes claim 7 of Rexam's '728 Patent.

### C.    Crown's Cans Infringe Rexam's '839 Patent

I have been asked to review Rexam patent No. 4,774,839 in regard to claims 1, 2, 5, and 11. Claim 1 states:

> A method of necking an open end of a container side wall to form a smoothly-shaped neck profile comprising the steps of:



My understanding is that this is the preamble to claim 1 and not considered a limitation of the claim. However, after examining the testimony, tooling drawings and physical samples showing each step of necking that Crown performs, it is my opinion that Crown is using a method of smooth die necking covered by the '839 Patent.

Claim 1 continues:

16

A120

producing relative axial movement between a container and a first necking die to engage the external surface of a portion of the open end of the container with said first die at a small acute angle to compress said side wall radially inwardly along a length of said container to produce a reduced cylindrical neck at said open end and form a first taper having a first arcuate segment on the end of said wall and a second arcuate segment on the end of said reduced cylindrical neck;

This claim requires a die to be moved axially, or vertically if looking at a can in an upright position. The die engages, or makes contact with, the outside open portion of the top of the can, whereby the die compresses a portion of the top of the can inward, or toward the center of the can, at a slight angle. The die is shaped to reduce the diameter of the top of the can and does so in a consistent and equal manner around the entire cylindrical area of the top of the can. The die forms a taper (even reduction of the diameter of the top of the can body) consisting of a predetermined radius on the sidewall curving inward (reducing the diameter of the open end as shown above in blue as item CA2 in Fig 16 of the '839 patent reproduced above) and a second predetermined radius curving upward (extending the height of the neck as shown above in pink as item CR2).

After reviewing the tooling drawings and the physical samples of cans during each stage of smooth die necking, it is my opinion that Crown's process of forming smooth die necked cans incorporates all of the elements of this limitation.

Claim 1 continues:

removing said container from said first necking die;

This element or limitation is necessary and common, as all cans are removed from dies in order to proceed to the next die and Crown's process is no exception.

Claim 1 continues:

producing relative axial movement between a second die and said container to engage the external surface of the container with the second die at an acute angle

17

to further compress said reduced cylindrical neck inwardly along a length of the container and form a second taper; and

This claim element requires, as did the first element, that a die be moved axially, or vertically if looking at a can in an upright position. The die engages, or makes contact with, the outside open portion of the top of the can, whereby the die compresses a portion of the top of the can inward, or toward the center of the can, again at a slight angle. The second die further reduces the diameter of the opening of the can body forming a second taper.

Again, after reviewing the tooling drawings and the physical samples of cans during each stage of smooth die necking, as well as the deposition testimony of Messrs. Bauder and Golding, it is my opinion that Crown's process of forming smooth die necked cans incorporates all of the elements of this limitation.

Claim 1 continues:

forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper to produce an enlarged smoothly-shaped necked-in profile.

This claim element requires that the second taper, formed as described above, form a taper that continues and adds to or extends the first taper by necking only an upper portion of the first taper. Thus, extending the first taper while maintaining a smooth inward overall taper.

Although it would not be possible to determine whether the necked-in portion of a can was formed by only necking an upper portion of the first taper without seeing the tooling drawings and the cans after each die necking process, my review of the tooling drawings and physical samples (photographs can be found in Attachment 3) provided by Crown as well as Crown's depiction of the forming of its can body, production nos. CCS0058042-43, has confirmed that Crown is employing this element of claim 1 in its smooth die necking process.

18

Hence, it is my opinion that Crown's method of smooth die necking utilizes the elements of this limitation of claim 1.



Therefore, it is my opinion that Crown's method of smooth die necking uses each and every limitation of claim 1 and thus infringes claim 1 of the '839 Patent.

Claim 2 of the '839 Patent states:

A method of die necking as defined in claim 1, wherein said second arcuate segment is reformed as a part of said second taper on said first taper whereby the two tapers combine and blend into a smooth neck profile.

I have already set forth the reasons why I believe that Crown infringes claim 1 of the '839 Patent and incorporate those opinions herein as they relate to this claim. Claim 2 adds a limitation relating to the second arcuate (or curved) segment. Claim 2 requires that the second curved segment combine and blend into a smooth neck profile. The second arcuate segment, as set forth above, is the portion of the necked-in can end that curves upward, extending the height of the neck. The second die is formed in such a way that the upward curve of the second arcuate portion (as shown above in green as item CR3) overlaps with the second arcuate portion of the first taper (as shown above in pink as item CR2) to form a smooth and continuous taper curving upward toward the vertical axis of the open end of the can.

After reviewing the tooling drawings, the physical samples of the cans produced by Crown, and the testimony of Messrs. Golding and Bauder, it is my opinion that Crown employs

19

each of the elements set forth in claim 2 of the '839 Patent.  Crown is therefore infringing the method claimed in claim 2 of the '839 Patent.

It is my opinion that claim 5 of the '839 Patent is also infringed.  Claim 5 states:

A method of die necking as in claim 1, further comprising the steps of forming necked-in profile by a series of die elements with each die element forming only a part of the neck profile, and the part formed by each die element partially integrates and blends with the portion formed by a preceding die element, and in which the neck profile is axially enlarged by each of said die elements.

Claim 5 is dependent from claim 1 of the '839 Patent and I have already set forth the reasons why I believe that Crown infringes claim 1 of the '839 Patent, and incorporate those opinions herein as they relate to this claim.  Claim 5 adds a limitation relating to multiple dies (i.e., more than two) to further reduce the diameter of the open end of the can.  Using multiple dies allows a manufacturer of cans to further reduce the open end of the can to conform with can ends as the ends become smaller in diameter.  This claim requires the same limitations as claim 1 with the additional limitation that numerous dies can be used to continue reducing the diameter of the open end of the can while maintaining a smooth profile.  Additionally, this claim continues the method claims of claim 1 and adds that the neck profile is axially enlarged (made taller) by each die element.  This limitation relates to the second arcuate portion that is curved inwardly and upwardly (items identified by CR) to enlarge the neck profile axially (make taller).  Hence, as the dies press the open end of the can inward, they also bend the open end upward.

The tooling drawings and physical samples of cans provided by Crown, which show each stage of necking, demonstrate that Crown employs each of the elements set forth in claim 5 of the '839 Patent.  Further, Crown's responses to Rexam's Interrogatories Nos. 22, 23 and 24 indicate that Crown forms the necks of can bodies using 11 or more die necking stages.

20

Therefore, it is my opinion that Crown is infringing the method claimed in claim 5 of the '839 Patent.

Claim 11 is an independent claim and states:

A method of necking an open end of a cylindrical metal container to produce a reduced diameter generally cylindrical portion above a cylindrical side wall through a smooth shaped portion comprising the steps of (a) forming a necked-in portion on the end of the cylindrical side wall and a reduced diameter cylindrical portion adjacent said open end with the necked-in portion having a first segment contiguous with said cylindrical side wall and a second segment contiguous with said reduced diameter portion; and , (b) reforming only an upper part of the necked-in portion including the second segment and the reduced diameter cylindrical portion to decrease the diameter and length of the reduced diameter cylindrical portion to decrease the diameter and length of the reduced diameter cylindrical portion and increase the axial length of the necked-in portion while further compressing the metal therein.

I have already set forth the reasons why I believe that Crown infringes claims 1, 2 and 5 of the '839 Patent and incorporate those opinions herein as they relate to this claim. As previously stated, Crown's necking process begins by creating a necked-in portion extending between the cylindrical side wall and the cylindrical reduced diameter portion. As explained above, Crown's process proceeds by further necking only the upper portion of the necked-in portion. This further necking necessarily reduces the diameter and length of the cylindrical reduced diameter portion and increases the length of the necked-in portion.

The tooling drawings and physical samples of cans provided by Crown, which show each stage of necking, demonstrate that Crown employs each of the elements set forth in claim 11 of the '839 Patent. Therefore, it is my opinion that Crown is infringing the method claimed in claim 11 of the '839 Patent.

D.    Crown Is Infringing the '385 Patent

I have also been asked to review Claim 17 of the '385 Patent. Claim 17 states:

21

A method of reforming the bottom of a container said container having a longitudinal and a radial axis, a generally cylindrical side wall parallel with said longitudinal axis, an outer annular wall; a convex U-shaped portion; a preformed bottom wall including a center domed portion; and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

With respect to claim 17 of the '385 Patent, I have reviewed sample cans provided by Crown, the testimony of Richard Golding, and drawings provided by Belvac and Crown. Based upon my review, along with my knowledge and experience in the can manufacturing industry, it is my opinion that Crown is using this method in reforming the bottoms of cans that it manufactures at its Fort Bend Facility.

The preamble requires reforming a can bottom of a container that has a vertical axis (a line from the bottom to the top of the can), a cylindrical (circular) side wall, a convex U-shaped portion (shown below); a preformed bottom wall and center domed portion (shown below). The claim limitation also requires an annular substantially longitudinal wall joining the domed portion and the convex U-shaped portion of the can end. All of these elements are represented in the figure below.



The elements of a can and can bottom that are set forth in this element of claim 17 are common in the beverage can manufacturing industry. Upon reviewing the samples provided by Crown and the testimony of Richard Golding, it is my opinion that Crown's cans have all of the elements of a can and can bottom as described in the preamble of claim 17.

Claim 17 continues:

22

providing radially inward support for said container;

This element requires that there be support on the outside of the area of the can bottom that is being reformed on the inside by the reformer. In reviewing the drawings, can samples and testimony of Richard Golding, it is my opinion that Crown uses a device that it calls a "dome receptacle." Richard Golding testified that Crown's current dome receptacle provides "outside support on the stand radius." Golding Transcript, pg. 57, lines 10-13. In reviewing Crown's diagrams, physical samples of Crown's cans and the testimony of Richard Golding, it is my opinion that the drawings that I have reviewed show that Crown is using a dome receptacle that provides inward support (i.e., provides support to the outer portion of the generally U-shaped area) that is being reformed from the inside by a reforming roller.

Therefore, it is my opinion that each element of this limitation is being practiced by Crown in its bottom reforming process.

Claim 17 continues:

providing a reforming roller; and

This limitation requires that a roller (circular wheel type apparatus) is used to reform the inner wall of the bottom of the can.

In reviewing Crown's diagrams, physical samples of Crown's cans and the testimony of Richard Golding, it is my opinion that Crown's method of reforming can bottoms uses a reforming roller.

Claim 17 continues:

Moving said reforming roller radially into engagement with said substantially longitudinal wall, said reforming roller rotating along said longitudinal wall and about an arcuate path in substantial radial alignment with said radial inward support;

23

This element of claim 17 requires that the roller be moved from near the center of the vertical axis of the can towards the inner wall of the can bottom that joins the generally convex U-shaped portion and the domed portion of the can bottom as depicted below.



It is my opinion that the reforming roller used by Crown rotates along the inner wall in an arcuate or circular path and that the roller is in substantial radial alignment with the inward radial support provided by the dome receptacle. In reviewing the drawings received from Crown and Belvac, it is my understanding that the dome receptacle used by Crown at its Fort Bend manufacturing facility has changed over the years. It is also my understanding that the drawings Rexam has received may not represent the profile of the dome receptacle that Crown has been using during the past six years. However, after reviewing the drawings and the deposition testimony of Crown's witnesses, in particular the testimony of Richard Golding, it is my opinion that all of the elements of this limitation are used by Crown when it reforms the bottom of its cans.

Claim 17 continues:

Wherein said reforming roller affects the angle of said substantially longitudinal wall.

This limitation requires that the reforming roller change or alter the shape of the inner wall thereby affecting the angle of the wall. After reviewing the technical drawings produced by Crown and Belvac, as well as the testimony of Crown's witnesses, it is my opinion that the method that Crown is using to reform its can bottoms affects the angle of the substantially

24

longitudinal wall.    Therefore, the method that Crown is using to reform its can bottoms incorporates this element of claim 17.

Since Crown's method of reforming the bottom of the can includes every element or limitation of claim 17, it is my opinion that Crown has been and is infringing claim 17 of the '385 Patent.

### E.    Crown Has Infringed Claims 11, 12 and 17 of the '242 Patent

I have been asked to review and compare claims 11, 12 and 17 of the '242 patent with the methods that Crown uses to reform the bottom of its cans.  Claim 11 states:

> A method of reforming a bottom of a drawn and ironed beverage container, said container having a longitudinal axis; a generally cylindrical side wall parallel with said longitudinal axis; the bottom having an outer annular wall, a convex U-shaped portion, a preformed bottom wall including a center domed portion, and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion, said method comprising:

Based upon my review of the technical drawings and the testimony of Richard Golding, it is my opinion that Crown employs each element of this limitation in its method of reforming can bottoms.  The preamble requires a drawn and ironed beverage can, having a longitudinal axis (which typical beverage cans all have) and a cylindrical side wall that is parallel with the longitudinal axis (typical of most, if not all, beverage cans).  The preamble also requires that the can have a bottom with a center domed portion, a convex, generally U-shaped stand radius and an outer annular wall that joins the generally U-shaped stand radius and the domed portion of the can bottom.  These elements are typical of beverage cans and Crown's cans are no exception.

Claim 11 continues:

> providing said drawn and ironed beverage container;

This element requires a typical beverage can and Crown's cans are drawn and ironed beverage cans.

25

A129

Claim 11 continues:

providing a reforming roller; and

This element requires at least one reforming roller and Crown uses a reforming roller to alter the shape of the inner longitudinal wall of the bottom of the can. Crown uses a reforming roller to carry out its base reforming process.

Claim 11 continues:

moving said reforming roller radially into engagement with said substantially longitudinal wall of said beverage container, said reforming roller rotating along said longitudinal wall and circumferentially about an arcuate path, wherein said reforming roller affects the angle of said substantially longitudinal wall.

This limitation requires that the reforming roller start near the center of the domed portion of the can bottom and that it be moved from that position to the wall of the can bottom until the roller engages the wall. Then the roller moves around the inner wall of the can bottom in a circular path and changes the shape and the angle of the wall.



After reviewing all of the technical drawings and testimony, it is my opinion that Crown's method of reforming the bottom of its cans employs all of these elements. Since Crown's method of bottom reforming utilizes all of the limitations of claim 11, it is my opinion that Crown has been and is infringing claim 11 of the '242 Patent.

Claim 12 depends from claim 11. As a dependent claim, claim 12 incorporates all of the limitations of claim 11. Claim 12 states:

The method of claim 11 including the steps of providing radial inward support for said container.

26

For purposes of analyzing this claim, I will incorporate all of my opinions relating to claim 11 set forth above. Claim 12 adds the limitation of providing radial inward support. This element requires that the retainer, or what Crown calls the dome receptacle, provide support on the outside of the can bottom. Richard Golding testified that Crown's current dome receptacle provides "outside support on the stand radius." Golding Transcript, pg. 57, lines 10-13. From my review of the technical drawings, the Belvac manual and the testimony of Richard Golding, it is my opinion that the method of base reforming being used by Crown includes a dome receptacle that provides radial inward support for the container. Since it is my opinion that Crown uses all of the limitations of claim 11 and the additional limitation of claim 12, it is my opinion that Crown's bottom reforming process infringes claim 12.

Claim 17 is also a dependent claim. Like claim 12, claim 17 depends from claim 11. Claim 17 states:

> The method of claim 11, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container.

Again, for purposes of analyzing claim 17, I will incorporate my opinions relating to claim 11. Claim 17 adds the limitation to claim 11 requiring that the angle that is created by the bottom reformer be negative in relation to the longitudinal axis of the container. From examination of Crown's documents, physical exhibits and the testimony of Crown's witnesses, it appears that the angle created by Crown's bottom reforming equipment forms a negative angle in relation to the longitudinal axis of the can.

Since Crown's bottom reforming method includes all of the elements of claim 11 and the additional limitation of claim 17, it is my opinion that Crown has infringed and is currently infringing claim 17 of the '242 Patent.

27

Date: Dec. 19, 2006

Edmund Gillest

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the date this proof of service is signed below, I served the

foregoing

**EXPERT REPORT OF EDMUND GILLEST REGARDING INFRINGEMENT OF U.S. PATENT NOS. 4,774,839, 5,222,385, 5,697,242, 6,129,230, AND 6,260,728**

in the above identified action, addressed as follows:

Sergio Chung
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA 19104-2891

Tel.: (215) 568-3100
Fax: (215) 568-3439

☑ **(BY ELECTRONIC MAIL)**

☑ **(BY FEDERAL EXPRESS)** By placing a true copy thereof enclosed in a sealed envelope.  I placed each such sealed envelope, with postage thereon fully prepaid with overnight courier.

☐ **(BY HAND)**

Date: _12/20/06_ _____

## ATTACHMENT #1

### Edmund T. Gillest
7815 Zinnia St
Arvada, CO
H- 303-431-6178
W- 720-891-2824
E-mail: egillest@msn.com

## Professional Qualifications:
A career characterized by exceptionally strong leadership and project management skills, combined with the drive to meet and exceed financial objectives.

## Experience in the following areas:
Operational improvements-efficiency gains & cost reductions, IP licensing, product development, engineering and project management, customer support and operational start-ups.

## Employment History

**Gillest & Associates, LLC**                                              **2006-Present**

**Alcan/Novelis Corporation, Aurora, IL**                                  **1996-2006**

Responsible for the following: engineering and service, product development, support of sales and marketing for Novelis Global Can Stock Group.

**Director-Technical Center**
Instituted the following: improvements in customer support, ISO-9001/Guide 25, self-directed work teams, project management programs, business systems, and health and safety procedures.

**Ball Packaging Products Metal Beverage Group, Westminster, Colorado**        **1978-1996**
Ball Corp. had operations in the U.S. and Canada, with joint ventures and licensees in Mexico, Taiwan, China, Sweden, Germany, France, and Israel.

**Vice President of Engineering and Development**
Responsible for the following: new/improved technology and manufacturing processes, cost improvement, capital projects, environmental compliance, IP/patent licensing and support of licensees world wide.

**T&H Tool, Broomfield, Colorado**                                         **1977-1978**
**Operations Manager**
T&H Tool manufactured components for the computer industry.

A134

**Ford Motor Company**, Monroe, Michigan                    1971 - 1977

Ford Motor Co. produced metal stampings, wheels, bumpers, coil springs, catalytic converters and energy shock absorber systems supplying assembly operations throughout North America.

Team Leader responsibility: quality, product design review/approval, customer service, and materials testing with a staff of 120.

## Education

**Regis University**, Denver, Colorado                    1983
**B.S., Business Administration, Minor in Economics**

**Monroe Community College**, Monroe, Michigan                    1971
**A.A., Industrial Management**

## Professional Affiliations

**Board Member, International Metal Decorators Association (Retired)**
**Board Member, Cannex (Retired)**
**Member, Society of Manufacturing Engineers (Retired)**

## ATTACHMENT #2

**Reference Materials:**

**CC&S/Metal Box/CMB** Patents: 6,848,875 B2, 6,935,826 B2, 6,065,634 and their respective file histories

**American-National Can/Rexam** Patents: 6,260,728, 6,129,230, 4,774,839, 5,222,385, 5,697,242, 5,356,256, and their respective file histories

**Kraska** Patents: 4,217,843, 4,448,322 & 4,093,102

**Kysh** Patent: 5,046,637

**Japanese** Publication/Application: 57-117323

**Japanese** Publication/Application: H5-185170

**Pechiney** Patent: 3,843,014

**Alcoa** Patent: 4,991,735

**Bulso** Patent: 4,808,052

**Belvac** Patents: 5,706,686 & 5,704,241

**REXAM Production Documents:** 005403/06, 016569, 048624/28, 056551/82, 056571/580, 045244/56, 048945/55, 010689/95, 043485/502, 073936, 074194/6, 074202-208, 074209-220, 074234-245, 074248, 024363/4, 065400, 004743, 003018, Customer Specification 2896, Customer Specification 2769, Drawing ST –2-1184-1&-2, Drawing EXP04-025

**CC&S Production Documents:** 0000184/93, 0000529/32, 0000535/6, 0016944/45, 0016946/54, 0029434G, 0042006/12, 0045670/72, 0048114/6, 0048199/228, 0048214, 0048305/97, 0057953, 0058041/43, 0059226, 0059245/46, 0059257/58, 62159-64203, 0060244-AA/PP, 074203/8

**Belvac Production Documents:** 0022890-925, 0022962/76, 0001133/48

**AB Production Documents:** 002421/71,

**Ball Production Documents:** 0000908/926, 0000893/897,

**Other** –Expert Report of Joseph Bulso, Rebuttal Expert Report of Joseph Bulso, Rebuttal Report of Martin J. Higham, Attachments & Expert Report of Martin Higham regarding infringement of US patent no. 6,065,634, Beverage Can Mini Seams by Pete Moran, Depositions of R. Golding and exhibits 6/14/2006 and 10/31/2006, Deposition of J. Bauder and exhibts 7/21/2006,

Depositions of Terry Babbit and exhibits 12/05/06 and 06/07/06, Depositions of Brian Fields 7/25/06 and 12/12/06, Deposition of Peter Moran and exhibits 8/14/06, Deposition of Peter Hinton and exhibits 10/26/06, physical exhibits produced by CC&S, physical exhibits produced by Rexam, conversations with Rexam engineers, Crown's Responses to Rexam's Interrogatories, Technical Statement by Gary Smith for Opposition to EP 828,663, Technical Statement by Dean Scranton, Dynamic III documents

**ATTACHMENT #3**

A138



























A142











A147













IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
(WILMINGTON)

| | |
|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. AND CROWN CORK & SEAL USA, INC., <br><br> PLAINTIFFS, <br><br> V. <br><br> REXAM BEVERAGE CAN CO., <br><br> DEFENDANT. | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. 05-608 (MPT) |

**REBUTTAL REPORT OF ANTON A. ASCHBERGER**

I, Anton A. Aschberger, provide this rebuttal report in *Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. v. Rexam Beverage Can Co.*, Civil Action No. 05-608 (MPT), to comment upon the Expert Report of Edmund Gillest dated December 19, 2006.

1.    My qualifications are set forth in my report of December 14, 2006.

**SUMMARY OF COMMENTS**

2.    In his report, Mr. Gillest expressed his opinion that Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. ("Crown") infringe claim 17 of U.S. Patent No. 5,222,385 ("the 385 patent") by the use of a bottom reforming process performed at Crown's Fort Bend, Texas can-manufacturing plant using a Belvac Production Machinery, Inc. bottom reforming machine.

3.    In view of the materials I have considered, mentioned below, I must respectfully disagree with Mr. Gillest's opinion that Crown's use of a bottom reforming process at its Fort Bend, Texas plant infringes claim 17 of the 385 patent.

**I DISAGREE WITH MR. GILLEST'S OPINION THAT THE BOTTOM REFORMING PROCESS USED BY CROWN INFRINGES CLAIM 17 OF THE 385 PATENT**

4.    I disagree with Mr. Gillest's opinion that the bottom reforming process used by Crown at its Fort Bend plant infringes claim 17 of the 385 patent.

5.    Claim 17 recites ". . . said reforming roller rotating along said longitudinal wall and about an arcuate path in substantial radial alignment with said radial inward support . . . ."

6.    I have been provided with the following constructions for the above-noted terms of claim 17. I am assuming that these constructions are correct. I realize that the final constructions will be issued by the Court at a later time.

7.    "Reforming roller rotating along said longitudinal wall and about an arcuate path" means reforming roller revolving around its own axis and rolling along the longitudinal wall on a curved path adjacent to the wall.

8.    "In substantial radial alignment with said radial inward support" means the roller path having a height in the direction of the longitudinal axis, more than half of which overlaps with the height of the radial inward support.

9.    I have inspected a base receptacle for a Belvac bottom reforming machine. I have been told that the configuration of this base receptacle matches the configuration of the base receptacles in use at Crown's Fort Bend plant. The as-measured value of the

groove depth for this base receptacle, i.e., the distance from the bottom of the groove to the front face of the base receptacle, is 0.070 - 0.071 inch.

10.     Copies of document nos. CCS-0055251; CCS-0055263-65; CCS-0055338-40; CCS-0055480-89; CCS-0055600-03; CCS-0055609; CCS-0056047-50; CCS-0056132-35; CCS-0074245, 46; and CCS-0074251, 52 are attached as Exhibit A hereto. I have been told that the can body configurations described in these documents represent the configurations of the can bodies that Crown has been making at its Fort Bend plant.

11.     Based on the measured value of the groove depth of the base receptacle, and the dimensions of the can bodies depicted in Exhibit A, it is my opinion that less than half of the height of the roller path overlaps with the height of the base receptacle in the bottom reforming machines in use at Crown's Fort Bend plant.

12.     I have been told that a method claim of a patent is infringed only if the accused method includes every method step recited in the claim. If the accused method does not include one or more of the steps recited in the claim, the claim is not literally infringed.

13.     Therefore, it is my opinion that Crown does not infringe claim 17 of the 385 patent because the bottom reforming method practiced by Crown does not include a reforming roller rotating along a longitudinal wall of a can body and about an arcuate path in substantial radial alignment with a radial inward support.

14.     Furthermore, I have reviewed the deposition testimony of Richard Golding and Terry Babbitt, and various exhibits referred to by Mr. Golding and Mr. Babbitt.

15.    A copy of Defendant's Exhibit 29A is attached as Exhibit B hereto.  Based on Mr. Golding's testimony, I understand that Exhibit 29A depicts a bottom reforming tooling assembly of a bottom reforming machine manufactured by Belvac Production Machinery, Inc.  I further understand, based on Mr. Golding's testimony, that the configuration of the dome receptacle and the reforming roller depicted in Exhibit 29A is diagrammatically representative of the configuration that Crown has been using at its Fort Bend plant since 1996, and looks substantially like the dome receptacle configuration that Crown is using at the Fort Bend plant.  Golding dep. of Oct. 31, 2006 at 17:23-20:2; 55:11-22.

16.    As can be seen from Exhibit 29A,  the reforming roller of the bottom reforming tooling assembly revolves around its own axis and rolls along the longitudinal wall on a curved path adjacent to the wall.  Exhibit 29A also shows that less than half of the path's height overlaps with the height of the dome receptacle, and thereby supports my opinion that Crown does not infringe claim 17 of the 385 patent.

17.    A copy of Defendant's Exhibit 175 is attached as Exhibit C hereto.  Based on Mr. Golding's testimony, I understand that Exhibit 175 depicts a base or dome receptacle for a bottom reforming machine.  I further understand, based on Mr. Golding's testimony, that the base receptacle depicted in Exhibit 175 looks substantially like the base receptacle that Crown is using at its Fort Bend plant.  Golding 30(b)(6) dep. of Oct. 31, 2006 at 55:11-22.

18.    The reforming roller in use at Crown's Fort Bend plant is not shown in Exhibit C.  Based on the dimensions of the can bodies and the base receptacle listed in Exhibits A and C, however, I have calculated the overlap between the height of the

roller's path and the height of the base receptacle. That calculation shows that less than half of the height of the roller's path overlaps with the height of the dome receptacle in the bottom reforming machines in use at Crown's Fort Bend plant, further supporting my opinion that Crown does not infringe claim 17 of the 385 patent.

19.    Copies of document nos. BEL 0022892, 0022893, and 0022923 are attached as Exhibit D hereto. I have been told that the reformer roller and the dome receptacle depicted in these documents were used in Belvac bottom reforming machines at Crown's Fort Bend plant to produce 16-ounce can bodies in the late 2005 through mid-2006 time frame.

20.    Based on the dimensions of the can bodies and the dome receptacle listed in Exhibits A and D, I have calculated the overlap between the height of the roller's path and the height of the dome receptacle. This calculation shows that less than half of the height of the path overlaps with the height of the dome receptacle. It is therefore my opinion that Crown's use of Belvac bottom reforming machines at its Fort Bend plant to reform the bottoms of 16-ounce can bodies in the late 2005 through mid-2006 time frame did not infringe claim 17 of the 385 patent.

January 5, 2007
_____
Dated

Anton A. Aschberger
_____
Anton A. Aschberger

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-608 (MPT) |
| v. | ) ) | |
| REXAM BEVERAGE CAN CO., | ) ) | |
| Defendant. | ) ) ) | |

CROWN PACKAGING TECHNOLOGY, INC. AND
CROWN CORK & SEAL USA, INC.'S RESPONSES TO REXAM
BEVERAGE CAN COMPANY'S FOURTH SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiffs Crown

Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (together "Crown"), hereby

respond and make the following objections to Rexam Beverage Can Company's ("Rexam")

Fourth Set of Interrogatories.

GENERAL OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Crown objects to the definition of "Crown" to the extent that, by incorporating

such definition, these interrogatories demand discovery of persons or entities other than Crown

Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. and those within its direct

control.  Crown further objects to this definition to the extent it purports to include Crown's

counsel, including outside counsel, within the definition of "Crown."

2.      Crown objects to the definitions and instructions, and to each interrogatory, to the

extent they seek, or may be construed to seek, information immune from discovery by reason of

- 1 -

A159

Crown further objects to identify "all documents that disclose the process by which the neck is formed" as overbroad and unduly burdensome. Crown will provide documents sufficient to schematically illustrate the relevant process by which the neck is formed.

Subject to these objections, and the foregoing general objections, Crown states that Request for Admission No. 124 was not admitted because the "Generic D&I 202 Can Specification" that was produced in this action by Crown having production numbers CCS0058043 and CCS0058042 schematically illustrates a 9 stages of die necking, followed by a spin, neck, and flange process. Since November 1999, the large majority of 211 can bodies made by Crown in the United States to be seamed onto 202 can ends have had necks formed after 11 die necking stages, followed by a spin, neck and flange process, or after 14 die necking stages, followed by a spin flanging process. Please see Crown's response to the above Interrogatory No. 23, as well as Exhibit A, for an identification of the types of can bodies subjected to 11 die necking stages or 14 die necking stages.

Crown further states that, pursuant to Fed. R. Civ. P. 33(d), Crown will produce additional drawings sufficient to schematically illustrate the 11-stage and 14-stage die necking identified in Exhibit A.

Pursuant to paragraphs 1 and 2 of the Agreed Protective Ordered entered in this action on May 23, 2006, Crown hereby designates the foregoing information provided in response to this interrogatory as CONFIDENTIAL.

**INTERROGATORY NO. 25:**

Specifically set forth a claim chart and detailed description of all the factual bases for Crown's contention that it does not infringe any claims of the '839 Patent by using or employing the methods claimed in the '839 Patent to manufacture cans in the United States (including an

explanation as to whether Crown claims that its process avoids the literal scope of each claim and/or infringement under the doctrine of equivalents).

## RESPONSE TO INTERROGATORY NO. 25:

Crown objects to this interrogatory to the extent it calls for information covered by the attorney-client privilege, work product doctrine, Rule 26(b)(4)(B) immunity, or other applicable protection or privilege.

Crown further objects to this interrogatory to the extent it calls for legal conclusions or expert opinions. The deadline for Crown's submission of its opening expert briefs in this action is December 15, 2006.

Crown further objects to this interrogatory as overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks Crown's positions with respect to all "claims of the '839 Patent." Rexam is only asserting claims 1, 2, 5 and 11 of the 839 Patent in this action, and Crown's response to this interrogatory will be correspondingly limited to these claims. *See* Rexam's Response to Amended Interrogatory No. 7, dated September 11, 2006.

Crown further objects to this interrogatory to the extent that it seeks to place an undue burden on Crown with respect to contentions that will, due to discovery and other developments of this action, necessarily change. Crown also objects to this interrogatory to the extent that it requires a "claim chart." The parties recently agreed to exchange claim construction positions on December 4, 2006.

Subject to these objections, and the foregoing general objections, Crown responds to this interrogatory as follows:

Rexam is only asserting that Crown infringes only claims 1, 2, 5, and 11 of the 839

- 10 -

A161

patent. Invalid claims cannot be infringed. Claims 1, 2, 5, and 11 of the 839 patent are invalid

for at least the following reason: claims 1, 2, 5, and 11 are anticipated under 35 U.S.C. § 102(b)

by U.S. patent no. 3,029,507 (the "Gaggini Patent"). Crown therefore does not infringe claims 1,

2, 5, or 11 of the 839 patent.

As shown by the following charts, the Gaggini Patent discloses every limitation of claims

1, 2, 5, and 11 of the 839 patent.

| Claim 1 of the 839 Patent | Gaggini Patent |
|---|---|
| A method of necking an open end of a container side wall to form a smoothly-shaped neck profile comprising the steps of: | Fig. 9<br>Col. 4, lines 47-51 |
| (a) producing relative axial movement between a container and a first necking die | Fig. 10<br>Col. 4, lines 18-27 |
| to engage the external surface of a portion of the open end of the container with said first die at a small acute angle | Fig. 10 |
| to compress said side wall radially inward along a length of said container to produce a reduced cylindrical neck at said open end | Fig. 10<br>Col. 4, lines 27-33 |
| and form a first taper having a first arcuate segment on the end of said wall and a second arcuate segment on the end of said reduced cylindrical neck; | Fig. 10 |
| (b) removing said container from said first necking die; | Col. 4, lines 39-43 |
| (c) producing relative axial movement between a second necking die and said container to engage the external surface of the container with the second die at an acute angle | col. 4, line 39-43;69-73 |
| to further compress said reduced cylindrical neck inwardly along a length of the container to form a second taper; and, | col. 4,<br>lines 34-39; lines 65-69 |
| (d) forcing said second taper downwardly until it is contiguous with said first taper | Figs. 10-11 |
| and reforms only an upper portion of said first taper | Figs. 10-11 |
| while producing an extension of said first taper to produce an enlarged smoothly-shaped necked-in profile. | Figs. 10-11 |

| Claim 2 of the 839 Patent | Gaggini Patent |
|---|---|
| A method of die necking as defined in claim 1, wherein said second arcuate segment is reformed as a part of said second taper on said first taper whereby the two tapers combine and blend into a smooth neck profile. | Fig. 14<br>col. 4, lines 36-39 |

- 11 -

| Claim 5 of the 839 Patent | Gaggini Patent |
|---|---|
| A method of die necking as defined in claim 1, further comprising the steps of forming necked-in profile by a series of die elements with each die forming only a part of the neck profile, and the part formed by each die element partially integrates and blends with the portion formed by a preceding die element, and in which the neck profile is axially enlarged by each of said die elements. | Figs. 10-21 col. 4, lines 34-43; lines 65-73; |

| Claim 11 of the 839 Patent | Gaggini Patent |
|---|---|
| A method of necking an open end of a cylindrical metal container to produce a reduced diameter generally cylindrical portion above a cylindrical side wall through a smooth shaped portion comprising the steps of | col. 1, lines 47-51 |
| (a) forming a necked-in portion on the end of the cylindrical side wall and | Fig. 11 col. 2, lines 11-13 |
| A reduced diameter cylindrical portion  adjacent said open end | Fig. 11 col. 2, lines 11-13 |
| with the necked-in portion having a first segment contiguous with said cylindrical side wall and | Fig. 9 col. 4, lines 29-331 |
| a second segment contiguous with said reduced diameter portion; and | Fig. 11 |
| (b) reforming only an upper part of the necked-in portion including the second segment and the reduced diameter cylindrical portion | Fig. 14 col. 4, lines 36-39 |
| to decrease the diameter and length of the reduced diameter cylindrical portion and | Fig. 14 col. 4, lines 36-39 |
| increase the axial length of the necked-in portion | Fig. 14 col.4, lines 36-39 |
| while further compressing the metal therein. | Fig. 14 col. 4, lines 46-51 |

Further information supporting Crown's non-infringement contentions will be forthcoming in its expert report due December 15, 2006, in accordance with the stipulated revised scheduling order.

A163

| Moving said reforming roller radially | BallRex-1620 - shaft (16) |
|---|---|
| into engagement with said substantially longitudinal wall, | BallRex-1620 - clevis (4); swivel (5); roller block (6); roller shaft (11) |
| said reforming roller rotating along said longitudinal wall | BallRex-1620 - bearings (14) facilitate rotation of indenting roller (10) |
| and about an arcuate path, | BallRex-1620 - bearings (15) facilitate relative rotational motion between dome receptacle (8)/container and indenting roller (10) |
| in substantial radial alignment with said radial inward support; | BallRex-1620 - dome receptacle (8) |
| Wherein said reforming roller affects the angle of said substantially longitudinal wall. | BallRex-1620 - indenting roller (10) forms the inner longitudinal wall into a beaded shape |

Further information supporting Crown's non-infringement contentions will be forthcoming in its expert report due December 15, 2006, in accordance with the stipulated revised scheduling order.

**INTERROGATORY NO. 27:**

Specifically set forth a claim chart and detailed description of all the factual bases for Crown's contention that it does not infringe any claims of the '242 Patent by using or employing the methods and/or apparatuses claimed in the '242 Patent to manufacture cans in the United States (including an explanation as to whether Crown claims that its process and/or apparatus avoids the literal scope of each claim and/or infringement under the doctrine of equivalents).

**RESPONSE TO INTERROGATORY NO. 27:**

Crown objects to this interrogatory to the extent it calls for information covered by the attorney-client privilege, work product doctrine, Rule 26(b)(4)(B) immunity, or other applicable protection or privilege.

Crown further objects to this interrogatory to the extent it calls for legal conclusions or expert opinions. The deadline for Crown's submission of its opening expert briefs in this action is December 15, 2006.

- 16 -

A164

Crown further objects to this interrogatory as overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks Crown's positions with respect to all "claims of the '242 Patent." Rexam is only asserting claims 11, 12, 17 of the 242 Patent in this action, and Crown's response to this interrogatory will be correspondingly limited to these claims. *See* Rexam's Response to Amended Interrogatory No. 9, dated September 11, 2006.

Crown further objects to this interrogatory to the extent that it seeks to place an undue burden on Crown with respect to contentions that will, due to discovery and other developments of this action, necessarily change. Crown also objects to this interrogatory to the extent that it requires a "claim chart." The parties recently agreed to exchange claim construction positions on December 4, 2006.

Subject to these objections, and the foregoing general objections, Crown responds to this interrogatory as follows:

Rexam is only asserting that Crown infringes claims 11, 12, and 17 of the 242 patent. Claim 11 of the 242 patent recites: "wherein said reforming roller affects the angle of said substantially longitudinal wall." Claims 12 and 17 of the 242 patent include this limitation by virtue of their dependence from claim 11.

If the term "affects the angle of said longitudinal wall" is construed as changing the orientation of the wall while maintaining its shape, Crown does not infringe claims 11 or 12 for at least the following reason: the bottom reforming process practiced by Crown changes the shape of the longitudinal wall of the container. Rexam is precluded from asserting infringement under the doctrine of equivalents under this construction because the range of equivalents is limited by the Ball Bottom Reforming Process.

- 17 -

Furthermore, if the term "affects the angle of said longitudinal wall" is construed as changing the orientation of the longitudinal wall while the shape of the wall is or is not maintained, claims 11 and 12 are not infringed at least by reason of their invalidity. An invalid claim cannot be infringed. Claims 11 and 12 are invalid for at least the following reason: claims 11 and 12 are anticipated under 35 U.S.C. § 102(g) by the Ball Bottom Reforming Process.

As shown by the following charts, the Ball Bottom Reforming Process discloses every limitation of claims 11 and 12 of the 242 patent if the term "affects the angle of said longitudinal wall" is construed as changing the orientation of the longitudinal wall while the shape of the wall is or is not maintained.

| Claim 11 of the 242 Patent | Ball Bottom Reforming Process |
|---|---|
| A method of reforming a bottom of a drawn and ironed beverage container, | |
| said container having a longitudinal axis; | BallRex-1620 - vertical axis of container shown as centerline |
| a side wall parallel with said longitudinal axis, | BallRex-1620 |
| the bottom having an outer annular wall; | BallRex-1620 |
| a convex U-shaped portion; | BallRex-1620 |
| a pre-formed bottom wall, including a center domed portion; | BallRex-1620 |
| and an annular, substantially longitudinal wall joining said domed portion and said convex U-shaped portion; | BallRex-1620 |
| said method comprising: | |
| providing said drawn and ironed beverage container; | BallRex-1620 |
| providing a reforming roller; and | BallRex-1620 indenting roller (10) |
| moving said reforming roller radially | BallRex-1620 - shaft (16) |
| into engagement with said substantially longitudinal wall of said beverage container, | BallRex-1620 - clevis (4); swivel (5); roller block (6); roller shaft (11) |
| said reforming roller rotating (i) along said longitudinal wall | BallRex-1620 - bearings (14) facilitate rotation of indenting roller (10) |
| and (ii) circumferentially about an | BallRex-1620 - bearings (15) facilitate relative |

- 18 -

A166

| arcuate path, | rotational motion between dome receptacle (8)/container and indenting roller (10) |
| wherein said reforming roller affects the angle of said substantially longitudinal wall. | BallRex-1620 - indenting roller (10) forms the inner longitudinal wall into a beaded shape |

| Claim 12 of the 242 Patent | Ball Bottom Reforming Process |
| --- | --- |
| The method of claim 11 including the step of providing radial inward support for said container. | BallRex-1620 - dome receptacle (8) |

Claim 17 of the 242 patent, which depends from claim 11, recites: "wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container."

If the term "negative angle" is construed as encompassing a beaded shape, claim 17 is not infringed at least by reason of its invalidity. An invalid claim cannot be infringed. Claim 17 is invalid for at least the following reason: claim 17 is anticipated under 35 U.S.C. § 102(g) by the Ball Bottom Reforming Process. As shown by the following chart, and the chart presented above in relation to claim 11, the Ball bottom reforming process discloses every limitation of claim 17 if the term "negative angle" is construed as encompassing a beaded shape.

| Claim 17 of the 242 Patent | Ball Bottom Reforming Process |
| --- | --- |
| The method of claim 11, wherein said reforming roller affects the angle of said substantially longitudinal wall by achieving a negative angle (A) from the longitudinal axis of said container. | BallRex-1620 - indenting roller (10) |

If the term "negative angle" recited in claim 17 is construed as not encompassing a beaded shape, Crown does not infringe claim 17 for at least the following reason: the reforming roller used in the bottom reforming process practiced by Crown does not affect the angle of the substantially longitudinal wall of the container by achieving a negative angle from the

- 19 -

A167

longitudinal axis of the container. Rexam is precluded from asserting infringement under the doctrine of equivalents under this construction because the range of equivalents is limited by the Ball Bottom Reforming Process.

Further information supporting Crown's non-infringement contentions will be forthcoming in its expert report due December 15, 2006, in accordance with the stipulated revised scheduling order.

## INTERROGATORY NO. 28:

Specifically set forth a claim chart and detailed description of all the factual bases for Crown's contention that it does not infringe any claims of the '230 Patent (including an explanation as to whether Crown claims that it avoids the literal scope of each claim and/or infringement under the doctrine of equivalents).

## RESPONSE TO INTERROGATORY NO. 28:

Crown objects to this interrogatory to the extent it calls for information covered by the attorney-client privilege, work product doctrine, Rule 26(b)(4)(B) immunity, or other applicable protection or privilege.

Crown further objects to this interrogatory to the extent it calls for legal conclusions or expert opinions. The deadline for Crown's submission of its opening expert briefs in this action is December 15, 2006.

Crown further objects to this interrogatory as overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks Crown's positions with respect to all "claims of the '230 Patent." Rexam is only asserting claims 2, 5, and 13 of the 230 Patent in this action, and Crown's response to this interrogatory will be correspondingly limited to these claims. *See* Rexam's Second Supplemental Response to

- 20 -

A168

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **CROWN PACKAGING TECHNOLOGY, INC.'S AND CROWN CORK & SEAL USA, INC.'S RESPONSES TO REXAM BEVERAGE CAN CO.'S FOURTH SET OF INTERROGATORIES** has been served, on this the 21th day of November 2006, in accordance with the Federal Rules of Civil Procedure, on the following in the manner indicated below:

### *Via E-Mail/Facsimile*

Gerald C. Willis, Esquire
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
jwillis@mhmlaw.com

### *Via Email*

Anne Shea Gaza, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
gaza@rlf.com

Dated: November 21, 2006

Chad E. Ziegler
WOODCOCK WASHBURN, LLP
One Liberty Place, 46th Floor
Philadelphia, PA  19103
(215) 568-3100

*Attorney for Plaintiffs*
*Crown Packaging Technology, Inc. and*
*Crown Cork & Seal USA, Inc.*

A169

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
> and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on January 25, 2007,  I caused to be via electronic mail the foregoing document to the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

RLF1-3000496-1