# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Crown Packaging Technology, Inc. and
Crown Cork and Seal USA, Inc.,

        Plaintiff/Counter Defendant,

    v.

Rexam Beverage Can Company,

        Defendant/Counterclaimant,

C. A. No. 05-608 (MPT)

**REDACTED - PUBLIC VERSION**

## REXAM BEVERAGE CAN COMPANY'S RESPONSE TO CROWN'S OPENING CLAIM CONSTRUCTION BRIEF RELATING TO CROWN'S AND REXAM'S PATENTS

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: February 23, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant/Counterclaimant
Rexam Beverage Can Co.*

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    CLAIM CONSTRUCTION ...................................................................................... 1

       A.    The Purpose Of Claim Construction Is To Make Clear The Scope and
             Meaning Of The Claims ................................................................................. 1

       B.    Role of Disclosed Embodiments in Determining the Meaning and Scope
             of Patent Claims ............................................................................................. 2

       C.    Role of Other Claims in Determining The Meaning and Scope of a Patent
             Claim .............................................................................................................. 3

III.   CROWN'S '826 AND '875 PATENTS ...................................................................... 4

       A.    "Chuck Walls" that Meet at a "Juncture" ...................................................... 5

       B.    "Peripheral Cover Hook" ............................................................................... 7

             1.    Crown's Patents Describe The Entire Curved Section At The
                   Outer Region Of The Can End As The Peripheral Cover Hook,
                   And, Show And Describe The Adjoining Chuck Wall As Flat ........... 8
             2.    In A Prior Action, Crown Directly Contradicted Its Position Here
                   By Admitting That The Chuck Wall Is Flat ..................................... 10
             3.    Rexam's Proposed Construction Provides Clarity That Is
                   Supported by Crown's Patents – Crown's Proposed Construction
                   Provides None And Should Be Rejected ........................................... 11

       C.    "Seaming Panel," and, "Adapted To Be Formed Into A Portion Of Said
             Double Seam During Said Seaming Operation" ........................................... 11

             1.    "Seaming Panel" ............................................................................... 12
             2.    "Adapted To Be Formed Into A Portion Of Said Double Seam
                   During Said Seaming Operation" ..................................................... 14

       D.    "Wall Extending Inwardly And Downwardly From Said Cover Hook"
             and "Lowermost End Of Said Wall" ............................................................ 16

       E.    "First Portion Of Said Wall Extending From Said Cover Hook" ................ 17

       F.    "First Point On Said Wall" ........................................................................... 17

       G.    "Adapted To Be Deformed During Said Seaming Process" ........................ 18

       H.    "So As To Be Bent Upwardly Around Said Juncture Of Said Chuck
             Walls At Said First Point On Said Wall" and "To Bend A Portion Of
             Said Can End Wall Upwardly Around Said Juncture Of Said Chuck
             Walls At A First Location On Said Can End Wall" ...................................... 18

       I.    "A Second Point Forming A Lowermost End Of Said Wall" ....................... 20

J.   "Annular Reinforcing Bead" ........................................................................ 20

    1.   Crown's Construction Is Based On Incomplete Dictionary Definitions ........................................................................ 21

    2.   Crown's Proposed Construction Is Not Supported By Crown's Patents ........................................................................ 22

    3.   Rexam's Proposed Construction Of "Annular Reinforcing Bead" Does Not Have Extraneous Limitations ........................................................................ 23

K.   "Circumferentially Extending Wall Comprising First and Second Portion[s]" ........................................................................ 27

L.   "First Wall Portion Extending From Said Seaming Panel To A First Location On Said Wall And Comprising A Radiused Portion Extending From Said Seaming Panel" ........................................................................ 28

M.   "Lowermost Point of Said Wall" ........................................................................ 29

N.   "Between About 20° and about 60°" ........................................................................ 30

O.   "Bent Upward Through An Angle Of At Least About 16°" ........................................................................ 30

P.   "Transition From Said Double Seam To Said Second Wall Portion" ........................................................................ 31

Q.   "Forming A Transition Therebetween" ........................................................................ 31

R.   "Between About 30° and about 50°" ........................................................................ 31

S.   "Bent Upward Through An Angle Of At Least About 26°" ........................................................................ 31

T.   "Wall Extending From Said Seaming Panel" ........................................................................ 32

IV.   REXAM'S '230 AND '728 PATENTS ........................................................................ 32

A.   Background Of Rexam's Score Line Patents ........................................................................ 32

B.   Hinge Segment (Claims 1 & 13 of the '230, Claim 7 of the '728) ........................................................................ 33

C.   The Hinge Line (Claim 7 of the '728) ........................................................................ 34

D.   Adjacent Area Of The Central Panel (Claim 1 of the '230) ........................................................................ 35

E.   Passing Through (Claim 13 of the '230) / Passes Through (Claim 7 of the '728) ........................................................................ 37

F.   To Direct Fracture Of Metal Of Said Hinge Segment In A Direction Away From Said Second End Of The Score (Claim 1 of the '728) ........................................................................ 38

V.   REXAM'S '242 AND '385 PATENTS ........................................................................ 40

A.   "Substantial Radial Alignment" (Claim 17 – '385 Patent) ........................................................................ 40

B.   "Negative Angle" (Claim 17 – '385 Patent) ........................................................................ 43

-ii-

VI.    REXAM'S '839 PATENT ........................................................................................ 43

    A.    "Smoothly Shaped Necked-in Profile" (Claim 1- '839 Patent) ............................ 43

    B.    "Reformed as a Part of Said Second Taper on Said First Taper" (Claim 2
       – '839 Patent) ................................................................................................ 45

    C.    "Combine and Blend" – (Claim 2 – '839 Patent) .............................................. 45

    D.    "The part formed by each die element partially integrates and blends
       with the portion formed by a preceding die" – (Claim 5 – '839 Patent) .............. 46

VII.    CONCLUSION ................................................................................................ 46

## TABLE OF AUTHORITIES

**CASES**

*AquaTex Indus. v. Techniche Solutions,*
   419 F.3d 1374 (Fed. Cir. 2005)............................................................................2

*Bell Atl. Network Servs. v. Covad Communs. Group, Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001)............................................................................2

*Bose Corp. v. JBL, Inc.,*
   274 F.3d 1354 (Fed. Cir. 2001)..........................................................................35

*Clearstream Wastewater Sys. v. Hydro-Action, Inc.,*
   206 F.3d 1440 (Fed. Cir. 2000)..........................................................................38

*Cole v. Kimberly-Clark Corp.,*
   102 F.3d 524 (Fed. Cir. 1996)..............................................................................2

*Cook Biotech, Inc. v. Acell, Inc.,*
   460 F.3d 1365 (Fed. Cir. 2006)............................................................................2

*Desper Prods. v. QSound Lab.,*
   157 F.3d 1325 (Fed. Cir. 1998)......................................................................4, 25

*Eiselstein v. Frank,*
   52 F.3d 1035 (Fed. Cir. 1995)............................................................................30

*Eli Lilly & Co. v. Aradigm Corp.,*
   376 F.3d 1352 (Fed. Cir. 2004)............................................................................2

*Ethicon Endo-Surgery v. United States Surgical Corp.,*
   93 F.3d 1572 (Fed. Cir. 1996)............................................................................18

*Hockerson-Halberstadt, inc. v. Converse Inc.,*
   183 F.3d 1369 (Fed. Cir. 1999)....................................................................17, 42

*Hormone Research Found. v. Genentech, Inc.,*
   904 F.2d 1558 (Fed. Cir. 1990)............................................................................4

*Kraft Foods, Inc. v. International Trading Co.,*
   203 F.3d 1362 (Fed. Cir. 2000)............................................................................3

*Linear Tech. Corp. v. Impala Linear Corp.,*
   379 F.3d 1311 (Fed. Cir. 2004)..........................................................................38

*Lisle Corp. v. A.J. Mfg. Co.,*
   398 F.3d 1306 (Fed. Cir. 2005)............................................................................2

*Lizardtech v. Earth Resource Mapping,*
   433 F.3d 1373 (Fed. Cir. 2006)............................................................................3

RLF1-3119420-1

*Markman v. Westview Instruments, Inc.*
517 U.S. 370 (1996) ........................................................................................................ 1

*Merck & Co. v. Teva Pharms. USA, Inc.*,
347 F.3d 1367 (Fed. Cir. 2003) .............................................................................. 23, 31

*Multiform Desiccants, Inc. v. Medzam Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998) ............................................................................... 3, 25

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) ................................................................................. 3, 4

*Pause Tech. LLC v. TiVo Inc.*,
419 F.3d 1326 (Fed. Cir. 2005) ............................................................................. 17, 27

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) *(en banc)* ............................................................ *passim*

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005) ....................................................................................... 42

*RF Delaware v. Pacific Keystone Technologies*,
326 F.3d 1255 (Fed. Cir. 2003) ....................................................................................... 3

*Sandisk Corp. v. Memorex Prods.*,
415 F.3d 1278 (Fed. Cir. 2005) ....................................................................................... 3

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................................................................................... 2

*Seachange Int'l, Inc. v. C-Cor Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ............................................................................ 3, 4, 25

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
810 F.2d 1113 (Fed. Cir. 1987) ..................................................................................... 35

*TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*,
375 F.3d 1126 (Fed. Cir. 2004) ..................................................................................... 42

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ....................................................................................... 1

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)) ................................................................................. 2, 23

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) ......................................................................................................... 18

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006) ..................................................................................... 36

- v -

**STATUTES**

35 U.S.C. § 112 .................................................................................................................. 2, 38, 39

**OTHER AUTHORITIES**

MPEP § 2173.05(g) .................................................................................................................. 38

Webster's Third New International Dictionary of the English Language"
    2002 ................................................................................................................ 15, 21, 23, 24

## I.    INTRODUCTION

Crown Packaging Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s (collectively "Crown")

Opening Claim Construction Brief (D.I. 241, "Crown's Brief" and "Cr. Br.") argues that Crown's U.S.

Patent Numbers 6,848,875 ("the '875 Patent") and 6,935,826 ("the '826 Patent") (collectively "Crown's

patents") are essentially boundless, while Rexam Beverage Can Company's ("Rexam") asserted U.S.

Patent Numbers 4,774,839 ("the '839 Patent"), 5,222,385 ("the '385 Patent"), 5,697,242 ("the '242

"Patent"), 6,129,230 ("the '230 Patent") and 6,260,728 ("the '728 Patent") are wrong for various reasons.

## II.    CLAIM CONSTRUCTION

Crown's proposed constructions violate a number of legal requirements that govern construction

of patent claims. This section addresses those requirements that, in addition to those that were addressed

by Rexam's Opening Brief on Claim Construction (D.I. 172), are implicated by Crown's Brief.

### A.    The Purpose Of Claim Construction Is To Make Clear The Scope and Meaning Of The Claims

A pervasive failure of Crown's proposed constructions of the disputed terms of Crown's patents is

their failure to provide any meaningful statement of the scope or meaning of claim terms. Clarity of

patent claims is a fundamental requirement of the patent system.

> [T]he limits of a patent must be known for the protection of the patentee, the
> encouragement of the inventive genius of others and the assurance that the subject of the
> patent will be dedicated ultimately to the public. Otherwise, a zone of uncertainty which
> enterprise and experimentation may enter only at the risk of infringement claims would
> discourage invention only a little less than unequivocal foreclosure of the field, and the
> public would be deprived of rights supposed to belong to it, without being clearly told
> what it is that limits these rights.

*Markman v. Westview Instruments, Inc.* 517 U.S. 370, 390 (1996)(internal citations omitted). When

claims do not convey their scope by plain and clear language, they must be construed "to clarify and

when necessary to explain what the patentee covered by the claims, for use in the determination of

infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

> Furthermore, Aradigm's argument is not an argument that the district court improperly
> paraphrased claim 6 in the jury instructions, but is rather an argument that claim 6
> requires construction because it does not convey its scope through the plain and clear
> meaning of its language. If a litigant seeks to raise such an argument, it must press the
> district court to engage in claim construction early in the proceedings.

1

*Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1362 (Fed. Cir. 2004).

The Federal Circuit has repeatedly held that claim construction must clarify and/or explain the meaning of claim terms. *See e.g. Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1372 (Fed. Cir. 2006)("Determining infringement generally requires two steps. 'First, the claim must be properly construed to determine its scope and meaning.'"); *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1379 (Fed. Cir. 2005)("An infringement analysis entails two steps. First, the meaning and scope of the asserted patent claims is determined."); *Lisle Corp. v. A.J. Mfg. Co.*, 398 F.3d 1306, 1312 (Fed. Cir. 2005)("First, the court determines the scope and meaning of the patent claims asserted."); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 528 (Fed. Cir. 1996)("The district court properly noted that analysis of patent infringement involves two steps: (1) claim construction to determine what the claims cover, i.e., their scope"). Crown's proposed constructions that do not provide clear meaning and scope for claim requirements of Crown's patents are not claim constructions.

### B.    Role of Disclosed Embodiments in Determining the Meaning and Scope of Patent Claims

Crown argues that any use of disclosed embodiments to limit construction of claims of its patents is improper. Crown is wrong. "The patent system is based on the proposition that claims cover only the invented subject matter." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (*en banc*). The invented subject matter must be described by the patent specification. 35 U.S.C. §112 ¶1. The patent specification is "the single best guide to the meaning of a disputed [claim] term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Disclosed embodiments are an essential part of the patent specification and must be considered in claim construction. "[W]e have specifically held that the written description of the preferred embodiments 'can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.'" *Bell Atl. Network Servs. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001).

2

When claim clarity can only be based on the features of a disclosed embodiment, claims can and must be limited to that embodiment. "[C]laims are not necessarily, and are not usually limited in scope simply to the preferred embodiment." *RF Delaware v. Pacific Keystone Technologies*, 326 F.3d 1255, 1263 (Fed. Cir. 2003). As Rexam recognized in its opening brief on claim construction, claims are not limited by mere references to a preferred embodiment. *Sandisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005).

> However, in whatever form the claims are finally issued, they must be interpreted, in light of the written description, but not beyond it, because otherwise they would be interpreted to cover inventions or aspects of an invention that have not been disclosed. **Claims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited.** One does not receive entitlement to a period of exclusivity for what one has not disclosed to the public.

*Lizardtech v. Earth Resource Mapping*, 433 F.3d 1373, 1375 (Fed. Cir. 2006) (Lourie, Chief Judge with Michel, C.J. and Newman, C.J. concurring)(emphasis added). Many terms of the asserted claims of Crown's patents can be understood only from the disclosed embodiments of Crown's patents. The scope and meaning of those terms are properly limited by those embodiments.

## C.    Role of Other Claims in Determining The Meaning and Scope of a Patent Claim

The doctrine of claim differentiation provides that "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1368-1369 (Fed. Cir. 2005)(internal citations omitted). However, that "is not a hard and fast rule of construction." *Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000). Claim differentiation will not "overcome the plain language of the claims themselves." *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001). Further, "the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998). "[C]laims that are written in different words may ultimately cover substantially the same subject matter." *Seachange*, 413 F.3d at 1368-1369.

3

Claim differentiation can be applied (1) where different words appear in a dependent claim than in an independent claim from which the dependent claim depends, and/or (2) where two similar independent claims use different words. *Seachange*, 413 F.3d at 1368-1369. The presumption of claim differentiation is weaker where different words are used in two independent claims. *Id.*; *Mycogen*, 243 F.3d at 1329; *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1567 (Fed. Cir. 1990)("It is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved").

The presumption of claim differentiation is significantly undermined where the patentee concedes that claims having different words should be interpreted the same at another place in the patent. *Desper Prods. v. QSound Lab.*, 157 F.3d 1325, 1337 (Fed. Cir. 1998)(patentee's claim differentiation argument lost "much of its force" where patentee admitted other words in the patent could be used interchangeably). A patentee cannot invoke the presumption of claim differentiation in favorable situations while ignoring it in others.

## III.    CROWN'S '826 AND '875 PATENTS

Crown's proposed claim constructions extend far beyond the invention disclosed by Crown's patents. To support those nearly boundless constructions, Crown argues that its invention is not what Crown's patents say that it is. For example, Crown's summary of the alleged inventions of its patents does not acknowledge that those patents clearly say that a narrow, but otherwise conventional, generally U-shaped reinforcing bead is an essential element of the invention. (D.I. 172 at 6-8.) Though Crown would clearly prefer to ignore those clear statements, they are so clear and so pervasive that Crown cannot avoid them.

Crown cites three sections of the '826 patent specification as disclosing the benefits of Crown's "new geometry." (D.I. 241 at 8.) Every one of those cited sections says that a narrow annular reinforcing bead is an element of that "new geometry." "We have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall **and limiting the width of the anti peaking bead,**" (D.I. 173 at A37, '826 patent column 1 lines 33 - 35 (emphasis added)), "**the concave bead narrower than 1.5 mm (.060")**," (D.I. 173 at A37, '826 patent col. 2 lines 10 – 11 (emphasis added)), and "[t]he

4

can ends may be economically made of thinner metal if pressure retention requirements permit because these can ends have a relatively small centre panel **in a stiffer annulus**." (D.I. 173 at A40, '826 patent col. 8 lines 40 – 42 (emphasis added)). Crown's goal, by this deliberate omission and throughout its proposed claim constructions, is to obtain by claim construction the claims that it wishes it had for the invention that it wishes it made. Crown's efforts must be rejected.

A.    **"Chuck Walls" that Meet at a "Juncture"**

Claim 13 of the '826 patent and claim 50 of the '875 patent require a "rotatable chuck" that has first and second walls that meet at a juncture. Crown's proposed construction of these claim requirements is: "First and second walls encircling the chuck forming a place between them at which they meet." (D.I. 241 at 9.) That provides no clarity of scope or meaning of the claim requirement, is self contradictory, and is not consistent with the claim language. It is no construction at all and should be rejected.

Crown's patents describe a chuck 30 having what are variously referred to as a "frustoconical drive surface 32" or a variant of that term (D.I. 173 at A38, '826 patent col. 4 lines 45, 47, 54 ), as "chuck wall 32" (D.I. 173 at A38, '826 patent col. 4 lines 61 – 62, 63) and as "chuck drive wall" 32. (D.I. 173 at A39, '826 patent col. 5 lines 14 – 15.) That surface (wall) may be at an angle between 20° and 60° to a vertical line as shown by Figure 5. The chuck 30 is also described as having a "substantially cylindrical surface portion 33" (D.I. 173 at A38, '826 patent col. 4 line 53), "cylindrical wall 33" ('826 patent col. 4 line 64, col. 5 line 15), "cylindrical surface 33" (D.I. 173 at A39, '826 patent col. 6 line 35), and "generally vertical surface 33." (D.I. 173 at A40, '826 patent col. 7 lines 63 – 64.) That surface is at an angle between +4° and -4°. (D.I. 173 at A38, '826 patent col. 4 lines 44 – 55.) As shown by Figure 5 of Crown's patents, those two surfaces or walls, 32 and 33, appear straight in cross section and meet at a point to form a distinct angle between them.

5



Fig.5.

In addition to depicting and describing chuck surfaces (or walls) at different angles that meet each other, Crown's patents describe an alternative transition from one wall to the other. Referring to Figure 8, the patent describes two transitions between the chuck surfaces or walls. Those two surfaces either meet each other at a "sharp transition" or have a "blend radius" R of .5 millimeters (.020 inches) interposed between them. (D.I. 173 at A40, '826 patent at col. 7 lines 35 – 38, col. 8 lines 9 – 14.) Crown's patents state that the blend radius is neither the frustoconical surface 32 nor the substantially cylindrical surface 33 but is interposed between the two and joins them.



Fig.8.

> Typically:--As shown in FIG. 8 the chuck comprises a **cylindrical land of length `1`** typically 1.9 mm (0.075") and **frustoconical drive surface 32 inclined at an angle Y°, typically 43°**, to the cylindrical [land] to which **it is joined by a radius R typically 0.5 mm (0.020")**. Angle "X" is typically 90°.

(D.I. 173 at A40, '826 patent col. 8 lines 9 – 14 (emphasis added).)

The language of claim 13 of the '826 patent, "first and second walls forming a juncture therebetween" and the language of claim 50 of the '875 patent, "first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween," do not permit the "juncture" to include anything that is interposed between the two walls. In the case of claim 13, the juncture is formed by the two walls, and in the case of claim 50, the second wall forms the juncture by depending from the first wall "so as to form a juncture." Therefore, the only embodiment described by Crown's patents in which two chuck surfaces (walls) meet to form a juncture is

6

the sharp transition between a frustoconical wall and a substantially cylindrical wall. As illustrated by Figure 5 of Crown's patents, those walls meet to form a distinct angle.

Crown's proposed construction of the requirements of claim 13 of the '826 patent and claim 50 of the '875 patent is so vague that it does not necessarily encompass the chuck depicted by Crown's Figure 5 and described by Crown's patents. Crown's proposed construction includes no requirement for a wall that excludes the surfaces 32 and 33 from jointly comprising a single wall, and therefore falling outside the scope of Crown's patents. There is also no requirement for a "juncture" that precludes any point along surfaces 32 and 33 from being a juncture. Under Crown's proposed construction, surfaces 32 and 33 may together be a single wall and may also be any number of walls. Under Crown's proposed construction, a juncture between two walls may be nowhere along the surfaces 32 and 33, may be at the point at which surface 32 meets surface 33, and may be anywhere else along the surfaces 32 and 33. Crown's proposed construction provides no basis at all for identifying the claimed walls and juncture in the only embodiment disclosed by its patents or in any other chuck. This is no claim construction at all.

Crown criticizes Rexam's proposed construction for requiring that the walls meet at a point (without specifying how the place that Crown argues for is different from a point) and for requiring that the two walls form a distinct angle at a juncture. (D.I. 241 at 10.) According to Crown, there are no requirements for either a wall or a juncture because the claims explicitly contain none and because the patents neither describe a juncture as a point nor say that chuck walls must form a distinct angle. Crown is wrong.

The term juncture is used only once in Crown's patents to describe the meeting of a frustoconical "chuck wall 32 and cylindrical wall 33." (D.I. 173 at A38, '826 patent col. 4 line 63.) That meeting is at a point, or "sharp transition." By requiring that a juncture between walls forms a distinct angle, Rexam's proposed construction brings the only clarity that is possible for these claim terms based on Crown's patents. Crown's proposed construction has no clarity of meaning or scope. It must be rejected.

### B.    "Peripheral Cover Hook"

Claim 13 of the '826 patent requires a "peripheral cover hook" and claims 32 and 50 of the '875 patent require a "circumferentially extending peripheral cover hook." Crown agrees that

7

"circumferentially extending" adds nothing to the meaning of "peripheral cover hook" by proposing the same construction for both claim terms. (D.I. 241 at 12.) Crown also acknowledges that Crowns' patents use the terms "cover hook' and "curl" synonymously. *Id.* Crown construes these terms to be the "curved portion of the can end that is to be formed into a portion of a double seam."

Rexam objects to one aspect of this proposed construction as it is presently understood. This proposed construction provides no basis for understanding what part of the claimed can end is a cover hook, and what part is not. Specifically, Crown's proposed construction provides no basis for identifying the location on a can end at which the peripheral cover hook ends. That location is critical for claim 13 of the '826 patent because, as discussed in section D below, a "wall" extends from the cover hook and several claim requirements apply to that wall. Those requirements do not apply to the cover hook. Identifying what part of a can end is "peripheral cover hook" and what part is "wall" is critical to claim 13 of the '826 patent. Neither this proposed construction nor Crown's proposed construction of "wall" provide any basis for identifying the boundary between the peripheral cover hook and the wall. Again, Crown proposes a construction that provides no clarity as to the meaning or scope of a term in its patents.

        **1.**    **Crown's Patents Describe The Entire Curved Section At The Outer Region Of The Can End As The Peripheral Cover Hook, And, Show And Describe The Adjoining Chuck Wall As Flat**

Crown criticizes Rexam's proposed construction of cover hook for requiring the cover hook to end at the location at which the can end is no longer curved. Crown now argues that the peripheral cover hook disclosed by its patents is not the entire curved outer portion of the can end depicted and described by its patents because chuck wall 24 extends into the curved region that conforms to radius $r_1$ and shares that curved region with the peripheral cover hook. (D.I. 241 at 13.) Crown now argues that "[t]he specification, therefore, confirms that the can end wall and the seaming panel portion of the cover hook may share a common radius." *Id.* at 13. Crown's argument directly contradicts Crown's patents.

Crown's patents identify the outermost portion of an unseamed can end as either a "peripheral curl" or a "peripheral cover hook." (D.I. 173 at A33, 34, 38, '826 Patent Fig.2, col.3 ln.24-25; Fig.4, col.3 ln. 54-57.) A chuck wall extends inwardly from the curl or cover hook. *Id.* Neither Fig. 2 for a

8

prior art can end, nor Figs. 4, 5, 6 or 7, all of which depict the same embodiment of Crown's alleged invention, identify the location at which the curl or cover hook ends and the chuck wall begins.

Crown's patents describe the entire outer curved portion of the can end as the peripheral curl. Figure 4 of Crown's patents (reproduced below) includes lines that indicate linear measurements of the can end, height and depth, and also indicate the radii and diameters of curved sections. The table in column 4 of the '826 Patent shows "typical dimensions" for those measurements.



FIG. 4

Those dimensions include a "seaming panel radius" identified as $r_2$ and a "seaming panel/chuck wall radius" identified as $r_1$. (D.I. 173 at A38, '826 patent col.4 ln.11-25.) The table at column 4 of the '826 Patent identifies diameters, $d_3$ and $d_4$ as "PC diameter of seaming panel /chuck wall radius" and "PC diameter of seaming panel radius," respectively. As shown by Figure 4, diameters, $d_3$ and $d_4$ are the locations at the peripheral curl portion of the can end at which the centers of radii $r_1$ and $r_2$, respectively, are located. The letters "PC" must refer to the "Peripheral Curl." The regions conforming to radii $r_1$ and $r_2$ are thereby labeled as parts of that peripheral curl, and the flat section adjacent to the region that conforms to $r_1$ is the chuck wall 24.

Crown's patents identify the chuck wall 24, which extends "from the interior of the peripheral cover hook" (D.I. 173 at A38, '826 patent col. 3 lines 56 – 57), as being the flat surface (in cross section). The chuck wall 24 has an angle indicated by C° in Figure 4. The angle C is the "chuck wall angle to vertical." (D.I. 173 at A38, '826 patent col. 4 line 24.) The can end chuck wall 24 is also described as "inclined to an axis perpendicular to the exterior of the central panel at an angle C. between 20° and 60°." (*Id.* at col. 3 lines 47 – 49, col. 2 lines 2 – 4.) Further, Crown's patents say that a frustoconical (flat in cross section) surface 32 of the chuck 30 engages the chuck wall. (*Id.* col. 4 lines 47

9

– 50.)  The specification of Crown's patents makes it abundantly clear that the chuck wall 24 is a flat (in cross section) surface.

### 2.    In A Prior Action, Crown Directly Contradicted Its Position Here By Admitting That The Chuck Wall Is Flat

Three years ago, Crown brought an appeal to the United States Court of Appeals for the Federal Circuit of a decision on its U.S. Patent No. 6,065,634 ("'634 patent") (A1-10), a patent that shares the same specification as the '875 and '826 patents.  In that appeal, Crown directly contradicted its position here that the chuck wall 24 shown and described by its patents has a curved upper section that shares the curved region that conforms to radius $r_1$ with the peripheral cover hook.  In that appeal, Crown admitted that the chuck wall 24, which Crown's patents depict and describe as extending from a cover hook, is flat.

The '634 patent has claims that require a "peripheral cover hook" and "a chuck wall dependent from an interior of the cover hook." (A24, App. Br. at 5.)  A district court had construed the chuck wall required by that claim to be flat, and Crown appealed.  Crown did not argue that the '634 patent disclosed any can end that had a curved wall adjacent to a cover hook.  Crown did not even dispute the district court's conclusion that the '634 patent disclosed only can ends having a flat wall extending from a cover hook.

> The District Court found that the "preferred embodiment, drawings and all references [in the specification] disclose exclusively flat chuck walls", and therefore, that the claimed chuck wall is limited to a flat shape.  This was error.  The fact that chuck walls may be the preferred or even the only embodiment disclosed in the specification is irrelevant to claim scope.

(A38, App. Br. at 19.)  Rather, Crown directly admitted that the preferred embodiment of its patents has a flat chuck wall.

> The District court also erred to the extent it read **a flat chuck wall limitation into the claims from the patent specification.  In so doing, the District Court limited the claims to the preferred embodiment**, a method of analysis that has been rejected by this Court.

(A30, App. Br. at 11 (emphasis added).)  And most directly, Crown argued that "[w]hile **the specification discloses a can end having a flat chuck wall**, the claims are not so limited." (A29. App. Br. at 10 (emphasis added).)

3.   **Rexam's Proposed Construction Provides Clarity That Is Supported by Crown's Patents – Crown's Proposed Construction Provides None And Should Be Rejected**

Crown's patents and Crown's admissions establish that the entire curved outer portion of the can end that is depicted and described by Crown's patents is the peripheral cover hook, and, that the chuck wall that extends from that cover hook is flat. Rexam's construction of "peripheral cover hook" requires that the cover hook end where the can end curvature ends. That is both consistent with Crown's patents and is required by them because they provide no other basis for identifying the inner boundary of the cover hook. Crown admits as much by providing no basis for identifying that location. Crown's proposed construction should be rejected for providing no clarity as to the meaning and scope of the term "peripheral cover hook" and Rexam's proposed construction should be adopted for providing clarity on the only basis that is supported by Crown's patents.

C.   **"Seaming Panel," and, "Adapted To Be Formed Into A Portion Of Said Double Seam During Said Seaming Operation"**

Claim 13 of the '826 patent and claims 32 and 50 of the '875 patent require a "seaming panel." Crown argues that the seaming panel requirements of all claims should be construed identically. Contrary to Crown's representation of Rexam's position, Rexam disagrees. Crown misrepresented Rexam's position concerning the seaming panel requirements by representing that Rexam's constructions of the seaming panel requirements of claim 32 and 50 of the '875 patent are the same as Rexam's construction of the seaming panel requirements of claim 13 of the '826 patent. (D.I. 241 at 13.) As set out by the Joint Claim Construction Statement submitted by the parties on December 15, 2006 (D.I. 158), Rexam's position on construction of the seaming panel requirements of the '875 patent is not the same as Rexam's position on construction of the seaming panel requirements of the '826 patent.

Rexam's position is different for Crown's two patents because the seaming panel requirements of claim 13 of the '826 patent are different than the seaming panel requirements of claims 32 and 50 of the '875 patent. The term "seaming panel" is common to the '875 and '826 patents. However, claim 13 of the '826 patent additionally requires that the seaming panel is "**adapted** to be deformed into a portion of said double seam during said seaming operation." (Emphasis added.) Rexam asserts that that additional

11

requirement makes the seaming panel of claim 13 of the '826 patent different from the seaming panel of claims 32 and 50 of the '875 patent.

### 1.    "Seaming Panel"

Crown argues that "seaming panel" should be construed to be the "curved innermost portion of the peripheral cover hook." Rexam objects to this proposed construction for four reasons: (1) Because Crowns' construction fails to provide clarity as to the scope and meaning of the term seaming panel; (2) Because Crown's construction directly contradicts claim 1 of Crown's '875 patent; (3) Because Crown's construction directly contradicts Crown's description of the seaming panel to the patent examiner during prosecution of the '875 patent in the United States Patent and Trademark Office ("PTO"); and (4) Because Crown's construction of seaming panel is not supported by Crown's patents.

Crown's construction provides no basis for identifying the innermost boundary of the seaming panel. Crown argues that the innermost boundary of the seaming panel is the innermost boundary of the peripheral cover hook. As discussed above, Crown's construction of peripheral cover hook provides no basis to identify that location. That leaves the scope of claims 32 and 50 of the '875 patent unknown. Claim 32 of the '875 patent requires a "first wall portion extending from said seaming panel" and claim 50 of the '875 patent requires a "circumferentially extending wall extending from said seaming panel." (D.I. 173 at A28, '875 patent col. 13 lines 11 – 12, col. 15 lines 15 – 17.) Without a basis to identify the innermost boundary of the seaming panel, there is no basis to know what part of a can end is seaming panel and what part is the "first wall portion" in the case of claim 32 or what part is the "circumferentially extending wall" in the case of claim 50. That deficiency is critical because claim 32 imposes requirements on the first wall portion and claim 50 imposes requirements on the circumferentially extending wall. Without any basis to identify the first wall portion or the circumferentially extending wall, there is no way to know whether a can end meets the requirements for those regions of a can end. Crown's proposed construction provides no clarity as to the scope or meaning for the required "seaming panel."

Crown's construction of "seaming panel" as being the innermost portion of the peripheral cover hook directly contradicts the statement in claim 1 of the '875 patent that the seaming panel is not the

12

innermost part of the peripheral cover hook. That claim requires "a can end having **a circumferentially extending peripheral curl** and **a wall extending circumferentially and radially inward from said curl**." (D.I. 173 at A26, '875 Patent col.9 ln. 22-24 (emphasis added).) As Crown admits, a peripheral curl is a peripheral cover hook. (D.I. 241 at 12.) Claim 1 of the '875 patent makes clear that the seaming panel is not the innermost portion of the curl by further requiring that the curl include a radiused portion that is interposed between the seaming panel and the wall: "said peripheral curl comprising a seaming panel and **a radiused portion extending from said seaming panel to said wall**." *Id.* at lines 27 - 29 (emphasis added). That requirement makes clear that the seaming panel does not extend to the innermost boundary of the peripheral curl where a wall extends from the peripheral curl or cover hook. The seaming panel is not the innermost portion of the peripheral cover hook.

Crown argues that a seaming panel should not be limited to a single curvature, as Rexam proposes, because Crown's patents disclose a seaming panel that is formed by two different curves. (D.I. 241 at 14.) That directly contradicts what Crown told the examiner of the '875 patent. From the time Crown filed its first patent application in January 1995 until February 2004, every claim that Crown submitted that was directed to a can end required that the can end have a wall that extended from a peripheral cover hook. In February 2004, Crown first submitted claims, such as claims 32 and 50 of the '875 patent, that require a wall that extends from the seaming panel. Crown specifically identified the "seaming panel portion of the cover hook" to the patent examiner as the region shown by Figure 4 of its patents that conforms to radius $r_2$:

> As shown in Figure 4 and described in the corresponding text of the instant application, the seaming operation begins by providing a can end that has **a wall extending from the seaming panel portion of the cover hook 23 (the radius of the seaming panel is designated $r_2$ in Figure 4**) to an annular reinforcing bead 25.

(A77, Amendment dated February 9, 2004 at p. 20 (emphasis added).) Here, Crown directly contradicts that statement asserting that the seaming panel portion extends beyond the region that conforms to radius $r_2$. "[T]he '*seaming panel*' is formed with more than one radius ($r_1$ and $r_2$) and is not limited to a constant radius." (D.I. 241 at 14.) As Crown admitted during prosecution of the '875 patent, that statement is wrong. The "seaming panel radius" $r_2$ is **the** radius of the seaming panel. That radius describes the shape

13



# FIG. 4

of the seaming panel – it has a single radius of curvature - and identifies the boundaries of the seaming panel – where the shape of the can end no longer conforms to that radius of curvature. Crown cannot rewrite its patents now.

Crown's proposed construction of seaming panel as being the innermost region of the peripheral cover hook and encompassing different curvatures is not supported by Crown's patents. Rexam's proposed construction of seaming panel: An uppermost portion of the peripheral cover hook formed by a constant radius, is fully supported by Crown's patents and Crown's representation to the PTO during prosecution of the '875 patent. There is no other disclosure in Crown's patents on which a construction can be based. Crown's proposed construction should be rejected as not supported by Crown's patents, and Rexam's proposed construction should be adopted.

## 2. "Adapted To Be Formed Into A Portion Of Said Double Seam During Said Seaming Operation"

Crown argues for the ordinary meaning based on dictionary definitions of claim terms of its patents, "juncture" (D.I. 241 at 10), "bead" (D.I. 241 at 20) and "transition" (D.I. 241 at 28). However, Crown ignores the plain meaning of the term "adapted." Crown argues that the term "adapted to be

formed into a portion of said double seam during said seaming operation" is "merely functional" language that defines what a seaming panel does, not what it is. That argument contradicts the plain meaning of the term "adapted", and should be rejected.

The dictionary on which Crown relies, "Webster's Third New International Dictionary of the English Language" 2002, defines the transitive verb "adapt" as "to make suitable or fit (as for a particular use, purpose, or situation)" and "to make suitable (for a different use or situation) by means of changes or modification." (A83, Webster's Third International Dictionary 2002.) A "seaming panel adapted to be formed into a portion of said double seam during said seaming operation" is then a seaming panel that has been made suitable or fit by changes or modifications to be formed into a part of the double seam. The ordinary meaning of "adapted" clearly makes this term a statement of what has been done to the seaming panel, not what it does.

Crown's argument directly contradicts Crown's statement to the patent examiner regarding the '826 patent. During prosecution of the '826 patent, Crown told the patent examiner that the claims were directed to "a can end **before** it has been seamed onto a can body." (D.I. 173 at A136, Reply Dated August 3, 2004 at page 9 (emphasis added).) Crown's argument that "adapted to be formed into a portion of said double seam during said seaming operation" is directed to what happens **during** seaming, directly contradicts Crown's prosecution representation that the claims are directed to a can end **before** seaming.

This requirement for a seaming panel is distinctly different from the requirements of claims 32 and 50 of the '875 patent. Those claims of the '875 patent require a "seaming panel to be deformed into a portion of said double seam during a seaming operation." (D.I. 173 at A28-29, '875 patent col. 13 lines 6 – 7, col. 15 lines 13 – 15.) This language defines what the seaming panel does, or more accurately what is done to it. The addition of the verb "adapted" changes the meaning to what has been done to the seaming panel. The requirement of claim 13 of the '826 patent is different than those of claims 32 and 50 of the '875 patent because Crown made those requirements different.

Rexam's proposed construction of claim 13 of the '826 patent requiring that the seaming panel "has some treatment or conditioning that makes the seaming panel easier to deform than the rest of the

15

can end to become part of the double seam during seaming to a can body" falls squarely within the ordinary meaning of the requirement. Crown's proposed construction ignores the plain meaning and contradicts Crown's representation as to the scope of that claim. Crown's proposed construction should be rejected and Rexam's should be adopted.

D.     "Wall Extending Inwardly And Downwardly From Said Cover Hook" and "Lowermost End Of Said Wall"

Rexam objects to Crown's construction of the term "a wall extending inwardly and downwardly from said cover hook" of claim 13 of the '826 patent for being vague when viewed in combination with its proposed construction of "cover hook" and for failing to incorporate all the requirements of that claim for the wall.

Rexam's proposed construction: "When looking at a cross section of the can end, a wall that begins where the peripheral cover hook ends, and extends to a lowermost point, which is located inwardly (toward the center of the can end) and downwardly (towards the bottom of the can) from the end of the cover hook;" provides bases for clearly understanding this requirement. Rexam's construction provides the perspective from which directional terms should be viewed. Crown does not dispute that that perspective is correct. Rexam's construction also clarifies that the wall begins at the end of the cover hook. Crown says that this is an undisputed issue. (D.I. 241 at 15.) Rexam's construction also says that the wall extends to the lowermost point. This is based on the explicit requirement of claim 13. (D.I. 173 at A39, '826 patent col. 6 lines 56 – 58.) Crown admits this is a requirement of claim 13. (D.I. 241 at 19.) However, Crown argues that including that requirement in the construction of wall is unnecessary. (D.I. 241 at 15.) Crown is wrong. It is error to construe a claim term without considering all claim requirements for the term.

> Specifically, Pause argues that "[r]egardless of what claim language appears in a later portion of the claim, that language should not be read into the interpretation of a separate claim element." However, "[p]roper claim construction . . . demands interpretation of the entire claim in context, not a single element in isolation."

16

*Pause Tech LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (quoting *Hockerson-Halberstadt, inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999), (ellipses in original). Rexam's proposed construction is clear, complete and correct. That construction should be adopted

### E. "First Portion Of Said Wall Extending From Said Cover Hook"

Crown asserts that the term "wall extending inwardly and downwardly from said cover hook" of claim 13 of the '826 patent needs no construction. Rexam proposes that the term be construed for clarity to mean "The upper portion of the end wall (or chuck wall) that begins where the cover hook ends." Crown only objects to this construction as confusing because the term "chuck wall," as used by claim 13, refers to a wall of a chuck not a can end. That is true. However, Crown's patents also refer to the wall of a can end that extends from a cover hook as a "chuck wall." (D.I. 173 at A38, '826 patent col. 3 lines 54 – 55.) Rexam's proposed construction clarifies the meaning of the claim term in the context of Crown's patents by identifying terms of Crown's patents to which this claim term relates. Rexam agrees that Crown's patents' use of the same term to refer to different things and use of different terms to refer to the same thing are confusing.

### F. "First Point On Said Wall"

Crown asserts that this term of claim 13 of the '826 patent needs no construction. Rexam proposes that the term be construed consistent with the additional requirements recited by claim 13 to require "The point on the wall of the can end, which can only be determined by looking at a cross section of the end with a seaming chuck in place, where the wall bends about the juncture of the two chuck walls of the seaming chuck during seaming." Crown criticizes this construction as grafting a method of applying the claim into construction of this term. (D.I. 241 at 16.) Crown is wrong.

Claim 13 of the '826 patent also requires "said first wall portion adapted to be deformed during said seaming operation so as to be bent upwardly around said juncture of said chuck walls **at said first point on said wall**." (D.I. 173 at A41, '826 patent col. 10 lines 52 – 56 (emphasis added).) Crown's construction of "first point" ignores that requirement. That is error. *Pause Tech. LLC*, 419 F.3d at 1331. Crown not only ignores that requirement in construing the term "first point," Crown also ignores that requirement in construing the "bent upwardly" clause where it appears. (D.I. 241 at 17-18.) Crown's

17

constructions remove that requirement from the claim entirely. That is clearly wrong. Every limitation of a claim is deemed to be important. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29-30 (1997). Claim construction cannot remove a limitation from a claim. *Ethicon Endo-Surgery v. United States Surgical Corp.*, 93 F.3d 1572, 1582 (Fed. Cir. 1996). Crown's proposed construction should be rejected, and Rexam's should be adopted.

G.    **"Adapted To Be Deformed During Said Seaming Process"**

Crown has changed its position on construction of this term of claim 13 of the '826 patent. Crown asserted in the Joint Claim Construction Statement that this term should be construed to require "[a]dapted to have its shape altered during the seaming operation." (D.I. 158 at 3.) Here, however, Crown drops "adapted to" from its construction and now argues that "adapted to" is merely functional language that adds no requirement to the claim. (D.I. 241 at 17.) That, apparently explains the disappearance of "adapted to" from Crown's construction. Rexam disagrees with this construction and proposes that this term be construed to require "some treatment or conditioning, done to the first wall portion of the can end that makes the first wall portion easier to deform than the rest of the can end." This proposed construction is consistent with Rexam's construction of the term "adapted to" as applied to the seaming panel. (Section C.2 above.) Crown argues here, as it did for the same language as applied to the seaming panel, that "adapted to" indicates what the can end does, not what it is. (D.I. 241 at 17.) Crown is wrong, as set out in section C.2 above. Crown's proposed construction should be rejected and Rexam's proposed construction should be adopted.

H.    **"So As To Be Bent Upwardly Around Said Juncture Of Said Chuck Walls At Said First Point On Said Wall" and "To Bend A Portion Of Said Can End Wall Upwardly Around Said Juncture Of Said Chuck Walls At A First Location On Said Can End Wall"**

Crown argues that Rexam's proposed construction of these terms of claim 13 of the '826 patent and claim 50 of the '875 patent is confusing because it states that the can end rotates when bent. (D.I. 241 at 18.) Crown correctly points out that rotation indicates turning about an axis. Crown is wrong in arguing that is not what is required by these terms of claim 13 of the '826 patent and claim 50 of the '875 patent.

18

Claim 13 of the '826 patent requires that the first wall portion be adapted to be deformed "so as to be bent upwardly around said juncture of said chuck walls at said first point on said wall." (D.I. 173 at A41, '826 patent col. 10 lines 54 – 56.) Claim 50 of the '875 patent requires a seaming operation to "bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall." (D.I. 173 at A29, '875 patent col. 15 lines 34–36.) Rexam construes the "bent upwardly" portion of these requirements to be: "to be bent around the juncture of the two chuck walls to rotate upwardly (away from the bottom of the can)." This construction is supported and required by two claim requirements: that the wall is bent around the juncture of the chuck walls, and that the bending occur at the first point. As set out in section A above, the juncture between chuck walls must be at a point. As recited by claim 13, the first point is a point. The bending required by claim 13 of the '826 patent must be at a point. As recited by claim 50, the first location is a place through which a straight line is drawn. (D.I. 173 at A29, '875 patent col. 15 lines 36 – 39.) If the first location was a region, it would be unclear where the line should be. For a line to pass through a location, the location must be a point. Since the the wall must bend around a juncture (point) and bend at a point on the wall, that bending must be rotation at the point, such as the deforming of the can end wall that is illustrated by Figure 7 of Crown's patents.

## Fig.7.



Crown complains that rotation indicates turning around an axis. (D.I. 241 at 18.) That is exactly what claim 13 of the '826 patent requires by requiring bending at a point and around a point. Rexam's construction is proper and clearer than that proposed by Crown. Crown's construction should not be adopted, and Rexam's should

19

**I.**    **"A Second Point Forming A Lowermost End Of Said Wall"**

Crown argues that this requirement of claim 13 of the '826 patent should be construed to require "a second point that marks the lowest end of the can end wall." That provides no guidance as to where the second point is located. It is no construction at all.

Crown misrepresents Rexam's proposed construction of the second point. The Joint Claim Construction Statement stated this requirement with language that it modifies: "a second portion of said wall extending from said first point to **a second point forming a lowermost end of said wall**." (D.I. 158 at 3.) Crown omitted that context language in stating this claim term in its Brief. (D.I. 241 at 19.) Rexam proposed the construction that restated the wall portion part of the claim and then provided a construction of the term at issue, "second point forming a lowermost end of said wall": "The portion of the wall that extends from the juncture of the seaming chuck to <u>the specific place on the wall nearest</u> <u>the central panel (toward the bottom of the can)</u>." (Emphasis added.) Rexam's proposed construction of the second point is emphasized and does not include the wall portion language. Rexam's proposed construction is clear and provides a basis to identify the location of the lowermost point, to the extent it can be construed at all.

Crown says that the chuck wall disclosed by its patents ends where it meets the reinforcing bead. (D.I. 241 at 19.) However, that provides no basis to locate the lower end of the wall where no reinforcing bead is present. Since no bead is recited by claim 13 of the '826 patent, and Crown argues that none is required, Crown's definition provides no basis to locate the lowermost point of the wall. Crown embraces that vagueness, arguing that it is entitled to this construction. Crown's proposed construction provides no clarity as to the meaning and scope of this limitation. It should be rejected and Rexam's proposed construction should be adopted.

**J.**    **"Annular Reinforcing Bead"**

Crown argues that the annular reinforcing bead recited by claim 14 of the '826 patent and claim 50 of the '875 patent is a "ring-like stiffening channel." Crown reached this construction by construing "annular" to be "ring-like," "reinforcing" to be "stiffening," and "bead" to be a channel." (D.I. 241 at 20.) Rexam asserts that the term "annular reinforcing bead" is used to refer to a feature of can ends and

questions whether "annular" and "reinforcing" require independent construction. Rexam sees no issue as to these terms, whether construed as Crown proposes or not at all. The term "bead" describes the features that are at issue. Crown's construction of the term "bead" to be a "channel" is not supported by Crown's patents and provides no clarity of meaning or scope of this requirement. That construction should be rejected.

### 1.    Crown's Construction Is Based On Incomplete Dictionary Definitions

Crown construes the term "bead" based on an incomplete definition. That definition, with the portions that Crown reproduced emphasized is "a **groove** or rounded elevation **on the surface of a metal can**, fiber drum, glass jar, **or metal closure to improve appearance and to stiffen**." (A85, Webster's Third International Dictionary 2002.) According to this definition, a bead is either a groove or a rounded elevation. Crown dropped "rounded elevation" portion from the definition. Crown apparently recognized that it does not describe any bead disclosed by Crown's patents and that a groove does describe all those beads.

Rexam agrees that groove is a reasonable description of the annular reinforcing beads disclosed by and referred to by Crown's patents, and that "rounded elevation" is inappropriate to explain the term "bead" as used by Crown's patents. Rexam's proposed construction, as shown by the emphasized portions of that construction is also based on this definition and requires a groove on the surface of a can end: "an outwardly concave generally "U" shaped **groove** (also called a countersink or anti peaking bead) **that is stamped or pressed into the can end**, and is located inwards from the bottom of the wall (chuck wall) when looking at a cross section of the can end, which encircles and supports the center panel of the can end."

Crown, without explaining why the term "bead" requires construction or why groove does not adequately describe the term "bead", additionally continues its construction of the term "bead" by looking to the definition of "groove." (D.I. 241 at 10.) Crown adopts as the definition of groove a "narrow hollow or **channel** made artificially in a surface". (*Id.* at 20 (emphasis added).) Choosing "channel" rather than "narrow hollow" and dropping completely the requirement "made artificially in a surface", Crown chooses only "channel" as a definition of "groove" and then dropping the requirement from the

21

definition of "bead" that a groove be "on the surface of a can", Crown concludes that a "bead" is a "channel." *Id.* Crown offers no explanation, nor even any explicit acknowledgement that it dropped all these definition requirements to reach this conclusion. Crown's claim "construction" is a series of incomplete definitions.

Crown's proposed construction of "annular reinforcing bead" is based entirely on manipulation of dictionary definitions. Such reliance on dictionary definitions has been specifically rejected.

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Phillips*, 415 F.3d at 1321. The Federal Circuit recognized that "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." *Id.* at 1322. Crown's approach is worse than reliance on dictionary definitions outside the context of the specification. Crown's construction is based on extracting the term "groove" from a dictionary definition of the claim term "bead," discarding the rest of the definition of the term "bead," extracting the term "channel" from a definition of the term "groove," and discarding the rest of the definition of the term "groove." The result of that process cannot be patent claim construction.

In addition to being the result of a flawed process, Crown's construction results in no clarity of meaning or scope of the claim term "annular reinforcing bead." Crown does not argue that "channel" is clearer than "bead" and offers no explanation as to what a "channel" on a can end may be. "Channel" is less clear than "bead," which can and must be understood based on Crown's patents. Crown's claim "construction" is apparently an attempt at claim expansion by partial lexicography. Crown's proposed construction must be rejected.

### 2.    Crown's Proposed Construction Is Not Supported By Crown's Patents

As set out by Rexam's Opening Claim Construction Brief (D.I. 172 at pages 6 – 8), the annular reinforcing bead disclosed by Crown's patents is a generally U-shaped groove at the outer edge of the central panel. Crown's patents discuss the possible range of variations in shape and size of that specific

22

shape. (D.I. 173 at A34, 38, '826 patent Fig. 4, col. 4 lines 18, 22, 23, col. 3 line 66 – col. 4 line 2.) Crown's patents also make clear that the annular reinforcing bead must be a groove adjacent to the surface of the central panel that accepts a seaming chuck extending into it. (D.I. 173 at A33, 38, '826 patent Figure 2, col. 3 lines 42 – 45, col. 4, lines 60 – 64.)

Crown argues that its proposed construction is consistent with the specification because the disclosed embodiments fall within Crown's construction. (D.I. 241 at 20.) That is not surprising as it is difficult to tell what would not fall within this vague and apparently boundless formulation. The scope of Crown's construction is not consistent with the scope of Crown's patent's disclosure of an annular reinforcing bead. The "annular reinforcing bead" recited by the claims of Crown's patents can be no broader than the disclosure by Crown's patents. Whatever "channel" means, it is not consistent with the disclosure of annular reinforcing beads by Crown's patents.

### 3. Rexam's Proposed Construction Of "Annular Reinforcing Bead" Does Not Have Extraneous Limitations

Crown says that Rexam's proposed construction has five extraneous limitations. Crown is wrong. "A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003). The patent specification is "the single best guide to the meaning of a disputed term" and is usually dispositive. *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). As properly construed, annular reinforcing bead requires every term of Rexam's proposed construction.

#### a. Outwardly concave

Crown's argument that "outwardly concave" is an extraneous limitation is based entirely on Crown ignoring the definition requirements of "bead" and "groove" to conclude that a bead is a channel. Crown construes "bead" to be a "groove". (D.I. 241 at 20). The definition of "groove" makes clear that a groove is something that is made "in a surface." (A85, Webster's Third International Dictionary 2002.) Crown nevertheless argues that describing a bead as "outwardly concave," which Crown acknowledges means extending inwardly and distinguishes extending outwardly, imposes an extraneous limitation.

23

(D.I. 241 at 20.) "Outwardly concave" may be extraneous because extending into a surface is necessarily required by the term "groove", but that does not add a limitation beyond what is necessarily required by recognizing that the claim term "bead" is a "groove". "Outwardly concave" is not an extraneous limitation. It may be redundant but it imposes no limitation in addition to what is required by the term "bead."

Crown's argument that "outwardly concave" is an additional limitation, is based on Crown's position that a bead does necessarily extend into a surface. Crown reached that conclusion by abandoning the term "groove" and abandoning the definition of "groove" to adopt only the term "channel." If Crown could rewrite its claims, then the claims can be anything. But Crown cannot. A bead is groove on a surface of a metal can closure and a groove is a narrow channel made artificially in a surface. (D.I. 241 at 20.) A bead must extend into a can end – it must be outwardly concave.

Crown contradicts itself in arguing that a bead is not necessarily outwardly concave. The definition of "bead," with which Crown starts its construction, makes clear that a bead has one of two shapes: "a groove or rounded elevation on the surface". (A84, Webster's Third International Dictionary 2002.) Crown began its claim construction by choosing groove, the only alternative that is rational in view of its patents' description of a bead, and rejected the only other shape, the "rounded elevation." (D.I. 241 at 20.) To now argue that a bead does not necessarily extend into a surface would argue that a bead does not have to be a groove. That directly contradicts Crown's decision to reject the "rounded elevation" and to adopt "groove" as the appropriate construction of the term "bead." Crown's rejection of the "rounded elevation" alternative for a bead acknowledges that "outwardly concave" is a necessary limitation of the claims of Crown's patents.

Crown argues, pointing to claim 1 of the '826 patent, which recites "an outwardly concave annular reinforcing bead" (D.I. 173 at A41, '826 patent col. 9 line 34), that claim differentiation requires

24

that "outwardly concave" is not part of the annular reinforcing bead requirement of claim 13[1]. As set out by section II.C above, claim differentiation only raises a presumption and does not alter a proper claim construction. *Multiform Desiccants*, 133 F.3d at 1480. Further, the presumption is weaker where language of two independent claims is compared. *Seachange*, 413 F.3d at 1368-1369. Finally, and particularly relevant to Crown's patents, claim differentiation is significantly undermined by admitted use of different terminology to mean the same thing. *Desper Prods.*, 157 F.3d at 1337. Crown admits that there is no difference between a "peripherally extending peripheral cover hook" and a "peripheral cover hook." (D.I. 241 at 12.) Crown also admits that its patents use the terms "curl" and "cover hook" interchangeably. Consistency in terminology is notably lacking in Crown's patents. *See e.g.* section III.A *supra*. Whatever Crown's patents leave for a presumption based on inconsistent use of language, that presumption does not displace the correct and required construction of "annular reinforcing bead" as outwardly concave.

### b.      Generally U-Shaped

Crown dismisses this requirement as a "word picture of the bead depicted in Figures 4 – 7", which are figures that show an embodiment of Crown's alleged invention. (D.I. 241 at 22.) Generally U-shaped describes more than the bead of one embodiment of Crown's alleged invention. That describes every embodiment described by Crown's patent as embodying Crown's invention, every bead of prior art can ends described by Crown's patents, and the prior art bead, 15, shown by Figure 2. Crown's patents make clear that the general U-shape of the reinforcing bead is an essential element of Crown's alleged invention.

Crown's patents describe the depicted embodiment and every contemplated variation of it as having a generally U-shaped reinforcing bead. Crown's patents give specific dimensions of the U-shaped

---

[1] Rexam agrees that claim 13 requires an annular reinforcing bead as that is an essential element of the alleged invention of Crown's patents. *See* Rexam's Opening On Claim Construction (D.I. 172) at 6 – 8. However, claim 13 does not recite an "annular reinforcing bead," claim 14 which depends from claim 13, does.

reinforcing bead shown by Figure 4. (D.I. 173 at 38, '826 patent col. 4 lines 4, 5, 6 and 8.) Crown's

patents describe the radius at the bottom of the generally U-shaped bead as typically "about .5 mm." (D.I.

173 at A38, '826 patent col. 3 line 50.) Crown's patents also describe that bead as preferably having

parallel sides but that the outer wall of the bead can be at an angle of -15° to + 15° to a line perpendicular

to the central panel and that the height of the outer side of the U-shaped bead, while preferably 1.78 mm,

may be up to 2.5 mm. (D.I. 173 at A38, '826 patent col. 3 lines 51 – 54.) As described by Crown's

patents, a can end according to its invention has a bead that is U-shaped with an opening of about 1 mm

(.5mm  X 2), a height of 1.78 mm to 2.5 mm, and legs that can vary from parallel to each other by 15°.

Every variation described by Crown's patent has the generally U-shaped reinforcing bead. (D.I. 173 at

A39, 40, '826 patent col. 5 table 2, col. 7 lines 17 – 28, table 6.)

Nothing in Crown's patents suggests that a bead that falls outside this description could be within

the scope of Crown's invention. Rather, Crown's patents describe an essential aspect of the invention to

be providing a can end with a bead that varies from the conventional generally U-shaped bead only in that

it is narrower than what was conventional. (D.I. 173 at A37, '826 patent col. 1 lines 32 – 34.) Generally

U-shaped is not an extraneous limitation. Crown's patents establish that it is an essential feature of an

"annular reinforcing bead."

### c.    "Stamped Or Pressed Into A Can End"

Crown argues that this term limits the method of manufacture of an annular reinforcing bead.

Crown is wrong. This term simply explains that a bead is a groove that is formed to extend into the can

end. It is included for clarity.

### d.    "Located Inwards From The Bottom Of The Wall"

Crown's objection to this requirement illustrates the extent of Crown's overreaching in

attempting to expand the scope of its claims. Crown does not suggest that its patents disclose or even

suggest any annular reinforcing bead that is not located inwards from the bottom of the wall. Neither

does Crown suggest how a bead that is not inward from the wall could open so that a seaming chuck can

enter the bead as required by every bead disclosed by Crown's patents. *See* D.I. 173 at A38, '826 patent

26

col. 3 lines 43 – 45, col. 4 lines 60 – 63.) This location of the annular reinforcing bead is a consistent and essential feature of every annular reinforcing bead disclosed by Crown's patents.

### e. "Supports The Central Panel"

This objection also illustrates Crown's overreaching. Crown does not suggest that its patents disclose or even suggest that any annular reinforcing bead does not support a can end central panel. Crown does not acknowledge the specific requirement of claim 14 of the '826 patent that the annular reinforcing bead connects the wall to the central panel. (D.I. 173 at A41, '826 patent col. 10 lines 62 – 65.) Supporting a central panel is a consistent and essential function of every annular reinforcing bead disclosed by Crown's patents.

### K. "Circumferentially Extending Wall Comprising First and Second Portion[s]"

This requirement of claim 32 of the '875 patent is apparently at issue only to the extent that Rexam's proposed construction requires that the two portions (upper and lower parts of the wall) "can be identified only during and after seaming." (D.I. 241 at 24.) Rexam asserts that this requirement is not "a method of determining infringement as asserted by Crown, but is rather an essential requirement of claim 32.

The first wall portion extends to a first location on the wall. (D.I. 173 at A28, '875 patent col. 13 lines 11 – 13.) The second wall portion extends from the first location. (D.I. 173 at A28, '875 patent col. 13 lines 14 – 15.) The "first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion." (D.I. 173 at A28, '875 patent col. 13 lines 40 – 43.) Obviously, there is no way to determine lower extent of the first wall portion and the upper extent of the second wall portion until after seaming. This additional requirement for defining the first and second wall portions must be considered by a construction of the first wall portion and the second wall portion. *Pause Tech.*, 419 F.3d at 1331. Crown acknowledges that this location must be determined after seaming. Cr. Br. at 28.

27

L.    **"First Wall Portion Extending From Said Seaming Panel To A First Location On Said Wall And Comprising A Radiused Portion Extending From Said Seaming Panel"**

This requirement of claim 32 of the '875 patent raises only issues that have already been addressed. Crown's proposed construction provides no clarity as to the meaning or scope of this claim requirement because it discloses no basis for identifying the location on a can end at which the first wall portion begins. Crown's proposed construction of seaming panel provided no basis for identifying the boundary of the seaming panel. Crown proposes a construction of a first wall portion that extends from the seaming panel that does not provide any basis for identifying the boundary of the first wall portion. Taken together, Crown's proposed constructions provide no basis for determining what portion of a can end is seaming panel and what portion is first wall portion. This is no construction at all.

Crown argues that Rexam's construction, which requires that "the upper portion of the end wall has a curved portion that is different from the radius of the seaming panel (i.e., the radiused portion of the upper portion of the wall is a part of the cover hook)", is not supported by Crown's patents because Crown argues that those patents disclose a seaming panel having two radii of curvature, $r_1$ and $r_2$ as shown by Figure 4 of Crown's patents. (D.I. 241 at 25.) Crown is wrong as set out by section C above. As also set out by that section, the seaming panel has a constant radius of curvature. As shown below by the Figure that is based on Figure 4 of Crown's patents, the boundary of the seaming panel is where the curvature of the can end changes. The radiused portion of the wall recited by claim 32 of the '875 patent is the region that conforms to the radius $r_1$.

28



# FIG. 4

Crown also argues that Rexam's construction of "first location" as set out by this proposed construction is claim application, not claim construction. First, Crown does not reproduce Rexam's proposed construction and does not accurately paraphrase that proposed construction. (*Compare* D.I. 158 at p. 3 and D.I. 241 at 24.) This issue of whether the construction of first location is properly based on claim requirements is the same issue addressed in section K *supra*. Rexam's proposed construction is appropriate and correct. Crown's proposed construction should be rejected for being vague and unsupported by Crown's patents.

**M.    "Lowermost Point of Said Wall"**

Crown's Brief completely misstates Rexam's proposed construction of this claim requirement. (*Compare* D.I. 158 at p. 5 and D.I. 241 at 25.) Crown's criticisms are misplaced. This limitation raises the same issues addressed by section D above. Rexam's proposed construction is correct for the reasons set out there.

RLF1-3119420-1

N.     **"Between About 20° and about 60°"**

Crown's and Rexam's proposed claim constructions of this term of claim 32 of the '875 patent differ only in that Crown provides no construction of the term "about" and Rexam clarifies the scope of this term as being the recited values.

Crown merely proposes that the term should be left in the construction without any clarification. This provides no clarity of the meaning or scope of this claim term. "The meaning of the word 'about' is dependent on the facts of a case, the nature of the invention, and the knowledge imparted by the totality of the earlier disclosure to those skilled in the art." *Eiselstein v. Frank*, 52 F.3d 1035, 1040 (Fed. Cir. 1995). In this case, the earlier disclosure supports ignoring the term "about." In the specification of the '875 and '826 Patents, Crown does not discuss an embodiment of the invention having chuck wall angles of less than 20 degrees or greater than 60 degrees. The specification does not even use the term "about" when discussing these angles. (D.I. 173 at A23, '875 patent, col. 3, ln. 48 and col. 4, ln. 29)("between 20 degrees and 60 degrees"). Because Crowns' patents do not support extending beyond the recited range case support ignoring the "about" limitations, Rexam's proposed construction should be adopted.

O.     **"Bent Upward Through An Angle Of At Least About 16°"**

Crown objects to Rexam's proposed claim constructions of this term as used by claims 32 and 51 of the '875 patent only for limiting the range of "about 16°". (D.I. 241 at 27.) Crown disputes the range of values that Rexam proposes to clarify in this claim requirement but provides no proposal to clarify the scope or meaning of this claim term. In short, Crown does not propose any construction of this claim term.

Crown completely fails to establish the meaning of the term "about" based on "the facts of a case, the nature of the invention, and the knowledge imparted by the totality of the earlier disclosure to those skilled in the art." *Eiselstein*, 52 F.3d at 1040. Crown's patents fail to disclose bending upward of any angle less than exactly 16 degrees (this number is obtained if the 20 degree wall is bent up to meet a 4 degree substantially cylindrical portion of the chuck). (D.I. 173 at A23, '875 Patent, col. 3, ln. 48, col. 4, ln. 29, and col. 4, ln. 33-34). Crown's patents do not use the term "about" when discussing the 20 degree chuck wall angle of the can or the +/- 4 degree angle of the substantially cylindrical portion of the chuck.

30

*Id.*   Rexam's proposed construction is generous in this context.   Crown proposes no construction. Rexam's construction should be adopted.

### P.    "Transition From Said Double Seam To Said Second Wall Portion"

Crown seems to object to Rexam's proposed construction only proposing that the transition from the double seam is at the location at the lowermost extent of the double seam. Crown does not provide any clarity as to what it proposes as the "transition" of this location. Crown acknowledges that the transition is the first location. (D.I. 241 at 28.) As discussed in section H above, the requirement that a line be drawn through the location (D.I. 173 at A28, '875 patent at col. 13 lines 19 – 20) requires that the location be a point. Because the location forms the transition (D.I. 173 at A28, '875 patent col. 13 lines 40 – 43), the transition must be a point. Crown's proposed construction provides no clarity of scope or meaning of this claim term. That construction should be rejected and Rexam's should be adopted.

### Q.    "Forming A Transition Therebetween"

Crown's proposed construction of this term again provides no clarity of meaning or scope. Crown disputes Rexam's proposed construction, which is based on the only disclosure of a transition between a wall and a reinforcing bead. Crown proposes instead that the transition be "a place." That ignores the only relevant disclosure of Crown's patents. That is error. *Merck & Co.*, 347 F.3d at 1371.

### R.    "Between About 30° and about 50°"

As with the claim term discussed in section N above, Crown's and Rexam's proposed claim constructions of this term of claim 33 of the '875 patent differ only in that Crown provides no construction of the term "about" and Rexam clarifies the scope of this term as being the recited values. Rexam's construction should be adopted for the reasons set out by that section.

### S.    "Bent Upward Through An Angle Of At Least About 26°"

As with the claim term discussed in section O above, Crown's and Rexam's proposed claim constructions of this term of claim 34 of the '875 patent differ only in that Crown provides no construction of the term "about" and Rexam clarifies the scope of this term as being within a specific range. Rexam's construction should be adopted for the reasons set out by that section.

31

T.    **"Wall Extending From Said Seaming Panel"**

Crown's section of its brief addressing this requirement is all wrong. (D.I. 241 at 30.) The claim language that it reproduces is only from claim 50 of the '875 patent, not as Crown represents from claim 32. The requirement of claim 32 of the '875 patent for a wall extending from a seaming panel is set out at page 24 of Crown's brief. (D.I. 241 at 24.) Rexam responds concerning that claim term in section L above. Rexam's position on the construction that Crown reproduces is not for the quoted requirement of claim 50 of the '875 patent, but is rather directed to the requirement of claim 32 that is addressed in section L above.

The construction that Rexam proposed for the reproduced requirement of claim 50 (D.I. 158 at 7) shares the portion of the construction that Crown mistakenly reproduced to which Crown objects. Rexam's construction of the reproduced requirement of claim 50 of the '875 patent, as set out at page 7 of the Joint Claim Construction Statement (D.I. 158 at 7) is correct, and Crown's objections to the substance of that construction are misplaced for the reasons set out in section L above. Rexam's construction should be adopted and Crown's should be rejected.

IV.    **REXAM'S '230 AND '728 PATENTS**

A.    **Background Of Rexam's Score Line Patents**

In its background section on the Rexam '230 and '728 Patents, Crown has succinctly described the problem that was solved by the Rexam invention and why the prior art was unable to adequately prevent frangible panel detachment. Specifically, in describing Figure 3 of U.S. Patent No. 6,234,336, Crown admits that when the fracturing metal would happen to run into the "short" anti-fracture score of the prior art, "its progress was stopped." (D.I. 241 at 31.) Crown continued: "However, since the end of the anti-fracture score was typically short – that is, not longer than the primary score, cracks could *potentially* reach the end of the primary score and completely sever the hinge." (Id.) The Rexam '230 and '728 Patents solved this problem.

The following are Rexam's responses to Crown's proposed constructions of terms of Rexam's score line patents.

32

**B.    Hinge Segment (Claims 1 & 13 of the '230, Claim 7 of the '728)**

Crown's construction of hinge segment as the "region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use" has no meaningful support. In claim construction, intrinsic evidence, i.e., the language of the claims themselves, the specification, and the prosecution history, trumps extrinsic evidence such as dictionary definitions or expert testimony. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).    With respect to the '230 and '728 Patents, the intrinsic evidence overwhelmingly shows that the hinge segment is located between the first and second ends of the primary score, not where the can end bends when opened during normal use.

Crown states:    "The 230 patent contains <u>no express definition</u> of the term 'hinge segment.'" (D.I. 241 at 32 (emphasis added).) Crown next offers a quote beginning at column 4, line 61 of the '230 patent which in no way defines the hinge segment as where the metal bends during opening. It simply says that the frangible panel remains connected "through the hinge segment." (D.I. 173 at A106, '230 Patent, Col. 4, ln. 66-67.)   More importantly, Crown chose not to inform the Court of the sentence immediately preceding this quote: "<u>The hinge segment</u> <u>26 is defined by</u> a generally straight line between a first end 28 and a second end 30 of the frangible score 22. (Id., '230 Patent, Col. 4, ln. 59-61 (emphasis added).)  In its opening claim construction brief, Rexam highlighted many other examples, from the claims themselves, the detailed description, and the figures, which further support the construction of the hinge segment as the segment of metal between the two ends of the primary score. We will not repeat them here.

Furthermore, Crown's proposed construction does not make sense in light of the purpose of the invention. For a frangible panel to become detached, a tear must travel from the first end to the second end of the primary score. Therefore, Rexam's construction of the hinge segment as

33

the segment of metal between these two ends does make sense since this is the region into which the anti-fracture score should travel to prevent detachments, <u>regardless of where the metal actually bends during opening</u>.

Crown all but abandons its proposed construction in favor of Rexam's construction when discussing the "passing through" limitation later in its brief. There, Crown admits that the patent figures 2, 4, and 7 show the second score "passing through the hinge segment 26 from one end to the other." (D.I. 241 at 40.) A quick look at any of these figures will show that they all depict unopened can ends. In other words, Crown has admitted that you do not have to know where the metal bends during opening to know the location of the hinge segment. In the same paragraph, Crown also cites to one of the many spots in which the specification describes the hinge segment as being between the ends of the primary score. (*Id.*)

Having no intrinsic support, Crown is left with the claim construction equivalent of table scraps, i.e., witness testimony and other prior art patents. When balanced against the clear intrinsic support for Rexam's construction, Crown's extrinsic evidence should carry almost no weight at all. *See Phillips*, 415 F.3d at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.")

In sum, while Crown would evidently prefer the application of its proposed construction in any upcoming infringement analysis, there is simply no intrinsic support for equating the "hinge segment" with the place of bending during opening.

### C.    The Hinge Line (Claim 7 of the '728)

Rexam disagrees with Crown's construction of the claim term "hinge line" to mean the same as the claim term "hinge segment." Claim 7 of the '728 Patent clearly defines the hinge line as the line "between the first end and the second end of the primary score groove." (D.I. 173

34

at A117, '728 Patent, Col. 8, ln. 40-41.)  Furthermore, as noted in Rexam's opening brief, a person of ordinary skill in the art would quickly recognize the hinge line in Figure 6 of the '728 Patent.

Crown correctly notes that the claim was mistakenly drafted to lack an antecedent basis. However, this failure should not render the claim indefinite.  In *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1359 (Fed. Cir. 2001), the Federal Circuit held that a claim is not indefinite, despite lacking an antecedent basis, "[i]f the scope of a claim would be reasonably ascertainable by those skilled in the art."  *See also Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1117 (Fed. Cir. 1987) (noting that a missing antecedent basis "did not fail to inform the public during the life of the patent of the limits of the monopoly asserted") (internal citation omitted).  In this case, the meaning of the term "hinge line" would be readily apparent and in accordance with the embodiment depicted in Figure 6 of the '728 Patent.

Finally, Crown's reliance on the prosecution history of the '230 Patent for this issue is misplaced.  In responding to the Examiner's 102(b) rejection, the prosecuting attorney's answer was not dependent upon whether he or she used the word "line" versus "segment" versus "region," etc.  In other words, since the prior art anti-fracture score did not even enter the hinge segment, it also stopped "far short of even the areas near the hinge line."  (A91-92, 12/2/99 Response to Office Action, at 6-7.)

### D.     Adjacent Area Of The Central Panel (Claim 1 of the '230)

Crown's proposed construction of "adjacent area of the central panel" attempts to inject new meaning into the plain meaning of Claim 1 of the '230 Patent.  Crown's construction is incorrectly premised on the fact that the hinge segment is mutually exclusive of (1) the frangible panel and (2) the area of the central panel adjacent to the frangible panel.  Crown offers the following analysis:

35

In other words, the claim refers to three regions – (1) a frangible panel, (2) a hinge segment, and (3) an area of the central panel that is adjacent the hinge segment (and is connected to the frangible panel by the hinge segment). (D.I. 241 at 39 (emphasis added).)

For starters, nowhere does the claim say that the area of the central panel is adjacent to the hinge segment. On the contrary, an examination of the antecedent basis (underlined below) for the "said adjacent area of the central panel" shows that the hinge segment serves to "integrally connect the frangible panel segment to an adjacent area of the panel." (D.I. 173 at A108, '230 Patent, Col. 8, ln. 12-17 (emphasis added).) The claim simply does not characterize the area as adjacent to the hinge segment.

Additionally, Crown's statement that "[t]hese three regions can be seen, for example, in the photograph of the sectioned end accused of infringement" is improper in the claim construction context. (D.I. 241 at 39.) Crown's own opening claim construction brief gives an excellent primer on the "Role of the Accused Device." It explains that "[i]t is improper to use the accused device as a form of extrinsic evidence in order to add limitations to patent claims. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006)." (D.I. 241 at 5.)

The Court should focus on the plain meaning of Claim 1 rather than concern itself with the structure of the accused product. In doing so, the Court will see that the claim requires "a second score groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment." (D.I. 173 at A108, '230 Patent, Col. 8, ln. 15-17 (emphasis added).) The claim's meaning is plain: the frangible panel and the adjacent area of the central panel lie next to each other.

While Crown has referenced certain portions of the detailed description which it believes support its construction, Rexam too can cite support from the specification for its position. For example, the "summary of the invention" section speaks of "the hinge region of the frangible tear

panel." (D.I. 173 at 106, '230 Patent, Col. 3, ln. 53-54 (emphasis added).) Like the plain meaning of the claim, this portion of the specification clearly suggests that the hinge segment is not mutually exclusive of the frangible panel.

The Court should embrace Rexam's proposed construction, which is consistent with the plain meaning of Claim 1 of the '230 Patent. Crown's proposed construction would improperly import limitations from the specification into the claim.

### E. Passing Through (Claim 13 of the '230) / Passes Through (Claim 7 of the '728)

Crown's proposed construction of "passing through" to mean "going from one end to the other" is unduly narrow. While the claims themselves are silent as to the meaning of this term, the specification and the prosecution history clearly support Rexam's broader construction.

Before engaging in a "battle of the dictionaries," Rexam notes that both the '230 Patent and its prosecution history suggest that the term "passing through" simply means "penetrating into." Asserted Claim 1 of the '230 Patent demonstrates the language used by the prosecuting attorney when he or she wished to connote "going from one end to the other." Namely, Claim 1 uses the expression "passing from A into B," as in "passing from the frangible panel into said adjacent area of the central panel." (D.I. 173 at A108, '230 Patent, Col. 8, ln. 15-17.) Instead of using this language again in Claim 13, the prosecuting attorney opted for the broader "passing through" to mean penetration or passage within the hinge segment.

The prosecution history of the '230 Patent also supports Rexam's construction. In fact, the same paragraph cited by Crown regarding the term "hinge line" is actually better suited to support Rexam's construction of the "passing through" term:

> Therefore, not only does the 769 patent specifically disclose the lack of a second score **transecting** the hinge region, but specifically discloses that any feature **passing through** the hinge area should be a bead or coined region rather than a score line. Accordingly, the 769 patent certainly does not disclose or teach the claimed structure of Claim 1, or the claims dependent therefrom (Claims 2-11 and 20). (A92, Office Action, at 7 (emphasis added).)

37

Here, the prosecuting attorney makes clear that not only does the prior art reference not disclose transecting (which the parties have agreed means cutting across) the hinge region, but it also makes clear that any feature penetrating into the hinge area should be a bead rather than a score. By juxtaposing "transecting" with "passing through" within a "not only, but" clause, the prosecuting attorney clearly uses "passing through" in a broader sense.

This same juxtaposition is seen again in the two independent claims of the '230 Patent (Claims 1 and 13). Consequently, the doctrine of claim differentiation also supports this distinction in meaning. *See Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000) ("Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims.") The language of the claims, the specification, and the prosecution history support Rexam's broader proposed construction of the claim term "passing through."

### F.    To Direct Fracture Of Metal Of Said Hinge Segment In A Direction Away From Said Second End Of The Score (Claim 1 of the '728)

While Crown is correct in noting that Claim 1 of the '728 Patent contains a functional limitation, it is totally off base in arguing that the limitation should be construed as a "means plus function" limitation under 35 U.S.C. § 112, ¶ 6. The "directing away" element is not described as a means divorced from a particular structure. Instead, the element is simply a functional limitation used in association with a particular structure to inform the reader of a functional capability of that structure. See MPEP § 2173.05(g), which notes that "[t]here is nothing inherently wrong with defining some part of an invention in functional terms." (A95.) Finally, because the claim does not contain the term "means," it is to be presumed that 35 U.S.C. § 112, ¶ 6 is inapplicable. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) (finding legal error when the district court failed to apply the presumption that § 112, ¶ 6 did not

38

apply when the limitation did not include the word "means"). Crown has failed to rebut that presumption since the claim term recites sufficient structure to accomplish the function of directing the metal along the anti-fracture score.

Crown claims that "the only structure recited in claim 1 is a 'second score groove.'" (D.I. 241 at 41.) As described in Rexam's opening brief, this is hardly the end of the story. The claim recites both a structure (a second score groove) and a location (adjacent both the second end of the primary score and the hinge segment). As Crown itself notes, the inventors of the '728 Patent did not have to claim a specific depth of the second score groove in order to avoid the application of § 112, ¶ 6. (D.I. 241 at 42.) To do so would unnecessarily narrow the scope of their invention. In effect, they claimed all second score grooves, in the proper location, which had the depth permitting the claimed "directing of metal away" from the primary score.

Crown's proposed "means plus function" construction is nothing more than an attempt to narrow Claim 1 of the '728 Patent to the best mode described by the inventors. An inventor is required to "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1. However, his ability to write claims is not so limited. To agree with Crown's proposed claim construction would improperly import limitations from the specification into Claim 1. The inventors of the '728 Patent were entitled to (and indeed did) write narrower claims involving the specific details of depths and residuals. For example, unasserted Claim 13 of the '728 Patent requires: "the primary score residual being less than the groove residual along at least a portion of said second groove." (D.I. 173 at A118, '728 Patent, Col. 9, ln. 18-20.) In the case of Claim 1, the inventors decided to write a claim that more broadly covered their invention. Crown should not be allowed to escape the meaning of this claim through its improper "means plus function" argument.

39

Rexam explains in its opening brief why a person of ordinary skill in the art would understand the recited structure to be sufficient to accomplish the directing away function. It basically boils down to the fact that fracturing metal will follow the path of least resistance. In other words, as between continuing to tear through the full thickness of the central panel versus traveling along the second score groove, the fracture will "opt" to be directed away.

Once again, the internal inconsistency of Crown's brief actually shows that Crown agrees that the recited structure of a second score groove in the claimed location is sufficient to accomplish the goal of stopping tears. In describing the "short" anti-fracture scores of the prior art, i.e., anti-fracture scores that did not enter the hinge segment, Crown explained that "if the path of the crack caused the metal to tear to the end of the anti-fracture score, its progress was stopped without problem." (D.I. 241 at 31 (emphasis added).) In taking this position, Crown implicitly acknowledges that a specific score residual of a specific length is not necessary to accomplish the goal of directing away metal tears. Crown's proposed "means plus function" construction should be rejected.

## V.    REXAM'S '242 AND '385 PATENTS

Relating to Rexam's '242 and '385 Patents, Crown states in its opening claim construction brief that "Rexam Agrees to Crown's Constructions for All but One Term." (D.I. 241, *Crown Opening Mem.* at 42.) Though Rexam agrees that several proposed constructions by Rexam and Crown are sufficiently similar that it would be reasonable to accept either construction, Rexam does dispute Crown's construction of *two*, rather than one claim term. In addition to the term "substantial radial alignment with said radial inward support," Rexam also disputes Crown's proposed construction of the term "negative angle." (D.I. 172, *Rexam Opening Mem.* at 30-31.)

### A.    "Substantial Radial Alignment" (Claim 17 – '385 Patent)

Claim 17 of Rexam's '385 Patent relates to a method of internal bottom reforming of a can. The term in question, "substantial radial alignment with said radial inward support," relates

to the alignment of the path of the reforming roller and the outer support for the can. Crown's construction, "[t]he roller path having a height in the direction of the longitudinal axis, more than half of which overlaps with the height of the radial inward support" adds a limitation, namely a specific dimension to the term "substantial." (D.I. 241, *Crown Opening Mem.* at 43.) There is nothing in the specification that suggests that Crown's suggested limitation, namely the fraction of overlap between the path of the roller and the radial inward support, is a correct use of the word "substantial."

Rexam construes this term to mean, "at or almost absolute radial alignment with said radial inward support." (D.I. 172, *Rexam Opening Mem.* at 30.) Rexam and Crown both agree that the phrase "substantial radial alignment" is not explicitly defined in the patent specification. Both parties also agree that the plain meaning of "substantial" is appropriate due to the specification's silence.

As Crown correctly notes, the roller paths in each of the embodiments of the '385 Patent "are completely aligned in the radial direction with the corresponding jig or lower can support." (D.I. 241, *Crown Opening Mem.* at 43.) Crown then correctly states that claim 17 "does not require complete radial alignment, but rather merely requires 'substantial' radial alignment between the support and roller path." *Id.* Rexam agrees that the radial alignment of the roller and the support is not limited to "complete" or "absolute" alignment. The term "substantial" suggests that it would cover "complete[ly]" or "absolute[ly]" radially aligned rollers (with the support), but that it would also cover those that are "almost absolute[ly]" radially aligned. (D.I. 172, *Rexam Opening Mem.* at 30-31.)

Federal Circuit law is clear that the term "substantial" is a term of approximation and that it should be construed accordingly. The Federal Circuit has rejected attempts (like Crown's) to read strict mathematical limitations into a claim with such a general term.

41

> The term "substantial" is a meaningful modifier implying "approximate," rather than "perfect." *Liquid Dynamics*, 355 F.3d at 1368. But the definition of "substantially flattened surfaces" adopted by the district court introduces a numerical tolerance to the flatness of the gripping area surfaces of the claimed applicator. That reading contradicts the recent precedent of this court, interpreting such terms of degree. In *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1361 (Fed. Cir. 2003), we refused to impose a precise numeric constraint on the term "substantially uniform thickness," noting that the proper interpretation of this term was "of largely or approximately uniform thickness" unless something in the prosecution history imposed the "clear and unmistakable disclaimer" needed for narrowing beyond this plain-language interpretation. *Id.* Moreover, in *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003), we held that "the phrase 'generally parallel' envisions some amount of deviation from exactly parallel," and that "words of approximation, such as 'generally' and 'substantially,' are descriptive terms 'commonly used in patent claims 'to avoid a strict numerical boundary to the specified parameter.'" *Id.* at 1311. In support of this holding, we noted that "nothing in the prosecution history [of the Anchor Wall patent]. . . clearly limited the scope of 'generally parallel' such that the adverb 'generally' does not broaden the meaning of parallel." *Id.* Similarly, in this case we find that in claiming "substantially flattened surfaces," Playtex claimed more than flat surfaces.

*Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) (emphasis added). Crown's construction seeks to add a precise limitation (i.e., "a height in the direction of the longitudinal axis, more than half of which overlaps") that is not present in the language of the claim. Crown attempts to support the addition of a numerical limitation by reference to the figures in the patent. This is improper where, as here, the specification does not otherwise support such a construction. *TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004) ("The drawings, without more, are insufficient to cabin the scope of the ordinary and customary meaning of the term 'within' in this case"). Patent drawings are not drawn to scale (unless explicitly described as such in the specification) and should not be used to import numerical limitations into the claims. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000). Crown's attempt to add a numerical limitation into the definition of "substantial" is not supported by the intrinsic evidence, extrinsic evidence or the case law. Because Crown's proposed construction sets "a strict numerical boundary to the

42

specified parameter" despite Claim 17's use of the term "substantial" (i.e., "a meaningful modifier implying 'approximate,' rather than 'perfect.'"), the Court should reject Crown's suggested interpretation. *Playtex Prods,. Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) (internal citations omitted).

The term "almost" (as in Rexam's proposed construction) properly indicates that the definition is one of approximation and the phrase as a whole indicates that the roller and the radial support are approximately in alignment. Therefore, the Court should reject Crown's proposed construction and adopt Rexam's definition of "substantially radial alignment with said radial inward support," namely "[a]t or almost absolute radial alignment with said radial inward support." (D.I. 172, *Rexam Opening Mem.* at 30.)

### B.    "Negative Angle" (Claim 17 – '385 Patent)

Because Crown did not dispute Rexam's proposed construction of the term "negative angle," as used in Claim 17 of the '385 Patent, and for the reasons set forth in Rexam's Opening Brief on Claim Construction, the Court should adopt Rexam's proposed construction of the claim term. (D.I. 172, *Rexam Opening Mem.* at 30-31.)

## VI.    REXAM'S '839 PATENT

### A.    "Smoothly Shaped Necked-in Profile" (Claim 1- '839 Patent)

Crown's Opening Brief on Claim Construction notes that Crown and Rexam dispute the construction of four terms from the '839 Patent. Despite different proposed constructions on additional terms (i.e., more than four) from the '839 Patent, Crown offered no argument supporting its constructions of the additional terms. As such, the Court should adopt Rexam's proposed constructions of the following claim terms: "Forcing said second taper downwardly until it is contiguous with said first taper and reforms only an upper portion of said first taper while producing an extension of said first taper," "through a smooth shaped portion," and

43

"reforming only an upper part . . . while further compressing." (D.I. 172, *Rexam Opening Mem.* at 32-33, 35.)

As to the first disputed term from the '839 Patent, "smoothly-shaped necked-in profile," from Claim 1, Crown proposes that the Court construe the term to mean "side view decreasing in diameter towards the open end with no <u>substantial</u> bumps, steps or ribs." (D.I. 241, *Crown Opening Mem.* at 44) (emphasis added). Quite the opposite as with the term "substantial radial alignment" (from Claim 17 of the '385 Patent), Crown proposes <u>adding</u> the term substantial where it does not belong. As stated above, "substantial" is a term of approximation. Nothing in the claim language or the specification suggests that such broadening language should be added to the term's construction.

Crown correctly states that the patent teaches the desirability of eliminating "'steps or ribs' from a container neck to produce a 'smooth neck construction.'" (D.I. 241, *Crown Opening Mem.* at 45). Crown then states that the drawings of the '839 Patent "confirm that the necked-in portions . . . formed during each operation decrease in diameter toward the open end of the container, and have no <u>substantial</u> steps, ribs, or other types of bumps." *Id.* (emphasis added). However, the drawings and specification demonstrate that the patented method results in a neck profile with <u>no</u> steps, ribs, or other types of bumps at all. The patent teaches the elimination of these features so that the neck profile is smooth. Crown impermissibly seeks to add a broadening limitation by placing the word "substantial" in its proposed construction. The old technology resulted in steps, ribs or bumps. One improvement employed a rolling step to eliminate those features. Claim 1 of the '839 Patent teaches still another improvement, namely die-necking that "produce[s] an enlarged smoothly-shaped necked-in profile." (D.I. 173 at A59, *'839* Pat., Col. 18, lns. 39-40.) Because Crown's proposed construction is contrary to the plain meaning of the word "smoothly," and because Crown proposes a definition that is considerably

44

more broad than the term itself, the Court should reject Crown's construction and adopt Rexam's proposed construction.

**B.    "Reformed as a Part of Said Second Taper on Said First Taper" (Claim 2 – '839 Patent)**

Crown proposes a construction of the term "reformed as a part of said second taper on said first taper" that ignores the phrase "on said first taper." (D.I. 241, *Crown Opening Mem.* at 46.) Instead, Crown focuses solely on the fact that "changed" is a definition of "reformed." Rexam agrees that the second arcuate (or curved) segment is changed, but also provides a definition that takes into consideration the explicit relationship with the first taper. Rexam's proposal (i.e., "a second curved segment is changed as a result of the second taper being forced downwardly on the first taper") defines the term in light of every word of the phrase in the proper context provided by the rest of the claim and the patent specification.

As Crown suggests, the second arcuate segment is changed. The claim term is clear that the change results from the second taper "being forced downwardly on the first taper." (D.I. 172, *Rexam Opening Mem.*, at 34.) Because Crown's proposed construction does not give full effect to each word from the claim term (i.e., "on said first taper"), the Court should reject Crown's proposal and adopt Rexam's plain and customary meaning construction of this claim term.

**C.    "Combine and Blend" – (Claim 2 – '839 Patent)**

Crown's proposed construction of "combine and blend" (i.e., "overlap") is contrary to the plain and customary meaning of the words in light of the specification. Fallen dominos "overlap" one another, but can hardly be said to "combine and blend" with one another. The term "combine and blend" is sufficiently clear in and of itself. Therefore, the Court should adopt Rexam's construction (i.e., "combine and blend") and reject Crown's unnecessary and incorrect proposed construction of the term.

45

D.   **"The part formed by each die element partially integrates and blends with the portion formed by a preceding die" – (Claim 5 – '839 Patent)**

Crown proposes that the Court adopt "[t]he portion of the necked-in profile formed by each necking die, other than the first, partially overlaps the portion formed during the preceding operation, so that no substantial bumps, steps, or ribs are present" as a proper construction of the disputed claim term. (D.I. 241, *Crown Opening Mem.* at 48.) Crown's proposed construction of the claim term again seeks to impermissibly add a broadening limitation, namely the word "substantial." Crown also uses the term "overlaps" without further qualification to describe blending. As stated earlier, "overlap" does not sufficiently account for the term "blend," especially when it is used in the context of methods of smooth die-necking. Crown's proposed construction also allows for "bumps, steps or ribs" so long as they are not "substantial." *Id.* This is contrary to the plain meaning of the term, which describes the part as "partially integrat[ing] and blend[ing] with the portion formed by the preceding die element." (D.I. 173 at A59, '839 Pat., col. 18, lns 55-57.) This term does not mention the steps, ribs or bumps, nor does it mention "substantial bumps, steps, or ribs." In fact, the term suggests a smooth surface by describing an "integrat[ion] and blend[ing]" with the "portion formed by [the] preceding die element." *Id.* Crown's proposed construction does not give the term its plain and ordinary meaning and, in fact, adds extra terms that alter the clear meaning of the term and of the claim as a whole. Therefore, the Court should adopt Rexam's proposed construction of the disputed term. (D.I. 172, *Rexam Opening Mem.* at 35.)

46

## VII.    CONCLUSION

For all the reasons stated herein the Court should reject Crown's proposed claim constructions and adopt Rexam's proposed claim constructions.

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant/Counterclaimant*
*Rexam Beverage Can Co.*

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601
312-775-8000

Dated:  February 23, 2007

47

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>   and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 26, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700