# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Crown Packaging Technology, Inc. and
Crown Cork and Seal USA, Inc.

         Plaintiff/Counter Defendant

    v.

Rexam Beverage Can Company

         Defendant/Counterclaimant

C. A. No. 05-608 (MPT)

**REDACTED - PUBLIC VERSION**

---

## APPENDIX IN SUPPORT OF
## REXAM BEVERAGE CAN COMPANY'S RESPONSE TO
## CROWN'S OPENING CLAIM CONSTRUCTION BRIEF RELATING TO
## CROWN'S AND REXAM'S PATENTS

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: February 23, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Defendant/Counterclaimant*
   *Rexam Beverage Can Co.*

# TABLE OF CONTENTS

1. US Patent Number 6,065,634 ............................................................................................ A1-A10

2. Crown's Appeal Brief ...................................................................................................... A11-A57

3. Amendment dated 2/9/04 from prosecution history of '875 patent ...................... A58-A80

4. Webster's Third International Dictionary 2002 ...................................................... A81-A85
   Adapt ............................................................................................................................. A83
   Bead ............................................................................................................................... A84
   Groove ........................................................................................................................... A85

5. Response to office action dated 12/2/99 from prosecution history of '230 patent ........ A86-A94

6. Manual of Patent Examining Procedures § 2173.05(g) ...................................... A95



US006065634A

# United States Patent [19]

Brifcani et al.

[11] **Patent Number:** 6,065,634

[45] **Date of Patent:** May 23, 2000

[54] CAN END AND METHOD FOR FIXING THE SAME TO A CAN BODY

[75] Inventors: Mouayed Mamdooh Brifcani, Oxfordshire; Peter James Hinton, Swindon Wiltshire; Mark Christopher Kysh, Wantage, all of United Kingdom

[73] Assignee: Crown Cork & Seal Technologies Corporation, Alsip, Ill.

[21] Appl. No.: 08/945,698

[22] PCT Filed: Mar. 25, 1996

[86] PCT No.: PCT/GB96/00709

§ 371 Date: Apr. 13, 1998

§ 102(e) Date: Apr. 13, 1998

[87] PCT Pub. No.: WO96/37414

PCT Pub. Date: Nov. 28, 1996

[30]        Foreign Application Priority Data

May 24, 1995  [GB]  United Kingdom .............. 9510515

[51] Int. Cl.$^7$ ................................ B21D 51/44

[52] U.S. Cl. ................. 220/619; 220/620; 220/906; 220/623

[58] Field of Search ..................... 220/619, 620, 220/623, 625, 621, 617, 615, 610, 62.22, 62 12, 268, 269, 270, 906

[56]              References Cited

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D. 279,265 | 6/1985 | Turner et al. . |
| D. 285,661 | 9/1986 | Brownbill . |
| D. 300,608 | 4/1989 | Taylor et al. . |
| D. 304,302 | 10/1989 | Dalli et al. . |
| D. 337,521 | 7/1993 | McNulty . |
| D. 347,172 | 5/1994 | Heynan et al. . |
| D. 352,898 | 11/1994 | Vacher . |
| D. 406,236 | 3/1999 | Brifcani et al . |

| | | |
|---|---|---|
| 3,023,927 | 3/1962 | Ehmen ...................... 220/619 |
| 3,967,752 | 7/1976 | Cudzik . |
| 4,015,744 | 4/1977 | Brown . |
| 4,024,981 | 5/1977 | Brown . |
| 4,148,410 | 4/1979 | Brown . |
| 4,150,765 | 4/1979 | Mazurek . |
| 4,210,257 | 7/1980 | Radtke . |
| 4,217,843 | 8/1980 | Kraska ...................... 413/12 |
| 4,276,993 | 7/1981 | Hasegawa . |
| 4,286,728 | 9/1981 | Fraze et al . |
| 4,448,322 | 5/1984 | Kraska ...................... 220/623 |
| 4,606,472 | 8/1986 | Taube et al. ................ 220/500 |
| 4,674,649 | 6/1987 | Pavely . |
| 4,681,238 | 7/1987 | Sanchez . |
| 4,685,582 | 8/1987 | Pulciani et al. . |
| 4,809,861 | 3/1989 | Wilkinson et al. ........... 220/623 |
| 4,893,725 | 1/1990 | Ball et al. . |
| 5,064,087 | 11/1991 | Koch . |
| 5,129,541 | 7/1992 | Voigt et al. . |
| 5,494,184 | 2/1996 | Noguchi et al. . |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 153 115 A3 | 8/1985 | European Pat. Off. . |
| 2 196 891 | 5/1988 | United Kingdom . |
| 2 218 024 | 11/1989 | United Kingdom . |
| WO 93/17864 | 9/1993 | WIPO . |

*Primary Examiner*—Stephen Castellano
*Attorney, Agent, or Firm*—Burns Doane Swecker & Mathis L.L.P.

[57]            ABSTRACT

A can end (22) comprising a peripheral cover hook (23), a chuck wall (24) dependent from the interior of the cover hook, an outwardly concave annular reinforcing bead (25) extending radially inwards from the chuck wall, and a central panel (26) supported by an inner portion (27) of the reinforcing bead, characterised in that, the chuck wall (24) is inclined to an axis perpendicular to the exterior of the central panel at an angle between 20° and 60°, and the concave cross-sectional radius of the reinforcing bead (25) is less than 0 75 mm.

9 Claims, 4 Drawing Sheets





FIG. 1
PRIOR ART

FIG. 2
PRIOR ART

FIG. 3
PRIOR ART



*FIG. 4*



*FIG. 5*



**FIG. 6**



**FIG. 7**



**FIG. 8**

**FIG. 9**

A5

6,065,634

| 1 | 2 |

## CAN END AND METHOD FOR FIXING THE SAME TO A CAN BODY

This invention relates to an end wall for a container and more particularly but not exclusively to an end wall of a can body and a method for fixing the end wall to the can body by means of a double seam.

U.S. Pat. No. 4,093,102 (KRASKA) describes can ends comprising a peripheral cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave annular re-inforcing bead extending radially inwards from the chuck wall and a central panel joined to an inner wall of the reinforcing bead by an annular outwardly convex bead. This can end is said to contain an internal pressure of 90 psi by virtue of the inclination or slope of the chuck wall, bead outer wall and bead inner wall to a line perpendicular to the centre panel. The chuck wall slope D° is between 14° and 16°, the outer wall slope B is less than 4° and the inner wall slope C° is between 10 and 16° leading into the outwardly convex bead. We have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall and limiting the width of the anti peaking bead.

U.S. Pat. No. 4,217,813 (KRASKA) describes an alternative design of can end in which the countersink has inner and outer flat walls, and a bottom radius which is less than three times the metal thickness. The can end has a chuck wall extending at an angle of approximately 24° to the vertical. Conversely, our European Patent application EPO340955A describes a can end in which the chuck wall extends at an angle of between 12° and 20° to the vertical.

Our European Patent No. 0153115 describes a method of making a can end suitable for closing a can body containing a beverage such as beer or soft drinks. This can end comprises a peripheral flange or cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave reinforcing bead extending radially inwards from the chuck wall from a thickened junction of the chuck wall with the bead, and a central panel supported by an inner portion of the reinforcing bead. Such can ends are usually formed from a prelacquered aluminum alloy such as an aluminum magnesium manganese alloy such as 5182.

Our International Patent Application published no. WO93/17864 describes a can end suitable for a beverage can and formed from a laminate of aluminum/manganese alloy coated with a film of semi crystalline thermoplastic polyester. This polyester/aluminum alloy laminate permitted manufacture of a can end with a narrow, and therefore strong reinforcing bead in the cheaper aluminum manganese alloy

These known can ends are held during double seaming by an annular flange of chuck, the flange being of a width and height to cover the anti-peaking bead. There is a risk of scuffing if this narrow annulus slips. Furthermore a narrow annular flange of the chuck is susceptible to damage.

Continuing development of a can end using less metal, whilst still permitting stacking of a filled can upon the end of another, this invention provides a can end comprising a peripheral cover hook, a chuck wall dependent from the interior of the chuck wall, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterised in that, the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between 30° and 60°, and the concave bead narrower than 1.5 mm (0.060") Preferably, the angle of the chuck wall to the perpendicular is between 40° and 45°.

In a preferred embodiment of the can end an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel at an angle between −15° to +15° and the height of the outer wall is up to 2.5 mm.

In one embodiment the reinforcing bead has an inner portion parallel to an outer portion jointed by said concave radius.

The ratio of the diameter of the central panel to the diameter of the peripheral curl is preferably 80% or less.

The can end may be made of a laminate of thermoplastic polymer film and a sheet aluminum alloy such as a laminate of a polyethylene teraphthalate film on an aluminium—manganese alloy sheet or ferrous metal typically less than 0.010 (0.25 mm) thick for beverage packaging. A lining compound may be placed in the peripheral cover hook.

In a second aspect this invention provides a method of forming a double seam between a can body and a can end according to any preceding claim, said method comprising the steps of:

placing the curl of the can end on a flange of a can body supported on a base plate, locating a chuck within the chuck wall of the can end to centre the can end on the can body flange, said chuck having a frustoconical drive surface of substantially equal slope to that of the chuck wall of the can end and a cylindrical surface portion extending away from the drive surface within the chuck wall, causing relative motion as between the assembly of can end and can body and a first operation seaming roll to form a first operation seam, and thereafter causing relative motion as between the first operation seam and a second operation roll to complete a double seam, during these seaming operations the chuck wall becoming bent to contact the cylindrical portion of the chuck.

Various embodiments will now be described by way of example and with reference to the accompanying drawings in which:

FIG. 1 is a diagrammatic sketch of known apparatus for forming a double seam;

FIG. 2 is an enlarged sectioned side view of a known chuck and can before seaming;

FIG. 3 is a sectioned view of a fragment of a known double seam;

FIG. 4 is a sectioned side view of a can end according to this invention before edge curling;

FIG. 5 is a sectioned side view of the can end of FIG. 4 on a can body before forming of a double seam;

FIG. 6 is a like view of the can end and body during first operation seaming;

FIG. 7 is a like view of the can end and body during final second operation seaming to create a double seam;

FIG. 8 is a fragmentary section of a chuck detail; and

FIG. 9 is a side view of the cans stacked one on the other.

In FIG. 1, apparatus for forming a double seam comprises a base plate 1, an upright 2 and a top plate 3.

A lifter 4 mounted in the base plate is movable towards and away from a chuck 5 mounted in the top plate. The top plate supports a first operation seaming roll 6 on an arm 7 for pivotable movement towards and away from the chuck. The top plate also supports a second operation seaming roll 8 on an arm 9 for movement towards and away from the chuck after relative motion as between the first operation roll and can end on the chuck creates a first operation seam.

As shown in FIG. 1 the chuck 5 holds a can end 10 firmly on the flange 11 of a can body 12 against the support provided by the lifter plate 4. The first operation roll 6 and second operation roll 7 are shown clear of chuck before the active seam forming profile of each roll is moved in turn to form the curl of the can end and body flange to a double seam as shown in FIG. 3.

FIG. 2 shows on an enlarged scale the chuck 5 and can end 10. The can end comprises a peripheral curl 13, a chuck

6,065,634

| 3 | 4 |

wall 14 dependent from the interior of the curl, an outwardly concave anti-peaking bead 15 extending inwards from the chuck wall to support a central panel 16. Typically the chuck wall flares outwardly from the vertical at an angle C about 12° to 15°.

The chuck 5 comprises a body 17 having a threaded bore 18 permitting attachment to the rest of the apparatus (not shown). An annular bead 19 projects from the body 17 of the chuck to define with the end face of the body a cavity to receive the central panel 16 of the can end. The fit of panel 16 in annulus 19 may be slack between panel wall and chuck.

The exterior surface of the projecting bead 19 extends upwards towards the body at a divergent angle B of about 12° to the vertical to the exterior of the chuck body 17 which tapers off an angle A° of about 4° to a vertical axis perpendicular to the central panel. The outer wall of the chuck 5 engages with the chuck wall at a low position marked "D" within the 12° shaped portion of the chuck bead 15.

As can ends are developed with narrower anti-peaking beads the chuck bead 15 becomes narrower and more likely to fracture. There is also a risk of scuffing of the can end at the drive position D which can leave unacceptable unsightly black marks after pasteurisation.

FIG. 3 shows a sectioned fragment of a typical double seam showing a desirable overlap of body hook 21 and end hook 20 between the can end 10 and can body 12.

FIG. 4 shows a can end, according to the invention, comprising a peripheral cover hook 23, a chuck wall 24 extending axially and inwardly from the interior of the peripheral cover hook, and outwardly concave reinforcing or anti-peaking bead 25 extending radially inwards from the chuck wall, and a central panel 26 supported or an inner portion panel with 27. The panel wall is substantially upright allowing for any metal spring back after pressing. The chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle C₁ between 20° and 60°; preferably between 40° and 45°. Typically the cross sectional radius of the antipeaking bead is about 0.5 mm.

Preferably the anti-peaking bead 25 is parallel sided, however the outer wall may be inclined to a line perpendicular to the central panel at an angle between −15° and +15° and the height h₁ of the outer wall may be up to 2.5 mm.

This can end is preferably made from a laminate of sheet metal and polymeric coating. Preferably the laminate comprises an aluminium magnesium alloy sheet such as 5182, or aluminium manganese alloy such as 3004 with a layer of polyester film on one side. A polypropylene film may be used on the "other side" if desired.

Typical dimensions of the example of the invention are:

| d5 | overall diameter (as stamped) | 65.83 mm |
| d4 | PC diameter of seaming panel radius | 61.54 mm |
| d3 | PC diameter of seaming panel/chuck wall | 59.91 mm |
| r₁ | seaming panel/chuck wall radius | 1.27 mm |
| r₂ | seaming panel radius | 5.56 mm |
| r₃ | concave radius in antipeaking bead | <1.5 mm |
| d₂ | maximum diameter of antipeaking bead | 50.00 mm |
| d₁ | minimum diameter of antipeaking bead | 47.24 mm |
| h₂ | overall height of can end | 6.86 mm |
| h₃ | height to top of antipeaking bead | 5.02 mm |
| h₅ | panel depth | 2.29 mm |
| h₁ | outer wall height | 1.78 mm |
| c | chuck wall angle to vertical | 43° |

From these dimensions it can be calculated that the ratio of central panel diameter of 47.24 mm to overall diameter of can end 65.84 is about 0.72 to 1.

For economy the aluminium alloy is in the form of sheet metal less than 0.010" (0.25 mm). A polyester film on the metal sheet is typically 0.0005" (0.0125 mm).

Although this example shows an overall height h₂ at 6.86 mm we have also found that useful can ends may be made with an overall height as little as 6.35 mm (0.25").

FIG. 5 shows the peripheral flange 23 of can end 22 of FIG. 4 resting on the flange 11 of a can body 12 before formation of a double seam as discussed with reference to FIG. 1.

In FIG. 5 a modified chuck 30 comprises a chuck body 31 having a frustoconical drive surface 32 engaging with the chuck wall 24 of the can end 22.

The frustoconical drive surface is inclined outwardly and axially at an angle substantially equal to the angle of inclination C° of between 20° and 60°; in this particular example on chuck angle of C of 43° is preferred. The drive surface 32 is a little shorter than the chuck wall 24 of the chuck body. The substantially cylindrical surface portion 33, rising above the drive surface 32, may be inclined at an angle between +4° and −4° to a longitudinal axis of the chuck. As in FIG. 2, this modified chuck 30 has a threaded aperture to permit attachment to the rest of the double seam forming apparatus (not shown).

In contrast to the chuck of FIG. 2 the modified chuck 30 is designed to drive initially on the relatively large chuck wall 32 without entering deeply into the anti-peaking bead 25. Further drive is obtained at the juncture of chuck wall 32 and cylindrical wall 33 as chuck wall of end 24 is deformed during 1st and 2nd operation seaming FIGS. 6 and 7. The chuck 30 shown in FIG. 5 has an annular bead of arcuate cross section but this bead is designed to enter the chuck wall without scratching or scuffing a coating on the can end; not to drive on the concave bead surface as shown in FIG. 2.

It will be understood that first operation seaming is formed using apparatus as described with reference to FIG. 1.

FIG. 6 shows the modified can end and chuck during formation of a first operation seam shown at the left of FIG. 2 as formed by a first operation roll 34 adjacent the interfolded peripheral flange of the can end and flange 11 body 12.

During relative rotation as between the can end 22 and first operation roll 34 the edge between the chuck drive wall 32 and cylindrical wall 33 exerts a pinching force between chuck 30 and roll 34 to deform the chuck wall of the can end as shown.

After completion of the first operation seam the first operation roll is swung away from the first operation seam and a second operation roll 38 is swung inwards to bear upon the first operation seam supported by the chuck 30. Relative rotation as between the second operation roll 38 and first operation seam supported by a chuck with 30 completes a double seam as shown in FIG. 7 and bring the upper portion 24 of the chuck wall 24 to lie tightly against the can body neck in a substantially upright attitude as the double seam is tightened by pinch pressure between the second operation roll 38 and chuck 30.

Can ends according to the invention were made from aluminium alloy 5182 and an aluminium alloy 3004/polymer laminate sold by CarnaudMetalbox under the trade mark ALULITE. Each can end was fixed by a double seam to a drawn and wall ironed (DWI) can body using various chuck angles and chuck wall angle as tabulated in Table 1 which records the pressure inside a can at which the can ends failed:

6,065,634

5              6

TABLE 1

| | CAN END DATA | | | PRESSURE IN BAR (PSIG) TO FAILURE FOR VARIOUS SEAMING CHUCK ANGLES B° | | | | |
|---|---|---|---|---|---|---|---|---|
| SAMPLE CODE | MATERIAL Thickness mm | MINIMUM Diameter D1 mm | CHUCK WALL ANGLE "C" | 23° | 10°/23° | 4°/23° | 23° WITH D. SEAM RING | 10/20 /23° WITH D. SEAM RING |
| A | ALULITE 0.23 | 52.12 (2.052") | 21.13° | 5.534 (80.20) | 5.734 (83.10) | 5.311 (76.97) | 6.015 (87.17) | 5.875 (85.14) |
| B | 5182 0.244 | 52.12 (2.052") | 21.13° | 5.599 (81.15) | 5.575 (80.79) | 5.381 (77.99) | 5.935 (86.01) | 5.895 (85.43) |
| C | 5182 0.245 | 52.12 (2.052") | 21.13° | 6.004 (87.02) | 5.910 (85.65) | 5.800 (84.06) | 6.224 (90.21) | 6.385 (92.54) |
| D | ALULITE 0.23 | 51.92 (2.044") | 21 13° | 5.334 (77.31) | 5.229 (75.78) | 5.238 (75.91) | 5.730 (83.04) | 5.404 (78.32) |
| E | 5182 0.224 | 51.92 (2.044") | 21.13° | 5.555 (80.50) | 5.514 (79.92) | 5.354 (77.60) | 5.895 (85.43) | 5.930 (55.94) |
| F | 5182 0.245 | 51.92 (2.044") | 23° | 5.839 (84.63) | 5.804 (84.12) | 5.699 (82.59) | 6.250 (90.58) | 6.435 (93.26) |
| G | ALULITE 0.23 | 51.92 (2.044") | 23° | | | 5.123 (74.25) | | |
| H | 5182 0.224 | (51.92) (2.044") | 23° | | | 5.474 (79.34) | | |
| I | 5182 0.245 | 51.92 (2.044") | 23° | | | 5.698 (82.58) | | |

All pressures on unaged shells in bar (psig). 5182 is an aluminium-magnesium-manganese alloy lacquered. The "ALULITE" used is a laminate of aluminium alloy and polyester film.

The early results given in Table 1 showed that the can end shape was already useful for closing cans containing relatively low pressures. It was also observed that clamping of the double seam with the "D" seam ring resulted in improved pressure retention. Further tests were done using a chuck wall angle and chuck drive surface inclined at nearly 45°: Table 2 shows the improvement observed:

TABLE 2

| Sample Code | b₂ mm (inches) | b₃ mm(inches) | b₄ mm (inches) | Chuck Angles B° 43° | 43° with seam ring |
|---|---|---|---|---|---|
| J | 6.86 (0.270) | 2.39(0.094) | 2.29 (0.09) | 4.89(70.9) | 6 15(89.1) |
| K | 7.11 (0.280) | 2.64(0.104) | 2.54 (0.10) | 4.83(70.0) | 5 98(86.6) |
| L | 7.37 (0.290) | 2.80(0.114) | 2.79 (0.11) | 4.74(68.7) | 6.44(93.3) |

Table 2 is based on observations made on can ends made of aluminium coated with polymer film (ALULITE) to have a chuck wall length of 5.029 mm (0.198") up the 43° slope.

It will be observed that the container pressures achieved for samples J, K, L, 4.89 bar (70.9 psig), 4.83 bar (70.0 psig) and 4.74 bar (68.7 psig) respectively were much enhanced by clamping the double seam.

In order to provide seam strength without use of a clamping ring, modified chucks were used in which the drive slope angle C° was about 43° and the cylindrical surface 33 was generally +4° and −4°. Results are shown in Table 3.

TABLE 3

| SAMPLE CODE | MATERIAL | LINING COMPOUND | CHUCK ANGLES DRIVE/WALL | PRESSURE |
|---|---|---|---|---|
| c | 0.224 5182 | with | 43° | 4.60 (66.7) |
| g | 0.23 Alulite | with | 43°/4° | 5.45 (79.0) |

TABLE 3-continued

| SAMPLE CODE | MATERIAL | LINING COMPOUND | CHUCK ANGLES DRIVE/WALL | PRESSURE |
|---|---|---|---|---|
| h | 0.224 5182 | with | 43°/4° | 6.46 (93.6) |
| j | 0 23 Alulite | without | 43°/4° | 5.91 (85.6) |
| k | 0.244 5182 | without | 43°/4° | 6.18 (89.6) |
| l | 0.23 Alulite | without | 43°/−4° | 5.38 (77.9) |
| m | 0.25 Alulite | without | 43°/−4° | 6.20 (89.8) |
| n | 0.23 Alulite | without | 43°/0° | 6.11 (88.5) |
| o | 0.25 Alulite | without | 43°/0° | 6.62 (95.9) |

ALL PRESSURES IN BAR (PSIG)
ALL CODES
Reform Pad Dia. 47.24 mm (1.860") (202 Dia).
6.86 mm (0.270") unit Depth b₂ 2.39 mm (0.094") Panel Depth

Table 3 shows Code "O" made from 0.25 mm Alulite to give 6.62 bar (95 psi) Pressure Test Result indicating a can end suitable for pressurised beverages. Further chucks with various band lengths (slope) were tried as shown in Table 4.

TABLE 4

| | CHUCK WALL ANGLE | | | |
|---|---|---|---|---|
| | 43°/0° 1.9 mm LAND SHARP TRANSITION | | 43°/0° 1 27 MM LAND R 0.5 MM BLEND | |
| VARIABLE CODE | NO. D.SEAM RING | WITH D.SEAM RING | NO. D.SEAM RING | WITH D.SEAM RING |
| 7 | 6.699(97.08) | 7.017(101.7) | 6.779(98 24) | 7.006(101.54) |
| 8 | 6.315(91 52) | 6.521(94.5) | 6.293(91 2) | 6.236(90.37) |
| 9 | 6.095(88.33) | 6.30(91.3) | 6.238(90.4) | 6.719(97 38) |

A8

6,065,634

7

ALL PRESSURES IN BAR (PSIG)
CODE

7=0.25 mm Alulite, 47.24 mm (1.860") Reform Pad, 6.86
mm (0.270") h₂ Depth, 2.38 mm (0.094") Panel; h₄
depth=2.29 mm (0 09")

8=0.23 mm Alulite, 47.24 mm (1.860") Reform Pad, 7.11
mm (0.280") h₂ Depth, 2.64 mm (0.104") Panel; h₄
depth=2.54 mm (0 10")

9=0.23 mm Alulite, 47.24 mm (1.860") Reform Pad, 7.37
mm (0.290") h₂ Depth, 2.90 mm (0.114") Panel; h₄
depth=2.79 mm (0.11")

Table 4 shows results of further development to seaming
chuck configuration to bring closer the pressure resistance of
ring supported and unsupported double seams.

Table 4 identifies parameters for length of generally
vertical cylindrical surface 33 on the seaming chuck 30, and
also identifies a positional relationship between the chuck
wall 24 of the end and the finished double seam. It will be
understood from FIG 7 shows that the forces generated by
thermal processing or carbonated products are directed
towards the resisted by the strongest portions of the com-
pleted double seam.

Table 5 shows results obtained from a typical seam chuck
designed to give double seam in accordance with parameters
and relationships identified in Table 4. Typically:—As
shown in FIG. 8 the chuck comprises a cylindrical land of
length '1' typically 1.9 mm (0.075") and frustoconical drive
surface 32 inclined at an angle Y°, typically 43°, to the
cylindrical to which it is joined by a radius R typically 0.5
mm (0.020"). Angle "X" is typically 90°.

TABLE 5

| CODE | GAUGE | h₂ | DIMENSIONS mm | | PRESSURE | |
|------|-------|-----|----|----|-----|-----|
| | | | h₃ | | bar | (psi) |
| 20 | 23 mm | 7.37 (.290") | 2.36 (.093") | | 6.383 | (92.6) |
| 21 | 23 mm | 7.37 (.290") | 2.36 (.093") with compound | | 6.402 | (92.8) |

8

TABLE 5-continued

| CODE | GAUGE | h₂ | DIMENSIONS mm | | PRESSURE | |
|------|-------|-----|----|----|-----|-----|
| | | | h₃ | | bar | (psi) |
| 26 | .23 mm | 6.87 (.2705") | 2.37 (.0935") | | 6.144 | (89.88) |
| 27 | .23 mm | 6.87 (.2705") | 2.37 (.0934") with compound | | 6.071 | (88.0) |
| 28 | .23 mm | 7.37 (.290") | 2.36 (.093") | | 6.414 | (93.0) |
| 29 | .23 mm | 7.37 (.290") | 2.84 (.112") | | 6.725 | (97.5) |
| 30 | .23 mm | 6.86 (.270") | 2.37 (.0935") | | 6.062 | (87.9) |
| 31 | .23 mm | 6.86 (.270") | 2.37 (.0935") | | 6.013 | (87.2) |
| 34 | 25 mm | 7.37 (.290") | 2.87 (.113") | | 7.787 | (112.9) |
| 36 | 25 mm | 7.32 (.288") | 2.34 (.092") | | 7.293 | (105.8) |
| 37 | 25 mm | 7.32 (.288") | 2.34 (.092") with compound | | 7.402 | (107.3) |
| 38 | 25 mm | 6.87 (.2705") | 2.41 (.095") | | 7.077 | (102.6) |
| 516 | .25 mm | 6.35 (.250") | 2.34 (.092") with compound | | 6.937 | (100.6) |

All variables made from Alulite, 10 Can per variable.

The can ends can be economically made of thinner metal
if pressure retention requirements permit because these can
ends have a relatively small centre panel in a stiffer annulus.

FIG. 9 shows a can 12a, closed according to this
invention, stacked upon a like can 12b shown sectioned so
that stacking of the upper can on the lower can end is
achieved by a stand bead 31a of the upper can fits inside the
chuck wall 24 of the lower can end with the weight of the
upper can resting on the double seam 34 of the lower can
end.

The clearance between the bottom of the upper can body
and lower can end may be used to accommodate ring pull
features (not shown) in the can end or promotional matter
such as an coiled straw or indicia.

Using the experimental data presented above, a computer
programme was set up to estimate the resistance to defor-
mation available to our can ends when joined to containers
containing pressurised beverage. The last two entries on the
table relate to a known 206 diameter beverage can end and
an estimate of what we think the KRASKA patent teaches.

TABLE 6

| END SIZE Bead O:D:1D d₂:d₁ | OVERALL DIA d₂ mm | PANEL DIA d₁ mm | RATIO D₂/D₁ | CHUCK WALL ANGLE B° | CHUCK WALL LENGTH L mm | RE-ENFORCING RAD r₅ mm | INNER WALL HEIGHT h₄ mm | OUTER WALL HEIGHT h₂ mm | PRE-DICTED CUT EDGE φ (* DENOTES ACTUAL) | ACTUAL THICKNESS TO CONTAIN PSI |
|---|---|---|---|---|---|---|---|---|---|---|
| 206-204 | 64.39 (2.535") | 49.49 (1.9485") | 1.3010 | 33.07° | 4.22 (0.166") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 75.230 (2.9618") | 0.255 |
| 206-202 | 64.39 (2.535") | 47.33 (1.7744") | 1.3604 | 42.69° | 4.95 (0.185") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 74.272 | 0.255 |
| 206-200 | 64.39 (2.535") | 45.07 (1.7744") | 1.4287 | 50.053° | 5.82 (0.229") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.713 (2.9021") | 0.255 |
| 204-202 | 62.18 (2.448") | 47.33 (1.8634") | 1.3137 | 29.78° | 3.96 (0.156") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.767 (2.9042") | 0.24 |
| 204-200 | 62.18 (2.448") | 45.07 (1.7744") | 1.3796 | 40.786° | 4.70 (0.185") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 72.911 (2.8705") | 0.24 |
| 202-200 | 71.98 (2.834") | 45.07 (1.7744") | 1.597 | 30.266° | 4.89 (0.161") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 71.984 (2.834") | 0.225 |
| 206 std | 64.69 (2.547") | 51.92 (2.044") | 1.2461 | 15.488° | 4.39 (0.173") | 0.56 (0.022") | 2.03 (0.080") | — | 76.454 (3.010")* | 0.28 |
| KRASKA ESTIMATE | 64.39 (eg 2.535") | — | — | 15° | 2.54 (0.100") | 0.81 (0.032") | 1.65 (0.065") | 2.29 (0.090") | 78.080 (3.074") | 0.292 (0.0115") |

All experiments modelled on a notional aluminium alloy of yield strength 310 mpa 0.25 mm thick. The standard was also 310 mpa BUT 0.275 mm thick.

A9

6,065,634

9

What is claimed is:

1. A can end comprising;

a peripheral cover hook;

a chuck wall dependent from an interior of the cover hook;

an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall; and

a central panel supported by an inner portion of the reinforcing bead;

wherein the chuck wall is inclined to an axis perpendicular to the central panel at an angle between 40° and 60°, and a concave cross-sectional radius of the reinforcing bead is less than 0.75 mm.

2. The can end according to claim 1, wherein the angle of the chuck wall to the perpendicular axis is between 40° and 45°.

3. The can end according to claim 1, wherein an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel of the can end at an angle between −15° and +15° and the height of the outer wall is up to 2.5 mm.

4. The can end according to claim 1, wherein the reinforcing bead has an inner portion parallel to an outer portion joined by said concave radius.

5. The can end according to claim 1, wherein the ratio of the diameter of the central panel to the diameter of the peripheral cover hook is 80% or less

10

6. The can end according to claim 1, wherein the can end is made of a laminate of thermoplastic polymer film and a sheet aluminum alloy.

7. The can end according to claim 1, wherein the can end is made of tinplate.

8. The can end according to claim 1, wherein the can end is made of electrochrome coated steel.

9. A can end comprising:

a peripheral cover hook;

a chuck wall dependent from an interior of the cover hook;

an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall; and

a central panel supported by an inner portion of the reinforcing bead;

wherein the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between 30° and 60°, and a concave cross-sectional radius of the reinforcing bead is less than 0.75 mm;

wherein the can end is made of a laminate of thermoplastic polymer film and a sheet aluminum alloy; and

wherein the laminate comprises a polyethylene teraphthalate film on an aluminum-manganese-alloy sheet less than 0.25 mm thick.

*    *    *    *    *

BRIEF OF DEFENDANT-APPELLANT CROWN CORK & SEAL
TECHNOLOGIES CORPORATION

IN THE

# United States Court of Appeals
FOR THE

# Federal Circuit

04-1185, -1188

ANHEUSER-BUSCH COMPANIES, INC., METAL CONTAINER
CORPORATION, and ANHEUSER-BUSCH, INC.,
*Plaintiffs-Cross Appellants,*

v.

CROWN CORK & SEAL TECHNOLOGIES CORPORATION,
*Defendant-Appellant*

and

CROWN CORK & SEAL CO. (USA), INC.,
*Defendant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WISCONSIN IN 03-CV-137,
JUDGE JOHN C. SHABAZ AND MAGISTRATE
JUDGE JOSEPH W. SKUPNIEWITZ

Dale M. Heist
Kevin M. Flannery
Woodcock Washburn, LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100
*Attorneys for Defendant-Appellant
Crown Cork & Seal Technologies
Corporation*

Date: March 23, 2004

NON-CONFIDENTIAL

CCS0014946

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A11

## CERTIFICATE OF INTEREST

Counsel for defendant-appellant Crown Cork & Seal Technologies Corporation, certifies the following:

1.    The full name of every party or amicus represented by me are Crown Cork & Seal Technologies Corporation and Crown Cork & Seal Co. (USA), Inc.

2.    The names of the real parties in interest represented by me are Crown Packaging Technology Co. (formerly Crown Cork & Seal Technologies Corporation) and Crown Cork & Seal USA, Inc. (formerly Crown Cork & Seal Co. (USA), Inc.).

3.    The parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the parties represented by me are:  Crown Holdings, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:

Dale M. Heist
Kevin M. Flannery
WOODCOCK WASHBURN LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103

Joseph Ranney
David Meany
DEWITT ROSS & STEVENS, S.C.

i

CCS0014947

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

2 East Mifflin Street, Suite 600
Madison, WI 53703

Diane Siegel Danoff
DECHERT LLP
4000 Bell Tower Building
1717 Arch Street
Philadelphia, PA 19103

5.    The following are attorneys who were admitted *pro hac vice* to the

District Court proceedings but who did not make an appearance and who do not

expect to appear before the Court of Appeals for the Federal Circuit in connection

with the captioned matter:

Robert C. Heim (Dechert LLP)
Robert Rhoad (Dechert LLP)
Paul Friedman (Dechert LLP)
Melvin Schwarz (Dechert LLP)

CCS0014948

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

ii

A13

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................................ i

STATEMENT OF RELATED CASES .................................................................... 1

STATEMENT OF JURISDICTION ......................................................................... 1

STATEMENT OF ISSUES ON APPEAL ............................................................... 2

I.      STATEMENT OF THE CASE ...................................................................... 3

II.     STATEMENT OF FACTS .............................................................................. 3

        A.    The Patent Specification ...................................................................... 3

        B.    The Prosecution History ...................................................................... 5

        C.    The Asserted Patent Claims ................................................................ 5

        D.    The District Court's Claim Construction Ruling ................................ 6

        E.    The District Court's Claim Application Ruling .................................. 7

        F.    The District Court's Doctrine of Equivalents Ruling ........................ 8

III.    SUMMARY OF THE ARGUMENT ........................................................... 10

IV.     ARGUMENT .................................................................................................. 13

        A.    The District Court Erred In Granting Summary Judgment Of No Literal
              Infringement ...................................................................................... 13

              1.    The District Court Erred By Concluding That The Plain Meaning
                    Of The Phrase "Chuck Wall . . . Inclined . . . At An Angle" Limits
                    The Chuck Wall To A Particular Shape ................................... 13

              2.    AB Has Acknowledged That Arcuate Chuck Walls May Be Said
                    To Be Inclined At An Angle ................................................... 16

              3.    The District Court Erred To The Extent It Read A *Flat* Chuck Wall
                    Limitation Into The Claims From The Patent Specification ...... 17

                    a)    The District Court Erroneously Limited The Claims To The
                          Preferred Embodiment .................................................. 19

CCS0014949

iii

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A14

        b)    The District Court Erroneously Limited Can End Product
Claims Based Upon A Specification Passage Relating To A
Seaming Process ......................................................................................19

            (1)    The Process Passage Relied Upon By The District
Court Is Irrelevant To Construction Of Product
Claims ...................................................................................20

            (2)    Even If Relevant, The Process Passage Contains No
Clear And Unmistakable Exclusion Of Non-Flat
Chuck Walls.........................................................................21

        c)    The District Court's Analysis Has Consistently Been
Rejected By This Court.............................................................22

    4.    The District Court Erred To The Extent It Read A *Flat* Chuck Wall
Limitation Into The Claims From The Prosecution History ......................24

  B.    The Construction of "*A* Concave Cross-Sectional Radius Of The
Reinforcing Bead" Can Be Decided By This Court As Part Of Its De Novo
Review Of Claim Construction.......................................................................27

  C.    The District Court Erred In Granting Summary Judgment Of Non-
Infringement Under The Doctrine Of Equivalents .......................................29

    1.    Summary Judgment Was Improper Because Crown Offered
Evidence That The Differences Between Elements Of The Claimed
Can End And LOF+ Were Insubstantial....................................................29

    2.    There Was Evidence Of Infringement By Equivalents Under A
Proper Application Of The Optional Function-Way-Result Test.............31

        a)    Crown Offered Evidence That The Elements Of The LOF+
Performed The Same Function, In Substantially The Same
Way, To Achieve Substantially The Same Result As The
Claimed End.........................................................................31

        b)    The Fact That The LOF+ Chuck Wall May Not Perform
An Optional, Unclaimed and Process-Related Function Of
The Recited Chuck Wall Provided No Basis For Dismissal
Of Crown's Infringement Claim..........................................32

V.    CONCLUSION.................................................................................................35

CCS0014950

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A15

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 7 is a description of the LOF+ can end by AB; the material omitted on page 8 is a description of the LOF+ can end by an AB employee; the material omitted on pages 9 and 10 is a description of the 634 patent disclosure and the LOF+ can end by AB's expert; the material omitted on page 14 is a description of the LOF+ can end by AB's expert; the material omitted on page 17 is a description of the LOF+ can end by AB's expert; the material omitted on pages 25-26 is a characterization of a portion of the prosecution history of the 634 patent by AB.

CCS0014951

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

## TABLE OF AUTHORITIES

### FEDERAL CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.,*
    350 F.3d 1365 (Fed. Cir. 2003) ................................................................. 27

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................. 20

Anderson vs. Liberty Lobby, Inc.,
    477 U.S. 242, 255 (1986) ....................................................................... 30

*Biogen, Inc. v. Berlex Laboratoriess, Inc.,*
    318 F.3d 1132 (Fed. Cir. 2003) ................................................................. 18

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
    320 F.3d 1339 (Fed. Cir. 2003) ................................................................. 33

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,*
    334 F.3d 1294 (Fed. Cir. 2003) .......................................................... 14, 19

*CCS Fitness Inc. v. Brunswick Corp.,*
    288 F.3d 1359 (Fed. Cir. 2002) ...................................................... 13, 23, 24

*Cultor Corp. v. A.E. Staley Manufacturing Co.,*
    224 F.3d 1328 (Fed. Cir. 2000) ................................................................. 18

*Golight, Inc. v. Wal-Mart Stores, Inc.,*
    355 F.3d 1327 (Fed. Cir. 2004) .......................................................... 19, 21

*KCJ Corp. v. Kinetic Concepts, Inc.,*
    223 F.3d 1351 (Fed. Cir. 2000) ................................................................. 28

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) ...................................................... 17, 22, 29

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,*
    355 F.3d 1361 (Fed. Cir. 2004) ................................................................. 13

CCS0014952

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A17

*Microsoft Corp. v. Multi-Tech System, Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ........................................................ 18

*Schumer v. Laboratory Computer System, Inc.,*
  308 F.3d 1304 (Fed. Cir. 2002) ........................................................ 30

*SciMed Life System, Inc. v. Advanced Cardiovascular System, Inc.,*
  242 F.3d 1337 (Fed. Cir. 2001) ........................................................ 18

*Sunrace Roots Enterprise Co. v. SRAM Corp.,*
  336 F.3d 1298 (Fed. Cir. 2003) ........................................................ 25

*Superguide Corp. v. DirecTV Enterprises, Inc.,*
  358 F.3d 870 (Fed. Cir. 2004) ............................................ 22, 23, 24

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
  299 F.3d 1313, 1327 (Fed. Cir. 2002)) .................................... 18, 31

*Toro Co. v. White Consolidated Industrial, Inc.,*
  266 F.3d 1367 (2001) ................................ 29, 30, 31, 33, 34

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.,*
  520 U.S. 17 (1997) ........................................................ 29, 34

## FEDERAL STATUTES

28 U.S.C. § 1295(a)(1) ........................................................ 1

28 U.S.C. §1331 ........................................................ 1

28 U.S.C. §1338(a) ........................................................ 1

28 U.S.C. §2107 ........................................................ 1

CCS0014953

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A18

## TABLE OF ABBREVIATIONS

"634 patent" refers to U.S. Patent No. 6,065,634 entitled "Can End and Method for Affixing the Same to a Can Body."

"Crown" refers to defendant-appellant Crown Cork & Seal Technologies Corporation, the assignee of the 634 patent.

"AB" refers collectively to plaintiffs-appellees, Anheuser-Busch Companies, Inc., Metal Container Corporation, and Anheuser-Busch, Inc.

"JA" refers to a page in the joint appendix.

CCS0014954

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A19

## STATEMENT OF RELATED CASES

1.    No other appeal in, or from, the same civil action or proceeding in the lower court was previously before this or any other appellate court under the same or similar title.

2.    Counsel for defendant-appellant is unaware of any other case pending in this or any other Court that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction of the patent infringement claim that is the subject of this appeal under 28 U.S.C. §§ 1331 and 1338(a).

On December 11, 2003, the District Court entered final judgment under FED. R. CIV. P. 54(b) holding that claims 1-3 and 5 of the 634 patent were not infringed by AB (JA69).

Crown's appeal and AB's cross-appeal were timely filed on January 5, 2004, and January 12, 2004, respectively. The timeliness of the filing of this appeal is governed by 28 U.S.C. § 2107 and FED. R. APP. P. 4.

This Court has exclusive jurisdiction of this appeal under 28 U.S.C. § 1295(a)(1).

CCS0014955

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

1

## STATEMENT OF ISSUES ON APPEAL

1.    Whether the District Court erred as a matter of law in granting summary judgment of no literal infringement based upon its construction of the phrase "chuck wall . . . inclined . . . at an angle between 40° and 60°" as being limited to flat chuck walls when neither the ordinary meaning nor anything in the specification or prosecution history limits the claimed chuck walls to any particular shape?

2.    Whether the construction of the phrase "comprising . . . an outwardly concave annular reinforcing bead . . . wherein . . . a concave cross-sectional radius of the reinforcing bead is less than 0.75 mm," which was not addressed by the District Court but which is disputed by the parties, refers to *at least one* such radius, or to *one and only one* such radius?

3.    Whether the District Court erred in granting summary judgment of no infringement of a product claim under the doctrine of equivalents despite evidence that the differences between claim elements and the accused product were "insubstantial" merely because there was no evidence the accused product could satisfy an unclaimed function of an optional method of using the claimed product?

CCS0014956

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

2

## I.    STATEMENT OF THE CASE

On March 24, 2003, AB filed suit seeking, *inter alia*, a declaration that its "LOF+" can ends do not infringe the 634 patent claims (JA83).  Crown counterclaimed for infringement of claims 1-3 and 5 (JA364-365).  The parties filed cross motions for summary judgment on the infringement and other issues (JA388; JA2189).

On November 20, 2003, the District Court granted AB's summary judgment motion and denied Crown's cross motion, holding that the asserted claims were not infringed either literally or under the doctrine of equivalents (JA64-65).

## II.    STATEMENT OF FACTS

### A.    The Patent Specification

The 634 patent specification discloses can ends for beer or beverage cans (JA111 at Col. 3, ll. 27-39; JA113 at Col. 8, ll. 35-38; JA107 at Fig. 4).  The specification also separately discloses methods and apparatus for seaming can ends to can bodies (JA110 at Col. 2, ll. 13-31; JA107-08 at Figs. 5-7).

The patent specification notes that there was a need for can ends that consumed less metal than conventional ends (JA110 at Col. 1, ll. 20-22 and 54; JA113 at Col. 8, ll. 21-23).  A common way to conserve metal is to simply reduce metal gauge (or thickness) (*id.*; *see also* JA113 at Table 6, which, in the column headed "ACTUAL THICKNESS TO CONTAIN PSI," compares metal thickness to contain a given pressure for can ends of the claimed invention and the prior art).

3

Reductions in metal gauge, however, are constrained by pressure retention requirements (JA113 at Col. 8, ll. 35-38; JA107 at Fig. 4).

The geometry of the can ends claimed in the 634 patent permits use of less metal without compromising pressure performance. The inventors discovered that significant metal savings could be achieved by: (1) "increasing the slope" or inclination of the can end chuck wall, thereby reducing center panel diameter compared to overall can end diameter; and (2) limiting "the width of the anti peaking bead" (JA33; JA110 at Col. 1, ll. 20-22; JA113 at Col. 8, ll. 21-23).

Typical prior art chuck walls were inclined at an angle of only about 12° to 15° with respect to vertical (JA111 at Col. 3, ll. 3-5). The claimed ends include a chuck wall inclined at an angle between 40° and 60° (claims 1, 3 and 5) or between 40° and 45° (claim 2). Further, unlike prior ends, the claimed ends employ a narrow reinforcing bead having a concave cross-sectional radius smaller than 0.75 mm (JA110 at Col. 1, ll. 20-22).

In addition to describing the geometry of claimed can ends (Figure 4), the patent specification separately discloses, as a "second aspect" (*id.* at Col. 2, ll. 13-31), a method and apparatus for seaming can ends to can bodies (Figures 5-7) and contrasts that method and apparatus with the prior art (Figures 1-3). Although the patent specification concludes with nine claims, none are directed to a method or apparatus for seaming can ends to can bodies.

CCS0014958

4

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A23

All claims, including asserted claims 1-3 and 5, are directed solely to can ends, by themselves, before they are seamed to a can body (JA114).

### B.    The Prosecution History

During patent prosecution, Crown sought examination of product claims directed to unseamed can ends, by themselves, and method claims directed to the seaming of can ends onto a can body (JA988-92). The PTO ruled that the product and method claims were separate and independent inventions (JA994-96) that not only lacked "corresponding technical features" but also were not linked as to form "a single general inventive concept" (JA995). Claims directed to the seaming method were withdrawn from consideration and the 634 patent was ultimately granted with claims directed solely to can ends themselves (JA1011).

### C.    The Asserted Patent Claims

Only four claims of the 634 patent, *i.e.*, claims 1-3 and 5, are in dispute. Claim 1 of the 634 patent recites:

1. A can end comprising:

a peripheral cover hook;

a chuck wall dependent from an interior of the cover hook;

an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall; and

a central panel supported by an inner portion of the reinforcing bead;

wherein the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between 40° and 60°, and a

CCS0014959

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

5

A24

concave cross-sectional radius of the reinforcing bead is less than 0.75 mm.

Claims 2, 3 and 5 all depend from claim 1. Claim 2 further recites that the chuck wall is inclined at an angle between 40° and 45°. Claim 3 further defines the reinforcing bead outer wall. Claim 5 further defines the central panel.

### D.    The District Court's Claim Construction Ruling

The only claim construction issues presented below relate to the meaning of the phrases: (1) "chuck wall . . . inclined . . . at an angle between 40° and 60°"; and (2) "a concave cross-sectional radius of the reinforcing bead [being] less than 0.75 mm" (JA40).[1]

As to the first issue, the District Court concluded that the phrase "chuck wall . . . inclined . . . at an angle between 40° and 60°" required "that the wall be 'flat,' that is, that in a cross section . . . the wall appears as a straight line" (JA41-42). The District Court limited the claimed chuck walls to only flat chuck walls because it concluded, with no evidentiary support, that according to the ordinary meaning

---

[1] There was no dispute below regarding the meaning of any of the terms "can end," "peripheral cover hook," "chuck wall," "reinforcing bead," or "central panel" found in the claims. "Can end" refers to an "unseamed" can end (JA549; JA2205). "Peripheral cover hook" refers to "the outer circumferential portion of the unseamed can end that is to be formed into a part of the double seam" (JA2205; JA 549). "Chuck wall" refers to the portion of the lid connecting the cover hook and the reinforcing bead (JA430; JA2205). "Reinforcing bead" refers to a ring-like stiffening channel for adding strength to the can end (JA2205-2206; JA551). "Central panel" means the central structure of the can end held up by the inner portion of the reinforcing bead (JA2206; JA553).

CCS0014960

6

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

of the claim language "only a flat wall would be described as inclining at 'an' angle" (*id*).

As to the second issue, the District Court never addressed the meaning of the phrase "a concave cross-sectional radius of the reinforcing bead [being] less than 0.75 mm." Crown proposed that the phrase be construed to mean that at least one "cross-section of the reinforcing bead" include the recited radius (JA2210). AB argued that the phrase was limited to a bead having only "a single arcuate portion at its base" with "a single radius of curvature less than 0.75 mm" (JA551; JA556).

### E.    The District Court's Claim Application Ruling

The District Court reprinted a cross section of AB's LOF+ can end in its opinion (JA37).

Deleted Materials Subject<br>to Protective Order

Further, the District Court correctly noted that LOF+ can ends included a chuck wall that "permits a smaller central panel thereby realizing metal savings in the same way as the lid of the 634 patent" (JA44). The infringement issues, therefore, turned upon whether the chuck wall of an LOF+ can end is inclined at an angle within the claimed range, and weather its reinforcing bead has "a concave cross-sectional radius" smaller "than 0.75 mm."

Crown's expert measured the LOF+ chuck wall angle as 45° (JA2352 at ¶

35j).

63).

Deleted Materials Subject
to Protective Order

The District Court, however, ignored the fact that *both side's* experts

measured an angle of inclination for the chuck wall. Instead, the District Court

concluded that the LOF+ can ends could not literally infringe any of the asserted

claims because the LOF+ chuck wall was arcuate rather than flat (JA43: "[t]he

futile of efforts of the competing experts to define the angle between the milti-

arcuate [sic] LOF+ chuck wall and the vertical axis makes the non-infringement

apparent").

**F.    The District Court's Doctrine of Equivalents Ruling**

The District Court also granted summary judgment of non-infringement

under the doctrine of equivalents, despite conflicting expert declarations on the

subject.

CCS0014962

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

8

A27

Crown's expert stated that, even if the claims were limited to flat chuck walls, there was infringement by equivalents because there was no substantial difference between the disputed elements of the claimed can ends and the elements of the LOF+ (JA3476 at ¶ 66). AB's expert, however, denied that there was infringement by equivalents (JA601 at ¶ 28).

Crown's expert showed that the claimed chuck wall performed the function of reducing "metal usage in the can end when compared to conventional ends while maintaining industry-standard pressure performance" (JA3476 at ¶68). He concluded that the LOF+ chuck wall satisfied the metal savings function in the same way as the claimed chuck wall and achieved the same result (JA3476-78 at ¶¶ 66-71, 74).

Deleted Materials Subject
to Protective Order

CCS0014963

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

Deleted Materials Subject
to Protective Order

The District Court correctly concluded that the LOF+ not only satisfied the metal savings/pressure retention function of the claimed chuck wall, but did so in the very "same way" as in the patent (JA44). The District Court, however, further concluded that, to show infringement by equivalence, Crown was required to prove not only that the LOF+ chuck wall satisfied the metal savings function, but also the additional and unclaimed process-related function of "facilitating the sealing process by permitting the use of a simple frustoconical chuck which can drive on the wall without entering the anti-peaking bead" (JA44-45).

Notwithstanding the conflicting expert declarations, the District Court dismissed Crown's infringement claim because there was no evidence the "arcuate" LOF+ chuck wall could perform this additional process-related function (JA45).

## III.    SUMMARY OF THE ARGUMENT

The asserted claims are directed to a can end having a chuck wall that is simply said to be "inclined . . . at an angle" within a range of 40° to 60°. While the specification discloses a can end having a flat chuck wall, the claims are not so limited. And when the claims are construed according to the plain and ordinary

A29

meaning of the claim language, dictionary and agreed-upon definitions for the recited language do not limit the shape of the claimed features of the can end.

The District Court, however, found that the plain meaning of the phrase "chuck wall . . . inclined . . . at an angle" limits the chuck wall to a flat shape. According to the District Court, only a flat structure can be said to be inclined at an angle. This was error. Common usage confirms that many structures may be said to be inclined or sloped at an angle even though the surface of the structure is not flat. In fact, AB has acknowledged that non-flat, curved (or "arcuate") chuck walls may be said to be inclined at an angle.

The District Court also erred to the extent it read a flat chuck wall limitation into the claims from the patent specification. In so doing, the District Court limited the claims to the preferred embodiment, a method of analysis that has been rejected by this Court. Also, while the claims recite a can end by itself, the District Court erroneously limited these *product* claims based upon an irrelevant passage in the specification relating to a *process* of seaming a can end to a can.

The District Court also erred to the extent it read a flat chuck wall limitation into the claims from the prosecution history. The District Court refused to accept a broad construction of the claims that would encompass something other than a flat chuck wall shape because there was no discussion of chuck walls having a non-flat shape in the prosecution history. But there is no requirement that either the

11

CCS0014965

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

applicant or examiner make affirmative statements as to the broad scope of a claim for it to be broadly construed. In fact, the law is to the contrary.

In the end, the District Court's claim construction analysis was one that has consistently been rejected by this Court.

In addition, the District Court provided no construction for the otherwise disputed claim phrase reciting that the can end "compris[es] . . . an outwardly concave annular reinforcing bead . . . wherein . . . a concave cross-sectional radius of the reinforcing bead is less than 0.75 mm." The construction of this phrase can be decided by this Court as part of its de novo review of claim construction. This phrase is properly construed to require that the reinforcing bead have at least one such radius within the cross section of the bead, but not one and only one such radius.

Finally, the District Court erred in granting summary judgment of non-infringement under the doctrine of equivalents. Infringement by equivalents requires an intensely factual inquiry. Crown offered evidence that not only satisfied the "insubstantial differences" test, but also that satisfied the optional "function-way-result" test. The District Court was not only required to consider this evidence, but was also required to draw all factual inferences in Crown's favor. This should have precluded the grant of summary judgment of non-infringement. But the District Court ignored Crown's evidence, and instead

CCS0014966

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

12

summarily dismissed its infringement claim because it found that the accused

product does not perform an optional, unclaimed and process-related function of

the recited chuck wall. In addition to the fact that the District Court ignored the

genuine factual dispute as to the tests, this, too, was error.

This Court should reverse the District Court's dismissal of Crown's

infringement claim and remand for further proceedings.

## IV.    ARGUMENT

The applicable standard of review was succinctly stated in *Liquid Dynamics*

*Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1366-1367 (Fed. Cir. 2004) ("The

Federal Circuit reviews the grant of summary judgment de novo").

### A.    The District Court Erred In Granting Summary Judgment Of No Literal Infringement

The District Court erred in granting AB's motion for summary judgment of

no literal infringement of claims 1-3 and 5. The District Court's decision was

based solely upon its erroneous construction of the claims at issue such that it can

be reviewed de novo by this Court.

#### 1.    The District Court Erred By Concluding That The Plain Meaning Of The Phrase "Chuck Wall ... Inclined ... At An Angle" Limits The Chuck Wall To A Particular Shape

There is a "heavy presumption" favoring the plain and ordinary meaning of

claim terms. *CCS Fitness Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir.

2002). Further, claim terms may initially be construed in accordance with their

CCS0014967

13

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

ordinary dictionary definitions. *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,* 334 F.3d 1294, 1298-1300 (Fed. Cir. 2003) (consulting dictionary definitions is a "first step in the claim construction analysis").

The parties agree that the claim term "chuck wall" refers to the portion of the lid connecting the cover hook and the reinforcing bead (JA430; JA2205). Nothing in that agreed-upon definition, however, limits a chuck wall to any particular shape, including "flat."

Deleted Materials Subject<br>to Protective Order

And the District Court correctly found that prior art can ends having non-flat chuck walls were known at the time of the invention (JA43).

Thus, the phrase reciting that the "chuck wall" is "inclined . . . at an angle between 40° and 60°" merely refers to the angle of inclination of the structure connecting the peripheral curl with the reinforcing bead without regard to the shape of the structure.

Webster's defines the word "inclined" as "having a leaning or slope" (JA2336), and notes that the word "at" is "a function word to indicate presence in, on, or near" (JA2330). Again, there is nothing in these definitions that limits a referenced structure (in this case a chuck wall) to any particular shape, including "flat."

CCS0014968

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

Thus, by mere application of agreed-upon and dictionary definitions of the claim terms, the plain meaning of the phrase "chuck wall . . . inclined . . . at an angle between 40° and 60°" refers to a structure connecting the peripheral curl with the reinforcing bead that leans or has a slope on or near "an angle" in the recited range.

The District Court concluded, and there is no real dispute, that the phrase "*an* angle" refers to "a single angle" (JA42). The dispute arises here because the District Court, with no support whatever, further concluded that according to the ordinary meaning of the claim language "only a flat [chuck] wall would be described as inclining at 'an' angle to a vertical axis" (JA41-42). This was error.

The District Court's conclusion is faulty because neither the term "chuck wall," nor the ordinary meaning of the phrase reciting that the chuck wall is "inclined . . . at an angle" requires, expressly or by implication, that the chuck wall have any particular shape, including flat. It simply does not follow that the *only* chuck wall shape that can be said to be inclined, or to be sloped, or to lean, at *an* angle is a "flat" chuck wall.

Common usage confirms that many structures may be said to be inclined or sloped at "an" angle even though the surface of the structure is not flat. For example, a roofer would have little difficulty stating that a roof has a 45 degree slope even though it is made of corrugated metal or Spanish tiles having an

15

undulating surface rather than a flat surface. Similarly, a skier would have little difficulty stating that a mountain has a 30 degree slope even though the surface of a ski run undulates and is not "flat" along the length of the trail. Nor would a truck driver have difficulty understanding a road sign warning that a highway has a 6 degree slope or grade even though the road surface is not flat.

The plain meaning of the phrase in question, therefore, refutes the claim construction imposed by the District Court.

### 2.   AB Has Acknowledged That Arcuate Chuck Walls May Be Said To Be Inclined At An Angle

Although the District Court provided no support for its conclusion that the ordinary meaning of the phrase "chuck wall . . . inclined . . . at an angle" limited the claims to "*flat* chuck walls," there was ample evidence refuting that finding. AB has twice admitted that the non-flat, arcuate LOF+ type chuck walls may be said to be inclined at a single angle.

AB holds a patent directed to LOF+ type can ends, which states that it "contemplates improved aluminum can lids combining a *slanted chuckwall* with a reduced seam" (JA2405 at Col. 2, ll. 17-18) (emphasis supplied). While AB's patent describes its can ends as having "*arcuate*" chuck walls (*id.* at Col. 2, ll. 19-26), the patent claims recite that a line passing through the ends of the arcuate chuck walls is inclined "*at an angle*" within a claimed range (JA2407 at Col. 6, ll. 31-42).

CCS0014970

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A35

The fact that *"arcuate"* chuck walls of LOF+ type can ends may not only be said to be *"slanted,"* but may also be characterized by a line inclined "at *an* angle" is persuasive evidence that arcuate chuck walls may be said to be inclined at *a single* angle even though the wall surface is not flat, as erroneously found by the District Court.

Deleted Materials Subject
to Protective Order

The admission of AB's expert, like the admission in AB's granted patent, is persuasive evidence that those skilled in the art understand that a non-flat structure may nevertheless be said to be inclined at a single angle in accordance with the plain and ordinary meaning of the asserted claims.

3. **The District Court Erred To The Extent It Read A *Flat* Chuck Wall Limitation Into The Claims From The Patent Specification**

The ordinary and customary meaning of claim terms controls unless the patent specification demonstrates "a clear intention [by the patentee] to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004)

---

[2] A dispute between experts as to the angle at which the LOF+ chuck wall is inclined is clearly a fact issue to be resolved in the claim application step of the literal infringement analysis.

CCS0014971

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A36

(citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)) ("the specification does not describe the invention as limited to embodiments having pressure jackets, and none of the other reasons that have been invoked for giving claims a narrow reading are present"). Here, the specification contains no such clear intention on the part of the patentee to exclude from the scope of the claims a chuck wall of a particular shape.[3]

The District Court, however, identified two points in the patent specification to support its view that the claims were limited to "flat" chuck walls: (1) the description of a preferred embodiment of the claimed can end, and (2) a process described in the specification for seaming a can end to a can body (JA42-43). Neither point supports the view that the patent specification "overwhelmingly" limits the claims to flat chuck walls as found by the District Court (JA42). More importantly, neither point provides the required "clear indication" establishing a "manifest exclusion" of non-flat chuck walls as required by controlling precedent.

_____

[3] Here, unlike *Biogen, Inc. v. Berlex Labs., Inc.* 318 F.3d 1132, 1140 (Fed. Cir. 2003), the specification includes no express limiting definition of the claim language. And, unlike *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000), the specification includes no narrow characterization distinguishing the invention from prior art on the basis of the chuck wall shape. And, unlike *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001), the specification includes no statement of express disclaimer. Finally, unlike *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348-49 (Fed. Cir. 2004), the specification includes no over-arching statement that the invention is drawn to a narrow embodiment.

CCS0014972

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

18

a)    **The District Court Erroneously Limited The
        Claims To The Preferred Embodiment**

The District Court found that the "preferred embodiment, drawings and all

references [in the specification] disclose exclusively flat chuck walls" (JA42-43),

and therefore, that the claimed chuck wall is limited to a flat shape (JA42). This

was error. The fact that flat chuck walls may be the preferred or even the only

embodiment disclosed in the specification is irrelevant to claim scope. *See*

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004)

("[W]e have outright rejected the notion that disclosure of a single embodiment

necessarily limits the claims."); *Brookhill-Wilk,* 334 F.3d at 1298 ("Absent a clear

disclaimer of particular subject matter, the fact that the inventor anticipated that the

invention may be used in a particular manner does not limit the scope that

narrowed context.").

b)    **The District Court Erroneously Limited Can
        End Product Claims Based Upon A
        Specification Passage Relating To A Seaming
        Process**

The District Court also pointed to a specification passage describing a

"second aspect of the invention" relating to "a method of forming a double seam

between a can body and can end" to support its view that the asserted product

claims are limited to flat chuck walls (JA43; JA110 at Col. 2, ll. 13-15). But again,

CCS0014973

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A38

this specification passage provides no "clear indication" establishing a "manifest exclusion" of non-flat chuck walls, for two reasons.

### (1)    The Process Passage Relied Upon By The District Court Is Irrelevant To Construction Of Product Claims

The passage relied upon by the District Court relates to an unclaimed and optional seaming method and seaming chuck that are irrelevant to the construction of the asserted product claims. The asserted claims are directed to unseamed can ends and contain no language limiting the claimed ends by any particular seaming method or chuck. In fact, claims directed to the seaming method were found to be separate and independent inventions by the PTO and withdrawn from consideration (JA994-96). Thus, the optional seaming method disclosed in the patent specification in no way limits the scope of the asserted product claims. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1328-29 (Fed. Cir. 2003) (it is "telling that neither in the briefing nor at oral argument did [the accused infringer] direct us to any *specific statement* in the [intrinsic record] to support the contention that the patentability of the product claims in suit depended upon the process by which those products are obtained") (emphasis added).

CCS0014974

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A39

(2)    **Even If Relevant, The Process Passage Contains No Clear And Unmistakable Exclusion Of Non-Flat Chuck Walls**

Even if the seaming process passage in the specification relied upon by the District Court were somehow relevant to construction of product claims, and it is not, the passage contains no clear and unmistakable exclusion of non-flat chuck walls for two reasons.

First, the District Court ostensibly concluded that the only reasonable interpretation of the patent specification passage describing a process that employs a seaming chuck having a "substantially equal slope" to that of the chuck wall is that the chuck wall must necessarily be flat. But the District Court ignored other reasonable interpretations of the passage. At most, the passage states that chuck wall slope may correspond to seaming chuck slope. The District Court ignored that the slope of a non-flat chuck wall could still be *substantially equal* to the seaming chuck slope even if the chuck wall is arcuate and the seaming chuck is flat. Where, as here, a passage is subject to multiple reasonable interpretations, it is improper to conclude that it evidences a clear and unmistakable exclusion of claim scope. *Golight*, 355 F.3d at 1332 ("because . . . statements in the [intrinsic record] are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of [claim terms]").

CCS0014975

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

Second, the District Court ignored that the seaming process passage upon which it relied simply describes a preferred embodiment of *that process*. As such, the passage is not even a clear and unmistakable exclusion of *other seaming processes*. See *Liebel-Flarsheim Co.*, 358 F.3d at 906-08. Thus, it is axiomatic that the passage cannot be an exclusion of non-flat chuck walls from the scope of the asserted product claims.

c)    **The District Court's Analysis Has Consistently Been Rejected By This Court**

The District Court's reading of the patent specification into the claims has been consistently rejected by this Court. Indeed, the present case is indistinguishable from *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004) in which a narrow claim construction was rejected because there was no limiting language in the patent specification:

> Had the patentee intended to limit the disputed claim term to [a 'flat' chuck wall], it could have easily done so by explicitly modifying the disputed claim language with the term ['flat']. [There is] nothing in the written description of the [634] patent, much less the claim language, that precludes [the chuck wall from having a non-flat shape]. The law 'does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention.' [There is] no reason here to limit the scope of the claimed invention to [a flat chuck wall], when [the claim language] is broad enough to encompass [chuck walls having non-flat shapes] and those skilled in the art knew [that non-flat shapes could be used for chuck walls]."

CCS0014976

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

*Id.* at 880 (patent terms at issue here have been substituted for the analogous claim terms of the original quotation in reported decision).

Similarly, the present case is indistinguishable from *CCS Fitness* where again a narrow claim construction was rejected because there was no limiting language in the patent specification. 288 F.3d at 1366-69. There, the claim term at issue was a "member." *Id.* at 1362. The district court limited the claims to "members" having the shape disclosed in a preferred embodiment in the specification. 288 F.3d at 1362. The district court found that infringement was avoided because the shape of the accused device (a "multicomponent, curved member") differed from that disclosed in the specification ("a single component, straight-bar 'member'"). *Id.* at 1362-64. This Court squarely rejected that analysis:

> [The accused infringer] has not shown that anything in the specification or prosecution history overcomes the 'heavy presumption' that 'member' carries its ordinary meaning. The specification never requires a certain number of components or certain shape; nor does it limit the 'member' in either regard. Contrary to the district court's analysis, moreover, the specifications did not need to include a drawing of a multicomponent, curved member for the claimed invention to cover that particular embodiment. The drawings merely illustrated a particular embodiment of the claimed member and the specifications did not clearly assign a unique definition to 'member,' distinguish 'member' based on the prior art, disclaim subject matter or describe a single component, straight-bar 'member' as important to the invention.

CCS0014977

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A42

*CCS Fitness*, 288 F.3d at 1367.

In conclusion, the patent specification here simply does not permit the rewriting of the asserted claims to require a flat chuck wall.

### 4.    The District Court Erred To The Extent It Read A *Flat* Chuck Wall Limitation Into The Claims From The Prosecution History

The prosecution history nowhere discusses whether the claimed chuck wall requires any particular shape. Neither the applicant nor the patent examiner ever discussed chuck wall shape. The claims were never rejected over prior art on the basis of chuck wall shape. Thus, the prosecution history nowhere supports, let alone requires, a construction limiting the claims to flat chuck walls.

Nevertheless, the District Court concluded that the prosecution history supported its view that the claims were limited to "flat" chuck walls because it "discloses no contemplation by either inventor or examiner of a chuck wall that was not flat, notwithstanding that such configurations were known in the prior art" (JA43). In so doing, the District Court turned the law on its head at AB's request. There is no requirement that either the applicant or examiner make affirmative statements as to the broad scope of a claim for it to be broadly construed. *Superguide*, 358 F.3d at 881 (for claim term to cover digital technology it is "irrelevant that the patentees did not argue during prosecution of the . . . patent

CCS0014978

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A43

that 'regularly received television signal' also included digital technology"). In fact, the law is to the contrary.

For the prosecution history to limit the scope of an otherwise broadly drawn claim, there must be a clear and unmistakable disavowal or disclaimer of subject matter. *Sunrace Roots Enterprise Co. v. SRAM Corp.*, 336 F.3d 1298, 1306 (Fed. Cir. 2003) ("[T]he prosecution history may not be used to infer the intentional narrowing of a claim absent the applicants' clear disavowal of claim coverage."). Such a disavowal must be "clear and unmistakable." *Id.* Thus, while an affirmative statement of disavowal is required to *limit* a claim, it does not follow that an affirmative statement of inclusion is necessary to obtain *broad* scope for patent claims, as erroneously suggested by the District Court.

While the District Court pointed to no particular part of the prosecution history to support its narrow claim construction, it may have been persuaded by AB's characterization of the prosecution history below. AB pointed to a particular passage at which the patent examiner rejected claims over the prior art (JA447-48). In that passage, the Examiner stated that the then-pending claims were disclosed in the prior art except for the recited chuck wall angle range (JA1012-13).

Deleted Materials Subject
to Protective Order

CCS0014979

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A44

Deleted Materials Subject
to Protective Order

But AB incorrectly characterized the patent examiner's comments below. The Examiner never stated that the claimed chuck walls were limited to flat or "frustoconical" walls either in the passage referred to by AB (JA1012-13) or elsewhere in the prosecution history. Thus, there is no evidence whatever that Crown ever acquiesced in the Examiner's supposed view that the claims were limited to flat chuck walls. In any event, neither the Examiner's comment nor Crown's response constituted a clear and unambiguous disavowal of non-flat chuck walls.

In fact, there was no reason for either the examiner or Crown to have limited the claims to flat chuck walls because the prior art relied upon by the examiner already disclosed flat chuck walls. Actually, Crown successfully distinguished the claims from the prior art, not based on chuck wall shape, but rather based on the fact that the prior art failed to disclose chuck walls inclined at an angle within the recited range (*see, e.g.*, JA1027). Thus, because the claims were ultimately allowed, not on the basis of chuck wall *shape*, but rather on the basis of chuck wall *angle*, there was no acquiescence in a supposed construction

CCS0014980

26

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A45

limited to flat chuck walls. *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373-74 (Fed. Cir. 2003) ("An applicant's silence in response to an examiner's characterization of a claim does not reflect the applicant's clear and unmistakable acquiescence to that characterization if the claim is eventually allowed on grounds unrelated to the examiner's unrebutted characterization.").[4]

### B.    The Construction of "*A* Concave Cross-Sectional Radius Of The Reinforcing Bead" Can Be Decided By This Court As Part Of Its De Novo Review Of Claim Construction

The District Court never construed the disputed phrase "*a* concave cross-sectional radius of the reinforcing bead." The parties disagree as to whether the term "*a*" should be construed to require *at least one* such cross sectional radius as urged below by Crown, or whether the term should be construed to require *one and only one* such cross-sectional radius as urged by AB. Because the disputed phrase is germane to infringement issues, this Court should construe it.

The word "a" in the phrase "*a* concave cross-sectional radius of the reinforcing bead" should be given its plain and ordinary dictionary meaning.

---

[4] It is notable that this case is removed from *3M* because there was no "characterization" of the claims by the Examiner here as being drawn to a can end having only a "flat" chuck wall. But even if there was such a characterization of the claims by the Examiner, the facts here *still* fail to support acquiescence in that characterization because the claims were distinguished over the prior art on the basis of chuck wall angle, not shape. Thus, even under those circumstances, the prosecution history could not limit the claims for the reasons discussed in *3M*.

Webster's defines the indefinite article "a" to mean "one or more," which normally will control where, as here, the term "a" is preceded by the open transitional phrase "comprising." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising'"). Here, the claim recites a can end "comprising . . . an outwardly concave annular reinforcing bead . . . wherein . . . a concave cross-sectional radius of the reinforcing bead is less than 0.75 mm."

Thus, under prevailing law, the plain meaning of "a concave cross-sectional radius" refers to at least one such radius. Nothing in the claim language limits the claimed can end to one and only one such radius. In fact, such a construction would be contrary to the ordinary meaning.

Further, the specification imposes no special meaning to the indefinite article "a" in the phrase "*a* concave cross-sectional radius" that is different from the ordinary and customary meaning as set forth above. *See KCJ Corp.*, 223 F.3d at 1356 ("[T]he article 'a' receives a singular interpretation only in rare circumstances when the patentee evinces a clear intent to so limit the article."). Similarly, there is no evidence in the prosecution history that reflects a clear and unambiguous disavowal of this meaning by the patentees. *See KCJ Corp.*, 223 F.3d at 1357 ("The intrinsic evidence simply provides no support for departing

CCS0014982

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

from the general rule."). Thus, the ordinary and customary meaning should control. *Liebel-Flarsheim Co.*, 358 F.3d at 913("[accused infringer] must overcome the 'heavy presumption' that [the claims] mean what they say") (second alteration in original).

### C. The District Court Erred In Granting Summary Judgment Of Non-Infringement Under The Doctrine Of Equivalents

Infringement under the doctrine of equivalents "requires an intensely factual inquiry." *Toro Co. v. White Consolidated Indus., Inc.*, 266 F.3d 1367, 1369-70 (2001) (citations omitted). Consequently, the District Court's dismissal of Crown's infringement claim could be affirmed here, if and only if, "the record contain[ed] no genuine issue of material fact and [left] no room for a reasonable jury to find equivalence." *Id.* But that is not the case.

#### 1. Summary Judgment Was Improper Because Crown Offered Evidence That The Differences Between Elements Of The Claimed Can End And LOF+ Were Insubstantial

The District Court's summary dismissal of Crown's infringement claim under the doctrine of equivalents was error because the Court failed to consider and credit Crown's evidence that there were only "insubstantial differences" between the claim element requiring a flat chuck wall (according to the wrong construction) and the LOF+. *Toro*, 266 F.3d at 1370 (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). But while the District Court

CCS0014983

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A48

cited *Warner-Jenkinson*, it not only ignored the insubstantial differences test, but also Crown's infringement proof under that test.

Whether the insubstantial differences test has been satisfied is a question of fact. *Toro*, 266 F.3d at 1370 ("The question of whether [accused device] is insubstantially different from [claim invention] is a material question of fact."). In opposition to AB's motion, Crown offered evidence, in the form of a declaration by a competent and qualified expert, sufficient to demonstrate that, even if the claims were limited to flat chuck walls, there was infringement by equivalents because there were no substantial differences between LOF+ and claimed can ends (JA3476 at ¶ 66). Although AB's expert disagreed (JA601 at ¶ 28), a reasonable jury certainly could side with Crown's expert, and the District Court was required to draw all factual inferences in Crown's favor. *Schumer v. Laboratory Computer Sys., Inc.*, 308 F.3d 1304, 1315(Fed. Cir. 2002) ("On summary judgment, all justifiable inferences are made in favor of the nonmovant.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Thus, the conflicting expert declarations, at a minimum, created a genuine issue of material fact that precluded the grant of summary judgment in favor of AB.

This Court should reverse the District Court's summary dismissal of Crown's infringement claim and remand for further proceedings on this basis alone.

CCS0014984

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A49

2.    **There Was Evidence Of Infringement By Equivalents Under A Proper Application Of The Optional Function-Way-Result Test**

In appropriate cases, "the function-way-result test" may offer "additional guidance on the question of equivalence." *Toro*, 266 F.3d at 1370.   Whether or not the function-way-result test is satisfied is also a question of fact. *Teleflex*, 299 F.3d at 1323 ("A determination of infringement, both under literal and the doctrine of equivalents, is a question of fact.").  Here, in addition to the insubstantial differences test, Crown also proffered evidence of equivalence under the function-way-result test.

a)    **Crown Offered Evidence That The Elements Of The LOF+ Performed The Same Function, In Substantially The Same Way, To Achieve Substantially The Same Result As The Claimed End**

In opposing AB's summary judgment motion, Crown's expert showed that the claimed chuck wall not only performed the function of reducing "metal usage in the can end when compared to conventional ends while maintaining industry-standard pressure performance" (JA3476 at ¶68), but also that the LOF+ chuck wall satisfied the metal savings function in the same way as the claimed chuck wall and achieved the same result (JA3476-78 at ¶¶ 66-71, 74).  In fact, AB never refuted Crown's assertion that that the LOF+ chuck wall was equivalent to the claimed chuck wall in terms of metal savings or pressure performance.  Thus, the

CCS0014985

31

A50

District Court correctly concluded that the LOF+ can ends not only satisfied the metal savings/pressure retention function of the claimed chuck wall, but did so in the very "same way" as in the patent (JA44).

This conclusion, by itself, should have ended the doctrine of equivalents inquiry and compelled the denial of AB's motion. This Court should reverse the District Court's dismissal of Crown's infringement claim on this ground alone, and remand for further proceedings.

        b)    **The Fact That The LOF+ Chuck Wall May Not Perform An Optional, Unclaimed and Process-Related Function Of The Recited Chuck Wall Provided No Basis For Dismissal Of Crown's Infringement Claim**

Even though it found that the LOF+ satisfied the metal savings function of the invention, the District Court nevertheless summarily dismissed Crown's infringement claim because it found:

(1) the "flat chuck wall of the patented lid" also performed "the significant function of facilitating the sealing process by permitting the use of a simple frustoconical chuck which can drive on the wall without entering the anti-peaking bead" (JA44-45); and

(2) the arcuate "chuck wall of the accused lid does not permit the use of a frustoconcial chuck" (JA45).

32

CCS0014986

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

The District Court's conclusion, however, was legally erroneous because it improperly limited the scope of the asserted product claims with reference to an optional and unclaimed method for seaming can ends onto can bodies. *See Toro*, 266 F.3d at 1371 ("[W]hile [claimed] structure could have a variety of other functions (as is often the case with structures), . . . these functions do not become part of the claimed structure unless claimed as such."); *see also Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003) ("[T]he relevant analysis is 'of the role played by each element in the context of the specific patent claim,' . . . not whether the accused element is capable of performing different roles than the claim element in other contexts.") (citation omitted).

In *Boehringer*, this Court affirmed a judgment of infringement by equivalents and rejected the alleged infringer's focus on an "optional" function of the accused product that was "irrelevant to the claim in suit." 320 F.3d at 1351-52 ("The fact that [accused product] can perform other functions in different ways to produce different results is not relevant."). In the present case, the patent claims are directed to can ends themselves, regardless of how those ends are seamed onto a can body. Thus, where the process-related function relied upon by the District Court relates to an unclaimed and optional seaming method disclosed in the patent

CCS0014987

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

33

A52

specification, a reasonable jury could find that this function is irrelevant to the asserted claims.

In *Toro*, this Court reversed a grant of summary judgment of non-infringement under the doctrine of equivalents because the district court erroneously focused upon unclaimed functions that were not part of the claimed structure. 266 F.3d at 1371-72. As in *Toro*, Crown is entitled to present evidence to the fact finder that the only pertinent function of the claimed can end is the promotion of metal savings. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) ("An analysis of the role played by each element *in the context of the specific patent claim* will thus inform the inquiry as to whether a substitute element matches the function, way and result of the claimed element") (emphasis added). For example, Crown is entitled to present to the fact finder evidence in the intrinsic record that 1) metal savings is, *of necessity*, the function linked to the can end of the claims (JA110 at Col. 1, ll. 20-22 and 54; JA113, Col 8, ll. 21-23; JA113 at Table 6); 2) metal savings promoted by the can end of the claims is said to distinguish the claimed invention from prior art can ends (JA110 at Col. 1, l. 54; JA113, JA113 at Table 6); and 3) during prosecution, the applicants distinguished the prior art on the basis of metal savings, which the examiner understood to be the function of the claimed invention (*see e.g.*, JA1040).

CCS0014988

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

The District Court's focus on the optional process-related functions of the claimed can ends was error. There was no need for Crown to show that the unclaimed seaming process would be satisfied in order to avoid dismissal of its infringement claim.

## V.    CONCLUSION

For all of the foregoing reasons, the judgment of the District Court holding that the asserted claims of the 634 patent have not been infringed, either literally or under the doctrine of equivalents, should be reversed and this case remanded to the District Court for further proceedings.

Respectfully submitted,

March 23, 2004

Dale M. Heist
Kevin M. Flannery
WOODCOCK WASHBURN, LLP
One Liberty Place, 46th Floor
Philadelphia, PA 19103
(215) 568-3100
Attorneys for Defendant-Appellant
Crown Cork & Seal Technologies
Corporation

CCS0014989

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A54

## CERTIFICATE OF SERVICE

I, Kevin Flannery, a member of the bar of this Court, hereby certify that on March 23, 2004, I served the foregoing Brief for Defendant-Appellant, Crown Cork & Seal Technologies Corporation by causing four copies (2 copies of the confidential brief and 2 copies of the nonconfidential brief) to be sent to each of the Plaintiffs-Cross Appellants, Anheuser-Busch Companies, Inc., Anheuser-Busch, Inc. and Metal Container Corporation by causing the copies (totaling 12) to be sent to counsel for Plaintiffs-Cross Appellants by commercial overnight delivery service, charges prepaid, addressed as follows:

John W. MacPete, Esquire
Storm & Hemingway
8117 Preston Road
Suite 460
Dallas, TX 75225

Kevin M. Flannery
Attorney for Defendant-Appellant Crown
Cork & Seal Technologies Corp.

CCS0014990

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

36

A55

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I, Kevin Flannery, verify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains 8,142 words, as measured using Microsoft® Word 2002, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2002 in 14 Point Times New Roman.

Kevin M. Flannery
Attorney for Defendant-Appellant

Date: _March 23, 2004_

CCS0014991

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

37

## ADDENDUM

Memorandum and Order | Order Partially Granting Plaintiffs' and Defendants' Motions for Summary Judgment; Denying Plaintiffs' Motion to Strike; Denying Defendants' Motion to Compel. (addendum hereto, may also be found at JA31-JA65)

Stipulated Order of Dismissal | Order dated December 5, 2003 dismissing tortuous interference and unfair competition claims, confirming Summary Judgment Order and acknowledging that both parties may appeal their respective claims based on the patents-in-suit. (addendum hereto, may also be found at JA66-JA68)

Judgment | Judgment dated December 11, 2003 entered on Court's previous Ruling on Dispositive Motions. (addendum hereto, may also be found at JA69)

U.S. 6,065,634 | U.S. Patent 6,065,634, assigned to Crown Cork & Seal Technologies Corporation (addendum hereto, may also be found at JA105-JA114)

CCS0014992

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A57

DOCKET NO.: CC-3397; A4772US4                                           PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

FEB 0 9 2004

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                      Confirmation No.: 1866
Brifcani, et al.

Application No.: 10/024,862                Group Art Unit: 3725

Filing Date: December 18, 2001             Examiner: Hong, William

For:    Can End and Method for Fixing Same to a Can Body

                                   EXPRESS MAIL LABEL NO.: EL 970382323 US
                                   DATE OF DEPOSIT: February 9, 2004

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### REPLY PURSUANT TO 37 CFR § 1.111

In response to the Official Action dated August 7, 2003, reconsideration is

respectfully requested in view of the amendments and/or remarks as indicated below:

⊠    **Amendments to the Specification** begin on page 2 of this paper.

⊠    **Amendments to the Claims** are reflected in the listing of the claims which
     begins on page 3 of this paper.

⊠    **Amendments to the Drawings** begin on page 4 of this paper and include an
     attached replacement sheet.

⊠    **Remarks/Arguments** begin on page 18 of this paper.

02/13/2004 DENMAHU1 00000049 233050    10024862

01 FC:1253        950.00 DA

02/13/2004 DENMAHU1 00000049 233050    10024862

02 FC:1201        86.00 DA
03 FC:1202        558.00 DA

CCS0016564

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A58

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

Amendments to the Specification:

Replace the paragraph beginning at page 1, line 15 (of the substitute specification) with the following re-written paragraph:

US Patent 4,217,843 (KRASKA) describes an alternative design of can end in which the countersink has inner and outer flat walls, and a bottom radius which is less than three times the metal thickness. The can end has a chuck wall extending at an angle of approximately 24° to the vertical. Conversely, the specification of our ~~European Patent application EP0340955A~~ United States Patent Number 5,046,637 describes a can end in which the chuck wall extends at an angle of between 12° and 20° to the vertical.

Replace the paragraph beginning at page 1, line 21 (of the substitute specification) with the following re-written paragraph:

The detailed description of our ~~Our European Patent No. 0153115~~ United States Patent Number 4,571,978 describes a method of making a can end suitable for closing a can body containing a beverage such as beer or soft drinks. This can end comprises a peripheral flange or cover hook, a chuck wall dependant from the interior of the cover hook, an outwardly concave reinforcing bead extending radially inwards from the chuck wall from a thickened junction of the chuck wall with the bead, and a central panel supported by an inner portion of the reinforcing bead. Such can ends are usually formed from a prelacquered aluminum alloy such as an aluminum magnesium manganese alloy such as alloy 5182.

Replace the paragraph beginning at page 2, line 8 (of the substitute specification) with the following re-written paragraph:

The specification of our ~~Our International Patent Application published no. WO93/17864~~ United States Patent Number 5,582,319 describes a can end suitable for a beverage can and formed from a laminate of aluminum/manganese alloy coated with a film of semi crystalline thermoplastic polyester. This polyester/aluminum alloy laminate permitted manufacture of a can end with a narrow, and therefore strong reinforcing bead in the cheaper aluminum manganese alloy.

Page 2 of 23

CCS0016565

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A59

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

This listing of claims will replace all prior versions, and listings, of claims
in the application.

**Listing of Claims:**

1-10    canceled

11.    (previously presented) A method of forming a double seam between a can
body and a can end, said method comprising the steps of:

a) providing a can end having a circumferentially extending peripheral curl
and a wall extending circumferentially and radially inward from said curl and an
annular reinforcing bead extending radially inward from said wall, said reinforcing
bead having an interior surface, said peripheral curl comprising a seaming panel and a
radiused portion extending from said seaming panel to said wall, said wall inclined
between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said curl of said can end into contact with a
circumferentially extending flange of a can body;

c) providing a rotatable chuck having first and second circumferentially
extending walls, said first and second walls forming a juncture therebetween; bringing
said chuck into engagement with said can end so that said juncture of said first and
second walls of said chuck contacts said inclined wall of said can end;

d) rotating said chuck;

e) performing a first seaming operation by placing a first seaming roll into
contact with said can end curl while rotating said can end so as to partially deform
said curl and said can body flange into a partial seam, said rotation of said can end
during said first seaming operation driven by said rotating chuck through driving
contact between said juncture of said first and second walls of said chuck and said
inclined wall of said can end without driving contact between said chuck and said can
end bead interior surface;

f) performing a second seaming operation by placing a second seaming roll
into contact with said partially deformed can end curl so as to further deform said curl
and said can body flange so as to further form said seam.

12.    (previously presented) The method according to claim 11, wherein said first
and second seaming operations reform said can end inclined wall by bending a first portion of
said inclined wall upward by an angle of at least about 16°.

13.    (previously presented) The method according to claim 11, wherein as a result
of said first and second seaming operations said can end inclined wall is reformed so that a
first portion of said wall is oriented substantially cylindrically.

Page 3 of 23

CCS0016566

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A60

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

14.    (previously presented) The method according to claim 11, wherein prior to performing said first seaming operation said wall of said can end is inclined between about 30° and about 50° with respect to said axial centerline of said can end.

15.    (previously presented) The method according to claim 14, wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is oriented substantially cylindrically.

16.    (previously presented) The method according to claim 14, wherein said first and second seaming operations reform said can end inclined wall by bending a first portion of said inclined wall upward by an angle of at least about 26°.

17.    (previously presented) The method according to claim 11, wherein prior to performing said first seaming operation said wall of said can end is inclined between about 40° and about 45° with respect to an axial centerline of said can end.

18.    (previously presented) The method according to claim 17, wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is oriented substantially cylindrically.

19.    (previously presented) The method according to claim 17, wherein said first and second seaming operations reform said can end inclined wall by bending a first portion of said inclined wall upward by an angle of at least about 36°.

20.    (previously presented) The method according to claim 11, wherein said first circumferentially extending wall of said chuck is oriented so as to be substantially cylindrical.

21.    (previously presented) The method according to claim 20, wherein said substantially cylindrical first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

22.    (previously presented) The method according to claim 11, wherein the distance from the lowermost point on said annular bead to the uppermost point on said curl defines a height of said can end, and wherein as a result of said first and second seaming operations said can end inclined wall is reformed so that a first portion of said wall is bent upwardly so as to substantially increase said height of said can end.

23.    (previously presented) The method according to claim 11, wherein said chuck second wall is inclined with respect to an axial centerline of said chuck that substantially matches said inclination of said can end wall, and wherein said rotation of said can end during said first seaming operation is aided by driving contact between said second wall of said chuck and said inclined wall of said can end.

24.    canceled

Page 4 of 23

CCS0016567

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A61

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

25.    (currently amended) The method according to claim 24 68, wherein during said seaming operation at least a portion of said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 16°.

26.    (currently amended) The method according to claim 24 68, wherein said line between said first and second locations on said wall of said can end is inclined between about 30° and about 50° with respect to an axial centerline of said can end prior to performing said seaming operation.

27.    (currently amended) The method according to claim 26, wherein during said seaming operation at least a portion of said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 26°.

28.    (currently amended) The method according to claim 24 68, wherein said line between said first and second locations on said second wall of said can end is inclined between about 40° and about 45° with respect to an axial centerline of said can end.

29.    (currently amended) The method according to claim 28, wherein during said seaming operation at least a portion of said can end inclined wall first portion is reformed by bending said first portion upward by an angle of at least about 36°.

30.    (currently amended) The method according to claim 24 68, wherein said substantially cylindrical first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

31.    (currently amended) The method according to claim 24 68, wherein the distance from the lowermost point on said annular bead to the uppermost point on said curl cover hook defines a height of said can end, and wherein as a result of said seaming operation at least a portion of said can end inclined wall is reformed so that said first wall portion of said wall is bent upwardly into said substantially cylindrical orientation so as to substantially increase said height of said can end.

32.    (currently amended) The method according to claim 24 68, wherein

f) said annular bead has an interior surface thereof;

g) said chuck further comprises a second wall, said first and second walls of said chuck form a juncture therebetween;

h) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end curl cover hook while said can end is rotated so as to partially deform said curl cover hook and said first wall portion and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially

CCS0016568

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

deformed can end ~~curl~~ cover hook so as to further deform said ~~curl~~ cover hook and said first portion and said can body flange so as to further form said seam;

i) said rotation of said can end during said first seaming operation is accomplished by imparting driving contact between said juncture of said first and second walls of said chuck and said ~~inclined~~ wall of said can end but without imparting driving contact between said chuck and said can end bead interior surface.

33.     (currently amended) The method according to claim ~~24~~ 68, further comprising the step of filling the can body with a carbonated beverage prior to performing said seaming operation.

34.     canceled

35.     (currently amended) The method according to claim ~~34~~ 77, wherein said line between said first and second locations on said wall of said can end is inclined between about 30° and about 50° with respect to said axial centerline of said can end prior to performing said seaming operation.

36.     (currently amended) The method according to claim 35, wherein during said seaming operation at least a portion of said can end ~~inclined~~ wall first portion is reformed by bending ~~said first portion~~ upward by an angle of at least about 26°.

37.     (currently amended) The method according to claim ~~34~~ 77, wherein said line between said first and second locations on said wall of said can end is inclined between about 40° and about 45° with respect to said axial centerline of said can end prior to performing said seaming operation.

38.     (currently amended) The method according to claim 37, wherein during said seaming operation at least a portion of said can end ~~inclined~~ wall first portion is reformed by bending ~~said first portion~~ upward by an angle of at least about 36°.

39.     (currently amended) The method according to claim ~~34~~ 77, wherein the can end further comprises a reinforcing bead extending radially inward from said second portion of said wall at said second wall location, the distance from [[the]] a lowermost point on said annular bead to the uppermost point on said ~~curl~~ cover hook defines a height of said can end, and wherein said upward bending of said first portion of can end ~~inclined~~ wall during said seaming operation substantially increases said height of said can end.

40.     (currently amended) The method according to claim ~~34~~ 77, wherein

f) said can end comprises an annular reinforcing bead extending radially inward from said ~~inclined~~ wall, said annular bead having an interior surface thereof;

g) said chuck further comprises a second wall, said first and second walls of said chuck form a juncture therebetween;

CCS0016569

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003                                          PATENT

h) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end ~~curl~~ peripheral cover hook while said can end is rotated so as to partially deform said ~~curl~~ cover hook and said first wall portion and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially deformed can end ~~curl~~ cover hook so as to further deform said ~~curl~~ cover hook and said first wall portion and said can body flange so as to further form said seam;

i) said rotation of said can end during said first seaming operation is accomplished by imparting driving contact between said juncture of said first and second walls of said chuck and said ~~inclined~~ wall of said can end but without imparting driving contact between said chuck and said can end bead interior surface.

41.    (currently amended) The method according to claim ~~34~~77, further comprising the step of filling the can body with a carbonated beverage prior to performing said seaming operation.

42.    (withdrawn) An apparatus for seaming a peripheral curl of a can end onto a flange of a can body, said can end having a wall extending radially inward from said cover hook and inclined between about 20° and about 60° with respect to a central axis of said can end, comprising:

a) a chuck adapted to hold said can end on said can body, said chuck comprising upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical; and

b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

43.    (withdrawn) The apparatus according to claim 42, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°.

44.    (withdrawn) The apparatus according to claim 42, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

45.    (withdrawn) The apparatus according to claim 44, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

CCS0016570

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A64

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

    46.   (withdrawn) An apparatus for seaming a can end onto a flange of a can body, said can end having a circumferentially extending peripheral curl and a wall extending circumferentially and radially inward from said curl and an annular reinforcing bead extending radially inward from said wall, said reinforcing bead having an interior surface, said peripheral curl comprising a seaming panel and a radiused portion extending from said seaming panel to said wall, said wall inclined between about 20° and about 60° with respect to an axial centerline of said can end, comprising:

        a) a chuck for holding said can end on said can body, said chuck comprising (i) upper and lower circumferentially extending walls forming a juncture therebetween, said lower wall inclined between about 20° and about 60° with respect to a central axis of said chuck, said upper wall being substantially cylindrical, and (ii) a downwardly extending annular bead, said chuck annular bead sized and located so as not to contact said inner interior surface of said chuck annular reinforcing bead when said chuck holds said can end on said can body; and

        b) at least one seaming roll adapted to urge an upper portion of said inclined wall of said can end against said upper wall of said chuck so as to deform said peripheral curl and said flange into a seam joining said can end to said can body.

    47.   (withdrawn) The apparatus according to claim 46, wherein said substantially cylindrical wall is inclined with respect to said central axis by not more than about 4°.

    48.   (withdrawn) The apparatus according to claim 46, wherein said lower wall of said chuck is inclined between about 30° and about 50° with respect to said central axis of said chuck.

    49.   (withdrawn) The apparatus according to claim 48, wherein said lower wall of said chuck is inclined between about 40° to about 45° with respect to said central axis of said chuck.

    50.   (withdrawn) The apparatus according to claim 46, wherein said lower wall of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

    51   (withdrawn) The apparatus according to claim 46, wherein said juncture between said upper and lower walls of said chuck is adapted to drive rotation of said can end and said can body while said chuck holds said can end onto said can body.

    52.   (withdrawn)  A method of seaming a can end to a can body, comprising the steps of:

        a) providing a can end having (i) a circumferentially extending peripheral curl, said peripheral curl forming a lip at one end thereof, (ii) a circumferentially extending wall extending downwardly and radially inwardly from an opposite end of said peripheral curl, at least an upper portion of said wall inclined with respect to an axial centerline of said can end, and (iii) a circumferentially extending annular bead

Page 8 of 23

CCS0016371

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A65

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

extending downwardly and radially inwardly from said wall, the distance from the lowermost point on said bead to the uppermost point on said curl defining a height of said can end;

b) placing said peripheral curl of said can end into contact with a circumferentially extending flange of a can body;

c) bringing a rotatable chuck into engagement with said can end;

d) bringing a seaming roll having a lower forming surface into rolling engagement with said curl, said seaming roll being positioned so that said lower forming surface is disposed above said lip of said curl upon initial engagement with said curl so that said seaming roll (i) displaces said curl upwardly as said curl is displaced inwardly and (ii) permanently bends said upper portion of said can end wall towards the axial direction so as to permanently increase said height of said can end.

53.    (withdrawn) The method of claim 52, wherein at least said upper portion of said wall is inclined between about 20° and about 60° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

54.    (withdrawn) The method of claim 53, wherein at least said upper portion of said wall is inclined between about 30° and about 50° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

55.    (withdrawn) The method of claim 54, wherein at least said upper portion of said wall is inclined between about 40° and about 45° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

56.    (withdrawn) The method according to claim 53, wherein said bending of said upper portion of said can end wall forms a crease between said upper portion of said can end wall and a lower portion of said can end wall.

57.    (withdrawn) The method of claim 52, wherein the rotatable chuck has first and second circumferentially extending walls, the first wall being substantially cylindrical, and wherein said bending of said upper portion of said can end wall causes said upper portion of said can end wall to be pressed against said chuck first wall, whereby said upper portion of said can end wall becomes substantially cylindrical.

58.    (withdrawn) The method according to claim 57, wherein at least said upper portion of said can end wall is inclined between about 20° and about 60° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

59.    (withdrawn) The method according to claim 58, wherein at least said upper portion of said can end wall is inclined between about 30° and about 50° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

60.    (withdrawn) The method according to claim 59, wherein at least said upper portion of said can end wall is inclined between about 40° and about 45° with respect to said axial centerline prior to bending of said upper wall portion of said can end.

CCS0016572

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A66

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

61.    (withdrawn): A method of seaming a can end to a can body, comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral curl, (ii) a circumferentially extending wall extending downwardly and radially inwardly from an opposite end of said peripheral curl, and (iii) a circumferentially extending annular bead extending downwardly and radially inwardly from said wall, said bead having inner and outer walls and a substantially convex base so as to form an interior surface thereof having a bottom;

b) placing said curl of said can end into contact with a circumferentially extending flange of a can body;

c) bringing a rotatable chuck into engagement with said can end;

d) performing at least a first seaming operation, said first seaming operation comprising placing a seaming roll into contact with said can end curl while rotating said can end so as to partially deform said curl and said can body flange into a partial seam, said rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said chuck and said wall of said can end without driving contact between said chuck and said base of said can end bead interior surface.

62.    (withdrawn)The method of claim 61, wherein an upper portion of said can end wall is inclined at an angle to an axial centerline of said can end prior to said seaming operation, and further comprising a second seaming operation that  bends said wall upper portion into an approximately cylindrical shape.

63.    (withdrawn) The method according to claim 62, wherein said upper portion of said can end wall is inclined between about 20° and about 60° with respect to said axial centerline of said can end prior to said first seaming operation.

64.    (withdrawn) The method according to claim 63, wherein said upper portion of said can end wall is inclined between about 30° and about 50° with respect to said axial centerline of said can end prior to said first seaming operation.

65.    (withdrawn) The method according to claim 64, wherein said upper portion of said can end wall is inclined between about 40° and about 45° with respect to said axial centerline of said can end prior to said first seaming operation.

66.    (withdrawn) The method according to claim 63, wherein said upper portion of said wall is bent  towards the axial direction so as to permanently increase the height of said can end during said first and second seaming operations.

67.    (withdrawn) The method according to claim 63, wherein said rotation of said can end during said first seaming operation is driven by said rotating chuck through driving contact between said chuck and said wall of said can end without driving contact between said chuck and any portion of said can end bead interior surface.

CCS0016573

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A67

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

68.    (new) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation, (ii) an annular reinforcing bead, and (iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall comprising first and second wall portions, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location to a second location on said wall that forms a transition with said reinforcing bead, whereby said first and second locations form end points of said second wall portion, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising a first circumferentially extending wall, said chuck first wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, said first location on said wall after said seaming operation forming the transition from said substantially cylindrical wall portion to said second wall portion, said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation.

69.    (new) The method according to claim 68, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall not being substantially cylindrical whereby said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall.

CCS0016574

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A68

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

70.    (new) The method according to claim 69, wherein the step of performing said seaming operation further comprises bending said first wall portion of said can end upwardly around said chuck wall juncture so as to permanently deform said first wall portion.

71.    (new) The method according to claim 68, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

72.    (new) The method according to claim 68, wherein said first and second portions of said wall of said can end lie along a substantially straight line prior to performing said seaming operation.

73.    (new) The method according to claim 68, wherein said line between the first and second locations on said second wall remains inclined between about 30° and about 50° after seaming.

74.    (new) The method according to claim 68, wherein said line between the first and second locations on said second wall remains inclined between about 40° and about 45° after seaming.

75.    (new) The method according to claim 68, wherein, in said step e) of performing the seaming operation, rotation of said can end is achieved without imparting driving contact between said chuck and a bottom interior surface of said reinforcing bead.

76.    (new) The method according to claim 68, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall being substantially frustoconical.

77.    (new) A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation and (ii) a circumferentially extending wall comprising first and second portion, said first wall portion to be formed into another portion of said double seam during said seaming operation, said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel, said second wall portion extending from said first wall portion at said first wall location on said wall to a second location on said wall, whereby said first and second locations form end points of said second wall portion, said second wall location being the lowermost point of said wall, and wherein a straight line extending between said first and second locations on said wall is inclined between about 20° and about 60° with respect to an axial centerline of said can end;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

Page 12 of 23

CCS0016575

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A69

DOCKET NO.: CC-3397; A4772US4                                                PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

c) providing a rotatable chuck comprising a first circumferentially extending wall, said first chuck wall being substantially cylindrical;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end so as to deform said seaming panel of said cover hook and said first wall portion and said can body flange into said double seam, said first portion of said can end wall being pressed against said chuck first wall so that at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16°, said first location on said wall after said seaming operation forming the transition from said double seam to said second wall portion, said line between said first and second locations remaining inclined between about 20° and about 60° with respect to said axial centerline.

78.      (new)  The method according to claim 77, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall not being substantially cylindrical whereby said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said second location on said can end wall.

79.      (new) The method according to claim 78, wherein said bending of said first wall portion during said seaming operation comprises bending said first wall portion upwardly around said chuck wall juncture.

80.      (new)  The method according to claim 78, wherein said end includes an annular reinforcing bead extending from said second wall portion and, in said step e) of performing the seaming operation, rotation of said can end is achieved without imparting driving contact between said chuck and a bottom interior surface of said reinforcing bead.

81.      (new)  The method according to claim 77, wherein the can end includes a reinforcing bead extending radially inward from said lowermost point of said second portion of the wall.

82.      (new) The method according to claim 77, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

83.      (new) The method according to claim 77, wherein said first and second portions of said wall of said can end lie along a substantially straight line prior to performing said seaming operation.

84.      (new) The method according to claim 77, wherein after said seaming operation said first and second portions of said can end wall intersect at an obtuse angle.

CCS0016576

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A70

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated:  August 7, 2003                                                    PATENT

85.      (new)  The method according to claim 77, wherein said chuck further comprises a second chuck wall depending from said substantially cylindrical first chuck wall, said second chuck wall being substantially frustoconical.

86.      (new)  The method according to claim 35, wherein said line between the first and second locations on said second wall portion remains inclined between about 30° and about 50° after seaming.

87.      (new)  The method according to claim 37, wherein said line between the first and second locations on said second wall portion remains inclined between about 40° and about 45° after seaming.

88.      (new)  A method of forming a double seam between a can body and a can end intended for use in packaging a carbonated beverage, said method comprising the steps of:

a) providing a can end having (i) a circumferentially extending peripheral cover hook, said peripheral cover hook comprising a seaming panel to be formed into a portion of said double seam during a seaming operation, (ii) an annular reinforcing bead, and (iii) a circumferentially extending wall extending from said seaming panel to said reinforcing bead, said wall and said reinforcing bead forming a transition therebetween;

b) placing said cover hook of said can end into contact with a circumferentially extending flange of a can body;

c) providing a rotatable chuck comprising first and second circumferentially extending walls, said second chuck wall depending from said first chuck wall so as to form a juncture therebetween;

d) bringing said chuck into engagement with said can end; and

e) performing said seaming operation by placing one or more seaming rolls into contact with said peripheral cover hook of said can end while said can end rotates so as to deform said seaming panel of said cover hook and to bend a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation.

89.      (new)  The method according to claim 88 wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 16°.

90.      (new)  The method according to claim 88, wherein said line extending from said first location to said transition is inclined between about 30° and about 50° with respect

CCS0016577

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A71

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003                                    PATENT

to said axial centerline of said can end both before and after performing said seaming operation.

91.    (new) The method according to claim 90, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 26°.

92.    (new) The method according to claim 88, wherein said line extending from said first location to said transition is inclined between about 40° and about 45° with respect to said axial centerline of said can end both before and after performing said seaming operation.

93.    (new) The method according to claim 92, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward through an angle of at least about 36°.

94.    (new) The method according to claim 88, wherein at least a portion of said portion of said can end wall bent upwardly during said seaming operation is bent upward into a substantially cylindrical configuration.

95.    (new) The method according to claim 88, wherein said wall of said can end is substantially frustoconical prior to performing said seaming operation.

96.    (new) The method according to claim 88, wherein said first wall of said chuck is oriented so as to be inclined with respect to an axial centerline of said chuck by no more than about 4°.

97.    (new) The method according to claim 88, wherein said first wall of said chuck is substantially cylindrical.

98.    (new) The method according to claim 97, wherein said said second chuck wall being substantially frustoconical.

99.    (new) The method according to claim 88, wherein the distance from a lowermost point on said annular bead to the uppermost point on said cover hook defines a height of said can end, and said seaming operation increases said height of said can end.

100.    (new) The method according to claim 88, wherein

f) said annular bead has an interior surface thereof;

g) said seaming operation comprises (i) performing a first seaming operation by placing a first seaming roll into contact with said can end curl while said can end is rotated so as to partially deform said cover hook and a first portion of said can end wall and said can body flange into a partial seam, and (ii) performing a second seaming operation by placing a second seaming roll into contact with said partially

CCS0016578

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A72

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

deformed can end cover hook so as to further deform said cover hook and said can end wall first portion and said can body flange so as to further form said seam;

h) said rotation of said can end during said first seaming operation is accomplished without imparting driving contact between said chuck and said can end bead interior surface.

CCS0016579

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A73

DOCKET NO.: CC-3397; A4772US4                                        PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

## Amendments to the Drawings

The attached sheet of drawings includes changes to Figures 1 through 9. The attached sheet, which includes Figures 1 through 9, replaces the original sheet including Figures 1 through 9.

Attachment: Replacement Sheet 1

CCS0016580

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A74

## REMARKS/ARGUMENTS

### OBJECTIONS TO THE DRAWINGS AND SPECIFICATION

The pending office action states that Figures 1, 2, and 3 should be designated by a legend indicating that the Figures illustrate only "that which is old." On the attached replacement sheet 1, Figures 1, 2, and 3 each bear the designation "Prior Art" to overcome the objection to the drawings.

The office action also states that the specification improperly incorporates essential matter by reference to foreign applications or patents. Without taking a position regarding whether the matter contained in the referenced documents constitutes essential matter, this amendment replaces the references to the EP application, EP patent, and international application in the specification with a reference to the specification (or a portion thereof) of the patent number of the corresponding U.S. patent. Accordingly, the specification after entry of this amendment refers only to material in a United States patent, thereby overcoming the objection without the need for a declaration or affidavit.

### REJECTIONS OF THE CLAIMS

All of pending claims 11 – 41 have been rejected under Section 103 based on United States Patent Number 5,911,551 ("Moran 551") in view of Japanese Utility Model Application No. 57-117323 ( the "JP Reference"). Applicants submit that the rejection is improper, first, because Moran 551 does not constitute prior art against the present application and, second, because the limitations of the claims are neither taught nor suggested from the cited prior art.

Claims 24 and 34 have been cancelled and replaced by new claims 68 and 76. Claims 25-33 and 35-41, which previously depended from claims 24 and 34, have been amended to depend from new claims 68 and 77, respectively. In addition, new claims 69-76 (which depend from claim 68) and new claims 78-87 (which depend from claim 77) been added to round out the scope of the claims. New independent claim 88 and dependent claims 89-100 have been added.

CCS0016585

A75

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

### The Cited Moran Reference Is Not Prior Art

Moran 551, which was asserted as prior art presumably under Section 102(e), does not constitute prior art against the present application because the claimed invention of the present application and the subject matter of Moran 551 were, at the time the invention of the present application was made, owned by the same entity. As stated in paragraphs 3 and 5 of the attached declaration of Ms. Ismay Ratliff, at the time the subject matter of the Moran 551 patent was developed and at the time the invention claimed in the 862 application was conceived and reduced practice, the subject matter of the 551 patent and the invention disclosed and claimed in the present application were owned by the same identity — CarnaudMetalbox plc.

Accordingly, the Moran 551 reference does not constitute prior art against the present application according to 35 U.S.C. § 103(c) because of the common ownership at the time the invention was made. On the basis, alone, that the primary reference -- on which the pending rejection is based — does not constitute prior art, Applicants submit that the pending claims are allowable.

### The Claimed Invention Is Patentable Over Any Other Prior Art Reference in Combination with the JP Reference

The office action states that "the angle of inclination is not given patentable weight as it does not affect the method steps claimed." (Office Action, 8/7/03, at 3). As an initial matter, Applicants submit that not giving patentable weight to the configuration of the unseamed can end, on which the method steps are performed, is incorrect as a matter of law.

In this regard, M.P.E.P. § 2116 et seq. requires that all limitations must be considered in determining patentability of a method claim, including beginning and ending materials: "The materials on which a process is carried out must be accorded weight in determining the patentability of a process." M.P.E.P. § 2116 (Edition 8, August, 2001, latest revision February 2003) (citing *Ex parte Leonard*, 187 USPQ 122 (Bd. App. 1974)). Moreover, M.P.E.P. § 2116.01 expressly states "All the limitations of a claim must be considered when weighing the differences between the claimed invention and the prior art in determining the obviousness of a process or method claim." *Id.* (emphasis in original). "[P]roper claim

CCS0016586

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A76

DOCKET NO.: CC-3397; A4772US4                                    PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

construction requires treating language in a process claim which recites the making or **using** of a nonobvious product as a material limitation. Motivation to make or use the nonobvious product must be present in the prior art for a 35 U.S.C. 103 rejection to be sustained." *Id.* (emphasis added) Accordingly, the claim limitations reciting structure of the can end before and after the method steps must be considered in determining patentability.

Furthermore, limitations relating to the "angle of inclination" should be given patentable weight because, for example, some of the claims recite reforming the can end wall in the seaming operation such that the angle of inclination of a portion of the wall is altered. For example, claim 68 recites that although "said seaming operation deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, . . . said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation" Accordingly, the numeric range of the "angle of inclination" does, in contrast the statement in the office action, "affect the method step."

Regarding the patentability of the pending claims, and as discussed in the background section of Applicants' specification, traditional unseamed metal can ends included a peripheral cover hook, a steeply inclined wall, an outwardly concave annular reinforcing bead, and a center panel. Such conventional unseamed metal can ends are joined to a metal can body by a seaming operation, in which the peripheral cover hook and can body flange are deformed together by seaming rolls to form the seam, as shown in Applicants' Figure 3.

Surprisingly, Applicants have discovered that both the thickness of the can end necessary to contain a given internal pressure and the overall diameter of the flat metal sheet from which the end is formed (that is, the "cut diameter") could be significantly reduced by providing a can end having a particular geometry, including a wall as recited in the pending claims, and deforming it *in a seaming operation* so as to produce a seamed end having a different geometry.

As shown in Figure 4 and described in the corresponding text of the instant application, the seaming operation begins by providing a can end that has a wall extending from the seaming panel portion of the cover hook 23 (the radius of the seaming panel is designated $r_2$ in Figure 4) to an annular reinforcing bead 25. The wall of the can end is then engaged by a chuck 31 having a substantially cylindrical wall 33 and an inclined wall 32, as

CCS0016587

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

shown in Figure 5. As shown in Figures 6 and 7, during the seaming operation, seaming rolls 34 and 38 deform an upper portion of the can end wall so it becomes substantially cylindrical after seaming so as to form, along with the peripheral curl, a double seam. However, the lower portion of the wall (and, of most importance for present purposes, a straight line extending between its two ends) remains inclined at an angle between about 20° and about 60° with respect to the axial centerline. The deformation of the upper portion of the wall so as to form a seam is accomplished by causing the juncture formed by the walls 32 and 33 of the chuck to engage the can end wall so that the upper portion of the can end wall is bent upwardly around the juncture by the seaming rolls. Further, the rotation of the can end is driven through driving contact between the juncture formed by the chuck walls 32 and 33 and the can end wall.

Accordingly, claim 68, for example, specifies a seaming method that comprises the step of "deforming said first wall portion such that at least a portion of said first wall portion after seaming is substantially cylindrical, . . . said line between said first and second locations on said wall remaining inclined between about 20° and about 60° with respect to said axial centerline after completion of said seaming operation." Claim 69, which depends from claim 68, further requires that "said first and second chuck walls form a juncture therebetween, and wherein the step of bringing said chuck into engagement with said can end comprises bringing said chuck wall juncture into engagement with said can end wall proximate said first location on said can end wall." Claim 70, which depends from claim 69, further requires "bending said first wall portion of said can end upwardly around said chuck wall juncture so as to permanently deform said first wall portion." Claim 25, which also depends from claim 68, specifies that "at least a portion of said can end wall first portion is reformed by bending upward by an angle of at least about 16°" during the seaming operation.

Claim 77 is similar to claim 68 but does not require that the can end have a reinforcing bead and specifies that the "first portion of said can end wall is bent upward through an angle of at least about 16°."

Claim 88 specifies that the seaming operation "bend[s] a portion of said can end wall upwardly around said juncture of said chuck walls at a first location on said can end wall, a straight line extending from said first location on said can end wall to said transition between

Page 21 of 23

DOCKET NO.: CC-3397; A4772US4
Application No.: 10/024,862
Office Action Dated: August 7, 2003

PATENT

said can end wall and said reinforcing bead inclined between about 20° and about 60° with respect to said axial centerline both before and after said seaming operation."

Claim 11 specifies that "rotation of said can end during said first seaming operation driven by said rotating chuck through driving contact between said juncture of said first and second walls of said chuck and said inclined wall of said can end without driving contact between said chuck and said can end bead interior surface."

The claimed method for seaming the disclosed can end onto a can body is neither taught not suggested by the prior art. In particular, the JP reference shows only an end **after** seaming onto a can body and provides no details concerning the configuration of the can end prior to seaming or, more importantly, the method used to yield the seamed can end shown in the figures of the JP reference.

The JP reference merely discloses a can end in which the wall is oriented at an angle θ of 20° to 70° after the can end is deformed by the seaming operation. To the extent that the JP reference provides any disclosure of a method of seaming, it teaches away from the current invention. The JP reference explains that the seamed can ends shown in the figures of JP reference comprise "a plate-like chuck panel positioned between a chuck wall that is to be **rolled and connected to a can body . . . in such a manner that said plate-like chuck panel is inclined at 20 to 70 degrees . . . .**" (JP reference, page 1) Thus, unlike the instant invention in which the lower portion of the wall remains substantially undeformed by the seaming operation while the upper portion of the wall is deformed so as to be substantially cylindrical, the JP reference teaches that seaming is performed in such a manner as to incline the lower portion of wall at an angle of 20 to 70 degrees. This suggests that the lower portion of the can end wall prior to seaming was not inclined at such an angle but was reformed during an undisclosed seaming operation so as to achieve that angle of inclination. In general, the configuration of the can end of the JP reference prior to seaming is unknown.

The claims that depend from claims 68 and 77 further distinguish the invention from the JP reference. Dependent claims 69 and 70 (further to the explanation above) and 78 and 79 recite a chuck having two walls that form a juncture therebetween that engages the can end wall during seaming so as to deform the upper portion of the can end wall into a substantially cylindrical configuration. By contrast, the JP reference provides no information

Page 22 of 23

CCS0016589

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

DOCKET NO.: CC-3397; A4772US4                                      PATENT
Application No.: 10/024,862
Office Action Dated: August 7, 2003

concerning the shape of the chuck to be used and the manner in which it is applied to the
unseamed can end so as to deform it into a seamed can end.

Additionally, with respect to claim 11, the JP reference neither teaches nor suggests
that "said rotation of said can end during said first seaming operation driven by said rotating
chuck through driving contact between said juncture of said first and second walls of said
chuck and said inclined wall of said can end without driving contact between said chuck and
said can end bead interior surface."

## CONCLUSION

Based on the foregoing, Applicants respectfully submit that the rejection is improper
at least because (i) the primary reference relied upon (Moran) is not prior art, (ii) the
limitations relating to starting configuration of the can end prior to seaming must be given
patentable weight, and (iii) the prior art, including the JP reference, neither teaches nor
suggests the claimed method for seaming a can end having the specified configuration prior
to seaming so as to produce an end having the specified configuration after seaming.
Applicants submit, accordingly, that each of the claims is in allowable condition, and request
favorable reconsideration of the pending rejection.

Date:  February 9, 2004

Harold Fullmer
Registration No. 42,560

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA  19103
Telephone: (215) 568-3100
Facsimile:  (215) 568-3439

Page 23 of 23                              CCS0016590

Crown Packaging, et al. v. Rexam
USDC District of DE CA 05-608

A80

# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER
EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.

Case 1:05-cv-00608-MPT Document 288 Filed 02/26/2007 Page 84 of 98



A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1993 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 1993 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language,
unabridged: a Merriam-Webster/editor in chief, Philip Babcock
Gove and the Merriam-Webster editorial staff.
    p.    cm.
    ISBN 0-87779-201-1 (blue sturdite).—ISBN 0-87779-202-X
(carrying case). — ISBN 0-87779-206-2 (imperial buckram).
    1. English language—Dictionaries.    I. Gove, Philip Babcock,
1902–1972.    II. Merriam-Webster, Inc.
PE1625.W36 1993
423–dc20                                        93-10630
                                                   CIP

*All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA
454647AG/H959493

A82

**23**                                                                 **adaptation**

fr. acuta
MIXTURE
measure
ographic

/-EST [L
akin to
rp point
less than
out that
JLE Illus-
of acute
pointed
iment or
INTERAT-
—Elinor
b : sens-
nsitively
istead of
: —A.L.
\an ~
r power-
ident ...
5 a med
<~ infec-
et, sharp
I) — op-
ases (an
attention
ation, or
after the
nt mark
\an ~
te accent

indicates
manding
atimately
ression of
te —S.E.
became
llege was
CRITICAL,
and may
s reached
and con-
ndition in
synthetic
is a year
situation,
implies a
ntinuous
ering of a
next, few
American
yn see in

vowel is
c), that a
t a vowel
est degree
or that a
. in maté)
an acute
ction)
ition re-

m intoxi-
cs that is
ters with
coordina-
dehydra-
ed from

rmed by

y
he higher
p mixture
ite <~ of
ol) <~ of
in which
lt of toxic

] : sharp»
lantar] of
us sharp

: acutely

aiara't : a

and as- before s ⟨assell⟩ and at- before t ⟨attune⟩ and ad- be-fore other sounds ⟨adnominal⟩ ⟨adverbial⟩ but sometimes ad-even before one of the listed consonants ⟨adpronominal⟩ 2 : near : adjacent to — in this sense always in the form ad- ⟨adoral⟩ ⟨adrenal⟩

-ad \"\ n suffix -s [MF & L; MF -ade, fr. L -ad-, -as, fr. Gk -ad-, -as, fem. suffix denoting descent from or con-nection with] 1 a : period of time ⟨quinquenniad⟩ b : group, aggregate, or unit of (so many) parts ⟨quintad⟩ c : element, atom, or radical having (such or so great) a chemical valence ⟨artiad⟩ ⟨perissad⟩ ⟨dyad⟩ 2 : epic of : poem celebrating ⟨Columbiad⟩ 3 [prob. fr. NL -ad-, -as (used as final element in botanical genus names), fr. Gk] : member of (such) a botanical group ⟨magnoliad⟩ ⟨moringad⟩ 4 : kind of plant or animal produced by or associated with ⟨ecad⟩ ⟨variad⟩ — -ad-io \adik, -ēk\ adj suffix

2-ad \"\ adv suffix [L ad] biol : in the direction of : toward — -WARD ⟨cephalad⟩ ⟨ventrad⟩

3ad abbr 1 adapted 2 administration 3 addition

AD abbr 1 active duty 2 often not cap after date 3 air-dried 4 alternate days 5 [L anno domini] in the year of our Lord — loften printed in small capitals 6 often not cap [L ante diem] before the day 7 archduke 8 assembly district 9 autograph document 10 average deviation

ad-ab-sur-dum \,adsb'sordsm\ adv [L] : to the point of ab-surdity (not slavishly imitate it ad absurdum —Frank Weiten-kamp)

adac-tyl-ia \,ā,dak'tilēa\ n -s [NL, fr. 2a- + -dactylia] : con-genital lack of fingers or toes

adac-ty-lous \(')ā'daktalas\ adj [2a- + -dactylous] 1 : with-out fingers or without toes 2 : without claws on the feet — used of crustaceans

adad interj [prob. by alter.] archaic : EGAD

2adad \"ä,dād\ n -s [prob. fr. Marshallese ādād, a species of Triumfetta] : a coarse fiber made from the stems of pilewort

adag abbr adagio

1ad-age \'adij, -ēj\ n -s [MF, fr. L adagio, adagium, fr. ad- + -agio, -agium (akin to aio I say, fr. — assumed — OL agio); akin to Gk ē he spoke, Arm asem I say] : a saying typically embodying common experience or observation often in meta-phorical form (as it is always darkest before the dawn)

2adage \ädäzh\ n -s [F, modif. of It adagio] : ADAGIO 2

1ada-gi-et-to \ə,dijē'ed-(,)ō, ,ä,-, -ēzhē^, ,ado'je-\ n -s [It, dim. of adagio] : a short adagio

2adagietto \"\ adv (or adj) [It, fr. adagietto, n.] : less slow than adagio — used as a direction in music

1ada-gio \ə'däj(,)ō, ä'dä[,a'da](,)ō,(,)zhē,jē,ō,[zhē]ō\ adv (or adj) [It, fr. ad, a to, at (fr. L ad) + agio ease, convenience, fr. Prov. aize comfort, fr. L adjacens, pres. part. of adjacēre to be near — more at AT, EASE] : SLOWLY : in an easy graceful manner : in a tempo between largo and andante — used chiefly as a direction in music

2adagio \"\ n -s [It, fr. adagio, adv.] 1 : a musical composi-tion or a movement or division of a composition in adagio tempo (the ~ of a symphony) 2 a : a series of sustained and perfectly controlled dance movements (as ballet exercises) displaying balance and grace b : a ballet duet by a man and woman or a ballet by a mixed trio displaying difficult feats of balance, lifting, or spinning; also : an acrobatic or ballroom duet with similar feats

adagy n -ES [L adagium] obs : 1ADAGE

adai \ə'dāi\ n, pl adai \"\ or adaize \-āz\ usu cap [F, prob. fr. Caddo] 1 : a Caddo people of Louisiana 2 : a member of the Adai people

ada-lat \ə'dālat, -äl-\ or adaw-lut \-ol-\ n -s [Hindi 'adālat, fr. Ar, 'adālat, 'adālah justice, equity] : any of several courts of justice operative in India until the late 18th century

1ad-am \'adom\ n -s cap [after Adam, the first man of the Bible, who sinned in the Garden of Eden (Gen 2 & 3), fr. ME, fr. LL, fr. Heb Adhām] : the unregenerate nature of man : human frailty — used esp. in the phrase the old Adam (a good deal of the old Adam in the rascal)

2adam \"\ adj, often cap [after Robert Adam †1792 & James Adam †1794 Scottish architects and designers] 1 of furniture : designed in a late 18th century style resembling Sheraton but differing from it in greater preference for straight lines and decoration of surfaces (as by carving, inlaying, and painting) and in more consistent use of conventional designs (as fes-tooned garlands and medallions) and in occasional employ-ment of superimposed ornaments (as vases and urns) 2 of architecture : in a late 18th century style characterized by an ordered use of classic ornament derived from contemporary archaeological discoveries in Italy

ad-a-man-cy \'adəmənsē\ n -ES [²adamant + -cy] : unyielding quality : condition or fact of being adamantine : STUBBORN-NESS, OBSTINACY

ad-am-and-eve \,+ən'(d)ēv\ n -S [so called fr. the resem-blance of the bulbs to human figures] : any of several plants of the genera Aconitum, Arethusa, Corallorhiza, Orchis, and Pulmonaria; esp : PUTTYROOT

1ad-a-mant \'adəmənt\ also -mant or -,maa(ə)nt\ n -s [ME, a fabulous mineral, diamond, lodestone, fr. OF, fr. L ada-mant-, adamas hardest iron or steel, diamond, fr. Gk] 1 : an imaginary stone of impenetrable hardness — formerly used of the diamond and other substances of extreme hardness

1ad-am-ite \'adə,mīt\ n -s usu cap [Adam, the biblical first man + E -ite] 1 : a person who imitates Adam in going naked; specif : a member of any of various ascetic sects noted for prac-ticing ritual nakedness in secret religious assemblies and dis-pensing with marriage on the basis of having entered a reborn state of heavenly innocence 2 : a descendant of Adam : a human being

2adamite \"\ adj, usu cap : of, relating to, or descended from Adam

3adamite \"\ also ad-am-ine \'adə,mēn\ n -s [adamite, modif. (influenced by -ite) of F adamine, fr. Gilbert-Joseph Adam †1881 Fr. mineralogist + F -ine; adamine fr. F] : a mineral $Zn_2(OH)AsO_4$ consisting of a basic zinc arsenate (hardness 3.5, sp. gr. 4.34–4.35)

ad-am-it-ic \,adə'mid-ik\ adj, usu cap [¹adamite + -ic] : hav-ing the characteristics of or resembling Adam and the Adamites (in a state of ~ nudity —Norman Douglas)

ad-am-it-ism \'adə,mīd-,izəm\ n -s usu cap : the practice of going naked : a state of being unclothed

adams pl of ADAM

adam's ale n, usu cap 1st A [after the biblical Adam; fr. its being provided by nature and thus presumably being the only drink in the Garden of Eden] : WATER

1adam's apple n, usu cap 1st A 1 : PLANTAIN 2 : CRAPE JASMINE 3 : SHADDOCK 1

2adam's apple n, usu cap 1st A 2 [trans. of NL pomum Adami, trans. of LHeb tappūah hā ādhām bodily protu-berance on a man, misinterpreted (because of double mean-ings in Heb) as the apple of Adam] : the projection formed by the thyroid cartilage in the neck particularly prominent in males — compare LARYNX

adam's cup n, usu cap A [so called fr. the shape of its leaves] : PITCHER PLANT a

adam's fig n, usu cap A : PLANTAIN

adam's flannel n, usu cap A [so called fr. the texture of the leaves] : MULLEIN

ad-ams-ite \'adəm,zīt\ n -s [Roger Adams b1889 Am. chemist + E -ite] : a yellow crystalline arsenical $C_{12}H_9AsClN$ similar in action to diphenylchloroarsine — called also diphenylaminechlorarsine, phenarsazine chloride

adam's needle also adam's needle-and-thread n, usu cap A [so called fr. the shape of the fruits] 1 : any of several species of the genus Yucca 2 adam's needles pl : LADY'S-COMB

adam's pitcher n, usu cap A : PITCHER PLANT a

ada-na \'äd^n,ä\ adj, usu cap [fr. Adana, Turkey] : of or from Adana, Turkey : of the kind or style prevalent in Adana

ad-anal \(')a,dān^l\ adj [ad- + anal] : near the anus (~ setae)

adance \ə^-\ adj [¹a- + dance (v.)] : DANCING

adan-gle \ə^-\ adj [¹a- + dangle (v.)] : DANGLING

ad-an-so-nia \,ad^n'sōnēə, a,dan^-, -nyə\ n, cap [NL, fr. Michel Adanson †1806 Fr. botanist + NL -ia] : a genus of trees (family Bombacaceae) having palmately divided leaves, white pendent flowers, and capsular fruits — see BAOBAB, CREAM-OF-TARTAR TREE

adap-i-dae \ə'dapə,dē\ n pl, cap [NL Adapid-, Adapis, type genus + -idae] : a family of extinct lemuroid primates widely distributed in the northern hemisphere during the Eocene and generally considered to be ancestral to modern lemurs

ad-a-pis \'adəpəs\ n, cap [NL] : a genus of primitive crested fossil lemurs from the Eocene of Europe

1adapt \ə'dapt also a^-\ vb -ED/-ING/-S [F or L; F adapter, fr. L adaptare, fr. ad- + aptare to fit, fr. aptus fit — more at ART] vt 1 a : to make suitable or fit (as for a particular use, purpose, or situation) : FIT, SUIT (the toughness of the ma-terial ~s it for many uses) b : to make suitable (for a new or different use or situation) by means of change or modifica-tions (he ~ed the novel for the stage) c : his instruction to meet individual needs —P.H.Furley) 2 : to adjust (oneself) to particular conditions or ways : bring (oneself) into harmony with a particular environment : ACCLIMATIZE (I could ~ myself to the isolated life —Ella E. Clark) (a given environment with organisms ~ing themselves to it —A.N. Whitehead) ~ vi 1 : to become adjusted; specif : to bring one-self or esp. one's acts, behavior, or mental state into harmony with changed conditions or environment (man ~s socially to an increasingly complicated . . . culture —J.F.Brown)

SYN ADJUST, ACCOMMODATE, CONFORM, RECONCILE: to adapt to something or to ADAPT one thing to another implies a suiting or fitting by alteration or modification (to see men only in terms of the geographical conditions to which they adapt themselves —Alfred Kazin) (our plans must change in adapt-ing to the new situations —Hugo Wall) (the inside walls are all movable so that the interior can easily be adapted to meet new requirements —London Calling) To ADJUST to something or to ADJUST one thing to another usu. suggests no significant alteration or modification but rather a bringing into a corre-spondence or harmony, prearranged or clearly possible but not quite achieved previously (the main problem confronting the child is not yet to adjust to a cultural milieu but primarily to adjust to the rapidly changing phases of his biological growth —Franz Alexander) ACCOMMODATE often suggests the special or transient adaptation of one thing to another or of two things to each other, implying a significant difference overcome in a specially arranged, temporary, or expedient

A83

**beacon**                                                                      **190**

light and inspiration ⟨the ~ to the oppressed of all countries
—Adrienne Koch⟩ ⟨a ~ for creative artists the world over
—A.R.Katz⟩  **5** *heraldry* **:** a fire basket usu. depicted in-
flamed set up on a pole against which a ladder leans **:** CRESSET
²**beacon** \"\ *vb* -ED/-ING/-S *vt* **1 a :** to light as a beacon ⟨the darkness
where the hedgers had been at work ~ed —Adrian Bell⟩  **b :** to give light to **:** inspire and guide **:** sum-
mon to achievement ⟨one truth would dimly ~ me —Robert
Browning⟩  **2 :** to furnish or mark with a beacon ⟨~ the
headland⟩ ~ *vi* **:** to shine as a beacon ⟨then Adventure ~ed
from far off, and his heart leapt —Maurice Hewlett⟩
**bea·con·age** \-nij\ *n* -S **:** charges levied for the maintenance
of beacons
**bea·con·ed** \-nit\ *n* -S *usu cap* [A. *Beacon* to the Society of
Friends, book by Isaac Crewdson †1844 Eng. religious leader
+ E -*ite*] **:** a member of an English party of Quakers that were
led by Isaac Crewdson to secede from other English Quakers
in 1836 on the basis that the doctrines of the latter were
scripturally unsound
**bea·con·less** \'bēkənlis\ *adj* **:** being without a beacon
**bea·con·ry** \'bēkənrē\ *n* -ES **:** the technique of using radio
beacons
¹**bead** \'bēd\ *n* -S *often attrib* [ME *bede* prayer, prayer bead, fr. OE
*bed, gebed* prayer;
akin to OHG *beta*
request, *gibet* prayer,
Goth *bida* prayer,
OE *biddan* to entreat,
pray — more at BID]
**1 a obs :** PRAYER,
SUPPLICATION — usu.
used in pl. **b :** beads
*pl* **:** a series of prayers
and devotional
meditations made
with the use of a rosary ⟨saying his ~s in
solitude⟩  **2 a :** a small often round piece of stone, glass, shell,
wood, metal, or other material that is pierced for threading
on a string or wire ⟨the ~s of the necklace⟩ ⟨~s for trade with
the natives⟩ ⟨children stringing ~s⟩; *specif* **:** a bead of a
rosary  **3** beads *pl*  **a :** ROSARY ⟨~s blessed by the bishop⟩
**b :** a necklace of beads or pearls  **4 :** a drop like a bead or a
small body shaped like a ball ⟨letting the ~s of bead pour as
easily as sand —Kay Boyle⟩:  **a :** a drop of sweat or blood
⟨~s of pain broke out on her forehead —Ellen Glasgow⟩ **b :** a
minute bubble formed in or on a beverage; *specif* **:** the bubbles
that are formed on the surface of a distilled beverage when it
is shaken and that by their number and duration may indicate
proof and quality ⟨this whiskey holds a good ~⟩  **c :** a small
knob of metal on a firearm near the muzzle used for a front
sight in aiming ⟨to draw a ~ on a target⟩ **:** AIM ⟨to take a ~
on a man⟩  **d :** a blob of weld metal or a continuous deposit
of weld metal blobs  **e :** the globule of precious metal obtained
by the cupellation process in assaying  **f :** a glassy drop of
flux (as borax or microcosmic salt) used as a solvent and color
test for several metallic oxides and salts (as of iron, manganese)
that is formed by fusion in the loop of a usu. platinum wire
**g :** one of a series of tiny bosses or raised dots on a coin,
token, medal, or plate  **5 :** a projecting rim, band, or mold-
ing: **a :** a small salient molding of rounded surface, continu-
ous or broken, the section being usu. an arc of a circle —
compare ASTRAGAL **1 b :** any of various pieces or members
(as a parting strip) usu. having a section somewhat like such
a molding  **c :** a similarly rounded or cordlike projecting band
(as the exposed portion of the headband of a book or a pro-
jecting band round a metal box)  **d :** one of the strips around
the inner periphery of a pneumatic tire shaped often with
external ridge or rounded fold for engaging the rim of a
wheel  **e :** a wood or metal strip embedded in the plaster at a
salient corner of a wall and serving as a guide and support
for the plaster  **f :** an extended rounded rim or flange (as on
a pot or kettle)  **g :** a ledge below the finish on a glass jar
or bottle to aid in removal of pry-off closure  **h :** a groove or
rounded elevation on the surface of a metal can, fiber drum,
glass jar, or metal closure to improve appearance and to
stiffen  **i :** the outer edge of circled heading that fits into the
croze of barrel staves  **j :** a raised ridge on sheet metal
²**bead** \"\ *vb* -ED/-ING/-S *vt* **1 :** to trim, furnish, or adorn with
beads or beading **:** cover with beads  **2 :** to string together
like beads ⟨row houses ~ed together⟩  **3 :** to cause beads to
develop on ⟨her face was flushed and rosy; ~ed with small
particles of rain —Thomas Wolfe⟩ ⟨tears were ~ing Dorinda's
lashes —Ellen Glasgow⟩  **4 :** to form a bead on (as sheet
metal) ~ *vi* **1 :** to form into a bead **:** develop as beads ⟨sweat
~ed on his forehead —Hartley Howard⟩  **2 :** to take aim
⟨the major ~ed too low⟩
**bead and butt** *n* **:** framing in which the panels are flush, having
beads stuck or run upon the two edges with the grain
**bead and flush** *n* **:** flush-bead work
**bead and reel** *n* **:** a round convex molding with disks alternat-
ing singly or in pairs with oblong
beads
**bead chain** *n* **:** a chain formed of
small hollow metal spheres con-
nected by short dumbbell-shaped
metal links that is used usu. in



beads 5a: *A* cock bead; *B, C* quirk
beads; *D* double-quirked bead

---

**bead pointing** *n* **:** masonry pointing that forms a protruding
bead
**bead·roll** \'₁₁\ *n* [¹bead + roll] **1** *archaic* **:** a list of persons
for whom prayers were to be said  **2 :** an often long list or
series of names **:** CATALOG ⟨the ~ of substantive and note-
worthy poems in English —George Saintsbury⟩  **3 :** ROSARY
**4 :** a bookbinder's finishing roll designed to impart a bead
pattern
**bead-ruby** \'₁,₁⁰\ *n* **:** FALSE LILY OF THE VALLEY
**beads** *pl of* BEAD, *pres 3d sing of* BEAD
**bead saw** *n* **:** a short saw with a curved blade and backward-
pointing teeth that is used for scoring grooves in window
and door frames in preparation for weatherstrips
**beads·man** *also* **bedes·man** \'bēdzmən\ *or* **bede·man** \-dmən\
*n, pl* **beadsmen** [ME *bedeman*, fr. *bade* prayer, prayer bead +
*man* — more at bead] **1 :** one who prays for the soul
of another — used until the 17th century in England in letters
as a complimentary close ⟨your grace's ~ and servant⟩
**2 a :** an almshouse inmate usu. charged with praying for the
souls of his benefactors  **b :** a licensed beggar in Scotland
⟨a king's ~ being given a blue gown on the king's birthday⟩
**bead snake** *n* [so called fr. its markings resembling beads]
**:** the common venomous coral snake (*Micrurus fulvius*) of
southeastern No. America
**bead tree** *n* [so called fr. its bright scarlet seeds, used for
necklaces] **1 :** CHINABERRY  **2 :** NECKLACE TREE  **3 :** RED
SANDALWOOD 2
**beadwork** \'₁,₁⁰\ *n* **1 :** ornamental work in beads  **2 :** joinery
beading
**beady** \'bēdē, -di\ *adj* -ER/-EST **1 :** seeming to resemble beads
**:** small, round, prominent, and intent esp. with interest or
greed (a look of avid interest crept into the ~ eyes of the priest
—T.B.Costain⟩  **2 :** marked by bubbles or beads ⟨a ~ liquor⟩
**bea·gle** \'bēgəl\ *n* -S [ME *begle*] **1 :** a small short-legged
smooth-coated hound said to have originated as a definite
breed in England at least four centuries ago, being about 12
to 15 inches high with pendulous ears and coat of hound
colors, the tricolor being common  **2 a :** CONSTABLE **:** sheriff's
officer **:** SPY  **b :** a zealous aide given to ferreting ⟨the senator's
~s probing the deal⟩  **3** *usu cap* **:** VIRGINIAN — used as a nick-
name
²**beagle** \"\ *vi* beagled; beagled; beagling \-g(ə)liŋ\ beagles
**:** to hunt game with a beagle or a pack of beagles
**bea·gler** \-g(ə)lə(r)\, *n* -S **:** one that beagles
**bea·gling** *n* -S **:** hunting with beagles
¹**beak** \'bēk\ *n* -S [ME *bec*, fr. OF, fr. L *beccus*, fr. Gaulish]
**1 a :** the bill of a bird; *sometimes* **:** the bill of a bird of prey
adapted for striking and tearing — often distinguished from
*bill*  **b :** the long projecting sucking mouth of some insects and
other invertebrates (as in the typical bugs)  **c :** the bill of some
other animals (as the turtle and octopus)  **d** (1) **:** the tip of
the umbo of a bivalve shell or a brachiopod (2) **:** the prolonga-
tion of certain univalve shells containing the canal  **e :** the
human nose ⟨his face, with small ~ and the pricked skin of
smallpox —Saul Bellow⟩  **f :** the projecting bony elements of
the jaws of a fish (as in the pike) or of the upper jaw only (as
in swordfish or sawfish) or of the lower jaw alone (as in the
halfbeak)  **2 a :** PEAK  **b :** a beam shod or armed with a metal head
or point projecting from the bow of an ancient galley for
piercing the ship of an enemy  **c :** PROMONTORY  **d** (1) **:** the
spout of a vessel (as a teakettle) (2) **:** the tapering tube of a
retort  **e :** one of the jaws of a forceps or pliers  **f :** a contin-
uous slight architectural projection ending in an arris or nar-
row fillet **:** the part of a drip from which water is thrown off
— see MOLDING illustration  **g :** a process terminating the
fruit or other parts of a plant and somewhat resembling the
beak of a bird; *esp* **:** a short awn on the outer chaff of wheat
**h :** the mouthpiece of a musical instrument (as the flageolet,
clarinet, or flûte à bec)  **3** *a chiefly Brit* **:** MAGISTRATE, JUSTICE
OF THE PEACE  **b :** a master at certain British public schools
²**beak** \"\ *vt* -ED/-ING/-S [ME *beken*, fr. OF *bequer, bequier*, fr.
*bec*] **1 :** PECK **:** peck at **:** strike or seize with the beak
**beaked** \'bēkt, 'bēkəd\ *adj* [¹beak + -ed] **1 :** having a beak:
**a :** ROSTRATE ⟨a ~ fruit⟩ **b :** having a mouth or proboscis re-
sembling a beak  **2 a :** resembling a beak ⟨a gaunt, grizzled
man of middle age, with a ~ nose —Ellen Glasgow⟩ **b :** having
a beaked nose ⟨a gaunt, ~ lady of eighty-odd —Frances G.
Patton⟩
**beaked cockle** *n* **:** a mollusk of the genus *Nuculana* or family
Nuculanidae — called also *elongate nut shell*
**beaked hazel** *or* **beaked hazelnut** *n* **:** an American hazel
(*Corylus cornuta*) with involucral bracts that enclose the nut
and form a tubular beak
**beaked nightshade** *n* **1 :** BUFFALO BUR
**beaked parsley** *n* **:** CHERVIL 1
**beaked salmon** *n, Austral* **:** SANDFISH
**beaked whale** *n* **:** a toothed whale of the family Ziphiidae
**¹beak·er** \'bēkə(r)\ *n* -S [ME *biker*, fr. ON *bikarr*, prob. fr. OS
*bekari*; akin to OHG *behhari* beak-
er; both fr. a prehistoric OHG-
OS word derived fr. ML *bicarius*
goblet, beaker, fr. Gk *bikos* earth-
en jug. prob. of non-IE origin]
**1 :** a large drinking cup without



bead and reel



gro·bi·an·ism \ˌgrō-bē-ə-ˌnizəm\ *n* -S : behavior typical of a grobian : BOORISHNESS

gro·cer \ˈgrōsə(r)\ *n* -S [ME *grocer, grosser* wholesale merchant, grocer, fr. MF *grossier* wholesale merchant, fr. *gros* thick, coarse, wholesale + -*ier* -er — more at GROSS] : a dealer in staple foodstuffs (as coffee, sugar, flour) and usu. meats and other foods (as fruits, vegetables, dairy products) and many household supplies (as soap, matches, paper napkins)

grocer's itch *n* : an itching dermatitis prob. allergic in nature that results from prolonged or repeated contacts with certain mites esp. of the family Acaridae, their products, or materials (as feeds, flour, or copra) infested by them — compare GRAIN ITCH

gro·cery \ˈgrōs(ə)rē, -ri\ *n* -ES [ME *grocerie,* fr. *grocer* + -*ie* -y] 1 *groceries pl a* : articles of food and other goods sold by a grocer (went out to buy some *groceries*) ⟨a bag of *groceries*⟩ — usu. sing. in Brit. usage (had been sent with a parcel of ~ to the cottage —Sabine Baring-Gould) b *dial* : intoxicating drink : LIQUOR 2 or grocery store a : the place of business of a retail grocer : a grocer's store b *dial* : BARROOM

gro·cery·man \-mən, -ˌman, -ˌmaa(ə)n\ *n, pl* grocerymen : GROCER

gro·ce·te·ria \ˌgrōsə'tirēə\ *n* -S [*grocery* + -*teria*] : a self-service grocery store

groe·nen·dael \ˈgrŭlnən̩ˌdil, -rōn-,-ˌrän-,-ren-\ *n* -S *usu cap* [fr. *Groenendael,* village in Belgium where it was developed] : a black-coated Belgian sheepdog with a heavily plumed tail — compare MALINOIS

groff \ˈgrŭf\ *Scot var of* ORUFF

¹grog \ˈgräg, also ˈgrȯg\ *n* -S [fr. *Old Grog,* nickname of Edward Vernon †1757 Eng. admiral who ordered the sailors' rum to be diluted; *Grog* short for *program;* fr. his habit of wearing a grogram cloak in bad weather] 1 : spirituous liquor; *specif* : liquor (as rum) cut with water and now often served hot with lemon juice and sugar sometimes added 2 : fired refractory material (as crushed pottery, firebricks) used in the manufacture of products (as crucibles) designed to resist extreme heat

²grog \ˈ\ *vb* grogged; grogged; grogging; grogs *vi* 1 : to drink grog (had been *grogging* with the steward —Lyndall Hadow) ~ *vt* : to soak (a liquor cask) with hot water so as to draw out the spirits from the wood

grog blossom *n* : RHINOPHYMA

grog·ger *var of* GRAGER

grog·gery \ˈg(r)ə\ *n* -ES [¹*grog* + -*ery*] 1 : a usu. low-class barroom 2 : a liquor store : PACKAGE STORE

grog·gi·ly \ˈgäle, -li\ *adv* : in a groggy manner : DAZEDLY ⟨~ opened his eyes⟩ : UNSTEADILY ⟨groped his way ~ across the room⟩

grog·gi·ness \ˈgēnəs, ˌgin-\ *n* -ES : the quality or state of being groggy

grog·gy \ˈgē, ˌgi\ *adj, usu* -ER/-EST [¹*grog* + -*y*] 1 *archaic* : INTOXICATED, DRUNK 2 *a of a horse* : weakened (as from age, overwork, or disease) in the fetlock joints and entire forelegs so as to have a hobbling gait marked by the knuckling over of the fetlock joints b *of a boxer* : weakened from fighting and esp. from blows on the head so as to be unsteady on the feet or to stagger and to have an impaired consciousness 3 : weak, sleepy, exhausted, ill, or otherwise physically affected in such a way as to be sluggish in one's reactions, torpid mentally, and usu. unsteady on the feet ⟨LOGY, FOGGY, DAZED, MUDDLED⟩ 4 : tending to wear away ⟨pumice and other soft ~ materials⟩ or crumble ⟨a ~ tooth⟩ or collapse ⟨a ~ old wooden tower⟩

gro·gnard \(ˌ)grō(ˈ)nyǟr\ *n* -S [F, fr. *grogner* to grunt, grumble (fr. OF *gronir, grogner,* fr. L *grunnire* to grunt) + -*ard*] 1 : an old soldier 2 *often cap* : a soldier of the original imperial guard that was created by Napoleon I in 1804 and that made the final French charge at Waterloo

grog·ram \ˈgrägrəm, -ˈrȯg-\ *n* -S [modif. of MF *gros grain* large grain, coarse texture] 1 : a coarse loosely woven fabric of silk or of silk and mohair or orig. of silk and wool and often stiffened with gum 2 : a garment (as a coat) made of grogram

grog·shop \ˈr₊s₊\ *n, chiefly Brit* : a usu. low-class barroom : GROGGERY

¹groin \ˈgrȯin\ *n* -S [ME, fr. MF, fr. LL *grunium,* fr. L *grunnire* to grunt — more at GRUNT] *dial Brit* : the nose and sometimes the upper lip of an animal (as a swine)

²groin \ˈ\ *n* -S [alter. (influenced by ¹*groin*) of ME *grynde,* fr. OE, abyss; akin to OE *grund* ground — more at GROUND] 1 : the fold or depression marking the line between the lower part of the abdomen and the thigh; *also* : the region of this line — called also *inguen* 2 a (1) : the projecting edge formed by the curved line along which two intersecting vaults meet (2) : a rib (as of wood, stone) designed to cover this edge b (1) : the curved surface of a vault — not often in technical use (2) : the spandrel of a vault — not often in technical use 3 *also* groyne \ˈ\ : a rigid structure built out at an angle



groins 2a(1)

time — *ing* meant before he ventured out) ⟨make neat⟩ ⟨make tidy ⟨a carefully ~*ed* lawn⟩ c : to remove crudity or other objectionable features from : make smooth or elegant : POLISH, REFINE ⟨was master of the epigram which Wilde was later to ~ for the drawing room —Maurice Edelman⟩ d : to get into readiness for some specific objective : READY, PREPARE ⟨was being ~*ed* as a presidential candidate⟩ ⟨~*ing* players for the Olympics⟩ ~ *vi* 1 : to groom oneself (is said to be ~*ing* for the top position) ⟨~*ing* for dinner⟩

³groom \ˈ\ *n* -S [origin unknown] *dial Eng* : a forked stick used by thatchers

groom's cake *n* : a light fruitcake served at a wedding

grooms·man \ˈ-mzmən\ *n, pl* groomsmen : a man (other than the best man) who attends a bridegroom at his wedding

groop \ˈgrŭp, -ū-\ *n* -S [ME *grope, groupe,* fr.₊MD *grope, groepe* — more at GRIP] *dial Eng* : DITCH, DRAIN

¹groove \ˈgrŭv\ *n* -S [ME *grofe, groof;* akin to OHG *gruoba* pit, cave, ON *grōf,* Goth *groba* pit, cave, OE *græfan* to dig — more at GRAVE] 1 *dial Eng* : a mining shaft : MINE 2 a : a long narrow hollow or channel made artificially in a surface: as (1) : the rectangular rabbet in the edge of a board designed to receive the tongue of another board in matching (2) : one of the spiral cuts of rifling (3) : the indentation on the bottom of a piece of printing type between the feet — compare NICK (4) : one of the cuts made across the back of an unbound hand-sewn book designed to receive the cords that secure the covers of the book — called also *kerf* (5) : the track on a phonograph record along which the stylus travels b : a long narrow depression occurring naturally on the surface of an organism or an anatomical part c : a long narrow furrow produced along a surface by a continuing erosive or otherwise wearing force (as of flowing water) 3 a (1) : a fixed routine : settled course (had hoped that the daily life on the farm would slip back into orderly ~*s* —Ellen Glasgow) : HABIT, CUSTOM, PRACTICE (will get you into the writing ~ —Cy Lance) (2) : an undeviating tiresomely predictable and often mechanical way of living or acting or thinking : RUT (walled in by authority which saw to it that he moved in ~*s* —E.A.Swinnerton) ⟨fail to realize how often their thoughts revolve in ancient ~*s* and circles —Thomas Munro⟩ b : a situation (as a profession, a way of living or acting) best suited to one's abilities or interests : NICHE (found his ~ in advertising —*Newsweek*) 4 : an imaginary line from the pitcher to the catcher representing the course of a pitched ball in the game of baseball; *esp* : such a line passing over the center of the plate about waist high — usu. used with *the* (hurled the ball right down the ~) 5 a : top form (after a couple of measures the jazz trio really got into the ~) ⟨a hot bath and, a drink will put you back in the ~⟩ ⟨it made no difference, when he was in the ~, what he chose to talk about —Henry Miller⟩ b : currently favored style — usu. used in the phrase *in the groove* (a new song that's right in the ~)

²groove \ˈ\ *vb* -ED/-ING/-S *vt* 1 a (1) : to make a groove in : provide with a groove ⟨a set of scenery that is *grooved* and quickly movable⟩ (2) : to make a disc recording of ⟨*grooving* a popular song as soon as it is written⟩ b (1) : to join by a groove ⟨wide boards that had been *grooved* together⟩ (2) : to cause to be fixed into a groove : cause to be ingrained ⟨a deeply *grooved* habit of honesty⟩ c : to hollow out in the form of a groove : FURROW (the experience that has been *grooved* into a person) (the years had *grooved* her mind that way —Bob Hope) 2 : to execute (as the delivery of a ball, the swing of a golf club) with maximum control and effect ⟨*grooved* the ball down the bowling alley⟩ ⟨developing a *grooved* swing⟩; *esp* : to pitch down the center of the groove ⟨*grooved* a fast ball past the batter⟩ ~ *vi* 1 : to become settled into a groove : move in a groove ⟨*grooving* along in the routine of the job⟩ 2 : to become joined or fitted by a groove ⟨elements of this rather intricate artistic pattern seem to ~ into each other —Scott Fitzgerald⟩ 3 : to form a groove ⟨eyes with faint white wrinkles at the corners that *grooved* merrily when he smiled —Ernest Hemingway⟩

³groove \ˈ\ *adj* : produced through a narrow deep opening formed at the free end of the tongue ⟨a ~ fricative such as \s\⟩ — compare SLIT

groove-billed ani \ˈˌ₊₌\ *n* : a rather small ani (*Crotophaga sulcirostris*) having the upper mandible marked by several curved grooves and ridges

grooved ax *n* : a prehistoric stone ax typical of the woodland pattern in No. America with a groove in which the handle fits

groove diameter *n* : the width of the bore of a rifled arm that is measured between diametrically opposite grooves

grooved shrimp *n* : a shrimp with lateral grooves along the carapace; *esp* : BRAZILIAN SHRIMP

groove·less \-vləs\ *adj* : having no grooves

groov·er \ˈ-və(r)\ *n* -S [in sense 1, ¹*groove* + -*er;* in other senses, fr. ²*groove* + -*er*] 1 *dial Eng* : MINER 2 a : a device that makes grooves (as by cutting, punching) b : a worker

Attorney Docket No. 400 P 971                                    PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of

   TIMOTHY L. TURNER and
   RANDY G. FORREST

Serial No. 09/215,897

Filed: December 18, 1998

For: "END CLOSURE WITH IMPROVED
        NON-DETACHABLE OPENING PANEL"

) Group Art Unit: 3727
)
) Examiner: S. Cronin
)
)
)

RECEIVED

DEC 9 1999

Group 3700

ASSISTANT COMMISSIONER FOR PATENTS
Washington, D.C. 20231
Attention: BOX FEE AMENDMENT

## AMENDMENT AND RESPONSE TO OFFICIAL ACTION (DATED 10/01/99)

Dear Sir:

      This is filed in response to the Examiner's Office Action, dated October 1, 1999.  In this

response, Applicants amend several of the claims, and amend the application with three

additional claims, Claims 21-23.

## CLAIM AMENDMENTS

Please amend the Claims as follows:

      1.      An end member for a container having a circumferential sidewall, the end member having

a peripheral seaming edge adapted to be integrally connected to the sidewall, and having a

central panel wall with a means for opening a frangible panel segment of the panel wall, the end

12/08/1999 NGHIFERO 00000032 09215897

01 FC:103                    54.00 DP

CCS0052695

Crown Packaging, et. al. v. Rexam
USDC District of DE  CA 05-608

A86

member comprising;

a rivet formed in the central panel and adapted to integrally attach a tab lever to the panel, the tab having a nose portion overlying at least a vent region of the frangible panel segment and having a lift end opposite said nose;

a primary score groove in the central panel wall defining an outer perimeter of the frangible panel segment, the score groove having a first end adjacent the vent region, and a second end joined to the first end by a curvilinear segment of the score groove, the first end and the second end being separated by a generally linear hinge segment of the central panel wall, said hinge segment being non-frangible to integrally connect the frangible panel segment to an adjacent area of the panel; and,

a second score groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment.

2.    The end member of claim 1, wherein, the second score groove has a curvilinear segment generally parallel an extent of the primary score groove, said curvilinear segment being positioned on the frangible panel radially inward of the outer perimeter.

3.    The end member of claim 1, wherein, the primary score groove and the second score groove together form a double scoreline, the double scoreline being separated at the second end of the primary score groove and said tail portion of the second score groove extending longer than said primary score groove second end.

2

CCS0052696

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A87

4. The end member of claim 1, wherein, the primary score groove has a score residual of the central panel wall, and said second score groove has a groove residual of the central panel wall, the primary score residual being less than the second score groove residual along said tail portion.

5. The end member of claim 4, wherein, the primary score residual of said second end is in the range of 0.003 to 0.005 inches, and the second score groove residual along the tail portion is between 0.001 to 0.002 inch greater than the score residual of said second end.

6. The end member of claim 1, wherein, at least a terminal length of the second score groove curves to a direction away from said first end of the primary score.

7. The end member of claim 1, wherein, the tail of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.

8. The end member of claim 1, wherein, the tail portion of the second score groove end extends into said adjacent area of the central panel and partially surrounds the second end of the primary score groove.

9. The end member of Claim 8, wherein, the tail portion has a curvilinear end extending generally away from the first end of the primary score groove to partially surround said second

3

CCS0052697

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A88

end of the primary score groove.

~~10.~~ 11.     The end member of Claim ~~3~~ 10, wherein, the primary score groove has a score residual at terminal region of said second end and the second score groove has a groove residual at the tail portion, the groove residual of the second score being less than 0.002 inch greater than said score residual of said terminal region of the primary score.



~~11.~~ 12.     The end member of Claim ~~10~~ 11, wherein, the tail of the second score groove tail portion is approximately 0.020 inches in length.

14.     The end member of claim ~~12~~ 13, wherein, the [second groove] tail portion passes through the hinge segment generally transverse to said straight line between the first and second end.

4

CCS0052698

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A89

Please add the following additional claims:

21.    An end member for a container, the end member having a central panel wall adapted to be secured to the container at the outer edge of the end member, the end member comprising;

a frangible panel formed in the panel wall and at least partially defined by a score groove with a first end and a second end, wherein the score groove at the second end is curved outward toward the outer edge of the panel;

a hinge line passing between the first and second end of the score groove; and,

a second score groove in the panel wall and transecting the hinge line.

22.    The end member of Claim 21, wherein the second score groove is an anti-fracture score with an extended end passing through the hinge line.

23.    The end member of Claim 21, wherein the second score groove has a terminal end curved outward toward the outer edge of the panel.

5

CCS0052699

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A90

## REMARKS

Examiner has rejected all pending claims (original Claims 1-20). Claims 1-4, 6-9, 12-14, 17, 19 and 20 were rejected by Examiner as allegedly being anticipated by Japanese Reference 8-244,769 (the '769 Reference). Claims 5, 10, 11, 15, 16 and 18 were rejected by Examiner as allegedly obvious under 35 U.S.C. Section 103(a) over the '769 Reference. Applicants respectfully traverse the claim rejections. Applicants also amend certain pending Claims (Amended Claims 1-11 and 14) to clarify the claimed invention.

<u>Claims 1-11 and 20</u>

Examiner has rejected Claims 1-4, 6-9 and 20 on the basis of 35 U.S.C. 102(b) as allegedly anticipated by Japanese Patent 8-244,769 ("the '769 patent"). Further, Examiner has rejected Claims 5 and 10-11 on the basis of 35 U.S.C. 103 as allegedly unpatentable over the '769 patent. Applicants respectfully traverse Examiner's rejections.

Claim 1, and the claims dependent therefrom, have been amended to more clearly describe the claimed structure. Contrary to the claim rejections of Examiner, the structure claimed is neither disclosed or taught by the cited references. Claim 1 has been amended to clarify the invention of an end member having a primary score groove and a second score groove, with a tail portion of the second score groove passing from the frangible panel into the adjacent area and transecting the hinge segment. This structure is nether taught or disclosed in the cited '769 patent reference. Rather, the '769 patent discloses a distinctly different structure wherein the second score clearly does not transect the hinge segment. As clearly shown in

6



CCS0052700

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A91

Figure 2 of the '769 patent, the second score 10 terminates short of the adjacent area, and is far short of even the areas near the hinge line (axis lines "x-x" and "y-y"). To the extent the '769 discloses any structure passing through the hinge line, such structure (shown as feature 9 in Figure 2 of the '769 patent) is clearly disclosed as a bead (Figures 3(a) - (c)). Apparently, the '769 discloses an alternative structure of a coined valley in rather than a bead (Figure 9(d)). The '769 patent further shows defined coin regions in Figures 5 (a) - (d). Such beads and coined regions are distinctly different from the structure of a second score, as claimed in the present application.

Therefore, not only does the '769 patent specifically disclose the lack of the second score transecting the hinge region, but is specifically discloses that any feature passing through the hinge area should be a bead or coined region rather than a score line. Accordingly, the '769 patent certainly does not disclose or teach the claimed structure of Claim 1, or the claims dependent therefrom (Claims 2-11 and 20).

Claims 12 - 19

Examiner has rejected Claims 12-14, 17 and 19 as allegedly anticipated under 35 U.S.C. 102 by the '769 patent, and has rejected Claims 15, 16 and 18 as allegedly unpatentable under 35 U.S.C. 103 in light of the '769 patent. Applicants respectfully traverse these rejections by Examiner.

The structure recited in Claim 12, and the claims dependent on Claim 12, includes an end member having a score groove and an anti-fracture score in which the anti-fracture score has a tail portion that passes through the hinge segment. As discussed above, the '769 patent clearly

7

does not disclose or teach such a structure as recited in Claim 12. Rather, the '769 patent merely discloses a double score in which the terminal end of the anti-fracture score (feature 10 of Figure 2) stops far short of the hinge segment, and certainly then does not pass through the hinge segment. Therefore, the structure recited in Claim 12 is not disclosed or taught by the '769 patent. Similarly, the claims dependent from Claim 12 (Claims 13-19) also are not taught or disclosed by the '769 patent, and are allowable over the cited reference.

Applicants have also amended Claim 14 to clarify the claimed structure, replacing "second groove" with the antecedent term used: "tail portion."

### New Claims 21-23

New claims 21-23 recite the structure of a container end having a score groove with an outward curve, and a second score groove that transects the hinge line. Dependent claims recite additional structure, including the second score being an anti-fracture score (Claim 22), and the second score having a terminal end curved outward (Claim 23). The structure recited by these claims is certainly neither disclosed or taught by the cited references, and should be allowed.

8

CCS0052702

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A93

Conclusion

For the foregoing reasons, the pending claims 1-20 and newly added claims 21-23 are allowable over the cited art. Applicants respectfully request early notification of such allowance, and invite the Examiner to call the undersigned attorney to discuss and expedite any further prosecution of this application.

Respectfully submitted,

Dated: 12-02-99

By: _____
Bradley F. Rademaker, Reg. No. 35,331
WALLENSTEIN & WAGNER, LTD.
311 South Wacker Drive - 53rd Floor
Chicago, Illinois 60606-6622
(312) 554-3300

CERTIFICATE OF MAILING

I hereby certify that this paper is being deposited with the U.S. Postal Service as First Class mail in an envelope addressed to: BOX FEB AMENDMENT, Assistant Commissioner for Patents, Washington, D.C. 20231, on this 2nd day of December, 1999.

_____
Netha Connely    (85497)

9

CCS0052703

Crown Packaging, et al. v. Rexam
USDC District of DE  CA 05-608

A94

Case 1:05-cv-00608-MPT    Document 288    Filed 02/26/2007    Page 97 of 98

construction which should not necessarily be rejected as improper or confusing under 35 U.S.C. 112, second paragraph. For example, claims which read: "The product produced by the method of claim 1." or "A method of producing ethanol comprising contacting amylose with the culture of claim 1 under the following conditions ....." are not indefinite under 35 U.S.C. 112, second paragraph, merely because of the reference to another claim. See also *Ex parte Porter*, 25 USPQ2d 1144 (Bd. Pat. App. & Inter. 1992) where reference to "the nozzle of claim 7" in a method claim was held to comply with 35 U.S.C. 112, second paragraph. However, where the format of making reference to limitations recited in another claim results in confusion, then a rejection would be proper under 35 U.S.C. 112, second paragraph.

## 2173.05(g) Functional Limitations

A functional limitation is an attempt to define something by what it does, rather than by what it is (e.g., as evidenced by its specific structure or specific ingredients). There is nothing inherently wrong with defining some part of an invention in functional terms. Functional language does not, in and of itself, render a claim improper. *In re Swinehart*, 439 F.2d 210, 169 USPQ 226 (CCPA 1971).

A functional limitation must be evaluated and considered, just like any other limitation of the claim, for what it fairly conveys to a person of ordinary skill in the pertinent art in the context in which it is used. A functional limitation is often used in association with an element, ingredient, or step of a process to define a particular capability or purpose that is served by the recited element, ingredient or step. Whether or not the functional limitation complies with 35 U.S.C. 112, second paragraph, is a different issue from whether the limitation is properly supported under 35 U.S.C. 112, first paragraph, or is distinguished over the prior art. A few examples are set forth below to illustrate situations where the issue of whether a functional limitation complies with 35 U.S.C. 112, second paragraph, was considered.

It was held that the limitation used to define a radical on a chemical compound as "incapable of forming a dye with said oxidizing developing agent" although functional, was perfectly acceptable because it set definite boundaries on the patent protection sought. *In re Barr*, 444 F.2d 588, 170 USPQ 33 (CCPA 1971).

In a claim that was directed to a kit of component parts capable of being assembled, the Court held that limitations such as "members adapted to be positioned" and "portions . . . being resiliently dilatable whereby said housing may be slidably positioned" serve to precisely define present structural attributes of interrelated component parts of the claimed assembly. *In re Venezia*, 530 F.2d 956, 189 USPQ 149 (CCPA 1976).

## 2173.05(h) Alternative Limitations

### I.    MARKUSH GROUPS

Alternative expressions are permitted if they present no uncertainty or ambiguity with respect to the question of scope or clarity of the claims. One acceptable form of alternative expression, which is commonly referred to as a Markush group, recites members as being "selected from the group consisting of A, B and C." See *Ex parte Markush*, 1925 C.D. 126 (Comm'r Pat. 1925).

*Ex parte Markush* sanctions claiming a genus expressed as a group consisting of certain specified materials. Inventions in metallurgy, refractories, ceramics, pharmacy, pharmacology and biology are most frequently claimed under the Markush formula but purely mechanical features or process steps may also be claimed by using the Markush style of claiming. See *Ex parte Head*, 214 USPQ 551 (Bd. App. 1981); *In re Gaubert*, 524 F.2d 1222, 187 USPQ 664 (CCPA 1975); and *In re Harnisch*, 631 F.2d 716, 206 USPQ 300 (CCPA 1980). It is improper to use the term "comprising" instead of "consisting of." *Ex parte Dotter*, 12 USPQ 382 (Bd. App. 1931).

The use of Markush claims of diminishing scope should not, in itself, be considered a sufficient basis for objection to or rejection of claims. However, if such a practice renders the claims indefinite or if it results in undue multiplicity, an appropriate rejection should be made.

Similarly, the double inclusion of an element by members of a Markush group is not, in itself, sufficient basis for objection to or rejection of claims. Rather, the facts in each case must be evaluated to determine whether or not the multiple inclusion of one or more elements in a claim renders that claim indefinite. The mere fact that a compound may be embraced by more than one member of a Markush

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>   and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 26, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700