IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., | ) ) ) | |
| | ) | Civil Action No. 05-608 (MPT) |
| Plaintiffs/Counter Defendants, | ) ) | |
| v. | ) ) | |
| | ) | REDACTED – PUBLIC VERSION |
| REXAM BEVERAGE CAN COMPANY, | ) ) | |
| Defendant/Counterclaimant. | ) ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT DISMISSING COUNTERCLAIMS I-V BASED ON PATENT INVALIDITY/NON-INFRINGEMENT**

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: February 20, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Defendant/Counterclaimant*
   *Rexam Beverage Can Co.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

I.      INTRODUCTION AND NATURE OF PROCEEDINGS.....................................1

II.     SUMMARY OF THE ARGUMENT......................................................................2

III.    RESPONSE TO CROWN'S ALLEGED UNDISPUTED FACTS........................3

        A.      Smooth Die Necking.................................................................................3

        B.      Bottom Reforming.....................................................................................5

        C.      Anti-Fracture Score...................................................................................8

        D.      Additional Facts......................................................................................15

IV.     ARGUMENT.......................................................................................................17

        A.      The Court Should Deny Crown's Motion For Summary Judgment Of
                Invalidity Of The '385 And '242 Patents Because They Are Valid And Enforceable.....23

                1.      Assuming, *Arguendo*, That The Ball Process Is Prior Art, Crown Has
                        Failed To Show That Each And Every Limitation Is Present......................24

                2.      The Ball Bottom Reforming Method Is Not Prior Art................................24

        B.      Crown Is Not Entitled To Summary Judgment Of Non-Infringement
                Of The '230 And '728 Patents..................................................................30

V.      CONCLUSION....................................................................................................35

TABLE OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................................. 17, 31

*ATD Corp. v. Lydall, Inc.*,
    159 F.3d 534 (Fed. Cir. 1998) .............................................................................. 2, 17, 24

*Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*,
    15 F.3d 1573 (Fed. Cir. 1993) .......................................................................................... 30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................................................... 31

*Gechter v. Davidson*,
    116 F.3d 1454 (Fed. Cir. 1997) ................................................................................. 17, 24

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) ......................................................................................... 18

*Hyatt v. Boone*,
    146 F.3d 1348 (Fed. Cir. 1998) .......................................................................... 25, 26, 28

*In re Eltgroth*,
    419 F.2d 918 (CCPA 1970) ............................................................................................. 26

*In re Robertson*,
    169 F.3d 743 (Fed. Cir. 1999) ......................................................................................... 20

*In re Wright*,
    569 F.2d 1124, 193 U.S.P.Q. (BNA) 332 (CCPA 1977) ................................................ 18

*Johns Hopkins Univ. v. CellPro. Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ....................................................................................... 30

*Kegel Co., Inc., v. AMF Bowling, Inc.*,
    127 F.3d 1420 (Fed. Cir. 1997) ................................................................................. 30, 31

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991) ....................................................................................... 31

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd by* 517 U.S. 370 (1996) ........................................... 30

*Merck & Co. v. Teva Pharms. USA*,
    228 F. Supp. 2d 480 (D. Del. 2002) ........................................................................... 18, 20

*Novartis Corp. v. Ben Venue Labs, Inc.*,
    271 F.3d 1043 (Fed Cir. 2001) ........................................................................................ 31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................................................... 31

ii

*Schumer v. Lab. Computer Sys., Inc.*,
   308 F.3d 1304 (Fed. Cir. 2002) ...................................................................................2, 17, 24

*Tenneco Automotive v. Visteon Corp.*,
   375 F. Supp. 2d 366 (D. Del. 2005) ...................................................................................... 18

*Vas-Cath, Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ...................................................................................... 25, 26

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ....................................................................................... 30, 31

*Zygo Corp. v. Wyko Corp.*,
   79 F.3d 1563 (Fed. Cir. 1996) ............................................................................................. 31

**STATUTES**

35 U.S.C. § 102 ........................................................................................................................ 3, 8

35 U.S.C. § 112 ........................................................................................................................... 25

35 U.S.C. § 120 ........................................................................................................................... 25

35 U.S.C. § 282 ..................................................................................................................... 17, 24

**OTHER AUTHORITIES**

Uniform Jury Instructions of Patent Cases in The United States District Court for the
   District of Delaware, § 3.11 ................................................................................................... 22

**RULES**

Fed. R. Civ. P. 56 ..................................................................................................................... 2, 17

RLF1-3117707-1

## I.    INTRODUCTION AND NATURE OF PROCEEDINGS

Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown") correctly state that this case is a patent infringement action. Crown has accused Rexam of infringing U.S. Patent Nos. 6,935,826 ("the '826 Patent") and 6,848,875 ("the '875 Patent") relating to beverage can ends and methods of seaming those can ends onto can bodies.

Rexam filed its answer and counterclaims to Crown's second amended complaint, alleging that Crown has infringed and/or is infringing Rexam's U.S. Patent Nos. 4,774,839 ("the '839 Patent") (relating to smooth die necking methods for beverage containers), 5,222,385 ("the '385 Patent") and 5,697,242 ("the '242 Patent") (relating to methods for reforming the bottom of beverage cans) and 6,129,230 ("the '230 Patent") and 6,260,728 ("the '728 Patent") (relating to the score profile on the can end).

The parties have concluded fact discovery and exchanged expert reports and rebuttal reports relating to the technical issues in this case, expert reports and rebuttals relating to damages in this case, and deposed each others' respective technical experts. The parties have also filed and served a joint table of disputed claim terms and opening claim construction briefs. Each party has moved for summary judgment on multiple issues.

In this instance, Crown has moved for summary judgment that the '839, '385 and '242 Patents are invalid because, they argue, the '839 Patent is anticipated by U.S. Patent No. 3,029,507 ("the Gaggini Patent") and that the '385 and '242 Patents are anticipated by certain patents owned by Ball Metal Beverage Container Corp., ("Ball"). (D.I. 194, Crown Mem. at 23-32.) However, Crown's contentions are based upon assumptions and opinion, rather than actual undisputed facts. The primary support for Crown's arguments is based upon an opinion offered by Crown's expert witness, and not "undisputed facts."

Crown has also moved for summary judgment of non-infringement of Rexam's '230 and '728 Patents. Here, Crown's arguments fail to demonstrate that there are no issues of material fact. Crown's

arguments are based upon its expert's opinion and improperly drawing key aspects of the '230 and '728 Patents.

For the reasons stated herein, Crown's motion for summary judgment on each issue of invalidity and non-infringement should be denied.

## II.    SUMMARY OF THE ARGUMENT

1.    Summary judgment is appropriate where "there are no genuine issues of material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. On each of the issues raised in Crown's motion for summary judgment, Crown has failed to establish that there are no genuine issues of material fact. Crown has therefore failed to establish that it is entitled to judgment as a matter of law.

2.    Crown has the burden of proving by clear and convincing evidence that the claims of the '839 Patent are anticipated by the Gaggini Patent. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002). Crown has failed to establish that the Gaggini Patent discloses every limitation of any of the asserted claims of the '839 Patent, as it must do to meet its burden. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed. Cir. 1998).

3.    Crown's expert's opinions relating to the Gaggini Patent and the claims of the '839 Patent are improperly based upon the drawings of the patent and his manipulation of those drawings. Therefore, Crown's reliance on its expert's opinion to support its motion for summary judgment is misplaced.

4.    Crown has the burden of proving by clear and convincing evidence that the claims of the '385 and '242 Patents are anticipated. *Schumer*, 308 F.3d at 1315. Crown has failed to establish that any prior art reference discloses every limitation of any of the asserted claims of the '385 and '242 Patents, as it must do to meet its burden. *ATD Corp.*, 159 F.3d at 545.

RLF1-3117707-1

5.    Crown has failed to establish that the Ball bottom reforming method is prior art under 35 U.S.C. § 102(g).  In addition, Crown has failed to establish that the disclosure of the January 1990 PCT application is not a sufficient disclosure to support the asserted claims of the '385 and '242 Patents.

6.    Crown has failed to establish that there are no genuine issues of material fact with respect to Crown's infringement of the '230 and '728 Patents.

## III.    RESPONSE TO CROWN'S ALLEGED UNDISPUTED FACTS

Crown sets forth what it claims to be "undisputed facts" relating to the validity of the '839, '385 and '242 Patents at pages 6 through 20 of its opening memorandum in numbered paragraphs 12 through 32.  Rexam will respond accordingly as to which facts are undisputed and which are disputed.

### A.    Smooth Die Necking

Crown's Memorandum sets out the alleged "Undisputed Facts Relating to Rexam's Smooth Die Necking Patent."  (D.I. 194, Crown Mem. at. 6.)   What follows is a response to each of Crown's purported "facts" related to smooth die-necking:

1.    Agree.

2.    Agree.

3.    Agree.

4.    Rexam does not dispute that the Gaggini patent was granted on April 17, 1962 and is prior art to the '839 Patent.

5.    Rexam does not dispute that the Gaggini patent was not considered by the United States Patent & Trademark Office ("PTO") before it decided to allow the claims of the '839 Patent.

6.    Rexam does not dispute that the Gaggini patent says the thin walled cylinder "[]is reduced to desired neck form without distortion or wrinkling of the walls."   However, Rexam disagrees with Crown's attempt to equate "distorting or wrinkling" with the steps or ribs that the rolling operation is designed to remove, as explained later.

7.     Rexam does not dispute that a portion of Mr. Gillest's answer[1]

Redacted

8.     Rexam does not dispute that the Gaggini patent states that "wrinkling and crimping" is avoided, as it is avoided with any other effective die-necking method.  The additional step of rolling the neck surface "for the purpose of smoothing the container surface[]" indicates that the neck of the container described in the Gaggini patent has features (bumps or steps) that require a separate rolling or "smoothing" operation in order to smooth down the bumps or steps. (A69, Gaggini Patent, Col.5, lns. 29-40.)

9.     Rexam disputes Crown's assertion that: "Every limitation of each of claims 1, 2, 5, and 11 of the 839 patent is disclosed in the Gaggini patent, and therefore, the claims are anticipated by it." As Mr. Gillest describes in his expert report, the Gaggini patent does not even describe a method of smooth die-necking, let alone one that falls within the scope of claims 1, 2, 5, and 11 of the '839 Patent.  (A84, Gillest Rebuttal at 14.)  The aforementioned claims each describe specific amounts of overlapping or integration between the successive die operations.  The Gaggini patent does not give details of any of these limitations.  Instead, as described below, Mr. Aschberger and Crown rely entirely on schematic drawings from the Gaggini patent and on Mr. Aschberger's own sketching, which is based exclusively on the drawings as well.  The shape of the dies, the way in which they contact the neck of the container, and the amount of overlap between die operations is critical to obtaining a smooth died neck.  The '839 Patent teaches and claims this method.  The Gaggini patent does nothing more than describe early die-necking (and without much detail).

10.     Rexam disputes Crown's assertion that:

Redacted

---

[1] Exhibits referenced herein are contained in the Appendix to Defendant's Memorandum in Support of its Opposition to Plaintiffs' Motion for Summary Judgment Dismissing Counterclaims I-V Based on Patent Invalidity/Non-Infringement filed contemporaneously herewith.

4

As explained in more detail below, Mr. Gillest opined that the

Redacted

The Gaggini patent is silent on the very limitations that make Rexam's '839 Patent novel, namely the amount of overlap between successive die operations. Furthermore, the additional rolling step in the Gaggini patent that expressly serves "the purpose of smoothing" the neck surface indicates that the surface of the neck in the Gaggini patent was not smooth as a result of the die-necking. Rather, the neck had bumps or steps (like all other die-necked cans before the '839 Patent) that rendered it un-smooth.

11.    Rexam does not dispute that the word "comprising" is present in each of Rexam's asserted claims from the '839 Patent.

**B.    Bottom Reforming**

12.    Agree.

13.    Agree.

14.    Agree.

15.    Rexam agrees that the testimony of the representatives from Ball

Redacted

However, there is nothing in that document, or the previous documents, that corroborates what method was actually used.

5

16.     For the reasons stated above in paragraph 15, Rexam cannot agree with Crown's asserted

fact that

Redacted

17.     Rexam cannot agree that the Ball bottom reforming process that Crown

, was not abandoned, suppressed, or concealed.  Crown cites

the fact that Ball's apparatus and method were later disclosed in Ball's U.S. Patent No. 5,325,696.

However, that patent application was not filed until April 28, 1993, over **two years** after Crown claims

There is no evidence of any public use, commercialization or

other public disclosure.

Redacted

In other words, Ball was concealing its alleged invention.

18.     Rexam admits that the United States Patent Office ("PTO") did not consider the "Ball

bottom reforming process" in connection with the '385 and '242 Patents.  However, there was no way

that it could have been cited to the PTO at the time of the filing of the '385 Patent because it was not

public.  Only Ball and the inventors knew about the bottom reforming process that Ball was working on at

the time.

19.     Rexam denies that there are no differences between claim 17 of the '385 Patent and

claims 11, 12 and 17 of the '242 Patent; otherwise, the PTO would not have allowed claims 11, 12 and 17

of the '242 Patent.   Similarly, Rexam denies that there are no differences between the "Ball bottom

reforming process" and the asserted claims of the '385 and '242 Patents.

20.     Rexam denies that the fact that Mr. Gillest, Rexam's expert,

Redacted

6

Redacted

PCT application, to which the '385 and '242 Patents claim priority, was filed nearly a year before the earliest Ball patent having anything to do with the shape of can bottoms was filed. (A287, Ball Patent No. 5,105,973 "Beverage Container With Improved Bottom Strength".)    Similarly, Ball's first patent application having anything to do with the method of reforming can bottoms, which was abandoned, was filed nearly two years after Rexam's PCT application, two months after the filing date of the '385 Patent, and more than a month after the PCT application was published.  (A219, Timeline of filing dates at issue.)

21.    Rexam disputes that the subject matter of the asserted claims was constructively reduced to practice on July 25, 1991.  Rexam agrees that it is claiming that the subject matter of the asserted claims was constructively reduced to practice on January 26, 1990, the filing date of the PCT application.

Redacted

22.    Rexam disputes that the asserted claims of the '385 and '242 Patents are not entitled to the priority date of the PCT application, January 26, 1990.

23.    Agree.

24.    Rexam disputes Crown's assertion that the PCT application does not disclose the step of moving a reforming roller radially into contact with the substantially longitudinal wall.    Redacted
PCT/US90/00451, at 31:29-32:1, and claim 4.)

25.    Rexam disputes Crown's assertion that the specification of the PCT application does not describe how the reforming roller is brought into engagement with the substantially longitudinal wall.

26.    Rexam disputes Crown's expert's opinion because one of ordinary skill in the art would know that moving the roller vertically would damage the can bottom, damage the roller and potentially damage the flange at the top of the can.

27.    Rexam acknowledges that Crown's expert has asserted his opinions about what is and is not disclosed in the PCT application, but asserts that Crown's expert is wrong.

28.    Rexam disputes Crown's assertion that its expert conceded that

Redacted

7

Redacted

in Crown's brief was based upon an incomplete hypothetical and not about what is taught in the disclosure of the PCT application.

29.    Rexam disputes Crown's assertion that the PCT application does not disclose radial movement of the reforming roller.  Rexam contends that it is entitled to a constructive reduction to practice date of January 26, 1990, the filing date of the PCT application.

30.    Rexam disputes Crown's assertion that the earliest date of constructive reduction to practice of the subject matter claimed in the '385 and '242 Patents is July 1991.

31.    Rexam disputes Crown's assertion that the Ball bottom reforming process is prior art under 35 U.S.C. § 102(g), as Crown has not established that Ball                 Redacted

and because the '385 and '242 Patents are entitled to the priority date of the PCT application, January 26, 1990.

32.    Rexam denies Crown's assertion that the asserted claims of the '385 and '242 Patents are anticipated by the Ball bottom reforming process.

### C.    Anti-Fracture Score

Crown's Memorandum set out the alleged "undisputed facts" relating to Rexam's score line patents.  (D.I. 194, Crown Mem. at 12.)  However, Crown's undisputed facts are not facts, but opinions based upon experimentation and subjective interpretation as to where the "hinge segment" and/or "hinge line" are located on the accused products, ignoring the specification and claims of the asserted patents. What follows is a response to each of Crown's purported "facts" related to score line patents:

34.    [sic] Crown states that: "Rexam has asserted that Crown's large opening end ('LOE') infringes its U.S. Patent Nos. 6,129,230 ('230 Patent') and 6,260,728 ('728 Patent'), both of which are directed to the score line used to create the opening on a can end." Rexam does not generally dispute this fact, but the claims of Rexam's '230 and '728 Patents are directed, more precisely, to the score line used to prevent complete detachment of the pour panel on beverage can ends.

35.    Crown states that: "Rexam's proof of infringement consists of the opinion of its expert, Mr. Gillest, who submitted an expert report opining that Crown's LOE end literally infringed the asserted claims of Rexam's score line patents." Rexam's proof of infringement is in no way limited to the expert report of Mr. Gillest. Rexam's proof of infringement consists of samples of ends provided by Crown, engineering drawings provided by Crown, testimony by Crown employees, testimony by Rexam's employees, and the expert report of Mr. Gillest.

36.    Rexam does not dispute Crown's assertion that Rexam has not asserted infringement under the doctrine of equivalents with respect to its score line patents.

37.    Rexam does not dispute Crown's assertion that Mr. Gillest

Redacted

38.    Rexam does not dispute Crown's assertion that "Rexam asserts that Crown's LOE end literally infringes three claims of the 230 patent – dependent claims 2 and 5 and independent claim 13. Claims 2 and 5 depend from claim 1. Thus, there can be no infringement of the 230 patent unless Rexam shows that all of the elements of claims 1 and 13 of the 230 patent are satisfied by Crown's accused LOE end."

39.    Crown states that: "Claim 1 of the 230 patent requires that the end have 'a second groove having a tail portion passing from the frangible panel into said adjacent area of the central panel and transecting said hinge segment.'" Crown has proposed that this limitation be construed to require that the "second score groove have a tail portion that passes from the frangible panel into the portion of the central panel near the hinge segment. Crown has further proposed that the term 'hinge segment' be construed as the 'region of metal that undergoes bending as a result of angular displacement of the frangible panel during normal use.'" Rexam does not dispute that Crown has proposed the aforementioned claim constructions in this case.

9

40.    Crown states that: "Mr. Gillest



Redacted




41.    Crown states that "[c]laim 13 of the 230 patent requires that the end have 'said anti-fracture score having a tail portion passing through the hinge segment.'"  Crown has proposed that this limitation be construed to require that the anti-fracture score have a tail portion that "'goes from one end to the other end' of the hinge segment."   Rexam acknowledges that Crown has proposed that construction of the aforementioned limitation to the Court.

42.    Rexam agrees that it has asserted that Crown's LOE end literally infringes dependent claim 7 of the '728 Patent, which depends from claim 1.

43.    Crown states that "[c]laim 7 of the 728 patent requires that 'at least a portion of the second score groove passes through the hinge line generally transverse to a hinge line passing between the first end and the second end of the primary score groove.'  Crown has proposed that this limitation be construed to require that the second score 'goes from one end to the other end' of the hinge segment generally transverse to a line passing between the first end and the second end of the primary score groove."  Rexam acknowledges that Crown has proposed such a construction of this limitation.

44.    Crown states that, "[t]he inventor of the 230 and 728 patent, Timothy Turner,



Redacted




...

10

Redacted

45.    Crown states that "[h]owever, Mr. Gillest testified that

Redacted

Rexam agrees that Crown accurately quoted a portion of Mr. Gillest's testimony.  As Mr. Gillest explained, the

Redacted

46.    Crown states that '

Redacted

Rexam agrees that Crown accurately quoted a portion of Mr. Gillest's testimony.  Again, the detailed description of the patent and the claims do not require the opening of can ends in order to determine the important points.  The claim language (and the specification) provide ample details for determining the

11

location of the relevant features (with the assistance of the patent drawings) without the opening of can ends.

47.    Crown states that: "Crown's expert, Martin Higham, undertook an analysis to determine the location of the hinge segment – that is, the location of the region of metal that undergoes bending when the frangible panel undergoes angular displacement during normal opening." Crown's characterization of Mr. Higham's "analysis" is misleading. Mr. Higham's analysis is directed to where the opening panel bends downwards – and not where the "hinge segment" is defined by the claim language and specification of the Rexam patents. Even assuming that Mr. Higham's analysis had some relationship to the patent claims, his conclusions are not even supported by his analysis.

48.    Crown states that: "Representative Crown LOE ends were taken off the production line at Crown's manufacturing plant. Photographs were taken of these ends after they were opened in the normal manner so as to accurately show the location of the hinge and the location of the end of the anti-fracture score relative to the hinge. Further, after opening, one of the ends was sectioned and photographed to show the location of the anti-fracture score and the location of the anti-fracture score relative to the hinge." Rexam disputes that Crown's stated procedure "accurately show[ed] the location of the hinge and the location of the end of the anti-fracture score relative to the hinge." Again, Crown used a methodology that is neither taught by the claim language nor the specification for determining the location of the hinge. The patent clearly shows where the hinge is located and describes the hinge. (A232, '230 and' 728 Patents at Figs. 6 & 7.) Crown's analysis ignores the clear teaching of the patents-in-suit.

49.    Crown states that: "Mr. Higham examined and opened sample of Crown LOE ends and studied the photographs of the opened ends taken by Messrs. Fields and Moger. He determined that the end of the anti-fracture score did not pass through the hinge segment. *A fortiori*, he found that the anti-fracture score did not extend into the area of the central panel adjacent the hinge segment. In fact, he found that the end of the anti-fracture score never even reached the center line of the hinge segment." Again, Crown relied on Mr. Higham's methodology which is contrary to the clear language of the patent.

12

Rexam disagrees that Mr. Higham "found that the end of the anti-fracture score never even reached the center line of the hinge segment." Mr. Higham did not even determine the location of the hinge segment based on the teachings and definitions provided in the '230 and '728 Patents.

50.    Crown stated that "[s]hown below is a photograph of an opened Crown LOE end taken by Fields followed by an enlargement of the area indicated by the dotted rectangle with annotations by Mr. Higham indicating the upper boundary of the hinge segment and the end of the anti-fracture score:"



*Id.* Rexam has no way to confirm whether the image is, as Crown suggests, a Crown LOE end. Regardless, Crown again determined the location of the key features in a way that is contrary to the clear teaching of the '230 and '728 Patents. Crown's assertion that Mr. Higham's annotations "indicat[e] the upper boundary of the hinge segment and the end of the anti-fracture score" is simply based on a purposely incorrect reading of the claims and the specification. If not purposely incorrect, it is certainly not based on the specification and drawings of the asserted patents.

51.    Crown stated that "[s]hown below is a close-up photograph of an opened Crown LOE end taken by Fields (looking along the hinge in a direction from the lower left toward the upper right in the photo above) on which Mr. Higham noted the upper boundary of the hinge segment and the end of the anti-fracture score:"

RLF1-3117707-1



*Id.* Again, Crown purposely repeated its methodology of deciding how their end could possibly avoid infringement, then characterizing the patent claims accordingly. Crown has deliberately and arbitrarily drawn the upper boundary of the hinge segment in a misleading way. Unfortunately for Crown, the '230 and '728 Patents clearly describe the location of the hinge features and the way in which to determine the cited locations.

52.     Crown stated, "[s]hown below is a photograph of an opened Crown 202 end sectioned by Moger, followed by a photograph of the sectioned metal in the area indicated by the dotted rectangle, with annotations by Mr. Higham indicating the upper and lower boundaries of the hinge segment, the center line of the hinge segment, and the end of the anti-fracture score:"

RLF1-3117707-1





*Id.* Crown again confuses its own understanding of the term "hinge" outside of the context of the Rexam patents with the very clear meaning of the terms when construed in light of the specification. Even if Crown's expert's methodology was accurate (and it's not), his results are visibly flawed. A quick look at the lower of the two images above shows that Crown chose a "Centerline of hinge segment" (identified by the yellow dotted line) that is located far above where the "centerline of hinge segment" actually is located. To steal a term that Crown has used in its reports, Crown clearly "cherry-picked" a location that happens to be above the end of the anti-fracture score.

53.    Crown stated, "[b]ased on his analysis, Mr. Higham concluded that the asserted claims of the Rexam score patents were not infringed." Rexam agrees that Mr. Higham "concluded that the claims of the Rexam score patents were not infringed." The record is clear that Mr. Higham's analysis ignored the clear teachings of the patent and the claim language, thereby rendering his "conclusions" worthless.

**D.    Additional Facts**

1.    The PCT application discloses and describes the method of reforming the bottom of the can by moving the roller to the outer portion of the dome (162) and then reforming the inner wall to a

more vertical angle. This means that the roller is brought into the dome area first, then it must move radially to engage the longitudinal wall to reform the wall.                    Redacted

2.      The PCT application describes the shape of the roller that is used. One of ordinary skill in the art would have understood that because of the shape of the roller, it would have to be moved radially into engagement with the longitudinal wall. (*Id.*)

3.      One of ordinary skill in the art would understand that the disclosure of "stretching" the dome would require radial movement of the roller into the longitudinal wall. (*Id.*) Even though it may be "possible," under some hypothetical, to get a minimal amount of stretching by moving a roller vertically, that would be counterintuitive to the teaching of the specification of the PCT application. (*Id.*) Moving the roller vertically into engagement would cause compression of the dome, not stretching. (*Id.*)

4.      One of ordinary skill in the art at the time of the filing of the PCT application would know that vertical movement of the roller to engage the longitudinal wall would scrape the wall on the way into and out of the dome area. (*Id.*) This scraping could affect the structural integrity of the can, which is the opposite of what the PCT application is teaching. (*Id.*)

5.      One of ordinary skill in the art would also know that moving the roller vertically into engagement with the longitudinal wall would damage the roller. (*Id.*) The roller is designed to "roll" around its own axis and around the center axis of the can in an arcuate path. (A121-122, PCT application.) One of ordinary skill would know that the roller is not designed to scrape the longitudinal wall, which is what would happen if one attempted to engage the longitudinal wall by moving the roller vertically. (*Id.*)

6.      One of ordinary skill in the art would also know that moving the roller vertically into engagement with the longitudinal wall could also damage the flange of the can. (*Id.*) No one of ordinary skill in the art would interpret the PCT application as Crown's expert has done. (*Id.*)

16

## IV.     ARGUMENT

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The '839 Patent is entitled to a presumption of validity. 35 U.S.C. § 282. To overcome the presumption of validity, Crown must prove facts supporting a determination of invalidity by clear and convincing evidence. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002) ("To overcome [the] presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence."). Crown relies exclusively on the Gaggini Patent to support its motion for summary judgment and must demonstrate that every limitation of the asserted claims is disclosed by that reference. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed. Cir. 1998). "[E]very limitation of a claim must **identically** appear in a **single** prior art reference for it to anticipate the claim." *Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997) (emphasis added). Crown has failed to satisfy its burden and its motion should be denied.

Crown states that "the undisputed facts demonstrate that Rexam's smooth die necking patent is anticipated by a prior art patent, U.S. Patent No. 3,029,507 to Gaggini ("Gaggini Patent")." (D.I. 194, Crown Mem., at 4.) Crown further states that "Crown's expert demonstrated without contradiction that each and every limitation of the asserted necking method claims of Rexam's 839 Patent is satisfied by the Gaggini patent." *Id.* To the contrary, Rexam's expert contradicted the notion that the Gaggini Reference discloses any method of smooth die-necking, let alone the methods claimed in Rexam's '839 Patent. Mr. Aschberger's conclusory statements about the method of necking as disclosed in the Gaggini patent are incorrect and insufficient as a matter of law for a finding of anticipation. *ATD*, 159 F.3d at 545. Mr. Aschberger impermissibly relied **exclusively** on patent drawings to determine precise dimensions when the specification from the Gaggini patent did not indicate that he could do so. (A330-334, Aschberger Dep. at 191-209.) Mr. Aschberger clipped the figures out of the patent, enlarged them on a copy

17

machine and hand traced the outline of each figure to create his exhibit, which he uses to support his

opinion. (*Id.*) Crown has failed to establish by clear and convincing evidence that no genuine issue of

material fact exists as to the invalidity of Rexam's asserted claims from the '839 Patent. *Merck & Co. v.

Teva Pharms. USA*, 228 F. Supp. 2d 480, 496 (D. Del. 2002) ("The party challenging the patent bears the

burden of proving by clear and convincing evidence that the patent is invalid.").

Mr. Aschberger, Crown's expert, relied exclusively on patent drawings to form his opinion about

precise dimensions, relative sizes, and relationships between various sections of beverage can necks.

Redacted                    Federal Circuit and District of Delaware case law conclusively

holds that patent drawings are of limited use in determining precise dimensions.

> HHI's argument is unavailing. The '792 patent is devoid of any indication that the
> proportions of the groove and fins are drawn to scale. HHI's argument thus hinges on an
> inference drawn from certain figures about the quantitative relationship between the
> respective widths of the groove and fins. Under our precedent, however, it is well
> established that patent drawings do not define the precise proportions of the elements and
> may not be relied on to show particular sizes if the specification is completely silent on
> the issue. See *In re Wright*, 569 F.2d 1124, 1127 193 U.S.P.Q. (BNA) 332, 335 (CCPA
> 1977).

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000). "Absent any

written description in the specification of quantitative values, arguments based on measurement of a

drawing are of little value." *Tenneco Automotive v. Visteon Corp.*, 375 F. Supp. 2d 366, 374 (D. Del.

2005) (quoting *In re Wright*, 569 F.2d 1124, 1127 (Ct. Cl. 1977)). Furthermore, Crown's other expert

witness, Martin Higham put an exclamation point on this very issue (many times). While discussing the

prior art to Crown's patents-in-suit, Mr. Higham

Redacted

18

RLF1-3117707-1

Redacted

19

Redacted

Mr. Aschberger measured a patent drawing (without support from the specification) and impermissibly used his dimensions to draw conclusions about the specific shape of the neck of a can and the method of creating that neck profile. Crown is required to conduct an element-by-element analysis in order to show that the Gaggini Patent discloses each and every element of Rexam's asserted claims from the '839 Patent. *Merck & Co. v. Teva Pharms. USA*, 228 F. Supp. 2d 480, 496 (D. Del. 2002) ("Anticipation under 35 U.S.C. § 102(e) requires that every element of the claim be found either expressly or inherently 'in a single prior art reference.'") (quoting *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999)). Instead, they relied on their expert testifying      Redacted

    then conveniently drawing conclusions that supposedly meet Rexam's claim limitations. (A332,

    Redacted

Crown incorrectly states that the "only reason offered by Rexam's expert as to why the Gaggini patent supposedly does not anticipate claims 1, 2, 5, and 11 of the 839 Patent is because the Gaggini patent discloses a post-necking rolling or polishing step." (D.I. 194, Crown Mem. at 7.) This is categorically false. Rexam's expert, Mr. Gillest, explained that Gaggini was not a "smooth-die necking"

20

method at all, let alone a smooth die-necking method as claimed in Rexam's '839 Patent. Mr. Gillest compared Gaggini to other prior art that disclosed similar features and that was determined by the patent examiner to not adversely affect the patentability of the '839 Patent.

> These patents disclose the use of multiple dies in the necking process, resulting in a stepped or ribbed appearance. Other methods go a step further to eliminate the visible steps or ribs, such as U.S. Patent 4,578,007. This patent reduces the visible steps or ribs by using an "external forming roller to eliminate at least some of the ribs and producing a frustoconical portion having a substantially uniform inwardly curving wall section defining the necked-in portion."
>
> ***
>
> The '839 Patent solved the problem of needing the extra steps of the forming roller for flattening the ribs or steps by claiming methods that call for specially designed necking dies and for methods that call for a specific amount of overlap in those dies. The Gaggini Reference describes die-necking in a similar way as U.S. Patent 4,578,007. True, the patent calls for the use of dies in necking a cylindrical can, but the patent fails to teach a method that would eliminate the additional step of flattening the steps or ribs.

(A83-84, Gillest Rebuttal at 13-14.) In other words, die-necking was known. Admittedly, patents and publications described die-necking before the filing date of the '839 Patent. As the patent examiner (and Mr. Gillest) noted, none of those prior art publications described "smooth die-necking," meaning die-necking in which the dies and the die-necking create a smooth neck. The "specific amount of overlap," discovered through exhaustive experimentation by the inventors, is what advanced the technology from "bump," "rib" and "step" necking to smooth die-necking. *Id.* This is the novelty of the methods claimed by the '839 Patent. Nothing in the Gaggini or other prior art references describes or teaches "reform[ing] only an upper portion of [the previous] taper" or any of the other limitations that make the methods of the '839 Patent "smooth die-necking" methods. Mr. Gillest stated clearly that the Gaggini reference does not teach "a method that would eliminate the additional step of flattening the steps or ribs." *Id.* "Following the completion of the necking operations, the container of Fig. 21 is subjected to a neck rolling step by means of roller 68 shown in Fig. 22. *** Either the roller or the container may be rotated to bring their surfaces into contact completely around the container for the purpose of smoothing the container surfaces." (A69, Gaggini Patent, col. 5, lines 29-39 (emphasis added).) The reason for the additional smoothing step described in the Gaggini patent is that the die-necking as described does not create a

21

smooth appearance on its own. The reason the die-necking does not create a smooth appearance on its own is because it is not performed in the manner taught and claimed by the '839 Patent.

Each of Rexam's asserted claims from the '839 Patent require that the necking operations create a "smoothly-shaped neck profile" or "smooth-shaped portion." (A18-19, '839 Patent, Col. 18, lns. 16, 40, 44-45; Col. 19, ln 20.) The die-necking of the Gaggini patent does not create a smoothly-shaped neck profile. Crown states that "Mr. Gillest . . . asserted that the Gaggini patent did not anticipate the asserted claims but only because the Gaggini patent discussed a post-necking rolling or polishing step." (D.I. 194, Crown Mem. at. 22.) Crown set up a straw man argument by suggesting the law on the term "comprising" supports their claim. Crown correctly notes "the fact that [the method] may also include an additional step is irrelevant." (*Id.* at 23 (quoting Uniform Jury Instructions of Patent Cases in The United States District Court for the District of Delaware, § 3.11.).) Rexam agrees that the word "comprising" does not limit the number of features or steps an infringing product or method may have. True, the claims of the '839 Patent cover all methods which comprise each of the claim limitations. The problem with Crown's argument is that the Gaggini patent does not teach each of the claim limitations from the asserted claims of the '839 Patent. Mr. Gillest simply noted that the rolling step is additional evidence that the die-necking methods were not "smooth die-necking" methods containing each of the limitations from the asserted claims. Instead, they taught traditional die-necking (i.e., not meeting the limitations of the asserted claims).

Claims 1, 2 and 5 all require that, during the necking operations, the upper portion of the first taper is reformed "to produce an enlarged smoothly-shaped necked-in profile." (A18, '839 Pat., Col. 18, lns 37-39, 40-45, 52-59.) This limitation is not met by the Gaggini patent. Similarly, Claim 11 from the '839 Patent describes limitations that create a "smooth shaped portion." As Mr. Gillest clearly stated in his report, "the Gaggini reference explicitly calls for the additional flattening step, indicating that the patent does not teach *smooth* die-necking, but rather it simply teaches traditional die-necking that still requires the additional step to attain a smooth appearance." (A84, Gillest Rebuttal at 14.) In other words,

22

Mr. Gillest is of the opinion that the Gaggini patent does not meet the limitations of Rexam's asserted claims and, not, as Crown suggests, because the Gaggini patent has an additional feature.

For the foregoing reasons, the Gaggini patent simply describes traditional die-necking. The amount of overlap, the area of the neck that is to be reformed, and the ultimate shape of the neck are different than the asserted claims of the '839 Patent require. Therefore, the Gaggini patent does not anticipate any of the asserted claims of the '839 Patent. The Gaggini Patent would not have rendered the '839 Patent obvious at the time of filing either. The purpose of the '839 Patent was to eliminate an additional rolling or smoothing step after the die-necking operations. The Gaggini Patent, like the other cited prior art, fell short of teaching or even suggesting such an advance in the technology. The Patent Office understood the novelty of the '839 Patent claims over the old die-necking technology. Therefore, this Court should deny Crown's motion for a summary judgment finding of invalidity of the asserted claims from Rexam's '839 Patent.

A.    **The Court Should Deny Crown's Motion For Summary Judgment Of Invalidity Of The '385 And '242 Patents Because They Are Valid And Enforceable**

Crown argues that the '385 and '242 Patents are invalid because they are anticipated by certain patents owned by Ball Metal Beverage Container Corp., ("Ball"). (D.I. 194 at 23-32.) However, Crown's contention is based upon assumptions and opinion, rather than actual undisputed facts. The primary basis for Crown's arguments is an opinion offered by Crown's expert witness, and not "undisputed facts." Crown's expert claims

Redacted

Based upon this unilateral opinion, Crown concludes that the Ball invention, which Crown alleges to have been        Redacted       , is prior art and anticipates the inventions of the '385 and '242 Patents, the first of which was filed on July 24, 1991.

Thus, a critical issue is whether the 1990 PCT application is a sufficient disclosure for the asserted claims of the '385 and '242 Patents. It is Rexam's contention that the PCT application

23

sufficiently disclosed the step of moving the roller radially into engagement with the longitudinal wall of the bottom of the can. However, even if the Ball bottom reforming process is prior art, Crown must show, by clear and convincing evidence, that each and every limitation of the asserted claims is present in that reference.

### 1.    Assuming, *Arguendo*, That The Ball Process Is Prior Art, Crown Has Failed To Show That Each And Every Limitation Is Present

The '385 and '242 Patents are entitled to a presumption of validity. 35 U.S.C. § 282. To overcome the presumption of validity, Crown must prove facts supporting a determination of invalidity by clear and convincing evidence. *Schumer*, 308 F.3d at 1315 ("To overcome [the] presumption of validity, the party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence."). Crown has failed to present any facts to support its claim that the Ball bottom reforming method anticipates the claims of the '385 and '242 Patents.

Assuming, *arguendo*, that the Ball bottom reforming process is prior art, Crown must show that every limitation of the asserted claims is disclosed by that reference. *ATD*, 159 F.3d at 545. "[E]very limitation of a claim must **identically** appear in a **single** prior art reference for it to anticipate the claim." *Gechte*, 116 F.3d at 1457 (emphasis added). Crown has not shown that each and every element of the asserted claims of the '385 and '242 Patents is present in the Ball bottom reforming process. Crown has not even described the Ball bottom reforming process. Indeed, Crown does not even compare the asserted claim limitations with the alleged prior art Ball method, and thus Crown has not even come close to satisfying its clear and convincing burden. Therefore, Crown's motion should be denied.

### 2.    The Ball Bottom Reforming Method Is Not Prior Art

No Ball bottom reforming process was publicly disclosed until, at the earliest, September 20, 1991, when Ball filed its first patent application relating to "methods" of reforming the bottom of a beverage container. (A347, Abandoned Ball Patent Application.) However, it is not clear that the September 1991 patent application describes the Ball method that was allegedly               Redacted

because Crown relies on the filing date of U.S. Patent No. 5,324,696 ("the '696 Patent),

which was not filed until April 28, 1993. (A149-187.) The application of the '696 Patent was filed **more than three years** after Rexam's PCT application, **more than eighteen months** after the application which became the '385 Patent was filed (July 1991) and **more than eighteen months** after the PCT application was published (August 1991).

Crown unilaterally proclaims that the Ball bottom reforming process was reduced to practice in February of 1991. Crown relies on the testimony of the named inventors of the '696 Patent and cryptic documents to support its claim.

Redacted

There is no report or description of the method that was used and, in fact,

Redacted

Therefore, Crown has not established that the methods claimed in the '696 Patent were reduced to practice        Redacted

Rexam disclosed, and constructively reduced to practice, the methods of the '385 and '242 Patents in its U.S. PCT application dated January 26, 1990. (A120-125.) *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir. 1998) ("The filing of a patent application serves as conception and constructive reduction to practice of the subject matter described in the application."). The '385 and '242 Patents are continuation-in-part applications to the 1990 PCT application. In order for the later-filed '385 and '242 Patents to benefit from the earlier-filed PCT application, the earlier application must meet the requirements of 35 U.S.C. § 120 and 35 U.S.C. § 112 ¶ 1. *Id.* In order to satisfy the written description requirement of § 112, the application must "convey with **reasonable clarity to those skilled in the art** that, as of the filing date sought, he or she was in possession of the invention." *Vas-Cath, Inc. v.*

25

*Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis added).   In analyzing the written

description requirement of § 112 and its application to seeking the benefit of the filing date of an earlier

filed application, the Federal Circuit explained:

> It should be readily apparent from recent decisions of this court involving the question of compliance with the description requirement of § 112 that each case must be decided on its own facts.  Thus, the precedential value of cases in this area is extremely limited.

*Id*. at 1562.  The Court continued:

> Since its inception, the Court of Appeals for the Federal Circuit has frequently addressed the "written description" requirement of § 112.   A fairly uniform standard for determining compliance with the "written description" requirement has been maintained throughout: "Although [the applicant] does not have to describe exactly the subject matter claimed, … the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed."

> *       *       *

> The test for sufficiency of support in a parent application is whether the disclosure of the application relied upon "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter."

*Id*. at 1562-63 (additional citations omitted, brackets in original).  When assessing the written description,

however, what is known to those of ordinary skill in the art "need not be included in a patent

specification."  *Hyatt*, 146 F.3d at 1353 (citing *In re Eltgroth*, 419 F.2d 918, 921 (CCPA 1970) ("This

court has often observed that minutiae of descriptions or procedures perfectly obvious to one of ordinary

skill in the art yet unfamiliar to laymen need not be set forth.")).   Where a limitation in a later-filed

application is not explicitly stated in the specification whose benefit is sought, it must be shown that one

of ordinary skill in the art would have understood, at the time that the earlier application was filed, that

the description requires that limitation. *Hyatt*, 146 F.3d at 1353.   For the reasons set forth herein, the PCT

application is a sufficient disclosure for the asserted claims of the '385 and '242 Patents.

   Crown's assertions that the PCT disclosure is insufficient to support the claims of the '385 and

'242 Patents is based on nothing more than its hired expert's opinion, who also happens to have worked

for Crown for many years.               Redacted

26

RLF1-3117707-1

that argument in a desperate attempt to save his former employer from facing the reality and consequences of its infringement of the methods claimed in Rexam's '385 and '242 Patents.

Redacted

.There is simply no support for that conclusion, and, as will be discussed below, his opinion makes no sense and is completely unreliable.

The PCT specification discloses a method for reforming the bottom of a beverage container by using a roller which is employed from the inside of the dome area of the can bottom. The PCT application states:

> A reforming roller is brought into engagement with the outside of the domed end 162 of the container and is supported on a shaft that is designed to be rotated along an arcuate path around the center axis for the container C. (A121-122.)

As Figure 10 shows, the dome 162 is a separate item from the inner wall.  The inner wall is identified by item number 170.



The specification continues:

> The roller has a peripheral configuration 166 which defines a substantially vertical upwardly and outwardly tapered wall having a generally arcuate upper portion 168 so that inner wall 170 of the countersink is reformed to a more vertical profile while the dome 162 is stretched to a small degree.

(A122, PCT Application at 32.)

27

The specification teaches one of ordinary skill in the art that the roller is moved into the dome 162 and **then reforms the inner wall** 170, which means the reforming roller must be brought radially into engagement with inner wall 170. (A314, Gillest Decl. at 5.)

The specification talks about stretching the dome, and originally filed claim 4 talks about expanding the center panel or dome. *Hyatt*, 146 F.3d at 1352 ("The claims as filed are part of the specification, and may provide or contribute to compliance with § 112."). One of ordinary skill in the art would understand that stretching the dome means that the roller is applying radial pressure on the inner wall 170. (A314, Gillest Decl. at 5.) Moving the roller vertically would cause compression of the dome.



Radial Engagement                                    Axial Engagement

    

Crown also claims that Rexam's expert, Mr. Gillest, conceded that some stretching would occur in the dome merely by moving the roller vertically and without moving it radially. Crown cites a single question, which was in response to a hypothetical question to support its claim, but Mr. Gillest's complete testimony shows otherwise:

Redacted

Redacted

Even if it were "possible" to have some stretching of the dome when moving a roller vertically into engagement with the inner wall under some unspecified circumstance, that is not what one of ordinary skill in the art would understand when reading the specification, claim 4 of the originally filed application and viewing the figures. The description of stretching the dome, along with the description of moving the roller into the dome 162 **first**, then reforming inner wall 170, means that the roller must move radially into engagement with inner wall 170 to reform it. Vertically engaging the inner wall would mean that the inner wall was reformed by the time the roller reached the outside of the domed end, which contradicts the specification. (A122, PCT Application at 32.)  Moving the roller vertically into engagement with the inner wall would also cause compression of the dome, not stretching, as illustrated above.            Redacted

Also, one of ordinary skill in the art would know that moving the roller vertically into engagement with the inner wall would cause the roller to scrape the inner wall while it was being moved into and out of the dome area. (A316, Gillest Decl. at 7; A328-329,          Redacted Scraping the wall could compromise the integrity of the strength of the can, which is the opposite of what the PCT application teaches.          Redacted

Additionally, one of ordinary skill in the art would know that moving the roller vertically into engagement with the inner wall would cause damage to the roller, which is designed to "roll" around its own axis and to rotate in an arcuate path around the center axis of the can. (A121-122, PCT Application at 31-32;          Redacted      The repeated pressure on the side of the roller while moving it

29

vertically into engagement with the inner wall would cause damage to the rollers and require frequent replacement of the rollers. (*Id.*)

Furthermore, one of ordinary skill in the art would know that moving the roller vertically into engagement with the inner wall could cause damage to the flange on the upper part of the can. (*Id.*) The flange is an important part of the seaming process and applying vertical pressure to the base of the can would mean the top of the can would be being pressed against the tool holding the can in place, thereby damaging the flange. (*Id.*) One of ordinary skill would know not to subject the flange to that type of pressure, as it would compromise the structural integrity of the flange and therefore, the seaming process. (*Id.*)

Crown's memorandum is based upon tactical assumptions and opinions, and not undisputed facts. Crown has failed to describe how the Ball process works and has failed to show how each element of the '385 and '242 Patents is allegedly disclosed by the Ball method. Crown has also failed to establish that that the disclosure of the PCT application is insufficient to support the asserted claims of the '385 and '242 Patents. Therefore, Crown has failed entirely to demonstrate a *prima facie* case, by **clear and convincing evidence**, that it is entitled to summary judgment of invalidity with respect to the '385 and '242 Patents. Therefore, as a matter of law, Crown is not entitled to summary judgment on this issue.

### B.    Crown Is Not Entitled To Summary Judgment Of Non-Infringement Of The '230 And '728 Patents

"'The determination whether a claim has been infringed requires a two-step analysis: First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Johns Hopkins Univ. v. CellPro. Inc.,* 152 F.3d 1342, 1353 (Fed. Cir. 1998) (quoting *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576 (Fed. Cir. 1993)); *see also Kegel Co., Inc., v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed. Cir. 1997). Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd by* 517 U.S. 370 (1996). The court should look first to the intrinsic evidence, i.e., the claims, the specification, and if necessary the prosecution history. *Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Id.* "[T]he claims must be read in view of the specification, of which they are a part." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).

"The plaintiff has the burden of proving infringement by a preponderance of the evidence." *Kegel*, 127 F.3d at 1425 (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991)). To prove infringement, "the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1568 (Fed. Cir. 1996) (citations omitted).

When a party moving for summary judgment does not bear the ultimate burden of proof on an issue, the moving party may satisfy its initial burden as movant by pointing out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In the patent litigation setting, since the ultimate burden of proving infringement rests with the patentee, an accused infringer may meet its initial burden for summary judgment of noninfringement by providing evidence that would preclude a finding of infringement or by showing that the evidence of record fails to establish a material issue of fact essential to the patentee's case. *Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043, 1046 (Fed Cir. 2001). If a moving party has made such a showing, the nonmoving party will prevail over the moving party if the nonmoving party can demonstrate that a genuine issue of material fact exists, which exists if a reasonable jury could reach a verdict in its favor. *Anderson*, 477 U.S. at 250-51. The non-movant must go beyond the pleadings and by affidavits, depositions, interrogatories and admissions designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

In this case, Crown has not provided evidence that would preclude a finding that its accused B64 LOE end literally infringes the asserted claims of the '230 and '728 Patents. Crown has also failed to show that there is no genuine issue of material fact as to infringement or noninfringement. Nevertheless,

Rexam will show that there is evidence to support its infringement claims and that a reasonable jury could find, and most likely will find, in Rexam's favor.

In Crown's Motion for Summary Judgment of Noninfringement, it claims noninfringement on two narrow grounds. Only those grounds will be addressed. First, Crown states that "Rexam has no proof of infringement because its expert never identified the hinge segment (*i.e.*, Region of Metal That Undergoes Bending During Opening) in Crown's accused end, nor did he determine the location of anti-fracture score relative to hinge segment." (Crown Mem. at 33.) Crown's argument relies on a claim construction that is contrary to the clear teaching of the patent, and a methodology that is contrary to a proper claim construction. Crown's suggested construction of the term "hinge segment" is simply incorrect and contrary to the definitions provided in the specification. Crown's "Region of Metal That Undergoes Bending During Opening" ignores the fact that the claim language describes the hinge segment as being defined as a "generally linear hinge segment" that separates "a first end" of the "primary score groove" from the "second end" of the groove. (A236, '230 Pat., Col. 8, lns 6-18.) Although this claim construction issue is addressed more fully in Rexam's Claim Construction Brief, in summary, a proper construction of the term "hinge segment" requires using the clear language of the patent claims (which define the hinge segment as the region of metal between the two ends of the primary score groove) in light of the specification (which presents seven images, all of which are of unopened can ends). The hinge segment is identified by name in Figures 6 and 7 of the '230 and '728 Patents (marked by dashed line 26). These figures show an unopened can end.





This illustrates the point that Crown's imported limitation (that you must determine where the hinge is after the can is opened) is absurd and not supported by the claim language or the specification. Crown similarly imports the "opening the can to determine the location" limitation to the term "hinge line" from Claim 7 of the '728 Patent. For the aforementioned reasons (i.e., clear language of the claim and clear teaching of the specification), Crown's construction of the term "hinge line" is similarly deficient.

Because Crown's noninfringement analysis relied on a faulty claim construction, the analysis was doomed from the start. Even accepting Crown's methodology (which is contrary to the clear language of the patent), Crown's expert applied it incorrectly. The chosen points are arbitrary, as is indicated by the curved dashed line on Crown's image below. The patent says that the hinge segment is generally linear. Crown looped around the key area (the end of the secondary score) to avoid the claim language. Crown



also picked a "center of hinge segment." A simple visual examination of the image above and to the right shows that what is supposed to represent the centerline of the "bent region of metal" is actually much closer to the horizontal area of metal (to the right) than it is to the roughly vertical region (to the left). Crown did not do this accidentally. Crown chose this clearly incorrect point so that the actual centerline's location would not be apparent. The actual centerline of the "bent region of metal" (using Crown's images) is closer to where Crown's "hinge segment" label line would extend. This line, if extended, would hit below (to the left of) the "end of anti-fracture score." This would destroy Crown's argument about the tail portion not transecting the "hinge segment." Because Crown's claim construction is flawed,

Crown's methodology is also flawed. Even accepting Crown's faulty claim construction, Crown's "analysis" is based on "cherry-picked" locations that are clearly incorrect, thereby at least raising a genuine issue of material fact about noninfringement.

Crown's second ground for claiming noninfringement is that "Rexam cannot prove infringement because undisputed evidence shows that the anti-fracture score in Crown's accused end does not pass through the hinge segment/hinge line." (D.I. 194, Crown's Mem. at 34.) Again, Crown used a faulty methodology and relied on a demonstrably incorrect claim construction in arriving at its conclusion. Crown purposely ignored the location of the "hinge segment" and the "tail portion" of the secondary score in relation to the hinge segment because doing so would have demonstrated that Crown infringes the '230 and the '728 Patents. Crown's flawed methodology produced irrelevant and mismarked images for the purposes of finding a way to avoid the clear language of Rexam's patent claims. Crown refers to

Redacted

Mr. Gillest's analysis appropriately used the patent claim language and specification as his guide and applied the plain and customary meaning to the claim terms as supported by the specification to perform his element-by-element analysis to draw his conclusion that Crown's B64 LOE end infringes the asserted claims of the '230 and '728 Patents. Mr. Gillest determined that each and every limitation from Claims 2, 5 and 13 from the '230 Patent and Claim 7 of the '728 Patent are present in Crown's LOE end. A quick comparison of the score configuration of Figures 6 and 7 from the patents in suit to Crown's can end (and reading of the claim language of Rexam's asserted claims) shows that Crown's end clearly falls

within the scope of the claims. The patent states that in "Fig. 6 [shown below and to the right], the tail portion 25 terminates in the end wall 12 beyond the score 22, and at least slightly transecting the line defining the hinge segment." *Id.* at Col. 7, lns 25-27 (emphasis added). Indeed, figure 6 of the patent shows the tail portion of the anti-fracture score touching the hinge segment 26. At the very least, a genuine issue of material fact exists as to the issue of noninfringement.




## V.    CONCLUSION

For all of the reasons stated herein, Crown has failed to demonstrate that it is entitled to summary judgment on any of the issues it raised in its motion. Therefore, Crown's motion for summary judgment should be denied.

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL   60601
312-775-8000

Dated:  February 20, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant/Counterclaimant*
*Rexam Beverage Can Co.*

RLF1-3117707-1

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>  and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on February 26, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700