# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., ) ) ) ) )  | |
| Plaintiffs, ) | Civil Action No. 05-608 (MPT) |
| v. ) ) | |
| REXAM BEVERAGE CAN CO., ) ) | REDACTED PUBLIC VERSION |
| Defendant. ) ) | |

**APPENDIX TO CROWN'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING REXAM'S COUNTERCLAIM I AND LIMITING DAMAGES ON COUNTERCLAIMS II-III BASED ON LACHES AND FAILURE TO COMPLY WITH 35 U.S.C. § 287(a)**

Barry Klayman (ID # 3676)
WOLF, BLOCK, SCHORR and
  SOLIS-COHEN LLP
Wilmington Trust Center
1100 N. Market Street
Wilmington, DE 19801
(302) 777-0313

Dale M. Heist
Lynn Malinoski
Chad E. Ziegler
WOODCOCK WASHBURN, LLP
2929 Arch Street
Philadelphia, PA 19104
(215) 568-3100

*Attorneys for Plaintiffs*
*Crown Packaging Technology, Inc.*
*and Crown Cork & Seal USA, Inc.*

Dated: March 9, 2007

**INDEX**

Exhibit 54            Excerpts from Deposition Transcript of Joseph Bauder

Exhibit 55            Declaration of Richard Krzyzanowski

Exhibit 56            Excerpts from 30(b)(6) Deposition Transcript of Terry Babbitt
                     dated 12/5/2006, pursuant to Rexam subpoena
                     **CONFIDENTIAL**

Exhibit 57            Excerpts from 30(b)(6) Deposition Transcript of
                     Richard Golding  dated 10/31/2006

# UNPUBLISHED DECISIONS INDEX

Exhibit G    *Stambler v. Diebold, Inc.*, No. 85 cv 3014, 1988 U.S. Dist. LEXIS 10132 (E.D.N.Y. Sept. 27, 1988)

Exhibit H    *Bound v. Spencer Gifts, Inc.*, Civ. No. 95-2216, 1996 U.S. Dist. LEXIS 14325 (E.D. Pa. Sept. 27, 1996)

Exhibit I    *W. Elec. Co., Inc. v. Piezo Tech.*, Case No. 81-694, 1990 U.S. Dist. LEXIS 12678 (M.D. Fla. Mar. 22, 1990)

Exhibit J    *Loral Corp. v. B.F. Goodrich Co.*, Civ. A. No. C-3-86-216, 1989 U.S. Dist. LEXIS 16865 (S.D. Ohio Jan. 27, 1989)

# EXHIBIT 54

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 1

```
 1
 2        IN THE UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF DELAWARE
 4                    -  -  -
 5   CROWN PACKAGING          :  C.A. NO.
     TECHNOLOGY, INC.,        :  05-608(KAJ)
 6   Plaintiff, and CROWN     :
     CORK & SEAL USA, INC.,   :
 7   Plaintiff and           :
     Counterclaim Defendant   :
 8
           vs.               :
 9
     REXAM BEVERAGE CAN CO.,:  JURY TRIAL
10   Defendant Counterclaim :   DEMANDED
11                    -  -  -
12            Friday, July 21, 2006
13                    -  -  -
             C O N F I D E N T I A L
14                    -  -  -
15                Videotape Deposition of
     JOSEPH F. BAUDER, taken pursuant to
16   notice, was held at the law offices of
     WOODCOCK WASHBURN, LLP, One Liberty
17   Place, 46th Floor, Philadelphia,
     Pennsylvania 19103, beginning at 9:09
18   a.m., on the above date, before MARIA
     NOELLE DAMIANI, Registered Merit
19   Reporter, Certified Realtime Reporter,
     Certified Shorthand Reporter (NJ License
20   No. 30XI00224100; DE License No. RPR-117)
     and a Notary Public.

21
                    -  -  -
22          ESQUIRE DEPOSITION SERVICES
            Four Penn Center, Suite 1210
23          1600 John F. Kennedy Boulevard
          Philadelphia, Pennsylvania 19103
24                (215) 988-9191
```

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 122

1  diameter on the necking die.
2      Q.   I have actually -- KO, is
3  that knock-out?
4      A.   That's knock-out.
5      Q.   What does knock-out mean?
6      A.   Knock-out is a -- is another
7  tool that's used in conjunction with the
8  die.
9      Q.   Is it strictly used for
10  necking operations or -- or is knock-out
11  a generic term used for several things in
12  tool and die?
13      A.   Yeah, knock-out is -- is
14  used for several terms -- things in -- in
15  the metal forming and tool and die, but
16  in this case, it's used -- referring to
17  necking.
18      Q.   Is it -- do you know -- what
19  does knock-out signify?  What in the
20  necking operation would be called
21  knock-out?  Is it a specific tool?
22      A.   There's a -- yes.
23      Q.   What -- what does that --
24  what -- what role does that tool play?

Page 123

1      A.   It's used in conjunction
2  with the necking die and it's on -- it's
3  really a plug that's, uhm, uhm, on the ID
4  of the necking die that works in the
5  metal forming process.
6      Q.   On the ID, what's the ID?
7      A.   The inside diameter, I'm
8  sorry.  The inside diameter of the
9  necking die, the knock-out is -- is
10  placed in there.
11      Q.   Is the knock-out doing any
12  of the bending of the back wall?
13      A.   Yes.
14      Q.   Which portion?
15      A.   The -- that's basically the
16  vertical portion where the metal comes
17  around and hits the knock-out and goes
18  vertical to the can wall again.
19      Q.   The narrower vertical
20  portion or the larger cylindrical
21  portion?
22      A.   The --
23      Q.   You said the vertical
24  portion.

Page 124

1      A.   You have a vertical wall,
2  which is your body -- body wall, and then
3  you have another vertical wall, which is
4  the neck -- neck wall after it's been
5  reduced.
6      Q.   Right.
7      A.   Well, if you don't have a
8  knock-out in there, the metal would just
9  keep going inwardly, so what happens is
10  the metal, when it comes around the die,
11  hits the knock-out and then goes vertical
12  again.
13      Q.   Is the knock-out located
14  inside the open end of the can?
15      A.   Yes, or during the process
16  of forming it, yes.
17      Q.   Is it what the -- the die on
18  the -- that goes over the external part
19  of the can?
20      A.   Yes.
21      Q.   Sort of -- sort of hits
22  against during the bending process?  It's
23  what keeps it from --
24      A.   The metal hits against.

Page 125

1      Q.   All right.  You already said
2  that's what keeps it from only bending
3  inward?
4      A.   Yes, it's -- it redirects
5  the metal --
6      Q.   Okay.
7      A.   -- to go vertical to the can
8  wall again.
9      Q.   Are you aware that Belvac
10  has a license agreement with -- in place
11  with Rexam related to smooth die necking?
12      A.   I believe there was some
13  discussions about that years ago.  I --
14      Q.   When do you believe you
15  became aware of that?
16      A.   Sometime in the early '90s,
17  I guess.  You know, I don't know when we
18  started to do the program, I guess.
19      Q.   Did you ever have a meeting
20  with anyone from Belvac where this
21  license agreement was discussed?
22      A.   You know, I don't recall.
23  I'm sure it must have come up somewhere
24  along the way, but I can't -- I can't say

32 (Pages 122 to 125)

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 126

1    for certain.
2        Q.   You mentioned earlier that
3    you know a Charlie Price from Belvac?
4        A.   Yes.
5        Q.   Did you discuss -- did you
6    discuss the Belvac, at the time, ANC
7    agreement, with Charlie Price at any
8    point?
9        A.   You know, I -- I don't want
10   to say I did or did not.  I just don't
11   remember, to be honest with you.  I would
12   guess that I probably did somewhere along
13   the way, but I don't -- I don't know.
14       Q.   Okay.  Did you know that
15   license agreement related to smooth die
16   necking technology?
17       A.   See, you know, I was vaguely
18   aware of some of this stuff.  There was,
19   uhm, I was main -- my -- my primary reason
20   was the equipment side of this and the
21   development side was handled by somebody
22   else, you know, in -- in, uhm -- during
23   that period from 1990 on, so I got
24   involved to some degree, but not real

Page 127

1    extensively.
2        MR. McANDREWS:  We are going
3    to break right now.  The
4    videographer needs to change the
5    tape.
6        THE WITNESS:  Sure.
7        THE VIDEOGRAPHER:  This is
8    the end of Tape Number 1.  The
9    time is 11:17 a.m.  We are now off
10   the record.
11       - - -
12       (Whereupon, there was a
13   discussion held off the record at
14   this time.)
15       - - -
16       THE VIDEOGRAPHER:  This is
17   the beginning of Tape Number 2.
18   The time is 11:19 a.m.  We are
19   back on the record.
20   BY MR. McANDREWS:
21       Q.   Mr. Bauder, you just
22   mentioned that, at that time, the time
23   being the early '90s, I believe you
24   said --

Page 128

1        A.   Yes.
2        Q.   -- you had possible
3    discussions with Belvac about the Belvac
4    ANC agreement.  You mentioned that you
5    worked more with the equipment as opposed
6    to the development.  Can you give me the
7    distinction?
8        A.   Yes.  Yes.  The development
9    of the can had moved to the -- to the
10   tech center, which was in Oak Brook,
11   Illinois, and Bob Gruodis was the fellow
12   that was really responsible for the
13   development process on the cans.
14       Q.   What's Mr. Gruodis' -- you
15   said Bob Gruodis?
16       A.   Yes.
17       Q.   What's his -- what was his
18   title at that time?
19       A.   He was a director -- maybe
20   it was director of development
21   engineering.  I'm not a hundred percent
22   certain of his exact title.  I know he
23   was a director.
24       Q.   So you think he's a likely

Page 129

1    person that would have been involved in
2    discussions with Belvac about that type
3    of thing?
4        A.   Yes.  Yes.
5        Q.   Is Mr. Gruodis still
6    employed by Crown?
7        A.   No.  Mr. Gruodis passed away
8    suddenly.
9        Q.   Did you meet with Charlie
10   Price on several occasions during 1993
11   and 1994?
12       A.   I'm sure I probably did.  I
13   -- I don't know.
14       Q.   Would -- would you be
15   surprised if Mr. Price recalls discussing
16   the license agreement with you?
17       A.   No.  You know, I mean, I
18   said it was possible.  I don't -- you
19   know, I know I heard of it, but, you
20   know, particular discussions, I'm not --
21   I just don't remember.
22       Q.   From that time frame, what
23   -- what do you recall about it, about the
24   -- the license agreement?  You said you

33 (Pages 126 to 129)

JOSEPH F. BAUDER, JULY 21, 2006
C O N F I D E N T I A L

Page 130

1   heard about it.
2       MS. MALINOSKI: Asked and
3   answered, but --
4   BY MR. McANDREWS:
5       Q.   You knew it related to
6   smooth die necking?
7       A.   Yes.
8       Q.   You knew that it related to
9   a patent held by ANC at the time?
10      A.   Yes.
11      MS. MALINOSKI: Objection.
12  Assumes --
13      THE WITNESS: I guess, I
14  would say yes.
15  BY MR. McANDREWS:
16      Q.   And did you know that it --
17  it covered Belvac equipment?
18      MS. MALINOSKI: I will
19  object to the extent that's asking
20  for a legal conclusion about what
21  the patent covered or a patent
22  covered.
23      THE WITNESS: I don't know.
24  BY MR. McANDREWS:

Page 131

1       Q.   Did you know -- did you know
2   at the time that it related to Belvac
3   equipment?
4       A.   I just knew they had some
5   agreement with -- with them. That's all.
6       Q.   That covered what?
7       A.   I think it could be used in
8   any equipment.
9       Q.   You thought the agreement
10  could be used in any equipment?
11      A.   No, I'm saying I just know
12  that -- you know, that Belvac had some
13  agreement to use whatever technology.
14      Q.   And you -- and you knew the
15  subject matter of the technology?
16      A.   The subject matter being
17  smooth die necking?
18      Q.   Correct.
19      A.   Yes, that was explained to
20  me.
21      Q.   Do you think you ever may
22  have had discussions with anyone else
23  from Belvac about the license agreement?
24      A.   It's -- I don't know. It's

Page 132

1   possible. I just don't know. I don't
2   remember.
3       Q.   Do you recall ever having
4   discussions with anyone from ANC about
5   the license agreement?
6       A.   No.
7       Q.   How about ANC's successor,
8   Rexam?
9       A.   No, I didn't have any
10  discussions with anybody.
11      Q.   With Rexam or any of its
12  predecessors?
13      A.   No.
14      Q.   Were you involved in
15  purchasing necking equipment from Belvac?
16      A.   Yes.
17      Q.   Okay. Do you know an R.L.
18  Szoch, S-z-o-c-h?
19      A.   Oh, yeah, Richard Szoch.
20      Q.   Szoch?
21      A.   Yes.
22      Q.   Okay. Is he still with the
23  company?
24      A.   No, he's retired.

Page 133

1       Q.   What was his title back in
2   the early '90s?
3       A.   He was director of engineer
4   -- no, I'm sorry. He was a
5   vice-president of engineering. I
6   reported to him. He was my boss.
7       Q.   How about an Ed Vesey?
8       A.   Ed Vesey.
9       Q.   Vesey, I'm sorry.
10      A.   Yes. He was purchasing. He
11  had responsibility for purchasing. I'm
12  not sure what he -- what his title was at
13  the time.
14      Q.   Would they have likely had
15  -- to the best of your knowledge, would
16  they have had discussions with Charlie
17  Price or anyone -- anyone else from
18  Belvac?
19      MS. MALINOSKI: Lack of
20  foundation.
21      MR. McANDREWS: If you know.
22      THE WITNESS: I don't know
23  -- I don't know.
24  BY MR. McANDREWS:

34 (Pages 130 to 133)

# EXHIBIT 55

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. AND CROWN CORK & SEAL USA, INC., <br><br> PLAINTIFFS, <br><br> V. <br><br> REXAM BEVERAGE CAN CO., <br><br> DEFENDANT. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION NO. 05-608 (MPT) |

### Declaration of Richard Krzyzanowski

I, Richard Krzyzanowski, hereby declare as follows:

1.    I was employed by Crown from 1967-2000. I held positions as Executive Vice President, Secretary and General Counsel. I am now engaged as a consultant for Crown.

2.    In the very early 1990s, I became aware of U.S. Patent No. 4,774,839. I asked for and received an opinion of counsel relating to this patent.

3.    In connection with this litigation, Crown conducted a reasonably diligent search and was unable to locate the opinion in its files.

I hereby declare under penalty of perjury of the laws of the United States of America that the statements made herein of my own knowledge are true and correct and the statements made on information and belief are believed to be true and correct, and further that these statements were made with the knowledge that, under the laws of the United States of America, willful false statements and the like so made are punishable by fine or imprisonment, or both. This declaration was executed in 3/1/'07 on the date set forth below.

Richard Krzyzanowski

Date: March 1, 2007

# EXHIBIT 56

# - Confidential -
# Subject to
# Protective Order

# EXHIBIT 57

RICHARD GOLDING,  30(b)(6),  OCTOBER 31, 2006

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
 2                  -   -   -
    CROWN PACKAGING          :   CIVIL ACTION
 3  TECHNOLOGY, INC.,        :
    Plaintiff, and CROWN     :
 4  CORK & SEAL, USA,        :
    INC., Plaintiff and      :
 5  Counterclaim Defendant,  :
                             :
 6        vs.                :
                             :
 7  REXAM BEVERAGE CAN CO.,  :   NO. 05-608
    Defendant Counterclaimant: (KAS)
 8                  -   -   -
 9             October 31, 2006
10                  -   -   -
11             30(b)(6) DEPOSITION
12                  -   -   -
13             Oral deposition of RICHARD
    GOLDING, held in the offices of Woodcock
14  Washburn LLP, One Liberty Place, 33rd
    Floor, Philadelphia, Pennsylvania 19103,
15  commencing at 10:06 a.m., on the above
    date, before Pamela J. Gober Bracic, a
16  Federally Approved Registered
    Professional Reporter and Commissioner
17  for the Commonwealth of Pennsylvania.
                    -   -   -
18
19
20
21
22        ESQUIRE DEPOSITION SERVICES
           Four Penn Center - Suite 1210
23         1600 John F. Kennedy Boulevard
           Philadelphia, Pennsylvania 19103
24              (215) 988-9191
```

RICHARD GOLDING, 30(b)(6), OCTOBER 31, 2006

Page 14

1    involvement.
2  BY MR. WILLIS:
3        Q.    Do you have an
4  understanding, as an engineer who is
5  familiar with this, as to whether there
6  are certain benefits from the reforming
7  process that is currently used at Fort
8  Bend?  In other words, reforming from the
9  inside as compared to reforming from the
10  outside?
11        MR. GORANIN:  Objection to
12    the extent that it doesn't fall
13    within the scope of the 30(b)(6).
14        MR. WILLIS:  Category one.
15        MR. GORANIN:  I don't see
16    any place in category one where
17    metal savings or benefits are
18    referred to.
19        MR. WILLIS:  It says "bottom
20    reforming process or processes
21    that Crown currently performs or
22    has performed since 1996."  I'm
23    asking if there's a benefit that
24    Fort Bend is using, as compared to

Page 15

1    what his former employer had on
2    the market.
3        MR. GORANIN:  I'm not
4    instructing the witness not to
5    answer at this point, but he is
6    testifying from his own individual
7    knowledge at this point and not on
8    above behalf of Crown.
9        THE WITNESS:  I'm a little
10    confused on the outcome of that
11    conversation.
12  BY MR. WILLIS:
13        Q.    The overall question is, is
14  there a benefit or an advantage to
15  reforming the base of the beverage can
16  from the inside versus reforming it from
17  the outside?
18        MR. GORANIN:  Same
19    objections as noted previously.
20        THE WITNESS:  There's two,
21    at least two, aspects of
22    differences in the equipment.  One
23    is how the equipment fits in with
24    the other equipment in the line.

Page 16

1        So given a particular
2    existing layout, that may favor
3    one piece of equipment over the
4    other.
5  BY MR. WILLIS:
6        Q.    Okay.
7        A.    And the processes themselves
8  both have benefits in slightly different
9  areas.  It goes back to a bigger question
10  of the can design in the location, as to
11  which one becomes more favorable to use.
12  So it's part of a broad equation, if you
13  like, that goes to whether one is more
14  beneficial than the other in any
15  particular application.
16        Q.    But in any event someone,
17  prior to your arrival at Crown, decided
18  to do the base reforming using internal
19  base reforming versus base reforming on
20  the outside?
21        A.    Someone made that decision,
22  yes.
23        Q.    You testified previously
24  that during the process of using the 595K

Page 17

1  base reformer to form base reforming,
2  there's a piece of the machine that holds
3  the can in place, and I believe you
4  called it the receptacle?
5        A.    Correct.
6        Q.    Does the receptacle keep the
7  can from moving during the base reforming
8  process?
9        A.    In a radial direction, yes.
10        Q.    I would like to show you
11  what we previously marked as Defendant's
12  Exhibit-29, which is Belvac production
13  number BEL 1133 through 1346.
14        Do you recall us talking
15  about this particular document at your
16  last deposition?
17        A.    I remember seeing something
18  similar to this, yes.
19        Q.    Is this something that
20  Belvac would provide to Crown when they
21  would sell a machine to Crown?
22        A.    Normally, yes.
23        Q.    I would like you to turn to
24  page BEL 1318.

5 (Pages 14 to 17)

RICHARD GOLDING, 30(b)(6), OCTOBER 31, 2006

Page 26

1    MR. GORANIN: Hole.
2    MR. WILLIS: Not you, Alex.
3    THE WITNESS: I don't know.
4  It's not something I've considered
5  before.
6  BY MR. WILLIS:
7    Q.   So you have no idea what the
8  purpose is of designing the dome
9  receptacle in this manner with that space
10 or opening there?
11    MR. GORANIN: Objection.
12    THE WITNESS: No, I don't.
13  I know the reasons why this is no
14  longer used like this.
15 BY MR. WILLIS:
16    Q.   Can you tell me why it's no
17 longer used like that?
18    A.   Because getting the can out
19 was a problem, and it kept tripping over
20 that sort of extended portion of the
21 receptacle.
22    Q.   If we are looking at it, say
23 we are looking at the right side of this
24 figure, which part of the receptacle are

Page 27

1  you talking about?
2    A.   Do you want me to put
3  another arrow and label it?
4    Q.   Sure.
5    A.   Let's call that the
6  receptacle tip.
7    Q.   So that receptacle tip was
8  removed to enable the can to come out of
9  the machine more easily?
10    A.   Yes.
11    Q.   So if you are saying it was
12 removed, are you implying that Crown did
13 actually use this form of or type of
14 bottom reformer depicted on 57953, and
15 then went to what is shown in Exhibit-29?
16    MR. GORANIN: Objection.
17  Outside the scope of the 30(b)(6).
18  The 30(b)(6) topics call for
19  topics since 1996.
20 BY MR. WILLIS:
21    Q.   Sometime between 1995 and
22 August of 1996, did Crown change from
23 this design to the design that was shown
24 this Exhibit-29?

Page 28

1    A.   By the time I arrived in
2  1996, the process was as depicted in
3  here.
4    Q.   Did you have some
5  understanding that --
6    MR. GORANIN: By "in here"
7  what do you mean?
8    THE WITNESS: Exhibit-29.
9  BY MR. WILLIS:
10    Q.   But it's your understanding
11 that what was depicted in Exhibit-29 came
12 after what is depicted in Exhibit-173?
13    A.   Yes.
14    Q.   I would like to show you
15 what I'm going to mark as Exhibit-174.  I
16 ask you if you recognize this document?
17    A.   Yes, I do.
18    Q.   And this document, it
19 appears to me, is dated either June 24,
20 1998 or August 24, 1998.  I can't tell.
21 And I even tried to blow it up.
22    A.   From this print, I agree.
23    Q.   But it's sometime in 1998.
24 Would you agree?

Page 29

1    A.   Yes.
2    Q.   Do you know who S.J. Digby
3  is?
4    A.   Yes, Steve Digby.
5    Q.   And he worked for Crown?
6    A.   He stills works for Crown in
7  the UK.
8    Q.   And this is a drawing that
9  was prepared at Crown? I believe you can
10 see the Crown logo in the box.
11    A.   Correct.
12    Q.   There are sort of three
13 drawings on this document.  What is the
14 larger drawing in the middle towards the
15 bottom; what does that represent?
16    A.   That's a detailed view of
17 the section circled in the right-hand
18 image.
19    Q.   I'm sorry, I was asking
20 about this one.  (Indicating.)
21    A.   I thought you said the big
22 one in the middle.
23    Q.   I'm sorry, mine is like
24 different.  Let's start over.

8 (Pages 26 to 29)

RICHARD GOLDING, 30(b)(6), OCTOBER 31, 2006

Page 30

1    The larger drawing on the
2  middle left, what is that drawing?
3        A.    It happens to be my right.
4        Q.    Sorry.
5        A.    That shows a cross-sectional
6  view of a dome receptacle.
7        Q.    And what you referred to a
8  moment ago, the blown-up portion, it says
9  "detail view."  Is that also a blown-up
10  portion of the dome receptacle?
11        A.    A portion on the dome
12  receptacle, yes.
13        Q.    And the diagonal lines,
14  again, shown there represent solid
15  material.  Is that correct?
16        A.    That's correct.
17        Q.    Was this another change in
18  the design of the dome receptacle during
19  your tenure at Crown?
20        A.    This is an experimental one
21  for the B890 bottom profile.
22        Q.    And what was the B890 bottom
23  profile?
24        A.    That is the nomenclature

Page 31

1  that Crown uses to describe our
2  two-on-two stackable base profile.
3        Q.    Now, would you agree with me
4  that what is shown in this diagram with
5  respect to the dome receptacle, and I
6  guess how high up it goes -- first of
7  all, looking at that detail view, can you
8  tell me which would be the inside and
9  which would be the outside?  Because I
10  can't tell.
11        A.    Outside of what?
12        Q.    Of the stand radius, if
13  there were a can in that receptacle.
14        A.    Okay.  Do you want me to
15  mark that on here?
16        Q.    That would be great.  That
17  might be the easiest way to do it.
18        A.    Okay.  (Witness complies.)
19  Between those two lines is inside the
20  stand diameter.
21        Q.    So on the blown-up version,
22  this hash mark is on the outside?
23        A.    Where you are pointing to is
24  on the outside, yes.

Page 32

1        Q.    You said it was an
2  experimental drawing.  Did Crown ever
3  implement this design?
4        A.    No.
5        Q.    Never used it commercially?
6        A.    Not commercially.  It was
7  used for trials in Alcip.
8        Q.    Do you know why it was never
9  implemented by Crown?
10        A.    It didn't give the benefits
11  that we were looking to achieve in doing
12  it.
13        Q.    And what benefits were you
14  trying to achieve?
15        A.    Improve the handling out of
16  the machine.
17        Q.    There's a notation that says
18  in the box, "third angle projection."
19  Can you tell me what that is referring
20  to?
21        A.    It's an engineering term
22  describing how the drawing was drawn.
23        Do you want me to go into
24  more detail about it?

Page 33

1        Q.    Yes, if you would.
2        A.    If you take an object and
3  draw it in views on a piece of paper,
4  there are different ways to do it.  You
5  can project this image either putting it
6  on the paper that way, when you convert
7  it to paper, or you can take it and put
8  it that way.  (Indicating.)
9        When you look at the drawing
10  you need to know which way it is being
11  done, otherwise you get mirror-image
12  parts.  That's in one dimension.
13        If you have a
14  three-dimensional part, there are
15  actually eight different ways you could
16  do it in all views.  And third-angle
17  projection is a description of one of
18  those systems.
19        Q.    And that's what is being
20  shown --
21        A.    That's how this is being
22  drawn, yes.
23        Q.    Got it.
24        A.    If this were a first-angle

9 (Pages 30 to 33)

Page 34

1  projection, these two images would swap
2  sides.
3      Q.   I'm going to show you what I
4  will mark Exhibit-175. And that is
5  production number CCS0059245.
6          Do you recognize this
7  document?
8      A.   Yes, I do.
9      Q.   Can you tell me what this
10 document is?
11     A.   This is of a base
12 receptacle, again, for use on the bottom
13 reformers in Patras, Greece.
14     Q.   Where does it tell you it's
15 for Patras, Greece?
16     A.   I was working on the project
17 when I drew this, and I can remember the
18 need for this.
19     Q.   So you don't know why we
20 would have received this document in this
21 case? Our case only deals with the U.S.
22     A.   This document was drawn in
23 the U.S., and I was asked for all
24 documents showing bottom reforming in the

Page 35

1  U.S. This was drawn in the U.S.
2      Q.   But it was never used in a
3  machine in the U.S.?
4      A.   No.
5      Q.   Do you know whether or not
6  Crown was also using the Belvac base
7  reforming equipment in Greece that would
8  correspond to what this drawing was for?
9      A.   Yes, we do use that bottom
10 reforming equipment in Greece.
11     Q.   So this has nothing to do
12 with the U.S., other than it was drawn
13 here?
14     A.   This drawing, that's
15 correct.
16     Q.   But there's nothing on the
17 document, other than your memory, that
18 would indicate that it was just for
19 Greece. Is that true?
20     A.   That is correct, yes.
21         Why I know it is the note
22 saying mine is nine thou. And I can
23 remember the panic on tooling delivery
24 that required this drawing to be drawn.

Page 36

1      Q.   Let me ask you a couple of
2  questions about this drawing anyway. In
3  the Detail B figure, what does the 64
4  degrees there mean?
5      A.   That would be the angle on
6  the tool -- the 72 thou radius is swept
7  round to a 64-degree angle, and then that
8  radius finishes.
9      Q.   What does the "E" identify?
10     A.   "D" and "E," if you look,
11 there's a note on the bottom. It says
12 "Profile D to E to be" polished to an
13 eight finish. So on that drawing it's
14 showing the area where you need to start
15 and finishing the tooling for
16 manufacture.
17     Q.   Let's move on. I'm going to
18 show you what I will mark as Exhibit-176.
19 This is production number CCS0059257.
20         Do you recognize this
21 document?
22     A.   Yes, I do.
23     Q.   Can you tell me what this
24 document represents?

Page 37

1      A.   This shows some
2  cross-sections of a receptacle and a
3  roller, and represents -- this refers to
4  some work in Alcip on setting up the
5  reformer for, again, some trials there.
6      Q.   I see there are two figures
7  on this document. Do you see that?
8      A.   Yes.
9      Q.   And the top figure says
10 "Current setup as of Tuesday 3/2/04." Do
11 you see that?
12     A.   Yes, I do.
13     Q.   Does that represent the
14 bottom reforming setup that Crown was
15 using at Fort Bend in 2004?
16     A.   No. That represents the
17 setup on the test rig in Alcip for
18 experimental purposes on that date.
19     Q.   So this drawing represents
20 experiments that were done with base
21 reformers in Alcip?
22     A.   Correct, yes.
23     Q.   Was this design ever put
24 into production at Crown's facilities in

10 (Pages 34 to 37)

Page 38

1  Fort Bend?
2      A.   Not as shown there, no.
3      Q.   Are there any drawings that
4  you've seen today that would indicate
5  what the base profile dome receptacle
6  would look like as of 2004?
7      A.   In Fort Bend?
8      Q.   In Fort Bend.
9          MR. GORANIN:  That you've
10  shown him today?
11          MR. WILLIS:  Or that's been
12  produced to us.
13          MR. GORANIN:  Any documents
14  that Crown has produced in this
15  case that show --
16          MR. WILLIS:  The current
17  configuration of the dome
18  receptacle of the bottom reforming
19  equipment being used at Fort Bend.
20          MR. GORANIN:  As of when?
21          MR. WILLIS:  As of now.
22          THE WITNESS:  There should
23  be.  The current tooling used are
24  all on Belvac drawings.  And I

Page 39

1      know we have not received copies
2  from Belvac of those drawings.
3  BY MR. WILLIS:
4      Q.   Is Belvac working, or was
5  Belvac working at this time in 2004, with
6  these drawings, working with Crown and
7  modifying the dome receptacle, or is that
8  something you guys were doing on your
9  own?
10      A.   Actually, no, this has
11  nothing to do with change in tooling.
12  This setup was used for the receptacle we
13  had to reform.  That receptacle was
14  already sitting in the drawer, and Allen
15  picked that one out to use.
16          So, yes, I'd asked him to do
17  some work on the -- looking at what the
18  setup details should be for a particular
19  can.
20          To do that, he needed to
21  pull tools that his had out of the drawer.
22  And these just depict the ones that he
23  picked from the drawer to make those
24  samples that were requested of him from

Page 40

1  the results of the specifications were
2  set up for -- using Belvac
3  nomenclature -- the HR and B diameter.
4  And then Belvac tools were used to create
5  that profile.
6      Q.   Okay.
7      A.   So the tools we used are
8  different than the ones used to generate
9  the settings.
10      Q.   Specifically with regard to
11  the dome receptacle, the dome receptacle
12  that is depicted on Exhibit-176 appears
13  to me to be different than the dome
14  receptacle that is shown on Exhibit-174.
15      A.   I believe it to be one and
16  the same base, 174 and 176.
17      Q.   And you said that 174 was
18  never commercially used by Crown.  Is
19  that right?
20      A.   That's right.  It was an
21  experimental one.
22      Q.   So then in 176, that's the
23  same experimental dome receptacle?
24      A.   Yes.

Page 41

1      Q.   When I asked you whether or
2  not this dome receptacle was ever
3  commercially implemented by Crown, you
4  said not this version.  What do you mean
5  by that?
6          MR. GORANIN:  On 176?
7          MR. WILLIS:  On 176.
8          THE WITNESS:  What I meant
9  by that -- can I refer to 174?
10  Because that's got details on it.
11  BY MR. WILLIS:
12      Q.   Sure.
13      A.   Receptacles with some of the
14  features shown here.  So with the 189
15  diameter here, and with the 70 thou
16  radius here, they were produced, and used
17  in Crown, but they didn't have this
18  height above it.  It looked closer to
19  this one. (Indicating.)
20          Again, this drawing was for
21  Greece, but this has the 189 dimension
22  and the 72 thou, but they used a
23  different plate.  But in the way that
24  this uses of the features of this 174

11 (Pages 38 to 41)

# EXHIBIT G

LEXSEE 1988 U.S. DIST. LEXIS 10132



Positive
As of: Mar 02, 2007

**LEON STAMBLER, Plaintiff, v. DIEBOLD, INC., NCR CORPORATION and MANUFACTURERS HANOVER TRUST, Defendants**

**No. 85 CV 3014**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*1988 U.S. Dist. LEXIS 10132; 11 U.S.P.Q.2D (BNA) 1709*

**August 30, 1988, Decided; September 2, 1988, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant moved for summary judgment pursuant to *Fed. R. Civ. P. 56* on the grounds of noninfringement, laches, estoppel and failure to mark.

**OVERVIEW:** Plaintiff was the owner of a certain patent for card validation for ATM machines. Plaintiff had approached defendant about licensing the patent. Defendant was not interested in such a license. Plaintiff then in 1975 filed suit against another company that he believed was infringing upon his patent. At that trial, plaintiff testified that he also believed that defendant was infringing upon his patent. Plaintiff waited eleven years before filing suit against defendant. Defendant moved for summary judgment pursuant to *Fed. R. Civ. P. 56* on the grounds that the suit was barred by noninfringement, laches and estoppel. Defendant argued that it had relied on the plaintiff's eleven years of inaction, by expanding research and production. The court granted defendant's motion, concluding that plaintiff had exercised unreasonable delay in bringing the suit and defendant had relied upon plaintiff's inaction.

**OUTCOME:** The court granted defendant's motion for summary judgment, as the action was barred by laches and estoppel.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] A party moving for summary judgment pursuant to *Fed. R. Civ. P. 56* bears the considerable burden of demonstrating the absence of disputed material issues of fact by proof that would be admissible at trial.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN2] A trial court must resolve all ambiguities and draw all reasonable inferences against the moving party. The

responsibility of the district court is to determine whether there are issues to be tried, rather than to try the issues via affidavits. Under *Fed. R. Civ. P. 56*, a party opposing summary judgment cannot rely on his pleadings alone to raise a genuine issue of fact. He must respond with affidavits of persons qualified to testify and other evidence admissible at trial. *Fed. R. Civ. P. 56(e)*.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
[HN3] The law is clear that in a suit brought for patent infringement, the affirmative defense of laches requires, in the light of all the existing circumstances, proof of unreasonable and inexcusable delay in the assertion of the claim and prejudice or injury resulting from the delay.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Damages > Time Limitations*
[HN4] Once a delay in asserting patent infringement exceeds six years, prejudice and unreasonable delay are presumed and the burden of proof shifts from the alleged infringer to the patentee to prove the existence and reasonableness of the excuse and to show lack of injury.

*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*
[HN5] See *35 U.S.C.S. § 286*.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
[HN6] Plaintiff has the burden of showing an excuse for his failure to bring suit.

*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*
[HN7] Plaintiff cannot recover damages for any alleged infringement after the expiration date of his patent.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > General Overview*
[HN8] The six-year period begins to run once a patent

owner has knowledge of sufficient facts to warrant the filing of suit or once he could have acquired sufficient facts by diligently making reasonable inquiries.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
[HN9] The existence of other litigation does not serve as a complete bar to the assertion of a laches defense.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN10] A showing of laches alone is insufficient to bar a patentee's request for prospective injunctive relief or damages arising after the filing of suit. The defendant must also prove estoppel by demonstrating actions on the part of a patentee that justify a belief by the alleged infringer that the patent will not be enforced against him. Additionally, the defendant must show that it actually relied on the misleading conduct to its detriment.

**OPINION BY:** [*1]

PLATT

**OPINION:**

*MEMORANDUM AND ORDER*

THOMAS C. PLATT, CHIEF UNITED STATES DISTRICT JUDGE

Defendant Diebold, Inc. ("Diebold") moves this Court for summary judgment pursuant to *Federal Rule of Civil Procedure 56* on the grounds of noninfringement, laches and estoppel, and failure to mark. Defendant NCR Corporation also moved for summary judgment; however, it subsequently settled with the plaintiff so is no longer a party in the action. As set forth below, we conclude that the action is barred by the doctrines of laches and estoppel.

*BACKGROUND*

Plaintiff, Leon Stambler, is an electrical engineer who conceived the Stambler card validation system, a system of activating automatic bank teller machines ("ATM's"), on November 20, 1968. n1 The Stambler patent, United States Letters Patent No. Re. *31,302* ("the

'302 patent"), was issued on January 15, 1974. On July 5, 1983, the original '302 patent was reissued on the same system, U.S. Patent No. 3,786,402 ("the 402 patent"). From the mid-1970's plaintiff was familiar with the ATM products of all major U.S. companies in the ATH business. Within months after his original patent issued on January 15, 1974, plaintiff wrote to defendant Diebold. [*2] In his letter, plaintiff asked whether the defendant would be interested in licensing the subject matter covered by the '302 patent for use in ATM's manufactured and distributed by defendant's company. On August 7, 1974, the defendant sent plaintiff a letter stating that it had no interest in obtaining a license under plaintiff's patent. It is undisputed that defendant received no further correspondence from plaintiff until the filing of the present law suit in 1985.

n1 Plaintiff's card validation system reduces the risk of loss due to the fraudulent use of credit and bank cards. It is an improved and economical system for the validation of credit or cash cards which involves a method whereby the cardholder keys in a memorized number and inserts any credit or bank card, which contains information relating to a customer's account number, into the ATM. One of the keyed-in numbers selects a translator to convert numbers read off the card into different numbers in order to "match up" with the remaining keyed-in numbers. The transaction will only proceed if the compared numbers match.

In January 1975, plaintiff filed a patent infringement suit against the Mosler Safe Company and American [*3] Standard Company under the original '302 patent. During the Mosler suit, plaintiff testified that he believed Diebold was infringing on his patent. The Mosler suit ended in settlement in 1976. The Diebold McCune and Kinker patents, the former of which discloses Diebold's Personal Identification Number (PIN) validation system, were issued in April and May 1977, respectively, more than eight years before the present suit was filed. Defendant continues to market its ATM's and to use its PIN validation system, a PIN offset and Algorithm type numbers. n2 This system of using a PIN, a Personal Account Number (PAN), and an Algorithm Number to initiate the encryptor for the PAN is accused of infringement. However, this system stems from a national industry standard proposed in 1973.

n2 Cardholders receive a number to memorize when issued a card. This number is called a Personal Identification Number (PIN). Additionally, each cardholder has a Personal Account Number (PAN) to identify his or her account. The PAN may be related to the PIN by a very complex crytographic algorithm. It is the Algorithm Number that initiates the encryption algorithm that Enciphers the PAN. In operation, the cardholder keys in his PIN. The PAN and Algorithm Number are read by the ATM. The encrypted PAN dig its are compared to the keyed-in PIN. If they match, the user is recognized as the authorized cardholder since he keyed-in the correct PIN. A finder of a card cannot readily decipher it from reading the PAN on the card. In many modern ATM systems, customers select PIN's of their choice, so that they can easily memorize the PIN. Rather than changing the customer's PAN to accommodate his choice PIN the bank simply employs an Offset that makes up the difference between the enciphered PAN and the selected PIN. This system stems from a standard proposed in 1973. Unlike the accused Diebold systems, the system described in the '302 patent does not permit a cardholder to select his own easily memorizable PIN.

[*4]

On August 13, 1985, plaintiff filed the present suit alleging infringement of his patent and seeking damages and a permanent injunction barring future infringement. In support of its motion to dismiss, the defendant argues that relying on plaintiff's eleven years of inaction, it expanded production, research, and marketing of its ATM's. Additionally, the company contends it invested considerable amounts of money in its manufacturing facilities. It contends that plaintiff waited to sue until after the manufacture of ATM's became a billion dollar business. Based on this delay and the resulting prejudice, the defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 to dismiss the claim for patent infringement on the ground, among other grounds, that the suit is barred by the equitable doctrines of laches and estoppel.

DISCUSSION

[HN1] A party moving for summary judgment

pursuant to Rule 56 bears the considerable burden of demonstrating the absence of disputed material issues of fact by proof that would be admissible at trial. See *Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2513 (1986); Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986);* [*5] *Adickes v. Kress & Co., 398 U.S. 144, 160 (1970); Gatling v. Atlantic Richfield Co., 577 F.2d 185, 188 (2d Cir. 1978),* cert. denied, *439 U.S. 861 (1978); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975).* The [HN2] Court must resolve all ambiguities and draw all reasonable inferences against the moving party. See *American Int'l Group, Inc. v. London Am. Int'l Corp., Ltd., 664 F.2d 348, 351 (2d Cir. 1981).* As the Second Circuit has explained, the responsibility of the district court is to determine whether there are issues to be tried, rather than to try the issues via affidavits. Id. The litigant opposing summary judgment may not rest on conclusory allegations or denials as the vehicle for obtaining a trial. *Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).* Rather, he must bring to the district court's attention some affirmative indication that his version of the relevant facts is not fanciful. Id. Under *Fed. R. Civ. P. 56,* a party opposing summary judgment cannot rely on his pleadings alone to raise a genuine issue of fact. *Gatling, 577 F.2d at 187-88.* He must respond with affidavits of persons qualified [*6] to testify and other evidence admissible at trial. *Fed. R. Civ. P. 56(e).*

In the following sections, the Court will analyze defendant's motion with respect to the defenses of laches and estoppel and the claim for willful patent infringement. The analysis will be guided by the principles ennuciated above.

### LACHES

[HN3] The law is clear that in a suit brought for patent infringement, the affirmative defense of laches requires, in the light of all the existing circumstances, proof of (1) unreasonable and inexcusable delay in the assertion of the claim and (2) prejudice or injury resulting from the delay. *Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1572 (Fed. Cir. 1987); Bott v. Four Star Corp., 807 F.2d 1567, 1575 (Fed. Cir. 1986); Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 741 (Fed. Cir. 1984);* see also *Jensen v. Western Irrigation and Mfg., Inc., 650 F.2d 165, 168-69 (9th Cir. 1980),; Studiengelsellschaft Kohle M.B.H. v. Eastman Kodak Co., 616 F.2d 1315, 1326 (5th Cir. 1980),* cert. denied, *449 U.S. 1014 (1980);*

*American Home Prod. Corp. v. Lockwood Mfg. Co., 483 F.2d 1120, 1122 (6th Cir. 1973),* cert. denied, *441 U.S. 1158 (1974); Lemelson* [*7] *v. Carolina Enter., Inc., 541 F. Supp. 645, 651 (S.D.N.Y. 1982).* [HN4] Once a delay in asserting patent infringement exceeds six years, prejudice and unreasonable delay are presumed and the burden of proof shifts from the alleged infringer to the patentee to prove the existence and reasonableness of the excuse and to show lack of injury. n3 *Hottel Corp., 833 F.2d at 1572; Bott, 807 F.2d at 1575; Jensen, 650 F.2d at 168; Potter Instrument Co., Inc. v. Storage Technology, 641 F.2d 190, 191 (4th Cir. 1981),* cert. denied, *454 U.S. 832 (1981); Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc., 630 F.2d 1155, 1159 (6th Cir. 1980); Lemelson, 541 F. Supp. at 651;* see also *Jones v. Ceramco, Inc., 387 F. Supp. 941, 941-42 (E.D.N.Y.),* aff'd, *526 F.2d 585 (2d Cir. 1975)* (granting a motion to dismiss on the grounds of laches and estoppel).

n3 The time limitation on suits brought for patent infringement is codified at *35 U.S.C. section 286.* Section 286 states in relevant part:

[HN5] Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

*35 U.S.C. § 286* (1982).

By its terms, the statute does not bar infringement actions, but merely limits recovery to six years preceding any damage action brought. [*8]

In the present case, the [HN6] plaintiff has the burden of showing an excuse for his failure to bring this suit before August 1985, and rebutting the presumption of prejudice to the defendant with regard to any claim based on the marketing of ATM's prior to August 1985, when the suit was filed. See *Hottel Corp., 833 F.2d at 1473; Mainland Indus., Inc. v. Standal's Patent Ltd., 799 F.2d 746, 748 (Fed. Cir. 1986); Jensen, 650 F.2d at 167; Lemelson, 541 F. Supp. at 652.* As to the claims based on sales of the ATM's after August 1985, the burden rests with the defendant to demonstrate both elements of unreasonable delay and prejudice. n4 See *Hottel Corp., 833 F.2d at 1573; Jensen, 650 F.2d at 169; Lemelson, 541 F. Supp. at 652.*

1988 U.S. Dist. LEXIS 10132, *8; 11 U.S.P.Q.2D (BNA) 1709

n4 [HN7] Plaintiff cannot recover damages for any alleged infringement after the expiration date of his patent.

Since this suit was commenced more than six years after the alleged infringement began, the plaintiff must rebut the presumption of prejudice and delay. Plaintiff has suggested, in rebuttal, a number of factual and legal arguments to support his failure to file his suit for eleven years. First, plaintiff argues that his delay in commencing [*9] this action was justified because he had no knowledge of defendant's alleged infringement.

This argument is not persuasive, even if factually supported, in light of the fact that the defendant's activities in connection with the manufacture of ATM's have been open and continuous since 1966. There is no evidence that defendant concealed its production or sales of ATM's or otherwise misled plaintiff as to its activities. Therefore, plaintiff's lack of knowledge does not constitute a legally sufficient "excuse" for his failure to bring a timely action. See also *Studiengesellschaft Kohle, 616 F.2d at 1326.*

[HN8] The six-year period begins to run once a patent owner has knowledge of sufficient facts to warrant the filing of suit or once he could have acquired sufficient facts by diligently making reasonable inquiries. n5 *Redman v. United States, 176 F.2d 713, 715-16 (2d Cir. 1949); Olympia Werke Aktiengesellschaft v. General Electric Co., 545 F.Supp. 598, 612-13 (W.D. Va. 1982),* aff'd, *712 F.2d 74 (4th Cir. 1983).* In the present case, it is undisputed that in December of 1975 plaintiff testified in the Mosler suit that he believed defendant was infringing his patent. n6 Furthermore, [*10] a document prepared by plaintiff in 1974 and sent to defendant stated that a national industry standard proposed by Thrift or MINTS n7 in 1973 infringed his patent. Plaintiff noted that defendant's ATM's from 1974 to date employed the relevant portions of this 1973 proposed standard. Lastly, plaintiff had defendant's "Technical Information Manual" on the Diebold TABS 600 ATM. Defendant's Reply Brief at 15. This evidence is particularly significant for it supports the contention that plaintiff knew or should have known of the defendant's alleged infringment.

n5 The Studiegesellschaft Kohle Court stated: "To determine the length of plaintiff's delay, the Court must look not to the date on which the patent issued but rather to the time at which the

plaintiff knew or, in the exercise of reasonable diligence should have known of the defendant's alleged infringing action." *Studiengesellschaft Kohle, 616 F.2d at 1326.*

n6 Plaintiff testified in December of 1975 that he believed then that Diebold was using his invention. His testimony was as follows:

Q. Is Diebold using your invention?

A. I believe they are.

Deposition of Leon Stambler at 32, Stambler v. Mosler, No. 75 CV 51C E.D.N.Y. Oct. 31, 1985).
[*11]

n7 MINTS is an acronym for Mutual Institutions National Transfer System, Inc., an organization that represents savings, loan, and thrift institutions.

With regard to plaintiff's efforts to make any inquiries concerning defendant's system, he testified that he could not recall whether he did conduct such an inquiry. Stambler Dep. at 181-82. From this evidence, it appears that plaintiff knew or at least should have known if he had made reasonable inquiries about defendant's alleged infringements by the latest 1975, ten years before he brought the present action. Had plaintiff made any reasonable inquiry as to Diebold's patents, he could have discovered and secured access to the McCune and Kinker patents and, consequently, the details of the Diebold PIN validation system at any time since May 1977.

The second excuse advanced by the plaintiff is that his infringement suit against Mosler filed in 1975 excuses his delay in filing this litigation. [HN9] The existence of "other litigation" does not serve as a complete bar to the assertion of a laches defense. *Jensen, 650 F.2d at 168; Jones, 387 F. Supp. at 941.* In Jones, plaintiff never notified the defendant of any claim of infringement [*12] during a twelve-year delay. In Jones, this Court acknowledged that the critical factor was whether plaintiff had provided the defendant with adequate notice "of his intention to enforce his rights under the patent when he had perfected his title thereto." *Jones, 387 F. Supp. at 942.* This Court concluded that if a plaintiff does not inform a defendant within six years that it plans to

Case 1:05-cv-00608-MPT        Document 313        Filed 03/09/2007        Page 26 of 100

Page 6

1988 U.S. Dist. LEXIS 10132, *12; 11 U.S.P.Q.2D (BNA) 1709

sue, as required by the Second Circuit, a defendant may presume that he was not infringing on plaintiff's rights. *Jones, 387 F. Supp. at 942.* The Court of Appeals for the Federal Circuit stated the applicable rule on notice as follows: "For other litigation to excuse a delay there must be adequate notice of the proceeding. The notice must inform the alleged infringer of the other proceeding and of the patentee's intention to enforce its patent upon completion of that proceeding." *Hottel, 833 F.2d at 1573.*

In the case at bar, plaintiff could not recall whether he inquired about defendant's ATM's in any respect between 1976 and 1983, the time period when plaintiff's re-issue applications were pending. Stambler Dep. at 181-82. In fact, since 1974 plaintiff has had no communication at all [*13] with the defendant's representatives with respect to the patent or pending litigation. There is no allegation that plaintiff ever indicated to defendant that its Mosler suit caused him to delay filing a complaint against defendant, or that he intended to sue the defendant as soon as the Mosler suit concluded. Following the rule set out above, plaintiff's failure to file a timely suit for infringement against this defendant may not be excused on the basis of his involvement with other lawsuits. Therefore, the plaintiff has not rebutted the presumption of unreasonable delay with respect to claims prior to August 1985, even assuming the facts as alleged by plaintiff as true. Plaintiff admits that he cannot recall whether or not he inquired about defendants ATM's in any respect between 1976 and 1983. Further, plaintiff did not otherwise exercise reasonable diligence in asserting his rights with respect to the patent in suit. Finally, plaintiff failed to alert the defendants of his intention to commence suit after the resolution of the pending litigation. See *Esco Lighting Co., Inc. v. Lighting Services, Inc., 178 U.S.P.Q. 191 (S.D.N.Y. 1973)* (citing *Baker Co. v. Whitewateer* [*14] *Mfg. Co., 430 F.2d 1008 (7th Cir. 1970),* cert. denied, *401 U.S. 956 (1971)).*

Third, the plaintiff claims that there has been no injury to the defendant. As noted earlier, since plaintiff's delay in suing was greater than six years, injury is presumed. See *Potter, 641 F.2d at 191; Watkins, 630 F.2d at 1159; Jensen, 650 F.2d at 168; Studiengesellschaft Kohle, 616 F.2d at 1326; Lemelson, 541 F. Supp. at 651.* n8 A variety of factors have been considered by courts in deciding the issue of prejudice to the defendant, i.e., whether an important witness is unavailable; the possible dulling of witnesses' memories;

the destruction or the loss of relevant records; and whether the defendant has made investments in connection with the operation of its business. See *Jensen, 650 F.2d at 169; Studiengesellschaft Kohle, 616 F.2d at 1326.* The defendant here has produced affirmative proof of prejudice. Characteristic of this long-delayed litigation are dimmed memories and discarded documents. The defendant clearly is prejudiced since the only person who could corroborate plaintiff's alleged invention date in 1968 is deceased. Stambler Dep. at 134-35. Additionally, documents [*15] have been lost or destroyed since the early 1970's. For example, plaintiff's diary for the critical year of 1971 cannot be found. Id. Furthermore, efforts to obtain documents by a subpoena to American Express, where plaintiff worked in 1975 and 1976, produced no documents. Other important witnesses have little or no current recollection of relevant facts that occurred ten years or more prior to the suit. Mr. Kinker and Mr. McCune, who were associated with defendant's development of its first ATM, have only hazy recollections of many important facts. See, e.g., Kinker Dep. at 425, 428. Mr. Frease, defendant's patent counsel in 1974, is now over eighty-three years old and has no recollection of the '302 patent or his investigation. Furthermore, the undisputed facts demonstrate that defendant has suffered material prejudice as a result of plaintiff's eleven-year delay in filing suit. See *Leinoff, 726 F.2d at 741.* n9 Since 1974, the defendant has invested a considerable amount of money in its business. Diebold has spent $ 48,000,000 on manufacturing facilities, $ 50,000,000 on product development, and $ 60,000,000 on direct marketing of ATM's. These substantial investments demonstrate [*16] the type of prejudice that will support the defense of laches. See *Lemelson, 541 F. Supp. at 657.*

n8 In *Dwight & Lloyd Sintering Co., Inc. v. Greenawalt, 27 F.2d 823, 827 (2d Cir. 1928).* Judge Learned Hand observed that:

Each year as it passes inevitably builds up a belief, if nothing has been done, that the patentee does not suppose his rights invaded, and, if the time be long enough, the infringer garners the harvest of even the earliest of the six years to which recovery is in any event limited, with just confidence that he will not be disturbed. To allow this reasonable inference to be upset, and his financial life perhaps to be gravely deranged, is

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 27 of 100

Page 7

1988 U.S. Dist. LEXIS 10132, *16; 11 U.S.P.Q.2D (BNA) 1709

thought to be commensurate with the importance of the patentee's stale claims.

Id.

n9 The longer the delay, the less need there is to show prejudice. *Leinoff, 726 F.2d at 741.*

Plaintiff's fourth argument is that the defendant's conduct has been so egregious as to foreclose its reliance on the equitable defense of laches. A plaintiff is barred from seeking damages prior to the filing of the suit by laches unless he can establish that the infringer had engaged in particularly egregious conduct that would tip [*17] the equities significantly in plaintiff's favor. See *TWM Mfg. Co., Inc. v. Dura Corp., 592 F.2d 346, 349 (1979),* cert. denied, *107 S.Ct. 183 (1986).* In the absence of plagiarism or harassment, a district court should sustain the defense of laches. Id. In this case, there are clearly no affirmative acts of misconduct by the defendant. There is no evidence of misleading silence by the defendant or misrepresentation by the plaintiff. Furthermore, there is no foundation for plaintiff's assertion that the defendant, after receiving plaintiff's 1974 letter, rushed to file a patent application on its own system. Even if this were true, the only significance such action could have is to secure patent protection on defendant's own system for all new patents are limited by pre-existing art. Lastly, plaintiff has not offered persuasive proof of deliberate, calculated plagiarism.

*WILLFUL INFRINGEMENT*

We need not reach the question of infringement to decide the validity of the laches and estoppel defenses. However, assuming arguendo that there was an infringement, this infringement was not willful. Plaintiff asserts that defendant has engaged in egregious conduct by willfully [*18] infringing the *'302* patent. It should be noted that the Court is aware of no case that stands for the proposition that willful infringement, without proof of deliberate, calculated plagiarism, constitutes such egregious conduct as to defeat a laches defense. See *Bott, 807 F.2d at 1576; TWM Mfg. Co., 592 F.2d at 349.* There is not a scintilla of evidence in the record that points to any plagiarism by defendant in light of the fact that the defendant's PIN validation system was designed by the end of 1973, before the *'302* patent was issued and before plaintiff sent his August 7, 1974, letter to defendant.

*ESTOPPEL*

[HN10] A showing of laches alone is insufficient to bar a patentee's request for prospective injunctive relief or damages arising after the filing of suit. The defendant must also prove estoppel by demonstrating actions on the part of a patentee that justify a belief by the alleged infringer that the patent will not be enforced against him. Additionally, the defendant must show that it actually relied on the misleading conduct to its detriment. *Jensen, 650 F.2d at 169; TWM Mfg. Co., 592 F.2d at 350; Advanced Hydraulics, Inc. v. Otis Elevator Co., 525 F.2d* [*19] *477, 479-80 (1975),* cert. denied, *423 U.S. 869 (1975).*

The record contains some evidence of misleading conduct on the part of the plaintiff that may have led defendant to conclude that plaintiff did not intend to enforce his patent. Silence alone is not sufficient affirmative conduct to give rise to estoppel. *Hottel, 833 F.2d at 1573;* see *Studiengesellschaft Kohle, 726 F.2d at 729* (a five-year silence is not enough to give rise to estoppel). However, there is precedent for applying estoppel where there has been intentionally misleading silence. See *Jensen, 650 F.2d at 169; Advanced Hydraulics, Inc., 525 F.2d at 481-82.*

Upon careful review of the entire record, it appears that plaintiff's silence was intentionally misleading. Ten years before this suit was filed, plaintiff concluded that the proposed Thrift or MINTS standard infringed his patent. It was well known to plaintiff and throughout the industry that the same provisions the plaintiff is relying on for infringement were being contemplated as national and international standards. Moreover, in the mid-1970's plaintiff sat on an American National Standard Institute standards committee after concluding that [*20] the proposed thrift and MINTS standards infringed his patent. Plaintiff subsequently left the committee without notifying it of the alleged infringement of his patent. Under these circumstances, plaintiff had a duty to speak out and call attention to his patent. Plaintiff contacted defendant only once, ten years before this suit was filed. In 1975, plaintiff testified that he believed defendant as infringing his patent. However, plaintiff failed to bring suit until ten years later. Plaintiff had a duty to speak out and his silence was affirmatively misleading. Plaintiff could not remain silent while an entire industry implemented the proposed standard and then when the standards were adopted assert that his patent covered what manufacturers believed to be an open and available standard. Furthermore, plaintiff's silence could

1988 U.S. Dist. LEXIS 10132, *20; 11 U.S.P.Q.2D (BNA) 1709

reasonably be interpreted as an indication that plaintiff had abandoned its patent claims.

In light of our findings above, it is not necessary to reach the merits as to whether defendant's system infringes plaintiff's patent. Nonetheless, it seems to us that the systems are sufficiently different, particularly in light of the prosecution history of the patients [*21] to support a finding of noninfringement.

When considering a summary judgment motion all inferences must be drawn in favor of the nonmovant.

*Hottel, 833 F.2d at 1574.* However, having determined that there has been no willful infringement and that there has been laches and estoppel, the Court holds that plaintiff is not entitled to damages or injunctive relief. Accordingly, summary judgment in favor of defendant is hereby granted.

*SO ORDERED.*

Dated: Brooklyn, New York August 30th, 1988

# EXHIBIT H

LEXSEE 1996 U.S. DIST. LEXIS 14325



Analysis
As of: Mar 02, 2007

**PATRICK S. BOUND v. SPENCER GIFTS, INC. v. CRAZY HELMET, INC.**

**CIVIL ACTION NO. 95-2216**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1996 U.S. Dist. LEXIS 14325*

**September 27, 1996, Decided**
**September 27, 1996, FILED**

**DISPOSITION:** [*1] Motion by Defendant Spencer Gifts for Summary Judgment GRANTED; the remaining claims DISMISSED without prejudice; plaintiff's Motion for Summary Judgment DENIED as moot; and, case closed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a patentee, filed a patent infringement action against defendant, a retailer, for injunctive relief and to recover damages for selling hats that infringed on the patentee's design patent of the "Hoser Hat," Patent No. 283,749. The retailer filed a motion for summary judgment on the grounds that the damage claim was barred by laches, and the patent was invalid. The court issued its decision in a memorandum opinion.

**OVERVIEW:** The patentee saw a hat for sale in one of the retailer's defendant's stores that he believed infringed on his patent. On June 17, 1986 the patentee's counsel wrote to the retailer to notify it of the patent and the infringement claim. The retailer referred the matter to its general counsel, who investigated and determined that there were at lease three other persons who claimed that they invested the unusual hat. Between 1986 and 1994, the patentee never returned to the store to determine whether the retailer had stopped selling the hat. The

retailer contended that the patentee's claim for damages was barred by laches. In granting the retailer's motion for summary judgment, the court held that the claim for damages was barred by laches because the only reasonable conclusion from the evidence was that the patentee knew of the retailer's alleged infringement in 1986, he failed to take even the most elemental steps to determine if the alleged infringement was continuing, he unreasonably and inexcusably delayed for over eight years in filing suit, and because of the long delay deprived the retailer of important evidence to defend the lawsuit.

**OUTCOME:** The court granted the retailer's motion for summary judgment as to the patentee's claim for damages, and dismissed the remaining claims without prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*

[HN1] In considering a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Only facts that may affect the outcome of the case under applicable law are material.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2] In deciding a motion for summary judgment, all reasonable inferences from the record must be drawn in favor of the non-movant. A nonmovant, however, must do more than merely raise some doubt as to the existence of a fact. The nonmovant has the burden of submitting evidence sufficient to require submission of a pertinent factual dispute to a fact-finder.

*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN3] Summary judgment is as appropriate in a patent case as in any other.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
[HN4] Laches is an equitable defense to a claim for patent infringement. *35 U.S.C.S. § 282.* The applicability of a laches defense is committed to the sound discretion of the court. To sustain a laches defense, a defendant must show that the plaintiff delayed filing suit for an unreasonable and inexcusable length of time after he knew or reasonably should have known of his claim, and that the defendant was prejudiced by such delay. A laches defense may still be defeated if the plaintiff can show that a defendant has engaged in particularly egregious conduct that would change the equities significantly in plaintiff's favor. A presumption of laches arises when a patentee delays bringing suit for more than six years after the date he knew or reasonably should have known of the alleged infringement. To overcome the presumption, a plaintiff must produce evidence showing that his delay was excusable or that the defendant suffered no resulting prejudice.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview*
[HN5] In a patent infringement action, the burden is on the defendant to prove invalidity by clear and convincing evidence.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN6] In determining whether a party engages in egregious conduct of a kind sufficient to defeat a laches defense in a patent infringement action, a court considers all pertinent factors. The doctrine of "unclean hands" applies to cases of an exceptional character, such as where a defendant is responsible for plaintiff's delay or affirmatively allays the plaintiff's suspicions through deception. Evidence of a defendant's calculated or flagrant infringement may be sufficient to bar a laches defense.

*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Notice*
*Torts > Negligence > Duty > Affirmative Duty to Act > General Overview*
[HN7] Where a potential infringer has actual notice of another's patent rights, he has an affirmative duty of due care. Thus, a defendant's failure to make a reasonable inquiry regarding patent validity after being apprised of its existence is a factor to be considered.

*Patent Law > Infringement Actions > General Overview*
[HN8] A manufacturer who intentionally copies a competitor's product is more culpable than a retailer who sells an array of products designed, manufactured, and warranted by others.

**COUNSEL:** For PATRICK S. BOUND, PLAINTIFF: JOHN J. SIMKANICH, NEWTOWN, PA USA.

For SPENCER GIFTS, INC., DEFENDANT: ROBERTA JACOBS-MEADWAY, CHARLES E. BERGERE, PANITCH SCHWARZE JACOBS & NADEL, PHILADELPHIA, PA USA. JOEL S. GOLDHAMMER, PANITCH, SCHWARZE, JACOBS & NADEL, PHILADELPHIA, PA USA. GARY A.

ROSEN, CONNOLLY EPSTEIN CHICCO FOXMAN ENGELMYER & EWING, PHILADELPHIA, PA USA.

For SPENCER GIFTS, INC., THIRD-PARTY PLAINTIFF: JOEL S. GOLDHAMMER, PANITCH, SCHWARZE, JACOBS & NADEL, PHILADELPHIA, PA USA.

**JUDGES:** JAY C. WALDMAN, J.

**OPINION BY:** JAY C. WALDMAN

**OPINION:**

**MEMORANDUM**

WALDMAN, J.

September 27, 1996

**Background**

This is a patent infringement action. Plaintiff claims that defendant Spencer Gifts sold hats in its retail stores that infringed plaintiff's design patent of the "Hoser Hat," U.S. Design Patent Number *283,749.* He seeks damages for past sales and a permanent injunction against any future sales by defendant Spencer Gifts. n1

> n1 Spencer Gifts has a contingent third party claim for indemnification against Crazy Helmet which supplied the hats and warranted that they were free of any rightful claim by a third party for infringement. This warranty is imposed by applicable state law "unless otherwise agreed" by the parties. See *N.J.S.A. § 12A:2-312.* It is uncontested that Spencer Gifts and Crazy Helmet did not otherwise agree. Crazy Helmet defaulted in this action and appears to be inactive, if not defunct.

[*2]

Presently before the court is the Motion of Spencer Gifts for Summary Judgment on the grounds that plaintiff is barred from pursuing his damage claim by the doctrine of laches and that the patent is invalid. n2

> n2 Defendant has committed not to resume sales of the allegedly infringing hat absent a

binding determination of patent invalidity. Plaintiff has elected not to pursue his claim for prospective relief and risk a finding of invalidity should the court determine that he is barred by laches from recovering damages for alleged past infringement. The parties have stipulated to a dismissal of all otherwise outstanding claims in the event of a determination adverse to plaintiff regarding laches, without prejudice to reassert such claims should plaintiff elect to pursue an appeal which is successful or if defendant breaches its commitment not to resume sales of the subject hat.

**Standard of Review**

[HN1] In considering a motion for summary judgment, the court must determine whether the pleadings, depositions, [*3] answers to interrogatories and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact, and whether the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir. 1986).* Only facts that may affect the outcome of the case under applicable law are "material." *Anderson, 477 U.S. at 248.*

[HN2] All reasonable inferences from the record must be drawn in favor of the non-movant. *Id. at 256.* A nonmovant, however, must do more than merely raise some doubt as to the existence of a fact. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988).* The nonmovant has the burden of submitting evidence sufficient to require submission of a pertinent factual dispute to a fact-finder. Id. [HN3] Summary judgment is as appropriate in a patent case as in any other. *Id. at 1561.*

Accordingly, the court first considers defendant's motion regarding laches on the evidence of record as uncontroverted or otherwise viewed most favorably to plaintiff.

**Laches** [*4]

Plaintiff made his first so-called "Hoser Hat" sometime in January of 1985 from several off-the-shelf items he purchased at retail stores. The hat is a baseball

style helmet with an automobile cup holder attached to each side. A multi-legged straw or tube is attached to the top of the helmet which allows the wearer to drink simultaneously from cups placed in each holder. n3 Plaintiff filed for a design patent on July 11, 1985. A patent was issued on May 13, 1986.

> n3 Defendant claims that the design of the hat was dictated by function and plaintiff merely assembled the several components in the only practical manner without materially altering or adding any ornamentation to them.

Defendant Spencer Gifts operates a chain of several hundred retail stores which stock thousands of various gift, novelty and similar items. Plaintiff saw a hat for sale in one of defendant's stores that he believed infringed on his patent. On June 17, 1986 plaintiff's counsel wrote to defendant to notify it of the '749 patent and [*5] his infringement claim. n4 Defendant referred the matter to its general counsel, Mr. Ronald Mangel, who telephoned plaintiff's counsel on June 30th to inform him that the matter would be investigated.

> n4 Plaintiff wrote identical letters to 17 other purported infringers during June and July of 1986.

Plaintiff's counsel wrote a second letter to defendant on July 8, 1986 in which he acknowledged that at least three other parties claimed to be the originators of the hat but stated that plaintiff was the "true inventor." Plaintiff's counsel indicated that he had retained an investigator to examine the competing claims. Shortly thereafter, defendant received a letter from Mr. T.G. Rebiskie in which he claimed that defendant's sales of the same drink hat infringed on his prior patent, U.S. Patent Des. *283,268*.

Defendant did not hear from plaintiff again for over eight years until January 18, 1995 when plaintiff's counsel wrote to defendant again alleging infringement. Plaintiff filed this action on April 14, [*6] 1995. Defendant has ceased selling the allegedly infringing hats. n5

> n5 Plaintiff sold 18 hats in 1995, none in 1994 and less than 100 in the two prior years.

[HN4] Laches is an equitable defense to a claim for patent infringement. See *35 U.S.C. § 282; A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992)*. The applicability of a laches defense is committed to the sound discretion of the court. *Id. at 1032*. To sustain a laches defense, a defendant must show that the plaintiff delayed filing suit for an unreasonable and inexcusable length of time after he knew or reasonably should have known of his claim, and that the defendant was prejudiced by such delay. Id. A laches defense may still be defeated if the plaintiff can show that a defendant "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Id. at 1033*.

A presumption of laches arises when a patentee delays bringing suit for more than six years after [*7] the date he knew or reasonably should have known of the alleged infringement. *Id. at 1035*. To overcome the presumption, a plaintiff must produce evidence showing that his delay was excusable or that the defendant suffered no resulting prejudice. *Id. at 1037-38*.

Plaintiff personally saw the allegedly infringing hat for sale in a Spencer Gifts store in a mall near his home in June of 1986. Plaintiff concedes that defendant never agreed to stop selling these hats but claims that he nonetheless believed defendant had stopped selling them. He claims that it was not until December of 1994, when he revisited the same store, that he learned defendant had continued to sell the hats. n6 Between 1986 and 1994, plaintiff never returned to the store to determine whether defendant had stopped selling the hat. He acknowledges that during these eight years, he never contacted defendant and never asked his investigator or counsel to determine whether defendant was continuing to sell such hats.

> n6 Plaintiff argues in a reply brief that he never visited a Spencer store prior to December 1994. This contention, however, is flatly contradicted by his own testimony, the only evidence of record on the question. At his deposition, plaintiff testified as follows:
>
> > Q: Did [your lawyer] write to Spencer Gifts on your behalf?
> > A: Yes.

Q: Now, prior to Spencer Gifts did you obtain a sample of the hat that was being sold by Spencer Gifts? Let me rephrase. Did you obtain a sample of the allegedly infringing [hat] that was being sold by Spencer Gifts?

A: I seen it with my own eyes.

Q: Where did you see it?

A: At one of their mall locations.

Q: Did you describe [the hat] to [your lawyer]?

A: Yes.

Q: Did [your lawyer] on your behalf write to Spencer Gifts?

A: Yes.

Q: Did he threaten them with infringement at that time?

A: Yes.

Q: Did Spencer Gifts stop selling the accused hat?

A: To my knowledge, yes.

Q: At that time where were you living in 1986?

A: Warminster.

Q: When did you next visit a Spencer Gifts store?

A: The next would have been November or December of 1994.

Q: Were they selling a [drink hat] at that time?

A: Yes.

Q: So if I understand you correctly, for a period of eight years you never again visited a Spencer Gifts retail store.

A: That's correct.

Q: And where was this Spencer store that you visited?

A: Neshaminy Mall.

Q: Same place as the previous store.

A: Yes.

Pltf. Dep. at 108-11 (emphasis added).

[*8]

Plaintiff states that he assumed defendant ceased selling the drink hats because he believed that the supplier was Johnny Dyer who stopped producing the hats at the end of 1986. This claimed justification simply is not supported by the evidence. Even accepting plaintiff's testimony that defendant's attorney told plaintiff's attorney that Mr. Dyer was the supplier, n7 plaintiff's own private investigator reported to plaintiff in 1986 that it was evident the allegedly infringing hats in defendant's stores were not made by Mr. Dyer. n8 There is no evidence that defendant represented to plaintiff that Dyer was the sole supplier of the drink hats. Plaintiff had the names of defendant's other suppliers, Crazy Helmet and Bednar Enterprises, and his attorney wrote letters to both companies on July 2, 1986 alleging infringement and threatening suit. Any mistaken assumption that Mr. Dyer was defendant's sole supplier was clearly the result of plaintiff's extreme lack of diligence.

n7 No competent evidence that such a conversation between the two attorneys ever took place has been submitted.

n8 Plaintiff claims not to have read this report for which he paid several thousand dollars. He does not, however, deny that he or his attorney received it.

[*9]

Plaintiff also seeks to excuse his delay by claiming that he was precluded from learning about defendant's continued alleged infringement because his father's jewelry outlet store went bankrupt sometime between 1989 and 1991 and, as a result, he lost his "eyes and ears" on the market. He also claims that the locations of defendant's stores are "low profile." n9 Plaintiff admits, however, that he learned of the continued infringement not by utilizing sources in the marketplace or from advertisements, but by personally visiting one of defendant's stores that remained in business at the same location from 1986 through 1994. Thus, clearly all plaintiff had to do to determine whether defendant had continued to sell the hats was to go back to a nearby mall. Plaintiff's other excuse that defendant selectively withheld products from some stores is wholly unsupported by even a scintilla of evidence. Moreover, plaintiff admits that for over eight years he never went back to any of defendant's stores or enlisted anyone else to do so. n10

n9 Plaintiff acknowledges that defendant's stores are located in major shopping malls and offers no evidence from which one could conclude that defendant hides its store locations from the public.

[*10]

n10 In plaintiff's answers to interrogatories, he asserted that he had psychological problems, was unemployed and was a party in unrelated litigation. He does not address these contentions in his briefs and appears not to rely on them to excuse the inordinate delay in this case. In any event, he has made absolutely no showing that any of these things prevented him for over eight years from visiting a nearby mall or enlisting someone else to do so.

The only reasonable conclusion from the evidence of record is that plaintiff knew of defendant's alleged infringement in June of 1986, failed to take even the most elemental steps to determine if the alleged infringement was continuing and unreasonably and inexcusably delayed for over eight years in filing suit.

Plaintiff did not literally produce evidence that this delay caused no prejudice to defendant. He does, however, point to testimony of witnesses produced by defendant that they invented or copied similar or identical drink hats before plaintiff's first creation to argue that defendant has not been prejudiced in defending on the ground of invalidity. [*11] In later addressing the issue of invalidity, plaintiff unsurprisingly contends that this very testimony is negated by other evidence and is not credible. Nevertheless, since defendant proceeded to present evidence of prejudice and such clearly appears from the record pertinent to that issue, the court will not belabor the point of whether a patentee may overcome the presumption with evidence he did not literally produce but at least theoretically could have produced had his adversary not done so first.

The witnesses who claim they earlier developed or copied similar or identical drink hats have lost or discarded documents crucial to verify their claims, including advertisements, invoices, purchase orders and receipts.

Jane Byrom testified that although she was not the inventor because "it was already out there," she began making similar drink hats in late 1984. Several photos of her hats depict a design that is virtually indistinguishable from plaintiff's. Due to the passage of time, plaintiff could not specify when the various photos were taken. Plaintiff points to a June 26, 1985 newspaper photo of a slightly different hat made by Byrom to argue that the other photos were taken [*12] sometime later and depict a later model of her hat. This argument merely underscores defendant's claim of prejudice. Byrom no longer has relevant receipts or other documents to corroborate her testimony. n11

n11 She testified that she had receipts from her suppliers but that after "so many years" she had "no need to keep [them]." The evidence which was submitted is that the slightly different hat came later in time. Byrom called it the "Deluxe" model and testified "we went to a larger basket or cupholder."

Robert Cortis testified that he and his friends invented a virtually identical drink hat sometime in the early 1980s but could no longer recall precisely when he first made or sold the hats. It appears from his testimony that he first sold these hats at a Detroit Tigers baseball game in 1983 or 1984 but he no longer has the promotional documents, invoices and purchase orders to verify this.

Plaintiff contends that the Cortis testimony is not credible because plaintiff believes the hat samples Mr. [*13] Cortis produced at his deposition were made after 1990. Again, this contention only buttresses defendant's claim of evidentiary prejudice.

Plaintiff claims that Sports Products, which supplied Mr. Cortis, only stopped putting its patent number on the helmet headband in 1990 and that the Cortis helmets lack the Sports Product patent number. There is no testimony from anyone at Sports Products or any other competent evidence to support plaintiff's statement that Sports Products produced no pre-1990 hats without a patent number. More importantly, Sports Products has a seven year record retention policy. By the end of 1994, it had destroyed all sales and correspondence records predating 1988. At the end of 1991, it had destroyed documentation regarding any sales to Mr. Cortis prior to 1985.

Defendant is clearly prejudiced in confirming prior use by Mr. Cortis.

Plaintiff's long delay in bringing suit has clearly deprived defendant of important evidence. Plaintiff himself can no longer remember the names of many of his distributors or the location of relevant employment records, purchase orders, invoices and other documents regarding his manufacture and sales of drink hats.

The loss [*14] of substantiating evidence is particularly acute given the weight of the burden of proof of invalidity. n12 Defendants' ability to prove that plaintiff's design was not new and original has been seriously undercut. The only reasonable conclusion from the record is that defendant suffered evidentiary prejudice from plaintiff's unreasonable and inexcusable delay. n13

> n12 [HN5] The burden is on defendant to prove invalidity by clear and convincing evidence. *Avia Group Int'l., 853 F.2d at 1562; Agrichem, Inc. v. Loveland Indus., Inc., 843 F. Supp. 520, 526 (D. Minn. 1994).*

> n13 Defendant also contends with force that it was economically disadvantaged by plaintiff's delay as the allegedly infringing product could have been sufficiently redesigned to limit any prospect of liability.

Plaintiff argues that defendant should nevertheless be precluded from asserting a laches defense because it engaged in such egregious conduct by continuing to sell the drink hat without obtaining a legal opinion by a patent attorney [*15] after notification of the *'749* patent that the equities are shifted significantly.

[HN6] In determining whether a party has engaged in egregious conduct of a kind sufficient to defeat a laches defense, a court considers "all pertinent factors." *A.C. Aukerman, 960 F.2d at 1039.* The doctrine of "unclean hands" applies to cases of an exceptional character, such as where a defendant was responsible for plaintiff's delay or affirmatively allayed the plaintiff's suspicions through deception. *Coleman v. Corning Glass Works, 619 F. Supp. 950, 955 (W.D.N.Y. 1985),* aff'd, *818 F.2d 874 (Fed. Cir. 1987).* Evidence of a defendant's calculated or flagrant infringement may be sufficient to bar a laches defense. See, e.g., *Bott v. Four Star Corp.,*

*807 F.2d 1567, 1576 (Fed. Cir. 1986)* (evidence that defendant knowingly copied product and accelerated infringing sales after a finding of liability).

[HN7] Where a potential infringer has actual notice of another's patent rights, he has an affirmative duty of due care. Rolls-Royce Ltd. v. GTE Valeron Corp., 1101, 1109 (Fed. Cir. 1986). Thus, a defendant's failure to make a reasonable inquiry regarding patent validity after being apprised of its [*16] existence is a factor to be considered. See *Cover v. Hydramatic Packing Co., Inc., 1994 WL 396423* at * 4 (E.D. Pa. 1994); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 1993 U.S. Dist. LEXIS 17101, 1993 WL 379548* at * 5 (N.D. Cal. 1993); *Ramos v. Biomet, Inc., 828 F. Supp. 1570, 1583-84 (S.D. Fla. 1993).* The court, however, has found no case in which a failure to seek expert legal advice on patent validity was alone deemed sufficient to support a finding or flagrant or egregious conduct. See *Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1428 (Fed. Cir. 1988)* (failure to obtain legal advice is not determinative factor in assessing willful infringement); *Rolls-Royce, 800 F.2d at 1109* (absence of counsel's opinion does not alone prove willful infringement); *Kloster Speedsteel AB v. Crucible, Inc., 793 F.2d 1565, 1579 (Fed. Cir. 1986)* (failure to obtain advice of counsel does not mandate finding of willfulness), cert. denied, *479 U.S. 1034 (1987).*

When defendant received plaintiff's letter of June 17, 1986, it immediately referred the matter to its general counsel. Defendant had sold the drink hat for over a year and had purchased its first hat prior to the filing of plaintiff's patent. [*17] Also, Mr. Mangel learned that at least three other people claimed to have invented the same drink hat, that Mr. Rebiskie claimed to hold a design patent for the same drink hat and that plaintiff himself had undertaken an investigation of various competing claims. Mr. Mangel believed that plaintiff did not have a valid claim for infringement. Defendant continued to sell the product for nearly nine more years without any further complaint or communication from plaintiff. It clearly would not be imprudent for a reasonable person in these circumstances to proceed with some confidence that a court might hold plaintiff's patent invalid. See *State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1581 (Fed. Cir. 1989).*

The cases in which a failure to seek an expert opinion on patent validity is cited as a key factor in denying a laches defense all involve defendants who

manufactured infringing products of competitors. See *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed. Cir. 1995); Cover, 1994 WL 396423* at *4; *Aukerman, 1993 WL 379548* at *5; *Ramos, 828 F. Supp. at 1583.* [HN8] A manufacturer who intentionally copies a competitor's product [*18] is more culpable than a retailer who sells an array of products designed, manufactured and warranted by others.

In none of these cases is the failure to obtain expert legal advice the determinative factor in the courts' analyses. The Court in Gasser emphasized the undisputed evidence that the defendant intentionally copied a competitor's invention. *60 F.3d at 775.* The defendant in Cover first began to manufacture an infringing product after receiving notice of a competitor's patent. *Cover, 1994 WL 396423* at *4.* The defendant in Aukerman began building infringing construction molds after receiving notice that another party had an exclusive license to do so, and built an infringing product after plaintiff had filed suit. *Aukerman, 1993 WL 379548* at *5.* In Ramos, plaintiff disclosed his patented hip prosthesis design to defendant to interest it in a marketing agreement, and within six months defendant manufactured its own hip prosthesis by pirating all of the elements of plaintiff's design. *Ramos, 828 F. Supp. at 1574.*

In every case in which a court found the failure to secure expert legal advice a crucial factor, there was evidence that a defendant intentionally [*19] copied a competitor's invention. In this case, defendant made retail sales of drink hats, legally warranted by the supplier against claims of infringement, for over a year before receiving any notice of plaintiff's patent. There is no evidence that defendant had ever before heard of plaintiff or saw any hat he made. Defendant learned shortly after hearing from plaintiff that multiple parties were contesting the validity of his patent.

One cannot reasonably characterize as "egregious" defendant's belief that plaintiff did not have a valid infringement claim or its decision to continue to sell the hats in the absence of any further information or communication from plaintiff. It certainly does not constitute egregious behavior sufficient to shift significantly the equities in favor of a plaintiff who unreasonably and inexcusably delayed filing his action for more than eight years against a defendant who has suffered clear evidentiary prejudice as a result. See *Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co., Inc., 708 F. Supp. 1423, 1439 (D. Del. 1989)* (mere proof of infringement after defendant knew of plaintiff's patent insufficient to establish egregious conduct); E.T. [*20] *Mfg. Co., Inc. v. Xomed, Inc., 679 F. Supp. 1082, 1087 (M.D. Fla. 1987)* (defendant's sales of allegedly infringing product after seeing patented device not sufficiently egregious to defeat laches defense); *Coleman v. Corning Glass Works, 619 F. Supp. 950, 955 (W.D.N.Y. 1985)* (granting summary judgment on laches defense despite inequity always implicit in allowing an infringer to deprive a patent holder of royalties), aff'd, *818 F.2d 874 (Fed. Cir. 1987).*

**Conclusion**

The doctrine of laches will rarely be applicable if not in the circumstances presented here. The court concludes that defendant has clearly sustained its defense of laches on the record in this case.

Accordingly, the court will grant defendant's motion for summary judgment on plaintiff's claim for past damages. Consistent with the parties' stipulation, see footnote 2 supra, and *Fed. R. Civ. P. 41(a)(1)(ii)*, the court will not address defendant's claim of invalidity and will dismiss all remaining claims without prejudice. An appropriate order will be entered.

**ORDER**

**AND NOW**, this 27th day of September, 1996, upon consideration of the Motion by Defendant Spencer Gifts for Summary [*21] Judgment (Doc. #18, Part #1) and Plaintiff's response, and after oral argument on said Motion, consistent with the accompanying memorandum and stipulation of the parties as confirmed on September 24, 1996, **IT IS HEREBY ORDERED** that said Motion is **GRANTED** and **JUDGMENT is ENTERED** in the above case for Defendant and against Plaintiff on his claim for damages for alleged past infringement by Defendant of Patent Design No. *283,749* as such claim is barred by laches; the remaining claims in the above case are **DISMISSED** without prejudice; plaintiff's Motion for Summary Judgment (Doc. #68, Part #1) is **DENIED** as moot; and, the above case is closed.

**BY THE COURT:**

**JAY C. WALDMAN, J.**

# EXHIBIT I

LEXSEE 1990 U.S. DIST. LEXIS 12678



Caution
As of: Mar 02, 2007

**WESTERN ELECTRIC COMPANY, INCORPORATED, Plaintiff, v. PIEZO TECHNOLOGY, INC., Defendant**

**Case No. 81-694-CIV-ORL-19**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

*1990 U.S. Dist. LEXIS 12678; 15 U.S.P.Q.2D (BNA) 1401; 1990-2 Trade Cas. (CCH) P69,097*

**March 22, 1990, Decided
March 22, 1990, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant for patent infringement, and defendant counterclaimed for a declaratory judgment of non-infringement, invalidity, and unenforceability of plaintiff's patent.

**OVERVIEW:** Defendant manufactured similar products to plaintiff's invention a few years before plaintiff's patent was issued. After the patent was issued, plaintiff informed defendant of possible infringement, which defendant denied. Several years passed with defendant hearing nothing from plaintiff. Plaintiff then filed a suit for patent infringement. Defendant counterclaimed for declaratory judgment that plaintiff's patent was invalid. The court held that plaintiff's suit was barred by the doctrines of laches and estoppel. Under the laches doctrine, plaintiff failed to provide an excuse as to why it waited over 10 years to pursue its patent infringement claim, and defendant had expended large sums of money developing the product. Under estoppel, plaintiff had sufficiently induced defendant into believing that plaintiff had abandoned its claim by its silence for five years and

by a statement early on that it was disclaiming certain portions of its patent. Therefore, the court entered judgment for defendant.

**OUTCOME:** The court found for defendant on plaintiff's patent infringement claim because plaintiff had failed to pursue its patent infringement claim in a reasonable time after notice of infringement, defendant had reasonably invested time and money into development of its product, and plaintiff had induced defendant into believing that it had abandoned its patent infringement claim. The court found for plaintiff on defendant's counterclaims.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN1] The application of laches and estoppel doctrines in a patent infringement suit is within the trial court's discretion after consideration of the facts of the particular

1990 U.S. Dist. LEXIS 12678, *; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

case.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] While laches bars recovery of damages for any patent infringement occurring prior to the filing of the suit, estoppel precludes the patentee from obtaining prospective relief, either an injunction or damages for infringement occurring after the filing of the suit.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
[HN3] There are two elements prerequisite to a finding of laches in a patent infringement case: (1) an unreasonable and inexcusable delay in filing suit; and (2) material prejudice to the defendant resulting from the delay. Estoppel requires, in addition to (1) and (2) above, two additional elements: (3) affirmative conduct by the patentee inducing the belief that it abandoned its claims against the alleged infringer; and (4) detrimental reliance by the infringer.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN4] As with all equitable defenses, a defendant in a patent infringement suit might not be permitted to invoke laches or estoppel if the defendant's own conduct has been inequitable.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN5] Although a showing of egregious conduct may persuade a court that the equities do not lie with the defendant, a plaintiff's allegations of willful patent infringement do not automatically bar the alleged infringer from asserting the laches and estoppel defenses; this is a matter for the court to determine in its equitable discretion.

*Patent Law > Inequitable Conduct > Effect, Materiality*

*& Scienter > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN6] Willful infringement is a term of art applied in appropriate cases in order to support an enhancement of the damage award. In determining whether an infringer engaged in willful infringement, a court should consider the totality of the circumstances, including (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN7] For purposes of laches, the length of delay is measured from the time the patentee knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN8] There can be no infringement until a patent has issued.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Ownership > Conveyances > Licenses*
[HN9] Under the laches doctrine, when the delay in filing suit exceeds six years, a rebuttable presumption arises that the delay was unreasonable and prejudicial to the defendant, and the burden shifts to the patentee to prove the existence and reasonableness of an excuse for the delay, as well as to show the lack of prejudice to the infringer.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN10] The general rule is that patent license

1990 U.S. Dist. LEXIS 12678, *; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

negotiations do not necessarily push back the running of time in a laches defense. For such tolling the negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Statutory Bars > Foreign Patenting*
[HN11] A concern that the patent may be invalid does not, in and of itself, toll the delay for purposes of laches. The doctrine of laches should, if anything, encourage the patentee to expedite its determination of patent validity so that it may proceed with a suit for infringement, if appropriate. It is true that a foreign patent proceeding may sometimes excuse a delay in bringing a patent infringement suit in the United States.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
[HN12] In order to excuse delay based on other litigation, the patentee must give notice to the alleged infringer of the existence of the other litigation and of an intent to enforce its rights against the infringer at the conclusion of the other litigation.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN13] For purposes of estoppel, the length of delay is measured from the time of the patent owner's misrepresentation or the beginning of the misleading silence.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN14] A patent infringement defendant asserting an estoppel defense has the burden of showing that all four elements of the estoppel defense are met.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN15] When the delay exceeds six years, the presumptions that apply in the doctrine of laches do not

apply with regard to estoppel, and the burden does not shift away from the patent infringement defendant who has asserted the estoppel defense.

**JUDGES:** [*1]

Patricia C. Fawsett, United States District Judge.

**OPINION BY:**

FAWSETT

**OPINION:**

ORDER

This action for patent infringement of United States Patent No. *3,564,463* (the *'463* Patent), was brought by Western Electric Company, Inc. ("Western"), now known as AT&T Technologies, Inc., a New Jersey corporation which manufactures and sells telecommunications equipment, against Piezo Technology, Inc. ("PTI"), a Florida corporation which manufactures and sells piezoelectric devices including monolithic crystal filters.

Plaintiff Western invokes jurisdiction of the Court pursuant to Title *35 United States Code §§ 281* and 271 and *28 United States Code § 1338*(a) and 1400(b). Defendant and Counterclaimant PTI invokes the jurisdiction of the Court pursuant to Title *28 United States Code, §§ 2101* and 2202, *15 United States Code §§ 1*, 2, 3, 14, 15 and 26, and *28 United States Code §§ 1337* and 1338(b). The claims of the respective parties are set forth in their Amended Pretrial Stipulation filed September 25, 1987 at pages 3 through 9, which is incorporated by reference.

In its original Complaint filed December 11, 1981, Western alleged that PTI devices infringed the *'463* Patent. PTI denied infringement, alleging that [*2] the *'463* Patent was invalid and unenforceable, and counterclaimed for a declaratory judgment of non-infringement, invalidity and unenforceability as well as for violations of the Sherman and Clayton Anti-Trust Acts. During the pendency of this action, the parties filed with United States Patent and Trademark Office Requests for Reexamination of the *'463* Patent. Both requests were granted and consolidated into a single reexamination. On February 13, 1986, the Patent office confirmed the patentability of claims 4-8 and 10-11 of the *'463* patent over all prior art cited by both parties. n1 After the

1990 U.S. Dist. LEXIS 12678, *2; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

reexamination was concluded, PTI amended its response, alleging that the patent was unenforceable because of misrepresentations by Western during the course of the reexamination and because Western allegedly withheld prior art in the reexamination.

n1 The United States Patent and Trademark Office has on two separate occasions determined that the invention of the '463 patent is patentable after review by two different Examiners. During the course of the first examination, Western disclaimed Claims 1, 2 and 9 of the '463 Patent. During the course of reexamination, Claim 3 was cancelled, and Claims 4 to 8 and 10 through 11 were confirmed as patentable over all cited references. Claims 4, 5, 7, 10 and 11 of the '463 Patent are asserted as being infringed in the present suit.

[*3]

Trial of this matter commenced January 20, 1988, and was completed February 3, 1989, with recesses for criminal matters. The trial encompassed approximately twenty-five days of testimony.

On January 31, 1989, during the pendency of the trial, the Court granted Western's Motion for Directed Verdict on PTI's Counterclaims alleging antitrust violations, except that the Court reserved ruling on Count III of PTI's Counterclaims. n2

n2 PTI's Third Counterclaim is a Walker Process type anti-trust counterclaim, asserting the use of a patent in an attempt to monopolize the monolithic crystal filter market.

The invention in question is a narrow band filter that separates telephone voice channels during long distance transmission and assures that voice channels do not pick up conversations from other channels. The filter is composed of a piezoelectric body with two opposing metal electrodes which are separated by a gap or space. Deposited metal tabs are placed for electrical contact with the electrodes. The piezoelectric structure [*4] is mounted on a base with tabs connected by ribbons to pins projecting from the filter base, and a cap is fitted around the body and sealed to the base to form the finished

structure. When an electrical signal is applied through the pins, ribbons and tabs to the input electrodes at the proper frequency, the region beneath the electrodes vibrates acoustically, and the vibration travels through the plate across the gap to the region beneath the output electrodes, exciting that region which generates an electrical field which is received by the output electrodes and travels out through the tabs, ribbons and pins to the load.

The invention has an interesting background. In 1962, Youko Nakazawa of Japan presented a paper to a technical audience geared to persons of ordinary skill in resonator and filter art at the Frequency Control Symposium. This paper and its presentation created a stir among the scientific community. n3

n3 Nakazawa's paper described a device which is essentially the same as the device described in the patent-in-suit. At least one expert, Dr. Frymoyer, testified that from Nakazawa's 1962 paper and presentation or from Nakazawa's 1968 paper on this device, the device in the '463 Patent could be reproduced by reasonable experimentation by a person of ordinary skill in the art.

[*5]

The excitement from Nakazawa's presentation was caused because those skilled in the art understood the impact of this device because of what it meant in economic terms.

Dr. Arthur Ballato, who attended the presentation of Dr. Nakazawa at the 1962 Symposium, explained that Nakazawa was presenting a new class of devices which, instead of incorporating two more crystals into an electric circuit by soldering, used a quartz plate for an integrated circuit. Thus, the devices could be smaller, were easier to make, and were more economical.

This was followed in 1963 by a paper given at the Frequency Control Symposium by Mr. Shockley who, according to Dr. Ballatto and Warren Smith, explained by a mathematical model the trapping and acoustical coupling presented in Nakazawa's 1962 paper. n4 (D-4).

n4 Shockley, a physicist, provided familiar models and made Nakazawa's contributions very

1990 U.S. Dist. LEXIS 12678, *5; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

clear by casting Nakazawa's work in electrical engineering terms which were more understandable to Symposium attendees. It appears from the evidence that part of the confusion in this case concerning the importance of Mr. Nakazawa's contribution depends on whether one was educated as a physicist or was educated as an electrical engineer, or both.

[*6]

Realizing what Dr. Ballato and others did at the time, Professor Onoe in his February and September 1965 papers (D 8 and D 7) took Shockley's analysis which was based on Nakazawa and made possible the design of practical crystal filters. n5

    n5 Onoe's September 1965 paper is an analysis of the energy trapping theory explained by Shockley by which Onoe produced a multi-mode theory resembling Nakazawa's crystal filter (D-7, page 85). In Onoe's earlier February 1965 paper, he refers to Nakazawa's work (D-8). Onoe's paper published in September of 1965 referred to his earlier February 1965 paper which contained equation 25 (D-8, page 17). Equation 25 reflects that three perameters of an MDR, including gap spacing, mass loading (relating to electrode thickness) and the length of the electrode.

By late 1965 and early 1966, William Beaver, who in 1962 was working with Warren Smith and Roger Sykes in the Piezo-electric Devices Department at Bell Telephone Laboratories, attempted to develop monolithic filters. In a notebook entry [*7] of March 18, 1965, witnessed on April 15, 1965, Beaver reported tests on a two resonator filter which included a set of impedance curves for the two arms of a lattice equivalent circuit showing "the frequency condition". Beaver, with Sykes, demonstrated a monolithic two pole filter with controlled mode spacing and in Roger Sykes' notebook entry of November 4, 1965, showed that they had extended the invention to several embodiments, such as generalizing from two electrode filters to multiple electrode filters. Additional tests of three different monolithic filters with three different electrode separations are recorded in Beaver's laboratory notebook entry of May 20, 1965. On April 11, 1966, William Beaver and Roger Sykes filed

their original Patent Application on Monolithic Filters, Serial No. 541,549. On April 20, 1966, they presented a jointly authored report on their work on the monolithic crystal filter at the Frequency Control Symposium of April 1966. Also presenting papers at this Symposium were Professor Onoe and Mr. Mailor. (See D 22, 23 and 64). On June 17, 1966, Beaver and Sykes filed Application Serial Number 558,338 as a continuation in-part of their original Application. [*8] This issued as United States Patent Number *3,564,463* (" *'463* Patent") on February 16, 1971 in the names of William D. Beaver and Roger A. Sykes and is entitled "Monolithic Piezo Electric Filter Having Mass faded Electrodes for Resonation Regions".

The Plaintiff contends that the *'463* Patent discloses and claims a monolithic and piezoelectric filter without additional components which has parameters (i.e., the thickness of the piezo electric plate, the lateral dimension of each electrode, the dimension of the gap between the input and the output electrodes, and plate back) which are chosen to produce an energy confinement condition n6 and an electrical condition, which Plaintiff denotes as "the frequency condition", or the "claimed impedance condition". n7

    n6 This is a relationship between the electrodes and the acoustic energy in the filter so that the acoustic energy in the piezoelectric body is substantially confined to the regions of the electrode pairs in order to keep the acoustic energy used by the filter away from the edges of the piezoelectric plate. It is the capacity of the electrodes to confine the vibration (acoustical) energy in the wafer plate due to a phenomenon which Western calls "mass loading". Mass loading is the phenomenon by which energy is confined due to the mass of the wafer plate and involves the exponential lessening of acoustical energy as it moves away from the electrode.

[*9]

    n7 The frequency condition relates to the monolithic filter in which both resonant frequencies of fA and fB should be less than both anti resonant frequencies of faA and faB. This frequency condition permits a variety of narrow band monolithic filters to be designed and

1990 U.S. Dist. LEXIS 12678, *9; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

manufactured without external components. The claimed impedance condition, an alternative expression for the frequency condition, is illustrated at Figure 10 of the *'463* Patent.

Western contends infringement by PTI of Claims 10 and 11 directed to an "electro mechanical filter" and Claims 5, 6, and 7 directed to "apparatus for translating input oscillatory electrical energy having first characteristics to output oscillatory electrical energy having second characteristics" of the *'463* Patent.

LACHES AND ESTOPPEL

The doctrines of laches and estoppel are invoked by Defendant PTI as equitable defenses to the action for patent infringement. [HN1] The application of these doctrines is within the trial court's discretion after consideration of the facts of the particular case. See, e.g., *Jamesbury Corp. v. Litton Industrial Products, Inc.,* [*10] *839 F.2d 1544* (Fed. Cir.), cert. denied *109 S.Ct. 80 (1988); Studiengessellschaft Kohle mb H v. Eastman Kodak Co., 616 F.2d 1315, 1325* (5th Cir.), cert. denied *449 U.S. 1014 (1980).*

Dr. William H. Horton, President of PTI, testified as a fact witness and as an expert witness on behalf of Defendant. From 1960 to 1965, he was involved in the design and manufacture of crystal filters and, with Robert Smythe, began using the monolithic dual resonator approach instead of the discrete resonator approach in the manufacture and sale of filters of a piezoelectric design as early as 1967. This was before the patent in suit issued. n8 PTI was designing and advertising for sale these monolithic dual resonators ("MDR"), when in early 1968, Messrs. Sailor and Sykes of Western contacted Horton and scheduled a meeting on February 15, 1968. At that time Mr. Sailor was attempting to sell to PTI a license to produce other crystal products, not monolithic filters, although the latter devices were discussed. During this meeting, all agreed that the Japanese would probably hold the basic licenses to the monolithic filters, and Horton, who had expressed concern about who would hold patents to [*11] these products, was admonished by Roger Sykes "not to worry about it." Sykes, who is listed as a co-inventor of the patent-in-suit, claimed at the meeting that he knew nothing about monolithic four poled filters and asked Horton how PTI manufactured them. There was no mention at this meeting of a pending patent application on behalf of Plaintiff. n9

n8 It is undisputed that PTI designed and manufactured its devices without any information from the *'463* patent and that Western employees knew that PTI was manufacturing these devices before Western originally applied for the patent in contention here.

n9 In 1967 and 1968, Horton had learned through the Toyo Corporation of which Yuko Nakazawa was an employee that it had a patent pending, so Horton was interested in negotiating a license with Nakazawa on behalf of PTI. While he suspected that Plaintiff's predecessor would be applying for a patent, he did not know what the patent would encompass.

Again in March of 1968, Messrs. Horton and Smythe of PTI and Messrs. Sykes [*12] and Spencer, a representative of Plaintiff who had replaced Mr. Sykes as a department head, met in New York to discuss monolithic crystal filters and the manufacture by PTI of such devices. At this meeting there was no reference by the Plaintiff's representatives to a patent application by Plaintiff on these devices, although the PTI representatives showed samples and data sheets of PTI monolithic products to Plaintiff's representatives.

In April of 1969, a technical paper was published by PTI on inductorless filters, and in a July 1969 IEEE trade journal, following an article on monolithic crystal filters, a list of all products manufactured by PTI was advertised (D-373). This list revealed to persons skilled in the art that PTI manufactured monolithic crystal filters with the claimed frequency condition.

In October of 1969, Horton and others from PTI travelled to visit the employees of Plaintiff's predecessor, Warren Smith and Dr. Spencer. There they discussed monolithic crystal filters and traded information on a "quid pro quo" basis. Horton carried with him a display case with PTI products which had been listed in the July 1969 trade publication, reviewed these products with the [*13] representatives of Plaintiff, and left them with actual samples and a data sheet list. At no time in 1969 did the representatives of Plaintiff who met with Horton make reference to an application for a patent by Plaintiff or its predecessor or any employee on a monolithic crystal filter such as is denoted in the *'463* Patent.

On April 3, 1970, William Spencer representing the

Plaintiff visited the PTI plant in Orlando, Florida, at which time technical information was again exchanged between PTI and Western. In the course of this meeting there was a discussion of patents in general. Horton asked Spencer his opinion on the patent situation and on the priority of Mr. Onoe and Mr. Nakazawa. n10 Mr. Spencer assured Mr. Horton that Spencer's name would not be placed on any patent application by Plaintiff relating to the monolithic crystal filter structure and left Horton with the belief that Spencer agreed that Onoe and Nakazawa would be prior art.

> n10 Around October of 1968, Plaintiff had been advised by PTI of Onoe's September 1965 paper (D-7).

[*14]

On February 16, 1971, the '463 Patent issued (PI). Horton learned of this Patent at a Frequency Control Symposium in 1971, and a copy of the Patent was forwarded by Western to Horton by letter dated May 4, 1971 and received May 8, 1971. This letter, written by Mr. A. E. Carlson on behalf of Plaintiff, was followed by attempts to schedule a meeting between Plaintiff and Defendant. On November 23, 1971, Mr. Carlson on behalf of Western and Messrs. Smythe, Hart and Horton on behalf of PTI attended a meeting at which Carlson offered PTI a license on the '463 Patent and on another patent, the Rennick-Smith patent. This meeting was followed by a letter dated December 14, 1971 from Mr. Carlson which included a proposed license agreement for PTI. Following a letter acknowledging receipt of the proposed license agreement dated January 11, 1972, Horton advised Western by telephone that PTI did not think the '463 Patent was valid to the extent it attempted to cover what PTI manufactured and further that PTI did not feel it was manufacturing a device encompassed by the patent.

After the April 1972 Frequency Control Symposium, a representative of Western conferred with Horton about another meeting [*15] which was scheduled and held in July of 1972. In attendance were Horton and PTI's attorney, Mr. Coplein, and for Plaintiff, Mr. Warren Smith with several lawyers and several persons from the patent licensing department. At this meeting there were discussions, including but not limited to whether the device in the patent was an MDR with the frequency condition or whether it was a MDR with the frequency

condition in a filter as described in the patent so that it had the insertion loss characteristics described in Figure 14 of the Patent. Plaintiff's representatives were advised by Horton that narrow band filters had the frequency condition and that PTI did not design filter circuits in the manner covered by the patent. At this meeting Horton provided a lawyer for Plaintiff, Mr. Olinder, with a copy of a 1962 article by Professor Nakazawa and made clear PTI's position that it felt the '463 Patent was invalid and that PTI products did not infringe.

Dr. Horton testified as to this meeting,

"A. Well, I remember the general atmosphere at the meeting was confusion. I don't think either side knew what the patent was about. We were unable to differentiate between whether it was claiming to [*16] be an invention of an MDR having the frequency condition or whether it was a MDR having the frequency condition used in a filter in the way it's described in the patent specifications so that you end up with a transmission -- insertion loss transmission characteristics shown in Figure 14 of the patent.

At that time it was sort of a foregone conclusion that narrow band filters have the frequency condition and we assume that it was the narrower interpretation, the filter having the characteristic of Figure 14, which incidentally is what finally issued in Japan and an even further restricted issue in Germany.

Q. Now, you expressed this in July?

A. Well, we said we did not design that way, and we don't, and I think I even went so far as to say you can't, but that's almost irrelevant because we don't. T. p.713.

Although Western Electric bought more filters from PTI in September of 1972, n11 from June of 1972 until May of 1974 there was no further contact of PTI by Western. At the 1974 Frequency Control Symposium, Mr. Libramento of Plaintiff's Patent Licensing Department contacted Horton and Lee Hart of PTI to advise them that Plaintiff had a report on the testing of a PTI filter which [*17] showed infringement. n12 Horton requested a copy of the report, which request Libramento refused. Horton then asked to look at the report. This request was also refused. Thereafter, Mr. Libramento contacted Horton on December 13, 1974, to set up a meeting on January 15, 1975 so that the parties'

respective attorneys could confer. Libramento again refused to provide a copy of the report showing the test results and the alleged infringement by PTI. However, Libramento advised Horton that PTI Models 1470, 1433 and 2194F, which had been manufactured and advertised for sale by PTI since the late 1960's, infringed the *'463* Patent.

n11 PTI had been advertising and selling these filters throughout this period, and occasionally Western bought them from PTI. There is evidence that Western bought PTI products which allegedly infringed the *'463* Patent in the spring of 1972.

n12 Horton's notes dated May 30, 1974 reflect the meeting was held in May of 1974.

The January 1975 meeting was held in New York at Western's offices [*18] and was attended by Horton and Coplein for PTI and by Mr. Rennick, two patent licensing lawyers, and two employees from the patent licensing division on behalf of Plaintiff. Western's attorney advised PTI that it infringed the *'463* Patent and a Rennick Patent, listing Claims 1, 2, 11 and 5 of the *'463* Patent as being infringed. The lawyer claimed that the frequency condition was infringed, and Horton stated directly to Plaintiff's representatives that some PTI MDR's had the frequency condition. A discussion of prior art occurred, including reference to Mr. Onoe's February 1965 and September 1965 papers. n13 Western's lawyer stated that he did not know of the February 1965 publication but that Western had sworn around Onoe's September 1965 publication. The lawyer further stated that Western recognized that Dr. Onoe had invented the monolithic crystal filter theory but that Onoe had done it "too late to prevent Western from obtaining a patent." When Horton asked what the date of Western's invention was, the lawyer refused to answer.

n13 As noted earlier, the September 1965 Onoe paper contains a reference to the February 1965 paper.

[*19]

On March 3, 1975, Mr. Mascarich of Plaintiff's Patent Licensing Department called Horton and advised

that Mr. Rennick had written a memo expressing concern because the lawyers at the previous meeting would not allow him to say anything. Mascarich indicated that he wanted to discuss Mr. Rennick's report with Horton and make an offer. Mascarich came to Orlando around March 12, 1975, but refused to show Horton Mr. Rennick's report. Mascarich offered a license on the patent in suit and the Rennick Patent which Horton refused. Horton orally conveyed PTI's position that it did not infringe the *'463* Patent if it was narrowly construed, and that if the Patent was broadly construed, it was invalid. Horton followed this meeting with a letter to Mr. Mascarich dated March 13, 1975, in which he related relevant points directed to the file history concerning the device claimed in the *'463* patent and further pointed out that whenever a device has the narrow band frequency, it has the so called "frequency condition" which was well known and which was embodied in the units designed by Professor Nakazawa. Horton further advised Mascarich that Western was incorrect in its band limitation theory on the [*20] *'463* Patent device. Horton also sent several references and papers to Mascarich.

This letter was followed by several communications between Horton and Mascarich, the latter requesting another meeting without "whippersnapper lawyers". On March 20, 1975, Horton advised Mascarich of the technical matters he would like to have discussed at a meeting. This meeting was held on April 10, 1975 and was attended by Robert Smythe and Horton on behalf of PTI and by Bob Rennick, Warren Smith, Mr. Sweeney and Mr. Mascarich, patent licensing representatives. Horton presented charts at this meeting outlining crucial points which he discussed with Western's representatives, including but not limited to the fact (1) that Nakazawa's invention had mass loading, n14 (2) that edge activity is a specious issue, (3) that Nakazawa's structure contained the acoustic coupling concept, (4) that when mode spacing is of a certain dimension, the frequency condition occurs, (5) that it was unclear whether the *'463* Patent claimed an MDR with a frequency condition or whether it was a MDR with a frequency condition used to make a filter with a transmission characteristic like Fig. 14 of the Patent, and (6) that Western [*21] had made several statements which were incorrect or misleading in the file history of the *'463* Patent. Horton also discussed with the Western representatives prior art and the fact that Toyo Corporation of Japan had commercialized the product on which Western's *'463* Patent is based.

n14 While Western representatives originally stated in these meetings that Nakazawa devices did not have mass loading, at trial they argued that the Nakazawa devices did not have significant mass loading. It is undisputed that the claims of the patent in suit contain the phrase, but do not define what is meant by, "substantial concentration" of acoustical energy. Dr. Meeker testified that exponential decrease in acoustical energy is a theory not subject to quantitative analysis. He testified that he gleaned this information from reading a paper dealing with an assumed thickness of the plate and an infinite strip electrode on an infinite quartz plate unlike the device described in the patent in suit.

PTI received no refutation of Horton's [*22] points made at this April 10, 1975 meeting. Horton later sent a letter dated April 15, 1975 addressed to Mr. Mascarich again setting forth PTI's positions in writing.

In May of 1975 Horton inquired of a representative of Western at the Frequency Control Symposium concerning the status of the points he had made. The representative wrote Horton by letter dated June 2, 1975 and advised him that the information Horton had sent was still being studied by Plaintiff.

On June 5, 1975, Horton wrote Mr. Sweeney, a representative of Plaintiff, who had requested more information about the Rennick Patent, and Horton sent certifications of the publication of Professor Onoe's February 1965 paper (D-8) to Mr. Sweeney with a list of prior art references. Sweeney responded by letter dated June 10, 1975 and advised that he had forwarded Horton's letter with attachments to Plaintiff's legal organization and that he would let Horton know when he had something to report.

For several months, PTI did not hear from Western. By letter dated February 9, 1976, Mr. Sweeney on behalf of Plaintiff advised Horton that Western had completed its study of his comments regarding the *463* Patent and that as a result [*23] of the documents Horton had forwarded, Plaintiff was in the process of disclaiming some claims of the *463* Patent. The specific claims being disclaimed were not identified. n15 No indication of an intent to enforce any claim of the Patent against PTI was given. PTI assumed all of the two pole or MDR claims of the *463* Patent had been disclaimed. n16 Several

additional letters passed between Sweeney and Horton, including one dated March 3, 1976 from Horton in which Horton explained why he felt that Plaintiff should disclaim all claims of the *463* Patent. n17 In June of 1976, informational letters passed between the parties with Sweeney again advising Horton by letter dated June 8, 1976 that an attorney was recently assigned to review Horton's letters and references.

n15 Western had filed a Disclaimer of Claims 1, 2 and 9 of the *463* Patent.

n16 The *463* Patent contained two groups of claims, some relating to the two pole or MDR devices (Claims 1, 2, 4, 5, 7, 9, 10 and 11) and some relating to more than two poles or resonator pairs (Claims 3, 6 and 8).

n17 Horton testified that Western had put effort into developing and manufacturing an eight resonator filter and that he assumed Western had disclaimed MDR claims, keeping the claims for triple mode and higher filters. Horton explained that PTI was not making these types of products and was not interested in them, but Horton did not feel that Western had priority on these claims, either. His letter contained his view that Western should disclaim everything, assuming that what Western had disclaimed was everything except the triple mode and higher filter.

[*24]

From July of 1976 until April 10, 1981, a period of five years, PTI heard nothing further from Western concerning the patent in suit. n18 Additionally, during this period, orders to PTI from Western for PTI's products ceased except for one or two small orders in 1981. This occurred in spite of the fact that Horton attempted to obtain business for PTI from Western by periodic personal visits to the Western offices. In the course of soliciting business for PTI from Western, Horton invited Mr. Oaks, the engineer responsible for monolithic filters at Western, to visit PTI's plant for the purpose of giving PTI business, stating words to the effect, "Let bygones by bygones." A meeting was arranged, but in March of 1981 Dr. Meeker arrived on behalf of Western instead Mr. Oaks. PTI gave Meeker a tour of its plant, talked about the monolithic filters it was producing, and tried to convince Meeker that Western

1990 U.S. Dist. LEXIS 12678, *24; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

should do business with PTI. Meeker said nothing about patents or his participation since 1980 at least on a litigation team formed by Western directed to PTI's products.

n18 There is nothing in the evidence to suggest that testing of PTI products for infringement is lengthy or difficult.

[*25]

Shortly after Meeker's visit, Horton received a letter dated April 10, 1981 from a new patent licensing employee of Plaintiff, Mr. Laguarde, in which he advised that a patent had now issued in Japan, n19 that the Plaintiff's attorneys had been considering the matter for some time, and that the issue was not concluded. A series of telephone calls and letters passed between Horton and Laguarde, resulting in a request by Western for another meeting. Horton testified that he was flabbergasted that the matter was going to be reopened n20 and that from his discussions with Laguarde he concluded that a whole new set of people had become involved in the situation so that the parties were starting all over again.

n19 This patent had issued in 1978. Horton previously was unaware of this.

n20 Horton testified that part of his reaction was based on the statement made at the January 1975 meeting in which the Western lawyer admitted that Onoe had independently invented the monolithic filter theory. See supra.

On September [*26] 15, 1981, a meeting was held between the two parties in Orlando. Horton, Smythe and two PTI engineers attended on behalf of Defendant, and Mr. Laguarde as well as Mr. Einschlag and Mr. Gunderson, two attorneys, attended on behalf of Western. At this meeting, Mr. Einschlag stated that Claim I of the Japanese Beaver/Sykes patent represented the invention in the United States, that the patent had issued in Japan against vigorous opposition, and additionally that the patent had issued in Holland and Germany. Because Horton felt that these new players on behalf of Western might be unaware of the history of the matter, he went through the details of the prior art, PTI's objections, and why PTI's products did not infringe. This meeting was

followed by a letter from Horton to Laguarde dated September 17, 1981, containing a summary of points and a copy of test information. n21

n21 The letters between the parties prior to the September 1981 meeting are filed in the record and are dated June 23, 1981, July 31, 1981, August 6, 1981 and September 14, 1981. Prior to this meeting, Western had sent Horton a copy of its Japanese patent translation and also a copy of the Beaver/Sykes patent as it then existed. Horton noticed that the Japanese Patent was significantly more restrictive than the U.S. '463 Patent. Since the Western representatives stated that the Japanese patent represented the invention in the U.S., Horton and Smythe tested the PTI products and compiled data showing that there was no infringement. The Japanese Beaver/Sykes Patent Claim which issued is limited to a filter terminated in the fashion shown in Figure 14 of the '463 Patent which Horton stated is not what is manufactured by PTI. This Japanese Patent combined resonator and filter properties.

[*27]

In December of 1981, Horton received a telephone call from Laguarde stating that Western was going to file suit against PTI for infringement of the '463 Beaver/Sykes patent.

During the period from 1967 until 1981, PTI had been manufacturing, advertising, and writing many technical papers drawing attention to its products to obtain as much publicity for its products as it could. Until Western filed the instant suit in 1981, Western did not give PTI any information concerning why Western contended PTI infringed the '463 Patent, nor did Western give any indication of how the claims of the '463 Patent "read on" the PTI products except for the statement in the January 1975 n22 meeting that certain PTI models infringed claims of the '463 Patent because these models contained the frequency condition.

n22 As noted earlier, this was the meeting at which one of the lawyers for Western admitted that Professor Onoe had independently invented the monolithic filter theory.

1990 U.S. Dist. LEXIS 12678, *27; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

During the period from 1971 through 1981, PTI developed from [*28] a small company with some fifty employees to a larger company employing approximately five hundred people. Its sales of about one million dollars in the early 1970's increased to over ten million dollars in the early 1980's. PTI made substantial capital investments during these years, financed by bank borrowings and secured by personal guarantee. It also developed new products now alleged to infringe the *463* Patent. Also, PTI, which has manufactured single and dual resonator structures, might have emphasized the single resonator investment if it had been aware that the dispute between the parties was still alive during this time. PTI did not set aside reserves n23 for the law suit and had offers of purchase for the company which it would have favorably considered if it had knowledge that the controversy between the parties was still alive.

    n23 There is evidence, however, that PTI did not have the funds to set up such contingency reserve.

Additionally, because of the passage of time before Western instituted suit, the [*29] testimony of witnesses favorable to Defendant is not available. For instance, Milton Dishal, Anatoly Zvrerov and Roger Sykes have died, and Mr. Brailsford who had agreed to be a witness and who authored a paper in 1946 anticipating the circuit aspects of the claimed invention including disclosure of a monolithic filter, became unavailable due to diagnosis of cancer of the pancreas. William Beaver, one of the Patent's listed co-inventors, was unavailable.

In addition, because of the passage of time, many witnesses who were deposed, such as Mr. Zuidervliet, Mr. Bies, Mr. Hurado, and even Mr. Meeker, were unable to recall what had happened back in the 1960's and early '70's. Further, the records of many witnesses for this period have been lost or destroyed. For instance, Mr. Sykes, one of the co-authors of the claimed invention, testified that he destroyed all of his documents around 1982, a year before he had been deposed in this case. Finally, some of Plaintiff's records pertaining to this dispute which PTI sought to obtain have been lost or misplaced.

From June of 1976 when Horton received the letter from Mr. Sweeney until Mr. Meeker's visit in March of 1981, Western did not contact [*30] PTI. Further, since

Mr. Sweeney had advised Mr. Horton of the disclaimer in the *463* Patent based on the Onoe reference which Horton felt clearly covered the subject of the *463* Patent, PTI felt that the issue between the parties was dead.

Throughout this period of time, it was the repeatedly asserted and unambiguous position of PTI that the frequency condition and impedance condition recited in claims of the *463* Patent were well known to anyone experienced in electrical theory to be the equivalent of the overlap characteristics set forth in Claim 1 of the Patent, which was disclaimed, and that the same device was being described in terms of different inherent physical or electrical properties since all of the retained MDR Claims 4, 5, 7, 10 and 11 covered the same subject matter as Claim 1.

In further support of PTI's position, the person in charge of the original *463* Patent Application, Mr. Warren Smith, testified at trial that Claims 1, 2 and 9 of the *463* Patent which were disclaimed, say essentially the same thing as Claims 4, 5, 7, 10 and 11 which are the subject of the instant suit.

Further, PTI had made known to Western that after Smythe and Horton attended the April 1966 [*31] Frequency Control Symposium at which Messrs. Onoe, Sykes and Mailer presented papers, Smythe obtained a copy of Onoe's September 1965 paper (D-7), and using Equation 25 developed a computer program n24 which PTI has used for the commercial manufacture of its products since 1967 without reference to any information contained in the Beaver/Sykes Patent later issued in 1971.

    n24 While Equation 25 contains a quantitative error, a minor change in a coefficient rectifies the error which does not effect the qualitative presentation of such equation. Robert Smythe testified he had used Equation 25 regularly since 1967 when he devised his program. Dr. Edward M. Frymoyer testified that an analysis based on Equation 25 remains a good model to use today.

Based on these facts, the Court finds that Western's claims against PTI are barred by laches and estoppel. The Court of Appeals for the Federal Circuit has recently reiterated the differences between laches and estoppel, and the proof required for each, in the context of a patent

[*32] infringement case, *Jamesbury Corp. v. Litton Industrial Products, Inc., 839 F.2d 1544* (Fed. Cir.), cert. denied *109 S.Ct. 80 (1988).* [HN2] While laches bars recovery of damages for any infringement occurring prior to the filing of the suit, estoppel precludes the patentee from obtaining prospective relief, either an injunction or damages for infringement occurring after the filing of the suit. *Jamesbury, supra, at 1551 and 1554.* [HN3] There are two elements prerequisite to a finding of laches in a patent infringement case: (1) an unreasonable and inexcusable delay in filing suit; and (2) material prejudice to the defendant resulting from the delay. *Id. at 1552.* Estoppel requires, in addition to (1) and (2) above, two additional elements: (3) affirmative conduct by the patentee inducing the belief that it abandoned its claims against the alleged infringer; and (4) detrimental reliance by the infringer. *Id. at 1554.*

[HN4] As with all equitable defenses, a defendant might not be permitted to invoke laches or estoppel if the defendant's own conduct has been inequitable. See *Bott v. Four Star Corporation, 807 F.2d 1567, 1576 (Fed. Cir. 1986); TWM Manufacturing Company, Inc. v.* [*33] *Dura Corporation, 722 F.2d 1261, 1269 (Fed. Cir. 1983),* cert. denied *479 U.S. 852 (1986).* Western contends, as an initial matter, that PTI is not entitled to invoke the doctrines of laches or estoppel because Defendant is a willful infringer and because PTI engaged in inequitable conduct during the Reexamination. [HN5] Although a showing of egregious conduct may persuade a court that the equities do not lie with the defendant, a plaintiff's allegations of "willful infringement" do not automatically bar the alleged infringer from asserting the laches and estoppel defenses; this is a matter for the court to determine in its equitable discretion. See TWM, supra, at 349. At any rate, the evidence does not show Defendant to be a willful infringer n25 or to have engaged in any inequitable conduct. Defendant is not precluded, therefore, from invoking the defenses of laches and estoppel.

n25 Not all infringement is "willful infringement." [HN6] "Willful infringement" is a term of art applied in appropriate cases in order to support an enhancement of the damage award. "In determining whether an infringer engaged in 'willful infringement,' a court should consider the totality of the circumstances, including (1) whether the infringer deliberately copied the ideas

or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation." *Bott, supra, at 1572.* Here there is ample evidence that Defendant developed its product independently of Plaintiff's patented product. There is also sufficient evidence to indicate that Defendant investigated the scope of the patent and concluded in good faith that if the patent were broadly construed it was invalid and if the patent were narrowly construed PTI's products were noninfringing. The Court further finds that PTI's litigation conduct has not been improper so as to constitute bad faith or willful infringement.

[*34]

[HN7] For purposes of laches, the length of delay is measured from "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity." *Jamesbury, supra, at 1552.* It is undisputed that Plaintiff knew about Defendant's allegedly infringing activities as early as 1971, the year the *'463* Patent was issued. n26 Thus, there was a delay of more than ten years before Plaintiff brought this suit in December of 1981.

n26 It is clear from the evidence that Plaintiff knew about Defendants activities in the field prior to 1971, but, of course, [HN8] there can be no infringement until a patent has issued. See *Bott, supra, at 1575.*

[HN9] Under the laches doctrine, when, as here, the delay in filing suit exceeds six years, a rebuttable presumption arises that the delay was unreasonable and prejudicial to the defendant, and the burden shifts to the patentee "to prove the existence and reasonableness of an excuse for the delay, as well as to show the lack of prejudice to the infringer." [*35] *Jamesbury, supra, at 1552.* Plaintiff argues that its delay was reasonable because from 1971 to 1976 Plaintiff offered Defendant a license under the patent and discussions were held on this matter. However, [HN10] "the general rule is that license negotiations do not necessarily push back the running of time in a laches defense. . . . For such tolling the

1990 U.S. Dist. LEXIS 12678, *35; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

negotiations must ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." *A.C. Auckerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 700 (7th Cir. 1982).* Throughout the attempts by Western to discuss a licensing arrangement, PTI continually declined a license and steadfastly maintained that the *'463* Patent was not valid and that PTI's products were noninfringing. The Court finds that the licensing discussions were in no sense "bilaterally progressing, with a fair chance of success," and, therefore, these discussions do not excuse Plaintiff's delay in bringing suit.

Plaintiff also argues that its delay is excusable because a new question arose as to the patent's validity when, in April of 1975, PTI cited to Western Onoe's February 1965 paper, causing Plaintiff [*36] to file a disclaimer and involving Plaintiff in an effort to resolve this new question through patent proceedings in Germany and Japan from 1976 to 1981. The question of the patent's validity was not "new" in 1975, however; Defendant had been stressing since 1971 that the patent was invalid because of prior art. Moreover, Onoe's February 1965 paper was referenced in his September 1965 paper, and it is established that Plaintiff knew about and had "sworn around" this latter paper at the time Plaintiff filed its patent application in 1966. At any rate, [HN11] a concern that the patent may be invalid does not, in and of itself, toll the delay for purposes of laches. The doctrine of laches should, if anything, encourage the patentee to expedite its determination of patent validity so that it may proceed with a suit for infringement, if appropriate. It is true that a foreign patent proceeding may sometimes excuse a delay in bringing a patent infringement suit in the United States. See *Mainland Industries, Inc. v. Standal's Patents Ltd., 799 F.2d 746, 749 and n. 2 (Fed. Cir. 1986).* [HN12] In order to excuse delay based on other litigation, however, "the patentee must give notice to the alleged infringer [*37] of the existence of the other litigation and of an intent to enforce its rights against the infringer at the conclusion of the other litigation." *Jamesbury, supra, at 1553.* See also *Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1573 (Fed. Cir. 1987).* The Court finds that Plaintiff did not give adequate notice to Defendant of the foreign litigation or of its intent to enforce the *'463* Patent against PTI once the foreign proceedings were concluded. The foreign patent proceedings, therefore, do not excuse Plaintiff's delay.

For the reasons stated above, Plaintiff has not met its burden of showing that its delay is excusable or that the Defendant was not prejudiced. Accordingly, the Court will apply the doctrine of laches.

[HN13] For purposes of estoppel, the length of delay is measured "from the time of the patent owner's misrepresentation or the beginning of the misleading silence." *Jamesbury, supra, at 1554.* In this case, Plaintiff's misleading silence began in 1976 and, thus, the delay was over five years.

The Court finds that Plaintiff's letters of February 9, 1976 and June 8, 1976, together with Plaintiff's subsequent silence from June 8, 1976 until 1981, when considered in [*38] the context of all communications between the parties prior to and after that time, constitute the "affirmative conduct" necessary for estoppel. n27 In the circumstances of this case, Western's silence of more than five years, following Western's statements to PTI that its review of the *'463* Patent matter was complete or soon to be complete, was sufficiently misleading to induce a reasonable person, n28 and did induce PTI, to believe that Western had abandoned its claims of infringement with respect to the *'463* Patent. See *Jamesbury, supra, at 1554* (holding that patentee's eight-year silence after informing alleged infringer that it was considering the alleged infringer's position of noninfringement was sufficiently misleading to meet the third element of estoppel). See *Hottel, supra, at 1574;* TWM, supra, at 350.

n27 The February 9, 1976 letter from Mr. Sweeney of Western to Mr. Horton of PTI stated:
We have completed our study of your comments regarding the Beaver-Sykes Patent, and wish to thank you for bringing to our attention the early publication date of the Onoe reference. As a result of the documents you have provided, we are in the process of disclaiming some claims of the Beaver-Sykes Patent.
(Exhibit L to Affidavit of William H. Horton in Support of Defendant's Motion for Summary Judgment on Issues of Laches/And/Estoppel, filed July 12, 1983.)

The June 8, 1976 letter indicated that an attorney had been assigned to review Dr. Horton's letters and references, and stated that "it may take some time, but there does appear to be a procedure established, which should lead to a

1990 U.S. Dist. LEXIS 12678, *38; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

conclusion." (Exhibit N to Affidavit of William H. Horton in Support of Defendant's Motion for Summary Judgment on Issues of Laches/And/Estoppel, filed July 12, 1983.) It is not clear whether these statements were made with reference to the Beaver-Sykes Patent or the Rennick-Smith Patent. Assuming, without deciding, that the statements were intended to refer to the Beaver-Sykes Patent, then these statements reopened an issue which the February 9, 1976 letter had indicated was already concluded, and Plaintiff was under an obligation to inform Defendant within a reasonable time of any decision to continue challenging Defendant's alleged infringement of the Beaver-Sykes Patent. See *Jamesbury, supra, at 1554.*

[*39]

n28 Plaintiff contends that it was not reasonable for Defendant to rely on the personal belief that the patent was disclaimed in its entirety. While such a belief, without further examination of the disclaimer or consultation with an attorney, might not be reasonable, that is not the issue here. Defendant does not argue that it believed the entire patent was formally disclaimed. Rather, Defendant persuasively contends that Plaintiff's statements and subsequent silence led PTI to believe that Western was abandoning its infringement claims against PTI.

[HN14] A defendant asserting an estoppel defense has the burden of showing that all four elements of the estoppel defense are met. n29 Defendant has met that burden here. It was unreasonable and inexcusable, in the circumstances of this case, for Western to fail to bring suit or otherwise inform Defendant of Plaintiff's intention to pursue its claim of infringement until more than five years after Plaintiff had indicated to Defendant that, after taking PTI's position into account, Western's study of the matter was concluded or soon to be concluded. Defendant [*40] has clearly shown that it has been prejudiced by this delay, e.g. through loss of evidence and death of witnesses. As discussed above, Western's letters to PTI in 1976, followed by silence on the issue for some five years, constituted affirmative conduct inducing the

reasonable belief that Western had abandoned its claim of patent infringement against PTI. Finally, the evidence establishes that Defendant relied on this belief to its detriment, e.g. by continuing to develop and market the allegedly infringing products and by declining offers to purchase the business. For these reasons, the Court will apply the doctrine of estoppel.

n29 Even [HN15] when the delay exceeds six years, the presumptions which apply in the doctrine of laches do not apply with regard to estoppel, and the burden does not shift away from the defendant who has asserted the estoppel defense. *Jamesbury, supra, at 1554.*

## PTI'S COUNTERCLAIM

Because the Court has held that Plaintiff is barred by laches and estoppel from asserting a claim of patent [*41] infringement against Defendant, there is no longer an actual case or controversy as to Defendant's counterclaim for a declaratory judgment of invalidity or non-infringement. See *Public Service Commission v. Wycoff Co., 344 U.S. 237 (1952); Warner-Jenkinson Co. v. Allied Chemical Corp., 567 F.2d 184, 186-87 (2d Cir. 1977).*

As to PTI's allegations of anti-trust violations, the Court finds there was bungling, lack of technical experience, and ignorance involved in Western's presentation to the United States Patent Office with reference to the *'463* Patent. For instance, the Court notes that the technical person responsible for Western's prosecution of the reexamination, Dr. Meeker, by his own admission in deposition, was not viewed by his colleagues as being as well-qualified as other colleagues in the field at Western and, except for some reading and conversations with others, was not involved in the quartz crystal field until 1972, after the original patent issued. Dr. Meeker's testimony at trial was at times conflicting and at times was inconsistent with his prior deposition testimony. Dr. Meeker and attorney Lester Birnbaum n30 were solely responsible for prosecuting the reexamination [*42] of the patent and made errors in their representations to the patent office concerning prior art, which errors Meeker from time to time admitted during his testimony at trial. n31 The person knowledgeable in the field who was responsible for prosecution of the original patent application on behalf of Western, Warren

1990 U.S. Dist. LEXIS 12678, *42; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

Smith, was not involved in the reexamination although he was still employed at Western and appears to have technical qualifications more relevant to the subject matter than Dr. Meeker. Mr. Smith, called as an adverse witness by PTI and on rebuttal by Western, admitted that although he attended meetings with PTI, he had no input into technical submissions and was at no time consulted about the reexamination proceedings. Further, as noted earlier, Mr. Warren Smith testified at trial that the claims of the *'463* Patent which were not disclaimed, Claims 4, 5, 7, 10 and 11, were essentially the same subject matter, the same structure, and the same function as Claim 1 of the Patent which had been disclaimed. n32 Despite these faults in Western's presentation to the Patent Office, however, the Court cannot find that Western committed intentional fraud on the Patent Office. The [*43] evidence does not support a conclusion that Plaintiff knowingly and willfully misrepresented facts to, or withheld information from, the Patent Office. See *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965); Argus Chemical Corporation v. Fibre Glass-Evercoat Company, Inc., 812 F.2d 1381, 1384-84 (Fed. Cir. 1987).*

n30 At the relevant time concerning the reexamination, Mr. Birnbaum had no patent experience or technical experience with respect to monolithic dual resonator devices or filter circuits. When he prepared the Request for Reexamination, he was told to look solely to Dr. Meeker for technical advice, which he did. Birnbaum's testimony on the witness stand was inconsistent. Further, he testified that he failed to disclose to the U.S. Patent Office during reexamination a relevant decision in 1979 of the German Federal Patent Court which was adverse to Western's position on reexamination because he personally made the determination that the German Court had erred and had misquoted and misunderstood Onoe in finding that Onoe had coincidence of the two critical frequencies fB faA. Finally, he admitted that he did not draw a distinction between a filter and a MDR device in the statements he made to the Patent Office.

[*44]

n31 Dr. Meeker testified on several occasions during the trial that he had made technical statements which were incorrect concerning the subject matter of the patent. Mr. Meeker was also technical adviser and extensively involved in the German Patent Court proceedings involving the Beaver-Sykes Patent.

n32 Dr. Meeker testified that Onoe's September 1965 publication was a reason that claims 1, 2 and 9 of the *'463* Patent had been disclaimed.

Furthermore, even if it were to hold the patent invalid and unenforceable, n33 the Court cannot find from the evidence presented that Plaintiff knew the patent was invalid and undertook to enforce that patent in bad faith. See *Argus, supra, at 1386.* Therefore, the Court rules against PTI on its anti-trust counterclaim.

n33 The Court has misgivings concerning the validity of the patent, and it is prepared to rule on this issue. In light of its finding of laches and estoppel, however, the Court does not think it appropriate to elongate this opinion with a discussion of the issues of invalidity and noninfringement.

[*45]

CONCLUSION

In conclusion, the Court finds that Western's suit is barred by the principles of laches and estoppel. The Court rules against PTI on its anti-trust counterclaim and declines PTI's request for a declaratory judgment on invalidity and noninfringement. Accordingly, Judgment is hereby entered against Plaintiff in its suit for patent infringement and against Defendant on its counterclaim. The case is DISMISSED.

Based on this Order, the Court does not need to reach the other issues asserted by the parties.

The Motion to Strike filed by Defendant on June 28, 1989 is DENIED. n34

n34 A Response was filed by Plaintiff on July 13, 1989.

1990 U.S. Dist. LEXIS 12678, *45; 15 U.S.P.Q.2D (BNA) 1401;
1990-2 Trade Cas. (CCH) P69,097

*DONE AND ORDERED* at Orlando, Florida, this 22nd
day of March, 1990.

# EXHIBIT J

LEXSEE 1989 U.S. DIST. LEXIS 16865



Positive
As of: Mar 02, 2007

LORAL CORPORATION, and GOODYEAR AEROSPACE CORPORATION,
Plaintiff and Defendants on Counterclaim, v. THE B.F. GOODRICH COMPANY,
Defendant and Counterclaimant, v. THE GOODYEAR TIRE & RUBBER
COMPANY, Defendant on Counterclaim

Civil Action No. C-3-86-216

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
OHIO, WESTERN DIVISION

*1989 U.S. Dist. LEXIS 16865; 14 U.S.P.Q.2D (BNA) 1081*

**January 27, 1989, Decided**
**January 30, 1989, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff brought suit for patent infringement, while defendant argued invalidity and raised affirmative defenses.

**OVERVIEW:** Both parties engaged in the aircraft brake business. After plaintiff alleged patent infringement, defendant argued invalidity and affirmative defenses. The court found that patent claims were valid and enforceable. Defendant was aware of the patents from their existence and willfully infringed, even after receiving infringement notice letters; thus, defendant was precluded from asserting estoppel. Furthermore, defendant lacked clear and convincing evidence that an offer for sale or public use occurred prior to the patent or that plaintiff was guilty of inequitable conduct with the patent office. Reasonable royalties for defendant's infringement had to be determined and would apply to manufacture, use, and sale of infringing aircraft carbon disc brakes, from the suit's date through March, 1989, and would not include damages for the sale of infringing brake assemblies because they were manufactured for and sold to the government. Increased damages and attorney fees were not awarded because plaintiff's delay in bringing suit was not reasonable.

**OUTCOME:** Judgment was entered for plaintiff because defendant willfully infringed on plaintiff's patent, which was found to be valid and enforceable, and because defendant had not established its defenses. Plaintiff was not entitled to increased damages or attorney fees because its delay in filing the action was not reasonable.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Burdens of Proof*
[HN1] The burden of proving infringement is plaintiff's. Plaintiff must prove infringement by a preponderance of the evidence.

*Patent Law > Infringement Actions > Doctrine of*

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

*Equivalents > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN2] In determining patent infringement, two inquiries are involved (1) the scope of the claims and (2) whether the claimed invention has been infringed. The second inquiry may be met by a determination of literal infringement or infringement under the doctrine of equivalents.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN3] In addition to the claims themselves, in construing disputed claims, the court may look to other claims, the specification, the prosecution history, and expert testimony.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN4] If an infringer's products come within the literal scope of the claim's language, infringement is made out and that is the end of it.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
[HN5] A pioneer patent is entitled to a broad scope of equivalents.

*Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview*
[HN6] A patent is viewed as a whole under the doctrine of equivalents.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
[HN7] *35 U.S.C.S. § 271*(b) provides that whoever actively induces infringement of a patent shall be liable as an infringer.

*Patent Law > Remedies > Damages > General Overview*
[HN8] A plaintiff is precluded from recovering damages for the sale of infringing devices if they were manufactured for and sold to the United States government.

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN9] It is plaintiff's burden to prove, by clear and convincing evidence, that defendant's infringement was willful. The test for determining willfulness is whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
*Torts > Negligence > Duty > Affirmative Duty to Act > General Overview*
[HN10] Where the infringer has actual notice of the patent's existence, and the patentee's rights, he has an affirmative duty of due care. This duty of due care normally requires the potential infringer to obtain competent advice of counsel before beginning or continuing infringement. The failure to obtain this advice is not necessarily determinative of the question, but it is one factor supporting a finding of willfulness.

*Patent Law > Remedies > Collateral Assessments > Attorney Fees*
*Patent Law > Remedies > Damages > General Overview*
[HN11] If infringement is willful, increased damages may be awarded at the discretion of the court. Damages may be increased up to three times, also in the exercise of the court's discretion. Willful infringement may also be a sufficient basis for finding a case "exceptional" for purposes of awarding attorney fees under *35 U.S.C.S. § 285.*

*Patent Law > Remedies > Damages > General Overview*
[HN12] In determining whether to increase damages as a result of defendant's willful infringement, the court is required to consider all of the circumstances of the case.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

[HN13] A patent is presumptively valid. *35 U.S.C.S. § 282*. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. That burden is constant and never changes and is to convince the court of invalidity by clear and convincing evidence.

*Patent Law > Statutory Bars > On Sale Bar > General Overview*
[HN14] A patent is invalid if it was on sale in the United States, more than one year prior to the date of the application for patent in the United States. *35 U.S.C.S. § 102*(b).

*Patent Law > Statutory Bars > On Sale Bar > General Overview*
[HN15] An actual sale is not necessary; an offer to sell is sufficient under the policy animating *35 U.S.C.S. § 102*(b), which proscribes not a sale, but a placing on sale.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > Statutory Bars > On Sale Bar > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*
[HN16] An invention is on sale within the meaning of *35 U.S.C.S. § 102*(b) when: 1) there was a definite sale or offer to sell more than one year before the patent application was filed; and 2) the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. The sale need not be consummated, nor accepted. All of the circumstances surrounding the alleged offer or sale must be considered. In determining whether an offer or sale occurred, the court should consider whether there was a reduction to practice, although this is not an absolute requirement of the on-sale bar. In addition, consideration should be given to the stage of development of the invention and the nature of the invention.

*Patent Law > Statutory Bars > Experimental Use > Elements*
*Patent Law > Statutory Bars > On Sale Bar > General Overview*

[HN17] If a sale or offer to sell was made, the on sale bar does not apply if the offer or sale was substantially for the purpose of experiment. In determining whether an offer or sale was for experimental purposes, the court must consider various factors, and consider the underlying facts of each case in light of all the circumstances. Factors which the court may consider include, the length of the test period; whether any payment was made for the invention, whether there is any secrecy obligation on the user's part, whether progress records are required, whether persons other than the inventor conducted the experiments, the extent of testing required, length of the test period in relation to test periods for similar devices, and the degree of commercial exploitation during the tests (in relation to the purpose of the experimentation). This is not an exhaustive list.

*Patent Law > Anticipation & Novelty > Knowledge & Use*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Statutory Bars > Abandonment & Forfeiture Bar > General Overview*
[HN18] In addition to barring patents which have been placed on sale more than one year before the filing date, *35 U.S.C.S. § 102*(b) also renders a patent invalid if the invention was in public use in this country more than one year prior to the date of application. This section precludes attempts by the inventor or his assignee from commercially exploiting an invention more than a year before the application for patent is filed.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Statutory Bars > Public Use Bar > General Overview*
[HN19] It is necessary for the court to consider all of the factors surrounding the purported public use. And, as with the on sale bar, the burden of proving invalidity remained with defendant, although if defendant made out a prima facie case, plaintiff is required to come forward with evidence to counter it.

*Patent Law > Statutory Bars > Experimental Use > Elements*
*Patent Law > Statutory Bars > Public Use Bar > General Overview*
[HN20] The relevant factors to consider in determining whether a public use occurred include, but are not limited

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

to, whether the patentee retained control over the invention, whether what was disclosed embodied the invention, whether the disclosure included a condition of confidentiality, and whether the use, if public, was experimental.

***Patent Law > Statutory Bars > Public Use Bar > General Overview***
[HN21] Public use is the use of the invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***
[HN22] A patent applicant owes an uncompromising duty of candor and good faith in dealings before the U.S. Patent and Trademark Office (PTO). Breach of this duty renders any patent issuing from such proceedings unenforceable. Such a breach has become known as inequitable conduct before the PTO.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN23] Inequitable conduct resides in the failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN24] Materiality can be established by any one of four tests: 1) the objective "but for" test; 2) the subjective "but for" test; 3) the "but it might have been" test; and 4) the U.S. Patent and Trademarks Office (PTO) test of whether there is a reasonable likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. However, the PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN25] To avoid a charge of inequitable conduct, attorneys do not have to raise and explain to the U.S.

Patent and Trademark Office all problems they have considered.

***Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof***
***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN26] In addition to materiality, defendant is also required to show intent by clear and convincing evidence to sustain its charge of inequitable conduct on plaintiff's part. To be guilty of inequitable conduct, one must have intended to act inequitably.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN27] Gross negligence, by itself, is not sufficient to compel a finding of intent to deceive.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN28] A determination on the issue of inequitable conduct requires a balancing of materiality and intent.

***Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
[HN29] Inequitable conduct during the reexamination must be shown by clear and convincing evidence. Defendant is required to show both materiality and intent.

***Patent Law > Inequitable Conduct > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations***
[HN30] The statute, the regulations, and the Manual of Patent Examining Procedure all specifically limit the reexamination proceeding to consideration of prior art patents and publications. *35 U.S.C.S. § 302; 37 C.F.R. § 1.552*; MPEP § 2258.

***Patent Law > Claims & Specifications > Definiteness > General Overview***
***Patent Law > Claims & Specifications > Description Requirement > General Overview***
[HN31] See *35 U.S.C.S. § 112.*

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

*Patent Law > Claims & Specifications > Best Mode > General Overview*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN32] Compliance with *35 U.S.C.S. § 112* requires the patentee to set forth the manner and process of making and using the invention (enablement), and the best mode contemplated by the inventor of carrying out the invention (best mode). These are two separate requirements.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN33] The essence of enablement is that the specification shall disclose an invention in such a manner as will enable one skilled in the art to make and utilize it.

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
[HN34] Separate and distinct from enablement is best mode, the essence of which requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out his invention. As the court views best mode, an inventor is in compliance therewith if he does not conceal what he feels is a preferred embodiment of his invention. The question of whether an inventor has or has not disclosed what he feels is his best mode is, however, a question separate and distinct from the question of the sufficiency of his disclosure to satisfy the requirements of enablement.

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN35] Defendant bears the burden of proving, by clear and convincing evidence, that the patent fails to disclose the best mode or does not enable one skilled in the art to practice the invention.

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
*Patent Law > Claims & Specifications > Best Mode > Time Limitations*
*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*

[HN36] The best mode provision speaks in terms of the inventor's knowledge at the time the application was filed. Thus, there is no objective standard by which to judge the adequacy of a best mode disclosure. Because not complying with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time of filing, in order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed. The failure to disclose the best mode need not be purposeful for the patent to be invalid.

*Patent Law > Claims & Specifications > Best Mode > General Overview*
[HN37] There is no requirement in *35 U.S.C.S. § 112* that an applicant point out which of his embodiments he considers his best mode; that the disclosure includes the best mode contemplated by the applicant is enough to satisfy the statute. There is no concealment of best mode where one of ordinary skill in the art could readily determine the best operating mode.

*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview*
[HN38] To be enabling under *35 U.S.C.S. § 112,* a patent specification must disclose sufficient information to enable those skilled in the art to make and use the claimed invention. A patent is sufficient for purposes of enablement if it discloses at least one means which enables a person of ordinary skill in the art to make and use the claimed invention. A patent is enabling even if some experimentation is required, so long as undue experimentation is not necessary. As with best mode, a decision on enablement looks to the time the patent application was filed. As with other assertions of invalidity, it is defendant's burden to establish nonenablement by clear and convincing evidence.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Remedies > Equitable Relief > Injunctions*

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

[HN39] Laches bars recovery by the patentee for any infringement before the filing of suit. Estoppel bars recovery for prospective relief, either monetary or injunctive, from the date suit was filed. Id. Both of these equitable doctrines are applied according to the facts of the case.

**Criminal Law & Procedure > Trials > Burdens of Proof > Defense**
**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview**
[HN40] To assert the defense of laches, the defendant must prove two essential elements: (1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice to the defendant resulting from this delay, but the longer the delay, the less need there is to show specific prejudice.

**Patent Law > Inequitable Conduct > General Overview**
**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements**
**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse**
[HN41] A delay equivalent to the statutory limitations period creates a presumption of laches. This presumption acts to shift the burden to the patentee to prove the existence and reasonableness of any excuse for the delay. Such a delay also creates a presumption of injury to the infringer, and obviates the need for the infringer to produce additional evidence of prejudice. This, too, shifts the burden to the patentee to show lack of injury to the infringer caused by the delay.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview**
[HN42] The decision to apply an equitable defense depends on the facts of the particular case and is a matter within the court's discretion. The doctrine of equitable estoppel bars the plaintiff from obtaining prospective relief, either injunctive or monetary, for infringement occurring after the date the suit was filed.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview**
[HN43] In addition to the laches factors of delay and prejudice, equitable estoppel requires that the actor commits himself to act, and indeed acts, as a direct consequence of another's affirmative conduct. Estoppel does not rise solely due to delay, even where that delay gives rise to laches.

**Civil Procedure > Pretrial Judgments > Nonsuits > Voluntary Nonsuits**
**Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement**
**Patent Law > Statutory Bars > Abandonment & Forfeiture Bar > Abandonment**
[HN44] While silence alone is generally insufficient evidence of affirmative conduct to give rise to estoppel, equitable estoppel may be applied where there is some evidence showing that the silence was sufficiently misleading to amount to bad faith. It must be sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse**
[HN45] Forbearance by the patentee in asserting its claim is not a reasonable justification for inexcusable delay where the forbearance is to render the litigation worthwhile. A patentee cannot sit idle while an infringer builds up its business to the point that the monetary reward from an infringement suit justifies its expense.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview**
[HN46] A defendant's willful and deliberate infringement precludes it from relying on the equitable defense of estoppel. When a potential infringer has actual notice of another's patent rights, he has the duty to exercise due care to determine whether or not he is infringing.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview**
[HN47] Due care usually includes the duty to seek and obtain competent legal advice before engaging in activity that may result in infringement.

**Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview**
**Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations**
**Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > Effect**

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 62 of 100

Page 7

1989 U.S. Dist. LEXIS 16865, *; 14 U.S.P.Q.2D (BNA) 1081

[HN48] *35 U.S.C.S. § 252* provides for intervening rights with respect to reissued patents. *35 U.S.C.S. § 307*(b) confers the same rights with respect to reexamined patents. Relief under these sections are within the court's discretion. The first paragraph of *35 U.S.C.S. § 252,* in conjunction with *35 U.S.C.S. § 307*(b), provides for the surrender of the original upon the issue of the reexamined patent. It provides further that the reexamined patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in amended form. However, this paragraph also limits the effect of the reexamined patent to the extent that its claims are identical with the original patent.

***Patent Law > Infringement Actions > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > General Overview***
[HN49] The term "identical" has been interpreted by the Federal Circuit to mean "at most, without substantive change." Thus, the statute sets forth a single test for determining whether the doctrine of intervening rights protects an alleged infringer. The only question to ask under this test is whether claims of the original patent appearing in the reexamined patent are infringed. If these substantively identical claims are infringed, then the doctrine of intervening rights affords no protection to the alleged infringer.

***Patent Law > Claims & Specifications > Claim Language > Multiplicity***
[HN50] The determination of whether the claims are substantively identical is made independent of the reason for the changes, and looks instead at the effect of the changes.

***Patent Law > Infringement Actions > Doctrine of Equivalents > General Overview***
***Patent Law > Infringement Actions > Prosecution History Estoppel > General Overview***
[HN51] The doctrine of equivalents and with it prosecution history estoppel only comes into play when there is no literal infringement.

***Patent Law > U.S. Patent & Trademark Office Proceedings > Reissues > General Overview***
[HN52] The doctrine of intervening rights is based on the idea that a party who has acted in good faith should be able to make business decisions secure in the knowledge that those actions which fall outside the original patent claims are protected. On the opposite side of the coin is the notion that an infringer whose actions are based neither in reliance upon the scope of the original patent nor upon a well founded belief that the original patent issued to the plaintiff was invalid is not entitled to have his investment protected by this doctrine.

**JUDGES:** [*1]

Phillip B. Baldwin, Senior United States Circuit Judge, (By Designation).

**OPINION BY:**

BALDWIN

**OPINION:**

FINDINGS OF FACT

BACKGROUND

A. The Parties

1. Plaintiff Loral Corporation is a corporation having its principal place of business in New York, New York, and is incorporated under the laws of the State of New York.

2. Plaintiff Goodyear Aerospace Corporation is a corporation having its principal place of business in Akron, Ohio, and is incorporated under the laws of the State of Delaware. Goodyear Aerospace is a wholly owned subsidiary of The Goodyear Tire & Rubber Company, defendant on the counterclaim, which has its principal place of business in Akron, Ohio, and is incorporated under the laws of the State of Ohio. Loral, Goodyear Aerospace, and Goodyear Tire & Rubber are referred to collectively as Goodyear.

3. Defendant The B.F. Goodrich Company (BFG) is a corporation having its principal place of business in Akron, Ohio, and is incorporated under the laws of the State of New York.

4. Goodyear and BFG, at all times pertinent to this action, have been engaged in the manufacture and sale of aircraft wheels and brakes.

1989 U.S. Dist. LEXIS 16865, *1; 14 U.S.P.Q.2D (BNA) 1081

B. The Patent in Suit.

5. The patent in suit is U.S. Patent No. [*2] 3,650,357 (hereafter the '357 patent), issued to Nelson, Miller, Dernovshek and Byers on March 21, 1972, based on patent application serial no. 833,836, filed May 8, 1969. This application was a continuation-in-part of patent application serial no. 739,836, filed June 25, 1968. Application serial No. 739,836, was subsequently abandoned. The '357 patent was assigned by the inventors to Goodyear Tire & Rubber Co. (PX-200).

6. On October 10, 1984, Goodyear Tire & Rubber Co. filed in the United States Patent and Trademark Office (PTO), a request for reexamination of the '357 patent, based on certain patents and publications that were not of record during the original prosecution of the patent. (PX-199). On April 22, 1986 Reexamination Certificate No. B1 3,650,357 issued to Goodyear Tire & Rubber Co. as assignee of the inventors. References to the '357 patent include the original patent and the reexamined patent unless otherwise indicated. (PX-210).

7. On April 29, 1986, Goodyear Tire & Rubber Co. assigned the '357 patent to Goodyear Aerospace Corp. On May 12, 1986, an additional assignment was executed to correct a typographical error. (Uncontroverted Fact # 6).

8. On January 12, 1987, [*3] subsequent to the filing of these consolidated actions, Loral Corp. purchased substantially all of the assets of Goodyear Aerospace Corp., including Goodyear Aerospace's rights under the '357 patent. Loral now owns all right, title, and interest in and to the '357 patent, including the right to sue for past infringement. (Uncontroverted Fact # 7).

9. Goodyear Tire & Rubber, through its subsidiary Goodyear Aerospace, practiced the '357 patent from 1970 until the time Loral purchased the rights to the '357 patent in 1987. Loral now practices the patent. (Trauger at 86).

C. Procedural Background

10. At the time it filed its request for reexamination, Goodyear mailed notification of the request to BFG informing BFG of the reexamination proceedings, and advising BFG that if the patent were successfully reexamined, Goodyear would expect fair compensation from those utilizing the '357 patent. BFG was provided with a complete copy of Goodyear's request. (PX-206).

11. On February 14, 1986, Goodyear again wrote to BFG informing BFG of the issuance by the PTO of a Notice of Intent to Issue a Reexamination Certificate. Goodyear enclosed a copy of the reexamined claims, and stated that it [*4] felt BFG's aircraft carbon disc brakes required a license under the '357 patent. Goodyear offered to provide such a license. (PX-207).

12. BFG filed suit against Goodyear Tire & Rubber Co. on May 5, 1986 in the United States District Court for the Northern District of Illinois, seeking a declaratory judgment that the '357 patent was invalid, unenforceable, and not infringed by aircraft carbon disc brakes manufactured and sold by BFG. BFG asserted invalidity of the '357 patent for failure to disclose the best mode and failure to provide an enabling disclosure under *35 U.S.C. § 112*, obviousness under *35 U.S.C. § 103*, as well as several grounds under *35 U.S.C. § 102*. BFG also claimed the '357 patent was unenforceable by reason of laches, estoppel and intervening rights *(35 U.S.C. § 307*(b)).

13. On May 9, 1986 Goodyear Tire & Rubber Co. and Goodyear Aerospace Corp. filed suit in the United States Claims Court against the United States Government seeking compensation for the government's use of allegedly infringing brakes sold by BFG and others. BFG intervened in that action. On January 9, 1987, the Claims Court stayed the action there pending the outcome of the District Court actions.  [*5]

14. On May 19, 1986, Goodyear Aerospace Corp. filed suit in this court for infringement of the '357 patent. BFG denied liability and asserted affirmative defenses on substantially the same grounds asserted in the Illinois action.

15. On May 19, 1986 Goodyear Tire & Rubber Co. filed a motion to dismiss the suit filed in Illinois or, in the alternative, to transfer the action to this court or the Northern District of Ohio. On May 21, 1986, BFG amended its complaint in the Illinois action to add Goodyear Aerospace. That same day BFG filed a motion to dismiss Goodyear Aerospace's suit in this court, or, in the alternative, to transfer to the Northern District of Illinois. On February 3, 1987, the Illinois action was transferred to this court, and on June 23, 1987, was consolidated with Goodyear Aerospace's suit filed in this court.

16. On March 12, 1987, BFG amended its answer to include an assertion that the '357 patent is unenforceable

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 64 of 100

Page 9

1989 U.S. Dist. LEXIS 16865, *5; 14 U.S.P.Q.2D (BNA) 1081

due to inequitable conduct in the procurement of the patent, as well an "on sale" defense under *35 U.S.C. § 102*(b). BFG also added a counterclaim alleging a violation of the antitrust laws by Goodyear, and adding Goodyear Tire & Rubber Co. as a counterclaim [*6] defendant. Loral Corp. was added as a party plaintiff by Goodyear Tire & Rubber and Goodyear Aerospace, and BFG amended its counterclaim to include Loral Corp. as well.

17. By stipulation of the parties the trial was bifurcated with BFG's counterclaims and the damages issue separated pending the outcome of the court's decision as to liability. Also by stipulation the case was tried in Washington, D.C.

18. All parties allege that the case is exceptional and seek an award of costs and attorney fees.

D. The Invention

19. The '357 patent is entitled "Disc Brake With Homogenous Brake Stack." A disc brake is comprised of a rotating body, a stationary axle supporting that body, and a series of discs, alternately arranged so that the stators are stationary while the rotors rotate with the wheel. Braking occurs when the rotors are forced against the stators, creating friction. (Moyer 478-81).

20. The '357 patent relates to a carbon disc brake wherein all discs, both rotors and stators, are made from a carbon base material (graphite and/or carbon). These brake discs act as the friction element as well as the primary heat sink. Heat sink is the term used to describe that portion of the [*7] brake which absorbs the heat generated when the brake transforms kinetic energy into thermal energy. (PX-200; Uncontroverted Fact # 11).

21. The '357 patent specification lists several objectives of the invention, including: 1) overcoming disc failures caused by thermal stress and 2) development of a lightweight, reliable brake with high heat sink and friction characteristics. (PX-200).

22. At the time of the invention represented by the '357 patent conventional aircraft disc brakes were made of steel discs. Steel brakes are significantly heavier than carbon brakes. (DX-51 at 12708, 12710; Moyer at 490; PX-192, 196).

23. Carbon brakes also have specific heat values much greater than steel brakes. (DX-51 at 12715).

24. The inventors first started working with carbon materials for disc brakes in 1966. The beginning work used carbon rubbing against steel. The results achieved by this combination were unsatisfactory. (Nelson at 567, 579).

25. Around this same time BFG was working with beryllium brakes. Beryllium presented other problems, including toxicity and high cost. The inventors sought a material that would work better than steel (and beryllium), and not pose the difficulties presented [*8] by beryllium. (PX-100; Nelson at 568-69).

26. At the time Goodyear began experimenting with carbon materials for brake discs, aircraft brakes then in service used dissimilar brake rubbing surfaces. Those skilled in the art of aircraft brake manufacturing believed that rubbing discs of similar composition did not produce acceptable frictional characteristics, and led to welding, spelling, or high brake fade. (PX-199 at Nelson Affidavit, p. 2).

27. In the 1965 to 1966 time frame, rubbing like materials together was contrary to accepted practice. The Goodyear inventors thus proceeded contrary to accepted practice when they tested carbon discs against carbon discs. (PX-199 Request for Reexam. at 17 n. 11, Tab J; DX-605, Tab 18, at 307).

28. The results achieved when carbon discs of like composition were rubbed against each other were unexpectedly positive, including satisfactory frictional characteristics without high fade, while operating under high torque load and at high temperatures. *In re Goodyear, 230 USPQ 357, 360* (Bd. Pat. App. & Int. 1985).

29. The '357 patent, proceeding contrary to then accepted brake art, teaches a lightweight aircraft brake which outperformed existing [*9] steel brakes, and did not present the toxicity problems of beryllium brakes. The importance of lighter weight brakes to the art of aircraft brake engineering is confirmed by the continuous reference to the desirability of this characteristic in much of the prior art. (E.g., DX-586, PX-199, Att. Vol. I, Tab T).

30. While there was prior art utilizing carbon materials for brakes and clutches, the '357 patent

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 65 of 100

Page 10

1989 U.S. Dist. LEXIS 16865, *9; 14 U.S.P.Q.2D (BNA) 1081

represented the first use of carbon on carbon for braking purposes.

31. The '357 patent is a revolutionary breakthrough in aircraft brake engineering. Defendant's expert Moyer testified that the development of the carbon heat sink brake was among the most significant developments in the industry in the last twenty-five years. (Moyer at 523; Ely at 276). The advantages of the invention include great weight savings and longer life, as well as smooth operation and resistance to melting and welding during difficult stops. (Trauger at 70-80; PX-100, 101).

32. There is now a clear trend in the aircraft brake industry toward the use of carbon disc brakes which rub carbon on carbon. This represents considerable commercial acceptance of the invention.

E. The '357 Patent

33. The [*10] specification of the invention lists as the object of the invention improvement of the friction materials and/or heat sink characteristics of disc brakes to overcome disc failures caused by thermal stress. This objective is accomplished by utilizing a "homogeneous stack of discs . . . where each disc is light in weight, has high heat sink characteristics and also excellent properties of friction with respect to adjacent discs so that heat dissipation occurs rapidly and brake reliability remains extremely high." (PX 200 col. 1, lines 4-18).

34. The specification calls for making an aircraft disc brake in which each disc of the brake stack is "made from a carbon-based material having a high specific heat, low density, low thermal expansion properties, and good frictional stability between adjacent discs over a wide range of loading characteristics." (PX-200 col. 1, lines 25-35).

35. The '357 patent is illustrated below (Fig. 1 of PX-200):

[SEE FIGURE 1 IN ORIGINAL]

The brake includes a stack of alternating rotating and stationary discs (15 & 17) mounted between a backing plate (9) and a pressure plate (8). The stationary discs are connected to a fixed axle (1), upon which a wheel [*11] (2) is mounted. The rotating discs (15) are connected to the wheel, and rotate with the wheel. When actuated, the bolt (12) is pulled by the piston (19) and cylinder (21).

The bolt forces the pressure plate (9) into the heat stack, comprised of discs (15 & 17). The stationary discs (17) rub against the rotating discs (15) (which are connected to the rotating wheel (2)) and cause friction, which acts to slow and stop the aircraft. (Moyer at 478-86).

36. The specification requires that each disc be made of "essentially" a carbon base, but does not require the discs to be identical, either to each other or in composition throughout the cross-section. The specification specifically allows that the "carbon base may be carbon itself, particularly in the form of graphite or amorphous carbon, or carbon compounds." In addition, the specification states that the "carbon base may be of solid and of uniform consistency throughout, . . . or it may have certain sections such as adjacent torque carrying surfaces, for example, which vary in density, make up or composition." (PX-200 col. 2, lines 13-39).

37. Goodyear asserts only one independent claim in this litigation, claim 4. Claim 4 is directed [*12] to an aircraft disc brake and reads as follows (underlined matter was added during the reexamination while bracketed matter represents that deleted during reexamination):

4. [A] An aircraft disc brake which comprises a rotatable body substantially open to a gaseous atmosphere,

a fixed axle on an aircraft rotatably supporting the body,

a stack of discs in a gaseous atmosphere splined in alternating relation respectively to the axle and the body, and

means to press the discs together which is characterized by each disc being made from a carbon-based material of substantially uniform composition in cross section having low weight, high specific heat and low thermal expansion properties, and having a friction coefficient of at least 0.10 between adjacent discs over the normal temperature operating range thereof[.], whereby said aircraft disc brake is capable of braking an aircraft.

38. Claims 22 and 25, which depend from claim 4, and which were added during reexamination, are also asserted by Goodyear. These claims read as follows:

22. The aircraft disc brake of claim 4 wherein at least 75% of the total volume of each disc is made up of graphite and carbon.

25. The aircraft [*13] disc brake of claim 22 wherein each disc is further characterized by a flexural strength greater than 5000 p.s.i., a density greater than 1.45 grams/cm<3> a specific heat greater than 0.17 cal./gm./degree C, across the normal operating temperature range of the disc, a conductivity greater than 0.04 calories per second per square centimeter per centimeter per degree centigrade, and a friction coefficient greater than 0.10 between adjacent discs over the normal temperature operating range of the disc.

39. During reexamination all of the claims of the '357 patent were amended.

40. BFG has stipulated that its aircraft carbon disc brakes meet all but one of the limitations of claim 4. The limitation BFG contends its brakes do not infringe is that requiring the carbon discs used in the brake to be "of substantially uniform composition in cross-section." (Final Pretrial Order at 9, Uncontroverted Fact # 15).

INFRINGEMENT

41. Both parties are engaged in the aircraft brake business. BFG has made and sold carbon aircraft disc brake assemblies, without license from Goodyear. Some of BFG's early sales were for test purposes. More recently, BFG has entered into production contracts for the [*14] provision of carbon aircraft brakes for commercial airlines. BFG's sales and tests have included brakes for United States military and commercial as well as foreign military and commercial aircraft. (See, e.g., DX-527, 528, 529, 535).

42. On May 15, 1985, BFG contracted to provide the Boeing Company with carbon disc brakes for the 757 aircraft. The negotiations for this contract began in 1983. (DX-257; Schaub at 360). On March 11, 1986, BFG contracted to provide Boeing with carbon disc brakes for its 747 aircraft. (PX-127; Schaub at 365). BFG also contracted to provide carbon disc brakes for the Air Force's C5-B transport plane. (PX-157 at 18; PX-174).

43. Carbon discs are made by a variety of processes. The Goodyear discs were initially made by a process known as resin-char. Goodyear has since moved away from discs made solely by this process, and now uses

discs made by a combination of the resin-char process and the chemical vapor deposition (CVD) process. BFG only uses discs made by the CVD process, but has experimented with resin-char discs and with hybrid process discs. BFG used the resin-char process until at least 1977. (Van Horn at 205-07). Both processes yield discs [*15] comprised completely of carbon materials. The resin-char discs have more uniform characteristics than the CVD discs. (Kirkhart at 307-25; Diefendorf at 884-89).

44. BFG interprets the disputed language to mean that the carbon discs used must have substantially uniform characteristics across the disc. The claim language does not include reference to the characteristics of the disc cross section. (PX-200, 201; Kirkhart at 300-02).

45. "Substantially uniform composition in cross section" allows for some variation in the characteristics of the discs. Qualification of the uniformity requirement is evident by the use of the term "substantially," which indicates something less than perfect uniformity is required. The patent specification contains language which indicates that the disputed language does not require substantially uniform characteristics:

The discs 15 and 17 are each made of essentially a carbon base having high heat sink characteristics and yet sufficient frictional coefficient when rubbed against each other so as to make a homogeneous stack of discs. The term homogeneous is used to indicate that each disc making up the stack is essentially homogeneous in its composition [*16] when taken in cross section, and that each disc is essentially like every other disc, except varying perhaps in thickness or configuration due to its position in the stack. In other words no extra friction material is added to any of the discs. This does not mean that the composition of each disc is exactly uniform across any section thereof as the composition may vary across the disc, or may be laminated, or the like. * * * The carbon base may be solid and of uniform consistency throughout, it may be a laminated relationship with some fiber mesh material, for example, or it may have certain sections such as adjacent torque carrying surfaces, for example, which vary in density, make up or composition.

(PX-200 col. 2 lines 14-26) (emphasis added).

46. The specification also discusses "the characteristics of the material making up the discs [as]

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 67 of 100

Page 12

1989 U.S. Dist. LEXIS 16865, *16; 14 U.S.P.Q.2D (BNA) 1081

critical to the homogeneous nature of the stack." Although Dr. Diefendorf testified that this sentence suggests that the discs must have uniform properties throughout, this is not what the quoted passage says. Rather, the language following this sentence indicates the characteristics required of the material used to make the discs, [*17] not the discs themselves. Dr. Diefendorf's testimony on this point is not credible.

47. The prosecution history of the '357 patent contains conflicting usages. In distinguishing the '357 patent invention over prior art, the patentees pointed out that their invention called for the use of a "carbon-based material of substantially uniform composition and [sic, in] cross-section." (PX-4 at 22). Later, in an affidavit submitted to the PTO, the patentee described the discs as "each of substantially uniform characteristics throughout." (PX-4 at 52). The use of the limitation "substantially uniform composition in cross-section" was not used to indicate that the discs must have substantially uniform characteristics, but was used, at least in part, to overcome the examiner's objections to the Graham prior art reference.

48. The expert testimony also was contradictory. Mr. Kirkhart testified that he understood the disputed language to require that the discs be comprised of all carbon, and that the patent calls for carbon discs which are homogeneous in nature. Mr. Kirkhart also opined that the patent does not require the density of the disc to be uniform throughout. (Transcript at 294). Mr. [*18] Kirkhart's testimony is very persuasive on this question, and is in accord with the court's own reading of the claims and the specification. Mr. Kirkhart also testified that discs made by either the resin-char or the CVD process would have density gradients. (At 313). While a smaller density gradient would affect the level of performance of a carbon disc brake, the patent does not require exactly uniform gradients.

49. The specification and prosecution history do not support BFG's position that the disputed language requires the carbon discs to have exactly uniform characteristics (such as density, strength, and oxidation resistance), throughout the disc. Rather, the specification and prosecution history strongly support the interpretation urged by Goodyear -- that the patent requires that the discs be comprised of all carbon, and that minor variations in certain characteristics of BFG's carbon brakes, such as those noted by Dr. Diefendorf at

trial, which result from the use of the CVD process instead of the resin-char process, are within the patent's claims. Dr. Diefendorf's testimony reveals that the "W" shaped density profile of the sample BFG disc is the result of deliberate insertion [*19] of additional resin-char carbon into the disc during its creation. (Diefendorf at 950-51, 959). This insertion actually serves to even out the density distribution. (Id. at 959).

50. BFG's carbon discs meet the claim limitations of claim 4 requiring the discs to be of "substantially uniform composition in cross-section." (Kirkhart at 286; Baden at 412). BFG's brakes are all carbon with an integral structure of carbon fibers held in a carbon matrix. They do not contain a non-carbon core or reinforcing plate. The cross sections of the BFG discs, when viewed axially, are comprised of all carbon, and appear uniform. (Kirkhart at 286; Diefendorf at 944).

51. One skilled in the art of aircraft wheel and brake design would find the BFG brakes made by the CVD process are of substantially uniform composition in cross-section. (Baden at 412-13)

52. BFG's carbon disc brakes infringe claim 4 literally.

53. The purpose of the carbon aircraft brakes made and sold by BFG is to brake the respective aircraft on which they are used, using a lighter brake which is more reliable and has better overall performance characteristics than steel or beryllium brakes, and which is cost-effective. (Schaub [*20] at 377; PX-100 at 3). These are also the precise purposes of the '357 patent. (PX-200).

54. BFG's carbon brakes accomplish their purpose in substantially the same way as the brakes defined by the '357 patent. BFG's brakes utilize a disc brake assembly. All of the discs are comprised of carbon based materials, made by the CVD process. BFG's brakes do not use a non-carbon core or backing plate to support the carbon material, and the discs in its brakes are designed and operate such that carbon rubs against carbon during the braking function. There is no other metal or non-carbon friction plate against which the carbon rubs. (PX-101; Kirkhart at 297-300; Van Horn at 164-65; DX-497).

55. The resin-char process produces carbon discs having characteristics which are not identical to the characteristics of discs produced by the CVD process. For the purposes of the '357 patent, however, the discs

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 68 of 100

Page 13

1989 U.S. Dist. LEXIS 16865, *20; 14 U.S.P.Q.2D (BNA) 1081

produced are identical in that they are all carbon, and both processes result in carbon discs which have a "substantially uniform composition in cross-section." (Kirkhart at 301-02). The BFG discs perform in a fashion that is identical to the discs defined in the patent.

56. BFG's aircraft carbon [*21] disc brakes achieve the same result as the patented invention -- that is, they successfully stop an airplane, and absorb sufficient amounts of energy without undue wear such that they perform as intended by the '357 patent. (E.g., PX-124).

57. The '357 patent represents a significant advancement in aircraft brake technology and has resulted in major changes in the way in which aircraft brakes are made and perform. (Ely at 258; PX-62).

58. The '357 patent is a pioneer patent, and is thus entitled to a broad scope of equivalents.

59. BFG's attempts to distinguish its discs from those made by Goodyear are discredited by the testimony of its own witnesses and the exhibits introduced which demonstrate the functional equivalence of carbon aircraft disc brakes made by either process. The evidence leaves no doubt that the BFG carbon aircraft disc brakes perform the same function as intended by the '357 patent, and in the same way to achieve the same result. (Kirkhart at 297-99).

60. The sample BFG disc provided at trial (PX-208) is representative of BFG carbon discs used in BFG's brakes which are on the Boeing 747-400, Boeing 757-200, AMX, and Lockheed C5-B. (Uncontroverted fact # 17). [*22]

61. Alternatively, BFG's carbon disc brakes infringe claim 4 under the doctrine of equivalents.

62. Claims 22 and 25 of the '357 patent both incorporate all of the elements and limitations of claim 4. Claim 22 adds the additional limitation that "at least about 75% of the total volume of each disc is made up of graphite or carbon." BFG's carbon brakes have been stipulated as meeting this additional limitation. (Uncontroverted Fact # 15(g)). Claim 25 adds the additional limitations that:

each disc is further characterized by a flexural strength greater than 5000 p.s.i., a density greater than 1.45 grams/cm<3> a specific heat greater than 0.17

cal./gm./degree C. across the normal operating temperature range of the disc, a conductivity greater than 0.04 calories per second per square centimeter per centimeter per degree centigrade, and a friction coefficient greater than 0.10 between adjacent discs over the normal temperature operating range of the disc.

The parties also agree that BFG's aircraft carbon disc brakes meet all of these additional limitations of claims 25 as well. (Uncontroverted Fact # 15(b)-(f); Transcript at 25).

63. The BFG brakes therefore also infringe claims 22 [*23] and 25 literally, and, in the alternative, under the doctrine of equivalents.

WILLFULNESS

64. BFG first learned, as a corporate entity, of the '357 patent in August of 1972 when a letter was sent from Goodyear counsel to BFG counsel informing BFG of the issuance of the '357 patent and suggesting that "you may want to consider [this patent] in connection with your furnishing brakes to the airline industry." (PX-202).

65. Prior to this time BFG had been aware of Goodyear's efforts to develop and market an aircraft carbon disc brake to the government for some of its military aircraft. (PX-100; Van Horn at 97). BFG's main non-steel efforts prior to this time were in beryllium brakes, for which it had the highest confidence level. (Van Horn at 113-18). BFG was also actively engaged, in the 1970 time frame, in learning of Goodyear's activities in the carbon brake area. (PX-29, 34, 35 and 36; Van Horn at 99-118). Indeed, there was a sense of urgency at BFG, in the wheel and brake division, that additional information on Goodyear's carbon brake advancements should be obtained to prevent BFG from losing ground in the aircraft brake field. (PX-33; Van Horn at 109).

66. As late as 1968 BFG [*24] engineers were not convinced that a brake which rubbed carbon on carbon would be successful. (PX-57, 160; Bok Dep. of Dec. 1, 1987 at 125).

67. It is clear from the testimony of many of the witnesses that it is the nature of the aircraft brake business for the companies involved to keep a careful eye on what each of their competitors is doing in all areas. In addition, the keen competition generated in this business indicates that competitors will take every opportunity to

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 69 of 100

Page 14

1989 U.S. Dist. LEXIS 16865, *24; 14 U.S.P.Q.2D (BNA) 1081

learn what the competition is doing. Thus, BFG was generally aware of Goodyear's activities in the carbon brake field, and Goodyear was generally aware of BFG's developments in this area as well. (PX-29, 85; Van Horn at 101-10; DX-185, 187; Nelson at 683-86).

68. During the period from August 1972, when BFG received notification from Goodyear of the existence of the '357 patent, until about October 1984, when Goodyear contacted BFG about the reexamination request, BFG's legal department did not attempt to ascertain the potential validity of the '357 patent or the potential infringement by BFG's carbon aircraft brakes. During this same period BFG did not receive any opinions from outside counsel concerning the '357 [*25] patent either. The only individual then at BFG with any recall of receiving a legal opinion was Mr. Perry. His testimony is unsupported by any of the other witnesses, and nothing has been introduced that would indicate that these purported conversations actually occurred. In fact, Mr. Perry's testimony that he discussed the '357 patent with Mr. Shira, a BFG patent attorney in the mid-1970's, is contradicted by Mr. Shira's deposition testimony. (Shira Dep. of Dec 2, 1987 at 11-13). The court finds Mr. Perry's testimony that he obtained an opinion of counsel lacks credibility.

69. Goodyear was setting the pace early on in the carbon aircraft disc brake field. Key personnel in BFG's engineering and legal departments were clearly aware of the existence of the '357 patent, yet failed to consider it in deciding to develop and market its own carbon aircraft disc brake. (Haney Dep. of Nov. 11, 1987 at 35-38; Shira Dep. of Dec. 2, 1987 at 12; Perry at 1081).

70. Key engineering personnel at BFG believed that Goodyear's carbon aircraft disc brake advancements presented a competitive threat to BFG's own beryllium brake program. (Van Horn at 96-102; PX-100). However, BFG later abandoned beryllium [*26] because of its toxicity. (Schaub at 1129-30).

71. Plaintiff has not proven to the court's satisfaction that BFG copied Goodyear's patent. A significant amount of evidence showed that BFG launched its own product development, while at the same time it attempted to learn as much as it could about Goodyear's brakes. (DX-427; PX-29; PX-100). BFG approached several carbon manufacturers in its attempts to locate a supplier of suitable carbon discs for its brake program. (PX-100 at 14; PX-36; Van Horn at 182). To the extent that any

copying occurred, it was copying of the idea of rubbing carbon on carbon, and has not been shown as a deliberate attempt to copy the '357 patent. Although the brakes BFG made, used and sold infringe the '357 patent, Goodyear has not proven that BFG copied the '357 patent.

72. In October 1984, when Goodyear wrote to BFG notifying BFG that Goodyear was seeking reexamination of the '357 patent, neither BFG engineers nor those in management obtained an opinion of counsel as to the validity of the '357 patent and/or the possibility that BFG's aircraft carbon disc brakes infringed that patent. (Perry at 1100; Schaub at 385-86).

73. Goodyear's letter to BFG in October [*27] 1984 should have resulted in action by BFG officials to determine whether its aircraft carbon disc brakes, which at this time were in production for and use on the Lockheed C5-B aircraft and the AMX fighter infringed the '357 patent. (PX 156).

74. BFG consciously decided that it need not partake in the reexamination proceeding, and continued its carbon aircraft disc brake business despite the reexamination proceeding. (Perry Dep. of Nov. 10, 1987 at 128).

75. On May 15, 1985, BFG consummated a contract with Boeing to supply carbon aircraft disc brakes for Boeing's new 757 airplanes. (Schaub at 359-60, 386). Although negotiations for that contract began in 1983, BFG did not actually sign the contract until May 1985, over 6 months after it was aware of the reexamination proceedings. (Id.). BFG performed under that contract and continues to do so today. (Schaub at 377). Again, BFG failed to obtain an opinion from counsel as to the validity or enforceability of the '357 patent, or on whether its brakes infringed that patent. (Schaub at 365-67).

76. After the PTO notified Goodyear that it intended to reissue the '357 patent as amended, Goodyear notified BFG of this fact, and provided [*28] BFG with the reexamined claims. (PX-207). Despite this notice, BFG continued its aircraft carbon brake activities. Within one month, on March 11, 1986, of receipt of the letter from Goodyear, which included the PTO notice of intent to reissue, BFG signed an extremely lucrative contract with Boeing to supply carbon aircraft disc brakes for the Boeing 747-400. (PX-127). However BFG did not seek an opinion from counsel until a month later, on April 25, 1986, when it received an oral opinion from outside counsel that the '357 patent was probably invalid or

unenforceable. (PX 156, 157; Schaub at 366-67). This oral opinion was not reduced to writing until November 3, 1986 -- fully eight months after the 747 contract was signed.

77. Up until November 3, 1986, BFG's infringing activities were all initiated with knowledge of the existence of the '357 patent, and without any reasonable basis for believing that the '357 patent was invalid or unenforceable. While BFG did not copy the '357 patent, its actions were at best reckless and without regard for the '357 patent, taken without any reliable opinion of counsel, and therefore willful.

VALIDITY AND ENFORCEABILITY

A. Facts Relating On [*29]  BFG's On Sale Defense

78. Goodyear filed the initial patent application, the parent application, on June 25, 1968. (PX-3). Thus, the critical date for determining whether any activities by Goodyear constitute invalidating sales or offers for sale, or public uses, is June 25, 1967, one year prior to this filing date.

79. The events to which BFG points as constituting invalidating offers for sale are the January 10, 1967 Goodyear proposal to Boeing for brakes for the Model 747 and the January 23, 1967 proposal to Boeing for brakes for the Model B-2707 Supersonic Transport aircraft. (DX-50, 51, 54). These proposals, which were steel brake proposals in the first instance, also included, at the request of Boeing, several possible alternate brake proposals, all of which were in response to Boeing's desire to find a brake for these aircraft that would be lighter than steel. (DX-49; Vana at 431).

80. The proposals consisted of multiple volumes. The main proposals in both instances were for steel brakes. (E.g., DX-54 at 2; Vana at 434). Per Boeing's request, the proposals were divided into "engineering" sections and "business" sections. (Vana at 433).

81. At the time the Boeing proposals [*30] were submitted, the inventors had run a series of dynamometer tests rubbing carbon against carbon which proved to them that the carbon discs had better characteristics than steel. (DX-15; Nelson at 582-83). The dynamometer tests are conducted to ascertain, as best as is possible, potential brake performance. However, these tests leave numerous unanswered questions which can only be resolved by

actual flight testing. (PX-77 at 5; PX-214). Plaintiff's exhibit 214 indicates that in 1968 officials of the Federal Aviation Administration were generally skeptical about the correlation between dynamometer testing and actual flight testing. Because of this feeling, the FAA refused Goodyear's 1968 request for certification to service test complete sets of new carbon brakes on Pan Am aircraft, and required both lab and flight testing of four brakes and submission of data correlating dynamometer tests and flight tests. (PX-214 at 3).

82. Goodyear also had run tests on a DIMAD brake, which is a less than full scale brake. The DIMAD tests are essentially material screening tests which are designed to "test friction materials as a prelude to select[ing] the material to put in a full size brake." [*31] (Moyer at 506).

83. The Goodyear proposals for the Boeing 747 and SST each discussed the alternate carbon brake designs. In the engineering sections of each proposal Goodyear touted the possibilities for development of a structural carbon brake based on its testing to date. However, the proposals also made clear that while the test results were promising, further development was required:

Goodyear's alternate proposals for GY4000 as a heat sink material are based on the merits of evaluation work to date. The testing completed indicates that Alternate [sic] One and Two will be capable of meeting the RTO requirements and will perform in an acceptable manner at service energy conditions. (emphasis added) (DX-51 at 12; see also DX-54, at 207).

The evaluation testing completed thus far by Goodyear has established the feasibility of utilizing GY4000 as a brake heat sink. However, further development is required before this material is completely ready for production units.

On the basis of the current results of Goodyear's evaluation testing, two alternate designs using GY4000 are proposed for consideration on the Model 747. (DX-51 at 7; DX-54 at 203-05).

Like most [*32] new materials, there are design elements that represent problems to be solved; however, none of these appears to be insurmountable. (DX-54 at 2).

84. Goodyear evaluated its beryllium brakes at a

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 71 of 100

Page 16

1989 U.S. Dist. LEXIS 16865, *32; 14 U.S.P.Q.2D (BNA) 1081

lower state of readiness and reliability in those proposals. (DX-54 at 231). However, this evaluation does not indicate that the alternate beryllium brakes were fully developed either. The entire discussion surrounding beryllium speaks to development and testing. Additionally, BFG elicited only equivocal testimony as to whether beryllium brakes were then in use. (Moyer at 552-54). More importantly, there was no persuasive evidence that beryllium brakes were in use by Goodyear, or that Goodyear had beryllium products to offer. If Goodyear had existing beryllium products, they would have likely appeared in the proposals' alternate sections. Thus, the court finds unpersuasive BFG's suggestion that the higher rating given structural carbon reflects anything more than Goodyear's opinion that carbon was a better product to pursue for development. (See generally DX-51 and 54 sections on carbon alternates).

85. The carbon brake which was proposed met many of the claim limitations of the '357 patent, [*33] but not all. For instance, one of the inventors, Mr. Nelson, testified that at the time of the Goodyear brake proposal to Boeing the test materials required a break-in period prior to achieving a friction coefficient greater than 0.1, and that this was then considered unacceptable. (Nelson at 590, 594).

86. The carbon brakes referred to in the alternate proposals were still in an experimental stage, and therefore the '357 patent was not reduced to practice, at the time Goodyear submitted its proposals to Boeing in January 1967.

87. BFG has sought to characterize these proposals as "offers" for the sale of carbon aircraft disc brakes by virtue of the alternate proposals in defendant's exhibits 50, 51 and 54. The proposals do not support such a characterization. The relevant portion of the proposal states:

Goodyear is particularly enthusiastic about the GY4000 alternate disk stacks, which are believed to be unique with the company. Goodyear has spent considerable time and money developing and testing GY4000. At this early stage of its development, GY4000 offers spectacular weight savings for the reasonably near future. Goodyear's present concept of this material indicates [*34] that it can be place in the space allocated for the growth version of the steel brake, save as much as 120 lb per brake, and justify itself, on a cost-per-pound or on a cost-per-landing basis, better than beryllium. Moreover, GY4000 material appears to have many advantages beyond beryllium's capabilities from the standpoint of original equipment weight-cost saving and airline operating costs, and it presents no new or additional airline handling problems.

Unfortunately, GY4000 is not sufficiently developed and tested, at this time, to allow a quotation on immediate production of this material for the entire Boeing Model 747 wheel and brake program. It is proposed, however, that Goodyear supply to Boeing, for incorporation and test on one flight test aircraft, one and one-half complete shipsets of the basic proposed wheel and brake modified with a GY4000 disk stack. Boeing would have the choice of Alternate One (GY4000 jacketed stationary and steel rotating disks) or Alternate Two (GY4000 structural stationary and rotating disks). One complete shipset would be intended for test and one-half shipset would serve as backup during the testing. The one and one-half [*35] shipsets of equipment would be supplied to Boeing at a cost that represents approximately one-third of the total cost of the manufactured equipment only. The firm fixed price quotations are:

Unit price for one and one-half shipsets (24 wheel and brake assemblies):

With Alternate One
GY4000 disk stack            $ 50,000 Total


With Alternate Two
GY4000 disk stack            $ 75,000 Total

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 72 of 100

Page 17

1989 U.S. Dist. LEXIS 16865, *35; 14 U.S.P.Q.2D (BNA) 1081

These prices are quoted with the following understanding:

1. If Goodyear is awarded the Model 747 wheel and brake production contract for any of the combinations of the proposed wheel and brake designs on which firm fixed prices have been quoted, Goodyear would pursue an accelerated development and test program for the next two years on the Boeing-selected GY4000 disk stack alternate to reach a certain agreed upon minimum level of brake performance as determined by a dynamometer. If the minimum level of performance is not reached by a specified and agreed upon date that would permit the test equipment to be included in the flight test program, Boeing would not be obligated to buy and test the set of [*36] equipment.

2. There will be no direct charges to Boeing for this developmental and test program beyond the specific charges quoted above for the flight test hardware itself no matter which of the GY4000 alternates Boeing prefers.

3. If the GY4000 design appears beneficial after flight testing, it is expected that consideration will be given to incorporation of the GY4000 disk configuration tested in the production program at whatever point can be initially agreed upon.

(DX-50 at 4-5) (Emphasis added).

88. The excerpt reprinted shows unequivocally that the carbon aircraft disc brakes included in the alternate proposals were not being offered for sale to Boeing. Rather, the carbon alternative was a development proposal which itself was linked to a series of contingencies, including acceptance of the basic steel brake proposal.

89. Defendant's exhibit 50 also reveals the indubitable experimental nature of the alternate proposals for carbon aircraft disc brakes. There are several references to a two year test and development program in the laboratory with subsequent flight tests. The proposal called for pursuit of "an accelerated development test program for the [*37] next two years . . . to reach a certain agreed upon minimum performance level as determined by a dynamometer." (emphasis added). Only if successful laboratory testing occurred would flight testing begin.

90. Boeing was not required to buy the test materials if laboratory results indicated flight testing would not be worthwhile. If flight testing was pursued, then the only charge to Boeing was for the hardware itself, and that charge was stated to be "approximately one-third of the total cost of the manufactured equipment." Thus, Goodyear's alternate proposal was an attempt to engage Boeing in an extended test and development program using Goodyear's carbon brake technology. (Id.)

91. At the time Goodyear submitted these proposals, laboratory testing was insufficient to show whether the carbon brake would work for its intended purpose. (Dernovshek Dep. of Feb. 11, 1988 at 134-42). BFG's expert initially testified that he felt the carbon aircraft brake proposal by Goodyear indicated that the carbon brakes could be placed on an airplane for flight testing, however, he stated that his opinion would have been different if he were aware that Goodyear had proposed a two year laboratory [*38] testing program. (Moyer at 535-38).

92. In addition, flight testing was an essential part of the determination whether the brake would work for its intended purpose. (Id.).

93. Goodyear did not get the Boeing 747 or SST contract, and therefore was never able to embark on this test program. (DX-125, PX-42).

94. BFG has presented no evidence, and has not contested the statement in the proposal that quotes the price at which the experimental shipsets were set -- one-third cost. (DX-50).

95. There is no dispute that Goodyear's technical proposals for the 747 and SST wheel and brake programs are virtually identical. The actual pricing proposal for the SST proposal was never produced (Hainline Dep. of Feb 17, 1988 at 27-28), and Goodyear contends that it was similar to the proposal for the 747. No testimony was introduced indicating otherwise, and the near identical nature of the produced portions of the proposals leads the court to find that, for the purposes of this suit, the two may be treated alike. That the alternate proposals for the SST program were intended to follow the same path indicated by the excerpted portions of the 747 proposal is revealed by the following statement: "The [*39] five alternates, as well as the basic design, are actually those proposed by Goodyear in its proposal for the wheels and brakes for the Boeing Model 747." (DX-54 at 200).

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 73 of 100

Page 18

1989 U.S. Dist. LEXIS 16865, *39; 14 U.S.P.Q.2D (BNA) 1081

96. Boeing's designated representative also concurred in his testimony as to his understanding that the Goodyear proposals were for steel brakes and that the carbon aircraft disc brake alternatives were experimental in nature. (Hainline Dep. of Feb 17, 1988 at 65-66 & 68-69). Goodyear witnesses confirmed in their testimony that they did not view the provision of one and one-half shipsets as a sale either. (See, e.g., Culbertson Dep. of Feb. 9, 1988 at 38).

97. BFG attempts to characterize Goodyear's efforts as sales based on contacts between Goodyear and Boeing representatives. (DX-53; DX-55). However, these exhibits and the testimony elicited about them indicate that the meetings were follow-up contacts between the companies about the Goodyear proposals, which were for steel brakes. There is nothing in the record which convinces the court that any discussion of Goodyear's alternate carbon proposals were discussed in a manner different than in the proposal itself as a research and development effort.

98. [*40] The fact that the development program proposed by Goodyear was not made to Boeing's "experimental" division is of no consequence. Because the program was submitted with the steel brake proposal, it was unnecessary for Goodyear to segregate the development proposal. It was not unreasonable, nor has BFG provided evidence which convinces the court that it was unusual, for Goodyear to proceed in the manner that it did.

B. Facts Relating to BFG's Public Use Defense

99. Prior to the critical date Goodyear prepared a movie which depicted certain dynamometer tests. The discs used in these tests were of structural carbon. (DX-385).

100. The testimony revealed that this film had been shown twice, once to Boeing representatives, and once to United States Navy representatives. Both of these presentations were made with an understanding of confidentiality. (Nelson at 729-30; DX-51; 54). References to other possible viewings were made without substantiation of the time frame, and thus were not proven to have occurred before the critical date, if at all. (Nelson at 624-26).

101. The court also finds that this film, DX-385, does not depict the developed carbon brake, but shows

experiments completed [*41] by Goodyear, with problems left unresolved. The film specifically states that problems remained to be solved, and shows instances where the structural carbon brake did not perform properly in the tests. (DX-385).

102. Goodyear clearly maintained control over the invention, and did not allow it to pass into public hands prior to the critical date.

C. Facts Relating to BFG's Inequitable Conduct Defense

103. BFG's inequitable conduct defense is premised on the failure of Goodyear to disclose the Goodyear proposals to Boeing to the United States Patent and Trademark Office (PTO) during the prosecution of the '357 patent and during the reexamination proceeding. The relevance of these proposals is presumed by BFG as a result of BFG's assertions that the proposals were offers, or reasonably construed as such.

104. The proposals clearly were not prior art.

105. The court finds that the Boeing proposals were of little or no value and that a reasonable patent examiner would not have considered them important. The alternate proposal for structural carbon brakes was experimental on its face, and thus could not reasonably have been interpreted as on-sale offers. The brakes proposed for development [*42] had not yet been reduced to practice, as all claim limitations had not yet been met. (Nelson 590, 594).

106. Goodyear's attorneys, as well as the inventors, were aware of these proposals at the time the '357 patent application was filed. (Milliken at 814; Nelson at 592). Both inside and outside patent counsel for Goodyear reviewed the Boeing proposals prior to filing the parent application. (Milliken at 814).

107. The Boeing proposals were not brought to the attention of the PTO during the application or the reexamination proceedings. (PX-3, 4, 199).

108. Mr. Milliken's testimony reveals, and it has not been contradicted, that the decision not to submit the Boeing proposals to the PTO was a good faith decision, and was made after consultation with outside counsel, and without intent to deceive the PTO. (Milliken at 814-18, 840-44). The objective good faith of Goodyear is supported by the fact that had Goodyear's attorneys

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 74 of 100

Page 19

1989 U.S. Dist. LEXIS 16865, *42; 14 U.S.P.Q.2D (BNA) 1081

perceived the Boeing proposals to be a potential on-sale problem, the patent application could have been prepared in a more rapid fashion. (Milliken at 842-43).

109. The "considerable commercial interest" (DX-57) which BFG seeks to highlight was aimed at the unspecified [*43] future potential of the invention. As found in the previous section of these findings, the part of the alternate proposal to Boeing dealing with structural carbon brakes was experimental, thus it was not unreasonable for Goodyear's personnel to conclude that it was not relevant to the patent application. As BFG's expert, Mr. Brenner stated, the PTO relies on applicants to make good faith judgments in submitting materials to the PTO during prosecution. (Brenner at 1154-55). BFG has presented no evidence contrary to the Goodyear witnesses which suggests bad faith.

110. The fact that the original oath (submitted with the CIP) prepared by Mr. Oldham omitted the on sale portion of the declaration is not persuasive since, upon return of the CIP, this omission was corrected, and a valid oath was submitted. (PX-4).

111. BFG's assertion that intent to mislead can be inferred by Goodyear's actions is negated by the experimental intent clearly evidenced in the Boeing proposals, the unfulfilled conditions precedent in those proposals, the fact that the invention was not reduced to practice at she time of the proposals, and the testimony of Goodyear's personnel that indicates the decision not [*44] to submit the Boeing proposals was not intended to deceive the PTO.

112. At the very most, Goodyear's failure to submit the Boeing proposals was indicative of minimal negligence. However, since the Boeing proposals were clearly not offers for sale, and thus were not material to the patent examination proceeding, Goodyear was not guilty of gross negligence in failing to submit the proposals to the PTO.

113. BFG's claim of inequitable conduct during the reexamination proceeding is premised upon the Boeing proposals as well. The reexamination statute does not permit consideration of on-sale matters by the PTO during a reexamination proceeding. Mr. Brenner's interpretation of the statute agrees with this. (Brenner at 1153-54). Finally, the Manual of Patent Examining procedure warns against requesting consideration of matters relating to on-sale. (§ 2216).

114. The fact that these materials are not permissible submissions during a reexamination proceeding forecloses the possibility of their being material to such a proceeding. No reasonable patent examiner would feel important that which he is not permitted to consider.

115. Goodyear's attorneys were not required, and in fact were not permitted, [*45] to submit information concerning the Boeing proposals to the PTO during the reexamination proceeding. The fact that Goodyear could have sought reissue as opposed to reexamination is of no consequence. There was no obligation to submit this information, thus there can be no intent to deceive the PTO during the reexamination proceeding. It cannot even be said that Goodyear was negligent in failing to submit the Boeing proposals during the reexamination.

D. Facts Relating to BFG's Best Mode and Enablement Defenses

116. BFG's best mode defense rests on the claim that Goodyear failed to include in the Continuation-in-Part (CIP) Application filed in May of 1969 two items in the specification which originally were included in the parent application, filed June 25, 1968.

117. The relevant portions of the parent application are as follows:

A typical material which comes close to possessing most of these above-listed properties is sold under the trade name Carb-i-tex and manufactured by Carborundum Co. However, the additives for strengthening and anti-oxidation set forth above are necessary to the basic Carb-i-tex material as made by Carborundum Co. to meet the specific characteristics [*46] set forth above.

(PX-3 at 5, lines 1-6).

The characteristics of the material making up the discs is critical to the homogeneous nature of the stack and to the correct operation of the brake in combination. * * * The remaining volume of the disc is made up by adding strengthening materials from a group composing [sic] of tungsten metal, di-tungsten-monoboride, silicon carbide, and other high temperature additives. Further, it is desirable to add anti-oxidizing agents from a group consisting of boron, tungsten, silicon carbide, zirconium, titanium, etc.

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 75 of 100

Page 20

1989 U.S. Dist. LEXIS 16865, *46; 14 U.S.P.Q.2D (BNA) 1081

(PX-3 at 4, lines 2-15).

118. When the CIP was filed, the first passage was replaced with the following:

The term homogeneous is used to indicate that each disc making up the stack is essentially homogeneous in its composition when taken in cross section, and that each disc is essentially like every other disc, except varying perhaps in thickness or configuration due to its position in the stack. In other words no extra friction material is added to any of the discs. This does not mean that the composition of each disc is exactly uniform across any section thereof as the composition may vary across the disc, or may be laminated, [*47] or the like. The carbon base may be carbon itself, particularly in the form of graphite or amorphous carbon, or carbon compounds typical of which are the carbides, such as boron carbide, silicone carbide, and titanium carbide. Mixtures of carbon in its various forms may of course be used. In addition to the carbon base other ingredients may be used such as anti-oxidants, binders, fillers, strengthening agents, and reinforcing fibers. The carbon base may be solid and of uniform consistency throughout, it may be a laminated relationship with some fiber mesh material, for example, or it may have certain sections such as adjacent torque carrying surfaces, for example, which vary in density, make up or composition.

(PX-200 col. 2, lines 16-39).

119. The section referring to di-tungsten monoboride (W[2]B) was changed only insofar as the deletion of the references to W[2]B. (PX-200, Col. 2, lines 52-57; PX-3, at 4, 9).

120. Neither of these sections was altered during prosecution of the '357 patent, thus they appear in the patent as written in the CIP.

121. Carb-i-tex is a trade name used by the Carborundum Company to describe the carbon discs it was then producing.

122. The description [*48] appearing in lieu of the use of Carb-i-tex by trade name is a generic description of carbon materials, including Carb-i-tex. Goodyear's expert in carbon materials, Mr. Kirkhart, whose testimony the court finds credible and reliable, testified both at trial and in a separate affidavit that the description at Col. 2, lines 16-39 of the '357 patent is a generic

description of Carb-i-tex. (PX-140; Kirkhart at 1228, 1235-36). BFG's expert, Dr. Diefendorf, also testified to the effect that this generic description includes Carb-i-tex type discs. (Diefendorf at 891-96).

123. The description at col. 2, lines 17-39 of the '357 patent can also include other carbons or carbon composites. (Id.).

124. At the time the CIP was filed more than one type of carbon composite material was available for use in carbon or carbon composite discs, as called for by the '357 patent. (PX-95, 175, 181; Diefendorf at 890).

125. More than one type of process for developing carbon suitable for use in aircraft brakes existed at the time the CIP was filed. (Id.; Nelson at 651). In addition, multiple carbon producers operated in the market during this time period. (PX-36, 95; Diefendorf at 890).

126. The claimed [*49] invention is directed to an aircraft carbon disc brake. (PX-200). The pioneering quality of the invention is found in the rubbing of carbon on carbon for this purpose. The invention is not directed to the process for making carbon discs used in the brakes.

127. GY 4041 Discs were not, when the CIP was filed, the only carbon composites capable of stopping an aircraft. (PX-93; Nelson at 651).

128. At the time the CIP was filed, the PTO was encouraging applicants to avoid using tradenames or trademarks as a means of reference. The PTO instead encouraged the use of technical descriptions. (PX-190; Oldham Dep. of Feb. 10, 1988 at 68-70). Thus, replacement of a trade name with a generic description was a generally preferred means of disclosure.

129. BFG's position is that a specially modified version of Carb-i-tex, known as GY4041, was the best carbon disc Goodyear had available for its carbon aircraft brake assemblies at the time the CIP was filed. BFG argues that the generic disclosure provided teaches away from Carb-i-tex because it includes carbons with strength characteristics unavailable in Carb-i-tex. The basis for BFG's argument is that GY4041 was, at the time the CIP was filed, [*50] the only carbon composite from which a disc capable of stopping an aircraft could be produced. As noted already, however, more than one successful means of developing a carbon disc capable of stopping an aircraft existed at the time the CIP was filed.

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 76 of 100

Page 21

1989 U.S. Dist. LEXIS 16865, *50; 14 U.S.P.Q.2D (BNA) 1081

130. The disclosure, as written at lines 16 through 39 of the '357 patent, includes a description of a means for making structural carbon discs like GY4041 discs, as well as other means of manufacturing carbon discs.

131. It is not disputed that the parent application contained references to di-tungsten monoboride (W[2]B), and that these references were not included in the CIP.

132. The parent application is part of the publicly available record of the '357 patent. MPEP § 103.

133. Carborundum knew prior to the time the CIP was filed that W[2]B broke down into tungsten and boron (its component parts) during the process of making the carbon discs. (PX-140; Nelson at 706-07).

134. Prior to the filing of the CIP, and pursuant to an agreement between Carborundum and Goodyear, technical proprietary information concerning Carborundum's method for Carb-i-tex processing began to flow from Carborundum to Goodyear. (PX-14).

135. The court finds [*51] that it is likely that this information included the fact that JAB breaks down into its component parts. (Nelson at 710-12; PX-9).

136. The patent discloses the existence of both elements, tungsten and boron, in the finished discs. The patent teaches the addition of strengthening materials (of which tungsten is one) and anti-oxidants (of which tungsten and boron are examples). (PX-200, col. 2, lines 50-57; Kirkhart at 1231-33).

137. The Court finds credible Mr. Kirkhart's uncontroverted testimony that it would require only routine skill, and minimal testing to discern that W[2]B was the most effective vehicle for introducing tungsten and boron into the carbon based disc. (Kirkhart at 1228-29). In fact, Dr. Diefendorf, BFG's carbon expert, testified that W[2]B is and was, at the time the CIP was filed, readily available from chemical supply houses. (Diefendorf at 938). Thus, W[2]B was obviously a commonly used substance, and it is not reasonable to suggest that a carbon processor would be unaware that this was a convenient vehicle for the introduction of the additive.

138. The invention claimed by the '357 patent does not include a process for producing carbon discs. The specification [*52] discloses sufficient information to allow an aircraft wheel and brake engineer of ordinary skill in that art to design and produce a carbon aircraft disc brake with structural carbon discs rubbing against structural carbon discs. The testimony at trial indicated that an aircraft wheel and brake engineer of ordinary skill in that art would not possess sufficient knowledge to produce carbon discs. Thus, this person would be required to work in conjunction with a carbon processor to obtain the discs required.

139. It was not necessary to include the exact chemical combination of the tungsten and boron additive, nor the precise amounts of each element added for two reasons. First, a successful combination and amount could be ascertained without undue experimentation. Second, while there was conflicting testimony concerning whether these elements could be added separately (compare Diefendorf and Kirkhart), no persuasive evidence was introduced by BFG that other combinations of these additives, or different quantities would yield less successful or unsuccessful results. Thus, the disclosure provided sufficient information on these additives to permit creation of GY4041 type discs without [*53] undue experimentation.

140. The description provided in the specification includes Carb-i-tex type materials. In addition, it required only routine skill to discern that W[2]B was a convenient method of introducing tungsten and boron into the discs. Thus, the '357 patent adequately discloses the best mode for developing the carbon discs necessary to practice the patent. The inventors included sufficient information in the specification to reveal that Carb-i-tex type discs with additives such as tungsten and boron yielded usable carbon discs. The patentees were not required to limit the disclosure to a particular type of carbon processing where they were aware of more than one type of disc that permitted successful practice of the patent.

141. BFG argues on the one hand that the process by which the carbon discs are made is "critical" to practicing the patent since not all carbon discs will successfully stop an airplane. On the other hand, BFG argues that an aircraft wheel and brake engineer of ordinary skill in that art would not find it "obvious" to use W[2]B as a convenient means for introducing tungsten and boron into the carbon disc processing. Thus BFG seeks for one purpose to [*54] have the process for making the discs part of the art of wheel and brake design, but for another purpose to suggest that those skilled in that art were

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 77 of 100

Page 22

1989 U.S. Dist. LEXIS 16865, *54; 14 U.S.P.Q.2D (BNA) 1081

insufficiently familiar with the process for making carbon discs to make critical distinctions.

142. The court finds that the relevant skill for practicing the claims of the '357 patent is that of the aircraft wheel and brake designer. The Court also finds that such a person generally would not be familiar with the chemical processes required to produce the carbon discs used in the patent. (Nelson at 701, 705, 715). Thus, the Court also finds that the art of carbon processing is relevant to the '357 patent to the extent that practicing the patent requires inclusion of discs which possess the requisite capabilities to perform the functions required by the patent. As Mr. Nelson, one of the inventors, testified, an aircraft wheel and brake engineer would turn to one with knowledge in the area of carbon processing in order to develop the carbon discs for use in the '357 patent invention.

143. BFG also asserts that the '357 patent is invalid under *35 U. S. C. § 112,* para. 1 for failure to provide an enabling disclosure. BFG's argument is [*55] that the '357 patent, as filed in the 1969 CIP, did not disclose the "special high strength materials" necessary for use in aircraft brakes. BFG's premise is that the '357 patent was required to provide sufficient information to teach one skilled in the art of aircraft brake engineering how to make the carbon discs necessary for the invention. Naturally, BFG's expert testified that an aircraft brake engineer would not possess sufficient knowledge to make, by himself, a carbon disc suitable for use in the brake from reading the patent. (Moyer at 510-11, 520).

144. The '357 patent provided sufficient information to allow one skilled in the art of aircraft wheel and brake design to obtain the necessary carbon discs to practice the invention. It is not disputed that there were numerous carbon processors in business at the time the patent issued. Goodyear's expert testified that, given the information provided by the disclosure of the '357 patent, a carbon processor would be able to develop a suitable disc for use in the patent with little experimentation. (Kirkhart at 1235-44). The '357 patent describes with sufficient detail the permissible constituents and necessary characterisitcs [*56] of the carbon discs required to practice the patent. Thus, there existed at the time the CIP was filed readily available sources of carbon production to those working in the aircraft wheel and brake field which could produce the discs called for with the disclosure provided by the patent.

145. The inventors of the '357 patent were aircraft wheel and brake engineers. Using BFG's logic that the disclosure should be sufficient to allow one skilled in the aircraft wheel and brake art to make the carbon discs would require a disclosure of every step of the carbon development process from beginning to end, including the most basic functions. The absurdity of this proposition is self-evident. The disclosure provided sufficient information to tell a wheel and brake engineer that not just any carbon disc could be used, and that specific constituents were required. Using the disclosure, and the readily available sources of carbon processing, one skilled in the aircraft wheel and brake field would, in 1969, have been able to obtain the discs necessary to practice the invention.

E. Facts Relating to BFG's Laches and Estoppel Defenses

146. BFG undertook a development program for the purpose [*57] of creating a carbon aircraft disc brake in the late 1960's. (DX-764, 765). BFG's activities were prompted by reports it received concerning Goodyear's work in the carbon brake field. (PX-29; Van Horn at 99-100).

147. The nature of the aircraft wheel and brake industry was such that competitors tended to keep track of each other's sales and development activities. Thus, Goodyear was generally aware of BFG's brake work, and BFG of Goodyear's.

148. Prior to the issuance of the '357 patent Goodyear became aware of efforts by its competitors in the aircraft wheel and brake field to develop carbon brakes. Included among these competitors was BFG. (DX-125, 134).

149. As early as 1971 BFG began to advertise its results to date in testing structural carbon discs for use in aircraft disc brakes. (DX-449, 455, 457). Goodyear's engineers were aware of these BFG ads. (Harry Dep. of Dec. 17, 1986 at 23-25).

150. Between 1973 and 1978, Super-Temp Corporation manufactured and sold carbon discs suitable for use in aircraft disc brakes. Goodyear purchased carbon discs from Super-Temp, and was aware that discs were being developed for other companies as well, including BFG. (DX-180, 153, 164).

151. [*58] From 1972 to 1978, BFG's activities in

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 78 of 100

Page 23

1989 U.S. Dist. LEXIS 16865, *58; 14 U.S.P.Q.2D (BNA) 1081

the carbon aircraft disc brake field were limited. BFG participated, along with Goodyear and other aircraft wheel and brake manufacturers, in test programs.

152. In 1975, BFG participated in a test program with the Douglas Aircraft Corporation (Douglas). BFG's test brakes were installed in one brake on a Douglas DC-10. The other nine brakes on the aircraft were conventional steel brakes. One of BFG's sales managers characterized the Douglas DC-10 program as a "small test program." (Brandewie Dep. of Dec. 2, 1987 at 11-12). Only one brake was ever tested. (PX-193). (Perry Dep. of June 10, 1986 at 49). The DC-10 project was cancelled before any further testing occurred. (PX-193). Although BFG received $ 60,000 for its participation in this brake test program, it never received payment for the brakes themselves from Douglas. (Perry Dep. of June 10, 1986 at 106-07).

153. The DC-10 test program constituted nothing more than early testing. It was not a sale by BFG. In fact, when BFG attempted to characterize it as such in a press release, Douglas challenged this characterization, and the press release was revised. (PX-50).

154. The test nature of the [*59] DC-10 program, as well as the eventual cancellation of the carbon brake on that airplane rendered BFG's existence in the carbon aircraft brake field uncertain. In the 1975 time frame, BFG's ability and intent to infringe the '357 patent was unclear.

155. From 1975 through 1978, the United States military began competitive evaluations of carbon aircraft disc brakes for the F-14, F-15 and F-16 fighter aircraft. Goodyear, BFG, and Bendix all competed for these opportunities.

156. The F-16 program requested proposals for developing a brake, evaluation of that brake in the company's laboratory, evaluation of one brake at Wright Patterson Air Force Base to determine brake life, and finally flight testing four or five assemblies on aircraft. (Bok at 1002-03; DX-214). This was the entirety of the request, even though BFG offered information on reprocurement. (DX-214). This test contract was awarded to BFG and Bendix, however, the actual contract to supply the carbon disc brakes for the F-16 was awarded to Goodyear. (DX-298; Bok at 1026). The approximately $ 300,000 BFG received was primarily to cover qualification and the hardware delivered by BFG. It did

not cover engineering costs involved [*60] in developing the brake. (Bok at 1003-04).

157. There is no dispute that Goodyear personnel knew about these contracts and knew that BFG and Bendix were participating in the testing. (DX-214; Wiseman at 1169). In fact, Goodyear employees were able to inspect photographs of a BFG brake that was placed on a DC-10, and Goodyear obtained documents and blueprints for BFG's DC-10 brake. (DX-185, 187, 210; Nelson at 680-86; Wiseman at 1171-72).

158. On August 25, 1976, Goodyear's Manager of Contract Administration for the Aircraft Wheel and Brake Division requested Goodyear's attorney, Mr. Milliken, to prepare a rough draft of an infringement letter to be sent to BFG concerning BFG's activities in the earlier DC-10 test program. (DX-215, 217, 218).

159. Goodyear's legal department did not send an infringement letter to BFG at this time. The justification for not sending an infringement letter was that Goodyear's attorneys felt that the test nature of BFG's activities to date did not indicate whether there would be any future sales which could infringe the '357 patent. (DX-225; Milliken at 836-39).

160. BFG supplied four test brakes for flight testing on the F-15 aircraft, but BFG never provided [*61] any additional brakes for that plane. (Bok at 1005, 1026).

161. BFG originally provided beryllium brakes for the F-14 aircraft. In 1976, BFG provided the United States with one carbon brake assembly for evaluation on the F-14. This evaluation was done, but nothing ever came of it. (Bok at 1005).

162. From the late 1970's through the present, BFG has participated in numerous competitions for carbon aircraft brake proposals. In addition to those already mentioned, BFG participated in competitions or contracted for, among others, the Boeing B-767 in 1979 (DX-300); the Boeing B-757 (DX-527); the Lear Fan 2100 (Bok at 1008); the Airbus A300-600 (Bok 1009-10); the Lockheed C5-B (PX-174; Bok at 1012-13); the Airbus A310-300 (Bok at 1011-12); and the Boeing B-747-400 (PX-127). Goodyear was generally aware of BFG's activities in the field during this time. (Harry Dep. of Dec. 17, 1986 at 66-73).

163. At approximately the same time in 1978 BFG

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 79 of 100

Page 24

1989 U.S. Dist. LEXIS 16865, *61; 14 U.S.P.Q.2D (BNA) 1081

and Goodyear sought to acquire Super-Temp, a subsidiary of the DuCommon company which was involved in the manufacture of carbon products, including carbon disc brake preforms. (Clark at 1050-55; Perry at 1088-89).

164. Upon learning of Goodyear's desire [*62] to purchase Super-Temp, BFG notified Goodyear of its opposition to Goodyear's action based on BFG's belief that the purchase would violate federal antitrust laws. BFG threatened to file a complaint along those grounds with the Federal Trade Commission if Goodyear followed through on its plan to purchase Super-Temp. (DX-506, 507; Clark at 1050-54).

165. At one point Goodyear offered to guarantee BFG a ready and continuing supply of Super-Temp carbon discs, and to release Goodyear's other exclusive carbon suppliers from that restriction to allow BFG to purchase carbon discs from these suppliers. (DX-506).

166. BFG ultimately purchased Super-Temp for over four million dollars. (DX-509).

167. Goodyear was aware of the BFG purchase of Super-Temp and considered obtaining a supply agreement from BFG for Super-Temp materials similar to that offered by Goodyear to BFG before BFG's acquisition of Super-Temp. (DX-279, 283, 284, 512; Clark at 1063-69).

168. BFG's intentions at the time it acquired Super-Temp were clear. The report presented to BFG's Board of Directors concerning the acquisition of Super-Temp by BFG discusses the implications of this purchase in the carbon aircraft brake business, [*63] but specifically refers to carbon brakes as a field for the "1980's and beyond." (PX-246). Although there were other possible uses of Super-Temp materials, BFG's internal notice of the acquisition suggesting that the Super-Temp materials would be used for brake linings, also stated that Super-Temp materials would add to BFG's position in future markets. (Id.).

169. The only verbal expression of BFG's intent to get involved in the carbon aircraft brake business following its acquisition of Super-Temp, of which Goodyear was aware, appears in the notes made by Mr. McKay, of BFG, detailing a telephone conversation with Mr. Clark of Goodyear in which joint efforts between Goodyear and BFG are proposed. (DX-512).

170. However, there is substantial evidence which suggests that Goodyear was well aware of BFG's efforts in the aircraft carbon brake field up to that point. (E.g., DX-279, 296; Milliken at 838-39; Davis at 783). Although BFG did not announce that it was then and there, in 1978, entering the aircraft carbon disc brake field as a full production competitor, all of its actions indicated that that was the direction in which it was heading. Goodyear recognized this direction. [*64] (DX-278).

171. At no time during the period when the Super-Temp purchase was discussed between representatives of the two companies did Goodyear assert the '357 patent. (Clark at 1051, 1055).

172. From 1972 through 1978, BFG invested millions of dollars in its carbon brake program. (Bok at 997-1007).

173. Although Goodyear failed to bring up the '357 patent during the Super-Temp negotiations, BFG has presented nothing which indicates that this failure was designed to intentionally mislead BFG into acting a certain way. The court is of the opinion, however, that it was clear that BFG was about to embark on a course that would result in a full scale program to develop aircraft carbon brakes. Goodyear's failure to raise the '357 patent constituted, at a minimum, poor judgment on the part of Goodyear. It is certainly not unrealistic to expect that Goodyear would raise the '357 patent to determine BFG's intentions upon acquiring Super-Temp. Along that same vein, however, BFG's discussion with Goodyear concerning possible joint efforts could have led Goodyear to believe that BFG was preparing for later entry into the carbon aircraft brake market.

174. BFG was not the only competitor acting [*65] in this market in the 1970's. Bendix Corp. also pursued, and obtained, carbon aircraft brake business similer to that obtained by BFG. (DX-227, 229, 278, 290). Goodyear and BFG were well aware of Bendix's work in the field as well. (DX-290; Harry Dep. of Dec. 19, 1986 at 70). As with BFG, Goodyear never contacted Bendix to inform them that their activities might constitute infringement. (Milliken at 857). Because these Bendix activities were developmental in nature, however, Goodyear was justified in waiting to see whether Bendix exhibited an intent or ability to continue in this area.

175. The evidence indicates, and the expert

testimony confirms, that carbon aircraft disc brakes were not commercially viable through the late 1970's. (See DePodwin at 1204). It was not until at least 1978 or later that carbon, due to a myriad of seemingly unrelated factors, became commercially viable. (Id. at 1205-08).

176. Goodyear was aware of the substantial investment necessary to develop an ability to compete in this field. Despite the then short term commercial outlook, BFG made a substantial investment in developing technology in the carbon aircraft brake field and this was known to [*66] Goodyear. (E.g., DX-106, 109). The costs incurred in submitting a proposal alone could amount to hundreds of thousands of dollars, and the costs for a single carbon program, prior to production, could amount to millions. (Davis at 791-92; N. Smith Dep. of Aug. 12, 1987 at 55-57).

177. A reasoned response on Goodyear's part would have been to raise the '357 patent. Despite the fact that neither BFG nor Bendix had obtained production contracts for carbon aircraft disc brakes, their participation in the competitive bidding process exhibited a clear intent that, should they win the contract, they would begin production. In fact, this is precisely what happened in the early 1980's when BFG changed the C5-B contract to carbon brakes.

178. Although Goodyear informed its competitors in 1972 of the issuance of the '357 patent, it did not act, until 1984, to dissuade any competitor's activity. More importantly, BFG's purchase of Super-Temp should have caused Goodyear to reassess any belief it may have had that BFG's activities prior to that time were experimental. Goodyear's marketing personnel recognized that the Super-Temp acquisition could result in BFG becoming a viable competitor in [*67] the carbon aircraft brake market. (DX-277). The Super-Temp purchase signalled BFG's full commitment to the development of carbon technology suitable for use in aircraft carbon disc brakes. This, coupled with BFG's attempts to obtain carbon aircraft brake production contracts with both Douglas and the United States government, warranted some sort of action on Goodyear's part to assert the '357 patent.

179. After the Super-Temp purchase BFG continued to pursue carbon aircraft disc brake business. In 1981, BFG participated in a prototype test program with Grumman on its X-29 prototype aircraft, supplying twelve brake assemblies at no cost. Nothing came of this program. (Bok at 1007-08). Also in 1981, BFG was

awarded a production contract to supply structural carbon brakes for the Lear Fan 2100. However, in 1983 only four shipsets were supplied, and the program was canceled in 1984. BFG was not able to recoup its development costs expended for this program. (Id. at 1008). BFG subsequently prepared carbon brake proposals for the Airbus A-300-600, the Lockheed L-1011, the Airbus A-310-300, the Boeing 767, and the S-310-300. BFG did not receive production contracts for any of these proposals. [*68] (Id. at 1009-12). There have been a number of other carbon brake proposals prepared by BFG which have not led to production contracts. Their relevance here is in the contribution to the total dollar amount expended by BFG in pursuit of carbon aircraft brake business. (PX-58).

180. In 1982, BFG was producing beryllium brakes for the Lockheed C5-A aircraft when it proposed, for the new C5-B version that Lockheed switch to structural carbon brakes. (PX-124). This proposal was accepted by Lockheed and, after complete testing, BFG began supplying carbon brakes at production levels for the C5-B in late 1985 or early 1986. (PX-121, 122, 123, 124; Schaub at 1115-17, 1131). The contract for these carbon brakes was signed in 1983, at which time BFG committed to produce the required shipsets of carbon brakes. (PX-174). However, due to testing time, and other factors, BFG changed the delivery date for these brakes, and did not deliver most of the brakes until after it received Goodyear's 1984 letter notifying it of the pending reexamination of the '357 patent. BFG subsequently received a contract to supply carbon brakes to the United States Air Force in 1988 and 1989 for the C5-B. (Schaub [*69] at 372-73). At no time during any of these contract signings did BFG consider the '357 patent. (Schaub at 372-74).

181. In 1983, BFG commenced negotiations with Boeing for carbon brakes on the Boeing 757 aircraft. These negotiations arose as a result of an earlier contract between the two companies by which BFG was to supply 300 shipsets of steel brakes. (DX-527; Schaub at 359-60). After BFG had supplied some of the steel brakes, Boeing decided to switch to carbon brakes, for which it accepted competing bids. Dunlop received the carbon brake contract. BFG negotiated with Boeing as a result of the apparent breach by Boeing of the steel brake contract. These negotiations yielded a new agreement (DX-527). (Schaub at 1119). The '357 was not considered by BFG personnel when the 757 agreement was signed. (Id. at

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 81 of 100

Page 26

1989 U.S. Dist. LEXIS 16865, *69; 14 U.S.P.Q.2D (BNA) 1081

360). Although the initial negotiations for this modification were undertaken before Goodyear's letter about the reexamination proceeding was sent to BFG, and thus BFG may have been reasonable in presuming at that point that Goodyear would not protest its sale of carbon brakes, the contract itself was not signed until after that letter was received. Thus, BFG had ample time [*70] -- seven months -- to reconsider its options with regard to Boeing's change of heart. BFG was by no means precluded from altering its settlement proposal. Many other courses were available to BFG, including renegotiating with provision for Goodyear's rights (or potential rights). Thus, without legal advice on the '357 patent, reliance by BFG on Goodyear's past silence with regard to the 1985 757 agreement was no longer reasonable after October 16, 1984.

182. In 1986, BFG entered into another contract to supply Boeing with carbon brakes for the 747-400 aircraft. (DX-528). The negotiations for that contract began in about 1984, after BFG received Goodyear's notice that the '357 patent was being reexamined. (Schaub at 383). This contract was no designed to insure BFG's position in the aircraft carbon brake market. In it, BFG agreed to provide between 100 and 200 total shipsets of carbon brakes to Boeing completely free, to pay Boeing to have its brakes certified, and to indicate to Boeing that BFG was prepared to invest in a plant of sufficient capacity to meet Boeing's future needs. (DX-528; Schaub at 388-89, 383-84, 376). BFG invested about a million dollars in the 747 program before [*71] the contract was ever signed, and, as a result of building its plant in Pueblo, Colorado specifically for meeting the demands of this 747 contract, has invested over fifteen million dollars more. (Schaub at 376). At the time the 747 contract was signed, BFG did not have any opinion of counsel, and, BFG had already been notified by Goodyear that the reexamination of the '357 patent was successful. (Schaub at 367; PX-207). BFG was not reasonable in relying on Goodyear's earlier complacency when it entered into the 747 contract with Boeing since it had notice before negotiations commenced that reexamination was in progress, and BFG was aware at the time it signed this contract, that the '357 patent had survived reexamination, that Goodyear felt BFG's brakes were infringing products, and BFG was without an opinion of counsel that might otherwise justify its actions.

183.    In    1986,    BFG    contracted    with

Aeritalia-Macchi-Embraer to provide carbon brakes for the AM-X. (DX-526, 529, 530; PX-132). This contract, for which negotiation had begun before the issuance of the reexamined '357 patent, but after the 1984 Goodyear letter informing BFG of the reexamination request, represents another [*72] instance where BFG's actions were not reasonable in light of Goodyear's clear expression that BFG's carbon brakes were considered potentially infringing, and BFG's failure to obtain a prior opinion of counsel as to the validity or enforceability of the '357 patent. (DX-529; Schaub at 367).

184. The monies invested by BFG before October 16, 1984, including the approximately four million dollars spent to purchase the Super-Temp facility, and the ensuing amounts spent on proposal preparations for a variety of aircraft, constitute a significant, detrimental change in position by BFG. BFG was prejudiced by Goodyear's failure to assert the '357 patent. Goodyear's failure to act in the face of competition became prejudicial to BFG after the Super-Temp purchase made it clear that BFG intended to compete for full production quantities and contracts. Similarly, after the Super-Temp purchase by BFG, Goodyear took no action for over six years, and did not file suit until eight years later, despite BFG's continued participation in bid competitions -- all known to Goodyear. Thus, Goodyear is guilty of more than mere silence.

185. Goodyear's failure to raise the '357 patent in the face of BFG's [*73] post 1978 activity resulted in BFG investing vast sums of money in the development of an carbon aircraft brake business. Additionally, BFG relied on Goodyear's acquiescence in deciding to pursue carbon on the C5-B. Goodyear did not attempt to assert the '357 patent until after the C5-B contract change. On the other hand, after receiveing notice from Goodyear that it was acting on the '357 patent, BFG, without concern for that patent, continued its activities unabated. The court finds that BFG could not have relied on Goodyear's earlier inaction with regard to the 747, 757 and AMX contracts.

F. Facts Relating to BFG's Intervening Rights Defense

186. BFG also asserts the unenforceability of the '357 patent against its actions under the equitable doctrine of intervening rights. 35 U. S. C. §§ 252, 307.

187. During reexamination the claims of the '357 patent were changed to specifically refer to carbon aircraft disc brakes. (PX-200, 201). Goodyear's reason for

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 82 of 100

Page 27

1989 U.S. Dist. LEXIS 16865, *73; 14 U.S.P.Q.2D (BNA) 1081

the changes was to "make explicit that which is already implicit" in the patent, that it is directed to aircraft brakes, and not brakes generally. (PX-199 Amendment A at 9).

188. No evidence was introduced showing that BFG [*74] relied on the scope or validity of the '357 patent in its decision to make and sell carbon aircraft disc brakes. In fact, BFG's personnel stated exactly the opposite. (Schaub at 356-57, 385-86; Brandewie Dep. of Dec. 2, 1987 at 101).

189. While BFG will not recoup its investment before the '357 patent expires, it never expected to be able to recoup its investment that early. BFG personnel testified about the extraordinary lengths to which BFG went to secure a foothold in the carbon aircraft brake business, including giving Boeing 100 to 200 shipsets of the brakes absolutely free. (See FF 182). BFG expects to make significant profits from its investments, and expects to earn income from its efforts thus far for up to thirty years. (Schaub at 373-76).

190. BFG's contracts are 'fixed price,' and they include provisions which allow BFG to earn significant profits. (See, e.g., DX-522, 529).

191. The nature of the carbon aircraft brake business is such that substantial up-front investments are required. These investments are recouped through an enduring existence in the market. The court has no doubt that BFG will be able to recoup its investment if that investment includes a [*75] reasonable royalty for BFG's willful infringement from the time suit was filed until the patent expires in March of 1989. BFG has not shown that it will be unable to recoup its investment if a reasonable royalty for this relatively short period is imposed, nor has BFG shown that its profits or sales will suffer any more than they should considering BFG's willfully infringing activities.

192. The reissued patent claims differed from the original patent claims only insofar as the reissue claims focused the patent's coverage on aircraft brakes alone. This alteration does not amount to a substantive change in the claims because the claims do not cover anything more in the reissue patent than they did in the original patent. In fact, they are narrower in the reissued patent. BFG's carbon aircraft brakes infringe the original patent literally, and also infringe the reissue patent literally. The fact that the claims were changed at all in the reissue thus had no effect on the fact that BFG's brakes infringe. Any

surrender which occurred as a result of the reissued claims was completely outside the scope of BFG's infringing activities.

CONCLUSIONS OF LAW

JURISDICTION AND VENUE

1. [*76] This court has jurisdiction over the subject matter and the parties under *28 U.S.C. §§ 1338*(a) and 2201. Venue is appropriate in this judicial district. Id. at § 1404(b). Neither party contests personal jurisdiction or venue. (Uncontroverted Fact No. 10).

INFRINGEMENT

2. [HN1] The burden of proving infringement is Goodyear's. Goodyear must prove infringement by a preponderance of the evidence. *Rite-Hite Corp. v. Kelley Co., 819 F.2d 1120, 1123, 2 USPQ2d 1915, 1917 (Fed. Cir. 1987).* Goodyear seeks recovery only from the time suit was filed, May 19, 1986.

3. [HN2] "In determining patent infringement, two inquiries are involved -- (1) the scope of the claims and (2) whether the claimed invention has been infringed." *McGill, Inc. v. John Zink Co., 736 F.2d 666, 671, 221 USPQ 944, 948* (Fed. Cir.), cert. denied, *469 U.S. 1037 (1984).* The second inquiry may be met by a determination of literal infringement or infringement under the doctrine of equivalents. *SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1118, 227 USPQ 577, 583 (Fed. Cir. 1985).*

4. [HN3] In addition to the claims themselves, in construing disputed claims, the court may look to other claims, the specification, [*77] the prosecution history, and expert testimony. *McGill, 736 F.2d at 673-75, 221 USPQ at 948-51; Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1570-71, 219 USPQ 1137, 1140-42,* (Fed. Cir. 1983); *Graham v. John Deere Co., 383 U.S. 1, 33 (1966).*

5. [HN4] If an infringer's products come within the literal scope of the claim's language, "infringement is made out and that is the end of it." *Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607 (1950).* BFG has admitted that the carbon aircraft disc brake assemblies it makes and sells infringe all aspects of independent claim 4 of the '357 patent, except the requirement that they be of a "substantially uniform

1989 U.S. Dist. LEXIS 16865, *77; 14 U.S.P.Q.2D (BNA) 1081

composition in cross-section." This court has determined, as a factual matter, that the discs used in BFG's brake assemblies since at least 1975 are of a substantially uniform composition in cross-section as that limitation is defined in the specification, and after consideration of the prosecution history and the expert testimony adduced at trial. Therefore, BFG's carbon aircraft disc brake assemblies literally infringe claim 4 of U.S. Patent No. 3,650,357 (hereafter the '357 patent).

6. The [*78] parties have stipulated, and BFG concedes, that its brake assemblies also meet all of the additional limitations of claims 22 and 25 of the '357 patent. (Uncontroverted Fact No. 15). Thus, BFG's carbon aircraft disc brake assemblies also literally infringe dependent claims 22 and 25.

7. In the alternative, BFG's disc brake assemblies, which are used in carbon aircraft disc brakes, infringe claims 4, 22 and 25 of the '357 patent under the doctrine of equivalents. The '357 patent is [HN5] a pioneer patent, and is thus entitled to a broad scope of equivalents. *Thomas & Betts Corp. v. Litton Systems, Inc., 720 F.2d 1572, 1580, 220 USPQ 1, 6 (Fed. Cir. 1983).* There is no doubt that BFG's brake assemblies, which utilize carbon discs made by the CVD process and have characteristics which vary across the disc, perform precisely the same function in the same way to achieve the same results. Even if the '357 patent were not a pioneer patent, the evidence overwhelmingly shows that, when the '357 [HN6] patent is viewed as a whole, as it must be under this doctrine, the BFG brake assemblies still infringe under the doctrine of equivalents. *Hughes Aircraft Co. v. United States, 717 F.2d 1351,* [*79] *1361, 219 USPQ 473, 480 (Fed. Cir. 1983).* BFG's assemblies utilize the true innovation of the '357 patent -- rubbing structural carbon discs on structural carbon discs to absorb sufficient energy to stop an airplane. The fact that carbon discs made with the CVD process may provide better results than those made strictly by the resin-char process does not affect the conclusion that BFG's brake assemblies infringe under the doctrine of equivalents. Whether or not CVD discs obtain improved results, it is well settled that "an improvement on the claimed subject matter does not avoid infringement even under the doctrine of equivalents." *Ryco Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1427, 8 USPQ2d 1323, 1330 (Fed. Cir. 1988).*

8. Nothing in the prosecution history precludes Goodyear from relying on the doctrine of equivalents to prove infringement. The language "substantially uniform composition in cross-section" was not added to claim 4 in order to escape prior art, or to overcome prior art having carbon discs rubbing against carbon discs in a brake apparatus wherein the entire disc cross-section, as well as the disc stack cross-section, was made up of a carbon material. *Bayer Aktiengesellschaft* [*80] *v. Duphar Int'l Research B.V., 738 F.2d 1237, 1242-43, 222 USPQ 649, 653 (Fed. Cir. 1984).*

9. Goodyear has proven that BFG's brake assemblies are in use in the Boeing B747-400 and B757-200, the Embraer AMX, and the Lockheed C5-B. Goodyear has shown, and BFG has not disputed, that BFG's sales of its brake assemblies are for the purpose of using them on the specific aircraft for which they are made. *35 U. S. C. § 271*(b) [HN7] provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." BFG's sales of its brake assemblies are made with the knowledge and intent that they be specifically used on aircraft. Therefore, BFG, having induced infringement of the '357 patent, is liable as an infringer. See also *35 U.S.C. § 271*(f)(1). BFG's brake assemblies are not staple articles of commerce or commodities which have suitable non-infringing uses. In fact, the only suitable use for BFG's brake assemblies is in the aircraft for which they are designed. Thus, BFG's actions also constitute contributory infringement under *35 U. S. C. §§ 271*(c) and (f)(2).

10. Although sufficient evidence has been adduced concerning BFG's manufacture and sale of infringing [*81] brake assemblies for the Lockheed C5-B, [HN8] Goodyear is precluded from recovering damages for the sale of these brake assemblies in this action because they were manufactured for and sold to the United States government. See *35 U.S.C. § 1498.*

WILLFULNESS

11. [HN9] It was Goodyear's burden to prove, by clear and convincing evidence, that BFG's infringement was willful. *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1439-40, 7 USPQ2d 1129, 1137* (Fed. Cir.), cert. denied, *109 S.Ct. 542 (1988).* The test for determining willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Ryco, 857 F.2d at 1428, 8 USPQ2d at 1331; Central Soya Co. v. Geo. A.*

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 84 of 100

Page 29

1989 U.S. Dist. LEXIS 16865, *81; 14 U.S.P.Q.2D (BNA) 1081

*Hormel & Co., 723 F.2d 1573, 1577, 220 USPQ 490, 492 (Fed. Cir. 1983).* [HN10] Where the infringer has actual notice of the patent's existence, and the patentee's rights, "he has an affirmative duty of due care." *Rolls-Royce, Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1109, 231 USPQ 185, 191 (Fed. Cir. 1986).* This duty of due care normally requires the potential infringer to [*82] obtain competent advice of counsel before beginning or continuing infringement. Id.; *Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1389-90, 219 USPQ 569, 576 (Fed. Cir. 1983).* The failure to obtain this advice is not necessarily determinative of the question, but it is one factor supporting a finding of willfulness. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1566, 7 USPQ2d 1548, 1555-56 (Fed. Cir. 1988).* "Though it is an important consideration, not every failure to seek an opinion of competent counsel will mandate an ultimate finding of willfulness." *Spindelfabrik Suessen-Schurr Stahlecker & Grill, GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1084 n.13, 4 USPQ2d 1044, 1051 n.13 (Fed. Cir. 1987),* cert. denied, *108 S.Ct. 1022 (1988).* "Conversely, that an opinion of counsel was obtained does not 'always and alone' dictate a finding that the infringement was not willful." Id.

12. BFG was aware of the existence of the '357 patent from its inception. Yet, BFG undertook all of its actions without regard for the '357 patent. Even after receiving Goodyear's letters in October 1984 and [*83] February 1986 notifying BFG of the institution of the reexamination proceeding and its successful outcome, respectively, BFG failed to obtain an opinion of competent counsel concerning the validity or enforceability of the '357 patent, and BFG continued, without concern for or thought of the '357 patent. BFG commenced or continued its infringing activities in direct disregard for Goodyear's patent rights, without any reasonable belief that it was not infringing or that the patent was invalid or unenforceable. See *Ryco, 857 F.2d at 1428, 8 USPQ2d at 1331.*

13. Every action taken by BFG to improve its position in the carbon aircraft brake market was taken with disregard for Goodyear's patent rights. It was not until more than six months after Goodyear's October 1984 letter that BFG consummated its agreement to provide Boeing with carbon brakes for the 757 aircraft. In addition, BFG signed contracts for the AMX, and the extremely lucrative Boeing 747-400 contract after it had

received notification that the '357 patent reexamination was successful, and before it sought competent advice of legal counsel. In response to a question whether BFG had decided to take the risk, one BFG witness [*84] responded "I would assume we did, yes." (Perry at 1104). Although BFG did not begin construction on its Pueblo, Colorado plant until after advice had been obtained, the construction of this plant had been agreed to as part of BFG's contract with Boeing to provide the 747 brakes. Thus, BFG cannot say that it acted to further the 747 contract only after seeking counsel's advice.

14. BFG did not obtain an opinion of counsel until April 25, 1986, when it obtained what would appear to be an informal oral opinion. Such an opinion was not one upon which one could base a good faith reliance of invalidity. See *Bott v. Four Star Corp., 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed. Cir. 1986).* It was not until November of 1986 that a formal written opinion of counsel was finally in BFG's possession. Such an after-the-fact opinion is insufficient to avoid willfulness. *Great Northern Corp. v. Davis Corp. & Pad Co., 782 F.2d 159, 167, 228 USPQ 356, 360 (Fed. Cir. 1986).*

15. BFG's cumulative conduct establishes, by clear and convincing evidence, the willfulness with which it infringed the '357 patent. All of BFG's early developmental work was undertaken with knowledge of the existence [*85] of the '357 patent. After Goodyear notified BFG of the reexamination proceedings, and Goodyear's intent to seek royalties upon successful reexamination, BFG, rather than ceasing its activities until competent advice of counsel could be obtained, accelerated its sales activities, and worked to gain a greater foothold in the carbon aircraft disc brake market. Slavish copying of the '357 patent is not required.

16. BFG argues that it was not required to obtain legal advice upon receipt of Goodyear's 1984 letter because this was an admission by Goodyear that the '357 patent was invalid. The contrary is true. The '357 patent was a valid and existing patent at that time. Goodyear's letter served to notify BFG of Goodyear's intention to rely on that patent. BFG had no competent advice that would suggest that there were any problems with the '357 patent. A reasonable person would have sought, at the time the 1984 letter was received, competent legal advice as to the validity and enforceability of the '357 patent before proceeding further. BFG did nothing along these lines, and therefore acted unreasonably.

Case 1:05-cv-00608-MPT   Document 313   Filed 03/09/2007   Page 85 of 100

Page 30

1989 U.S. Dist. LEXIS 16865, *85; 14 U.S.P.Q.2D (BNA) 1081

17. Although the infringer's behavior as a party to the litigation is a relevant factor [*86] to consider in determining willfulness, *Bott v. Four Star Corp., 807 F.2d at 1572, 1 USPQ2d at 1213,* BFG, contrary to Goodyear's suggestion, is not guilty of any litigation misconduct. The court is of the firm belief that all of BFG's arguments were made with a good faith belief in their veracity, or with a good faith intent to extend the law.

18. [HN11] If infringement is willful, increased damages may be awarded at the discretion of the court. *Ryco, 857 F.2d at 1429, 8 USPQ2d at 1332.* Damages may be increased up to three times, also in the exercise of the court's discretion. Id. Willful infringement may also be a sufficient basis for finding a case "exceptional" for purposes of awarding attorney fees under *35 U.S.C. § 285. Bott, 807 F.2d at 1574, 1 USPQ2d at 1215.*

19. A finding of willfulness does not require this court to either increase a damages award or provide for an award of attorney fees. *35 U. S. C. § 284,* 285. Rite-Hite Corp. v. *Kelley Company, Inc., 819 F.2d 1120, 1126, 2 USPQ2d 1915, 1919 (Fed. Cir. 1987).* [HN12] In determining whether to increase damages as a result of BFG's willful infringement, this court is required to consider all of the circumstances [*87] of this case. As the Federal Circuit has stated, "[t]he measure of damages . . . provides an opportunity for the trial court to balance equitable concerns as it determines whether and how to recompense the successful litigant." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc., 781 F.2d 198, 201, 228 USPQ 367, 369 (Fed. Cir. 1986).*

20. BFG's actions, though egregious, are sufficiently offset for purposes of increased damages by Goodyear's considerable delay in filing suit. As this opinion concludes, infra, Goodyear's eight year delay, following the Super-Temp purchase, before filing suit, coupled with the considerable prejudice to BFG resulting from this delay, is unreasonable and inexcusable. In addition to these factors, Goodyear's failure to assert the patent during the Super-Temp purchase negotiations, or for more than six years thereafter while BFG pursued numerous carbon brake contracts, gave BFG reasonable grounds for believing that the '357 patent would not be asserted against it. In reliance on Goodyear's nonassertion of the patent, despite Goodyear's knowledge of BFG's activities, BFG invested millions of dollars in an effort to establish itself in the carbon [*88] aircraft brake

business before October 1984. But for BFG's egregious conduct following assertion of the '357 patent by Goodyear, Goodyear would be estopped from asserting that patent.

21. After weighing all of the facts and events surrounding BFG's infringement in this case, the court is of the opinion that increased damages would not be appropriate. The countervailing considerations outlined above and infra lead the court to conclude that the interests of justice would not be served by awarding Goodyear increased damages.

22. For similar reasons the court is also convinced that this case is not exceptional, and that attorney fees should not be awarded. Despite the parties' contentions, neither party's actions justify relieving it of the fees for this litigation. For the reasons discussed above, BFG's willfulness does not justify awarding Goodyear fees. Similarly, as discussed infra, Goodyear is not guilty of inequitable conduct before the PTO, therefore BFG's request for attorney fees on this basis is also denied.

VALIDITY

23. [HN13] The '357 patent is presumptively valid. *35 U.S.C. § 282.* "The burden of establishing invalidity of a patent or any claim thereof shall rest on the [*89] party asserting such invalidity." Id. "That burden is constant and never changes and is to convince the court of invalidity by clear [and convincing] evidence." *American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed. Cir.), cert. denied, 469 U.S. 821 (1984); Baker Oil Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1558, 1563, 4 USPQ2d 1210, 1213 (Fed. Cir. 1987); Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed. Cir. 1986),* cert. denied, *479 U.S. 1030 (1987).* Thus, for each claim of invalidity, BFG was required to present this court with clear and convincing evidence of that claim.

A. BFG's on Sale Defense

24. [HN14] A patent is invalid if it was "on sale in this country, more than one year prior to the date of the application for patent in the United States." *35 U. S. C. § 102*(b). In this case the the date of the original patent application was June 25, 1968, thus the critical date is June 25, 1967. [HN15] An actual sale is not necessary; "[a]n offer to sell is sufficient under the policy animating the statute, which proscribes not a sale, but a placing 'on

sale'." *D.L. Auld Co. v.* [*90] *Chroma Graphics Corp., 714 F.2d 1144, 1150, 219 USPQ 13, 18 (Fed. Cir. 1983),* cert. denied, *474 U.S. 825 (1985).*

25. [HN16] An invention is on sale within the meaning of 102(b) when: 1) there was a definite sale or offer to sell more than one year before the patent application was filed; and 2) "the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Electronics Co. v. United States, 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed. Cir. 1987),* cert. denied, *108 S.Ct. 748 (1988).* The sale need not be consummated, nor accepted. *Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1464, 7 USPQ2d 1325, 1327-28 (Fed. Cir. 1988).* All of the circumstances surrounding the alleged offer or sale must be considered. *A.B. Chance Co. v. RTE Corp., 854 F.2d 1307, 1311, 7 USPQ2d 1881, 1884 (Fed. Cir. 1988); UMC, 816 F.2d at 656, 2 USPQ2d at 1471-72.* In determining whether an offer or sale occurred, the court should consider whether there was a "reduction to practice," although this is not an absolute requirement of the on-sale bar. *UMC, 816 F.2d* [*91] *at 656, 2 USPQ2d at 1471.* In addition, consideration should be given to the stage of development of the invention and the nature of the invention. Id.

26. [HN17] If a sale or offer to sell was made, the on sale bar does not apply if the offer or sale was "substantially for the purpose of experiment." *Baker Oil, 828 F.2d at 1563, 4 USPQ2d at 1213* quoting *Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256 (1887).* In determining whether an offer or sale was for experimental purposes, the court must consider various factors, and consider the underlying facts of each case in light of all the circumstances. *Western Marine Electronics, Inc. v. Furuno Electric Co., Ltd., 764 F.2d 840, 845, 226 USPQ 334, 337-38 (Fed. Cir. 1985); Baker Oil, 828 F.2d at 1564, 4 USPQ2d at 1214.* Factors which the court may consider include, the length of the test period; whether any payment was made for the invention, whether there is any secrecy obligation on the user's part, whether progress records are required, whether persons other than the inventor conducted the experiments, the extent of testing required, length of the test period in relation to test periods for similar devices, [*92] and the degree of commercial exploitation during the tests (in relation to the purpose of the experimentation). *In re Brigance, 792 F.2d 1103, 1108, 229 USPQ 988, 991*

*(Fed. Cir. 1986).* This is not an exhaustive list. Although Goodyear must "come forward" with an explanation of the circumstances surrounding an offer or sale if it seeks to show that the proposals were experimental in nature, BFG retains the burden of proving the patent is invalid by clear and convincing evidence. Cf. *TP Laboratories, Inc. v. Professional Positioners, Inc., 724 F.2d 965, 971-72, 220 USPQ 577, 582* (Fed. Cir.), cert. denied, *469 U.S. 826 (1984).*

27. The sole bases for BFG's on sale argument are the proposals made by Goodyear to Boeing in January 1967, five months prior to the critical date. These proposals were for the sale of steel brakes. Alternate designs were provided, including one using structural carbon. At the time these proposals were made the '357 patent had not been tested on an aircraft, and had not been completely tested in the laboratory. (DX 15; Nelson at 582-83). The experimental nature of the brakes reflects the fact that they were not, at the time of the proposals, reduced [*93] to practice. BFG argues that flight testing was not necessary for a reduction to practice. However, the evidence indicates otherwise. (Hainline Dep. of Feb. 17, 1988 at 63-64; Perry Dep. of Nov. 10-11, 1987 at 194-95). The nature of the airplane industry is such that actual flight testing is generally considered a prerequisite for reduction to practice for a part as critical as brakes. See *Gaiser v. Linder, 253 F.2d 433, 436, 117 USPQ 209, 211 (CCPA 1958)*(airplane windshield not reduced to practice without flight testing); *Chandler v. Mock, 202 F.2d 755, 757, 97 USPQ 135, 136 (CCPA 1953)*(aircraft engine carburetor not flight tested was not reduced to practice); *Balogh v. Crot, 176 F.2d 923, 926, 83 USPQ 130, 132 (CCPA 1949)*(flexible joint for brake hydraulic line not reduced to practice without flight testing, despite attempts to simulate flight conditions as nearly as possible). In both Gaiser and Chandler, the Court of Customs and Patent Appeals did not foreclose reduction to practice without flight testing completely, but concluded in both instances that the simulated tests which were conducted did not sufficiently simulate actual flight conditions [*94] in every respect. The dynamometer testing done by Goodyear was characterized by BFG's expert, Mr. Moyer, as "screening" work. (Moyer at 526). In addition, Mr. Moyer testified that while a dynamometer was a useful tool, it could not simulate many of the actual variations a brake might experience in use, such as moisture conditions, runway undulations, and objects (or dirt) on the runway -- all of which could have minimal or great effect on brake performance. (Id.

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 87 of 100

Page 32

1989 U.S. Dist. LEXIS 16865, *94; 14 U.S.P.Q.2D (BNA) 1081

at 523-31; PX 77, 214).

28. The lack of flight testing, combined with the fact that the discs tested at the time of the Boeing proposals required a break-in period before achieving the necessary friction coefficient (a condition deemed "unacceptable" by the inventor Nelson) lead to the conclusion that the '357 patent was not reduced to practice in January of 1967 when the Boeing proposals were made. See *McDonnell Douglas Corp. v. United States, 670 F.2d 156, 162, 214 USPQ 857, 861 (Ct. Cl. 1982)* ("Tests which fail to simulate the varying and multiple conditions of the invention's intended environment will not serve to prove the operability, stability and reliability of the invention for practical use"); *Chandler,* [*95] *202 F.2d at 758, 97 USPQ at 137* ("The practicability of the invention should have been established by timely tests which adequately embraced the essential conditions which the carburetor would be required to meet in actual service on an airplane").

29. Finally, the proposals themselves indicate Goodyear's belief that the carbon brakes were still in a developmental stage. One need only refer to the earlier quoted passages to see that Goodyear unequivocally expressed the sentiment that, while it had high hopes for its GY4000, the material was new and still had problems, though none which were believed "insurmountable." Considering all of the circumstances surrounding the proposals made by Goodyear to Boeing in January of 1967, Goodyear's carbon brakes were not sufficiently developed to be the subject of an offer for sale. *UMC, 816 F.2d at 656, 2 USPQ2d at 1471-72;* Shatterproof Glass Corp. v. *Libbey-Owens Ford Co., 758 F.2d 613, 622-23, 225 USPQ 634, 639-40* (Fed. Cir.), cert. dismissed, *474 U.S. 976 (1985).*

30. This conclusion is supported by the proposals themselves, which show, on their faces, that they were intended to be experimental. Thus, even assuming some sort [*96] of offer were made, the evidence shows that the Boeing proposals were "substantially for the purpose of experiment." *Smith & Griggs, 123 U.S. at 256.* The basic proposal was for steel brakes. The alternate proposal for carbon brakes expressed in unequivocal terms that further testing and development both in the laboratory and on aircraft was necessary before carbon brakes could be supplied. In fact, aircraft testing would occur only if laboratory testing were successful. Boeing's designated representative interpreted the proposals as

experimental. (Hainline Dep. of Feb. 17, 1988 at 103-04). These proposals speak for themselves. While Boeing was required to pay some money for the materials involved, that amount represented, as the proposal itself states, "approximately one-third" of the cost of the equipment Goodyear would supply.

31. When the criteria applicable to determining whether the proposals were primarily for experimental purposes are applied, there is little room for doubt. The length of the test period is substantial -- up to two years of laboratory testing with subsequent flight testing. The payment made by Boeing cannot be said to be payment for the invention. It was [*97] payable only if flight testing occurred, and represented only a fraction of the cost of the manufactured equipment. Thus, it did not include any recompense for Goodyear's substantial development efforts. In addition, Boeing was not bound to purchase any quantity of carbon brakes from Goodyear as a result of the development program. The proposal contemplates a close working relationship by the two companies, with Goodyear and Boeing sharing in the responsibility of the development. During the test period no commercial exploitation was contemplated, nor was any required thereafter. The proposals contain a clear secrecy requirement at the very beginning of the volume, where a paragraph states that the proposals consist of proprietary information which may not be divulged without Goodyear's approval. This same paragraph also restricted any use or resale, to the detriment of Goodyear, of the information in the proposal. When viewed as a whole, the language of the proposal clearly supports the conclusion that the alternate carbon proposal was primarily for experimental purposes.

32. BFG has not provided clear and convincing evidence which shows that an invalidating sale or offer was made. [*98] BFG has failed to make out even a prima facie case of an offer for sale. When combined with the evidence supporting the experimental nature of the alternate carbon brake proposals, it is evident that BFG has failed to carry its burden. *UMC, 816 F.2d at 656, 2 USPQ2d at 1472.*

B. BFG's Public Use Defense

33. [HN18] In addition to barring patents which have been placed on sale more than one year before the filing date, section 102(b) also renders a patent invalid if "the invention was . . . in public use . . . in this country more

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 88 of 100

Page 33

1989 U.S. Dist. LEXIS 16865, *98; 14 U.S.P.Q.2D (BNA) 1081

than one year prior to the date of application." This section precludes "attempts by the inventor or his assignee from commercially exploiting [an] invention more than a year before the application for patent is filed." *Western Marine Elec., Inc. v. Furuno Elec. Co., 764 F.2d 840, 845, 226 USPQ 334, 337 (Fed. Cir. 1985).* The policy reasons relating to this bar are the same as those for the on sale bar. As with the on sale bar, [HN19] it is necessary for this court to consider all of the factors surrounding the purported public use. *TP Labs, 724 F.2d at 971-72, 220 USPQ at 582-83.* And, as with the on sale bar, the burden of proving invalidity remained [*99] with BFG, although if BFG made out a prima facie case, Goodyear was required to "come forward" with evidence to counter it. Id.

34. [HN20] The relevant factors to consider in determining whether a public use occurred include, but are not limited to, whether the patentee retained control over the invention, whether what was disclosed embodied the invention, whether the disclosure included a condition of confidentiality, and whether the use, if public, was experimental. *Id. at 971-73, 220 USPQ at 582-83.*

35. BFG argues that Goodyear's showing of its film illustrating tests it had done on GY4000 constituted a public use because these presentations were part of marketing presentations made to military and commercial customers. BFG has shown conclusively that two presentations of this film were made prior to the critical date -- one to Boeing and one to the U.S. Navy. In both of these instances, however, the film was shown with an understanding of confidentiality. Thus, these showings were not a [HN21] "use of [the] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith, 714 F.2d 1127, 1134, 218 USPQ* [*100] *976, 983 (Fed. Cir. 1983).* BFG has presented nothing which even suggests that Goodyear somehow relinquished control over the invention when it showed these films. Cf. *Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed. Cir. 1986),* cert. denied, *479 U.S. 1030 (1987).*

36. Finally, even if these minimal, confidential uses could be said to be public uses for the purposes of section 102, the experimental nature of the tests depicted in these films was well established by Goodyear, and not rebutted by BFG, refuting BFG's assertion of a public use. *Grain Processing Corp. v. American Maize-Products Co., 840*

*F.2d 902, 906, 5 USPQ2d 1788, 1791-92 (Fed. Cir. 1988).* Considering all of the facts relating to BFG's public use claim, BFG has failed to establish a prima facie case, let alone show by clear and convincing evidence, that Goodyear put its invention into public use more than one year prior to the patent application.

C. BFG's Inequitable Conduct Defense

37. [HN22] A patent applicant owes an uncompromising duty of candor and good faith in dealings before the PTO. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery* [*101] *Co., 324 U.S 806, 818 (1945).* Breach of this duty renders any patent issuing from such proceedings unenforceable. *A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1396-99, 230 USPQ 849, 852-55 (Fed. Cir. 1986).* Such a breach has become known as inequitable conduct before the PTO.

38. [HN23] "Inequitable conduct resides in [the] failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., No. 88-1265, slip op. at 9 (Fed. Cir. December 21, 1988); *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed. Cir. 1984),* cert. denied, *474 U.S. 822 (1985).*

39. [HN24] Materiality can be established by any one of four tests: 1) the objective "but for" test; 2) the subjective "but for" test; 3) the "but it might have been" test; and 4) PTO Rule 1.56(a), otherwise known as the test of whether there is a reasonable likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether [*102] to allow the application to issue as a patent. *J.P. Stevens, 747 F.2d at 1559, 223 USPQ at 1092.* However, "[t]he PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO." Id. Goodyear's position is that only prior art can be material. However, this is not borne out by the Federal Circuit's opinions. While many cases finding inequitable conduct concerned instances where references had been withheld from the PTO, the PTO rule test considers whether information was withheld. Cf. *Argus Chemical Corp. v. Fibre Glass-Evercoat Co., 759*

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 89 of 100

Page 34

1989 U.S. Dist. LEXIS 16865, *102; 14 U.S.P.Q.2D (BNA) 1081

F.2d 10, 15, 225 USPQ 1100, 1103 (Fed. Cir.), cert. denied, *474 U.S. 903 (1985)*(failure to disclose sales information constituted inequitable conduct).

40. The simple fact is that the Boeing proposals did not create an on sale bar. On their face they were mere proposals for a test program. It is highly unlikely that a reasonable patent examiner would have found this information important in making his decision to issue the '357 patent. BFG's assertion is premised on its own conclusion that the Boeing proposals constitute offers to [*103] sell. This simply is not the case, nor could it reasonably be construed to be the case. The Federal Circuit has stated that an attorney is not obliged to disclose every scrap of possibly relevant information to the PTO. "Attorneys have to make judgments on many matters before filing a patent application. [HN25] To avoid a charge of inequitable conduct, they do not have to raise and explain to the PTO all problems they have considered." *Reactive Metal Alloys Corp. v. ESM, Inc., 769 F.2d 1578, 1583, 226 USPQ 821, 824 (Fed. Cir. 1985).* Considering the nature of the proposals, they cannot be said to have been material. In addition, as to BFG's claim of inequitable conduct in the reexamination proceedings, these proposals were no more material in 1984 than they had been in 1968-72.

41. [HN26] In addition to materiality, BFG was also required to show intent by clear and convincing evidence to sustain its charge of inequitable conduct on Goodyear's part. "To be guilty of inequitable conduct, one must have intended to act inequitably." *FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1415, 5 USPQ2d 1112, 1115 (Fed. Cir. 1987).* The Federal Circuit recently resolved the question of whether [*104] [HN27] gross negligence, by itself, is sufficient to compel a finding of intent to deceive, holding that it is not. Kingsdown, slip op. at 18-19. The court has held, in banc, that "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Id. at 19.

42. BFG has failed to bring forth any evidence which demonstrates that Goodyear's attorneys intended to deceive the PTO in deciding not to submit the Boeing proposals. The mere fact that Goodyear's attorneys considered the proposals on several occasions does not prove, as BFG suggests, that Goodyear's attorneys consciously decided to deprive the PTO of important information. From the testimony elicited, it is clear, and these repeated considerations support, that the decision not to submit the Boeing proposals was carefully considered. The court will not, as BFG asks, presume Goodyear's intent to deceive the PTO because Goodyear asserted its attorney client privilege as to certain [*105] documents. The cases cited by BFG for this proposition are not supportive of this conclusion. *A.B. Dick, 798 F.2d at 1400 n.9, 230 USPQ at 855 n.9,* says only that the failure or refusal to call certain witnesses permits the trier of fact to draw adverse inferences therefrom, not that, as a matter of law, adverse inferences must be drawn. Nor does it address a privilege situation. *Kloster Speedsteel AB v. Crucible, Inc., 793 F.2d 1565, 1580, 230 USPQ 81, 90-91 (Fed. Cir. 1986),* cert. denied, *479 U.S. 1034 (1987)* merely allowed an adverse finding that a party had not sought advice of counsel (in the willfulness context) from the party's refusal, under the cloak of privilege, to state whether such advice had been sought. Here, Goodyear's claim of privilege was upheld by the magistrate, and not further challenged by BFG. Goodyear's claim was a legitimate claim of privilege from which no adverse inferences should be drawn. Compare *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc., 220 USPQ 609, 612 (D. Mass),* aff'd, *718 F.2d 1201, 220 USPQ 786 (1st Cir. 1983).*

43. BFG has not provided clear and convincing evidence of an intent to mislead. [*106]

44. [HN28] A determination on the issue of inequitable conduct requires a balancing of materiality and intent. *J.P. Stevens, supra* balancing the low level of materiality of the Boeing proposals against the lack of evidence tending to show that Goodyear's failure to submit these proposals to the PTO was the result of any intent to deceive the PTO, results in a conclusion that BFG has failed to carry its substantial burden of showing by clear and convincing evidence that Goodyear is guilty of inequitable conduct in the prosecution of the '357 patent.

45. BFG also has charged Goodyear with inequitable conduct during the 1984 reexamination proceedings stemming from the failure to disclose these same Boeing proposals. This charge is not supported by the facts, and is also legally unsupportable. First, [HN29] inequitable

conduct during the reexamination must be shown by clear and convincing evidence. Second, BFG was required to show both materiality and intent. Kingsdown, supra. For the same reasons discussed earlier, the materiality of the Boeing proposals was marginal. In addition, BFG has produced no evidence which indicates that Goodyear's attorneys intended to deceive the PTO during the [*107] reexamination proceeding. Thus, even if Goodyear could have placed the Boeing proposals before the PTO, the failure to do so did not constitute inequitable conduct.

46. BFG's assertion of inequitable conduct during the reexamination proceedings is also legally incorrect. The Manual of Patent Examining Procedure (5th ed. rev. 1988) (MPEP) gives specific guidelines for reexamination requests. MPEP Ch. 2200. These guidelines conform to the limits expressed in the reexamination statute and regulations. *35 U.S.C. §§ 301*-07; *37 C.F.R. §§ 1.501* et seq. [HN30] The statute, the regulations and the MPEP all specifically limit the reexamination proceeding to consideration of prior art patents and publications. *35 U.S.C. § 302; 37 C.F.R. § 1.552*; MPEP §§ 2258; see also *In re Etter, 756 F.2d 852, 856-57, 225 USPQ 1, 4* (Fed. Cir.) (in banc), cert. denied, *474 U.S. 828 (1985).* The MPEP states in several places that information other than prior patents and publications may not and will not be considered. Section 2216 ("Questions relating to grounds of rejection other than those based on prior patents or printed publications, such as on [sic] public use, on sale, or fraud should not be included [*108] in the request and will not be considered by the examiner if included"); § 2246 ("If arguments are presented as to grounds not based on prior patents or printed publications, such as those based on public use or sale, abandonment under *35 U.S.C. 102*(c) the examiner should note that such grounds are improper for reexamination and are not considered or commented upon. *37 C.F.R. 1.552(c)*"); § 2258 ("Rejections will not be based on matters other than patents or printed publications, such as public use or sale, inventorship, § 101, fraud, etc.").

47. BFG, relying on *Precision Instrument, 324 U.S. at 818,* and MPEP § 2258, suggests that once amendment to the '357 patent claims was required during reexamination, Goodyear had an overriding duty to disclose the Boeing proposals through the use of the reissue proceeding, which permits consideration of matters potentially constituting an on sale, bar. BFG concludes that once in reissue, the Boeing proposals

could have been considered. However, MPEP § 2258 merely requires the examiner in a reexamination proceeding to note, in an Office action, the existence of questions other than those resulting from prior patents and printed publications. [*109] In such a case, the section continues, "the patent owner may desire to consider the advisability of filing a reissue application." Id. (emphasis added). This section does not require the patent owner to submit such 'other information' for consideration, nor does it require the patent owner to file for reissue. It states only that the examiner will notify the patent owner of that option. Cf. *Etter, 756 F.2d at 857 n.4; 225 USPQ at 4 n.4.* In addition, the Note Form paragraph accompanying section 2258, which provides a form of notice for use by the examiner, reads in part: "While this issue is not within the scope of reexamination, the patentee is advised that it may be desirable to consider filing a reissue application provided that the patentee believes one or more claims to be partially or wholly inoperative or invalid based upon the issue." Id. (emphasis added). BFG has brought forth no evidence which suggests that Goodyear's attorneys believed that the Boeing proposals would operate to partially or wholly invalidate any of the '357 patent's claims. Goodyear has contended precisely the opposite throughout this entire litigation.

48. BFG argues that Ex parte [*110] *McGaughey, 6 USPQ2d 1334* (Bd. Pat. App. & Int. 1988) permits consideration during reexamination proceedings of on sale prior art. In fact, McGaughey says exactly the opposite. That case only allowed "admissions which have already been established in the record" to be used in reexamination proceedings. *Id. at 1338.* The Board specifically dispelled any notion that it was interpreting section 2258 or *37 C.F.R. 1.106(c)* to allow "other types of evidence such as on-sale bars" to be considered during a reexamination.

49. Similarly, BFG's citation of Precision Instrument as creating a duty on Goodyear's part to submit the Boeing proposals during reexamination is misplaced. Precision Instrument, written long before the reexamination statute appeared, requires that all relevant evidence be placed before the PTO during its proceedings. The important point is that the PTO have the opportunity to pass upon the sufficiency of the evidence. *324 U.S. at 818.* Because the PTO is forbidden from passing upon the "sufficiency" of the Boeing proposals during a reexamination, there was no duty to present

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 91 of 100

Page 36

1989 U.S. Dist. LEXIS 16865, *110; 14 U.S.P.Q.2D (BNA) 1081

them. Additionally, because Goodyear never believed one or more of the claims to be [*111] partially or wholly inoperative as a result of the Boeing proposals, it was not required to seek reissue.

50. BFG has failed to sustain its burden of proving inequitable conduct in either the original proceedings or the reexamination proceedings.

D. BFG's Best Mode and Enablement Defenses

51. *35 U.S.C. § 112* states, in relevant part:

[HN31] The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

52. [HN32] Compliance with section 112 requires the patentee to set forth the manner and process of making and using the invention (enablement), and the best mode contemplated by the inventor of carrying out the invention (best mode). These are two separate requirements. *Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1532, 3 USPQ2d 1737, 1742* (Fed. Cir.), cert. denied, *108 S. Ct. 346 (1987).* The difference between the two requirements is explained [*112] in *In re Gay, 309 F.2d 769, 772, 135 USPQ 311, 315 (CCPA 1962):*

[HN33] The essence of [enablement] is that the specification shall disclose an invention in such a manner as will enable one skilled in the art to make and utilize it. [HN34] Separate and distinct from [this] is [best mode], the essence of which requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out his invention

. . . .

As we view [best mode], we think that an inventor is in compliance therewith if he does not conceal what he feels is a preferred embodiment of his invention. The question of whether an inventor has or has not disclosed what he feels is his best mode is, however, a question separate and distinct from the question of the sufficiency of his disclosure to satisfy the requirements of [enablement]. (Emphasis in original).

53. [HN35] BFG bears the burden of proving, by clear and convincing evidence, that the '357 patent fails to disclose the best mode or does not enable one skilled in the art to practice the invention. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1575, 1 USPQ2d 1081, 1087-88 (Fed. Cir. 1986).*

[*113]

1. Best Mode

54. [HN36] The best mode provision speaks in terms of the inventor's knowledge at the time the application was filed. Thus, "there is no objective standard by which to judge the adequacy of a best mode disclosure." *Spectra-Physics, 827 F.2d at 1535, 3 USPQ2d at 1745.* "Because not complying with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time of filing, in order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed." *Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384-85, 231 USPQ 81, 94 (Fed. Cir. 1986),* cert. denied, *480 U.S. 947 (1987).* The failure to disclose the best mode need not be purposeful for the patent to be invalid. *Spectra-Physics, 827 F.2d at 1535, 3 USPQ2d at 1745.* "It is concealment of the best mode of practicing the claimed invention that section 112 para. 1 is designed to prohibit." *Randomex, Inc. v. Scopus Corp., 849 F.2d 585, 588, 7 USPQ2d 1050, 1053 (Fed. Cir. 1988).*

55. BFG cites two distinct things which it claims invalidate the '357 patent for failure [*114] to disclose the best mode. The first is the substitution for Carb-i-tex with a more generic definition of carbon composite discs, and the second is the deletion of di-tungsten monoboride. The essence of BFG's argument is that the specification fails to disclose adequately the processes by which the carbon discs are made for use in the claimed invention. Specifically, BFG argues that, because the inventors believed, at the time the CIP was filed, that carbon discs known as GY4041 would work better than any other material, they were obliged to disclose the precise method for making those discs, including impregnation cycles, furnace temperatures, and heat treatments, as well as the specific means of introducing tungsten and boron through di-tungsten monoboride and the specific quantities preferable.

56. Claim 4, the sole independent claim involved in this litigation, is directed to an aircraft carbon disc brake

having a stack of discs where each disc is made from a carbon-based material. The claim does not discuss the process for making carbon discs suitable for use in aircraft brakes. BFG asserts here that the specification does not disclose GY4041 carbon or its equivalent because [*115] it does not adequately disclose the process for making those discs. BFG cites Spectra-Physics and *Dana Corp. v. IPC Limited Partnership, 860 F.2d 415, 8 USPQ2d 1692 (Fed. Cir. 1988)* in support of its position. In each of these cases, however, there is an important difference from the present case -- that is that the patents in those cases failed to disclose the best mode required to make the claimed invention. In Spectra-Physics, the patents were directed to an ion laser structure and to a method of fabricating an ion laser. There, the Federal Circuit held that the failure to disclose the details of the process for accomplishing a means for attaching limitation contained in the claims violated the best mode. *827 F.2d at 1527 n.2, 1537, 3 USPQ2d 1739 n.2, 1745-46.* Similarly, in Dana, the claimed invention was for a valve stem seal comprised of an elastomeric material. The best mode known to the inventor required the claimed seal to be coated with flouride. This was not disclosed anywhere in the patent, and thus section 112 para. 1 was violated. *860 F.2d at 420, 8 USPQ2d at 1696-97.*

57.  Goodyear's patent is directed to an aircraft carbon disc brake, and not to [*116] the process for creating carbon discs. Thus, the alleged failure to disclose concerns matters outside of the claimed invention, but necessary to the practice of it. This situation is similar to that in the Federal Circuit's Randomex opinion, where the claimed invention was for a portable computer disk cleaning pack, and the specification included a reference to cleaning solutions "not specifically claimed in the '660 patent, but needed to practice the invention." *849 F.2d at 586, 7 USPQ2d at 1051.* There, the court held section 112 para. 1 had not been violated by a failure to include in the specification the precise formula for the preferred cleaner. The court noted that best mode is directed to the claimed invention, and because it is "absurd" to expect persons skilled in the computer disk pack cleaning art to know the formula for every cleaning fluid the patent did not have to include more than a general description of the cleaning fluid. The court concluded that "[t]hose skilled in other arts [than the art of cleaning fluids] would simply ask those who knew." *Id. at 589, 7 USPQ2d at 1053.*

58.  Here, the claimed invention is for carbon aircraft disc brakes. "This invention [*117] neither added nor claimed to add anything to the prior art respecting [carbon disc processing]." *Id. at 590, 7 USPQ2d at 1054.* Since the '357 patent discloses carbon aircraft disc brakes of Carb-i-tex type material with tungsten and boron additives, the best mode for practicing the claimed invention is disclosed. In Randomex the specification included a tradename and minimal description. BFG's argument is that the deletion of the tradename Carb-i-tex somehow made the description provided deficient. This argument overlooks the evidence indicating that the description was preferable to use of a tradename at this point in time (PX 190), and that, as the expert testimony indicated, in this instance the technical description is more accurate than the tradename.

59.  BFG also contends that even if the generic description in the specification includes Carb-i-tex type materials, "the quality of the disclosure [is] so poor as to effectively result in concealment." *Spectra-Physics, 827 F.2d at 1536, 3 USPQ2d at 1745.* The facts do not support this conclusion.

60.  The '357 patent specification generically describes Carb-i-tex type materials other than Carb-i-tex, as well as Carb-i-tex. [*118] Despite BFG's contrary assertions, Goodyear's patent attorney at the time the CIP was filed gave a plausible, uncontradicted reason for the change from the use of the Carb-i-tex tradename to the generic description used -- that the PTO was then urging the use of generic descriptions instead of tradenames. (Cf. PX 190). Experts from both sides agreed that the generic description provided included Carb-i-tex type materials. Their disagreement was as to how broad the description was. Evidence was introduced which showed that BFG was able to ascertain quite quickly that the carbon material used in Goodyear's brakes was a Carb-i-tex material. Thus, BFG's argument that the generic description in the '357 patent is so broad as to be meaningless is belied by its own actions.

It was not necessary for the specification to point out the particular embodiment which constitutes the best mode. *Randomex, 849 F.2d at 589, 7 USPQ2d at 1054.* The Federal Circuit recently cited with approval the following comment made by the Board of Patent Appeals and Interferences:

[HN37] There is no requirement in *35 U.S.C. § 112* that an applicant point out which of his embodiments he

Case 1:05-cv-00608-MPT    Document 313    Filed 03/09/2007    Page 93 of 100

Page 38

1989 U.S. Dist. LEXIS 16865, *118; 14 U.S.P.Q.2D (BNA) 1081

considers his best mode; that [*119] the disclosure includes the best mode contemplated by the applicant is enough to satisfy the statute. There is no concealment of best mode [where] one of ordinary skill in the art could readily determine the best operating mode.

Id., quoting *Ernsthausen v. Nakayama, 1 USPQ2d 1539, 1549* (Bd. Pat. App. & Int. 1985), aff'd in unpublished opinion, *809 F.2d 787-88* [tables] (Fed. Cir. 1986). See also *In re Bosy, 360 F.2d 972, 976, 149 USPQ 789, 792 (CCPA 1966)*. The specification also states that additives such as tungsten and boron are "desirable." Uncontradicted expert testimony stated that a carbon processor would have known that di-tungsten monoboride broke down into these component parts, and that it would take little experimentation and routine skill to discern that di-tungsten monoboride was a convenient and effective means of introducing these additives. Finally, no evidence was introduced by BFG which even suggested that tungsten and boron could be added only in the form of di-tungsten monoboride, and BFG's expert testified that di-tungsten monoboride was a readily available mixture at the time the CIP was filed.

61. As in Randomex, it would be absurd for this [*120] court to require the inventors, whose skill was in the art of aircraft brake technology, to disclose a complete process for making carbon composites, including each and every step of that production process. This would amount to that which the Court of Customs and Patent Appeals warned against in In re Gay, turning patent specifications into production specifications. *309 F.2d at 769, 135 USPQ at 316.*

62. BFG makes several assertions that Goodyear is unable to prove certain points, including that tungsten and boron are sufficient disclosures. These statements exemplify a fundamental error in BFG's presentation. The burden is not on Goodyear to prove that its disclosure satisfies the best mode, but on BFG to prove, by clear and convincing evidence, that it does not. BFG has failed to present such clear and convincing evidence, and therefore has not proven that the '357 specification fails to meet the best mode requirements of section 112 para. 1.

2. Enablement

63. [HN38] "To be enabling under § 112, a patent specification must disclose sufficient information to enable those skilled in the art to make and use the

claimed invention." *Hybritech, 802 F.2d at 1384, 231 USPQ at 94.* [*121] A patent is sufficient for purposes of enablement if it discloses at least one means which enables a person of ordinary skill in the art to make and use the claimed invention. *Spectra-Physics, 827 F.2d at 1533, 3 USPQ2d at 1743.* A patent is enabling even if some experimentation is required, so long as undue experimentation is not necessary. *Hybritech, 802 F.2d at 1384, 231 USPQ at 94.* As with best mode, a decision on enablement looks to the time the patent application was filed. *White Consolidated Industries, Inc. v. Vega Servo-Control, Inc., 713 F.2d 788, 791, 218 USPQ 961, 964 (Fed. Cir. 1983).* As with other assertions of invalidity, it was BFG's burden to establish nonenablement by clear and convincing evidence. *Ralston Purina Co. v. Far-Mar-Co., Inc., 772 F.2d 1570, 1573-74, 227 USPQ 177, 178 (Fed. Cir. 1985).*

64. The level of skill in the art is that of an aircraft wheel and brake engineer with approximately two years of experience in the field, and possibly, but not definitely, with a bachelor of science degree. Although BFG's aircraft wheel and brake expert testified that such a person would not be able to make the carbon discs necessary for use [*122] in the patent, as noted above, the patent is not one directed to making carbon discs. Mr. Nelson, one inventor, testified at several points that his invention was for, a carbon on carbon brake. He was not a chemist, and relied on carbon processors to obtain the carbon discs necessary to practice the patent. Expert testimony from Goodyear's carbon expert confirmed that the information provided would allow a carbon processor to develop a carbon disc suitable for use in the patent without undue experimentation. Finally, the evidence showed that more than one carbon disc was perceived, at the time the CIP was filed, as suitable for the intended purpose of the patent.

The availability of carbon processors with the capability to make the discs necessary for use in the patent is not disputed. In fact, BFG was also working with several carbon processors who were able to provide carbon materials which would have been suitable for use in the '357 patent. Clearly the techniques necessary to make these discs were known to carbon processors, and are properly relied on by Goodyear. *In re Strahilevitz, 668 F.2d 1229, 1232, 212 USPQ 561, 564 (CCPA 1982).*

65. BFG has failed to provide clear and [*123] convincing evidence which demonstrates that the '357

patent fails to provide an enabling disclosure as required by *35 U.S.C. § 112.*

E. BFG's Laches and Estoppel Defenses

66. BFG asserts that Goodyear's actions prior to suit render the '357 patent unenforceable under the doctrines of laches and estoppel. [HN39] Laches bars recovery by the patentee for any infringement before the filing of suit. *Jamesbury Corp. v. Litton Indus. Products, Inc., 839 F.2d 1544, 1551-52, 5 USPQ2d 1779, 1785 (Fed. Cir. 1988),* cert. denied, *109 S.Ct. 80 (1988).* Estoppel bars recovery for prospective relief, either monetary or injunctive, from the date suit was filed. Id. Both of these equitable doctrines are applied according to the facts of the case.

67. "The law is well settled that in order [HN40] to assert the defense of laches, the defendant must prove two essential elements: (1) unreasonable and inexcusable delay in the assertion of the claim; and (2) material prejudice to the defendant resulting from this delay, but the longer the delay, the less need there is to show specific prejudice." *Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 741, 220 USPQ 845, 850 (Fed. Cir. 1984).* The [*124] burden of proof is on BFG to prove unreasonableness in delay, however, [HN41] a delay of six years equivalent to the statutory limitations period -- creates a presumption of laches. Id. This presumption acts to shift the burden to the patentee to prove the existence and reasonableness of any excuse for the delay. *Id. at 742, 220 USPQ at 850.* A delay of six years also creates a presumption of injury to the infringer, and obviates the need for the infringer to produce additional evidence of prejudice. Id. This, too, shifts the burden to the patentee to show lack of injury to the infringer caused by the delay.

68. Goodyear only claims damages from the date of suit. Laches generally does not bar relief for these damages. However, BFG claims that the existence of laches renders enforcement of the '357 patent against its activities prior to suit unjust, and, since the sales contracts for the 747, 757, and AMX aircraft were entered into 'before suit was filed, BFG argues that Goodyear should, under the doctrine of laches, be barred from recovering for effects from those sales which extend beyond the date suit was filed. Both parties have asked that the laches issue should be decided [*125] here because the same issue is present in the copending Claims Court action with respect to BFG's liability on the

C5-B contract.

69. Goodyear knew of BFG's infringement as early as 1975. However, Goodyear was also aware of the major investment required for participation in the carbon aircraft disc brake market. Because BFG's activities preceding the Super-Temp purchase were de minimis, the future of carbon brakes on aircraft was uncertain during this time, and carbon brakes were of questionable viability, (DePodwin at 1204-08), Goodyear's failure to bring suit against BFG before 1978 was not unreasonable. *Mead Digital Systems, Inc. v. A.B. Dick Co., 521 F. Supp. 164, 180, 213 USPQ 328, 343 (S.D. Ohio 1981),* aff'd on other grounds, *723 F.2d 455, 221 USPQ 1035 (6th Cir. 1983)* (Commercial uncertainty of the product covered by the patent, coupled with infringer's commercial uncertainty in that area justifies delay of more than six years before bringing suit).

70. With BFG's purchase of Super-Temp, and the events that developed in the late 1970's, the situation in the carbon aircraft disc brake field changed dramatically. BFG was no longer a commercial uncertainty in the [*126] field, and carbon aircraft disc brakes were rapidly becoming profitable, or potentially profitable. Goodyear was well aware of all of these events, and of BFG's ensuing participation in carbon brake competitions.

71. Despite BFG's obvious intent to continue its carbon brake activities, and internal concern dating to 1976 within Goodyear that BFG might be infringing the '357 patent, Goodyear waited until 1986 before instituting suit, and until 1984 before informing BFG that it felt BFG might be infringing the '357 patent. Goodyear has failed to adequately explain its failure to act before 1984.

72. Goodyear's assertion that it could not sue BFG in 1983 as a result of the C5-B contract because *35 U.S.C. § 1498* limited its remedies to actions against the government does not justify its inaction. Nothing prevented Goodyear from notifying BFG of its belief that it was, through the C5-B brake sales, infringing the '357 patent. Reasonably prompt action on Goodyear's part could have prevented BFG's expenditures for the renegotiation of the C5-B contract.

73. BFG did not receive notice of Goodyear's intent to rely on or assert the '357 patent until approximately six years after the Super-Temp [*127] purchase, and Goodyear did not actually initiate suit until eight years later, therefore, Goodyear is barred from enforcing the

1989 U.S. Dist. LEXIS 16865, *127; 14 U.S.P.Q.2D (BNA) 1081

'357 patent against BFG for sales made pursuant to the specific contract signed in 1983.

74. Although BFG's infringement was willful during the time period from 1978 through 1984, the court is of the opinion that BFG's willfulness during this time period was not characterized by egregious conduct. At the time BFG renegotiated the C5-B contract BFG should have known that it was infringing the '357 patent, but Goodyear's failure to assert the '357 patent justified BFG's belief that Goodyear would not object to this renegotiation. Thus, BFG is not precluded from asserting laches as it pertains to this contract.

75. BFG also asserts that Goodyear is barred from recovering damages for BFG's infringement after suit was filed under the doctrine of equitable estoppel. Estoppel may occur where there is: (1) unreasonable and inexcusable delay in filing the suit; (2) material prejudice to the infringer as a result of the delay; (3) affirmative conduct by the patentee inducing the reasonable belief that the patentee had abandoned its claims against the infringer; and [*128] (4) detrimental reliance by the infringer. *Hottel Corp. v. Seaman Corp., 833 F.2d 1570, 1573, 4 USPQ2d 1939, 1941 (Fed. Cir. 1987); Jamesbury, 839 F.2d at 1553-54, 5 USPQ2d at 1786-87.*

76. [HN42] The decision to apply this equitable defense depends on the facts of the particular case and is a matter within the court's discretion. The doctrine of equitable estoppel bars the plaintiff from obtaining prospective relief, either injunctive or monetary, for infringement occurring after the date the suit is filed. *Id. at 1551-53, 5 USPQ2d at 1785-87.*

77. "While estoppel and laches are closely related, they are nonetheless distinct . . .. Thus, [HN43] in addition to the laches factors of delay and prejudice, equitable estoppel requires that the actor commits himself to act, and indeed acts, as a direct consequence of another's affirmative conduct." *Hottel, 833 F.2d at 1573, 4 USPQ2d at 1941.* Estoppel does not rise solely due to delay, even where that delay gives rise to laches. *Young Engineers, Inc. v. International Trade Comm., 721 F.2d 1305, 1317, 219 USPQ 1142, 1153 (Fed. Cir. 1983).*

78. Goodyear had actual knowledge of BFG's infringement more than 10 years prior to the [*129] date of suit. From 1975 through 1978 the U.S. military conducted competitive evaluations of carbon aircraft disc brakes in which both Goodyear and BFG participated.

Goodyear had actual knowledge of BFG's participation in these contracts and Goodyear personnel acquired photographs, documents and blueprints for BFG's DC-10 carbon disc brake.

79. In 1976, Goodyear management requested that an infringement letter be sent to BFG concerning BFG's carbon brake activities. Goodyear instead chose to delay until BFG was in production. Throughout the Super-Temp negotiations Goodyear failed to assert the '357 patent. In addition, following the Super-Temp deal, Goodyear sought an agreement with BFG for BFG to provide Super-Temp materials for Goodyear's aircraft brakes. Goodyear thus was aware that Super-Temp could and would be used by BFG to make discs for use in carbon aircraft disc brakes.

80. There is no evidence that Goodyear intentionally misled BFG into believing that the '357 patent would not be asserted. However, such intentional misleading is not an absolute requirement for applying equitable estoppel. [HN44] While silence alone is generally insufficient evidence of affirmative conduct to give [*130] rise to estoppel, equitable estoppel may be applied where there is "some evidence [showing] that the silence was sufficiently misleading to amount to bad faith. . . . It must be sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims." *Hottel, 833 F.2d at 1573-74, 4 USPQ2d at 1941.*

81. Considering all of the circumstances from 1975 through 1984, it is clear that Goodyear's continued silence amounted to bad faith, and led BFG reasonably to infer that it would not exercise its rights under the '357 patent. Goodyear's failure to assert the patent while BFG competed for several carbon brake contracts about which Goodyear was aware signalled a lack of intent to enforce the '357 patent. That signal remained unchanged until 1984. Goodyear's only excuse for this failure to act is that BFG had not sufficiently progressed toward production to the point where Goodyear reasonably felt BFG intended to remain in the field, or that BFG would become a commercially viable competitor. This simply is not a reasonable conclusion from the facts, including BFG's post-Super-Temp activities, and as Goodyear's own documents reflect. [*131] [HN45] Forbearance by the patentee in asserting its claim is not a reasonable justification for inexcusable delay where the forbearance is to render the litigation worthwhile. *Baker Mfg. Co. v.*

1989 U.S. Dist. LEXIS 16865, *131; 14 U.S.P.Q.2D (BNA) 1081

*Whitewater Mfg. Co., 430 F.2d 1008, 1014, 166 USPQ 463, 467-68 (7th Cir. 1970),* cert. denied, *401 US 956 (1971).* "[A] patentee cannot sit idle while an infringer builds up its business to the point that the monetary reward from an infringement suit justifies its expense." *Dymo Indus., Inc. v. Monarch Marking Sys., Inc., 474 F. Supp. 412, 415, 206 USPQ 185, 188 (N.D. Tex. 1979).*

82. BFG's actual prejudice and injury is established by the substantial investments it made in the carbon brake field, most notably through the acquisition of a carbon disc supplier. These investments, the death of key witnesses, the faded memories of key witnesses and the loss or destruction of documents constitute material prejudice to BFG. *A. C. Aukerman Co. v. Miller Formless Co., Inc., 693 F.2d 697, 701, 216 USPQ 863, 866 (7th Cir. 1982).* BFG presented clear evidence that, at least until 1984, its executives acted with the belief that Goodyear did not intend to assert the '357 patent. BFG altered [*132] its position on the C5-B contract, which posed short term losses in exchange for long term gains. This represents, at least in the short term, a detrimental change in position, and a large risk taken in reliance on Goodyear's dormancy.

83. The Court finds that Goodyear exhibited an intent to assert the '357 patent before filing suit in 1986. Goodyear did notify BFG in 1984 that it intended to assert its rights under the '357 patent. Despite this notice, BFG plowed full ahead with its carbon brake business. It sought new business, signed production contracts, and obligated itself to build new plant capacity. All of this was done recklessly, without regard for the '357 patent, and without advice of competent counsel.

BFG's 757, 747, and AMX contracts were all signed at a time when it was fully aware that Goodyear intended to assert its rights under the patent. Without seeking advice of counsel, BFG acted in direct disregard of those rights.

84. None of BFG's post-1984 contracts can be said to have been signed on a reasonable reliance of Goodyear's abandonment of the '357 patent. Thus, with regard to the 747, 757, and AMX contracts, the court concludes that the facts, when viewed as [*133] a whole, do not give rise to an estoppel. Although BFG had invested in research and development, it did not need to sign these contracts before a competent opinion of counsel could be obtained. Yet, with complete awareness of Goodyear's intent to assert the patent, it chose to do so.

85. BFG's signing of these contracts can hardly be considered detrimental actions on its part. They represent lucrative business opportunities. None, like the C5-B contract, represents a significant change in position, and no evidence was introduced which suggests BFG would have received non-carbon contracts for these aircraft. Once BFG was aware of Goodyear's intent to assert the '357 patent, signing these contracts was no longer a reasonable action.

86. Finally, [HN46] BFG's willful and deliberate infringement precludes it from relying on the equitable defense of estoppel. When a potential infringer has actual notice of another's patent rights, he has the duty to "exercise due care to determine whether or not he is infringing." *Bott v. Four Star Corp., 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed. Cir. 1986).* Goodyear notified BFG via a letter dated 16 October 1984 of the pending reexamination of the '357 [*134] patent. [HN47] Due care usually includes the duty to seek and obtain competent legal advice before engaging in activity that may result in infringement. *Id. at 1572.* BFG's continued reliance on Goodyear's past silence and conduct and BFG's failure to obtain competent legal advice following notification of the reexamination wash unreasonable. BFG's carbon brake activities following the notice and successful completion of the patent reexamination, its knowledge that Goodyear believed BFG's brakes were infringing products, and its failure to obtain an opinion of counsel which might otherwise justify its actions, constitutes willful infringement of a sufficiently egregious nature to preclude BFG from relying on the equitable estoppel defense. Cf. *Id. at 1576, 1 USPQ2d at 1217.* Equity will not help those with unclean hands.

F. BFG's Intervening Rights Defense

87. *35 U.S.C. § 252* [HN48] provides for intervening rights with respect to reissued patents. Section 307(b) confers the same rights with respect to reexamined patents. Relief under these sections are within the court's discretion. The first paragraph of section 252, in conjunction with section 307(b), provides for the surrender of [*135] the original "upon the issue of the [reexamined] patent." It provides further that the reexamined patent "shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in amended form." However, this paragraph also limits the effect of the reexamined patent "to the extent

1989 U.S. Dist. LEXIS 16865, *135; 14 U.S.P.Q.2D (BNA) 1081

that its claims are identical with the original patent."

88. [HN49] The term "identical" has been interpreted by the Federal Circuit to mean "at most, 'without substantive change.'" *Seattle Box Co. v. Industrial Crating & Packing, Inc., 731 F.2d 818, 827-28, 221 USPQ 568, 574 (Fed. Cir. 1984)*(Seattle Box I). Thus, as noted in Seattle Box I, "[t]he statute sets forth a single test for determining whether the doctrine of intervening rights protects an alleged infringer." *Id. at 731 F.2d at 830, 221 USPQ at 576.* The only question to ask under this test is whether claims of the original patent appearing in the reexamined patent are infringed. Id. If these "substantively identical" claims are infringed, then "the doctrine of intervening rights affords no protection to the alleged infringer." Id.

89. Each of the [*136] claims of the '357 patent were amended during the reexamination from broad coverage of carbon disc brakes generally, to carbon aircraft disc brakes. This narrowing of claims was done to make explicit what was already implicit. Thus, the reexamination did not add to the reexamined patent something which was "not specifically claimed in the original patent." *Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc., 756 F.2d 1574, 1579, 225 USPQ 357, 361 (Fed. Cir. 1985)*(Seattle Box II). BFG contends that the changes in the claims render them substantively different, and that this fact is "an inescapable conclusion" from simply reading the claims, relying on *Fortel Corp. v. Phone-Mate, Inc., 825 F.2d 1577, 1580-81, 3 USPQ2d 1771, 1774 (Fed. Cir. 1987).* BFG's conclusion is not supported by Fortel, and is contradicted by the language of Seattle Box I as well as the holdings of the Seattle Box and Fortel cases. In Seattle Box I and II the Federal Circuit found intervening rights where the reissued claims broadened the scope of the original claims. *731 F.2d at 827-28, 231 USPQ at 575.* This broadening had the result of bringing within the reissued [*137] patent actions by the infringer which fell outside the claims of the original patent. *756 F.2d at 1580, 225 USPQ at 362.* Such a result, said the court, would constitute a "gross injustice." Id. Similarly, in Fortel, the Federal Circuit considered reissued claims to constitute substantively different claims "upon a mere reading of th[e] claims" where the claims were admitted to be "'slightly broader'" in the reissued patent. *825 F.2d at 1580-81, 3 USPQ2d at 1774.*

90. The situation here is precisely the opposite from

Seattle Box and Fortel. Here, contrary to those cases, the change is "a matter of a mere clarification of language to make specific what was always implicit or inherent." *731 F.2d at 828, 221 USPQ at 575.* The prosecution history of the reexamination proceedings supports this conclusion. This case is similar to *Kaufman Co., Inc. v. Lantech, Inc., 807 F.2d 970, 978, 1 USPQ2d 1202, 1207-08 (Fed. Cir. 1986)* where the claims were not substantially changed, and the intervening rights defense was unavailable to the infringer. Thus, because the claims are substantively identical as that term has been defined by the Federal Circuit, and because BFG's brakes [*138] infringe the claims of the '357 patent both as originally issued and as reexamined, BFG is not protected by the doctrine of intervening rights.

91. It is unnecessary to restate all of the findings and conclusions concerning BFG's infringement here. It was earlier found that BFG's brakes infringe the '357 patent literally and under the doctrine of equivalents. BFG argues, however, that Goodyear is precluded from arguing the identical nature of the claims by prosecution history estoppel because it narrowed the claims during the reexamination in order to overcome prior art. BFG presents no authority supportive of this novel proposition. The fact that Goodyear narrowed its claims in order to overcome prior art is not relevant to the determination of whether the claims are identical. [HN50] The determination of whether the claims are substantively identical is made independent of the reason for the changes, and looks instead at the effect of the changes. Seattle Box I. In any event, BFG's brakes literally infringe the claims both as originally granted and as reissued, and, as the Federal Circuit has stated, "[t]he [HN51] doctrine of equivalents [and with it prosecution history estoppel] only comes [*139] into play when there is no literal infringement." *731 F.2d at 828, 221 USPQ at 576.*

92. Even if the doctrine of intervening rights is properly raised by BFG, BFG is not entitled to relief under it. The second paragraph of section 252 states:

No [reexamined] patent shall abridge or affect the right of any person . . . who made, purchased or used prior to the grant of a [reexamination] anything patented by the [reexamined] patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such things infringes a valid claim of the reexamined

Case 1:05-cv-00608-MPT     Document 313     Filed 03/09/2007     Page 98 of 100

Page 43

1989 U.S. Dist. LEXIS 16865, *139; 14 U.S.P.Q.2D (BNA) 1081

patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the [reexamination], and it may also provide for the continued practice of any process patented by the [reexamination], practiced, or for the practice of which substantial preparation was made, prior to the grant of the [reexamination], to the extent and under such [*140] terms as the court deems equitable for the protection of investments made or business commenced before the grant of the [reexamination].

93. Application of the provisions of this section are a discretionary function of the court, which "must consider whether to use its broad equity powers to fashion an appropriate remedy." *Seattle Box I, 731 F.2d at 830, 221 USPQ at 577.*

94. BFG claims an absolute immunity to continue the contracts it entered prior to the date the reexamination was granted. Section 252 does not provide such an absolute immunity, and the court does not believe that equity warrants such a conclusion. Section 252, para. 2 empowers this court to "fashion a remedy from a wide range of options available." *Seattle Box I, 731 F.2d at 830, 221 USPQ at 577.* Included among the choices listed in Seattle Box I was the choice of limiting the remedy to pre-reexamination products. Goodyear is not seeking damages prior to the date of suit, thus the court need not consider whether BFG is entitled to intervening rights prior to the reexamination date, since the date of suit came after the reexamination was granted. However, BFG seeks intervening rights for all of its post-reexamination [*141] activities as well.

95. The Federal Circuit has not addressed the question of a continued right to infringe in terms of section 252 under the facts here presented. In Seattle Box II the court stated that section 252, para. 2 requires consideration of "whether 'substantial preparation' was made [by the infringer] before the" reexamination was granted. *756 F.2d at 1579-80, 225 USPQ at 361.* There, however, the court only found intervening rights with respect to products in inventory prior to the date of reissue. *Id. at 1581, 225 USPQ at 363.*

There is, however, other persuasive authority on this issue. Senior Judge Miller, sitting by designation in *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc., 607 F.2d 885, 203 USPQ 27 (10th Cir. 1979),* cert. denied, *444 U.S. 1018 (1980),* considered whether prior investment made by an infringer constituted sufficient grounds for affording the infringer intervening rights. Judge Miller concluded that "[t]his would effectively extinguish, the patentee's rights under the guise of protecting the investment of an infringer." *607 F.2d at 902, 203 USPQ at 41.* Judge Miller also considered other factors, including the fact [*142] that the equipment in which the infringer invested could be used for noninfringing purposes. *Id. at 903, 203 USPQ at 41; see also Seattle Box II, 756 F.2d at 1580, 225 USPQ at 362.*

96. Although Seattle Box II includes as a factor to consider "previously placed business orders and contracts," Id., the opinion does not mandate intervening rights solely because of the existence of such contracts. As noted above, BFG's infringement has been willful and deliberate since at least 1984. It had full notice of the fact that its products infringed the '357 patent when it signed all of the contracts in question here, chose not to seek an opinion of counsel, plowed onward -- even accelerating the pace of its business, contracted to build a new plant, and actively solicited business in the carbon aircraft brake field. The reexamination application did not contain amended claims, and thus BFG had no reasonable basis to believe that its brakes would subsequently fall outside the new claims. Had BFG participated in or tracked the reexamination proceedings, it would have known that the claims as amended would continue to encompass its brakes. Accord *White v. Fafnir Bearing Co.,* [*143] *263 F. Supp. 788, 812, 152 USPQ 464, 482 (D. Conn. 1966),* aff'd, *389 F.2d 750, 156 USPQ 657 (2d Cir. 1968)* (Willful infringement deprived infringer of "standing to invoke the equitable power of this Court to escape the consequences of its own wilful acts").

97. [HN52] The doctrine of intervening rights is based on the idea that a party who has acted in good faith "should be able to make business decisions secure in the knowledge that those actions which fall outside the original patent claims are protected." *Seattle Box II, 756 F.2d at 1580, 225 USPQ at 362.* On the opposite side of the coin is the notion that an infringer whose actions are based neither in reliance upon the scope of the original patent nor upon a "well founded [belief] that the original patent issued to the plaintiff was invalid" is not entitled to have his investment protected by this doctrine. *Container Corp., 607 F.2d at 902 n. 42, 203 USPQ at 41 n. 42,*

quoting *Maxon Premix Burner Co. v. Mid-Continental Metal Products Co., 279 F. Supp. 164, 168, 155 USPQ 434, 445 (N.D. Ill. 1967).* (Emphasis in original). Accord Abercrombie & Fitch Co. v.*Baldwin, 245* U.S. 198, 209-10 (1917).

98. Because [*144]  BFG had neither a well-founded belief in the invalidity of the '357 patent, nor a reasonable reliance that its brakes did not infringe the '357 patent, the court believes that intervening rights should not extend beyond the date of reexamination. The court also believes that BFG is not equitably entitled to protection under this doctrine for the performance of contracts entered into prior to the date of reexamination, but not performed until after that, or which are still executory.

99. BFG is not entitled to protection under this equitable doctrine for the AMX, Boeing 747, and Boeing 757 contracts. It is the court's understanding that Goodyear does not seek damages for the C5-B contract in this action, thus the court declines to consider what BFG's rights may be under the doctrine concerning that contract.

100. Goodyear does not seek an injunction against further infringement. It seeks a reasonable royalty from the date suit was instituted until expiration of the patent on March 21, 1989. Recovery of a reasonable royalty for this time is appropriate here, particularly where, as here, BFG has acknowledged that it will continue to benefit from its infringement for a lengthy period.  [*145]

101. Claims 4, 22, and 25 of the '357 patent are valid and enforceable. BFG has willfully infringed the patent, and because of the egregious nature of that willful infringement, BFG is precluded from asserting its estoppel defense against Goodyear. A hearing shall be held to determine a reasonable royalty for BFG's infringement. The royalty shall apply to manufacture, use and sale of infringing aircraft carbon disc brakes from the date of suit through March 21, 1989. Increased damages will not be awarded, nor will attorney fees.

ORDER - January 30, 1989, Filed

Pursuant to *Fed. R. Civ. P. 52(a)*, the Court hereby makes and adopts the attached Findings of Fact and Conclusions of Law in the above-referenced matter.

It is so ORDERED and DECREED this 27 day of January, 1989.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Redacted Public Version of The Appendix to Crown's Reply Memorandum In Support Of Its Motion has been served on this the 9th day of March 2007, in accordance with the Federal Rules of Civil Procedure, on the following in the manner indicated below:

### VIA E-MAIL AND FEDERAL EXPRESS:

Gerald C. Willis, Esq.
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL  60601

Anne Shea Gaza, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

*Attorneys for Defendant Rexam
Beverage Can Co.*

Dated: March 9, 2007

  /s/ Barry Klayman
Barry M. Klayman, Esquire (ID # 3676)
Wolf, Block, Schorr and
Solis-Cohen LLP
Wilmington Trust Center
1100 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 777-0313

Attorney for Plaintiffs
Crown Packaging Technology, Inc. and
Crown Cork & Seal USA, Inc.