## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Crown Packaging Technology, Inc. and Crown
Cork and Seal USA, Inc.,

        Plaintiff/Counter Defendant,

      v.

Rexam Beverage Can Company,

        Defendant/Counterclaimant.

C. A. No. 05-608 (MPT)

REDACTED – PUBLIC VERSION

---

## REXAM BEVERAGE CAN COMPANY'S REPLY TO
## CROWN'S OPPOSITION TO REXAM'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## THAT THE 826 AND 875 PATENTS ARE INVALID

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: March 2, 2007

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
   *Attorneys for Rexam Beverage Can Co.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES............................................................................................................ iii

I.        Crown's "Statement of Facts"....................................................................................1

II.       Reply to Crown's Argument ....................................................................................10

          A.      "Rexam Bears a Heavy Burden of Proving Invalidity On Summary Judgment"............10

          B.      "Genuine Issues of Material Fact Preclude Summary Judgment that Claim 13 is
                  Anticipated by the '323 Reference"......................................................................11

                  1.      "Rexam Has Failed To Show The '323 Reference Seaming Chuck
                          Element Of The Claim" ................................................................................12

                  2.      "Rexam Has Failed To Show That The '323 Reference Satisfies The
                          First Point, Second Point And 30 To 60 Degree Elements" ...............................12

                  3.      "Rexam Has Failed To Show That The '323 Reference Satisfies The
                          'Bent Upwardly' Element" ............................................................................12

          C.      "Rexam's Motion Regarding Anticipation of Claim 14 By The 323 Reference Should
                  Be Denied"......................................................................................................12

                  1.      "Genuine Issues Of Material Fact Preclude Summary Judgment That
                          Claim 14 Is Anticipated By The '323 Reference" .............................................12

                  2.      "In Any Event, Rexam Has Failed To Make Even A Prima Facie
                          Showing That Claim 14 Is Anticipated By The 323 Reference" .........................13

          D.      "Rexam's Motion Regarding Anticipation Of Claim 32 By The 323 Reference
                  Should Be Denied"............................................................................................13

                  1.      "Genuine Issues of Material Fact Preclude Summary Judgment That
                          Claim 32 Is Anticipated By The 323 Patent"...................................................13

                  2.      "In Any Event, Rexam Has Failed to Make Even a Prima Facie Showing
                          That Claim 32 is Expressly or Inherently Anticipated By the 323
                          Reference"..................................................................................................13

          E.      "Rexam's Motion Regarding Anticipation Of Claims 33-34 And 50-52 By The 323
                  Reference Should Be Denied".............................................................................14

          F.      "Rexam's Motion Regarding Anticipation Of Claims 32, 50 And 51 By The
                  Purported Dynamic III Seaming Method Must Be Denied" ..............................14

i

G.   "Rexam's Motion Regarding Obviousness Must Be Denied Not Only Because Rexam Has Failed To Establish A Prima Facie Case But Also Because Genuine Issues Of Material Fact Preclude Summary Judgment" ................................................ 14

    1.   "Rexam Has Failed To Make Even A Prima Facie Showing Of Obviousness And Genuine Issues Of Material Fact Would Preclude Summary Judgment In Any Event" ................................................................ 14

H.   Rexam Has Established That The Written Description Of Crown's Patents Does Not Adequately Support Claims Covering A Can End Without An Annular Reinforcing Bead ................................................................................................................. 15

I.   Rexam Has Established That The Claims Of The '875 And '826 Patents Are Indefinite ............................................................................................................. 18

III.   CONCLUSION ................................................................................................................. 20

RLF1-3122144-1

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Syntron Bioresearch, Inc.,*
   334 F.3d 1343 (Fed. Cir. 2003)...................................................................................................2

*Advo, Inc. v. Philadelphia Newspapers, Inc.,*
   51 F.3d 1191 (3d Cir. 1995)..................................................................................3, 4, 12, 14

*Chiron Corp. v. Genentech, Inc.,*
   363 F.3d 1247 (Fed. Cir. 2004)..........................................................................................2, 10

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.,*
   401 F.3d 1367 (Fed. Cir. 2005).........................................................................................18, 19

*In re Cruciferous Sprout Litigation,*
   301 F.3d 1343 (Fed. Cir. 2002)...........................................................................................11

*Iron Grip Barbell Co. v. USA Sports, Inc ,*
   392 F.3d 1317 (Fed. Cir. 2004)...........................................................................................11

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999).............................................................................................................1

*LizardTech, Inc. v. Earth Res. Mapping, Inc.,*
   424 F.3d 1336 (Fed. Cir. 2005)...........................................................................................11

*Lockwood v. American Airlines, Inc.,*
   107 F.3d 1565 (Fed. Cir. 1997)...........................................................................................11

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,*
   7 F.3d 1571 (Fed. Cir. 1993)...............................................................................................16

*Novo Indus., L.P. v. Micro Molds Corp.,*
   350 F.3d 1348 (Fed. Cir. 2003)...........................................................................................19

*Ruiz v. A.B. Chance Co.,*
   234 F.3d 654 (Fed. Cir. 2000).............................................................................................15

*Sand Technologies, Ltd. v. Resco Metal & Plastics Corp.,*
   264 F.3d 1344 (Fed. Cir. 2001)...........................................................................................11

*Schering Corp. v. Geneva Pharms., Inc.,*
   339 F.3d 1373 (Fed. Cir. 2003)......................................................................................10, 11

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
   247 F.3d 1316 (Fed. Cir. 2001)...........................................................................................11

*Tronzo v. Biomet, Inc.,*
   156 F.3d 1154 (Fed. Cir. 1998)..................................................................................16, 17, 18

*University of Rochester v. G.D. Searle & Co.,*
   358 F.3d 916 (Fed. Cir. 2004).............................................................................................11

*Vas-Cath Inc. v. Mahurkar,*
  935 F.2d 1555 (Fed. Cir. 1991)..........................................................................................16

*Yarway Corp. v. Eur-Control USA, Inc.,*
  775 F.2d 268 (Fed. Cir. 1985)............................................................................................7

**Statutes**

35 U.S.C. § 102 ........................................................................................................11

35 U.S.C. § 112 ..............................................................................................11, 16, 18, 19

35 U.S.C. § 282 ........................................................................................................16

**Rules**

Fed. R. Evid. 702........................................................................................................1

RLF1-3122144-1

Crown's "Memorandum In Opposition To Rexam's Motion For Partial Summary Judgment That The 826 And 875 Patents Are Invalid" ("Crown Brief") is rife with misstatements and critical omissions. What Crown claims are "disputed facts" are either not disputed at all or are immaterial to a proper invalidity analysis. Rather than restate Crown's alleged "disputed facts," Rexam will address Crown's allegations by number.

## I.    CROWN'S "STATEMENT OF FACTS"

1.    Rexam does not dispute that it alleges that Claims 13 and 14 of the '826 Patent are anticipated by the '323 Reference. The record shows conclusively, based on the general can end seaming principles annunciated by Crown's very own

Redacted

and Rexam's expert Mr. Gillest, that the '323 Reference anticipates Claims 13 and 14 of the '826 Patent. Moreover, Crown relies exclusively on the Rebuttal Expert Report of Mr. Higham to create this "dispute." Yet, Mr. Higham testified: "I'm not an expert in seaming." (B2, Higham Dep. at 481.)[1] His opinion directly relates to general and specific seaming principles. As a non-expert in the relevant subject matter, Mr. Higham's Rebuttal Report cannot create a genuine issue of material fact.[2] As such, there are no disputed facts.

2.    Rexam does not dispute that it alleges that Claims 32-34 and 50-52 of the '875 Patent are anticipated by the '323 Reference. The record shows conclusively, based on the general can end seaming principles annunciated by Crown's   Redacted   and Rexam's expert Mr. Gillest, that the '323 Reference anticipates Claims 32-34 and 50-52 of the '875 Patent. Moreover, Crown relies exclusively on the Rebuttal Expert Report of Mr. Higham to create this "dispute." Yet, he testified that he is not an expert in seaming. (B2, Higham Dep. at 481.)[3] His opinion directly relates to general and specific

---

[1] After recognizing the damaging nature of his testimony, Crown attempted to put the toothpaste back in the tube by changing his clear admission to "I am not 'a detailed' expert in seaming 'but I have a thorough knowledge of beverage seaming technology" in the errata sheet for his deposition. (B6, *Higham Errata Sheet.*)

[2] Federal Rule of Evidence 702 obligates judges to ensure that all expert testimony is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Specifically, Rule 702 provides that an expert must be qualified by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. In this case, Crown's expert himself acknowledges that he is not an expert in the field of seaming.

[3] *See* Fn 1, *Supra.*

seaming principles. As a non-expert in the relevant subject matter, Mr. Higham's Rebuttal Report cannot create a genuine issue of material fact. As such, there is no disputed fact.

3.      Rexam does not dispute that it has alleged that the Dynamic III seaming method anticipates Claims 32, 50 and 51 of the '875 Patent. Crown relies exclusively on the Rebuttal Expert Report of Mr. Higham to support their statement that there is a "dispute." As a self-proclaimed non-expert in the relevant subject matter, Mr. Higham's Rebuttal Report cannot create a genuine issue of material fact. See Fn 2. As such, there is no disputed fact.

4.      Rexam does not dispute that it asserts that claims from the '826 Patent are obvious in light of, among other things, "the various pieces of prior art" cited to the examiner. The examiner is presumed to have considered "the various pieces of prior art" cited in the '826 Patent. Crown purposely stated this fact out of context, focusing only on the fact that the examiner reviewed the "cited" prior art. What Crown fails to mention is the fact that the examiner did not consider other prior art relied on by Rexam, namely (1) the Dynamic III can end and method of seaming it and (2) the Miller Brewing Company video related to seaming.

With respect to the cited prior art, the "presumption of validity remains the same whether or not the art relied upon at trial was before the examiner." *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1357 (Fed. Cir. 2003). "The presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against the challenger's evidence." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258-59 (Fed. Cir. 2004). In other words, Crown's misleading assertion does not constitute a genuine issue of material fact.

5.      Rexam does not dispute that it has asserted a defense of invalidity due to obviousness related to Claims 32-34 and 50-52 of the '875 Patent. However, Crown's statement reflects only a portion of Rexam's obviousness argument.

Again, Rexam agrees that the examiner is presumed to have considered prior art that the patent applicant submitted. However, the patent applicant did not cite, and the examiner did not consider, the Dynamic III can end or method of seaming. Nor did the examiner consider the Miller Brewing Company seaming video. Crown's misleading assertion does not constitute a genuine issue of material fact.

2

6.    Contrary to Crown's assertion, Rexam's statement that the '323 Reference "clearly provides the motivation to modify" is not, as Crown suggests, limited to the pieces of prior art "described in the 826 patent itself." (D.I. 264, Crown's Opposition, at 4.) To the contrary, Rexam states that those "are just the cited pieces of prior art. . . . [T]he Dynamic III can end . . . also had a can end wall with angles of greater than 20 degrees." (D.I. 210, Rexam Br., at 31.) Also, the declarations from the '826 Patent's file history do not contradict the clear motivation provided by the '323 Reference that (1) altering the angle of a can end's wall to angles between 20° and 70° (2) reduces the size of the central panel, thereby (3) increasing the strength of the can end and, (4) decreasing metal usage. Crown's misstatement does not constitute a "disputed fact."

7.    Rexam does not dispute that can end manufacturers have made can ends lighter and lighter over the years.

8.    Rexam does not dispute that can lightweighting had been generally made by "necking down" the can body and reducing the overall diameter of the can end. Other methods that were used prior to Crown's introduction of SuperEnd involved changing the geometry of the can ends, by using techniques such as "coining," by narrowing the countersink (as taught in many of the cited references) or by changing the angle of the countersink and end wall (as taught by the Kraska '843 Reference). Because Rexam agrees that "necking down" is one way of saving metal and that "necking down" involved high capital costs, this does not constitute a "disputed fact."

9.    Rexam does not dispute that "can diameter reduction" is a relatively expensive undertaking.

Depending on the definition of "conventional can ends," Rexam disputes Crown's contention that such ends remained "virtually unchanged."                    Redacted

                    National Can Company's Dynamic III can end provides still more indisputable evidence that can ends were made with a geometry that was far from "unchanged." In other words, the statement that "conventional can ends remained virtually unchanged for 20 years" is incorrect and unsupported by the evidence. "[E]xpert testimony without such a factual foundation cannot defeat a motion for summary judgment." *Advo, Inc. v. Philadelphia Newspapers, Inc.,*

3

51 F.3d 1191, 1198 (3d Cir. 1995).  In other words, Crown's unsupportable assertion does not constitute a "genuine issue of material fact."

10.    Crown cites the testimony of Rexam's    Redacted    for the proposition that the industry had no reason to change designs.  Contrary to Crown's unsupported assertion that "there was no great incentive to change equipment or introduce radically different products to the market," (D.I. 264 at 5),

Redacted

(B10, *Turner Dep.* at 158;18-159;7.)  Mr. Higham's conclusion regarding the "incentive to change equipment" is based on the demonstrably false assumption that "can ends remained virtually unchanged for 20 years" and is not a disputed fact.  (B13-14, *Higham Rebuttal Report,* paragraph 174.)

11.    Rexam does not dispute that the SuperEnd uses about 10% less metal than conventional ends.  The assertion that SuperEnd "exceed[s] industry pressure performance requirements" is demonstrably false.    Redacted

(D.I. 210, Rexam Br., at 33.)  Rexam does not dispute that a conversion to SuperEnd would require less capital investment than would a change in can end diameter.  Rexam does not dispute that the capital cost to convert to SuperEnd is limited to changing comparatively inexpensive seaming tooling, but notes for the record that this cost alone pales in comparison to the loss of business accompanying a conversion to SuperEnd.

12.    Rexam does not dispute that the major companies in the industry were in the process of moving toward using 202 diameter can ends in the late 1990's.

13.    Though Rexam is not fully aware of the diameter-reduction capabilities of its competitors as of the late 1990's, Rexam does not dispute Crown's assertion that the technology for smaller diameter ends (i.e., smaller than 202) did not exist yet.  Rexam does not dispute than Anheuser-Busch was technologically capable of switching its 204 diameter ends to 202 diameter ends.

4

14.    Rexam is unaware of the motivation of brewers to not switch from 204 to 202 can ends. That said, Rexam does not dispute that all can fillers prefer to get the most metal-savings (assuming performance is not an issue) for the lowest capital investment possible.

15.    Rexam does not agree that "Crown's competitors were content with the status quo and supplied undifferentiated commodity products." (D.I. 264 at 5.) As a matter of fact, the document and testimony that Crown cites as support actually state that competitors are

                                Redacted                    : Trimming costs with metal-

savings hardly demonstrates contentment with the status quo. Rexam does not dispute that it would not characterize its changes to the B64 end geometry as radical. However, the subtle changes such as "coining" and adjustments to the countersink area and central panel enabled the use of thinner-gauge metal (i.e., the subtle changes saved metal). Rexam does not dispute that these changes "provide[d] incremental metal savings."

16.    Rexam does not dispute that                    Redacted

                            (D.I. 264 at 6.) Rexam also does not dispute that it could choose to respond in one of several ways, some of which Crown lists.

17.    Rexam does not dispute that Crown "offered to license each of its three major competitors . . . ." Crown's statement that its three competitors "entered into agreements with one another designed to stop or slow the commercialization of Crown's SuperEnd" is demonstrably false. Rexam, as a responsible company, reviews, tests and analyzes any potential new products before licensing or launching the new product. Rexam's research does not constitute an attempt to "stop or slow the commercialization of Crown's SuperEnd," but rather constitutes an effort to find or develop a competitive product. Crown's baseless assertion cannot create a genuine issue of material fact.

18.    Rexam does not dispute that Anheuser Busch currently sells the LOF+ can end, indicating that it was unsatisfied with the Lid of the Future (LOF) can end. Rexam also does not dispute Crown's assertion that Ball developed a can end that did not meet Anheuser Busch's technical requirements. This is not uncommon. Crown should know.                    Redacted                    Even though

Anheuser Busch took a license to avoid further litigation with Crown, Anheuser Busch still insists on

                                5

manufacturing its own can end, the LOF+, indicating that Anheuser Busch has problems with the SuperEnd as well.

19.     Rexam does not dispute Crown's assertion that MCC and Ball "jointly develop[ed] a lightweight alternative to the SuperEnd" that is currently sold by Anheuser Busch.   Crown's characterization of Ball and MCC's earlier efforts as "failures" is more inflammatory than is warranted. Some companies set their own performance bar higher than others, which is not an indication of failure, while others launch products that are deemed to be of poor quality or even unsafe to their major customers or potential licensees. Rexam does not dispute that Anheuser Busch currently uses its LOF+ can ends in 204 and 202 diameters.

20.     Crown's assertion that "Crown prevailed in the Federal Circuit against MCC and Anheuser Busch" is partially correct. The District Court granted summary judgment of noninfringement to MCC and Anheuser Busch. The Federal Circuit overruled the grant of summary judgment on a narrow issue of claim construction related to whether Crown's claims only cover straight can end walls. The District Court never ruled on the issue of the patent's invalidity (or infringement) because Crown offered Anheuser Busch and MCC                    Redacted                    :                    Crown made this offer on the eve of trial, indicating its fear of losing again.  Crown says "both were forced to take a license under Crown's patents." MCC is a subsidiary of Anheuser Busch. Neither was "forced to take a license," but rather they accepted a settlement to avoid further litigation. As stated earlier, MCC and Anheuser Busch use LOF+ ends because, like the other competitors and many customers, they deemed the SuperEnd to be an inferior can end. MCC and Anheuser Busch simply chose to eliminate any risk of losing the right to manufacture its end and being forced to use the inferior and, according to some,
        Redacted                    . .

21.     Rexam does not dispute that Container Development Ltd. developed another "alternative lightweight end" to compete with the other lightweight ends.  Rexam has no basis for concluding that it was "modeled on the SuperEnd." (D.I. 264 at 7.)  Being in litigation with Ball, Crown may have evidence of the modeling "on SuperEnd" to which Rexam is not privy.

22.     Crown's assertion that Rexam "began its copying efforts relatively late in the game" is categorically false.                    Redacted

6

Redacted                          Rexam's extensive research and development and unique design

are evidence that, far from "copying," Rexam painstakingly designed a noninfringing (and better)

alternative to Crown's SuperEnd. As the Federal Circuit has stated: "One of the benefits of a patent

system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are

patented, thus bringing a steady flow of innovation to the marketplace." *Yarway Corp. v. Eur-Control

USA, Inc.*, 775 F.2d 268, 277 (Fed. Cir. 1985). Rexam's Rexam End is exactly that type of innovative

"design around" envisioned by the writers of the patent laws.

Redacted

(to other companies' new ends and even to competitors' old technology B64

ends) as a result of inferior technology. Rexam would not and did not copy a can end (SuperEnd) that

Redacted

The testimony cited by Crown also suggests that Rexam would have been happy with Crown's

SuperEnd becoming the industry standard if that was what customers wanted.

Redacted                          (D.I. 210, Rexam Br., at 32-33.)

Redacted

Rexam does not dispute the fact that

(not taking into account the cost of conversion, the

cost of problems due to use of an inferior product, or the cost of losing enormous market share as Crown

did after conversion).

Having produced no evidence whatsoever that would suggest that Rexam copied Crown's

technology or that the early metal-savings projections have any bearing on the value of SuperEnd,

Crown's assertion is unsupportable and cannot constitute a genuine issue of material fact.

Redacted

(B9, *Turner* at 47;20-48;7.) Crown

7

Redacted

launches products (like SuperEnd)

Crown's inexplicable hypocrisy cannot constitute a genuine

issue of material fact.

    23.    Rexam does not dispute that Rexam focused its efforts on Rexam End after       Redacted

Rexam does not dispute that it filed an opposition challenging Crown's

SuperEnd patents in Europe based, in part, on the 323 reference. As Crown is well aware, the European

Opposition resulted in the narrowing of Crown's claims to cover can ends with end walls inclined at

between 40°-60° (as opposed to 30°-60° or even 20°-60°). Yes, Crown's patent was "granted

notwithstanding that challenge," but was narrowed to a point that even Crown's expert would not say

covers Rexam's product. Mr. Higham claims that the end walls on the Rexam end are inclined at an

angle of 33° (obviously not covered by the 40°-60° scope of the European patent).

    24.    Rexam does not dispute that Crown has entered into license agreements with

Redacted               Crown's

characterization of the licenses as "SuperEnd" licenses is misleading. The evidence establishes that, of

the purported "SuperEnd licensees,"

Redacted

Of course, Crown used its own technology. Finally, Crown has presented no

evidence suggesting that       has had a successful implementation of SuperEnd.

    The record, and the fact that      Redacted      share since introducing SuperEnd,

does not prove "tremendous success[]" as Crown suggests, but rather it clearly establishes that the product

is inferior to other competitive products (like LOF+ or even the older B64 end technology). Even though

Crown has sold a great deal of SuperEnds, Crown's Chairman explained that

Redacted

(D.I. 210 at 32.) If SuperEnd had performed as Crown originally suggested it would, Crown

8

would not have its own licensees and customers

Redacted

Crown's unsubstantiated

assertion about the success of SuperEnd does not constitute a genuine issue of material fact.

25.    Crown's suggestion that Anheuser Busch and MCC "unsuccessfully challenged Crown's patents in the Western District of Wisconsin in 2003" is incorrect. Anheuser Busch and MCC actually prevailed at summary judgment before the Federal Circuit remanded the case on a narrow claim construction ground. If Anheuser Busch and MCC's challenge was, as Crown suggests, unsuccessful, then why would Crown have accepted a

Redacted

Crown knew that its

patents were invalid and possibly not infringed by Anheuser Busch's LOF+ product, so they ended the litigation early to keep their hopelessly invalid patents alive. Rexam does not dispute that Anheuser Busch and MCC did not have the chance to invalidate Crown's patent at trial.

26.    Rexam does not dispute Crown's "80 billion can ends" number, but it is unclear what percentage of these can ends are not actually SuperEnds. Mr. Mechura admitted that Crown includes LOF+ sales by Anheuser Busch and MCC when boasting of the total number of "SuperEnds" sold. Rexam also does not dispute Crown's assertion that it

Redacted

Rexam also

does not dispute that SuperEnds have been sold to customers listed by Crown. Interestingly, Crown's

Redacted                    (D.I. 210 at 32-33.)

27.

Crown applied for patent protection of this idea and then abandoned the patent application. Tellingly, Crown's application did not claim any relationship (i.e. continuation, continuation-in-part, divisional application) to the patents described as SuperEnd patents (including the '875 and '826 patents in suit). In other words, Crown thought the DA (double angle) idea was a separate and new invention worthy of its own patent protection. Crown then halted the use of the

9

double angle in the marketplace, going so far as to disparage the use of a double angle or "stepped approach."

Redacted

Crown thought the double angle idea was new in 1999, then abandoned the application and disparaged the idea to customers because of poor performance. Now that its SuperEnd customers are demanding a radical change to the SuperEnd because of poor performance, Crown would like to call its new double-angled can end a "SuperEnd."

Redacted

28.    Rexam does not dispute Crown's assertion that Rexam has charged that Claim 13 of the '826 Patent and Claims 32-34 of the '875 Patent are invalid due to a failure to comply with the written description requirement. Rexam also does not dispute that a patent examiner is required to "thorough[ly] read[] . . . an application" to insure compliance with the written description requirement. Rexam admits that Crown has patent claims that are presumed to be valid. "The presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against the challenger's evidence." *Chiron Corp.*, 363 F.3d at 1258-59.

29.    Rexam does not dispute Crown's assertion that Rexam has charged that all of the asserted claims of the '826 and '875 patent are invalid due to indefiniteness. Rexam also does not dispute that a patent examiner is required to determine "whether the claim meets the threshold requirements of clarity and precision." Rexam admits that Crown has patent claims that are presumed to be valid. "The presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against the challenger's evidence." *Id.*

## II.    REPLY TO CROWN'S ARGUMENT

### A.    "Rexam Bears a Heavy Burden of Proving Invalidity On Summary Judgment"

Rexam is aware that it carries the burden of proving invalidity. That said, summary judgment of patent invalidity is frequently granted and affirmed by the Federal Circuit. *Schering Corp. v. Geneva*

10

*Pharms., Inc.*, 339 F.3d 1373 (Fed. Cir. 2003) (affirming summary judgment that the patent-in-suit was invalid under 35 U.S.C. § 102 as anticipated by prior art); *In re Cruciferous Sprout Litigation*, 301 F.3d 1343 (Fed. Cir. 2002) (affirming summary judgment that the patent-in-suit was invalid due to anticipation); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001) (affirming summary judgment of invalidity due to anticipation and explaining that "although anticipation is a question of fact, it still may be decided on summary judgment. . ."); *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997) (invalidating patent for anticipation and obviousness); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004) (affirming summary judgment of invalidity due to obviousness); *Sand Technologies, Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1356-1357 (Fed. Cir. 2001) (affirming summary judgment of anticipation and obviousness); *University of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 917 (Fed. Cir. 2004) (affirming summary judgment of invalidity for failure to comply with the written description requirement); *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346-1347 (Fed. Cir. 2005) (affirming summary judgment of invalidity due to a failure to comply with the written description and enablement requirements of 35 U.S.C. § 112). Despite the fact that Rexam carries the burden, summary judgment is entirely appropriate given the failure of Crown to raise any genuine issues of material fact.

**B.    "Genuine Issues of Material Fact Preclude Summary Judgment that Claim 13 is Anticipated by the '323 Reference"**

Crown's characterization of the '323 Reference during the prosecution of the patents-in-suit consisted of misrepresentations about the behavior of can ends during the seaming process. Mr. Higham, who admitted that he is "not an expert in seaming,"[4] made the unsupportable declaration to the Patent and Trademark Office related to the '323 Reference. (B86-106, Higham Declaration.) His statement, related to the nature of the seaming process of can ends, was relied upon by the patent examiner in granting the claims. When questioned about the nature of the seaming process during his deposition, Mr. Higham admitted that he was not qualified to make such judgments. In other words, Crown's arguments to the Patent and Trademark Office (supported by a Declaration by Martin Higham) were based on the same lack of understanding admitted to by Mr. Higham. Crown's purported "additional record evidence" is the

---

[4] *See* Fn 1, *Supra.*

11

Expert Rebuttal of Mr. Higham. "[E]xpert testimony without . . . a factual foundation cannot defeat a motion for summary judgment." *Advo, Inc.*, 51 F.3d at 1198.

### 1.   "Rexam Has Failed To Show The '323 Reference Seaming Chuck Element Of The Claim"

Contrary to Crown's argument, Rexam offered a great deal of evidence supporting its position that seaming chuck shapes are related to the shape of a seamed can end. In order to make it clear that no genuine issue of material fact exists related to the seaming principles, Rexam relied, not only on the testimony of its own expert witness, but also on documents and testimony from Crown employees Brian Fields and Pete Moran, and Crown's "expert" Martin Higham. (D.I. 210 at 12-13, 17-18, 21-23, 26.) Rexam's arguments are supported by the documents and the testimony of both Rexam and Crown witnesses.

### 2.   "Rexam Has Failed To Show That The '323 Reference Satisfies The First Point, Second Point And 30 To 60 Degree Elements"

Crown's argument fails because Rexam's position is clear that one can find the "first point" after seaming. The second point is the lowermost point on the can end wall. The '323 Reference illustrates a seamed can end in Figure 4. (D.I. 210 at 31.) The lower wall of the illustrated can end is described as inclined at 45°. The lower wall is straight, indicating that the angle would not change depending on where the upper or lower points were drawn. Rexam's Brief clearly describes how the '323 Reference meets all of the aforementioned elements.

### 3.   "Rexam Has Failed To Show That The '323 Reference Satisfies The 'Bent Upwardly' Element"

Rexam did address the '323 Reference's clear teaching of the "Bent Upwardly" limitation, contrary to Crown's assertion. As Rexam's brief explains in detail, the upper portion of the unseamed can end of the '323 Reference is inclined at 45°. After seaming, the upper portion is inclined to an almost vertical position. Crown's argument has no merit.

### C.   "Rexam's Motion Regarding Anticipation of Claim 14 By The 323 Reference Should Be Denied"

### 1.   "Genuine Issues Of Material Fact Preclude Summary Judgment That Claim 14 Is Anticipated By The '323 Reference"

Crown's argument that the '323 Reference fails to disclose an "annular reinforcing bead" is a textbook case of a patentee wanting his patent to be construed both broadly so that competitors infringe

and narrowly so as to avoid anticipatory prior art. Crown's own claim construction suggests that an "annular reinforcing bead" is a "ring-like stiffening channel." (D.I. 173, A1-14, Joint Statement.) Rexam's Brief explains why the '323 Reference discloses such a feature under Crown's claim construction or under Rexam's proposed construction.

> **2.** **"In Any Event, Rexam Has Failed To Make Even A Prima Facie Showing That Claim 14 Is Anticipated By The 323 Reference"**

Rexam only learned that Crown was asserting Claim 14 after expert reports were due. Crown's attorney stated that he was aware of Rexam's position on the annular reinforcing bead because of Rexam's discussion about the annular reinforcing bead from Claim 50 of the '875 Patent.[5] Mr. Gillest addressed the '323 Reference's teaching of an annular reinforcing bead with respect to other claims asserted by Crown (such as Claims 50-52 of the '875 Patent). Rexam's Brief describes the reinforcing bead issue in detail and why the '323 Reference includes such a feature.

> **D.** **"Rexam's Motion Regarding Anticipation Of Claim 32 By The 323 Reference Should Be Denied"**
>
> > **1.** **"Genuine Issues of Material Fact Preclude Summary Judgment That Claim 32 Is Anticipated By The 323 Patent"**

No genuine issue of material fact exists regarding Claim 32's invalidity in light of the '323 Reference. *See* ¶ 2, *(Supra) and* Rexam's Brief (D.I. 210). Crown's arguments to the contrary are unsupportable by the evidence in the case, including the testimony of multiple Crown employees deemed to be knowledgeable in this area. As such, summary judgment of invalidity of Claim 32 of the '875 Patent is appropriate.

> > **2.** **"In Any Event, Rexam Has Failed to Make Even a Prima Facie Showing That Claim 32 is Expressly or Inherently Anticipated By the 323 Reference"**

Crown's arguments are unsupported. Rexam presented clear and convincing evidence that demonstrates why the '323 Reference discloses each and every limitation of Claim 32 of the '875 Patent. Crown's assertion regarding "Rexam's Four Possible Unseamed End Designs for the '323 Reference" does not in any way damage Rexam's argument. The fact that embodiments could have existed that may not anticipate Crown's claim does not address the fact that a specific embodiment is described that was

---

[5] "I understand your position on the r.b. [reinforcing bead] from claim 50 . . . ." (B75, *Jan. 4, 2007 Email from Chad Ziegler to Jerry Willis.*)

13

necessarily seamed according to the method of Claim 32. Crown's misstatement that Rexam offered no support for its argument cannot serve as the basis for creating a genuine issue of material fact.

E.    **"Rexam's Motion Regarding Anticipation Of Claims 33-34 And 50-52 By The 323 Reference Should Be Denied"**

Crown relies on Mr. Higham's unsupportable assertions and the fact that the patent claims were granted by the Patent and Trademark Office in concluding that Rexam's motion should be denied. "[E]xpert testimony without . . . a factual foundation cannot defeat a motion for summary judgment." *Advo, Inc.,* 51 F.3d at 1198. In other words, Crown's unsupportable assertion does not constitute a genuine issue of material fact, and Rexam's motion should be granted.

F.    **"Rexam's Motion Regarding Anticipation Of Claims 32, 50 And 51 By The Purported Dynamic III Seaming Method Must Be Denied"**

Contrary to Crown's arguments, Rexam did corroborate its evidence of the seaming of the Dynamic III can end in the form of engineering drawings, seamed and unseamed can ends, pictures of seamed and unseamed can ends, sales documents that establish the sale of the product and a Declaration from a former employee of the manufacturer who has actual knowledge of the method of seaming Dynamic III. (D.I. 210, Rexam Br., at 28-30.) Rexam's Brief describes limitation by limitation why the Dynamic III seaming method of National Can Company anticipates Claims 32, 50 and 51 of the '875 Patent. Crown cannot simply bury its head in the sand and ignore what it refers to as a "purported . . . seaming" method.

G.    **"Rexam's Motion Regarding Obviousness Must Be Denied Not Only Because Rexam Has Failed To Establish A Prima Facie Case But Also Because Genuine Issues Of Material Fact Preclude Summary Judgment"**

1.    **"Rexam Has Failed To Make Even A Prima Facie Showing Of Obviousness And Genuine Issues Of Material Fact Would Preclude Summary Judgment In Any Event"**

Crown incorrectly states that Rexam did not consider the question of obviousness on a "claim by claim basis." Rexam did exactly that. Pages 30 through 35 of Rexam's brief deal with Crown's invalid claims individually. Rexam explicitly incorporated its obviousness arguments related to Claim 32 into its arguments related to Claims 33-34 and 50-52 of the '875 Patent. Crown also incorrectly states that "Rexam has presented insufficient evidence regarding the scope and content of the prior art." (D.I. 264, Crown Opp., at 30.) This is Crown's way of saying that Rexam presented evidence that Crown does not

14

like. Rexam described in detail the scope and content of the prior art, including both cited and uncited art. (D.I. 210, Rexam Br., at 30-35.)

Crown also incorrectly states that Rexam offered "no evidence whatsoever on [the level of one of ordinary skill in the art]." (D.I. 264 at 31.) Crown cites to the *Ruiz* case to support its contention. The case actually states:

> <u>Factors that may be considered</u> in determining the ordinary level of skill in the art include: 1) the types of problems encountered in the art; 2) the prior art solutions to those problems; 3) the rapidity with which innovations are made; 4) the sophistication of the technology; and 5) the educational level of active workers in the field.

*Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666-667 (Fed. Cir. 2000)(emphasis added). Rexam's brief (D.I. 210) describes in detail (1) the types of problems encountered in the art (*See* discussion of the desire for greater strength and metal-savings at 30-32); (2) the prior art solutions to those problems (*See* discussion of the state of the prior art at 30-32); and (3) the sophistication of the technology (*See* discussion of the "simple concept taught" by the prior art at 31). Moreover, Crown's expert and Rexam's expert had very similar definitions of the level of one of ordinary skill in the art. (D.I. 207, A105-133; D.I. 264, Ex. 3, Tab A.) As such, no genuine issue of material fact exists that would preclude summary judgment.

Crown incorrectly states that "Rexam has presented no evidence of the differences between each of the claim elements and each item of prior art upon which it relies." (D.I. 264 at 31.) To the contrary, Rexam presented ample evidence describing the very minimal differences between Crown's claims and the prior art, including an explanation of the motivation to modify prior art that lacked each claim element to include each and every claim element. (D.I. 210 at 30-32.) Crown's statement that "Rexam has failed to provide sufficient evidence showing a motivation to combine the cited references" is absurd, considering the fact that the motivation cited (*i.e.* the '323 Reference's teaching that using end walls between 20°-70° will save metal while increasing strength) precisely mirrors the benefits touted by Crown in the '826 and '875 Patents, as well as in numerous sales and promotional documents. (*Id.*)

### H.    Rexam Has Established That The Written Description Of Crown's Patents Does Not Adequately Support Claims Covering A Can End Without An Annular Reinforcing Bead

Contrary to Crown's assertion, Rexam's summary judgment brief is not the first time that Rexam has raised the written description defense. In Rexam's answer to Crown's second amended complaint, Rexam pled, as an affirmative defense, that Crown's patents were invalid for failure to comply with 35

U.S.C. § 112. (D.I. 17 at 8.) Rexam also served Crown with its expert's report, which included his opinion that the claims of the '875 and '826 patents failed to satisfy the written description requirement. (B84, Gillest Expert Report at 7-8.) Rexam also included a written description argument in its opening claim construction brief. (D.I. 172 at 2-3, opening c.c. brief.)

Rexam acknowledges that the '875 and '826 Patents are entitled to a presumption of validity. 35 U.S.C. § 282. Despite the presumption of validity, the evidence of record (*i.e.*, the specifications of the parent patents, the specifications of the patents-in-suit, the claims and the file histories) establishes that there is no support for the claims that exclude the annular reinforcing bead limitation, as there is no evidence that the inventors were in possession of such an invention at the time the original parent application was filed in 1995. 35 U.S.C. § 112, ¶ 1; *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ("A valid patent requires a written description of the invention that permits persons of ordinary skill in the art to recognize the invention by the written claim."). The written description requirement of § 112 prevents a patentee from narrowly disclosing an invention and then arguing later that the claims cover an invention not described in the patent. *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993).

The Federal Circuit has held that the scope of claims may be limited to a particular structure where the specification makes it clear that the invention is limited to that structure. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998). In *Tronzo*, the Federal Circuit held that the claims in a later filed continuation-in-part application were not entitled to the filing date of the parent patent because the written description of the parent patent only disclosed a specific shape of the invention. *Id.* at 1159 ("There is nothing in the '589 specification to suggest that shapes other than conical are necessarily a part of the disclosure. Indeed, as discussed above, the specification clearly suggests the contrary by asserting the advantages of the conical shape over the prior art."). Thus, the broader more generic claims of the later patent were not entitled to the earlier filing date of the parent application. *Id.*

In this case, the '826 and '875 patents are continuation patents, which claim priority back to May 24, 1995, based upon the GB Patent No. 9510615. Neither the specifications nor the claims of any patent in the family tree of patents prior to the patents-in-suit ever discussed a can end without an outwardly concave generally U-shaped countersink or annular reinforcing bead. In explaining the invention of the

'826 Patent (as well as the '875 and the parent patents), the inventors describe their invention as comprising:

> **an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, . . . and the concave bead narrower than 1.5 mm (0.060").**

(D.I. 173, A37, '826 patent, col. 2, lines 1-11 (emphasis added)). The inventors of the '875 and '826 Patents repeatedly distinguished the shape of the reinforcing bead of their invention from the prior art.

Crown's patents describe and depict a particular embodiment and every contemplated variation of it, as having a generally U-shaped reinforcing bead. (D.I. 173 at A39, 40, '826 patent col. 5 table 2, col. 7 lines 17 – 28, table 6.) As set forth in Rexam's opening brief (D.I. 210 at 35-38) and its claim construction brief (D.I. 172 at 6-8) every prior art reference, every figure and every description of the alleged invention that is discussed in the specifications of Crown's patents has a generally U-shaped reinforcing bead. Crown's patents give specific dimensions of the U-shaped reinforcing bead shown by Figure 4. (D.I. 173 at A38, '826 patent col. 4 lines 4, 5, 6 and 8.) Crown's patents describe the radius at the bottom of the generally U-shaped bead as typically "about .5 mm." (D.I. 173 at A38, '826 patent col. 3 line 50.) Crown's patents also describe that bead as preferably having parallel sides but that the outer wall of the bead can be at an angle of -15° to + 15° to a line perpendicular to the central panel and that the height of the outer side of the U-shaped bead, while preferably 1.78 mm, may be up to 2.5 mm. (D.I. 173 at A38, '826 patent col. 3 lines 51 – 54.) As described by Crown's patents, a can end according to its invention has a bead that is U-shaped with an opening of about 1 mm (.5mm X 2), a height of 1.78 mm to 2.5 mm, and legs that can vary from parallel to each other by 15°. Every variation described by Crown's patent has the generally U-shaped reinforcing bead.

Nothing in the specification of Crown's patents comes remotely close to suggesting that the can end without the type of annular reinforcing bead described in the specification could be within the scope of Crown's invention. Rather, Crown's patents describe the invention as having a bead, which varies from the conventional generally U-shaped bead of the prior art in that it is narrower than what was known in the art. (D.I. 173 at A37, '826 patent col. 1 lines 32 – 34.) Crown's patents establish that the narrower U-shaped bead is a structure of its invention. Thus, the claims of the '875 and '826 Patents, just as in *Tronzo*, are limited to the disclosed shape of the annular reinforcing bead. Therefore, the written

17

description does not support the broader claims of the '826 and '875 Patents that eliminate the "annular reinforcing bead" limitation.

**I.    Rexam Has Established That The Claims Of The '875 And '826 Patents Are Indefinite**

Crown again incorrectly claims that Rexam has raised the defense of indefiniteness for the first time in its motion for summary judgment. To the contrary, Rexam pled that Crown's patents were invalid under 35 U.S.C. § 112. (D.I. 17 at 8.) Rexam also set forth its contention that Crown's patents were indefinite in its answers to Crown's first set of interrogatories (B76-81.)

The test for meeting the statutory requirement that the claim be "definite" is "whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005). Crown's response fails to refute the fact that the claims of the '875 and '826 Patents are hopelessly indefinite.

In this case, the claims that Crown has asserted against Rexam contain limitations that cannot be given any reasonable meaning. Specifically, claim 13 of the '826 Patent refers to first and second wall portions and first and second "points," while the claims of the '875 Patent refer to first and second wall portions and first and second "locations." The first and second "points" and "locations" are critical to the asserted claims because they are to define the points on the can end that are to be used to determine the angle of the second wall portion of the can end in order to determine whether the angle of the second wall portion falls within the range claimed (20° to 60° and/or 30° to 60°) in the asserted claims. However, neither the claims nor the rest of the specification provide any guidance as to where those "points" and "locations" are located on the can end.

Even assuming, *arguendo*, that the first "point" or "location" of Crown's patents could be determined, there is no way to determine where the "second point" or "second location" is located on the can end. Claim 13 describes the second point as "forming a lowermost end of said wall." (D.I. 173 at A41, '826 Patent, Col. 10, lns. 58-59.) There is no written guidance in the specification to tell one of ordinary skill where the "lowermost end" of the wall is located. If one of ordinary skill cannot determine where the second point or second location is located, he or she could not "determine whether a particular [product or method] infringes or not." *Howmedica*, 401 F.3d at 1371 (brackets in original). This is particularly true where moving the "point" or "location" a millimeter or two can significantly change the

18

"angle" of the end wall. These limitations of the asserted claims of the '826 and '875 Patents render the claims "insolubly ambiguous" and they should be held invalid for failing to comply with 35 U.S.C. § 112. *See Novo Indus., L.P. v Micro Molds Corp.*, 350 F.3d 1348, 1353 (Fed. Cir. 2003).

Similarly, Claim 32 of the '875 Patent describes the first wall portion of the can end as: "said first wall portion extending from said seaming panel to a first location on said wall and comprising a radiused portion extending from said seaming panel." (D.I. 173 at A28.) Here again there is no guidance or direction in the claims or the specification to determine where the first wall portion begins and the seaming panel ends. This information is critical because the claim requires that "at least a portion of said first portion of said can end wall is bent upward through an angle of at least about 16 degrees." (D.I. 173 at 28.) There is no guidance as to where to attempt to make this determination or which portion of the wall to measure from, or how far out on the radius of the seaming panel the first wall portion extends. This is information that one of ordinary skill in the art would need in order to "determine whether a particular [product or method] infringes or not." *Howmedica*, 401 F.3d at 1371 (brackets in original).

One need look no farther than the report of Crown's expert to conclude that this limitation is indefinite. Crown's expert desperately attempts to come up with a method to determine where the upper portion of the end wall begins. (D.I. 173 at A165-207, Higham report at A207.) Mr. Higham resorted to drawing various arbitrary circles of differing radii - then drew arbitrary lines within those circles to form his opinions about how many degrees the Rexam End was supposedly reformed during seaming. (D.I. 173 at A207.) The random and arbitrary extremes that Mr. Higham went through to attempt to establish where one determines the point on the "upper wall portion" is located on the Rexam End demonstrates the futility of Crown's ambiguous claims. There is absolutely nothing in the specifications or claims of Crown's patents to support, suggest or teach the method that Mr. Higham used. As such, there is no basis to determine whether Mr. Higham's method was proper. For all of the reasons stated herein, and in Rexam's opening brief, there are no genuine issues of material fact regarding the insolubly ambiguous claims of Crown's patents and Rexam is entitled to judgment as a matter of law.

Crown argues that Rexam's indefiniteness argument is belied by Rexam's own claim construction brief. (D.I. 264 at 38-39, Crown Opp. Brief.)    However, Rexam had no choice but to propose a construction of the disputed terms of the claims. Rexam's proposed constructions of the indefinite

19

limitations discussed above provide some guidance as to where those points or locations may be located, whereas Crown's proposed construction, and the patent for that matter, provide no guidance at all. It would seem that at some point, the wall comes to an end and the countersink begins — but again there is no guidance for determining such a point. (*See* D.I. 210 at 38-39.) Rexam's construction relies on the plain and customary meaning of the disputed terms which imply that the lowest point of the wall should be the point closest to the central panel towards the bottom of the can. However, even under Rexam's construction, it is still not clear as to where that point is actually located, which is due to the hopeless ambiguity of the claim limitation. The same hopeless ambiguity is found in the limitation "said first wall portion extending from said seaming panel ..." as in the limitation discussed above, despite Rexam's best efforts to provide some meaning to those limitations.

## III.    CONCLUSION

For all of the reasons stated herein and in Rexam's opening memorandum, the Court should find that the asserted claims of Crown's patents are invalid, and Rexam respectfully requests that the Court grant Rexam's motion for summary judgment of invalidity.

<table>
<tr>
<td>

Of Counsel:<br>
George P. McAndrews<br>
Steven J. Hampton<br>
Gerald C. Willis<br>
Paul W. McAndrews<br>
McAndrews, Held & Malloy, Ltd.<br>
500 W. Madison Street, Suite 3400<br>
Chicago, IL 60601<br>
<br>
Dated: March 2, 2007

</td>
<td>

*Anne Shea Gaza*<br>
Frederick L. Cottrell, III (#2555)<br>
cottrell@rlf.com<br>
Anne Shea Gaza (#4093)<br>
gaza@rlf.com<br>
Richards, Layton & Finger, P.A.<br>
One Rodney Square<br>
920 North King Street<br>
Wilmington, DE 19801<br>
302-651-7700<br>
*Attorneys for Rexam Beverage Can Co.*

</td>
</tr>
</table>

20

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Barry M. Klayman, Esq.
> Wolf, Block, Schorr
>   and Solis-Cohen LLP
> Wilmington Trust Center
> 1100 North Market
> Street, Suite 1001
> Wilmington, DE   19801

I hereby certify that on March 9, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

> Dale M. Heist, Esq.
> heist@woodcock.com
> Chad E. Ziegler, Esq.
> ziegler@woodcock.com
> Woodcock Washburn LLP
> Cira Centre
> 2929 Arch Street, 12th Floor
> Philadelphia, PA 19104-2891

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700