IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Crown Packaging Technology, Inc. and Crown Cork and Seal USA, Inc.<br><br>Plaintiff/Counter Defendant<br><br>v.<br><br>Rexam Beverage Can Company<br><br>Defendant/Counterclaimant | C. A. No. 05-608 (MPT)<br><br>REDACTED – PUBLIC VERSION |

**APPENDIX IN SUPPORT OF REXAM BEVERAGE CAN COMPANY'S REPLY TO CROWN'S OPPOSITION TO REXAM'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT THE 826 AND 875 PATENTS ARE INVALID**

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
*Attorneys for Defendant/Counterclaimant Rexam Beverage Can Co.*

Of Counsel:
George P. McAndrews
Steven J. Hampton
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60601
312-775-8000

Dated: March 2, 2007

## TABLE OF CONTENTS

1. Martin Higham deposition transcript 1/10/07 .......... B1-3

2. Martin Higham errata sheets and certification sheet .......... B4-7

3. Timothy Turner deposition transcript 8/21/06 .......... B8-11

4. Martin Higham's rebuttal report on validity of '826 and '875 patents .......... B12-15

5. Plaintiff's exhibit number 24 .......... B16-22

6. Defendant's exhibit number 218 .......... B23-28

7. "Nampak" license agreement .......... B29-54

8. PCT application WO98/34743 .......... B55-71

9. Brian Fields deposition transcript 12/12/06 .......... B72-74

10. E-mail from Ziegler to Willis 1/4/07 .......... B75

11. Rexam's Responses to Crown's Interrogatories Nos. 3 & 6 .......... B76-81

12. Edmund Gillest expert report on invalidity of '826 and '875 patents .......... B82-85

13. Higham declaration to the United States Patent and Trademark Office .......... B86-106

14. European Patent Office appeal decision .......... B107-26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

* * *

CROWN PACKAGING TECHNOLOGY, INC., and CROWN CORK & SEAL USA, INC.,
Plaintiffs,
-vs-
REXAM BEVERAGE CAN CO. and REXAM BEVERAGE CAN AMERICAS, INC.,
Defendants.

CIVIL ACTION
NO. 05-608(MPT)

* * *

Wednesday, January 10, 2007

* * *

Continued confidential realtime videotaped expert deposition of MARTIN J. HIGHAM, held in the law offices of WOODCOCK WASHBURN LLP, Cira Centre, 12th Floor, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2891, on Wednesday, January 10, 2007, beginning at 8:19 a.m., before Kimberly A. Cahill, a Registered Professional Reporter and Approved Reporter of the United States District Court.

* * *

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 John F. Kennedy Boulevard, 12th Floor
Philadelphia, PA 19103
(215) 988-9191

seaming? 14:42:32
MR. McANDREWS: Yes. 14:42:36
THE WITNESS: Probably. 14:42:40
BY MR. McANDREWS:
Q. Are you aware of any 14:44:31
problems that might occur in the lower 14:44:32
wall of the seaming chuck if the angle of 14:44:35
the lower wall of the seaming chuck does 14:44:42
not closely approximate the lower end of 14:44:45
the can end? 14:44:50
MR. ZIEGLER: Objection to 14:44:52
the form. 14:44:54
BY MR. McANDREWS:
Q. Would that condition 14:45:06
possibly cause the end to distort or 14:45:07
move? 14:45:11
MR. ZIEGLER: Objection to 14:45:14
form and compound. 14:45:14
MR. McANDREWS: During 14:45:20
seaming? 14:45:21
MR. ZIEGLER: Objection to 14:45:23
form and compound. 14:45:25
THE WITNESS: I'd need to 14:45:32
know the degree. 14:45:33

BY MR. McANDREWS:
Q. Of variance? 14:45:36
A. Yes. 14:45:41
Q. 10 degrees. 14:45:42
A. What's 10 degrees? 14:45:44
Q. Well, you just said the 14:45:46
degree of variance. 14:45:48
A. Is the chuck 10 degrees away 14:45:49
from the end? 14:45:52
Q. Yes. 14:45:53
A. So that the chuck is -- 14:45:53
Q. -- at a given angle from 14:45:58
vertical, and the end is at a -- a given 14:45:59
angle from vertical of greater than 10 14:46:04
degrees farther from vertical than the 14:46:11
chuck. 14:46:14
MR. ZIEGLER: Objection to 14:46:15
form. 14:46:15
THE WITNESS: I don't really 14:46:16
understand the question. 14:46:17
BY MR. McANDREWS:
Q. What was your understanding 14:46:24
of my question when you said it would 14:46:25
depend on the variance? 14:46:27

MR. ZIEGLER: Objection to 14:46:30
form. 14:46:31
BY MR. McANDREWS:
Q. What would depend on the 14:46:32
variance? 14:46:40
MR. ZIEGLER: Same 14:46:40
objection. 14:46:40
THE WITNESS: I'm -- I'm not 14:47:02
an expert in seaming. You're 14:47:03
asking me to hypothesize and I 14:47:06
can't here. I'd need to think 14:47:13
about it and talk to some people 14:47:14
before I could draw a conclusion. 14:47:16
MR. McANDREWS: Okay. 14:47:17
BY MR. McANDREWS:
Q. If you were told that 14:47:35
somebody was going to show you a can that 14:47:36
is to be seamed, what would you think 14:47:39
they meant by that? 14:47:43
Would that -- would -- would 14:47:44
your understanding be that that is a can 14:47:47
that has not yet been seamed or a can 14:47:49
that has already been seamed? 14:47:53
MR. ZIEGLER: Objection to 14:47:56

the form. 14:47:57
THE WITNESS: I've lost the 14:47:58
beginning of your question. Could 14:47:58
you ask it again? 14:48:00
BY MR. McANDREWS:
Q. If I were to tell you, I've 14:48:01
got a 206 end that is to be seamed, would 14:48:02
you think that it was already seamed onto 14:48:10
a can body or that it was not yet seamed 14:48:12
onto a body -- seamed onto a can body? 14:48:15
MR. ZIEGLER: Objection to 14:48:24
form. 14:48:24
THE WITNESS: I'd need to 14:48:27
read the exact context. 14:48:28
BY MR. McANDREWS:
Q. Let's limit it to my 14:48:31
context, where I said, I have a can end 14:48:33
for you that is to be seamed. 14:48:36
MR. ZIEGLER: Objection to 14:48:42
the form. 14:48:43
THE WITNESS: But the 14:48:55
question is -- is, this end is to 14:48:56
be seamed. 14:49:01
MR. McANDREWS: To be 14:49:02

535

ERRATA

| PAGE | LINE | CHANGE |
|---|---|---|
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |

537

CERTIFICATE

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

____________________
Kimberly A. Cahill, RMR, CSR
Dated: January 14, 2007

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

536

ACKNOWLEDGEMENT OF DEPONENT

I, ____________, do hereby certify that I have read the foregoing pages, _______, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

______________________
DATE

Subscribed and sworn to before me this _____ day of _________,
200_.
My commission expires: _________

____________
Notary Public

538

LAWYER'S NOTES

| Page | Line | |
|---|---|---|
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |
| ___ | ___ | ___________ |

13-02-2007 16:56 FROM:HIGHAMS + 27 12 461257 TO:= PAGE:2

ERRATA

| PAGE | LINE | CHANGE |
|---|---|---|
| 43 | 18 | remove 'be' |
| 46 | 18 | replace 'got' with 'have'. |
| | 19 | replace 'corners' with 'a radius'. |
| | | replace 'would' with 'will'. |
| | 22 | replace 'in rounds' with 'around a radius', |
| | | add 'end' before 'point' |
| 56 | 19 | replace 'end' with 'seaming panel'. |
| 108 | 12 | replace '--' with 'end'. |
| | 18 | replace 'point' with 'date'. |
| 142 | 19 | remove 'as a --'. |
| 170 | 12 | replace 'that' with 'of'. |
| 182 | 1 | replace 'what' with 'that'. |
| 270 | 2 | replace 'access' with 'axis'. |
| 273 | 1 | replace 'would' with 'could'. |
| 294 | 9 | replace 'much' with 'such'. |
| 295 | 14 | replace 'remarked' with 'marked'. |
| 300 | 7 | replace 'ask' with 'answer'. |
| 309 | 23 | replace '3.33' with '0.33'. |
| 310 | 10 | replace 'by direction' with 'at my direction'. |
| 314 | 4 | replace 'straightest' with 'shortest'. |
| 315 | 1/2 | replace 'that's' with 'that'. |

# ERRATA

| PAGE | LINE | CHANGE |
|---|---|---|
| 324 | 21 | replace 'particularly the -- in a -- circular fashion' with 'around a radius which is'. |
| 326 | 4 | remove 'my - yeah'. |
| 334 | 5 | replace 'it at' with 'by asking'. |
| | 13 | replace '-- lower --' with 'point'. |
| 335 | 17 | replace '--' with 'real end profile whereas'. |
| 337 | 17 | replace 'lack of' with 'lacquer'. |
| | 18 | remove 'the --'. |
| 340 | 5 | replace 'making' with 'forming'. |
| 366 | 2 | after 'is' insert generally. |
| 372 | 24 | after 'yes' insert 'I understand the question'. |
| 373 | 2 | insert 'I understand the question' after 'yes'. |
| 383 | 22 | remove 'asked --' |
| | 24 | remove '-- that.' |
| 384 | 22 | replace 'had a -- had it through' with 'used'. |
| | 23 | replace 'it' with 'they'. |
| 392 | 11 | remove 'As you've just -- it -- it --'. |
| 415 | 4 | replace 'saying' with 'referring'. |
| 416 | 5/6 | replace 'that is' with 'the methodology employed to determine where the reinforcing bead is to identify' |
| 416 | 7 | removed 'required --' |
| 416 | 11 | remove 'under the' |
| | | replace 'description' with 'definition' |
| | 12 | replace 'at the same --' with 'that' |
| 423 | 3 - 6 | remove both sentences starting with 'If' and ending in 'No' and 'right'. |
| 433 | 19 | replace 80 with 0.080 inches. |
| | [illegible] | after 'dimensions' add 'for th[illegible] |

# ERRATA

| PAGE | LINE | CHANGE |
|---|---|---|
| 433 | 21 | replace '97' with 0.097 inches. |
| 442 | 16 | replace '80,000ths of an inch' with 0.080 inches |
| | 17 | replace 97 with 0.097 inches. |
| | 18 | replace 100 thou with 0.100 inches. |
| 444 | 8 | replace 80 with 0.080 inches<br>replace 'hundred thou' with 0.100 inches |
| 445 | 9 | replace 35 with 0.035 inches<br>replace 40,000ths of an inch with 0.040 inches |
| 455 | 6 | replace 'low' with 'lower'. |
| 463 | 23/24 | remove 'and does any point along it'. |
| 481 | 8 | add 'a detailed' after 'not'. |
| | ? | add after 'seaming' - 'but I have a thorough knowledge of beverage seaming technology' |
| 497 | 2 | replace '32 sic' with '323'. |
| 500 | 7-11 | replace the complete sentence from 'And' to 'end' with 'The end material thickness went from 0.27 mm for a 206 B52 end to 0.245 mm for a 206 B64 end'. |

ACKNOWLEDGMENT OF DEPONENT

I, MARTIN JOHN HIGHAM, do hereby certify that I have read the foregoing pages, 1 to 533 and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

[signature]

DATE 13th February 2007 SIGNATURE

Subscribed and sworn to before me this _____ day of __________, 200_.

My commission expires: _________

Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC., and CROWN CORK & SEAL USA, INC.,

Plaintiffs,

vs.

REXAM BEVERAGE CAN CO.,

Defendant.

Civil Action No. 05-608 (KAJ)

The videotaped deposition of TIMOTHY L. TURNER, called by the Plaintiffs for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Sandra L. Rocca, CSR, CRR and Notary Public in and for the County of DuPage, and State of Illinois, at 500 West Madison, Chicago, Illinois, on the 21st day of August, 2006, at the hour of 9:30 a.m.

# PAGES B9-B10
# REDACTED

Page 166

Redacted

MR. HAMPTON: Okay.

VIDEOGRAPHER: We are off the record at 4:43 p.m. with the end of tape Number 3.

(Proceedings adjourned at 4:43 p.m.)

Page 167

______________________
TIMOTHY L. TURNER

SUBSCRIBED and sworn to before me this _____ day of ______________, 2006.

______________________
Notary Public

Page 168

STATE OF ILLINOIS)
) SS:
COUNTY OF DuPAGE )

I, Sandra L. Rocca, CSR and Notary Public in and for the County of DuPage and State of Illinois, do hereby certify that on the 21st day of August, 2006, at 9:30 a.m., at 500 West Madison, Chicago, Illinois, the deponent TIMOTHY L. TURNER personally appeared before me.

I further certify that the said TIMOTHY L. TURNER was by me first duly sworn to testify and that the foregoing is a true record of the testimony given by the witness.

I further certify that the deposition terminated/adjourned at 4:45 p.m.

I further certify that the reading and signing of the deposition was not waived, and the deposition was submitted for signature. Pursuant to Rule 30(e) of the Rules of Civil Procedure, if deponent does not appear or read and sign the deposition within 30 days, or make other arrangements for reading and signing, the deposition may be used as fully as though signed, and this certificate will then evidence such failure to appear as the reason for signature not being obtained.

Page 169

I further certify that I am not counsel for nor related to any of the parties herein, nor am I interested in the outcome hereof.

In witness whereof, I have hereunto set my hand and seal of office this day of , 2006.

Notary Public, DuPage County, Illinois
CSR No. 084-003435- Expiration Date: May 31, 2007.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC.,

Plaintiffs,

v

REXAM BEVERAGE CAN CO.,

Defendant.

Civil Action No. 05-608 (MPT)

REBUTTAL REPORT OF MARTIN J. HIGHAM REGARDING THE VALIDITY OF U.S. PATENT NOS. 6,935,826 AND 6,848,875

173. Prior to introduction of SuperEnd, advances in can lightweighting were generally made by reduction in the diameter of the can end, an historical process known as "necking down." Over the past 20 years, the can end has been incrementally "necked down" from a diameter of 211 to today's 202. A reduction to the diameter of can ends provided a significant savings in the form of metal reduction, but came at a high capital investment cost. Each incremental diameter reduction meant a large capital investment in 1) new can necking and flanging tooling; 2) new can handling equipment; 3) new can lining equipment; 4) new punch and die tooling used to cut out the blank from aluminum sheeting; 5) new shell press tooling used to form the blank into the end; 6) new conversion tooling used to add the pull-tab and score for the opening; 7) new seamer tooling, used to seam the end onto the can body in the beverage packaging process; and 8) new filler tooling. The capital cost could only be justified by a relatively large incremental reduction in the can end diameter -- on the order of a 4/16th reduction as when the soda industry converted to 202 from 206 diameter ends.

174. The shape of the conventional can end remained virtually unchanged for 20 years. Being a mature industry with only a few competitors, there was no great incentive to change equipment or introduce radically different products to the market. This scenario changed in the late 1990's, when Crown invented a new and improved can end called the "Superend," the geometry of which radically differed from the conventional can end. The new Superend used 10% less metal than conventional ends while exceeding industry pressure performance requirements. Importantly, because the Superend was a geometry change, rather than a diameter change, the metal savings did not come by way of high capital costs. For Crown's customers, the capital cost to

convert to Superend was limited to changing the chucks, seaming rolls, and knock-out pads in the seamer. Each of these are wear items that are changed in any event and are not capital items

175.    Near the time of the introduction of Superend, soft drink fillers were in the process of converting from 206 diameter ends to 202 diameter ends, driven by Coca-Cola. Brewers, such as Anheuser-Busch had converted to 204 diameter ends earlier, and were looking at ways to convert to 202 diameter.

176.    Near the time of the introduction of Superend, necking a can down from 211 to 202 diameter was the smallest diameter can technologically possible at the time. Thus, for soft drink fillers, there was a need for further metal savings, but the technology for further diameter reductions in the end was lacking.

177.    For Brewers, such as Anheuser-Busch, the hurdle for further diameter reductions was not technological, but was instead based on economics. The metal savings associated with a diameter reduction from 204 to 202, without an end technology change, were insufficient to justify the enormous capital costs of converting. Thus, for brewers, there was a need for further metal savings to justify the capital costs associated with the reduction of the end diameter from 204 to 202.

178.    Crown's competitors were content with the status quo of brewers at 204 B64 and soft drink fillers at 202 B64. Near the time of the introduction of Superend, Rexam's only "new" technology was a coining process used in the conversion press, which was nothing more than a subtle adjustment to the center panel radius to provide incremental metal savings.

194. I further reserve the right to prepare trial aids for use at trial.

Dated: 6th January 2007

Martin J. Higham

**PAGES B16-B54**
**REDACTED**



**PCT** WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau

INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(51) International Patent Classification 6 : B21D 51/38, 51/32 — A1

(11) International Publication Number: WO 98/34743

(43) International Publication Date: 13 August 1998 (13.08.98)

(21) International Application Number: PCT/GB98/00243

(22) International Filing Date: 27 January 1998 (27.01.98)

(30) Priority Data: 9702475.6 7 February 1997 (07.02.97) GB

(71) Applicant (*for all designated States except LS US*): CROWN CORK & SEAL TECHNOLOGIES CORPORATION [US/US]; 11535 S. Central Avenue, Alsip, IL 60803-2599 (US).

(71) Applicant (*for LS only*): CARNAUDMETALBOX PLC [GB/GB]; Downsview Road, Wantage, Oxfordshire 0X12 9BP (GB).

(72) Inventor; and
(75) Inventor/Applicant (*for US only*): FIELDS, Brian [GB/US]; 16W660 Mockingbird Lane #19J, Hinsdale, IL 60521 (US).

(74) Agent: GADSDEN, Robert, Edward; Carnaudmetalbox plc, Downsview Road, Wantage, Oxfordshire OX12 9BP (GB).

(81) Designated States: AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, CA, CH, CN, CU, CZ, DE, DK, EE, ES, FI, GB, GE, GH, GM, GW, HU, ID, IL, IS, JP, KE, KG, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, MD, MG, MK, MN, MW, MX, NO, NZ, PL, PT, RO, RU, SD, SE, SG, SI, SK, SL, TJ, TM, TR, TT, UA, UG, US, UZ, VN, YU, ZW, ARIPO patent (GH, GM, KE, LS, MW, SD, SZ, UG, ZW), Eurasian patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European patent (AT, BE, CH, DE, DK, ES, FI, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, ML, MR, NE, SN, TD, TG).

Published
*With international search report.*

(54) Title: CAN ENDS

(57) Abstract

An unseamed can end comprises a cover hook, (1) a chuck wall (2), a reinforcing bead (4) and a central panel (3). The chuck wall is in two parts; an upper part (5) adjacent the cover hook, and a lower part (6) adjacent the reinforcing bead. The upper part is at an angle of approximately 14° to the horizontal, and the lower part is at an angle of approximately 42° to the horizontal. This produces a step (7) between the two parts of the chuck wall. This arrangement maintains the advantages of a shallower than conventional chuck wall, whilst reducing the reforming of the chuck wall during seaming.

*FOR THE PURPOSES OF INFORMATION ONLY*

Codes used to identify States party to the PCT on the front pages of pamphlets publishing international applications under the PCT.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AL | Albania | ES | Spain | LS | Lesotho | SI | Slovenia |
| AM | Armenia | FI | Finland | LT | Lithuania | SK | Slovakia |
| AT | Austria | FR | France | LU | Luxembourg | SN | Senegal |
| AU | Australia | GA | Gabon | LV | Latvia | SZ | Swaziland |
| AZ | Azerbaijan | GB | United Kingdom | MC | Monaco | TD | Chad |
| BA | Bosnia and Herzegovina | GE | Georgia | MD | Republic of Moldova | TG | Togo |
| BB | Barbados | GH | Ghana | MG | Madagascar | TJ | Tajikistan |
| BE | Belgium | GN | Guinea | MK | The former Yugoslav Republic of Macedonia | TM | Turkmenistan |
| BF | Burkina Faso | GR | Greece | | | TR | Turkey |
| BG | Bulgaria | HU | Hungary | ML | Mali | TT | Trinidad and Tobago |
| BJ | Benin | IE | Ireland | MN | Mongolia | UA | Ukraine |
| BR | Brazil | IL | Israel | MR | Mauritania | UG | Uganda |
| BY | Belarus | IS | Iceland | MW | Malawi | US | United States of America |
| CA | Canada | IT | Italy | MX | Mexico | UZ | Uzbekistan |
| CF | Central African Republic | JP | Japan | NE | Niger | VN | Viet Nam |
| CG | Congo | KE | Kenya | NL | Netherlands | YU | Yugoslavia |
| CH | Switzerland | KG | Kyrgyzstan | NO | Norway | ZW | Zimbabwe |
| CI | Côte d'Ivoire | KP | Democratic People's Republic of Korea | NZ | New Zealand | | |
| CM | Cameroon | | | PL | Poland | | |
| CN | China | KR | Republic of Korea | PT | Portugal | | |
| CU | Cuba | KZ | Kazakstan | RO | Romania | | |
| CZ | Czech Republic | LC | Saint Lucia | RU | Russian Federation | | |
| DE | Germany | LI | Liechtenstein | SD | Sudan | | |
| DK | Denmark | LK | Sri Lanka | SE | Sweden | | |
| EE | Estonia | LR | Liberia | SG | Singapore | | |

"CAN ENDS"

The present invention relates to can ends, and to the attachment of can ends to a can body by means of a double seam.

Our earlier published patent application WO96/37414 describes a can end having a chuck wall which is at a much shallower angle than has heretofor been conventional. The present invention provides a modification to the can end described therein.

Accordingly there is provided an unseamed can end comprising a peripheral cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterised in that the chuck wall is in two parts, a first part adjacent the cover hook and a second part adjacent the reinforcing bead, the second part being inclined to an axis perpendicular to the exterior of the central panel to a greater extent than the first part, the first part being inclined to the said axis at an angle of between 1° and 39°, and the second part being inclined to the said axis at an angle between 30° and 60°.

The advantage of this two part design is that it reduces the amount of reforming of the chuck wall which takes place during the seamer operation. This may make it easier to obtain satisfactory and consistent seamer settings.

Preferably the angle of the second part of the chuck wall to the said axis is between 40° and 45°, and the angle of the first part of the chuck wall to the said axis is between 4° and 20°, typically between 7° and 14°.

Conveniently the concave cross sectional radius of the reinforcing bead is less than 0.75mm, and the outer wall of the reinforcing bead is inclined to the said axis at an angle between -15° and 15° and the height of the outer wall is up to 2.5mm.

The can end is conveniently made of a laminate of thermoplastic polymer film and a sheet aluminium alloy or tinplate or electrochrome coating of steel. Preferably the laminate comprises a polyethelene teraphalate (PET) film on an aluminium/manganese alloy sheet less than 0.01" (0.25mm) thick. The length of the first part of the chuck wall is conveniently between 0.05" and 0.15", and preferably is approximately 0.1".

The invention further resides in a method of forming a can end comprising the steps of:-

i) forming an end shell comprising a peripheral cover hook portion, a chuck wall dependant from the interior of the cover hook portion, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, the chuck wall being inclined to an axis perpendicular to the exterior of the central panel at an angle of bewtween 30° and 60°; and

ii) deforming a part of the chuck wall adjacent the cover hook portion so that it is inclined to the said axis at an angle of between 1° and 39°, but less than the angle of the remainder of the chuck wall. The method preferably includes the additional step of subsequently curling over the periphery of the cover hook portion to form a curled cover hook.

The invention further resides in a method of forming a double seam between a can body and a can end as

previously described, said method comprising the steps of:-

placing the curl of the can end on a flange of a can body supported on a base plate;

locating a chuck within the chuck wall of the can end, said chuck wall being in two parts, a first part adjacent the curl of the can end being inclined to the longitudinal axis of the can at an angle of between 1° and 39°, and a second part inclined to the said axis at an angle of between 30° and 60°, the inclination of the second part being greater than that of the first part, said chuck having a frustoconical drive surface of substantially equal slope to that of the second part of the chuck wall of the can end and a substantially cylindrical surface portion extending away from the drive surface;

causing relative motion as between the assembly of can end and can body and a first operation seaming tool to form a first operation seam;

and thereafter causing relative motion as between the first operation seam and a second operation tool to complete a double seam, whereby during these seaming operations the first part of the chuck wall of the can end becomes deformed to contact the cylindrical portion of the chuck.

The invention will now be further described by way of example only, with reference to the accompanying drawings, in which:-

Fig.1 is a sectioned side view of the can end according to the invention before edge curling;

Fig.2 is a sectional side view of the can end according to the present invention, shown in an end press at a first stage of the manufacturing process;

Fig.3 is a sectional side view of the can end according to the present invention, shown in an end press at a 2nd stage of the manufacturing process;

Fig.4 is a sectional side view of the can end according to the present invention, shown in an end press at a final stage of the manufacturing process;

Fig.5 is a sectioned side view of the can end and a can body at the start of the seaming operation; and

Fig.6 is a sectioned side view of the can end and can body of Fig.5 during the seaming operation.

Referring to Fig.1, a can end in accordance with the invention comprises a peripheral cover hook 1, a chuck wall shown generally at 2 extending axially and inwardly from the interior of the cover hook, and a central panel 3. Between the chuck wall 2 and the central panel 3 is an outwardly concave reinforcing bead 4 (known as an anti-peaking bead or countersink). The dimensions and other details of the reinforcing bead 4 are as described in our application WO96/37414.

The chuck wall 2 is in two parts 5 and 6. The first upper part 5 adjacent to the cover hook 1 is at an angle of approximately 14° to the vertical (i.e. the axis perpendicular to the central panel 3). The first part 5 is approximately 0.1" long. The second lower part 6 adjacent the reinforcing bead 4 is at an angle of approximately 42° to the vertical. The first and second parts of the chuck wall 2 meet at an annular elbow 7.

The can end is formed in a conventional end shell press, as will now be described with reference to Figures

2 to 4. Referring to Fig.2, the press comprises an annular pressure ring 20 and a draw punch 21 arranged coaxially and slideably within the pressure ring. Opposite the pressure ring is an annular draw ring 22 having an angled draw surface 23. Coaxially and slideably arranged within the draw ring is a reform pad 24, with an annular recess 25 therebetween. In use a metal blank is held between the draw punch 21 and the reform pad 24, and also between the pressure ring 20 and draw ring 22. As the draw punch 21 and reform pad 24 are moved downwardly with respect to the pressure ring 20 and draw ring 22, the material is drawn over the draw surface 23 of the draw ring in order to form an end shell with an angled chuck wall 2. Subsequently the draw punch and reform pad are raised with respect to the pressure ring and draw ring so that material at the bottom of the chuck wall is deformed in an unconstrained rolling action into the annular recess 25 so as to form the anti-peaking bead 4.

The end shell is then transferred by means of a belt (not shown) to a second forming station, shown in Fig.3. As before the shell is held between a pressure ring 20', a draw punch 21', a draw ring 22' and a reform pad 24'. The draw surface of the draw ring and the outer sidewall 26 of the draw punch have complementary shaped surfaces so as to reform the chuck wall 2 into the two part geometry described with reference to Fig.1. At the same time, a first curling punch 27 slideably located over the pressure ring is moved so as to contact the outer periphery of the end shell so as to form an initial curl, shown generally at 28.

The end shell is then transferred, again by belt, to a final curling station shown in Fig.4. The draw punch 21", draw ring 22" and reform pad 24" are substantially as before, whilst the pressure ring is now formed of two concentric rings 29 and 30 respectively. The outer ring 30 is moved upwardly to allow the further curling of the periphery of the end shell, by means of an upwardly moving second curling punch 31. This forms the shape of the final curl, shown generally at 32.

Fig.5 shows a completed can end 8 positioned on a can body 9 and held in place by a chuck 10. The chuck has a frustoconical drive surface 11 at an angle of 42° and adapted to drive the can end via contact with the lower part 6 of the chuck wall 2. The can end 8 is seamed onto the can body with conventionl first and second operation double seaming rolls, one of which is shown at 12 in Fig.3. During the seaming operation the upper part 5 of the chuck wall of the can end is reformed to be substantially vertical, being constrained between the seaming roll 12 and the cylindrical sidewall 13 of the chuck 10. Fig.6 shows the second seaming operation in progress, with the left hand side of the figure showing the seam following the first operation and prior to the second operation, whilst the right hand side of the figure shows a portion of the seam which has been contacted by the seaming roll 12 to complete the double seam.

CLAIMS:

1. An unseamed can end comprising a peripheral cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterised in that the chuck wall is in two parts, a first part adjacent the cover hook and a second part adjacent the reinforcing bead, the second part being inclined to an axis perpendicular to the exterior of the central panel to a greater extent than the first part, the first part being inclined to the said axis at an angle of between 1° and 39°, and the second part being inclined to the said axis at an angle of between 30° and 60°.

2. A can end according to claim 1, wherein the angle of the second part of the chuck wall to the said axis is between 40° and 45°.

3. A can end according to claim 1 or claim 2, wherein the angle of the first part of the chuck wall to the said axis is between 4° and 20°.

4. A can end according to claim 3, wherein the angle of the first part of the chuck wall to the said axis is between 7° and 14°.

5. A can end according to any of claims 1 to 4, wherein the concave cross sectional radius of the reinforcing bead is less than 0.75mm.

6. A can end according to claim 5, wherein an outer wall of the reinforcing bead is inclined to the said axis at an angle between -15° and +15° and the height of the outer wall is up to 2.5mm.

7. A can end according to any preceding claim when made of a laminate of thermoplastic polymer film and a sheet aluminium alloy or tinplate or electrochrome coated steel.

8. A can end according to any preceding claim, wherein the length of the first part of the chuck wall is between 0.05 inches and 0.15 inches.

9. A can end according to claim 8, wherein the length of the first part of the chuck wall is approximately 0.1 inch.

10. A method of forming a can end comprising the steps of

i) forming an end shell comprising a peripheral cover hook portion, a chuck wall dependant from the interior of the cover hook portion, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, the chuck wall being inclined to an axis perpendicular to the exterior of the central panel at an angle of between 30° and 60°; and

ii) deforming a part of the chuck wall adjacent the cover hook portion so that it is inclined to the said axis at an angle of between 1° and 39°, but less than the angle of the remainder of the chuck wall.

11. A method according to claim 10, including the additional step of subsequently curling over the periphery of the cover hook portion to form a curled cover hook.

12. A method of forming a double seam between a can body and a can end according to any of claims 1 to 8, said method comprising the steps of:-

placing the curl of the can end on a flange of a can body supported on a base plate;

locating a chuck within the chuck wall of the can end, said chuck wall being in two parts, a first part adjacent the curl of the can end being inclined to the longitudinal axis of the can at an angle of between 1° and 39°, and a second part inclined to the said axis at an angle of between 30° and 60°, the inclination of the second part being greater than that of the first part, said chuck having a frustoconical drive surface of substantially equal slope to that of the second part of the chuck wall of the can end and a substantially cylindrical surface portion extending away from the drive surface;

causing relative motion as between the assembly of can end and can body and a first operation seaming tool to form a first operation seam;

and thereafter causing relative motion as between the first operation seam and a second operation tool to

complete a double seam, whereby during these seaming operations the first part of the chuck wall of the can end becomes deformed to contact the cylindrical portion of the chuck.

WO 98/34743 PCT/GB98/00243

1/3

Fig.1.

5
7
6
1
2
3
4

Fig.2.

20
21
2
23
22
4
24
25

B67

WO 98/34743 PCT/GB98/00243

2/3

Fig.3.

27
20'
26
21'
28
22'
24'

Fig.4.

30
29
32
21''
31
22''
24''

B68



WO 98/34743 PCT/GB98/00243

3/3

Fig.5.

10
6
9
2
8
11

Fig.6.

5
5
13
12
10
6
3
9

B69



# INTERNATIONAL SEARCH REPORT

Inte ,onal Application No
PCT/GB 98/00243

**A. CLASSIFICATION OF SUBJECT MATTER**
IPC 6 B21D51/38 B21D51/32

According to International Patent Classification (IPC) or to both national classification and IPC

**B. FIELDS SEARCHED**

Minimum documentation searched (classification system followed by classification symbols)
IPC 6 B21D B65D

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

**C. DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | WO 96 37414 A (METAL BOX PLC ;CARNAUDMETALBOX SA (FR); CARNAUDMETALBOX NV (NL); C) 28 November 1996 cited in the application see the whole document | 1,10 |
| A | EP 0 340 955 A (METAL BOX PLC) 8 November 1989 | |
| A | US 4 716 755 A (BULSO JR JOSEPH D ET AL) 5 January 1988 | |
| A | US 3 843 014 A (COSPEN J ET AL) 22 October 1974 | |

☐ Further documents are listed in the continuation of box C.

☒ Patent family members are listed in annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance

"E" earlier document but published on or after the international filing date

"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

"O" document referring to an oral disclosure, use, exhibition or other means

"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.

"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 26 March 1998 | 06/04/1998 |

| Name and mailing address of the ISA | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel. (+31-70) 340-2040, Tx. 31 651 epo nl, Fax: (+31-70) 340-3016 | Peeters, L |

Form PCT/ISA/210 (second sheet) (July 1992)

1

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No
PCT/GB 98/00243

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| WO 9637414 A | 28-11-96 | AU 5153396 A | 11-12-96 |
| | | EP 0828663 A | 18-03-98 |
| EP 0340955 A | 08-11-89 | AU 608443 B | 28-03-91 |
| | | AU 3545389 A | 24-11-89 |
| | | CN 1039197 A,B | 31-01-90 |
| | | FI 97954 B | 13-12-96 |
| | | WO 8910216 A | 02-11-89 |
| | | GB 2218024 A,B | 08-11-89 |
| | | JP 7071710 B | 02-08-95 |
| | | JP 3503140 T | 18-07-91 |
| | | NO 174284 B | 03-01-94 |
| | | US 5046637 A | 10-09-91 |
| US 4716755 A | 05-01-88 | GB 2193139 A,B | 03-02-88 |
| | | HK 27991 A | 19-04-91 |
| US 3843014 A | 22-10-74 | NONE | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC. )
and CROWN CORK & SEAL USA, INC., )
Plaintiffs and )
Counterclaim Defendants, ) Civil Action
-vs- ) No. 05-608
REXAM BEVERAGE CAN COMPANY, ) (KAJ)
Defendant and )
Counterclaimant. )

C O N F I D E N T I A L

The confidential resumed videotaped deposition of BRIAN FIELDS, called as a witness herein for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before ROSANNE M. NUZZO, a Notary Public within and for the County of Will, State of Illinois, and a Certified Shorthand Reporter of said state, at the offices of Crown Packaging Technologies, Inc., 11535 South Central Avenue, Alsip, Illinois, on the 12th day of December, A.D. 2006, at 8:54 a.m.

Page 500

Redacted

Page 501

Page 502

Page 503

BRIAN FIELDS, DECEMBER 12, 2006
CONFIDENTIAL

Page 644

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC. ) and CROWN CORK & SEAL USA, INC. ) Civil Action -vs- ) No. 05-608 REXAM BEVERAGE CAN COMPANY. ) (KAJ)

I hereby certify that I have read the foregoing transcript of my deposition given at the time and place aforesaid, consisting of Pages 299 to 643, inclusive, and I do again subscribe and make oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid, and includes changes, if any, so made by me.

BRIAN FIELDS

SUBSCRIBED AND SWORN TO before me this day of , A.D. 200 .

Notary Public

Page 645

STATE OF ILLINOIS )
) SS:
COUNTY OF W I L L )

I, ROSANNE M. NUZZO, a Notary Public within and for the County of Will, State of Illinois, and a Certified Shorthand Reporter, CSR No. 84-1388, of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction, and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set

Page 646

my hand and affix my seal of office at Chicago, Illinois, this 20th day of December, 2006.

Notary Public, Will County, Illinois.
My commission expires May 16, 2009.

C.S.R. Certificate No. 84-1388.

Page 647

INDEX

WITNESS: PAGE:
BRIAN FIELDS
BY MR. McANDREWS.................. 302
BY MR. ZIEGLER.................... 626
BY MR. McANDREWS.................. 637
BY MR. ZIEGLER.................... 642

*****

EXHIBITS

EXHIBIT NUMBER MARKED FOR ID
DEFENDANT'S DEPOSITION EXHIBITS
No. 205.............................. 340
No. 206.............................. 343
No. 207.............................. 377
No. 208.............................. 399
No. 209.............................. 406
No. 210.............................. 410
No. 211.............................. 412
No. 212.............................. 431

**Jerry Willis**

**From:** ziegler@woodcock.com
**Sent:** Thursday, January 04, 2007 4:06 PM
**To:** Jerry Willis
**Subject:** Re: '826 Patent
**Attachments:** ENVELOPE.TXT

Yes we are. But I understand you position on the r.b. from claim 50, so no need for elaborate supplementation before his deposition.

---

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: jwillis@mhmlaw.com
To: Ziegler, Chad (Woodcock Washburn)
Sent: Wed Jan 03 16:31:17 2007
Subject: '826 Patent

Chad, I noticed that Claim 14 was included in the joint claim chart - and you and I talked about the possibility of Crown adding that claim. However, we don't believe that we received anything in writing from you that Crown is asserting claim 14 of the '826 patent. Is Crown asserting claim 14 of the '826 Patent? If so, we may have an objection or, at the very least, we may need to have Mr. Gillest supplement his expert report.

Jerry

**************************************************************

CONFIDENTIALITY NOTICE:

This Material is intended for the named recipient and, unless otherwise expressly indicated, is confidential and privileged information. Any dissemination, distribution or copying of this material is prohibited. If you received this message in error, please notify the sender by replying to this message and then delete it from your system. Your cooperation is appreciated.

**************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CROWN PACKAGING TECHNOLOGY, INC., Plaintiff, and CROWN CORK & SEAL USA, INC.,

Plaintiff and Counterclaim Defendant,

v.

REXAM BEVERAGE CAN COMPANY,

Defendant and Counterclaimant.

Civil Action No. 05-608 (KAJ)

**DEFENDANT-COUNTERCLAIMANT REXAM BEVERAGE CAN COMPANY'S RESPONSES TO CROWN TECHNOLOGY'S AND CROWN USA'S FIRST SET OF INTERROGATORIES**

Defendant-Counterclaimant Rexam Beverage Can Company ("Rexam"), through its counsel, hereby submits its general objections, specific objections and responses to Crown Packaging Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s ("Plaintiffs") First Set Of Interrogatories.

**GENERAL OBJECTIONS:**

Rexam objects to Plaintiffs' Interrogatories to the extent they seek information, documents or things protected by the attorney-client privilege, are immune from discovery pursuant to the work product doctrine, or are protected or immunized by any other applicable privilege, immunity, doctrine or protection from discovery. All of the following responses and answers are made subject to this objection and none of the following responses or answers, none of the information, documents or things identified in

INTERROGATORY NO. 3:

Provide a detailed description of the factual basis for Rexam's contention that the claims of the 875 Patent are invalid under 35 U.S.C. § 112.

RESPONSE TO INTERROGATORY NO 3:

Rexam objects to this Interrogatory to the extent that it seeks privileged or immune information. Rexam also objects to this Interrogatory to the extent that it seeks detailed claim construction which conflicts with the agreed scheduling order, wherein the parties agreed that claim construction contentions will be identified in July of 2006.

Subject to those objections and the general objections set forth above, it is Rexam's contention each of the asserted claims of the 875 Patent is invalid pursuant to 35 U.S.C. § 112. For example, there is nothing in the specification that identifies specifically where said first wall portion begins and ends, where said second wall portion begins and ends, where the "first location" is located, where the "second location" is located, where the "end points" are located, etc. The claims are not supported by the specification and the claims themselves do not provide adequate guidance as to the structure, location and cooperation of the elements. The result is vague and indefinite claims which are invalid under 35 U.S.C. § 112.

Additionally, neither the specification nor the claims disclose the best mode contemplated by the inventors. This fact is demonstrated by Plaintiffs' abandoning the method of seaming disclosed in the 875 on or about the same time that the 875 Patent application was filed.

Rexam continues to investigate and will continue to take discovery on issues relating to this Interrogatory. If additional non-privileged, non-immune information, documents or things responsive to this Interrogatory become available, Plaintiffs will be made aware of or provided with that information or those documents or things.

**INTERROGATORY NO. 4:**

Provide a claim chart and detailed description of the factual basis for Rexam's contention that it does not infringe any claims of the 826 Patent by its making, using, selling, and/or offering for, sale the Rexam end or by using the process used to seam the Rexam end to a filled can. The detailed description should include, but should not be limited to, an explanation as to which claims are allegedly not met by the Rexam end or Rexam seaming process (including an explanation as to whether the process avoids the literal scope of each claim and/or infringement under the doctrine of equivalents); an explanation of the claim construction of the limitations of each claim alleged not to be infringed; an explanation as to why each such claim limitation is not met by the Rexam end or Rexam seaming process (either literally and/or under the doctrine of equivalents); and an explanation as to whether there are any alleged limitations on the application of the doctrine of equivalents, including whether there is any alleged prosecution history estoppel.

**RESPONSE TO INTERROGATORY NO 4:**

Rexam objects to this Interrogatory to the extent that it prematurely seeks contentions and positions. The agreed schedule for this matter contemplates an exchange of claim construction positions in July of 2006. Rexam further objects to this Interrogatory to the extent that it seeks to place an undue burden on Rexam with respect to contentions that will, due to discovery and other development of this action, necessarily change. Rexam also objects to this Interrogatory to the extent that it seeks to discover information that is subject to the attorney/client privilege or work product immunity and to the extent that it requires a "claim chart". Subject to those objections and the General objections, Rexam states that its accused Rexam end does not infringe

show diagrams of can ends that are to be seamed to cans using the double seaming process having chuck walls with angles of between 30 and 60 degrees.

Rexam continues to investigate and will continue to take discovery on issues relating to this Interrogatory. If additional non-privileged, non-immune information, documents or things responsive to this Interrogatory become available, Plaintiffs will be made aware of or provided with that information or those documents or things.

**INTERROGATORY NO. 6:**

Provide a detailed description of the factual basis for Rexam's contention that the claims of the 826 Patent are invalid under 35 U.S.C. § 112.

**RESPONSE TO INTERROGATORY NO 6:**

Rexam objects to this Interrogatory to the extent that it seeks privileged or immune information. Rexam also objects to this Interrogatory to the extent that it seeks detailed claim construction which conflicts with the agreed scheduling order, wherein the parties agreed that claim construction contentions will be identified on July of 2006.

Subject to those objections and the general objections set forth above, it is Rexam's contention that claim 13 of the 826 Patent is invalid pursuant to 35 U.S.C. § 112. For example, there is nothing in the specification that identifies specifically where said first wall portion begins and ends, where said second wall portion begins and ends, where the "first point" is located, where the "second point" is located, etc. The claim is not supported by the specification and the claim itself does not provide adequate guidance as to the structure, location and cooperation of the claim elements. The result is a vague and indefinite claim which is invalid under 35 U.S.C. § 112.

Additionally, neither the specification nor the claims disclose the best mode contemplated by the inventors. This fact is demonstrated by Plaintiffs' abandoning the method of seaming disclosed in the 826 Patent years before the 826 Patent application was filed.

Rexam continues to investigate and will continue to take discovery on issues relating to this Interrogatory. If additional non-privileged, non-immune information, documents or things responsive to this Interrogatory become available, Plaintiffs will be made aware of or provided with that information or those documents or things.

**INTERROGATORY NO. 7:**

Provide a claim chart and detailed description of the factual basis for Rexam's allegation that Crown is infringing claims of the 839 Patent by its making, using, and selling of the three can ends attached hereto as Exhibits 1-3. The detailed description should include, but should not be limited to, an identification of the asserted claims; an identification of the Crown product accused of infringement; an explanation as to which claims are allegedly infringed either literally or under the doctrine of equivalents for each accused product; an explanation of the claim construction of the limitations of each claim alleged to be infringed; and an explanation as to why each such claim limitation is met (either literally and/or under the doctrine of equivalents).

**RESPONSE TO INTERROGATORY NO 7:**

Rexam does not allege that Crown is infringing any claim of the 839 patent by its making, using, and selling any can end, and in particular, Rexam does not allege that Crown is infringing the 839 patent by making, using, and selling the three can ends identified by the Exhibits that are attached to Plaintiffs Crown Technology's and Crown USA's First Set of Interrogatories.

a second score groove adjacent the second end of said primary score and adjacent said hinge segment to direct fracture of metal of said hinge segment in a direction away from said second end of the score.

Rexam construes this limitation to require a score, the second score, that lies in a location that is adjacent the second end of the primary score and adjacent said hinge segment, said second score serving the purpose of directing a tear in the hinge segment away from the second end of the primary score.

**FOR THE OBJECTIONS TO INTERROGATORY NOS. 1-11, THE LEGAL CONTENTIONS SET FORTH HEREIN AND THE LEGAL AUTHORITY SET FORTH IN THE ANSWERS TO INTERROGATORY NOS. 1-11:**

Date: 12/14/05

George P. McAndrews
Steven J. Hampton
Richard T. McCaulley
Gerald C. Willis
Paul W. McAndrews
McAndrews, Held & Malloy, Ltd.
500 W. Madison Street, Suite 3400
Chicago, IL 60661
Tel: 312.775.8000
Fax: 312.775.8100

Frederick L. Cottrell, III,
Anne Shea Gaza
Richards, Layton & Finger, P.A.
One Rodney Square, 920 N. King Street,
P.O. Box 551
Wilmington, Delaware 19899-0551
Telephone: 302-651-7700
Telecopier: 302-651-7701

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., | ) | |
| Plaintiffs/Counterclaim Defendants, | ) | |
| v. | ) | Civil Action No. 05-608 (MPT) |
| REXAM BEVERAGE CAN COMPANY, | ) | |
| Defendant/Counterclaimant. | ) | |

**EXPERT REPORT OF EDMUND GILLEST REGARDING INVALIDITY OF CROWN'S U.S. PATENT NOS. 6,935,826 AND 6,848,875**

## I. Introduction

I am currently the owner of Gillest & Associates, LLC, a company founded in 2006 for the purpose of doing research, development and engineering for the metal packaging and golf industries. In addition to my consulting work at Gillest & Associates, LLC, I have worked in the metal (automotive and packaging) forming and processing area for over 40 years. From 1964-1977, I worked for Ford Motor Company in the automotive industry; from 1978 to 1996, I worked for Ball Corporation in the metal packaging industry; and from 1996 to 2006, I worked for Alcan (currently Novelis Corp.) in the metal processing/packaging area.

As a result of my education, training, and experience, I have developed knowledge of metal forming and packaging, including knowledge of can end and can body research, design, manufacturing and implementation. My attached resume provides additional details related to my background.

It is my understanding that the Plaintiffs, Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown") filed a lawsuit, alleging that Rexam Beverage Can Company's ("Rexam") can end known as the Rexam End infringes Crown's U.S. Patent

Crown's End

Pre-seaming

Post-seaming

The upper and lower images to the left depict Crown's "new" can end being seamed.[4] Again, this concept was well known in the beverage can industry.

## V. If Crown Invented Anything At All, It Must Include An Outwardly Concave Annular Reinforcing Bead Extending Radially Inwards From The End Wall

In my opinion, those of ordinary skill in the art in May 1995, when the application from which the '826 and '875 Patents claim priority was filed, would understand from the specifications of those patents that the new can end those patents describe must include a generally U-shaped "annular reinforcing bead" surrounding the central panel of the can end.

To begin, the abstracts of both patents describe a can end that has "an outwardly concave annular reinforcing bead."

The "Background of the Invention" section of the '875 and '826 patents describes a prior art patent, U.S. Patent No. 4,093,102, as disclosing a can end having an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and describes the inventions of the '875 and '826 patents in comparison to that prior art can end by stating that "[w]e have discovered that improvement in the metal usage can be made by increasing the slope

[4] Images taken from an animation Crown presented to the U.S. Patent Office during an interview.

of the chuck wall and **limiting the width of the anti peaking bead**." ('875 and '826 patents, Col. 1, lines 32 – 35). Even more clearly describing the scope of the invention, Crown's patents state:

> Continuing development of a can end using less metal, whilst still permitting stacking of a filled can upon the end of another, **this invention provides a can** end comprising a peripheral cover hook, a chuck wall dependant from the interior of the chuck wall, **an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead,** characterized in that, the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between 30° and 60°, **and the concave bead narrower than 1.5 mm (0.060")**. ('826 patent, col. 2, lines 1-11).

The can end shown by both the '875 and '826 patents as examples of the inventions of those patents has an annular, outwardly concave, generally U-shaped bead surrounding the central panel. See Figs. 4 – 7 and 9. That bead is described as having a cross sectional radius of about .5 mm (col. 3 lines 49 – 50), having parallel side walls (col. 3 line 51) though the walls may be angled plus or minus 15 degrees. (Col. 3 lines 52 – 53). The height of the outer wall of the anti-peaking bead may be up to 2.5 mm.

Nothing in the '875 and '826 patents suggests that a can end can be made according to the alleged inventions without the widely known and used annular concave generally U-shaped reinforcing bead. Instead, the '875 and '826 patents describe that reinforcing bead as a critical component of the invention. In my opinion, any claim of the '875 and '826 patents that does not require an annular, concave, generally U-shaped reinforcing bead between the central panel and the end wall would encompass a can end that is not described by those patents. I understand that such a claim would be invalid for doing so.

Date: Dec. 19, 2006

Edmund Gillest



CC-3545;4772US8

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of:
**Brifcani et al.**

| | | | |
|---|---|---|---|
| Serial No.: | **10/417,980** | Group Art Unit: | **3727** |
| Filed: | **April 17, 2003** | Examiner: | **Nguyen, Jimmy T** |

For: **Can End And Method For Fixing The Same To A Can Body**

Assistant Commissioner for Patents
Washington, D.C. 20231

**DECLARATION OF MR. MARTIN HIGHAM**

I, Martin Higham ,make the following declaration:

1. I, Martin Higham, am an independent consultant to the beverage can industry and have been so since 1999. I have spent the past forty years in the can making industry. From 1966 to 1999 I worked for Metal Box, which became CarnaudMetalBox ("CMB") in the 1980's and, in the 1990's, was acquired by Crown Cork & Seal Company, which is the parent of the assignee of the patent application that is the subject of this declaration.

2. I am familiar with U.S. Patent Application Serial No. 10/417,980 and the development of the end that is the subject of the application. Such end is referred to within the industry as the "SuperEnd" and I will refer to this application as the "SuperEnd Application." During the development of the SuperEnd in the early 1990's I was the supervisor of inventors Kysh and Hinton. As consultant, I have advised Nampak, a can end maker licensed to make SuperEnds. In addition, I have acted as a consultant to Crown Cork & Seal Technology ("Crown"), the assignee of the SuperEnd Application, in connection with litigation between Crown Cork & Seal Technologies Corp, et al., ("Crown") and Anheuser Busch Companies Inc. and Metal Container Corp., et al., "("Anheuser-Busch") in the United States District Court for

the Western District of Wisconsin related to U.S. Patent No. 6,064,634, which I understand issued from one of the earlier applications from which the currently pending SuperEnd Application claims priority. During the course of that litigation, I submitted an expert report on the subject of patent validity and infringement and was deposed by attorneys for Anheuser-Busch. I have been engaged by Crown as a consultant in connection with the prosecution of the currently pending SuperEnd Application in order to provide information to the Examiner concerning the beverage can industry and my opinion concerning the propriety of the rejection of claims in that application.

**Background on Beverage Can End Development Since the 1970's**

3. The beverage can industry in the 1970's developed the "easy open" aluminum beverage can. The easy opening end (*e.g.*, a end having a ring pull opening) was introduced to the market on 211 end diameter[1] from coated aluminum approximately 0.35 mm (0.0138 inches) thick. During most of its life, the 211 end was used on beverages cans of three piece design, with a seamed-on steel bottom and the easy open, aluminum top.

4. The 211 easy open end was commercially successful with large annual market growth; it essentially replaced most other ends worldwide. Further development of the easy open end focused on techniques for cost reduction. Such cost reduction was achieved primarily by reducing the diameter of the cut edge[2] and/or reducing the metal thickness. Eventually, the can body diameter was reduced by necking its top to enable a smaller diameter end, which by itself reduced metal volume usage because of the

[1] The conventional nomenclature for can end diameter provides the diameter in inches followed by the fraction in 16ths. For example, a 211 can end has a seamed end diameter of two and eleven sixteenths inches.

[2] "Cut edge" is the diameter of the flat, circular metal blank from which the unseamed end is formed. The cut edge for various ends is listed in Table 6 of the patent application.

reduced cut edge of the smaller diameter ends and the thickness reduction that results from the increased strength associated with a smaller diameter end.

5. The progression on the easy open end diameter reduction, began in the early 1980's and was driven by the desire to save metal costs. Soft drink companies, lead by Coca Cola, went from 211 to 209 to 206 and eventually to 202 ends. Brewers went from 211 to 209 to 207½ to 204. Each time such a change was made, the fillers incurred a significant capital cost to purchase new tooling to handle and seam the new cans with smaller diameter necks. High capital costs were also associated with forming the ends and forming the necks on the can bodies. In general, it was thought that the savings resulting from reduced size justified the enormous capital cost associated with such a modification only if the reduction was of at least two sizes -- that is, a reduction from 206 to 204 was not thought economically justified, whereas a reduction from 206 to 202 was economically justified.

6. Throughout this development, the angle of the wall of the end extending below the seaming panel remained below 20°, typically 12° to 15°. The angle of the wall of the seaming chuck was typically close to, but slightly less than, that of the wall of the end. At some point, a chuck with a two part wall was introduced. The lower wall of the chuck remained inclined at an angle slightly less than that of the end, while the upper wall was inclined at a smaller angle, typically 4°. Since the inclination of the wall was typically about 14°, this resulted in bending the metal during the seaming operation by no more than 10°.

7. Seaming of the end onto the can body became more difficult as the diameter of the end became smaller and the metal thinner. A mini seam was developed that not

only made seaming easier on the smaller, thinner ends, but allowed the cut edge to be further reduced.[3]

8. Eventually, the shell design itself was reconsidered by end designers as a possible option to reduce the metal cost. An end with a deeper countersink, as well as a deeper panel, was developed. The larger metal area required for the deeper countersink was more than offset by the thickness reduction enabled by the stronger shell. This end configuration was commercialized in a 206 diameter end using what was referred to as a midi seam.

9. Up until the introduction of the 206 ends in the mid-1980's, virtually all of the beverage can end shells of a given size, regardless of the manufacturer, were of the same configuration so as to be interchangeable by the filler that seamed the ends onto the can body in the filling line. The standard 206 shell was generally referred to as a B52 shell and was characterized by a 0.250 inch countersink height and 0.080 inch panel height.[4] The 206 ends (which were used by soft drinkers) and 204 ends (which were used by brewers) were commercialized in more than one non-interchangeable configuration. This lead to problems for the fillers because switching to ends supplied by a different manufacturer required changing the seaming chucks on the filling lines.

10. In Europe at this time, virtually all aluminum beverage cans/ends were 206 B52 design both for the carbonate soft drink companies, such as Coca-Cola, and brewers such as Scottish and Newcastle, Interbrew, etc. The soft drink companies lead the evaluation of the 202 ends supported by all can/end manufacturers, filler equipment manufacturers, and seamer machine producers.

---

[3] The mini seam is described in the manual "Mini Seams" by Pete Moran, published by CMB Engineering Group plc, a copy of which I understand has already been given to the Examiner.
[4] The countersink height and panel height are indicated in the patent application in Figure 4 as $h_2$ and h3, respectively.

CC-3545;4772US8

11. In the early 1990's, the soft drink companies, led by Coca-Cola, prodded can end makers to develop a 202 end and to do so in such a manner that the end would be interchangeable – that is, all 202 ends could be seamed using the same chuck. This chuck, which was eventually became the industry standard for 202 ends, employed the same design principles as the chucks used on prior ends in that the lower wall was inclined at 12° and the upper wall was inclined at 4°. The 202 can end wall itself was inclined at about 14°. The 202 end was first commercialized in Europe by Coca Cola in the 1994-1995 time frame and was eventually adopted by most soft drink companies in Europe and the United States.

12. As is now well known, the project was successful and the 202 can/end has become the standard can size for carbonated soft drink fillers. A major factor in the success was that the economics of the conversion from the standpoint of the carbonated soft drink fillers and from the standpoint of the can/end makers justified the total capital investment. The metals savings paid back the capital investment of the carbonated soft drink fillers (such as Coca-Cola) in approximately two years.

13. The payback calculation for some brewers in the UK at the time was very different because the brewers' filling lines were typically older and slower and therefore has lower annual throughput. For example, a newer carbonated soft drink line (as of the early 1990's) had a capacity of approximately 600 million cans per year, compared with an older beer line which had a capacity of approximately 240 million cans per year (that is, only 40% of the capacity of the new lines of the carbonated soft drink lines).

14. The brewers not only could obtain less absolute savings per line because of the slower throughput, but they had other disincentives to changing can diameter: expensive changes to the pasteurizer. Beer filling lines will contain a pasteurizer, which is a very large, complex machine requiring significant costs to convert it to

handle 202 ends. As a result, for a beer filling line the capital cost to convert to 202 may be close to double the cost required to convert a carbonated soft drink line.

15. Hence for a relatively slow beer line, the payback as a function of the payback of a carbonated soft drink line could be fairly approximated to be 2 (that is, double the absolute cost) divided by 0.4 (that is, the ratio of the throughput and therefore the metal saving potential) or 5 times that for the carbonated soft drink line, and thus provide a payback of approximately 8 to 10 years compared with a payback of roughly 2 years for carbonated soft drink (depending on the assumption used).

16. This long payback period explains why the brewers in the UK, when presented with the option of changing to 202 cans/ends, concluded that they could not justify the change financially and formally requested that CMB develop a cheaper and hence more materially efficient 206 end. Brewers in the UK made the request to me personally. This was the motivation for the "lightweight" 206 can end project, which ultimately lead to the development of the SuperEnd described in the instant patent application.

17. For illustration, the tables below provide an overview of the metal cost reduction with the development of can ends and includes both conventional ends and SuperEnds. The units are English except for metal thickness, which is provided in millimeters, for ease of showing the calculation of additional metal cost on a price per unit pound basis for thinner aluminum. As explained more fully in paragraph 39, aluminum suppliers charge approximately 1.0% to 1.2% more on a price per unit weight basis for each 0.01 mm reduction in metal thickness, which is reflected in sixth column.

**Metal Usage and Costs for Various 206, 204, and 202 End Designs**

| End Size & Design | Cut Edge Dia. (in) | Thickness (mm) | Metal Vol. (in³) | Metal Vol. as % of 206 std. B52 | Cost adder as % change from 0.27 mm | Metal Cost as % of 206 std. B52 |
|---|---|---|---|---|---|---|
| 206 std. B52 | 3.008 | 0.27 | 0.0755 | 100.00% | 0.00% | 100.0% |
| 206 B64 | 3.047 | 0.245 | 0.0703 | 93.11% | 3.00% | 96.1% |
| 206 SuperEnd | 2.935 | 0.245 | 0.0652 | 86.39% | 3.00% | 89.4% |
| 204 std. | 2.944 | 0.235 | 0.0629 | 83.37% | 4.20% | 87.6% |
| 202 std. | 2.844 | 0.224 | 0.0560 | 74.16% | 5.52% | 79.7% |
| 202 Superend | 2.735 | 0.208 | 0.0481 | 63.69% | 7.44% | 71.1% |

18. The following table is based on the foregoing table and provides the decrease in metal cost from one end to another. The SuperEnd described in the instant patent application provides metal cost savings roughly equivalent to a decrease in end size.

**Metal Cost Savings By End Size and Type**

| Changing From | To | Metal Savings |
|---|---|---|
| 206 std. | 206 B64 | 3.9% |
| 206 std. | 206 S/E | 10.6% |
| 206 std. | 202 std. | 20.3% |
| 206 std. | 204 std | 12.4% |
| 204 std. | 202 std. | 9.85% |
| 204 std. | 202 S/E | 20.4% |
| 202 std. | 202 S/E | 12.2% |

**Initial Reactions to SuperEnd by Others in the Field**

19. In South Africa in the mid/late 1990's Bevcan (a division of Nampak) were considering the 202 change that had been made in Europe. Their customers were aware of 202 and wanted the cost savings. Bevcan had been a licensee of Metal Box but this had ceased when Metal Box was taken over by Crown Cork. The only alternative to 202 appeared to be the 206 Superend which was being talked about by Metal Box/Crown in

Europe but without any commercial experience being developed. Details of this end were available to Bevcan. The director responsible for customer seaming assistance and the Operations director were of the considered opinion that, although the end was strong, the seaming process was significantly different from proven current techniques in commercial use. These differences were likely to cause inconsistent and variable seams leading to possible leakage. Any leakage is totally unacceptable.

20. I have been told that when the subject of 206 Superends was raised at Bevcan board meetings this seaming process change was identified and the project taken no further until practical proof was available. They were not prepared to spend time and money on a project that the technical experts considered had little chance of success. Also if Crown/Metal Box were not commercialising the technology, there must be some technical problems. This position only changed when I became a consultant to Bevcan and was able to convince them that the potential benefits were worth practical trials to evaluate the reliability/consistency of the new Superend seaming process.

<u>The Kysh End</u>

21. I am familiar with U.S. Patent No. 5,046,637 (the "Kysh Patent") and had managerial responsibility for the group in which Mr. Kysh worked when he developed the end that is the subject of that application.

22. The Kysh end was aimed at improving the strength, specifically the buckle pressure resistance, of a 206 end by changing the geometry of the reinforcing bead. Such a strength improvement would facilitate a reduction in the thickness of the end. We anticipated that the angle of the wall in the Kysh end, indicated as "C" in Figure 18 of the Kysh Patent, would remain at the conventional value of about 15°, which is reflected in the Kysh Patent by the statement that the angle should "preferably be in the range from 12° to 15°" (column 6, lines 40-43). We hoped that maintaining the wall at the conventional angle of inclination would allow the use of a conventional chuck, which, as

explained above, has a wall angle of about 14°. However, the Kysh Patent indicates that Mr. Kysh apparently considered the possibility of employing an angle within the broader range of 12° to 20°.

23. Even though the wall angle of the Kysh end, as we attempted to commercialize it, remained at the conventional value of about 15°, the changes in the bead geometry made it difficult to seam the end using a conventional seaming chuck unless the chuck were modified slightly to accommodate the revised bead geometry. Despite the fact that the Kysh end achieved a modest increase in pressure resistance, beverage can fillers were unwilling undertake the capital investment and commercial risk associated with using even a slightly modified seaming chuck. Consequently, our attempts to commercialize the Kysh end were unsuccessful and the project was eventually abandoned.

**Analysis of Japanese JP 57-117323 Published Unexamined Utility Model Application**

24. I have studied Japanese JP 57-117323 published unexamined utility model application (the "JP Reference").

25. The JP Reference describes, among other things, a seamed can end having an chuck panel inclined at about 45 degrees. As far as I am aware, the seamed end shown in Figure 4 of the JP Reference was never commercially produced.

26. From the information provided in the JP reference, I performed the calculations and made the observations below. The JP Reference states that it shows a "conventional . . . carbonated beverage can 1b" (JP Reference, page 1, last paragraph) in its Figure 2 ("JP Reference's conventional end") and "an example in which [the] invention is applied to a carbonated beverage can" (JP Reference, page 3, last paragraph) in its Figure 4 ("JP Reference's modified end").

CC-3545;4772US8

27. I assessed the countersink height of both the JP Reference's conventional seamed end (Figure 2) and modified seamed end (Figure 4). Based on the fact that the beverage can disclosed in the JP Reference has a straight wall without a necked-in portion at its top and based on the can body diameter stated in its Table 2, it is clear the can disclosed in the JP Reference is a 211 diameter can.

28. The JP Reference does not state the material of which the end if made, but it is my opinion that it discloses a steel, non-easy open end in its Figure 4. I reached this conclusion because the pressure data for the particular plate thickness provided in Table 2 could only be obtained with a steel end and because no evidence of an easy open end type pour aperture is mentioned in the JP Reference. At the time of filing of the JP Reference, it would not be uncommon for a beverage can to be a three piece design with a pair of seamed ends.

29. Based on my experience in the can industry, the countersink height of a 211 steel, non-easy open end as shown in the JP Reference's Figure 2 would be about 0.150 inches. I have calculated the corresponding countersink height of the JP Reference's modified end of Figure 4 to be 0.378 inches. I arrived at the latter figure by adding the seam height of a standard full seam in use at the filing date of the JP Reference, 0.125 inches, plus the calculated height from the bottom of the seam to the bead. The latter dimension can be approximately calculated from the data provided by the JP Reference: angle of chuck panel 18b of 45 degrees, can body diameter of 65.35 mm, and chuck wall radius diameter of 52.50 mm.

CC-3545;4772US8

JP Reference's Figure 2

JP Reference's Figure 4

30. Accordingly, the JP Reference teaches – in accordance with its goal of reducing the center panel diameter – not only to reduce the center panel diameter but also to have an unusually long chuck wall, which necessarily results in an unusually deep end. Thus, in the only example provided, the JP Reference's modified end has a countersink height (0.378 inches), which is 0.228 inches deeper than that of its "conventional" end (0.150 inches).

31. The large countersink height of JP's modified end would have inherent drawbacks in end manufacturing, such as problems associated with shell ejection from the shell press, and in seaming, such as in end handling. But more significantly, the extremely large depth of the countersink of the JP Reference's modified end would likely result in diminished headspace volume of the seamed can end and be difficult to drink from.

32. Specifically, the large countersink height and correspondingly large dimension from the center panel to the top of the seam yields a reduced headspace volume, which is the freeboard volume above the liquid within a seamed can. Employing the configuration taught by the JP Reference would likely unacceptably diminish the head space of a can unless the entire can would be redesigned (such as, by changing its diameter and/or height), which would be commercially infeasible.

33. For example, if a particular can's volume is designed to receive an intended volume of a beverage within a volume tolerance, increasing the depth of the countersink radius and corresponding vertical dimension from the center panel to the seam would require either: (1) the beverage volume to be diminished to maintain the headspace volume, which would shortchange customers; or (2) the headspace volume to be diminished to maintain the beverage volume, which will result in increased headspace pressure and possible over-filling.

34. Considering the JP Reference's teaching to reduce the center panel diameter, and the long, inclined chuck panel wall 18b as the means to achieve the goal of the reduced center panel diameter, there is no incentive to modify Kysh to incorporate a long, inclined wall because the resulting deep center panel would likely interfere with head space requirements. In my opinion, a person skilled in the art would not choose one aspect of JP's teaching (that is, inclination of the wall) while ignoring another aspect (that is, length of the wall to form a deep center panel), especially because ignoring the teaching of the length of the wall would be contrary to the goal and principle of operation of the JP Reference – that is, contrary to forming a small center panel.

35. The other disincentive to modifying Kysh according to the teachings of the JP Reference inherent in its smaller center panel is that the smaller center panel provides less area in which to fit a relatively large pour opening and positions the opening farther from the can's outer rim, which makes the end more difficult to drink from.

36. Also, the JP Reference would not offer the benefits that may appear from a superficial reading of it. Even though Table 2 of the JP Reference shows a decrease in material *thickness* from 0.32 mm to 0.28 mm between its Figure 2 and Figure 4, that data provides only part of the story for the real commercial goal: reduction in metal volume and cost. The parameter that is missing from the JP Reference is the cut edge diameter required to make the modified end. I made calculations to compare the total metal usage of the JP Reference's "conventional" end (Figure 2) with the JP Reference's modified

end (Figure 4). As explained below, by my calculations the JP Reference would provide little metal cost savings and possibly result in a metal cost increase compared to its "conventional" end.

37. Referring to the figures of the JP Reference provided above, I calculated the cut edge diameter of the blank from which the seamed ends were formed by adding the length of the conventional full seams, plus the outer radii of the bead, plus the center panel diameter, as summarized in the table below:

**Cut Edge Diameter Estimates (Inches) for the JP Reference's Figure 2 and Figure 4**

| Figure 2: conventional end | | Figure 4: modified end | |
|---|---|---|---|
| 2 x seam (0.3245) | 0.649 | 2 x seam (0.3245) | 0.649 |
| 2 x radius (0.0625) | 0.125 | 2 x radius (0.358) | 0.716 |
| 1 x center panel dia. | 2.402 | 1 x center panel dia. | 2.067 |
| cut edge dia. (sum of above) | 3.176 | cut edge dia. (sum of above) | 3.432 |

38. Calculating the area of the cut edge from the above diameters yields that the modified end uses a cut edge area that is 16.7% larger than that of the conventional end (that is, $100 \times (3.432/3.176)^2$). Now, considering the purported reduction in metal thickness shown in the JP Reference's Table 2 from 0.32 mm to 0.28 mm, I calculate that the JP Reference's modified end of Figure 4 would actually use more metal than its conventional end of Figure 2 (that is, 116.7% x (0.28 mm/0.32 mm) = 102.1%). The actual increase in metal volume usage of the JP Reference's Figure 4 may be conceptually explained by the increase in countersink height explained elsewhere in my declaration.

39. Further, reducing metal volume by reducing the metal thickness does not produce a proportionate decrease in material cost because suppliers charge a slight premium for thinner material on a cost per weight basis. As a rule of thumb which is often used in the can making industry, a reduction of metal thickness of 0.01 mm increases the cost of the

metal on a cost per weight basis (such as $/lb.) by 1.0 to 1.2%. For example, if a technical improvement would enable the end thickness to be reduced by 0.01 mm but would result in an increase in the cut edge diameter such that the overall metal volume is reduced by 1.0%, the metal cost would be the same because the increase in material cost would offset the metal volume reduction.

40. The calculations provided above are not intended to be exact, but merely to explain that it is incorrect to conclude that a person skilled in the art would understand that following the teaching of the JP Reference would result in a significant decrease in metal volume and metal cost. By my estimates, in fact, the JP Reference's modified end would save little or nothing in cost and would likely result in a net increase in the cost of material to produce its modified end, despite what the JP Reference appears to teach.

41. The offsetting costs and benefits of reducing end metal thickness while increasing the cut edge diameter that occurs in the JP Reference was not unusual at the time of the filing of the JP Reference and even into the 1990's. In fact; is was common in the history of the development of end technology before SuperEnd's radical technology was invented.

42. Accordingly, one skilled in the art studying the JP Reference would not be motivated to modify an end according to its teaching (even presuming, of course, that someone could divine what the JP Reference looked like in its unseamed state) because the JP Reference provided very little, if any, commercial benefit, and possibly would cost more, not less, to manufacture.

**One Skilled in the Art Would not have been motivated by the JP Reference to Increase the Chuck Wall Angle of the Kysh End into the range of 30° to 60°**

43. I have considered the rejection of the claims of the currently pending SuperEnd Application over the Kysh Patent in view of the JP Reference. As I understand it, the Examiner's position, as set out in his paper dated February 3, 2004, is that:

> it would have been obvious to one having ordinary skill in the art the time the invention was made to incline the wall of Kysh between about 20° to about 70° in view of JP to provide a can end for internally pressurized cans which can realize high pressure resistance and which can reduce the volume of raw material used. Additionally, the angle of inclination is not given patentable weight because the type of an can end as claimed is well known as described above, and changing the angle of the wall required only a change in the chuck wall to accommodate any angle of inclination.

44. The Examiner's position is incorrect. One skilled in the art would not have been motivated to revise the angle of inclination of the Kysh can end wall according to the JP Reference so as to increase the angle of inclination of the wall to 30° or more. This is so for at least three reasons.

45. First, the JP Reference describes only a can end after it has been seamed onto the can body. It provides no information on the shape of the can end prior to seaming, nor the type of tooling to be used in the seaming operation. Thus, it would have provided no suggestion to modify the unseamed end described in the Kysh Patent.

46. Second, the Kysh end is fundamentally inconsistent with the invention described in the JP Reference. According to the JP Reference, the improvement in pressure resistance results from a reduction in the diameter of the center panel, indicated by $D_b$ in Figures 2 and 4 of the JP Reference. The JP Reference states that "in order to reduce this buckling, the size of the center panels 3a, 3b may be reduced to thereby reduce, in turn, the internal pressure applied thereto" (page 2) and that "in a case where the can tops 12a, 12b, 12b' constructed [according to the invention] . . ., the areas of the center panels 13a, 13b, 13b' become smaller . . . and this reduces their pressure receiving areas, whereby

CC-3545;4772US8

axial loads acting thereon become smaller, thereby making it possible to reduce the thickness required to secure the predetermined pressure resistance" (JP Reference, pages 4-5).

47. However, the invention of Kysh improves pressure resistance by incorporating a vertical outside wall on the bead. As indicated in the Figure below, combining the teachings of Kysh with the JP Reference by forming a wall onto the JP Reference while keeping the chuck panel wall angle and countersink height constant will increase the diameter of the center panel. Therefore, one skilled in the art would not consider combining these two references because they push the design in opposite directions.

Combination of Kysh and the JP Reference

48. The third reason why one skilled in the art would not have been motivated to revise the angle of inclination of the wall of the unseamed can end described in the Kysh Patent according to the description of the seamed end in the JP Reference, so as to increase the angle of inclination of Kysh's wall to 30° or more, is because one would not have expected that any increase in pressure resistance would have been achieved as a result of such a modification.

CC-3545;4772US8

49. As explained above, by the mid-1990's, the industry had standardized on a seaming chuck with a lower wall angle of about 12° and an upper wall angle of about 4°. Seaming a Kysh end modified as suggested by the Examiner using a chuck of the conventional design would have resulted in unacceptable pressure resistance due to the wrinkling that would likely have occurred as a result of the very large inward deflection of the metal toward the upper portion of the seaming chuck. A sketch showing a conventional chuck inserted into a Kysh end modified according to the JP Reference so as to increase the angle of inclination of the wall to about 45° is shown below:

Kysh Modified to Increase Its Chuck Wall Angle

50. Therefore, one skilled in the art would have concluded that such a modified end, assuming it could be successfully seamed at all, would require the use of a chuck that was not designed according to the generally accepted configuration. The relatively modest reduction in metal usage (if any) resulting from the use of a can end according to the JP Reference would not have justified the use of a chuck of non-standard design.

51. Even if one were to modify the design of the chuck, according to the conventional thinking, to accommodate the increased angle of inclination, one would not have

expected that an increase in pressure resistance would result. The conventional thinking, prior to and at the time of the development project that resulted in SuperEnd, was that increasing the chuck wall angle from the standard 14° would weaken the end. Accordingly, significantly increasing the chuck wall angle of Kysh would have been considered a radical idea. And according to the conventional thinking of those in the seaming field at the time of the development of SuperEnd, the angle of the upper portion of the chuck wall, against which the metal is pressed by the seaming rolls, should be set so that the metal is bent through an angle of no more than about 10°. Therefore, according to conventional chuck design principles, a can end wall inclined at 43° would indicate that the angle of the upper portion of the chuck wall against which the metal is pressed by the seaming rolls should be no less than about 33°. One skilled in the art would not expect that seaming a can end having a 43° wall using such a chuck would result in a significant increase in pressure resistance.

52. The inventors of the SuperEnd Application discovered that increasing the overall angle of inclination of the end wall results in improved pressure resistance only when seamed using a radically different method of seaming. In particular, they discovered that improved pressure resistance is obtained by imparting an increased overall angle of inclination to the can end wall but then reforming an upper portion of that wall so that, in the seamed configuration, the lower portion of the wall remains inclined at a large angle but the upper portion becomes substantially vertical. This method is shown in the SuperEnd Application in Figures 5 to 7 and involves the use of a chuck in which the lower wall is inclined at a large angle but the upper wall is substantially cylindrical. This method of seaming was not taught or suggested by the prior art and there is nothing in the prior art cited by the Examiner that teaches or suggests seaming the end described in the Kysh Patent using such a method.[5]

[5] I understand that in another patent application pending in the U.S. Patent Office, the Examiner has determined that the method of seaming disclosed in the SuperEnd application is novel and nonobvious.

CC-3545;4772USB

53. In short, without having discovered the seaming method described in the SuperEnd Application, one skilled in the art would not have been motivated to modify the end disclosed in Kysh so as to increase the overall angle of inclination of the end wall into the 30° to 60° range.

54. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 29th July 2004.

Martin Higham [signature]

# CURRICULUM VITAE
## MARTIN HIGHAM

I am a graduate mechanical engineer (Cambridge University). I joined Metal Box, pre-University, as the first College Apprentice for a 1-year Practical Engineering course. I rejoined with an Honours Degree as a Graduate Trainee.

I have had over 30 years' experience in management of packaging manufacture in the UK, Kenya, S. E. Asia and South Africa.

This broad experience is in four significantly different cultures, and included management training courses -- one of which was a PMD course at Cape Town Business School.

My early experience was in production management and continued through Technical management as Technical Director in S. E. Asia across a wide range of technologies in 3 separate countries, followed by Technical Director of a division in Nampak, South Africa, and finally as senior manager / director in Technology Development in the Internationally renowned Metal Box Research Centre at Wantage, UK.

My management style is characterised by:

- Appreciation of peoples' needs and capabilities
- Determination and drive
- Team working, both as leader and participant

My key strengths are:

- Technical understanding of equipment and manufacturing processes
- An appreciation of the "value" of Technology Development
- An ability to make things happen quickly and effectively

| Personal Details: | Education: |
|---|---|
| • Married – 4 children<br>• Born – 30.03.1941 – England<br>• Home<br>398 Julius Jeppe Street<br>Waterkloof 0181<br>Pretoria<br>South Africa<br>• UK Citizen<br>• Willingness to travel and work abroad | • Epsom College 1954 – 1958<br>3 "A" levels – 8 "O" levels<br>• Cambridge University<br>Mechanical Science Tripos<br>• P.M.D. course, Cape Town Business School<br>• Various management courses |

Employment History – all within Metal Box / CMB/ Crown Cork & Seal

1. 2003 – present - Bevcan Division – various positions. Currently working as a consultant mainly for Nampak resolving issues on their 206 SuperEnd project, as well as technical support and a new promotional development.

2. 1999 – 2002 – Project Manager for 206 SuperEnd. Introduction into South African Beverage industry in all respects from material qualifications/supply, equipment choice and proving, plant development, initial production trials, customer presentations, initial customer conversions and final industry conversions covering 33 filling lines in 8 regions in Southern Africa and on 13 different seamer types. Capital cost for Nampak – US$10 million and annual production capacity of 4 billion.

3. 1997 – 1999 – Technical director Crown Cork & Seal in South Africa, involved in the manufacture of Crowns, beverage cans and ends, food cans, aerosols and general packaging.

4. CEO Dufalco – JV CMB/Hoogovens Aluminium, Belgium. Managing a technology development team of 30+ people with an annual budget of £1.8M. Identifying appropriate new technology, managing the development and technology transfer into commercial production.

5. Technical Director, Bevcan Division – Europe
New innovations, either invented or chosen, using appropriate management techniques.
Major successes as follows:

- 202 conversion for steel and aluminium cans
- Super End through need to prototype manufacture
- POP end, instant prize can and other promotional developments
- Customer presentations to demonstrate innovation capability of CMB for Bevcan customers and its mutual value.
- Lightweighting programmes

6. R&D Management projects whilst in Wantage Management team.
   - Warehouse – identified need, designed, capexed, directed project through to successful operation to time and cost (£0.6M).
   - T.Q. programme – responsible for identifying the need and choosing the Consultant, David Hutchins. Then setting up and managing the programme for 4 years.

7. 1988 – 1990 – Genesis Project Manager – Metal Box R&D, Wantage. The project was a JV – MB/Alcoa – to make plastic packaging in the USA. My role – manage technology development programmes and technology transfer into commercial production.

8. 1982 – 1988 – Technical Director – Beverage Division, Nampak Initially as Technical Manager at Rosslyn Plant to resolve output restrictions caused by technical problems. Major success with improvements to all important criteria. Promoted to Technical Director on setting up separate Beverage Can Division – 3 plants, 1.5 billion cans/ends capability.
   Major successes included:
   - Setting up technical support team
   - Introduction of technical manuals system
   - Direction of capital project for new Beverage line in Durban – cost £8M – output 300M – to time and cost.
   - Direction of capital Project converting SOT – EO Ends, using the very latest equipment to a very tight timescale dictated by the customer. The project was completed to time and cost.
   - Development of locally made production equipment to required standards for use instead of high cost imports.

9. 1976 – 1982 – Technical Director – Metal Box South East Asia. Metal Box had a regional organisation to support manufacturing activities in Singapore, Malaysia and Thailand. I provided technical and operational support for current production and planning of new projects.
   Major successes included:
   - Improvement to output performance in spoilage reductions, output improvement and resolution of major quality problems.
   - Direction/management of large projects to time and cost –
     - In 209 to 206 conversion – own and customer plants
     - purchase of second-hand can line, conversion to beverage and installation in Singapore to time and cost
     - development of local tool room to become profitable from a loss potion. Employment – 50 people.
     - Installation of DWI canmaking facility

1975 – 1976 DWI Operations Manager, Metal Box UK
1972 – 1975 Works Manager, Thika, Kenya
1969 – 1972 Technical Manager – Winsford Factory, Metal Box UK
I was responsible for building co-ordination and for equipment scheduling installation.
1963 – 1969 Various management roles from Trainee Foreman to Manafacturing Managing in the following factories, Wisbech, Westhoughton, Worcester, Arbroath.

**M.J. Higham**
21 May 2003





EPA/EPO/OEB
D-80298 München
+49 89 2399-0
TX 523 656 epmu d
FAX +49 89 2399-4465

Europäisches Patentamt | European Patent Office | Office européen des brevets

Generaldirektion 2 | Directorate General 2 | Direction Générale 2

COPY

Harding, Charles Thomas
D Young & Co
120 Holborn
London EC1N 2DY
GRANDE BRETAGNE

Datum/Date 29.04.05

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°/Patent Nr./Patent No./Brevet n°. |
|---|---|
| R4772EPn | 96908205.6-2308/0828663 |
| Anmelder/Applicant/Demandeur/Patentinhaber/Proprietor/Titulaire | |
| CarnaudMetalbox plc, et al | |

COMMUNICATION PURSUANT TO RULE 58(5) EPC

You are hereby informed that
(X) with the appeal decision of 10.02.05 the matter was remitted to the Opposition Division for maintenance of the patent as amended. A complete copy of the documents is attached hereto.
( ) the interlocutory decision by the Opposition Division of .........., on the amended form in which the European patent can be maintained has become final.

To enable the patent to be maintained in the amended form communicated the patent proprietor(s) is (are) requested WITHIN A PERIOD OF THREE MONTHS of notification of this communication

1. to pay the fee for the printing of a new specification of the European patent; this fee is set out below:

   EUR 50,00

2. to file translations of the amended claims in the two other official languages of the European Patent Office.

If the acts are not performed in full in due time they may still be validly performed within two months of notification of a communication pointing out the deficiencies, provided that within this two-months period, in addition to the omitted act(s) being completed, a surcharge equal to twice the fee for printing a new specification of the European patent is paid (Rule 58(6) EPC).

Confidential

REX 043540

Crown Packaging Technology v. Rexam Beverage Can 03-603

REGISTERED LETTER ../2

EPO Form 2328 12.01






Europäisches Patentamt | European Patent Office | Office européen des brevets

**COPY**

If the request pursuant to Rule 58(5) EPC is not met and full use or use in due time is not made of the aforementioned possibility, the European patent will be revoked (Article 102(4) and (5) EPC).
The designated Contracting States, the title of the invention in the three official languages of the European Patent Office, the international patent classification and the patent proprietor are set out in the attached EPO Form 2356.

FILING OF TRANSLATION IN THE CONTRACTING STATES
Pursuant to Article 65(1) EPC the following Contracting States require a translation of the new specification of the European patent in their/one of their official language(s) (the designated Contracting States are marked with a cross Rule 58(7) EPC)

WITHIN THREE MONTHS of publication of the mention of the decision on the opposition:

AT (X) Austria
BE (X) Belgium
CH/LI (X) Switzerland/Liechtenstein
CY ( ) Cyprus
DE (X) Germany (if B1 document published after 31.5.92)
DK ( ) Denmark
ES (X) Spain
FI ( ) Finland
FR (X) France
GB ( ) United Kingdom (if B1 document published after 31.8.1987)
GR (X) Greece
IT (X) Italy
NL ( ) Netherlands
PT (X) Portugal
SE ( ) Sweden
TR ( ) Turkey
.. ( ) ..........................

WITHIN SIX MONTHS of publication of the mention of the decision on the opposition:

IE ( ) Ireland
.. ( ) ..........................

The date on which the European Patent Bulletin publishes the mention of the decision on the opposition will be indicated in the decision on the maintenance of the European patent (EPO Form 2329).
The translation(s) must be filed in accordance with the provisions applying thereto in the Contracting State(s) concerned. Further details (e.g. appointment of a national representative or indication of an address for service within the country) are given in the EPO information brochure "National law relating to the EPC" and in the supplementary information published in the Official Journal of the EPO.

Failure to supply such translation(s) in time and in accordance with the requirements may result in the patent being deemed to be void ab initio in the State concerned.

Confidential

REX 043541

| Anmeldung Nr./Application No./Demande n°/Patent Nr./Patent No./Brevet n°. | Blatt/Page/Feuille |
|---|---|
| 96908205.6 ../3 | 2 |

B108

Europäisches Patentamt | European Patent Office | Office européen des brevets

COPY

Note to users of the automatic debiting procedure:

Unless the EPO receives prior instructions to the contrary, the fee will be debited on the last day of the period for payment. For further details see the Arrangements for the automatic debiting procedure (see Supplement to OJ EPO 2/1999; OJ EPO 2000, 62).

Konstantin Berger
Formalities Officer
Tel-No.: (089) 2399-2036

Enclosures: Form 2356
X Copies of the documents specified in the appeal decision

Confidential

REX 043542

| Anmeldung Nr./Application No./Demande n°./Patent Nr./Patent No./Brevet n°. | Blatt/Page/Feuille |
|---|---|
| 96908205.6 REGISTERED LETTER | 3 |

| EPO Form 2328 12.01 | | | | 7051071 22/04/05 |
|---|---|---|---|---|
| 96908205.6 | PMAP,C | DOC | etc. | |
| | | | | |

EPA/EPO/OEB
D-80298 München
+49 89 2399-0
TX 523 656 epmu d
FAX +49 89 2399-4465

Europäisches Patentamt | European Patent Office | Office européen des brevets

Generaldirektion 2 | Directorate General 2 | Direction Générale 2

COPY

Lawrence, Peter Robin Broughton
GILL JENNINGS & EVERY,
Broadgate House,
7 Eldon Street
London EC2M 7LH
GRANDE BRETAGNE

Datum/Date
29.04.05

| Zeichen/Ref/Réf | Anmeldung Nr./Application No./Demande n°/Patent Nr./Patent No./Brevet n° |
|---|---|
| PRL0433500 OPPO 01 | 96908205.6-2308/0828663 |
| Anmelder/Applicant/Demandeur/Patentinhaber/Proprietor/Titulaire | |
| CarnaudMetalbox plc, et al | |

/OD

COMMUNICATION PURSUANT TO RULE 58(5) EPC

You are hereby informed that
(X) with the appeal decision of 10.02.05 the matter was remitted to the Opposition Division for maintenance of the patent as amended. A complete copy of the documents is attached hereto.
( ) the interlocutory decision by the Opposition Division of .........., on the amended form in which the European patent can be maintained has become final.

To enable the patent to be maintained in the amended form communicated the patent proprietor(s) is (are) requested WITHIN A PERIOD OF THREE MONTHS of notification of this communication

1. to pay the fee for the printing of a new specification of the European patent; this fee is set out below:

   EUR 50,00

2. to file translations of the amended claims in the two other official languages of the European Patent Office.

If the acts are not performed in full in due time they may still be validly performed within two months of notification of a communication pointing out the deficiencies, provided that within this two-months period, in addition to the omitted act(s) being completed, a surcharge equal to twice the fee for printing a new specification of the European patent is paid (Rule 58(6) EPC).

Confidential

REX 043543

FOR INFORMATION ../2

EPO Form 2328 12.01

Europäisches Patentamt | European Patent Office | Office européen des brevets

COPY

If the request pursuant to Rule 58(5) EPC is not met and full use or use in due time is not made of the aforementioned possibility, the European patent will be revoked (Article 102(4) and (5) EPC).
The designated Contracting States, the title of the invention in the three official languages of the European Patent Office, the international patent classification and the patent proprietor are set out in the attached EPO Form 2356.

FILING OF TRANSLATION IN THE CONTRACTING STATES
Pursuant to Article 65(1) EPC the following Contracting States require a translation of the new specification of the European patent in their/one of their official language(s) (the designated Contracting States are marked with a cross Rule 58(7) EPC)

WITHIN THREE MONTHS of publication of the mention of the decision on the opposition:

AT (X) Austria
BE (X) Belgium
CH/LI (X) Switzerland/Liechtenstein
CY ( ) Cyprus
DE (X) Germany (if B1 document published after 31.5.92)
DK ( ) Denmark
ES (X) Spain
FI ( ) Finland
FR (X) France
GB ( ) United Kingdom (if B1 document published after 31.8.1987)
GR (X) Greece
IT (X) Italy
NL ( ) Netherlands
PT (X) Portugal
SE ( ) Sweden
TR ( ) Turkey
.. ( ) .........................

WITHIN SIX MONTHS of publication of the mention of the decsion on the opposition:

IE ( ) Ireland
.. ( ) .........................

The date on which the European Patent Bulletin publishes the mention of the decision on the opposition will be indicated in the decision on the maintenance of the European patent (EPO Form 2329).
The translation(s) must be filed in accordance with the provisions applying thereto in the Contracting State(s) concerned. Further details (e.g. appointment of a national representative or indication of an address for service within the country) are given in the EPO information brochure "National law relating to the EPC" and in the supplementary information published in the Official Journal of the EPO.

Failure to supply such translation(s) in time and in accordance with the requirements may result in the patent being deemed to be void ab initio in the State concerned.

Konstantin Berger
Formalities Officer
Tel-No.: (089) 2399-2016

Enclosures: Form 2356
X Copies of the documents specified in the appeal decision

| Anmeldung Nr./Application No./Demande n°/Patent Nr./Patent No./Brevet n°. | Blatt/Page/Feuille |
|---|---|
| 96908205.6 | 2 |

EPO Form 2328 12.01 7051081 22/04/05

Confidential

REX 043544

EPA/EPO/OEB
D-80298 München
☎ +49 89 2399-0
TX 523 656 epmu d
FAX +49 89 2399-4465

Europäisches Patentamt | European Patent Office | Office européen des brevets

Generaldirektion 2 | Directorate General 2 | Direction Générale 2

COPY

Harding, Charles Thomas
D Young & Co
120 Holborn
London EC1N 2DY
GRANDE BRETAGNE

Datum/Date 29.04.05

| Zeichen/Ref./Réf. | Anmeldung Nr./Application No./Demande n°/Patent Nr./Patent No./Brevet n°. |
|---|---|
| R4772EPu | 96908205.6-2308 0828663 |
| Anmelder/Applicant/Demandeur/Patentinhaber/Proprietor/Titulaire | |
| CarnaudMetalbox plc, et al | |

For the intended maintenance of the european patent, (1) the title of the invention in the three official languages of the European Patent Office, (2) the International Patent Classification and (3) the designated Contracting States and the proprietor's registered name, address and country of residence or principal place of business are set out below.

(1)
- DOSEN ENDVERSCHLUSS UND VERFAHREN ZUM BEFESTIGEN DESSELBEN AN EINEM DOSENKÖRPER
- CAN END AND METHOD FOR FIXING THE SAME TO A CAN BODY
- EXTREMITE DE BOITE METALLIQUE ET PROCEDE PERMETTANT DE LA FIXER SUR UN CORPS DE BOITE METALLIQUE

(2) CLASS STRING: B65D6/30, B21D51/32

(3) GB-IE
CarnaudMetalbox plc
Downsview Road
Wantage, Oxon OX12 9BP/GB

AT-BE-CH-LI-DE-DK-ES-FI-FR-GR-IT-NL-PT-SE
CarnaudMetalbox SA
67, rue Arago
93400 Saint Ouen/FR

Confidential

REX 043545

Crown Packaging Technology v. Rexam Beverage Can

B112

7. JAN. 2005 11:39 D YOUNG & CO NO. 380 P. 39

16/2/05

EP 0 828 663 B1

before forming of a double seam with a can body, the can end

Description

[0001] This invention relates to an end wall for a container and more particularly but not exclusively to an end wall of a can body according to the preamble of claim 1 and a method for fixing the end wall to the can body by means of a double seam according to the preamble of claim 9.

[0002] US Patent 4093102 (KRASKA) describes can ends comprising a peripheral cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave annular re-inforcing bead extending radially inwards from the chuck wall and a central panel joined to an inner wall of the reinforcing bead by an annular outwardly convex bead. This can end is said to contain an internal pressure of 90psi by virtue of the inclination or slope of the chuck wall, bead outer wall and bead inner wall to a line perpendicular to the centre panel. The chuck wall slope D° is between 14° and 16°, the outer wall slope E is less than 4° and the inner wall slope C° is between 10 and 16° leading into the outwardly convex bead. We have discovered that improvements in metal usage can be made by increasing the slope of the chuck wall and limiting the width of the anti peaking bead.

[0003] US Patent 4217843 (KRASKA) describes an alternative design of can end in which the countersink has inner and outer flat walls, and a bottom radius which is less than three times the metal thickness. The can end has a chuck wall extending at an angle of approximately 24° to the vertical. Conversely, our European Patent application EP0340955A describes a can end in which the chuck wall extends at an angle of between 12° and 20° to the vertical.

[0004] Our European Patent No. 0153115 describes a method of making a can end suitable for closing a can body containing a beverage such as beer or soft drinks. This can end comprises a peripheral flange or cover hook, a chuck wall dependent from the interior of the cover hook, an outwardly concave reinforcing bead extending radially inwards from the chuck wall from a thickened junction of the chuck wall with the bead, and a central panel supported by an inner portion of the reinforcing bead. Such can ends are usually formed from a prelacquered aluminium alloy such as an aluminium magnesium manganese alloy such as alloy 5182.

[0005] Our International Patent Application published no. WO93/17864 describes a can end suitable for a beverage can end formed from a laminate of aluminium/manganese alloy coated with a film of semi crystalline thermoplastic polyester. This polyester/aluminium alloy laminate permitted manufacture of a can end with a narrow, and therefore strong reinforcing bead in the cheaper aluminium manganese alloy.

[0006] These known can ends are held during double seaming by an annular flange of chuck, the flange being of a width and height to enter the anti-peaking bead. There is a risk of scuffing if this narrow annulus slips. Furthermore a narrow annular flange of the chuck is susceptible to damage.

[0007] Continuing development of a can end using less metal, whilst still permitting stacking of a filled can upon the end of another, this invention provides a can end comprising a peripheral cover hook, a chuck wall dependant from the interior of the cover hook, an outwardly concave annular reinforcing bead extending radially inwards from the chuck wall, and a central panel supported by an inner portion of the reinforcing bead, characterised in that, the chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle between [30°] and 60°, and the concave cross sectional radius of the reinforcing bead is less than 0.75mm. Preferably, the angle of the chuck wall to the perpendicular is between 40° and 45°.

40°

[0008] In a preferred embodiment of the can end an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel at an angle between -15° to +15° and the height of the outer wall is up to 2.5mm.

[0009] In one embodiment the reinforcing bead has an inner portion parallel to an outer portion joined by said concave radius.

[0010] The ratio of the diameter of the central panel to the diameter of the peripheral curl is preferably 80% or less.

[0011] The can end may be made of a laminate of thermoplastic polymer film and a sheet aluminium alloy such as a laminate of a polyethylene teraphthalate film on an aluminium - manganese alloy sheet or ferrous metal typically less than 0.010 (0.25mm) thick for beverage packaging. A lining compound may be placed in the peripheral cover hook.

[0012] In a second aspect this invention provides a method of forming a double seam between a can body and a can end according to ~~any preceding claim~~, said method comprising the steps of:-

placing the curl of the can end on a flange of a can body supported on a base plate, locating a chuck within the chuck wall of the can end to centre the can end on the can body flange, said chuck having a frustoconical drive surface of substantially equal slope to that of the chuck wall of the can end and a cylindrical surface portion extending away from the drive surface within the chuckwall, causing relative motion as between the assembly of can end and can body and a first operation seaming roll to form a first operation seam, and thereafter causing relative motion as between the first operation seam and a second operation roll to complete a double seam, during these seaming operations the chuck wall becoming bent to contact the cylindrical portion of the chuck.

[0013] Various embodiments will now be described by way of example and with reference to the accompanying drawings in which:-

the invention

(whereby the examples disclosing angles C below 40° do not fall within the scope of the claims)

Confidential

REX 043546

EMPFANGSZEIT 7. JAN. 12:47 AUSDRUCKSZEIT 7. JAN. 13:04

10/2/05

EP 0 828 663 B1

Figure 1 is a diagrammatic sketch of known apparatus for forming a double seam;
Figure 2 is an enlarged sectioned side view of a known chuck and can end before seaming;
Figure 3 is a sectioned view of a fragment of a known double seam;
Figure 4 is a sectioned side view of a can end according to this invention before edge curling;
Figure 5 is a sectioned side view of the can end of Figure 4 on a can body before forming of a double seam;
Figure 6 is a like view of the can end and body during first operation seaming;
Figure 7 is a like view of the can end and body during final second operation seaming to create a double seam;
Figure 8 is a fragmentary section of a chuck detail; and
Figure 9 is a side view of the cans stacked one on the other.

[0014] In Figure 1, apparatus for forming a double seam comprises a base plate 1, an upright 2 and a top plate 3.

[0015] A lifter 4 mounted in the base plate is movable towards and away from a chuck 5 mounted in the top plate. The top plate supports a first operation seaming roll 6 on an arm 7 for pivotable movement towards and away from the chuck. The top plate also supports a second operation seaming roll 8 on an arm 9 for movement towards and away from the chuck after relative motion as between the first operation roll and can end on the chuck creates a first operation seam.

[0016] As shown in Figure 1 the chuck 5 holds a can end 10 firmly on the flange 11 of a can body 12 against the support provided by the lifter plate 4. Each of the first operation roll 6 and second operation roll 8 are shown clear of chuck before the active seam forming profile of each roll is moved in turn to form the curl of the can end and body flange to a double seam as shown in Figure 3.

[0017] Figure 2 shows on an enlarged scale the chuck 5 and can end 10. The can end comprises a peripheral curl 13, a chuck wall 14 dependent from the interior of the curl, an outwardly concave anti-peaking bead 15 extending inwards from the chuck wall to support a central panel 16. Typically the chuck wall flares outwardly from the vertical at an angle C about 12° to 15°.

[0018] The chuck 5 comprises a body 17 having a threaded bore 18 permitting attachment to the rest of the apparatus (not shown). An annular bead 19 projects from the body 17 of the chuck to define with the end face of the body a cavity to receive the central panel 16 of the can end. The fit of panel 16 in annulus 19 may be slack between panel wall and chuck.

[0019] The exterior surface of the projecting bead 19 extends upwards towards the body at a divergent angle B of about 12° to the vertical to join the exterior of the chuck body 17 which tapers off an angle A° of about 4° to a vertical axis perpendicular to the central panel. The outer wall of the chuck 5 engages with the chuck wall at a low position marked "D" within the 12° shaped portion of the chuck bead 15.

[0020] As can ends are developed with narrower anti-peaking beads the chuck bead 19 becomes narrower and more likely to fracture. There is also a risk of scuffing of the can end at the drive position D which can leave unacceptable unsightly black marks after pasteurisation.

[0021] Figure 3 shows a sectioned fragment of a typical double seam showing a desirable overlap of body hook 21 and end hook 20 between the can end 10 and can body 12.

[0022] Figure 4 shows a can end, according to the invention, comprising a peripheral cover hook 23, a chuck wall 24 extending axially and inwardly from the interior of the peripheral cover hook, an outwardly concave reinforcing or anti-peaking bead 25 extending radially inwards from the chuck wall, and a central panel 26 supported by an inner portion 27 of bead 25. The panel wall is substantially upright allowing for any metal spring back after pressing. The chuck wall is inclined to an axis perpendicular to the exterior of the central panel at an angle C between 30° and 60°; preferably between 40° and 45°. Typically the cross sectional radius of the antipeaking bead is about 0,5mm.

4

[0023] Preferably the anti-peaking bead 25 is parallel sided, however the outer wall may be inclined to a line perpendicular to the central panel at an angle between -15° to +15° and the height $h_4$ of the outer wall may be up to 2.5mm.

[0024] This can end is preferably made from a laminate of sheet metal and polymeric coating. Preferably the laminate comprises an aluminium magnesium alloy sheet such as 5182, or aluminium manganese alloy such as 3004 with a layer of polyester film on one side. A polypropylene film may be used on the "other side" if desired.

[0025] Typical dimensions of the example of the invention are:-

| | | |
|---|---|---|
| d5 | overall diameter (as stamped) | 65.83mm |
| d4 | PC diameter of seaming panel radius | 61.54mm |
| d3 | PC diameter of seaming panel/chuck wall radius | 59.91mm |
| $r_1$ | seaming panel/chuck wall radius | 1.27mm |

Confidential

REX 043547

Crown Packaging Technology v. Rexam Beverage Can

(continued)

| | | |
|---|---|---|
| $r_2$ | seaming panel radius | 5.56mm |
| $r_3$ | concave radius in antipeaking bead | <0.75mm |
| $d_2$ | maximum diameter of antipeaking bead | 50.00mm |
| $d_1$ | minimum diameter of antipeaking bead | 47.24mm |
| $h_2$ | overall height of can end | 6.86mm |
| $h_1$ | height to top of antipeaking bead | 5.02mm |
| $h_3$ | panel depth | 2.29mm |
| $h_4$ | outer wall height | 1.76mm |
| c | chuck wall angle to vertical | 43° |

[0026] From these dimensions it can be calculated that the ratio of central panel diameter of 47.24mm to overall diameter of can end 65.84 is about 0.72 to 1.

[0027] For economy the aluminium alloy is in the form of sheet metal less than 0.010" (0.25mm). A polyester film on the metal sheet is typically 0.0005" (0.0125mm).

[0028] Although this example shows an overall height $h_2$ at 6.85mm we have also found that useful can ends may be made with an overall height as little as 6.35mm (0.25").

[0029] Figure 5 shows the peripheral flange 23 of can end 22 of Figure 4 resting on the flange 11 of a can body 12 before formation of a double seam as discussed with reference to Figure 1.

[0030] In Figure 5 a modified chuck 30 comprises a chuck body 31 having a frustoconical drive surface 32 engaging with the chuck wall 24 of the can end 22.

[0031] The frustoconical drive surface is inclined outwardly and axially at an angle substantially equal to the angle of inclination C° of between [illegible] and 60°; in this particular example on chuck angle C of 43° is preferred. The drive surface 32 is a little shorter than the chuck wall 24 of the chuck body. The substantially cylindrical surface portion 33, rising above the drive surface 32, may be inclined at an angle between +4° and -4° to a longitudinal axis of the chuck. As in Figure 2, this modified chuck 30 has a threaded aperture to permit attachment to the rest of the double seam forming apparatus (not shown).

[0032] In contrast to the chuck of Figure 2 the modified chuck 30 is designed to drive initially on the relatively large chuck wall 32 without entering deeply into the anti-peaking bead 25. Further drive is obtained at the juncture of chuck wall 32 and cylindrical wall 33 as chuck wall of end 24 is deformed during 1st and 2nd operation seaming Figure 6 and 7. The chuck 30 shown in Figure 5 has an annular bead of arcuate cross section but this bead is designed to enter the chuck wall without scratching or scuffing a coating on the can end; not to drive on the concave bead surface as shown in Figure 2.

[0033] It will be understood that first operation seaming is formed using apparatus as described with reference to Figure 1.

[0034] Figure 6 shows the modified can end and chuck during formation of a first operation seam shown at the left of Figure 2 as formed by a first operation roll 34 adjacent the interfolded peripheral flange of the can end and flange 11 body 12.

[0035] During relative rotation as between the can end 22 and first operation roll 34 the edge between the chuck drive wall 32 and cylindrical wall 33 exerts a pinching force between chuck 30 and roll 34 to deform the chuck wall of the can end as shown.

[0036] After completion of the first operation seam the first operation roll is swung away from the first operation seam and a second operation roll 38 is swung inwards to bear upon the first operation seam supported by the chuck 30. Relative rotation as between the second operation roll 38 and first operation seam supported by a chuck wall 30 completes a double seam as shown in Figure 7 and brings the upper portion of the chuck wall 24 to lie tightly against the can body neck in a substantially upright attitude as the double seam is tightened by pinch pressure between the second operation roll 38 and chuck 30.

[0037] Can ends were made from aluminium alloy 5182 and an aluminium alloy 3004/polymer laminate sold by CarnaudMetalbox under the trade mark ALULITE. Each can end was fixed by a double seam to a drawn and wall ironed (DWI) can body using various chuck angles and chuck wall angle as tabulated in Table 1 which records the pressure inside a can at which the can ends failed.

Confidential

REX 043548

10/2/05

TABLE 1

| SAMPLE CODE | CAN END DATA | | | PRESSURE IN BAR (PSIG) TO FAILURE FOR VARIOUS SEAMING CHUCK ANGLES B° | | | | |
|---|---|---|---|---|---|---|---|---|
| | MATE-RIAL Thickness mm | MINIMUM Diameter D1 mm | CHUCK WALL ANGLE "C" | 23° | 10°/23° | 4°/23° | 23° WITH D. SEAM RING | 10°/23° WITH D. SEAM RING |
| A | ALULITE 0.23 | 52.12 (2.052") | 21.13° | 5.534 (80.20) | 5.734 (83.10) | 5.311 (76.97) | 6.015 (87.17) | 5.876 (85.14) |
| B | 5182 0.244 | 52.12 (2.052") | 21.13° | 5.599 (81.15) | 5.575. (80.79) | 5.381 (77.99) | 5.935 (86.01) | 5.895 (85.43) |
| C | 5182 0.245 | 52.12 (2.052") | 21.13° | 6.004 (87.02) | 5.910 (85.65) | 5.800 (84.06) | 6.224 (90.21) | 6.385 (92.54) |
| D | ALULITE 0.23 | 51.92 (2.044") | 21.13° | 5.334 (77.31) | 5.229 (75.78) | 5.238 (75.91) | 5.730 (83.04) | 5.404 (78.32) |
| E | 5182 0.224 | 51.92 (2.044") | 21.13° | 5.555 (80.50) | 5.514 (79.92) | 5.354 (77.60) | 5.895 (85.43) | 5.930 (85.94) |
| F | 5182 0.245 | 51.92 (2.044") | 23° | 5.839 (84.63) | 5.804 (84.12) | 5.699 (82.59) | 6.250 (90.58) | 6.435 (93.26) |
| G | ALULITE 0.23 | 51.92 (2.044") | 23° | | | 5.123 (74.25) | | |
| H | 5182 0.224 | (51.92) (2.044") | 23° | | | 5.474 (79.34) | | |
| I | 5182 0.245 | 51.92 (2.044") | 23° | | | 5.698 (82.58) | | |

All pressures on unaged shells in bar (psig). 5182 is an aluminium-magnesium-manganese alloy lacquered. The "ALULITE" used is a laminate of aluminium alloy and polyester film.

[0038] The early results given in Table 1 showed that the can end shape was already useful for closing cans containing relatively low pressures. It was also observed that clamping of the double seam with the "D" seam ring resulted in improved pressure retention. Further tests were done using a chuck wall angle and chuck drive surface inclined at nearly 45°: Table 2 shows the improvement observed:-

Confidential

Table 2

| Sample Code | $h_2$ mm(inches) | $h_3$ mm(inches) | $h_4$ mm(inches) | Chuck Angles B° | |
|---|---|---|---|---|---|
| | | | | 43° | 43° with seam ring |
| J | 6.85(0.270) | 2.39(0.094) | 2.29(0.09) | 4.89(70.9) | 6.15 (89.1) |
| K | 7.11(0.280) | 2.64(0.104) | 2.54(0.10) | 4.83(70.0) | 5.98 (86.6) |
| L | 7.37(0.290) | 2.90(0.114) | 2.79(0.11) | 4.74(68.7) | 6.44 (93.3) |

[0039] Table 2 is based on observations made on can ends made of aluminium coated with polymer film (ALULITE) to have a chuck wall length of 5.029mm (0.198") up the 43° slope.

[0040] It will be observed that the container pressures achieved for samples J, K, L, 4.89 bar (70.9 psig), 4.83 bar (70.0 psig) and 4.74 bar (68.7 psig) respectively were much enhanced by clamping the double seam.

[0041] In order to provide seam strength without use of a clamping ring, modified chucks were used in which the drive slope angle C° was about 43° and the cylindrical surface 33 was generally +4° and -4°. Results are shown

REX 043549

C Thy 10/2/05

EP 0 828 663 B1

Table 3

| Results | | | | |
|---|---|---|---|---|
| SAMPLE CODE | MATERIAL | LINING COMPOUND | CHUCK ANGLES DRIVE/WALL | PRESSURE |
| c | 0.224 5182 | with | 43° | 4.60 (66.7) |
| g | 0.23 Alulite | with | 43°/4° | 5.45 (79.0) |
| h | 0.224 5182 | with | 43°/4° | 6.46 (93.6) |
| j | 0.23 Alulite | without | 43°/4° | 5.91 (85.6) |
| k | 0.244 5182 | without | 43°/4° | 6.18 (89.6) |
| l | 0.23 Alulite | without | 43°/-4° | 5.38 (77.9) |
| m | 0.25 Alulite | without | 43°/-4° | 6.20 (89.8) |
| n | 0.23 Alulite | without | 43°/0° | 6.11 (88.5) |
| o | 0.25 Alulite | without | 43°/0° | 6.62 (95.9) |

ALL PRESSURES IN BAR (PSIG)
ALL CODES
Reform Pad Dia. 47.24mm (1.860") (202 Dia).
6.86mm (0.270") unit Depth $h_2$ 2.39mm (0.094") Panel Depth

[0042] Table 3 shows Code "O" made from 0.25mm Alulite to give 6.62 bar (95 psi) Pressure Test Result indicating a can end suitable for pressurised beverages. Further chucks with various land lengths (slope) were tried as shown in Table 4.

Table 4

| CHUCK WALL ANGLE | | | | |
|---|---|---|---|---|
| VARIABLE CODE | 43°/0° 1.9mm LAND SHARP TRANSITION | | 43°/0° 1.27MM LAND R. 0.5MM BLEND | |
| | NO. D.SEAM RING | WITH D.SEAM RING | NO. D.SEAM RING | WITH D.SEAM RING |
| 7 | 6.699(97.06) | 7.017(101.7) | 6.779(98.24) | 7.006(101.54) |
| 8 | 6.315(91.52) | 6.521(94.5) | 6.293(91.2) | 6.235(90.37) |
| 9 | 6.095(88.33) | 6.30(91.3) | 6.238(90.4) | 6.719(97.38) |

ALL PRESSURES IN BAR (PSIG)

CODE
7 = 0.25mm Alulite, 47.24mm (1.860") Reform Pad, 6.85mm (0.270") $h_2$ Depth, 2.38mm (0.094") Panel; $h_4$ depth = 2.29mm (0.09")
8 = 0.23mm Alulite, 47.24mm (1.860") Reform Pad, 7.11mm (0.280") $h_2$ Depth, 2.54mm (0.104") Panel; $h_4$ depth = 2.54mm (0.10")
9 = 0.23mm Alulite, 47.24mm (1.860") Reform Pad, 7.37mm (0.290") $h_2$ Depth, 2.90mm (0.114") Panel; $h_4$ depth = 2.79mm (0.11")

Confidential

[0043] Table 4 shows results of further development to seaming chuck configuration to bring closer the pressure resistance of ring supported and unsupported double seams.

[0044] Table 4 identifies parameters for length of generally vertical cylindrical surface 33 on the seaming chuck 30, and also identifies a positional relationship between the chuck wall 24 of the end and the finished double seam. It will be understood from Figure 7 that the forces generated by thermal processing or carbonated products are directed towards and resisted by the strongest portions of the completed double seam.

[0045] Table 5 Shows results obtained from a typical seam chuck designed to give double seam in accordance with

REX 043550

Crown Packaging Technology v. Rexam Beverage Can 05-608

7. JAN. 2005 11:34 D YOUNG & CO NO. 380 P. 36

10/2/05

EP 0 828 663 B1

parameters and relationships identified in Table 4. Typically: As shown in Figure 8 the chuck comprises a cylindrical land of length T typically 1.9mm (0.075") and frustoconical drive surface 38 inclined at an angle Y°, typically 43°, to the cylindrical to which it is joined by a radius R typically 0.5mm (0.020"). Angle "X" is typically 50°.

Table 5

| CODE | GAUGE | DIMENSIONS mm | | PRESSURE | |
|---|---|---|---|---|---|
| | | $h_2$ | $h_3$ | bar | (psi) |
| 20 | .23mm | 7.37 (.290") | 2.36 (.093") | 6.383 | (92.6) |
| 21 | .23mm | 7.37 (.290") | 2.36 (.093") with compound | 6.402 | (92.8) |
| 26 | .23mm | 6.87 (.2705") | 2.37 (.0935") | 6.144 | (89.98) |
| 27 | .23mm | 6.87 (.2705") | 2.37 (.0934") with compound | 6.071 | (88.0) |
| 28 | .23mm | 7.37 (.290") | 2.36 (.093") | 6.414 | (93.0) |
| 29 | .23mm | 7.37 (.290") | 2.84 (.112") | 6.725 | (97.5) |
| 30 | .23mm | 6.86 (.270") | 2.37 (.0935") | 6.062 | (87.9) |
| 31 | .23mm | 6.86 (.270") | 2.37 (.0935") | 6.013 | (87.2) |
| 34 | .25mm | 7.37 (.290") | 2.87 (.113") | 7.787 | (112.9) |
| 36 | .25mm | 7.32 (.288") | 2.34 (.092") | 7.293 | (105.8) |
| 37 | .25mm | 7.32 (.288") | 2.34 (.092") with compound | 7.402 | (107.3) |
| 38 | .25mm | 6.87 (.2705") | 2.41 (.095") | 7.077 | (102.6) |
| 516 | .25mm | 6.35 (.250") | 2.34 (.092") with compound | 6.937 | (100.6) |
| All variables made from Alulite, 10 Cans per variable. | | | | | |

[0046] The can ends may be economically made of thinner metal if pressure retention requirements permit because these can ends have a relatively small centre panel in a stiffer annulus.

[0047] Figure 9 shows a can 12a, closed according to this invention, stacked upon a like can 12b shown sectioned so that stacking of the upper can on the lower can end is achieved by a stand bead 31a of the upper can fits inside the chuck wall 24 of the lower can end with the weight of the upper can resting on the double seam 34 of the lower can end.

[0048] The clearance between the bottom of the upper can body and lower can end may be used to accommodate ring pull features (not shown) in the can end or promotional matter such as an coiled straw or indicia.

[0049] Using the experimental data presented above, a computer programme was set up to estimate the resistance to deformation available to our can ends when joined to containers containing pressurised beverage. The last two entries on the table relate to a known 206 diameter beverage can end and an estimate of what we think the KRASKA patent teaches.

Confidential

REX 043551

Crown Packaging Technology v. Rexam Beverage Can 03-cv-

10/2/05

TABLE 6

| END SIZE [illegible] | OVERALL DIA $d_2$ mm | PANEL DIA $d_1$ mm | RATIO $D_2/D_1$ | CHUCK WALL ANGLE B° | CHUCK WALL LENGTH L mm | RE-ENFORCING RAD $r_3$ mm | INNER WALL HEIGHT $h_i$ mm | OUTER WALL HEIGHT $h_t$ mm | PREDICTED CUT EDGE ø (* DENOTES ACTUAL) | ACTUAL THICKNESS TO CONTAIN PSI |
|---|---|---|---|---|---|---|---|---|---|---|
| 206-204 | 64.39 (2.535") | 49.49 (1.9485") | 1.3010 | 33.07° | 4.22 (0.166") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 75.230 (2.9618") | 0.255 |
| 206-202 | 64.39 (2.535") | 47.33 (1.8634") | 1.3604 | 42.69° | 4.95 (0.195") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 74.272 (2.9241")* | 0.255 |
| 206-200 | 64.39 (2.535") | 45.07 (1.7744") | 1.4207 | 50.053° | 5.82 (0.229") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.713 (2.9021") | 0.255 |
| 204-202 | 62.18 (2.448") | 47.33 (1.8634") | 1.3137 | 29.78° | 3.96 (0.156") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 73.767 (2.9042") | 0.24 |
| 204-200 | 62.18 (2.448") | 45.07 (1.7744") | 1.3796 | 40.786° | 4.70 (0.185") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 72.911 (2.8705") | 0.24 |
| 202-200 | 71.90 (2.034") | 45.07 (1.7744") | 1.597 | 30.266° | 4.09 (0.161") | 0.52 (0.0204") | 2.34 (0.092") | 1.78 (0.070") | 71.904 (2.034") | 0.225 |
| 206 std | 64.69 (2.547") | 51.92 (2.044") | 1.2461 | 15.488° | 4.39 (0.173") | 0.56 (0.022") | 2.03 (0.080") | - | 76.459 (3.010")* | 0.28 |
| KRASKA ESTIMATE | 64.39 (eg 2.535") | - | - | 15° | 2.54 (0.100") | 0.81 (0.032") | 1.65 (0.065") | 2.29 (0.090") | 78.080 (3.074") | 0.292 (0.0115") |

All experiments modelled on a notional aluminium alloy of yield strength 310mpa 0.25mm thick. The standard was also 310mpa BUT 0.275mm thick.

Confidential

REX 043552

Crown Packaging Technology v. Rexam Beverage Can

7. JAN. 2005 11:31 V YOUNG & CO NO. 380 P. 15

10/2/05

REQUEST

~~AUXILIARY REQUEST (2)~~

1. A can end before forming of a double seam with a can body, the can end comprising a peripheral cover hook (23), a chuck wall (24) dependent from the interior of the cover hook, an outwardly concave annular reinforcing bead (25) extending radially inwards from the chuck wall, and a central panel (26) supported by an inner portion (27) of the reinforcing bead, characterised in that, the chuck wall (24) is inclined to an axis perpendicular to the exterior of the central panel (26) at an angle c between 40° and 60°, and the concave cross-sectional radius of the reinforcing bead (25) is less than 0.75 mm.

2. A can end according to claim 1 wherein the angle of the chuck wall (24) to the perpendicular axis is between 40° and 45°.

3. A can end according to any of claims 1 to 2, characterised in that an outer wall of the reinforcing bead is inclined to a line perpendicular to the central panel (26) of the can end at an angle between -15° and +15° and the height $h_4$ of the outer wall is up to 2.5mm.

4. A can end according to any of claims 1 to 3 characterised in that the reinforcing bead (25) has an inner portion parallel to an outer portion joined by said concave radius.

5. A can end according to any preceding claim characterised in that the ratio of the diameter of the central panel (26) to the diameter of the peripheral curl (23) is 80% or less.

6. A can end according to any preceding claim characterised in that it is made of a laminate of thermoplastic polymer film and a sheet aluminium alloy or tinplate or electrochrome coated steel.

Confidential

REX 043553

Crown Packaging Technology v. Rexam Beverage Can 03-070

EMPFANGSZEIT 7. JAN. 12:47 AUSDRUCKSZEIT 7. JAN. 13:06

Clays 10/2/05

7. A can end according to claim 6 characterised in that the laminate comprises a polyethylene terephthalate film on an aluminium - manganese - alloy sheet less than 0.010" (0.25mm) thick.

8. A method of forming a double seam between a can body (12) and a can end (22) according to any preceding claim, said method comprising the steps of:-
placing the curl (23) of the can end on a flange (11) of a can body supported on a base plate (4); locating a chuck (30) within the chuck wall (24) of the can end, said chuck having a frustoconical drive surface (32) of substantially equal slope B° to that of the chuck wall of the can end and a substantially cylindrical surface portion (33) extending away from the drive surface; causing relative motion as between the assembly of can end and can body and a first operation seaming roll (34) to form a first operation seam, and thereafter causing relative motion as between the first operation seam and a second operation roll (38) to complete a double seam, during these seaming operations the chuck wall (24) of the can end becoming bent to contact the cylindrical portion (33) of the chuck.

9. A method according to claim 8 characterised in that the substantially cylindrical surface portion (33) of the chuck is inclined at an angle between +4° and -4° to the longitudinal axis of the chuck.

Confidential

REX 043554

Crown Packaging Technology v. Rexam Beverage Can

EP 0 828 663 B1

Fig.1.
3
7
9
5
8
6
11
10
2
12
4
1

C
A
B
18
17
5
13
14
19
15
16
10
D
Fig.2.

14
16
21
Fig.3.
20
12
10

Confidential

REX 043555

12

B122




Fig.4.

Fig.5.

Confidential

REX 043556

EP 0 828 663 B1

Fig.6.

34
33
30
32
23
11
24
26
12
22

Fig.7.

30
38
24
25
26
12

Confidential

REX 043557

14

B124



EP 0 828 663 B1

Fig.8.
X°
R
l
Y°
12a
31a
34
24
Fig.9.
12b
31b

Confidential

REX 043558

15

B125

(5051051)EPASYS
European Patent Office - DG2 22/04/05*2308

Application No. 96908205.6/0828663

MAINTENANCE OF THE PATENT WITH THE DOCUMENTS SPECIFIED IN THE FINAL DECISION

I. Findings
[ ] The interlocutory decison by the Opposition Division of 05.05.03 has become final.

[X] With the appeal decision of 10.02.05 the matter was remitted to the Opposition Division for maintenance of the patent as amended

II. To director
to check the current composition of the opposition division and order the correction of EXCO, if necessary.

III. To the Opposition Division
The dossier are attached hereto. Please complete as appropriate the items under IV. below so that the procedure under Rule 58(5) to (8) EPC can be carried out.

22.04.05 Bg .... Konstantin Berger
Date Formalities Officer

IV. 1. Patent classification
[X] The classification indicated on the patent specification remains unchanged.
[ ] The change in classification has been entered on Form 2356.

2. Title of the invention
[X] The title indicated on the patent specification remains unchanged.
[ ] The change in title (max. 600 characters per language) has entered on Form 2356.

3. [ ] STIN The file contains technical information submitted after the application was filed and not included in this specification.

4. [ ] The following relevant documents not specified in the speci-fication were cited during the opposition proceedings.
CDOC US-A-3843014
JP-A-57117323
US-A-5356256 26.04.05 Bg

Further citations are to be found, where appropriate, in the appeal dossier (sheet ...).

V. To the Formalities Section
to carry out the maintainence procedure.

25.4.05 A. Denante
Date Signature of a member of the Opposition Division
A. Denantes

EPO Form 2335 11.99

Confidential

REX 043559

B126

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2007, I caused to be served by hand delivery and electronic mail the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Barry M. Klayman, Esq.
Wolf, Block, Schorr
and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market
Street, Suite 1001
Wilmington, DE 19801

I hereby certify that on March 9, 2007, I caused the foregoing document to be served via electronic mail on the following non-registered participants:

Dale M. Heist, Esq.
heist@woodcock.com
Chad E. Ziegler, Esq.
ziegler@woodcock.com
Woodcock Washburn LLP
Cira Centre
2929 Arch Street, 12th Floor
Philadelphia, PA 19104-2891

Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700