## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., | : : : : |
| Plaintiffs, | : : |
| v. | : Civil Action No. 05-608-MPT |
| REXAM BEVERAGE CAN CO., | : : : |
| Defendant. | : |

## MEMORANDUM OPINION

Barry Klayman, Esquire, Wolf, Block, Schorr and Solis-Cohen LLP, Wilmington Trust Center, 1100 N. Market Street, Wilmington, DE 19801.
    Of Counsel: Dale M. Heist, Esquire, Lynn Malinoski, Esquire, and Chad E.
    Ziegler, Esquire, Woodcock Washburn, LLP, Philadelphia, PA.
Counsel for Plaintiffs Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc.

Frederick L. Cottrell, III, Esquire, Anne Shea Gaza, Esquire, Richards, Layton & Finder, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801.
    Of Counsel: George P. McAndrews, Esquire, Steven J. Hampton, Esquire,
    Gerald C. Willis, Esquire, and Paul W. McAndrews, Esquire, McAndrews, Held &
    Malloy, Ltd. Chicago, IL.
Counsel for Defendant/Counterclaimant Rexam Beverage Can Company.

Wilmington Delaware
July 24, 2007

**Thynge, U.S. Magistrate Judge**

## 1. INTRODUCTION

This is a patent infringement case. On August 18, 2005 Crown Packaging

Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown") filed suit

against Rexam Beverage Can Co. ("Rexam") and Rexam Beverage Can Americas, Inc.

alleging infringement under 35 U.S.C. § 271 of Crown's U.S. Patent No. 6,848,875 ("the

'875 patent).[1]  On August 30, 2005, Crown filed its First Amended Complaint and added

a count alleging infringement of its U.S. Patent No. 6,935,826 ("the '826 patent").[2]  On

October 18, 2005, Crown filed an unopposed motion for leave to file a second amended

complaint[3] which was granted on October 20, 2005.[4]

On November 3, 2005, Rexam filed its Answer to Crown's Second Amended

Complaint for Patent Infringement and Counterclaims, denying infringement, raising

certain affirmative defenses and alleging infringement of its U.S. Patent Nos. 4,774,839

("the '839 patent"), 5,222,385 ("the '385 patent"), 5,697,242 ("the '242 patent"),

6,129,230 ("the '230 patent"), and 6,260,728 ("the '728 patent").[5]  On December 23,

2005, Crown answered Rexam's counterclaims, denied infringement and raised certain

affirmative defenses.[6]

Crown moved for partial summary judgment on Rexam's Counterclaims I-III

---

[1] D.I. 1 (Complaint for Patent Infringement).

[2] D.I. 3 (First Amended Complaint for Patent Infringement).

[3] D.I. 13.

[4] D.I. 16. Rexam Beverage Can Americas, Inc. was dismissed as a defendant on the same date. *See* D.I. 13, ¶ 4; D.I. 15. No additional patents were asserted by Crown in the Second Amended Complaint. *See* D.I. 16.

[5] D.I. 17.

[6] D.I. 37.

2

based on laches and failure to comply with the patent marking statute, 35 U.S.C. § 287(a).[7]  Crown also moved that evidence of laches should be presented to the jury.[8] This is the court's decision on those motions.

## 2. BACKGROUND

The patents-in-suit relate to the art of manufacturing beverage cans.  Beverage cans are generally two-piece containers made from aluminum.  One piece is the can body, the other the can end.  Before the can end is seamed to the top of the can body, the body undergoes a process called "necking" which reduces the diameter of the top of the can.  Of the several types of necking methods, the '839 patent addresses a smooth die neck process which uses dies of successively decreasing internal diameter.  This process leaves no bumps or ridges in the neck of the can.  Crown purchased twenty-six "595 Model" neckers between 1993 and 1999 from Belvac Production Machinery.  All of Crown's 595 Model machines, in ten manufacturing locations, use smooth die necking to manufacture over 17 billion cans per year.  The 595 Model neckers are capable of non-infringing necking methods, as well as, the patented smooth die necking process, when outfitted with the proper tooling.

Rexam and Belvac entered into a license agreement that covered the '839 patent in March 1993.  The agreement gave Belvac a non-exclusive license to make, use and sell "Licensed Machines"[9] and obligated it to sublicense purchasers of the

---

[7] D.I. 197.

[8] D.I. 201.  Crown's motion to bifurcate trial of Rexam's Counterclaims I-V is not addressed in this opinion.

[9] A "Licensed Machine" is defined as an apparatus and/or equipment incorporating or made in whole or in part through the use of the "Licensed Technology."  "Licensed Technology" is technology under the '839 patent. *See* D.I. 274 at 179.

3

Licensed Machines. Belvac was to provide Rexam with quarterly royalty reports with the names of purchasers and numbers of units sold. The agreement also provided Belvac with the tooling drawings and technology to perform smooth die necking claimed in the '839 patent. Belvac breached the original agreement within the first year and Rexam renegotiated a second licencing agreement with Belvac ("the 1994 Agreement"). The new agreement allowed Belvac to manufacture and sell machines under the '839 patent and specifically *excluded* any rights to sublicense the technology.

The 1994 Agreement required Belvac to send a letter to current and prior customers that were potential licensees.[10] Rexam also required that the same language be used in a terms and conditions paragraph in quotes, and provided to prospective purchasers. Rexam reserved the right to inspect Belvac's container necking equipment, smooth die necking tooling, and/or tooled machines on Belvac's premises to determine whether infringement of the apparatus claims of the '839 patent was occurring. Belvac was not required to and never marked its machines or tools with the '839 patent number. Belvac was required to maintain, but not reveal the names of customers to Rexam in its royalty reports. The 1994 Agreement specified that Belvac would be subject to royalty fees if it helped customers acquire tools or configure the 595 Model neckers to perform the smooth die necking method of the '839 patent. The patent and the 1994 Agreement expired on October 4, 2005.

---

[10] The letter stated: "Earlier Belvac entered into an agreement with American National Can Company [Rexam] for a license involving smooth die necking. Although we now have a replacement agreement with ANC, this is to notify you that neither agreement conveys a license for commercial operation of the equipment under U.S. Patent No. 4,774,839. A license to commercially operate the machine is available from ANC, the patent owner, for necking machines that employ smooth die neck tooling. It is your responsibility to determine if such a license is required."

4

Rexam's other patents[11] pertain to bottom reforming, a process for shaping the bottom of aluminum beverage cans. Bottom or base reforming can be done with the Belvac 595 Model machine. Rexam first sold equipment incorporating the technology of the inventions of the '385 and '242 patents in January 1994. Crown purchased Belvac bottom reforming machines for its Fort Bend Texas plant in 1995-1996, and has used them to produce approximately two million cans per year. Prior to 1995, Belvac was licensed to practice and commercialize a bottom reforming method patented by Ball Corporation. From February through April 1995, Belvac corresponded with Rexam and explained that Belvac's machines did not infringe Rexam's bottom forming patents. In February 1996, Belvac met with Rexam and presented a position paper and claim charts which supported Belvac's position that it had specifically designed around the '385 patent to avoid infringement.

On June 25, 1996 Rexam filed a patent application descending from the '385 patent, which ultimately issued as the '242 patent in December 1997. The '242 patent is directed to methods and apparatus for reforming can bottoms and is the subject of Rexam's third counterclaim. Prior to this litigation, Rexam has not asserted its rights in the '385 or '242 patents.

## 3. LEGAL STANDARD

Summary Judgment

A grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions

---

[11] The '385 patent issued in 1993 and the '242 patent issued in 1997.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[12] This standard is applicable to all types of cases, including patent cases.[13] A Rule 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case."[14] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[15] The nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant.[16] The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient to deny a motion fo summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.[17] If the nonmoving party fails to make a sufficient showing on an essential element of its case, the moving party is entitled to judgment as a matter of law.[18]

## Notice Requirement

The amount of damages a patentee may recover in an infringement suit is statutorily limited to acts of infringement that occurred after the patentee gave the alleged infringer notice of infringement.[19] The statute permits either constructive notice,

---

[12] Fed. R. Civ. P. 56(c).

[13] *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[15] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[16] *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

[17] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[18] *See Celotex Corp.*, 477 U.S. at 325.

[19] 35 U.S.C. § 287(a) (1999). "Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United

6

which is accomplished by marking the article with the patent number, or actual notice.

"The requirement of actual notice is designed to assure that the accused infringer knew

of the adverse patent *and* the alleged infringement during the period in which its liability

accrues."[20] The Federal Circuit addressed the requirement of actual notice in *Amsted*

*Indus. Inc., v. Buckeye Steel Castings Co.*[21] In *Amsted*, the mere "notice of the patent's

existence or ownership" is not "notice of the infringement," and, as such, is insufficient

to comply with section 287(a).[22] The court concluded that an "affirmative

communication of a specific charge of infringement by a specific accused product or

device is required to comply with section 287(a)."[23] As long as "the communication from

the patentee provides sufficient specificity regarding *its belief* that the recipient may be

an infringer, the statutory requirement of actual notice is met."[24] To determine whether

sufficient specificity is communicated, the knowledge or understanding of the alleged

infringer cannot be taken into consideration.[25]

---

States, may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."

    35 U.S.C. § 287(b)(5)(A) (1999). "[N]otice of infringement means actual knowledge, or receipt by a person of a written notification, or a combination thereof, of information sufficient to persuade a reasonable person that it is likely that a product was made by a process patented in the United States."

    35 U.S.C. § 287(b)(5)(A) (1999). "A written notification from the patent holder charging a person with infringement shall specify the patented process alleged to have been used and the reasons for a good faith belief that such process was used. The patent holder shall include in the notification such information as is reasonably necessary to explain fairly the patent holder's belief, except that the patent holder is not required to disclose any trade secret information."

[20] *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed.Cir.1997) (emphasis added).

[21] 24 F.3d 178, 187 (Fed. Cir.1994).

[22] *Id.*

[23] *Id.*

[24] *SRI Int'l, Inc.*, 127 F.3d at 1470 (emphasis added).

[25] *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001).

"The law is clear that notice provisions of section 287(a) do not require marking where a patent is directed to a process or method."[26] When a patent contains both apparatus and method claims, and there is "a tangible item to mark by which notice of the asserted method claims can be given, a party is obliged to do so if it intends to avail itself of the constructive notice provisions of section 287(a)."[27] "[R]egardless of whether a plaintiff is asserting method claims, apparatus claims, or both, that party must properly mark its products."[28] With regard to a plaintiff's ability to recover damages, section 287(a) would "preclude recovery of damages only for infringement for any time prior to compliance with marking or actual notice requirements of the statute."[29]

Laches

Laches, as defined under 35 U.S.C. § 282, is an equitable defense to a claim for patent infringement. This provision in the Patent Act bars recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a counterclaim for infringement. The law on laches is rooted in the equitable principle that courts will not assist one who has "slept on his rights." To establish laches, a party must prove: 1) an unreasonable and inexcusable delay by the plaintiff in raising infringement when the plaintiff knew or reasonably should have known of the defendant's allegedly infringing activity; and 2) material prejudice to the defendant resulting from the delay.[30] Material prejudice may be defined as either evidentiary

---

[26] *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993).

[27] *Id.*

[28] *Mosel Vitelic Corp. v. Micron Technology, Inc.*, 2000 WL 1728351, at *2 (D. Del. Feb. 25, 2000).

[29] *American Medical Systems, Inc.*, 6 F.3d at 1537.

[30] *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992).

prejudice or economic prejudice. Evidentiary prejudice arises when the infringer cannot put on a fair defense because of the loss of records, death of witnesses, or the dimming of memories.[31]  Economic prejudice arises when an infringer suffers the loss of monetary investments or incurs damages that would likely have been prevented by an earlier suit.[32]  The monetary loss claimed by the defendant must have a proven nexus to the patentee's delay in filing suit.[33]

The equitable nature of laches does not follow hard and fast rules with regard to the level of actual knowledge required to trigger laches.  It is enough that the plaintiff has or should have "more than a mere suspicion but less than absolute assurance of the alleged infringement in order to activate the laches clock."[34]  Courts impose a duty on patentees to police their patent rights and will impose constructive knowledge based on the required reasonable, diligent inquiry.[35]

The period from which the delay is measured begins at "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the allegedly infringing activity."[36]  The defendant can establish a presumption of laches by showing that more than six years elapsed between the time the plaintiff knew or should have known of the alleged infringing activity and the time of filing suit.[37]  A delay of six years or more raises a presumption that the delay is unreasonable, inexcusable, and

---

[31] *Id.* at 1033.
[32] *Id.*
[33] *See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995).
[34] *Rockwell Intern. Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000).
[35] *See Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998).
[36] *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267 (Fed. Cir. 1990).
[37] *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992).

9

prejudicial.[38]  If such a presumption is established, the burden shifts to the plaintiff to produce sufficient evidence to "put the existence of a presumed fact into genuine dispute" with regard to the reasonableness of the delay or the alleged prejudice.[39]  Once the presumption is established it is up to the plaintiff to present "affirmative evidence of a lack of prejudice."[40]  If the presumption is rebutted, the defense of laches is not eliminated; rather, "the defendant can still establish laches by establishing the elements for this defense based upon the totality of the evidence presented."[41]  The court must also consider and weigh the excuse for the delay offered by the plaintiff. Ultimately, where there is "evidence of other factors which would make it inequitable to recognize the defense [of laches] despite undue delay and prejudice, the defense may be denied."[42]

Unclean Hands

Rexam suggests that Crown should not be allowed a defense of laches because it willfully infringed the necking and bottoming patents and, therefore, has unclean hands.  The "unclean hands doctrine" is rooted in the historical concept of the court as a "vehicle for affirmatively enforcing the requirements of conscience and good faith" as it requires that the parties "have acted fairly and without fraud or deceit as to the controversy in issue."[43]  The concept flows from the maxim, "He who seeks equity must

---

[38] See id. at 1035-36.

[39] See id. at 1038.

[40] See Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1554 (Fed. Cir. 1996).

[41] McKesson Information Solutions v. Trizetto Group, Inc., 426 F. Supp. 2d 203, 208 (D. Del. 2006) (citing Aukerman, 960 F.2d at 1037).

[42] See Hall, 93 F.3d at 1554.

[43] Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814 (1945).

do equity."[44]  "A party's unclean hands may stand as an obstacle to the application of the doctrine of laches in certain circumstances.  The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice."[45]

The unclean hands defense requires convincing evidence of misconduct.[46]  An infringer must participate in "*particularly egregious* conduct [that] would change the equities *significantly* in the plaintiff's favor."[47]  Evidence of laches, knowledge of prior art and prior negotiations are relevant to a willfulness defense[48] and are criteria considered in the context of the totality of the circumstances.[49]

## 4. POSITIONS OF THE PARTIES - the '839 Patent

Crown argues that Rexam's counterclaims are nothing more than a litigation-inspired after-thought.  It suggests that if Rexam had any meritorious claims and sought to protect its intellectual property, it would have made infringement claims against Crown prior to the onset of this litigation.  It contends that Rexam's necking and bottom reforming patents were issued between nine and eighteen years ago, and the delay in filing is fatal to its counterclaims.  Finally, Crown argues that Rexam did not make any attempt to provide its competitors with actual or constructive notice of the patents.

---

[44] *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038 (Fed. Cir. 1992).

[45] *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999).

[46] *Sanofi-Aventis v. Advancis Pharmaceutical Corp.*, 453 F. Supp. 2d 834, 856 (D. Del. 2005).

[47] *Odetics, Inc. v. Storage Technology Corp.*, 14 F. Supp. 2d 800, 806 (E.D. Va. 1998) (emphasis in original).

[48] *See McKesson Information Solutions v. Trizetto Group, Inc.*, 426 F. Supp. 2d 203, 208 (D. Del. 2006).

[49] *See Knorr-Bremse Systeme Fuer Nutzfahrqeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004).

Marking and Notice - the '839 patent

Crown asserts that summary judgment should be granted based on Rexam's failure to comply with the marking and notice provisions of 35 U.S.C. § 287(a). Crown argues that no damages exist because actual notice occurred when the counterclaim was filed on November 3, 2005, approximately one month after the patent expired.

*Constructive Notice*

According to Crown, Rexam acknowledges that no marking of the necking and bottom reforming equipment it made and sold occurred, and the evidence shows that Rexam did not require its licensee, Belvac, to mark the necking equipment it made and sold. No dispute exists that the Belvac 595 Model necking machines and tools used for smooth die necking were not marked with Rexam's patent number. Therefore, no constructive notice was provided through that equipment.

In its 1993 Agreement with Belvac, Rexam required the machines and tools to be marked with the appropriate patent numbers. When the agreement was modified in 1994, Rexam eliminated the marking requirement and required letters be sent and the same language in the letter be added to the terms and conditions of the sales receipts. Rexam admittedly chose not to require Belvac to mark the 595 Model necking machines or the specific tools used in the smooth die necking process.

The '839 patent contains both apparatus and method claims and clearly is not a "method only" patent. The 595 Model necker, machine tools and products made by the process could be marked. When a patent contains both apparatus and method claims, as it does in the present matter, and a tangible item results from the process, Rexam is

12

obliged to mark,[50] and is not relieved of that duty simply by asserting only the method claims of its necking patent.[51]  Rexam cites several cases to support the proposition that the marking statute does not apply to method *claims*.[52]  Contrary to Rexam's argument, the cases found that method-only *patents* do not require marking, and do not depend upon "whether apparatus claims have been asserted as well."[53]  "The reason that the marking statute does not apply to method claims is that, *ordinarily*, where the patent claims are directed to only a method or process there is nothing to mark."[54] Rexam's argument, that it was not required to mark because it was only asserting method claims, is at odds with the very purpose of the marking statute: "to avoid innocent infringement, encourage patentees to give public notice of patent protection, and aide the public in identifying patented articles."[55]  Regardless of whether or not it asserted method claims, apparatus claims or both, Rexam was required to mark and have its licensee, Belvac, mark products in order to obtain the benefits of the constructive notice provisions set forth in section 287(a).  Therefore, Rexam had the duty to mark to recover pre-litigation damages.

---

[50] *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993); *see also IMX Inc., v. Lendingtree, LLC*, 2005 WL 3465555 *3 (D. Del. Dec. 14, 2005).

[51] *See Merck & Co., Inc. v. Mediplan Health Consulting. Inc.*, 434 F. Supp. 2d 257, 261 (S.D.N.Y. 2006) (citing *Halliburton Serv. v. Smith Int'l Inc.*, 317 F. Supp. 2d 719, 725 (E.D. Tex 2004)).

[52] Among other cases, Rexam references *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, (Fed. Cir. 1987), *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) and *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057 (Fed. Cir. 2003) for the proposition that marking is not required when asserting method claims in an apparatus patent.  Of note, only one of the three references, *State Contracting*, concludes that patents must be looked at independently to determine if they contain "only method claims" and if so, do not need to be examined to determine if "something could have been marked in order to assess whether the notice provision applies . . ." *Id.* at 1074.

[53] D.I. 276 at 21.

[54] *American Medical Systems, Inc.*, 6 F.3d at 1538 (emphasis added).

[55] *Merck & Co., Inc.*, 434 F. Supp. 2d at 263 (citing *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1443 (Fed. Cir. 1998)).

### Actual Notice

Rexam argues that the letter Belvac provided to customers served as actual notice of the patent and, therefore, satisfies its obligation under the marking statute. The parties agree that Belvac provided a copy of a warning to all potential purchasers of the 595 Model machines. The language states that Rexam's agreement with Belvac under the '839 patent does not provide customers with a licence to operate under the patent.[56] Crown maintains that the letter does not provide actual notice within the meaning of section 287(a). Although Crown may have been aware of Rexam's patent as a result of the letter and purchase agreement text, Crown's knowledge of the patent is irrelevant as to whether Rexam met the statutory requirements for notice. The language in both the letter and in the terms and conditions provision lacks the specificity of an affirmative charge of infringement and is insufficient to comply with section 287(a).[57] Under the notice inquiry, focus is on "the action of the patentee, not knowledge or understanding of the infringer."[58] Even if Crown was aware that its actions infringed Rexam's patent, such knowledge does not prove that "the infringer was *notified* of the infringement."[59]

The Federal Circuit in *Gart v. Logitech, Inc.,* determined that an alleged infringer's subjective belief of a charge of infringement has no bearing on the adequacy of notice.[60] In *Gart*, the letters to an alleged infringer contained specific references to

---

[56] The letter suggested that: "A license to commercially operate the machine is available from ANC [Rexam], the patent owner, for necking machines that employ smooth die neck tooling. It is your responsibility to determine if such a license is required."

[57] *See Amsted Industries Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 187 (Fed. Cir. 1994).

[58] *Id.*

[59] *Devices for Medicine, Inc. v. Boehl,* 822 F.2d 1062, 1066 (Fed. Cir. 1987) (emphasis added).

[60] 254 F.3d 1334, 1346 (Fed. Cir. 2001).

14

patent claims and encouraged consideration whether a non-exclusive license is needed. *Gart* found that a reference to specific claims and a specific product and the suggestion that a license may be needed, are more than just an "mere invitation" and satisfy the requirement for a specific charge of infringement. Moreover, the court in *SRI Intern., Inc. v. Advanced Technology Labs, Inc.,* concluded that notice which provided the identity of the patent and the activity believed to be infringing, along with a demand to abate the infringement, complies with the actual notice requirement.[61] The *SRI* court found that an infringer's knowledge of the patent is not conclusive; rather, the "actual notice requirement is met when the recipient is notified, with sufficient specificity, that the *patent holder believes* that the recipient of the notice may be an infringer."[62]

Rexam's argument that the duty to mark was satisfied by the language of Belvac's letters or its purchase receipts to customers is unpersuasive. Those communications, pointing Belvac purchasers to a patent number and advising them to determine if they need a license, do not meet the standards of *Gart* or *SRI*. Since the 1994 Agreement eliminated Belvac's duty to mark, Rexam was obligated under section 287(a) to provide an affirmative communication to an alleged infringer of a "specific charge of infringement."[63]  Rexam apparently believed it had an obligation to mark as evidenced in the 1993 Agreement which required Belvac to mark the necking equipment. Rexam never apprised Crown of any infringement nor provided notice or reference to the specific claims allegedly infringed. As a result, no constructive notice

---

[61] 127 F.3d 1462, 1470 (Fed. Cir. 1997).

[62] *Id.* (emphasis added).

[63] *Amsted Industries Inc. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 187 (Fed. Cir. 1994).

15

under 35 U.S.C. § 287(a) occurred, and actual notice of the '839 patent is the filing date of Rexam's counterclaims.

Since Rexam failed to provide constructive notice, and provided actual notice only after expiration of the patent, no damages are recoverable under Rexam's Counterclaim I.[64]  Damages cannot accrue after a patent's expiration because an expired patent cannot be infringed.[65]

Laches/Unclean Hands - the '839 Patent

In support of its laches defense, Crown relies on the absence of any constructive notice and late actual notice of the expiration of the '839 patent.  Crown further suggests that during its commercial relationship with Belvac, Rexam was well aware that Belvac was making and selling equipment for smooth die necking and bottom reforming to can manufacturers.  It contends that Rexam also knew that the customer base of can manufacturers was limited[66] and knew, or should have known, that the manufacturers were purchasing equipment from Belvac and practicing Rexam's necking patent.  Crown contends that there is no evidence in the record that it believed, was aware of or should have been aware of infringement prior to the filing of Rexam's counterclaims.  It notes that no witnesses have testified that Belvac advised how Crown could be infringing.  Regarding the meetings with Belvac, Crown relies on the testimony of its executive, who could not remember the details of any licensing discussion or whether such discussion occurred.  Crown points to the absence of any meeting notes

---

[64] *Uniboard Aktiebolong v. Acer America Corp.*, 118 F. Supp. 2d, 19,26 (D.D.C. 2000), *aff'd., Lans v. Digital Equip. Co.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001).

[65] *See Lans v. Digital Equip. Co.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001); *see also Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999).

[66] Only six can manufacturers, in addition to Rexam, existed in the early 1990s.

16

or memoranda, emails and correspondence relating to the contents of these meetings. It asserts economic prejudice from Rexam's delay because it purchased Belvac equipment and produced over seven billion cans per year. Crown also claims evidentiary prejudice because two of the four inventors on the '839 patent are deceased.

Rexam denies that it knew Crown was infringing its patents. It suggests that visual inspection does not indicate the necking method used to manufacture Crown's cans. Further, it only learned of Crown's alleged infringement through discovery in the present litigation. Rexam points to evidence of Crown's unclean hands by willful infringement to include letters from Belvac referencing Rexam's right in the '839 patent, the language added to the terms and conditions provision and comments showing probable dates for licensing meetings between Belvac and Crown. Rexam further maintains that Crown knew it was infringing since the '839 patent was mentioned as a prior art reference in several of its patents. Rexam concludes that, in light of such evidence supporting willful infringement, a genuine issue of material fact exists preventing judgment in favor of Crown on a laches defense.

Having considering all of the parties arguments, whether or not discussed, and based on the findings herein on marking and notice, Crown's motion for summary judgment on laches is moot.

## 5. POSITIONS OF THE PARTIES - the '385 and '242 Patents

Crown's motion on laches also encompasses Rexam's counterclaims of infringement under the '385 and '242 patents. Crown claims that a presumption of laches exists because Rexam delayed bringing suit against Crown for more than six

17

years after it knew or should have know of Crown's alleged infringement. Crown argues that as early as 1994, Rexam was on notice that Belvac manufactured and sold bottom reforming equipment. It contends that in 1996, Rexam met with Belvac to discuss infringement of its patents, but did nothing. Crown argues that Rexam had a duty to police, but never followed up or contacted Crown to discuss any alleged infringement. Crown notes that Rexam acquired cans made at Crown's Fort Bend plant for competitive analysis in 1999, which, by visual examination, evidence potential infringement of the patents. Crown maintains that it suffered economic prejudice as a result of Rexam's delay because it commercially used three Belvac base reformers while Rexam remained silent. The Fort Bend plant produces approximately 2 million cans per year, all of which allegedly infringe.

Rexam argues that it took affirmative steps in 1996 to inquire whether Belvac's bottom reforming equipment infringed. Rexam notes that, at that time, Belvac explained that its equipment did not infringe Rexam's '385 patent. Machine drawings and claim charts were provided and Belvac opined that the configuration of the dome receptacle was different than the patented invention. Rexam maintains that the configuration of the machine which Belvac showed Rexam in 1996 is not the same configuration of the machine actually sold. While Rexam admits that as of "March 1998 [it] may have been aware that Crown was selling cans that appeared to be manufactured using some type of bottom reforming process,"[67] it was unaware when Belvac's customers may have changed the tooling for the dome receptacle. Rexam

---

[67] D.I. 199, Ex. 8 (Response to Interrogatory No. 17).

suggests that although one skilled in the art may be able to tell when the base of a can has been reformed, it is impossible to tell how the reforming was done. Finally, Rexam argues that Crown has not suffered any material economic prejudice because of Rexam's alleged delay in bringing suit because Crown did not purchase any bottom reforming machines after 1996.

#### Notice of the '385 and '242 patents

Crown argues that Rexam failed to comply with the marking and notice provisions of section 287(a) with regard to the '385 and '242 patents. It contends that Rexam sold bottom reforming machines, but failed to mark those units, and the record is devoid of any evidence that it ever communicated to Crown about either the '385 or '242 patents. Rexam contends that it was not obligated to mark under section 287(a) because only method claims are asserted under those patents.

There is no dispute that Rexam failed to provide constructive notice of its patents to Crown.[68] Rexam concedes that it sold bottom reforming machines as early as 1994.[69] In defense to section 287(a), Rexam only contends that it was not required to mark in light of asserting only method claims. The court disagrees with Rexam's analysis as discussed previously herein.[70] Therefore, Rexam was obligated to mark the machinery, equipment or tooling it sold, and as a result, no constructive notice was given. Since actual notice of the '385 and '242 patents was provided upon the filing of

---

[68] D.I. 200, Ex. 24. "Rexam . . . did not consistently and continuously mark its smooth die necking equipment or bottom reforming equipment."

[69] D.I.199, Ex. 8. Rexam's Response to Interrogatory No. 14. "Rexam believes it first sold and offered to sell equipment incorporating the technology of the inventions of the '385 and '242 Patents in or about January 1994."

[70] See supra, section: Marking and Notice - the '839 patent.

19

Rexam's counterclaims, no damages for alleged infringement may be recovered prior to that date.

Laches - the '385 and '242 Patents

To succeed in its motion, Crown must prove that Rexam's delay in filing suit was unreasonable and inexcusable after it knew or should have know of Crown's infringing activity. Since Rexam discussed non-infringing methods of bottom forming with Belvac, there is a genuine issue of material fact as to whether Rexam knew or should have known that Crown was infringing its bottom forming patents.

Rexam had a duty to police its bottom forming patents and satisfied that duty by engaging Belvac in licensing discussions in 1995 and 1996. Rexam's evidence shows that it investigated Ball's bottom forming patents, and understood that Belvac was licensed to produce can making machines and other equipment under the Ball patents. The evidence shows that Rexam continued its inquiry through correspondence and meetings with Belvac to determine if it was infringing the bottom forming patents by selling the 595 Model machines and related tooling. In response, Belvac prepared a written analysis, which included machine tool drawings and claim charts, explaining how its tools, machinery and methods did not infringe. Crown contends that in 1999 Rexam possessed the allegedly infringing cans and should have known, based on simple observation, that the cans were reformed by Rexam's patented process. Rexam's experts, however, maintain that although visual inspection may indicate that a can is reformed, "it would be very difficult to tell what the [bottom forming] method is."[71]

---

[71] D.I. 200, Ex. 42.

Rexam's objective evidence reveals that Belvac was selling bottom forming machines which were configured for non-infringing uses. Rexam investigated Belvac's machinery and its methods for bottom reforming and that investigation suggested that Belvac supplied non-infringing equipment to the canning industry. Therefore, under the facts presented, Rexam's actions could be considered reasonable under the circumstances. Because there are disputed issues of material fact as to whether Rexam knew or should have known of Crown's alleged infringement of the '385 and '242 patents prior to November 3, 1999, Crown's motion is denied to the extent that it requests judgment on a laches defense to the '385 and '242 patents.

## 6. PRESENTATION OF EVIDENCE OF LACHES TO THE JURY

Crown argues that it should be permitted to present evidence relevant to its laches defense to the jury regarding the necking and bottom reforming patents. It also maintains that Rexam's counterclaims should be bifurcated, because bifurcation of those counterclaims serves the interests of judicial economy.[72] Crown suggests that the entire history between Crown, Rexam, and Belvac is relevant to Rexam's claims of willful infringement. Crown posits that "the defendant's state of mind when it infringed the patent, is a finding of fact inextricably bound to the facts underlying the alleged infringement."[73] Crown suggests that laches-related evidence is also relevant to Rexam's damages argument. Finally, Crown contends that resolution of this issue is not pre-mature, as Rexam suggests, because the court has before it all of the

---

[72] D.I. 201. Crown's Motion to Bifurcate Trial of Rexam's Counterclaims I-IV and to Submit Evidence Relating to Laches to the Jury. Crown's motion to bifurcate is not addressed in this opinion.
[73] *Kimberly-Clark Corp. v. James River Corp. of Virginia*, 131 F.R.D. 607, 609 (N.D. Ga. 1989).

21

necessary facts and information for a decision.

Rexam responds that a laches-related defense should not be presented to the jury because there is no procedural motion before the court that supports such an argument. As an equitable defense, Rexam insists that the issue should be tried only to the court. Rexam submits that presentation of the defense will confuse jurors and will prejudice its case. It notes that evidence can be proffered to the court outside the presence of the jury, and therefore, will not cause undue delay and inefficiency.

Whether or not judicial efficiency will be impacted, evidence of laches will be allowed before the jury as relevant to Rexam's allegations of willful infringement, thereby possibly reducing the need for a separate presentation to the court. To the extent that there is other relevant laches evidence, a portion of the trial may be allocated to make the record for the court.

The reasoning in *McKesson Information Solutions LLC, v. The Trizetto Group, Inc.* supports that when willfulness is raised, a jury should hear evidence of laches at trial.[74] In her memorandum order, then-Chief Judge Robinson reasoned that the entire history of the relationship between the parties, including evidence of laches, was admissible because such evidence is relevant to a defense against willful infringement.[75] Although willfulness is determined by the trier of fact, that decision "is [to be] made on consideration of the totality of the circumstances."[76]

---

[74] *See McKesson Information Solutions v. Trizetto Group, Inc.*, 2006 U.S. Dist. LEXIS 18655, at *2 (D. Del. Apr. 11, 2006) (citing *Knorr-Bremse Systeme Fuer Nutzfahrqeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004) (a wilfulness determination includes many factors to be evaluated and weighed by the jury)).

[75] *Id.*

[76] *Knorr-Bremse*, 383 F.3d at 1342.

22

Rexam raised willfulness as a defense against laches as noted previously herein. As a result, Rexam has conceded to a direct relationship between willful infringement and laches. Since Rexam raised willfulness, Crown should be allowed to fully address it.[77] Consequently, Crown will be permitted to submit laches evidence to the jury.

## 7. CONCLUSION

For the reasons contained herein, Crown's motion for summary for partial summary judgment dismissing Rexam's Counterclaim I and limiting damages on Counterclaims II-III based on laches and failure to comply with 35 U.S.C. § 287(a) (D.I. 197) is granted in part and denied in part. Crown's motion to dismiss Counterclaim I based on failure to mark is GRANTED. Crown's motion to limit damages based on laches on Counterclaim I is DISMISSED AS MOOT. Crown's motion to limit damages based on laches on Counterclaims II-III is DENIED. Crown's motion to submit evidence relating to laches to the jury (D.I. 201) is GRANTED. An appropriate order consistent with this memorandum will follow.

---

[77] *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1555 (Fed. Cir. 1996).