# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CROWN PACKAGING TECHNOLOGY, INC. and CROWN CORK & SEAL USA, INC., | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil Action No. 05-608 (MPT) |
| REXAM BEVERAGE CAN CO., | : : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

Barry Klayman, Esquire, Wolf, Block, Schorr and Solis-Cohen LLP, Wilmington Trust Center, 1100 N. Market Street, Wilmington, DE 19801.
    <u>Of Counsel</u>: Dale M. Heist, Esquire, Woodcock Washburn, LLP, Philadelphia, PA.
Counsel for Plaintiffs Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc.

Frederick L. Cottrell, III, Esquire, Anne Shea Gaza, Esquire, Richards, Layton & Finder, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801.
    <u>Of Counsel:</u> George P. McAndrews, Esquire, Steven J. Hampton, Esquire, Gerald C. Willis, Esquire, and Paul W. McAndrews, Esquire, McAndrews, Held & Malloy, Ltd. Chicago, IL.
Counsel for Defendant/Counterclaimant Rexam Beverage Can Company.

Wilmington Delaware
January 15, 2010

Thynge, U.S. Magistrate Judge

## PROCEDURAL BACKGROUND

This patent infringement case returns to the court on remand from the United States Court of Appeals for the Federal Circuit. On August 18, 2005 Crown Packaging Technology, Inc. and Crown Cork & Seal USA, Inc. (collectively "Crown") filed suit against Rexam Beverage Can Co. ("Rexam") and Rexam Beverage Can Americas, Inc. alleging infringement under 35 U.S.C. § 271 of Crown's U.S. Patent No. 6,848,875 ("the '875 patent").[1] On August 30, 2005, Crown filed its First Amended Complaint and added a count alleging infringement of its U.S. Patent No. 6,935,826 ("the '826 patent").[2] On October 18, 2005, Crown filed an Unopposed Motion for Leave to File Second Amended Complaint[3] which was granted on October 20, 2005.[4] That complaint was filed on the same date.[5]

On November 3, 2005, Rexam filed its Answer to Second Amended Complaint for Patent Infringement and Counterclaims, denying infringement, raising certain affirmative defenses and alleging infringement of its U.S. Patent Nos. 4,774,839 ("the '839 patent"), 5,222,385 ("the '385 patent"), 5,697,242 ("the '242 patent"), 6,129,230 ("the '230 patent"), and 6,260,728 ("the '728 patent").[6] On December 23, 2005, Crown answered Rexam's counterclaims, denying infringement and raising certain affirmative

---

[1] D.I. 1 (Complaint for Patent Infringement).

[2] D.I. 3 (First Amended Complaint for Patent Infringement).

[3] D.I. 13.

[4] D.I. 15.

[5] D.I. 16. Rexam Beverage Can Americas, Inc. was terminated as a defendant on this same date. *See* D.I. 13, ¶ 4; D.I. 15. No additional patents were asserted by Crown in the Second Amended Complaint. *See* D.I. 16.

[6] D.I. 17.

defenses.[7]

On January 25, 2007, Crown moved for partial summary judgment on Rexam's Counterclaims I-III  based on laches and failure to comply with the patent marking statute, 35 U.S.C. § 287(a).[8]  On July 30, 2007, in an amended order, this court granted Crown's motion to dismiss Rexam's Counterclaim I, which alleged infringement of the '839 patent, based on failure to mark.[9]  Following additional briefing and oral arguments, this court issued a claim construction order on May 17, 2007.[10]  On January 22, 2008, this court granted Rexam's motion for summary judgment of noninfringement, holding that no genuine issue of material fact existed as to whether Rexam's can ends infringed claim 14 of Crown's '826 patent under the doctrine of equivalents.[11]  A final judgment and order to this effect issued on March 31, 2008.[12]  Crown timely appealed to the Federal Circuit.

On March 17, 2009, the Federal Circuit reversed and remanded (1) this court's grant of Rexam's motion for summary judgment of noninfringement of the '826 patent and (2) this court's grant of Crown's motion for summary judgment dismissing Rexam's Counterclaim I based on failure to mark.[13]  On August 17, 2009, Crown and Rexam

---

[7] D.I. 37.  On September 11, 2006, the parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72, to conduct all proceedings and enter the order of judgment and the case referred to the magistrate judge the following day.  *See* D.I. 111, D.I. 114.

[8] D.I. 197.

[9] D.I. 350.

[10] D.I. 334.

[11] *Crown Pkg. Tech. v. Rexam Bev. Can Co.*, 531 F. Supp. 2d 629, 645 (2008).

[12] D.I. 392.

[13] See *Crown Pkg. Tech. v. Rexam Bev. Can Co.*, 559 F.3d 1308, 1317 (2009), where the Federal Circuit concluded:

Because there are material issues of fact regarding the function of the annular reinforcing bead [one element of claim 14 of Crown's '826 patent], we *reverse* and *remand* the district court's grant of Rexam's motion for summary judgment of noninfringement of claim 14 of the

agreed to voluntarily dismiss with prejudice Crown's claim of infringement of the '826

patent pursuant to the parties' stipulation under Fed. R. Civ. P. 41(a)(1)(ii).[14]  Only

Rexam's Counterclaim I alleging infringement of the '839 patent remains at issue in this

case.[15]  This is the court's decision on Crown's August 17, 2009 Renewed Motion for

Partial Summary Judgment Dismissing Rexam's Counterclaim I Based on Laches.[16]

**FACTUAL BACKGROUND**

      Crown and Rexam are both in the business of selling and manufacturing can

ends and bodies.  Beverage cans are generally two-piece containers made from

aluminum.  One piece is the can body, the other the can end.  Before the can end is

seamed to the top of the can body, the body undergoes a process called "necking"

which reduces the diameter of the top of the can.  Of the several types of necking

methods, the '839 patent addresses a smooth die necking process which uses dies of

successively decreasing internal diameter.  This process leaves no bumps or ridges in

the neck of the can.  Crown purchased twenty-six "595 Model" neckers between 1993

and 1999 from Belvac Production Machinery ("Belvac").  All of Crown's 595 Model

machines, in ten manufacturing locations, use smooth die necking to manufacture over

17 billion cans per year.  Since 1992, Crown has sold over 100 billion can bodies that

---

'826 patent.  We also *reverse* and *remand* the district court's grant of Crown's motion for summary judgment dismissing Rexam's counterclaim for infringement of the '839 patent as Rexam was not required to mark apparatuses used to perform its claimed method.
[14] D.I. 418.
[15] Effective March 17, 2008, Rexam's other counterclaims against Crown alleging infringement of the '385, '242, '230, and '728 patents were dismissed with prejudice pursuant to a Settlement Agreement between the parties.  *See* D.I. 392, ¶ 10.  Crown's claim of infringement of the '875 patent was resolved when this court granted Rexam's motion for summary judgment and held that claim 34 of the '875 patent was invalid under 35 U.S.C. § 112, ¶ 1.  See *Crown Pkg. Tech. v. Rexam Bev. Can Co.*, 531 F. Supp. 2d 629, 645 (2008).
[16] D.I. 413.

were smooth die necked.

In March 1993, Rexam and Belvac entered into a license agreement that covered the '839 patent. The agreement gave Belvac a non-exclusive license to make, use and sell "Licensed Machines"[17] and obligated it to sublicense purchasers of the Licensed Machines. Belvac was to provide Rexam with quarterly royalty reports with the names of purchasers and numbers of units sold. The agreement also provided Belvac with the tooling drawings and technology to perform the smooth die necking claimed in the '839 patent. Belvac breached the original agreement within the first year and Rexam renegotiated a second licensing agreement with Belvac ("the 1994 Agreement").

The 1994 Agreement, executed in January 1995 but retroactively effective as of April 17, 1994, granted Belvac a non-exclusive license to the '839 patent for the limited purpose of manufacturing and selling "Licensed Tooled Machines"[18] and "Smooth Die Necking Tooling"[19] and for using Licensed Tooled machines and Smooth Die Necking Tooling solely for testing which did not produce cans for sale to customers. The agreement specifically *excluded* any right to commercially operate Licensed Tooled Machines or machines using Smooth Die Necking Tooling and any right to sublicense that technology.

---

[17] A "Licensed Machine" was defined as an apparatus and/or equipment incorporating or made in whole or in part through the use of the "Licensed Technology." "Licensed Technology" is technology under the '839 patent. *See* D.I. 274 at 179.

[18] The definition of a "Licensed Tooled Machine" encompassed necking equipment designed for performing smooth die necking as disclosed in the '839 patent, equipment for which Belvac procured tooling sets operable as disclosed in the '839 patent, and untooled machines for which Belvac assisted a customer in obtaining such tooling by providing confidential information of ANCC [Rexam]. *See* D.I. 415 at Ex. 18.

[19] "Smooth Die Necking Tooling" was defined as "the group of dies and knockout punches which are held by one or more turrets that perform a smooth die necking operation within the scope of the method claims 1-31 of U.S. patent No. 4,777,839 [the '839 patent]." *See* D.I. 415 at Ex. 18.

4

The 1994 Agreement required Belvac to send a letter to current and prior customers explaining that no license for commercial operation of equipment covered by the '839 patent had been conveyed and that such a license was available from Rexam.[20]  Rexam required similar language to be used in an "Additional Terms and Conditions" paragraph that Belvac delivered to its customers first as a part of its formal quotation packages and second as a part of its purchase order acknowledgments.[21]  On January 6, 1995, Belvac informed Rexam that it sent the letters required by the 1994 Agreement to (1) all customers to whom Belvac shipped die necking machinery from March 19, 1993 to January 6, 1995; (2) all customers who had placed purchase orders for die necking machinery but had not yet received shipment; and (3) all prospects with whom Belvac had open quotations.

Belvac shipped Crown die necking equipment seventeen times based on eleven orders between March 19, 1993 and January 1995.  Belvac sent Crown the '893 patent-related language required by the 1994 Agreement at least once, on June 15, 1995, and likely with each formal quotation package and purchase order acknowledgment used in Belvac and Crown's post-1995 transactions.[22]

---

[20] The letter stated:  "Earlier Belvac entered into an agreement with American National Can Company [Rexam] for a license involving smooth die necking.  Although we now have a replacement agreement with ANC [Rexam], this is to notify you that neither agreement conveys a license for commercial operation of the equipment under U.S. Patent No. 4,774,839.  A license to commercially operate the machine is available from ANC [Rexam], the patent owner, for necking machines that employ smooth die neck tooling.  It is your responsibility to determine if such a license is required."

[21] The additional terms and conditions provided: "A license for commercial operation of die necking equipment for smooth die necking is not granted under U.S. Patent No. 4,774,839.  A license to commercially operate the machine is available from the patent owner for necking machines that employ smooth die neck tooling.  It is the responsibility of the purchaser to determine if such a license is required."

[22] As explained by one of its executives, after January 1995, Belvac included a terms and conditions paragraph containing the '839 patent-related language required by the 1994 Agreement in all of its formal quotation packages and purchase order acknowledgments.  Thus, with each order of equipment Belvac's customers received the '839 patent-related language twice.

The 1994 Agreement also specified that Belvac would be subject to royalty fees for the manufacture and sale of Licensed Tooled Machines or Smooth Die Necking Tooling and for assisting customers in acquiring tools or configuring the 595 Model neckers to perform the smooth die necking method of the '839 patent.  Belvac was required to maintain and submit to Rexam quarterly royalty reports which disclosed whether smooth die necking equipment or tooling had been sold and whether Belvac had assisted customers in obtaining the tooling required for smooth die necking.  These reports did not reveal the names of Belvac's customers.  From January 1995 until 2005, Belvac regularly sent quarterly royalty reports to Rexam.  The reports for 1995 alone show 16 royalty-bearing transactions.  The reports submitted during the decade prior to 2005 show more than 90 royalty-bearing transactions.

For many years, Rexam examined the features of cans made by its few competitors.[23]  "Rexam may have been aware that Crown was selling cans that appeared to be manufactured using some form of a smooth die necking process at least as of March 1998 . . . ."[24]  Rexam, however, neither communicated directly with Crown about nor accused Crown of infringing the '839 patent until Rexam's November 3, 2005 filing of its counterclaims.  This was almost one month past the expiration of both the '893 patent and the 1994 Agreement.[25]  Rexam bases its allegations of Crown's

---

[23] Crown contends that in 1993 there were only six competitors in the can making industry other than Rexam–Crown, Ball Corporation ("Ball"), Metal Container Corporation ("MCC"), Coors Brewing, BevPac, and Reynolds.  Rexam does not dispute that there was a limited number of can body manufacturers in the U.S. in 1993.  It is undisputed that today there only four manufacturers of can bodies in the U.S.–Rexam, Crown, Ball, and MCC.

[24] D.I. 415 at Exhibit 1 (providing Defendant-Counterclaimant Rexam Beverage Can Company's Supplemental Responses to Crown Technology, Inc.'s and Crown Cork & Seal USA, Inc.'s Second Set of Interrogatories).

[25] The '839 patent and the 1994 Agreement expired on October 4, 2005.

infringement of the '839 patent on information acquired after Rexam investigated certain

Crown cans, concluded that Crown was using a smooth die necking method to

manufacture its can bodies, and confirmed with its engineers that the necked-in portion

of Crown's can body must have been made using the methods claimed in the '839

patent.[26]

## LEGAL STANDARD

<u>Summary Judgment</u>

A grant of summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."[27]

This standard is applicable to all types of cases, including patent cases.[28]  A Rule 56(c)

movant bears the burden of establishing the lack of a genuinely disputed material fact by

demonstrating "that there is an absence of evidence to support the nonmoving party's

case."[29]  "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no genuine issue for trial."[30]  The nonmovant must be

---

[26] There is some contention between the parties concerning when Rexam investigated Crown's cans.  Crown asserts that Rexam's investigation occurred prior to the November 3, 2005 filing of Rexam's Answer to Second Amended Complaint for Patent Infringement and Counterclaims, which included Counterclaim I.  Rexam disputes this, arguing that its investigation occurred instead within the ten-month period between the November 3, 2005 filing and September 11, 2006–when Rexam served its Supplemental Responses to Crown's Amended Interrogatories Nos. 7 through 9, which contained Rexam's description of its investigation of Crown's cans.  In any event, Rexam bases its allegations of infringement on information gleaned from its inspection and examination of Crown cans purchased on the market.

[27] Fed. R. Civ. P. 56(c).

[28] *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).

[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[30] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotations omitted).

given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant.[31]  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient to deny a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.[32]  If the nonmoving party fails to make a sufficient showing on an essential element of its case, the moving party is entitled to judgment as a matter of law.[33]

<u>Laches</u>

Laches is an equitable defense to a claim for patent infringement.  Laches will bar recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a counterclaim for infringement.  The law on laches is rooted in the equitable principle that courts will not assist one who has "slept on his rights."  To establish laches, a party must prove:  1) an unreasonable and inexcusable delay by the plaintiff in raising infringement when the plaintiff knew or reasonably should have known of the defendant's allegedly infringing activity; and 2) material prejudice to the defendant resulting from the delay.[34]  Material prejudice may be defined as either evidentiary prejudice or economic prejudice.  Evidentiary prejudice arises when the infringer cannot put on a fair defense because of the loss of records, death of witnesses, or the dimming of memories.[35]  Economic prejudice arises when an infringer suffers the loss of monetary investments or incurs damages that would likely have been prevented by an earlier

---

[31] *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).
[32] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).
[33] *See Celotex Corp.*, 477 U.S. at 322–23.
[34] *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032  (Fed. Cir. 1992).
[35] *Id.* at 1033.

suit.[36]

The equitable nature of laches does not follow hard and fast rules with regard to the level of actual knowledge required to trigger laches.  The period from which the delay is measured begins at "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the allegedly infringing activity."[37]  It is enough that the plaintiff has or should have "more than a mere suspicion but less than absolute assurance of [the] alleged infringement in order to activate the laches clock."[38]  Thus, courts impose a duty on patentees to police their patent rights and will impose constructive knowledge based on the required reasonable, diligent inquiry.[39]  A patentee must investigate "'pervasive, open, and notorious activities' that a reasonable patentee would suspect were infringing."[40]  "For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention . . . give rise to a duty to investigate whether there is infringement."[41]  "Furthermore, constructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor."[42]

---

[36] *Id.*  Any monetary loss claimed by the defendant must have a proven "nexus" to the patentee's delay in filing suit.  *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995).

[37] *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1270 (Fed. Cir. 1990).

[38] *Rockwell Intern. Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1197 (N.D. Cal. 2000).

[39] *See Wanlass v. General Elec. Co.,* 148 F.3d 1334, 1338 (Fed. Cir. 1998).

[40] *Id. (*quoting *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 (Fed. Cir. 1996)).

[41] *Id.* (Internal citations omitted).

[42] *Id.*

If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent.  If he shirks this duty, he does so on

An alleged infringer can establish a presumption of laches by showing that more than six years elapsed between the time the patentee knew or should have known of the alleged infringing activity and the time of filing suit.[43]   A delay of six years or more raises a presumption that the delay is unreasonable, inexcusable, and prejudicial.[44]   If such a presumption is established, the burden shifts to the patentee to produce sufficient evidence to "put the existence of a presumed fact into genuine dispute" with regard to the reasonableness of the delay or the alleged prejudice.[45]   "Importantly, where the patentee does not meet this burden of production by failing to come forward with *either* affirmative evidence of a lack of prejudice *or* a legally cognizable excuse for its delay in filing suit, the two facts of unreasonable delay and prejudice '*must* be inferred.'"[46]

"Ultimately, the establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case.   Laches remains an equitable judgment of the trial court in light of all circumstances."[47]   "[W]here there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied."[48]   Thus, "[e]ven if unable to overcome the presumption, a patentee may be able to preclude application of the laches defense with proof that the accused

---

peril of triggering the laches period and perhaps ultimately losing his right to recover damages for the infringement.
*Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911, 918 (E.D. Va. 1996), *on remand* 14 F. Supp. 2d 800 (E.D. Va. 1998), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1990).
      [43] *A.C. Aukerman Co.*, 960 F.2d at 1037.
      [44] *Id.* at 1035–36.
      [45] *Id.* at 1038.
      [46] *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (emphasis in original) (quoting *A.C. Aukerman Co.*, 960 F.2d at 1037).
      [47] *Abbott Diabetes Care, Inc. v. Roche Diagnostics Corp.*, 2007 U.S. Dist. LEXIS 31193, at *8 (N.D. Cal. Apr. 24, 2007) (internal citation omitted) (citing *A.C. Aukerman Co.*, 960 F.2d at 1036).
      [48] *Id.* at 1036.

infringer was itself guilty of misdeeds towards the patentee."[49]  This concept flows from the maxim, "He who seeks equity must do equity."[50]

Unclean Hands

The "unclean hands doctrine, rooted in the historical concept of the court as a "vehicle for affirmatively enforcing the requirements of conscience and good faith," requires that the parties "have acted fairly and without fraud or deceit as to the controversy in issue."[51]  "The notion of unclean hands working as a bar to the application of laches stems from the belief that an equitable defense, such as laches, cannot be used to reward a party's inequities or to defeat justice."[52]  To invoke the unclean hands doctrine, a patentee must prove that "'the infringer has engaged in *particularly egregious* conduct [that] would change the equities *significantly* in the plaintiff's favor.'"[53]  "[W]illful infringement, by itself, is insufficient to preclude application of the laches defense."[54]

---

[49] *A.C. Aukerman Co.*, 960 F.2d at 1038.

[50] *Id.*

[51] *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15 (1945).

[52] *Hot Wax, Inc. V. Turtle Wax, Inc.*, 191 F.3d 813, 825 (7th Cir. 1999).

[53] *Odetics, Inc.*, 14 F. Supp. 2d at 806 (emphasis in original) (quoting *A.C. Aukerman Co.*, 960 F.2d at 1033).  Many of the cases in which the laches defense was not allowed involved conduct more egregious than willful infringement alone.  *See, e.g.*, *Bott v. Four Star Corp.*, 807 F.2d 1567, 1576 (Fed. Cir. 1986) (egregious conduct consisted of (i) copying the claimed invention and (ii) inexcusably accelerating infringing sales after [the Federal Circuit] had affirmed the district court's decision on liability"); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 1993 U.S. Dist. LEXIS 17101, at *13 (N.D. Cal. Sept. 13, 1993) (defendant's construction of new infringing product after litigation commenced, failure to investigate patent's validity, and knowledge that there was only one licensee constituted "particularly egregious" conduct).

[54] *Odetics, Inc. v. Storage Technology Corp.*, 14 F. Supp. 2d 800, 806 (E.D. Va. 1998); *see also Western Elec. Co., Inc. v. Piezo Tech.*, 1990 U.S. Dist. LEXIS 12678, at *33 (M.D. Fla. Mar. 22, 1990) ("Although a showing of egregious conduct may persuade a court that the equities do not lie with the defendant, a plaintiff's allegations of 'willful infringement' do not automatically bar the alleged infringer from asserting the laches and estoppel defenses . . . ."); *Loral Corp. v. B.F. Goodrich Co.*, 1989 U.S. Dist. LEXIS 16865, at *127 (S.D. Ohio Jan. 27, 1989) ("Although BFG's infringement was willful . . . the court is of the opinion that BFG's willfulness during this time period was not characterized by egregious conduct. . . . Thus, BFG is not precluded from asserting laches . . ."), *rev'd on other grounds*, 899 F.2d 1228 (Fed. Cir. 1990); *Stambler v. Diebold, Inc.*, 1988 U.S. Dist. LEXIS 10132, at *18 (E.D.N.Y. Sept. 27, 1988) ("[T]he Court is aware of no case that stands for the proposition that willful infringement, without proof of

**ANALYSIS**

The Laches Presumption

Crown argues that Rexam's counterclaims are nothing more than a litigation-inspired after-thought and that Rexam's delay in filing is fatal to its counterclaim. Crown asserts that the laches clock was triggered at least seven years prior to Rexam's filing of Counterclaim I and that Crown is therefore entitled to a presumption that Rexam's delay was both unreasonable and prejudicial. Rexam denies that it delayed at all, let alone for more than six years, in bringing its claim for infringement of the '839 patent.[55] Rexam refutes that it knew or should have known of Crown's alleged infringing activities.

Neither party disputes the following: in 1993, there was a limited number of can body manufacturers in the United States; today, there are only four such manufacturers; Crown and Rexam are competitors in the can manufacturing field; since 1992, Crown sold over 100 billion can bodies that were smooth die necked; cans manufactured by Crown are easy to obtain on the market; for many years Rexam has periodically examined some features of some cans made by some competitors; and "Rexam may have been aware that Crown was selling cans that appeared to be manufactured using

---

deliberate, calculated plagiarism, constitutes such egregious conduct as to defeat a laches defense."), *aff'd*, 878 F.2d 1445 (Fed. Cir. 1989); c*f. TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 517–18 (D. Del. 2008) (deciding not to bar the defendant's equitable claims because the plaintiff failed to point to any particular actions on the part of the defendant that could bridge the gap between willfulness and particularly egregious conduct). In *TruePosition*, dismissing plaintiff's argument to the contrary, the court declined to find (as a matter of first impression) that "the Federal Circuit's 'new tougher' standard set forth in *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007)" for willfulness "raised the bar so high so as to render 'objective recklessness' and 'egregiousness' virtually indistinguishable." *Id.*

[55] *See* D.I. 421 at 23 ("Crown has failed to establish that Rexam unduly delayed for any length of time, much less for . . . six years.").

some form of a *smooth* die necking process at least as of March 1998."[56]  Further, from 1995 until 2005, Rexam received regular quarterly royalty reports from Belvac which reflect over 90 royalty-bearing transactions–transactions in which either (a) smooth die necking equipment or tooling was sold or (b) Belvac assisted a customer in obtaining the tooling required for smooth die necking (either directly or via referral to a third-party tooling company[57]).

Crown contends that based solely on the above evidence, Rexam should have known of Crown's alleged infringing activities at least as of March 1998.  Crown further asserts that Rexam should have known of Crown's alleged infringing activity between

---

[56] D.I. 415, Exhibit 1 at 10 (emphasis added).  In June 2006, Rexam provided the following in response to a set of Crown interrogatories:

> [A]lthough Rexam may have been aware that Crown was selling cans that appeared to be manufactured using some form of a smooth die necking process at least as of March 1998, there was no way to be certain that Crown was employing the methods claimed in the 839 Patent because the documents, information and equipment that will show that Crown is in fact infringing the methods claimed in the '839 Patent are in the possession, custody and control of Crown.

*Id.*  Presently, Crown argues that Rexam's above response indicates that Rexam should have known of Crown's alleged infringing activities at least as of March 1998.  Rexam argues that "not all die necking falls within the scope of Rexam's '839 patent," and that "Crown's argument confuses manufacture using die necking with infringement of Rexam's '839 patent."  D.I. 421 at 21.  Rexam, however, cannot plausibly argue that its above response was not directed to "smooth" die necking, but was instead directed to die necking generally or some other method of necking combining die and spin necking.  Rexam has consistently asserted that "[t]he technology of Rexam's '839 patent relates to what is now known as *smooth* die necking," D.I. 217 at 2 (Rexam's Memorandum in Support of its Motion for Partial Summary Judgment of Infringement of U.S. Patent Nos. 4,774,839 and 5,697,242) (emphasis added).  "Rexam's patented method became known as 'smooth die necking.'"  See D.I. 426, Exhibit 26 at 10 (providing an excerpt from the brief Rexam submitted to the Federal Circuit).

[57] Rexam points out that the royalty reports received from Belvac did not identify customers by name and did not indicate whether Belvac's duty to pay a royalty for "tooling assisting" had been triggered by (a) assisting a customer in starting up or operating a Belvac machine equipped with or capable of being equipped with tooling to perform the methods claimed by the '839 patent or (b) giving a customer the name of a tooling supplier who could supply tooling for a Belvac machine that would enable that machine to perform the methods claimed by the '839 patent.  D.I. 421.  Thus, Rexam argues, "[t]he Belvac reports of assistance therefore did not tell Rexam the number of machines that had been made that would perform smooth die necking or that might or could infringe."  *Id.*  With respect to when Rexam knew or should have known of Crown's alleged infringing activities, this is a distinction without a difference.  The fact remains, regardless of what type of "assistance" triggered Belvac's royalty obligations, those obligations were triggered.

seven to ten years prior to the November 2005 filing of Rexam's counterclaim because one can determine whether Rexam's claimed smooth die necking method was used to manufacture a can by simply looking at the can.  The testimony of the two remaining necking patent inventors still alive, both ex-Rexam employees, and a Rexam engineer support Crown's argument.[58]

Rexam denies that visual inspection indicates the necking method used to manufacture Crown's cans.  Rexam maintains that it only learned of Crown's alleged infringement through discovery in the present litigation and insists that it could not have learned of Crown's alleged infringing activity earlier because it did not have access to Crown's documents, information, and equipment.

---

[58] The following is an excerpt from the deposition of Dietrich Neggert, one of the '839 patent inventors:

> Q.  See, if you look at this can, can you tell how that was necked?
> A.  Yeah, that was die necked.
> Q.  And when you say die necked, you mean smooth, smooth die necked?
> A.  Yes, although I don't know why it's like this on the bottom, but that is.  This would not have been acceptable when we made the tooling because it's not smooth.
> Q.  That one little shoulder thing there?
> A.  Yes, yeah.  So I don't know why they did that, but that's what it is.

D.I. 415, Exhibit 11, Naggert at 70:20–71:6.  The following is an excerpt from the deposition of Thomas William Ames, also one of the '839 patent inventors:

> Q.  Mr. Ames, I'd like to show you what I've marked as Plaintiff's Exhibit 202, and I'll represent that this is a Bud [Light] can that Rexam brought to us that they relied on in an interrogatory response.
> . . .
> Q.  Looking at that can, can you tell whether that can was smooth-necked or some other kind of necking?
> A.  No.  This is smooth neck.
> Q.  And why do you say it's smooth-neck.  Looking at it?
> A.  Well, it doesn't have any spin-neck lines in it. . . .
> Q.  So you're saying that you can look at a smooth-die-necked can if you know what you're doing?
> A.  Well, this is a Crown can, by the way.  But it's a smooth-neck can.
> Q.  And looking at–at that Crown can, Exhibit 202, what did you say on it told you that it was smooth-die-necked?  You said you could see something?
> A.  I can see where the die lapping is.
> Q.  Okay.

D.I. 415, Exhibit 12, Ames at 112:24–114:2.  Leo Hayden, a Rexam engineer, also stated, "If a can appears to be smooth, it's more–most likely it's die necked."  D.I. 415, Exhibit 13, Hayden at 182:8–9.

In contending that "[a] can that is necked by a spin flow process is not visibly different from a die necked can body,"[59] Rexam primarily relies on one Crown executive's testimony that the profiles of a die necked can and a spin necked can are "similar."[60] This testimony, however, relates not to the presence, or lack thereof, of the striations which Rexam's own statements indicate can distinguish spin necked and smooth die necked cans, but rather to the *profiles* of cans necked by the two different methods.[61] Moreover, Rexam's arguments asserting the futility of visually inspecting a can are undercut by the fact that Rexam's allegations of infringement of the '839 patent are themselves based on visual inspection and examination of Crown's cans.[62]

---

[59] D.I. 421.

[60] *See* D.I. 422 at A70 (providing an excerpt from the deposition of Joseph Bauder, Vice President of Crown's machinery and tooling division).

> Q. . . . Are you – are you able to get a similar profile from spin necking – say you do a 202 end with smooth die necking alone, and then you do one with die necking and then spin necking, can you arrive at the same profile or are there – is there a standard profile for –
> A. I would say it's similar. Similar. Whether it's exactly the same or – I would think there's some – you know, if you measured that profile, I would think you'd get some differences, but to look at it, it looks similar, I would say.

*Id.* Rexam also relies on the following excerpt from the deposition of Andrew Halasz, the inventor listed on two U.S. patents related to "Spin Flow Forming" necking methods:

> A. There is die necking, spin necking, Metal Box, spin flow necking, roll necking.
> . . .
> Q. But can you tell the difference between a die neck can and a roll neck can by looking at the can?
> A. Certain roll neck, you know, the Metal Box roll neck, yes, you can . . .
> Q. So if you were looking at a can, you would agree with me that you can tell whether it had been die necked or spin or roll necked?
> A. The–probably only can tell the roll neck of the Metal Box version. I'm not sure that I could tell the others.
> Q. Do you agree that spin necking produces visible ridges in the necked in portion of the can?
> A. You could see it on the Metal Box roll necking.

D.I. 422 at A78. The court is not persuaded that this testimony provides support for the proposition that a spin necked or spin flow necked can is visually indistinguishable from a die-necked can.

[61] *See* D.I. 415, Exhibit 2 at 5 ("Examination of certain of Crown's cans indicate that there are no striations associated with the tapered neck as those that can be seen when forming a tapered neck using a forming roller.").

[62] *See* D.I. 415, Exhibit 2 at 5 (providing Rexam's response to a Crown interrogatory requesting the factual basis for Rexam's claims of infringement).

> Rexam asserts that its investigation of certain Crown cans shows that Crown is using a *smooth die necking* method to manufacture its can bodies. Examination of certain of

Rexam also argues that this court cannot attribute to it the constructive knowledge of infringement required to trigger the laches presumption due to the secrecy of Crown's manufacturing and Crown's denial of infringement.  Rexam relies on *Eastman Kodak v. Goodyear Tire & Rubber Co*,[63] in which the Federal Circuit affirmed a district court's ruling barring a laches defense.[64]  The district court in *Eastman Kodak* ruled that the alleged infringer did not establish that the patentee knew or should have known of an infringing process more than six year prior to filing suit.[65]  The court based its finding on the patentee's limited knowledge of the alleged infringer's processes, the alleged infringer's policy of maintaining the secrecy of those processes, and the alleged infringer's denials of infringement.[66]  *Eastman Kodak* is inapplicable here.  In *Eastman Kodak*, the alleged infringer had a well-documented policy of secrecy.[67]  In this case, Rexam has put forward no evidence indicating the existence or lack thereof of a similar Crown policy.  In *Eastman Kodak*, the alleged infringer's denials of infringement occurred upon the patentee's inquiry and well before the patentee filed suit.[68]  Here, it is undisputed that Rexam never directly communicated with Crown concerning the '839 patent prior to filing its counterclaim and that Crown's denial of infringement occurred three months after that filing.  Few patentees begin infringement actions armed with

Crown's cans indicate that there are no striations associated with the tapered neck as those that can be *seen* when forming a tapered neck using a forming roller. . . .  Rexam has also discussed this matter with its engineers who confirm that the necked-in portion of Crown's can body *must* have been made using the methods claimed in the '839 patent. *Id.* (emphasis added).

[63] *Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997).
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*

admissions of infringement.  Had Rexam made an inquiry of Crown, Rexam may have

obtained information about Crown's methods.  Had Crown refused to provide any

information, Rexam could have used such a denial as further ground for bringing suit.[69]

*Eastman Kodak* does not dictate that this court avoid attributing to Rexam constructive

knowledge of Crown's alleged infringing activities.

Although can manufacturing is squarely within Rexam's field of endeavor, a field

populated by very few competitors, and Crown's activities in that field were open,

pervasive, and notorious, Rexam never undertook *any* investigation of the circumstances

associated with Crown's alleged infringing activities.[70]  A reasonable patentee would

have suspected Crown's potentially infringing activities.  For these reasons and those set

forth above, this court finds that Rexam has failed to raise a genuine issue regarding the

fact that it should have known of Crown's alleged infringing activities at least as early as

March 1998.  Further, because Rexam delayed more than six years before filing its

counterclaim, this court presumes that the delay was both unreasonable and

prejudicial.[71]  Accordingly, Rexam bears the burden of producing sufficient evidence to

---

[69] *See, e.g., Hoffmann-La Roche, Inc. v. Invamed Inc.*, 213 F.3d 1359, 1361–63 (Fed. Cir. 2000) (affirming a Rule 11 basis for suit where the alleged infringer refused to disclose its manufacturing processes to the patentee prior to the patentee's filing suit).

[70] *See Comcast Cable Communs. Corp. v. Finisar Corp.*, 2008 U.S. Dist. LEXIS 3661, at *14 (N.D. Cal. Jan. 17, 2008) ("[The patentee] insists that it was under no duty to investigate [the alleged infringer's product] because infringement was not apparent from the product itself. . . . [The patentee's] argument is ill-founded.  The case law is clear that [the patentee] was under a duty to investigate the circumstances associated with possibly infringing activities. This duty includes testing possibly infringing devices to explore whether or not they read on the claims of the patent."); *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1339 (Fed. Cir. 1998) ("[A] reasonable patentee . . . keeps abreast of the activities of those in his field of endeavor.  Allocating the burden to patentees to seek out infringers is proper, furthermore, because . . . they are in the best position to know the scope of their patent protection and, therefore, also to know likely places to find infringement.").

[71] *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) ("A presumption of laches arises where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity.").

17

raise a genuine issue regarding the reasonableness of the delay, a lack of prejudice to Crown, or Crown's unclean hands.[72]

Reasonableness of the Delay

Rexam, as discussed above, flatly denies any delay. Rexam neither argues that its delay was reasonable nor provides any excuse for its delay.[73] Rexam has thus failed to introduce sufficient evidence to create a genuine issue of material fact regarding the reasonableness of its delay.

Material Prejudice

Material prejudice may be either economic or evidentiary.[74] Because of the laches presumption, Rexam bears the burden of production and must come forward with evidence sufficient to raise a genuine factual issue as to whether prejudice exists. Crown can remain "utterly mute" on the issue of prejudice and nonetheless prevail.[75]

I. Economic Prejudice

"[E]conomic prejudice is not a simple concept but rather is likely to be a slippery

---

[72] *See id.* ("A presumption [of laches] has the effect of shifting the burden of going forward with evidence, not the burden of persuasion."). The presumption disappears once the patentee introduces evidence sufficient to create a genuine issue that would rebut any laches factor, including the reasonableness of or an excuse for the delay, lack of prejudice, or egregious misconduct by the accused infringer. *See id.* at 1037–38 (discussing the "bursting bubble" nature of Fed. R. Evid. 301 presumptions and the presumption of laches).

[73] *See id.* at 1033 (listing the following excuses for a presumed unreasonable delay, which courts have recognized in some instances: other litigation; negotiations with the accused; possibly poverty and illness under limited circumstances; wartime conditions; extent of infringement; and dispute over ownership of the patent).

[74] *Id.; see also Abbott Diabetes Care, Inc. v. Roche Diagnostics Corp.*, 2007 U.S. Dist. LEXIS 31193, at *20 (N.D. Cal. Apr. 24, 2007) ("A showing of either evidentiary or economic prejudice constitutes material prejudice.").

[75] *See Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996) ("[T]he defendants could have remained utterly mute on the issue of prejudice and nonetheless prevailed. [Plaintiff] failed to come forward with any evidence demonstrating a lack of prejudice as to any of the defendants, and thus failed to 'burst' the *Aukerman* presumption 'bubble' with a 'no prejudice' lance.").

issue to resolve."[76]  "It is not enough that the alleged infringer changed his position–i.e., invested in production of the allegedly infringing device.  The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity."[77]  An alleged infringer need not show economic prejudice due to *reliance upon* the patentee's delay, but rather must show economic prejudice that *results from* the patentee's delay.[78]

Crown asserts economic prejudice from Rexam's delay because it purchased Belvac equipment and expanded its can manufacturing activity to produce over seventeen billion cans per year.  Rexam contends that Crown has failed to show that its change in economic position was a result of Rexam's alleged delay.  Because of the laches presumption, however, Rexam bears the burden of production and must come forward with evidence sufficient to raise a genuine factual issue as to whether economic prejudice exists.  Rexam has not done so.

Rexam does not dispute that Crown continued to buy 595 neckers from Belvac after 1992 and currently has a total of 26 Belvac neckers spread over ten can body manufacturing facilities in the United States.  Rexam contends that, because Crown "was notified at every step of its expansion that it may need a license under the '839 patent[, a]ny economic prejudice that Crown has suffered is based on its deliberate disregard of notices that Rexam assured that it would receive."[79]  Rexam argues that "[t]his is not

---

[76] *A.C. Aukerman Co.*, 960 F.2d at 1033.

[77] *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992).

[78] *See Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992) ("[L]aches does require that prejudice results from the delay.  As stated in *Aukerman*, there is a difference between prejudice that *results from* delay and prejudice that is due to *reliance upon* delay.") (emphasis in original).

[79] D.I. 421.

economic prejudice due to delay.  It is economic prejudice due to deliberate infringement."[80]  Rexam's argument is better directed toward its allegations of Crown's unclean hands, discussed below.  It does not, drawing all reasonable inferences in favor of Rexam, provide sufficient evidence from which a reasonable factfinder could potentially conclude that Crown would not have altered its investments or expenditures even if sued earlier.[81]  Rexam has thus failed to overcome the presumption of economic prejudice.

## II.  Evidentiary Prejudice

Crown claims evidentiary prejudice because two of the four inventors on the '839 patent are deceased.  Rexam asserts that Crown has failed to establish evidentiary prejudice.  The only evidence submitted by Rexam with its opposition on the topic of evidentiary prejudice is:  (1) deposition testimony indicating that one of the '839 patent inventor's notes were destroyed in 1986, prior to the alleged delay, and that another of the inventors retired from Rexam in 1996; and (2) attorney argument that Crown did not prove evidentiary prejudice because it failed to show that the two deceased '839 patent inventors died during the alleged delay.

---

[80] *Id.*

[81] *Cf. Abbott Diabetes Care, Inc. v. Roche Diagnostics Corp.*, 2007 U.S. Dist. LEXIS 31193, at *23–*24 (N.D. Cal. Apr. 24, 2007) ("[The patentee] provided sufficient evidence to support a finding of the nonexistence of the required 'nexus' for economic prejudice.").  In *Abbott*, the patentee submitted evidence that:  (1) the only basis for the alleged infringer's continuing investment in the technology covered by the patent was an undisclosed oral opinion of counsel; (2) the alleged infringer's witness on the issue of economic prejudice testified that he was not aware of any documents indicating that the alleged infringer was unlikely to be sued by the patentee, or that the alleged infringer's investments were made because of some conduct by the patentee; (3) the alleged infringer, after being sued, did not change its business plans for either allegedly infringing product, continued to sell those products, and continued to invest in those products; and (4) the alleged infringer never considered pulling its products off the market or halting introduction of those products due to the patent at issue.  *Id.*  Despite considering such evidence "indirect" and not very compelling, the court in *Abbott* concluded that this evidence was enough to overcome the presumption of economic prejudice.  *Id.*  Rexam has presented no evidence of this sort.

The record indicates that two of the '839 patent inventors are deceased, one of whom was the driver of the invention and instrumental in the development of Rexam's smooth die necking method.[82]  Moreover, the two living inventors stated that they did not have any of their records relating to the invention and did not know where the records could be located.  Much of the most relevant evidence relating to Crown's alleged infringement would presumably be under Rexam's control, yet Rexam presents no evidence that addresses whether Crown's ability to present defenses to its alleged infringement has been preserved.  Rexam's evidentiary showing is thus insufficient to overcome the presumption of evidentiary prejudice.[83]

Unclean Hands

Crown contends that there is no evidence in the record that it believed, was aware of, or should have been aware of infringement prior to the filing of Rexam's Counterclaim I.  Rexam argues that Crown is a willful infringer, that Crown's willful infringement was particularly egregious, and that Crown therefore has unclean hands and should be precluded from asserting a laches defense to its alleged infringement.  Rexam bears the burden of producing sufficient evidence to enable a jury reasonably to find that Crown has willfully infringed and has done so in a particularly egregious manner.

Arguing that Crown has unclean hands, Rexam asserts the following:  (1) there is no evidence that Crown ever obtained an opinion of counsel clearing its operation of

---

[82] Rexam admitted as much at the outset of this litigation.  *See* D.I. 426, Exhibit 25 at 4 (providing Rexam's initial disclosures).  "It is believed that the inventors Antonio Caleffi and Edward Traczyk are deceased."  *Id.*

[83] *See A.C. Aukerman Co.*, 960 F.2d at 1038 ("[T]he patentee may eliminate the [laches] presumption by offering proof that no additional prejudice occurred in the [period of delay], i.e., that evidence respecting an alleged infringer's defenses remain available substantially as before the delay . . . .").

Belvac machinery; (2) in January 1995, Belvac sent Crown the letter required by the 1994 Agreement that informed Crown that it did not have a license under the '839 patent to commercially operate the neckers that Crown had previously purchased from Belvac; (3) Crown placed at least 41 orders for necking machinery with Belvac between January 1995 and May 2005, and a Belvac executive explained that, as a general practice after January 1995, Belvac included in its official quotation packages and purchase order acknowledgments a terms and conditions paragraph which included language informing Belvac customers that they did not have a license under the '839 patent;[84] (4) the '839 patent was cited against at least seven Crown patents from 1994 to 2004; and (5) Crown never contacted Rexam to discuss a license for the commercial operation of Belvac machinery despite the presence of the following language in Belvac's 1995 letter and its aforementioned terms and conditions paragraphs:  "A license to commercially operate the machine is available from the patent owner for necking machines that employ smooth die neck tooling.  It is the responsibility of the purchaser to determine if such a license is required."

The evidence fails to raise a genuine issue of material fact as to Crown's alleged particularly egregious willful infringement because (1) "there is no affirmative obligation to obtain opinion of counsel in order to avoid liability for willful infringement"[85] and (2) there is no affirmative duty of care on potential infringers to determine whether their

---

[84] This executive's explanation is the only evidence put forward by Rexam to show that Crown received these terms and conditions paragraphs twice with each of its 41 orders for a total of "more than 80" times.
[85] *Voda v. Cordis Corp.*, 536 F.3d 1311, 1327 (Fed. Cir. 2008) (internal quotations omitted).

conduct is infringing, even if they have notice of another party's patent rights.[86]  The language in the letter sent from Belvac to Crown and in the terms and conditions paragraphs likely sent from Belvac to Crown did not impose upon Crown a duty which the law expressly denies.  For the above reasons, Rexam has failed to raise a genuine issue of material fact regarding whether Crown has unclean hands due to particularly egregious conduct that significantly shifts the equities in Rexam's favor.

**CONCLUSION**

For the reasons contained herein, having considered the record as a whole and given Rexam the benefit of all justifiable inferences, it is the equitable judgment of this court that Crown's Renewed Motion for Partial Summary Judgment Dismissing Rexam's Counterclaim I Based on Laches is granted.  An appropriate order consistent with this memorandum will follow.

---

[86] In *In re Seagate*, 497 F.3d 1360 (Fed. Cir. 2007), the Federal Circuit, sitting en banc, expressly overruled this standard of willfulness, which had been adopted in *Underwater Devices Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380 (Fed. Cir. 1983).  *Cf. Voda*, 536 F.3d at 1328 (vacating and remanding the district court's finding of willfulness because the district court instructed the jury that "[w]hen a person becomes aware that a patent may have relevance to his or her activities, that person has a duty to exercise due care and to investigate whether or not his or her activities or proposed activities infringe any valid, enforceable claim of the patent").